1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**EXHIBIT EE**

## COMPARISON OF LAYFIELD V. AVENATTI

| Layfield | Avenatti (Y/N) |
| --- | --- |
| Convicted at trial of 23 counts after testifying. [Exhibit FF, p. 1].[1] | No |
| 89 victims. [*Id.* at p. 11, n. 6] | No |
| Fled to Costa Rica and committed other efforts to avoid law enforcement detection. [*Id.* at 14]. | No |
| Stole from his employees' retirement accounts. [*Id.* at 2]. | No |
| Intended loss amount exceeding $7,500,000. [*Id.* at 8]. | No |
| Participated in separate embezzlement scheme during trial and furthered scheme while sitting at counsel table. [*Id.* at 24]. | No |
| Caused the State Bar of California to pay millions to his victims prior to sentencing. [*Id.* at 22]. | No |
| Operated his law firm as "an abusive tyrant" and regularly "profanely berated and embarrassed his employees in front of others." [*Id.* at 20]. | No |
| Child has refused to communicate with him. [*Id.* at 21]. | No |

---

[1] Attached hereto as Exhibit FF is a copy of the government's sentencing position in *United States v. Layfield*. Citations herein are to that document.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27

# EXHIBIT FF

28

1  TRACY L. WILKISON
   United States Attorney
2  SCOTT M. GARRINGER
   Assistant United States Attorney
3  Chief, Criminal Division
   MARK AVEIS (Cal. Bar No. 107881)
4  IAN V. YANNIELLO (Cal. Bar No. 265481)
   CAROLYN S. SMALL (Cal. Bar No. 304938)
5  Assistant United States Attorneys
        1100 United States Courthouse
6       312 North Spring Street
        Los Angeles, California 90012
7       Telephone: (213) 894-4477/3667/2041
        Facsimile: (213) 894-6269
8       E-mail:   mark.aveis@usdoj.gov
                  ian.yanniello@usdoj.gov
9                 carolyn.small@usdoj.gov

10 Attorneys for Plaintiff
   UNITED STATES OF AMERICA

11

12                    UNITED STATES DISTRICT COURT

13              FOR THE CENTRAL DISTRICT OF CALIFORNIA

14 UNITED STATES OF AMERICA,              No. CR 18-124(A)-MWF

15           Plaintiff,                   GOVERNMENT'S SENTENCING POSITION
                                          AND RESPONSE TO PRESENTENCE REPORT
16           v.                           FOR DEFENDANT PHILIP JAMES
                                          LAYFIELD; MEMORANDUM OF POINTS AND
17 PHILIP JAMES LAYFIELD,                 AUTHORITIES; DECLARATION OF SAM
        aka Philip Samuel Pesin,          CHAN; EXHIBITS
18
             Defendant.                   [Concurrently filed with
19                                        separately lodged, under seal,
                                          supporting documents]
20
                                          Date: February 17, 2022
21                                        Time: 1:00 p.m.

22

23      The government, by and through its counsel of record, the United

24 States Attorney for the Central District of California and Assistant

25 U.S. Attorneys Mark Aveis, Ian V. Yanniello, and Carolyn S. Small,

26 hereby files its sentencing position and response to the Revised

27 Presentence Report disclosed on January 21, 2022 (Dkt. 346)("PSR")

28 for defendant Philip James Layfield.

1    The government's sentencing position is based upon the attached

2  memorandum of points and authorities; the supporting declaration of

3  Sam Chan and attached exhibits; the concurrently lodged (under seal)

4  declaration of Matthew Zawol, document excerpts, and supporting

5  letters; and such further information and argument as the Court may

6  permit at the sentencing hearing.

7  Dated: February 3, 2022          Respectfully submitted,

8                                    TRACY L. WILKISON
                                     United States Attorney
9
                                     SCOTT M. GARRINGER
10                                   Assistant United States Attorney
                                     Chief, Criminal Division
11

12                                   _____/s/_____
                                     MARK AVEIS
13                                   IAN V. YANNIELLO
                                     CAROLYN S. SMALL
14                                   Assistant United States Attorneys

15                                   Attorneys for Plaintiff
                                     UNITED STATES OF AMERICA
16

17

18

19

20

21

22

23

24

25

26

27

28

                                      2

## TABLE OF CONTENTS

DESCRIPTION                                                                                        PAGE

MEMORANDUM OF POINTS AND AUTHORITIES.................................1

I.     INTRODUCTION.................................................1

II.    GOVERNMENT'S GUIDELINES CALCULATION AND RESPONSE TO THE PSR....3

       A.    Factual Findings.......................................3

       B.    Summary of Guidelines Calculation, Objection to PSR,
             Total Offense Level, and Sentencing Recommendation.......3

       C.    Objection to PSR.......................................4

       D.    Base Offense Level.....................................7

       E.    An 18-Level Enhancement Applies Because the Total
             Intended Loss is Between $3.5 Million and $9.5 Million....8

             1.    The Intended Loss Was $7,563,431.45.................8

             2.    Defendant Should Not Receive Any Credit for
                   Payments to Clients Out of Other Victims'
                   Settlements.......................................9

             3.    Defendant Should Not Receive Any Credit for
                   Payments Made from the State Bar's Client
                   Security Fund or from Other Third Parties..........11

       F.    A Two-Level Enhancement Applies for 10 or More Victims...13

       G.    A Two-Level Enhancement Applies for Evading Law
             Enforcement/Scheme Offshore............................14

       H.    A Two-Level Adjustment Applies for Abuse of Position
             of Trust/Use of Special Skill..........................16

       I.    The Tax Offenses Do Not Change the Guidelines'
             Calculation............................................16

       J.    Defendant is Not Entitled to Any Credit for Acceptance
             of Responsibility......................................17

III.   A SENTENCE OF 168 MONTHS IS REASONABLE AND APPROPRIATE
       UNDER THE 3553(A) FACTORS...................................18

       A.    Nature and Seriousness of the Offense, § 3553(a)(1)......18

       B.    History and Characteristics of Defendant, § 3553(a)(1)...19

       C.    Need for Deterrence, to Promote Respect for the Law,
             and for Just Punishment, § 3553(a)(2)....................23

i

**<u>TABLE OF CONTENTS (CONTINUED)</u>**

<u>DESCRIPTION</u>                                                        <u>PAGE</u>

    D.   Policy Statements and Need to Avoid Unwarranted
        Sentencing Disparities, § 3553(a)(6).......................25

IV.   FINE ......................................................26

V.    RESTITUTION...............................................26

VI.   CONCLUSION................................................26

DECLARATION OF SAM CHAN AND EXHIBITS

<u>**TABLE OF AUTHORITIES**</u>

<u>DESCRIPTION</u>                                                          <u>PAGE</u>

**Federal Cases**

<u>Gall v. United States,</u>
  552 U.S. 38 (2007)  .......................................... 25

<u>In re Kassas,</u>
  631 B.R. 469 (Bankr. C.D. Cal. 2021)  ...................... 12

<u>United States v. Blitz,</u>
  151 F.3d 1002 (9th Cir. 1998)  ............................... 9

<u>United States v. Callaway,</u>
  762 F.3d 754 (8th Cir. 2014)  ................................ 9

<u>United States v. Ochoa,</u>
  265 F.3d 837 (9th Cir. 2001)  ............................... 17

<u>United States v. Stoddard,</u>
  150 F.3d 1140 (9th Cir. 1998)  ........................... 9-10

**Federal Statutes**

18 U.S.C. § 3553 ....................................... passim

18 U.S.C. § 3663 .......................................... 26

**United States Sentencing Guidelines**

U.S.S.G. § 2B1.1 ....................................... passim

U.S.S.G. § 3A1.1 ........................................... 4

U.S.S.G. § 3B1.3 .......................................... 16

U.S.S.G. § 3E1.1 .......................................... 17

**Other Authorities**

Cal. Bus. & Prof. Code § 6140.5 ........................... 11

<u>Brookman v. State Bar,</u>
  46 Cal. 3d 1004 (1988)  ................................... 12

**MEMORANDUM OF POINTS AND AUTHORITIES**

**I.   INTRODUCTION**

Defendant Philip Layfield is due to be sentenced following a trial in which a federal jury convicted him of 19 counts of wire fraud and one count each of mail fraud, tax evasion, failure to collect and pay over payroll tax, and willful failure to file a tax return.

Defendant, now a disbarred lawyer, aggressively marketed himself as a champion of the severely injured.  He actively solicited case referrals from other lawyers by representing that he would invest what it took to yield high outcomes that he would share with fellow members of the Bar.

It was all a sham.  The evidence introduced during a nearly three-week trial established beyond a reasonable doubt that defendant carefully curated an image of empathy for clients and respect for fellow lawyers to perpetrate and conceal a scheme to steal millions of dollars in case settlements to fund his lifestyle and boost his ego.

The evidence, including defendant's own testimony, showed that defendant repeatedly stole money from his trust account that he should have paid to his clients who had suffered horrible personal injuries.  They had hired defendant to bring them closure and some sense of relief.  Their faith in the legal system shaken, defendant compounded his clients' stress and anxiety by forcing them to hire other counsel to try to recover money from defendant, only to find little or nothing.

1    Defendant not only misused his clients' and referral counsels'
2    money, but he enjoyed the added benefit of not paying income taxes on
3    the millions he had stolen.

4    Defendant's scheme did not end with stealing money from his
5    clients or referral counsel.  He also stole from and exploited his
6    own employees.  He misused money due their retirement accounts.  He
7    withheld information from them about the dire financial condition of
8    the firm.  He used them to lie to their clients who, unlike
9    defendant, they sincerely cared about.

10   As defendant's house of cards was collapsing, defendant cowardly
11   abandoned his clients and relocated with his cars and horses to Costa
12   Rica, leaving others who had trusted him to deal with the financial
13   and emotional ruin defendant had caused.

14   Even after defendant was charged, he moved on to a new scheme to
15   misappropriate money entrusted to him, placing his wife in harm's way
16   to answer to defendant's latest victims, much like defendant had done
17   to his former employees.

18   And, even as defendant stands convicted and awaiting sentencing,
19   he continues to scheme to defraud, this time to fool the Court into
20   believing that defendant is sincerely contrite.

21   The nature and seriousness of defendant's heartless offense
22   conduct, defendant's contemptible history and characteristics, and
23   the need to promote respect for the law, provide just punishment, and
24   protect the public from further crimes of the defendant are just some
25   of the factors on which the government recommends that the Court
26   impose a sentence at the top of the anticipated Guidelines range, 168
27   months.

28

**II.  GOVERNMENT'S GUIDELINES CALCULATION AND RESPONSE TO THE PSR[1]**

> **A.  Factual Findings**

The government generally concurs in the PSR's factual findings except as discussed below regarding the Guidelines calculation and applicable sentencing factors under 18 U.S.C. § 3553(a).

> **B.  Summary of Guidelines Calculation, Objection to PSR, Total Offense Level, and Sentencing Recommendation**

The government concurs with the PSR's Guidelines calculation, except that the government objects to the PSR for not applying a two-level vulnerable victim adjustment.  As more fully argued below, the overwhelming evidence shows that defendant knew that his clients were vulnerable.  He actively sought out clients whose vulnerability from grave injuries defendant could exploit when they most needed loyal and empathetic counsel.  He used those same vulnerabilities to get the very settlements that he later embezzled.

Thus, with a vulnerable victim adjustment of two levels, the government believes that the total offense level should be 33, not 31 as determined by the PSR.  The corresponding sentencing range is 135-168 months, and the government recommends that defendant should be sentenced at the high end of that range.

The parties exchanged their draft Guidelines briefs, and then conferred, in an effort to eliminate or hone areas of dispute.  The government's analysis and detailed response to the PSR's Guidelines calculation also reflects the parties' discussions and defendant's

---

[1]  The parties agreed and advised the probation officer that the initial Presentence Report (Dkt. 334) erroneously calculated tax loss and a multiple count adjustment.  The probation officer then issued a Revised Presentence Report.  (Dkt. 346.)  All references herein to the "PSR" are to the revised report.

Case 8:19-cr-00061-JVS   Document 1026-1   Filed 10/25/22   Page 12 of 168   Page ID
#:25043
Case 2:18-cr-00124-MWF   Document 345   Filed 02/03/22   Page 9 of 31   Page ID #:3276

1  anticipated arguments.

2      **C.**   **Objection to PSR**

3    The PSR did not apply a vulnerable victim adjustment on the

4  ground of insufficient evidence.  (PSR, ¶ 66.)  The government

5  objects and believes that the evidence overwhelmingly supports a two-

6  level vulnerable victim adjustment.

7      A vulnerable victim adjustment applies if defendant "knew or

8  should have known that a victim of the offense was a vulnerable

9  victim."  U.S.S.G. § 3A1.1(b)(1).  A "vulnerable victim" is defined

10  as "a person (A) who is a victim of the offense of conviction" or any

11  relevant conduct, and "(B) who is unusually vulnerable due to age,

12  physical or mental condition, or who is otherwise particularly

13  susceptible to criminal conduct."  *Id.*, comment, note 2.  The

14  adjustment should be applied if supported by a preponderance of the

15  evidence.  (PSR, ¶ 66.)

16      The evidence at trial established beyond a preponderance of the

17  evidence (if not beyond a reasonable doubt) that defendant "knew or

18  should have known that a victim of the offense was a vulnerable

19  victim" for several reasons.  First, he targeted a uniquely

20  vulnerable population through extensive print and Internet

21  advertising.  In defendant's own words

22        Our typical client is a person who was catastrophically injured
      in a violent event that lasted maybe one second but changed
23        their life forever . . . ."  Our niche is trying to bring
      economic justice and positive change to such people, who trust
24        and rely upon our firm.

25  (Government's Trial Ex. 21, attached hereto to declaration of Sam

26  Chan.)  The foregoing quote was excellent evidence of defendant's

27  state of mind that informed his business plan.  As more fully stated

28  below, defendant was an experienced business operator who knew who to

Case 8:19-cr-00061-JVS   Document 1026-1   Filed 10/25/22   Page 13 of 168   Page ID
#:25049
Case 2:18-cr-00124-MWF   Document 349   Filed 02/03/22   Page 10 of 31   Page ID #:3277

1    target in order to maximize revenue.  While defendant's firm

2    certainly took cases involving less serious accidents, clearly

3    defendant focused on courting big-ticket cases from both clients and

4    referral counsel to whom defendant promised handsome returns.  There

5    can be no argument that, based on defendant's own testimony as to his

6    experience, he was as a threshold matter well aware that money was

7    best made by getting cases involving the most serious of injuries or

8    death.

9        And, as the victims' trial testimony and many of the

10   concurrently filed supporting letters make clear, defendant's

11   marketing strategy worked.  The people who sought defendant's legal

12   services had been struck by cars or a train (*see, e.g.*, letters from

13   J.N., J.Y., F.H., R.P., and M.M.); they had been the victims of

14   serious medical malpractice (*see, e.g.*, letter from T.B.); or they

15   had lost a spouse or a parent to a defective product (*see, e.g.*,

16   letter from D.S.).  They were suffering from broken bones and spinal

17   and brain injuries; they were dealing with chronic pain; they were

18   undergoing numerous medical procedures and facing mounting medical

19   expenses.  Given their ages and/or their physical and mental

20   conditions stemming from, as defendant put it, "catastrophic[]"

21   injuries, defendant's clients were particularly vulnerable and

22   susceptible to exploitation.

23       Next, and to be clear, defendant knew or had reason to know

24   specific clients' conditions and vulnerability *before* he recovered

25   any money on their behalf.  Defendant had access to his clients'

26   accident reports.  The reports included extensive details about and

27   gruesome photographs of their injuries and consequences.  Defendant

28   used that same information, photos and all, in mediation briefs.  For

Case 8:19-cr-00061-JVS   Document 1026-1   Filed 10/25/22   Page 14 of 168   Page ID
#:25050
Case 2:18-cr-00124-MWF   Document 349-1   Filed 02/03/22   Page 11 of 31   Page ID #:3278

1   example, in December 2016 defendant pitched his firm to P.C. and her

2   referral counsel (J.L., who testified at trial).  As J.L. testified,

3   defendant stated that he would hire experts and spend hundreds of

4   thousands of dollars to press P.C.'s case.[2]  P.C. had suffered

5   permanent disfigurement and faced a lifetime of special needs

6   following impalement by parts from the exploding undercarriage of her

7   car.  Defendant used accident reports and medical records for his

8   mediation brief for P.C.'s case.  He wrote all about P.C.'s injuries

9   and their consequences, adding vivid accident and surgical photos.

10  Defendant wrote that

11          [P.C.] also has suffered (and continues to suffer) from severe
            emotional distress.  Her injuries required her to wear a
12          colostomy bag for four (4) years, . . .  As a result, she
            avoided family and friends.  Her injuries . . . result[ed in
13          the couple's separation.  These burdens have fundamentally
            altered [P.C.]'s sense of self-worth and have left her with
14          profound and overwhelming feelings of sadness, anxiety, and
            worthlessness.
15
    (Chan Decl., ¶ 3.)
16

17          Defendant thus demanded a settlement of $2,000,000 given P.C.'s

18  "severe and debilitating physical, emotional, and psychological"

19  damages.  Defendant also stated that P.C.'s medical expenses totaled

20  $283,292.47" and that P.C. "also has lost earnings of at least

21  $113,028.08."  (Chan Decl., ¶ 3.)

22          Within approximately 30 days of pitching to get P.C.'s case,

23  defendant settled the case for $600,000.  He did not invest the

24

25  _____
            [2]   The timing of getting P.C.'s case was critical.  By December
26  2016, defendant had embezzled the entirety of J.N.'s settlement (more
    than $2 million due J.N.) as well as several million from other
27  clients.  And, based on the testimony of defendant's firm's
    controller, Jeff Pannebaker, defendant could not make payroll.  In
28  short, defendant badly needed P.C.'s case and had to turn it into
    quick cash.

                                        6

hundreds of thousands of dollars that he had promised.  Defendant

did, however, promptly embezzle P.C.'s settlement.  Within a month of

receiving P.C.'s settlement, defendant had spent down the IOLTA to

$5,216 even with millions in settlements received but unpaid by that

time.  (Chan Decl,, ¶ 4.)  P.C. and referral counsel J.L., as J.L.

testified at trial, got nothing from the settlement.

Finally, defendant made his clients even more vulnerable.  For

example, as client J.N. continued to convalesce and rebuild her life

following an auto accident in which she was hoisted, head-first,

through windshield of an oncoming car, defendant repeatedly misled

J.N. into believing that her settlement funds were safe and sound.

Within but a few months after depositing and spending down nearly all

of J.N.'s settlement funds without a word to her, defendant then

trumped even his own manipulative depravity.  He increased J.N.'s

vulnerability and anxiety by convincing J.N. to put J.N.'s non-

existent settlement funds in a trust to protect her money from her

family.  The last thing that J.N. needed at that time was defendant

driving a wedge between her and her loved ones.

In the end, defendant's own words were a window into his soul.

He well knew or had reason to know that the very individuals he

sought out were vulnerable on account of their "age, physical or

mental condition" or were "particularly susceptible to criminal

conduct."  A two-level vulnerable victim adjustment should apply.

**D.  Base Offense Level**

The government concurs with the advisory Guidelines

calculations in the PSR for the base offense level.  The base

offense level for the fraud counts is seven because defendant was

convicted of multiple counts of wire fraud and one count of mail

1  fraud.  Each of those counts carries a statutory maximum sentence of

2  20 years imprisonment.  (U.S.S.G. § 2B1.1(a)(1); PSR, ¶ 53.)[3]

3     **E.    An 18-Level Enhancement Applies Because the Total Intended
           Loss is Between $3.5 Million and $9.5 Million**

4

5     The government agrees with the PSR that an 18-level loss

6  enhancement applies because the total intended loss is between $3.5

7  million and $9.5 million.  (PSR, ¶¶ 54-55); U.S.S.G.

8  § 2B1.1(b)(1)(J).)  The government further agrees with the PSR that

9  defendant's loss should not be reduced by payments to clients from

10  sources other than their own settlement funds, including from third

11  party sources like the State Bar's Client Security Fund.  However,

12  even if the Court were to credit defendant with payments to clients

13  from unrelated sources, the Court need not determine the propriety of

14  those payments.  The total Guidelines loss would still be well above

15  the $3.5 million threshold for application of an 18-level

16  enhancement.

17     1.    The Intended Loss Was $7,563,431.45

18     The evidence at trial showed that defendant embezzled nearly $7

19  million of his clients' settlement money, on top of which he

20  defrauded a litigation advance lender out of $700,000.  Accordingly,

21  the total intended loss from defendant's embezzlement scheme was

22  $7,563,431.45[4].  (Chan Decl., ¶ 5, and Ex. A attached thereto.)

23  _____

24     [3]  As more fully discussed below regarding the grouping analysis
    of the fraud and tax counts, and as noted in the PSR, the base

25  offense level for the tax counts does not affect the base offense
    level calculation. (PSR, ¶¶ 73-83.)

26     [4] The loss figure differs slightly from the loss figure in the
    PSR that was based on information that the government initially

27  provided to the USPO.  (See PSR, ¶ 38.)  The reasons for the
    discrepancy are that: (1) unpaid medical liens have now been removed

28  for certain victims; and (2) certain victims (F.Z., B.J., and C.C.)
    *(footnote cont'd on next page)*

8

1    Counts one through 19 (wire fraud) and Count 23 (mail fraud) are

2  all related to defendant's embezzlement scheme and are grouped for

3  Guideline calculation purposes to reflect an aggregate loss amount.

4  (PSR, ¶ 50.)

5              2.   <u>Defendant Should Not Receive Any Credit for Payments</u>
                    <u>to Clients Out of Other Victims' Settlements</u>

6

7    Defendant is not entitled to any credit against Guideline loss

8  for payments made to one victim from funds from another victim's

9  settlement because defendant made such payments to continue and

10  conceal his fraudulent scheme.

11    While, generally, loss shall be reduced by money the defendant

12  returned to the victim *before* the offense was detected, U.S.S.G.

13  § 2B1.1, comment. (n.3(E)(i)), a defendant is not entitled to any

14  such credit when the defendant's repayment serves merely to

15  perpetuate ongoing fraud.  *See, e.g., United States v. Blitz*, 151

16  F.3d 1002, 1012 (9th Cir. 1998)(no offset for refunds "done for the

17  sole purposes of deflecting serious disruption of [the defendants']

18  schemes and making the operation look legitimate"); *United states v.*

19  *Callaway*, 762 F.3d 754, 759 (8th Cir. 2014)(no credit for payments

20  where the defendant "paid only when repeatedly confronted with [the

21  victim's] desperate medical needs or threats of legal action by

22  third parties, either of which could have foreseeably led to

23  discovery of the scheme"); *see also United States v. Stoddard*, 150

24  F.3d 1140, 1146 (9th Cir. 1998)(holding that "[r]epayments before

25  detection show an untainted intent to reduce any loss," whereas

26  _____

27  were removed from the loss calculation because the government
    received incomplete information about amounts owed from their

28  settlements.  In any event, their loss amounts do not change the +18
    loss enhancement.

                                    9

1    "[r]epayments after detection may show no more than an effort to

2    reduce accountability.").

3         Here, defendant should not receive any credit for repaying one

4    client-victim with funds from another client-victim's settlement.

5    Defendant's own retainer agreements and applicable California law

6    required that defendant hold client settlement funds in trust and

7    only make client-specific disbursements.  The government proved at

8    trial, including through IOLTA records and Special Agent Chan's

9    testimony, that defendant regularly used later-received settlement

10   funds to repay money to clients whose earlier settlement funds

11   defendant had embezzled, and commonly to those clients who threatened

12   to report defendant to the State Bar and/or to sue him.  (*See, e.g.*,

13   Trial Ex. 50, attached to Chan Declaration.)

14        Moreover, defendant admitted during his own direct examination

15   that he had, for years, misused client trust funds to pay unrelated

16   obligations.  The jury did not buy defendant's attempt to minimize

17   his invading the IOLTA.  It was plain that the government's evidence,

18   corroborated by defendant's admissions, proved that defendant made

19   Ponzi-type payments to stave off client complaints to law enforcement

20   and to regulatory agencies which, in turn, allowed defendant to

21   continue his scheme undetected.  Thus, just as the Ninth Circuit

22   stated in *Stoddard, supra,* defendant did not make repayments to show

23   an "untainted intent to reduce loss."  He should not, therefore, get

24   the benefit of reducing his Guideline loss exposure for misusing

25   money to facilitate new thefts and to conceal his offense conduct.[5]

26   _____

27        [5] Because the case law is clear that the "Credits Against Loss"
     provision in § 2B1.1, Application Note 3(E) does not apply to any
28   money returned for the purpose of perpetuating the fraudulent scheme,
                        *(footnote cont'd on next page)*

1    In any event, even if the Court were to credit defendant with

2    payments he made to earlier victims from later victims' settlements,

3    it would not change the Guidelines loss calculation.  The actual

4    loss remaining would still easily exceed the $3.5 million threshold

5    by approximately $2 million.  (*See* Chan Decl., ¶ 6 and Ex. B

6    attached thereto (actual Guideline loss at least approximately

7    $5,551,756.64.)

8             3.   Defendant Should Not Receive Any Credit for Payments
                   Made from the State Bar's Client Security Fund or from
9                  Other Third Parties

10   The Guidelines loss also should not be reduced by payments made

11   to victim-clients from the California State Bar's victim fund (the

12   "Client Security Fund" or the "Fund").

13   The Fund exists to "relieve or mitigate pecuniary losses caused

14   by the dishonest conduct" of lawyers.  (Zawol Decl., ¶ 3 (quoting

15   Cal. Bus. & Prof. Code § 6140.5(a).)  The Fund paid 89 of

16   defendant's former clients a total of approximately $2,796,057.58,

17   exclusive of costs or interest. [6]  (Zawol Decl., ¶ 4 and page 4 of

18   attached spreadsheet.)  These payments "were made to help alleviate

19   losses resulting from [defendant]'s dishonest conduct."  (*Id.*, ¶ 7.)

20   The dishonest lawyer is responsible for reimbursing the Fund for

21   those payments.  (*Id.*)

22

23   ─────────────────
     the Court need not address the applicability of the special rule
24   prohibiting credit for payments made during a Ponzi or other
     investment scheme.  *See* U.S.S.G. § 2B1.1, comment. (n.3(F)(iv)).

25        [6]  The government only recently obtained at defendant's
     counsel's request the information provided by the Fund.  The Fund
26   identified 89 clients, of which approximately 19 were identified at
     trial or in the discovery.  Thus, for the purpose of determining
27   Guideline loss, the government has included as victims only those
     former clients who were identified either in the government's
28   evidence presented at trial, or in discovery previously produced to
     the defense.

                                  11

1    Additionally, a Fund payment to an aggrieved client "is a fine

2  payable to a governmental unit that is not compensation for actual

3  pecuniary loss." *In re Kassas,* 631 B.R. 469, 470-74 (Bankr. C.D.

4  Cal. 2021)("The debt owed by Kassas to the Client Security Fund is a

5  penalty imposed in furtherance of the State's interest in punishing

6  and rehabilitating errant attorneys, rather than compensation for

7  actual pecuniary loss."); *Brookman v. State Bar*, 46 Cal. 3d 1004,

8  1008 (1988)(attorney's obligation to repay amounts paid by CSF to

9  clients is "imposed in order to protect the public and to help

10 rehabilitate the State Bar member.").

11    Consistent with the purpose and character of money paid by the

12 Fund, Guidelines loss shall be reduced by "[t]he money returned

13 . . . <u>by the defendant or other persons acting jointly with the</u>

14 <u>defendant</u>." U.S.S.G. § 2B1.1, comment. (n.3(E)(i)) (emphasis

15 added).  And, no reimbursements from the Fund "should be construed

16 as having been made on [defendant]'s behalf." (Zawol Decl., ¶ 7.)

17    Applying the foregoing, it is clear that Fund payments to

18 clients were not "returned" by defendant nor made on his behalf.

19 Fund payments were made to clients because defendant had stolen

20 their money.  The fact that the Guidelines do not provide for a

21 credit for a third-party's payments to a defendant's victims makes

22 sense: there is nothing mitigating about a third party stepping in

23 to provide victims some remedy for a defendant's harms.  At most,

24 such payments merely change to whom restitution is owed and in what

25 amounts.

26

27

28

Case 8:19-cr-00061-JVS   Document 1026-1   Filed 10/25/22   Page 21 of 168   Page ID
Case 2:18-cr-00124-MWF   Document 349   Filed 02/03/22   Page 18 of 31   Page ID #:3285
#:25057

1      **F.    A Two-Level Enhancement Applies for 10 or More Victims[7]**

2           The PSR also correctly applied a two-level enhancement because

3      defendant's offense conduct involved 10 or more victims.  (*See* PSR,

4      ¶¶ 59-60; *see also* Chan Decl., Exs. A, B.)

5           The term "victim" includes "any person who sustained any part

6      of the actual loss."  U.S.S.G. § 2B1.1, comment. (n.1).  The word

7      "person" includes corporations, companies, or associations.  *Id.*

8           To the extent that defendant argues that some victims should

9      not be counted because they were purportedly made whole by payments

10     from the Fund or other third parties, the argument should be

11     rejected.  As argued above with respect to determining Guideline

12     loss, there is no basis in the Guidelines for crediting defendant in

13     this way for payments made by third parties.  No less, the fact that

14     a client received some compensation from a fund <u>designed to repay</u>

15     <u>clients harmed by a lawyer's dishonesty</u> does not make that client

16     any less a victim of defendant's scheme.

17          Similarly meritless would be an argument that defendant alluded

18     to during trial that litigation advance lender US Claims Opco is not

19     a victim because it somehow failed to perfect its lien against

20     defendant's receivables.  There is no requirement in the Guidelines

21     that victims affirmatively act in a certain way to pursue their

22     civil remedies against a defrauding defendant or else risk losing

23     their status as a victim.  The Guidelines thus follow the law that

24     negligence would not be a defense to the very fraud of which

25     defendant was convicted.  Any such requirement would unduly burden

26

27     ────────────────

28          [7]  For the reasons set forth in footnote six, the government
       does not intend to seek a greater enhancement for multiple victims
       based upon the recently received Client Security Fund information.

                                       13

1   victims and would result in an unwarranted windfall to defendants.

2       **G.   A Two-Level Enhancement Applies for Evading Law**
3           **Enforcement/Scheme Offshore**

4       The PSR correctly applied a two-level enhancement under

5   U.S.S.G. § 2B1.1(b)(10) because defendant relocated to Costa Rica to

6   evade law enforcement and that, with his operations in India as well

7   as his conduct in Costa Rica, defendant conducted a substantial

8   portion of the scheme from outside the United States.  (PSR, ¶¶ 61-

9   63.)

10      The evidence at trial established that defendant owned and

11  controlled his law firm.  His ownership and control included his

12  financial and "back-office support" operations in India.  Defendant

13  testified that the India operations were well underway in summer

14  2016 and, in defendant's view, the offshore "mutiny" there

15  interfered with his ability to pay his clients.

16      Defendant's self-serving attempt at blaming his India-based

17  employees was rejected by the jury, but his own testimony about the

18  India operations and activity in summer of 2016 proved that he

19  conducted a substantial part of the charged scheme offshore.  The

20  jury heard that defendant had just purchased a $4.5 million house

21  that he clearly could not afford and that he had, between mid-March

22  2016 and the beginning of August, embezzled at least approximately

23  $2.5 million from clients to where defendant had a whopping $4,900

24  in the IOLTA.  (Chan Decl., ¶ 7.)  As perceptively noted by a former

25  employee in his letter to the Court, defendant used the India-based

26  operations as a "scapegoat" and a way to obfuscate and conceal

27  defendant's repeated theft.  (A.L. letter at 2, lodged concurrently

28  under seal.)

14

Case 8:19-cr-00061-JVS   Document 1026-1   Filed 10/25/22   Page 23 of 168   Page ID
#:25059
Case 2:18-cr-00124-MWF   Document 349   Filed 02/03/22   Page 20 of 31   Page ID #:3287

1      Once in Costa Rica, defendant took numerous steps to avail

2  himself of his offshore sanctuary to evade law enforcement, his

3  growing list of victims and creditors, and to continue his

4  fraudulent scheme.  Among other things, defendant

- Refused to communicate with clients or creditors by email,
  but freely communicated with individuals of his choice
  (like his trial witnesses who testified that they had no
  problem communicating with defendant in Costa Rica).

- Disconnected his firm-related email account.

- Used a mail drop in Florida that had no connection
  whatsoever to any legitimate firm business.

- Directed his Costa Rica employees to not to use phone
  equipment from his failed firm because, as defendant
  wrote, "[w]e can't have people getting old L&B client
  calls and saying shit like, 'I'm in Costa Rica.'"

- Directed a Costa Rica employee to travel to the United
  States to seize the firm's servers and to ship them to
  Costa Rica.

- Created a new law name, called "Atlas Legal," and directed
  his Costa Rica employees to cold-call former Layfield &
  Barrett clients to hire defendant *after* Layfield & Barrett
  was in bankruptcy and under the control of a trustee.

- And, as to at least one former Layfield & Barrett client,
  S.J., defendant attempted to settle S.J.'s case without
  S.J.'s knowledge or consent, going so far as to signing
  under penalty of perjury and filing with a court a "Notice
  of Settlement."

1    (*See* Chan Decl., ¶¶ 8,15.)[8]

2        In short, there is ample evidence that defendant relocated his

3    fraudulent scheme to Costa Rica to evade law enforcement, and that a

4    substantial part of his scheme was committed in India and Costa

5    Rica.

6        **H.    A Two-Level Adjustment Applies for Abuse of Position of
           Trust/Use of Special Skill**

7

8        The PSR also correctly applied a two-level enhancement under

9    U.S.S.G. § 3B1.3 because, as the overwhelming trial evidence showed,

10   defendant abused a position of trust and used a specialized skill to

11   repeatedly defraud his clients.  (PSR, ¶¶ 68-71.)  "This adjustment

12   . . . applies in the case of an embezzlement of a client's funds by

13   an attorney serving as a guardian."  U.S.S.G. § 3B1.3, comment.

14   (n.1); *see id.* at n.4 (noting the use of specialized skills by

15   lawyers).

16       **I.    The Tax Offenses Do Not Change the Guidelines' Calculation**

17       The PSR correctly determined that the base offense level for

18   defendant's tax offenses is 20 because the tax loss was more than

19   $550,000 but not more than $1,500,000.  (PSR, ¶ 74; Chan Decl., ¶ 14,

20   Ex. C (calculating a total tax loss of $1,211,796.74.)  The PSR

21   further correctly determined that a two-level enhancement applies

22   because defendant failed to report that well over $10,000 of his

23   gross income had been derived from embezzlement.  (PSR, ¶¶ 75-76.)

24

25   ────────────────

26       [8]   S.J. was the victim identified in counts 21, 22, 24 and 25 of
     the First Superseding Indictment.  After the Court dismissed the

27   aggravated identity theft counts (24 and 25), the government did not
     pursue counts 21 and 22 at trial.  Defendant's attempt to defraud

28   S.J., however, is relevant and should be considered by the Court at
     sentencing.

                                     16

Case 8:19-cr-00061-JVS   Document 1026-1   Filed 10/25/22   Page 25 of 168   Page ID
#:25061
Case 2:18-cr-00124-MWF   Document 349   Filed 02/03/22   Page 22 of 31   Page ID #:3289

1   As noted in the PSR, however, the tax offenses do not result in any

2   increase in offense level.  (PSR, ¶¶ 81-83.)

3        **J.   Defendant is Not Entitled to Any Credit for Acceptance of
              Responsibility**

4

5        Defendant is expected to claim that he is entitled to a two-

6   level reduction for acceptance of responsibility.  His claim is

7   meritless.

8        It is defendant's burden to establish eligibility for acceptance

9   of responsibility credit where defendant is convicted at trial.

10  *United States v. Ochoa,* 265 F.3d 837, 843 (9th Cir. 2001).  The

11  Guidelines provide that a defendant may receive credit for acceptance

12  of responsibility, post-trial

13       [i]n *rare* situations . . . for example, where a defendant goes
         to trial to assert and preserve issues that do not relate to
14       factual guilt (e.g., to make a constitutional challenge to a
         statute or a challenge to the applicability of a statute to his
15       conduct).  *In each such instance, however, a determination that
         a defendant has accepted responsibility will be based primarily
16       upon pre-trial statements and conduct.*

17  USSG § 3E1.1, App. Note 2 (italics added).

18       This case is not that "rare" situation.  Defendant has no legal

19  challenges, just factual ones.  The jury heard substantial

20  incriminating evidence of defendant's "pretrial statements and

21  conduct" regarding, among other things, defendant dodging and

22  misleading client inquiries about where their money was and bank

23  records showing illegal transfers of client funds that defendant made

24  from accounts he solely controlled.  The jury rejected defendant's

25  self-serving version of the facts that he was victimized by the

26  incompetence of others and only intended a "short term

27  misappropriation" as he told the Probation Officer.  (PSR, ¶ 47.)

28

17

Case 8:19-cr-00061-JVS  Document 1026-1  Filed 10/25/22  Page 26 of 168  Page ID
#:25062
Case 2:18-cr-00124-MWF  Document 349-1  Filed 02/03/22  Page 23 of 31  Page ID #:3290

Additionally, on cross examination, defendant continued to deny responsibility by denying the most basic facts.  For example, defendant suggested, without any evidence, that the money he had stolen from clients was possibly present and properly accounted for in *other* IOLTA accounts.[9]

In short, defendant cannot demonstrate that he has accepted responsibility as that phrase is defined in the Guidelines.

**III. A SENTENCE OF 168 MONTHS IS REASONABLE AND APPROPRIATE UNDER THE 3553(A) FACTORS**

Based on the numerous aggravating circumstances present here, a high-end sentence of 168 months is appropriate, just, and not greater than necessary to achieve the goals of sentencing.

**A.  Nature and Seriousness of the Offense, § 3553(a)(1)**

Defendant occupied a very significant role in the lives of his clients and referral lawyers whose money he stole.  Defendant held himself out as a champion of the injured and vulnerable, and then he ruthlessly stole millions from them.  As J.N. explained in her letter,

> "[w]hile I was worried about my piling medical bills, lack of work, and possible economic ruin, Layfield was using my settlement as his personal piggy bank to fund a lavish lifestyle of Maybachs, private jets, horses, [and] luxury homes."

Defendant specifically targeted vulnerable clients like J.N. Defendant pretended to be a caring, ethical lawyer so he could gain his clients' trust, all the while intending to breach their trust

---

[9]  Government counsel promptly debunked defendant's obstructive testimony by publishing bank statements that proved without any doubt that the very funds at issue during that line of questioning were deposited into, and manipulated by defendant from, the one and only IOLTA into which defendant had deposited <u>all</u> of the victims' funds in this case.

18

Case 8:19-cr-00061-JVS   Document 1026-1   Filed 10/25/22   Page 27 of 168   Page ID
Case 2:18-cr-00124-MWF   Document 349   Filed 02/03/22   Page 24 of 31   Page ID #:3291
#:25063

and steal from them.  Defendant's clients had turned to defendant in
their darkest hours, expecting to find an advocate and protector;
instead, they were at the mercy of a thief who cared only about
himself.

Defendant stole more than money from his victims.  He robbed
them of their ability to get necessary and potentially life-changing
medical treatment; to afford housing and food; and to obtain mental
health services.  He robbed them of their faith in lawyers and the
legal system, and of their ability to gain closure after devastating
accidents.  Already suffering from life-altering injuries, defendant
compounded his victims' stress and anxiety by forcing them to focus
on attempting to claw their money from defendant's grip when they
should have been focusing on their recovery.

The injuries that defendant caused to referral counsel is
serious too.  Defendant not only solicited their cases then stole
the very referral fees he promised to pay, but he put referral
counsel in the impossible position of trying to answer clients'
questions about where the money went.  Defendant placed referral
counsel in the line of fire with their own clients who trusted that
bringing defendant aboard would help their cases.  It did the
opposite, and defendant abandoned referral counsel to fend for
themselves, facing litigation and more in the wake.

In short, defendant's crimes were exceedingly serious and
caused widespread harm.  Such significant misconduct warrants a
correspondingly significant term of imprisonment.

**B.   History and Characteristics of Defendant, § 3553(a)(1)**

Defendant's history and characteristics present further
aggravating factors that justify a high-end sentence of 168 months.

19

Case 8:19-cr-00061-JVS   Document 1026-1   Filed 10/25/22   Page 28 of 168   Page ID
#:25064
Case 2:18-cr-00124-MWF   Document 349   Filed 02/03/22   Page 25 of 31   Page ID #:3292

1    Defendant's education and work history show that he had every

2  opportunity to run a legitimate business and lead a law-abiding

3  life.  Defendant was well-educated and possessed credentials that

4  exceeded those of most lawyers.  He had an advanced law degree in

5  taxation from a top program in the country.  He was a certified

6  public accountant who worked for several years at some of the

7  largest accounting firms.  He knew about business, and he clearly

8  understood accounting.  He could have --- and should have --- used

9  his background to help his clients; instead, he used it to steal

10  from them.

11    Defendant showed no respect for others, including his own

12  employees.  He operated his firm as an abusive tyrant.  He regularly

13  and profanely berated and embarrassed his employees in front of

14  others.  His former employees describe him as a "bully" who

15  "constantly berated" his employees and was "verbally abusive" and

16  "disrespectful."  (*See, e.g.*, A.L. Letter at 1; T.W. Letter.)  As

17  the jury heard at trial through the testimony of Todd Wakefield,

18  defendant thought little of his clients, referring to them at times

19  as "pieces of shit" who didn't deserve to be paid, or words to that

20  effect.  Among other contemptible features, these characteristics

21  served to ensure that no one would question how defendant ran his

22  firm which, of course, allowed defendant to carry out and conceal

23  his scheme.

24    Defendant also routinely sacrificed his own employees'

25  reputations and future job prospects to protect himself from the

26  clients he had victimized.  Defendant had very little, if any, day-

27  to-day contact with most of his victim clients.  Instead, those

28  clients dealt with associates and support staff who were in the dark

Case 8:19-cr-00061-JVS   Document 1026-1   Filed 10/25/22   Page 29 of 168   Page ID
#:25065
Case 2:18-cr-00124-MWF   Document 345   Filed 02/03/22   Page 26 of 31   Page ID #:3293

1   that defendant had drained the IOLTA.  As the Court and jury saw,

2   defendant wrote misleading emails to throw clients and his own staff

3   off the scent that something was wrong, at times stating that

4   defendant would "handle it" or that defendant was wrangling some

5   unicorn in the form of a mythical "accounting" of the IOLTA -- a

6   task defendant claimed would be completed, conveniently, days after

7   his move to Costa Rica.  Defendant deliberately left his employees

8   to tell clients the unsatisfying truth that only defendant knew

9   where the money was.  Defendant left his employees to face lawsuits

10  and State Bar complaints and spend years rebuilding their careers.

11  (*See, e.g.,* G.S. Letter; A.L. Letter.)

12      Defendant also caused the State Bar to pay out millions of

13  dollars to defendant's victims, money that defendant will most

14  likely never repay and shouldering law-abiding lawyers with the

15  responsibility to cover through Bar dues.

16      Another factor in aggravation is defendant's core desire to

17  take chances, albeit with other people's money.  While in custody

18  following the verdicts in this case, defendant explained to a former

19  business colleague that he has an outsized appetite for risk, which

20  leads him to make bad decisions.  Defendant wrote

21      "I only feel alive when I'm in some sort of challenge with risk
        involved.  I can think of so many bad decisions where I could
22      have played it safe and chose not to.  I see these people at
        soccer games with kids living these boring lives and feel like
23      that should be enough, but it never was for me."

24  (Chan Decl., ¶ 10.)

25      In his own words, defendant made a conscious choice to gamble.

26  Fiduciaries, like defendant, deserve hefty prison sentences for

27  choosing to chase their own desires that breach the trust that

28  others place in them.

                              21

Case 8:19-cr-00061-JVS   Document 1026-1   Filed 10/25/22   Page 30 of 168   Page ID
#:25066
Case 2:18-cr-00124-MWF   Document 349   Filed 02/03/22   Page 27 of 31   Page ID #:3294

1    There are no significant mitigating factors to weigh against

2  the many aggravating factors.  Defendant's lack of criminal history

3  points is not mitigating because, by defendant's own account at

4  trial, defendant had been misappropriating client funds and treating

5  the client-trust account as his personal piggybank for years before

6  he was charged in this case.  Defendant's lack of criminal history

7  thus reflects only that defendant was able to evade detection by law

8  enforcement for many years, not that defendant's charged misconduct

9  was aberrant.

10    Defendant was married and has a child, but his wife left him

11  shortly after the verdicts and both his wife and child have refused

12  to communicate with him.  (PSR, ¶ 111.)  There is no evidence that

13  defendant devoted time or money to religious, charitable, or

14  volunteer causes.  Whatever supporting letters defendant may

15  introduce are likely to be those of family members or friends who,

16  like defendant's clients and employees, had no visibility into

17  defendant's criminal activities.

18    Furthermore, defendant has never shown remorse for his crimes

19  or a shred of compassion for his many victims.  As noted above, he

20  continues to this day to minimize his egregious misconduct,

21  referring to it as a "short-term misappropriation" and a mere

22  "ethical violation."  (PSR, ¶ 47.)  Defendant also continues to

23  promote the false narrative that he "was always trying to pay the

24  money back." (PSR, ¶ 45).  The overwhelming evidence was to the

25  contrary.  For example, he could have used all or a substantial part

26  of the $700,000 loan proceeds from US Claims Opco (that he, no less,

27  represented in writing he would for business purposes) to repay

28  clients.  Instead, he used it to buy yet another horse, ship a

1  horse, payoff a car he had shipped, and gave tens of thousands to

2  his wife.  (Chan Decl., ¶ 11.)

3  **C.  Need for Deterrence, to Promote Respect for the Law, and**
   **for Just Punishment, § 3553(a)(2)**

4

5      The need for both general and specific deterrence, to promote

6  respect for the law, and to provide just punishment further justify

7  a high-end sentence of 168 months.

8      Defendant engaged in a compassionless scheme to enrich himself

9  by preying on the vulnerable.  The need to deter defendant and

10 others from committing similar crimes is great.  As A.L. wrote in

11 his letter to the court, defendant's "shameful, despicable conduct

12 reflects poorly on all of us as attorneys, and erodes the public's

13 confidence in the legal system."  (*See also* C.D. Letter ("The

14 California Bar does not seem to have the resources and/or

15 inclination to police all its members ... I know that the

16 plaintiff's bar in California is closely watching this case and what

17 the consequences will be for such an audacious breach of public

18 trust.").)

19     The recommended sentence is also justified because, as noted

20 above, defendant has never -- including leading up to this sentence

21 -- shown any respect for the law.  For example, during a December

22 2021 jailhouse phone call with a relative,[10] defendant indicated that

23 he intended to feign remorse at sentencing.  Defendant stated that

24     You know, I'm trying to work on, you know, we're supposed to
       make this, like, make a statement at the sentencing, so I'm
25     like working on, like, what I'm gonna supposedly say to the
       judge in light of everything.  You know, I have to balance it
26     and try to be remorseful and reasonable, but what I really want
       to say is "you made a bunch of bad rulings and totally screwed

27

28     [10]  The government will separately lodge with the Court the
   recording of this call.

23

1    me over and I hope the Ninth Circuit turns it over and throws
     it in your face." That's what I really want to say. . . .
2    But, you can't say that, you can't say the truth, you have to
     dance this dance. . . . The [C]ommittee has come up with these
3    [G]uidelines from these idiot law professors.

4        Defendant has also demonstrated his disregard for this Court

5    and the law at least two other times. While defendant was in

6    pretrial custody, defendant practiced law --- while suspended from

7    practice by the State Bar --- by purporting to provide legal advice

8    to fellow inmates who were already represented by competent,

9    experienced counsel. Never mind that defendant, who admittedly had

10   no federal criminal law experience, may have interfered with those

11   inmates' relationships with their lawyers. That did not deter

12   defendant from billing thousands of dollars and actually collecting

13   at least $6,000 before he was exposed by an inmate's wife. (Chan

14   Decl., ¶ 12.)

15       Next, the government has information that defendant engaged in

16   yet another embezzlement scam during trial. The Court permitted

17   defendant's pretrial release on the condition that defendant "not

18   engage in any employment where he acts or is called upon to act as a

19   fiduciary for the funds of another person or entity . . . ." (Dkt.

20   65).

21       Just prior to and during trial, the government received

22   numerous complaints that defendant had fleeced truckers out of their

23   fees. They claimed that they had agreed to move freight for a

24   trucking business under defendant's wife's name and that the company

25   had embezzled their fees paid to the company by customers who hired

26   the company to ship freight. While defendant sat at his counsel

27   table *during the trial in this case*, he sent an email to one of

28   several truckers who together claimed that defendant had embezzled

Case 8:19-cr-00061-JVS   Document 1026-1   Filed 10/25/22   Page 33 of 168   Page ID
#:25069
Case 2:18-cr-00124-MWF   Document 349   Filed 02/03/22   Page 30 of 31   Page ID #:3297

1  more than $100,000 in trucking fees due those owner-operators.

2  Defendant's "wife's trucking business" has since closed down,

3  leaving those truckers out that money.  It was plain, from

4  defendant's own email, that defendant was shilling his wife to run

5  the trucking company because defendant knew that the Court had

6  barred him from holding other people's money.  (Chan Decl., ¶ 13.)[11]

7      The government's recommended sentence specifically targets the

8  unique misconduct of this defendant and promotes respect for the

9  law.  A significant sentence is appropriate to promote specific

10  deterrence in light of defendant's repeated failures to comply with

11  the law, even in the face of significant punishment.

12      **D.    Policy Statements and Need to Avoid Unwarranted Sentencing
            Disparities, § 3553(a)(6)**

14      Because the government's recommended sentence is within the

15  Guidelines range, it will not cause unwarranted sentencing

16  disparities with other defendants in similar circumstances.  *See*

17  *Gall v. United States*, 552 U.S. 38, 54 (2007) ("[A]voidance of

18  unwarranted disparities was clearly considered by the Sentencing

19  Commission when setting the Guidelines ranges.")

20  **IV.   FINE**

21      The government defers to the Court regarding whether to impose a

22  fine.

23

24

25

---

26      [11]  Defendant cleverly created the trucking business in his
    wife's name and put all accounts under her name as well.  All that
27  defendant and his wife previously knew about the trucking business
    came from defendant's discussions with his pretrial cellmate, a
28  trucker busted for smuggling drugs in a truck, and by defendant's
    work as a trucker while on pretrial release.  (*See* Dkt. 155.)

**V.   RESTITUTION**

The parties agree that restitution is not fully ascertainable at this time because the parties are awaiting additional information from the State Bar's Client Security Fund.  The parties have met and conferred and believe that they may be able to reach a stipulation as to restitution.

Accordingly, with the agreement of defendant's counsel and pursuant to 18 U.S.C. § 3663(d)(5), the government requests that the Court set a date for a final determination of restitution not later than 90 days after sentencing.

**VI.   CONCLUSION**

For the foregoing reasons, the government recommends that the Court sentence defendant to 168 months in prison on each of the fraud counts, to run concurrently; the maximum statutory terms of imprisonment on each of the tax counts, to run concurrently with each other and the fraud counts; a three-year period of supervised release; a fine, if any, as determined by the Court; a mandatory special assessment of $2,300; and such other and further terms and conditions as the Court deems appropriate.

Case 8:19-cr-00061-JVS   Document 1026-1   Filed 10/25/22   Page 35 of 168   Page ID
#:25071
Case 2:18-cr-00124-MWF   Document 349-1   Filed 02/03/22   Page 1 of 29   Page ID #:3299

1                          DECLARATION OF SAM CHAN

2        I, Sam Chan, declare as follows:

3        1.!  I am a special agent with IRS, Criminal Investigation.  I

4   make this declaration in support of the government's sentencing

5   position for defendant Philip James Layfield ("defendant").  I have

6   personal knowledge of the facts set forth herein, unless otherwise

7   stated, and could and would testify to those facts fully and

8   truthfully if called and sworn as a witness.  Because I am making

9   this declaration for the limited purpose of addressing issues related

10  to defendant's sentencing, I have not included every fact known to me

11  concerning this investigation.

12       2.!  I testified as a witness at defendant's trial.  During my

13  trial testimony, which I incorporate herein by reference, I explained

14  my background and involvement in this case, and I summarized the

15  voluminous records I reviewed in connection with this matter,

16  including financial records showing defendant's receipt and

17  expenditure of client settlement money.

18       3.!  The government's concurrently submitted under seal filing

19  includes excerpts of a mediation brief signed by defendant on behalf

20  of client P.C.  That brief was provided by the State Bar from its

21  proceeding against defendant and then provided by the government as

22  discovery in this case.  I believe these excerpts submitted under

23  seal are true and accurate.

24       4.!  I know from my review of the IOLTA records (Esquire Bank

25  account ending in 2012, the "IOLTA"), about which I testified at

26  trial in this case, that P.C.'s total settlement proceeds of $600,000

27  were deposited into the IOLTA on or about February 22, 2017 and that,

28  by on or about March 23, 2017, the IOLTA balance was approximately

Case 8:19-cr-00061-JVS  Document 1026-1  Filed 10/25/22  Page 36 of 168  Page ID
Case 2:18-cr-00124-MWF  Document 349-1  Filed 02/03/22  Page 2 of 29  Page ID #:3300
#:25072

1    $5,216 even after the deposit of millions of dollars in settlements

2    that were unpaid by that time.

3        5.!  Attached hereto as Exhibit A is a document setting forth

4    what I believe to be the intended loss caused by defendant for 26

5    different individuals (former law firm clients and referral

6    attorneys) plus one lender.

7            a.!  For client-victims, the amount listed in the "Amount

8    Owed from Settlement" column is the settlement amount less an

9    approximation of attorneys' fees and costs.  To the extent there is

10   evidence that the client-victim's medical liens were not paid, the

11   amount of the outstanding medical bills are included in the total

12   amount of settlement money owed to the client.  For referral counsel,

13   the amount listed in the "Amount Owed from Settlement" column is the

14   referral fee owed from a client's settlement.  For the lender, the

15   amount listed is the amount of an advance that was to be repaid upon

16   receipt of a client's settlement.

17           b.!  The column titled "Supporting Records" identifies the

18   evidence I reviewed when determining the approximate amount of money

19   owed to the listed victims.

20           c.!  I know from reviewing financial records, including the

21   IOLTA, that defendant spent the entirety of the settlement money owed

22   to the listed client-victims before any of the listed victims

23   received what they were owed from the respective settlements.  I was

24   able to make this determination by reviewing records from the IOLTA

25   and other financial accounts and tracking the drawdown of settlement

26   money that was deposited.  Interviewing every victim was not

27   necessary to determine that defendant had embezzled the victim's

28   settlement money.

2

d.!  When tracing the expenditure of settlement money and identifying victims of defendant's scheme through an analysis of the relevant financial records, I took a conservative approach and did not include clients in Exhibit A if there was a possibility that case costs could have been equal to or exceeded the settlement amount such that no money would have been owed to the client.  Based on my review of the IOLTA and the drawdown of funds deposited on behalf of dozens of other individuals who appeared to be clients like those identified at trial, it is possible --- and indeed likely --- that there are many more victims of defendant's embezzlement scheme.

6.!  I know from reviewing financial records and internal law firm documents, that defendant authorized partial payments to certain clients, usually when the client threatened to file a State Bar complaint or take other legal action.  Attached hereto as Exhibit B is a document that shows intended loss, or loss before reduction of any payment that a client may have received from defendant, and actual loss, or the amount a client was still owed after receiving a partial payment from defendant.  Exhibit B also includes those clients who received no partial payment.  However, I know from reviewing relevant financial records that these repayments were not from the victims' own settlements; rather, they were made from settlements from other client-victims.

7.!  Based upon my review of the IOLTA, retainer agreements, and trial testimony, I believe that defendant had embezzled a total of at least approximately $2.5 million during the brief period of mid-March 2016 through August 1, 2016.  The embezzled funds came from clients M.L. (whose settlement proceeds of approximately $750,000 were deposited into the IOLTA in March 2016); J.Y. (whose settlement

Case 8:19-cr-00061-JVS   Document 1026-1   Filed 10/25/22   Page 38 of 168   Page ID
#:25074
Case 2:18-cr-00124-MWF   Document 349-1   Filed 02/03/22   Page 4 of 29   Page ID #:3302

1  proceeds of approximately $699,000 were deposited into the IOLTA in

2  May 2016); and T.B. (whose settlement proceeds of approximately $1

3  million were deposited in the IOLTA in June 2016).  The foregoing

4  evidence, and more, showed that none of these clients or their

5  referral attorneys who were owed several hundred thousand dollars

6  received any funds during the foregoing four-month period.  Moreover,

7  the IOLTA balance was approximately $4,915 on August 1, 2016.

8       8.!  During the course of this investigation, I learned that

9  defendant had started a new law firm in Costa Rica under the name,

10  "Atlas Legal."  I interviewed witness K.P.  K.P told me that he had

11  worked for Layfield & Barrett in the U.S. and that defendant had

12  hired him to move to Costa Rica to work for defendant.  K.P. stated

13  that he relocated to Costa Rica and did work there for defendant who

14  told him (K.P.) to solicit former Layfield & Barrett clients to

15  retain defendant's new firm, Atlas Legal.  I know from reviewing

16  interview reports for a former Layfield & Barrett client, S.J., that

17  an individual named "[K.]" called S.J. to retain Atlas Legal and that

18  S.J. stated that he did not hire Atlas Legal or authorize defendant

19  to settle S.J.'s case.

20       9.!  Attached hereto as Exhibit C is a document showing the loss

21  to the IRS that resulted from defendant's tax offenses.  The column

22  titled "Source of Loss and Supporting Records" identifies the type of

23  tax defendant failed to pay that resulted in the loss, and it also

24  identifies the records I reviewed in determining the amount of loss.

25       10.!  I reviewed letters that defendant sent while in custody

26  following the verdicts in this case.  I also listened to recordings

27  of non-privileged telephone calls that defendant placed while in

28  custody during the same time period.  The letters and recordings were

4

Case 8:19-cr-00061-JVS  Document 1026-1  Filed 10/25/22  Page 39 of 168  Page ID
#:25075
Case 2:18-cr-00124-MWF  Document 349-1  Filed 02/03/22  Page 5 of 29  Page ID #:3303

1   provided, unaltered, by the jail facility to my co-case agent, Mark

2   Speidel.  The excerpts of defendant's letters and the transcript of

3   the recording that were described in the government's sentencing

4   position accurately reflect the letters that I read and the recording

5   that I listened to.

6       11.!  As I testified during trial, I traced the use of the

7   proceeds of the approximately $700,000 loan advanced to defendant by

8   US Claims Opco that were deposited into defendant's personal account

9   at USAA, ending in 1924, on or about June 12, 2017, the day before he

10  flew to Costa Rica.  From my review of bank records for that account,

11  and from other related documents, I determined that defendant used a

12  substantial amount of those loan proceeds for what appeared to be

13  personal use, including approximately $20,000 to buy a horse named

14  "Chinaco;" to ship his personal goods to Costa Rica; approximately

15  $37,000 to pay off a truck he had shipped from the U.S. to Costa

16  Rica; and a $50,000 transfer to his wife.  I did not see any use of

17  the proceeds of that $700,000 loan to pay any of the clients whose

18  cases, as I have testified, settled and for which they received

19  nothing despite being entitled to, in total, several million dollars.

20  Please see attachment B for a detailed description of those clients

21  and their unpaid settlement entitlements.

22      12.!  Between about March and late July, 2018, the parties in

23  this case litigated over defendant's pretrial release from MDC where

24  defendant was housed with other inmates including an individual named

25  M.G.  I received from Agent Speidel documents indicating that

26  defendant had billed M.G. for legal services that defendant purported

27  to provide to M.G. while both were in custody and, according to the

28  docket in M.G.'s case, M.G. was represented by counsel.  I

5

1   incorporate by reference the government's motion to revoke

2   defendant's pretrial release (Dkt. 155).  In in essence, M.G.'s wife

3   refused to pay defendant's bill although another inmate's family did,

4   in fact, pay defendant $6,000 for his "legal services."

5       13.!  Just before and during trial in this case, co-case agent

6   Ryan Heaton of the FBI provided emails to me from a group of

7   individuals who stated that defendant's wife's company, Maximum

8   Global Transportation, owed them over $100,000 in unpaid freight

9   transport costs.  One such email was from defendant, attached hereto,

10  that was apparently emailed by defendant while he sat at the counsel

11  table during the trial in this case.

12      14.!  Attached hereto as Exhibit D is a compilation of documents

13  obtained during the investigation of this case that I understand,

14  including based on the "Bates" number on each such document, were

15  produced by the government to the defense as part of discovery.

16      15.!   I interviewed R.M. as part of the investigation of this

17  case.  R.M. told me, among other things, that defendant, for whom she

18  had worked at Layfield & Barrett, offered her a job with him in Costa

19  Rica.  R.M. further stated that she relocated to Costa Rica to work

20  for defendant and that, while there, defendant directed her to travel

21  to the U.S. to retrieve and send back to Costa Rica computer servers

22  that had been used by the Layfield & Barrett firm.  R.M. stated that

23  she followed defendant's direction and obtained and sent the servers

24  to Costa Rica.

25  ///

26  ///

27  ///

28  ///

1    I declare under penalty of perjury under the laws of the United

2    States of America that the foregoing is true and correct and that

3    this declaration is executed at Santa Ana, California, on February 3,

4    2022.

5

6                                          SAM CHAN

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Case 8:19-cr-00061-JVS   Document 1026-1   Filed 10/25/22   Page 42 of 168   Page ID
#:25078
Case 2:18-cr-00124-MWF   Document 349-1   Filed 02/03/22   Page 8 of 29   Page ID #:3306

## U.S. v. PHILIP LAYFIELD, CR 18-124(A)-MWF

### Intended Loss

| | VICTIM | AMOUNT OWED FROM SETTLEMENT (INCLUDING AMOUNT OWED FOR MEDICAL LIENS) | SUPPORTING RECORDS |
|---|---|---|---|
| 1 | A.L. | $7,002.85 | May 5, 2017 email from Wakefield to Layfield, CA State Bar Complaint, Bill.com records |
| 2 | Bl. S. | $30,390.14 | Actually paid via Bill.com on Jan 26, 2017 |
| 3 | Bo. S. (Referral Counsel for Client J.Y.) | $179,098.20 | Pay order |
| 4 | C.D. (Referral Counsel for Client J.Y.) | $58,750.27 | Pay order |
| 5 | C.S. | $30,390.14 | Settlement letter dated Sep 2, 2016 |
| 6 | Da. S. (Referral Counsel for Client R.P.) | $243,000.00 | Closing Statement (in Excel file) |
| 7 | De. S. | $60,780.28 | Settlement letter dated Sep 2, 2016 |
| 8 | F.H. | $295,686.66 | Settlement letter dated Apr 20, 2017 along with Closing Statement |
| 9 | Ir. C. | $19,640.73 | May 5, 2017 email from Wakefield to Layfield |
| 10 | J.L. (Referral Counsel for Client P.C.) | $83,300.00 | Closing Statement & Trial testimony |
| 11 | J.N. | $2,260,893.41 | Retainer agreement dated Feb 24, 2016 (60%), $25,000 Case advance check / letter dated Feb 15, 2017, pre-closure email & spreadsheet provided by Almeida on Feb 3, 2017 (case fee $59,283.59 / medical liens $27,723), email from Layfield to Wakefield with payables / creditor list of $1.8 million and attached excel file as of July 15, 2017 ($7,900 not paid), Medi-Cal Lien dated May 9, 2017 |
| 12 | J.S. | $127,239.22 | Amount paid via Bill.com from other client's settlement on Sep 29, 2016 |
| 13 | J.Y. | $250,000.00 | Pay order |
| 14 | M.B. (Referral Counsel for Client M.M.) | $126,467.00 | Closing Statement |
| 15 | M.H. | $52,141.77 | May 5, 2017 email from Wakefield to Layfield, Bill.com records |
| 16 | M.L. | $307,054.00 | Closing Statement & Trial testimony |
| 17 | M.M. | $442,502.16 | Settlement letter dated Sep 19, 2016 along with Closing Statement |
| 18 | M.W. (Referral Counsel for Client M.M.) | $235,549.36 | Closing Statement |
| 19 | P.A. (on behalf of The Dominguez Firm) (Referral Counsel for Client M.L.) | $150,000.00 | Closing Statement & Trial testimony |
| 20 | P.C. | $317,560.08 | Closing Statement & Medi-cal Lien dated Jun 26, 2017 |

EXHIBIT A-1

Case 8:19-cr-00061-JVS   Document 1026-1   Filed 10/25/22   Page 43 of 168   Page ID
#:25079
Case 2:18-cr-00124-MWF   Document 349-1   Filed 02/03/22   Page 9 of 29   Page ID #:3307

| 21 | P.M. (Referral Counsel for Client T.B.) | $24,382.37 | Closing Statement |
|----|------|------|------|
| 22 | R.P. | $560,105.44 | Retainer agreement dated Sep 22, 2014, Bill.com records, closing statement (excel file) |
| 23 | Se. A. | $382,028.01 | Closing Statement |
| 24 | Si. A. | $14,025.33 | Bill.com record |
| 25 | T.B. | $581,061.66 | Closing Statement ($538,187.41) & Letter dated April 8, 2017 ($42,874.25) |
| 26 | W.M. (Referral Counsel for Client T.B.) | $24,382.37 | Closing Statement |
|    |      | **AMOUNT OWED TO LENDER** | |
| 27 | US Claims Opco LLC (Lender) | $700,000.00 | BK Case #17-BK-19548-NB Claim of Proof, US Claims Oppo production, USAA #1924 records / wire |
|    |      |      | |
|    | **TOTAL** | **$7,563,431.45** | |

EXHIBIT A-2

# U.S. v. PHILIP LAYFIELD, CR 18-124(A)-MWF

## Intended and Actual Loss (selected victims)

|   | **VICTIM** | **INTENDED LOSS** | **ACTUAL LOSS** |
|---|---|---|---|
| 1 | A.L. | $7,002.85 | $7,002.85 |
| 2 | Da. S. (Referral Counsel for Client R.P.) | $243,000.00 | $243,000.00 |
| 3 | F.H. | $295,686.66 | $115,247.54 |
| 4 | Ir. C. | $19,640.73 | $19,640.73 |
| 5 | J.L. (Referral Counsel for Client P.C.) | $83,300.00 | $83,300.00 |
| 6 | J.N. | $2,260,893.41 | $2,235,893.41 |
| 7 | M.H. | $52,141.77 | $52,141.77 |
| 8 | M.L. | $307,054.00 | $287,054.00 |
| 9 | M.M. | $442,502.16 | $442,502.16 |
| 10 | P.A. (on behalf of The Dominguez Firm) (Referral Counsel for Client M.L.) | $150,000.00 | $150,000.00 |
| 11 | P.C. | $317,560.08 | $317,560.08 |
| 12 | P.M. (Referral Counsel for Client T.B.) | $24,382.37 | $24,382.37 |
| 13 | R.P. | $560,105.44 | $560,105.44 |
| 14 | Se. A. | $382,028.01 | $182,028.01 |
| 15 | T.B. | $581,061.66 | $42,874.25 |
| 16 | W.M. (Referral Counsel for Client T.B.) | $24,382.37 | $24,382.37 |
| 17 | US Claims Oppo LLC (Lender) | $700,000.00 | $700,000.00 |
|   | **TOTAL** | **$6,450,741.51** | **$5,551,756.64** |

EXHIBIT B

# U.S. v. PHILIP LAYFIELD, CR 18-124(A)-MWF

## Loss to IRS

|   | Victim | Loss | Source of Loss and Supporting Records |
|---|--------|------|----------------------------------------|
| 1 | Internal Revenue Service | $128,763.74 | Payroll Taxes (via Namely data) |
|   |  | $1,083,033.00 | Personal Income Tax (via Revenue Agent Report) |
|   | **TOTAL LOSS TO IRS** | **$1,211,796.74** |  |

EXHIBIT C

TRIAL EXHIBITS



# TRIAL LAWYERS
## *for the People, in Pursuit of Justice*

**Layfield & Barrett Trial Attorneys Refuse to Back Down, Insist on Remaining at the Forefront of Technology, Training, and Education, and Refuse to Settle for Anything Less Than Their Injured Clients Deserve**

*by Jennifer Hadley*

"We are trial lawyers for the people—a full-service law firm, vibrant and hard-working, filled with a passion to bring justice to people on a contingency fee arising from accidents, defective products, business disputes, wrongly handled insurance claims, employment and workers' rights cases, police misconduct and more," says Founder and Managing Partner of Layfield & Barrett Trial Attorneys, APC (Layfield & Barrett).

As a firm with more than 95 staff members and 24 attorneys, Layfield & Barrett serves victims of catastrophic injuries from across the nation, with offices in Los Angeles; Park City, UT; San Diego; San Francisco; Washington, D.C.; and Scottsdale, AZ. However, their largest office is the firm's Irvine office, where Layfield has been based for the last 3 years. Under his direction and vision, the firm has grown a whopping 500% over the last 3 years, in terms of attorneys, staff, cases and revenue. Most recently, in January 2016 the firm officially became Layfield Barrett Trial Attorneys, APC, when Joe Barrett, one of California's most respected trial attorneys, who was formerly with The Cochran Firm, joined forces with Layfield and his team of aggressive, creative, and highly skilled trial lawyers.

"Our typical client is a person who was catastrophically injured in a violent event that lasted maybe one second but changed their life forever, or someone who has been wronged by a corporation, government or insurance company for a unique reason. Our niche is trying to bring economic justice and positive change to such people, who trust and rely upon our firm," says Layfield.

## FIGHTING FOR THE PEOPLE

"Only by being a Trial Lawyer for the People can I truly obtain the blessing of both doing good and doing well, as the late Johnnie L. Cochran, Jr. said. I can care for those I serve, provide great career opportunities for the people I work with, and bring justice to the folks we serve. Nothing is more rewarding," says L&B partner Joe Barrett. He isn't just blowing smoke, either. His firm routinely takes cases that even some of the largest plaintiff's firms reject, and turns them into economic justice for victims. Such was the case last year when one of the firm's partners settled a case for a teenager who fell out of her third-floor bedroom window one night, resulting in a tragic and life-changing accident. "Through tenacious legal work, we changed

EXHIBIT 21
Page 2 of 6



CLIENT: M.L.

DEPOSIT: $750,000 on 3/18/16

SETTLEMENT GONE / SUBSTANTIALLY GONE: 5/3/16

## Transfers to Philip James Layfield (2016)

United States vs. Philip James Layfield

**$405,000** Transfers from Esquire Bank Acct #2012 (IOLTA) into LAYFIELD's personal account (USAA #1924)

| Date | Amount |
|---|---|
| 2/16/16 | $50,000.00 |
| 2/17/16 | $50,000.00 |
| 2/18/16 | $30,000.00 |
| 2/22/16 | $50,000.00 |
| 7/1/16 | $50,000.00 |
| 8/15/16 | $25,000.00 |
| 10/28/16 | $15,000.00 |
| 10/31/16 | $35,000.00 |
| 12/15/16 | $15,000.00 |
| 12/15/16 | $25,000.00 |
| 12/28/16 | $60,000.00 |

**$189,265** Transfers from the operating account (via Bill.com) into LAYFIELD's personal account (USAA #1924)

| Date | Amount |
|---|---|
| 1/5/16 | $10,000.00 |
| 1/5/16 | $10,000.00 |
| 1/8/16 | $30,000.00 |
| 1/21/16 | $4,264.92 |
| 1/21/16 | $10,000.00 |
| 1/26/16 | $10,000.00 |
| 1/28/16 | $15,000.00 |
| 2/1/16 | $5,000.00 |
| 2/1/16 | $10,000.00 |
| 2/12/16 | $50,000.00 |
| 4/7/16 | $25,000.00 |

**$150,000** Transfer from the operating account to Jim Tracy for LAYFIELD's home loan

| Date | Amount |
|---|---|
| 8/30/16 | $100,000.00 |
| 9/15/16 | $50,000.00 |

**$1,357,500** Transfers from Esquire Bank Acct #2004 (operating account) into LAYFIELD's personal account (USAA #1924)

| Date | Amount | Date | Amount |
|---|---|---|---|
| 4/4/16 | $50,000.00 | 8/30/16 | $50,000.00 |
| 4/7/16 | $50,000.00 | 8/30/16 | $50,000.00 |
| 4/19/16 | $50,000.00 | 8/31/16 | $50,000.00 |
| 4/25/16 | $25,000.00 | 9/1/16 | $50,000.00 |
| 4/29/16 | $25,000.00 | 9/2/16 | $50,000.00 |
| 5/6/16 | $30,000.00 | 9/6/16 | $50,000.00 |
| 5/13/16 | $40,000.00 | 9/7/16 | $50,000.00 |
| 5/18/16 | $35,000.00 | 9/12/16 | $40,000.00 |
| 5/23/16 | $50,000.00 | 9/19/16 | $50,000.00 |
| 5/24/16 | $35,000.00 | 9/26/16 | $45,000.00 |
| 5/31/16 | $30,000.00 | 10/3/16 | $50,000.00 |
| 6/13/16 | $15,000.00 | 10/07/2016 | $50,000.00 |
| 6/29/16 | $50,000.00 | 10/11/2016 | $25,000.00 |
| 6/30/16 | $25,000.00 | 10/19/2016 | $25,000.00 |
| 7/12/16 | $35,000.00 | 10/24/2016 | $50,000.00 |
| 7/15/16 | $25,000.00 | 10/27/2016 | $30,000.00 |
| 7/28/16 | $25,000.00 | 10/31/2016 | $25,000.00 |
| 7/29/16 | $7,500.00 | 12/06/2016 | $25,000.00 |
| 8/8/16 | $20,000.00 | 12/12/2016 | $50,000.00 |
| 8/18/16 | $20,000.00 | | |

TOTAL: $205,000

EXHIBIT 49
Page 1 of 6







EXHIBIT 49
Page 4 of 6



EXHIBIT 49
Page 5 of 6



EXHIBIT 49
Page 6 of 6

# Ex. 50 - Summary of Client Settlement Payments

## M.L. (Deposited into IOLTA on 3/18/16)

| | | |
|---|---|---|
| Settlement Amount | $750,000.00 | |
| M.L.'s Entitled Amt from Settlement | $307,054.00 | Per closing statement / letter from Pannebaker on Jan 13, 2017 (Exs. 232, 233) |
| Payments made to client | | |
| 10/24/2016 | $5,000.00 | Paid from other client settlements |
| 11/7/2016 | $5,000.00 | Paid from other client settlements |
| 12/5/2016 | $5,000.00 | Paid from other client settlements |
| 12/5/2016 | $5,000.00 | Paid from other client settlements |
| | $20,000.00 | Paid from other client settlements |
| **Amount Not Paid:** | **$      287,054.00** | |

## Se. A. (Deposited into IOLTA on 4/1/16)

| | | |
|---|---|---|
| Settlement Amount | $1,250,000.00 | |
| Se. A.'s Entitled Amt from Settlement | $382,028.01 | Per closing statement (Ex. 237) |
| Payments made to client | | |
| 8/23/2016 | $5,000.00 | Paid from M.M.'s portion of settlement |
| 9/15/2016 | $5,000.00 | Paid from J.N.'s portion of settlement |
| 10/24/2016 | $5,000.00 | Paid from other client settlements |
| 11/7/2016 | $5,000.00 | Paid from other client settlements |
| 11/18/2016 | $5,000.00 | Paid from other client settlements |
| 1/11/2017 | $25,000.00 | Potentially paid w/ F.H.'s portion of settlement |
| 2/10/2017 | $25,000.00 | Paid from other client settlements |
| 3/1/2017 | $75,000.00 | Potentially paid from R.P. & P.C. portion of settlement |
| 4/27/2017 | $10,000.00 | Paid from other client settlements (via WFB #3706) |
| 4/27/2017 | $15,000.00 | Paid from other client settlements (via WFB #3706) |
| 6/19/2017 | $25,000.00 | Paid from other client settlements |
| | $200,000.00 | |
| **Amount Not Paid:** | **$182,028.01** | |

**EXHIBIT 50**
**Page 1 of 3**

**T.B.** (Deposited into IOLTA on 6/28/16)

| | | |
|---|---|---|
| Settlement Amount | $1,068,100.85 | Per closeout statement and adjustment email from TW on Apr 18, 2017 (Exs. 262A, 265) |
| T.B.'s Entitled Amt from Settlement | $42,874.25 | |
| Payments made to client | | |
| 8/19/2016 | $275,000.00 | Paid from M.M.'s portion of settlement |
| 9/19/2016 | $213,187.41 | Paid from J.N.'s portion of settlement |
| 9/30/2016 | $50,000.00 | Paid from J.N.'s portion of settlement |
| | $538,187.41 | |
| *Amount Not Paid:* | *$42,874.25* | |

**M.M.** (Deposited into IOLTA on 8/16/16)

| | | |
|---|---|---|
| Settlement Amount | $991,249.01 | Per closeout statement and accompaning letter (Ex. 273) |
| M.M.'s Entitled Amt from Settlement | $442,502.07 | |
| *Amount Not Paid:* | *$442,502.07* | |
| *Payment made to referral counsel - M.B. | 9/19/2016 $99,124.90 | Paid from J.N.'s portion of settlement |
| *Payment made to referral counsel - M.W. | 9/19/2016 $198,249.80 | Paid from J.N.'s portion of settlement |

EXHIBIT 50
Page 2 of 3

**J.N.** (Deposited into IOLTA on 8/26/16 & 8/29/16)

| | | |
|---|---|---|
| Settlement Amount | $3,900,000.00 | Per Philip Layfield attaching cost break-down spreadsheet on Feb 3, 2017 (Exs. 286, 286A, 286B) |
| J.N.'s Entitled Amt from Settlement | $2,053,164.73 | |
| Payment made to client | 3/9/2017 $25,000.00 | Paid from other client settlements |
| *Amount Not Paid:* | *$2,028,164.73* | (Does not include $199,828 in Medi-Cal liens) |

**P.C.** (Deposited into IOLTA on 2/22/17)

| | | |
|---|---|---|
| Settlement Amount | $595,001.00 | |
| P.C.'s Entitled Amt from Settlement | $270,014.86 | Per closing statement (Ex. 324) |
| *Amount Not Paid:* | *$270,014.86* | |

**R.P.** (Deposited into IOLTA on 2/24/17)

| | | |
|---|---|---|
| Settlement Amount | $1,350,000.00 | |
| R.P.'s Entitled Amt from Settlement | $183,984.97 | Manually calculated per pre-closure statement (Ex. 343) |
| *Amount Not Paid:* | *$183,984.97* | (Does not include over $376,120 unpaid liens) |

**EXHIBIT 50**
**Page 3 of 3**

**From:** Philip Layfield [mailto:p@maximumlegalservices.com]
**Sent:** Friday, June 30, 2017 10:57 AM

# REDACTED

**Importance:** High

Ok.  That's great news.  Here are some of my observations:

1.  L&B needs a dedicated phone number to receive phone calls.  One line, one number that provides a recorded message that says:

Thank you for calling L&B, nobody is available to take your call right now.  If you need to communicate with someone regarding your case, your file, or any other matter, please address any issues in writing to XXXXX (florida address.)  This number needs to be given to the ML staff to pass on.  We are not going to take emails any longer to

2.  ML needs to have its own separate phone system separate from MLS.  That means that nobody in India should be on the ML phone system.  Only the MLS system.  ML needs its own voice recordings and their should be NO L&B voice recordings for anything other than #1 above.

3.  MLS needs to have its own voice recordings.  Rita, Rohit, Kenny, Phil, John, and others need to have proper phone numbers.  Right now, I believe mine is all screwed up.  I see my phone with a 7243 extension with messages and I don't even know what my new phone number is and I don't know what my password is.  We can't allow ANYBODY FOR MLS TO BE ON THE OLD L&B SYSTEM.

4.  We need to check caller IDs and make sure everything is properly reflected;

5.  I see phones downstairs with message lights?  How is that possible if we are on an MLS system?  I suspect you guys have brought old L&B extensions.  We can't have people getting old L&B client calls and saying shit like, "I'm in Costa Rica".

6.  We need phones for the marketing team and accounting team in San Jose.  We need phones for India with Florida numbers, not Irvine numbers.  I need to see an inventory of what we

USAO_37193

**EXHIBIT 153**
**Page 1 of 3**

have.

This is not an option, we need to have all of this resolved no later than July 10th.



USAO_37194

**EXHIBIT 153**
**Page 2 of 3**

REDACTED

USAO_37195

EXHIBIT 153
Page 3 of 3

**Michael Artinian**

| | |
|---|---|
| **From:** | info <info@layfieldbarrett.com> |
| **Sent:** | Tuesday, June 27, 2017 6:26 PM |
| **To:** | Michael Artinian |
| **Subject:** | Automatic reply: J.N. ▮▮▮▮▮▮▮ |

Please be advised that Layfield & Barrett does not accept email communications on any business matters at this time.  If you have any questions or correspondence, please send to our mailing address of:

L&B, APC
382 NE 191st St. #42308
Miami, Florida 33179-3899

1

USAO CONFIDENTIAL INFORMATION - SUBJECT TO PROTECTIVE ORDER  002509
EXHIBIT 293
Page 1 of 1

EMAIL SENT DURING TRIAL

Case 8:19-cr-00061-JVS   Document 1026-1   Filed 10/25/22   Page 62 of 168   Page ID
#:25098
Case 2:18-cr-00124-MWF   Document 349-1   Filed 02/03/22   Page 28 of 29   Page ID #:3326

""""""!#$%&' %) ( !* ) ++' , ) !""""""
**From:**!-. / 00 2!3' 45) ( -!
**To:**!-6       7       -!
**Cc:**!-8 / %0-90 ) !3' 45) ( -!                    -8          3

**Sent:**!;  ) ( 46 =, !>?4<@4@@!' 9B00@6 *
**Subject:**!E ) 06        7
Hi Adrian:

I sincerely apologize that the company has not been able to pay you in full.  Unfortunately, the
company ran into some unanticipated financial difficulties, that have caused delays in making
payments to Owner Operators.  We have been trying to work out payment arrangements with
several of our OOs.  One solution that we have with some of our OO's is that we simply have
committed to paying them $1,000 per day as long as they are moving freight.  This will keep cash
flow in your pocket and allow you to continue to earn while we get your past balance paid down.
 At this time, we just can't pay you the full balance, but if you are willing to get your truck out of

the shop and commit to a load and keep running, then we can keep money flowing to you.  The
problem is that many owner operators like you have all put their trucks in the shop for repairs
and nobody is generating any money.  We need to reverse this situation so the company has
funds to pay its bills.  Please give chris a call today and see if you can work out an arrangement to
get your truck out of the shop and so we can get you loads booked and start paying you money
each day.

Thank you.

On Aug 17, 2021, at 2:24 PM, A        S                          wrote:

Can I please get paid this week? What is the problem that I have to wait weeks to
get paid for the work I've done? Plus why is it that you offer to pay in increments
instead of my whole check? I am owed $6,890.84. Once again, the contract that
was signed by both of us said that you had up to 6 days to pay me after the invoice
was sent. I don't want to pursue legal action but I may have to. I don't work for free.
All I ask is communication & I haven't been getting that at all. Please respond via
email or better yet call me.

F/ 0-!G) ++' , ) !0-!H-5: 5[] ) : 90 1!.0G' 4!' 1+$!K) !2%0) , ) ( !$%&9 ) %&0-) !2%59 H9 ( !K4!9 ) !&$%M2%$( =H9( $H9%0 ) !$%
$9 ) %9 , , ' 1%9 +!.54$=!/ ' L) !%H) 0) ( !9K4!G0-9 M 42!' +) !9 9=+!M $&!K4!) "G' 0!%214' : ( !( ) 1 9 !095%G!4$=%
+4+9 Gl!N$=!G' 4!: $9H524!9 0-!G) ++' , ) !$%9 0-!H-5+) !0-!H-5: 9 : 9-!$!' : 4$: ) IF/ ) !0 9 , %84!' : ( !+) H=%84!$59 0-
G) ++' , ) !!H : : $9K) !, =' %: 9 ) ( !$: !9 ) !J 9 %) 9

**EXHIBIT GG**

# District at a Glance

## Central District of California

### Fiscal Year 2019



## Type of Crime



- Immigration 15.0%
- Drugs 28.0%
- Firearms 6.8%
- Other 20.2%
- Robbery 3.1%
- Fraud/Theft/Embezzlement 26.9%

## Sentence Imposed Relative to the Guideline Range



- Within Range 33.9%
- Upward Departure/Variance 0.7%
- §5K1.1 12.9%
- §5K3.1 8.3%
- Downward Departure 7.6%
- Downward Variance 36.6%

### Number of Federal Offenders Over Time



### Race and Gender



### Citizenship, Guilty Pleas, and Trials



## SENTENCING INFORMATION BY TYPE OF CRIME

| | TOTAL | Immigration | Drug Trafficking | Firearms | Fraud/Theft /Embezzle | Robbery | Child Porn | Money Laundering | All Other |
|---|---|---|---|---|---|---|---|---|---|
| | 1,143 | 171 | 303 | 78 | 308 | 35 | 18 | 43 | 187 |
| Mean Sentence (months) | 45 | 18 | 78 | 43 | 28 | 107 | 82 | 59 | 24 |
| Median Sentence (months) | 27 | 15 | 60 | 33 | 21 | 78 | 60 | 30 | 6 |
| **IMPRISONMENT** | | | | | | | | | |
| **Total Receiving Imprisonment** | **979** | **165** | **293** | **75** | **250** | **35** | **18** | **38** | **105** |
| Prison Only | 919 | 163 | 279 | 74 | 229 | 33 | 18 | 30 | 93 |
| Up to 12 Months | 137 | 54 | 7 | 6 | 42 | 1 | 1 | 2 | 24 |
| 13 to 60 Months | 521 | 106 | 121 | 55 | 156 | 13 | 10 | 15 | 45 |
| 61 to 120 Months | 176 | 3 | 103 | 10 | 27 | 13 | 4 | 4 | 15 |
| Over 120 Months | 85 | 0 | 48 | 3 | 4 | 6 | 3 | 9 | 9 |
| Prison and Alternatives | 60 | 2 | 14 | 1 | 21 | 2 | 0 | 8 | 12 |
| **PROBATION** | | | | | | | | | |
| **Total Receiving Probation** | **134** | **6** | **10** | **3** | **57** | **0** | **0** | **5** | **53** |
| Probation Only | 86 | 3 | 7 | 2 | 35 | 0 | 0 | 1 | 38 |
| Probation and Alternatives | 48 | 3 | 3 | 1 | 22 | 0 | 0 | 4 | 15 |
| **FINE ONLY** | **30** | **0** | **0** | **0** | **1** | **0** | **0** | **0** | **29** |

*(Annotations on table: "8.76%" and "1.29%" highlighted in red near the 61 to 120 Months and Over 120 Months rows for Fraud/Theft/Embezzle)*

Cases with indeterminable sentence terms are excluded from the calculation of the Mean Sentence or Median Sentence category. Sentences greater than 470 months and probation were included in the sentence average computations as 470 months and zero months, respectively. Cases in the Total Receiving Imprisonment, Total Receiving Probation, and Fine Only categories total 100 percent of all cases. Cases missing information required for a specific analysis were excluded from that analysis. Descriptions of variables used in this analysis are provided in Appendix A.

SOURCE: U.S. Sentencing Commission, 2015 - 2019 Datafiles, USSCFY15 - USSCFY19.

# District at a Glance
## Central District of California
### Fiscal Year 2020



**Type of Crime**



**Sentence Imposed Relative to the Guideline Range**



**Number of Federal Offenders Over Time**



**Race and Gender**



**Citizenship, Guilty Pleas, and Trials**



## SENTENCING INFORMATION BY TYPE OF CRIME

| | TOTAL | Immigration | Drug Trafficking | Firearms | Fraud/Theft /Embezzle | Robbery | Child Porn | Money Laundering | All Other |
|---|---|---|---|---|---|---|---|---|---|
| | 918 | 101 | 275 | 90 | 245 | 35 | 20 | 20 | 132 |
| Mean Sentence (months) | 44 | 19 | 75 | 25 | 22 | 69 | 57 | 65 | 37 |
| Median Sentence (months) | 27 | 18 | 60 | 24 | 12 | 57 | 47 | 41 | 11 |
| **IMPRISONMENT** | | | | | | | | | |
| **Total Receiving Imprisonment** | **762** | **89** | **260** | **81** | **180** | **34** | **20** | **16** | **82** |
| Prison Only | 720 | 87 | 253 | 76 | 160 | 34 | 20 | 16 | 74 |
| Up to 12 Months | 103 | 27 | 6 | 14 | 39 | 1 | 1 | 1 | 14 |
| 13 to 60 Months | 410 | 58 | 112 | 60 | 103 | 16 | 12 | 7 | 42 |
| 61 to 120 Months | 146 | 2 | 97 | 2 | 14 | 16 | 6 | 4 | 7 |
| Over 120 Months | 61 | 0 | 38 | 0 | 4 | 1 | 1 | 4 | 11 |
| Prison and Alternatives | 42 | 2 | 7 | 5 | 20 | 0 | 0 | 0 | 8 |
| **PROBATION** | | | | | | | | | |
| **Total Receiving Probation** | **146** | **12** | **15** | **9** | **65** | **1** | **0** | **4** | **40** |
| Probation Only | 99 | 10 | 12 | 4 | 40 | 0 | 0 | 2 | 31 |
| Probation and Alternatives | 47 | 2 | 3 | 5 | 25 | 1 | 0 | 2 | 9 |
| **FINE ONLY** | **10** | **0** | **0** | **0** | **0** | **0** | **0** | **0** | **10** |

Cases with indeterminable sentence terms are excluded from the calculation of the Mean Sentence or Median Sentence category.  Sentences greater than 470 months and probation were included in the sentence average computations as 470 months and zero months, respectively.  Cases in the Total Receiving Imprisonment, Total Receiving Probation, and Fine Only categories total 100 percent of all cases.  Cases missing information required for a specific analysis were excluded from that analysis.  Descriptions of variables used in this analysis are provided in Appendix A.

SOURCE:  U.S. Sentencing Commission, 2016 - 2020 Datafiles, USSCFY16 - USSCFY20.

# District at a Glance
## Central District of California
### Fiscal Year 2021



**Number of Federal Offenders Over Time**



## Type of Crime



Immigration 9.2%
Fraud/Theft/Embezzle 25.0%
Drugs 34.6%
Robbery 3.8%
Other 18.3%
Firearms 9.1%

### Race and Gender



## Sentence Imposed Relative to the Guideline Range



Within Range 24.4%
Upward Departure/Variance 0.9%
§5K1.1 11.0%
§5K3.1 4.6%
Downward Departure 8.4%
Downward Variance 50.6%

### Citizenship, Guilty Pleas, and Trials



## SENTENCING INFORMATION BY TYPE OF CRIME

| | TOTAL | Immigration | Drug Trafficking | Firearms | Fraud/Theft /Embezzle | Robbery | Child Porn | Money Laundering | All Other |
|---|---|---|---|---|---|---|---|---|---|
| | 876 | 81 | 301 | 80 | 219 | 33 | 26 | 20 | 116 |
| Mean Sentence (months) | 46 | 20 | 69 | 35 | 23 | 83 | 77 | 47 | 40 |
| Median Sentence (months) | 27 | 15 | 57 | 30 | 12 | 72 | 53 | 15 | 12 |
| **IMPRISONMENT** | | | | | | | | | |
| **Total Receiving Imprisonment** | **734** | **74** | **280** | **73** | **162** | **33** | **25** | **17** | **70** |
| Prison Only | 675 | 74 | 266 | 72 | 132 | 31 | 25 | 15 | 60 |
| Up to 12 Months | 86 | 24 | 12 | 6 | 29 | 0 | 0 | 4 | 11 |
| 13 to 60 Months | 389 | 48 | 132 | 54 | 86 | 14 | 14 | 9 | 32 |
| 61 to 120 Months | 131 | 2 | 82 | 12 | 10 | 2 | 7 | 1 | 5 |
| Over 120 Months | 69 | 0 | 40 | 0 | 7 | 2 | 4 | 1 | 12 |
| Prison and Alternatives | 59 | 0 | 14 | 1 | 30 | 2 | 0 | 2 | 10 |
| **PROBATION** | | | | | | | | | |
| **Total Receiving Probation** | **136** | **7** | **21** | **7** | **56** | **0** | **1** | **3** | **41** |
| Probation Only | 88 | 5 | 14 | 4 | 41 | 0 | 0 | 1 | 23 |
| Probation and Alternatives | 48 | 2 | 7 | 3 | 15 | 0 | 1 | 2 | 18 |
| **FINE ONLY** | **6** | **0** | **0** | **0** | **1** | **0** | **0** | **0** | **5** |

4.56%
3.19%

Cases with indeterminable sentence terms are excluded from the calculation of the Mean Sentence or Median Sentence category.  Sentences greater than 470 months and probation were included in the sentence average computations as 470 months and zero months, respectively.  Cases in the Total Receiving Imprisonment, Total Receiving Probation, and Fine Only categories total 100 percent of all cases.  Cases missing information required for a specific analysis were excluded from that analysis.  Descriptions of variables used in this analysis are provided in Appendix A.

SOURCE:  U.S. Sentencing Commission, 2017 - 2021 Datafiles, USSCFY17 - USSCFY21.

**EXHIBIT HH**

## HIGH PROFILE FRAUD CASES
### Correlation Between Loss and the Resultant Sentence
### (ranked most severe to less severe)

| Offender | Loss | Sentence | $ per mo. |
|---|---|---|---|
| **Michael Avenatti** (as proposed by Gov) | $12,350,000[1] | 210 | 58,810 |
| **Michael Avenatti** (as proposed by USPO) | $12,350,000 | 151 | 81,788 |
| John Miller | $21,000,000 | 159 | 132,075 |
| Gary Vanwaeyenberghe | $25,521,966 | 168 | 151,916 |
| **Michael Avenatti** (as proposed by Def) | $12,350,000 | 72 | 171,528 |
| Sujata Sachdeva | $34,000,000 | 132 | 257,575 |
| Calude LeFebrve | $64,850,000 | 240 | 270,208 |
| Jeff Skilling | $80,000,000 | 288 | 277,778 |
| Joseph Nacchio | $28,000,000 | 72 | 388,889 |
| Kevin S. Jackson | $20,000,000 | 51 | 392,157 |
| Raj Rajaratnam | $53,800,000 | 132 | 407,577 |
| Timothy Rigas | $102,000,000 | 240 | 425,000 |
| Morad Abu Sliman | $26,000,000 | 57 | 456,140 |
| Frederick Darren Berg | $128,827,051 | 216 | 596,452 |
| John Rigas | $102,708,142 | 144 | 713,251 |
| Martin Shkreli | $10,400,000 | 84 | 866,666 |
| Mark Turckan | $25,000,000 | 12 | 2,083,333 |
| Billy McFarland | $26,000,000 | 72 | 2,166,666 |
| Marc Dreier | $700,000,000 | 240 | 2,916,667 |
| Ronald Ferguson | $500,000,000 | 24 | 20,833,333 |
| Bernard Ebbers | $11,000,000,000 | 300 | 36,666,667 |

---

[1] As discussed in defendant's sentencing position, defendant in no way concedes that the loss amount at issue is $12,350,000. For the purposes of this analysis, this sum is used to establish that even using the loss amount claimed by the government, the sentences recommended by the government and Probation are entirely unreasonable. The degree of unreasonableness only increases as the loss amount decreases.

**UNDER SEAL
EXHIBIT II**

**UNDER SEAL
EXHIBIT JJ**

**UNDER SEAL
EXHIBIT KK**

**EXHIBIT LL**

## MR. JOHNSON

### Loss Amount

| Description | Amount | Source |
|---|---|---|
| Total Settlement Amount Paid | $4,000,000 | [Gov. Exh. 420] |
| Attorneys' Fees | -$1,600,000 | [Gov. Exh. 420] |
| Costs and Expenses through January 29, 2015 | -$543,062 | [Dkt. 1000-1, pgs. 3-4] |
| Payments, Costs and Expenses from January 30, 2015 through March 22, 2019 | -$282,070 | [Dkt. 1000-1, pgs. 3-4] |
| Defendant's Work on Other Matters | ~$90,000 | [Def. Sent. Exh. DD] |
| Estimated Loss Amount: 1,484,868 | | |

### Additional Restitution Reductions

| | | |
|---|---|---|
| Costs to Co-Counsel | -$2,776.00 | [Dkt. 1000-1, p. 3] |
| Funds Paid by Michael Eagan | -$1,500,000 | [Tr. 7/22/21, Vol. 2, p. 26] |
| Estimated Restitution Amount: -17,908 | | |

## MS. GARDNER

### Loss Amount

| Description | Amount | Source |
|---|---|---|
| Total Settlement Amount Paid 1/21/2017 | $2,750,000 | [Gov. Exh. 139] |
| Attorneys' Fees | -$990,000 | [Gov. Exh. 430] |
| Costs, Expenses, Security Deposit | -$71,715 | [Dkt. 1000-1, p. 5] |
| Payments made to Gardner (Dec. 2016 – March. 2019) | -$227,500 | [Dkt. 1000-1, p. 6; Exh. E]. |
| Defendant's Work on Other Matters | ~$100,000 | [Def. Sent. Exh. DD] |
| Estimated Loss Amount: 1,360,750.00 | | |

### Additional Restitution Reductions

| | | |
|---|---|---|
| Costs Claimed by Co-Counsel | -34,267.87 | [Gov. Exh. 168] |
| Estimated Restitution Amount: 1,326,482.13 | | |

## MR. BARELA

### Loss Amount

| Description | Amount | Source |
|---|---|---|
| Total Settlement Amount Paid 1/5/18 | $1,600,000 | [Gov. Exh. 439] |
| Attorneys' Fees | -$760,000 | [Gov. Exh. 439] |
| Costs and Expenses | -$180,797 | [Dkt. 1000-1, p. 7] |
| Payments made to Barela | -$130,000 | [Dkt. 1000-1, p. 7; Gov. Exh. 239] |
| Defendant's Work on Quix, *Carthey*, and other matters. | ~$250,000 (at least) | [Def. Sent. Exh. DD] |
| Estimated Loss Amount: less than $279,203 | | |

### Additional Restitution Reductions

| Funds Received by Third Parties | Unknown | [Dkt. 1000, p. 7]. |
|---|---|---|
| Estimated Restitution Amount: $279,203 less the amounts third parties have paid on civil claims. | | |

## MS. PHAN

### Loss Amount

| Description | Amount | Source |
|---|---|---|
| Total Cash Settlement Amount for Common Stock Repurchase Agreement | $37,168,678 | [Gov. Exh. 444] |
| Attorneys' Fees | -$2,787,651 | [Gov. Exh. 444] |
| Cash Amount Received by Client | -$30,380,897 | [Gov. Exh. 444] |
| Attorney's fees of 7.5% on all other benefits and assets received (i.e., EM Cosmetics, likeness, trademarks, image) | -4,387,500 (at least) | [Def. Sent. Exh. W, X]. |
| Estimated Loss Amount: No less than $-387,500.00 | | |

### Additional Restitution Reductions

| None. | None. | N/A |
|---|---|---|
| Estimated Restitution Amount: No less than $-387,500.00 | | |

**EXHIBIT MM**

June 16, 2022
Press Conference
Following Defendant's Change of Plea

Participants:

| | |
|---|---|
| AUSA: Ranee Katzenstein | AUSA-K |
| AUSA: Brett Sagel | AUSA-S |
| Reporter 1: | R-1 |
| Reporter 2: | R-2 |

[0:58]
**R-1**: The original press release said 12 million estimated. Where did the 9 million come from?

[1:07]
**AUSA-K:** The $9 million has to do with the scope of the fraud.  I don't know - why is It?  [AUSA-K looks to AUSA-S].

[1:12]
**AUSA-S**: I'd have to see what you're referring to, if the $12 referred to the clients and so forth.

[1:18]
**R-1**: It could've also been the tax.

[1:20]
**AUSA-S**: It can also be depending on the manner in which it was stated there was $12 million taken of settlement funds that he took.  So for example, $4 million from Johnson, $4 million from Phan, $2.75 from Gardner and $1.6 from Barela.  So adding that up it might've been $12 million of settlement money that he took entirely of.  Again without knowing what you're exactly referencing, I don't want to comment . . . .

[1:43]
**R-1**: Sure.

[1:43]
**AUSA-S**: [CONT'D] but that might've been the $12 million dollar number.

[1:46]
**R-1**: Ok.

[1:46]
**R-2**:  What does that mean?  So the 9 million dollar number then what is that?  [UNINTELLIGIBLE (due wind blowing)] he said [VOICES OVERLAP]

[1:52]
**AUSA-S**: It is. . .

[1:53]

**R-2:**   [CONT'D] owed his clients 9 million.

[1:54]

**AUSA-S**: Well there is a difference between the entirety of the settlement potentially and any that he may have been entitled to, if he was entitled to any of it.

Source: i<u>https://twitter.com/i/status/1537530836269993984</u>

**EXHIBIT NN**

1

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

– – –

THE HONORABLE JAMES V. SELNA, JUDGE PRESIDING

UNITED STATES OF AMERICA,      )CERTIFIED TRANSCRIPT
                    Plaintiff, )
        vs.                    )
                               ) SACR-19-00061-JVS
MICHAEL JOHN AVENATTI,         )
                    Defendant. )
------------------------------)

REPORTER'S TRANSCRIPT OF PROCEEDINGS

Santa Ana, California

June 16, 2022

SHARON A. SEFFENS, RPR
United States Courthouse
411 West 4th Street, Suite 1-1053
Santa Ana, CA  92701
(612) 804-8655

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

1    to you to get you to plead guilty?

2              THE DEFENDANT:  No.

3              THE COURT:  Are you pleading guilty voluntarily

4    and of your own free will?

5              THE DEFENDANT:  I am.

6              THE COURT:  Is your willingness to plead guilty

7    the result of any discussion with the government?

8              THE DEFENDANT:  No.

9              THE COURT:  Have you been told by anyone what

10   specific sentence the Court would impose if the Court

11   accepts your pleas?

12             THE DEFENDANT:  Other than I have had discussions

13   with my advisory counsel and other lawyers in my other cases

14   about a potential sentence, no one has given me any

15   guarantees because there are no guarantees, Your Honor.

16             THE COURT:  Right.

17             Is the government prepared to recite a factual

18   basis for the charges?

19             MS. KATZENSTEIN:  I think the defendant has

20   prepared a factual basis.  There is no agreement here.

21             THE COURT:  Well, I understand that.

22             Do you have a factual basis that you want to

23   present?

24             THE DEFENDANT:  Yes, Your Honor, I do.

25             I will start relating to Counts 5, 8, 9, and 10,

1    the wire fraud counts.  I was licensed to practice law in

2    the state of California from June of 2000 through 2020.  I

3    represented thousands of clients during that time, including

4    the clients who are identified as Clients 1, 2, 3, and 4 in

5    the Indictment.

6            As to Clients 1, 2, 3, and 4, I

7    misappropriated and misused certain of their settlement

8    funds to effectuate a plan, and I effectuated wire transfers

9    in pursuit of that plan and in carrying out that plan as

10   referenced in Counts 5, 8, 9, and 10 of the Indictment.

11           In particular, those wire transfers that I caused

12   to be effectuated as part of the plan were a $60,000 wire

13   transfer sent on or about January 10, 2018, from CNB account

14   5566 -- CNB is City National Bank -- to California Bank &

15   Trust account ending in 3714.

16           In addition, on March 20, 2018 -- and, Your Honor,

17   I'm reading from Exhibit 457 that was submitted into

18   evidence just for the record during the first trial.  On

19   March 20, 2018, I caused a $200,000 wire transfer to be sent

20   from City National Bank account ending in 4705 to California

21   Bank & Trust account ending in 4613.  That related to Client

22   4.

23           The first wire, Your Honor, I should also note

24   related to Client 3.

25           On or about June 18, 2018, I caused a $16,000 wire

1    to be sent from California Bank & Trust account ending in

2    4613 to a J.P. Morgan Chase Bank account in the name of

3    Client 2.

4              On July 13, 2018 -- this would be Count 10 -- I

5    caused a $1,900 wire to be sent from California Bank & Trust

6    account ending in 4613 to a Bank of America account in the

7    name of Client 1.  That is the factual basis for those four

8    wire fraud accounts.

9              THE COURT:  Did you understand that in making

10   those transfers you were carrying out a scheme to defraud

11   each of your Clients 1, 2, 3, and 4?

12             THE DEFENDANT:  Yes.

13             THE COURT:  Did you understand that you were not

14   authorized to make those transfers by your client?

15             THE DEFENDANT:  Yes.

16             THE COURT:  Did you make those transfers

17   voluntarily?

18             THE DEFENDANT:  Yes.

19             THE COURT:  Okay.  Let's go on to the tax count.

20             THE DEFENDANT:  In connection with the tax count,

21   Count 19, I previously served as the CEO of a company by the

22   name of Global Baristas U.S., LLC.  The Internal Revenue

23   Service obtained liens on various property and undertook

24   collection efforts to collect taxes due the Internal Revenue

25   Service from Global Baristas U.S., LLC.

1              In connection with those efforts, I undertook

2    efforts to obstruct the Internal Revenue Service's ability

3    to obtain those monies and to execute on those liens by

4    instructing other employees of Global Baristas U.S., LLC, to

5    undertake various efforts to prevent the Internal Revenue

6    Service from timely obtaining the money that the Internal

7    Revenue Service was due.

8              THE COURT:  Did you understand that the

9    instructions and the carrying out of those instructions

10   would obstruct the ability of the government to collect

11   lawful taxes?

12             THE DEFENDANT:  Yes.

13             THE COURT:  And did you undertake that conduct

14   voluntarily?

15             THE DEFENDANT:  I did.

16             THE COURT:  And did you in fact understand that

17   the actions you directed would obstruct the government's

18   collection of taxes?

19             THE DEFENDANT:  I did, Your Honor.

20             There is one other point just because of what I

21   was -- I was charged under 26 U.S.C. 7212(a).  I just want

22   to be clear that there was never any threat of force or

23   anything of that nature.  I just want the record to be clear

24   in that regard.  That's an important point.  I don't believe

25   the government is claiming there was, but I just want that

| | |
|---|---|
| 1 | to be clear.  There was never any threat of force or |
| 2 | anything of that nature. |
| 3 | THE COURT:  Not part of your allocution. |
| 4 | THE DEFENDANT:  All right. |
| 5 | THE COURT:  Are there any other facts you want to |
| 6 | allocute to? |
| 7 | THE DEFENDANT:  Not at this time, Your Honor. |
| 8 | THE COURT:  Is the government satisfied with the |
| 9 | factual basis? |
| 10 | MS. KATZENSTEIN:  Not entirely, Your Honor. |
| 11 | THE COURT:  Okay. |
| 12 | MS. KATZENSTEIN:  I will state certain facts for |
| 13 | the Court.  Before I do that, I will also say that of course |
| 14 | the Court can find a factual basis based on anything in the |
| 15 | record of the case, including all of the testimony that the |
| 16 | Court had previously heard.  So that is with respect to |
| 17 | Counts 5, 8, 9, and 10. |
| 18 | I will supplement the record here on certain facts |
| 19 | with respect to the tax count, because it is an element of |
| 20 | the offense that Mr. Avenatti acted corruptly, and he did |
| 21 | not state that, and he would need to admit that he acted |
| 22 | corruptly.  But I will go through a few details now if |
| 23 | that's acceptable to the Court. |
| 24 | THE DEFENDANT:  Your Honor, I admit that I acted |
| 25 | corruptly in connection with Count 19. |

1          MS. KATZENSTEIN:  All right.

2          THE COURT:  Do you understand the technical

3   meaning of a corrupt act?

4          THE DEFENDANT:  Yes, and I reviewed it in

5   preparation for the hearing today.

6          THE COURT:  Okay.

7          MS. KATZENSTEIN:  May I just have one moment?

8          (Government counsel conferring)

9          MS. KATZENSTEIN:  With respect to the wire fraud,

10   I would just like to clarify that Mr. Avenatti understood

11   that he made false statements to the clients underlying each

12   of the counts to which he is pleading guilty, that he

13   understood that those statements were material, and that he

14   acted with the intent to defraud, that is, the intent to

15   deceive and cheat.  He needs to admit that as well.

16          THE DEFENDANT:  Your Honor, I have stated my

17   allocution.  I think it's acceptable under the law.  I will

18   cite the Court to United States versus Nickle.  It's a Ninth

19   Circuit case, 816 F.3d 1230.  Basically, a District Court

20   must accept an unconditional guilty plea so long as it meets

21   the requirements of Federal Rule of Criminal Procedure

22   11(b).  And I am going to paraphrase the case.  Unless I

23   denied an element of the offense, that's sufficient enough

24   to support my guilty plea.  I think I have stated and I have

25   allocuted in sufficient detail here today to support my

1    unconditional guilty plea.

2            THE COURT:  With respect to the wire transfers,

3    did you fail to disclosure to your clients that you were

4    making those transfers?

5            THE DEFENDANT:  Yes, Your Honor.

6            THE COURT:  Do you believe the fact that you were

7    transferring their funds would have been material to your

8    relationship with the clients?

9            THE DEFENDANT:  I believe, Your Honor, that the

10   transfer of the money was a material fact that should have

11   been disclosed to the clients.

12           THE COURT:  Okay.  And you knowingly failed to do

13   that?

14           THE DEFENDANT:  Yes, Your Honor.

15           THE COURT:  Okay.  Anything else with regard to

16   the sufficiency?

17           MS. KATZENSTEIN:  May I have a moment, Your Honor?

18           (Government counsel conferring)

19           MS. KATZENSTEIN:  Your Honor, the government

20   believes that there are sufficient facts in the record based

21   upon which the Court can accept the guilty pleas today.

22   Obviously we will be supplementing the record extensively

23   prior to sentencing.

24           THE COURT:  Sir, are you pleading guilty because

25   you if fact did the acts charged in each of Counts 5, 8, 9,

```
 1    10, and 19?
 2              THE DEFENDANT:  Yes.
 3              THE COURT:  Sir, do you understand that all that
 4    is left in this case in the event that I accept your pleas
 5    is the imposition of sentence which may include imprisonment
 6    under the federal guidelines?
 7              THE DEFENDANT:  Depending on what the government
 8    decides to do with the remaining counts, yes.
 9              THE COURT:  Well, I'm talking about the five
10    counts to which you are pleading.
11              THE DEFENDANT:  I understand.
12              THE COURT:  You know, we may be dealing with
13    additional counts.  We may not.  But at some point if I
14    accept your plea, I will sentence you on those five counts.
15              THE DEFENDANT:  I understand that, Your Honor.
16    I'm going to request one sentencing as opposed to a
17    bifurcated sentencing, but we don't have to discuss that
18    now.
19              THE COURT:  Right.  But do you understand that all
20    that is left in sentencing whenever I get to those five
21    counts, whether only five counts or they're part of
22    additional counts, imposition of imprisonment may result?
23              THE DEFENDANT:  Yes, I understand.
24              THE COURT:  Having in mind all we have
25    discussed --
```

**EXHIBIT OO**

| | |
|---|---|
| **From:** | Drum, John <John.Drum@█████████████████ |
| **Sent:** | Friday, April 29, 2022 3:43 PM |
| **To:** | Sagel, Brett (USACAC); Carter, Evan |
| **Cc:** | Katzenstein, Ranee (USACAC); Remoun.Karlous█████████████ov; James Kim - IRS (██████████████) |
| **Subject:** | [EXTERNAL] RE: Tabs Data |

Brett, thanks for this.  In terms of budget, we think $50k would be reasonable for updating the analyses and preparing for and providing testimony.  Of course that could change if we receive access to significantly more data.  Let me know if you would like to discuss further.  Thanks.

**John Drum | Vice President**
**Analysis Group, Inc. | Economic, Financial, and Strategy Consulting**
1900 16th Street Suite 1100 Denver, CO 80202
720 963 5310 (direct) | 720 963 5300 (main)
www.analysisgroup.com

---

**From:** Sagel, Brett (USACAC) <Brett.Sagel@██████████
**Sent:** Thursday, April 28, 2022 4:49 PM
**To:** Drum, John <John.Drum@analysisgroup.com>; Carter, Evan <Evan.Carter@███████████
**Cc:** Katzenstein, Ranee (USACAC) <Ranee.Katzenstein@█████████; Remoun.Karlous@████████████; James Kim - IRS (James.Kim@████████ <James.Kim@████████████
**Subject:** Tabs Data

[External email: Use caution with links and attachments]

John/Evan-
Attached are data sets from Tabs that we obtained in August 2021 from the forensic copy of EA LLP's server in LA (USAO_01144111-174) and in March 2022 from a copy of the EA LLP server in DC (USAO_01145656-744).  After you have had a chance to look at them, let us know if you want to set up a call to discuss these items further.
Brett

USAO_01145763

**UNDER SEAL
EXHIBIT PP**

**EXHIBIT QQ**

Case 8:19-cr-00061-JVS   Document 1026-1   Filed 10/25/22   Page 93 of 168   Page ID
#:25129
Case 8:19-cr-00061-JVS   Document 1000   Filed 10/11/22   Page 1 of 52   Page ID #:23772

1   E. MARTIN ESTRADA
    United States Attorney
2   SCOTT M. GARRINGER
    Assistant United States Attorney
3   Chief, Criminal Division
    RANEE A. KATZENSTEIN (Cal. Bar No. 187111)
4   Assistant United States Attorney
    Chief, Major Frauds Section
5       1100 United States Courthouse
       312 North Spring Street
6       Los Angeles, California 90012
       Telephone: (213) 894-2432
7       Facsimile: (213) 894-6269
       Email: Ranee.Katzenstein@usdoj.gov
8
    BRETT A. SAGEL (Cal. Bar No. 243918)
9   Assistant United States Attorney
      Ronald Reagan Federal Building
10      411 West Fourth Street, Suite 8000
       Santa Ana, California 92701
11      Telephone:  (714) 338-3598
       Facsimile:  (714) 338-3708
12      Email:      Brett.Sagel@usdoj.gov

13   Attorneys for Plaintiff
    UNITED STATES OF AMERICA

14

15               UNITED STATES DISTRICT COURT

16           FOR THE CENTRAL DISTRICT OF CALIFORNIA

17   UNITED STATES OF AMERICA,        SA CR No. 19-061-JVS

18        Plaintiff,           GOVERNMENT'S SENTENCING POSITION
                             AND RESPONSE TO PRESENTENCE REPORT
19          v.                AND RECOMMENDATION LETTER FOR
                             DEFENDANT MICHAEL JOHN AVENATTI;
20   MICHAEL JOHN AVENATTI,         MEMORANDUM OF POINTS AND
                             AUTHORITIES; DECLARATION OF
21        Defendant.          SPECIAL AGENT REMOUN KARLOUS;
                             EXHIBITS
22
                             [Victim Impact Statements Lodged
23                       Concurrently Under Seal]

24                       SENTENCING HEARING:
                      Date: November 7, 2022
25                       Time: 9:00 a.m.

26

27      Plaintiff, United States of America, by and through its counsel

28   of record, the United States Attorney for the Central District of

Case 8:19-cr-00061-JVS   Document 1026-1   Filed 10/25/22   Page 94 of 168   Page ID
#:25130
Case 8:19-cr-00061-JVS   Document 1000   Filed 10/11/22   Page 2 of 52   Page ID #:23773

California and Assistant U.S. Attorneys Brett A. Sagel and Ranee A. Katzenstein, hereby files its sentencing position and response to the Presentence Report and Recommendation Letter disclosed on August 22, 2022 (CR 977, 978) for defendant Michael John Avenatti.

The government's sentencing position is based upon the attached memorandum of points and authorities; the attached declaration of Special Agent Remoun Karlous and exhibits thereto; the victim impact statements concurrently lodged under seal; the files and records in this case, including the evidence and testimony at trial; and such further evidence and argument as the Court may permit at the sentencing hearing.

Dated: October 11, 2022          Respectfully submitted,

                                 E. MARTIN ESTRADA
                                 United States Attorney

                                 SCOTT M. GARRINGER
                                 Assistant United States Attorney
                                 Chief, Criminal Division


                                       /s/
                                 _____
                                 BRETT A. SAGEL
                                 RANEE A. KATZENSTEIN
                                 Assistant United States Attorneys

                                 Attorneys for Plaintiff
                                 UNITED STATES OF AMERICA

# TABLE OF CONTENTS

DESCRIPTION                                                                                                                                          PAGE

MEMORANDUM OF POINTS AND AUTHORITIES..................................1

I.     INTRODUCTION....................................................1

II.    GOVERNMENT'S GUIDELINES CALCULATION AND RESPONSE TO THE PSR....3

       A.     Factual Findings.......................................4

              1.     Offense Conduct.................................4

              2.     Objections to the PSR's Factual Findings............6

       B.     Sentencing Guidelines..................................8

              1.     Summary.........................................8

              2.     Objections to the PSR's Guidelines Calculation.......9

III.   A SENTENCE OF 210 MONTHS IS REASONABLE AND APPROPRIATE
       BASED ON THE 3553(A) FACTORS.................................20

       A.     Overview..............................................20

       B.     Nature and Circumstances of the Offenses
              (§ 3553(a)(1))........................................21

       C.     History and Characteristics of Defendant
              (§ 3553(a)(1))........................................28

       D.     Need to Reflect the Seriousness of the Offense,
              Promote Respect for the Law, provide Just Punishment,
              Afford Deterrence, and Protect the Public from Further
              Crimes of the Defendant (§ 3553(a)(2))..................35

       E.     Policy Statements and Need to Avoid Unwarranted
              Sentencing Disparities (§ 3553(a)(6))..................41

       F.     The USPO's Sentencing Recommendation Is Factually and
              Legally Flawed........................................41

IV.    RESTITUTION...................................................44

V.     CONCLUSION....................................................46

Case 8:19-cr-00061-JVS   Document 1026-1   Filed 10/25/22   Page 96 of 168   Page ID
#:25132
Case 8:19-cr-00061-JVS   Document 1000   Filed 10/11/22   Page 4 of 52   Page ID #:23775

**TABLE OF AUTHORITIES**

**CASES:**

Gall v. United States,
  552 U.S. 38 (2007) ....................................... 20, 41

United States v. Fellows,
  157 F.3d 1197 (9th Cir. 1998) ............................. 15

United States v. Batson,
  608 F.3d 630 (9th Cir. 2010) ........................... 20, 46

United States v. Bergman,
  416 F.Supp. 496 (S.D.N.Y. 1976) ........................... 39

United States v. Gagarin,
  950 F.3d 596 (9th Cir. 2020) .............................. 45

United States v. Gordon,
  393 F.3d 1044 (9th Cir. 2004) ............................. 46

United States v. Halamek,
  5 F.4th 1081 (9th Cir. 2021) .............................. 8

United States v. Iniguez,
  368 F.3d 1113 (9th Cir. 2004) (en banc) ................... 19

United States v. Joetzki,
  952 F.2d 1090 (9th Cir. 1991) ............................. 19

United States v. Orlando,
  553 F.3d 1235 (9th Cir. 2008) ............................. 36

United States v. Ramos,
  923 F.2d 1346 (9th Cir. 1991) ............................. 15

United States v. Rutledge,
  28 F.3d 998 (9th Cir. 1994) ............................... 14

United States v. Thomsen,
  830 F.3d 1049 (9th Cir. 2016) ............................. 45

United States v. Valle,
  940 F.3d 473 (9th Cir. 2019) (en banc) .................... 8

**TABLE OF AUTHORITIES (CONTINUED)**

DESCRIPTION                                                          PAGE

**STATUTES:**

18 U.S.C. § 1028A ............................................... 42

18 U.S.C. § 1343 ................................................. 1

18 U.S.C. § 3572 ................................................ 45

18 U.S.C. § 3663A ........................................... 44, 45

18 U.S.C. § 3664 ................................................ 45

26 U.S.C. § 7212 ................................................. 1

**RULES:**

Federal Rule of Criminal Procedure 8 ........................... 17

Federal Rule of Criminal Procedure 11 .......................... 14

Federal Rule of Criminal Procedure 32 ........................... 6

**SENTENCING GUIDELINES:**

USSG § 1B1.3 ................................................12, 18

USSG § 2B1.1 ................................................. 8, 9

USSG § 2T1.1 .................................................... 9

USSG § 3A1.1 .................................................... 9

USSG § 3B1.3 .................................................... 9

USSG § 3C1.1.............................................. passim

USSG §§ 3D1.1-4 ................................................. 9

USSG § 3E1.1 ............................................... 12, 16

USSG § 4A1.3 ............................................... 16, 17

USSG § 5E1.1 ............................................... 20, 46

USSG § 5G1.2 ............................................... passim

USSG § 5G1.3 ................................................... 41

Case 8:19-cr-00061-JVS   Document 1026-1   Filed 10/25/22   Page 98 of 168   Page ID
#:25134
Case 8:19-cr-00061-JVS   Document 1000   Filed 10/11/22   Page 6 of 52   Page ID #:23777

**MEMORANDUM OF POINTS AND AUTHORITIES**

## I.   INTRODUCTION

Defendant Michael John Avenatti is due to be sentenced following his pleas of guilty to four counts of wire fraud, in violation of 18 U.S.C. § 1343, and one count of obstructing the due administration of the internal revenue laws, in violation of 26 U.S.C. § 7212.

Defendant, a now-suspended plaintiff's attorney, stole from his clients instead of advocating for them.  Although the details pertaining to each of the four clients underlying the charges in the indictment differ, the general pattern was the same.  Defendant would lie about the true terms of the settlement agreement he had negotiated for the client, conceal the settlement payments that the counterparty had made, secretly take and spend the settlement proceeds that belonged to the client, and lull the client into not complaining or investigating further by providing small "advances" on the supposedly yet-to-be paid funds.  Through this multi-year fraudulent scheme, defendant stole millions of dollars from his clients.[1]

Defendant was also a tax cheat.  Defendant failed to file Forms 941 and pay payroll taxes for Global Baristas US LLC ("GBUS"), and then willfully obstructed the Internal Revenue Service's ("IRS") efforts to collect the amounts due.  Defendant obstructed the IRS, by, among other means: making false statements to the revenue officer; directing employees to stop depositing cash receipts; and

---

[1] A detailed description of this scheme is set out in paragraphs 26-67 of the Presentence Report ("PSR").  For this reason, and because the Court heard the evidence presented at the trial on Counts 1-10, this memorandum does not include a full recitation of the facts of the wire fraud scheme.

Case 8:19-cr-00061-JVS   Document 1026-1   Filed 10/25/22   Page 99 of 168   Page ID
#:25135
Case 8:19-cr-00061-JVS   Document 1000   Filed 10/11/22   Page 7 of 52   Page ID #:23778

1    changing the company name, Employer Identification Number, and bank

2    account information listed with his credit card processing company to

3    avoid IRS levies.[2]  (PSR ¶ 77.)  In addition, defendant failed to

4    file individual tax returns (Forms 1040) or pay any personal income

5    taxes for 2011 through 2017, even though he had a substantial income

6    and lived lavishly; failed to file partnership returns (Forms 1065)

7    or pay taxes for Eagan Avenatti, LLP ("EA LLP"), of which he was the

8    managing partner, for 2013 through 2017, even though EA LLP received

9    many millions of dollars during those years; failed to file corporate

10   tax returns (Forms 1120) or pay taxes for Avenatti & Avenatti

11   ("A&A"), of which he was president, for 2011 through 2017, even

12   though this entity also received substantial funds; and failed to

13   file Forms 941 and pay payroll taxes for EA LLP.[3]

14        Defendant's scheme to defraud his clients was cruel -- often

15   reducing those clients to begging for needed funds and making them

16   feel beholden to him when he "advanced" or "loaned" them funds that

17   were, in fact, the clients' own money; callous -- blaming and

18   disparaging the supposedly derelict counterparties for the "missing"

19   money that defendant himself had stolen; and calculating -- with

20   defendant exploiting his knowledge of the legal system to conceal his

21   thefts by falsely telling his victims that the settlements were

22   confidential and dire consequences would follow if they discussed

23   their cases with anyone other than defendant.  Defendant's tax fraud

24   scheme was massive, resulting in losses to the federal treasury of

25   _____

26        [2] The PSR contains a detailed description of defendant's
     obstruction of the tax laws at paragraphs 68-77.
27
          [3] Defendant's failures to file and pay his personal taxes and
28   the taxes of the entities he controlled are described in the PSR at
     paragraphs 141-146.

1  over $3.2 million from just the failure to pay GBUS payroll taxes and

2  harming hundreds of his employees whose payroll taxes he stole.

3  There was no excuse for defendant's criminal conduct, which was

4  motivated solely by arrogance and greed.

5      The seriousness of defendant's crimes, the deleterious impact --

6  both financial and emotional -- on the victims, the other aggravating

7  factors, and the need for specific and general deterrence call for a

8  significant sentence.  Defendant's advisory United States Sentencing

9  Guidelines ("USSG") range is 262 to 327 months if the Court finds

10  that he has accepted responsibility for his offenses, and 324 to 405

11  months if the Court does not so find.[4]  As set forth more fully

12  below, if defendant accepts responsibility for his conduct, the

13  government submits that a sentence of 210 months (consecutive to any

14  previously imposed sentences) is appropriate and necessary to achieve

15  the goals of sentencing in this case.[5]  In the event that defendant

16  does not accept responsibility for his offenses, the government

17  recommends that a higher sentence be imposed.

18  **II.  GOVERNMENT'S GUIDELINES CALCULATION AND RESPONSE TO THE PSR**

19      The United States Probation Office ("USPO") disclosed the PSR on

20  August 22, 2022 (CR 978).  A brief summary of the factual support for

21  the guideline calculations as well as objections to the factual

22  findings and guidelines calculation are set forth below.

23  _____

24      [4] Because defendant pleaded guilty to four wire fraud offenses
    and one tax fraud offense, the statutory maximum for his crimes is 83

25  years, and therefore the Probation Officer erred when she applied
    USSG § 5G1.2(d) and reduced defendant's guidelines sentence to 240

26  months.  (PSR ¶ 265.) See Section II.B.2.d, below.

27      [5] This recommendation is based on defendant's conduct and the
    sentencing factors in this case and recognizes that the sentence to
    be imposed will be in addition to the total of five years'

28  imprisonment that has been imposed in defendant's two other federal
    cases.

3

1      **A.    Factual Findings**

2          1.    <u>Offense Conduct</u>

3      The government generally concurs in the PSR's factual findings.

4  As the PSR sets forth, because defendant lied to his clients about

5  their settlements and his receipt of the settlement money, and stole

6  from his clients, defendant is not entitled to any credit for his

7  fees and expenses in determining the loss amount.  (PSR ¶ 95 and

8  n.15.)  Therefore, the loss in this matter is $12,350,000 based on

9  defendant stealing: the $4 million settlement of Geoffrey Johnson's

10 ("Johnson") lawsuit against the County of Los Angeles (Count 10

11 ("Client 1"); PSR ¶¶ 42-47); $2,750,000 of Alexis Gardner's

12 ("Gardner") $3 million settlement with her ex-boyfriend, which

13 defendant used to buy a private jet (Count 9 ("Client 2"); PSR ¶¶ 48-

14 52); the initial $1,600,000 settlement payment of Gregory Barela's

15 ("Barela") $1,900,000 intellectual property settlement (Count 5

16 ("Client 3"); PSR ¶¶ 53-58); and $4,000,000 from Michelle Phan's

17 ("Phan") settlement with her former company (Count 8 ("Clients 4 and

18 5"); PSR ¶¶ 59-67).  Defendant's theft of his clients' money resulted

19 in substantial financial hardship to Johnson, Gardner, and Barela.

20 (PSR ¶¶ 98-101.)

21     To conceal his fraudulent scheme, defendant made

22 misrepresentations and took other fraudulent actions during the

23 course of EA LLP's bankruptcy (In re Eagan Avenatti, LLP, No. 8:17-

24 bk-11961-CB), including, but not limited to: failing to include

25 Gardner's settlement payment (or at least the fees) in January 2017

26 on the statement of financial affairs (or the amended statement of

27 financial affairs) that defendant signed under penalty of perjury;

28 opening new bank accounts to deposit Barela and Phan's settlement

4

Case 8:19-cr-00061-JVS   Document 1026-1   Filed 10/25/22   Page 102 of 168   Page ID
#:25139
Case 8:19-cr-00061-JVS   Document 1000   Filed 10/11/22   Page 10 of 52   Page ID #:23781

1   payments and failing to include his receipt of these payments on the

2   respective Monthly Operating Reports that defendant signed under

3   penalty of perjury; and stealing Phan's money to pay creditors,

4   including the IRS, to get EA LLP out of bankruptcy.  (PSR ¶¶ 102-

5   105.)  Defendant carried out his fraudulent scheme for over four

6   years through sophisticated means including, among other actions:

7   forging Johnson's signature on his settlement agreement without

8   providing Johnson the agreement or the terms; providing Barela with a

9   bogus settlement agreement; moving the stolen settlement proceeds

10  through multiple bank accounts; failing to provide Gardner with a

11  copy of her settlement agreement, lying about the true terms of the

12  agreement, and depositing money into Gardner's account in a form

13  designed to make her believe the payments were from her ex-boyfriend;

14  splitting up the wire transfers to Phan to enable defendant to claim

15  to Phan and Long Tran ("Tran") that there were three wire transfers

16  when there were only two; and making lulling payments to Johnson,

17  Gardner, and Barela.  (PSR ¶¶ 106-109.)

18       Defendant lied to Johnson and stole Johnson's settlement money

19  knowing he was a vulnerable victim, namely, he was a paraplegic with

20  mental health issues who was in need of the money for his living and

21  medical expenses.  (PSR ¶¶ 110-113.)  Defendant also used his special

22  skills as an attorney and abused the trust placed in him by his

23  clients to carry out his scheme.  (PSR ¶¶ 114-115.)  Finally,

24  defendant obstructed justice by perjuring himself in civil

25  proceedings pertaining to the conduct in this case; threatening and

26  intimidating witnesses; and producing false documents in an official

27  proceeding.  (PSR ¶¶ 116-117; see also Section II.B.2.a., below.)

28

1    With respect to obstructing the IRS's ability to collect taxes

2    owed, defendant failed to pay over to the IRS approximately $3.2

3    million in federal payroll taxes that had been withheld from the

4    paychecks of his employees at GBUS; failed to pay over to the IRS

5    approximately $1.6 million in federal payroll taxes that had been

6    withheld from the paychecks of his employees of EA LLP; and corruptly

7    obstructed the IRS' efforts to collect the moneys that GBUS, which he

8    controlled, owed to the United States.   (Count 19; PSR ¶¶ 68-77.)

9          2.   Objections to the PSR's Factual Findings

10        The government notes the following updates, clarifications and

11   corrections.[6]   The government submits that the Court need not rule on

12   these updates, clarifications and corrections because they are either

13   undisputed or will not be considered and/or affect sentencing (See

14   Fed. R. Crim. P. 32(i)(3)(B)):

15        ¶ 47(a): Payments to Johnson and on Johnson's behalf: From

16   January 30, 2015, through March 22, 2019, approximately 99 payments

17   totaling approximately $282,070 were made to Johnson and for his

18   rent.

19        ¶ 52(a): Payments to Gardner:  From March 2017 to March 2019,

20   approximately 15 payments (either through cashier's checks or wire

21   transfers) totaling $218,000 were made to Gardner.

22        ¶ 60: Ipsy repurchase agreement:  Ipsy -- not Phan -- agreed to

23   repurchase the Ipsy shares.

24

25   _____

26        [6] The PSR includes findings that are based only on defendant's
     own statements and are not otherwise corroborated.  Although the
27   government does not specifically object, except as noted, to these
     findings because it submits that the information should not
28   materially affect the Court's sentencing determinations, the
     government does not concede the accuracy of this information.

1    ¶ 61: Ipsy repurchase agreement:  The total repurchase amount

2 was $37,168,678.85, not $35,625,228.

3    ¶ 181: Self-surrender date: Defendant self-surrendered on

4 February 7, 2022, not 2020.

5    ¶ 215: Donation to George Washington University Law School:

6 According to information developed in Parris et al. v. Avenatti et

7 al., Case No. 19CV1686 (Santa Barbara Superior Court), defendant

8 funded this payment with monies that he stole from Stoll, Nussbaum &

9 Polakov, to whom he owed the money pursuant to a fee-sharing

10 agreement.

11    ¶¶ 219-230: Employment Record:  Defendant's ownership and

12 control of GBUS (as well as his role as CEO), operating Tully's

13 Coffee, and GB Autosport, LLC, which managed defendant's car racing

14 team, and the related time periods, should be included (and should

15 have been disclosed by defendant).[7]  (See ¶ 31(a), (c).)

16    ¶¶ 233-235:  Financial Condition:  Without explanation or

17 authority, defendant failed to provide a personal financial statement

18 and instead relied on a Declaration . . . in Continued Support of CJA

19

20 _____

21    [7] The PSR reports, based on information defendant supplied, that
defendant formed a new law firm, Augustus LLP, in 2019.  (PSR ¶ 230.)
In two separate judgment-debtor examinations ("JDE"), however,
22 defendant hid his interests in Augustus LLP from creditors.  (Dec. of
Remoun Karlous, Sentencing Exhibit ("Sent. Ex") 1 ("Q: who owns
23 Augustus LLP? A: I'm not at liberty to disclose that.  It's not me.
Q: Do you have any direct or indirect interest in Augustus, LLP. A:
24 No. Q: Why are you not at liberty to disclose who owns it? A: Because
it was established for a client."); Sent. Ex 2 ("Q: With respect to –
25 – have you ever heard of something called Augusta, LLP? A: Yes. Q: Do
you know what it is? A: Yeah. It's a limited liability partnership.
26 Q: Are you a member? A: No. Q: Do you know who the partners are? A:
No. Q: Do you have any interest in the partnership? A: No.").)
27 Moreover, although defendant now claims he started Augustus LLP for a
"clean start" with "different clients," (PSR ¶ 230) he used the
28 Augustus LLP bank account to make lulling payments to the victims in
this case and to pay EA LLP employees.  (Sent. Exs 3, 4.)

1   Appointment.  Much of the financial information provided is

2   unverified. (E.g., ¶¶ 241, 243, 244, 246, 248, 253, 254, 255.)  For

3   example, although defendant claims to owe approximately $465,000 in

4   principal on three outstanding loans, no information is provided

5   identifying the lenders, the terms of the loans or what collateral if

6   any defendant provided to secure the loans.  (¶ 248.)

7        **B.   Sentencing Guidelines**

8             1.   Summary

9        Except as noted below, the government concurs with the

10  guideline analysis in the PSR (¶¶ 85-137) and submits that the

11  applicable guidelines are as follows based on all of the evidence in

12  the record:[8]

13  **WIRE FRAUD**
    **(Counts 5, 8-10)**

| | | | |
|---|---|---|---|
| Base Offense Level: | 7 | USSG § 2B1.1(a)(1) | PSR ¶ 92 |
| Loss Greater than $9,500,000: | +20 | USSG § 2B1.1(b)(1)(K) | PSR ¶¶ 93-95 |
| Substantial Financial Hardship to One or More Victims: | +2 | USSG § 2B1.(b)(2)(A) | PSR ¶¶ 96-101 |
| Misrepresentation or Other Fraudulent Action | +2 | USSG § 2B1.1(b)(9)(B) | PSR ¶¶ 102-105 |

---

[8] The Ninth Circuit has explained that "[i]n the sentencing context, "[w]e review the district court's factual findings for clear error, its construction of the United States Sentencing Guidelines de novo, and its application of the Guidelines to the facts for abuse of discretion."  United States v. Halamek, 5 F.4th 1081, 1087 (9th Cir. 2021) (internal citation omitted).  "A finding of fact is clearly erroneous if it is '(1) illogical, (2) implausible, or (3) without support in inferences that may be drawn from the facts in the record.'" United States v. Valle, 940 F.3d 473, 478 (9th Cir. 2019) (quoting United States v. Hinkson, 585 F.3d 1247, 1262 (9th Cir. 2009) (en banc) (cleaned up)).  Here, the Court can clearly find factual support for the guideline calculations in the record, including the trial testimony and evidence as well as in the sworn affidavits in support of the criminal complaint, search warrants, and motion to revoke bail in this case.

8

| | | | |
|---|---|---|---|
| During the Course of a Bankruptcy Proceeding: | | | |
| Sophisticated Means: | +2 | USSG § 2B1.1(b)(10)(C) | PSR ¶¶ 106-109 |
| Vulnerable Victim: | +2 | USSG § 3A1.1(b)(1) | PSR ¶¶ 110-113 |
| Abuse of Position of Trust or Special Skill: | +2 | USSG § 3B1.3 | PSR ¶¶ 114-115 |
| Obstruction of Justice | +2 | USSG § 3C1.1 | PSR ¶¶ 116-117 |

**TAX OFFENSE (Count 19)**

| | | | |
|---|---|---|---|
| Base Offense Level (Loss Greater than $1,500,000) | 22 | USSG §§ 2T1.1(a)(1); 2T4.1(I) | PSR ¶¶ 119-123 |
| Sophisticated Means | +2 | USSG § 2T1.1(b)(2) | PSR ¶ 124 |

| | | | |
|---|---|---|---|
| **MULTIPLE COUNT ADJUSTMENT** | -- | USSG §§ 3D1.1-4 | PSR ¶¶ 129-132 |

2.   Objections to the PSR's Guidelines Calculation

a.   *Additional Bases for Applying the Obstruction of Justice Enhancement*

The USPO correctly applied a two-level upward adjustment pursuant to USSG § 3C1.1 because defendant willfully obstructed the administration of justice with respect to the investigation and prosecution of his offense.  This enhancement applies when a defendant "threaten[s], intimidat[es] . . . a witness directly or indirectly, or attempt[s] to do so."  USSG § 3C1.1, comment. (n.4(A)).  The USPO applied the enhancement based on the threat to Gardner and her ex-boyfriend implied in a tweet defendant posted after a Los Angeles Times article named them as a victim and related party who had been listed anonymously in the indictment.  (PSR ¶ 117.)

9

1    Application of this enhancement is also supported by the

2    following additional facts.  In another instance of threatening and

3    intimidating a witness, defendant served a trial subpoena on Barela's

4    wife when she accompanied Barela to Court, and then used the subpoena

5    to force her out of the courtroom because there was a witness

6    exclusion rule.  It is clear these acts were meant to intimidate

7    Barela and ensure that his wife was not present to support him

8    because at no point before or after did defendant list Barela's wife

9    as a witness.  (CR 723; Sent. Ex 5.)

10    The commentary to the obstruction guideline provides other

11   examples of obstructive conduct warranting the enhancement, two of

12   which are also relevant here.  First, the enhancement also applies if

13   the defendant committed perjury, including in civil proceedings, if

14   such perjury pertains to conduct that forms the basis of the offense

15   of conviction.  USSG § 3C1.1, comment. (n.4(B)).  Defendant provided

16   perjurious under-oath testimony pertaining to the conduct that forms

17   the basis of his offenses of conviction at various JDEs, at his state

18   bar disciplinary hearing, and during the Section 341 hearing during

19   EA LLP's bankruptcy (at which defendant testified as the managing

20   partner).  For example:

21    • During a JDE on March 15, 2022, defendant testified that,

22   to the best of his knowledge, Johnson had been paid all the money he

23   was owed and neither defendant nor his firm had any current

24   obligation to make payments to Johnson.  (Trial Exhibit ("Tr. Ex")

25   404 at 12-14.)[9]

26

27        [9] The Trial Exhibits are not attached to the government's
     sentencing position memorandum because the government understands the
28   Court has a copy of the Trial Exhibits; however, upon the Court's
     request, the government can provide the Trial Exhibits to the Court.

1          •    During a JDE on March 22, 2022, defendant falsely testified
2   that: (a) the $1,600,000 from Brock USA that was deposited into
3   defendant's attorney client trust account did not belong to Barela;
4   (b) Johnson's matter with the County of Los Angeles had not been
5   settled in its entirety; (c) the settlement agreement in the Johnson
6   matter was not the settlement agreement; (d) the Johnson settlement
7   agreement was confidential; (e) he had "absolutely not" stolen
8   Johnson's money; (f) it was "absolutely false" to say that, instead
9   of paying Johnson his settlement money, defendant had been making
10  small payments; (g) he was sure he gave Johnson a lump sum payment
11  after the $4,000,000 came in; (h) the monies paid to Johnson over the
12  years were "an advance" on future settlement monies; and (i) it was
13  "absolutely false" that Phan, like Barela, had accused him of
14  stealing her money.  (Tr. Ex 405 at 8-26; 406.)

15         •    During defendant's state bar disciplinary hearing on
16  January 14, 2020 (after the indictment was filed in this case), when
17  the judge asked defendant whether he had informed Barela of the
18  $1,600,000 in settlement funds, defendant: (a) falsely stated "Mr.
19  Barela was fully informed of the receipt of those monies"; (b)
20  falsely claimed that it was Barela who was lying when he said he had
21  not been notified of the $1,600,000 settlement money; and (c) falsely
22  claimed he provided Barela an accounting.  (Sent. Ex 6.)[10]

23       Second, the enhancement applies if the defendant "produc[ed] or
24  attempt[ed] to produce a false, altered, or counterfeit document or
25  record during an official investigation or judicial proceeding."

26

27  _____

28       [10] Sentencing Exhibit 6 is a transcript of the recording of the
     January 14, 2020, proceeding.  Upon the Court's request, the
     government will also file a copy of the recording itself.

Case 8:19-cr-00061-JVS   Document 1026-1   Filed 10/25/22   Page 109 of 168   Page ID
#:25145
Case 8:19-cr-00061-JVS   Document 1000   Filed 10/11/22   Page 17 of 52   Page ID #:23788

USSG § 3C1.1, comment. (n.4(C)).  Defendant forged the signature of
his law partner, Michael Eagan, on a settlement agreement to be used
as part of the stipulation to dismiss the EA LLP bankruptcy
proceedings.  (Tr. Ex 342.)  Defendant admitted that he forged
Eagan's signature on the document during a recorded phone call with
Eagan. (Sent. Ex 7.)[11]

>           *b.   No Acceptance of Responsibility*

The government objects to the PSR's reduction of defendant's
offense level pursuant to USSG § 3E1.1 based on his purported
acceptance of responsibility.  (PSR ¶¶ 83-84, 135.)  To date,
defendant's actions and admissions to the Court and the USPO -- which
have not included admissions to any specific offense conduct -- do
not reflect true acceptance of responsibility for his crimes.

The guidelines explain that "[i]n determining whether a
defendant qualifies under subsection (a) of USSG § 3E1.1, appropriate
considerations include" whether defendant "truthfully admit[s] the
conduct comprising the offense(s) of conviction, and truthfully
admit[s] or [does] not falsely deny[] any additional relevant conduct
for which the defendant is accountable under § 1B1.3 (Relevant
Conduct)."  Although a defendant is not required to affirmatively
admit relevant conduct beyond the offense of conviction to qualify
for the reduction, "a defendant who falsely denies, or frivolously
contests, relevant conduct that the court determines to be true has
acted in a manner inconsistent with acceptance of responsibility."
USSG § 3E1.1 (comment. (n.1(A)).

---

[11] Sentencing Exhibit 7 is a transcript of the recorded call
between defendant and Michael Eagan on August 22, 2019.  Upon the
Court's request, the government will also file a copy of the
recording itself.

Case 8:19-cr-00061-JVS   Document 1026-1   Filed 10/25/22   Page 110 of 168   Page ID
#:25146
Case 8:19-cr-00061-JVS   Document 1000   Filed 10/11/22   Page 18 of 52   Page ID #:23789

1    Here, defendant's statements at the change-of-plea hearing show

2    that he has not yet accepted responsibility for his conduct.  As he

3    had done at trial, defendant continued to deny the full scope of the

4    harm his criminal conduct caused.  After government counsel stated

5    the amount of restitution to be ordered based on all the conduct

6    encompassed by the fraudulent scheme to which he was pleading guilty,

7    defendant stated "I don't' agree that the restitution amount or the

8    loss amount is $9 million, nor the tax loss amount is $5 million."

9    (RT 6/16/2022 at 14.)  These assertions are empty and frivolous

10   denials of the uncontested evidence that was presented at trial, with

11   respect to the wire fraud counts, and provided through the documents

12   produced in discovery, with respect to the tax offense.

13   At trial, defendant repeatedly implied through his cross-

14   examinations of witnesses that there were additional reimbursable

15   costs that dramatically reduced the amount he owed his clients.  But

16   defendant never produced evidence of these purported additional

17   costs.  He repeatedly speculated that the TABS accounting data that

18   he claimed to have not received before trial would show these

19   additional costs.  When the data was examined, however, it showed

20   that the government's loss calculations were correct -- indeed, if

21   anything, they were generous because they gave defendant credit for

22   "costs" to which he was not actually entitled.  (CR 809, 825.)[12]

23   Defendant's false denials at the change-of-plea hearing about

24   the scope of harm he inflicted show that he has not accepted

25

26   _____

27           [12] Notably, at no point during trial, nor after trial when
     defendant gained full access to the TABS records from the EA LLP
     servers, has defendant ever identified any evidence that the costs

28   and the expenses incurred on the cases at issue were more than the
     costs and expenses for which the government gave defendant credit.

Case 8:19-cr-00061-JVS   Document 1026-1   Filed 10/25/22   Page 111 of 168   Page ID
Case 8:19-cr-00061-JVS   Document 1000 Filed 10/11/22   Page 19 of 52   Page ID #:23790
#:25147

1   responsibility for the offenses to which he has pleaded guilty.  "The

2   goals of the acceptance of responsibility provision would not be

3   fulfilled if a defendant were eligible to receive the reduction even

4   though he falsely denied relevant conduct. . . . . [T]he district

5   court may weigh the false denial in considering a reduction for

6   acceptance of responsibility."  United States v. Rutledge, 28 F.3d

7   998, 1002 (9th Cir. 1994) (affirming denial of acceptance of

8   responsibility where defendant who pleaded guilty to being a felon in

9   possession of a firearm falsely denied that he used the firearm

10  during the commission of an attempted robbery).

11      Defendant's statements at the change-of-plea hearing also show

12  that he has not truly accepted responsibility for his offenses but is

13  only saying what he thinks will gain him a reduction in his offense

14  level.  When asked to clarify, with respect to the wire fraud, that

15  he understood that he made the false statements underlying each of

16  the counts to which he was pleading guilty, that the statements were

17  material, and that he acted with the intent to defraud, defendant

18  refused.  Instead, he said:

19          I have stated my allocution. I think it's acceptable under
            the law. I will cite the Court to United States versus
20          Nickle. It's a Ninth Circuit case, 816 F.3d 1230.
            Basically, a District Court must accept an unconditional
21          guilty plea so long as it meets the requirements of Federal
            Rule of Criminal Procedure 11(b). And I am going to
22          paraphrase the case. Unless I denied an element of the
            offense, that's sufficient enough to support my guilty
23          plea. I think I have stated and I have allocuted in
            sufficient detail here today to support my unconditional
24          guilty plea.

25  (RT 6/16/2022 at 24-25.)  The scant facts that defendant admitted and

26  his acknowledged plan to admit only the absolute minimum needed to

27  enter his guilty pleas, show that defendant has not accepted

28

1   responsibility for the offenses to which he pleaded guilty.[13]   See

2   United States v. Ramos, 923 F.2d 1346, 1360 (9th Cir. 1991)

3   (affirming district court's finding that defendant had not accepted

4   responsibility where the defendant's "minimalist description of his

5   involvement in the affair (two or three sentences) did not suffice,

6   in the eyes of the probation officer or the district court, given

7   evidence which suggested a much deeper involvement in the scheme")

8   (overruled on unrelated grounds); United States v. Fellows, 157 F.3d

9   1197, 1200, 1202-1203 (9th Cir. 1998) (affirming denial of acceptance

10  of responsibility where the district court found that defendant's

11  letter expressing remorse "was merely 'an effort to manipulate the

12  system and say only as absolutely much as he thinks he needs to in

13  order to gain acceptance' rather than an actual acceptance of

14  responsibility for his criminal actions").

15      Defendant submitted to the USPO an "apology" letter addressed to

16  all of the wire fraud victims together but did not identify any

17  specific conduct for which he was apologizing.  (PSR ¶ 84.)  Again,

18  defendant said the bare minimum and only said it when the issue of

19

20  _____

21      [13] Even after defendant filed his notice of intent to change his
    plea (CR 945) and pleaded guilty in June 2022 (CR 955), defendant

22  continued to -- falsely -- blame others for his predicament,
    including the former President, a former lawyer at his firm, and a

23  prosecutor in this case (CR 951; Sent. Exs 8, 9).  In July 2022,
    defendant caused two letters to be posted on his Twitter account

24  seeking an investigation into "the likely misuse of the [IRS] and the
    Treasury Department by former President Donald J. Trump and his

25  allies in order to target [defendant] for political and personal
    gain." (Sent. Exs 8, 9.)  Defendant knew that he had been the subject

26  of three separate civil IRS audits and collection activities
    (including the collection activities he admitted obstructing when he

27  pleaded guilty to count 19) between 2011 and 2017 and that an IRS
    revenue agent had made a criminal referral in early 2018, before

28  defendant ever met or filed a claim on behalf of Stephanie Clifford
    against the former President. (PSR ¶¶ 76, 144, 146; RT 8/18/21 v.II
    at 44, 48.)

Case 8:19-cr-00061-JVS   Document 1026-1   Filed 10/25/22   Page 113 of 168   Page ID
#:25149
Case 8:19-cr-00061-JVS   Document 1000   Filed 10/11/22   Page 21 of 52   Page ID #:23792

1   his "acceptance of responsibility" is being considered in connection

2   with his sentencing.  This self-serving "apology" does not reflect an

3   acceptance of responsibility worthy of recognition by a 2-level

4   reduction in his offense level under USSG § 3E1.1.[14]

5        Defendant says that he will address the Court at the sentencing

6   hearing "regarding his acceptance of responsibility" (PSR ¶ 83).

7   Based on what he has done and said to date, however, he has not yet

8   accepted responsibility for his crimes.

9                    c.   *Criminal History Category III Does Not*
                          *Substantially Overrepresent the Seriousness of*
10                        *Defendant's Criminal History*

11       Defendant has previously been convicted of a total of five

12   felony offenses in two cases prosecuted in the Southern District of

13   New York ("SDNY").  (PSR ¶¶ 150-151.)  He has 6 criminal history

14   points, placing him in Criminal History Category ("CHC") III. (PSR ¶

15   152.)

16       Section 4A1.3 of the Sentencing Guidelines sets out criteria for

17   upward and downward departures based on "inadequacy of criminal

18   history category."  A downward departure "may be warranted" "[i]f

19   reliable information indicates that the defendant's criminal history

20   category substantially over-represents the seriousness of the

21   _____

22       [14] Defendant had multiple opportunities to accept responsibility,
     admit his conduct, and apologize to his victims, but on every
23   occasion, he did the opposite.  When his victims tried to get their
     money, defendant repeatedly lied and provided excuses, and made
24   lulling payments to keep his victims at bay.  After Barela and Phan
     hired new attorneys, defendant neither responded to their requests
25   for information and documentation nor admitted what had happened;
     instead, in the case of Barela, defendant repeatedly and publicly
26   attacked Barela -- and continued to do so for the next several years
     -- as a "career criminal" who could not be trusted.  And when
27   confronted with stealing Johnson's money on March 22, 2019, instead
     of acknowledging what he did, defendant lied under oath and rushed to
28   Johnson's residence to lie to him further and trick him into signing
     other documents. (PSR ¶ 47d.)

                                    16

Case 8:19-cr-00061-JVS   Document 1026-1   Filed 10/25/22   Page 114 of 168   Page ID
#:25150
Case 8:19-cr-00061-JVS   Document 1000   Filed 10/11/22   Page 22 of 52   Page ID #:23793

1  defendant's criminal history or the likelihood that the defendant

2  will commit other crimes." USSG § 4A1.3(b)(1).  As illustration for

3  this concept, the Sentencing Guidelines provides the example that a

4  downward departure may be warranted if "the defendant had two minor

5  misdemeanor convictions close to ten years prior to the instant

6  offense and no other evidence of prior criminal behavior in the

7  intervening period." USSG § 4A1.3, comment. (n.3).

8       Here, the USPO asserts that a downward departure to CHC II is

9  appropriate for a different reason, namely, that the SDNY matters

10  "could have been combined into one criminal case" and, if that had

11  occurred, defendant would have only 3 criminal history points,

12  placing him in CHC II. (Recommendation Letter ("Rec. Let.") at 9.)

13  The USPO's analysis is wrong.

14       Sentencing Guideline 4A1.2(a)(2) provides that "[i]f there is no

15  intervening arrest [i.e., between the conduct underlying the two

16  offenses], prior sentences are counted separately unless . . .  the

17  sentences resulted from offenses contained in the same charging

18  instrument."  Defendant's extortion offenses (CR 19-373-PGG (SDNY))

19  and his embezzlement and aggravated identity theft offenses (CR 19-

20  374-JMF (SDNY)) could not have been joined in the same charging

21  instrument.  Under Federal Rule of Criminal Procedure 8, joinder is

22  only permissible where the offenses are of the same or similar

23  character, or are based on the same act or transaction, or are

24  connected with or constitute parts of a common scheme or plan.  The

25  offenses charged in the two SDNY cases were of a completely different

26  character, involved completely different acts, and were not part of a

27  common scheme or plan.  Although the offenses occurred in the same

28  time frame, neither the extortion offenses nor the embezzlement

1  offenses are relevant conduct within the meaning of USSG 1B1.3 for

2  each other.[15]

3      In any case, defendant's criminal history score properly

4  includes 6 points, placing him in CHC III.  This category accurately

5  reflects defendant's conduct and likelihood of recidivism given his

6  extensive criminal behavior, the fact that his multiple crimes have

7  not all accrued their own criminal history points, his lack of

8  remorse, and his demonstrated willingness to lie to further his own

9  interests at the expense of others. (See Sections II.B.2.b, above,

10  and III.C, below.)

11          d.   *No Reduction Under USSG § 5G1.2(d)*

12      The government objects to the reduction of defendant's

13  sentencing range to 240 months based on the purported applicability

14  of USSG § 5G1.2(d).  (PSR Guideline Summary, ¶ 265, Rec. Let. at 9.)

15      Defendant pleaded guilty to four wire fraud counts (each with a

16  statutory maximum sentence of 20 years) and a tax offense (with a

17  statutory maximum sentence of 3 years). (See PSR ¶ 264.)  The total

18  statutory maximum sentence that may be imposed for his five crimes is

19  83 years.

20

21  _____

22      [15] Judge Furman rejected defendant's downward departure request
    on this very ground in the SDNY embezzlement case.  Defendant
23  complained that "by prosecuting him on two separate occasions, [the
    government] had the ability to now argue that he should be placed in
    criminal history category III as opposed to category I or II."
24  (6/2/2022 RT 18 (CR 19-374-JMF).)  Judge Furman found that
    defendant's criminal history score was not overstated.  Judge Furman
25  reasoned that, "had the government chosen to charge those two crimes
    together, or multiple crimes together, [defendant] almost certainly
26  would have moved for, and probably been granted, a severance since
    the Nike [extortion] conduct had absolutely nothing to do with the
27  [embezzlement] conduct at issue here. . . . [The Nike conviction] is
    not relevant conduct with respect to this case within the meaning of
28  the guidelines, which is to say it's discrete criminal conduct."
    (Id. at 19-20.)

Case 8:19-cr-00061-JVS   Document 1026-1   Filed 10/25/22   Page 116 of 168   Page ID
#:25152
Case 8:19-cr-00061-JVS   Document 1000   Filed 10/11/22   Page 24 of 52   Page ID #:23795

1    The Sentencing Guidelines includes instructions regarding the

2   interplay of advisory sentencing ranges and statutory maximums.

3   First, the Court determines the total punishment to be imposed.

4   Then, "[i]f no count carries an adequate statutory maximum,

5   consecutive sentences are to be imposed to the extent necessary to

6   achieve the total punishment." USSG § 5G1.2(d), comment. (n.1 (final

7   paragraph)); see also United States v. Iniguez, 368 F.3d 1113, 1115-

8   16 (9th Cir. 2004) (en banc); United States v. Joetzki, 952 F.2d

9   1090, 1097-98 (9th Cir. 1991).

10    Here, the USPO has found that the total offense level is 37 (39

11   if no reduction for acceptance of responsibility applies). Defendant

12   is properly assigned to CHC III so his guidelines range is 262-327

13   months (level 37) or 324-405 (level 39). Should the Court determine

14   that a sentence in either of these ranges is appropriate, § 5G1.2(d)

15   instructs the Court to impose 240 months as the sentence for one of

16   the wire fraud counts and then impose consecutive sentences on one or

17   more of the other counts "to the extent necessary to produce a

18   combined sentence equal to the total punishment." The guidelines

19   provide no authority for reducing the total punishment the Court

20   otherwise finds appropriate to the statutory maximum for a single

21   count where defendant -- as here -- has pleaded guilty to multiple

22   counts.

23                    e.   *Restitution for the Tax Offense*

24    The government objects to the USPO's statement that restitution

25   can only be ordered in a tax case to the extent agreed to by the

26   parties in a plea agreement. (PSR ¶ 280.) As described more fully

27   below in Section IV, this is incorrect. The Court can order

28   restitution as a condition of supervised release to the victim of any

1 criminal offense, including those in Title 26, for which supervised

2 release is properly imposed, limited to the losses caused by the

3 count of conviction.  United States v. Batson, 608 F.3d 630, 633-37

4 (9th Cir. 2010); see also USSG § 5E1.1(a)(2).

5 **III. A SENTENCE OF 210 MONTHS IS REASONABLE AND APPROPRIATE BASED ON THE 3553(A) FACTORS**

6
7 **A.   Overview**

8      Defendant's criminal conduct arose from calculated choices that

9 resulted in multiple blatant and egregious violations of the trust

10 placed in him by his clients over the course of many years.  The

11 malevolence of defendant's actions is magnified by the undisputed

12 fact that defendant did not need to do what he did.  Defendant was

13 not driven to commit his crimes by need, desperation, or the

14 inability to legitimately earn a living.  Despite the significant

15 advantages defendant enjoyed -- including a first-rate education and

16 a thriving professional career -- defendant chose to commit numerous,

17 deplorable crimes harming vulnerable victims over a lengthy period of

18 time.

19      The advisory Sentencing Guidelines are the starting point for

20 sentencing.  Gall v. United States, 552 U.S. 38, 49 & n.6 (2007).

21 With an advisory range of 262-327 months' imprisonment (or 324-405

22 months if the Court finds that a two-level reduction for acceptance

23 of responsibility does not apply), and based on the numerous

24 aggravating circumstances that far outweigh any mitigating

25 circumstances present here, the government submits that a sentence of

26 210 months, consecutive to the previously imposed sentences defendant

27 is serving for separate crimes, is appropriate, just, and not greater

28

Case 8:19-cr-00061-JVS   Document 1026-1   Filed 10/25/22   Page 118 of 168   Page ID
#: 25154
Case 8:19-cr-00061-JVS   Document 1000   Filed 10/11/22   Page 26 of 52   Page ID #:23797

1    than necessary to achieve the goals of sentencing.[16]   Because the

2    aggravating factors far outweigh any mitigating factors, the

3    circumstances of defendant's case do not support an exercise of

4    leniency.

5        **B.    Nature and Circumstances of the Offenses (§ 3553(a)(1))**

6        Defendant's crimes were exceedingly serious.  With respect to

7    the wire fraud scheme, defendant inflicted tremendous harm on his

8    victims.  The victims testified about those harms at trial and have

9    submitted victim impact statements ("VIS") that further describe the

10   financial and emotional harms defendant caused over the course of

11   many years, the deleterious effects of which will endure for

12   additional years to come.  The emotional damage was particularly

13   acute because defendant stole from clients who had turned to him for

14   help addressing harms they had already suffered and had put their

15   trust in him and relied on him to represent their interests.  Rather

16   than honor his obligations and fulfill his duties -- legal,

17   professional, and ethical -- defendant stole from his legal clients,

18   lied to them for months and years, forged and fabricated documents,

19   testified falsely under oath, and went to great lengths to conceal

20   his fraud.  Defendant did not commit his crimes to support his

21   family, pay child support, or for any other arguably mitigating

22   reason; to the contrary, he stole from his clients to live an

23   extravagant lifestyle while some of his victims could barely make

24   ends meet.

25

26

---

27       [16] This recommendation is contingent upon defendant's acceptance
     of responsibility for his crimes. (See Section II.B.2.b, above.)   In
28   the event that defendant does not accept responsibility, the
     government will recommend a higher sentence.

Case 8:19-cr-00061-JVS   Document 1026-1   Filed 10/25/22   Page 119 of 168   Page ID
#: 25155
Case 8:19-cr-00061-JVS   Document 1000   Filed 10/11/22   Page 27 of 52   Page ID #:23798

1    Defendant stole nearly two million dollars from Johnson, a

2   paraplegic client with mental health issues who needed the money to

3   pay for his living and medical expenses.  Defendant lied to Johnson

4   for years and when defendant was caught, he lied some more and

5   tricked Johnson into signing documents designed to support a self-

6   serving defense that defendant intended to use to defeat any claims

7   of misconduct that might be made against him.  Defendant's scheme

8   derailed Johnson's efforts to purchase a handicap accessible house[17]

9   and caused him to lose his SSI benefits. (PSR ¶¶ 42-47.)

10   Defendant also stole nearly two million dollars from Gardner

11   who, at the time, was living in her car and needed money to get back

12   on her feet.  Defendant misappropriated this money to buy a private

13   plane.  Defendant lied to Gardner for years and concealed his fraud

14   by blaming the purported non-payment of the agreed upon settlement

15   on her ex-boyfriend, which caused Gardner further emotional

16   distress.  (PSR ¶¶ 48-52.)

17   Defendant stole nearly a million dollars from Barela by

18   providing him a bogus settlement agreement and lying to him for

19   months while Barela's financial situation worsened.  Then, when

20   Barela uncovered defendant's fraud, defendant publicly -- and

21   ruthlessly -- attacked Barela for daring to accuse defendant of

22   doing exactly what defendant had, in fact, actually done.  At the

23

24  _____

25   [17] In 2015, defendant stole Johnson's settlement money that he
     could have used to buy the house in 2017 for $600,000. Although
     defendant was flush with cash in September 2017 (having received
26   nearly $5 million dollars in attorneys' fees combined from the
     Phan/Tran settlement and the settlement in another case (Tr. Exs 368,
27   386)), defendant did not pay Johnson his money but, instead, in
     October 2017, forged Johnson's name without his knowledge on loan
28   documents and then caused the house deal to collapse.  (Tr. Exs 89,
     94, 95.)

1   same time, defendant sought a percentage of Barela's other business

2   ventures and offered to "lend" Barela -- with interest -- money in

3   January 2019 that was, in fact, Barela's own money (the concealed

4   second settlement payment that defendant would also steal).  (PSR ¶¶

5   53-58.)

6        Finally, defendant stole four million dollars from Phan so he

7   could pay off creditors, including the IRS, to get his law firm out

8   of bankruptcy.  Defendant lied to Phan and her business manager for

9   months to conceal his fraud, providing them with false documentation

10  that increased their anxiety about the missing money. (PSR ¶¶ 59-

11  67.)

12       The VISs describe in detail the effects defendant's conduct had

13  on the victims up through trial, including from the crimes

14  themselves as well as defendant's treatment of his victims after the

15  crimes were uncovered.[18]  Johnson described defendant's conduct and

16  its impact: "To this day, I do not know why Michael lied and

17  deceived me, why he broke my trust, why he broke my heart. I trusted

18  him implicitly, I believed the things he told me, but it was all

19  part of his plan to defraud me of my settlement. To this day, I have

20  a hard time trusting people because of what Michael did, and I live

21  in constant fear of being taken advantage of again, particularly

22  given my physical disability." (Johnson VIS ¶ 23.)  Gardner

23  explained the effects defendant's actions have had on her: "It

24  creates resentment, a wave of bitter anger at having been

25  mistreated. I have lost job opportunities, personal relationships,

26

27  ─────────────────

28       [18] The VISs have been provided to the Court, the USPO, and
    defendant and their contents are for this reason not repeated fully
    herein.

Case 8:19-cr-00061-JVS   Document 1026-1   Filed 10/25/22   Page 121 of 168   Page ID
#:25157
Case 8:19-cr-00061-JVS   Document 1000   Filed 10/11/22   Page 29 of 52   Page ID #:23800

1    and friendships where I have pushed people away in fear of being

2    taken advantage of. I am constantly plagued by my wounds, as my

3    heart truly hurts. I have felt pain writing this. To elaborate on

4    these moments causes me chest pain, jitters, a throbbing migraine,

5    sweat, blurred vision, and my throat becomes so tight I can barely

6    speak." (Gardner VIS at 6.)

7        Barela detailed the impact that defendant's criminal conduct

8    had on him when it was added on top of the circumstances that had

9    led Barela to hire defendant in the first place: "And, as the months

10   go by and with an even further pit in the stomach, you must now face

11   the truth that, yes, you have been swindled, not once, but twice,

12   and the second time by the very person who swore to help.  Not only

13   is there the realization that the money that you needed to keep your

14   family and your business afloat is not coming to you, you realize

15   the man you have admired and even felt a friendship towards, has,

16   without any apparent regard for your well-being, cheated you, lied

17   to you repeatedly, and is still trying to convince you otherwise."

18   (Barela VIS at 1.)  Finally, Tran itemized the harm defendant caused

19   to both Phan and Tran: "I must live with this heavy burden, this

20   overwhelming guilt, this immense shame in knowing that my closest

21   friend endured a great deal of suffering because I chose to hire

22   Michael Avenatti.  I can't fix this and that knowledge will eat away

23   at me for the rest of my life." (Tran VIS.)

24       The advisory guidelines account for some of the aggravating

25   factors involved in defendant's wire fraud scheme, including: the

26   millions of dollars in actual loss; the abuse of trust and abuse of

27   his role as the victims' attorney to commit and conceal his crimes;

28   the substantial financial hardship he caused to at least three of

24

1   his victims; his use of sophisticated means to carry out the crime;

2   his misrepresentations and fraudulent actions during the course of

3   bankruptcy proceedings, which served to conceal his thefts; the

4   crimes being committed against someone defendant knew was a

5   vulnerable victim; and defendant's obstruction of justice.  The

6   guidelines, however, do not capture many other aggravating aspects

7   of defendant's criminal conduct, which the Court should consider.

8       First, defendant's wire fraud scheme entailed other crimes,

9   including identity theft and making false statements under penalty

10  of perjury in civil proceedings, including in EA LLP's bankruptcy,

11  which defendant committed to conceal his thefts.  For example,

12  defendant engaged in aggravated identity theft and other fraud

13  relating to the attempted purchase of the house for Johnson in 2017

14  by forging Johnson's name on loan documentation. (See footnote 18,

15  above.)  Defendant made misleading statements at various JDEs to

16  conceal his theft of client funds.  For example, although defendant

17  improperly used his various attorney client trust accounts to pay

18  for his personal and business expenses (see, e.g., Tr. Exs 368-370,

19  372, 386-387), he refused to answer questions about where he held

20  trust accounts at JDEs and suggested he had no control over those

21  funds -- much less that he had, in fact stolen those funds -- by

22  claiming "those funds don't belong to me." (Tr. Ex 403 at 7-8.)

23  Defendant also made false statements under oath and/or under

24  penalties of perjury about his filing of tax returns for himself,

25  A&A, and EA LLP, and the efforts he purportedly took to locate the

26  returns, even though defendant knew he had never filed the returns.

27

28

Case 8:19-cr-00061-JVS   Document 1026-1   Filed 10/25/22   Page 123 of 168   Page ID
#:25159
Case 8:19-cr-00061-JVS   Document 1000   Filed 10/11/22   Page 31 of 52   Page ID #:23802

1   (Sent. Exs 2, 10, 11, 12.).[19]

2          Second, defendant's wire fraud scheme harmed more than the four

3   victims underlying the counts of conviction. Defendant also stole

4   settlement money from other clients, including nearly 170 clients he

5   represented in connection with Greco v. NFL, from whom he stole

6   approximately $807,000 (PSR ¶¶ 139-140), and Amélia Racine, from

7   whom he stole $15,000 (Sent. Ex 21).

8          Third, defendant's wire fraud scheme caused harm to more than

9   just the proximate victims of his scheme, wreaking havoc in the

10  lives and affairs of many third parties.  For example, other members

11  of EA LLP have been sued and have paid civil settlements based on

12  defendant's criminal conduct.  Both EA LLP and GBUS were placed into

13  bankruptcy due to defendant's actions, and countless creditors are

14  owed millions of dollars that they will almost certainly never

15  recover.  In addition, the parties to some of the underlying civil

16  cases that resulted in the settlements that defendant stole,

17  resolved their matters through confidential agreements; those

18  parties lost the privacy protections of those agreements when the

19  agreements became issues in defendant's public criminal trial.  The

20  final resolutions that the parties in the civil matters believed

21  they had reached have also been upended; instead, the parties have

22  needed to expend more time and money in connection with defendant's

23  criminal case.[20]

24  ─────────────

25  [19] Defendant also fraudulently submitted tax returns that he
    never filed to The Peoples Bank in order to secure loans in 2014.

26  (See Indictment, Counts 30-31.)

27  [20] Defendant's course of conduct regarding the failed purchase of
    a home for Johnson epitomizes the collateral damage defendant caused.
    In addition to preventing Johnson from being able to purchase a

28  handicap-accessible home, which was one of Johnson's primary goals in

*(footnote cont'd on next page)*

26

Case 8:19-cr-00061-JVS   Document 1026-1   Filed 10/25/22   Page 124 of 168   Page ID
#: 25160
Case 8:19-cr-00061-JVS   Document 1000   Filed 10/11/22   Page 32 of 52   Page ID #:23803

1    Fourth, the guidelines do not fully capture all of defendant's

2 reprehensible conduct and the harm it inflicted.  Defendant's

3 offense level would be the same if defendant had simply lied to his

4 clients about their settlement agreements and payments, and then

5 just stolen their money.  But defendant did far more than that. He

6 prevented Johnson from buying a handicap-accessible home; caused

7 Johnson to lose his SSI benefits; lied to Johnson and provided him

8 with yet more bogus documentation in March 2019; caused Gardner to

9 suffer additional emotional harm by making her believe her ex-

10 boyfriend was continuing to mistreat her; and violated his duty of

11 loyalty to his clients by publicly attacking them.

12    Fifth, the harms caused when a lawyer betrays his clients go

13 far beyond the financial harm that is the focus of the Sentencing

14 Guidelines.  Earlier this year, the Honorable Michael W. Fitzgerald,

15 United States District Judge, recognized these additional harms when

16 he sentenced another plaintiff's lawyer who stole approximately $5.5

17 million from his clients to 144 months' imprisonment. Judge

18 Fitzgerald's analysis, especially in relation to the nature and

19 circumstances of the crime, is apropos here.  United States v.

20 Layfield, CR 18-124-MWF, Dkt 443.  Judge Fitzgerald described "the

21 _____

22 pursuing his case against the County of Los Angeles, defendant wasted
considerable time and money of others, including the seller, two real

23 estate agents, the escrow officers, and the loan agent.  Defendant
took no action to help Johnson buy the property but instead lied to

24 Johnson and everyone involved to string them along.  After months of
false promises by defendant that caused the seller to move out of her

25 home, store her belongings, and pay for a short-term lease, the
seller finally decided to cancel the escrow after becoming

26 emotionally and physically ill due to the stress.  (Sent. Ex 13.)
And despite defendant's preventing the sale from closing based on

27 repeated lies about delays in connection with a purportedly required
special needs trust for Johnson, defendant refused to sign the escrow

28 cancellation documents and threatened to sue the other side.  (Sent.
Exs 14, 15, 16.)

1   seriousness of the crime, indeed the heinousness, the sheer evil of

2   the crime" of a lawyer stealing from his clients as "utterly

3   reprehensible" and "pretty much the worst thing that a lawyer could

4   ever do."  Id. at 11, 25, 53.  Judge Fitzgerald called defendant's

5   actions an "appalling and shocking violation of the attorney-client

6   relationship," whereby the victims "were vulnerable because they had

7   been injured . . . [a]nd they were vulnerable in the sense because

8   of the fiduciary relationship" and "were reluctant" to believe they

9   "were at odds with their own lawyer" who they believed "was their

10   champion."  Id. at 43.

11       Finally, the guidelines do not capture the harms caused by

12   defendant's tax crime, since no multi-count adjustment apples.  But

13   the tax crime is also extremely serious, resulting in over $3.2

14   million in federal payroll taxes not being paid. (PSR ¶¶ 71-77.)

15   This crime, too, caused harm not just to the immediate victim -- the

16   U.S. Treasury -- but also to the hundreds of GBUS employees whose

17   tax accounts were affected.

18       In short, defendant's crimes were exceedingly serious and

19   caused widespread harm.  Such significant misconduct warrants a

20   correspondingly significant term of imprisonment.

21       **C.**  **History and Characteristics of Defendant (§ 3553(a)(1))**

22       Defendant's history and characteristics present further

23   aggravating factors that justify a significant custodial sentence.

24   Defendant's education and work history show that he had every

25   opportunity to live a prosperous, law-abiding life running a

26   legitimate and lucrative law practice.  Defendant is well-educated

27   and well-credentialed.  Instead of using his skills and personal

28   qualities to build up his legal practice and help his clients, he

1    stole millions of dollars from them.  When confronted, defendant

2    used his superior knowledge of the legal system to conceal his

3    thefts by lying over and over again.  Defendant consistently puts

4    his own interests and desires ahead of the interests and needs of

5    others and will say and do anything -- whether or not legal and/or

6    truthful -- that he believes will benefit himself.[21]

7         These characteristics are clear not just in the instant case

8    but also in the matters underlying defendant's two other federal

9    prosecutions.  The convictions in those matters similarly involved

10   defendant's violations of his duties as a lawyer by lying to and

11   betraying his clients for his own personal benefit.  In connection

12   with the sentencing in the Nike extortion case, the Honorable Paul

13   G. Gardephe, United States District Judge, described defendant's

14   criminal conduct as follows:

15

16   _____

17        [21] For example, in 2018, before he was indicted, defendant
     repeatedly gave assurances during media interviews (and on Twitter)
18   that he would release his tax returns if he ran for president,
     despite not having filed tax returns for nearly a decade.  (Sent. Ex
19   17; ABC This Week interview on August 12, 2018,
     https://abcnews.go.com/Politics/stormy-daniels-lawyer-michael-
20   avenatti-presidential-hopeful/story?id=57142701, at 7:20-7:50; and
     The Texas Tribune One on One with Michael Avenatti,
21   https://www.youtube.com/watch?v=NdbAMCs2FFQ&t=32s, at 52:40-53:12.)
     Likewise, defendant repeatedly touted, including during trial and in
22   filings in this case, the "billion dollars in verdicts and
     settlements" he obtained as a lawyer, which included a $454 million
23   dollar verdict.  That verdict was immediately reduced to $25 million
     and ultimately overturned on appeal by the Ninth Circuit resulting in
24   no recovery.  When asked in a JDE what value defendant placed on the
     $454 million Kimberly Clark verdict about which he constantly bragged
25   (including at trial), defendant testified: "zero. . . .  Because any
     experienced trial lawyer will tell you that you cannot put a value to
26   it until it's actually received."  (Sent. Ex 2.)  In fact, at trial
     defendant attempted to mislead the jury about the verdict by
27   eliciting testimony from his office manager about the $454 million
     verdict to attempt to contradict her testimony about the dire
28   financial condition of the firm (RT 7/28/21 v.2 at 33-34), and then
     sought to prevent the jury from learning that the case actually
     resulted in nothing for the firm (RT 7/29/21 v.1 at 11-14).

1    Mr. Avenatti's conduct was outrageous.  He hijacked his
2    client's claims and he used those claims to further his own
     agenda, which was to extort millions of dollars from Nike
3    for himself. . . .  [Defendant's client] was never more
     than a convenient pawn for Avenatti, a vehicle for Avenatti
4    to extract millions from Nike.  But Mr. Avenatti did more
     than hijack his client's claims for his own financial gain.
5    He outright betrayed his client. . . .  He had become
     someone who operated as if the laws and rules that apply to
6    everyone else didn't apply to him.

7    (19-CR-373-PGG (SDNY), RT 7/8/21 at 39-40.)

8         The Honorable Jesse M. Furman, United States District Judge, in

9    the wire fraud and identity theft case, was struck by the same

10   characteristic.  At sentencing, he described defendant's conduct as

11   follows: "Mr. Avenatti [used] his intelligence and formidable legal

12   skills, not for good, not for his clients' interest, but for his

13   own" and noted that defendant was "brazenly lying to and stealing

14   from [his clients], indeed, [] defaming them, both privately and

15   publicly, when they had the audacity to confront him for his

16   crimes."  (19-CR-374-JMF (SDNY), RT 6/2/22 at 47.)

17        Here, defendant's callous abuse of his clients extended beyond

18   the crimes he committed.[22]  After the indictment was returned and its

19   allegations of defendant's abuse of Johnson became public, and then

20   again after Johnson sued defendant for fraud, defendant publicly

21

22

23   ────────────────

24   [22] Defendant also threatened and bullied many others, including
     lay individuals, lawyers, and members of the media, if they accused
     defendant of impropriety.  For example, when an attorney in Seattle
25   alleged misconduct by defendant -- allegations that later proved to
     be accurate -- defendant attacked the attorney publicly and made
26   baseless and outlandish claims about the attorney's character and
     even threatened the newspaper if it continued its reporting.  (Sent.
27   Exs 18, 19; see also https://lawandcrime.com/opinion/michael-
     avenatti-threatened-to-sue-our-reporter-after-unfavorable-coverage-
     then-trolled-him-on-twitter/; CR 549, 679 (baseless allegations in
28   filings about a reporter covering defendant's case).)

1   vilified Johnson claiming he was "disturbed" and not credible.[23] At
2   trial, defendant attacked, berated and attempted to embarrass his
3   clients by posing questions during cross-examination based on
4   irrelevant -- and confidential -- information that he only knew
5   because of his prior representation of the clients.

6       For example, defendant asked questions of Gardner about an
7   instance in which she had been sexually assaulted and questioned
8   Johnson about having been naked on the street during a mental health
9   episode, his hallucinations, and his purported assault of a nurse.
10  (RT 8/3/21 v.I at 64; RT 7/22/21 v.I at 89, v.II at 33; see also
11  Johnson VIS ¶ 20 (describing defendant's cross-examination as
12  "abusive," with defendant "shout[ing]" at Johnson, "ridicul[ing]"
13  him, and claiming he was "mentally ill for simply testifying
14  truthfully"); Gardner VIS at 4, 7 (referring to defendant's
15  "manipulation and purely evil" cross-examination of Gardner as an
16  attempt to "mak[e] a damn fool of [her] again and trying to break
17  [her] further" as well as "seek[ing] to destroy [her] mentally,
18  physically, and emotionally.")[24] Defendant's cross-examination of
19  Tran included allegations that Tran and Phan were trying to evade
20  paying taxes on their settlement money even though -- as defendant
21  knew -- they were handling the money in the way to which defendant -

22
23      [23] PSR ¶47e, n.8; see also CR 283 Exs 2, 3; "Paraplegic Man Sues
24  Michael Avenatti For Allegedly Embezzling $4M Settlement,"
    https://www.cbsnews.com/losangeles/news/paraplegic-man-sues-michael-
25  avenatti-for-embezzling-4m-settlement/; "Paraplegic man sues former
    attorney Michael Avenatti, claims he stole settlement money,"
26  https://abc7.com/michael-avenatti-lawsuit-orange-county-geoffrey-
    johnson/5345745/.
27      [24] Defendant's continuing abuse of his victims was also
    demonstrated by his effort to intimidate Barela by serving his wife
28  with a trial subpoena when she accompanied Barela to Court. See
    Section II.B.2.a., above.

1  - their lawyer -- had advised them.  (RT 8/10/21 v.II at 91.)

2  Defendant's shameless cross-examinations of his victims -- which

3  could elicit almost nothing that could actually advance his defense

4  -- showed he had no remorse for the harm he had already inflicted on

5  them and has no empathy for anyone who he believes stands in his way

6  of obtaining what he wants.[25]

7      Defendant's abusive cross-examinations were in keeping with his

8  pre-trial conduct, in which defendant attempted to intimidate and

9  embarrass his victims when they confronted him about his illegal

10 actions.  For example, in May 2019, U.S. Probation and Pretrial

11 Services ("USPPS") advised the Court that defendant had made

12 statements (in violation of his duty of loyalty and confidentiality)

13 about Gardner and her former boyfriend that USPPS interpreted as

14 potential threats and witness intimidation.  (PSR ¶ 18.)  Although

15 defendant promised to "refrain from any similar conduct," he

16 subsequently attacked Johnson in the media with information to which

17 he had access solely due to his representation of him.[26]  (See n.24,

18 _____

19    [25] Defendant's abusive cross-examinations came several weeks
   after defendant's sentencing hearing in the Nike extortion case, when
20 he said during his allocution: "I am truly sorry for all of the pain
   that I have caused to Mr. Franklin and others.  I am deeply humbled
21 before you here today.  Despite the deep shame and remorse, I still
   feel positive because I know that I can do better, that I can be the
22 person I dreamed of being when I was a child.  I look forward to
   working hard to become the person I once was, and I will, if given
23 the chance."  (19-CR-373-PGG, RT 7/8/21 at 29.)  Defendant had the
   chance but did not act on it and, instead, brow-beat his victims
24 during his cross-examinations in this case shortly after his
   allocution, demonstrating that his purported contrition was simply an
25 attempt to garner a benefit for himself at sentencing.

      [26] Barela was the first client to publicly accuse defendant of
26 stealing his money, and defendant mercilessly attacked Barela and
   Barela's character, including with false information.  See, e.g.,
27 "Michael Avenatti Gives First Interview Since Arrest," 3/27/19,
   https://www.youtube.com/watch?app=desktop&v=z2iYbRUbMNE at 2:37-3:05.
28 At a public judgment debtor examination, when asked simply to
                                        *(footnote cont'd on next page)*

Case 8:19-cr-00061-JVS   Document 1026-1   Filed 10/25/22   Page 130 of 168   Page ID
#:25166
Case 8:19-cr-00061-JVS   Document 1000   Filed 10/11/22   Page 38 of 52   Page ID #:23809

1   above.)

2       Defendant has also shown himself to be willing to say anything

3   -- truthful or not -- to the Court that he thinks will benefit him

4   or serve his purposes.  For example, on May 14, 2019, at the

5   beginning of this case and seven days after defendant received $1

6   million in attorney's fees, defendant applied for representation by

7   the Federal Public Defender, claiming he was financially unable to

8   obtain counsel.  (CR 98 at 13, 26.)  During trial, defendant made

9   false statements to the Court in connection with his efforts to call

10  witnesses who were hardly relevant.  For example, defendant told the

11  Court he needed to call Morgan Witos because she "was a CPA at the

12  law firm."  (RT 8/19/21 v.1 at 26.)  Defendant also repeatedly

13  implied that Ms. Witos was a CPA through his cross-examination

14  questions.  (RT 7/28/21 v.II at 30; RT 8/17/21 v.II at 25.) But

15  defendant knew Ms. Witos was not a CPA and had never claimed to be

16  one.  (Sent. Ex 20.)  Similarly, defendant sought to justify calling

17  two FBI agents based in New York by claiming that they had

18  participated in the execution of search warrants in this district,

19  when, as defendant knew, they had not participated in the search

20  warrants or any other aspect of this case.[27]

21

22

23  identify Barela, defendant answered: "Gregory Barela is currently on
    felony probation for making false statements in an effort to get paid
24  money.  He's a former client of the firm.  I think he's been
    convicted two or three times of various felonies."  (Sent. Ex 11.)
25

    [27] Although the government is not privy to defendant's *in camera*
26  proffer to the Court to call the SDNY case agents as witnesses in
    this case, based on the colloquy with the Court after defendant's
27  direct examination of one of the agents, it became clear defendant
    had not been truthful with the Court. (RT 8/17/21 v.II at 95.)
28  Defendant did not call the second agent despite making her travel
    from New York to California based on his claims.

                                    33

1    Defendant's willingness to twist the truth to serve his own

2    purposes continued throughout trial.  For example, during his cross-

3    examination of his office manager, defendant referred to his

4    representation of a family that had lost their son to a drug

5    overdose in a case involving a famous comedian and asserted that he

6    had paid the settlement money to the family appropriately.  (RT

7    7/29/21 v.I 46-47, 57; Tr. Ex 387 at 15.)  In truth, defendant had

8    spent the settlement money that was received in October 2017 (Tr. Ex

9    386) and only paid the family the amounts they were due five months

10   later on March 20, 2018, using $200,000 that defendant had stolen

11   from Phan.  (Tr. Exs 368 at 9, 369 at 2, 386, 387.)

12          Even now, defendant continues to make self-serving statements

13   designed to obtain a reduced sentence, regardless of defendant's

14   prior statements contradicting his newly made claims.  For example,

15   defendant now maintains that he has alcohol and substance abuse

16   issues that peaked between 2018 and 2020 and seeks a recommendation

17   from this Court that defendant qualify for the RDAP program (PSR ¶¶

18   206-211), which could provide defendant with a credit against his

19   sentence.  Defendant never previously mentioned his purported

20   alcohol and substance abuse issues at any time during the several

21   years he was on pretrial release.  Indeed, USPPS stated in its

22   initial April 2019 report that "defendant indicated no history of .

23   . . substance abuse history, alcohol abuse or substance abuse

24   treatment."  Of course, had defendant mentioned his purported

25   substance abuse issues then, he would have had to comply with

26   substance-related conditions of release which would have been

27   imposed.  (CR 10, 13.)  Mentioning these issues now, however, serves

28   his interests of attempting to obtain every possible sentence

34

Case 8:19-cr-00061-JVS   Document 1026-1   Filed 10/25/22   Page 132 of 168   Page ID
#:25168
Case 8:19-cr-00061-JVS   Document 1000   Filed 10/11/22   Page 40 of 52   Page ID #:23811

1    reduction that he can.

2          In sum, although defendant has constantly portrayed himself in

3    the media and elsewhere (including in his opening statement at

4    trial) as someone who represents "Davids" versus "Goliaths", as a

5    "fighter" for the little guys and a person who gives "people who had

6    no chance a fighting chance" (RT 7/21/21 v.I 64), in fact, defendant

7    did not and does not fight for anyone but himself.

8          **D.    Need to Reflect the Seriousness of the Offense, Promote
               Respect for the Law, provide Just Punishment, Afford**
9          **Deterrence, and Protect the Public from Further Crimes of
               the Defendant (§ 3553(a)(2))**

10

11         It is frequently impossible for a Court to right all wrongs,

12   make victims whole or give victims a sense of closure and that is,

13   unfortunately, the case here.  The victims in this case have lost

14   millions of dollars, been deceived for years by the person they

15   believed was fighting for them, and then endured abuse and re-

16   victimization when they confronted defendant and sought to obtain

17   justice.  The monetary and emotional harms caused by defendant's

18   crimes are extreme, and a substantial sentence is necessary to

19   reflect the seriousness of the offenses, promote respect for the

20   law, provide just punishment, and deter future criminal conduct.

21         The need for specific and general deterrence is particularly

22   pronounced.  As to the former, defendant's lack of remorse and

23   continued infliction of harm for years even after his thefts were

24   revealed shows that a significant sentence is necessary if there is

25   to be any hope that he will conform his future conduct to the law.

26   Indeed, in revoking defendant's bail, the Court found probable cause

27   to believe defendant committed federal and state crimes while on

28   pretrial release and found defendant presented an "ongoing danger"

1    to the community, which was "real and palpable."  (RT 1/15/20 at

2    37.)  The Court stated on several occasions thereafter: "The Court

3    has not lost sight and neither should the parties of this Court's

4    finding, and the Ninth Circuit's affirmance, that Avenatti is a

5    danger to the community. . . . That remains the case." (CR 128 at 2;

6    CR 132; RT 3/31/20 at 6.)  Defendant's failure to accept full

7    responsibility for his wrongful conduct or even admit its full

8    scope, as well as his conduct throughout this case, as described

9    above, including his willingness to engage in further criminal

10   conduct to try to conceal his prior criminal activity, all make

11   clear that a significant sentence is needed to achieve specific

12   deterrence.

13        Defendant's lengthy history of flouting the tax laws likewise

14   shows the need for a significant sentence to deter further crimes.[28]

15   In addition to defendant's criminal conduct in relation to the

16   payroll taxes for GBUS employees, defendant also has failed to file

17   his individual tax returns from 2011 through 2017, notwithstanding

18   his receipt of substantial income in those years.  (PSR ¶¶ 145-146.)

19   Likewise, he repeatedly failed to meet his tax obligations with

20   respect to his companies EA LLP and A&A, despite their generating

21   substantial revenues.  (PSR ¶¶ 142-143.)  Defendant's contempt for

22   his obligation to follow the tax laws is clear not only from his

23   failure to file returns and pay the amounts owed but also from his

24   _____

25        [28] The Ninth Circuit has observed that tax crime sentences should
     reflect a particular sensitivity to deterrence under the section
26   3553(a) factors.  United States v. Orlando, 553 F.3d 1235, 1239 (9th
     Cir. 2008); see also USSG Part T, Introductory Commentary (November
27   1, 2012) ("Because of the limited number of criminal tax prosecutions
     relative to the estimated incidence of such violations, deterring
28   others from violating the tax laws is a primary consideration
     underlying these guidelines.").

Case 8:19-cr-00061-JVS   Document 1026-1   Filed 10/25/22   Page 134 of 168   Page ID
#:25170
Case 8:19-cr-00061-JVS   Document 1000   Filed 10/11/22   Page 42 of 52   Page ID #:23813

1    brazen lies about his supposed tax compliance.[29]

2          As to general deterrence, defendant's conduct in this case

3    exemplifies the danger posed by an attorney who abuses his unique

4    position of trust to defraud his clients.  Given the nature of

5    attorneys' relationships with their clients, attorney theft is not

6    easily detectible and, in fact, is extremely hard to uncover.[30]  The

7    legal system depends on clients being able to trust that their

8    attorneys are working in the clients' best interests and, because of

9    that trust, few clients second-guess their attorney's actions.

10   Moreover, the attorney-client privilege shields this relationship

11   from public scrutiny, making detecting attorney fraud against

12   clients even more difficult.

13         Defendant obviously never intended for his clients to discover

14   that he had stolen their money, and he abused his relationship with

15   his clients and his knowledge of the legal system to try to keep

16   them in the dark so that he would not get caught.  As the Court

17   heard at trial, defendant insisted that only he discuss settlement

18   issues with his clients, and he became irate when he learned that

19   other members of his firm had discussed the settlement agreement

20   with Barela.  (RT 7/28/21 v.I at 16; RT 8/17/21 v.II at 38-39.)

21   When clients asked questions about their purportedly missing

22   settlement payments or options to collect on the settlement

23   agreement, defendant repeatedly told them they could take no action

24   and were not permitted to discuss the situation with anyone else due

25   to the supposed confidential nature of their settlement agreements.

26   _____

27         [29] See Section III.B, above.

28         [30] Indeed, special procedures including the use of taint teams
     are required simply to investigate attorneys for fraud involving
     their legal practice.

1  (See, e.g., RT 8/4/21 v.II at 92; RT 8/5/21 v.I at 49.) And when
2  Johnson and Gardner did discuss their settlement agreements with
3  others, defendant became furious and instructed them to never again
4  talk to anyone other than defendant about their settlements.  (RT
5  7/22/21 v.I at 44; RT 7/30/21 v.II at 17-18; RT 8/3/21 v.I at 58.)
6  In these ways, defendant prevented his clients from uncovering
7  sooner the fraud he had perpetrated against them.  Turning justice
8  on its head, defendant used the legal system to cover his tracks and
9  continue to exploit the very clients whose interests he had sworn to
10  uphold.

11      Concerns for general deterrence also call for a substantial
12  sentence to send a message to attorneys and other fiduciaries who
13  take advantage of their positions to benefit and enrich themselves
14  at their clients' expense.  The victims of defendant's criminal
15  conduct include the entire legal profession.  Whenever a lawyer
16  commits a crime in breach of his/her legal and ethical
17  responsibilities, it casts doubt on other dedicated, honest, and
18  ethical lawyers and brings the legal profession, and here the
19  plaintiff's bar in particular, into disrepute.  That defendant was
20  able to conceal his criminal acts for so long serves to increase the
21  harm to the reputation of lawyers through a loss of public
22  confidence in the integrity of the profession.  A significant
23  sentence is needed to deter other lawyers from believing they can
24  violate the very laws they swear to uphold without consequences, and
25  to reassure the public that the criminal justice system holds
26
27
28

Case 8:19-cr-00061-JVS   Document 1026-1   Filed 10/25/22   Page 136 of 168   Page ID
#:25172
Case 8:19-cr-00061-JVS   Document 1000   Filed 10/11/22   Page 44 of 52   Page ID #:23815

1    lawyers as accountable for their misdeeds as it does everyone else.[31]

2        The need for just punishment also supports a significant term

3    of incarceration in this case.  Defendant maintained during the

4    recent sentencings in New York that the fact that he will never be

5    able to practice law again and the damage resulting from his

6    convictions to the reputation he spent decades cultivating

7    constitute sufficient punishment. (CR 19-373-PGG (SDNY), Dkt 317 at

8    11; CR 19-374-JMF (SDNY), Dkt 433 at 20.)  Not so.  As the Honorable

9    Dale S. Fischer, United States District Judge, stated when rejecting

10   similar claims raised by another prominent attorney who had been

11   convicted of federal crimes:

12       Most criminals lose their jobs and livelihood and the
         respect of people who believe they knew them.  These things
13       are a natural consequence of [defendant's] deliberate
         conduct.  They are not punishment and certainly not
14       sufficient punishment.  I agree with my colleague in the
         Southern District of New York[32] that it is not possible to
15   _____

16       [31] Judge Furman addressed this issue at defendant's sentencing
     hearing: "I do think that this case will send a message to lawyers
17   and others in the legal profession that if you go astray in the way
     that Mr. Avenatti did, you will pay a steep price, not only in losing
18   your right to practice your profession, but also in losing your
     liberty." (CR 19-374-JMF (SDNY), RT 6/2/22 at 49-50.)

19       [32] Judge Fischer was referencing the statements of the Honorable
     Marvin E. Frankel, United States District Judge, in sentencing a
20   prominent rabbi:

21       If punishment were wholly or mainly retributive, [public
         humiliation] might be a weighty factor.  In the end,
22       however, it must be a matter of little or no force.
         Defendant's notoriety should not in the last analysis serve
23       to lighten, any more than it may be permitted to aggravate,
         his sentence.  The fact that he has been pilloried by
24       journalists is essentially a consequence of the prestige
         and privileges he enjoyed before he was exposed as a
25       wrongdoer.  The long fall from grace was possible only
         because of the height he had reached.  The suffering from
26       loss of public esteem reflects a body of opinion that the
         esteem had been, in at least some measure, wrongly bestowed
27       and enjoyed.  It is not possible to justify the notion that
         this mode of nonjudicial punishment should be an occasion
28       for lenience not given to a defendant who never basked in
                                              *(footnote cont'd on next page)*

                                   39

Case 8:19-cr-00061-JVS   Document 1026-1   Filed 10/25/22   Page 137 of 168   Page ID
#:25173
Case 8:19-cr-00061-JVS   Document 1000   Filed 10/11/22   Page 45 of 52   Page ID #:23816

1   justify the notion that public humiliation and other forms
2   of non-judicial punishment should be an occasion for
    lenience not given to a defendant who has never had the
3   opportunity to reach the same heights in the community. . .
    The concept of equal justice requires that the Court give
4   little weight to this particular defendant's personal and
    professional accomplishments and the somewhat unique
    collateral consequences his own conduct has caused.

5

6   United States v. Terry Christensen, CR 04-1046(E)-DSF, Sentencing

7   Hearing, Nov. 24, 2008, at 56-57.  Any collateral consequences

8   defendant has or will suffer are the direct result of defendant's own

9   deliberate criminal conduct and do not justify a lenient sentence.

10      In arguments at his sentencings in New York and statements to

11  the USPO in this case, defendant maintains that his incarceration --

12  and specifically the alleged "horrible" conditions of his confinement

13  and "intense lockdown for over 100 days" -- at MCC warrant a downward

14  variance.  (PSR ¶ 202; CR 19-373-PGG (SDNY), Dkt 317 at 18-25; CR 19-

15  374-JMF (SDNY), Dkt 433 at 18-19.)  But even though defendant's

16  counsel thought it would be a "good idea" to return defendant to this

17  District following the conclusion of his Nike trial (RT 1/31/20 at

18  20-21), defendant opposed being returned to this district on February

19  20, 2020, claiming his conditions of confinement had "substantially

20  improved."  (CR 100, CR 101 at 2-3, CR 102.)[33]  To the extent this

21  issue warrants any variance, Judge Gardephe already varied downward

22

    _____

23      such an admiring light at all.  The quest for both the
        appearance and the substance of equal justice prompts the
24      court to discount the thought that the public humiliation
        serves the function of imprisonment.
25
    United States v. Bergman, 416 F.Supp. 496, 502-03 (S.D.N.Y. 1976).

26      [33] Defendant has also repeatedly complained about his being
    confined to a 1,000 square foot, two-bedroom apartment during his
27  temporary release. (CR 271, CR 448, CR 891.)  Defendant chose this
    apartment to live after he violated his bail conditions, and these
28  living conditions were better than the conditions two of his victims
    endured due directly to defendant's criminal conduct.

Case 8:19-cr-00061-JVS  Document 1026-1  Filed 10/25/22  Page 138 of 168  Page ID
#:25174
Case 8:19-cr-00061-JVS  Document 1000  Filed 10/11/22  Page 46 of 52  Page ID #:23817

1   on this basis when he imposed the sentence in the Nike extortion

2   case.  (PSR ¶ 202.)  No further variance on this basis is appropriate

3   here.

4       **E.    Policy Statements and Need to Avoid Unwarranted Sentencing
            Disparities (§ 3553(a)(6))**

5

6       Because the government's recommended sentence is within or

7   below the Sentencing Guidelines range, it will not cause unwarranted

8   sentencing disparities with other defendants in similar

9   circumstances.  See Gall v. United States, 552 U.S. 38, 54 (2007)

10  ("[A]voidance of unwarranted disparities was clearly considered by

11  the Sentencing Commission when setting the Guidelines ranges.").

12      **F.    The USPO's Sentencing Recommendation Is Factually and
            Legally Flawed**

13

14      Notwithstanding the seriousness of the crimes defendant

15  committed, the significant harms he inflicted on his former clients

16  and many others, and his utter lack of true remorse, the USPO has

17  recommended an extraordinarily lenient sentence of effectively 91

18  months.  Although the USPO ostensibly recommends 151 months, she

19  proposes that it be served concurrently with the total 60-month

20  sentence defendant is already serving for the SDNY convictions.  The

21  Court should reject the recommendation.

22      First, as explained above, defendant's offense level is 37 (39

23  if acceptance of responsibility is denied) and his CHC is III,

24  resulting in an advisory guidelines range of 262-327 (or 324-405)

25  months.  Defendant's guidelines range is not reduced to 240 by

26  operation of USSG § 5G1.3(d) as the USPO contends and no downward

27  departure based on over-statement of criminal history is appropriate.

28

                                    41

1      Second, defendant's sentence should not run concurrent to at

2   least 24 months of the sentence imposed for the New York convictions.

3   One of those convictions was for a violation of 18 U.S.C. § 1028A.

4   That statute provides: "Notwithstanding any other provision of law .

5   . . except [in circumstances not relevant here], no term of

6   imprisonment imposed on a person under this section shall run

7   concurrently with any other term of imprisonment imposed on that

8   person under any other provision of law." 18 U.S.C. § 1028A(b)(2).

9      Third, the arguments advanced in support of a downward variance

10  are without merit.  The USPO recognizes the amount of loss is

11  accurate under the guidelines but argues that it should be mitigated

12  because "defendant should benefit from the legal work he successfully

13  performed to acquire settlements for his victim-clients."  (Rec.

14  Letter at 9.)  But defendant did not perform this work -- whether

15  successful or not -- for his clients.  He hijacked their claims and

16  the work he did was not for their benefit but for his own, putting

17  the money he would eventually steal within his grasp.

18      The USPO also finds mitigating the "unstable and abusive

19  childhood" defendant "endured."  (Rec. Let. at 9.)  The USPO's view

20  of defendant's upbringing is based on defendant's current

21  description.[34]  Defendant, however, has made numerous public

22  _____

23      [34] Although both of defendant's parents are alive, the USPO did
    not interview either of them.  The USPO "corroborated" defendant's
24  statements by interviewing his first wife, Christine Avenatti-Carlin,
    who has no first-hand knowledge of the relevant facts.  Moreover, she
25  was intimately involved in defendant's criminal activity that
    resulted in defendant's bail being revoked, specifically assisting
26  defendant in hiding over $700,000 from creditors and buying a car for
    defendant in her name.  (CR 98.)  Avenatti-Carlin's other statements
27  in the PSR also demonstrate her bias (referring to defendant's
    criminal convictions as "mistakes" and blaming defendant's failure to
28  pay child support on the instant case (PSR ¶ 175) even though she
    *(footnote cont'd on next page)*

Case 8:19-cr-00061-JVS   Document 1026-1   Filed 10/25/22   Page 140 of 168   Page ID
#:25176
Case 8:19-cr-00061-JVS   Document 1000   Filed 10/11/22   Page 48 of 52   Page ID #:23819

1   statements throughout the last few years about his childhood, which

2   paint an entirely different picture than what defendant now depicts

3   to justify a lighter sentence.  For example, in March 2018, defendant

4   described having fond memories of his middle-class upbringing in St.

5   Louis; in May 2019, he maintained he lived a perfectly normal

6   childhood in a middle-class family; and in February 2020, he

7   described his childhood in a solid middle-class household during

8   which he regularly went skiing, attended baseball games and races,

9   drove go-carts, and went to racing school.[35]  Defendant's childhood,

10  which defendant himself has conceded was less challenging than most

11  defendants' experiences (PSR ¶ 162), does not justify a downward

12  variance.

13         The USPO also bases her variance recommendation on defendant's

14  having had a "stable work history as an attorney" and being "a

15  devoted father to his children."  (Rec. Let. at 9.)  Even if true,

16  these characteristics would be no more than what is expected of a

17  law-abiding member of society; they are hardly a reason for a

18  downward variance.  In any case, they aren't completely true.

19  Defendant used his skills as a lawyer to defraud his clients.

20  Despite the money he earned as a lawyer, the money he stole from his

21  victim-clients, and the money he failed to pay in taxes for years,

22  _____

23  previously claimed that defendant had not been paying child support
    for over a decade and owes over $5 million dollars in arrears (CR 448
24  at 18).

25         [35] "Porn star Stormy Daniels' lawyer graduated from Parkway
    Central," https://www.stltoday.com/news/local/columns/joe-
    holleman/porn-star-stormy-daniels-lawyer-graduated-from-parkway-
26  central/article_8ce4cfef-818e-58db-8250-a8f7d317effa.html; "I Flew
    Too Close to the Sun. No Question. Icarus": Inside the Epic Fall of
27  Michael Avenatti," https://www.vanityfair.com/news/2019/05/inside-
    the-epic-fall-of-michael-avenatti; Dinner with Racers Episode 155 –
28  Michael Avenatti, https://dinnerwithracers.com/ep-155-michael-
    avenatti/ at 11:30-17:15.

43

Case 8:19-cr-00061-JVS   Document 1026-1   Filed 10/25/22   Page 141 of 168   Page ID
#:25177
Case 8:19-cr-00061-JVS   Document 1000   Filed 10/11/22   Page 49 of 52   Page ID #:23820

1    defendant still, by his own admission, did not pay millions of
2    dollars in child support for his children.   (CR 448 at 18; see also
3    PSR ¶ 167.)

4         The USPO bases her recommendation that the sentence in this case
5    be imposed to run concurrently with the New York sentences on her
6    belief that "the instant federal matter is an exponential punishment
7    from past judgments" and that running the term in this case
8    consecutively to the New York terms would be "an unreasonable
9    incremental punishment."  (Rec. Let. at 10.)   This conclusory
10   assertion should be rejected.   It is true that defendant's sentencing
11   exposure in this case is greater than the sentences imposed in the
12   New York cases but that is appropriate given the different facts.
13   For example, here, the wire fraud victims' losses exceeded $12
14   million dollars and the tax loss exceeded $3 million, and there were
15   multiple victims who suffered substantial financial hardship and at
16   least one vulnerable victim, a paraplegic client; the victims in the
17   New York cases were a massive corporation whose losses were only its
18   attorney's fees ($259,800) and a single individual whose actual
19   losses were under $150,000.

20   **IV.   RESTITUTION**

21        The Mandatory Victim Restitution Act, 18 U.S.C. § 3663A,
22   requires courts to order restitution to all identifiable victims of
23   applicable crimes who have suffered pecuniary loss. A "victim" is
24   defined as "a person directly and proximately harmed as a result of
25   the commission of an offense for which restitution may be ordered."
26   18 U.S.C. § 3663A(a)(2). For scheme offenses such as wire fraud, this
27   includes "any person directly harmed by the defendant's criminal
28   conduct in the course of the scheme." Id. "Section 3663 . . .

Case 8:19-cr-00061-JVS   Document 1026-1   Filed 10/25/22   Page 142 of 168   Page ID
#:25179
Case 8:19-cr-00061-JVS   Document 1000   Filed 10/11/22   Page 50 of 52   Page ID #:23821

1  provides that if the offense of conviction involves a scheme, . . .

2  restitution may include all losses caused during the course of that

3  scheme." United States v. Thomsen, 830 F.3d 1049, 1064 (9th Cir.

4  2016) (quoting United States v. Gamma Tech Indus., Inc., 265 F.3d

5  917, 927 n.10 (9th Cir. 2001)).  Here, counts 5 and 8-10 to which

6  defendant pleaded guilty involved a scheme.  Restitution is limited

7  to the victims' actual losses.  United States v. Gagarin, 950 F.3d

8  596, 607 (9th Cir. 2020) ("Because the purpose of restitution is to

9  put the victim back in the position he or she would have been but for

10 the defendant's criminal conduct, the amount of restitution is

11 limited to the victim's 'actual losses' that are a direct and

12 proximate result of the defendant's offense.") (Internal citations

13 and quotations omitted).

14     Section 3663A requires the Court to order full restitution

15 without regard to defendant's economic situation.  18 U.S.C.

16 § 3664(f)(1)(A).  The Court must order full and immediate payment of

17 restitution, unless, in the interest of justice, the Court provides

18 for payment on a date certain or in installments.  18 U.S.C.

19 § 3572(d)(1).

20     Here, defendant was convicted of wire fraud, which is an offense

21 against property under Title 18 for purposes of § 3663A.  Therefore,

22 pursuant to 18 U.S.C. § 3663A, and to put the victims in the

23 positions they would have been but for defendant's fraud, the

24 government requests that the Court order that defendant pay the

25 following restitution amounts to the following victims: $1,572,092 to

26 Geoffrey Johnson; $1,460,785 to Alexis Gardner; $598,887 to Gregory

27 Barela; and $4,000,000 to Michelle Phan. (See attached declaration

28 of Special Agent Remoun Karlous and exhibits establishing these

45

1   amounts.)   Pursuant to 18 U.S.C. § 3664(j)(1), the Court must order
2   the restitution to be paid to the victims first, with any amounts due
3   to other parties be paid subsequently.

4        The Court may order restitution as a condition of supervised
5   release to the victim of any criminal offense, including those in
6   Title 26, for which supervised release is properly imposed, limited
7   to the count of conviction.   Batson, 608 F.3d at 633-37; see also
8   USSG § 5E1.1(a)(2) (instructing courts to order restitution as a
9   condition of supervised release when a defendant has been found
10  guilty of certain crimes that would include tax crimes under Title
11  26).   Although the Court could impose interest upon the restitution
12  up to the date of sentencing, the government only seeks restitution
13  for the unpaid taxes related to Count 19.   See Batson, 608 F.3d at
14  637; United States v. Gordon, 393 F.3d 1044, 1058-59 (9th Cir. 2004),
15  abrogated on other grounds by Lagos v. United States, 138 S. Ct. 1684
16  (2018).   Therefore, the government requests that the Court order
17  restitution in the amount of the unpaid payroll taxes for GBUS,
18  namely $3,207,144, to be paid to the IRS as a condition of supervised
19  release.   (PSR ¶ 73.)[36]

20  **V.   CONCLUSION**

21       For the foregoing reasons, the government recommends that the
22  Court sentence defendant to 210 months in prison on each of counts
23  5, 8, 9 and 10, to run concurrently to one another, and 36 months on
24  count 19, to run concurrently with the sentences imposed on counts
25  5, 8, 9 and 10, with all sentences to be consecutive to the

26

27       [36] The government is not seeking a fine in addition to the
    restitution because defendant appears to be currently unable to pay a
28  fine and unlikely to become able to pay a fine in addition to the
    restitution.

sentences imposed in the New York cases; a three-year period of supervised release; a mandatory special assessment of $500; and restitution in the amount of $7,631,764 due to the wire fraud victims and $3,207,144 to the IRS as a condition of supervised release.

Dated: October 11, 2022            Respectfully submitted,

                                   E. MARTIN ESTRADA
                                   United States Attorney

                                   SCOTT M. GARRINGER
                                   Assistant United States Attorney
                                   Chief, Criminal Division


                                   _____/s/_____
                                   BRETT A. SAGEL
                                   RANEE A. KATZENSTEIN
                                   Assistant United States Attorneys

                                   Attorneys for Plaintiff
                                   UNITED STATES OF AMERICA

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**EXHIBIT RR**

## COMPARISON OF OHANIAN V. AVENATTI

| Ohanian | Avenatti (Y/N) |
|---|---|
| Misled clients and engaged in fraudulent conduct only five months after being sworn in to the California bar. [Def. Sent. Exh. SS, p. 3].[1] | No |
| Presented clients with counterfeit court orders containing forged judges' signatures and counterfeit government documents with forged seals. [*Id.* at 1]. | No |
| Intended loss of $64,326,836.48. [*Id.* at 12]. | No |
| Breached plea agreement by continuing to defraud victims after entering into plea agreement. [*Id.* at 24]. | No |
| Provided clients counterfeit checks with insufficient funds. [*Id.* at p. 3] | No |
| Agreed to represent over 25 victims related to immigration issues. After taking their money, he did nothing to help them obtain green cards. [*Id.* at 4]. | No |
| Defrauded his own family members (wife, father, aunt, uncle) and friends. [*Id.* at 5-6]. | No |
| Continued fraudulent scheme while his criminal defense counsel negotiated a pre-indictment disposition. [*Id.* at 11]. | No |

---

[1] Attached hereto as Exhibit SS is a copy of the government's sentencing position in *United States v. Ohanian*. Citations herein are to that document.

**EXHIBIT SS**

1  NICOLA T. HANNA
   United States Attorney
2  BRANDON D. FOX
   Assistant United States Attorney
3  Chief, Criminal Division
   ARON KETCHEL (Cal. Bar No. 250345)
4  J. JAMARI BUXTON (Cal. Bar No. Pending)
   Assistant United States Attorneys
5  Public Corruption and Civil Rights Section
         1500 United States Courthouse
6        312 North Spring Street
         Los Angeles, California 90012
7        Telephone: (213) 894-1019/3519
         Facsimile: (213) 894-7631
8        E-mail:    aron.ketchel@usdoj.gov
                    jamari.buxton@usdoj.gov
9
   Attorneys for Plaintiff
10 UNITED STATES OF AMERICA

11                   UNITED STATES DISTRICT COURT

12            FOR THE CENTRAL DISTRICT OF CALIFORNIA

13 UNITED STATES OF AMERICA,          No. CR 19-284-JAK

14           Plaintiff,               GOVERNMENT'S SENTENCING POSITION
                                      FOR DEFENDANT SHANT OHANIAN
15              v.
                                      Hearing Date: November 12, 2020
16 SHANT OHANIAN,                     Hearing Time: 8:30 a.m.
                                      Location:    Courtroom of the Hon.
17           Defendant.                            John A. Kronstadt

18

19      Plaintiff United States of America, by and through its counsel

20 of record, the United States Attorney for the Central District of

21 California and Assistant United States Attorneys Aron Ketchel and

22 Jamari Buxton hereby files its sentencing position with respect to

23 defendant Shant Ohanian.  This sentencing position is supported by

24 the attached memorandum of points and authorities, the exhibits

25 ///

26 ///

27 ///

28

1  to be lodged under seal in a separate pleading, and such further

2  evidence and argument as the Court may permit at the sentencing

3  hearing, currently set for November 12, 2020, at 8:30 a.m.

4   Dated: October 29, 2020          Respectfully submitted,

5                                    NICOLA T. HANNA
                                     United States Attorney
6
                                     BRANDON D. FOX
7                                    Assistant United States Attorney
                                     Chief, Criminal Division
8

9                                    _____/s/_____
                                     ARON KETCHEL
10                                   J. JAMARI BUXTON
                                     Assistant United States Attorney
11
                                     Attorneys for Plaintiff
12                                   UNITED STATES OF AMERICA

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

**TABLE OF CONTENTS**

2    I.    INTRODUCTION.....................................................1

3    II.   BACKGROUND FACTS................................................2

4          A.   Defendant Began His Fraud Scheme Shortly After Law
                School.....................................................3

5

6          B.   Many of Defendant's Victims Were Unfamiliar With the
                Law or Had a Close Relationship With Defendant...........4

7               1.   Immigration Victims.................................4

8               2.   Family Members......................................5

9               3.   Friends of Defendant................................7

10         C.   Defendant Involved Family Members in His Fraud Scheme.....8

11         D.   Defendant's Fraud Scheme Had Life-Altering
                Consequences for his Victims..............................8

12

13         E.   Defendant Did Not Defraud Purely for Monetary Gain.......10

14         F.   Defendant's Scheme Continued After Defendant's
                Disbarment and Arrest....................................11

15   III.  RESPONSE TO THE PSR............................................12

16         A.   Offense Level............................................12

17         B.   Criminal History Category................................14

18   IV.   A SENTENCE OF 204 MONTHS IS REASONABLE AND APPROPRIATE
           UNDER THE 3553(A) FACTORS.....................................14

19

20         A.   Nature and Circumstances of the Offense, § 3553(a)(1)....15

21         B.   History and Characteristics of Defendant, § 3553(a)(1)...15

22         C.   Need for Deterrence and to Promote Respect for the
                Law, § 3553(a)(2)........................................16

23         D.   Policy Statements and Need to Avoid Unwarranted
                Sentencing Disparities, § 3553(a)(6).....................17

24

25   V.    RESTITUTION AND FINE..........................................17

26   VI.   CONCLUSION....................................................18

27

28

**MEMORANDUM OF POINTS AND AUTHORITIES**

## I.    INTRODUCTION

The legal system depends on a client being able to trust that the client's attorney is working in the client's best interest. Indeed, the attorney-client privilege shields this relationship from public scrutiny and makes detecting attorney fraud against the client even more difficult.

This case exemplifies the danger posed by an attorney who abuses his unique position of trust as an officer of the Court to defraud his clients and destroy their lives.  Moreover, defendant's devious and malicious scheme effectively made it impossible for his clients to discover they were being defrauded; thus, it enabled him to perversely use our civil justice system to cover his tracks and continue his exploitation of the clients whose interests he swore to fight for.  In a vacuum, a client could potentially think that a purported settlement offer is too good to be true.  But how can a client question an attorney's statements when the attorney goes to great lengths to corroborate his fraudulent claims with counterfeit court orders containing forged judges' signatures, counterfeit government documents with forged seals, spoofed phone calls appearing to originate from the Court, and counterfeit cashier's checks purporting to pay the settlement amount, among other deceptive practices?

Defendant Shant Ohanian's actions were particularly egregious. Immediately after graduating from law school and taking the oath to uphold the Constitution, defendant instead used his degree to harm others.  Defendant took on clients in need who required legal assistance in a variety of areas – immigration applications,

commercial disputes, divorce petitions, and affirmative tort claims.
In each case, defendant told his clients he would represent their
interests and, in each case, defendant reported a successful outcome
– often to an extreme degree.  But the reality was that in each case
defendant had not taken any meaningful action on behalf of his
clients.  To back up his lies, defendant took extraordinary efforts
to fabricate corroborating documents and orchestrate spoofed phone
calls to make his fraud undetectable.  Defendant's consistent lies to
each client, often occurring over the course of years, not only
obliterated viable legal claims but also ruined lives—financially,
emotionally, and through the loss of time and opportunity to right
the wrongs they had suffered.

     When defendant agreed to plead guilty to the offense pre-
indictment, and save the government considerable resources, the
government offered a favorable disposition to defendant considering
the aggravating circumstances at issue.  Unbeknownst to the
government, however, while defendant negotiated his plea agreement
and even after he entered his guilty plea, defendant continued to
engage in his fraudulent scheme.  This Court has already found that
defendant breached his plea agreement and the government is thus no
longer bound by its obligations under the plea agreement.  In light
of the additional aggravating factors not referenced in the plea
agreement, the government recommends the Court impose a sentence of
204 months' custody, three years of supervised release, and
restitution in the amount of $4,456,959.44.

**II.  BACKGROUND FACTS**

     Defendant's fraudulent conduct is described in detail in the
plea agreement as well as in the PSR.  The government will not repeat

1  all of the conduct involving all of the victims here.  Instead, the

2  government will focus on information learned after the PSR was

3  drafted and on the facts that support the government's sentencing

4  recommendation.

5      **A.**    **Defendant Began His Fraud Scheme Shortly After Law School**

6      Defendant graduated from law school in 2011 and was sworn in to

7  the California Bar in January 2012.  (PSR ¶ 158.)  Five months later,

8  in May 2012, M.C. and R.M. retained defendant to represent them in a

9  commercial dispute with a franchisor.  (Id. ¶ 18.)  There is no

10  indication that defendant took any steps to effectively litigate

11  M.C.'s and R.M.'s claims.  Instead, defendant lied to M.C. and R.M.

12  over six years, telling them that the case settled in their favor,

13  and ultimately provided M.C. and her son (R.M. had passed away during

14  the period of defendant's fraud) counterfeit checks totaling over

15  $3.1 million that the victims attempted to negotiate without

16  knowledge that there were insufficient funds.  (Id. ¶¶ 18-24.)

17      In October 2012 – ten months after his admission to the Bar –

18  defendant began defrauding new victim A.G. after A.G. paid defendant

19  $1,200 to help obtain a green card.  (Id. ¶ 14.)  Again, over

20  multiple years, defendant lied to A.G. and falsely claimed that he

21  had been approved for a green card when, in fact, defendant never

22  filed an application for A.G.  When the green card never arrived,

23  defendant attempted to cover his tracks.  Defendant claimed that he

24  was suing the federal government for failing to produce the green

25  card and, using counterfeit emails, Superior Court correspondence and

26  orders (including the forged signatures of a Superior Court judge and

27  multiple other government officials), defendant falsely told A.G.

28  that the government had agreed to pay A.G. nearly $3 million in

Case 8:19-cr-00061-JVS  Document 1026-1  Filed 10/25/22  Page 154 of 168  Page ID
Case 2:19-cr-00284-JAK  Document 81  Filed 10/29/20  Page 7 of 21  Page ID #:456
#:25190

1  damages.  (Id. ¶ 16.)  Defendant began defrauding clients almost as

2  soon as he became a lawyer and continued defrauding them until the

3  day he was remanded into custody in this matter.

**B.  Many of Defendant's Victims Were Unfamiliar With the Law or Had a Close Relationship With Defendant**

6  Defendant's fraudulent activity likely was able to continue

7  undetected for years longer because defendant's victims were

8  reluctant to approach law enforcement and because defendant targeted

9  close friends and family members who took defendant at his word.

10 Defendant deliberately and successfully preyed on victims who would

11 allow him to continue his lengthy and steady stream of fraud

12 business.

1.  Immigration Victims

14 Over twenty-five victims sought representation for immigration-

15 related issues that defendant fraudulently failed to provide.  (PSR

16 ¶ 17; Ex. B.[1])  Some of these victims sought green cards in order to

17 eventually become naturalized citizens, like defendant.  (PSR ¶ 14,

18 130.)  Other victims were caught in foreign warzones and retained

19 defendant to file refugee applications so they could seek safety in

20 the United States.  (Ex. B.)  In every instance, defendant took their

21 money, claimed he was filing the appropriate applications, but in

22 actuality did nothing.  Foreign victims likely did not know how to

23 seek recourse for defendant's ineffective assistance.  Many other

24 immigration victims never approached law enforcement (to the

25 government's knowledge) and may have been reluctant to reveal

27  [1] The government intends to lodge the exhibits in support of the
sentencing position under seal in a separate pleading.  The exhibits
28 are lodged under seal because they contain sensitive information
about the victims' financial loss as a result of defendant's actions.

Case 8:19-cr-00061-JVS  Document 1026-1  Filed 10/25/22  Page 155 of 168  Page ID
#:25191
Case 2:19-cr-00284-JAK  Document 87  Filed 10/29/20  Page 8 of 21  Page ID #:457

1  defendant's actions because their legal status had lapsed while

2  defendant fraudulently claimed he was applying on their behalf and

3  thus they likely were concerned that doing so would subject them

4  further adverse legal consequences.

            2.   Family Members

6       Indicative of a fraudster whose depths knows no bounds,

7  defendant's fraudulent activity extended to his own family members.

8  Defendant defrauded an immediate family member of his wife, Silva

9  Sevlian (the victim was referred to as Victim Y in the Stipulation

10  Regarding Bond Forfeiture and Breach of Plea Agreement, Dkt. No. 51).

11  Defendant fraudulently asserted that he filed a civil lawsuit on

12  behalf of Victim Y and then falsely claimed that he obtained a $3.5

13  million judgment on behalf of Victim Y.  Defendant informed another

14  attorney (Victim X) that he would deposit the funds for Victim Y in

15  Victim X's trust account, but defendant never did.  (PSR ¶¶ 59-64.)

16  Defendant also admitted that he wrote a counterfeit check in the name

17  of Victim Y in the amount of $500,000 to deposit into defendant's

18  bank account because defendant wanted to show another victim (P.Q.)

19  that defendant had a high balance in his bank account that he could

20  use to pay back P.Q. after P.Q. discovered he was defrauded.

21       More recently, the government learned that defendant defrauded

22  his aunt and uncle, H.M. and O.M., who stated they previously treated

23  defendant like their son.  (Ex. A. at 2.)  After H.M. and O.M. were

24  denied refinancing on their home in 2015, defendant claimed he filed

25  a lawsuit against PennyMac on their behalf and later claimed that he

26  prevailed in a lawsuit against PennyMac and that victims O.M. and

27  H.M. would receive $57 million.  (Id. at 9, 12.)  Inexplicably,

28  defendant instructed H.M. and O.M. to stop making mortgage payments

                              5

Case 8:19-cr-00061-JVS  Document 1026-1  Filed 10/25/22  Page 156 of 168  Page ID
Case 2:19-cr-00284-JAK  Document 87  Filed 10/29/20  Page 9 of 21  Page ID #:458
#:25192

while he purportedly litigated their claims.  This resulted in the

bank foreclosing on H.M.'s and O.M.'s home.  (Id. at 3.)  Defendant,

however, persisted in his fraud by claiming that the bank issued the

foreclosure notice in error and defendant then provided H.M. and O.M.

with a litany of forged documents from various governmental entities

indicating that the victims had paid off their mortgage and would be

receiving tens of millions of dollars in damages.  (Id. at 4-12.)  To

disguise his fraud and prevent the rightful sale of H.M.'s and O.M.'s

house in foreclosure, defendant fraudulently filed for personal

bankruptcy in O.M.'s name in June 2019 without O.M.'s knowledge.

(Id. at 11-12.)  Defendant also made spoofed phone calls to O.M. in

which defendant impersonated individuals in the County Recorder's

Office and the Ninth Circuit Court of Appeal, to corroborate

defendant's lies.  (Id. at 5.)

     As detailed throughout, defendant went to great lengths to

conceal his fraud.  In April 2019, defendant escorted H.M. and O.M.

to a Citibank branch where he instructed O.M. to open a new bank

account so that O.M. could receive a payment of $40 million in

damages.  O.M.'s new account indeed reflected a balance of $40

million for months before the bank informed O.M. that the funds

purportedly transferred by defendant never cleared and O.M.'s account

was closed.  (Id. at 9.)  When O.M. became suspicious of defendant's

activities, O.M. insisted on accompanying defendant to the County

Recorder's Office in June 2019 to retrieve documents regarding his

residence.  (Id. at 12.)  Defendant instructed O.M. to sit and wait

while O.M. spoke with the clerk at the Recorder's Office.  O.M.

observed defendant speak with the clerk and when defendant returned

from the counter, defendant provided O.M. with forged documents

Case 8:19-cr-00061-JVS  Document 1026-1  Filed 10/25/22  Page 157 of 168  Page ID
#:25193
Case 2:19-cr-00284-JAK  Document 81  Filed 10/29/20  Page 10 of 21  Page ID #:459

1  containing both a notary seal and a wet seal of the Registrar that

2  appeared to corroborate defendant's fraudulent claims.[2]

3                  3.   Friends of Defendant

4        Defendant, utilizing Ms. Sevlian, defrauded a number of people

5  by exploiting their personal friendships.  For example, victim A.Z.

6  met defendant in or around 2000 while attending community college

7  together and later became friends when they were members of the same

8  fraternity at UCLA.  Victim A.Z. later referred his father, victim

9  G.Z. (Victim 7 in the plea agreement) to defendant.  Victim A.T. met

10 defendant in law school and started a two-person law firm with

11 defendant after they graduated law school together.  (PSR ¶ 76.)

12 Victim A.G.'s wife was a former co-worker of Ms. Sevlian and they

13 became social friends.  Victim A.G.'s wife asked Ms. Sevlian if

14 defendant handled immigration matters and Ms. Sevlian confirmed that

15 defendant did, which is why A.G. retained defendant.  Victim P.S. was

16 a former college professor of Ms. Sevlian and defendant offered to

17 help victim P.S. with his divorce application pro bono based upon

18 P.S.'s relationship with Ms. Sevlian.  Based upon their pre-existing

19 relationships with defendant and Ms. Sevlian, these individuals

20 likely placed greater trust in defendant and more readily accepted

21 defendant's false assertions about the important legal work he was

22 performing.

23

24

25
_____

26      [2] The government does not believe that the clerk of the
   Recorder's office was aware of or participated in the fraudulent
27 conduct.  Rather, it appears that defendant orchestrated an elaborate
   ruse in which he appeared to deliver documents that had been given to
28 him by the clerk when, in fact, defendant had created the forged
   documents.

Case 8:19-cr-00061-JVS  Document 1026-1  Filed 10/25/22  Page 158 of 168  Page ID
#:25194
Case 2:19-cr-00284-JAK  Document 81  Filed 10/29/20  Page 11 of 21  Page ID #:460

### C.    Defendant Involved Family Members in His Fraud Scheme

When not defrauding victim family members, defendant was organizing and turning other family members into co-conspirators in his fraud.  Defendant admitted in his plea agreement and under oath before this Court that his wife participated in the fraud scheme and the government believes that defendant directed Ms. Sevlian to make calls and deliver documents to certain victims.  In addition, defendant's sister stated in a sworn declaration that defendant directed her to speak with clients and convey false information to them.  (CR 19-305, Dkt. No. 69, Ex. A ¶¶ 2-3.)[3]

### D.    Defendant's Fraud Scheme Had Life-Altering Consequences for his Victims

Defendant's fraudulent activity left a path of destruction through the lives of multiple victims.  The destruction took various forms.  Some of the harm was financial harm, such as the $2.8 million that victims G.Z. and A.Z. paid defendant for services that defendant never performed.  (PSR ¶ 40.)

In another example, victim P.S. believed that defendant had successfully filed a divorce petition for P.S. and that P.S.'s marriage had been dissolved.  Years later, P.S. learned that defendant never filed the divorce petition and P.S. was required to repay the Social Security Administration over $100,00014,000 in benefits and penalties, along with forfeiting additional benefits of nearly $8,000, because P.S. erroneously received benefits as an unmarried individual.  (Id. ¶¶ 56-58.)  In addition, P.S. stated the

---

[3] Defendant's mother also claimed in a sworn declaration submitted to this Court that she delivered documents at the direction of defendant but the government does not rely on the declaration here because the government has concerns about the veracity of defendant's mother's declaration.

total loss, which includes various costs for professional services to correct defendant's fraudulent actions, will cost P.S. approximately $100,000.

Victims O.M. and H.M. reported that in May 2019, defendant provided O.M. and H.M. a check for $72,000 (purportedly issued by the U.S. District Court as part of a judgment against PennyMac), which the victims attempted to deposit to fund a $40,000 down payment for a new home. The check, however, never cleared, and O.M. and H.M. fell out of escrow on the residence. (Ex. A at 10.) O.M. reported that he missed so many days of work dealing with damage awards defendant repeatedly promised that she was terminated from his job. (Id. at 9.) O.M. now drives for a ride-sharing service approximately 12 hours each day to make ends meet. (Id.)

Victims M.C. and R.M. reported that they used retirement savings to pay for needed construction based on defendant's representations that he had secured a large settlement in their favor. By the time they discovered defendant had lied to them, M.C.'s and R.M.'s retirement savings had been significantly depleted. R.M. passed away and M.C. reported having "abysmal financial obligations," which forced M.C. to take a reverse mortgage on her home to survive. (PSR ¶ 67.)

Victims P.F. and R.A. operated a successful multi-million dollar business before defendant's fraudulent activity resulted in a default judgment being entered against victims P.F. and R.A., which wiped out the victims' retirement savings and forced them to sell their home. (PSR ¶ 69.) The victims report that they are now unable to afford services for their daughter with special needs. (Id. ¶ 70.) P.F. and R.A. further report that they are working laborer jobs in

Case 8:19-cr-00061-JVS  Document 1026-1  Filed 10/25/22  Page 160 of 168  Page ID
#:25196
Case 2:19-cr-00284-JAK  Document 81  Filed 10/29/20  Page 13 of 21  Page ID #:462

1   construction, ride sharing, and delivery jobs in order to earn a

2   living.  (Id. ¶  69.)

3       Finally, other victims lost their ability to bring legal claims,

4   the harm of which is difficult to quantify.  Defendant agreed to

5   represent victim A.M. in a tort action after A.M. fell and sustained

6   injuries at a local mall.  (PSR ¶ 45.)  Defendant falsely claimed

7   that he secured a $25,000 judgment on A.M.'s behalf and sent A.M. a

8   counterfeit check, which she attempted to deposit without success.

9   (Id. ¶¶ 47-48.)  By the time A.M. discovered she had been defrauded,

10  the statute of limitations had run on A.M.'s claims and she was

11  unable to recover compensation for her injuries.  (Id. ¶ 49.)

12  Similarly, defendant offered to represent victim B.M. in a sexual

13  harassment lawsuit.  (Id. ¶ 50.)  Defendant claimed he received a

14  $125,000 settlement in B.M.'s favor and provided B.M. with a

15  counterfeit wire transfer receipt in that amount.  (Id. ¶ 51.)  When

16  B.M. realized she had been defrauded, the statute of limitations had

17  expired and she was unable to pursue her claim.  (Id. ¶ 52.)

18      **E.   Defendant Did Not Defraud Purely for Monetary Gain**

19      One aggravating aspect of defendant's fraud scheme is that

20  defendant was not motivated solely by greed.  Defendant fraudulently

21  charged some clients large amounts for his services, such as victims

22  G.Z. and A.Z. (who paid over $2.8 million to defendant) (PSR ¶ 40).

23  Unlike a classic fraud scheme, however, in which a defendant seeks to

24  maximize the monies paid by unsuspecting victims, defendant did not

25  always demand payment from his victims.  (See, e.g., PSR ¶¶ 18, 45,

26  50, 53, 56.)  In cases in which defendant was purportedly working on

27  a contingency basis, defendant knew that he would not receive

28  compensation because defendant never pursued a legal cause of action.

In such cases, defendant faced zero prospect of achieving real success or making money.  Rather, defendant appeared to be acting solely in a sociopathic manner in which he falsely made himself seem important and powerful to these victims and caused significant harm to the them but without receiving any direct financial benefit.

**F.   Defendant's Scheme Continued After Defendant's Disbarment and Arrest**

The relentlessness of defendant's fraud campaigns was staggering.  Following a complaint filed by victim A.G. with the California Bar in approximately December 2016 (which led to the instant federal investigation), defendant's license to practice law in California was suspended in January 2017.  Defendant, however, was undeterred, and continued to fraudulently represent clients in multiple purported legal actions.  (See PSR ¶¶ 23-24, 30, 37-38.)

The government began negotiating a pre-indictment disposition with defendant's then-counsel in late 2018 and early 2019.  Defendant continued to engage in fraud during this time frame.  For example, defendant delivered a counterfeit check to victim S.Y. in April 2019. (Ex. B at 3; see also Ex. C (Victims S.S. and R.S. reporting activity in the spring of 2019).)  Defendant was arrested on April 28, 2019, and released on bond (the government was not aware of defendant's ongoing fraudulent activity at that time).  Defendant entered his guilty plea before the Court on June 6, 2019.  Defendant continued to commit fraud.

On the day after defendant entered his guilty plea, defendant falsely claimed that he was bringing a $3.5 million cashier's check for Victim Y.  (PSR ¶ 64.)  This conduct resulted in the Magistrate Court issuing an order to show cause on June 20, 2019, as to why

Case 8:19-cr-00061-JVS  Document 1026-1  Filed 10/25/22  Page 162 of 168  Page ID
#:25199
Case 2:19-cr-00284-JAK  Document 81  Filed 10/29/20  Page 15 of 21  Page ID #:464

1  defendant's bond should not be revoked.  (Dkt. No. 40.)  That hearing

2  was held on July 2, 2019.  (Dkt. No. 46.)  Defendant continued to

3  engage in fraud up until the day he was remanded into custody.  While

4  defendant was driving to the OSC hearing on July 2, defendant called

5  victim O.M. and told O.M. that the judgment in O.M.'s favor had been

6  increased from $52 million to $57 million and did not indicate that

7  he would be unavailable.  (Ex. A at 12.)

8  **III. RESPONSE TO THE PSR**

9      **A.    Offense Level**

10      The government generally concurs with the PSR's calculation of

11  defendant's offense level, but seeks additional enhancement based on

12  information learned subsequent to the filing of the PSR.

13  Specifically, the government agrees that the base offense level for

14  defendant's offense of conviction is governed by U.S.S.G.

15  § 2B1.1(a)(1) and is 7.  (PSR ¶ 89.)  The PSR applied a 20-level

16  enhancement because the PSR found that the total intended loss

17  amount was between $9.5 million and $25 million.  Based upon the

18  recently discovered evidence of defendant falsely attempting to

19  transfer $40 million into victim O.M.'s bank account, the government

20  contends the appropriate enhancement is 22 because the intended loss

21  was $64,326,836.48.  (PSR ¶ 92; Ex. A.)  The government agrees that

22  a 4-level enhancement pursuant to U.S.S.G. § 2B1.1(b)(2)(B) is

23  appropriate because defendant's conduct resulted in substantial

24  financial hardship for five or more victims.  (PSR ¶¶ 94-96.)  The

25  government agrees that a 2-level enhancement pursuant to U.S.S.G.

26  § 2B1.1(b)(9)(B) is appropriate because the conduct involved a

27  fraudulent action during a bankruptcy proceeding.  (PSR ¶ 98-99; Ex.

28  A at 11-12.)  The government agrees that a 2-level enhancement

Case 8:19-cr-00061-JVS   Document 1026-1   Filed 10/25/22   Page 163 of 168   Page ID
#:25199
Case 2:19-cr-00284-JAK   Document 81   Filed 10/29/20   Page 16 of 21   Page ID #:465

1    pursuant to U.S.S.G. § 2B1.1(b)(10)(C) is warranted because the

2    offense involved sophisticated means and the defendant intentionally

3    engaged in or caused the conduct constituting sophisticated means.

4    (PSR ¶¶ 100-101.)   The government agrees that a 2-level enhancement

5    pursuant to U.S.S.G. § 2B1.1(b)(11)(A)(ii) is appropriate because

6    the offense involved the use of authentication features.   (PSR

7    ¶¶ 103-104.)

8        Based primarily on the declaration filed by Lernik Ohanain

9    (defendant's sister) in the related matter, and the government's

10   understanding of the relationship between defendant and Silva

11   Sevlian, the government believes a 2-level role enhancement pursuant

12   to U.S.S.G. § 3B1.1(c) is warranted because defendant organized,

13   led, and managed Lernik Ohanian's and Silva Sevlian's participation

14   in the offense conduct.   In order for the enhancement to apply,

15   defendant needed to lead or manage only one other individual.

16   U.S.S.G. § 3B1.1(c), App. Note 2.

17       The government agrees that a 2-level enhancement pursuant to

18   U.S.S.G. § 3B1.3 is warranted because defendant used a special skill

19   in a manner that significantly facilitated the commission or

20   concealment of the offense.   (PSR ¶¶ 106-107.)   The government

21   agrees that a 2-level enhancement pursuant to U.S.S.G. § 3C1.1 is

22   warranted because defendant "willfully obstructed or impeded, or

23   attempted to obstruct or impeded, the administration of justice with

24   respect to the investigation, prosecution, or sentencing of the

25   instant offense" and "the obstructive conduct related to . . . the

26   defendant's offense of conviction and any relevant conduct."   (PSR

27   ¶¶ 108-111.)

28       Based upon the increased intended loss and the inclusion of the

Case 8:19-cr-00061-JVS  Document 1026-1  Filed 10/25/22  Page 164 of 168  Page ID
#:25200
Case 2:19-cr-00284-JAK  Document 81  Filed 10/29/20  Page 17 of 21  Page ID #:466

1   role enhancement, the government asserts that the appropriate

2   adjusted offense level is 45.  The government agrees that defendant

3   should not receive an acceptance of responsibility reduction.  (PSR

4   ¶¶ 114-118.)  Defendant obstructed justice throughout the fraudulent

5   scheme, which weighs against an acceptance of responsibility

6   reduction.  U.S.S.G. § 3E1.1, App. Note 4; PSR ¶ 117.  In his plea

7   agreement, defendant pledged not to commit further crimes, but

8   defendant broke that promise and continued to defraud victims until

9   he was remanded into custody.  This resulted in the Court's finding

10  that defendant breached his plea agreement.  Defendant was not

11  charged with any additional crimes based upon his breach of the plea

12  agreement, but defendant should not receive the benefit of an

13  acceptance of responsibility reduction following such conduct.

14          **B.   Criminal History Category**

15          The government concurs with the PSR's determination that

16  defendant has no criminal history, which places defendant in

17  criminal history category I.  (PSR ¶ 125.)

18          The above calculations result in a total offense level of 45

19  with a criminal history category of I, with a resulting Guidelines

20  range of life.[4]

21  **IV.  A SENTENCE OF 204 MONTHS IS REASONABLE AND APPROPRIATE UNDER THE
22       3553(A) FACTORS**

23          The government respects the Probation Office's recommendation of

24  a statutory maximum sentence of 240 months in custody.  In certain

25  respects, this sentence would be justified by the particularly high

26  adjusted offense level and the aggravating factors discussed above

27  

28          [4] The Guidelines chart does not list ranges beyond offense level
    43.

                                    14

and below.  The government, however, contends that a sentence of 204
months would be sufficient but no greater than necessary to achieve
the goals of § 3553(a).

**A.   Nature and Circumstances of the Offense, § 3553(a)(1)**

The nature of defendant's offense is described in detail above
and in the plea agreement.  Defendant's fraudulent scheme involved
myriad aggravating factors.  Specifically, defendant used his role
as an attorney to commit the fraud; defendant engaged in fraud
continuously over a seven-year period; defendant used sophisticated
means, authentication features, and forged signatures that made it
virtually impossible for victims to detect that they had been
defrauded; defendant's actions deprived certain victims of viable
causes of action that, when they became no longer viable,
significantly undercut their quality of life; defendant's
sociopathic conduct caused significant harm to victims without any
direct financial benefit to defendant; the offense involved a high
number of victims; the high actual loss amount; and the offense
involved an extraordinarily high intended loss amount.

The reliance on intended loss rather than actual loss for the
purpose of calculating defendant's offense level results in a four-
level increase.  The government's recommended sentence accounts for
this difference.

**B.   History and Characteristics of Defendant, § 3553(a)(1)**

Defendant's background does not reflect significant mitigating
circumstances.  Defendant was raised by a supportive family and
successfully immigrated to the United States.  (PSR ¶¶ 130-133.)
Upon arriving in the United States, defendant attended community
college and successfully transferred to a four-year university.

Case 8:19-cr-00061-JVS  Document 1026-1  Filed 10/25/22  Page 166 of 168  Page ID
Case 2:19-cr-00284-JAK  Document 81  Filed 10/29/20  Page 19 of 21  Page ID #:468
#:25202

1   (Id. ¶ 141.)  Defendant was consistently gainfully employed after

2   college until he attended law school.  (Id. ¶¶ 160-163.)  Defendant

3   does not report any substance abuse problems nor does defendant

4   report mental health issues other than anxiety that appears related

5   to the offense conduct.  (Id. ¶¶ 149-153.)  That defendant's crimes

6   were not motivated because of financial distress or some intervening

7   compelling need for money adds to the pile of aggravating factors.

8        While defendant does not score any criminal history points,

9   defendant committed significant fraud over a seven-year period.

10  Defendant's lack of scoreable criminal history thus reflects

11  defendant's success at not being caught rather than defendant's law

12  abiding nature.

13       Defendant is married and has a young daughter.  (Id. ¶ 144.)

14  The government's recommended downward variance takes into account

15  defendant's inability to participate meaningfully in his daughter's

16  life while incarcerated.

17       **C.   Need for Deterrence and to Promote Respect for the Law,
            § 3553(a)(2)**

18

19       The government's recommended sentence promotes respect for the

20  law.  A significant sentence is appropriate to promote specific

21  deterrence in light of defendant's repeated failures to comply with

22  the law, even in the face of significant punishment.  The

23  recommended sentence also seeks to promote general deterrence by

24  establishing that attorneys will face significant punishment if they

25  use their unique position of trust to defraud their clients.  A

26  significant sentence must account for the dark stain defendant has

27  placed on the legal profession and help rebuild public trust in that

28  oath.

**D.   Policy Statements and Need to Avoid Unwarranted Sentencing Disparities, § 3553(a)(6)**

The government believes that the proposed below-Guidelines sentence will not cause unwarranted sentencing disparities with other defendants in similar circumstances.

**V.   RESTITUTION AND FINE**

The government concurs with the Probation Office's finding that defendant does not have an ability to pay a fine.  (PSR ¶ 174.)  The government notes, however, that defendant has retained at least three different law firms to defend him in this action.  In addition, defendant's level of education and family connections suggests that defendant will have the ability to pay restitution to the victims upon his release from custody.

The government concurs with the PSR's finding that restitution should be awarded to the nine victims identified in the PSR.  (PSR ¶ 188.)  In addition, the government learned of additional restitution claims after the release of the PSR.  This includes a retainer payment of $2,000 made by victim S.Y. (Ex. B at 2) and a loss incurred by Chase Bank in the amount of $18,239.44 (Ex. G).  The complete set of victims is set forth below.  (PSR ¶ 188.)

| Victim | Restitution Amount |
|---|---|
| M.C. and R.M. | $80,240 |
| P.F. and R.A. | $1,326,605 |
| G.Z. and A.Z. | $2,839,875 |
| H.A. | $80,000 |
| P.S. | $100,000 |
| A.T. | $10,000 |

17

| S.Y. | $2,000 |
|---|---|
| Chase Card Services | $18,239.44 |

The government requests entry of a restitution order totaling $4,456,959.44.

**VI.   CONCLUSION**

For the foregoing reasons, the government believes that the sentence recommended by the government is sufficient, but not greater than necessary, to punish defendant and her crime, promote respect for the law, deter defendant and others from committing similar crimes in the future, and avoid unwarranted sentencing disparities.  See generally 18 U.S.C. § 3553(a).

The government therefore recommends that the Court sentence defendant to 204 months in custody, a three-year period of supervised release, restitution according to the schedule described above, and a mandatory special assessment of $100.

18