1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# EXHIBIT TT

STEPHANIE M. HINDS (CABN 154284)
United States Attorney

THOMAS A. COLTHURST (CABN 99493)
Chief, Criminal Division

JEFF SCHENK (CABN 234355)
JOHN C. BOSTIC (CABN 264367)
ROBERT S. LEACH (CABN 196191)
KELLY I. VOLKAR (CABN 301377)
Assistant United States Attorneys

    150 Almaden Boulevard, Suite 900
    San Jose, California 95113
    Telephone: (408) 535-5061
    Fax: (408) 535-5066
    Email: Robert.Leach@usdoj.gov

Attorneys for United States of America

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No. 18-CR-00258 EJD |
| Plaintiff, | UNITED STATES' SENTENCING MEMORANDUM |
| v. | Date: November 18, 2022 |
| ELIZABETH A. HOLMES, | Time: 10:00 a.m. |
| Defendant. | Court: Hon. Edward J. Davila |

1

2                                    **TABLE OF CONTENTS**

3   TABLE OF AUTHORITIES ...................................................................................................1

4   INTRODUCTION .................................................................................................................1

5   FACTS .................................................................................................................................2

6   I.      THE OFFENSE CONDUCT ....................................................................................2

7           A.      The Investor Fraud .....................................................................................2

8           B.      The Impact on Patients ...............................................................................8

9           C.      The Cover Up .............................................................................................13

10  II.     PROCEDURAL HISTORY ....................................................................................15

11  THE SENTENCING GUIDELINES CALCULATION .........................................................15

12  I.      LOSS MORE THAN $550,000,000 ......................................................................16

13  II.     OFFENSE INVOLVING 10 OR MORE VICTIMS ...............................................20

14  III.    OFFENSE INVOLVING CONSCIOUS OR RECKLESS RISK
        OF DEATH OR  SERIOUS BODILY INJURY ......................................................21

15          A.      Defendant's Conduct Created a Risk of Serious Harm to Theranos Patients....21

16          B.      Holmes' Treatment of Theranos Patients is Relevant Conduct .......................24

17  IV.     ROLE IN THE OFFENSE .....................................................................................26

18          A.      Holmes Was a Leader and Organizer .........................................................26

19          B.      Holmes' Fraud Was "Otherwise Extensive".................................................27

20  ARGUMENT .......................................................................................................................31

21  I.      LEGAL STANDARD ...........................................................................................31

22  II.     GOVERNMENT RECOMMENDATION ..............................................................32

23          A.      The Nature and Circumstances of Holmes' Crimes (18 U.S.C. § 3553(a)(1))....32

24          B.      The History and Characteristics of Holmes (18 U.S.C. § 3553(a)(1)) ..............34

25          C.      The Need to Reflect the Seriousness of the Offense, Promote Respect for the
                    Law, and Provide Just Punishment for the Offense (18 U.S.C.
26                  § 3553(a)(2)(A))...........................................................................................35

27          D.      The Need to Afford Adequate Deterrence to Criminal Conduct (18 U.S.C.
28                  § 3553(a)(2)(B)).........................................................................................35

Case 8:19-cr-00061-JVS   Document 1048-1   Filed 11/21/22   Page 4 of 332   Page ID
#:25396
Case 5:18-cr-00258-EJD   Document 1649   Filed 11/15/22   Page 3 of 46

E.    The Need to Protect the Public From Future Crimes by Holmes (18 U.S.C. § 3553(a)(2)(C)) ................................................................................................36

F.    The Properly Calculated Sentencing Guideline Range and Pertinent Policy Statements Provided by the Sentencing Commission (18 U.S.C. §§ 3553(a)(4) & 3553(a)(5)) ....................................................................................................37

G.    The Need to Avoid Unwarranted Disparities (18 U.S.C. § 3553(a)(6)) ..........38

H.    The Need to Provide Restitution to Any Victim ..............................................40

III.    RESTITUTION AND FINE ..........................................................................................40

CONCLUSION ..................................................................................................................41

## <u>TABLE OF AUTHORITIES</u>

Page(s)

**Cases**

*Gall v. United States*,
   552 U.S. 38 (2007) ................................................................................ 31

*United States v. Bakhit*,
   218 F. Supp. 2d 1232 (C.D. Cal. 2012) ............................................... 16

*United States v. Berger*,
   587 F.3d 1038 (9th Cir. 2009) .............................................................. 16

*United States v. Booth*,
   309 F.3d 566 (9th Cir. 2002) ........................................................... 28, 29

*United States v. Bright*,
   353 F.3d 1114 (9th Cir. 2004) .............................................................. 17

*United States v. Bryson*,
   101 F. Supp. 3d 147 (D. Conn. 2015) .................................................. 17

*United States v. Byors*,
   586 F.3d 222 (2d Cir. 2009) ................................................................. 17

*United States v. Carty*,
   520 F.3d 984 (9th Cir. 2008) ............................................................... 31

*United States v. George*,
   949 F.3d 1181 (9th Cir. 2020) ............................................................. 20

*United States v. Goffer*,
   721 F.3d 113 (2nd Cir. 2013) ............................................................... 36

*United States v. Govan*,
   152 F.3d 1088 (9th Cir.1998) .............................................................. 30

*United States v. Henderson*,
   893 F.3d 1338 (11th Cir. 2018) .............................................. 21, 22, 23

*United States v. Johansson*,
   249 F.3d 848 (9th Cir. 2001) ............................................................... 21

*United States v. Laurienti*,
   611 F.3d 530 (9th Cir. 2010) ............................................................... 17

Case 8:19-cr-00061-JVS   Document 1048-1   Filed 11/21/22   Page 6 of 332   Page ID
#:25398
Case 5:18-cr-00258-EJD   Document 1649   Filed 11/15/22   Page 5 of 46

*United States v. Leung,*
   35 F.3d 1402 (9th Cir. 1994) ................................................................. 28

*United States v. Martin,*
   796 F.3d 1101 (9th Cir. 2015) ............................................................... 19

*United States v. Moran,*
   778 F.3d 942 (11th Cir. 2015) ............................................................... 22

*United States v. Musgrave,*
   761 F.3d 602 (6th Cir. 2014) ................................................................. 36

*United States v. Pham,*
   545 F.3d 712 (9th Cir. 2008) ................................................................. 20

*United States v. Popov,*
   555 F. App'x 671 (9th Cir. 2014) .......................................................... 22

*United States v. Ressam,*
   679 F.3d 1069 (9th Cir. 2012) ............................................................... 31

*United States v. Rose,*
   20 F.3d 367 (9th Cir.1994) ................................................................... 30

*United States v. Turk,*
   626 F.3d 743 (2d Cir. 2010) .................................................................. 17

*United States v. Watts,*
   519 U.S. 148 (1997) ........................................................................ 24, 33

*United States v. Zolp,*
   479 F.3d 715 (9th Cir. 2007) ................................................................. 16

**Statutes**

18 U.S.C. § 3553 .......................................................................................... 2, 7
18 U.S.C. § 3553(a) ........................................................................... 31, 32, 38
18 U.S.C. § 3553(a)(1) ....................................................................... 32, 33, 34
18 U.S.C. § 3553(a)(2)(A) ........................................................................... 35
18 U.S.C. § 3553(a)(2)(B) ........................................................................... 35
18 U.S.C. § 3553(a)(2)(C) ........................................................................... 36
18 U.S.C. § 3553(a)(6) ........................................................................... 38, 39
18 U.S.C. § 3663A(a)(1) .............................................................................. 40
18 U.S.C. § 3664(d)(5) ................................................................................ 41

# INTRODUCTION

Over the course of many years, Elizabeth Holmes defrauded dozens of investors of hundreds of millions of dollars.  Time and again, she chose deceit over candor.  She forged her own endorsements.  She preyed on hopes of her investors that a young, dynamic entrepreneur had changed healthcare.  She leveraged the credibility of her illustrious board.  And, through her deceit, she attained spectacular fame, adoration, and billions of dollars of wealth.

When a journalist dared to ask questions about Theranos' actual achievements, she tried to dupe him and then attacked him, along with his sources.  After her fraud was revealed, she lied, obfuscated, and concealed.  At trial, she blamed her COO (and longtime boyfriend), her board, her scientists, her business partners, her investors, her marketing firm, her attorneys, the media—everyone, that is, but herself.

She also put patients at risk.  As money was drying up, she went to market with an unproven and unreliable medical device.  When her lead assay developer quit as Theranos launched, she chillingly told the scientist: "she has a promise to deliver to the customer, she doesn't have much of a choice but to go ahead with the launch."  Trial Transcript ("Tr.") at 1216.  As her lab director kept encountering issues with Theranos' device and tests, she chose "PR and fundraising" over patient care.  Tr. at 1703.  During her fraud scheme, women received wrong tests about their pregnancies, Theranos generated wrong results for cancer tests, and one victim was led to believe she had the virus that causes AIDS.  Even after Theranos itself concluded that there was a possible patient impact for every single test run for patients on its "Edison" device and voided all Edison tests, Holmes minimized its primary regulator's findings of immediate jeopardy and condition-level deficiencies as not "major."  Tr. at 4709.

Holmes speaks eloquently about her desire to innovate and improve healthcare.  She has demonstrated a strong work ethic, charisma, and ambition.  But she is blinded by that ambition.  Her reality distortion field put, and will continue to put, people in harm's way.  She stands before the Court remorseless.  She accepts no responsibility.  Quite the opposite, she insists she is the victim.

She is not.  Holmes was the CEO and the Chairperson of Theranos.  She repeatedly chose lies, hype, and the prospect of billions of dollars over patient safety and fair dealing with investors.  Elizabeth

1   Holmes' crimes were not failing, they were lying—lying in the most serious context, where everyone

2   needed her to tell the truth.

3       The Sentencing Guidelines appropriately recognize that Holmes' crimes were extraordinarily

4   serious, among the most substantial white collar offenses Silicon Valley or any other District has seen.

5   According to the Presentence Investigation Report ("PSR"), they yield a recommended custodial

6   sentence beyond the statutory maximum.  The factors set forth in 18 U.S.C. § 3553—notably the nature

7   and circumstances of the offense, the need for the sentence to reflect the seriousness of the offense and

8   promote respect for the law, and the need for both specific deterrence and general deterrence—demand a

9   significant custodial sentence.  With these factors in mind, the government respectfully recommends a

10  sentence of 180 months in custody.  The Court should also order Holmes to serve a three-year term of

11  supervised release, pay full restitution to her investors (including Walgreens and Safeway), and pay the

12  required special assessment for each count.

13                                          **FACTS**

14  **I.      THE OFFENSE CONDUCT**

15          **A.      The Investor Fraud**

16          Through numerous misrepresentations and half-truths, Holmes sold investors on the fact that

17  Theranos had a customer-ready device—proven through its use and validation by several large

18  pharmaceutical companies, the Department of Defense, and Walgreens—that analyzed tiny drops of

19  blood taken from the finger to produce better, faster, cheaper, more accurate laboratory test results.

20  Specifically, Holmes secured dozens of investors in Theranos over several years by falsely claiming that

21  Theranos had manufactured one single, proprietary blood analyzer device that could run any blood test

22  that was run by conventional labs, all from a blood sample drawn via a fingerstick rather than the

23  traditional draw from a vein, with higher accuracy and less variability than traditional methods, due in

24  part to its more automated process that reduced human error inherent in running blood tests in a

25  laboratory.  To support her bold claims, Holmes repeatedly told potential investors that Theranos'

26  technology had been comprehensively validated by multiple major pharmaceutical companies and was

27  being used in the battlefield by the Department of Defense to treat wounded soldiers.  Holmes also

28  asserted that Theranos was a profitable company and had a healthy ongoing relationship with retail

1    pharmacy company Walgreens, through which it provided blood tests to patients beginning in

2    September 2013.  Not only did several representatives of investors testify that Holmes made these

3    statements to them in meetings, Holmes also began providing written materials and binders to investors

4    in 2014 and 2015 that contained these false statements.

5         In truth, scientists who had worked at Theranos testified that Theranos' proprietary device could

6    never complete more than 12 types of blood tests, often with less accuracy, less automation, and more

7    variability than traditional "predicate" machines manufactured by third-party companies, such as

8    Siemens AG.  Because of these shortcomings, pharmaceutical companies did very little work with

9    Theranos and did not validate its technology, and the Department of Defense never used Theranos'

10    analyzer to clinically treat soldiers.  Theranos had zero revenue in 2012 and 2013 and desperately

11    needed new sources of cash.  Holmes hid the shortcomings of Theranos' proprietary device by using—

12    without telling potential investors—modified and unmodified third-party machines to fulfill the

13    remainder of Theranos' available blood test menu to patients at Walgreens stores.  As a result, Theranos'

14    relationship with Walgreens was faltering because the percentage of traditional venous draws was too

15    high.  But none of this information was shared with investors in Theranos.

16         As but a few examples of misrepresentations made by Holmes to Theranos investors:

17       •    In April 2010, Holmes emailed executives of Walgreens reports with favorable

18    conclusions about Theranos' technology that were emblazoned with logos of large pharmaceutical

19    companies Pfizer, GlaxoSmithKline, and Schering Plough (now Merck) and Holmes described the

20    attached reports as "three independent due diligence reports on Theranos systems" that were "from"

21    those companies.  However, at trial, Holmes admitted that she added the logos of the pharmaceutical

22    companies to reports written by Theranos and enhanced the conclusions shortly before sending to

23    Walgreens.  And, while a Pfizer representative testified at trial that he told Holmes directly that Pfizer

24    did not see a use for Theranos' technology in 2009, Holmes continued to send the doctored Pfizer report

25    to investors throughout 2014 and 2015.

26       •    In 2010, Holmes told Steve Burd, then-CEO of Safeway, that Theranos was cash flow

27    neutral and projected revenue for 2011 of $223 million when, in truth, Theranos' revenue was steadily

28    declining from approximately $2.8 million in 2009 to less than $600,000 in 2011.  Despite Theranos

earning *zero* revenue in 2012 and 2013, Holmes and COO Ramesh Balwani provided investors with projections that Theranos would earn $140 million in revenue for 2014 and nearly $1 billion in 2015. Indeed, Holmes told one investor in December 2013 that Theranos had historically earned over $200 million from its work with the Department of Defense and pharmaceutical companies, when, in reality, Theranos had never earned more than $10 million from both sources combined.

- In August and September 2013, internal Theranos scientists, including long-time employee Surekha Gangakhedkar and then-laboratory director Dr. Adam Rosendorff warned Holmes that Theranos' proprietary device was not able to reliably test patient samples. They both testified that Holmes pressured and rushed the scientists to quickly validate assays for clinical use in advance of the launch with Walgreens. Ms. Gangakhedkar and other scientists ultimately resigned shortly before the Walgreens launch because of concerns with reliability of running patient tests on Theranos' proprietary device, but when Ms. Gangakhedkar informed Holmes of her concerns, Holmes responded that she had made a promise to deliver to the customer (Walgreens) that she must fulfill. Despite these internal concerns being voiced repeatedly to Holmes, Holmes reviewed and approved an article in *The Wall Street Journal* claiming Theranos' device could run 1,000 laboratory tests with more accuracy than conventional methods. Holmes shared the article with investors.

- In 2013 and 2014, Holmes repeatedly told investors that the Department of Defense was using Theranos' proprietary analyzer on medevac helicopters, in the battlefield, or to treat soldiers in Afghanistan or Iraq. In truth, the Department of Defense never used Theranos' device to clinically treat patients, nor did it ever move out of initial testing phases. One investor victim impact statement captures the depravity of Holmes' lies in this respect as follows: "I feel strongly that the sentencing should take into account Defendants' intentional decision to prey upon investors' reverence for our servicemen and servicewomen in the Armed Forces. Our country's freedom is protected everyday by the courageous and selfless service of these men and women, and the Defendants took advantage of investors' patriotic feelings for selfish gain through deceit. Indeed, Elizabeth Holmes lied to me about saving soldiers' lives through military contracts and Theranos' use of 'proprietary technology' on military helicopters. Simply put, Holmes's actions were loathsome and un-American." Victim Impact Statement of Craig Hall dated Sept. 6, 2022, at p.1.

Case 8:19-cr-00061-JVS   Document 1048-1   Filed 11/21/22   Page 11 of 332   Page ID
#:25402
Case 5:18-cr-00258-EJD   Document 1649   Filed 11/15/22   Page 10 of 46

• In August 2014, Balwani forwarded to Holmes an email from Walgreens executives expressing a desire to reduce venous draws to below 10% (whereas they had been hovering around 40% for most of the year) before expanding further. Nevertheless, Holmes presented financial projections to at least one investor in October 2014 that projected Theranos would increase from being in a few dozen Walgreens stores to being in 900 locations by 2015.

Holmes exploited investors' altruistic motives to dupe investors of all experience levels to invest in Theranos. Holmes fooled investors who were new to the healthcare investment sphere as well as investors with deep sophistication and experience in the healthcare and bio-tech sector, such as PFM, a regulated investment entity, led by managing partner and chief investment officer Brian Grossman, who had over twenty years of experience analyzing or investing in companies like Theranos. Mr. Grossman testified that he sent lengthy due diligence questions to Holmes and Balwani to ensure there was no ambiguity about the limitations of Theranos' proprietary technology, and yet he was shocked to learn more than eighteen months after his investment that Theranos used third-party commercial machines and not exclusively Theranos' proprietary device as Holmes had previously led him to believe. Former Secretary of State George Shultz invested in Theranos on behalf of his family members and, as his son and daughter-in-law described in their victim impact statement, "[Holmes] succeeded by using my father (and others) and played him for the fool." Victim Impact Statement of Alex & Janel Shultz at p.1. Holmes often seized upon investors' desire to make the world a better place in order to lure them into believing her lies. For example, Lisa Peterson, a representative of investor RDV Corporation, was moved by Holmes' pitch because she could envision the benefits Holmes promised Theranos could deliver on her husband's health condition. Holmes and Balwani knew this and even sent text messages to each other such as "[t]hey also care about our mission to do good because they are a religious org" to which Holmes responds "Good[.]" TX 5387D at 21.

While Holmes was publicly touting Theranos as a revolution in healthcare, she and Balwani quietly and repeatedly acknowledged the dark reality within Theranos to each other. For example, they texted as follows:

| Date | Exchange | TX 5387D page |
|---|---|---|
| 5/9/2012 | EAH: "We have to work together on the rev piece" | 7 |

Case 8:19-cr-00061-JVS   Document 1048-1   Filed 11/21/22   Page 12 of 332   Page ID
#:25404
Case 5:18-cr-00258-EJD   Document 1849   Filed 11/15/22   Page 11 of 46

| | | | |
|---|---|---|---|
| | SB: "you are the company.  we need revenue . . . ." | |
| 11/20/2013 | SB: "Pissing me off we don't have anyone managing PSC, ctn production, cart production, elisa assays, TSH"<br><br>EAH: "I know." | 14-15 |
| 11/19/2014 | SB: "Need to focus on ops. . . . Lab, customer service, tat, all need director level people . . . . We need. The lab and call center fixed. . . . Rebuild."<br><br>EAH:  "Fundamentally we need to stop fighting fires by not creating them . . .  Need to fix root cause here . . . Yes" | 23-24 |
| 11/19/2014 | SB: "We can't scale with wag." | 24 |
| 11/28/2014 | SB: "Normand lab is a fucking disaster zone." | 29 |
| 4/10/2015 | SB: "The point about narrowing down menu to hit high fs % came to me like gift of God. . . . We must hit our volume goals now.  We need to make it a matter of life and death. Survival.  We must not lose" | 43 |
| 4/25/2015 | SB: "I am worried about over exposure without solid substance which is lacking right now.  We can talk tomorrow about over exposure."<br><br>EAH: "Agree." | 54 |
| 4/28/2015 | SB: "It is most maddening there is no focus in any chem teams and no product coming out."<br><br>EAH: "I know." | 58 |
| 5/6/2015 | SB: "We need our heads down and execute.  Bring billion equity and billion revenue."<br><br>EAH: "I know.  Thinking same." | 68 |
| 5/13/2015 | SB: "We need a better strategy for Normandy.  For a long time to come we will have hybrid solutions. . . ."<br><br>EAH: "I agree." | 78 |
| 6/3/2015 | SB: "We need to focus on being a technology company.  We spend all our time with CLIA morons."<br><br>EAH: "Yes"<br><br>SB: "I deal with CLIA everyday and I hate the low quality of people in lab . . . ."<br><br>EAH: "I was thinking about the exact same." | 83 |

Case 8:19-cr-00061-JVS  Document 1048-1  Filed 11/21/22  Page 13 of 332  Page ID
#:25405
Case 5:18-cr-00258-EJD  Document 1649  Filed 11/15/22  Page 12 of 46

| | | |
|---|---|---|
| 7/28/2015 | SB: "We need to commit to each other and get out of this hell so we can live in paradise we both have."<br><br>EAH: "I have literally been meditating on exact same. Whole time I was running was thinking that. . . ."<br><br>SB: "We need to commit to focusing and getting in paradise."<br><br>EAH: "Product company.  Winning" | 90 |
| 9/22/2015 | SB: "Our validation reports are terrible.  Really painful going thru this process.  Same issues fda pointed out. . . . Going bad so far.  Pray.  Daniel has nothing ready . . . ."<br><br>EAH: "Praying" | 107 |

In a note to herself, Holmes said Balwani was "[c]onvinced never happen ever.  Not thanksgiving not ever."  TX 7534.  Balwani, Holmes wrote, bemoaned there was "[n]o product" and the "[f]ucking mediocre quality of this piece of shit company."  *Id.*  When they drew government scrutiny, Holmes and Balwani bragged about their ability to "run circles around others and fda by manipulating their game."  TX 5387D at 102; *id.* (EAH: "We can definitely run circles.").

Holmes' fraud was spectacularly successful.  At the peak, she was "one of the richest and most celebrated woman leaders in our [country's] history."  Victim Impact Statement of Alex and Janel Shultz at 2.  By the end of 2014, Holmes' shares in Theranos were valued at more than **$4 billion**.  Tr. at 8014.  She took home hundreds of thousands of dollars in annual salary.  PSR ¶ 162.  She traveled in a Theranos-paid private jet.  Tr. at 721-22; TX 5387D at 3 (Holmes and Balwani musing about "get[ting] a plane for these short journeys after C2 [a reference to the C-2 investment round]").  She and Balwani ruled Theranos from a $15 million mansion in Atherton.  PSR ¶ 166 at p. 44.  She donned the cover of *Fortune*, *Forbes*, *Inc.*, *Glamour*, and *T: The New Your Times Style Magazine*.  *See* https://www.nytimes.com/2015/10/30/business/the-narrative-frays-for-theranos-and-elizabeth-holmes.html.  She dined at the White House; she gave the commencement address at Pepperdine University; she joined the Board of Fellows of Harvard Medical School; and at the peak of the fraud was named by *Time* as one of the 100 Most Influential People in the World.  *Id.*; TX 5387D at 34;

Case 8:19-cr-00061-JVS Document 1048-1 Filed 11/21/22 Page 14 of 332 Page ID
#:25406
Case 5:18-cr-00258-EJD Document 1649 Filed 11/15/22 Page 13 of 46

1    https://blogs.bmj.com/bmj/2019/04/12/jeffrey-flier-elizabeth-holmes-and-harvard-medical-school-
2    board-of-fellows-a-cautionary-tale/.

3            Between 2010, when she induced Walgreens and Safeway to invest based on false
4    pharmaceutical company endorsements and fantastical revenue projections, and March 2015, Holmes
5    raised hundreds of millions of dollars.  As the PSR notes, $730,840,309 came from "Series C-1" and
6    "Series C-2" investors who invested subsequent to Theranos' public relations push in September 2013
7    during the conspiracy.  Representatives of seven such investors testified in the trials: Alan Eisenman,
8    Brian Grossman (Partner Investments LP/PFM Healthcare), Chris Lucas (Black Diamond Ventures XII-
9    B, LLC), Pat Mendenhall (Mendenhall TF Partners), Daniel Mosley (Mosley Family Holdings LLC),
10   Lisa Peterson (RDV Corporation/Dynasty Financial II/Lakeshore Capital Management), and Bryan
11   Tolbert (Hall Black Diamond II LLC).  At least eight additional investor/investor representatives
12   (including three board members) were interviewed by the government, testified before the SEC, or
13   submitted victim impact statements:  David Boies (Boies, Schiller & Flexner LLP), Kendra Fadil, Frank
14   Gordon (Crofton Capital/Gordon Family Trust), Henry Kissinger, Richard Kovacevich, Don Lucas Jr.
15   (Lucas Venture Group), Mark Campbell and Jared Hutchings (Peer Ventures Group), and Natalie Ravitz
16   (Rupert Murdoch).  *See* 11/11/2022 Decl. of AUSA Robert S. Leach in Support of U.S.' Sentencing
17   Memorandum, Exhibits B-L, filed concurrently.  The $730,840,309 in C-1 and C-2 investments does *not*
18   include an additional $70 invested by Walgreens and Safeway on account of convertible promissory
19   notes and $3 million invested by director George Shultz, who testified in PFM's civil action against
20   Holmes and whose family also submitted a victim impact statement.

21          **B.      The Impact on Patients**

22          Throughout the relevant time period, Holmes touted Theranos as a company that would
23   revolutionize blood testing, making health information more reliable and more accessible.  Beginning in
24   late 2013, Theranos actually offered clinical blood testing services to the public, first in the Bay Area,
25   then in Arizona.  To jumpstart the process of making its tests available to the public, and to reach as
26   many patients as it could, Theranos partnered with retail pharmacy chain Walgreens—a company with a
27   nationwide footprint that could make Theranos' product accessible to most of the country's population.
28   In so doing, Holmes and Balwani benefitted from goodwill and credibility associated with the

1   Walgreens name.  There can be no doubt that, as with investors, patients were more comfortable trusting

2   Theranos because they assumed that an established business like Walgreens would not promote a service

3   that was not similarly legitimate and reputable.  Thus, Walgreens was not only Theranos' launchpad but

4   also its de facto ambassador.  Throughout the partnership with Walgreens, Defendants pushed for wider

5   and faster expansion, with Walgreens holding back and expressing concerns over Theranos' inability

6   conduct much of its testing using its vaunted fingerstick method, among other things.  Despite

7   Walgreens' hesitations about expanding the Theranos partnership more rapidly, thousands of patients

8   ended up receiving blood test services from Theranos between 2013 and 2015.

9         The evidence at trial revealed something Holmes and Balwani worked hard to hide from those

10   patients:  Theranos' proprietary testing was not reliable.  Theranos' homegrown "TSPU" device—used

11   for several important tests including HCG (to assess the presence and stage of a pregnancy), PSA (to

12   check for potentially lethal prostate cancer), and TSH (a measure of thyroid health) (TX 4533)—was

13   plagued by issues.  It broke down frequently and, when it did return results, it suffered from serious

14   accuracy problems.  *See* TX 1587, 1633.  Erika Cheung, a Theranos employee who operated the TSPU

15   to generate patient test results, had the following to say about her faith in the technology:

16          I was really stressed and uncomfortable with what was going on because I had at that

17          point amassed a lot of evidence to suggest that the technology, the Edison device

18          specifically, were not adequate to test on patients, and I did not feel comfortable running

19          patient samples.

20   9/15/21 Tr. at 968.  Ms. Cheung went on to explain that she was concerned about patients, who

21   "think that they're getting accurate results, and they're making very important medical decisions

22   about what their treatments are, what their diagnoses are, what medications they take…."  *Id.* at

23   969.  Dr. Rosendorff agreed that the Edison device was flawed, explaining that he resigned from

24   his job as Theranos lab director partly because he was being asked to vouch for tests that he did

25   not have confidence in, and he felt that the testing platform "was not allowing [him] to function

26   effectively as a lab director."  9/24/21 Tr. at 1703.  Similar problems arose when Theranos used

27   modified third-party devices to test finger-stick samples.  *See* 10/6/21 Tr. at 2810 (Dr.

28   Rosendorff testifying that the Theranos modifications to third-party devices made them less

U.S.' SENTENCING MEM.,
CASE NO. 18-258 EJD                                      9

Case 8:19-cr-00061-JVS   Document 1048-1   Filed 11/21/22   Page 16 of 332   Page ID
#:25408
Case 5:18-cr-00258-EJD   Document 1849   Filed 11/15/22   Page 15 of 46

1    accurate).

2         Erika Cheung and Dr. Rosendorff were not alone in their concerns about the reliability of

3    Theranos technology.  Surekha Gangakhedkar was a senior scientist who resigned from Theranos upon

4    learning of the company's plan to use its Edison 3.0 and 3.5 devices to conduct clinical testing for

5    patients.  9/17/21 Tr. at 1149-50.  She explained that she knew of "reliability issues" with those devices

6    that were not fully resolved, affecting their ability to return consistent results.  *Id.* at 1186-87.

7         Given the dim view that Theranos' own scientists took of its technology, it is no surprise that a

8    number of Theranos patients received results that were suspicious or demonstrably incorrect.  For

9    example, Dr. Mark Burnes testified at trial about a patient named Mehrl Ellsworth, who sought PSA

10   (prostate specific antigen) testing from Theranos in advance of an international trip.  11/18/21 Tr. at

11   6836.  Theranos reported Dr. Ellsworth's PSA levels to be extremely elevated compared to his previous

12   results—a change that could have indicated of prostate cancer if accurate.  TX 4938, 4415; 11/18/21 Tr.

13   at 6882.  Dr. Ellsworth's next test from Theranos, however, showed normal PSA levels.  TX 4938,

14   4415; 11/18/21 Tr. at 6842-6856.  The third test from Theranos was once again dramatically elevated,

15   but subsequent testing returned normal results.  *Id.*  It turned out that the two unexpectedly elevated PSA

16   results from Theranos had something in common:  they were both run on a Theranos proprietary system,

17   whereas the normal results had been generated by traditional, FDA-approved methods.  *Id.*  Dr. Burnes

18   was able to conclude that the elevated PSA levels indicated by the Theranos-specific tests were not

19   valid.  11/18/21 Tr. at 6858.  Theranos' repeated failure to return an accurate PSA test result after

20   multiple attempts using its proprietary equipment speaks volumes about the reliability of Theranos

21   technology.

22        Theranos patients also experienced problems with the company's PT/INR test, which relates to

23   blood clotting.  Patient "AT" suffered from atrial fibrillation (AFib) and her doctor instructed her to

24   obtain a PT/INR test from Theranos.  PSR ¶ 55.  Although her PT/INR level was normally between two

25   and three, Theranos returned an unusually low level of 0.08.  *Id.*  "AT's" doctor did not believe the

26   Theranos results could be accurate, and sent her to a traditional lab for confirmatory testing, which

27   yielded a result of 2.8—in her typical range for that assay.  *Id.*  "AT" told government investigators that,

28   had she adjusted her medication in response to the erroneously low Theranos PT/INR value, she would

have been at risk for internal bleeding, a common complication of AFib. *Id.* Theranos' own employees were not immune from questionable results. "EG" was a Theranos phlebotomist who had been on blood-thinning medication for years due to a history of blood clots. *Id.* at 56. When she went to Theranos for a PT/INR test, her results came back markedly different from her usual levels, and her doctor adjusted her medication in response. *Id.* Due to skepticism over the validity of the Theranos results, "EG" had confirmatory testing performed at a traditional lab and received results matching her usual values, showing that the adjustment to her medication had been unnecessary. *Id.*

Several Theranos patients received erroneous HCG tests providing inaccurate information about the status of their pregnancies. Brittany Gould and her treating nurse practitioner, Dr. Audra Zachman, testified at trial about multiple dubious HCG results provided by Theranos in October 2014. *See* TX 5410, 2044, 4242, 3305, 5411. Ms. Gould, who had suffered multiple miscarriages in the past, obtained a series of HCG values from Theranos and traditional lab Quest Diagnostics over the course of a week. The Theranos results—which included a dramatic drop in HCG value—strongly indicated that Ms. Gould was having another miscarriage, but confirmatory testing by Quest indicated a viable pregnancy, and Ms. Gould went on to deliver a healthy baby. 9/21/21 Tr. at 1396-1403. Dr. Zachman testified that she doubted the accuracy of both Theranos test results received by Ms. Gould, and stated that she had never had accuracy issues with HCG tests from other labs the way she did with the results for Ms. Gould. *Id.* Unfortunately, Ms Gould's experience with Theranos' HCG test was not unique. In May 2014, a physician had called Theranos about HCG results that turned out to be unexpectedly low and would have suggested a miscarriage if accurate, prompting the company to collect another sample and rerun the test. TX 4145. Five months later, a provider contacted Theranos to complain about Theranos HCG tests that had suggested that a pregnant patient was miscarrying. TX 4222. In response to that Theranos test value, the patient's doctor had her discontinue pregnancy medications and get ready for her next cycle. *Id.* When the patient was tested again for HCG, however, her value was over 2000 and a subsequent scan detected a fetal heartbeat. *Id.* When Holmes learned about this erroneous test result, she asked Balwani, "How did that happen?"—a strange question from someone who had been aware of problems with Theranos' HCG test for months.

/ /

Case 8:19-cr-00061-JVS   Document 1048-1   Filed 11/21/22   Page 18 of 332   Page ID
#:25420
Case 5:18-cr-00258-EJD   Document 1649   Filed 11/15/22   Page 17 of 46

It is impossible to know exactly how many times frightening scenarios like these played out in the lives of patients who trusted their blood testing to Theranos.  The government's investigation of Theranos did not reveal a centralized, comprehensive log of customer complaints.  Instead, that information was apparently stored in multiple places and compiled as needed.  *See* Balwani TX 4520. (complaint log selections provided to Balwani in connection with Adam Rosendorff).  Equally alarming is the high likelihood that numerous patients relied on inaccurate blood test results from Theranos without ever realizing that they were unreliable.  It is likely that some portion of Theranos patients experienced harm to their health as a result of invalid Theranos test results without ever realizing the cause.

The evidence available paints a bleak picture of Theranos' ability to return valid results using its TSPU analyzer.  Internal quality control checks at Theranos provided a valuable objective measure of how accurate the analyzer was.  Analyzing standardized samples, with known concentrations of the substance being tested, the Theranos machines would either pass or fail daily checks of individual assays.  In March of 2014, records indicate that nearly 26% of quality control checks on the TSPU resulted in failures, i.e., inaccurate results.  TX 1633.  Some of the individual assays performed even worse.  Theranos' PSA test failed quality control nearly 30% of the time, and the company's test for triiodothyronine failed more than 50% of the time.  *Id.*  Because there is no guaranteed way to identify inaccurate patient test results, Theranos' poor QC numbers are the best available method to estimate how frequently Theranos was sending incorrect values to patients.  *See* 9/15/21 Tr. at 967.

When Centers for Medicare and Medicaid Services (CMS) inspected Theranos in the late summer and fall of 2015, the agency found systemic issues with quality control for the Theranos miniature analyzer or TSPU.  PSR ¶ 58.  In particular, CMS put Theranos on notice of "multiple and recurrent time periods (across all analytes tested) of abrupt shifts in [quality control] means, high rates of 1-2s QC rule failures, and QC CVs far exceeding limits for a stable testing process."  *Id.*  In other words, Theranos' own quality control data revealed severe reliability problems with its testing systems, just as employees had warned Defendants years earlier.  Faced with CMS's findings, Theranos itself admitted that there had been "a global and long-term failure of the quality control program for this instrument," and further concluded that "there is a possible patient impact for every test reported from

Case 8:19-cr-00061-JVS  Document 1048-1  Filed 11/21/22  Page 19 of 332  Page ID
#:25464
Case 5:18-cr-00258-EJD  Document 1649  Filed 11/15/22  Page 18 of 46

1    the laboratory's TPS 3.5 instruments." *Id.*  Based on the scale of the problems highlighted by CMS,

2    Theranos voided every patient test result ever run on its Edison device in the clinical lab.  Of course, this

3    step did nothing to mitigate the harm patients would already have suffered due to their reliance on

4    inaccurate medical test information.

5            **C.      The Cover Up**

6            In April 2015, Holmes learned that a *Wall Street Journal* reporter was working on a negative

7    story about Theranos.  *See* TX 5387D at 50 ("Wsj guy might show up tomorrow").  She and Balwani

8    scrambled to have the Phoenix store prepared to perform only fingerstick tests rather than vein draws –

9    hoping to avoid the possible impression Theranos was doing ordinary blood testing.  *Id.* (SB: "We need

10   tomorrow to test and then the team can push production tomorrow night. . . . So Wednesday it will

11   trigger fs for gc18 [general chemistry] . . . [s]o if he comes it may be 3 fs.").  Ultimately, Balwani told

12   Holmes "[t]he team is not confident about pushing out fingerstick tonite . . . we don't want to rush this.

13   We went thru hell." *Id.* at 52.  Unable to dupe the reporter, they then hired David Boies to try to get him

14   to drop the story.  Tr. at 7998.  When that failed, Holmes personally appealed to the owner of *The Wall

15   Street Journal*, who also was a significant investor in Theranos, to quash the story.  Tr. at 7999; TX

16   5704.

17          Holmes also attacked those she believed to be the reporter's sources.  *See* Victim Impact

18   Statement of Alex & Janel Shultz at 1 ("[S]he sure did her best to intimidate and silence the truth

19   tellers.").  In June 2015, she had a man sit all day outside of Erika Cheung's new workplace to serve a

20   letter from Boies Schiller Flexner LLP threatening her with legal action.  Tr. at 982-985, 7974-77; TX

21   2567; TX 5387D at 85 (SB: "I am ok sending letter to Erika as in [General Counsel] heather [King's]

22   email").  After the reporter published a negative story, Holmes tried to dismiss Cheung as a low-level

23   disgruntled employee.  Tr. at 7978.  She also had Boies Schiller lawyers surprise Tyler Shultz at his

24   grandfather George Shultz's house to have him sign an affidavit identifying himself as a source for the

25   reporter.  Tr. at 7995-97; Leach Decl. Ex. L at 55-58; TX 5387D at 76 (EAH: "If Tyler thinking abt

26   George fyi at right time"); *id.* at 82 (SB: "You not calling George back also sends a message that we are

27   about to suit").  The incident enraged George Shultz, which he described as "one of the worst little

28   things he had seen anybody try to do."  Tr. at 7995-96; Leach Decl. Ex. L at 57; TX 5387D at 84

Case 8:19-cr-00061-JVS   Document 1048-1   Filed 11/21/22   Page 20 of 332   Page ID
#:25412
Case 5:18-cr-00258-EJD   Document 1649   Filed 11/15/22   Page 19 of 46

1  ("George wants to know what Tyler has done. Would you ask David if I should say or tell him we'll let

2  him know la[t]er and txt me back").  During this time period, Holmes and Balwani also discussed

3  "nail[ing] this mother fucker" "in CLIA" who they believed to be spreading negative information, and at

4  various times contemplated action against "Tyler [Shultz],", "Erika [Cheug]," "Adam [Rosendorff],"

5  and "Rochelle [Gibbons]," the wife of a Theranos scientist who committed suicide in 2013.  TX 5387D

6  at 76-78, 86; Tr. at 1468-71, 8474; Balwani Trial Transcript at 6531.

7       When the negative *Wall Street Journal* story broke, Holmes lied and dissembled.  On October

8  15, 2015, when confronted on Jim Cramer's *Mad Money* with the *Journal*'s claim that Edison could

9  only do 15 out of 240 tests, Holmes falsely stated "every test that we offer in our laboratory can run on

10  our proprietary devices." TX 2851.  At the time, Theranos was not using Edison (or any future iteration

11  of its device) for *any* tests, and had never used Edison for more than 12.  On October 21, 2015, she

12  falsely stated at a public conference that Theranos "never used commercially available lab equipment for

13  finger-stick based tests."  ECF No. 588 at 14; https://www.wsj.com/video/elizabeth-holmes-discusses-

14  theranos-at-wsjdlive-2015/20CE68A0-CAEE-48E0-BAB4-FD6C47D283BE.html.  The comment so

15  concerned Balwani that he texted: "Worried about your 'all fingersticks on our technology' comment."

16  TX 5387D at 117.

17       Months later, Holmes "continued to withhold information from [RDV] and other investors,

18  which . . . made it impossible to make informed decisions about the status and value of our investment."

19  *See* Victim Impact Statement of RDV Corporation dated Aug. 26, 2022 at p.4.  She insisted the issues

20  CMS identified were not major and downplayed their significance.  Tr. at 4709.

21       Holmes' coverup had lasting and devastating effects.  According to one victim impact statement,

22  Holmes "intentionally lied to [George Shultz] about Tyler to discredit him to prevent [George Shultz]

23  from learning the truth," creating a "permanent rift" within the family.  *See* Victim Impact Statement of

24  Alex & Janel Shultz at p.2 (describing how Holmes "[took] a wrecking ball to [Shultz's] family" and

25  stating "[t]he most heart breaking of all is to hear your son describe that he contemplated suicide

26  because he felt abandoned, isolated, threatened and hopeless, for doing the right thing.").

27  / /

28

U.S.' SENTENCING MEM.,
CASE NO. 18-258 EJD                14

Case 8:19-cr-00061-JVS   Document 1048-1   Filed 11/21/22   Page 21 of 332   Page ID
#:25413
Case 5:18-cr-00258-EJD   Document 1649   Filed 11/15/22   Page 20 of 46

## II.    PROCEDURAL HISTORY

On July 28, 2020, the government filed the Third Superseding Indictment, charging Holmes and Balwani with ten counts of wire fraud (Counts 3-12) and two counts of conspiracy to commit wire fraud (Counts 1-2).  ECF No. 469.  The Court severed the case in March 2020.  ECF No. 362.  Beginning on August 31, 2021, Holmes' trial spanned four months, during which over 900 exhibits were admitted and 32 witnesses testified.  *See* ECF No. 1395.  On January 3, 2022, the jury found Holmes guilty of four counts charging conspiracy to commit wire fraud during the period 2010 to 2015 and wire fraud against three specific investors in Theranos (Mosley, RDV, and PFM).  ECF No. 1235.  The jury did not reach a unanimous verdict with respect to the remaining investor-related counts and acquitted Holmes on the patient-related counts.  *Id.*  Balwani's separate trial began in March 2022 on the same twelve counts.  Following a comparably lengthy trial, the jury found Balwani guilty of all twelve counts.  ECF No. 1507.

### THE SENTENCING GUIDELINES CALCULATION

The government calculates the total offense level as follows:

| | | | |
|---|---|---|---|
| a. | Base Offense Level, U.S.S.G. § 2B1.1(a)(1) | | 7 |
| b. | Specific offense characteristics, U.S.S.G. § 2B1.1(b) | | |
| | Loss more than $550,000,000, U.S.S.G. § 2B1.1(b)(1)(P) | | +30 |
| | Offense involving 10 or more victims, U.S.S.G. § 2B1.1(b)(2)(A) | | +2 |
| | Offense involving the conscious or reckless risk of death or serious bodily injury, U.S.S.G. § 2B1.1(b)(16) | | +2 |
| c. | Adjustment for Role in the Offense, U.S.S.G. § 3B1.1(c) | | +4 |
| d. | Total Offense Level | | 43[1] |

Holmes falls within Criminal History Category I.  Thus, for Offense Level 43, the Guidelines recommend a sentence beyond the statutory maximum of 80 years.  The PSR omits the 2B1.1(b)(16) enhancement; the government objects to the omission.  The PSR recommends that the Court vary from Guidelines and impose a sentence of 108 months.  *See* PSR Sentencing Recommendation at p.1.

---

[1]    The Guidelines provide that "[a]n offense level of more than 43 is to be treated as an offense level of 43."  U.S.S.G. Ch. 5, Part A applic. note 2.

Case 8:19-cr-00061-JVS   Document 1048-1   Filed 11/21/22   Page 22 of 332   Page ID
#:25414
Case 5:18-cr-00258-EJD   Document 1649   Filed 11/15/22   Page 21 of 46

The government agrees with the Probation Office that the total offense level is 43. Holmes objects to the application of certain adjustments. The government thus addresses them in turn.

## I.   LOSS MORE THAN $550,000,000

Under the Guidelines, loss "is the greater of actual or intended loss." U.S.S.G. § 2B1.1(b) applic. note 3(A). "'Actual loss' means the reasonably foreseeable pecuniary harm that resulted from the offense." *Id.* note 3(A)(i). "'Intended loss' . . . [includes] the pecuniary harm that the defendant purposely sought to inflict." *Id.* note 3(A)(ii). "'[R]easonably foreseeable pecuniary harm' means pecuniary harm [i.e., harm that is monetary or otherwise readily measurably in money] that the defendant knew or, under the circumstances, reasonably should have known, was a potential result of the offense." *Id.* notes 3(A)(iii & iv).

"The guidelines do not present a single universal method for loss calculation under § 2B1.1 . . . ." *United States v. Zolp*, 479 F.3d 715, 718 (9th Cir. 2007). The Court "need only make a reasonable estimate of the loss." U.S.S.G. § 2B1.1(b) note 3(C). Because the Court is in a unique position to assess the evidence and estimate the loss, its determination is entitled to appropriate deference. *Id.* In estimating loss, the Guidelines direct the Court to consider "the cost to the victim of replacing [the unlawfully taken] property," "[t]he approximate number of victims," and "reduction that resulted from the offense in the value of equity securities or other corporate assets." *Id.*

In the context of public company securities, the Ninth Circuit has expressly rejected the need to show "loss causation." *United States v. Berger*, 587 F.3d 1038, 1044-45 (9th Cir. 2009). In the public company context, the Ninth Circuit has observed:

> Measurement of loss becomes considerably more complex, however, when the court confronts a "pump-and-dump" scheme involving an otherwise legitimate company. In such a case, because the stock continues to have residual value after the fraudulent scheme is revealed, the court may not assume that the loss inflicted equals the full pre-disclosure value of the stock; rather, the court must disentangle the underlying value of the stock, inflation of that value due to the fraud, and either inflation or deflation of that value due to unrelated causes.

*Zolp*, 479 F.3d at 719 (citing cases involving public company securities and efficient markets); *United States v. Bakhit*, 218 F. Supp. 2d 1232, 1236-37 (C.D. Cal. 2012) (cited by *Zolp* with approval and

Case 8:19-cr-00061-JVS   Document 1048-1   Filed 11/21/22   Page 23 of 332   Page ID
#:25415
Case 5:18-cr-00258-EJD   Document 1649   Filed 11/15/22   Page 22 of 46

noting "after the fraud was fully disclosed and absorbed by the market, [the] stock continued to trade at around $5.00 per share.").

Conversely, the "pecuniary harm" to an investor induced to invest by fraud is the amount of the investment.  *See*, *e.g.*, *United States v. Turk*, 626 F.3d 743, 750 (2d Cir. 2010) ("[T]he crux of [defendant's] offense is that she obtained loans by fraudulently leading unsecured creditors to believe that they were secured creditors.  Without this deceit, she could not have obtained her victims' money."); *United States v. Bryson*, 101 F. Supp. 3d 147, 155 (D. Conn. 2015) ("[F]or those investors who were fraudulent induced to invest following the onset of the conspiracy, a reasonable estimate of the actual loss attributable to the offense conduct is the total value of their investment.") (citing *Turk*, 626 F.3d at 750).  Where a defendant's victims are "left with nothing of value when the fraud was uncovered," a court may find "loss based on the victims' total . . . investment."  *United States v. Byors*, 586 F.3d 222, 226 (2d Cir. 2009).

"Because [Holmes] was convicted of conspiracy, and because the losses were incurred because of that conspiracy, the 'preponderance of the evidence' standard applies."  *See United States v. Laurienti*, 611 F.3d 530, 556 (9th Cir. 2010); *id.* at 557 (noting a court may infer in the conspiracy context all investors who purchased a particular security were duped by the conspiracy).

Here, Holmes was convicted of three counts of wire fraud relating to investments by Mosley, RDV, and PFM.  Mosley and representatives of RDV testified at length in both trials about the misrepresentations and half-truths that induced their investments.  Mosley invested $5,999,997 on October 31, 2014.  PSR ¶ 47.  He lost his entire investment.  RDV invested $99,999,984 on October 31, 2014.  *Id.*  It also lost its entire investment.  *See* Victim Impact Statement of RDV Corporation dated Aug. 26, 2022.  PFM invested $96,139,998 in three separate wires on February 4, 2014.  *See* Victim Impact Statement of PFM dated Sept. 6, 2022; PSR ¶ 46-47.  Although $43,500,00 was returned on May 1, 2017, as settlement of a civil lawsuit, this does not offset the loss.  *See* U.S.S.G. § 2B1.1 applic. Note (E)(i) ("Loss shall be reduced by . . . [t]he money returned . . . by the defendant or other persons acting jointly with the defendant, to the victim before the offense was detected."); *United States v. Bright*, 353 F.3d 1114, 1118 (9th Cir. 2004) (the defendant is only "entitled to credit for refunds paid prior to the

Case 8:19-cr-00061-JVS   Document 1048-1   Filed 11/21/22   Page 24 of 332   Page ID
#:25416
Case 5:18-cr-00258-EJD   Document 1649   Filed 11/15/22   Page 23 of 46

1   discovery of the offense").  The Mosley, RDV, and PFM investments *alone* account for $202,139,979 in

2   loss.[2]

3          Holmes also was convicted of conspiracy to commit wire fraud against Theranos investors

4   during the period 2010 to 2015.  ECF No. 1235 at 1; ECF No. 469.  Between September 2013, when

5   Theranos publicly launched its partnership with Walgreens, and 2015, Holmes raised $730,840,309 from

6   investors in the Series C round – Series C-1 and C-2 (including Mosley, RDV, and PFM).  According to

7   Daniel Edlin, who reported to Holmes, he prepared binders to investors based on an approved checklist.

8   Tr. at 3993-94.  He authenticated a "typical investment related binder" that went to one specific investor.

9   *See* Tr. 3996 & TX 1940, 4869.  He explained that a confidential Theranos briefing "was included in all

10  of the investment binders to my knowledge."  Tr. at 4001; *see also* Tr. 3997-4000.  The government

11  also presented evidence of a recorded call between Holmes and a group of C-1 investors in advance of

12  investments by Chris Lucas' and Bryan Tolbert's firms.  Because investors were generally provided

13  similar information, and because they were exposed to similar public information (e.g., the September

14  2013 *Wall Street Journal* promotion, the September 2013 press release regarding Walgreens, the June

15  2014 Roger Parloff article), it is reasonable to conclude for sentencing purposes that they too are victims

16  of the scheme to defraud the jury found.  But for settlements of lawsuits after the fraud was exposed,

17  there is no evidence the C-1 or C-2 investors received any money or property or return on account of

18  their investments.  They too lost the entirety of their investment when Theranos declared bankruptcy

19  through an assignment for the benefit of creditors.

20         The trial also included evidence that Safeway and Walgreens invested $30 million and $40

21  million respectively on account of convertible promissory notes.  None of these investments yielded a

22  return.  *See, e.g.*, ECF No. 517-1.

23         Holmes appears to suggest that the "loss" is somehow not the money investors actually lost.  She

24  appears to argue that the loss is not reasonably estimable because Theranos was a real company with

25  cash and patent rights at certain periods of time, and that the actual loss must be reduced by some

26  hypothetical fair market value of Theranos when the fraud was discovered, or some other date.  This

27

28  _____
    [2]     The Guidelines provide for a 26-level increase for losses more than $150,000,000.  *See* U.S.S.G.
    § 2B1.1(b)(1)(N).

Case 8:19-cr-00061-JVS   Document 1048-1   Filed 11/21/22   Page 25 of 332   Page ID
#:25417
Case 5:18-cr-00258-EJD   Document 1649   Filed 11/15/22   Page 24 of 46

defies logic and is unsupported by Ninth Circuit authority. *Zolp* applies in the *public company* context, which makes sense: when a fraud is revealed in a public and efficient market, one can determine through the price change what the impact is to investors. Here, by contrast, there is no dispute: the C-1 and C-2 investors received nothing of value from their Theranos investment (save for some amounts returned through lawsuits after the fraud was revealed that cannot be a credit against loss). There were no sales of Theranos securities after the October 2015 *Wall Street Journal* article from which a fair market value could be derived; indeed, there was no market for Theranos shares at all. Holmes' victims were induced to invest in Theranos based on the premise that its technology was market ready and comparable to Quest and LabCorp; after the truth was revealed, they found themselves stuck in a market-less investment with nothing but a hope (never realized) that it would some day be market-ready.

The Ninth Circuit has said that "district courts should 'take a realistic, economic approach to determine what losses the defendant truly caused or intended to cause, rather than the use of some approach which does not reflect the monetary loss.'" *United States v. Martin*, 796 F.3d 1101, 1110 (9th Cir. 2015). Here, any realistic approach must recognize that, except for lawsuit settlements, the victim investors in this case have never received any monetary payment from Holmes or Theranos.

To the extent the Court nonetheless concludes that it is necessary to ascribe some hypothetical value to Theranos at the time victims invested or when the fraud revealed, the government has engaged and proffers the opinions of Carl Saba, a partner with the Forensic Consulting Group at Hemming Morse, LLP, and a Certified Valuation Analyst and Accredited Senior Appraiser with decades of experience in the valuation of businesses. Leach Decl. Ex. A. At the government's request, Mr. Saba attempted to estimate the fair market value of Theranos' equity on October 15, 2015 (when the fraud first started to come to light) and other valuation dates based on available information, and to calculate the loss to Theranos Series C-1 and C-2 investors based on those valuations. *Id.* ¶ 6. Mr. Saba was asked to define a minimum range of loss to investors and to apply assumptions that provide a favorable interpretation of the equity value of Theranos on October 15, 2015, and other valuation dates, including adoptions of optimistic management forecasts that assume Theranos' significant technology challenges would be resolved and Theranos would realize high revenue growth. *Id.* ¶¶ 7-8.

Case 8:19-cr-00061-JVS   Document 1048-1   Filed 11/21/22   Page 26 of 332   Page ID
#:25438
Case 5:18-cr-00258-EJD   Document 1649   Filed 11/15/22   Page 25 of 46

Applying widely accepted valuation methods, and based on assumptions favorable to Holmes, Mr. Saba determined that the loss to C-1 and C-2 investors – i.e. the loss measured by the difference between the price paid by the investors and his estimated value as of the valuation date of October 15, 2015 – to be between $237.323 million and $273.646 million, depending on the valuation method used. *Id.* ¶ 15 & Ex. A-1.  Mr. Saba's report, which was provided to the defense and Probation in advance of the draft presentence report, demonstrates by any standard of proof that Holmes inflicted hundreds of millions of losses on her investors.  *Id.*

For the reasons set forth above, the 30-point enhancement for a loss of more than $550 million is warranted.  In no event is the loss less than $150 million.

## II.    OFFENSE INVOLVING 10 OR MORE VICTIMS

The PSR applies a two-point enhancement for the number of victims.  This enhancement also is warranted.

The Guidelines provide for a two-level increase if the offense "involved 10 or more victims." U.S.S.G. § 2B1.1(b)(2)(A)(i).  For purposes of Section 2B1.1, "victim" means "any person who sustained any part of the actual loss determined under subsection (b)(1)."  U.S.S.G. § 2B1.1 applic. note 1.  As with loss, estimating the number of victims does not require absolute precision, and the Court may make a reasonable estimate based on available information.  *See United States v. George*, 949 F.3d 1181, 1186 (9th Cir. 2020) ("It [is] 'sufficient for the government to produce evidence for enough of the [victims] to allow the sentencing court reasonably to infer a pattern." (quoting *United States v. Pham*, 545 F.3d 712, 720 n.3 (9th Cir. 2008) (alteration in original))).

The PSR correctly finds that this enhancement applies.  PSR ¶¶ 93, 107.  More than 10 individuals and entities invested in Theranos in the C-1 and C-2 rounds subsequent to September 2013, when Theranos issued a press release announcing its launch and induced *The Wall Street Journal* to falsely tout Theranos' capabilities.  Seven of those investors testified in the trials to the misrepresentations and half-truths they were told.  An additional nine provided statements to the government or the SEC or submitted a victim impact statement.  *See generally* Leach Decl. Exs. B-L. Representatives of Walgreens and Safeway also testified in the trial to how they were deceived into

1    investing in Theranos.  Under any measure, more than 10 individuals or entities sustained a loss as a

2    result of Holmes' conspiracy and wire fraud offenses.

3    **III.    OFFENSE INVOLVING CONSCIOUS OR RECKLESS RISK OF DEATH OR
          SERIOUS BODILY INJURY**

4         **A.    Defendant's Conduct Created a Risk of Serious Harm to Theranos Patients**

5         The Guidelines provide for a two-level increase in offense level if the conduct involved "the

6    conscious or reckless risk of death or serious bodily injury." U.S.S.G. § 2B1.1(b)(16)(A).  The evidence

7    in this case establishes that this enhancement is warranted.  Holmes could have founded any kind of

8    business when she dropped out of Stanford.  She chose to create a startup operating in the medical field,

9    where the stakes are inevitably high.  As described above, Holmes caused Theranos to market and

10   perform blood tests that were not sufficiently accurate or reliable for clinical use.  Despite knowing of

11   the serious flaws in Theranos' testing, Holmes continued to promote and offer those tests to patients

12   with the knowledge that those patients and their physicians would rely on the Theranos tests to make

13   medical decisions.  Her conduct created a significant risk of death or serious injury as a result of

14   misdiagnosis; an inaccurate test result could cause a patient to undergo an unnecessary treatment that

15   could harm them, or to forego a necessary treatment that could save them.  As Dr. Rosendorff testified at

16   trial, "Accuracy is critical.  Physicians and other health care providers depend on the accuracy of a test

17   to make medical decisions, sometimes life and death medical decisions."  9/24/21 Tr. at 1706.

18        The obvious danger associated with inaccurate and unreliable medical tests is sufficient to

19   warrant application of U.S.S.G. § 2B1.1(b)(16)(A), regardless of whether the government can show how

20   much harm resulted.  Courts recognize that this two-level enhancement "focuses on the defendant's

21   disregard of risk, rather than on the result." *United States v. Henderson*, 893 F.3d 1338, 1351 (11th Cir.

22   2018) (quotation omitted).  In other words, the government "need not show actual injury to any

23   particular victim." *Id.*  Additionally, under Ninth Circuit law, a defendant cannot escape this

24   enhancement by claiming ignorance of the risk created by his conduct. *United States v. Johansson*, 249

25   F.3d 848, 859 (9th Cir. 2001) (interpreting similar provision in U.S.S.G. § 2F1.1, now consolidated with

26   Section 2B1.1).  "[A] defendant does not have to subjectively know that his conduct created the risk."

27   *Id.*  Nor does the enhancement require that the defendant take some violent or direct action toward

28

Case 8:19-cr-00061-JVS   Document 1048-1   Filed 11/21/22   Page 28 of 332   Page ID
#:25420
Case 5:18-cr-00258-EJD   Document 1649   Filed 11/15/22   Page 27 of 46

1   victims.  Thus, in *Henderson*, it was enough that the government presented evidence that false entries in

2   a computerized patient record system "could have delayed and influenced patient care."  *Henderson*, 893

3   F.3d at 1352.  In *United States v. Moran*, the enhancement was applied where defendants ran a

4   healthcare facility and admitted elderly patients with dementia although the facility and staff were not

5   equipped to meet those patients' needs.  *United States v. Moran*, 778 F.3d 942, 978 (11th Cir. 2015).  In

6   *Popov*, the Ninth Circuit affirmed application of the standard where a doctor signed patient charts and

7   Medicare reimbursement forms indicating he had supervised medical examinations when he had not.

8   *United States v. Popov*, 555 F. App'x 671, 676 (9th Cir. 2014).  The risk to Theranos patients created by

9   Holmes' conduct is at least as serious and certain as the dangers posed by the criminal conduct in the

10  above cases.

11          Moreover, the evidence shows that Holmes was fully conscious of the risks caused by Theranos'

12  unreliable tests—starting years before the company launched its testing service and continuing through

13  the point when they finally discontinued it.  As early as 2010, Holmes laughed off a dire warning she

14  received from an outside consultant evaluating Theranos technology.  Kevin Hunter was hired by

15  Walgreens in May or June 2010 as a laboratory consultant to advise Walgreens on its incipient

16  partnership with Theranos.  *See* 12/6/21 Kevin Hunter 302 (Leach Decl. Ex. K).  Hunter participated in

17  regular meetings with Holmes and Balwani, during which they told him that the Theranos Edison

18  analyzer could perform approximately 193 tests.  *Id.*  Hunter's team wanted to perform comparison

19  testing of Theranos against a lab at Stanford, but Holmes and Balwani would not agree.  *Id.*  Nor would

20  Holmes allow Hunter to take a tour of the Theranos lab.  *Id.*  As Hunter asked more pointed questions,

21  Holmes and Balwani began to take him out of the loop in conversations with Walgreens.  *Id.*

22  Eventually, Hunter's frustration with the lack of substantiation for Theranos' claims moved him to

23  confront Holmes during a video teleconference.  *Id.*  He admonished her that her company was going to

24  offer lab tests that people would use to make medical decisions, and warned her of the risk that she

25  could be responsible for killing someone if the lab put out bad tests, and that she might go to jail as a

26  result.  *Id.*  Holmes reportedly responded with something to the effect of, "They don't put pretty people

27  like me in jail."  *Id.*  Hunter eventually separated from the Theranos-Walgreens project.  *Id.*

28

Case 8:19-cr-00061-JVS   Document 1048-1   Filed 11/21/22   Page 29 of 332   Page ID
#:25424
Case 5:18-cr-00258-EJD   Document 1649   Filed 11/15/22   Page 28 of 46

Holmes's lax attitude toward patient safety continued into 2013 and beyond.  Leading up to the launch of Theranos' testing services, Theranos' lab director spoke to Holmes personally in order to "raise alarm bells" about assays that he "didn't feel were ready for launch."  9/24/21 Tr. at 1725-1730; TX 1049.  During that time period, Holmes and Balwani had set a schedule for assay validation that Dr. Rosendorff viewed as "rushed."  *Id.*  In his communication to Holmes, Dr. Rosendorff suggested that Theranos might need to delay the launch and work on its calibrators or chemistry—essentially returning to the fundamentals to identify and solve "a basic problem" with the company's equipment.  *Id.*  Dr. Rosendorff testified that Holmes did not seem surprised to hear of problems with Theranos' tests, but that the conversation seemed to make her very nervous.  *Id.* at 1731-32.  Ultimately, she refused to delay the launch as he recommended, suggesting instead that certain tests could be performed on traditional equipment.  *Id.*

While Theranos' clinical lab was in operation, Holmes received reports of serious problems with the company's tests.  In April 2014, Balwani received an email from a senior scientist at Theranos reporting that the company's proprietary potassium results were running high as a result of sample hemolysis, forcing the lab to review images of all samples to determine whether to rerun—a practice Balwani told Holmes was "not scalable."  TX 4124.  Earlier in that email chain, Balwani had questioned the accuracy of the test "given this is an ISE," indicating awareness of preexisting accuracy problems with Theranos' ion-selective-electrode blood tests.  *Id.*  Also in April, employee Tyler Shultz sent Holmes a detailed email to alert her to several ways in which Theranos was overstating the accuracy of its tests and potentially masking problems.  TX 1660.  The points raised by Mr. Shultz gained no traction with Holmes.  In late May 2014, Dr. Rosendorff halted all testing of HCG (a pregnancy hormone) on Theranos analyzer in light of inaccurate results, and Balwani immediately passed along that news to Holmes.  TX 4147.  Dr. Rosendorff testified that the company resumed HCG testing on the Edison despite the fact that issues with that test persisted.

In August of that year, Dr. Rosendorff emailed Balwani to inform him that Theranos' bicarbonate test had lost all diagnostic value "and probably also reliability" due to the fact that the company voided all abnormal results in response to accuracy problems with this test.  TX 4189.  Balwani forwarded that notice to Holmes.  Around that same time, another email exchange

Case 8:19-cr-00061-JVS   Document 1048-1   Filed 11/21/22   Page 30 of 332   Page ID
#:25462
Case 5:18-cr-00258-EJD   Document 1649   Filed 11/15/22   Page 29 of 46

1    memorialized Balwani asking another Theranos scientist about the company's PT/INR test reporting

2    inaccurately low numbers.  TX4181.  When the scientist provided a theoretical explanation and

3    proposed an internal study to address the problem, Balwani emailed Holmes complaining, "Always

4    another study after the fact."  *Id.*  In September 2014, Defendant's brother Christian Holmes sent her an

5    individual email seeking a "candid conversation" because it was "pretty obvious" the company was

6    having issues with the accuracy of its calcium, potassium, and sodium tests. TX 1953.  In that message,

7    Christian went so far as to suggest Theranos stop offering those tests until the problem was identified

8    and solved.  *Id.*  By late November 2014, Defendants' collective faith in their lab still had not improved,

9    with Balwani texting Holmes that the Normandy lab (where Theranos conducted its proprietary testing)

10    was a "f___ing disaster zone." TX 5387D at 29.  Despite ample notice of serious issues plaguing

11    Theranos' technology, Holmes and Balwani stubbornly continued to send out clinical test results from

12    their "disaster zone" of a laboratory, forcing Theranos' patients to unknowingly incur a risk of death or

13    injury.  Ultimately, they had to void every single Edison test following extremely negative CMS

14    findings and their own assessment of possible patient impact.

15            **B.**       **Holmes' Treatment of Theranos Patients is Relevant Conduct**

16          Holmes' acquittal on the counts relating to her scheme to defraud patients does not prevent this

17    enhancement from applying.  The Supreme Court has held that a sentencing court may consider facts

18    underlying acquitted counts as relevant conduct for sentencing purposes as long as the conduct is proven

19    by a preponderance of the evidence.  *United States v. Watts*, 519 U.S. 148 (1997).  In this case, it is

20    impossible to know the precise reasons why the jury did not return guilty verdicts on the patient-focused

21    counts, and the Court should disregard any speculation proffered by the defense on this question.  The

22    Court is well aware, though, of the evidence presented at trial demonstrating Holmes' role in the scheme

23    to defraud Theranos patients.  Even if the jury concluded that at least one element of those charged

24    counts was not proven beyond a reasonable doubt, the Court should still conclude that Holmes' conduct

25    toward patients has been proven by a preponderance.  Indeed, the jury in the Balwani trial convicted on

26    all counts based on substantially overlapping evidence, including Count 2 of the Third Superseding

27    Indictment alleging a conspiracy between Holmes and Balwani to defraud patients.  ECF No. 1507

28

Case 8:19-cr-00061-JVS   Document 1048-1   Filed 11/21/22   Page 31 of 332   Page ID
#:25423
Case 5:18-cr-00258-EJD   Document 1649   Filed 11/15/22   Page 30 of 46

1      Given that Holmes' actions toward patient victims have been shown by a preponderance of the

2  evidence, they easily qualify as relevant conduct for sentencing purposes.  Guidelines ranges are to be

3  determined based on, in pertinent part, "all acts and omissions committed, aided, abetted, counseled,

4  commanded, induced, procured, or willfully caused by the defendant," as well as certain acts of

5  coconspirators, that "occurred during the commission of the offense of conviction, in preparation for that

6  offense, or in the course of attempting to avoid detection or responsibility for that offense."  U.S.S.G.

7  § 1B1.3(a)(1).  The Guidelines go on to include as "relevant conduct" any such acts that were "part of

8  the same course of conduct or common scheme or plan as the offense of conviction."  *Id.* at

9  § 1B1.3(a)(2).

10      Holmes' actions directed toward Theranos patients are undoubtedly part of the same course of

11  conduct and scheme or plan as their fraud on investors.  In order to attract investors and induce them to

12  purchase Theranos stock, Holmes and Balwani sought to portray Theranos' technology as advanced,

13  novel, and, critically, mature without any significant research and development remaining.  As victims

14  explained at trial, investing in a company whose key device was already market-ready carried

15  significantly less risk than investing in an earlier-stage startup still working to develop its technology.

16  11/10/21 Tr. at 6081-83.  With Theranos short on money in the second half of 2013, Defendants were

17  motivated to show that their technology could actually be used for clinical patient testing—or at least to

18  give the public that impression.  With the commercial launch of Theranos testing services in September

19  2013, Holmes and Balwani sent a message to the world—and the pool of potential investors—that

20  Theranos' technology could be trusted and there was nothing standing in the way of the company's

21  expansion.  Holmes made that message explicit in communications celebrating the launch.  *See* TX 1113

22  (press release); TX 1334 (email to investors claiming Theranos is "rapidly scaling" following

23  commercial launch).  This method worked, igniting a wave of interest among investors that led to

24  Theranos raising approximately $730 million between fall of 2013 and 2015.  PSR ¶ 47.  From 2013 on,

25  the operation of Theranos' clinical lab furthered Defendant's goal of defrauding investors, constituting

26  part of the same plan or scheme or course of conduct as the offenses of conviction.

27      Accordingly, a two-level increase is warranted under U.S.S.G. § 2B1.1(b)(16)(A), reflecting the

28  fact that Holmes' conduct involved a conscious or reckless risk of death or serious bodily injury

Case 8:19-cr-00061-JVS   Document 1048-1   Filed 11/21/22   Page 32 of 332   Page ID
#25424
Case 5:18-cr-00258-EJD   Document 1649   Filed 11/15/22   Page 31 of 46

1   imposed on Theranos patients.  Alternatively, the Court should account for Holmes' conduct toward

2   patients under U.S.S.G. § 1.4, which allows the Court to consider, "without limitation," any information

3   concerning the conduct of the defendant, in order to determine the sentence to impose within the

4   guideline range or whether to depart from the guidelines.

5   **IV.   ROLE IN THE OFFENSE**

6        Holmes should also receive an additional enhancement due to her role as a manager and leader of

7   the extensive criminal activity that occurred in connection with the company she founded.  Under the

8   Guidelines, a four-level increase is warranted if a defendant was an "organizer or leader" of criminal

9   activity that either (1) involved five or more participants or (2) was otherwise extensive.  U.S.S.G.

10  § 3B1.1(a).  The commentary for that section of the Guidelines defines "participant" as "a person who is

11  criminally responsible for the commission of the offense," although that person "need not have been

12  convicted."  *Id.* applic. note 1.  In this case, the Court need not determine whether the offense involved

13  five or more participants.  Section 3B1.1(a) applies because, regardless of the number of culpable

14  participants, the criminal activity here was "otherwise extensive."  The Guidelines commentary advises

15  that, in determining whether criminal activity was extensive under this provision, a court should

16  consider "all persons involved during the course of the entire offense."  *Id.* applic. note 3.  Even if a

17  fraud involves fewer than five participants, it still can qualify as extensive under section 3B1.1(a) if it

18  "used the unknowing services of many outsiders."  *Id*.  That language perfectly describes the way

19  Holmes and Balwani used the many employees of Theranos—along with Walgreens personnel,

20  marketing experts, journalists, and others—to carry out their scheme to defraud investors.

21        **A.   Holmes Was a Leader and Organizer**

22        First, there can be no dispute that Holmes was an organizer and leader of the criminal activity

23  charged in this case, satisfying the first requirement for this four-level enhancement.  The Guidelines

24  instruct that, in identifying defendants with a leadership or organizational role, courts should consider

25  factors including "the exercise of decision making authority," "the claimed right to a larger share of the

26  fruits of the crime," "the degree of participation in planning or organizing the offense," and "the degree

27  of control and authority exercised over others."  U.S.S.G. § 3B1.1 applic. note 4.  Here, the evidence at

28  trial revealed the unsurpassed level of authority that Holmes wielded inside her company.  In terms of

Case 8:19-cr-00061-JVS   Document 1048-1   Filed 11/21/22   Page 33 of 332   Page ID
#:25425
Case 5:18-cr-00258-EJD   Document 1649   Filed 11/15/22   Page 32 of 46

reporting relationships at Theranos, Holmes acknowledged that all roads ultimately led to her as Chief Executive Officer.  11/30/21 Tr. at 8007.  Holmes' power at Theranos was enhanced by her role as President of the Board of Directors and the fact that she was by far the company's largest shareholder. And because she held far more Theranos stock than anyone else, she stood to gain the most from the inflated share price caused by her false and misleading statements about the company.

Holmes was a hands-on leader at Theranos, working long hours in the office.  10/15/21 Tr. at 3854.  Throughout the trial, documentary evidence and witness testimony highlighted Holmes' control over many of Theranos' business.  While Holmes restricted the flow of information among employees at Theranos, she and Balwani were unique in that they had access to all information about the company's activities.  *Id.* at 3855-57.  As CEO, Holmes had the authority to:  approve the training program for the personnel who would staff Theranos Wellness Centers at Walgreens stores (10/15/21 Tr. at 3862-63); give or withhold permission for an individual outside Theranos to receive a tour of specific areas inside company facilities (*id.* at 3865-66); order demonstrations of Theranos technology (*id.* at 3869); review and weigh in on the content of demo reports (TX 860); and control communications between Theranos and outside entities like pharmaceutical companies (TX 528), the U.S. military (10/19/21 Tr. at 4018-19), and potential investors (TX 1940; 10/19/21 Tr. at 3994), among many other things.  Holmes herself confirmed at trial that she was the founder and owned a majority of the company.  11/30/21 Tr. at 8005. She understood that her status gave her the power to terminate anyone at the company, including second-in-command Balwani, the lab directors, and even members of the board.  *Id.* at 8005-06.

Holmes was clearly a leader and organizer at Theranos.  When it came to carrying out the scheme to defraud investors, the evidence at trial showed that she stayed true to that role, as explained below.

**B.    Holmes' Fraud Was "Otherwise Extensive"**

This case satisfies the second requirement for the four-point enhancement under section 3B1.1(a) because Holmes used her authority to direct many others in furtherance of the scheme to defraud Theranos' investors.  Therefore, her criminal activity was "otherwise extensive" as contemplated by the Guidelines.  The Ninth Circuit has made clear that this enhancement is not limited to cases where the defendant is aided by multiple people with criminal intent.  Instead, criminal activity can be "otherwise

Case 8:19-cr-00061-JVS  Document 1048-1  Filed 11/21/22  Page 34 of 332  Page ID
#:25426
Case 5:18-cr-00258-EJD  Document 1649  Filed 11/15/22  Page 33 of 46

extensive" where it involves the *unknowing* participation of people who were simply doing their jobs.
*See United States v. Leung*, 35 F.3d 1402, 1406 (9th Cir. 1994) (affirming application of enhancement in case where defendant rented a warehouse to store drugs and hired shipping and transport companies to move the drugs).  In the case of Theranos, Holmes' efforts to attract investors were supported by the hard work of hundreds of employees and outside partners who were doing their jobs in good faith: designing and manufacturing Theranos' analyzers, managing Theranos' finances, securing Theranos' intellectual property and other legal rights, and outfitting and maintaining Theranos' facilities.  The fact that those individuals had no idea their efforts were furthering a fraudulent scheme is no barrier to this four-level enhancement.  *See United States v. Booth*, 309 F.3d 566, 577 (9th Cir. 2002) (affirming four-level enhancement under Section 3B1.1(a) "because of the involvement, albeit unknowing, of more than ten employees and the geographical reach of the scheme").

The evidence at trial included additional specific examples of Holmes and Balwani's reliance on others' services within Theranos to further the fraud.  For example, several groups of employees at Theranos were involved in setting up and running technology demonstrations for potential investors, including personal assistants, engineers, lab personnel, and phlebotomists.  10/15/21 Tr. at 3869-70.  Those demonstrations directly furthered their scheme to defraud investors in that they left victims with an unrealistic image of the capabilities of Theranos' proprietary analyzer and the extent to which the company was using it for clinical testing.  *See* TX 957; Balwani 4/19/22 Tr. at 2919-20 (testimony of Walgreens representative Nimesh Jhaveri that he not aware the sample collected from him during a Theranos demo was tested on a third-party device).  Similarly, multiple Theranos employees—along with outside consultants and contractors—were involved in creating and maintaining the Theranos company website.  Holmes stayed involved and in charge, receiving input from several employees and outside lawyers regarding claims on the website that might be difficult to defend.  *See, e.g.*, TX 3965, 3981, 5438.  Holmes evidently decided to ignore much of that guidance, and the Theranos website ended up containing a number of materially misleading claims about Theranos technology.  *See* Balwani TX 5805 (Theranos website pages).  The work done by Holmes' agents on the Theranos website unwittingly furthered her scheme to defraud investors, as the website was an effective tool to spread misinformation that induced victims to invest.

Case 8:19-cr-00061-JVS   Document 1048-1   Filed 11/21/22   Page 35 of 332   Page ID
#:25424
Case 5:18-cr-00258-EJD   Document 1649   Filed 11/15/22   Page 34 of 46

Holmes and Balwani's scheme to defraud investors also relied on the use of members of the media. Journalists who obtained information from Holmes and Balwani and their agents unknowingly passed along false and misleading information about the company's achievements and abilities, embellishing Theranos' reputation and fueling investor excitement about the opportunity to buy a stake in the company. The evidence at trial included several articles repeating and amplifying Holmes' false statements, including articles published in *The Wall Street Journal* and *Fortune* magazine. TX 1106, 1776. In connection with the *Fortune* article, several Theranos employees answering to Holmes worked together to provide journalist Roger Parloff with requested information presenting a favorable image of Theranos. *See* TX 1753 (email including action item list with assigned employees).

As discussed in Section III above, Holmes and Balwani's scheme to defraud investors also depended on the successful operation of Theranos' blood testing business. Holmes had ultimate authority over that part of Theranos' operations just as she did for every other aspect of the company's activity. An org chart presented to CMS by Theranos displayed Holmes at the top of the CLIA lab operation, overseeing a group comprised of more than sixty Theranos employees including her coconspirator Ramesh Balwani. TX 4528 at 9.

The success of Holmes and Balwani's scheme turned on their ability to contain bad news about Theranos' accuracy problems. If word had gotten out about the poor reliability of Theranos' blood tests, prospective investors surely would have hesitated to part with the large sums that they did, and current investors would have asked questions Defendants did not want to answer. Defendants' efforts to suppress the truth depended on the participation of the Theranos employees who interacted with doctors and patients. Theranos' customer service group included more than twenty individuals who responded to questions about Theranos' test results. Complaint records document the ways in which Defendants used these employees to quell doubts about Theranos' test accuracy. For example, in connection with potentially erroneous results in April and August 2015, one Theranos customer representative assured a doctor that he believed the test results were accurate. TX 4520. In the log of that call, the employee noted, "When I talk to physicians or guests I try to offer them different variables or scenarios to consider when they question our results. *Of course none of them have to do with our testing methods*." *Id.* (emphasis added).

Case 8:19-cr-00061-JVS   Document 1048-1   Filed 11/21/22   Page 36 of 332   Page ID
#:25428
Case 5:18-cr-00258-EJD   Document 1649   Filed 11/15/22   Page 35 of 46

1       This use of other employees to appease doctors and patients troubled by dubious test results was

2   an important part of Holmes and Balwani's plan.  Indeed, when employees refused to spin Theranos'

3   flawed test results as Defendants demanded, significant conflict arose.  For example, Dr. Rosendorff,

4   Theranos' lab director, testified that he felt pressured him to vouch for and explain away test results that

5   he viewed as questionable, leading to heated internal exchanges over how to respond to inquiries from

6   Theranos' customers.  *See* 9/28/21 Tr. at 1940-1946; TX 4323, 4314.  Ultimately, Dr. Rosendorff

7   resigned partly out of unwillingness to keep "endorsing results that [he] essentially didn't have faith in."

8   10/5/21 Tr. at 2733; TX 4330.  In addition to all the other ways Holmes' fraud depended on the work of

9   numerous others, her exploitation of unknowing—and sometimes unwilling—employees to help cover

10   up problems at Theranos certainly qualifies her for the offense level increase in Section 3B1.1(a).

11       Finally, even if this case did not involve the unknowing participation of so many people, the

12   "otherwise extensive" requirement under Section 3B1.1(a) would still be satisfied.  As the Ninth Circuit

13   has instructed, "[w]hether criminal activity is 'otherwise extensive' depends on such factors as (i) the

14   number of knowing participants and unwitting outsiders; (ii) the number of victims; and (iii) the amount

15   of money fraudulently obtained or laundered."  *United States v. Rose*, 20 F.3d 367, 374 (9th Cir.1994)

16   (citations omitted); *see also United States v. Govan*, 152 F.3d 1088, 1096 (9th Cir.1998) (finding that a

17   conspiracy was "clearly 'otherwise extensive'" because it "involved interstate travel, a large number of

18   victims… as well as nearly $100,000 in robbery proceeds").  Here, the large number of investor victims,

19   the fact that Theranos' activities stretched across state and national borders, and the nine-figure loss

20   amount all weigh heavily in favor of a finding that Holmes organized a led criminal activity that was

21   "otherwise extensive" under the Guidelines.

22       In sum, the facts of this case compel application of U.S.S.G. § 3B1.1(a).[3]

23   / /

24

25

26

27

28

---

[3]       Even if Section 3B1.1(a) were not satisfied, subsection (c) undoubtedly applies.  *See* U.S.S.G.
§ 3B1.1(c) ("If the defendant was an organizer, leader, manager, or supervisor in any criminal activity
other than described in (a) or (b), increase by 2 levels.").

Case 8:19-cr-00061-JVS   Document 1048-1   Filed 11/21/22   Page 37 of 332   Page ID
#:25429
Case 5:18-cr-00258-EJD   Document 1649   Filed 11/15/22   Page 36 of 46

# ARGUMENT

## I.    LEGAL STANDARD

The overarching goal of a sentencing court is to impose a sentence that is sufficient to "reflect the seriousness of the offense, promote respect for the law, and provide just punishment; to afford adequate deterrence; to protect the public; and to provide the defendant with needed education or vocational training, medical care, or other correctional treatment." *United States v. Ressam*, 679 F.3d 1069, 1088-89 (9th Cir. 2012) (*en banc*); *see United States v. Carty*, 520 F.3d 984, 991 (9th Cir. 2008); 18 U.S.C. § 3553(a).  The Court should begin the sentencing process by correctly calculating the applicable Guidelines range and must "remain cognizant of them throughout the sentencing process." *Gall v. United States*, 552 U.S. 38, 50 n.6 (2007).  The Court should then consider the factors outlined in Section 3553(a) to determine the appropriate sentence.  *Ressam*, 679 F.3d at 1089.  If the Court determines that a sentence outside of the Guidelines range is warranted, it must ensure that the "justification is sufficiently compelling to support the degree of the variance."  *Id.* (internal quotation omitted). "[A] major departure should be supported by a more significant justification than a minor one." *Gall*, 552 U.S. at 50

The Section 3553(a) factors are:

(1)    the nature and circumstances of the offense and the history and characteristics of the defendant;

(2)    the need for the sentence imposed (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; (C) to protect the public from further crimes of the defendant; and (D) to provide the defendant with needed educational or vocations training, medical care, or other correctional treatment in the most effective manner;

(3)    the kinds of sentences available;

(4)    the kinds of sentence and the sentencing range established in the Guidelines;

(5)    any pertinent policy statement by the Sentencing Commission;

(6)    the need to avoid unwarranted disparities among defendants with similar records who have been found guilty of similar conduct; and

(7)    the need to provide restitution to any victims.

*See* 18 U.S.C. § 3553(a)(1)-(7).

Case 8:19-cr-00061-JVS   Document 1048-1   Filed 11/21/22   Page 38 of 332   Page ID
#:25430
Case 5:18-cr-00258-EJD   Document 1649   Filed 11/15/22   Page 37 of 46

1    II.    **GOVERNMENT RECOMMENDATION**

2         With these principles in mind, the government respectfully recommends a sentence of 180

3    months in custody.

4         The factors the Court should consider in determining the appropriate sentence include (i) the

5    nature and circumstances of the offense and the history and characteristics of the defendant, (ii) the need

6    for the sentence imposed to reflect the seriousness of the offense, to provide just punishment for the

7    offense, to afford adequate deterrence to criminal conduct, to protect the public from further crimes of

8    the defendant, and to provide the defendant with needed correctional treatment, (iii) the Sentencing

9    Guidelines and related Sentencing Commission policy statements, (iv) the need to avoid unwarranted

10   sentence disparities among similarly-situated defendants, and (v) the need to provide restitution to the

11   victim of the crime.  18 U.S.C. § 3553(a).

12        As described above, Holmes' Total Offense Level (43) and Criminal History Category (I) yield a

13   sentence within Zone D.  PSR ¶¶ 114, 118, and 176.  Zone D sentences shall be satisfied with a

14   custodial sentence.  *Id.* and § 5C1.1(f).  The applicable sentencing custodial range is capped at 960

15   months' imprisonment.  PSR ¶ 170.  This range assumes a sentence of 240 months' imprisonment (the

16   statutory maximum) would be imposed for each of the four counts of conviction, run consecutively.  *Id.*

17   Considering the extensiveness of Holmes' fraud, the sentencing factors support a sentence of 180

18   months' imprisonment, as it would reflect the seriousness of the offenses, promote respect for the law,

19   provide for just punishment for the offenses, and deter Holmes and others.

20        A.    **The Nature and Circumstances of Holmes' Crimes (18 U.S.C. § 3553(a)(1))**

21        Elizabeth Holmes' charged conduct was extremely serious.  The Indictment in this case lays out

22   the key events in the story of Holmes' company Theranos, focusing on the fraudulent schemes that

23   Holmes and Balwani devised and executed to benefit themselves and attract business and investment

24   capital to Theranos.  PSR ¶¶ 10-84.  As detailed in the Indictment, one of Holmes' fraud schemes

25   targeted investors in Theranos—individuals and entities who entrusted defendants with hundreds of

26   millions of dollars based on representations made by Holmes and Balwani.  *Id.*  In a separate but closely

27   related fraud, defendants targeted patients who paid for and relied upon Theranos' testing services to

28   investigate and diagnose health conditions and make high-stakes decisions about medical care.  *Id.*  In

each of these fraudulent schemes, Holmes and Balwani misled victims regarding material facts about Theranos and the capabilities of its blood-testing technology. *Id.* The effects of Holmes and Balwani's fraudulent conduct were far-reaching and severe: dozens of investors lost over $700 million and numerous patients received unreliable or wholly inaccurate medical information from Theranos' flawed tests, placing those patients' health at serious risk. PSR ¶¶ 49, 106

Holmes was convicted at trial of four counts related to her scheme to defraud investors (Counts 1 and 6 through 8 of the Third Superseding Indictment, ECF. No. 469). PSR ¶ 5. Holmes was acquitted of the four counts related to her scheme to defraud patients (Counts 2, 10 through 12). PSR ¶ 6. Nevertheless, the Court should consider Holmes' role in each scheme to defraud when evaluating the nature and circumstances of the offenses and to determine the appropriate sentence. *See United States. v. Watts*, 519 U.S. 148 (1997) (Sentencing court may consider conduct of which defendant has been acquitted, so long as that conduct has been proved by a preponderance of the evidence).

As alleged in the Indictment and proven at trial, Theranos was founded by Holmes in approximately 2003, and drew little public attention for its first ten years. PSR ¶¶ 10-84. The company's stated goal was to develop innovative methods for testing tiny blood samples obtained from a fingertip with a small lancet without the need for traditional venous blood draws. *Id.* In or around 2013, Theranos began to publicize its technology and tout its purported advantages, all while soliciting massive contributions from investors and gearing up toward the public launch of its testing services. *Id.* Beginning in September 2013, Theranos offered blood testing to patients at its "Wellness Centers" in various locations in California and Arizona. *Id.*

Unbeknownst to those outside the company, defendants were presenting investors with a deceptive picture of their company and its technology, overstating Theranos' achievements, promising unrealistically favorable developments on the horizon, and misrepresenting the abilities of its proprietary analyzer. *Id.* In dealing with doctors and patients, defendants promoted the company's blood-testing services through explicit and implicit representations that Theranos' test results were reliable and accurate although they knew that was not the case. *Id.*

The nature and circumstances of Holmes' crimes are aggravating factors for several reasons. First, Holmes' crimes were not isolated events. They were not the result of poor choices on a single day.

Case 8:19-cr-00061-JVS  Document 1048-1  Filed 11/21/22  Page 40 of 332  Page ID
#:25482
Case 5:18-cr-00258-EJD  Document 1649  Filed 11/15/22  Page 39 of 46

1  They were not limited to her interactions with one investor or a single patient.  Instead, Holmes

2  developed a complex scheme, and executed it over the course of many years.  Holmes presented a fake

3  story about Theranos' technology day after day in meeting after meeting.  Holmes maintained this

4  façade of accomplishments, after making the calculated decision that honesty would destroy her

5  company.  She ignored innumerable opportunities to chose a lawful path.

6      Second, each investment in Theranos came with opportunity cost.  Money invested with Holmes'

7  company was money not invested in legitimate, promising technology.  Holmes' scheme not only

8  diverted valuable funding to her fraudulent purposes, but it also has the effect of discouraging

9  investments generally in new technologies, as investors reasonably remain skeptical that the next

10  investment pitch is too good to be true.  In short, Holmes' criminal activities were serious, extended, and

11  extremely damaging.  The nature and circumstances of Holmes' criminal activity are significant

12  aggravating factors in determining an appropriate sentence.

13      **B.      The History and Characteristics of Holmes (18 U.S.C. § 3553(a)(1))**

14      In addition to the nature of the offenses, Holmes' history and characteristics militate in favor of a

15  significant custodial sentence.  Some defendants have difficult childhoods filled with obstacles that must

16  be overcome.  Holmes did not.  PSR ¶¶ 122-125.  Some defendants have few formal educational

17  opportunities, and instead are left to receive their educations informally, where they can find them.

18  Holmes had many educational opportunities.  PSR ¶¶ 122-126, 158-160.  Some defendants have no

19  support networks, and instead must fend for themselves.  Holmes had and continues to have a substantial

20  one.  PSR ¶¶ 144-148.  While some defendants certainly deserve consideration from a sentencing court

21  for the obstacles they have overcome and the regrettable criminal motivations they adopt, Holmes does

22  not.  Holmes, with strong family support, exceptional educational opportunities, and financial stability,

23  chose to commit fraud, repeatedly.  Holmes' history and characteristics are aggravating factors that

24  should lead this Court to impose a significant custodial sentence.  Similarly, the presence of these

25  aggravating factors should discourage the Court from varying substantially from the applicable

26  Guidelines range.

27  / /

28

U.S.' SENTENCING MEM.,
CASE NO. 18-258 EJD                    34

Case 8:19-cr-00061-JVS   Document 1048-1   Filed 11/21/22   Page 41 of 332   Page ID
#:25432
Case 5:18-cr-00258-EJD   Document 1649   Filed 11/15/22   Page 40 of 46

**C.      The Need to Reflect the Seriousness of the Offense, Promote Respect for the Law, and Provide Just Punishment for the Offense (18 U.S.C. § 3553(a)(2)(A))**

This Court should send a clear message to the community that white collar crime is serious and deserving of significant punishment.  Through this sentencing proceeding, the public will observe the law, through this Court, treat fraudsters fairly for significant crimes.  Statements from victims in this prosecution provide additional support for the argument that a significant custodial sentence is needed to promote respect for the law.  In his statement, investor Craig Hall wrote, "…I urge you, first and foremost, to consider the broader and more significant impact this sentencing will have on our society moving forward.  Given the high-profile nature of this case, the sentencing will undoubtedly send a message to the community at large.  That messaging should, in my opinion, clearly and unequivocally communicate that there is no justification for or tolerance of fraud in the business world.  Deterring similar debacles is critical to avoid society's future loss of hundreds of millions of dollars, amounts which could otherwise be used to aid in the entrepreneurial efforts of hard-working, honest Americans, bolstering the economy and fostering the American Dream."  PSR ¶ 95; Craig Hall Letter, dated Sept. 6, 2022, at p. 1.  In Brent Bingham's victim impact statement, he wrote, "I feel sentencing should reflect a standard that medical related technology shouldn't be Beta tested by patients without consent.  Medical technology companies should receive a very clear message that placing finance and 1st to market considerations above engineering and science is not acceptable."  In Elizabeth R. Daoust's victim impact statement, she wrote, "Penalties for white collar crime seem too often to be slap[]s on the wrist.  People/companies perpetuating financial fraud often get light, if any, sentences in a minimum security prison and keep most of the stolen money.  This system of 'justice' has alienated a large swath of our citizens, weakened values, and turned more people against our government.  It is a serious problem that both the courts and legislatures need to remedy."  These, and many other, victim impact statements demonstrate the need for this sentence to reflect the seriousness of the offenses and promote respect for the law.

**D.      The Need to Afford Adequate Deterrence to Criminal Conduct (18 U.S.C. § 3553(a)(2)(B))**

A sentence of 180 months in custody will serve to deter others from committing or contemplating committing white collar crimes, especially those who might consider taking advantage of

Case 8:19-cr-00061-JVS   Document 1048-1   Filed 11/21/22   Page 42 of 332   Page ID
#:25484
Case 5:18-cr-00258-EJD   Document 1349   Filed 11/15/22   Page 41 of 46

1    investors or vulnerable patients.  General deterrence is of particular importance in white collar cases

2    such as this one because would-be offenders need to be put on notice that there are severe consequences

3    for engaging in this type of criminal conduct.  *See, e.g.*, *United States v. Musgrave*, 761 F.3d 602, 609

4    (6th Cir. 2014) ("Because economic and fraud-based crimes are more rational, cool, and calculated than

5    sudden crimes of passion or opportunity, these crimes are prime candidates for general deterrence.")

6    (citation and internal quotation omitted); *United States v. Goffer*, 721 F.3d 113, 132 (2nd Cir. 2013)

7    (addressing the need for general deterrence for those who might otherwise feel that some white-collar

8    crimes are "game[s] worth playing").

9            Holmes' criminal scheme was committed in Silicon Valley.  This region is known for

10   innovation, where companies rely upon investments to fund ideas before they become profitable.  This

11   investment relationship is built, at least in part, on trust.  The relationship between innovators and

12   investors generates tremendous good far beyond this community.  Unfortunately, Holmes' crimes

13   damaged the trust and integrity that are necessary for this community to thrive.  A significant custodial

14   sentence will serve not only to deter future startup fraud schemes, but it will also serve to rebuild the

15   trust investors must have when funding innovators.

16       **E.     The Need to Protect the Public From Future Crimes by Holmes (18 U.S.C.
                  § 3553(a)(2)(C))**

17
         Specific deterrence, due to the brazenness of Holmes' conduct, coupled with the lack of any
18
     discernable economic need that might have motivated her, also counsels in favor of a sentence that is
19
     sufficiently punitive to deter Holmes from ever contemplating committing fraud again.  There is a need
20
     for this Court's sentence to deter Holmes from future criminal conduct.  First, Holmes has not accepted
21
     responsibility for her criminal conduct.  PSR ¶ 98.  Rather than acknowledge her role in this fraud,
22
     Holmes continues to view herself as one of Theranos' victims.  PSR ¶ 99.  Moreover, Holmes'
23
     experiences at Theranos apparently have not deterred her from similar employment.  Holmes continues
24
     to work on new patents involving chemistry within the health care space.  PSR ¶¶ 138-139.  Likewise,
25
     Holmes' settlement with the Securities and Exchange Commission allows her to return as an officer or
26
     director in the future.  *Securities and Exchange Commission v. Elizabeth Anne Holmes and Theranos*
27
     *Inc.*, 18-CV-01602-EJD, ECF. No. 9 at 3.
28

Case 8:19-cr-00061-JVS   Document 1048-1   Filed 11/21/22   Page 43 of 332   Page ID
#:25435
Case 5:18-cr-00258-EJD   Document 1649   Filed 11/15/22   Page 42 of 46

1    Finally, during her trial testimony, the following exchange occurred during her cross

2    examination:

3        Q:    Okay.  And holding a patent does not necessarily mean the invention described in the

4    patent works; correct?

5        A:    Yes.

6        Q:    For example, you don't have an ingestible pill that enables you to, to measure lipids in

7    the blood, correct?

8        A:    **Not yet**.

9    12/7/21 Tr. at 8484. (emphasis added).  Approaching sentencing, this Court cannot be confident that

10   Holmes has been deterred from future fraud.  Therefore, the Court must deter future criminal fraud,

11   especially in the health care space, by Holmes through a significant custodial sentence.

12   **F.    The Properly Calculated Sentencing Guideline Range and Pertinent Policy
        Statements Provided by the Sentencing Commission (18 U.S.C. §§ 3553(a)(4) &
13      3553(a)(5))**

14       Holmes' Total Offense Level (43) and Criminal History Category (I) yield a sentence within

15   Zone D.  PSR ¶¶ 114, 118, and 176.  Zone D sentences shall be satisfied with a custodial sentence.  PSR

16   ¶¶ 169, 170, and 176.  The applicable sentencing range is capped at 960 months' imprisonment.  PSR

17   ¶ 70.  This range assumes a sentence of 240 months' imprisonment (the statutory maximum) would be

18   imposed for each of the four counts of conviction, run consecutively.  *Id.*

19       The Sentencing Commission makes clear that the focus on loss amount in federal fraud

20   sentencing hearings is reasonable and appropriate.  In particular, the Sentencing Commission states,

21   "The Commission has determined that, ordinarily, the sentences of defendants convicted of federal

22   offenses should reflect the nature of magnitude of the loss caused or intended by their crimes.

23   Accordingly, along with other relevant factors under the guidelines, loss serves as a measure of the

24   seriousness of the offense and the defendant's relative culpability and is a principal factor in determining

25   the offense level under this guideline."  *See* U.S. Sentencing Guidelines Manual, 2021, p. 102.

26       The government agrees with the Commission's assessment of the importance of loss amount as a

27   measure of the gravity of a fraud conviction.  Here, Holmes' loss number is so high that a portion of it is

28   not accounted for within the Section 2B1.1 table, as there is no additional increase for any loss amount

Case 8:19-cr-00061-JVS  Document 1048-1  Filed 11/21/22  Page 44 of 332  Page ID
#:25430
Case 5:18-cr-00258-EJD  Document 1649  Filed 11/15/22  Page 43 of 46

1  above $550 million.  This provides an additional basis to conclude that a sufficient sentence is 180

2  months' imprisonment.

3          **G.**      **The Need to Avoid Unwarranted Disparities (18 U.S.C. § 3553(a)(6))**

4          The government recommends the Court impose a custodial sentence of 180 months'

5  imprisonment.  This sentence would amount to a variance of 60 months from the statutory maximum

6  sentence applicable to each count of conviction.  The basis for this five-year variance request is found in

7  the 3553(a) factors.  First, this variance request acknowledges the gap that exists between the losses

8  sustained by victim-investors and Holmes' realized financial gain through this fraud.  Through this

9  variance request, the government also acknowledges that the Holmes' crimes were not motivated by a

10  short-term desire for financial gain.  Second, this recommended sentence satisfies the "sufficient but not

11  greater than necessary" standard found in 18 U.S.C. § 3553(a).  Finally, the Court will achieve the

12  important sentencing goal of providing adequate deterrence to criminal conduct through a 15-year

13  custodial sentence.

14          The United States Probation Office agrees that a variance is appropriate.  PSR Addendum.

15  Certain of Holmes' history and characteristics persuaded Probation to make this recommendation,

16  including her family and social support, collateral punishments, and her experience with trauma.  *Id*.

17  While the government agrees that a variance is appropriate and agrees that her history and

18  characteristics are relevant factors this Court should weigh at sentencing, a variance of eleven years

19  from the statutory maximum sentence, and a significantly greater variance from the applicable Guideline

20  range, is not justified.  Even more, a significant variance also fails to achieve important sentencing

21  goals, such as general deterrence and promoting respect for the law.

22          The determination that a custodial sentence is or is not reasonable should not be based upon its

23  absolute number alone, that is, their number of years.  Instead, custodial sentences are reasonable

24  through the process that is followed to arrive at them.  And if the process includes too significant a

25  variance, general deterrence and respect for the law suffer.  In the government's view, a nine-year

26  custodial sentence would be the result of too significant a variance, especially when based upon factors

27  such as the collateral consequences of Holmes' trial and conviction.  The Probation Office is correct that

28  this case has garnered significant national media attention.  *Id*.  The Probation Office is also correct that

U.S.' SENTENCING MEM.,
CASE NO. 18-258 EJD         38

Case 8:19-cr-00061-JVS   Document 1048-1   Filed 11/21/22   Page 45 of 332   Page ID
#:25437
Case 5:18-cr-00258-EJD   Document 1849   Filed 11/15/22   Page 44 of 46

this causes significant collateral consequences for Holmes.  *Id*.  And in many cases, the defendant

cannot control which cases draw media coverage and which do not.  This case is different.  As the Court

knows from the trial, Holmes not only sought out media attention for her company, but she made false

statements to the media and used false stories in the press to corroborate false statements she had made

to investors.  Therefore, not only should this Court discount the collateral consequences of Holmes' trial

and conviction, the Court also should feel comfortable emphasizing the significant general deterrence

opportunity presented by this sentencing hearing.

Additional support for the government's sentencing recommendation is found in similar cases.

The Judiciary Sentencing Information (JSIN) data supports the government's sentencing

recommendation.  PSR ¶ ¶ 188-191.  Holmes' primary guideline will be § 2B1.1, with a Total Offense

Level of 43 and a Criminal History Category of I.  *Id*.  According to the JSIN data, during the last five

fiscal years (FY2017-2021), there were 29 offenders whose primary guideline was § 2B1.1, with a Final

Offense Level of 43 and a Criminal History Category of I, after excluding offenders who received a

§5K1.1 substantial assistance departure.  *Id*.  For the 29 offenders (100%) who received a sentence of

imprisonment in whole or in part, the average length of imprisonment imposed was 226 months and the

median length of imprisonment imposed was 180 months.  *Id*.  While one may think this prosecution is

unique, the data suggests otherwise.  Roughly six fraud defendants each year face sentencing at the very

top of the Guidelines.  And it appears that a variance is common.  This is not surprising, since the

Guidelines in each case are likely higher than the statutory maximum sentence.

Furthermore, a review of certain specific sentences imposed in similar cases demonstrate the

wide range of custodial sentences imposed in large-dollar fraud cases.  While each case is different,

there is precedent for Courts to impose significant custodial sentences in white collar cases.

| Defendant | Case No. | Approximate Loss Amount | Sentence |
|---|---|---|---|
| Charles W. McCall (McKesson-HBOC Chairman of the Board) | 00-CR-505 WHA (N.D. Cal.) | $8.6 billion | 120 months (no cooperation) |
| Walter A. Forbes (Cendant CEO) | 02-CR-264 AHN (D. Conn.) | More than $1 billion | 151 months (no cooperation) |
| Timothy J. Rigas (Adelphia CFO) | 02-CR-1236 LBS (S.D.N.Y) | More than $100 million | 204 months (no cooperation) |

Case 8:19-cr-00061-JVS   Document 1048-1   Filed 11/21/22   Page 46 of 332   Page ID
#:25432
Case 5:18-cr-00258-EJD   Document 1349   Filed 11/15/22   Page 45 of 46

| John Rigas (Adelphia CEO) | 02-CR-1236 LBS (S.D.N.Y) | More than $100 million | 144 months (no cooperation) |
|---|---|---|---|
| Bernard J. Ebbers (WorldCom CEO) | 02-CR-1144 BSJ (S.D.N.Y) | More than $1 billion | 300 months (no cooperation) |
| Sanjay Kumar (Computer Associates CEO) | 04-CR-846 ILG (E.D.N.Y.) | More than $400 million | 144 months (no cooperation) |
| Jeffrey K. Skilling (Enron CEO) | 04-CR-025 (S.D. Tex.) | More than $80 million | 168 months (no cooperation) |
| Samuel "Mouli" Cohen | 10-CR-547 CRB (N.D. Cal.) | $31 million | 264 months (no cooperation) |
| Ebrahim Shabudin (United Commercial Bank Chief Credit Officer) | 11-CR-664 JSW (N.D. Cal) | $677 million | 97 months (no cooperation) |
| John Geringer | 12-CR-888 EJD (N.D. Cal) | Approx. $45 million | 140 months (with cooperation) |
| Christopher Luck | 12-CR-888 EJD (N.D. Cal) | Approx. $45 million | 130 months (no cooperation) |
| Sean Clark Cutting (Sonoma Valley Bank CEO) | 14-CR-139 SI (N.D. Cal) | $47 million | 100 months (no cooperation) |

**H.    The Need to Provide Restitution to Any Victim**

The Court should order Holmes to pay restitution as further described below.

## III.    RESTITUTION AND FINE

The Mandatory Victims Restitution Act of 1996 (the "MVRA") provides that "when sentencing a defendant convicted of an offense described in [§ 3663A(c)], the court shall order . . . that the defendant make restitution to the victim of the offense." 18 U.S.C. § 3663A(a)(1). A "victim" is "a person directly and proximately harmed as a result of the commission of an offense for which restitution may be ordered." *Id.* § 3663A(a)(2). The MVRA applies to cases of an offense resulting in damage to or loss or destruction of property of a victim. *Id.* § 3663A(b)(1). "In each order of restitution, the court shall order restitution to each victim in the full amount of each victim's losses as determined by the court and without consideration of the economic circumstances of the defendant." *Id.* § 3664(f)(1)(A).

Case 8:19-cr-00061-JVS   Document 1048-1   Filed 11/21/22   Page 47 of 332   Page ID
#:25439
Case 5:18-cr-00258-EJD   Document 1649   Filed 11/15/22   Page 46 of 46

1   Any dispute as to the proper amount or type of restitution shall be resolved by the court by the

2   preponderance of the evidence. *Id.* § 3664(e).

3        Here, the preponderance of evidence shows that Theranos C-1 and C-2 investors, Walgreens,

4   Safeway, and George Shultz suffered a loss of $803,840,309. This amount was fully foreseeable by

5   Holmes. Although the amount of restitution may dwarf Holmes' ability to pay, those factors simply are

6   not relevant to the Court's determination of the restitution amount. The Court should order restitution as

7   required by the MVRA. Alternatively, if the Court determines that the victims' losses are not fully

8   ascertainable at this time, the Government requests that the Court postpone a final determination of the

9   restitution amount for 90 days. *See* 18 U.S.C. § 3664(d)(5).

10        Based on the PSR, it appears that Holmes has modest assets outweighed by $450,000 in "loan[s]

11   for SEC Settlement" and a liability for legal fees in excess of $30 million. The PSR notes it is unknown

12   whether any third parties, guarantors, or others are also liable on or expected to pay the legal fees. The

13   PSR also notes that Holmes' family appears to have substantial assets and that Holmes is managing her

14   affairs to avoid subjecting their assets to any judgment in this case. Before foregoing a fine, the Court

15   should assure itself that such liabilities are current and genuine and consider whether Holmes'

16   management of her affairs reflects a genuine desire to make her investors whole.

17                                    **CONCLUSION**

18        For these reasons, the government recommends the Court sentence the defendant to 180 months

19   in custody and order her to pay $803,840,309 in restitution and a $400 special assessment.

20

21   DATED: November 11, 2022                    Respectfully submitted,

22                                               STEPHANIE M. HINDS
23                                               United States Attorney

24                                                 */s/ Robert S. Leach*
25                                               ROBERT S. LEACH
                                                 JEFF SCHENK
26                                               JOHN C. BOSTIC
                                                 KELLY I. VOLKAR
27                                               Assistant United States Attorneys

28

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**EXHIBIT UU**

## COMPARISON OF HOLMES v. AVENATTI

| Holmes | Avenatti (Y/N) |
|---|---|
| Caused a loss in the amount of $803,840,309. [Def. Sent. Exh. TT, p. 41].[1] | No[2] |
| Total Offense Level of 45. [*Id.* at 15]. | No |
| Has refused repeatedly, including in connection with her sentencing, to accept responsibility for the crimes. [*Id.* at 1, 36]. | No |
| Described as "among the most substantial white collar offenses Silicon Valley or any other District has seen." [*Id.* at 2]. | No |
| Proceeded to trial and was found guilty of multiple counts of conspiracy to commit wire fraud and wire fraud after a four month trial. [*Id.* at 15]. | No |
| Caused loss and harm to more than 10 victims. [*Id.* at p. 20] | No |
| Conduct created a significant risk of death or serious injury as a result of potential for misdiagnosis, inaccurate test results, unnecessary treatment, decisions to forgo necessary lifesaving treatment, etc. [*Id.* at 21]. | No |
| As a result of the conduct, patients were led to believe they had blood results akin to patients with cancer. Other patients changed their blood thinning medication because Theranos blood test revealed out of the ordinary results. The tests also led pregnant women to believe they were suffering a miscarriage.  [*Id.* at 9-11]. | No. |
| Identified as an "organizer or leader" in a widespread criminal scheme. [*Id.* at 26]. | No |
| Falsely claimed that her technology was being used in the battlefield by the Department of Defense. [*Id.* at 2]. | No |

[1] Attached hereto as Exhibit TT is a copy of the government's sentencing position in *United States v. Holmes*. Citations herein are to that document.
[2] The loss amount here is less than 1/100th of the loss amount in the *Holmes case.*

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# EXHIBIT VV

Michael John Avenatti (Pro Se)

H. Dean Steward, SBN 85317
17 Corporate Plaza, Suite 254
Newport Beach, California 92660
Tel (949) 481-4900
Fax (949) 706-9994

Advisory Counsel for Defendant
MICHAEL JOHN AVENATTI

# UNITED STATES DISTRICT COURT

# FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | SA CR No. 19-061-JVS |
| Plaintiff, | |
| | DEFENDANT'S SENTENCING MEMORANDUM AND OBJECTIONS TO THE PSR |
| v. | |
| | Date: November 7, 2022 |
| | Time: 9:00 a.m. |
| MICHAEL JOHN AVENATTI, | |
| Defendant. | |

Defendant MICHAEL JOHN AVENATTI ("Defendant"), by and through his advisory counsel of record, H. Dean Steward, hereby files Defendant's Sentencing Memorandum and Objections to the PSR. Defendant's filing is based on the attached; the evidence referenced in the attached; the files, records and transcripts in this case and the other cases cited herein; and such further evidence and argument as the Court may permit at a hearing on this matter.

Dated: October 14, 2022          Respectfully submitted,

/s/ Michael John Avenatti
MICHAEL JOHN AVENATTI

Case 8:19-cr-00061-JVS   Document 1048-1   Filed 11/21/22   Page 52 of 332   Page ID
#:25444
Case 8:19-cr-00061-JVS   Document 1016   Filed 10/14/22   Page 2 of 54   Page ID #:24390

# **TABLE OF CONTENTS**

**TABLE OF AUTHORITIES** ................................................................ iv

**MEMORANDUM OF POINTS AND AUTHORITIES** ..................................... 1

I.   **INTRODUCTION** .................................................................. 1

II.  **THE §3553 FACTORS SUPPORT A DOWNWARD VARIANCE**…2

   A. Findings by the Hon. Paul G. Gardephe & Hon. Jesse M. Furman ..... 3

   B. Disparity in Sentences ........................................................... 4

   C. Challenging Childhood & Upbringing ....................................... 4

   D. Positive Work Performed While an Attorney ............................... 5

   E. Defendant's Close Family & Personal Relationships ...................... 7

   F. Custody Conditions ............................................................... 8

      1. *"Horrific Conditions" at MCC* ...................................... 8

      2. *Harsh Conditions Due to Covid-19 and Associated Risks* ........ 9

   G. Exemplary Conduct While in Custody ...................................... 9

   H. Defendant's Low Risk of Recidivism ....................................... 10

      1. *Defendant's DOJ PATTERN Score* ................................ 10

      2. *RDAP* ................................................................ 11

      3. *Age Upon Release* ................................................... 12

   I. Little Need for Further Deterrence ......................................... 12

   J. The Government's Spoilation of Mitigation Evidence ..................... 13

   K. Criminal Conduct ................................................................ 14

III.  **ACCEPTANCE OF RESPONSIBILITY** ......................................... 14

IV.  **CRIMINAL HISTORY CATEGORY** ............................................. 15

V.   **OBJECTION TO JUDICIAL FINDINGS OF FACT**
    **AND CONDUCT OUTSIDE OF DEFENDANT'S PLEA** ............... 17

VI.  **OBJECTIONS TO THE PSR** ...................................................... 18

VII. **WIRE FRAUD COUNTS 5, 8, 9 & 10** ........................................... 18

   A. Loss Amount ...................................................................... 31

ii

B. Section 2B1.1 & Disproportionate Sentence ...................................... 33

C. Obstruction of Justice........................................................................... 34

D. Substantial Financial Hardship ........................................................... 37

E. Sophisticated Means & Abuse of Position of Trust............................ 40

F. Misrepresentation During Bankruptcy Proceeding............................ 41

G. Vulnerable Victim ................................................................................ 42

**VIII. CONCURRENT SENTENCING** ......................................................... 43

**IX.     DEFENDANT'S PROPOSED SENTENCING CALCULATION** .. 44

**X.      CONDITIONS OF SUPERVISED RELEASE** ................................. 44

**XI.     CONCLUSION** ...................................................................................... 45

Case 8:19-cr-00061-JVS   Document 1048-1   Filed 11/21/22   Page 54 of 332   Page ID
#:25446
Case 8:19-cr-00061-JVS   Document 1016-4   Filed 10/14/22   Page 4 of 54   Page ID #:24392

# TABLE OF AUTHORITIES

## CASES: <span style="float:right">__Page__</span>

*Arizona v. Youngblood,*
488 U.S. 51 (1988)……………………………………..…………………………13

*Britt v. Plumley,*
2018 U.S. Dist. LEXIS 213904 (E.D. Cal. 2018)………………………..………11

*Concepcion v. United States,*
142 S. Ct. 2389 (2022)………………………………………………..…………10

*Dillon v. United States,*
560 U.S. 817 (2010)…………………………………………….………………2

*Hance v. Super Store Industries,*
44 Cal. App. 5th 676 (2020)………..………………………..…..……….………33

*Jones v. United States,*
135 S. Ct. 8 (2014)(Scalia, J., Dissenting)……………………………….………18

*MacInnis v. Pope,*
134 Cal. App. 2d 528 (1955)……………………………..…………….………33

*Oliver v. Campbell,*
43 Cal. 2d 298 (1954)……..…………………………………...………..…….………33

*Sheppard, Mullin, Richter & Hampton, LLP v. J-M Manufacturing Co., Inc.,*
6 Cal. 5th 59 (2018)……………………………………….………..…………...33

*Toyota Motor Mfg., Inc. v. Williams,*
534 U.S. 184 (2002)……..…………………………………………..………..37

*United States v. Abdellatiff,*
205 Fed. Appx. 601 (9th Cir. 2006)(unpublished)..……………..……….………33

*United States v. Adelson,*
441 F. Supp. 2d 506 (S.D.N.Y. 2006)....……………………………..….………2

*United States v. Armstead,*
552 F.3d 769 (9th Cir. 2008)………………………………..……...…..…...32

Case 8:19-cr-00061-JVS   Document 1048-1   Filed 11/21/22   Page 55 of 332   Page ID
#:25447
Case 8:19-cr-00061-JVS   Document 1016   Filed 10/14/22   Page 5 of 54   Page ID #:24393

*United States v. Backman*,
817 F.3d 662 (9th Cir. 2016)……………………………..………...……...42

*United States v. Bell*,
808 F.3d 926 (D.C. Cir. 2015)(Kavanaugh, J., concurring)………………..……..…18

*United States v. Blitz*,
151 F.3d 1002 (9th Cir. 1998)…………...………………………………..….……33

*United States v. Booker*,
543 U.S. 220 (2005)………………………………………………….……………..2

*United States v. Boykin*,
785 F.3d 1352 (9th Cir. 2015)...……………..………...……..……..…….……15

*United States v. Bright*,
353 F.3d 1114 (9th Cir. 2004)………………………………..……………..….……33

*United States v. Castaneda*,
239 F.3d 978 (9th Cir. 2001)………...……………..………..……..….……42

*United States v. Carson*,
2021 U.S. Dist. LEXIS 1611 (W.D. Wash. 2021)……..……………..………..…..11

*United States v. Cavera*,
550 F.3d 180 (2d. Cir. 2008)………………..………..……..………..………..…...3

*United States v. Door*,
996 F.3d 606 (9th Cir. 2021)………………………………..……..………..36

*United States v. Dudley*,
1992 U.S. App. LEXIS 13556 (9th Cir. 1992)………………………………..…..36

*United States v. Ebbers*,
458 F.3d 110 (2d Cir. 2006)……………………………..………..……...…...34

*United States v. Fatico*,
603 F.2d 1053 (2d Cir. 1979)…………………………..………..…..…..………..33

*United States v. George*,
949 F.3d 1181 (9th Cir. 2020)…...………………..………..……..………..…….37

Case 8:19-cr-00061-JVS   Document 1048-1   Filed 11/21/22   Page 56 of 332   Page ID
#:25448
Case 8:19-cr-00061-JVS   Document 1016   Filed 10/14/22   Page 6 of 54   Page ID #:24394

*United States v. Goddard*,
537 F.3d 1087 (9th Cir. 2008)…..………..………….………..…….……45

*United States v. Green*,
940 F.3d 1038 (9th Cir. 2019)…………………………………..…….……14

*United States v. Grusd*,
787 Fed. Appx. 922 (9th Cir. 2019)(unpublished)………..……..……….…..……...33

*United States v. Henderson*,
649 F.3d 955 (9th Cir. 2011)…………………………...…….……..……33

*United States v. Jenkins*,
275 F.3d 283 (3d. Cir. 2001)…………………………….………...……..…...35

*United States v. Lonich*,
23 F.4th 881 (9th Cir. 2022)…………………………………….……..……...32

*United States v. Lofton*,
905 F.2d 1315 (9th Cir. 1990)………....………………………...….……...35

*United States v. McLaughlin*,
203 Fed. Appx. 891 (9th Cir. 2006)(unpublished)……………………..…….……40

*United States v. McRae*,
2021 U.S. Dist. LEXIS 8777 (S.D.N.Y 2021)…..……………………….…….……..9

*United States v. Moody*,
2013 U.S. Dist. LEXIS 109506 (D. Colo. 2013)……………...……….…….……34

*United States v. Monge*,
2015 U.S. Dist. LEXIS 23034 (C.D. Cal. 2015)…………………………….…….…...33

*United States v. Parris*,
573 F. Supp. 2d 744 (E.D.N.Y. 2008)……………………...…….…….……34

*United States v. Plouffe*,
445 F.3d 1126 (9th Cir. 2006)……………………………………….…….……...2

*United States v. Reese*,
2 F.3d 870 (9th Cir. 1993)……………………….…..………..….……….……41

*United States v. Rodriguez*,
2021 U.S. Dist. LEXIS 73233 (S.D. Ca. 2021)……………….…....…....…….……...9

*United States v. Saeteurn*,
504 F.3d 1175 (9th Cir. 2007)……………….…..………….…..……….……..……4

*United States v. Scheele*,
231 F.3d 492 (9th Cir. 2000)……………….…..……….…..……..……..………36

*United States v. Spencer*,
1995 U.S. App. LEXIS 2697 (9th Cir. 1995)………………….…..……..……15

*United States v. Stroud*,
893 F.2d 504 (2d Cir. 1990)……………….……………….…..…….……..…35

*United States v. Sung*,
740 Fed. Appx 878 (9th Cir. 2018)……………….…………….……………….4

*United States v. Watson*,
582 F.3d 974 (9th Cir. 2009)……………….…………….…..…....……..…44

*United States v. Wetchie*,
207 F.3d 632 (9th Cir. 2000)……………….…....…..…….……..……..…...42

*United States v. Williams*,
2021 U.S. Dist. LEXIS 141123 (D. Mont. 2021)……………….……..…….…12

## STATUTES AND CODE SECTION:

18 U.S.C. § 3013………………….…………….………….………….………30, 31

18 U.S.C. § 3553……………….………………….………….…….……….passim

26 U.S.C. § 7212……………….………….…………….……….……….14, 27

28 C.F.R. § 550.53 ……………….…………….…………….…………...11

U.S.S.G. § 5G1.3 ……………….…………….…………….…….……...43, 44

U.S.S.G. §2B1.1…………….…………….…………….………….passim

U.S.S.G. §3A1.1…………….…………….…………….…………….27, 42

U.S.S.G. §3C1.1……………………………………………………………………34

U.S.S.G. §3E1.1……………………………………………………………………14

U.S.S.G. §4A1.1……………………………………………………………………...15

**OTHER SOURCES:**

*2020 Review and Revalidation of the First Step Act Risk Assessment Tool*, U.S
Department of Justice - National Institute of Justice (January 2021)……………..….10,11

B. Boss & K. Kapp, *How the Economic Loss Guideline Lost its Way,
and How to Save It*, Ohio State Journal of Criminal Law,
Vol.: 18.2: 605 (2021)……………………………………………………………….33

Bowman III, Frank O., *Sentencing High-Loss Corporate Insider Frauds after Booker*,
University of Missouri School of Law Scholarship Repository,
Vol 20, n. 3 (2008)………………………………………………………………….41

California Rule of Professional Conduct 1.15…………………………………….33

E. Podgor, *Throwing Away the Key*, 116 Yale Law Journal, Pocket Part 279 (2007)
*Recidivism and Federal Bureau of Prisons Programs,*
U.S. Sentencing Commission (May 2022)……………………………………...34

U.S. Department of Justice – Office of the Inspector General,
*The Impact of an Aging Inmate Population on the Federal Bureau of Prisons*
(May 2015, Revised February 2016)…………………………………………….12

Case 8:19-cr-00061-JVS   Document 1048-1   Filed 11/21/22   Page 59 of 332   Page ID
#:25451
Case 8:19-cr-00061-JVS   Document 1016   Filed 10/14/22   Page 9 of 54   Page ID #:24397

## **MEMORANDUM OF POINTS AND AUTHORITIES**[1]

### I.   INTRODUCTION

Defendant misappropriated monies due four of his legal clients, misled them repeatedly, and violated their trust. In doing so, he put his own selfish interests ahead of his clients, committed federal crimes, and broke some of the most important rules governing attorneys in the State of California.[2] He also impeded the ability of the Internal Revenue Service to collect taxes that were due. Defendant deserves just punishment for his crimes, including a prison sentence. He likewise deserves to lose his law license, his 22-year career, his assets, his countless personal and professional relationships, and his reputation, almost all of which have already been rightly taken from him.

However, defendant also deserves to be sentenced according to the law and similar to other defendants who committed frauds in the seven figures. He should be sentenced based on his life as a whole across the last 51 years, _not_ his notoriety; the desire of the government and others to make an example out of him; unbridled vindictiveness; and/or what those in the media, or on social media, may say after his sentencing. To do otherwise is not consistent with the law or our most basic concepts of justice.

This case, while serious, does not begin to approach a case involving a crime of violence or a fraud resulting in a loss of tens of millions or hundreds of millions of dollars. It does not involve scores of victims; a Ponzi or fraud scheme that left hundreds or thousands destitute; a widespread fraud that put a major company or financial institution, together with thousands of jobs and retirement benefits, at risk; a defendant who fled; or a defendant who proceeded to verdict or who has refused to accept any responsibility or remorse for the harm he did. Nor does it involve a defendant with a lifelong history of criminal conduct, who never positively contributed to society or the greater good. The conduct and defendants at the center of these types of cases deserve to spend a decade or

---

[1] Defendant's under seal supplemental filing (Dkt. 1012) is incorporated herein by reference.

[2] Defendant reiterates and stands by the entirety of his written apology and promises to his four clients as quoted in the Presentence Investigation Report ("PSR") at p. 24.

more in prison.

Such a sentence in this case, however, involving these facts, the §3553(a) factors, and this defendant, would be unreasonable and inconsistent with sentences in similar cases and the appropriate Guideline range.[3] Instead, for each of the reasons set forth herein, *defendant respectfully submits that a sentence of **no more than seventy-two (72) months in prison*** – to be served concurrently with both sentences previously imposed in the Southern District of New York - followed by three (3) years of supervised release, is "sufficient, but not greater than necessary" to achieve the purposes of sentencing.

## II.    THE §3553 FACTORS SUPPORT A DOWNWARD VARIANCE

"[I]f ever a man is to receive credit for the good he has done, and his immediate misconduct assessed in the context of his overall life hitherto, it should be at the moment of his sentencing, when his very future hangs in the balance." *United States v. Adelson*, 441 F. Supp. 2d 506, 513-14 (S.D.N.Y. 2006).[4] The "clear and unambiguous language of the Supreme Court in *Booker* has established that district courts must now view the Guidelines as advisory." *United States v. Plouffe*, 445 F.3d 1126, 1130 (9th Cir. 2006), *citing United States v. Booker*, 543 U.S. 220, 245-46 (2005). A sentencing court "may not presume [the Guidelines] are correct or reasonable when it considers an individual sentencing decision." *Dillon v. United States*, 560 U.S. 817, 841 (2010). In addition, the

---

[3] As explained below, the offense level and Guideline range included in the PSR are grossly inflated due to a flawed loss calculation and overlapping and stacking of 32 levels of enhancements beyond the base offense level of 7. This is an example of how the misapplication of the fraud Guidelines, including loss amount and other enhancements, together with little consideration for reasonableness, can produce results that are indisputably far "greater than necessary" and nearly meaningless in determining an appropriate sentence. For instance, as reflected on Exhibit A, the offense level of 39 calculated in the PSR is greater than that for selling or buying a child for production of pornography; second degree murder; trafficking in over 600 images of child pornography involving infants and depicting violence; and robbing a family of over $100 million at gun point.

[4] Importantly, the PSR contains little to no mention or consideration of the positive work, for the benefit of thousands, that defendant did across over two decades as a lawyer despite Probation being provided this information well before the PSR was completed.

2

Court has "very wide latitude to decide the proper degree of punishment for an individual offender and a particular crime." *United States v. Cavera*, 550 F.3d 180, 188 (2d. Cir. 2008). In determining the proper degree of punishment for the instant offense, defendant requests that the Court consider his life as a whole and credit him for the good he has done. He further respectfully requests that the Court take into account the following facts when determining defendant's sentence.

### A.  Findings by the Hon. Paul G. Gardephe and Hon. Jesse M. Furman

During defendant's two recent sentencing proceedings, the district courts made factual findings regarding defendant's positive character traits, contributions to society, strong familial ties, and the conditions he endured while in custody. These findings must be taken as true because they were never appealed or challenged by the government.

On July 8, 2021, Judge Paul G. Gardephe made the following factual findings in SDNY 19-Cr-00373-PGG: (1) "By all accounts, Mr. Avenatti is a loving and devoted father."; (2) "As to education and employment, Mr. Avenatti's early years were marked by hard work, determination, and ambition… Because his parents were not in a position to fund his education, he worked full time to do so."; (3) "Mr. Avenatti has no criminal record."; (4) "[] Mr. Avenatti had expressed what I believe to be sincere remorse today. . ."; and, (5) "A variance is also necessary because Mr. Avenatti was held in horrific conditions at the MCC for more than three months, in solitary confinement for much of the time and in lockdown for nearly all of it. . . Conditions were terrible. It's hard to believe they could occur in the United States of America." *See,* SDNY 19-Cr-00373-PGG [Dkt. 341, pgs. 38-39, 42-43].

On June 2, 2022, Judge Jesse M. Furman made the following findings in SDNY 19-Cr-00374-JMF: (1) "[][I]t is certainly clear to me that there is more to Mr. Avenatti than the conduct that led to his legal troubles may suggest. They do reveal a thoughtful and hardworking person devoted to his family **and his clients**."; (2) "I think it's clear from his record in law school, his earlier legal career, not to mention his handling of trial in this case -- as much as I took issue with some of his conduct at trial -- that he is quite smart

1    and has formidable legal skills."; (3) "I acknowledge that there are ways in which you
2    have done **good in the world and on behalf of your clients**, and that is part of the reason
3    I think a below-guideline sentence is appropriate."; (4) "[] it is clear to me that who you
4    were as a person is certainly more than the conduct that landed you here." *See,* SDNY 19-
5    Cr-00374-JMF [Dkt. 447, pgs. 47, 56 (emphasis added)].

6         B.   Disparity in Sentences

7         Pursuant to §3553(a)(6), the Court must consider the need to avoid unwarranted

8    sentence disparities with *similar cases nationwide*. *See, e.g., United States v. Sung*, 740

9    Fed. Appx 878, 880 (9th Cir. 2018)(vacating sentence and remanding for resentencing

10   because "The district court stated that it could not consider this factor because it had never

11   sentenced a defendant for a similar crime and need not consider similar cases from other

12   jurisdictions. This was error [due to need for national uniformity]")(*quoting and citing*

13   *United States v. Saeteurn*, 504 F.3d 1175, 1181 (9th Cir. 2007)(unpublished). Here, the

14   sentence recommended by Probation is <u>dramatically and punitively higher than that for</u>

15   <u>similar fraud and tax cases and defendants</u>. [Exhibit B]. Exhibit B demonstrates that

16   defendant's requested sentence of 72 months is more than reasonable when analyzed in

17   the context of other fraud and tax cases with similar loss amounts and conduct.

18        C.   Challenging Childhood & Upbringing[5]

19        Defendant was born on February 16, 1971, as the only child of Marcene and William

20   Avenatti. ███████████████████████████████████████████████

21   ████████████████████████████████████████████████████████

22   ████████████████████████████████████████████████████████

23   ████████████████████████████████████████████████████████

24   ████████████████████████████████████████████████████████

25   ████████████████████████████████████████████████████████

26   ████████████████████████████████████████████████████████

27

28   _____
     [5] Defendant directs the Court to paragraphs 158-187 of the PSR for additional details of
     defendant's childhood and the conditions he overcame.

                                             4

██████████████████████████████████████████████

███████████████████████████ Defendant knew at a young age that he needed to work hard and rely solely on himself to achieve success and contribute to society.

Defendant always maintained a strong work ethic. Starting at age 15, defendant worked several minimum wage jobs, including at a McDonalds, a grocery store stocking produce at 4 a.m., and the shoe department of Marshall's discount clothing store. When he was 17 years old, he worked at an athletic complex in St. Louis, Missouri, where he managed five employees and umpired over 500 baseball games.

Because his family could not afford it, defendant was required to pay for his higher education entirely on his own. Defendant completed the first two years of college at St. Louis University and used his academic achievement there to transfer to the University of Pennsylvania, where he obtained a degree in political science, becoming the first member of his family to graduate from college. Defendant worked full-time throughout his college years until his graduation in 1996. Following college, defendant was accepted into George Washington University Law School, where he attended evening classes so that he could continue to work full-time and pay his own way. Even with these obstacles against him, he was a member of the Law Review, participated in extra-curricular activities, and performed pro bono work. [Exhibit D]. One of his well-known law school professors, Jonathan Turley, has publicly described defendant as one of his brightest and most hard-working students in over 25 years of teaching. Defendant subsequently earned law clerk positions with prestigious international law firms, and in December 1999 he graduated at the top of his class. Defendant's parents did not attend his law school graduation. Soon after graduating from law school, his *alma mater* established the Michael J. Avenatti Award for Excellence in Pre-Trial and Trial Advocacy. [Exhibit E]. In 2010, the law school honored defendant with its prestigious "Recent Alumni Achievement Award" and a seat on its Board of Advisors.

D. Positive Work Performed While an Attorney

Defendant asks that the Court consider the positive contributions defendant has

5

made and the countless lives he has changed for the better when determining his sentence. Defendant respectfully requests that the Court review the letters submitted by defendant's former clients and colleagues attesting to his positive contributions. [Exhibit F].

After law school, defendant moved to California and passed the bar exam on his first attempt. He was licensed in June 2000. He settled in Newport Beach and worked as an associate with O'Melveny & Myers, LLP, where he worked closely with Gary Singer and Daniel Petrocelli. In 2003, he left O'Melveny and joined the boutique plaintiffs' firm Greene Broillet Panish & Wheeler, LLP, where he represented numerous individuals harmed by large corporations and wrongdoers. In 2006, he obtained a $22.5 million settlement on behalf of investors harmed by a large Orange County embezzlement scheme perpetrated by William Anthony Lloyd.[6] [Exhibit G].

In approximately 2006, defendant opened two firms, Avenatti & Associates, APC and Eagan O'Malley & Avenatti, LLP (later known as Eagan Avenatti, LLP). In 2008, he obtained a $41 million jury verdict after five weeks of trial on behalf of investors who had been defrauded. In 2009, he was voted by his peers as the Trial Lawyer of the Year and was also honored by the California Assembly for "his unwavering commitment to the principles of legal ethics and the preservation of the justice system." In 2014, defendant settled, during trial, a $80 million class action he brought on behalf of thousands of Jewish families whose loved ones' graves had been desecrated, including by having their remains thrown in a mass grave (some of whom were Holocaust survivors). [Exhibit H].

Defendant also recovered tens of millions of dollars for thousands of victims and investors (many of whom were elderly or disabled) in connection with two other frauds: a huge Ponzi scheme in Seattle[7] and a $37 million embezzlement involving the publicly traded company Koss Corporation (Koss).[8] [Exhibits I, J]. In April 2017, after a trial in

---

[6] Llloyd was also convicted and sentenced in the Central District (Santa Ana).
[7] The perpetrator, Darren Berg, was sentenced in U.S. District Court in Seattle to an 18-year prison term in 2012.
[8] Sue Sachdeva, the embezzler, was sentenced to 11 years in federal prison in Milwaukee in 2010.

6

the Central District, defendant obtained a $454 million jury verdict[9] in a fraud case brought against Kimberly-Clark Corp. relating to the sale of defective personal protective equipment. Defendant, after years of work, proved that manufacturers had knowingly put thousands of medical providers – doctors, nurses, and first responders – at risk by selling defective surgical gowns for years, including during the Ebola pandemic. [Exhibit K]. As a result of defendant's efforts, the gowns were removed from the U.S. National Strategic Stockpile, which resulted in numerous lives being saved when the Covid-19 pandemic hit just three years later. Defendant subsequently earned the National Public Justice Trial Lawyer of the Year Award for his dedication to the common good. [Exhibit L]. In 2018 and 2019, defendant was responsible for reuniting over 70 children with their parents after they were purposely separated at our Southern Border as a result of the Trump Administration's draconian policy. [Exhibit M]. This work was done pro bono and required exhaustive efforts and significant out-of-pocket costs.

The above recitation are mere examples of the thousands of people that defendant helped and represented, ethically and with great success, over the last twenty years. Indeed, during this time period, defendant obtained over $500 million in payments to his clients. Accordingly, defendant asks that the Court recognize that the conduct at issue is an outlier to what was otherwise a career marked by the highest standards, both ethically and professionally, and fashion a sentence accordingly.

E. Defendant's Close Family & Personal Relationships

In 1994, defendant married Christine Avenatti-Carlin, his college sweetheart. Defendant was readily welcomed by his wife's family. Defendant found the security and affection that he had yearned for as a child. When his mother-in-law became ill, he moved into her home to help provide lay palliative care in the final months of her life. Defendant is most proud of his children. Defendant and Ms. Avenatti-Carlin have two daughters,

---

[9] The verdict was later overturned in 2020, after defendant was indicted, thus rendering defendant's work entirely pro bono and costing defendant millions in out-of-pocket costs. (Defense counsel was paid $51 million (not a typo) to defend the case).

7

Defendant has maintained communication with his children throughout these proceedings and has prioritized their relationship above all. By all accounts, he is a loyal, loving, supportive, and fun father. He has instilled integrity, confidence, and a drive for success in each of his children in whatever they do. Attached are photos of defendant with his children [Exhibit N] as well as letters from family members, friends, and loved ones who continue to support him. [Exhibit O]. Defendant has also attached examples of cards he received from some of those who worked for him, including witnesses Judy Regnier and Kathy Mosby, further evidencing his generosity and the positive work environment he fostered for years. [Exhibit P].

F. Custody Conditions

1. "Horrific Conditions" at MCC

Defendant was arrested on January 14, 2020, with his *Nike* trial scheduled to commence the following week. He was subsequently remanded into custody and transported to MCC in New York, where he was housed in solitary confinement within the notorious "10 South" unit, the highest security pre-trial facility in the United States. This facility has historically been used to house the most dangerous inmates who pose national security threats to the United States including international terrorists and Joaquin "El Chapo" Guzman. Attached hereto as Exhibit Q is a portion of the sentencing brief submitted in the Southern District of New York detailing the horrendous conditions defendant faced while in custody at MCC New York. Judge Gardephe later determined that his treatment at MCC and the surrounding circumstances were "horrific" and that "[i]t's hard to believe they could occur in the United States of America." The degree of punishment inflicted on defendant is unique in our justice system – and rightly so. It is intolerable and should never be inflicted on anyone. Accordingly, defendant respectfully requests a downward variance due to the inhumane conditions of his confinement at MCC.

2. Harsh Conditions Due to Covid-19 and Associated Risks

It is beyond dispute that prison time now is far harsher due to the Covid-19 pandemic, which causes heightened concerns regarding safety, risk of disease, restricted

8

Case 8:19-cr-00061-JVS   Document 1048-1   Filed 11/21/22   Page 67 of 332   Page ID
#: 25459
Case 8:19-cr-00061-JVS   Document 1016   Filed 10/14/22   Page 17 of 54   Page ID #:24405

access to programming, frequent lockdowns, and inability to see and communicate with one's family. *See, e.g., United States v. McRae*, 2021 U.S. Dist. LEXIS 8777, *12 (S.D.N.Y 2021)("[][A] day spent in prison under extreme lockdown and in well-founded fear of contracting a once-in-a-century deadly virus exacts a price on a prisoner beyond that imposed by an ordinary day in prison. While such conditions are not intended as punishment, incarceration in such circumstances is, unavoidably, experienced as more punishing."); *United States v. Rodriguez*, 2021 U.S. Dist. LEXIS 73233, *19 (S.D. Ca. 2021)("It is also significant that Defendant has endured the uncertainty, danger and extraordinarily restrictive conditions created by the COVID-19 during her incarceration."). These concerns are even more intensified due to defendant's health conditions. Infectious Disease Specialist Dr. Asfour previously determined "[d]ue to his underlying history of respiratory infections and pneumonia, and his long standing history of hypertension, were Mr. Avenatti to acquire COVID-19, he will have a high risk of severe disease, long term sequelae and even death." [Dkt. 280-281]. Judge Gardephe similarly found, "Mr. Avenatti was at risk [at MCC] from the Covid-19 virus as a result of a preexisting medical condition."

Indeed, because of Covid-19, defendant has already endured beyond challenging conditions while incarcerated, including multiple lockdowns and quarantines, and repeated isolation from his family and even his counsel. Most recently, on July 27, 2022, an individual in defendant's unit tested positive for Covid-19, prompting the Warden of Terminal Island to lockdown and quarantine the entire unit. Defendant's unit remained on lockdown until September 8, 2022 (approximately six weeks). During this time, defendant was deprived of all in-person visits, had limited access to his legal team and communication with his family, programming was eliminated, and defendant had approximately five hours of fresh air in total each week. Incarceration during Covid-19 has taken, and will take, a significant toll on defendant and his family. It is simply beyond dispute that each day spent in prison today is far worse than in prior years.

G. Exemplary Conduct While in Custody

It is appropriate for the Court to consider defendant's conduct in prison in fashioning his sentence. *See, e.g., Concepcion v. United States*, 142 S. Ct. 2389, 2400 (2022). During the last three years, defendant has been held in no fewer than seven different jails/prisons across the country, often in solitary confinement.[10] Further, he has been unable to be designated to a federal prison camp because of the manner in which the government charged him (*i.e.*, three different cases).[11] This has also resulted in defendant being incarcerated in facilities and units with violent offenders and sex offenders. For instance, approximately **30-35%** of the inmates at Terminal Island, where defendant is currently incarcerated, are serving sentences for sex crimes against children.

Despite all of this, he has maintained a spotless disciplinary record, has been a model inmate, and currently has a security classification of minimum. In addition, defendant has already been accepted into, and begun treatment through, the Bureau of Prison's intensive Residential Drug Treatment Program, is participating in Alcoholics Anonymous meetings, has completed an OSHA course and earned his certification, and has taken other courses designed to prepare him for a life after prison (*i.e.*, an entrepreneurship course and a vocational training course). Defendant has also volunteered to work in the BOP's Suicide Prevention Program, where inmates observe and assist inmates on suicide watch to ensure they regain stability and do not engage in self-harm.

H. Defendant's Low Risk of Recidivism

*I.  Defendant's DOJ PATTERN Score*

In 2019, the Department of Justice, together with acclaimed criminal justice experts, developed the DOJ Prisoner Assessment Tool Targeting Estimate Risk and Needs ("PATTERN"). *2020 Review and Revalidation of the First Step Act Risk Assessment Tool*,

---

[10] MCC-Manhattan; MDC-Brooklyn; MDC-Los Angeles; FCI-Victorville; Grady County, Oklahoma; Santa Ana Jail; and FCI-Terminal Island.

[11] Any total cumulative sentence equal to or greater than 10 years across defendant's three cases will also likewise disqualify defendant from a minimum security camp, irrespective of his security classification (which is de minimis).

U.S Department of Justice - National Institute of Justice, p. 1 (January 2021). This assessment is "designed to predict the likelihood of general and violent recidivism for all BOP inmates three years postrelease [sic]." [*Id.* at 2]. For men, a general score of 5 or less places them in the "minimum" risk category. A violence score of 7 or less, similarly places male inmates in the minimum risk category. In 2021, the National Institute of Justice performed an analysis of the accuracy of the PATTERN scores in predicting recidivism. *2020 Review and Revalidation of the First Step Act Risk Assessment Tool*, U.S Department of Justice - National Institute of Justice, p. 1 (January 2021). It was determined that the PATTERN score "displays a high level of predictive accuracy across all four of its tools. The PATTERN risk scores are accurate predictors of recidivism at both the first and last assessments." *Id.* On March 21, 2022, defendant's Recidivism Assessment was performed by DOJ. [Exhibit R]. He was given a general score of 3 and a violence score of 2. On August 26, 2022, another recidivism analysis was done on defendant by DOJ using the PATTERN scoring system. [*Id.*]. Defendant was given a general score of 4 and a violence score of 1.[12] These scores show that defendant's recidivism risk upon release from custody, according to the DOJ, is minimum – the lowest category possible.

### 2. RDAP

The Bureau of Prisons offers a Residential Drug Abuse Treatment Program ("RDAP"), which is "an intensive drug treatment program for federal inmates with verifiable substance abuse disorders." *Britt v. Plumley*, 2018 U.S. Dist. LEXIS 213904, *3 (E.D. Cal. 2018), *citing* 28 C.F.R. § 550.53(b). The verifiable disorder must have been present during the 12 months preceding defendant's arrest and been a contributing factor to the criminal conduct.

A 2022 Sentencing Commission study revealed, "[l]ess than half of RDAP Completers (48.2%) recidivated in the eight-year follow-up period of this study, compared to 68.0 percent of RDAP Eligible Non-Participants." *Recidivism and Federal Bureau of Prisons Programs,* U.S. Sentencing Commission (May 2022), p. 6. District courts

---

[12] Between the two analyses, the DOJ made small changes to the scoring system.

routinely recognize the benefits of the program. *See, e.g., United States v. Carson*, 2021 U.S. Dist. LEXIS 1611, at *9 (W.D. Wash. 2021)(granting Motion for Sentencing Reduction in part due to his "service to fellow inmates through the suicide companion program, completion of the 'RDAP' drug abuse program, and other activities."); *United States v. Williams*, 2021 U.S. Dist. LEXIS 141123, *5 (D. Mont. 2021). As soon as he was able to secure a spot in the program, defendant enrolled in RDAP to address his alcohol abuse and its history in defendant's family, including its significant contribution to the criminal conduct at issue in this case. He remains in the program, which is five days a week (it is a 500 hour program) and is presently scheduled to graduate in May 2023.

### 3. Age Upon Release

The Office of the Inspector General has determined that aging inmates (defined as 50 and older) are costly to incarcerate, commit less misconduct while incarcerated, and have a lower rate of re-arrest once released. U.S. Department of Justice – Office of the Inspector General, *The Impact of an Aging Inmate Population on the Federal Bureau of Prisons* (May 2015, Revised February 2016). Defendant is currently 51 years old. As a result, his likelihood of recidivism is reduced and his financial strain on BOP is increased.

### I.   Little Need for Further Deterrence

Defendant's cataclysmic fall and the resulting humiliation has played out in a very public way, across three years, nationwide and, due to the way he was charged (across three cases and two coasts), underlined repeatedly. This has had a tremendous, negative impact on his family, his friends, his support system, and him. He will underlined forever be branded with his criminal convictions and the title "disgraced former attorney." All of this will make it exponentially harder, if not nearly impossible, for him to attempt to pick up the pieces and attempt to regain some semblance of a normal life once released from prison. He rightly has paid, and will continue to pay for the balance of his life, a very steep price for his criminal conduct. Further, defendant will never be able to practice law again or engage in the conduct at issue. Accordingly, there is no need for additional specific deterrence.

Moreover, defendant has already been made an example of on a national stage,

1   repeatedly. The message has already been sent to the public and attorneys nationwide,

2   plastered across DOJ press releases and press conferences, TV, social media, and

3   newspapers. *See,* SDNY, 19-cr-00374-JMF, Dkt. 153 (detailing the widespread negative

4   media attention directed at defendant in connection with his bi-coastal prosecutions). As

5   a result, minimal, if any, additional general deterrence will be gained by adding numerous

6   years to defendant's existing prison sentence.

7     J.   The Government's Spoilation of Mitigation Evidence

8       When the government fails to preserve potentially exculpatory material and the

9   government acted in bad faith, the Due Process Clause has been violated. *Arizona v.*

10  *Youngblood,* 488 U.S. 51 (1988). At trial, former office manager Judy Regnier testified

11  that after the execution of the March 2019 search warrant at her home, she called Special

12  Agent Karlous and informed him that the government left behind six to seven boxes of

13  items described as "correspondence from fans, personal records, MA finances, other

14  companies, and a ton of EA records case related." [Tr. 7/28/21, Vol. 1, p. 95]. SA Karlous

15  testified that he remembered being alerted about these materials, was told that she was

16  going to "either move them, burn them, or possibly trash them" and he still made no effort

17  to pick up the boxes. [Tr. 8/18/21, Vol. 1, p. 62-63].

18      Ms. Regnier later testified she caused these materials to be shredded. *See, e.g.* [Tr.

19  7/28/21, Vol. 1, p. 97]. These boxes contained eighteen years' worth of mitigation

20  materials, including thank you cards, notes of appreciation, letters, awards, etc., spanning

21  defendant's legal career and representation of thousands of clients. When contacted by

22  advisory counsel, through her counsel, Ms. Regnier relayed that she no longer has any

23  such thank you cards, notes, or other items described in her possession. Counsel for Ms.

24  Regnier further relayed to advisory counsel that according to Ms. Regnier, the mitigation

25  materials sought by the defense were contained within the materials destroyed.[13] These

26  materials are irreplaceable and cannot be duplicated or obtained by other means. As a

27

28  [13] Neither defense counsel nor defendant were given any advance notice of the likely
destruction or provided any opportunity to acquire the evidence.

13

result, defendant asks that the Court consider a variance due to the defendant's inability to present contemporaneous mitigation materials from countless former clients attesting to the good he has done over his over two decades in the law.

### K. Criminal Conduct

As explained in the first paragraph of this submission, defendant's criminal conduct at the center of his case is substantial. He pled guilty to four counts of wire fraud, violations of 18 U.S.C. § 1343, for misappropriating funds due to four of his legal clients. Defendant took large sums of money due his legal clients, lied to them repeatedly, and violated numerous professional standards and rules of ethics. Defendant also pled guilty to a single count of violating 26 U.S.C. § 7212, for impending the ability of the IRS to collect taxes that were due to the federal treasury. As described above and below, defendant takes responsibility for his crimes, appreciates the seriousness of his misconduct, and recognizes and agrees that punishment and a prison sentence is deserved.

## III.   ACCEPTANCE OF RESPONSIBILITY

Pursuant to §3E1.1(a), "[i]f the defendant clearly demonstrates acceptance of responsibility for his offense, decrease the offense level by 2 levels." Subsection (b) provides an additional one-level reduction upon motion of the government.[14] The "primary goal of the reduction is to reward defendants who are genuinely contrite." *United States v. Green*, 940 F.3d 1038, 1042 (9th Cir. 2019). The PSR recommended that defendant's base offense level be reduced by two levels due to his acceptance of responsibility, but refused to recommend that defendant receive the additional one level reduction. This is not equitable under the facts. [PSR ¶¶ 134-35].

By pleading guilty, absent an agreement, defendant cumulatively prevented (a) two trials, totaling at least ten to twelve weeks; (b) additional emotional and other burdens on the clients; (c) significant costs to the Court and the government; and (d) likely multiple

---

[14] On July 8, 2022, defendant, through advisory counsel, made a written request to the government for a third level reduction pursuant to 3E1.1(b). [Exhibit S]. The government did not respond.

appeals.[15] Accordingly, defendant's base offense level should be reduced by three, not two, levels.

## IV.  CRIMINAL HISTORY CATEGORY

The criminal history category "is designed expressly to account for a defendant's *prior* criminal conduct." *United States v. Spencer*, 1995 U.S. App. LEXIS 2697, *5 (9th Cir. 1995)(emphasis added). A "defendant with a record of *prior* criminal behavior is more culpable than a first offender and thus deserving of greater punishment . . ." §4A1.1, *Introductory Commentary* (emphasis added). The district court "retains discretion to depart downward from the guidelines should it find 'mitigating circumstances of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the guidelines that should result in a sentence different from that described.'" *United States v. Boykin*, 785 F.3d 1352, 1363 (9th Cir. 2015).

Prior to being sentenced on the *Nike* matter, defendant had a criminal history score of zero. Defendant's criminal history was reevaluated before he was sentenced on the *Daniels* matter. The *Nike* conviction resulted in a criminal history score of three, placing defendant in criminal history category II. The SDNY Probation Department determined, "[b]ased on the nature of these offenses, their proximity to one another, and the defendant's lack of other criminal history, it appears his criminal history may be overstated in the Criminal History Computation . . . . It appears as though defendant has done a lot of good work in his legal career up until the events of his criminal activity." Thereafter, defendant was sentenced to a period of 24 months for Count 1, and 24 months for Count 2, with 18 months to be served concurrently with the sentence imposed in the *Nike* matter.

The instant PSR concluded that defendant now has a total criminal history score of six, which places him in a criminal history category of III, but recommended a departure

---

[15] Defendant has also taken practical steps to evidence his acceptance of responsibility, inclusive of sending a letter to his victim clients [PSR ¶ 84], voluntarily relinquishing his interest in a jet claimed by the government to be purchased with misappropriated funds [Dkt. 974, Exh. B]; and, attempting to voluntarily and permanently resign from the practice of law. [Exhibit T].

to Category II. [PSR ¶¶ 153, 282, Dkt. 977, p. 9]. However, a downward departure to category I is warranted here. Prior to the filing of three federal indictments, defendant had never been charged with a crime. That changed in early 2019, when DOJ filed three separate cases against defendant within approximately 60 days. [Exhibit U]. Because each case involved a single defendant, charged similar allegations (particularly the *Daniels* matter), and had overlapping periods of conduct, the normal course (followed in almost all federal prosecutions) would have been to bring one case. Instead, defendant was subjected to defending three criminal cases, on two coasts, at once. Now, defendant's criminal history category is similarly negatively affected by the government's decision not to bring one case, but instead three. And a criminal history category of III has the potential to add *years* to his sentence.

The defense submits that this highly unusual decision resulted from defendant's notoriety, the government's desire to have three high-profile prosecutions of defendant, and an internal "turf" battle within DOJ. This is improper and highly prejudicial. In fact, it was recently revealed that former SDNY U.S. Attorney Geoffrey Berman acted in concert with former CDCA U.S. Attorney Nicola Hanna to determine when the agencies would effectuate the arrest and charging of defendant in multiple cases in two districts as opposed to having one office charge defendant. On September 13, 2022, Berman released his book, "Holding the Line: Inside the Nation's Preeminent US Attorney's Office and its Battle with the Trump Justice Department." In the book, Berman states: "We prosecuted friends of the president [Trump]. And we prosecuted one of his most persistent antagonists: Michael Avenatti, the lawyer who represented Stormy Daniels." In "Part Three: Priorities" an entire chapter is devoted to defendant. [Exhibit BB][16]

Mr. Berman reveals in the book that prosecutors in the Southern District and the Central District had ample knowledge and opportunity to bring the instant matter and the *Nike* matter (as well as the later filed *Daniels* matter) in one case to be filed in the Central

---

[16] There are numerous erroneous "facts" in the chapter, many of which are contradicted by the government's own filings in the Southern District of New York and the evidence presented at trial.

District, consistent with the normal course and DOJ policy. Instead, they chose to pursue the cases separately, made no efforts of consolidating the cases and conserving resources, and were instead more concerned over who would benefit from a high-profile prosecution of defendant and avoid being "punished" by Main Justice.[17] These statements also undermine the repeated representations from the government that Main Justice was never involved in the prosecution of defendant.

The conduct at issue in this case occurred prior to the conduct in both New York matters. Although those cases proceeded to trial and sentencing prior to the instant case, the underlying conduct for each occurred <u>after</u> the relevant conduct here. The spirit of the criminal history category is to prevent recidivism after a defendant has served his sentence and has been given a chance to do better. Thus, it would not be just to increase defendant's sentence in this case due to conduct that occurred after the fact, especially under the circumstances. Defendant asks that the Court perform a downward departure to criminal history category I. Defendant's lack of prior criminal conduct, his age of 51, the proximity of the relevant offenses, and the government's act of knowingly pursuing three indictments at the same time, warrants such a departure.

## V.   OBJECTION TO JUDICIAL FINDINGS OF FACT AND CONDUCT OUTSIDE OF DEFENDANT'S PLEA

Defendant is entitled to a jury trial as to any conduct not specifically pled to, and the government may not rely on judicial fact finding for enhancements, relevant conduct, or offense behavior in connection with defendant's sentencing. Indeed, it is unconstitutional for the Court to engage in judicial fact finding as to any conduct beyond that specifically pled to at the time of defendant's guilty plea, and then use such conduct either to enhance defendant's sentence (*i.e.*, to support a sentence enhancement such as obstruction of justice, bankruptcy enhancement, etc.) or as "relevant conduct" in connection with defendant's sentence. Doing so violates defendant's right to due process,

---

[17] The government also later refused on multiple occasions to transfer the *Daniels* case to the Central District for consolidation. [SDNY 19-Cr-00374, Dkts. 20, 59].

his rights under the Sixth Amendment, and the guarantee of a jury trial.

Under the Constitution, defendant is entitled to have a jury determine, using a beyond a reasonable doubt standard, any fact that defendant has not specifically pled to that is used to increase his sentence. *See, e.g.*, *Jones v. United States*, 135 S. Ct. 8, 8-9 (2014)(Scalia, J., Dissenting)("It unavoidably follows that any fact necessary to prevent a sentence from being substantively unreasonable – thereby exposing the defendant to the longer sentence – is an element that must be either admitted by the defendant or found by the jury. It *may not* be found by a judge."); *United States v. Bell*, 808 F.3d 926, 928 (D.C. Cir. 2015)(Kavanaugh, J., concurring)("Allowing judges to rely on acquitted or uncharged conduct to impose higher sentences than they otherwise would impose seems a dubious infringement of the rights to due process and to a jury trial."). Accordingly, defendant objects to any judicial fact finding or reliance by the government on facts outside defendant's prior plea, as stated on the record, in connection with defendant's sentencing. The Court must decide defendant's sentence solely based on the conduct and facts he pled to, together with the §3553 factors.

## VI.   OBJECTIONS TO THE PSR

On August 22, 2022, the PSR and a Letter to the Court were filed. [Dkt. 977, 978]. As detailed below, defendant objects to many of the PSR's findings and much of its content as incorrect, unreasonable, and excessive. Among other things, the PSR drastically overstates the applicable Guideline range; performs a faulty "loss" analysis; provides defendant with no credit for the tremendous work he performed on behalf of his clients; includes double counting by relying on an inaccurate recitation of defendant's conduct and the facts to justify the stacking of enhancements;[18] and improperly "convicts" defendant

---

[18] In preparation of the PSR, Probation never made any inquiry of the defendant or his advisory counsel as to the offense conduct, despite being invited to do so on multiple occasions. Instead, it appears that the government provided an inflammatory, one-sided, lengthy factual recitation (totaling over 15 single-spaced pages) to Probation that was then inserted in the PSR, without any verification by Probation or attribution stating it came from the government. This, in turn, leads the reader to erroneously conclude that these are "facts" independently determined by Probation. The CDCA PSR also fails to include many

18

Case 8:19-cr-00061-JVS   Document 1048-1   Filed 11/21/22   Page 77 of 332   Page ID
#:25469
Case 8:19-cr-00061-JVS   Document 1016   Filed 10/14/22   Page 27 of 54   Page ID #:24415

of other conduct for which he has not pled guilty, all in an attempt to account for the suggested unreasonable sentence of 151 months. This is not proper. Thus, defendant makes the following objections to the PSR and the Letter to the Court.

1 - PSR Page 2, Release Status, Dk. 977, p. 7: Defendant was arrested and released on March 25, 2019, not April 1, 2019. [Dkt. 9]. Defendant was released from Metropolitan Correctional Center ("MCC") in New York and transported back to California on April 24, 2020, not April 20, 2020. The PSR states that defendant self-surrendered on February 7, 2022, to commence the sentence imposed in 19-CR-00374-JMF. This is incorrect. He self-surrendered on that date to await sentencing in that case and to begin serving his sentence in SDNY 19-CR-00373-PGG.

2 - PSR Page 4, Guidelines Summary; ¶¶ 128-132; ¶ 265; Dkt. 977, p. 9: As addressed below, defendant objects to the calculation of the Guidelines range.

3 - PSR ¶ 1, n. 1: Defendant objects to the procedural history as incomplete and asks that the PSR include that the mistrial was declared due to the government's failure to produce significant *Brady* material "with respect to a very important range of documents relating to the financial affairs of Mr. Avenatti's firm." [Tr. 10/15/21, p. 4]. Defendant also asks that the impetus behind the Preliminary Order of Forfeiture be included, namely that as part of his acceptance of responsibility, defendant proactively waived his interest in the property and did not contest the issuance of the Order.

4 - PSR ¶ 9; ¶ 81; ¶ 280: Defendant objects to the finding that he agreed (by stating he "understood") that he would be required to pay full restitution to the victims of the wire fraud offenses "which may be to victims and in amounts based on any relevant conduct as to the wire fraud scheme, and to the victim of the tax offenses (count 19) to which he was pleading guilty." Instead, during the change of plea hearing, AUSA Katzenstein stated, "defendant will be required to pay full restitution to the victims of the wire fraud offenses, that is, Counts 5, 8, 9, and 10, to which defendant is pleading guilty." [Tr. 6/16/22, p. 12].

---

positive facts and other mitigation factors [SDNY Dkt. 429] that were included in the SDNY *Daniels* PSR.

Case 8:19-cr-00061-JVS   Document 1048-1   Filed 11/21/22   Page 78 of 332   Page ID
#: 25470
Case 8:19-cr-00061-JVS   Document 1016   Filed 10/14/22   Page 28 of 54   Page ID #:24416

She also stated: "the Court **may** order defendant to pay restitution in the form of any additional taxes, interest, and penalties that the defendant may owe to the United States based on the tax offense, Count 19, to which he is pleading guilty." [*Id.* (emphasis added)]. Although defendant acknowledged he understood the potential penalties, he stated that he did not agree with the restitution amount or the loss amount. [*Id.* at 14]. In any event, defendant never agreed any restitution was due or owing as a result of his guilty plea to Count 19.

5 - PSR ¶ 18-19; ¶ 82; ¶ 116-17; Dkt. 977, p. 6: The PSR states, "According to the government, on April 21, 2019, Avenatti intimidated and threatened witnesses Gardner and Whiteside when he sent a tweet stating that he looked forward to the facts underlying their civil case coming out." Defendant objects to these findings and addresses them in the Obstruction of Justice section below. There was never any effort to intimidate or threaten any witness in this case.

6 - PSR ¶ 20; Dkt. 977, p. 6: Defendant objects to this recitation of facts as incomplete and asks that the PSR also include that no charges were ever filed, and the government never proved any of the alleged offenses. As a result of the government's allegations, defendant was detained at MCC. The conditions of defendant's incarceration as a result of these allegations, including his incarceration in the 10 South solitary confinement terrorist unit, are further addressed above and should be included in the PSR.

7 - PSR 7 ¶ 21: Defendant was released from MCC on April 24, 2020, not April 20, 2020. Defendant asks that the PSR include information about his extensive and restrictive conditions. Defendant was placed on temporary release on thirty conditions on home confinement, no ability to leave for the first year, electronic GPS monitoring, monitoring of financial transactions, lack of access to the internet, and the retention of a third-party custodian (among other restrictive conditions). [Dkt. 140, 151].

8 - PSR ¶ 23; Dkt. 977, p. 7: Defendant self-surrendered to the U.S. Marshals Service following his trial (not sentencing).

9 - PSR ¶ 30: Defendant was not EA LLP's managing member. The managing

20

member was instead Avenatti & Associates, APC ("A&A"), of which defendant served as its President. Also, at all times relevant to this case, defendant owned 75-100% of the equity in EA LLP (through A&A).

10 - PSR ¶ 31(a), (c), (d): Defendant objects to the statement that he was the effective owner and controlled these entities. GBUS was owned by GB LLC, GB Auto was owed by GB LLC, and Passport 420 was an entity owned 50/50 by defendant (through A&A) and William Parrish (through Spring Creek Research).

11 - PSR ¶ 36: Defendant objects to the inclusion of the provision regarding the special needs trust as inaccurate and unsupported by the evidence. The definition and the nature of a special needs trust was never presented through expert testimony at trial despite the prosecution's pre-trial claim they would do so.

12 - PSR ¶ 41: Defendant objects to the language of this paragraph as it implies that there were more than four wire fraud victims. Defendant pled to four counts of wire fraud relating to the only four client victims in this case. Mr. Long Tran testified at trial he was not a victim (Tr. 8/10/21, Vol. 1, p. 68-69) nor was there any other wire fraud victim.

13 - PSR ¶ 41, n. 5; ¶ 50, n. 9; ¶ 55, n. 10: As discussed below, defendant objects to the PSR's findings regarding Eagan Avenatti, LLP's bankruptcy and defendant's obligations stemming from the relevant proceedings.

14 - PSR ¶ 43, n. 7; ¶ 107: The PSR states, "At trial, Johnson testified that the signature above his printed name on the settlement agreement did not resemble his true signature." This is not accurate. The PSR cites "1-7-21 Vol 1 34:24-35:4[,]" but this testimony does not support the statement in the PSR. At trial, the evidence did not show that the signature was forged. In March 2019, Mr. Johnson met with prosecutors and told agents he may have signed the settlement agreement. [Tr. 7/22/21, Vol. 2, p. 9]. In the corresponding memorandum of interview dated March 31, 2019, agents described that "Johnson stated that his signature looked funny to him. The 'G' and 'E' in his signature looked funny. Johnson stated that he may have signed the document but his signature looks funny." [USAO_000133557]. At trial, Mr. Johnson agreed that he also told the agents that

21

Case 8:19-cr-00061-JVS   Document 1048-1   Filed 11/21/22   Page 80 of 332   Page ID
#:25472
Case 8:19-cr-00061-JVS   Document 1016   Filed 10/14/22   Page 30 of 54   Page ID #:24418

the settlement document was delivered to him by defendant while Mr. Johnson was living at Sunrise of West Hills. [Tr. 7/22/21. Vol. 2, p. 12]. When asked to look at the date on the signature page at trial, he testified, "Dated 1 – my signature is dated January 2nd, 2015." [*Id*]. (emphasis added). The finding that defendant forged Mr. Johnson's signature is also improperly used to support a finding of sophisticated means.

15 - PSR ¶¶ 45-47(a)-(e): Defendant objects to the PSR's factual findings and the loss amount associated with Mr. Johnson as inaccurate.

16 - PSR ¶ 47(c); ¶ 98; 112: Defendant objects to the PSR's finding that defendant "failed to provide the requested information to SSA, which resulted in Johnson's SSI benefits being discontinued in or about February 2019." During trial, it was established that in February 2012, Mr. Johnson applied for SSI benefits. [Tr. 7/23/21, Vol. 1, p. 94]. Elsa Guerrero with Social Security Administration ("SSA") testified that she had a phone call with Mr. Johnson on November 1, 2018. Following the call, Mr. Johnson received a letter describing items SSA required so that Mr. Johnson could continue to receive SSI. [*Id.* at 84, Gov. Exh. 108]. Ms. Guerrero revealed that following the November 2018 call, and after requesting documents from Mr. Johnson, she learned Mr. Johnson was receiving cash gifts, "gambled away $15,000" and testified, "that is why I could not reinstate his benefits in May 2019." [Tr. 7/23/21, Vol. 2, p. 6-7]. Further, defendant was in no way obligated to assist Mr. Johnson with his SSI benefits but did so anyway. The finding that defendant was the cause of Mr. Johnson not having his SSI benefits is incorrect and is improperly used to support the PSR's finding of substantial financial hardship and vulnerable victim.

17 - PSR ¶ 47(e), n. 8; ¶113; Dkt. 977, p. 6: The PSR describes defendant's conduct following Mr. Johnson's initiation of the civil lawsuit against him. Specifically, the PSR describes defendant posting on Twitter a series of documents and messages related to Mr. Johnson. Defendant objects to this recitation as incomplete. Defendant's conduct followed a July 2019 press conference held by Mr. Johnson's civil counsel.[19] During the press

---

[19] *See,* [https://www.kron4.com/news/national/paraplegic-man-sues-says-avenatti-kept-

conference, counsel publicly commented on the pending criminal case and repeatedly disparaged defendant. Defendant maintains that he was properly exercising his First Amendment rights to defend himself in the public arena, only after Mr. Johnson's counsel publicly disparaged defendant during his press conference.

18 - PSR ¶¶ 48-52(b): Defendant objects to the recitation of the facts related to Ms. Gardner as incomplete.

19 - PSR ¶48; ¶50-51: The PSR fails to include the work defendant performed on behalf of Ms. Gardner including immediately providing her a hotel and meals and later short-term housing on her behalf due to her financial condition. The PSR fails to provide defendant credit for costs and expenses he incurred on her behalf and the work he performed for Ms. Gardner on other matters. The PSR goes as far to suggest that defendant diverted all of Ms. Gardner's money and none of it went to her. This is inaccurate. Defendant also objects to the findings by the PSR related to the loss suffered by Ms. Gardner.

20 - PSR ¶49; ¶107: The PSR states, "In order to conceal the true details of the settlement agreement from Gardner, Avenatti did not provide a copy of the settlement agreement to Gardner, did not allow her to read it before signing it, and did not go over it with her prior to signing it." Ms. Gardner was actively involved in the resolution of her case. At trial, Ms. Gardner testified that she participated in a very lengthy mediation, which she estimated was a "15-hour day." [Tr. 7/30/21, Vol. 1, p. 77]. This mediation led to the settlement at issue in this case. Ms. Gardner stated that because it was late in the evening, defendant did not read the entire agreement but told her the amount, read her portions of the agreement, and she ultimately signed the settlement agreement. [*Id.* at 77-80]. Ms. Gardner also agreed that she had an opportunity to communicate with the mediator. [Tr. 7/30/21 Vol. 2, p. 58-59]. Assertions that Ms. Gardner was completely kept in the dark, had no knowledge regarding the terms of the settlement and was never allowed to view

_____

settlement-money/].

1   the agreement or its terms are incorrect.

2       **21 - PSR ¶ 52(a); ¶99; ¶107:** The PSR states that defendant and Ms. Regnier "direct

3   deposit[ed] cashier's checks into Gardner's bank account, at Avenatti's direction, to make

4   it appear as if the money had come from Whiteside by, for instance, putting Whiteside's

5   name on the checks as the remitter of the cashier's checks. (Trial Exhs. 158-159. [sic]) For

6   example, on June 18, 2018, Avenatti caused a $16,000 cashier's check drawn on EA

7   Account 4613 to be deposited into Gardner's bank account, which falsely identified

8   Whiteside as the 'remitter.'" However, a review of Exhibits 158 and 159 (cited by the

9   PSR) reveal that many of the cashier's checks coming from the same bank account were

10  issued to Ms. Gardner with various remitters including "Whiteside[,]" "Avenatti and

11  Associates – Whiteside[,]" "Michael J. Avenatti[,]" and "Eagan Avenatti[.]" The incorrect

12  finding that "Whiteside" was listed as the remitter in an effort to deceive Ms. Gardner is

13  used to support the PSR's application of the substantial financial hardship and

14  sophisticated means enhancements. Defendant objects to any finding that the "Whiteside"

15  remitter was a means of intentionally deceiving Ms. Gardner and also objects to its use for

16  an enhancement.

17      **22 - PSR ¶ 52(b); ¶ 99:** The PSR describes, "As a result of the missing payments,

18  Gardner was unable to pay her living expenses, causing her to rely on friends for housing."

19  However, the evidence presented at trial established that Ms. Gardner was living with a

20  man and ultimately left his home after she suffered an assault. In February 2019, Ms.

21  Gardner texted defendant about needing money because she was moving out of his home

22  based on their personal issues. During this exchange, she relayed she was moving in with

23  her friend. [Tr. 8/3/21, Vol. 1, p. 64-65; Gov. Exh. 160, p. 19]. As described below, at the

24  time of trial, Ms. Gardner not only had a place to live, but she was living in a luxurious

25  high rise apartment complex in downtown Los Angeles as a result of the settlement money

26  defendant had obtained for her.

27      **23 - PSR ¶ 54; ¶ 100:** The PSR states that defendant told Mr. Barela that he could

28  incur charges on his credit cards for his business ventures while he waited for the

24

settlement funds. This factual finding is repeated: "When Barela did not receive his settlement money, he could not pay these charges, and likewise could no pay rent, other credit bills, and other living expenses. Barela kept Avenatti updated on how dire his financial condition was, but Avenatti did nothing other than continue to lie to Barela." Defendant objects to these findings and denies making these statements to Mr. Barela. Defendant also denies any allegation that he "did nothing other than continue to lie to Mr. Barela" in response to his financial condition.

　　24 - PSR ¶¶ 55-57: The PSR describes defendant's legal fees and costs associated with his representation of Mr. Barela. Defendant objects to these findings.

　　25 - PSR ¶¶ 53-58: Defendant objects to the recitation of the facts related to Mr. Barela as incomplete.

　　26 - PSR ¶ 57(b): The PSR states, "In November 2018, when Barela told Avenatti how badly he needed money, Avenatti told Barela that Avenatti could lend him $100,000 in January but would charge him at a ten percent interest rate." The testimony at trial did not establish that defendant offered to personally loan Mr. Barela $100,000. Mr. Barela instead testified that he did not know the source of the funds defendant referred to. [Tr. 8/5/21, Vol. 1, p. 56-57]. The PSR is incorrect to assert that defendant told Mr. Barela that he could not publicly enforce the settlement. Instead, the evidence established that defendant alerted Mr. Barela regarding the settlement agreement's confidentiality clause, a breach of which could jeopardize the agreement. [Tr. 8/4/21, Vol. 2, p. 91-92; 8/5/21, Vol. 1, p. 49]. The PSR also states that defendant refused to provide Mr. Barela with a copy of the fully executed settlement agreement. However, on June 3, 2019, an application for involuntary inactive enrollment was filed in the State Bar Court. Attached to the application was a Declaration of Gregory Barela. In the declaration, which he signed under penalty of perjury, Mr. Barela declared that on December 28, 2017, he was provided a copy of the signed settlement agreement. Attached to the declaration was a copy of the settlement agreement with Mr. Barela's signature page attached.

　　27 - PSR ¶ 63: Defendant objects to the finding that he collected all fees owed to

Case 8:19-cr-00061-JVS   Document 1048-1   Filed 11/21/22   Page 84 of 332   Page ID
#:25476
Case 8:19-cr-00061-JVS   Document 1016   Filed 10/14/22   Page 34 of 54   Page ID #:24422

him related to Ms. Phan on March 15, 2018. Defendant never received all of the compensation he was due (*i.e.*, he received no payment in connection with his negotiation of Ms. Phan's ownership of EM Cosmetics and acquisition of other valuable assets). He is entitled to a credit against loss for what he is due.

28 - PSR ¶ 65: The PSR states that both defendant and Ms. Phan happened to be in New York City between April 23, 2019, and April 24, 2019. These interactions occurred on April 23, 2018, and April 24, 2018. The PSR then describes that the April 23, 2018, payment of $147,972 was done to "smooth the way to the meeting…" However, Ms. Phan stated that when they met at the party on April 23, 2018, she did not want to bring up business at her celebration and in front of her colleagues. [Tr. 8/12/21, Vol. 1, p. 45]. The next day when they had lunch privately, they discussed the matter in a limited sense and Ms. Phan testified she did not confront him. [*Id.* at 48]. There is no evidence that defendant attempted to smooth anything over or sought to meet up with Ms. Phan to do so.

29 - PSR ¶¶ 59-67: Defendant objects to the recitation of the facts and the relevant loss amount related to Ms. Phan as incomplete.

30 - PSR ¶ 71-75: Defendant objects to the factual findings underlying, "Failure to Pay Over Federal Payroll Taxes for GBUS Employees[.]" Defendant did not plead guilty in connection with this conduct. The facts described in this section are not based on evidence and are unsupported by the record. As discussed below, defendant objects to judicial fact finding used to justify an increased sentence outside of conduct he pled guilty to.

31 - PSR ¶ 79; ¶93-95: The PSR describes the loss in this matter as $12,350,000. As addressed below, this loss amount and the analysis is inconsistent with the law; the sentencing Guidelines; and the position that other district courts and prosecutors in the Central District of California have routinely taken in similar cases. Accordingly, defendant objects to this loss amount as grossly inflated and inaccurate, resulting in an incorrect Guidelines range.

32 - PSR ¶ 94: Defendant objects to the statements made in this paragraph as to each

26

Case 8:19-cr-00061-JVS   Document 1048-1   Filed 11/21/22   Page 85 of 332   Page ID
#:25477
Case 8:19-cr-00061-JVS   Document 1016   Filed 10/14/22   Page 35 of 54   Page ID #:24423

1   client.

2       **33 - PSR ¶ 98:** The PSR states, "By stealing Johnson's entire settlement payment,

3   Avenatti forced Johnson to rely on small payments from Avenatti to be able to pay his

4   living expenses." Any statement that defendant stole the entirety of Mr. Johnson's

5   settlement is false. In addition, the payments referred to as *advances* were provided to Mr.

6   Johnson in small increments at Mr. Johnson's request. Mr. Johnson testified that defendant

7   said that "the firm can advance [him] whatever [he] need[ed], and [Mr. Johnson] said that

8   it had to be less than $2,000" because Mr. Johnson was required by SSA to have less than

9   $2,000 in his bank account. [Tr. 7/22/21, Vol. 1, p. 45].

10      **34 - PSR ¶¶ 96-101:** Defendant objects to the two level enhancement pursuant to

11   §2B1.1(b)(2)(A). He also objects to the factual findings underlying this determination,

12   which are discussed below.

13      **35 - PSR ¶¶ 102-105, ¶ 50 n. 9; ¶55, n. 10; ¶ 61, n. 12:** Defendant objects to the two

14   level enhancement pursuant to §2B1.1(b)(9)(B). He further objects to the factual findings

15   underlying this determination, which are discussed below.

16      **36 - PSR ¶¶ 106-109:** Defendant objects to the two level enhancement pursuant to

17   §2B1.1(b)(10)(C). He objects to the factual findings underlying this determination, which

18   are discussed below.

19      **37 - PSR ¶ 108:** Defendant objects to the PSR's finding that defendant's act of

20   splitting up the wire transfers was done in an effort to deceive Ms. Phan and Mr. Tran.

21   There is no evidence to support this assertion.

22      **38 - PSR ¶¶ 110-113:** Defendant objects to the two level enhancement pursuant to

23   §3A1.1. He further objects to the factual findings underlying this determination, which are

24   discussed below.

25      **39 - PSR ¶¶ 121; Pages 21-22 ¶ 76:** Defendant objects to the finding that he pled

26   guilty to the omnibus clause of 18 U.S.C. § 7212(a).

27      **40 - PSR ¶ 123; ¶ 76 :** Defendant objects to the finding that the base offense level

28   for Count 19 is 22. The PSR came to this conclusion after determining that the amount

due to the IRS is $3,207,144. However, defendant did not plead guilty to failure to file the tax or pay this amount. Instead, defendant pled guilty to obstructing the IRS' ability to collect taxes. Prior to coming to this conclusion regarding the tax loss amount, the government must establish that but for defendant's efforts to obstruct, the IRS would have been able to collect a specific amount. No such showing has been made here. As a result, this finding (which lacks any evidentiary support), cannot be used to justify an elevated loss amount or restitution amount.

41 - PSR ¶ 124: Defendant objects to the application of the sophisticated means enhancement related to Count 19. These factual findings were never proven in the record and cannot be used to justify an enhanced sentence. By way of example only, defendant objects to the finding that he changed the company names and EIN numbers to avoid the IRS levies.

42 - PSR ¶¶ 139-140; Dkt. 977, p. 6: Defendant objects to the finding of any "offense behavior" related to "wire fraud" and the National Football League ("NFL") litigation. As an initial matter, the PSR's statement of facts regarding the NFL litigation is incorrect. The NFL litigation was not a class action, as class certification was denied. Further, the PSR cites to *In Re Eagan Avenatti, LLP*, 8:18-cv-01644-VAP-KES, Dkt. 51, Exhs. 32, 33, 34 for the proposition that "The Super Bowl Clients were entitled to approximately $952,995 of the $1,550,000 settlement funds." A review of these exhibits does not establish these facts. Further, defendant disputes that he was required to declare the transfer of funds associated with this settlement for the purposes of his EA Bankruptcy proceedings. Defendant also objects to the finding of loss associated with these clients. The basis of the $807,773 alleged loss amount[20] is unclear and certainly fails to account for the enormous costs and expenses associated with this massive litigation, which spanned two cases, not one.[21] Not a single plaintiff of this case has sued defendant civilly

---

[20] The government has failed to prove the loss amount as required by law and has also failed to produce all information and *Brady* material bearing on the loss amount.

[21] One of the cases proceeded to trial, Northern District of Texas 11-cv-00248-M, and verdict, with significant out-of-pocket costs and expenses being incurred.

in connection with this litigation and the government has not sought to charge defendant for this conduct. Although the government indicated that it was going to introduce evidence regarding the NFL litigation during trial, no such evidence was ever presented. As described above, defendant objects to the Court's consideration of this uncharged and inaccurately described conduct to increase his sentencing exposure.

43 - PSR ¶¶ 141-146; Dkt. 977, p. 6: Defendant objects to the finding of any "offense behavior" related to the "tax fraud scheme" which the PSR refers to as the failure to file tax returns for EA LLP and A&A and failure to pay federal payroll taxes for EA LLP employees. Defendant further objects to the Court's consideration of this conduct (to which he has not pled guilty) to increase his sentencing exposure. In addition, defendant objects to the recitation of facts associated with this alleged conduct. By way of example only, the PSR describes that EA LLP received $137,890,016 in bank deposits between the tax years of 2011 through 2017. Defendant objects to this dollar amount as irrelevant because it includes monies that clearly are not <u>income</u>, including settlement monies and other monies due to clients and others. These factual findings were never proven in the record and cannot be used to justify an enhanced sentence.

44 - PSR ¶¶ 145-146; Dkt. 977, p. 6: Defendant objects to the finding of any "offense behavior" related to his alleged failure to file personal income tax returns. As described above, defendant objects to the Court's consideration of this conduct (to which he has not pled guilty) to increase his sentencing exposure.

45 - PSR ¶ 136: Defendant objects to the PSR's two level, as opposed to three level, reduction for acceptance of responsibility.

46 - PSR Page 38, Adjustment to Pretrial Supervision: The PSR writes that defendant was released on bond on April 1, 2019. However, he was released on bond after being arrested on March 25, 2019. He later had his initial appearance on April 1, 2019. Further,  defendant was alleged to have violated his condition of reporting transactions in excess of $5,000. However, the dollar amount associated with this condition was $500.

47 - PSR Page 38, Adjustment to Incarceration: Defendant asks that the PSR include

that he self-surrendered and begun serving his sentences on both SDNY cases. Defendant also asks that the PSR accurately reflect each facility where he has been incarcerated since he surrendered in February 2022. *See,* fn. 10.

<u>48 - PSR ¶¶ 152-153, Dkt. 977, p. 6, 9</u>: As explained elsewhere herein, defendant objects to the criminal history category determination. Defendant further objects to the finding that his prior federal fraud offense speaks to his need for deterrence and recidivism.

<u>49 – PSR ¶156</u>: Defendant objects to the description of his November 14, 2018, arrest. The description entitled "charge" incorrectly implies that he was charged, but he never was. He was arrested on suspicion of domestic violence, but <u>no charges were ever filed</u> because it was shown during the investigation that the allegation was part of a planned extortion attempt and hoax. Further, the statement "prosecution prefiling deferral[,]" under the heading "disposition[,]" implies that a diversion program was used. No program was completed in exchange for defendant never being charged because he never engaged in any criminal conduct, which is why he was never charged.

<u>50 - PSR ¶216</u>: Defendant objects to this statement regarding the status of his proceedings before the State Bar of California.

<u>51 - PSR ¶218, Dkt. 977, p. 8</u>: Defendant objects to this paragraph regarding his programming while at FCI Terminal Island as incomplete. The work he has performed while in custody is described elsewhere herein.

<u>52 - PSR ¶ 233</u>: On June 24, 2022 (rather than June 23, 2022), defendant submitted an under seal and in-camera Declaration with the Court in continued support of CJA appointment on his behalf. After the PSR was issued, on August 24, 2022, defendant submitted another filing as required (every sixty days).

<u>53 - PSR ¶¶ 235, 242, 244</u>: Since the June 24, 2022, financial filing (the version Probation was provided), several minor changes were made and should be reflected here. In defendant's updated financial affidavit, he relayed that the Court of Appeal later affirmed the ruling. In defendant's updated financial declaration he removed "Fox News Network, LLC and certain of its on-air talent" as one of the parties he has a potential tort

Case 8:19-cr-00061-JVS   Document 1048-1   Filed 11/21/22   Page 89 of 332   Page ID
#: 25481
Case 8:19-cr-00061-JVS   Document 1016   Filed 10/14/22   Page 39 of 54   Page ID #:24427

claim against. Additionally, the recently filed declaration included an update regarding his claim against the BOP.

54 - PSR ¶ 274: Defendant objects to the special assessment determination of $500 per count. Pursuant to 18 U.S.C. § 3013, the special assessment associated with a felony is in "the amount of $100 if the defendant is an individual[.]" 18 U.S.C. § 3013(a)(2)(A). Here, defendant has pled guilty to five counts for a total of $500 ($100 x 5).

55 - PSR Page 61 ¶¶ 278-279; Dkt. 977, p. 1, 5: Defendant objects to any deferred restitution hearing or determination. The government, and its well compensated financial expert, have had ample time to determine their position on restitution and provide the evidence to defendant and the Court.[22]

56 - Dkt. 977, Pages 2, 6, 9: Defendant objects to the PSR's sentence recommendation as unreasonable and unnecessary, and inconsistent with the requirement that it be "sufficient, but not greater than necessary, to comply with the purposes set forth" in §3553(a)(2). Defendant also specifically objects to the finding that the lengthy term of imprisonment is necessary to protect the public.

57 - Dkt. 977, Pages 2-4, 11-12: Defendant objects to the PSR's recommended conditions of supervised release as discussed below.

58 - Dkt. 977, Page 4: Defendant objects to the PSR's implication that defendant suffers from "narcotic addiction or drug dependency." Defendant struggles with alcoholism, but has never had any narcotic addiction or drug dependency, nor is there any evidence of this.

59 - Dkt. 977, Page 5: Defendant objects to the findings concerning the loss amount as described herein as to the victim clients, the IRS, and the NFL clients.

60 - Dkt. 977, Page 10: Defendant objects to the inaccurate determination that the sentence recommended avoids unwarranted disparities among similarly situated defendants. Defendant addresses this issue above and by way of his exhibits (Exhibit B).

61 – PSR Cover Page, Pg. 2 Dependents, ¶¶ 17, 64, 37, 226: Attached hereto as

---

[22] Defendant requested all applicable information weeks ago but it has not been provided.

Exhibit CC are six pages of the PSR with annotated corrections. These annotations are limited to typographical errors contained in the PSR.

### VII.   WIRE FRAUD COUNTS 5, 8, 9, & 10

A. <u>Loss Amount</u>

In evaluating the loss amount, <u>the government</u>, and <u>the government alone</u>, bears the burden of establishing the loss suffered by the victims, including any and all credits due the defendant. The Guidelines define actual loss as "the reasonably foreseeable pecuniary harm that resulted from the offense." §2B1.1, *Application Note* 3(A). Here, the government must prove the loss-related enhancements (*i.e.*, the loss amount) by *clear and convincing evidence. United States v. Lonich*, 23 F.4th 881, 914 (9th Cir. 2022)(finding that the government did not demonstrate by clear and convincing evidence the requisite loss amount to support the 20-level loss enhancement); *see also, United States v. Armstead*, 552 F.3d 769, 776 (9th Cir. 2008). The clear and convincing standard requires that the factfinder have "'an abiding conviction that the truth of [the] factual contentions' at issue is 'highly probable.'" *Lonich,* 23 F.4th at 914.

The PSR incorrectly determined, "Avenatti did not render services to his clients pursuant to the terms of his fee agreements with his clients or pursuant to the terms of the California Rules of Professional Conduct." [PSR ¶ 94]. The PSR also erroneously found, "[b]ecause Avenatti lied to his clients about the settlements and his receipt of the settlement money, he is not entitled to a credit against the full amount of the client monies he stole for his fees and expenses." [PSR ¶ 95]. The PSR recommends that the Court increase the base offense level by 20 levels based on a $12,350,000 loss amount: $4,000,000 (Johnson), $2,750,000 (Gardner), $1,600,000 (Barela), and $4,000,000 (Phan). [PSR ¶¶ 94-95].[23]

Defendant vehemently disagrees with this analysis and assessment of the loss

---

[23] Probation simply took the gross amount of each monetary settlement, without any deduction, and added them together. In fact, Probation did not even deduct from the loss amount any of the monies that defendant paid <u>directly to the clients</u> before the fraud was detected.

amount because it is contrary to the law and the Guidelines. Among other things, it grossly overstates the loss amount by millions of dollars and provides defendant with no credit for his earned attorneys' fees, the costs and expenses spent for the benefit of his former clients, the advances and payments he made to and for the benefit of the clients, and/or the work he performed on other matters for the clients, all of which must be included in the loss analysis and deducted.[24] *See, e.g.,* §2B1.1, *Application Note 3(E)(i)*, *United States v. Grusd*, 787 Fed. Appx. 922, 925 (9th Cir. 2019)(overturning sentence due to failure to properly determine credits due in loss calculation)(unpublished). *See also, United States v. Bright*, 353 F.3d 1114 (9th Cir. 2004), *United States v. Abdellatiff*, 205 Fed. Appx. 601, 602 (9th Cir. 2006)(unpublished), *United States v. Blitz*, 151 F.3d 1002 (9th Cir. 1998), *Hance v. Super Store Industries*, 44 Cal. App. 5th 676 (2020), *Sheppard, Mullin, Richter & Hampton, LLP v. J-M Manufacturing Co., Inc.,* 6 Cal. 5th 59 (2018), *MacInnis v. Pope*, 134 Cal. App. 2d 528 (1955), *Oliver v. Campbell*, 43 Cal. 2d 298, 306-07 (1954), California Rule of Professional Conduct 1.15. In addition, because of the importance of the loss amount in determining defendant's Guidelines and sentence, defendant specifically requests an evidentiary or *Fatico* (*United States v. Fatico*, 603 F.2d 1053 (2d Cir. 1979)) hearing on the issue prior to sentencing. The proper loss amount in this case, if calculated pursuant to the Guidelines and California law, is between $1,500,000 to $3,500,000.[25]

### B. Section 2B1.1 & Disproportionate Sentencing

Defendant requests that the Court consider the widespread criticisms of §2B1.1 when fashioning a sentence. Indeed, it is well established "that the court may vary from the Guidelines based on policy disagreements with them…" *United States v. Monge*, 2015 U.S. Dist. LEXIS 23034, *6 (C.D. Cal. 2015), *citing United States v. Henderson*, 649 F.3d

---

[24] Defendant alerted Probation to this in writing before the PSR was issued.

[25] Even though he has no burden to prove the loss amount, defendant provides a preliminary calculation of the loss amounts for the four clients as follows: Mr. Johnson – less than $1,491,000; Ms. Gardner – less than $1,376,385; Mr. Barela – less than $529,203; Ms. Phan – less than $0; total – less than $3,396,588. Citations to some of the evidence relating to this loss amount calculation are set forth on Exhibit DD.

955, 963 (9th Cir. 2011). The sentences recommended by the 2B1.1 loss table "are widely viewed as unduly severe, increasingly arbitrary, and manifestly disproportionate to the non-violent nature of the underlying economic crimes[.]" B. Boss & K. Kapp, *How the Economic Loss Guideline Lost its Way, and How to Save It*, Ohio State Journal of Criminal Law, Vol.: 18.2: 605, 619 (2021), *citing* E. Podgor, *Throwing Away the Key*, 116 Yale Law Journal, Pocket Part 279, 280 (2007). For instance, a first-time fraud offender convicted of an offense involving a loss of $9.5 million would face a Guidelines sentence that is comparable to a defendant convicted of attempted murder, arson, and assault with the intent to commit murder. *Id.*

Many courts across the country have criticized the loss amount figures and their impact on sentences for white collar criminal defendants. *See, e.g., United States v. Ebbers*, 458 F.3d 110 (2d Cir. 2006)("Under the Guidelines, it may be well that all but the most trivial frauds in publicly traded companies may trigger a sentence amounting to life imprisonment."); *United States v. Parris*, 573 F. Supp. 2d 744, 750-51 (E.D.N.Y. 2008)(In regards to the 2B1.1 calculation, "[] if not for the wisdom of the Supreme Court in recognizing the need to free district courts from the shackles of the mandatory guidelines regime, I would have been confronted with the prospect of having to impose what I believe any rational jurist would consider to be a draconian sentence."); *United States v. Moody*, 2013 U.S. Dist. LEXIS 109506 (D. Colo. 2013)(agreeing that the "fraud guideline is not the product of the Sentencing Commission employing an empirical study…"). In defendant's June 2022 sentencing, Judge Furman echoed these sentiments: "[] I agree that the guidelines at issue here results in an unreasonably harsh sentence. That is not only because Section 2B1.2 [sic] of the guidelines gives undue weight of the loss amount…." *See,* SDNY 19-Cr-00374-JMF [Dkt. 477, p. 48].

Defendant recognizes the conduct at issue is serious and warrants punishment. However, using the loss amount suggested by the PSR, together with the other 32 levels of enhancements, results in a corresponding Guideline range that is unreasonable, excessive, and comparable to one used in a case involving a heinous violent crime. *See,*

34

Case 8:19-cr-00061-JVS   Document 1048-1   Filed 11/21/22   Page 93 of 332   Page ID
#: 25485
Case 8:19-cr-00061-JVS   Document 1016   Filed 10/14/22   Page 43 of 54   Page ID #:24431

Exhibit A.

    C. <u>Obstruction of Justice</u>

    Pursuant to §3C1.1, if a defendant (1) <u>willfully</u> obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution or sentencing of the offense, and (2) the obstructive conduct related to (A) the offense of conviction or related conduct; or, (B) the a closely related offense, then the Court is directed to apply a two level enhancement. The "term 'willfully' requires that defendant consciously act with the purpose of obstructing justice." *United States v. Lofton*, 905 F.2d 1315, 1317 (9th Cir. 1990), *citing United States v. Stroud*, 893 F.2d 504, 507 (2d Cir. 1990); *see also, United States v. Jenkins*, 275 F.3d 283, 287 (3d. Cir. 2001)(determining that willfully is deliberately or intentionally and is "not 'negligently, inadvertently, or accidentally.'"). The PSR incorrectly determined that the two level enhancement is warranted as a result of a message defendant posted to his Twitter. [PSR ¶117].

    The facts demonstrate that on April 21, 2019, a L.A. Times article was published wherein confidential details of the settlement agreement between Ms. Gardner and Mr. Whiteside were released.[26] Defendant was contacted for comment and he replied stating that no monies were embezzled and "I look forward to all of the relevant documents and facts being presented at trial." In further response, on April 21, 2019, defendant made a post to Twitter. [PSR ¶18]. The government sent former defense counsel a letter describing defendant's conduct as attempted intimidation. The government noted, "The government has no objection to defendant's direct statements to the <u>Los Angeles Times</u> or other public statements denying wrongdoing." Soon thereafter on April 25, defendant emailed Pretrial Services denying any malicious intent. [Exhibit Y]. Later, Pretrial Services submitted a letter to the Court but <u>did not</u> allege, as claimed in the PSR, "that Mr. Avenatti violated the no contact condition in an attempt to threaten or intimidate victims/witnesses through

---

[26] This leak must have come from the government because it obviously did not come from the defense, Ms. Gardner or Mr. Whiteside.

social media." Instead, the letter stated these allegations were made by the prosecution. [Dkt. 25]. Pretrial Services determined, "The defendant denies any malicious intent, and Pretrial Services cannot substantiate either the defendant's or the victim's position in this case." [*Id.* at 3 (emphasis added)]. No further action was taken in this case; by either court in New York; or by any of the prosecutors here or in the Southern District of New York.

Second, defendant did not disseminate any of the confidential terms of the settlement agreement between Ms. Gardner and Hassan Whiteside. The relevant tweet did not even include Ms. Gardner's name. Even so, Ms. Gardner had already executed a waiver of her attorney-client relationship by April 21, 2019. The details of the settlement, the money received by Ms. Gardner, and the money deducted for fees and costs were all issues at the center of the case and had already been reported on at the time of the tweet. The tweet was in no way a threat or a means of intimidation and was instead a public denial of wrongdoing. The Guidelines specifically state, "This provision is not intended to punish a defendant for the exercise of a constitutional right. A defendant's denial of guilt … is not a basis for application of this provision." Defendant's statements that he looked forward to evidence being presented at trial is not an actual or implied threat but instead a public comment about his denial of guilt.

Third, the instant matter is drastically different from other cases where district courts have applied the obstruction of justice enhancement. *See, e.g., United States v. Door*, 996 F.3d 606, 611 (9th Cir. 2021)(two level obstruction enhancement was properly applied after the defendant threatened to kill case agent on multiple occasions); *United States v. Scheele*, 231 F.3d 492, 500-01 (9th Cir. 2000)(the obstruction of justice enhancement was proper when the defendant was recorded saying that he would "thrash you within an inch of your life" to an individual he referred to as a "narc"); *United States v. Dudley*, 1992 U.S. App. LEXIS 13556 (9th Cir. 1992)(the obstruction enhancement applied after the court determined that the defendant threatened to kill a potential witness).

Finally, at the time of the tweet, Mr. Whiteside was not even a government witness. On April 1, 2019, several days before the tweet was published, the defense was provided

the government's "Victim & Witness List[.]" This list included 37 individuals, but Hassan Whiteside was not referenced as a victim or witness. [Exhibit Z]. Further, Mr. Whiteside was not a witness at the first trial. The two level obstruction enhancement should not be applied to increase defendant's sentence based on his conduct affecting a non-witness. Accordingly, the two level obstruction of justice enhancement is inapplicable.

### D. Substantial Financial Hardship

If the offense "resulted in substantial financial hardship to one or more victims," the district court is directed to increase the offense level by two levels. §2B1.1(b)(2). The Court is directed to consider a variety of factors: whether the offense resulted in the victim being insolvent, filing for bankruptcy, suffering a loss of a retirement, education, or other savings funds, making substantial changes to employment or living arrangements, and suffering substantial harm to his ability to obtain credit. §2B1.1, *Application Note 4(F)(i)-(vi)*. The term *substantial* indicates "considerable" or "to a large degree[.]" *United States v. George*, 949 F.3d 1181, 1184 (9th Cir. 2020), *quoting Toyota Motor Mfg., Inc. v. Williams*, 534 U.S. 184, 196 (2002). Whether a loss has resulted in a substantial loss for the purposes of the enhancement "'will, in most cases be gauged relative to each victim,' and '[t]he same dollar harm to one victim may result in a substantial hardship, while for another it may be only a minor hiccup.'" *Id.* at 1185. The substantial financial harm enhancement has also been "interpreted to impose a causation requirement." *George*, 949 F.3d at 1187. The government must establish both but-for causation and proximate causation. *Id.* at 1187. But-for cause of harm is "anything without which the harm would not have happened." *Id.* However, proximate causation "is a more restrictive requirement that excludes some of the improbable or remote causal connections that would satisfy a pure but-for cause standard." *Id.* The PSR identified three victims who suffered substantial financial hardship. [PSR ¶ 98]. However, based on the following, this enhancement is inapplicable.

### 1. Geoffrey Johnson

As addressed above, defendant objects to the factual findings used to justify this

specific offense characteristic. [PSR ¶98]. These factual objections are addressed individually above. *See, e.g.* PSR Objection Nos. 16, 33.

When defendant met Mr. Johnson, Mr. Johnson had no means of paying his living expenses and was in jail. [Tr. 7/22/21, Vol. 1, p. 90]. Mr. Johnson had been cut off from his family's financial support. [*Id.* at 89, 99-100]. Defendant (alongside Mr. Johnson's criminal defense counsel who defendant retained) managed to have Mr. Johnson released jail and arranged for him to have a place to live. [*Id.* at 90]. Defendant paid his bills when no one else would. Indeed, Mr. Johnson agreed that over the last ten years, there was no other individual who paid more of his bills and supported him financially than defendant. [Tr. 7/22/21, Vol. 2, p. 36]. This included the <u>three years</u> before defendant obtained the settlement for Mr. Johnson, during which defendant supported Mr. Johnson and paid nearly all of his living and medical expenses. Defendant did not cause Mr. Johnson *substantial* financial harm for the purposes of §2B1.1(b)(2).

### 2. *Alexis Gardner*

As described above, defendant objects to the factual findings used to justify this enhancement. [PSR ¶ 99]. Many of these factual objections are addressed individually above. *See, e.g.* PSR Objection Nos. 19, 22.

When defendant and Ms. Gardner were introduced, Ms. Gardner was living in her car, with no one willing to pay her bills or assist her. Defendant immediately arranged for Ms. Gardner to stay at a hotel that evening and then found her an Airbnb before more permanent housing (*i.e.*, an apartment) was arranged by defendant (at a cost to defendant over $56,000). [Tr. 7/30/21, Vol. 2, p. 49-51]. Ms. Gardner repeatedly told defendant that she was much better off than when they met. In November 2018, Ms. Gardner wrote to defendant, "I'm so thankful for you and how you came into my life <u>and changed it for the better</u>." [*Id.* at 26 (emphasis added)]. On another occasion, Ms. Gardner wrote to defendant, "Hassan hasn't been compliant, but at best, <u>I have a million times more than I started with when we met at Starbucks, and that's more than enough to be excited about.</u>" [*Id.* at 36 (emphasis added)]. At the time of trial, it did not appear as if Ms. Gardner was

financially destitute - she was living in a luxurious high rise building in downtown Los Angeles equipped with a pool, cabanas, private cinema, fitness center, business center, and a concierge service, presumably as a result of the additional monies ($250,000) she received from the settlement defendant obtained for her. *See,* [metropolislosangeles.com].

Ms. Gardner's inability to pay her bills was not caused by defendant, but was instead a pre-existing issue. Further, Ms. Gardner's housing challenges were not caused by defendant's conduct. Instead, the evidence shows that personal struggles she faced with a man she was living with caused her to relocate. Although Ms. Gardner suffered financial harm, she did not incur *substantial* financial harm that was actually and proximately caused by defendant's misconduct.

### 3. Gregory Barela

As described above, defendant objects to the factual findings used to justify this enhancement. [PSR ¶ 100]. These factual objections are addressed individually above. *See, e.g.* PSR Objection No. 23.

During the relevant period and prior to meeting defendant, Mr. Barela engaged in several business ventures. As a result of the nature of Mr. Barela's entrepreneurial work, the testimony at trial showed that Mr. Barela was tight on cash and struggling to pay his bills long before he met defendant. Even before any settlement was reached, Mr. Barela needed money to repay loans, pay credit off cards, pay his criminal restitution order, and maintain his business ventures. However, Mr. Barela's financial condition never arose to a substantial financial hardship caused by defendant.

Defendant takes responsibility for his misappropriation of funds to Mr. Barela's detriment. However, Mr. Barela did not suffer permanent financial harm due to defendant's conduct. Defendant provided Mr. Barela with what he called "advances" on multiple occasions to cover his living expenses. Mr. Barela did not declare bankruptcy, become insolvent, lose his retirement or other savings fund, or make any changes to his residence or employment as a result of defendant's conduct. Quix, the primary business to which Mr. Barela needed funds to allow the company to stay afloat, remained active and

a source of Mr. Barela's income at the time of the first trial according to Mr. Barela. Further, Mr. Barela received the additional $300,000 due him under the settlement defendant obtained. Defendant did not cause Mr. Barela *substantial* financial harm for the purposes of §2B1.1(b)(2).

### E. Sophisticated Means & Abuse of Position of Trust

Pursuant to §2B1.1(b)(10)(C), if the offense "involved sophisticated means and the defendant intentionally engaged in or caused the conduct constituting sophisticated means. . ." then the Court is instructed to increase the offense level by two levels. The Guidelines defines *sophisticated means* as an "especially complex or especially intricate offense conduct pertaining to the execution or concealment of an offense…Conduct such as hiding assets or transactions, or both, through the use of fictitious entities, corporate shells, or offshore financial accounts also ordinarily indicates sophisticated means." §2B1.1, *Application Note* 9(B). *See also, United States v. McLaughlin*, 203 Fed. Appx. 891, 893 (9th Cir. 2006)(unpublished)("Although the PSR stated that [defendant] deposited client funds into a separate, private account in her name and that she lied to her law-firm partners about the status of cases, these facts alone do not indicate that her concealment was carried out in a particularly sophisticated manner."). Defendant objects to the use of a sophisticated means enhancement here. [PSR ¶ 109].

First, defendant objects to many of the statements that make up the factual basis for the sophisticated means enhancement. These factual objections are addressed individually above. *See, e.g.* PSR Objection Nos. 14, 20, 21, and 37.

Second, the conduct at issue in this case is not at all sophisticated and instead is no different than many other fraud schemes. Defendant misappropriated legal fees to which he was not entitled. After obtaining settlement funds on behalf of his clients, he used a portion of the funds that did not belong to him and concealed his conduct from his victims through lies. The conduct is very straightforward, does not employ the use of offshore accounts, did not involve fictious entities, and did not employ any corporate shells.

Third, an enhancement pursuant to §3B1.3 is more appropriate here (*i.e.*, Abuse of

Position of Trust or Use of Special Skill). Lawyers are clearly included as a class of people who possess "a skill not possessed by members of the general public and usually requiring substantial education, training or licensing." §3B1.3, *Application Note 4.* However, "[t]his adjustment may not be employed if an abuse of trust or skill is included in the base offense level or specific offense characteristic." §3B1.3. The application of both the sophisticated means specific offense characteristic and the abuse of position of trust or special skill adjustment is violative of §3B1.3's directives. Although some courts have determined that both enhancements apply, the government under similar circumstances has correctly chosen not to seek both the sophisticated means special offense characteristic and the abuse of position of trust or special skill adjustment. *See, e.g., United States v. Layfield*, CDCA Case No. 18-Cr-00124; *United States v. Myers*, D. Ak. Case No. 12-Cr-097-RRB; *United States v. Hall*, CDCA Case No. 16-Cr-00132-CJC. Further, in the most recent *Daniels* matter, the 2022 PSR recommended that the district court apply the special skill or abuse of position of trust adjustment but made no such recommendation regarding sophisticated means.

Finally, the application of both the adjustment and the special offense characteristic would violate the Guidelines unequivocal ban on *impermissible double counting*. Impermissible double counting occurs "where one part of the U.S. Sentencing Guidelines Manual is applied to increase a defendant's punishment on account of a kind of harm that has already been fully accounted for by the application of another part of the U.S. Sentencing Guidelines Manual." *United States v. Reese*, 2 F.3d 870, 895 (9th Cir. 1993), *see also,* Bowman III, *supra, Sentencing High-Loss Corporate Insider Frauds After Booker,* at 170 ("Judges should be particularly sensitive to the Commission's failure to consider adequately the cumulative effects of a number of closely correlated sentence enhancements that cluster in cases of high -loss fraud by corporate officers."). The conduct underlying this enhancement is used to substantiate a more appropriate and narrowly tailored sentencing enhancement, the abuse of position of trust/special skill. The application of both punishes defendant for conduct fully accounted for by that

Case 8:19-cr-00061-JVS   Document 1048-1   Filed 11/21/22   Page 100 of 332   Page ID
#:25492
Case 8:19-cr-00061-JVS   Document 1016   Filed 10/14/22   Page 50 of 54   Page ID #:24438

enhancement. Accordingly, the sophisticated means enhancement is inapplicable.

  F. <u>Misrepresentation During Bankruptcy Proceeding</u>

  If it is determined that the defendant's offense involved "a misrepresentation or other fraudulent action during the course of a bankruptcy proceeding" the district court is instructed to increase the offense level by two levels. §2B1.1(b)(9)(B). The enhancement is inappropriate for at least the following reasons: (a) the PSR fails to show a contemporaneous legal obligation on behalf of defendant to disclose the information; (b) the PSR misstates which clients were actually represented by the firm that was in bankruptcy as opposed to another of defendant's firms or him individually; and (c) at all relevant times, defendant relied on the advice of legal counsel in connection with the bankruptcy and his filings, representations, and conduct. Further, as set forth above, defendant objects to any use of this enhancement or associated judicial fact finding as violative of his rights under the Constitution, due process, and right to a beyond a reasonable doubt burden of proof before a jury.

  G. <u>Vulnerable Victim</u>

  Pursuant to §3A1.1(b)(1), "if the defendant knew or should have known that a victim of the offense was a vulnerable victim, increase by 2 levels." A *vulnerable victim* is "unusually vulnerable due to age, physical or mental condition, or who is otherwise particularly suspectable to the criminal conduct." §3A1.1, *Application Note 2*. Vulnerable victims are "those who are in need of greater societal protection" or "when targeted by a defendant, render the defendant's conduct more criminally depraved." *United States v. Wetchie*, 207 F.3d 632, 636 (9th Cir. 2000)(emphasis added)(internal citation omitted). Whether an individual victim is vulnerable is "*not* measured against the general population." *United States v. Backman*, 817 F.3d 662, 670 (9th Cir. 2016). Instead, "an 'unusually vulnerable victim is one who is less able to resist than the typical victim of the offense of conviction.'" *Id.*, quoting *United States v. Castaneda*, 239 F.3d 978, 980 (9th Cir. 2001). The PSR determined that a two level increase is applicable as a result of defendant's representation of Mr. Johnson. [PSR ¶ 110-13].

First, defendant objects to many of the factual findings underlying the PSR's determination here. *See, e.g.,* PSR Objection Nos. 16, 33. Long before any settlement was reached, for three years, defendant provided Mr. Johnson with live-in medical facilities, arranged his release from jail and retained his counsel, provided him with living expenses, and gave him access to the company credit card. Mr. Johnson testified that during the relevant time period, no individual paid more of his bills and supported him financially than defendant. [Tr. 7/22/21, Vol. 2, p. 36]. In addition, the vulnerable victim enhancement is not a means of punishing defendant for his efforts to conceal his scheme. The purpose of the enhancement is focused on the victim and whether that victim is more susceptible to the scheme than a similarly situated individual.

Second, the victims here were no more vulnerable than any other individual who fell victim to a scheme to which their legal counsel misappropriated a portion of client funds. The nature of the attorney-client relationship allows for an inherent inequitable power dynamic wherein the client relies on the representations of his counsel and trusts his or her knowledge and experience. The Guidelines punish the abuse of this relationship by way of the special skills enhancement. There is nothing about the victims in this case that make Mr. Johnson, Mr. Barela, Ms. Gardner, or Ms. Phan more vulnerable than any other intended victim of a similar scheme. Nor is there any evidence that defendant targeted any victim because of any alleged vulnerability. Although Mr. Johnson was physically paralyzed as a result of his suicide attempt and independently suffered from mental health issues, these conditions did not make him any more suspectable to be taken advantage of by an attorney than a similarly situated plaintiff. Mr. Johnson was no more vulnerable to a scheme to defraud than another other client pursuing a serious personal injury case.

Finally, defendant did not solicit or target any of the clients at issue in this case. They all came to him and were anxious to have him represent them. Thus, the vulnerable victim enhancement is inapplicable.

## VIII.  CONCURRENT SENTENCING

Defendant requests that the Court determine that he is entitled to concurrent treatment of the sentence here to the sentences imposed in the Southern District of New York. Pursuant to § 5G1.3(b), if a defendant has a term of imprisonment that resulted from another offense that is relevant conduct, the court "shall adjust the sentence for any period of imprisonment already served on the undischarged term of imprisonment if the court determines that such period of imprisonment will not be credited to the federal sentence by the Bureau of Prisons; and, the sentence for the instant offense shall be imposed to run concurrently to the remainder of the undischarged term of imprisonment." (emphasis added). Given the overlap in time, the similar modus operandi, and the financial nature of the *Nike* and *Daniels* convictions as compared to Counts 5, 8, 9, 10, and 19, not to mention the manner in which defendant was charged (three cases within 62 days), defendant asserts that the Guidelines require that the sentences run concurrently.

However, should the Court find that concurrent treatment is discretionary, defendant requests that the Court exercise that discretion here. *See, e.g.*, *Setser v. United States*, 132 S. Ct. 1463, 1468 (2012); *See also,* 5G1.3(d).

## IX.  DEFENDANT'S PROPOSED SENTENCING CALCULATION

Defendant agrees that the base offense level for the wire fraud offenses is 7. §2B1.1(a). Defendant maintains that the loss amount is between $1,500,000 and $3,500,000. As a result, the base offense level shall be increased by 16 levels. §2B1.1(b)(1)(I). Defendant anticipates that the Court may apply four levels of enhancements resulting in offense level of 27. Defendant maintains that at this level, the tax count would result in no additional points. Defendant respectfully requests that the Court then reduce the adjusted offense level by three levels for acceptance of responsibility for a total net offense level of 24.

## X.  CONDITIONS OF SUPERVISED RELEASE

The Court is permitted to impose a term of supervised release along with conditions that are related to the nature and circumstances of the offense. 18 U.S.C. § 3583.

Conditions must be "reasonably related to the goals of deterrence, protection of the public, or rehabilitation of the offender, taking into account the offender's history and personal characteristics, and involve no greater deprivation of liberty than is reasonably necessary for the purposes of supervised release." *United States v. Watson*, 582 F.3d 974, 982 (9th Cir. 2009), *quoting United States v. Goddard*, 537 F.3d 1087, 1089 (9th Cir. 2008). It is the government's "burden of showing that these statutory standards are met." *Id.*, *citing United States v. Stoteau*, 524 F.3d 988, 1002 (9th Cir. 2008). Defendant objects to proposed conditions 2, 4, 5, 8, and 9, as overly broad and unduly oppressive and restrictive, and requests that the Court compare the proposed conditions here to those imposed in the *Nike* matter and impose consistent conditions. [Exhibit AA].

## XI.   CONCLUSION

Based on the foregoing, defendant respectfully requests that the Court impose a sentence of no greater than seventy-two (72) months in prison, to be served concurrently with both sentences previously imposed, followed by three (3) years of supervised release.

Dated: October 14, 2022                    Respectfully submitted,

                                            /s/ Michael John Avenatti

                                           MICHAEL JOHN AVENATTI

45

## **CERTIFICATE OF SERVICE**

I, H. Dean Steward, am a citizen of the United States, and am at least 18 years of age. My business address is 17 Corporate Plaza, Suite 254 in Newport Beach, California. I am not a party to the above-entitled action. I have caused, on October 14, 2022, service of the:

DEFENDANT'S SENTENCING MEMORANDUM AND OBJECTIONS TO THE PSR

on the following party, using the Court's ECF system:

AUSA RANEE KATZENSTEIN AND AUSA BRETT SAGEL

I declare under penalty of perjury that the foregoing is true and correct.

Executed on October 14, 2022

/s/ H. Dean Steward

H. Dean Steward

46

**EXHIBIT WW**

Case 8:19-cr-00061-JVS   Document 1048-1   Filed 11/21/22   Page 106 of 332   Page ID
#:25498
Case 8:19-cr-00061-JVS   Document 1026   Filed 10/25/22   Page 1 of 21   Page ID #:25016

Michael John Avenatti (Pro Se)

H. Dean Steward, SBN 85317
17 Corporate Plaza, Suite 254
Newport Beach, California 92660
Tel (949) 481-4900
Fax (949) 706-9994

Advisory Counsel for Defendant
MICHAEL JOHN AVENATTI

# UNITED STATES DISTRICT COURT

## FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | SA CR No. 19-061-JVS |
| Plaintiff, | |
| | DEFENDANT'S OPPOSITION TO THE GOVERNMENT'S SENTENCING POSTION AND RESPONSE TO PRESENTECE REPORT |
| v. | |
| | Date: November 7, 2022 |
| | Time: 9:00 a.m. |
| MICHAEL JOHN AVENATTI, | |
| Defendant. | |

Defendant MICHAEL JOHN AVENATTI ("Defendant"), by and through his advisory counsel of record, H. Dean Steward, hereby files Defendant's Opposition to the Government's Sentencing Position and Response to the Presentence Report. Defendant's filing is based on the attached; the evidence referenced in the attached; the files, records and transcripts in this case and the other cases cited herein; and such further evidence and argument as the Court may permit at a hearing on this matter.

Dated: October 25, 2022                 Respectfully submitted,

                                        /s/ Michael John Avenatti
                                        MICHAEL JOHN AVENATTI

## <u>TABLE OF CONTENTS</u>

**TABLE OF AUTHORITIES** ................................................................................ iv

**I.**     **INTRODUCTION** ................................................................................ 1

**II.**    **DISPARITY IN SENTENCING** ......................................................... 1

**III.**   **CONCURRENT SENTENCING** ........................................................ 2

**IV.**    **THE §3553(a) FACTORS SUPPORT A DOWNWARD VARIANCE**

    A. <u>The Government's Callous Disregard for Mitigating Factors</u> ............. 3

    B. <u>The Court Should Reject the Government's Attempt to Ignore
    The Prior Findings of Judge Gardephe and Judge Furman
    and the Facts in the Prior Unchallenged PSRs</u> ..................................... 4

**V.**     **LOSS AMOUNT & RESTITUTION** ..................................................... 5

    A. <u>The Government's Loss Amount is Incorrect</u> ..................................... 5

    B. <u>Restitution</u> ........................................................................................ 6

**VI.**    **OTHER FACTORS AFFECTING THE GUIDELINES**

        **CALCULATION** ............................................................................... 8

    A. <u>Acceptance of Responsibility</u> ........................................................... 8

    B. <u>Criminal History Category</u> ............................................................. 10

    C. <u>Obstruction of Justice</u> ..................................................................... 11

    D. <u>Reduction Under §5G1.2(d)</u> ............................................................ 12

**VII.**   **RELEVANT CONDUCT** ................................................................... 12

    A. <u>Pre Trial & Trial Conduct</u> ............................................................... 13

    B. <u>Other Offense Conduct</u> .................................................................... 15

**VIII.** **CONCLUSION** .................................................................................. 16

# TABLE OF AUTHORITIES

## CASES

*Gall v. United States*,
552 U.S. 38 (2007)……………………………………………………………………..1

*Jones v. United States*,
574 U.S. 948 (2014)(Scalia, J., dissenting)………………………………………….12

*Lagos v. United States*,
138 S. Ct. 1684 (2018)……………………………………………………………….7

*Marlow v. United States*,
555 U.S. 963 (2008)(Scalia, J., dissenting)……………………………..………….12

*Taylor v. Illinois*,
484 U.S. 400 (1988)……………………………………..…………………………11

*United States v. Barany*,
884 F.2d 1255 (9th Cir. 1989)………………………………………………………7

*United States v. Bell*,
808 F.3d 926 (D.C. Cir. 2015)(Millett, concurring)………………………………12

*United States v. Boscarino*,
437 F.3d 634 (7th Cir. 2006)………………………………………………………..1

*United States v. DeGeorge*,
380 F.3d 1203 (9th Cir. 2004) ………………………………………………………11

*United States v. Gamma Tech. Indus.*,
265 F.3d 917 (9th Cir. 2011) ………………………………...……………………7

*United States v. Green*,
940 F.3d 1038 (9th Cir. 2019) ………………………………………………………8

*United States v. Gussi*,
608 F.3d 574 (9th Cir. 2010) ………………………………...……………………7

*United States v. Hernandez*,
894 F.3d 1104 (9th Cir. 2018)…………………………………………………….13

*United States v. Jawara,*
474 F.3d 565 (9th Cir. 2007) …………………………..……………10

*United States v. Jimenez,*
258 F.3d 1120 (9th Cir. 2001)…………………………………………5

*United States v. Koenig,*
952 F.2d 267 (9th Cir. 1991) ………………………………..………7

*United States v. Kohring,*
637 F.3d 895 (9th Cir. 2011) ………………………………………14

*United States v. Ladwig,*
192 F.Supp. 1153 (E.D. Wa. 2016)……………………………………5

*United States v. Margiotta,*
475 Supp. 3d 1152 (D. Mont. 2020) ………………………..……………7

*United States v. Mateo-Medina,*
845 F.3d 546 (3d Cir. 2017) ……………………………..………13

*United States v. Parker,*
462 F.3d 273 (3d Cir. 2006)…………………………………………1

*United States v. Sabillon-Umana,*
772 F.3d 1328 (10th Cir. 2014)………………………..……………1, 12

*United States v. Stanley,*
309 F.3d 611 (9th Cir. 2002)…………………………………………6

*United States v. Thompson,*
792 F.3d 273 (2d. Cir 2015)…………………………………………7

*United States v. Watt,*
910 F.2d 587 (9th Cir. 1990)…………………………………………9

**OTHER AUTHORITIES**
U.S.S.G. §2B1.1………………………………………………………5
U.S.S.G. §3C1.1 ……………………………..………………………11
U.S.S.G. §4A1.2(a)(2) ………………………………………………10
U.S.S.G. §5G1.2 ……………………………………………………12
U.S.S.G. §5G1.3 ………………………………………..…………3

iv

Case 8:19-cr-00061-JVS   Document 1048-1   Filed 11/21/22   Page 110 of 332   Page ID
#:25502
Case 8:19-cr-00061-JVS   Document 1026   Filed 10/25/22   Page 5 of 21   Page ID #:25020

## I.    INTRODUCTION[1]

Sentencing someone to prison has to be one of the district judge's toughest tasks. So much is at stake for the defendant, the victim, and the community. So much responsibility rests on the judge's shoulders, along with the high expectation that the judge will wisely weigh things that cannot be easily weighed. How much punishment is enough to protect the public? To deter future wrongdoing? To reflect the gravity of the offense? And how much punishment suffices to accomplish all these things without verging on cold revenge or needless retribution? There's rarely a single right answer to hard questions like these. So our system depends, as perhaps it must, on the discretion of thoughtful judges. *U.S. v. Sabillon-Umana*, 772 F.3d 1328, 1330 (J. Gorsuch, 10th Cir. 2014).

The above words of Justice Gorsuch are especially applicable here. The government's demand that defendant spend <u>at least 22.5 years in prison</u> is unreasonable, vindictive, and, unfortunately, personal. It is inconsistent with the law and the fundamental purpose of sentencing. And it completely ignores the critical issue of sentencing disparity and the reality of the sentences similar defendants in similar fraud cases routinely receive (less than five years). For the reasons below and in defendant's opening brief, defendant requests that the court overrule each of the government's objections to the PSR and soundly reject their requested sentence.

## II.    DISPARITY IN SENTENCING

Citing *Gall v. United States*, 552 U.S. 38 (2007), the government claims that the disparity of sentencing analysis is limited to a simple question: is the sentence imposed within the Guideline range? [Dkt. 1000, p. 41]. This is a fundamental misstatement of the law and one that is not supported by *Gall* (or the Guidelines). The government's view, if correct, would render the requirements of §3553(a)(6) unnecessary and meaningless. But the section is clear - the Court must consider "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." *See also*, *United States v. Parker*, 462 F.3d 273, 277 (3d Cir. 2006)("Congress's primary goal in enacting §3663(a)(6) was to promote national uniformity in sentencing…"); *United States v. Boscarino*, 437 F.3d 634, 638 (7th Cir. 2006)("[T]he kind

---

[1] This brief is being filed on the two-week deadline provided by the Court at Dkt. 982.

Case 8:19-cr-00061-JVS   Document 1048-1   Filed 11/21/22   Page 111 of 332   Page ID
#: 25503
Case 8:19-cr-00061-JVS   Document 1026   Filed 10/25/22   Page 6 of 21   Page ID #:25021

of 'disparity' with which §3663(a)(6) is concerned is an unjustified difference across judges (or districts)…"). Knowing full well that a sentence of 17.5 years is grossly punitive and well beyond the norm for similarly situated defendants in fraud and tax cases (see chart at Exhibit B), the government simply ignores the requirement.

Instead, in passing, however, the government mentions *United States v. Layfield*, a case where the defendant received a sentence of 144 months. But *Layfield* is easily distinguishable and actually supports the reasonableness of defendant's requested sentence. [Exhibit EE]. There, attorney Layfield, among other things, (a) committed misconduct against 89 victims; (b) fled to Costa Rica; (c) stole from his employees' retirement accounts; (d) engaged in a separate fraudulent scheme while at counsel's table during his own trial; and (e) caused a loss greater than $7,000,000. *See* Chart at Exhibit at EE and Government's Sentencing Brief, Exhibit FF. The government's position here, and its recommended sentence, cannot be rectified with the position it took, and the sentence imposed, in a case more serious than this.[2]

Moreover, a review of the U.S. Sentencing Commission's analysis of cases in the Central District over the last three years demonstrates the unreasonableness of the sentences requested by the government and Probation. Less than 2% (15 out of 772) of fraud defendants have received a sentence of 10 years or more. [Exhibit GG]. The instant offense, while serious, does not fall within the top 2% of fraud cases within this district across the last three years. Further, the requested sentences reflect an extremely severe and "off the chart," sentence to loss ratio when compared to other nationwide high profile fraud cases. [Exhibit HH].

### III.   CONCURRENT SENTENCING

Defendant reasserts that any sentence in this case must be ordered concurrent to all

---

[2] The government also makes reference to *United States v. Terry Christensen*, which involved a convicted attorney, but does not inform the Court that Christensen received a sentence of 36 months. The *United States v. Ohanian* matter is also easily distinguishable from the instant case. [Exhibits RR, SS]. These cases are yet further evidence of the reasonableness of defendant's requested sentence.

Case 8:19-cr-00061-JVS   Document 1048-1   Filed 11/21/22   Page 112 of 332   Page ID
#:25504
Case 8:19-cr-00061-JVS   Document 1026-4   Filed 10/25/22   Page 7 of 21   Page ID #:25022

sentences imposed in the two prior SDNY cases. *See,* §5G1.3(b)(if the defendant has a term of imprisonment resulting from another offense that is *relevant* conduct, then "the instant offense *shall* be imposed to run concurrently."). In its sentencing position, the government repeatedly cites the negative findings of Judge Gardephe and Judge Furman, claims that the SDNY offenses are analogous to the instant case, and even uses the loss amounts in both the *Nike* and *Daniels* cases.[3] [Dkt. 1000, p. 16, 18, 29, 30, 39, 40, 42, 44]. As such, the prosecution has conceded that both convictions involve relevant conduct for the purposes of §5G1, thus requiring concurrent sentences.

In addition, the government claims that the Court must impose a consecutive sentence to defendant's prior aggravated identity theft conviction. Although defendant disagrees and objects, to the extent that the law requires consecutive treatment of a prior §1028A conviction, this is a determination that must be made by the Bureau of Prisons when computing defendant's total sentence. This Court does not have jurisdiction to modify the sentence imposed in the *Daniels* case to order it consecutive to this sentence.

## IV.    THE §3553(a) FACTORS SUPPORT A DOWNWARD VARIANCE

### A. The Government's Callous Disregard for Mitigating Factors

In an effort to convince the Court to endorse needless retribution, the prosecution disregards every positive attribute of defendant, casts aside all mitigating factors as bogus, and dismisses his life struggles as a sham. To hear the government tell it, Judges Gardephe and Furman's positive findings regarding defendant, all three PSRs, and all letters of support are pure fiction. And only the AUSAs assigned to this case are the truth tellers when it comes to defendant. In fact, in their sentencing submission, the prosecution goes as far as to object to Probation's findings regarding the circumstances of defendant's childhood and the obstacles he overcame [PSR ¶161-62] and accuse defendant and his ex-

---

[3] The government here takes an entirely contrary position to what it claimed in both cases as it relates to loss. The government previously successfully claimed, over defendant's objection, that the loss amount was $297,500 in *Daniels* and approximately $22.5 million in *Nike*.

Case 8:19-cr-00061-JVS   Document 1048-1   Filed 11/21/22   Page 113 of 332   Page ID
#:25505
Case 8:19-cr-00061-JVS   Document 1026   Filed 10/25/22   Page 8 of 21   Page ID #:25023

1    wife of fabricating them (which is a crime). [Dkt. 1000, p. 42, n. 34].[4] The prosecutors

2    also criticize Probation for not confronting defendant's elderly parents, who are 86 and

3    87. [*Id.*]. In addition, the government dismisses defendant's "alleged" (their word in

4    quotes) brutal and inhumane treatment while at MCC (which was found by a federal judge)

5    and falsely claims defendant wished to remain there.[5] The prosecution also attempts to

6    discredit defendant's alcoholism, undermining the findings and integrity of the BOP, its

7    well-regarded RDAP program, and its experts. [Exhibit KK]. Defendant's efforts to better

8    himself and finally resolve a multi-generational substance abuse problem are likewise

9    belittled.[6] All of this further demonstrates the unreasonableness of the government.

10        B.    The Court Should Reject the Government's Attempt to Ignore the Prior
                Findings of Judge Gardephe and Judge Furman and the Facts in the Prior
11              Unchallenged PSRs

12        Faced with factual findings recently made by two other federal judges (Judge

13    Gardephe and Judge Furman), which are helpful to defendant and fully contradict

14    numerous accusations made by the government in its brief, the government simply

15    pretends they never occurred.[7] But they did. Even worse for the government, their DOJ

16    colleagues never disagreed with them, challenged them, or appealed them. The reason –

17    because they are true. Further, the government repeats this strategy as it relates to

18

19    ────────────────

      [4] This accusation is baseless and especially vindictive. It is directly contradicted by factual
20    findings in two prior PSRs, to which the government never objected, as well as attached
      Exhibits II and JJ and Exhibit O submitted with defendant's opening brief.
21    [5] After defendant was isolated in solitary confinement, he was briefly (about eight days)
      released to general population before suffering two additional lockdowns. During the
22    interim period, CDCA prosecutors sought to give him some "diesel therapy" and bring
      him to California for a March 2020 status conference and then ship him back to New York
23    prior to the SDNY *Daniels* trial, scheduled for April 2020. This request was opposed (and
      then properly denied). [Dkts. 100-102].
24
      [6] The government claims defendant is seeking a RDAP referral from this Court to get a
25    year off his sentence. This is not accurate. First, defendant is already in RDAP. Second,
      the BOP has informed defendant he is ineligible for the year off because of how he was
26    charged (in three cases).
27    [7] The government is well aware of the findings because they quote other portions of the
      sentencing transcripts in their brief.

28

defendant's two prior PSRs, which were drafted by two different probation officers.[8] Accordingly, the Court should not permit the government to take positions in this case relating to defendant's character, history, work ethic, family history, etc. that are entirely contrary to the express findings of Judge Gardephe and Judge Furman. *See, e.g, United States v. Jimenez,* 258 F.3d 1120, 1123-24 (9th Cir. 2001)(recognizing effect of failure to object to factual findings in a PSR); *United States v. Ladwig*, 192 F.Supp. 1153, 1156 (E.D. Wa. 2016)(failure to object to PSR's finding of a prior conviction was a concession of the criminal history).

## V. LOSS & RESTITUTION AMOUNT

### A. The Government's Loss Amount is Incorrect

The government's loss analysis, which mirrors that in the PSR, is incorrect as a matter of law as explained in defendant's opening brief [Dkt. 1016, p. 32-34] and grossly overstates the loss amount, leading to a 20 level enhancement. Among other things, it fails to credit defendant for the money returned and the services rendered as required[9] by §2B1.1, n. 3(E)(i).[10]

In fact, prior to its sentencing position, the government agreed and consistently took the position that the loss amount in this case is equal to the net amount defendant stole from his clients (*i.e.,* the funds to which defendant was not entitled). When agents searched the law firm servers, prosecutors seized items specific to attorney costs, expenses, advances, fees, and accounting to establish what defendant was lawfully owed. [19-mj-00419, Dkt. 4-1]. Further, investigators questioned witnesses regarding how costs

---

[8] The government effectively claims that two district court judges, three probation officers (two from SDNY and one from CDCA), defendant's ex-wife, his children, numerous former clients, friends, and defendant, are all wrong in finding any mitigating personal or professional attributes of defendant. This is simply not credible.

[9] California law relating to civil disputes is irrelevant and, in any event, does not support the government's re-writing of the Guidelines to void the deductions.

[10] Even though he has no burden to prove loss, defendant has prepared a draft chart detailing some of the required deductions. [Exhibit LL]. This exhibit shows that the loss amount is approximately $3,124,821 and the restitution amount (discussed immediately below) is less than $1,587,777.13.

5

1  and expenses were maintained at defendant's law firm in an attempt to access these

2  materials. [Dkt. 822, Exh. H]. At trial, prosecutors affirmatively presented evidence that

3  provided defendant credit for attorneys' fees as well as some of the costs and expenses his

4  firm incurred for the benefit of the clients. [Gov. Exh. 48, 174, 420, 430, 439]. And the

5  government's forensic accountant admitted at trial that the firm was entitled to deduct its

6  fees and costs. [Tr. 8/13/21, Vol. 2, p. 77 ("Q: Mr. Drum, is it your position that the law

7  firm was not entitled to deduct its legal fees and costs from the settlement amounts? Is that

8  your position yes or no? A: That is not my position.")]. Finally, even during their press

9  conference held immediately after the change of plea hearing, prosecutors acknowledged

10  that the loss amount was not the gross amount of the victims' settlements. [Exhibit MM].

11  They should not be permitted to reverse course now.

12       B. Restitution

13       Defendant objects to the government's request for restitution as follows and, as with

14  the issue of the loss amount, requests that the Court conduct an evidentiary or *Fatico*

15  hearing before sentencing to address various relevant legal and factual disputes.

16       First, defendant objects to the amounts requested for the four fraud victims because

17  such amounts do not account for credits due defendant, as required, for (1) all monies paid

18  and advances to the clients by defendant; (2) all costs and attorneys' fees due defendant

19  for his work on other matters for the clients; and (3) all monies advanced by defendant for

20  the benefit of the four clients. [Dkt. 1016, p. 32-33].

21       Second, the requested restitution for the four fraud victims fails to credit defendant

22  with the full amount of all monies paid to date by third parties with respect to the losses

23  as required by 18 U.S.C. § 3664(j)(2).[11] *United States v. Stanley*, 309 F.3d 611, 613 (9th

24  Cir. 2002)(the Court must engage in a two-step process (1) determine the full amount of

25

26  [11] Defendant has repeatedly requested this information from the government, but they have
not provided it. Most recently, the government claimed that they do not have all of this
27  information and implied they cannot get it from at least one of the victims. [Dkt. 1000-1
¶18]. This strains credibility. Defendant is entitled to this information and it should be
28  immediately provided for each of the four victims. Otherwise, restitution should be denied.

loss to the victim; and, (2) subtract the amount "other parties have paid civil damages for the same loss."). In addition, defendant maintains that the third parties who have resolved civil claims with the victims are not entitled to restitution under §3664(j)(1). *See, United States v. Thompson*, 792 F.3d 273 (2d. Cir 2015)(determining that restitution is applicable to third parties only "where a third party has assumed the victim's losses by reimbursing the victim…"). For instance, instead of assuming the loss of one of the victim clients, Mr. Eagan settled a lawsuit to release himself from civil claims and allegations that he participated in the scheme to defraud. Unlike an insurance provider, he did not assume the victims' loss with the expectation that he would be reimbursed.

<u>Third</u>, the requested restitution for the four fraud victims improperly charges defendant with attorneys' fees, costs and other expenses that are not recoverable under the law. *See, e.g., Lagos v. United States*, 138 S. Ct. 1684 (2018); *United States v. Barany*, 884 F.2d 1255 (9th Cir. 1989); *United States v. Margiotta*, 475 Supp. 3d 1152, 1157-60 (D. Mont. 2020); 18 U.S.C. §3663. This includes the government's attempt to charge defendant with unsupported fees, costs, and expenses of $828,250 relating to Mr. Johnson. *See,* [Karlous Dec., Dkt. 1000-1, Exh. C].[12] In addition, permitting this will allow for an impermissible double recovery.

<u>Fourth</u>, once the above is taken into account and a proper calculation is performed, the four fraud victims are due less than $2,000,000 in total restitution. *See,* [Exhibit LL].

<u>Fifth</u>, the requested restitution allegedly relating to the tax amount, $3,207,144, was not directly and proximately caused by the offense defendant pled to as required for recovery. *See, e.g., United States v. Koenig*, 952 F.2d 267, 275 (9th Cir. 1991)(holding restitution is permitted "only for losses <u>directly resulting</u> from the defendant's offense.")(internal quotations and citations omitted)(emphasis added); *United States v. Gussi*, 608 F.3d 574, 581 (9th Cir. 2010); *United States v. Gamma Tech. Indus.,* 265 F.3d 917, 927 (9th Cir. 2011). The PSR also correctly noted that because a plea agreement was

---

[12] Defendant has requested from the government the backup documentation and information supporting each claimed amount, but none has been provided.

not entered in this case, "discretionary restitution is not applicable." [PSR ¶ 280]. As a result, this amount may not be ordered to be paid as restitution.

Sixth, the government has failed, in connection with its restitution request, to submit any evidentiary support for the alleged $3,207,144 in restitution due the IRS, thus requiring that the Court deny the request because it is unsupported and defendant has not been timely provided the required information and documentation.

## VI.   OTHER FACTORS AFFECTING THE GUIDELINES CALCULATION

### A. Acceptance of Responsibility

The government claims (falsely) that defendant is not entitled to a two level reduction pursuant to §3E1.1(a),(b). Contrary to the government's assertions, defendant is entitled to a three level reduction for acceptance of responsibility.

First, defendant's allocution during his open plea does not undermine his entitlement to the reduction, it supports it. Defendant agreed that he had committed crimes and the elements of counts 5, 8-10, and 19.[13] The inquiry for a lengthier factual basis was not from the Court, but instead from the government. [Exhibit NN]. The fact that defendant refused to parrot a script the government wrote and wanted read does not mean defendant did not accept responsibility. *See, United States v. Green*, 940 F.3d 1038, 1042 (9th Cir. 2019)("When a district court determines [at a plea hearing] that a defendant's plea [is] adequately supported by the defendant's admissions, as the district court did here, that determination compels the inference that [the defendant] had truthfully admitted the conduct comprising the offense of conviction" thus satisfying the Guidelines.)(internal quotation and citation omitted). Further, defendant has since apologized to his victims and has taken practical steps to show his remorse. [Dkt. 1016, p. 15, n. 15]. Meanwhile, the government has taken an adversarial position each time defendant has expressed a desire

---

[13] At the change of plea hearing, the government made no representations about how it planned to proceed on the remaining counts. As a result, defendant was aware that statements he made under oath could be used against him in connection with Counts 1-4, 6-7, 11-18, and 20-36.

to accept responsibility – including during his guilty plea.[14]

Second, the government argues that defendant's conduct at trial undercuts the applicability of §3E1.1 based on his implications "that there were additional reimbursable costs that dramatically reduced the amount due to his clients." [Dkt. 1000, p. 13]. Defendant's position throughout this case has remained unchanged: after he resolved a client's claim, his firm was entitled to its legal fees and all out-of-pocket costs expended in connection with the matter. Defendant's act of cross-examining witnesses regarding additional costs and expenses spent, advances made, and time incurred on other matters was an exercise of a constitutional right to present a defense, which cannot be used to justify a denial of a §3E1.1 departure. *United States v. Watt*, 910 F.2d 587, 592 (9th Cir. 1990)("[] in determining a defendant's acceptance of responsibility, a sentencing court cannot consider against a defendant any constitutionally protected conduct…").

Third, the prosecution claims that the basis of the mistrial, the government's suppression of the Tabs data, "showed that that the government's loss calculations were correct" and any claims that the suppressed materials are favorable evidences a lack of remorse. The government's repeated assertions that the Tabs data did not undermine its case are untrue. Indeed this representation is especially surprising given the prosecution's reliance on the Tabs materials discovered after trial for its restitution analysis, which shows additional costs, expenses, and advances not reflected in the government's trial exhibits. [Gov. Sent. Exh. B, F]. Further, after the mistrial, the government sent its financial analyst "data sets from Tabs [it] obtained in August 2021" to which Mr. Drum responded that he needed an additional $50,000 to update his analysis and prepare to

---

[14] After the mistrial last year, defendant sought to engage in a settlement conference – the government refused (for the second time). [Dkt. 781]. This year, defendant attempted to enter into a plea agreement – the government did not negotiate in good faith. When defendant presented an open plea, the prosecution objected to his ability to speak with advisory counsel [Tr. 6/16/22, p. 3] and also falsely claimed they were unaware of defendant's intent to plead guilty to Counts 5, 8-10, and 19. [*Id.* at 3, 31]. But the government (AUSA Katzenstein) was informed by Mr. Steward of this intention the day before during a telephone conference.

Case 8:19-cr-00061-JVS   Document 1048-1   Filed 11/21/22   Page 119 of 332   Page ID
#: 35411
Case 8:19-cr-00061-JVS   Document 1026   Filed 10/25/22   Page 14 of 21   Page ID #:25029

testify. [Exhibit OO]. If the government's calculations remain unchanged, Mr. Drum would not have required $50,000. The prosecution is well aware that the suppressed Tabs data established over $150,000 of additional costs, expenses, and advances made for the benefit of the clients (inclusive of over 100 transactions), as well as references to defendant's (and his firm's) time spent on other matters for the benefit of the clients.[15]

B. Criminal History Category

The government claims that "defendant's criminal history score properly includes 6 points, placing him in CHC III[.]" Disagreeing with the findings of Probation, the prosecution argues that no departure is warranted because defendant's SDNY conduct could not have been joined in the same charging instrument under Rule 8 as the SDNY convictions were "of completely different character, involved completely different acts, and were not part of the same common plan or scheme." [Dkt. 1000, p. 17]. Later in its brief, however, the government takes a different approach: "The convictions in those [SDNY] matters similarly involved defendant's violation of his duties as a lawyer by lying to and betraying his clients for his own personal benefit." [Dkt. 1000, p. 29]. Further evidencing its ever-changing position, the government has previously described Rule 8 in a broader fashion than it does here. [Dkt. 298, p. 11 ("'Courts have broadly construed Rule 8 in favor of joinder because joint trials conserve government funds, minimize inconvenience to witnesses and public authorities, and avoid delays in bringing a defendant to trial.' *United States v. Jawara*, 474 F.3d 565, 572-73 (9th Cir. 2007).")].

Defendant maintains that due to the temporal overlap, the similarity of conduct, and the one defendant nature, a single case (instead of three) should have been filed. Moreover, even if the charges would have later been severed for the purposes of trial, defendant's criminal history category at sentencing would have remained one (I) because the charges would have stemmed from the same charging instrument. *See* Guideline §4A1.2(a)(2). The

---

[15] All of these materials should have been provided to defendant prior to the first trial, and would have supported the theories advanced by the defense. Among other things, they would have been used to impeach the credibility of Mr. Drum, who was paid over $600,000, and the accuracy of his financial analysis.

1  prejudice from the government's failure to bring a single case has caused significant undue

2  prejudice and now an unwarranted increase to defendant's criminal history score.

3  Accordingly, a downward departure to criminal history category I is warranted.

4         C. <u>Obstruction of Justice</u>

5         The obstruction of justice enhancement is applicable where a defendant threatens

6  witnesses, risks the confidentiality of an informant, destroys evidences, or willfully

7  interferes with a pending criminal investigation. The government's (and Probation's)

8  application of §3C1.1 is improper when applied to the facts here.

9         <u>First</u>, as discussed in defendant's prior brief, the 2019 post to Twitter cannot be used

10  to justify an §3C1.1 enhancement. [Dkt. 1016, p. 35].

11         <u>Second</u>, the government incorrectly asserts that defendant sought to intimidate Mr.

12  Barela when he "served a trial subpoena on Barela's wife when she accompanied Barela

13  to Court, and then used the subpoena to force her out of the courtroom…" [Dkt. 1000, p.

14  10]. But the service of Talitha Barela with a subpoena was done in anticipation of calling

15  her as a witness. *Taylor v. Illinois*, 484 U.S. 400, 409 (1988). Indeed, Ms. Barela was even

16  listed on the government's April 1, 2019 and May 15, 2020, "Victim & Witness List."

17  [Exhibit Z; Exhibit PP]. Ms. Barela also personally sued defendant in connection with the

18  conduct at issue here, further establishing her relevance. There is no evidence defendant

19  attempted to intimidate Ms. Barela (or anyone else) through the service of this subpoena.

20         <u>Third</u>, the government urges the Court to apply the two level enhancement based on

21  statements defendant made during two Judgment Debtor Examinations ("JDEs") and a

22  State Bar hearing, and unrelated and irrelevant statements to his law partner. This is not a

23  proper exercise of the obstruction of justice enhancement. The two level increase is

24  warranted only when the *willful* obstruction is performed *during* the course of the

25  investigation, prosecution, or sentencing of the instant offense or conviction. *United States*

26  *v. DeGeorge*, 380 F.3d 1203, 1222 (9th Cir. 2004)(remanding the district court's

27  application of §3C1.1 because defendant's "perjury occurred during the *civil* trial as part

28  of his scheme to defraud and not during the *criminal* investigation as part of an attempt to

Case 8:19-cr-00061-JVS   Document 1048-1   Filed 11/21/22   Page 121 of 332   Page ID
#: 25513
Case 8:19-cr-00061-JVS   Document 1026   Filed 10/25/22   Page 16 of 21   Page ID #:25031

obstruct justice."). During the conduct at issue, there is no evidence that defendant was aware of any ongoing or impending criminal investigation. As such, there can be no finding that defendant *willfully* obstructed anything.

### D. Reduction Under §5G1.2(d)

Using an incorrect Guideline calculation, Probation erroneously determined that the conduct at issue here resulted in a Guideline range of 262 to 327 months. [PSR ¶265]. Because the maximum sentence for wire fraud is 20 years, the PSR then reduced the Guideline range to 240 months. In response, the government objects based on a tortured reading of §5G1.2(d). But the Guidelines make clear that the "sentence imposed on [the wire fraud] count <u>shall not be greater than</u> the statutorily authorized maximum sentence on that count" (§5G1.2(d), App. Note 3 (emphasis added)) and that all similar counts are to be grouped and run concurrently. §5G1.2(c). Accordingly, the maximum total sentence on each of the four wire fraud counts is 20 years, each of the counts to run concurrent with each other. However, as explained previously, the appropriate Guideline range and other facts require a sentence nowhere near 240 months.

## VII.  RELEVANT CONDUCT

Defendant objects to any judicial fact finding or reliance on unproven facts to justify an increase in his sentence. Defendant is entitled to a jury trial (and a *beyond a reasonable doubt* burden of proof) as to any conduct not specifically pled to. The consideration of facts outside of his guilty plea violates defendant's right to due process, the Sixth Amendment, and the guarantee of a jury trial. *See, e.g., Jones v. United States*, 574 U.S. 948 (2014)(Scalia, J., joined by Thomas & Ginsburg, JJ, dissenting); *United States v. Bell*, 808 F.3d 926, 929 (D.C. Cir. 2015)(Millett, concurring)("I agree with Justices Scalia, Thomas, and Ginsburg … the circuit case law's incursion on the Sixth Amendment 'has gone long enough.'"); *Sabillon-Umana*, 772 F.3d at 1331 (10th Cir. 2014)("…based on facts the judge finds without aid of a jury or the defendant's consent. It is far from certain whether the Constitution allows at least the second half of that equation"); *Marlow v. United States*, 555 U.S. 963 (2008)(Scalia, J., dissenting)(finding that the judicial fact

Case 8:19-cr-00061-JVS   Document 1048-1   Filed 11/21/22   Page 122 of 332   Page ID
#:25514
Case 8:19-cr-00061-JVS   Document 1026   Filed 10/25/22   Page 17 of 21   Page ID #:25032

finding "falls short of what we have held the right to a trial by jury demands…"); *United States v. Mateo-Medina*, 845 F.3d 546, 554 (3d Cir. 2017)("[C]alculating a person's sentence based on crimes for which he or she was not convicted undoubtedly undermines the fairness, integrity, and public reputation of judicial proceedings.").

Attached hereto as Exhibit QQ is the government's sentencing brief, with highlighted portions representing irrelevant and/or unproven "facts". Defendant objects to the Court's consideration of these statements/accusations as violative of the Sixth Amendment, due process, and defendant's right to a jury trial. By way of example only, defendant addresses several of the government's unsupported allegations below.

A. <u>Pre Trial & Trial Conduct</u>

The government describes defendant's pretrial and trial conduct as an aggravating factor sufficient to "justify a significant custodial status." [Dkt. 1000, p. 28]. However, the government's false accusations about defendant's conduct at trial are nothing more than a disguised trial penalty[16] and are <u>unsupported by the trial record</u>. Throughout the trial, defendant exercised decorum and treated the Court and witnesses with respect and professionalism. The Court was present throughout all proceedings and never once admonished defendant about any alleged abusive tactics as now claimed by the government. Pointing to three examples, the government argues that defendant "brow-beat his victims" during cross-examination with "almost nothing that could actually help his defense." [Dkt. 1000, p. 32, n. 25]. These claims are <u>false</u> and suggest that this Court allowed defendant to run amok during the trial and engage in rampant misconduct. The Court knows this never happened. It would <u>never</u> tolerate the defendant (or any party or attorney) purposely humiliating a witness, eliciting testimony solely intended to cause emotional harm, or attempting to degrade a witness as the government now claims.

The government states that defendant unnecessarily asked Ms. Gardner about an

---

[16] Defendant cannot be punished for exercising his constitutional right to proceed to trial (and represent himself). *See, United States v. Hernandez*, 894 F.3d 1104, 1112 (9th Cir. 2018)("Permitting courts to impose a harsher sentence on those few defendants who do go to trial could in practice restrict the exercise of the [Sixth Amendment] right…").

13

1   incident when she was █████████████████████. The prosecution is wrong.

2   Instead, the government first presented the false narrative that defendant (rather than ████

3   ████████████ was the cause of Ms. Gardner moving out of her home.[17] Prior to

4   defendant's cross-examination, a sidebar was held and the Court allowed defendant to

5   elicit the testimony at issue: "Your point is the jury was left with the impression that the

6   money was cut off and she had to go find someplace to live..." [Tr. 8/3/21 (Under Seal),

7   p. 5]. The record is clear that defendant's questioning was done in response to the

8   government's presentation of misleading evidence.

9        Second, defendant cross-examined Mr. Johnson regarding his mental health issues.

10   This was entirely proper under the law. *See, e.g., United States v. Kohring*, 637 F.3d 895,

11   912 (9th Cir. 2011)(mental health issues can be material as impeachment evidence because

12   they cast doubt on the accuracy of the witness' testimony).

13        Third, defendant did not *imply* that Tran and Phan were "trying to evade paying

14   their taxes on their settlement money..." [Dkt. 1000, p. 31]. Instead, at trial, after the

15   government claimed that Mr. Avenatti directed Mr. Tran to commit a tax offense, Mr. Tran

16   agreed that Ms. Phan had multiple "financial advisors relating to how this money would

17   be handled so that it could be sheltered from taxes" including her personal CPA. [Tr.

18   8/10/21, Vol. 1, p. 95-96]. Again, this was a proper exercise of cross-examination.

19        Fourth, citing to Morgan Witos and Special Agents Galicia and Penland, the

20   government accuses defendant of "making false statements to the Court in connection with

21   his efforts to call witnesses who were hardly relevant." [Dkt. 1000, p. 33]. Contrary to the

22   government's assertions, defendant reasonably believed that Ms. Witos was a CPA despite

23   the discovery that she was not licensed. [Tr. 7/28/21, Vol. 2, p. 30](when asked whether

24   Ms. Witos was a CPA, Ms. Regnier replied, "I believe so, yes."]. Even so, Ms. Witos

---

26 [17] The government was well aware of the truth as to why Ms. Gardner removed herself

27 from this living situation prior to trial, but presented the misleading testimony anyway. *See, e.g.,* [VIS, B ("...I didn't come to understand it was ████ until 2 years later. Brett

28 Segal [sic] told me at my first interview for court, that what happened to me was defined as ████ ")(emphasis added)].

14

performed tasks at the firm consistent with that of a CPA: inputting costs and expenses and performing financial reporting - both issues central to the defense. Prior to allowing the testimony of the New York based agents, defendant was required to submit a written and oral proffer. [Dkt. 641]. Ultimately, defendant elicited limited testimony from SA Galicia, but only after prosecutors warned defendant that broad questioning would result in cross-examination about the SDNY investigation and prosecutions. [Tr. 8/17/21, Vol. 2, p. 63-64]. For this reason, defendant chose not to call SA Penland as a witness. These strategic decisions were not an abuse of process.[18]

Finally, the government falsely accuses defendant of misrepresenting his financial status to gain the assistance of the Federal Public Defender. However, defendant consulted with the Federal Public Defender and proceeded with the requested appointment because of the uncertainty of his future financial stability given the three pending criminal cases, multiple civil lawsuits, and two forfeiture allegations. [Dkt. 28]. The concerns cited have come to fruition, and the government concedes defendant's financial condition through its decision to forgo a fine. [Dkt. 1000, p. 46, n. 36].

B. Other Offense Conduct

Without evidentiary support, the government argues that defendant stole approximately $807,773 from his clients in the *Greco v. NFL* matter,[19] $15,000 from Amelia Racine, and delayed payment to (but ultimately compensated) defendant's former clients who lost their son as a result of a drug overdose. The government's act of attaching a single interview and citing a portion of defendant's bank statements is insufficient to establish that these uncharged crimes occurred – they did not.

---

[18]Prior to trial, the government identified many witnesses (inclusive of an expert) and disclosed many proposed exhibits (and entire themes of evidence), many of which were never presented to jurors. A change of strategy is not synonymous with an abuse of process.

[19] Other than citing the PSR ¶¶139-140 (information presumably provided by prosecutors), the government offers no support of this contention. The PSR's findings and defendant's objections are discussed in defendant's sentencing position. [Dkt. 1016, p. 28].

15

Case 8:19-cr-00061-JVS   Document 1048-1   Filed 11/21/22   Page 125 of 332   Page ID
#: 25517
Case 8:19-cr-00061-JVS   Document 1026   Filed 10/25/22   Page 20 of 21   Page ID #:25035

**VIII. CONCLUSION**

      Based on the foregoing, defendant renews his request for this Court to impose a sentence of no greater than seventy-two (72) months in prison, to be served concurrently with both sentences previously imposed, followed by three (3) years of supervised release.

Dated: October 25, 2022                Respectfully submitted,

                                        /s/ Michael John Avenatti

                                      MICHAEL JOHN AVENATTI

16

Case 8:19-cr-00061-JVS   Document 1048-1   Filed 11/21/22   Page 126 of 332   Page ID
#: 25519
Case 8:19-cr-00061-JVS   Document 1026   Filed 10/25/22   Page 21 of 21   Page ID #:25036

## CERTIFICATE OF SERVICE

I, H. Dean Steward, am a citizen of the United States, and am at least 18 years of age. My business address is 17 Corporate Plaza, Suite 254 in Newport Beach, California. I am not a party to the above-entitled action.  I have caused, on October 25, 2022, service of the:

DEFENDANT'S OPPOSITION TO THE GOVERNMENT'S SENTENCING
POSTION AND RESPONSE TO PRESENTECE REPORT

on the following party, using the Court's ECF system:

AUSA RANEE KATZENSTEIN AND AUSA BRETT SAGEL

I declare under penalty of perjury that the foregoing is true and correct.

Executed on October 25, 2022

/s/ H. Dean Steward

H. Dean Steward

17

**EXHIBIT XX**

Michael John Avenatti (Pro Se)

H. Dean Steward, SBN 85317
17 Corporate Plaza, Suite 254
Newport Beach, California 92660
Tel (949) 481-4900
Fax (949) 706-9994

Advisory Counsel for Defendant
MICHAEL JOHN AVENATTI

# UNITED STATES DISTRICT COURT

## FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | SA CR No. 19-061-JVS |
| Plaintiff, | |
| | DECLARATION OF DEFENDANT |
| v. | |
| MICHAEL JOHN AVENATTI, | |
| Defendant. | |

## DECLARATION OF MICHAEL JOHN AVENATTI

I, Michael John Avenatti, affirm, certify and declare as follows:

1.  On April 10, 2019, an Indictment was filed in the above-entitled action charging me with thirty-six counts. Count 19 alleged a violation of 26 U.S.C. § 7212(a). [Dkt. 16, p. 28]. The Indictment did not make reference to the omnibus clause.

2.  On June 16, 2022, I pled guilty to Count 19, a violation of 26 U.S.C. § 7212(a). I stated, "In connection with the tax count, Count 19, I previously served as the CEO of the a company by the name of Global Baristas U.S., LLC. The Internal Revenue Service obtained liens on various property and undertook collection efforts to collect taxes due the Internal Revenue Service from Global Baristas U.S., LLC. In connection with those efforts, I undertook efforts to obstruct the Internal Revenue Service's ability to obtain those monies and to execute on those liens by instructing other employees of Global Baristas U.S., LLC, to undertake various efforts to prevent the Internal Revenue Service from timely obtaining the money that the Internal Revenue Service was due." [Tr. 6/16/22, p. 21-22]. I also agreed that I made instructions and the carrying out of those instructions would obstruct the government's ability to collect taxes. [*Id.*]. I agreed that I voluntarily performed this conduct. [*Id.*]. I also admitted that "I acted corruptly in connection with Count 19." [*Id.* at 23]. Each of these statements were true when made and remain true.

3. When my original sentencing submission was filed, I believed that because I was charged with 26 U.S.C. § 7212 and not the omnibus clause specifically, the improper base offense level was being used. As a result, I lodged a legal objection to what I understood to be the misapplication of the base offense level for Count 19. However, I did not retract my statements at the change of plea hearing nor did I seek to call into question the veracity of those statements or avoid responsibility or accountability.

4. Having now further reviewed the law, including the Supreme Court case of *Marinello v. United States*, 138 S.Ct. 1101 (2018) and the Guidelines provisions related to both 26 U.S.C. § 7212(a) and the omnibus clause (2A2.4 and 2T1.1, respectively), I believe my objection and prior position are contrary to these authorities and therefore I

1  withdraw them.

2       5. To be clear, I take responsibility for a violation of the omnibus clause of 26 U.S.C.

3  § 7212(a). I also take responsibility for the corresponding restitution amount determined

4  by Probation in connection with Count 19 in the amount of $3,207,144 and concede that

5  it should be ordered in connection with my sentencing.

6       I make these statements under penalty of perjury under the laws of the United States

7  of America.

8

9

10

11  Dated:  11 / 20 / 2022

12                                        Michael John Avenatti

13

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**EXHIBIT YY**



**Average and Median Sentence Length**
Fiscal Year 2015,2016,2017,2018,2019,2020,2021

■ Sentence Length (Average Months)   ■ Sentence Length (Median Months)

Months

30

37

The figure includes the 125 cases reported to the Commission. Cases missing information necessary to complete the analysis were excluded from this figure. Sentences of 470 months or greater (including life) and probation were included in the sentence average computations as 470 months and zero months, respectively. Sentences of probation only are included here as zero months.
The information in this figure includes conditions of confinement as described in USSG §5C1.1.
FILTER:
Fiscal Year: 2015,2016,2017,2018,2019,2020,2021; Circuit: 9th Circuit; State: All; District: California, Central; Race: All; Gender: All; Age: All; Citizenship: All; Education: All; Crime Type: Fraud/Theft/Embezzlement; Guideline: §2B1.1; Drug Type: All; Sentencing Zone: D; Criminal History: II; Career Offender Status: All



**Average and Median Imprisonment Length**
Fiscal Year 2015,2016,2017,2018,2019,2020,2021

■ Imprisonment Length (Average Months)   ■ Imprisonment Length (Median Months)

Months

30

38

The figure includes the 119 cases reported to the Commission. Cases missing information necessary to complete the analysis were excluded from this figure. Sentences of 470 months or greater (including life) were included in the sentence average computations as 470 months. The information in this figure does not include probation or conditions of confinement as described in USSG §5C1.1.
FILTER:
Fiscal Year: 2015,2016,2017,2018,2019,2020,2021; Circuit: 9th Circuit; State: All; District: California, Central; Race: All; Gender: All; Age: All; Citizenship: All; Education: All; Crime Type: Fraud/Theft/Embezzlement; Guideline: §2B1.1; Drug Type: All; Sentencing Zone: D; Criminal History: II; Career Offender Status: All





Average and Median Sentence Length
Fiscal Year 2015,2016,2017,2018,2019,2020,2021

The figure includes the 314 cases reported to the Commission. Cases missing information necessary to complete the analysis were excluded from this figure. Sentences of 470 months or greater (including life) and probation were included in the sentence average computations as 470 months and zero months, respectively. Sentences of probation only are included here as zero months.
The information in this figure includes conditions of confinement as described in USSG §5C1.1.
FILTER:
Fiscal Year: 2015,2016,2017,2018,2019,2020,2021; Circuit: 9th Circuit; State: All; District: All; Race: All; Gender: All; Age: All; Citizenship: All; Education: All; Crime Type: Fraud/Theft/Embezzlement; Guideline: §2B1.1; Drug Type: All; Sentencing Zone: D; Criminal History: II; Career Offender Status: All



Average and Median Imprisonment Length
Fiscal Year 2015,2016,2017,2018,2019,2020,2021

The figure includes the 290 cases reported to the Commission. Cases missing information necessary to complete the analysis were excluded from this figure. Sentences of 470 months or greater (including life) were included in the sentence average computations as 470 months. The information in this figure does not include probation or conditions of confinement as described in USSG §5C1.1.
FILTER:
Fiscal Year: 2015,2016,2017,2018,2019,2020,2021; Circuit: 9th Circuit; State: All; District: All; Race: All; Gender: All; Age: All; Citizenship: All; Education: All; Crime Type: Fraud/Theft/Embezzlement; Guideline: §2B1.1; Drug Type: All; Sentencing Zone: D; Criminal History: II; Career Offender Status: All

**EXHIBIT ZZ**

# H. Dean Steward
ATTORNEY AT LAW

17 Corporate Plaza Drive
Suite 254
Newport Beach, CA 92660
949-481-4900

Nov. 8, 2022

Leslie De La Torre
Federal Probation

Via email

Re: Your filing in the *Avenatti* matter of Nov. 7, 2022

Dear Leslie:

In your filing of yesterday, at Docket 1043, you note on page 18 that "The Probation Officer was able to access the presentence reports and statement of reasons for the cases sentenced in the Central District of California. Based on the presentence reports for the 16 cases, the Total Offense Levels ranged from 20 to 32, and the Criminal History Categories ranged from I to III."

You cited this information in support of your position that defendant's case is not similar to the 16 cases you referenced from the Central District of California.

So that Mr. Avenatti may properly prepare a response to this statement, object to its conclusion, and prepare for his sentencing on December 5, 2022, he requests that you immediately provide the Presentence Reports and statement of reasons for each of the cases you referenced to me.

Thank you in advance for your prompt attention to this matter.

Dean Steward

• Admitted-California & Hawaii • Fellow-American College of Trial Lawyers •
fax: 949-706-9994 • e-mail: deansteward7777@gmail.com

From: **Leslie De La Torre** ███████████████████
Date: Thu, Nov 10, 2022, 4:48 PM
Subject: RE: Avenatti matter
To: deansteward7777_gmail.com <deansteward7777@gmail.com>

Good evening Dean,

Pursuant to Local Criminal Rule 32-3.5, Presentence Investigations, Reports and Recommendation Letters are confidential records of the Court.  Further, under Local Criminal Rule 49.1-2, the Presentence Investigation Reports and Statement of Reasons are not to be included in the public case file. As such, I do not have the authority to give you copies of the Presentence Reports or Statement of Reasons.

Thank you,

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# EXHIBIT AAA

1  TRACY L. WILKISON
   Acting United States Attorney
2  BRANDON D. FOX
   Assistant United States Attorney
3  Chief, Criminal Division
   VALERIE L. MAKAREWICZ (CBN 229637)
4  Assistant United States Attorney
   Major Frauds Section
5       1100 United States Courthouse
        312 North Spring Street
6       Los Angeles, California 90012
        Telephone: (213) 894-0756
7       Facsimile: (213) 894-6265
        E-mail: Valerie.Makarewicz@usdoj.gov
8  Attorneys for United States of America

9                    UNITED STATES DISTRICT COURT

10           FOR THE CENTRAL DISTRICT OF CALIFORNIA

11                        WESTERN DIVISION

12  UNITED STATES OF AMERICA,        No. 2:19-cr-00399-AB

13                 Plaintiff,        GOVERNMENT'S SENTENCING
                                     MEMORANDUM
14           v.

15  DENNIS BLIEDEN,                  Hearing:   June 9, 2021
                                     Time:      2:00 p.m.
16                 Defendant.        Courtroom: 350 West 1st Street
                                                Courtroom 7B
17                                              Los Angeles, CA

18

19       The United States of America, by and through its undersigned

20  counsel, hereby respectfully submits a memorandum in anticipation of

21  the sentencing of defendant Dennis Blieden, currently scheduled for

22  June 9, 2021.

23       As set forth more fully below, the government agrees with the

24  United States Pretrial and Probation Officer's recommended sentence

25  of a term of imprisonment of 102 months, three-years' supervised

26  release, and the imposition of an order for defendant to pay

27  //

28  //

1   $22,669,979.07 in restitution to defendant's employer, representing

2   the losses caused by the defendant's criminal conduct.

3

4                                        Respectfully submitted,

5                                        TRACY L. WILKISON
                                         Acting United States Attorney
6                                        BRANDON D. FOX
                                         Assistant United States Attorney
7                                        Chief, Criminal Division

8

9   DATED: __5/26/21_____          _/s/_____
                                         VALERIE L. MAKAREWICZ
10                                       Assistant United States Attorney

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**TABLE OF CONTENTS**

I.    Introduction.................................................4

II.   Procedural History.........................................4

      A.    Indictment...........................................4

      B.    Plea Agreement and Rule 11 Hearing.......................4

      C.    PSR..................................................6

III.  Consideration of Section 3553(a) Factors.......................6

      A.    Nature and Circumstances of the Offenses.................7

      B.    History and Characteristics of Defendant.................11

      C.    Deterrence and Respect for the Law.......................12

      D.    Protection of the Public from Further Crimes............13

      E.    Need to Provide Educational or Vocational Training.......14

      F.    Need to Avoid Unwarranted Sentencing Disparities.........14

      G.    Restitution..........................................14

IV.   Conclusion.................................................15

**MEMORANDUM OF POINTS AND AUTHORITIES**

**I.   Introduction**

     For years, defendant worked through the ranks of his former employer, Company-1, to achieve the position of its Comptroller and Vice President of Accounting and Finance. Empowered with the trust reposed with him by his employer, defendant brazenly stole from them a staggering amount of money, over $22 million, and used that money to fuel his gambling addiction.  Defendant's actions are unconscionable and deserving of a significant sentence of incarceration of 102 months, a three-year term of supervised release, and the imposition of a restitution order of $22,669,979.07 against him.

**II.  Procedural History**

     **A.   Indictment**

     On July 9, 2019, a grand jury returned an indictment against defendant that charged defendant with eleven counts of violations of 18 U.S.C. § 1343, wire fraud, and one count of a violation of 18 U.S.C. § 1028A, aggravated identity theft.  Docket No. 3.  Defendant was arrested in Las Vegas, Nevada.  PSR, ¶ 73.

     **B.   Plea Agreement and Rule 11 Hearing**

     On October 6, 2019, a plea agreement was filed and on defendant November 22, 2019, defendant plead guilty.  Docket Nos. 48, 50. Defendant plead guilty to one count of a violation of 18 U.S.C. § 1343, wire fraud, and one count of a violation of 18 U.S.C. § 1028A, aggravated identity theft.  Id.

     As enumerated in the plea agreement filed and accepted by the Court, defendant and the United States of America stipulated to a base offense level of seven, and a 20-level increase for loss

pursuant U.S.S.G. §§ 2B1.1(a) and (b)(1)(K), because the loss was greater than $9.5 million. Docket No. 48, p. 13. Defendant agreed to an offense level increase of two levels pursuant to U.S.S.G. § 3E1.1 because he abused his position within Company-1 to accomplish his embezzlement. Id. Defendant agreed to an additional offense level increase of two levels pursuant to U.S.S.G. § 2B1.1(b)(10)(C), because his crime involved sophisticated means. Id.

The government agreed to a two-level downward adjustment for defendant's acceptance of responsibility under U.S.S.G. §3E1.1, and agreed to move for an additional one-level downward adjustment under U.S.S.G. §3E1.1(b), if defendant met certain conditions as enumerated in the plea agreement. Id. Assuming defendant continues to accept responsibility for his actions, the computation results in a total offense level of 28, Zone D. Id.

The parties agreed not to seek, argue, or suggest in any way, either orally or in writing, that any other specific offense characteristic, adjustments, or departures relating to the offense level be imposed. Id., p. 14. Defendant agreed that the Court must sentence him to a term of 2 years' imprisonment on Count Twelve of the Indictment (aggravated identity theft), which must run consecutively to any term of imprisonment imposed for Count One of the Indictment (wire fraud). Id., pp. 13-14.

Defendant reserved the right to argue for a more lenient sentence from the sentence suggested under the Sentencing Guidelines by arguing factors set forth in 18 U.S.C. §§ 3553(a)(1), (a)(2), (a)(3), (a)(6), and (a)(7). Id., at 14. The parties did not agree as to defendant's criminal history or criminal history category. Id.

**C.    PSR**

On February 14, 2020, the United States Pretrial and Probation Office (USPPO) filed the Presentence Report (PSR) with respect to defendant, and disclosed its recommendation letter. Docket Nos. 53, 54.  USPPO calculated defendant's criminal history category in Category I. PSR, p. 4. The Probation Officer did not find any factors that would warrant a departure or a variance.  PSR, ¶¶ 108, 109.  As such, the USPPO recommended a sentence term of 102 months, that consisted of 78 months on Count 1, and 24 months on Count 12, to be served consecutively. Docket No. 53, p. 2.

In compliance with its obligations enumerated in the plea agreement, the United States recommends the same sentence as the USPPO. Docket No. 48, p. 3.

**III. Consideration of Section 3553(a) Factors**

In determining the appropriate sentence to be imposed, this Court must also consider all sentencing considerations set forth in section 3553(a). Those factors include: (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (3) the need to afford adequate deterrence to criminal conduct, and to protect the public from further crimes of the defendant; (4) the need to provide the defendant with educational or vocational training, medical care, or other correctional treatment in the most effective manner; (5) the guidelines and policy statements issued by the Sentencing Commission; (6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar

1  conduct; and (7) the need to provide restitution to any victims of

2  the offense. 18 U.S.C. § 3553(a).

3      A sentence of 102 months incarceration, the low-end of

4  defendant's calculated Sentencing Guidelines range, is reasonable and

5  just, considering the section 3553(a) factors.

6      **A.   Nature and Circumstances of the Offenses**

7      The nature and circumstances of defendant's crime are serious.

8  18 U.S.C. § 3553(a)(1).  Defendant's scheme to defraud Company-1 was

9  carefully orchestrated and executed and sophisticated in nature.

10     Defendant used a intricate method and structuring his

11 embezzlement through multiple transfers, thus, making it difficult

12 for anyone to uncover his stealing.  Defendant fraudulently wired

13 money from Company-1's main operating account with Wells Fargo,

14 through its Western Union business account, to its account with

15 Silicon Valley Bank, and then, into one of his six personal accounts

16 with multiple banks. PSR, ¶ 17; Docket No. 48, p. 9. In furtherance

17 of his crimes, time and time again, defendant made fraudulent entries

18 in Company-1's accounting software, SAP, account records, falsely

19 representing that the wire transfers were authorized payments of

20 money due to the company's clients on the dates and in the amounts

21 indicated in the SAP accounting records made by defendant. PSR, ¶ 17;

22 Docket No. 48, p. 10. Those payments were never made to Company-1's

23 clients until defendant's crime was uncovered (if at all), a breach

24 of trust and obligation not only to Company-1 as its Comptroller and

25 a Vice President.  Defendant also breached the trust and obligations

26 owed to the young and perhaps unsophisticated YouTube, Instagram, and

27 other social media influencers and creators, who earned money through

28 their work on said platforms, that were needed to support their

families. Docket Nos. 48, p. 8; 79, p. 2.  Those clients relied upon defendant to do his job, when instead, he stole millions from them. He lied to his co-workers when he emailed that he had paid the clients, when he had not.  Docket Nos. 48, pp. 8-9, 11; 79, p. 2. After the stolen funds were transferred into one of his personal bank accounts, defendant used the money to either pay personal expenses, including people to whom he owed money from gambling, or to fund his crypto-currency account, all methods undertaken to avoid any detection or raise any suspicion.  Docket No. 48, p. 10.

In another part of his scheme, he falsely represented on the user activity records for Company-1's SVB bank account that the massive transfers from Company-1's SVB account to defendant's Chase account were "equity" draws owed to him by the company. Id. In fact, defendant never made any capital contributions but again, tricked anyone who would review the statements to cover his crimes.

Defendant created false documents and forge signatures on these documents of his superior and owner of Company-1, S.H., to hide his transfers, and quell any inquiry as to the business purposes (or lack thereof) of the money, $230,000. Id. Defendant faked a lease agreement for the rental of a condo in Mexico, and Western Union wire transfer letters.  Id., p. 11.  Defendant abused his status as Comptroller and Vice President to provide legitimacy to statements and emails that assured Company-1's executives, employees, clients, outside vendors, and financial institutions that he was honestly performing his job duties, when for years, the opposite was true.

Defendant's scheme was not an accident; it was deliberate and brazen, or as S.H. phrased it, "calculated and deliberate." Docket No. 79, p. 2.  His scheme financially devastated Company-1. PSR, ¶

22. More than 60 employees of Company-1 have lost their jobs –
Company-1 ceased to exist because of defendant's stealing.  PSR, ¶
22e.  Through no fault of their own, the 60 individuals were abruptly
forced to find other work to support themselves and their families,
all due to defendant's uncontrolled greed and addiction.

The people who created and worked for and with Company-1 also
experienced a grave loss.  The Chief Financial Officer, defendant's
supervisor, who discovered defendant's crimes, discussed the personal
impact of defendant's actions upon her.  PSR, ¶ 22.  This person
suffers from very real and lasting health concerns because of
defendant. Id. This victim worked long and difficult hours unwinding
defendant's scheme, when in the end, this person also lost her job
when Company-1 collapsed. Id. Company-1's finance team spent two
years internally investigating defendant's crimes after they were
uncovered -- the very people that defendant worked closely with
confronted this crime on a daily basis, until all of defendant's
fraud was uncovered.  PSR, ¶ 22; Docket No. 79, p. 2.

The CEO of Company-1 vividly described the pain and destruction
defendant caused upon herself and the other employees who comprised
Company-1, who simply came to work each day to earn an honest living.
Docket No. 79, p. 2.  The CEO lost the company she created and
developed for eight years. Id.  All the while, defendant worked
alongside Company-1's employees with whom he socialized and who
likely believed he was their friend.  The same people who supported
and developed his career at Company-1, provided him limitless
opportunities, and professional growth. Id. The personal betrayal and
loss of 60 individuals' work adequately support a sentence of 102
months.

1    Defendant's actions upon discovery of his crimes are mitigating

2    factors.  Defendant accepted responsibility, pleaded guilty,

3    voluntarily entered in-patient rehabilitation for a substantial

4    amount of time, and met with counsel for Company-1 on several

5    occasions to assist its internal investigation.  For these reasons,

6    the government agrees that the three-level reduction for acceptance

7    of responsibility is appropriate. The government notes that defendant

8    will likely explain his meetings with Company-1's counsel in greater

9    detail, but regardless, defendant's cooperation is part of the

10   acceptance of responsibility for his actions, nothing more.  Part of

11   defendant's qualification for the three-level reduction under

12   U.S.S.G. § 3E1.1 is his voluntary assistance in recovery of the

13   fruits and instrumentalities of the offense.  U.S.S.G. § 3E1.1,

14   Application Note 1.  Also, defendant's post-offense conduct in

15   seeking addiction treatment does not warrant a variance from the

16   recommended Sentencing Guidelines range.  Again, post-offense

17   rehabilitative efforts, while admirable, is part of defendant's

18   acceptance of responsibility and the appropriate three-level

19   reduction.

20   Overall, the Sentencing Guidelines account for the seriousness

21   of defendant's conduct, that include the staggering amount of

22   monetary losses, defendant's use of sophisticated means, the

23   devastating effects on Company-1 and its human victims, and

24   defendant's repeated abuse of his position of trust.  The government

25   submits that the low-end of the Sentencing Guideline range

26   appropriately balances the brazenness of defendant's conduct with the

27   mitigating factors of his acceptance of responsibility.

28

**B.   History and Characteristics of Defendant**

Section 3553(a)(1) also instructs the Court to consider a defendant's characteristics in fashioning a reasonable sentence. In this case, defendant's history and characteristics support a Guidelines range sentence.

From defendant's own account, defendant reported having a privileged childhood, living with both parents in an "upper-middle-class" neighborhood. PSR, ¶¶ 57, 59.  Defendant received a solid secondary and post-secondary education, a benefit not available to many.  PSR, ¶¶ 80-82.  After receiving his college degree, defendant quickly found jobs in his chosen field in a new city, Los Angeles, until he found work with Company-1 in September 2013.  PSR, ¶¶ 84-86. Shortly after joining Company-1, executives within Company-1 found defendant's financial skills and judgment to be valuable, and in turn, promoted him to Controller and Vice President of Accounting and Finance, and paid him a more-than-adequate salary of $140,000, plus bonuses. PSR, ¶¶ 13, 84.

Defendant's addiction, whether to gambling or substances, is not disputed by the government. The government does not question that defendant has an addiction, one that arose early in his life. PSR, ¶ 60.  However, even at a young age, defendant received multiple treatments and opportunities to address his addiction. Even in his interview with USPPO, defendant failed to admit the full extent of his addiction when he did not disclose his alcohol and marijuana use, and subsequent court ordered treatment he received.  Rather, it was defendant's father who disclosed defendant's participation in court ordered outpatient treatment for marijuana use and drinking when defendant was 16- and 17-years-old. PSR, ¶ 79. Again, at the age of

22, perhaps encouraged by skills learned at the court mandated

addiction treatment, defendant admitted to his parents that he had a

gambling addiction. PSR, ¶ 74.  Defendant received treatment at UCLA

through an outpatient treatment program in approximately 2011, aided

with his parents' support. Id.

However, despite the three experiences with addiction treatment,

and the steady support of his parents, defendant ignored his past

addiction, when he rose to a position within Company-1 that gave him

unfettered access to its money.  Instead of being honest, asking for

assistance, and putting in the undisputed difficult and hard work

done in addiction treatment programs, defendant sadly relapsed in an

astonishing fashion.  Armed with skills learned in the treatment he

received thrice before, and ample opportunities and people to assist

him, defendant took an easier route, and thus began his years' long

pattern of lying to his employer about his prior gambling history.

Defendant failed to advise his company that unchecked access to large

sums of money would not be wise (or healthy for him), abused the

trust his employer had given him, lied to those he reported to,

supervised, and his fellow co-workers, used their identities to cover

his crimes and then, time after time, in sums as large as $230,000 at

a time, stole from his company to feed into this long-standing

addiction.

These are the facts demonstrate defendant's true character.

**C.    Deterrence and Respect for the Law**

A 102-month Guidelines sentence adequately addresses the need

for the sentence imposed "to promote respect for the law," as well as

"the need to afford adequate deterrence to criminal conduct."

Defendant's sentence must provide adequate deterrence to criminal

1   conduct, both to deter the defendant from committing future crimes,

2   and deter others who made by disposed to commit similar offenses.

3        As addressed above, defendant was very aware of his addiction,

4   yet, failed to disclose it to his employer when it presented him with

5   a job that would trigger this addiction.  As such, defendant's

6   history and characteristics, as well as the nature and circumstances

7   of his crimes, demonstrate that defendant poses a significant

8   recidivism risk.  Defendant's crime was not one of opportunity or a

9   one-time mistake.  His scheme spanned years and required active and

10  deliberate measures to defraud Company-1 for his own benefit.  Also

11  noted by the USPPO, a significant sentence <u>may</u> deter defendant from

12  future criminal conduct.  Disclosed Letter, p. 5 [emphasis added].

13  The recommended three-year term of supervised release will ensure

14  defendant is closely monitored upon release into the community.  <u>Id.</u>,

15  p. 6.

16       In addition, a significant sentence is necessary to deter other

17  similarly situated individuals.  As this Court is aware, fraud runs

18  rampant through this district and, unfortunately, recent tragedy,

19  like the COVID-19 pandemic, has only created more opportunities for

20  fraud.  Many are interested in the outcome of this case, which has

21  generated substantial press.  A significant sentence is needed to

22  deter defendant and others who contemplate executing similar

23  fraudulent schemes.

24       **D.   Protection of the Public from Further Crimes**

25       As noted in the Disclosed Letter, USPPO highlighted that

26  defendant continues to pose a significant threat to the community at

27  large.  Disclosed Letter, p. 5.  The recommended sentence of 102

28

months will serve to protect the community during defendant's incarceration.  The government wholly agrees with USPPO.

**E.   Need to Provide Educational or Vocational Training**

The need to provide defendant with any educational or vocational training, medical care, or other correctional treatment may be a minor factor in this case.  While defendant is educated in finance accounting, upon release, defendant may not able to resume or find work in that area, so further education or different vocation may be needed.

**F.   Need to Avoid Unwarranted Sentencing Disparities**

A within-Guidelines sentence of 102 months of imprisonment would ensure that defendant does not receive a sentence below or above what other similarly situated defendants would receive.  For example, very recently, in a case bearing striking similarities to the instant one, Hon. John A. Kronstadt sentenced a defendant who embezzled $36 million from his employer to a within-Guidelines sentence of 126 months. United States v. Paul McDaniel, Case No. 2:17-cr-00570-JAK, Docket No. 116 (C.D.C.A., April 9, 2021)[1].

**G.   Restitution**

Restitution is mandatory pursuant to the Mandatory Victims Recovery Act ("MVRA").  18 U.S.C. § 3663A.  Defendant has agreed that the loss incurred through his scheme to defraud is $22,669,979.07. Docket No. 48, p. 11.  As such, the Court should enter a restitution order against defendant in favor of Company-1 in that amount.

---

[1]    Defendant McDaniel plead guilty to one violation of wire fraud and was a criminal history category III, unlike defendant herein, who also plead to aggravated identity theft that requires the Court to sentence defendant to a 24-month sentence to run concurrently with any sentence the Court may impose for the wire fraud count and is Criminal History Category I.

## IV. Conclusion

As a victim told this Court, defendant caused severe "pain and destruction" to many people and "destroyed lives" when he meticulously, deceptively, and callously stole over $22 million from Company-1. Defendant caused tremendous and long-lasting tangible and intangible damage and hardship to Company-1, its parent company, and to its employees. Defendant made deliberate and criminal choices to take advantage of the responsibility he earned for personal profit at the expense of his employer. Defendant engaged in a fraud that lasted many years and caused significant harm.

For the reasons set forth above, the government respectfully requests that the Court find that defendant's total offense level is 28 and sentence him to 102 months, the low-end of the applicable advisory Sentencing Guideline range. The government submits that this sentence is sufficient, but not more than necessary to achieve the goals of sentencing and appropriately reflects the aggravating factors in this case. To the extent there are any mitigating factors, those are recognized by imposing a low-end sentence. The Court should further order the defendant to pay restitution in the total amount of $22,669,979.07 to Company-1.

There is little doubt that defendant's significant criminal conduct warrants an equally significant prison sentence. There are no other section 3553(a) factors in this case which weigh against imposition of such a sentence upon defendant; to the contrary, the section 3553(a) factors on balance support the imposition of the recommended Guideline punishment.

TRACY L. WILKISON
United States Attorney
SCOTT M. GARRINGER
Assistant United States Attorney
Chief, Criminal Division
ALEXIS D. GREGORIAN
Assistant Chief
EMILY Z. CULBERTSON (CA Bar No. 282560)
Trial Attorney
United States Department of Justice
Fraud Section, Criminal Division
    300 North Los Angeles Street, Suite 2001
    Los Angeles, California 90012
    Telephone: (202) 768-1172
    E-mail:   alexis.gregorian@usdoj.gov
               emily.culbertson@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | No. 2:16-CR-00415-GW |
| Plaintiff, | GOVERNMENT'S SENTENCING MEMORANDUM |
| v. | |
| DONALD WOO LEE,<br>  aka "Donald Lee,"<br>  aka "Donald Woolee," | Hearing: April 28, 2022<br>Time: 8:00 a.m.<br>Courtroom: 9D |
| Defendant. | |

    Plaintiff United States of America, by and through its counsel of record, the Fraud Section of the United States Department of Justice, hereby files its Sentencing Memorandum with respect to defendant Donald Woo Lee.

    This Sentencing Memorandum is based upon the attached memorandum of points and authorities, the files and records in this case, the revised Presentence Investigation Report ("revised PSR"), and such

1  further evidence and argument as the Court may permit at the

2  sentencing hearing.

3   Dated: April 14, 2022                Respectfully submitted,

4                                        TRACY L. WILKISON
                                         United States Attorney
5
                                         SCOTT M. GARRINGER
6                                        Assistant United States Attorney
                                         Chief, Criminal Division
7
                                                    /s/
8                                        _____
                                         ALEXIS D. GREGORIAN
                                         EMILY Z. CULBERTSON
9                                        Criminal Division, Fraud Section
                                         United States Department of Justice
10
                                         Attorneys for Plaintiff
11                                       UNITED STATES OF AMERICA

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# **TABLE OF CONTENTS**

MEMORANDUM OF POINTS AND AUTHORITIES.................................1

I.   INTRODUCTION....................................................1

II.  OFFENSE CONDUCT................................................2

          1.   Defendant Donald Woo Lee...........................2

          2.   Venous Insufficiency and Vein Ablation.............3

          3.   Medicare Coverage of Vein Ablation Procedures......4

          4.   Defendant Performed Medically Unnecessary Vein
               Ablation Procedures on his Patients................5

          5.   Patient Testimony..................................8

          6.   Upcoding for Vein Ablation Claims to Medicare.....10

          7.   Reuse and Storage of Single-Use ClariVein
               Catheters.........................................14

          8.   False Statements in Bankruptcy....................17

III. POST-CONVICTION CONDUCT.......................................21

IV.  GUIDELINES CALCULATION........................................23

     A.   Loss Amount..............................................24

          1.   Legal Standard....................................24

     B.   Federal Health Care Offense.............................27

     C.   Abuse of a Position of Trust............................27

V.   RESTITUTION...................................................29

     A.   The Court Must Order Restitution in this Case...........29

     B.   Restitution Is Due and Payable Immediately, but
          Defendant May Pay According to the Recommended
          Schedule While the Government Pursues Other Avenues to
          Satisfy the Restitution Order...........................31

VI.  ANALYSIS OF THE SECTION 3553(a) FACTORS.......................33

     A.   Nature and Circumstances of the Offenses................34

     B.   History and Characteristics of the Defendant............35

i

C.    Deterrence, Promoting Respect for the Law, and
      Punishing Defendant for His Crimes.......................37

VII. CONCLUSION....................................................38

1

**TABLE OF AUTHORITIES**

<u>CASES</u>

2

3

United States v. Agbu,
     640 Fed. App'x 613 (9th Cir. 2016)............................25

4

United States v. Booker,
     543 U.S. 220 (2005).........................................33

5

United States v. Bryant,
     128 F.3d 74 (2d Cir. 1997).................................27

6

United States v. Carty,
     520 F.3d 984 (9th Cir. 2008)................................33

7

8

United States v. Gunning,
     339 F.3d 948 (9th Cir. 2003)................................32

9

United States v. Hawkins,
     392 F. Supp. 2d 757 (W.D. Va. 2005).........................32

10

11

United States v. James,
     312 F. Supp. 2d 802 (E.D. Va. 2004).........................32

12

United States v. Koenig,
     952 F.2d 267(9th Cir. 1991).................................26

13

14

United States v. Laurienti,
     731 F.3d 967 (9th Cir. 2013)................................28

15

United States v. Martin,
     278 F.3d 988 (9th Cir. 2002)................................29

16

17

United States v. Popov,
     742 F.3d 911 (9th Cir. 2014)................................25

18

United States v. Ross,
     310 F. App'x 160 (9th Cir. 2009)............................29

19

20

United States v. Scrivener,
     189 F.3d 944(9th Cir. 1999).................................27

21

United States v. Serrano,
     234 Fed. Appx. 685 (9th Cir. 2007)..........................25

22

23

United States v. Shepherd,
     171 Fed. App'x. 611 (9th Cir. 2006).........................25

24

United States v. Walter-Eze,
     869 F.3d 891 (9th Cir. 2017)................................25

25

26

27

28

iii

**STATUTES**

18 U.S.C. § 1347.................................................1, 30

18 U.S.C. § 152(3).........................................1, 17, 21

18 U.S.C. § 3553.................................33, 34, 35, 38

18 U.S.C. § 3555.................................................33

18 U.S.C. § 3572.................................................29

18 U.S.C. § 3663A................................................30

18 U.S.C. § 3664.................................29, 30, 31, 32

**MISCELLANEOUS**

15 C.C.R. § 3999.325............................................22

U.S.S.G. § 2B1.1.................................24, 25, 26, 27

U.S.S.G. § 2F1.1.................................................26

U.S.S.G. § 3B1...................................24, 27, 28

iv

<u>**MEMORANDUM OF POINTS AND AUTHORITIES**</u>

**I.   INTRODUCTION**

On October 16, 2019, a jury found defendant Donald Woo Lee ("defendant") guilty of seven counts of health care fraud, in violation of Title 18, United States Code, Section 1347, and one count of adulteration of a medical device, in violation of Title 21, United States Code, Sections 331(k), 333(a), and 351(a)(2)(A), as charged in a June 7, 2018 superseding indictment (Dkt. 38, 147).  The United States Probation Office ("USPO") issued its Presentence Investigation Report on February 6, 2020.  (Dkt. 163.)  On March 2, 2020, defendant pleaded guilty to one count of false declarations in a bankruptcy proceeding, in violation of Title 18, United States Code, Section 152(3), which was also charged in the June 7, 2018 superseding indictment.  (Dkt. 167.)  The USPO issued a revised PSR on May 4, 2020.  (Dkt. 174 ["revised PSR"].)  The government filed its objection to the revised PSR on May 18, 2020.  (Dkt. 175.)

Defendant's sentencing was continued numerous times between March 2020 and January 2022.  During that time, defendant had been ordered to stop practicing medicine and surrender his license. Nevertheless, defendant continued to practice medicine by offering and performing invasive procedures on patients and sold foreign unapproved products for use on patients.  As a result, the government moved this Court to remand defendant to custody.  The Court found defendant in violation of his bond and ordered him detained.  (Dkt. 207.)  Defendant entered custody on February 3, 2022.

For the reasons set forth below, and consistent with the revised PSR, the government respectfully submits that the Court should find that the total offense level for defendant is 31.  Based on the

1  finding in the revised PSR that defendant is in criminal history

2  category I, the resulting advisory guidelines range is 108-135

3  months.  The government submits that a sentence of 120 months of

4  imprisonment, followed by three years of supervised release, a

5  restitution order of $4,587,533.79, and a special assessment of $900

6  is sufficient, but not greater than necessary, to provide just

7  punishment in this case, promote respect for the law, and deter

8  defendant and others from committing similar crimes in the future.

9  **II.  OFFENSE CONDUCT**

10      The Court is no doubt familiar with the facts of this case,

11  having presided over the trial of defendant in October 2019.

12  Nevertheless, given the intervening years between defendant's trial

13  conviction and sentencing, a detailed review of the facts in this

14  case is set forth below.

15              1.  Defendant Donald Woo Lee

16      According to the evidence, defendant was an internal medicine

17  physician who owned, operated, and oversaw several medical clinics in

18  the greater Los Angeles area, including in Temecula, Mira Loma,

19  Hemet, and Blythe, California. (Trial Tr. 457:23-458:19 (testimony of

20  Donna Knobloch).[1]) Defendant admitted that he enrolled as a Medicare

21  provider from 2012 to 2016 and agreed not to knowingly present or

22  cause to be presented a false or fraudulent claim for payments by

23  Medicare; and not to submit claims with deliberate ignorance or with

24  reckless disregard for their truth or falsity. (Trial Tr. 1346:4-14

25  (testimony of Donald Woo Lee.)  Defendant also knew he could only

26

27  [1] The Trial transcripts are available on CM/ECF as Dkt. Nos. 150
   (pgs. 1-134); 124 (pgs. 135-296); 152 (pgs. 297-430); 125 (pgs. 431-
28  603); 154 (pgs. 604-667); 126 (pgs. 668-815); 156 (pgs. 816-953); 127
   (pgs. 954-1134); 158 (1135-1374); and 160 (pg. 1375-1488).

2

1  submit claims for medically necessary services, and that he was

2  responsible for all Medicare claims.  (Trial Tr. 1346:15-1347:2.)

3  Defendant also agreed to submit claims that were accurate, complete,

4  and truthful.  (Trial Tr. 1347:3-5.)

5       Beginning in or around August 2012, Lee started submitting

6  claims to Medicare for vein ablation procedures.  (See Trial Tr.

7  1192:23-25 (testimony of SSA Kelly Berwanger).) Between August 2012

8  and August 2015, defendant billed Medicare approximately $12,476,350

9  for vein ablation procedures and ultrasound codes, and was paid

10 $4,587,533 as a result.  (Trial Tr. 1193:4-8.)

11            2.   Venous Insufficiency and Vein Ablation

12      As the government's medical expert, Dr. Steven Zimmet testified

13 at trial that vein ablation is a treatment for incompetent saphenous

14 veins.  (Trial Tr. 755:18-20 (testimony of Dr. Steven Zimmet).)

15 There are various treatments available for venous insufficiency in

16 saphenous veins.  Treatment is elective; venous insufficiency is

17 neither life-threatening nor limb-threatening.  (Trial Tr. 754:7-19.)

18 There are both conservative and procedural treatment options.

19 Conservative treatments include graduated medical compression

20 stockings, exercises, leg elevation, and sometimes losing weight,

21 whereas vein ablation is the typical procedural treatment for

22 incompetent saphenous veins.  Vein ablation means closing or sealing

23 off the incompetent vein so the blood doesn't pool and instead re-

24 routes through other, normal veins.  (Trial Tr. 754:20-756:1.)

25      There are several types of vein ablation methods, but the method

26 most relevant to this case is mechanical-chemical ablation, or

27 "MOCA."  In this method, a catheter is inserted into the incompetent

28 vein and a chemical agent, known as sclerosant, is delivered into the

vein through a rotating wire.  Together, the sclerosant and rotating wire seal the incompetent vein.  The device that performs this MOCA method is marketed under the commercial name "ClariVein." (Trial Tr. 756:2-14.)  The ClariVein device is a single-use device, meaning it should be disposed of after use. This is stated in ClariVein's instructions for use and is also printed on the box the ClariVein devices arrives inside.  (Trial Tr. 759:5-12.)

Vein ablation is not always appropriate for patients with incompetent saphenous veins; there are several contraindications.  If a patient cannot walk well, vein ablation is not advised because it places the patient at high risk for a blood clot.  Vein ablation is also contraindicated if the patient has significant peripheral arterial disease (known as "PAD"), has an infection in the area, or is allergic to the sclerosant.  (Trial Tr. 770:6-77:7.)

3.   Medicare Coverage of Vein Ablation Procedures

As demonstrated by the evidence introduced at trial, Medicare covers vein ablation procedures in certain circumstances only. Medicare will cover vein ablation procedures only if the procedure is actually provided and if there are significant symptoms.  Medicare does not cover vein ablation procedures if they are cosmetic only. (See Trial Tr. 271:2-4 (testimony of Shannon Bartlett); 772:5-13 (testimony of Steve Zimmet, MD).)

Medicare's coverage of vein ablation procedures during the relevant time period (2012-2015) was set forth in documents called Local Coverage Determinations ("LCDs").  (Trial Tr. 273:1-21 (testimony of Shannon Bartlett); Ex. A (Gov. Exs. 401-402[2]).)

---

[2] "Gov. Ex." refers to the government trial exhibit number.

According to these LCDs, in order for Medicare to consider vein ablation medically necessary, a patient had to have the following symptoms: (a) an ulcer in their leg, (b) pain or edema that would interfere with their activities of daily living, such as dressing or doing housework, (c) bleeding associated with the veins, (d) recurrent phlebitis, which is irritation of the lower legs, or (e) edema or swelling of the legs that does not go away.  (Trial Tr. 274:22-275:20); Ex. A (Gov. Exs. 401-402).)  Medicare required that these symptoms be documented in a patient's medical record and even if a patient had one of these symptoms documented, Medicare still required that the patient try conservative treatment before Medicare would cover vein ablation. (Trial Tr. 276:5-11.)  According to the LCDs, conservative treatment included weight reduction, daily exercise, elevation of the leg, and compression stockings for a period of 6-8 weeks.  This conservative treatment had to have failed and also be documented in the patient's record before Medicare would consider vein ablation medically necessary.  (Trial Tr. 276:14-277:18.)

        4.   Defendant Performed Medically Unnecessary Vein Ablation Procedures on his Patients

Defendant set up one of his clinics in a senior living community in Mira Loma, California.  (Trial Tr. 1206:18-1207:2 (testimony of SSA Kelly Berwanger).)  Defendant performed vein ablation procedures on 49 of the Medicare patients in this senior living community alone. (Trial Tr. 1207:6-12); Ex. B (Gov. Ex. 1214).)  Defendant not only performed vein ablations on many patients, but also performed many ablations on each patient.  Agent Berwanger testified that among all the patients who received vein ablations, 83% received more than one

1   ablation, and 51% of the patients received four or more vein

2   ablations.  (Trial Tr. 1196:16-1197:25.)   The average number of

3   ablations defendant gave to each patient was 3.7 procedures.  (Trial

4   Tr. 1198:1-3.)

5       Agent Berwanger testified at trial that when she and a team of

6   agents executed a search warrant at defendant's Temecula office, they

7   seized the medical records of Medicare patients to whom defendant had

8   provided vein ablations.  (Trial Tr. 1175:15-1176:7.)   From these

9   files, the case agents randomly selected 35 patients (amounting to

10  approximately 10% of the total pool of 333 patients).  (Trial Tr.

11  1176:23-1177:13.)   The medical records of these 35 patients were then

12  provided to Dr. Zimmet, along with the seven additional patients who

13  had been previously interviewed during the investigation, including

14  Patricia Chastain, Sam Meek, Cosmas Castille, Flossie Smalley, and

15  Christine Bronson.  (Trial Tr. 1177:14-18; 1176:2-3.)

16      Dr. Zimmet testified about his review of these 42 patients'

17  medical files. (Trial Tr. 789:8-18.)   Based on his review, Dr. Zimmet

18  concluded that the vein ablation procedures defendant performed on

19  these patients and billed to Medicare were neither medically

20  necessary under Medicare's guidelines nor within the standard of

21  care.  (Trial Tr. 789:19-790:9.)

22      Moreover, in reviewing the number of veins defendant ablated in

23  each of these 42 patients compared to several study results published

24  in well-regarded, peer-reviewed medical journals, it was clear that

25  defendant performed many more vein ablations on his patients than was

26  typical in the field.  (Trial Tr. 791:25-797:13.)   For example, one

27  study examined over 340,000 Medicare patients across 10,000 medical

28  providers and across that large number of Medicare patients, there

1    was an average of 1.8 vein ablation per patient.  In comparison, of

2    the 42 patient files that Dr. Zimmet reviewed, defendant performed an

3    average of 4.2 ablations per patient—that is, more than double the

4    average number of ablations in the study.  (Trial Tr. 793:24-794:19.)

5         With respect to the five patients listed in the indictment, Dr.

6    Zimmet found that none of them had documented reflux in their patient

7    files and that many of them had contraindications—reasons that vein

8    ablations should not be performed on those patients.  (Trial Tr.

9    831:10-16 (Sam Meek); 831:3-22 (Christine Bronson); 843:7-24 (Cosmas

10   Castille); 854:15-855:3 (Patricia Chastain); 862:11-863:13 (Flossie

11   Smalley).)  Indeed, Dr. Zimmet pointed out that for some of these

12   patients, vein ablation was contraindicated because the surgery was

13   elective and the patients' health was too weak to support providing

14   elective surgery.  (Trial Tr. 808:20-25; 809:16-25; 847:5-19; 866:5-

15   13.)  Dr. Zimmet also noted that the medical records of several of

16   these patients reflected that the patients suffered pain as a result

17   of the unnecessary vein ablations that defendant provided.  For

18   example, Mr. Castille's patient record reflected a few weeks after

19   his vein ablation he complained of "pain, stiffness in both legs ever

20   since the procedure, ankle to his knees, most of the time it's 10 out

21   of 10 pain."  (Trial Tr. 852:17-853:15.)  Despite this "worst

22   imaginable pain," Dr. Lee performed additional unnecessary vein

23   ablation procedures on Mr. Castille two weeks later.  (Trial Tr.

24   853:11-24.)  Ms. Flossie Smalley's medical record indicated that she

25   was afraid to do the procedure.  (Trial Tr. 871:23-872:6.)  She was

26   treated for a surgical wound after defendant gave her a vein

27   ablation, and received additional ablations from defendant after

28   that.  (Trial Tr. 877:20-878:22.)  The records also supported that

1   Ms. Smalley received a nerve injury from one of the many ablations

2   defendant gave her, causing a "shocking feeling" that made "her whole

3   leg jump." (Trial Tr. 879:2-880:6.) Even after this issue,

4   defendant wanted to schedule more ablations on Ms. Smalley. (Trial

5   Tr. 880:22-881:19.)

6        Agent Berwanger also testified that Medicare conducted a medical

7   review of the medical records seized from defendant's Temecula

8   office. (Trial Tr. 1178:13-24.) Medicare contractor Safeguard

9   Services ("SGS") performed a medical review of the medical records

10  for 95 randomly-selected patients among those that received vein

11  ablation from defendant. (Ex. C.) This medical review found that

12  100% of the claims would have been denied because in many instances

13  the documentation in the medical records did not support that the

14  patients needed vein ablation, and in other instances, defendant used

15  CPT code of 37241 when he should have used the code for vein

16  ablation. (Id. at 1, 2, 4.)

17        5.   Patient Testimony

18        As further described below, Medicare beneficiaries Flossie

19  Smalley, Christine Bronson, and Patricia Chastain testified at trial

20  that they did not have varicose veins, yet defendant recommended that

21  each of them get multiple vein ablations without first recommending

22  that they try conservative care. The parties also stipulated to the

23  testimony of Medicare beneficiaries Sam Meek and Cosmas Castille.

24  Several of these beneficiaries experienced pain as a result of the

25  unnecessary vein ablations defendant performed on them, yet defendant

26  callously continued to perform and/or recommend additional vein

27  ablations.

28

1    Flossie Smalley testified that she has never had varicose veins,

2   and that defendant recommended vein ablation to help her with

3   neuropathy.  (Trial Tr. 348:9-17.)  Defendant did not recommend any

4   conservative treatments before she received the ablations.  (Trial

5   Tr. 347:24-348:4.)  Defendant asked Ms. Smalley to get vein ablation

6   "[m]any, many times," but Ms. Smalley was fearful of the treatment.

7   (Trial Tr. 349:12-20.)  Defendant ablated seven or eight veins on Ms.

8   Smalley.  (Trial Tr. 351:13-19.)  After one of the ablations, she got

9   a painful infection.  (Trial Tr. 352:10-16.)  One of the ablations

10  caused Ms. Smalley to have a nerve injury which felt like "electrical

11  shocks."  (Trial Tr. 353:13-20.)  Defendant gave her methadone to

12  treat the nerve injury which caused her to sleep for two days.

13  (Trial Tr. 354:5-18.)  The "painful electrical shocks" still affected

14  her years later. (Trial Tr. 355:7-16.)  Ms. Smalley also submitted a

15  victim statement for sentencing, which is attached hereto as Exhibit

16  D.  According to Ms. Smalley's victim statement, "it took [defendant]

17  a year to persuade me to accept his procedures when I did not have a

18  clear sign it was needed.  This aggression was unnecessary, I am

19  daily continuously suffering as a result . . . ."  (Ex. D at 2.)

20    Christine Bronson testified that she did not have any bulgy

21  twisty veins, and that defendant never recommended any conservative

22  treatment before ablating her veins.  (Trial Tr. 366:8- 369:18;

23  370:25-731:14.)  Ms. Bronson also testified that she was surprised

24  when she received an explanation of benefits from Medicare that

25  defendant charged $17,800 for a 30-minute procedure particularly

26  because she had just had a multi-hour shoulder replacement surgery

27  which cost $5,000.  When she asked defendant why he charged so much,

28

Case 8:19-cr-00061-JVS   Document 1048-1   Filed 11/21/22   Page 168 of 332   Page ID
#:25560
Case 2:16-cr-00415-GW   Document 211   Filed 04/14/22   Page 16 of 44   Page ID #:2952

1  he said that if "he didn't bill this kind of bill, that he wouldn't
2  get paid what he needed to."  (Trial Tr. 376:10-378:10.)

3      Patricia Chastain testified that she did not have any varicose
4  veins when she went to see defendant.  (Trial Tr. 395:3-7.)  She felt
5  that defendant was impatient with her.  (Trial Tr. 400:4-9.)  Ms.
6  Chastain testified that, after the procedure, she had a knot develop
7  above her knee and went to her primary care physician, Dr. Matthias,
8  to get it checked out.  (Trial Tr. 403:10-19.)  Dr. Matthias
9  testified that he examined both legs and they looked fine, so he told
10 Ms. Chastain not to get any more procedures done for varicose veins.
11 (Trial Tr. 419:15-24; 422:1-5.)

12     The parties stipulated that Sam Meek would have testified that
13 he never had varicose veins, and that defendant never recommended any
14 conservative treatment options such as compression stockings or leg
15 elevation, and that defendant performed four ablations on Mr. Meek.
16 (Trial Tr. 585:6-586:1.)

17     The parties also stipulated that Cosmas Castille would have
18 testified that defendant did not recommend any conservative care
19 treatment options and performed two vein ablations on Mr. Castille.
20 After the ablations, Mr. Castille had a lot of trouble with his leg
21 including swelling and cramping.  (Trial Tr. 583:7-584:20.)

22         6.   Upcoding for Vein Ablation Claims to Medicare

23     In medical billing, there is a set of codes that medical
24 providers use to submit claims to insurance providers like Medicare.
25 These are referred to as current procedural terminology ("CPT")
26 codes.  The American Medical Association promulgates this set of
27 codes in a CPT Code Manual and updates them on a yearly basis.
28 (Trial Tr. 281:7-282:6 (testimony of Shannon Bartlett).)

The evidence introduced at trial demonstrated that defendant knowingly used the incorrect CPT code to bill Medicare for ClariVein procedures in order to receive a higher reimbursement than that to which he was entitled.  CPT Code 37241 was introduced in the CPT Code Manual in January 2014 to bill for vascular embolization and occlusion procedures.  (Ex. E (Gov. Ex. 404).)  Vascular embolization or occlusion typically involves the installation of a coil or a plug into a vein.  It's done in a specialized setting and it is not done on saphenous veins.  Moreover, ClariVein is not vascular embolization or occlusion.  (See Trial Tr. 790:15-18 (testimony of Steve Zimmet, MD); Trial Tr. 1077:16-1078:3 (testimony of Adam Saltman, MD).)

Defendant was made aware that CPT code 37241 was an inappropriate code to use for ClariVein on five separate occasions throughout 2014 and 2015.  First, defendant received an email in March 2014 two months after code 37241 came out.  The email had an attachment that stated that the American Medical Association said that for ClariVein procedures, code 37799, not code 37241 should be billed.  (Ex. F (Gov. Ex. 503).)  Defendant clearly opened and reviewed this email because he forwarded it.  Nevertheless, defendant kept billing Medicare using code 37241.  He billed Medicare over $11.3 million using code 37241 following this email. (Trial Tr. 1220:12-1221:22 (testimony of SSA Kelly Berwanger); Ex. G (Gov. Ex. 1232).)

Second, in April 2014, a coding alert was issued by Medicare. This coding alert made clear that code 37241 "must not be used to bill" Medicare for ClariVein vein ablation procedures.  Defendant continued to use code 37241 to submit claims to Medicare, billing close to $11 million with code 37241 after this coding alert came

11

out.   (Trial Tr. 1221:23-1222:22; Ex. F (Gov. Ex. 503), Ex. H (Gov. Ex. 1233).)

Third, in November 2014, defendant received an email from Geoff Heldoorn, a salesman who sold ClariVein catheters to defendant, that included as an attachment an article from CPT Assistant.  That article said code 37799 should be used to bill for ClariVein and that it is "incorrect" to use code 37241.  Defendant continued to bill Medicare another $6.5 million for ClariVein procedures using the wrong code, 37241.  (Trial Tr. 1222:23-1223:20; Ex. I (Gov. Ex. 504), Ex. J (Gov. Ex. 1234).)

Fourth, in January 2015, defendant was forwarded an email containing Medicare's position regarding the use of code 37241 to bill Medicare for ClariVein.  The email said not to bill CPT 37241 for the ClariVein procedure.  Defendant still billed Medicare close to $5.8 million using the wrong code, 37241, after he received this email.  (Trial Tr. 1223:21-1225:1; Ex. K (Gov. Ex. 505), Ex. L (Gov. Ex. 1235).)

Finally, in October 2015, Medicare issued a revised LCD, specifically stating that ClariVein should be billed using code 36299.  Following the issuance of this LCD, defendant billed Medicare another $2.5 million for ClariVein using the wrong code, 37241. (Trial Tr. 1225:2-15; Ex. M (Gov. Ex. 403), Ex. N (Gov. Ex. 1236).)

Defendant billed Medicare approximately $8,900 for every ClariVein procedure he billed using CPT code 37241.  By comparison, he billed Medicare approximately $3,000 for a similar procedure, vein ablation using radiofrequency.  (Ex. O (Gov. Ex. 1206); Trial Tr. 1200:8-14.)  Defendant was an outlier in the Medicare data for his use of code 37241. Compared to the 3,600 medical providers nationwide

1  who submitted claims to Medicare using code 37241, defendant was

2  number two in the country and number one in California.  In total,

3  between January 2014 and December 2016, defendant billed Medicare

4  over $13,500,000 using code 37241.  (Trial Tr. 1201:15-1203:7; Ex. P

5  (Gov. Ex. 1208).)

6      This was not defendant's first experience with fraudulent

7  upcoding.  The government introduced at trial an Accusation and

8  Stipulated Settlement between defendant and the California Medical

9  Board.  (Trial Tr. 1226:10-25; Ex. Q (Gov. Ex. 1101).)  The

10 Accusation alleged that defendant performed nonsurgical laser vein

11 removal procedures on over 20 patients, but fraudulently billed

12 Medicare using CPT Codes 36478 and 36479 and received over $35,000 in

13 excess Medicare reimbursements as a result.  (Trial Tr. 1227:2-25;

14 Ex. Q (Gov. Ex. 1101).)  The Accusation also alleged that defendant's

15 employee Tanya Uribe showed defendant a printout that he had billed

16 Medicare using the wrong code, defendant looked at the printout and

17 threw it in the trash.  (Trial Tr. 1228:2-10.)  The Accusation

18 continued that defendant later falsely told the Medical Board that he

19 did not realize he used the wrong codes, and never did return any

20 portion of the excess payments he received as a result of using the

21 wrong codes.  (Trial Tr. 1228:21-1229:14.)  In September 2012,

22 defendant signed a stipulation that he read and understood the

23 charges and allegations in the Accusation and that he understood if

24 the charges were proven at the hearing would constitute cause for

25 discipline on his physician's license.  (Trial Tr. 1231:5-1232:3.)

26 Ms. Uribe also testified at trial that while she was working at

27 defendant's medical practice from 2003 to 2007, she discovered that

28 defendant was billing for vein ablation when he was really providing

13

laser vein treatments.  (Trial Tr. 434:18-25, 437:2-438:22.)  Ms.
Uribe testified that she informed defendant that he had been using
the wrong code and handed him a printout regarding the codes.  (Trial
Tr. 438:21-439:13.)  In response, defendant told her, "don't fucking
worry about it," and tossed the printout in the trash.  (Trial Tr.
439:19-440:22.)

       7.   Reuse and Storage of Single-Use ClariVein Catheters

     Special Agent Berwanger testified at trial that when she and a
team of agents executed a search warrant at defendant's Temecula
office, they took a photograph of used vein catheters gathered in a
storage room of defendant's office.  (Trial Tr. 1173:2-15; Ex. R
(Gov. Ex. 803).)

     Ultrasound technician Virginia Ratcliff testified that she
worked with defendant when he conducted vein ablation procedures, and
that in June 2016 she saw defendant flush ClariVein catheters and
wipe them down after use.  (Trial Tr. 512:23-513:19.)  Ms. Ratcliff
asked defendant why he was doing this, and defendant responded that
he was thinking of reusing them on mission trips.  (Trial Tr. 513:20-
25.)  Ms. Ratcliff further testified that she saw approximately 100
used ClariVein catheters in defendant's office in Blythe, and she saw
some again at defendant's office in Temecula and took a picture.
(Trial Tr. 514:6-518:4.)  After a procedure in Lake Havasu, defendant
asked Ms. Ratcliff to clean the catheters and write a patient's name
on the box.  (Trial Tr. 518:5-519:25.)  Ms. Ratcliff then sent
defendant an email terminating her business relationship with him
because of his reuse of catheters on patients.  (Trial Tr. 520:3-22;
Ex. S (Gov. Ex. 903).)  Defendant responded, "I have used the same

14

1   catheters on same patients, those patients for the free services and
2   cash patients." (Ex. S (Gov. Ex. 903).)

3        Ultrasound technician Aaron Montijo testified that he worked
4   with defendant on vein ablation procedures. (Trial Tr. 1028:5-19.)
5   Mr. Montijo testified that after defendant used a vein catheter on a
6   patient, defendant often wiped it down with a cloth and took it down
7   the hall. (Trial Tr. 1031:24-1033:13.) Mr. Montijo saw the used
8   catheters in his office on the desk, at least a dozen of them neatly
9   stacked up, side by side. (Trial Tr. 1033:14-18, 1036:2-11.) Mr.
10  Montijo had never seen another doctor save used catheters, because
11  usually they go into a biohazard waste bag to be destroyed. (Trial
12  Tr. 1034:7-13.) Mr. Montijo explained that he asked defendant why he
13  was saving the catheters, and defendant responded that he was going
14  to use them for some mission work in Korea. (Trial Tr. 1036:14-19.)
15       Geoffrey Heldoorn, a salesman who sold ClariVein catheters to
16  defendant, testified that ClariVein catheters cannot be reused and
17  cannot be sterilized after use. (Trial Tr. 618:1-15.) He testified
18  that the instructions for use made it clear that the ClariVein
19  catheter may not be reused, reprocessed, or re-sterilized because
20  that "may compromise the structural integrity of the device and/or
21  lead to device failure, which in turn may result in patient injury,
22  illness, or death," and may "create a risk of contamination of the
23  device and/or cause patient infection or cross infection, including,
24  but not limited to, the transmission of infectious disease from one
25  patient to another." (Trial Tr. 623:20-624:7.) Mr. Heldoorn
26  testified that defendant joked with him about reusing catheters and
27  Mr. Heldoorn told defendant that the catheters were for single use
28  only. (Trial Tr. 628:8-22.)

15

Case 8:19-cr-00061-JVS   Document 1048-1   Filed 11/21/22   Page 174 of 332   Page ID
#:25566
Case 2:16-cr-00415-GW   Document 211   Filed 04/14/22   Page 22 of 44   Page ID #:2958

1       Mr. Heldoorn further testified that he stopped working with

2  defendant in 2016 when Mr. Heldoorn learned from Virginia Ratcliff

3  that defendant was reusing ClariVein catheters.  (Trial Tr. 629:1-8.)

4  Defendant called Mr. Heldoorn and said that his reuse of the

5  catheters was none of Ms. Ratcliff's business, that defendant was the

6  physician and it was his choice to reuse them.  (Trial Tr. 629:16-

7  25.)  He also stated that he was reusing the catheters for procedures

8  given to patients on whom he had already used the catheters once.

9  (Trial Tr. 630:1-4.)  Mr. Heldoorn also testified that in 2016 he had

10  seen about 20 used catheters in defendant's office, with first and

11  last names written on the exterior.  (Trial Tr. 631:16-632:23, 633:4-

12  6.)  Defendant told Mr. Heldoorn that he was saving the catheters for

13  a mission trip, and that the FDA's rules about sterilization would

14  not apply outside the U.S.  (Trial Tr. 633:7-17.)  Mr. Heldoorn

15  informed defendant that his company would provide free catheters for

16  mission trips, but defendant never took the company up on that offer.

17  (Trial Tr. 633:24-634:25.)

18       Dr. Adam Saltman testified as an expert in FDA approval of

19  medical devices, including the ClariVein device.  (Trial Tr. 1062:9-

20  15.)  Dr. Saltman testified that there is no way to properly

21  sterilize a ClariVein catheter for safe and effective reuse on a

22  patient.  (Trial Tr. 1070:19-22.)  He testified that he would have

23  serious concerns that a reused catheter would not perform properly on

24  reuse, and that bacteria could grow on a used catheter in a

25  nonsterile environment.  (Trial Tr. 1073:6-24.)  Reusing a used

26  catheter could cause bodily harm especially an infection.  (Trial Tr.

27  1073:25-1074:18.)

28

8.   <u>False Statements in Bankruptcy</u>

On July 18, 2019, the Court severed Count 9 of the First Superseding Indictment ("FSI"), charging false declarations in bankruptcy in violation of 18 U.S.C. § 152(3), from the remaining charges of the Indictment.  (Dkt. 87.)  After trial as to Counts 1 to 8 of the FSI, on March 2, 2020, defendant pleaded guilty to Count 9. (Dkt. 167.)

The government's investigation of Count 9 found the following facts: On September 24, 2013, defendant and his wife filed for Chapter 11 bankruptcy on behalf of themselves in the case, <u>In re Donald Woo Lee, et al.</u>, Case No. 8:13-BK-17920-ES (C.D. Cal.).  On November 18, 2013, defendant filed for Chapter 11 bankruptcy on behalf of Prime Partners in the case, <u>In re Prime Partner Medical Group, Inc.</u>, Case No. 8:13-BK-19404-ES (C.D. Cal.).  On May 23, 2014, the bankruptcy court entered an order substantively consolidating Prime Partners' Chapter 11 proceeding into the defendant's Chapter 11 bankruptcy (as consolidated, the "Estate").  On December 22, 2014, the bankruptcy court appointment Richard A. Marshack as Chapter 11 Trustee of the consolidated cases.  Marshack retained Lori Ensley of Bicher & Associates as the field agent to assist in the operations of Prime Partners.

In January 2015, Ensley discovered that Prime Partners issued a $252,000 payment to an unknown source for "catheters" on July 25, 2014.  According to Ensley, this was four to five times the usual monthly expense for catheters.  When Ensley questioned defendant about this payment, defendant responded that he used the funds to purchase catheters on the "black market."  Ensley obtained the check for the $252,000 payment and determined that the payment had been

17

1    issued to Sang Paik, a dentist and family friend of Lee's. (See Ex. T

2    (Ensley Interview Report).)  The trustee determined that Paik used

3    the payment by defendant to make an investment in Genelux, a

4    restricted stock, on defendant's behalf and determined that this

5    payment was an unauthorized post-petition transfer under Title 11,

6    United States Code, Section 549.

7         Following this determination, the trustee negotiated a

8    settlement with defendant and Paik whereby defendant agreed to remit

9    $86,000 and Paik agreed to remit $166,000 to the trustee on behalf of

10   the Estate.  Defendant and Paik also agreed to submit declarations

11   under penalty of perjury disclosing the source of their respective

12   payments.

13        On June 25, 2015, defendant remitted a cashier's check to the

14   Trustee for $86,000 as defendant's settlement payment.  On July 27,

15   2015, defendant signed a declaration, under penalty of perjury, that

16   stated in paragraph 5, "In order to fund the Settlement Payment, I

17   obtained three (3) loans, one from Ms. Amy Kim, one from Ms.

18   Bernadette Roman, and one from Mr. Mike Kim."  (Ex. U (Declaration to

19   Bankruptcy Court).)  Amy Kim (legal name "Yong Mi Kim") is

20   defendant's sister, Bernadette Roman was defendant's employee, and

21   Mike Kim is defendant's relative.

22        Paragraph 10 of the declaration states, "None of the funds used

23   in the Settlement Payment came from myself, my wife, [Prime

24   Partners], or any other corporate entity that I have either have an

25   ownership in, and/or am an officer, director or employee of."  Both

26   paragraphs 5 and 10 contained false declarations.

27        In fact, neither Ms. Kim nor Ms. Roman lent money to defendant.

28   Rather, defendant paid each of them $20,000 from corporate bank

accounts that he owned and asked them to deposit those checks into their own bank accounts and then remit cashier's checks to defendant. Specifically, the banking records show that on June 15, 2015, defendant paid Ms. Kim $20,000 from a Pacific Western corporate bank account for SD Medical Clinic, which is a corporation owned and operated by defendant, on which defendant is the sole signatory. Also on June 15, 2015, defendant paid Ms. Roman $20,000 from a Rabobank corporate bank account for Donald Woo Lee, A Professional Corporation, a corporation owned and operated by defendant, on which defendant is the sole signatory.  On June 25, 2015, Bernadette Roman and Yong Kim each remitted cashiers' checks to Dr. Donald Lee for $20,000.

Agents interviewed both Ms. Roman and Ms. Kim, who stated that they did not loan Lee $20,000.  (Ex. V (Roman Interview Report); Ex. W (Kim Interview Report).)  Ms. Roman stated that defendant gave her a check and asked her to get a bank check for his "lawyer," later identified as Richard Marshack, the Trustee.  Ms. Roman sent the check to Marshack via certified mail, but it was rejected because Ms. Roman's name was on the check as the remitter.  Ms. Roman obtained a new cashier's check to pay the $20,000 to Lee.  According to Ms. Roman, it was not her money that she remitted to defendant and was therefore not a loan.  Ms. Kim was also interviewed and brought before the grand jury where she testified that Lee gave her a $20,000 check and asked her to deposit it and get him a cashier's check.  Ms. Kim testified this was not a personal loan to Lee.

Accordingly, the $20,000 that defendant received from each of Ms. Kim and Ms. Roman was not a loan, but money that defendant

1  himself paid them from corporate entities that he owned.  As such,

2  paragraphs 5 and 10 of Lee's declaration are false.

3       On February 2, 2018, Paik proffered to the government that he

4  has had a personal friendship with defendant and defendant's family

5  for over 20 years.  (Ex. X (Paik Interview Report).)  Paik explained

6  that in July 2014, Paik met with defendant at a Starbucks and Paik

7  told defendant about an investment opportunity with the company

8  Genelux, an immunotherapy technology company.  Defendant told Paik

9  that he wanted to invest.  Paik knew at the time that defendant was

10 in bankruptcy, but defendant told Paik that the bankruptcy would be

11 over soon and asked Paik to make an investment for defendant in his

12 (Paik's) name.  Defendant wrote Paik a $252,000 check a few days

13 later, Paik deposited the check and then purchased the Genelux stock

14 on about July 28, 2014.

15      The following year, Paik received a packet in the mail from the

16 Trustee inquiring about the $252,000 check.  Paik asked defendant

17 what was going on.  Defendant told Paik he (defendant) had fabricated

18 a backstory to explain the $252,000 check—the money was for black

19 market catheters.  More specifically, defendant fabricated the

20 following details: Paik's cousin in New York owed Paik $240,000, and

21 the cousin knew someone who was selling catheters on the black

22 market, so instead of repaying Paik, the cousin repaid the debt to

23 Paik by purchasing the black-market catheters for Prime Partners.

24 Defendant wrote the $252,000 check to Paik to cover the purchase of

25 the black-market catheters.  Assuming that the cousin had delivered

26 the catheters to defendant, Paik made the Genelux investment.  During

27 his proffer, Paik explained this backstory was entirely false.

28

1     Paik was not a part of the settlement negotiation with the
2  Trustee regarding the $252,000 payment.  Defendant told Paik that
3  defendant would repay the $166,000 to the Estate that Paik owed under
4  the terms of the settlement agreement.  Paik did not draft his
5  declaration, he received it from defendant's bankruptcy attorney and
6  was told to sign it.  Paik knew that the declaration contained false
7  statements, but he signed it anyway, believing that the money was
8  going to be paid back to the Estate and that this would be behind
9  him.

10     On December 20, 2018, Paik pleaded guilty to an information,
11  admitting to false declarations in connection with a bankruptcy
12  proceeding in violation of 18 U.S.C. § 152[3] in the case United
13  States v. Sang Paik, 5:18-CR-283-GW (C.D. Cal.).  Paik's sentencing
14  is currently scheduled on May 9, 2022.

15     At trial, defendant also admitted that he lied to the bankruptcy
16  court about the $252,000 check to Sang Paik for "black market
17  catheters."  (Trial Tr. 1363:3-1365:7.)

**III. POST-CONVICTION CONDUCT**

19     After trial, the government raised concerns to the Court about
20  defendant's importation of foreign unapproved products after
21  defendant's conviction.  (Trial Tr. at 1483.)  For these and other
22  reasons, the Court ordered defendant to stop practicing medicine as a
23  condition of his release on bond pending sentencing.  (Trial Tr.
24  1486-87.)  Defendant remained out on bond for two and half years
25  after his conviction due to court closures during the COVID-19
26  pandemic.  During that time, defendant ignored the Court's order to
27  stop practicing medicine and the government's concerns about his
28  activities with foreign unapproved products.

Case 8:19-cr-00061-JVS   Document 1048-1   Filed 11/21/22   Page 180 of 332   Page ID
#:25572
Case 2:16-cr-00415-GW   Document 211   Filed 04/14/22   Page 28 of 44   Page ID #:2964

1          Despite the Court's order, several witnesses told law

2   enforcement that in 2020 and 2021, they saw defendant Lee soliciting

3   patients to receive treatments, performing procedures, and

4   instructing others on how to perform them.  These procedures included

5   thread lift and penis enlargement procedures.  Thread lifts are

6   temporary face lifts in which barbed sutures are used to tighten the

7   skin. A penis enlargement with fillers consists of injecting filler

8   into the penis, by defendant Lee's own description. (Ex. Y at 24,

9   Nov. 23, 2020 Text Message (describing that the procedure will

10  require multiple injections).)  Defendant is unlicensed, so in

11  California he is treated as a "medical assistant" who may only

12  perform "non-invasive routine technical support services."  15 C.C.R.

13  § 3999.325(f) (emphasis added).  Because both the thread lift and

14  penis enlargement procedures pierce the skin, they are invasive, and

15  may not be performed by an unlicensed person. Cf. id. (listing the

16  routine technical support services that may be performed by a medical

17  assistant).  Therefore, defendant was not permitted to perform these

18  procedures both because he was unlicensed and because of the Court's

19  order.

20         Several witnesses told law enforcement that they saw defendant

21  Lee perform and train others to perform thread lifts. (Ex. Z at 2;

22  Ex. Y at 1, 5-7.)  In addition, defendant's interview was reported in

23  a newspaper article in which he admitted to performing Botox on a

24  patient. Joe Nelson, 'Real Housewives of OC' star had convicted,

25  unlicensed doctor work on her patient, lawsuit claims, Daily Bulletin

26  (Jan. 3, 2022, updated Jan. 4, 2022), available at

27  https://www.dailybulletin.com/2022/01/03/real-housewives-of-oc-

28  starhad- convicted-unlicensed-doctor-work-on-her-patient-lawsuit-

claims (last visited Jan. 17, 2022). Despite the Court's oral and written orders on October 16 and 17, 2019 that defendant could not practice medicine, defendant has been training other providers on how to conduct invasive procedures such as thread lifts, has been providing thread lifts to patients and has injected at least one person with "Botox." Defendant has also offered to perform a penile enlargement procedure. This was in direct contradiction to the Court's order and was unlicensed practice of medicine.

Defendant also imported products from Korea that were not approved for use in the United States and sold them to physicians and doctors' offices for use on patients. (Ex. AA; Ex. Z at 2-3; Ex. BB at 1; Ex. Y at 2, 39.)

Moreover, defendant actively attempted to avoid the detection of his unlawful and dangerous activities, as demonstrated by defendant's text messages to witness E.G. on September 28, 2021. (Ex. Y at 46.) Defendant asked E.G. by text message if E.G. could join the messaging application "Telegram." E.G. asked defendant the purpose of messaging via Telegram and defendant responded, "Telegram is not monitor [sic] by the government." (Id.) Defendant was thus clearly aware his activities are unlawful and persisted nonetheless.

**IV. GUIDELINES CALCULATION**

In the revised PSR, the USPO calculated defendant's total offense level as 31, with an advisory guidelines range of 108-135 months. (Revised PSR ¶ 108.) The government agrees with the total offense calculation in the revised PSR and respectfully submits that the Court should calculate the guidelines range for defendant as follows:

| | | | |
|---|---|---|---|
| 1 | Base Offense Level: | 6 | U.S.S.G. § 2B1.1(a)(2) |
| 2 | Loss amount: | 20 | U.S.S.G. §§ 2B1.1(b)(1)(K) |
| 3 | More than $9.5 million but less than $25 million | | |
| 4 | Federal Health Care Offense | 3 | U.S.S.G. §2B1.1(b)(7) |
| 5 | Abuse of a Position of Trust | 2 | U.S.S.G. § 3B1.3 |

Accordingly, defendant's total offense level should be 31.

**A.   Loss Amount**

The government agrees with the USPO's determination in the revised PSR that a 20-level enhancement applies under U.S.S.G. § 2B1.1(b)(1)(K) based on the intended loss to Medicare of at least approximately $12,476,350.  (Revised PSR ¶¶ 44, 45.)

1.   Legal Standard

Pursuant to the Guidelines, the loss amount "is the greater of actual loss *or* intended loss."  U.S.S.G. § 2B1.1, cmt. n.3(A) (emphasis added).  The intended loss means "the pecuniary harm that defendant purposely sought to inflict; and . . . includes intended pecuniary harm that would have been impossible or unlikely to occur" (e.g., as in a government sting operation, or an insurance fraud in which the claim exceeded the insured value)."  Id., cmt. n.3(A)(ii). The Commentary to U.S.S.G. § 2B1.1 states that "[i]n cases in which the defendant is convicted of a Federal health care offense involving a Government health care program [i.e., Medicare], the aggregate dollar amount of fraudulent bills submitted to [Medicare] shall constitute prima facie evidence of the amount of the intended loss, i.e., is evidence sufficient to establish the amount of the intended loss, if not rebutted."  Id., cmt. n.3.F(viii).

1    The Ninth Circuit and numerous other courts have reached the
2 same conclusion that the amount billed to Medicare is the proper
3 measure of the intended loss under U.S.S.G. § 2B1.1.  See, e.g.,
4 United States v. Walter-Eze, 869 F.3d 891, 912 (9th Cir. 2017) ("In
5 health care fraud cases, the amount billed to an insurer shall
6 constitute prima facie evidence of intended loss for sentencing
7 purposes."); United States v. Agbu, 640 Fed. App'x 613, 616 (9th Cir.
8 2016) (unpublished) ("[T]he billed amount is prima facie evidence of
9 intended loss . . . ."); United States v. Popov, 742 F.3d 911, 916
10 (9th Cir. 2014) ("In health care fraud cases, the amount billed to an
11 insurer shall constitute prima facie evidence of intended loss for
12 sentencing purposes."); United States v. Shepherd, 171 Fed. App'x
13 611, 615 (9th Cir. 2006) (unpublished) ("Shepherd billed for over
14 $800,000, and thus intended to deprive Medicare of that amount,
15 regardless of how much was actually collected."); United States v.
16 Serrano, 234 Fed. App'x 685, 687 (9th Cir. 2007) (unpublished) ("We
17 hold that the district court properly interpreted § 2B1.1 and that
18 the court did not clearly err when it approximated the intended loss
19 as the amounts Appellant submitted to Medicare and Medi-Cal for
20 reimbursement.").

21    Both Dr. Zimmet and a Medicare medical reviewer reviewed random
22 samples of defendant's vein ablation medical records and determined
23 that 100% of the vein ablations reviewed did not meet Medicare's
24 coverage criteria.  Dr. Zimmet conducted a review of a random sample
25 of defendant's patient records to determine whether the ablations
26 defendant billed to Medicare met the coverage requirements, and found
27 that 100% of defendant's vein ablation procedures were medically
28 unnecessary and failed to meet Medicare's coverage criteria.  Dr.

1  Zimmet testified that he reviewed the medical records of a total of

2  42 patients on whom defendant performed vein ablation procedures.

3  (Trial Tr. at 746-47.)   These 42 patients included the five patients

4  who are named in the indictment, plus 37 randomly selected patients.

5  (Id. at 789.) In his medical opinion, none of those vein ablation

6  procedures was medically necessary, none was within the standard of

7  care, and none met the Medicare guidelines for coverage.   (Id. at

8  789-90.)   Medicare contractor SGS also conducted a review of 95

9  randomly-selected patients' medical records for defendant's vein

10  ablation patients.   (Ex. C.)   This medical review found that 100% of

11  the claims would have been denied because in many instances the

12  documentation in the medical records did not support that the

13  patients needed vein ablation, and in other instances, defendant used

14  CPT code of 37241 when he could have used the code for vein ablation.

15  (Id. at 1, 2, 4.)

16       The findings of Dr. Zimmet and the Medicare medical review may

17  be extrapolated to the rest of defendant's billings for vein ablation

18  and related procedures.   Under the Sentencing Guidelines, "[t]he

19  court need only make a reasonable estimate of the loss," which "shall

20  be based on available information. . . ."   U.S.S.G. § 2B1.1, cmt. n.

21  3(C).   For example, the Sentencing Guidelines also provide that

22  estimates of loss in fraud cases "may be based on the approximate

23  number of victims multiplied by the average loss to each

24  victim."   U.S.S.G. § 2F1.1, App. Note 9; United States v. Koenig, 952

25  F.2d 267, 271-72 (9th Cir. 1991) (affirming district court's method

26  of loss calculation where court multiplied average value of

27  counterfeit ATM cards by the number of cards defendants had attempted

28  to make).   "[I]t is permissible for the sentencing court, in

calculating a defendant's offense level, to estimate the loss resulting from his offenses by extrapolating the average amount of loss from known data and applying that average to transactions where the exact amount of loss is unknown." United States v. Bryant, 128 F.3d 74, 76 (2d Cir. 1997). The Ninth Circuit has approved statistical sampling as a reasonable method for estimating the total amount of loss for sentencing. See United States v. Scrivener, 189 F.3d 944, 950 (9th Cir. 1999), as amended (Nov. 10, 1999) (approving the extrapolation of fraud in a sample to estimate the amount of intended loss in defendant's conduct at a whole).

Defendant billed Medicare $12,476,350 for vein ablation and related procedures. Based on Dr. Zimmet's and Medicare's analyses, the total amount billed should be defendant's intended loss for sentencing purposes, which corresponds to a 20-level enhancement pursuant to U.S.S.G. §2B1.1 for losses between $9,500,000 and $25,000,000.

**B.    Federal Health Care Offense**

Section 2B1.1(b)(7) of the Sentencing Guidelines provides that a 3-level enhancement applies to defendants convicted of a federal health care offense involving a government health care program if the loss is more than $7,000,000. U.S.S.G. § 2B1.1(b)(7). Here, the loss to the Medicare program, a government health care program, is $12,476,350 and thus this 3-level enhancement should be applied.

**C.    Abuse of a Position of Trust**

The government agrees with the USPO's determination in the revised PSR that a 2-level enhancement applies for abuse of a position of trust under U.S.S.G. § 3B1.3. The Sentencing Guidelines define "a position of public trust" as one "characterized by

professional or managerial discretion (i.e., substantial discretionary judgment that is ordinarily given considerable deference)." U.S.S.G. § 3B1.3, cmt. n.1. The Ninth Circuit has explained that "the presence or lack of 'professional or managerial discretion' represents the decisive factor in deciding whether a defendant occupied a position of trust," and that "[a] defendant has this discretion when, because of his or her special knowledge, expertise, or managerial authority, [he or she] is trusted to exercise substantial discretionary judgment that is ordinarily given considerable deference." United States v. Laurienti, 731 F.3d 967, 973 (9th Cir. 2013)(internal citation and quotation marks omitted). As a medical doctor and owner of his clinics, defendant had both professional and managerial discretion at his clinics and Medicare trusted defendant to submit truthful claims. Defendant abused his position of trust by billing Medicare for medically unnecessary vein ablations and by billing Medicare using the incorrect CPT code, even though he had promised Medicare that he would only submit claims for medically necessary services and claims that were accurate, complete, and truthful, and that he would not submit fraudulent claims, or submit claims with reckless disregard for their truth. (Trial Tr. 1346:4-1347:5.) In addition, defendant violated the trust of his patients by providing them with painful, invasive procedures that they did not need. (Trial Tr. 789:19-790:9.) On top of that, defendant continued performing the procedures on his patients despite "10 out of 10" pain, infections, and nerve injury. (Trial Tr. 852:17-853:24; 871:23-872:6; 877:20-878:22; 879:2-880:6; 880:22-881:19.) He further put many of his patients at grave risk by reusing the single use vein catheters, which were clearly marked as

1  single use only, and the reuse of which could cause infection and

2  bodily harm.  (Trial Tr. 1073:6-24; 1073:25-1074:18.)

3       Therefore, as set forth in the revised PSR, the enhancement

4  should be applied.  (PSR ¶ 48.)

5  **V.   RESTITUTION**

6       The Court should order defendant to pay restitution to Medicare

7  in the amount of $4,587,533.79, which is the amount that Medicare

8  paid based on the false and fraudulent billings that the defendant

9  submitted or caused to be submitted.  See Trial Exhibit 1201.  This

10  is the amount recommended in the revised PSR.  (Revised PSR ¶ 120.)

11       **A.   The Court Must Order Restitution in this Case**

12       Title 18, United States Code, Section 3663A mandates restitution

13  for offenses against property under Title 18, including any offense

14  committed by fraud or deceit, and for any offense in which an

15  identifiable victim has suffered pecuniary loss.  Under Section

16  3663A, the Court must order full restitution without regard to

17  defendant's economic situation.  18 U.S.C. § 3664(f)(1)(A).  The

18  Court shall order full and immediate payment of restitution, unless,

19  in the interest of justice, the Court provides for payment on a date

20  certain or in installments.  18 U.S.C. § 3572 (d)(1).  "Immediate

21  payment of restitution is the general rule."  United States v.

22  Martin, 278 F.3d 988, 1006 (9th Cir. 2002).  See also id. (finding

23  that the district court did not err in following the general rule

24  because it had information regarding the defendant's financial

25  resources that it had "presumably considered and found insufficient

26  to warrant periodic payments"); see generally United States v. Ross,

27  310 F. App'x 160, 162 (9th Cir. 2009) (finding that "immediate

28  repayment is the rule" but that "[e]xceptions may be made in the

interests of justice, such as when the defendant is not able to make more than nominal periodic payments," and the defendant carries the burden of proving such inability).

Here, defendant was convicted of seven counts of health care fraud in violation of 18 U.S.C. § 1347, which are crimes involving fraud or deceit and crimes for which an identifiable victim has suffered pecuniary loss for purposes of Section 3663A. Therefore, pursuant to 18 U.S.C. § 3663A, the government requests that the Court order that defendant pay $4,587,533.79 in restitution to Medicare.

While the Court shall order restitution "without consideration" of defendant's financial circumstances, 18 U.S.C. § 3664 (f)(1)(A), the restitution payment order must specify the manner in which, and the schedule according to which, restitution is to be paid, by taking in consideration: (a) the financial resources and other assets of the defendant, including whether any of these assets are jointly controlled; (b) projected earnings and other income of the defendant; and (c) any financial obligations of the defendant; including obligations to dependents. 18 U.S.C. § 3664 (f)(2).

Defendant bears the "burden of demonstrating" defendant's financial resources, and was obligated to "prepare and file with the probation officer an affidavit fully describing defendant's financial resources, including a complete listing of all assets <u>owned</u> or <u>controlled</u> by the defendant as of the date on which the defendant was arrested . . . ." 18 U.S.C. § 3664(d)(3) and (e) (emphasis added). As expressly set forth in Section 3664(d)(3) and (e), defendant's financial resources include assets that defendant "owns," as well as those that defendant "controls." Thus, the Court's consideration of defendant's "financial resources and other assets" when devising a

restitution payment order pursuant to § 3664(f)(2), should include both the assets that defendant "owns" and those that defendant "controls."

The Court's consideration under Section 3664(f)(2) is not limited to just those resources and assets to which defendant holds legal title at the time of sentencing. The express language of Section 3664 reflects that Congress intended the Court to look beyond those assets to which defendant holds legal title when fashioning a payment plan order. A defendant must provide the United States Probation Office with "an affidavit fully describing the financial resources of the defendant, including a complete listing of all assets owned or controlled by the defendant as of the date on which the defendant was arrested . . . ." 18 U.S.C. § 3664(d)(3)(emphasis added). In reviewing the information in this affidavit, the Court must consider all the "financial resources and other assets" available to a defendant, including those that are "jointly controlled." 18 U.S.C. § 3664 (f)(2)(A).[3]

**B.    Restitution Is Due and Payable Immediately, but Defendant May Pay According to the Recommended Schedule While the Government Pursues Other Avenues to Satisfy the Restitution Order**

---

[3] The specificity of the language used in the statute directs the Court to look beyond ownership or the legal title of property when fashioning a restitution payment order to consider all financial resources and assets generally available to defendant. See generally Duncan v. Walker, 533 U.S. 167, 174 (2001) (holding that it is "a cardinal principle of statutory construction" that "a statute ought, upon the whole, to be so construed that, if it can be prevented, no clause, sentence, or word shall be superfluous, void, or insignificant."); see also United States v. Menasche, 348 U.S. 528, 538-39 (1955) ("It is our duty to give effect, if possible, to every clause and word of a statute.").

1    In the event the Court finds that defendant is unable to make

2  immediate payment of restitution in full, pursuant to 18 U.S.C.

3  § 3664(f)(1)-(3), this Court should order the restitution "due and

4  payable immediately," while setting a payment schedule for the

5  restitution.  United States v. Gunning, 339 F.3d 948 (9th Cir. 2003).

6  The government has reviewed the "Assessment of Ability to Pay" in the

7  revised PSR and disagrees with the recommendation.  As set forth in

8  the government's objections to the revised PSR, the government

9  asserts that defendant has omitted the proceeds of a $37,500 transfer

10 to defendant.  Consequently, the government requests that the Court

11 make a finding that, in the interest of justice, restitution is to be

12 paid in installments and order an immediate payment of at least

13 $37,250 within 30 days of entry of this judgment.

14    The existence of a payment schedule does not preclude the

15 government from pursuing other avenues of ensuring that defendant's

16 restitution obligation is satisfied.  See United States v. Hawkins,

17 392 F. Supp. 2d 757, 760 (W.D. Va. 2005); United States v. James, 312

18 F. Supp. 2d 802, 806-07 (E.D. Va. 2004).

19    To ensure the enforcement of the mandatory restitution order, as

20 well as all of defendant's Court-ordered financial obligations, the

21 government respectfully requests that the Court order the following:

22    1.   Defendant shall notify the Court of any material change in

23 defendant's ability to pay, including without limitation any

24 increases in wages, income, or assets.

25    2.   Defendant shall apply all monies received from income tax

26 refunds to the outstanding Court-ordered financial obligation. In

27 addition, defendant shall apply all monies received from lottery

28 winnings, inheritance, judgments and any anticipated or unexpected

financial gains to the outstanding Court-ordered financial obligation.

    3.    Defendant shall notify the Financial Litigation Section of the United States Attorney's Office for the Central District of California before transferring any interest in real property, owned directly or indirectly by defendant, including any interest held or owned under any other name or entity, including trusts, partnership and/or corporations.

    4.    The United States Probation Office shall preserve and provide the Financial Litigation Section of the United States Attorney's Office for the Central District of California with all the financial documentation relied upon in the preparation of the Presentence Report, including any net worth and cash flow statements completed by defendant.

**VI.   ANALYSIS OF THE SECTION 3553(a) FACTORS**

    The federal statute governing sentencing requires district courts to take the applicable Sentencing Guidelines range into consideration when sentencing, along with other sentencing factors enumerated by Congress.  See 18 U.S.C. § 3555; United States v. Booker, 543 U.S. 220, 264 (2005) ("The district courts, while not bound to apply the Guidelines, must consult those Guidelines and take them into account when sentencing.").  When the Court determines a sentence, "the Guidelines are the starting point and the initial benchmark."  United States v. Carty, 520 F.3d 984, 991 (9th Cir. 2008) (en banc) (quotations omitted).  Once the Court calculates the defendant's Sentencing Guidelines range, it must then consider the factors set forth in 18 U.S.C. § 3553(a) to decide if they support the sentence recommended by Probation and the parties.  Id. These

factors include, among others: (a) the nature and circumstances of defendant's offense and his history and characteristics; (b) the need for the sentence contemplated to, among other things; (i) reflect the seriousness of the offense; (ii) promote respect for the law and provide just punishment for the offense; (iii) afford adequate deterrence to criminal conduct; and (iv) protect the public from further crimes of defendant; and (c) the need to provide restitution to the victim of defendant's offenses.

The government submits that the Section 3553(a) factors support a sentence of 120 months in custody for defendant.  Such a sentence would be "sufficient, but not greater than necessary" to comply with the purposes enumerated in 18 U.S.C. § 3553(a)(2), discussed further below.

**A.    Nature and Circumstances of the Offenses**

Defendant's crimes were serious because he took advantage not only of the Medicare program, a taxpayer-funded program that is designed to provide critical health services to some of the most vulnerable members of society, but also because he took advantage of elderly Medicare beneficiaries themselves.  Evidence introduced at trial demonstrated that defendant submitted and caused to be submitted to Medicare millions of dollars of false and fraudulent claims for medically unnecessary vein ablations.  (Trial Tr. at 746-47; Ex. C (SGS Medical Review) at 1, 2, 4.)  More importantly — and egregiously — defendant continued to subject his elderly Medicare patients to these unnecessary procedures even when they reported "10 out of 10" pain, infections, and nerve injury.  (Trial Tr. 852:17-853:24; 871:23-872:6; 877:20-878:22; 879:2-880:6; 880:22-881:19.) Defendant also put patients at grave risk by reusing the single use

vein catheters, which were clearly marked as single use only, the reuse of which could cause infection and bodily harm. (Trial Tr. 1073:6-24; 1073:25-1074:18.)

Between 2012 and 2015, defendant submitted these false and fraudulent claims to Medicare for unnecessary ablations, upcoding the claims to receive a higher and unwarranted reimbursement.  Defendant billed Medicare approximately $12,476,350 for these procedures and related ultrasounds.  During this time period, improper payments from Medicare, including those resulting from fraud, were estimated to be approximately $36 billion in fiscal year 2013 and $45 billion in fiscal year 2014.  See Department of Health & Human Services, Centers for Medicare & Medicaid Services, Annual Report to Congress – Medicare and Medicaid Integrity Programs for Fiscal Years 2013 and 2014 at 60, available at https://www.cms.gov/about-cms/components/cpi/downloads/2016-07-15-fy-2013-2014-mandm-pi-rtc-final.pdf.  Schemes like the one perpetuated by defendant threaten the Medicare program and jeopardize its ability to provide much needed health care benefits to the elderly and disabled.  Thus, defendant's crimes were serious and a sentence of 120 months is appropriate.

**B.   History and Characteristics of the Defendant**

Defendant's history and characteristics counsel a significant sentence in this case.  See 18 U.S.C. § 3553(a)(1).  Defendant was raised in a middle-class environment where he always had food, clothing, and shelter, and he benefited from a close family relationship with his parents and five siblings.  PSR ¶¶ 75, 76. He was privileged to obtain a Bachelor of Science from University of California Riverside in 1988 and a medical degree from St. George's

Medical School in 1994.  Id. ¶¶ 90, 91.  Unlike many other defendants in the criminal justice system, defendant had an education and a skill set that provided him with options.  Indeed, he has been able to support his wife, who is a homemaker, and children in a comfortable lifestyle, including by sending them to expensive private college such as Pepperdine University.  Id. ¶¶ 79, 80.  He was able to obtain between $30,000 and $50,000 per month from his medical practice, and took home between $200,000 and $360,000 per year.  Id. ¶¶ 95, 97, 98.  However, rather than own and operate a medical clinic that submitted legitimate claims to Medicare and live off a moderate salary, defendant chose to take advantage of the Medicare program and Medicare beneficiaries by performing medically unnecessary services and submitting false and fraudulent claims in order to line his pockets.

    The government recognizes that defendant is a first-time offender without a prior criminal record; however, it is worth noting that defendant has pending charges in Riverside County Superior Court that still have not been resolved and pre-date the charges in this case.  Moreover, defendant was convicted of three separate crimes charged in the FSI (health care fraud, adulteration of a medical device, and false statements in bankruptcy).  In addition, after his conviction in this matter, defendant ignored the Court's order to stop practicing medicine and the government's concerns about his activities with foreign unapproved products.  Defendant solicited patients to receive treatments such as a penis enlargement, trained others on how to perform thread lifts, and provided Botox to a patient.  Defendant also imported products from Korea that were not approved for use in the United States and sold them to physicians and

1  doctors' offices for use on patients.  Defendant also actively

2  attempted to avoid detection of his unlawful and dangerous activities

3  by using Telegram instead of text messaging because he believed

4  Telegram would not be monitored by the government.  Thus, defendant's

5  lack of criminal history does not warrant an additional variance;

6  rather, his continued conduct of violating the law and putting

7  patients' safety and health at risk for the benefit of his own greed

8  warrants the highest possible sentence available within the

9  guidelines.

10      Accordingly, defendant's history and characteristics weigh in

11  favor of a sentence of 120 months in custody.

12      **C.   Deterrence, Promoting Respect for the Law, and Punishing
       Defendant for His Crimes**

13

14      A sentence of 120 months is appropriate to deter others from

15  engaging in similar illegal conduct.  Individuals who are engaged in

16  Medicare fraud schemes like defendant's make a calculated decision

17  that the risk of being caught and punished is worth the illicit

18  proceeds that they can obtain from the Medicare program.  As stated

19  by the drafters of 18 U.S.C. § 3553(a), general deterrence is

20  particularly important for white collar criminals in order to

21  dissuade actors that small fines or low sentences can be dismissed as

22  simply a "cost of doing business."  S. Rep. No. 98-225, at 76 (1983),

23  as reprinted in 1984 U.S.C.C.A.N. 3182, 3259.  A sentence of 120

24  months will serve to affect that calculus and cause individuals to

25  decide that the money to be gained from the Medicare program is not

26  worth the risk of incarceration.  A 120-month sentence will deter

27  defendant and others, particularly other physicians, from engaging in

28  health care fraud in the future.

1    Defendant orchestrated this scheme to defraud Medicare by

2   submitting and causing the submission of false and fraudulent claims

3   for vein ablation and related ultrasounds.  As the owner of his

4   clinics, defendant benefitted financially from this fraud.  This

5   offense should result in a meaningful custodial sentence.  By

6   requiring defendant to spend 120 months in custody, the Court will

7   impress upon defendant the seriousness of his crimes and will give

8   defendant time to reconsider his actions in light of the

9   consequences.

10    Furthermore, a sentence of 120 months will promote respect for

11   the law and will adequately punish defendant for his unlawful scheme

12   that resulted in a loss to Medicare of at least $4,587,533.79.

13   **VII. CONCLUSION**

14    For the foregoing reasons, the government respectfully submits

15   that sentence requested by the government is sufficient, but not

16   greater than necessary, to provide just punishment to defendant for

17   his crimes, promote respect for the law, and deter defendant and

18   others from committing similar crimes in the future.  See 18 U.S.C.

19   § 3553(a).  The government thus recommends that the Court sentence

20   defendant to 120 months imprisonment, three years of supervised

21   release, order $4,587,533.79 in restitution, and impose a $900

22   special assessment.

23

24

25

26

27

28

1  TRACY L. WILKISON
   Acting United States Attorney
2  SCOTT M. GARRINGER
   Assistant United States Attorney
3  Chief, Criminal Division
   ALEXANDER B. SCHWAB (Cal. Bar No. 283421)
4  Assistant United States Attorney
   Major Frauds Section
5       1100 United States Courthouse
        312 North Spring Street
6       Los Angeles, California 90012
        Telephone: (213) 894-1259
7       Facsimile: (213) 894-0141
        E-mail:    alexander.schwab@usdoj.gov
8
   Attorneys for Plaintiff
9  UNITED STATES OF AMERICA

10                 UNITED STATES DISTRICT COURT

11           FOR THE CENTRAL DISTRICT OF CALIFORNIA

12  UNITED STATES OF AMERICA,          No. CR 19-541-AB
                                       No. CR 19-744-AB
13           Plaintiff,
                                       GOVERNMENT'S SENTENCING POSITION
14           v.                        REGARDING DEFENDANT ADAM JOINER

15  ADAM JOINER,                       Hearing Date: October 15, 2021
                                       Hearing Time: 1:30 p.m.
16           Defendant.                Location:     Courtroom of the
                                                     Honorable André
17                                                   Birotte Jr.

18

19       Plaintiff United States of America, by and through its counsel

20  of record, the Acting United States Attorney for the Central District

21  of California and Assistant United States Attorney Alexander B.

22  Schwab, hereby files its sentencing position regarding defendant Adam

23  Joiner ("defendant").  The government is also filing separately, and

24  under seal, a victim impact statement as an exhibit to this

25  sentencing position.

26       This sentencing position is based upon the attached memorandum

27  of points and authorities, the files and records in this case,

28

1  including the Presentence Investigation Report ("PSR"), and such

2  further evidence and argument as the Court may permit.

3

4   Dated: October 1, 2021            Respectfully submitted,

5                                    TRACY L. WILKISON
                                     Acting United States Attorney
6
                                     SCOTT M. GARRINGER
7                                    Assistant United States Attorney
                                     Chief, Criminal Division
8

9                                          /s/
                                     _____
10                                   ALEXANDER B. SCHWAB
                                     Assistant United States Attorney
11
                                     Attorneys for Plaintiff
12                                   UNITED STATES OF AMERICA

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**TABLE OF CONTENTS**

DESCRIPTION                                                                    PAGE

MEMORANDUM OF POINTS AND AUTHORITIES.................................1

I.     INTRODUCTION.....................................................1

II.    STATEMENT OF FACTS..............................................2

III.   SENTENCING GUIDELINES...........................................6

IV.    ARGUMENT........................................................8

       A.    The Nature of Defendant's Crimes and the Shamelessness
             of His Behavior Demonstrate a Particular Need for a
             Sentence Sufficient to Afford Adequate Deterrence.........8

       B.    The Seriousness of Defendant's Crimes...................10

       C.    Defendant's Background Provides No Excuse for His
             Conduct.................................................11

V.     RESTITUTION....................................................13

VI.    CONCLUSION.....................................................13

i

**TABLE OF AUTHORITIES**

DESCRIPTION                                                          PAGE

**Federal Cases**

United States v. Augare,
   800 F.3d 1173 (9th Cir. 2015) .................................. 7

United States v. Finck,
   407 F.3d 908 (8th Cir. 2005) ................................... 7

United States v. Horob,
   735 F.3d 866 (9th Cir. 2013) ................................... 7

United States v. Jennings,
   711 F.3d 1144 (9th Cir. 2013) .................................. 7

United States v. Martin,
   455 F.3d 1227 (11th Cir. 2006) ................................. 8

United States v. Tanke,
   743 F.3d 1296 (9th Cir. 2014) .................................. 7

**Federal Statutes**

18 U.S.C. § 1343 ................................................... 4

18 U.S.C. § 3147 .................................................. 14

18 U.S.C. § 3553 ................................................... 8

**United States Sentencing Guidelines**

USSG § 2B1.1 .................................................... 6, 7

USSG § 3C1.1 ...................................................... 6

USSG § 3C1.3 ...................................................... 6

**Other Authorities**

S. Rep. No. 98-255 (1983)....................................... 8, 9

## MEMORANDUM OF POINTS AND AUTHORITIES

**I.   INTRODUCTION**

Defendant gives new meaning to the industry term "development hell."  Using a fraudulent Netflix distribution agreement bearing the forged signatures of real executives, defendant convinced investment firms in Korea and China to give him $14 million to invest in a film that would depict folklore icons like Paul Bunyan and John Henry.  Defendant's representations proved to be as fictitious as the legendary figures his film was supposed to depict.  While defendant spent millions on himself, including the purchase of a $5.2 million house in Manhattan Beach, he continued to dissemble, concocting tales of contract negotiations with director Guillermo del Toro and a new distribution agreement with Amblin Partners in an effort to lull his victims into complacency.  Defendant's scheme was eventually uncovered, and he was arrested.

What followed was an exhibition in chutzpah.  After signing his plea agreement, defendant sold the Manhattan Beach house he had purchased with the proceeds of his fraud.  Before doing so, he fraudulently removed the liens his victims had placed on the house by filing documents bearing the forged signatures of attorneys who represented the victims.  Caught again, defendant entered an additional guilty plea to wire fraud.

Defendant's brazen conduct calls for a sentence sufficient to make him, and others like him, think twice before following a similar path.  The government therefore recommends, for both cases, concurrent sentences of 108 months' imprisonment, which fall at the low end of defendant's guideline range; three years of supervised release; and two $100 special assessments.

**II.   STATEMENT OF FACTS**

Defendant committed two sets of crimes.  First, he cheated two Asian investment firms out of $14 million, over $5 million of which he spent on purchasing a house in Manhattan Beach.  Second, after signing a plea agreement, defendant fraudulently removed liens placed by the victims on the home he bought.  These two sets of crimes gave rise to two separate guilty plea factual bases, both of which are recounted here.

At defendant's first change of plea, he agreed to the following factual basis:

> Beginning on an unknown date, and continuing through at least July 13, 2017, in Los Angeles County, within the Central District of California, and elsewhere, defendant knowingly and with the intent to defraud devised and executed a scheme to defraud potential investors as to material matters, and to obtain money and property from the potential investors by means of material false and fraudulent pretenses, representations, and promises, and the concealment of material facts.  Defendant would represent to potential investors that he was seeking financial backing for a film he was producing called Legends.  To convince the potential investors to back the film, defendant would falsely represent that major film distributors, including Netflix and Amblin/Storyteller, had agreed to distribute Legends and send them fabricated distribution agreements purporting to verify his false representations.  These false distribution agreements used the names and sometimes purported signatures of real persons associated with the film distributors.  In reality, as defendant knew, no such agreements had been made, his representations were false, and the distribution agreements were fraudulent and the signatures on them were forgeries.  In reliance on these fabricated distribution agreements, the potential investors would enter into investment agreements with defendant and transfer funds to a bank account under his control.

> In furtherance of the scheme, defendant sought funding from Korean Investment Partners Co., Ltd. ("KIP"), which managed the assets of Korea Investment Global Contents Fund ("KIGCF"), an investment fund based in South Korea.  On or about April 8, 2016, defendant forwarded an email chain -- thereby making use of an international wire communication -- to a KIP executive located in South Korea.  The email chain included a purported email from a Netflix Vice

President, whose initials are S.C., stating, "Look forward to making this movie!"  This email was a forgery.  The email chain also included, as an attachment, a purported distribution agreement between defendant's company Dark Planet Pictures -- and Netflix.  The distribution agreement, which also was a forgery, included the name and a purported signature from an individual whose initials are T.S. and who was the Chief Content Officer for Netflix.  At the time he sent them to KIP, defendant knew T.S. and S.C. to be real people, and knew the email chain and distribution agreements to be fabricated.  Defendant submitted the same fraudulent distribution agreement with the purported signature of T.S. to Star Century Pictures Co., Ltd. ("Star Century"), which was a Chinese investment firm, and PGA Yungpark Capital Ltd ("Yungpark"), which was an affiliate of Star Century.  In reality, defendant had no distribution agreement with Netflix.

After sending the false distribution agreement to KIP and Star Century, defendant continued to provide false updates concerning the film which were designed to lull KIP and Star Century into believing his earlier false representations.  For example, on October 1, 2016, defendant emailed representatives from both investment firms stating, "We agreed to terms verbally yesterday with Guillermo del Toro and his agent."  Eventually, defendant informed KIP representatives that he was attempting to bring on Storyteller Distribution Co., LLC, doing business as Amblin Partners ("Amblin"), to replace Netflix to distribute Legends.  On December 2, 2016, defendant caused a third party to email KIP personnel a purported "memorandum of understanding" between Dark Planet Pictures and Amblin that was dated December 1, 2016.  The memorandum of understanding provided that Amblin would distribute Legends, and the document contained a supposed signature from M.W., a real individual who was Amblin's CEO.  Again, defendant knew this purported agreement to be a forgery at the time he sent it to KIP as he, in fact, had no such agreement with Amblin.

Based on the fraudulent material representations defendant made, KIGCF and Yungpark agreed to invest in Legends and wired money into a Bank of America account ending -0230 in the name "Legends Film Co, LLC" that defendant controlled ("Legends Bank of America account").  These wirings included an April 14, 2016, deposit for $4 million from KIGCF; a June 3, 2016, deposit for $6 million from Yungpark; and another $4 million deposit from KIGCF on January 11, 2017.  With the funds defendant received into his Legends Bank of America account from KIGCF and Yungpark, defendant caused the following financial transactions to occur:

- April 15, 2016, transfer of $800,000 to defendant's joint account with his wife (the "Joint Account");

3

- June 27, 2016, transfer of $160,500, to California Investor Escrow as a security deposit for the purchase of a house in Manhattan Beach;

- August 12, 2016, transfer of $5,192,916.92 to California Investor Escrow to pay for the balance of the amount owed for the purchase of the house in Manhattan Beach;

- September 21, 2016, transfer of $120,000 to the Joint Account;

- January 13, 2017, transfer of $4,300,000 to another bank account in the name of Stock Car Willie, LLC;

- January 30, 2017, transfer of $60,000 to another bank account in the name of Stock Car Willie, LLC;

- June 2, 2017, transfer of $400,000 to the Joint Account; and

- June 9, 2017, transfer of $25,000 to the Joint Account.

In total, defendant's fraud scheme caused approximately $8 million in financial losses to KIGCF and another $6 million in losses to Yungpark for a total of approximately $14 million.

(CR 19-541-AB, Plea Agreement ¶ 11, at 7-11).

In entering his second guilty plea, defendant agreed to the following additional factual basis:

Beginning on an unknown date, and continuing through at least October 11, 2019, in Los Angeles County, within the Central District of California, and elsewhere, defendant knowingly and with the intend to defraud devised and executed a scheme to defraud as to material matters, and to obtain money and property by means of material false and fraudulent pretenses, representations, and promises, and the concealment of material facts.  On August 27, 2019, defendant was arrested in United States v. Joiner, No. CR 19-541-AB, and made his initial appearance, at which time he was released on a $350,000 appearance bond under Title 18, United States Code, Chapter 207.  Defendant later signed a plea agreement with the government in which he agreed, among other things, to plead guilty to one count of wire fraud, in violation of 18 U.S.C. § 1343, and not commit any other crimes.  That plea agreement was filed with the Court on September 16, 2019, and defendant entered his guilty plea to wire fraud on October 18, 2019.

4

As part of the conduct that gave rise to his guilty plea to wire fraud, defendant used approximately $5.2 million of the proceeds of wire fraud to purchase the real property located at 441 3rd Street, Manhattan Beach, California 90266 (the "Manhattan Beach House") knowing that the funds he used were the proceeds of wire fraud. The victims of the wire fraud to which defendant pleaded guilty -- Korean Investment Partners Co., Ltd. ("KIP"), which managed the assets of Korea Investment Global Contents Fund ("KIGCF"); and Star Century Pictures Co., Ltd. ("Star Century"), and its affiliate PGA Yungpark Capital Ltd ("Yungpark") -- secured liens on the Manhattan Beach House in connection with civil litigation against defendant, and Star Century and Yungpark had also secured a writ of execution against the Manhattan Beach House.

After defendant signed his plea agreement but before entering his guilty plea, defendant engaged in a scheme to fraudulently remove the liens on the Manhattan Beach House so he could sell it to a prospective home buyer. In furtherance of this scheme, defendant created purported legal filings, including a "release of writ of attachment," a "release of notice of pendency of action," and a "release of writ of execution." In conducting this scheme, defendant used the identities of individuals he knew to be real persons: the "release of writ of attachment" included the name and forged signature of victim E.J.C., a real attorney representing KIP; and the "release of notice of pendency of action" and "release of writ of execution" included the name and forged signature of victim R.M., a real attorney who formerly represented Star Century. In the course of selling the Manhattan Beach House to the prospective home buyer, defendant furnished these fraudulent "release" documents to Fidelity National Title Company. Defendant caused these fraudulent releases, along with a grant deed to the Manhattan Beach House transferring ownership from defendant to the prospective home buyer, to be recorded with the Official Records Recorder's Office, Los Angeles County, on October 10, 2019. Defendant conducted this transaction knowing that it was designed in whole or in part to conceal or disguise the nature, location, source, ownership, and control of the proceeds of the wire fraud offense to which he previously pleaded guilty.

As a result of the sale of the Manhattan Beach House, on October 11, 2019, defendant caused a wire transfer of $5,497,410.83 to be sent from a Peninsula Escrow, Inc. escrow account to a Morgan Stanley bank account ending in "2039" that was in the name of defendant and his wife. That wire transfer traveled in interstate commerce.

(CR 19-744-AB, Superseding Plea Agreement ¶ 13, at 10-12).

**III. SENTENCING GUIDELINES**

As part of his superseding plea agreement, defendant stipulated to the following sentencing guidelines:

| | | |
|---|---|---|
| Base Offense Level | 7 | USSG § 2B1.1(a)(1) |
| Loss > $9.5 million | +20 | USSG § 2B1.1(b)(1)(K) |
| Obstruction of Justice | +2 | USSG § 3C1.1 |
| Offense While on Release | +3 | USSG § 3C1.3 |

The PSR also applies a two-level adjustment under USSG § 2B1.1(b)(10) for defendant's use of "sophisticated means" in committing his offense specifically citing the fact that he "created three [fictitious] legal filings . . . used the names and forged the signatures of actual lawyers representing the victims . . . then provided these fraudulent release documents to Fidelity National Title Company, causing these releases, along with the grant deed, to be recorded in the county recorder[']s office."  (PSR ¶ 49, at 11-12).  As the factual basis to defendant's original plea agreement makes clear, this was not the first time defendant employed convincing forgeries to further his schemes, having persuaded KIP and Star Century to provide him $14 million based on a series of fabricated emails and fake distribution agreements.  To further lull his victims, defendant fabricated new distribution agreements purporting to show that Amblin, rather than Netflix, would be distributing his film.

The application notes to the Sentencing Guidelines offer, as examples of "sophisticated means," "locating the main office of the scheme in one jurisdiction but locating soliciting operations in another jurisdiction" or "hiding assets or transactions, or both, through the use of fictitious entities, corporate shells, or offshore

1  financial accounts." USSG § 2B1.1, comment. (n.9(B)). This list is

2  not exhaustive, and "the enhancement properly applies to conduct less

3  sophisticated than the list articulated in the application note."

4  United States v. Jennings, 711 F.3d 1144, 1147 (9th Cir. 2013).

5      In particular, courts have repeatedly cited the use of forged

6  documents as a basis for applying the sophisticated means

7  enhancement. See United States v. Tanke, 743 F.3d 1296, 1307 (9th

8  Cir. 2014) ("Although Tanke did not use 'fictitious entities,

9  corporate shells, or offshore financial accounts,' as the Sentencing

10  Commission's commentary contemplates, he created at least six false

11  invoices and falsified carbon copies of checks in Azteca's check

12  register on at least 10 occasions to conceal the payments."); United

13  States v. Horob, 735 F.3d 866, 872 (9th Cir. 2013) (per curiam)

14  ("[The defendant] did more than lie to obtain a loan. He manipulated

15  several people to lie for him, used several different bank accounts

16  (including accounts of other people) to move funds around, and

17  fabricated numerous documents."). Even when a particular artifice

18  would not trigger the enhancement in isolation, "'[r]epetitive and

19  coordinated conduct, though no one step is particularly complicated,

20  can be a sophisticated scheme.'" United States v. Augare, 800 F.3d

21  1173, 1175 (9th Cir. 2015) (quoting United States v. Finck, 407 F.3d

22  908, 915 (8th Cir. 2005)).

23      Including two levels for sophisticated means and adjusted for

24  defendant's acceptance of responsibility, defendant's total offense

25  level is 31, which yields a guideline range of 108 to 135 months'

26

27

28

1  imprisonment.  The government's recommendation of 108 months'

2  imprisonment falls at the low end of that range.[1]

3  **IV.  ARGUMENT**

4       While all the statutory sentencing factors support a significant

5  sentence in this case, such a sentence is most strongly supported

6  here by the need for adequate general and specific deterrence and the

7  seriousness of defendant's crimes.  See 18 U.S.C. § 3553(a)(2)(A),

8  (B).

9        **A.   The Nature of Defendant's Crimes and the Shamelessness of**
   **His Behavior Demonstrate a Particular Need for a Sentence**
10       **Sufficient to Afford Adequate Deterrence**

11       Defendant's scheme, which generated $14 million in proceeds,

12  requires a serious sentence to deter others who might believe such a

13  staggering sum of money would be worth the chance of being caught.

14  Economic crimes like defendant's are quintessentially deterrable so

15  long as they are met with significant term of imprisonment.  "Because

16  economic and fraud-based crimes are 'more rational, cool, and

17  calculated than sudden crimes of passion or opportunity,' these

18  crimes are 'prime candidate[s] for general deterrence.'"  United

19  States v. Martin, 455 F.3d 1227, 1240 (11th Cir. 2006) (quoting

20  Stephanos Bibas, White-Collar Plea Bargaining and Sentencing After

21  Booker, 47 Wm. & Mary L. Rev. 721, 724 (2005)).  In fact, Congress,

22  in drafting § 3553, confirmed that this common-sense principle was

23  one of the driving forces for including deterrence among the goals of

24  sentencing.  See S. Rep. No. 98-255, at 76 (1983), reprinted in 1984

25  U.S.C.C.A.N. 3182, 3259 ("To deter others from committing the offense

26  _____

27        [1] Without inclusion of the additional two levels for use of
   sophisticated means, defendant's guideline range would be 87 to 108
28  months' imprisonment, and the government's recommendation would fall
   at the high end of that range.

8

1  . . . is particularly important in the area of white collar crime.").

2  Indeed, Congress was expressly concerned with the fact that "[m]ajor

3  white collar criminals often are sentenced to . . . little or no

4  imprisonment," which the offenders disregard as "a cost of doing

5  business." Id.

6       Defendant's conduct demonstrates more than just the need for

7  general deterrence applicable to all large-scale fraud schemes;

8  rather, the crimes he committed after his arrest in his original case

9  reveal a particular need for specific deterrence as well.  Under

10  defendant's original plea agreement, he faced an anticipated

11  guideline range of 51 to 63 months' imprisonment based on the loss

12  amount and acceptance of responsibility.  But apparently the prospect

13  of a sentence within this range was insufficient to dissuade him from

14  persisting in criminal activity.  The behavior also demonstrates that

15  defendant's investment fraud scam was not an aberration, meaning that

16  there is little assurance defendant will not reoffend without a

17  significant sentence in place.

18       Defendant's mentality is further confirmed by emails he sent his

19  neighbors in which he continued to lie and obfuscate even after his

20  arrest.  On August 28, 2019, after some news outlets covered

21  defendant's arrest, defendant wrote, "I have been released, any and

22  all charges against me will be dropped, and I will be testifying

23  against my former partner for each of the charges referenced above in

24  the article.  Those charges are against him.  Not me." (PSR ¶ 40, at

25  10).  Even after he entered his (first) guilty plea, defendant

26  persisted in his lies, writing, "I did enter a plea agreement on

27  Friday.  A conditional plea agreement where all charges against me

28  are dropped in exchange for providing any and all testimony as

required against my former partner.  There is no guilt and there is

no guilty plea."  (PSR ¶ 41, at 10).  A 108-month sentence, at the

low end of defendant's guideline range, is therefore necessary to

afford adequate direct deterrence in this case.

Finally, while defendant's criminal history is relatively minor,

it does include a 2011 misdemeanor conviction for falsifying business

records -- in this case, to support "expense account reimbursements

to which he was not entitled to between August 2010 and December

2010."  (PSR ¶ 64, at 13).  The PSR explains that defendant "did this

on eight occasions and fraudulently received $6,673.31."  (Id.).

While the proceeds of defendant's past crime were several orders of

magnitude smaller than those in his current offense, this prior

conviction does reveal a disturbing trend of an individual who

graduated from a small-time con to a major investment scam.  This

prior conviction may not be a basis for further increasing

defendant's sentence, but it should serve as caution against the

imposition of a sentence below defendant's guideline range.

### B.   The Seriousness of Defendant's Crimes

Defendant's crimes speak for themselves: he spent years

orchestrating an elaborate scheme to defraud foreign investment

companies out of $14 million; he used over $5 million in criminal

proceeds to buy himself a house in Manhattan Beach; and even after he

was caught, he sought to subvert the judicial process by fraudulently

attempting to sell that house out from under the investors by

impersonating real lawyers who represented the victims.  Both the

audacity and the consistency of these offenses speak to their

seriousness.

1    In addition to causing losses of $14 million to his victims,

2  crimes like defendant's have ripple effects that undermine legitimate

3  investments.  KIP, which serves as the general partner managing

4  KIGCF, a Korean government fund, has noted in its victim impact

5  statement that "the loss of investment funds has triggered an

6  abundance of negative feedback that will impact future government

7  funding."  (Exh. A, at 6).  Likewise, for legitimate film producers

8  looking for funding, defendant's crimes may prove an obstacle to

9  securing investments, either by scaring off potential investors

10  worried about falling prey to a fraud or increasing the costs of

11  borrowing.

12    To defendant's credit, since his second guilty plea, he and his

13  counsel have been cooperative in KIP's efforts to recover funds

14  defendant fraudulently obtained.  Per his superseding plea agreement,

15  he stipulated to forfeiture of the proceeds of the sale of the

16  Manhattan Beach house, permitting KIGCF to recoup over $4 million

17  before sentencing.  And it is the government's understanding that

18  defendant has willingly shared information with KIP's counsel to

19  assist in tracing how he spent the $8 million KIP invested, though it

20  does not appear that this information has proved fruitful to KIP.

21  While defendant's actions generally fall within the scope of his plea

22  agreement and restitution obligations, they do demonstrate a

23  meaningful effort to make his victim whole, though not an

24  extraordinary one.  For these reasons, a sentence at the low end of

25  defendant's guideline range suffices.

26    **C.   Defendant's Background Provides No Excuse for His Conduct**

27    Notwithstanding defendant's claim that his childhood was "hard"

28  because of the lack of emotional support he received from his father

1   (PSR ¶ 74, at 14), defendant benefited from a stable, supportive

2   upbringing.  Defendant grew up in a two-parent household, had

3   academic and athletic success, was not socially isolated during his

4   childhood, and graduated from UCLA.  (PSR ¶¶ 73, 76, 95 at 14-15,

5   17).  That is not to say that defendant's upbringing was idyllic in

6   its entirety.  Almost no one's is.  But defendant's circumstances are

7   a far cry from the crippling poverty and unstable home life that

8   afflicted many of the criminal defendants in this district.

9        In mitigation, defendant also submits a psychological report

10   that identifies his "collection of serious anxieties and

11   insecurities" and alcohol abuse, while simultaneously acknowledging

12   that defendant is "clearly intelligent" and "clearly able to

13   understand the nature of his actions and the wrongfulness of his

14   actions."  (Romanoff Report 32).  Without diagnosing any specific

15   psychological ailment, the report concludes that defendant's

16   symptoms, "taken together[,] represent actual serious mental illness"

17   because "[o]ne of the essential hallmarks of all mental illness . . .

18   centers on the degree to which that illness impairs one's functioning

19   in the real world."  (Id.).

20        This analysis begs the question.  Rather than looking to

21   defendant's psychological conditions and determining whether they

22   induced his criminal behavior, the report does the opposite: it takes

23   the fact of defendant's crimes as itself proof that he must suffer

24   from "serious mental illness."  At a trivial level, it is undoubtedly

25   true that serious criminals engage in decisions and behaviors

26   different from the law-abiding, but it is unclear what import this

27   insight has for defendant's case.  It makes him no less morally

28   culpable for his conduct; as defendant's own psychiatric report

12

1  notes, he is both "clearly intelligent" and "clearly able to

2  understand the nature of his actions and the wrongfulness of his

3  actions." (Romanoff Report 32).  Neither does attributing the harm

4  defendant inflicted to mental illness do anything to make his victims

5  whole.  Nor does it mitigate the need for a sentence sufficient to

6  deter both defendant and others contemplating similar fraudulent

7  conduct.  If anything, a defendant who lacks self-control requires a

8  greater sentence than the average person to discourage him from

9  reoffending.

10 **V.   RESTITUTION**

11      As set forth in defendant's superseding plea agreement,

12 defendant caused $8 million in losses to KIGCF and $6 million in

13 losses to Yungpark Capital.  The total amount of restitution is

14 therefore $14 million.

15      Through the forfeiture process, KIGCF has already received

16 $4,075,171.07 in funds that were seized from the sale of defendant's

17 house in Manhattan Beach, and that figure should be credited toward

18 defendant's restitution obligation.  An additional amount of

19 $1,497,410.83 was also forfeited, and KIGCF is currently engaged in

20 the Department of Justice's remission process to have those funds

21 disbursed as restitution.  Assuming that occurs, those funds should

22 be credited against defendant's restitution obligation to KIGCF as

23 well, but only once the funds have been successfully remitted.

24 **VI.  CONCLUSION**

25      For the foregoing reasons, the government respectfully requests

26 that this Court impose a sentence of two concurrent terms of 108

27

28

13

months' imprisonment[2] and three years of supervised release, along with two $100 special assessments and an order of $14 million in restitution with credit for the restitution payments KIGCF already received.

---

[2] Because, by statute, defendant's enhanced sentence under 18 U.S.C. § 3147 must run consecutive to the rest of his sentence, the government joins the Probation Office in recommending that this be accomplished in case number 19-744-AB through a sentence of 90 months' imprisonment on count one followed by an 18-month sentence under § 3147.

1   TRACY L. WILKISON
    Acting United States Attorney
2   SCOTT M. GARRINGER
    Assistant United States Attorney
3   Chief, Criminal Division
    ADAM P. SCHLEIFER (Cal. Bar No. 313818)
4   Assistant United States Attorney
    Major Frauds Section
5        1100 United States Courthouse
         312 North Spring Street
6        Los Angeles, California 90012
         Telephone: (213) 894-4849
7        Facsimile: (213) 894-6269
         E-mail:   adam.schleifer@usdoj.gov
8
    Attorneys for Plaintiff
9   UNITED STATES OF AMERICA

10                  UNITED STATES DISTRICT COURT

11             FOR THE CENTRAL DISTRICT OF CALIFORNIA

12   UNITED STATES OF AMERICA,          No. CR 19-463-SVW

13             Plaintiff,

14             v.                       GOVERNMENT'S SENTENCING POSITION

15   CHARLES THOMAS SEBESTA,            Hearing Date: August 30, 2021
                                        Hearing Time: 11:00 a.m.
16             Defendant.               Location:     Courtroom of the Hon.
                                                      Stephen V. Wilson
17

18        Plaintiff United States of America, by and through its counsel

19   of record, the Acting United States Attorney for the Central District

20   of California and Assistant United States Attorney Adam P. Schleifer,

21   hereby files its sentencing position in this case.

22        This sentencing position is based upon the attached memorandum

23   //

24   //

25   //

26   //

27   //

28

of points and authorities, the files and records in this case, and such further evidence and argument as the Court may permit.

Dated: August 16, 2021                    Respectfully submitted,

                                          TRACY L. WILKISON
                                          Acting United States Attorney

                                          SCOTT M. GARRINGER
                                          Assistant United States Attorney
                                          Chief, Criminal Division

                                          *APS*
                                          _____
                                          ADAM P. SCHLEIFER
                                          Assistant United States Attorney

                                          Attorneys for Plaintiff
                                          UNITED STATES OF AMERICA

<u>**MEMORANDUM OF POINTS AND AUTHORITIES**</u>

**I.   INTRODUCTION**

Pursuant to the terms of his written plea agreement, defendant Charles Thomas Sebesta ("defendant") pleaded guilty on February 3, 2020 to Counts Five (wire fraud in violation of 18 U.S.C. § 1343) and Eight (bank fraud in violation of 18 U.S.C. § 1344(2)) of the thirteen-count indictment in this case. (<u>See</u> Dkt. Nos. 1, 30.)

The United States Probation Office ("USPO") disclosed its Presentence Investigation Report ("PSR") and its sentencing recommendation on April 13, 2020. (Dkt. Nos. 31, 32.)  The USPO determined that the total offense level under the United States Sentencing Guidelines ("USSG") applicable to defendant's convictions is 30; that defendant's Criminal History Score of 3 establishes a USSG Criminal History Category of II; that the applicable USSG range of imprisonment is therefore 108-135 months; that the Guidelines term of supervised release is 2-5 years; that defendant owes restitution totaling $11,438,213 as well as a mandatory special assessment of $200; and that concurrent terms of imprisonment of 108 months would satisfy the sentencing factors of 18 U.S.C. § 3553(a).

The government does not object to the USPO's calculations of defendant's total Guidelines offense level, criminal history, or payment obligations.  For the reasons set forth below, the government recommends that the Court impose a within-Guidelines term of imprisonment of 130 months; a five-year term of supervised release; $11,438,213 in restitution according to the schedule set forth in the PSR; and the mandatory $200 special assessment.

## II.  STATEMENT OF FACTS

For at least ten years, from at least 2006 through 2016, defendant functioned brazenly as what one victim aptly described as "a master serial-embezzler" and "master manipulator." (PSR ¶ 34.) Defendant's primary——but hardly only——criminal scheme preyed upon a Los Angeles Church, the Fifth Church of Christ, Scientist (the "Church").  Defendant insinuated himself into the Church's trust first by gaining employment as a facilities manager in 2001 and, by 2005, also joining as a member and serving as Chairperson of the Church's Board.  (PSR ¶ 13; Dkt. No. 27 at 10.)  Having wrested operational and financial control of the Church from its elderly members by 2006, defendant began a ten-year spree in which he treated the Church and its considerable assets as his own personal piggy bank, stealing and dissipating more than $11.4 million.  (PSR ¶¶ 13-30.)

Among other means, defendant perpetrated his scheme by:

- forging signatures upon the Church's checks;
- creating fictitious accounting entries and false invoices payable to legitimate-sounding shell companies defendant created for his fraudulent purpose;
- causing the Church to sell its real property and embezzling the proceeds;
- intercepting bequests to the Church from the estates of deceased members and arrogating them for his own use and benefit;
- generating cashier's checks from Church accounts and using them for extravagant personal purchases of homes and other luxury items for himself and his family;

2

- dissipating Church assets by spending at least $9.6 million
  in luxury expenses for himself and his family,[1] including
  hundreds-of-thousands of dollars of expenses at a luxury
  hotel with a romantic partner;
- impersonating others and creating false and fraudulent
  email accounts and emails in their names; and
- causing the Church to fire, ostracize, and disbelieve those
  who raised concerns or threatened to impede defendant's
  fraudulent progress.

(See PSR ¶¶ 12-34; Dkt. No. 27 at 9-14.)

In other words, and in Guidelines terms, defendant stole $11,438,213 and destroyed a venerable church, its congregation, and the faith its congregants had in one another by employing sophisticated means to abuse his position of trust and cause the Church not only substantial, but ruinous, financial hardship.  (See PSR ¶¶ 33-34, 42-47.)

In parallel to and concurrently with the frauds defendant perpetrated against the Church and the banks with whom the Church dealt, defendant also devised and executed three other fraudulent schemes.  First, from at least September 2012 through January 2013, defendant embezzled some $34,000 from a separate employer of his (a private high school in Los Angeles) through a fictitious-invoice scheme that shared features with the fraud he perpetrated against the Church.  (PSR ¶ 53.)  Second, defendant defrauded a set of religious and medical charities, convictions and probation for which frauds did

---

[1] On August 16, 2021, defendant represented to the government that he had dissipated essentially all of the $11.4 million he'd stolen from the Church, with some $9.6 million in stolen funds spent on travel, entertainment, and other sundry credit-card expenses.

3

1  nothing to deter defendant from continuing in his as-yet undiscovered

2  fraud against the Church.  (PSR § 57.)  Indeed, defendant continued

3  to execute his scheme to defraud in this case at the very same time

4  that he stood before a California court offering self-justifying

5  pieties and false promises "to ensure I do not put myself or anyone

6  else in this position again" as part of a successful effort to avoid

7  a custodial conviction in connection with his state crimes.  Third,

8  defendant used ill-gotten Church monies and fraudulent email accounts

9  and identities in connection with a scheme involving a professional

10  sports franchise and an exclusive dining club at Disneyland.  (See,

11  e.g., Dkt. No. 1 at 7-8.)

12      For his fraudulent scheme against the Church, defendant was

13  charged in a thirteen-count Indictment of August 14, 2019.  Pursuant

14  to the parties' plea agreement (Dkt. No. 27), defendant pleaded

15  guilty to Counts Five and Eight of that Indictment on February 3,

16  2020.[2]  (Dkt. No. 30.)

17  **III. The Presentence Report**

18      The USPO calculated defendant's USSG Total Guidelines Offense

19  Level at 30, pursuant to the following calculations, which are

20  consistent with the parties' plea agreement and with which the

21  government agrees:

22   Base Offense Level              7            U.S.S.G. § B1.1

23   Loss Amount                    +20     U.S.S.G. § 2B1.1(b)(1)(K)

24

25  _____

26      [2] Count Five charged defendant with wire fraud in violation of
18 U.S.C. § 1343 for an interstate email defendant sent to a Church

27  email account in which the defendant impersonated an executive of the
real estate developer who had purchased property from the Church;
Count Eight charged defendant with bank fraud in violation of 18

28  U.S.C. § 1344(2) for forging a $3,700 Church check for the benefit of
defendant's wife.  (Dkt. No. 1 at 9, 11.)

| Financial Hardship | +2 | U.S.S.G. § 2B1.1(b)(2) |
| Sophisticated Means | +2 | U.S.S.G.§ 2B1.1(b)(10)(C) |
| Abuse of Position of Trust | +2 | U.S.S.G.§ 3B1.3 |
| Acceptance of Responsibility | -3 | U.S.S.G. § 3E1.1(a) |

(See PSR ¶¶ 37-52.)

Noting that defendant committed the instant offense while on probation for his fraud against the religious-medical charities, the USPO calculated defendant's Criminal History Score as 3, placing him within Criminal History Category II, a calculation with which the government agrees.

With a Total Guidelines Offense Level of 30 and a Criminal History Category of II, the USPO found that the Guideline range for defendant's term of imprisonment was 108-135 months; that the maximum statutory term of imprisonment was sixty years; that $11,438,213 in restitution is owed; that any fine amount should be waived in light of the restitution owed; and that the Guidelines term of supervised release is 2-5 years.  (PSR ¶¶ 106-121; Dkt. No. 31 at 6.)  The government agrees with these calculations and findings.

**IV.  The Government's Sentencing Position**

With no apparent motivation or circumstance other than his criminal cupidity,[3] defendant stole more than $11.4 million from the Fifth Church of Christ, Scientist and, in the process, destroyed not only what had once been a venerable institution, but also the trust and faith that its congregants had placed in one another.  Defendant

---

[3] To the extent defendant argues that his medical infirmities justify a lower sentence, it is well-established that the "the sick do not have a license to commit crime."  E.g., United States v. Dachman, 743 F.3d 254, 263 (7th Cir. 2014) (affirming 120-month sentence for $4 million fraud scheme).

1   turned those congregants against one another; he impersonated

2   legitimate businesspeople and sent fraudulent communications in their

3   name; he intercepted the bequests of decedents and arrogated their

4   dying wishes to his limitless criminal greed; he forged checks and

5   defrauded multiple banks in the process; and he managed, he claims,

6   to have spent all of his ill-gotten gains in the process.

7        Defendant did all this not as an impulsive one-off, but as a way

8   of life. He operated three other similar schemes during the decade in

9   which he ripped off the Church and betrayed the trust of its aged

10  congregants.  (See PSR §§ 53, 57; Dkt. No. 1 at 7-8.)

11       In light of defendant's fraudulent conduct and shameless

12  recidivism, the low-end Guidelines term of imprisonment and mid-range

13  term of supervised release recommended by the USPO would fail to

14  satisfy the sentencing factors set forth in 18 U.S.C. § 3553(a).

15  Rather a within-Guidelines term of imprisonment of 130 months is

16  necessary to reflect the seriousness of defendant's offense, promote

17  respect for the law, afford adequate deterrence both to defendant and

18  the public, and, finally, protect the public from further crimes by

19  the defendant.  § 3553(a)(2)(A)-(C).  See, e.g., United States v.

20  Sotomayor, 563 Fed. Appx. 123, 124-28 (3d Cir. 2014) (affirming as

21  reasonable above-Guidelines 216-month sentence for recidivist

22  fraudster who targeted church and its members).  In similar

23  circumstances, indeed, courts of appeal have affirmed as reasonable

24  sentences "double the advisory Guidelines." United States v. Zaler,

25  405 Fed. Appx. 301, 302-310, 316-17 (affirming above-guidelines

26  sentence of 180 months for recidivist fraudster who created false

27  invoices and manipulated innocent associates while emphasizing his

28  untreated bipolar disorder).

**V.    CONCLUSION**

For the foregoing reasons, the government respectfully requests that this Court impose a within-Guidelines term of imprisonment of 130 months; a five-year term of supervised release; $11,438,213 in restitution according to the schedule set forth in the PSR; and the mandatory $200 special assessment.

1  TRACY L. WILKISON
   United States Attorney
2  SCOTT M. GARRINGER
   Assistant United States Attorney
3  Chief, Criminal Division
   JUSTIN P. GIVENS
4  Trial Attorney
   United States Department of Justice
5  Fraud Section, Criminal Division
        300 North Los Angeles Street, Suite 2001
6       Los Angeles, California 90012
        Telephone: (202) 880-2234
7       E-mail:    justin.givens@usdoj.gov

8

   Attorneys for Plaintiff
9  UNITED STATES OF AMERICA

10

11                    UNITED STATES DISTRICT COURT

12              FOR THE CENTRAL DISTRICT OF CALIFORNIA

13  UNITED STATES OF AMERICA,          No. 2:21-CR-00246-PA

14          Plaintiff,                 GOVERNMENT'S SENTENCING MEMORANDUM
                                       REGARDING DEFENDANT ROBERT BENLEVI
15             v.

16  ROBERT BENLEVI,                    Date:  June 27, 2022
                                       Time:  8:30 A.m.
17          Defendant.

18

19

20       Plaintiff United States of America, by and through its counsel

21  of record, the Fraud Section of the Criminal Division of the U.S.

22  Department of Justice, hereby files its Sentencing Memorandum with

23  respect to Defendant Robert Benlevi.

24  //

25  //

26  //

27  //

28  //

1      This Sentencing Memorandum is based upon the attached memorandum

2 of points and authorities, the files and records in this case, and

3 such further evidence and argument as the Court may permit.

4 Dated: June 22, 2022           Respectfully submitted,

5                                TRACY L. WILKISON
                               United States Attorney

6

7                                SCOTT M. GARRINGER
                               Assistant United States Attorney
                               Chief, Criminal Division

8

                                  /s/

9                                JUSTIN P. GIVENS
                               Criminal Division, Fraud Section

10                                U.S. Department of Justice

11                                Attorneys for Plaintiff
                               UNITED STATES OF AMERICA

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**MEMORANDUM OF POINTS AND AUTHORITIES**

**I.    INTRODUCTION**

On March 28, 2022, a jury found defendant Robert Benlevi ("defendant") guilty of six counts of bank fraud, in violation of Title 18, United States Code, Section 1344, six counts of false statements to a financial institution, in violation of Title 18, United States Code, Section 1014, and four counts of conducting monetary transactions in criminally derived property over $10,000, in violation of Title 18, United States Code, Section 1957, as charged in a May 18, 2021 indictment.  (Dkt. 1, 95.)  The United States Probation Office ("USPO") issued its Presentence Investigation Report ("PSR") on June 13, 2022.  (Dkt. 98.)  Defendant's sentencing is scheduled for June 27, 2022, at 8:30 a.m.

For the reasons set forth below, the government respectfully submits that the Court should find that the total offense level for defendant is 30.  Based on the finding in the PSR that defendant is in Criminal History Category IV, the resulting advisory guidelines range is 135-168 months.  The government submits that a sentence of 135 months, a five-year period of supervised release, and a mandatory special assessment of $1,600, along with a restitution order of $3,000,000 is sufficient, but not greater than necessary, to provide just punishment in this case, promote respect for the law, and deter defendant and others from committing similar crimes in the future.

**II.  OFFENSE CONDUCT**

The Court is no doubt familiar with the facts of this case, having presided over the trial of defendant in March 2022.

According to the evidence, defendant owned and controlled multiple corporate entities registered in California, including the

following: Ultra+ Health, LLC; 4HEALTH WONDERS, LLC; JOYOUS-HEALTH4U, LLC; 1STELLAR HEALTH, LLC; BESTWAYS2 HEALTH, LLC; 4STARS COLLECTION, LLC; 2GR8 HEALTH, LLC; and TOPSTARS HEALTH, LLC (collectively, the "Benlevi-controlled entities"). California Secretary of State records identify defendant as the organizer for each of the Benlevi-controlled entities. (Gov. Exs. 101-108[1].) Between April 28, 2020, and May 20, 2020, defendant submitted 27 applications for loans from the Small Business Administration's ("SBA") Paycheck Protection Program ("PPP") on behalf of various Benlevi-controlled entities to Wells Fargo, U.S. Bank, WebBank (via PayPal), and Bank of America (identified in the indictment as Banks A, B, C, and D, respectively). (Gov. Exs. 201-228.)

Each of the 27 applications submitted by defendant sought $1 million in PPP loans. (Ex. A [Gov. Ex. 601].) Further, each of the 27 applications stated the submitting company had 100 employees and average monthly payroll of $400,000. (Ex. B [Gov. Exs. 602-605].) Many of the applications also included 2019 IRS Form 940s stating that each company had $4.8 million in payments to employees in 2019 and IRS Form 941s listing 2020 quarterly employee wages of $1.2 million. (Id.) On each of the 27 applications, defendant certified multiple times that the loan funds would be used to retain workers and maintain payroll, that the applicant company was in operation with employees on February 15, 2020, and that all information and supporting documents in the applications were true and accurate in all material respects. (Gov. Exs. 201-228.)

---

[1] "Gov. Ex." Refers to the government trial exhibit number.

1        As demonstrated by the evidence introduced at trial, the

2    information that defendant submitted in the 27 loan applications was

3    false and fraudulent and the IRS documentation that the defendant

4    included was completely fabricated.  California Employment

5    Development Department ("EDD") witness Sonny Pilanthnakorn testified

6    at trial that none of the Benlevi-controlled entities paid any

7    payroll taxes or payroll expenses between the years 2012 through

8    2021.  (Ex. C [3.25.2022 A.M. Trial Tr.] at 126-127.[2])  IRS witness

9    Renee McClain testified at trial that none of the Benlevi-controlled

10   entities filed any IRS Form 940s or Form 941s and that the IRS tax

11   forms the companies did file——the IRS Form 1120S——reflected the

12   companies paid no salary or wages in 2019.  (Ex. C at 88-90.)

13   Federal Deposit Insurance Corporation ("FDIC") witness Erin Bourassa

14   testified at trial that, after analyzing over 5,000 pages of banking

15   documentation for accounts controlled by the defendant both in his

16   name and the names of the Benlevi-controlled entities, there was no

17   history of any payroll or payments to employees from any of any of

18   the 45 bank accounts analyzed.  (Ex. C at 60-69.)

19        Further evidence presented at trial, including testimony by Bank

20   of America Witness Christopher Yuasa and SBA witness Gil Hopenstand,

21   proved that the defendant's false statements were material to the

22   lenders and, had Bank of America and SBA known that defendant's

23   companies had no payroll and no employees, the companies would not

24   have been eligible for the $3 million in PPP funds that defendant

25   ultimately received.  (Ex. C at 29-35, 96-107.)

26

27   _____

28   [2] The final trial transcripts are not yet available, so the
     government references the "rough" transcript from the March 23, 2022
     a.m. session which is attached here as Exhibit C.

**A.    Presentence Investigation Report**

In the PSR, the USPO calculated defendant's total offense level as 34, with a Criminal History Category IV, as follows:

| | | |
|---|---|---|
| Base Offense Level: | 7 | U.S.S.G. § 2B1.1(a)(1) |
| Intended Loss (More than $25 million but less than $65 million): | 22 | U.S.S.G. § 2B1.1(b)(1)(L) |
| Obtained >$1m from Bank | 2 | U.S.S.G. § 2B1.1(b)(17)(A) |
| Sophisticated Means | 2 | U.S.S.G. § 2B1.1(b)(10) |
| Money Laundering | 1 | U.S.S.G. § 2S1.1(b)(2)(A) |

Accordingly, the USPO's calculation of a total offense level of 34 results in a Guidelines range of 210 to 262 months.

**B.    Government's Calculation**

The United States submits that the Guidelines factors listed below apply to the defendant:

| | | |
|---|---|---|
| Base Offense Level: | 7 | U.S.S.G. § 2B1.1(a)(1) |
| Intended Loss (More than $9.5 million but less than $25 million): | 20 | U.S.S.G. § 2B1.1(b)(1)(K) |
| Obtained >$1m from Bank | 2 | U.S.S.G. § 2B1.1(b)(17)(A) |
| Money Laundering | 1 | U.S.S.G. § 2S1.1(b)(2)(A) |

Accordingly, the United States calculates the defendant's offense level to be 30, which, with a Criminal History Category IV, results in a Guidelines range of 135 to 168 months.

**C.    Applicable Guidelines Provisions**

1.    <u>Intended Loss</u>

The government respectfully disagrees with the PSR and submits that the intended loss in this case is approximately $21 million. The Guidelines provide that loss is the greater of actual loss or intended loss.  U.S.S.G. § 2B1.1(b)(1)(L) Application Note 3.  As

1   shown in the table below, defendant submitted PPP loan applications

2   to Bank of America, Wells Fargo, and U.S. Bank on either April 28 or

3   April 29, 2020.  In or around May 1, 2020, U.S. Bank notified

4   defendant that he was ineligible for the seven PPP loans he applied

5   for through seven of the Benlevi-controlled companies.  Then on May

6   20, 2020, after defendant was already aware that the loan

7   applications for the seven U.S. Bank PPP loans had been denied,

8   defendant applied for the remaining six loans through PayPal/WebBank.

9        Therefore, at the time defendant applied for the first 21 loans

10  on April 28 and April 29, 2020, the intended loss was $21 million.

11  After seven of those loans were denied on May 1, 2020, defendant

12  thereafter applied to PayPal/WebBank for six additional loans on May

13  20,2020, resulting in an intended loss of $20 million since defendant

14  was aware at that time his seven previous loan applications to U.S.

15  Bank were already denied.  Given the timing of those applications,

16  the government conservatively calculates the intended loss to be

17  $21 million, resulting in a 20-level enhancement for intended loss

18  more than $9.5 million but less than $25 million, pursuant to

19  U.S.S.G. § 2B1.1(b)(1)(K).[3]

| Bank (# of applications) | Application Date |
|---|---|
| Bank of America (6) | 4/28/2020 |
| Wells Fargo (8) | 4/28/2020 |
| U.S. Bank (7) | 4/29/2020 **(denied 5/1/2020)** |
| PayPal/WebBank (6) | 5/20/2020 |

---

[3] Of note, whether the Court concludes the intended loss under this methodology is $20 million or $21 million, the loss enhancement would not be affected.

2. <u>Gross Receipts Enhancement</u>

The government agrees with the USPO's determination in the PSR that a 2-level enhancement applies for deriving more than $1 million in gross receipts from a financial institution as a result of the offense, pursuant to U.S.S.G. § 2B1.1(b)(17)(A).  (PSR ¶¶ 32-34.) Here, defendant fraudulently obtained $3 million from Bank of America, a financial institution, through his applications for the Benlevi-controlled entities, and thus the 2-level enhancement should be applied.

3. <u>Sophisticated Means</u>

While the government understands the reasoning of the USPO and initially recommended to the USPO that the sophisticated means enhancement be applied, upon further reflection, as well as review of applicable caselaw and the commentary to the United States Sentencing Guidelines, the government respectfully declines to seek this enhancement given the facts of this case.

4. <u>Money Laundering Enhancement</u>

The government agrees with the USPO's determination in the PSR that a 1-level enhancement applies, pursuant to U.S.S.G. § 2S1.1(b)(2)(A), for a conviction under Title 18, United States Code, Section 1957.  Here, defendant was convicted of four counts (Counts 13-16) of conducting monetary transactions in criminally derived property over $10,000, in violation of Title 18, United States Code, Section 1957 and thus the 1-level enhancement should be applied.

**III. RESTITUTION**

The government respectfully requests that the Court order defendant to pay restitution to Bank of America in the amount of

1  $3,000,000,[4] which was the amount that Bank of America paid the

2  Benlevi-controlled entities based on the defendant's fraudulent PPP

3  loan applications.  This is the amount recommended by the USPO in the

4  PSR, pursuant to Title 18, United States Code, Section 3663A.  (PSR

5  ¶¶ 97-99.)

6  **IV.  ANALYSIS OF THE SECTION 3553(a) FACTORS**

7      The federal statute governing sentencing requires district

8  courts to take the applicable Guidelines range into consideration

9  when sentencing, along with other sentencing factors enumerated by

10 Congress.  See 18 U.S.C. § 3553; United States v. Booker, 543 U.S.

11 220, 264 (2005) ("The district courts, while not bound to apply the

12 Guidelines, must consult those Guidelines and take them into account

13 when sentencing.").  When the Court determines a sentence, "the

14 Guidelines are the starting point and the initial benchmark." United

15 States v. Carty, 520 F.3d 984, 991 (9th Cir. 2008) (en banc)

16 (quotations omitted).  Once the Court calculates defendant's

17 Guidelines range, it must then consider the factors set forth in 18

18 U.S.C. § 3553(a) to decide if they support the sentence recommended

19 by Probation and the parties.  Id.  These factors include, among

20 others, (a) the nature and circumstances of defendant's offense and

21 his history and characteristics; (b) the need for the sentence

22 contemplated to, among other things, (i) reflect the seriousness of

23 the offense, (ii) promote respect for the law and provide just

24 punishment for the offense, (iii) afford adequate deterrence to

25

26 _____

27 [4]  The total amount provided to defendant by Bank of America based on
   his fraudulent PPP loan applications was $3,000,000.  The FBI seized
   $2,876,666.37 from bank accounts controlled by defendant.  These

28 funds are in the process of being returned to Bank of America,
   resulting in a loss of $123,333, but have not yet been returned.

criminal conduct, and (iv) protect the public from further crimes of defendant; and (c) the need to provide restitution to the victim of defendant's offenses.

The government submits that the Section 3553(a) factors support a sentence of 135 months in custody for defendant. Such a sentence would be "sufficient, but not greater than necessary" to comply with the purposes enumerated in 18 U.S.C. § 3553(a)(2), discussed further below.

**A.   Nature and Circumstances of the Offense**

To try to alleviate the significant impact of the COVID-19 pandemic on businesses, the federal government created the PPP to help small businesses financially survive the pandemic. The funds were intended to keep business owners and their employees above water during a time of severe economic disruption. Due to the nature of the program and the immediacy of the financial danger resulting from the pandemic, the PPP loans did not require the same vetting and due diligence as a typical business loan——a feature that was necessary to quickly get the funds to the small businesses and employees that needed them most. Instead, the program depended on the honesty of the applicants. Defendant turned that feature to his advantage and lied, multiple times, in 27 fraudulent PPP applications for $1 million each. Because banks were relying on applicants to tell the truth in order to get the PPP relief money out to those who needed it as quickly as possible, the defendant's obtained $3 million dollars based on his lies.

**B.   History and Characteristics of the Defendant**

Defendant is 53 years old, and lives with and is the sole caregiver for his mother. (PSR ¶ 61.) Defendant was born in Tehran,

Iran, and reportedly came to the United States as a refugee with his mother and sister in 1985.  (Id. ¶ 63.)  Defendant reportedly has a Bachelor of Science in Pharmacy and is a trained pharmacist.  (Id. ¶¶ 74-75.)

Defendant has a substantial criminal history that results in a Criminal History Category IV, including convictions for theft, forgery, entering a noncommercial dwelling, as well as multiple probation violations.  (Id. ¶¶ 45-54.)

**C.    Deterrence, Promoting Respect for the Law, and Punishing Defendant for Her Crime**

The government believes a serious sentence in this case is necessary for both specific and general deterrence.  The defendant's criminal record indicates that he has been willing to break the law routinely, even if for matters less severe than the instant offenses. That attitude about the law appears to have carried over to these offenses, where he was willing to take advantage of vulnerabilities in the PPP loan program.

The sentence in this case should send a clear message to the defendant and other offenders that there are serious consequences for defrauding government emergency relief programs.  As stated by the drafters of 18 U.S.C. § 3553(a), general deterrence is particularly important for white collar criminals in order to dissuade actors that small fines or low sentences can be dismissed as simply a "cost of doing business."  S. Rep. No. 98-225, at 76 (1983), as reprinted in 1984 U.S.C.C.A.N. 3182, 3259.  A significant sentence of incarceration is necessary to affect that calculus so that others realize that the "risk" is too high—that they will pay a significant cost if they are caught.  Actors like the defendant who seek to

1  defraud these programs make it more difficult for administrators of

2  government and other relief programs to get aid to individuals who

3  qualify for and need it.  The defendant's sentence should serve as a

4  warning and deterrent to others inclined to exploit similar relief

5  programs.

6  **V.    CONCLUSION**

7       For the foregoing reasons, the government respectfully requests

8  that the Court:  (1) find defendant's total offense level is 30;

9  (2) applying a Criminal History Category IV, sentence defendant at

10  the low end of the advisory Guidelines range for a sentence of 135

11  months in custody, along with a five-year period of supervised

12  release, and a mandatory special assessment of $1,600; and (3) order

13  defendant to pay restitution to Bank of America in the amount of

14  $3,000,000.

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1  NICOLA T. HANNA
   United States Attorney
2  DENNISE D. WILLETT
   Assistant United States Attorney
3  Chief, Santa Ana Branch Office
   VIBHAV MITTAL (Cal. Bar No. 257874)
4  DANIEL S. LIM (Cal. Bar No. 292406)
   Assistant United States Attorneys
5       8000 United States Courthouse
        411 West Fourth Street
6       Santa Ana, California 92701
        Telephone:  (714) 338-3500
7       Facsimile:  (714) 338-3708
        E-mail:     vibhav.mittal@usdoj.gov
8
   Attorneys for Plaintiff
9  UNITED STATES OF AMERICA

10                    UNITED STATES DISTRICT COURT

11             FOR THE CENTRAL DISTRICT OF CALIFORNIA

12  UNITED STATES OF AMERICA,          No. SA CR 15-35-JLS

13          Plaintiff,                 GOVERNMENT'S POSITION RE:
                                       SENTENCING; EXHIBITS
14          v.
                                       Hearing Date: August 3, 2018
15  PETER HEINRICH CONRAD REINERT,     Hearing Time: 8:30 a.m.
                                       Location:     Courtroom of the
16          Defendant.                               Hon. Josephine L.
                                                     Staton
17

18
        Plaintiff United States of America, by and through its counsel
19
   of record, the United States Attorney for the Central District of
20
   California and Assistant United States Attorney Vibhav Mittal, hereby
21
   files its position regarding sentencing.
22

23

24

25

26

27

28

1          This position is based upon the attached memorandum of points

2    and authorities, exhibits, the files and records in this case, and

3    such further evidence and argument as the Court may permit.

4    Dated: July 20, 2018              Respectfully submitted,

5                                      NICOLA T. HANNA
                                       United States Attorney
6
                                       DENNISE D. WILLETT
7                                      Assistant United States Attorney
                                       Chief, Santa Ana Branch Office
8

9                                      _____/s/_____
                                       VIBHAV MITTAL
10                                     DANIEL S. LIM
                                       Assistant United States Attorneys
11
                                       Attorneys for Plaintiff
12                                     UNITED STATES OF AMERICA

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1          <u>**MEMORANDUM OF POINTS AND AUTHORITIES**</u>

2    **I.    INTRODUCTION**

3          Between 2010 and April 2015, defendant PETER HEINRICH CONRAD

4    REINERT ("defendant") defrauded victims of approximately $7.3 million

5    in three investment fraud schemes.  (PSR ¶ 45.)  In the first scheme,

6    Fazer Technologies Corporation ("Fazer"), defendant acted as the

7    President and Chief Executive Officer ("CEO") for a company that was

8    purportedly developing, among other things, a product that could

9    increase gas mileage for any car to 150 miles per gallon.  (CR 51 at

10   2.)  In the second scheme, Global Encryption Imaging Corporation

11   ("GEIC"), defendant acted as the President and CEO for a company that

12   was purportedly developing, among other things, an anti-

13   counterfeiting technology.  (<u>Id.</u>)  In the third scheme, Income from

14   Waste Corporation ("IFW"), defendant acted as the Chairman of the

15   Board of Directors and CEO for a company that was purportedly

16   developing, among other things, a technology to convert trash,

17   including used tires, into useable energy, including electricity and

18   oil.  (<u>Id.</u>)  Defendant failed to file corporate tax returns for

19   entities that he ran, including Fazer, GEIC, and IFW.  (PSR ¶¶ 33-

20   36.)

21         In addition, defendant, who was born in Germany as Peter

22   Heinrich Conrad Reinert, fraudulently obtained United States

23   passports in 1989, 1996, and 2009, where he falsely claimed that he

24   was born in the state of Maine as Peter Michael Berger.  (PSR ¶ 57.)

25   Notably, during his presentence interview, defendant made material

26   false statements to the probation officer when he said that his date-

27   of-birth was December 7, 1954, and he was born in Maine.  (PSR ¶ 40.)

28

On March 14, 2018, defendant pleaded guilty pursuant to a plea agreement to a single count of wire fraud, in violation of 18 U.S.C. § 1343.  (CR 155.)  In the plea agreement, defendant admitted to defrauding victims of the Fazer, GEIC, and the IFW schemes.  (CR 154 at 10-20.)  Defendant also accepted responsibility for these schemes during his presentence interview.  (PSR ¶ 41.)

On June 22, 2018, the United States Probation Office ("USPO") issued its PSR, calculating a guidelines range of 78 to 97 months based on a total offense level of 26 and a criminal history category of III.  (PSR at 3.)  The USPO applied a two-level enhancement for obstruction of justice pursuant to USSG § 3C1.1 because defendant made materially false statements when he misrepresented his date-of-birth and birthplace.  (PSR ¶¶ 50-51.)  Despite this obstruction of justice, the probation office elected to still apply the downward adjustment for acceptance of responsibility.  (PSR ¶ 54.)  In its disclosed recommendation letter to the Court, the USPO recommends a sentence of 63 months to be followed by three years of supervised release, applying a two-level downward variance.  (CR 160.)

The government concurs with the probation office's calculations of the guidelines range.[1]  However, the government does not believe a two-level downward variance is warranted.  Accordingly, because of the over $7 million in fraud at issue, defendant's obstruction of justice during his presentence interview, defendant's prior criminal

---

[1] The recommendation letter lists GEIC victim Andrew Gadd as "Andree Gadd."  (CR 160 at 11).  This should be corrected in the final list of victims.  Moreover, the recommendation letter includes standard language related to a preliminary order of forfeiture.  (CR 160 at 2.)  However, this language is not necessary as the FBI has administratively executed the forfeiture, per the plea agreement. (CR 154 at 3-5.)

history, and all the facts relevant to the § 3553(a) analysis, a 78-month sentence is warranted.

**II.   ARGUMENT**

The applicable guideline range in this case is 78 to 97 months. While not definitive, the Guidelines range provides the starting point for finding a reasonable sentence and must then be considered with the factors set forth in Section 3553(a).  See United States v. Cantrell, 433 F.3d 1296, 1279 (9th Cir. 2006).  To comply with the requirements of Booker, the district court must have sufficiently considered the Guidelines as well as the other factors listed in § 3553(a).  This requirement does not necessitate a specific articulation of each factor separately, but rather a showing that the district court considered the statutorily-designated factors in imposing a sentence." United States v. Nichols, 464 F.3d 1117, 1125 (9th Cir. 2006) (quoting United States v. Knows His Gun, 438 F.3d 913, 918 (9th Cir. 2006)).

> **A.   A 78-month sentence is reasonable in light of the nature and circumstances of the offense and defendant's history and characteristics**

To execute these schemes and cause over $7 million in loss, defendant used brands and institutions that have credibility to falsely bolster himself and his fraudulent offerings.  In addition, defendant made material omissions relating to his criminal history and the use of the victim money.  If the victims knew who defendant was and how their money was being used, they surely would not have invested with defendant.

Associating himself with reputable brands and institutions allowed defendant to build trust with the victims.  Defendant made

3

false statements and used material omissions to obtain investments

from the victims and also to subsequently lull those victims so they

believed that they were part of a legitimate investment.  For

example, in the Fazer private placement memorandum ("PPM") (Ex. 1)

and GEIC website (Ex. 2), defendant falsely claimed to have a MBA

from UCLA.[2]  During the search of his office on April 15, 2015, the

FBI found fake diplomas from UCLA.  (Ex. 3.)   In the marketing

material, defendant presented himself as a successful, trustworthy

CEO, which was far from the truth.  (Ex. 6 at 1.)   Defendant, in

fact, had multiple fraud felonies.

     Similarly, defendant made up tall tales to victims about his

background in and connections to the government to reassure them that

they were investing with someone who could be trusted.   In one

recorded meeting, defendant went so far as to tell a GEIC scheme

victim, Andrew Gadd, he had been:  in the Marines for 12 years; an

intelligence officer who killed and interrogated people; and a

liaison for the CIA who put together capture/kill teams.  (Ex. 5 at

2-3.)   The FBI also found material in his office that falsely

suggested that defendant was a United States Marine.  (Ex. 4.)   To

state the obvious, defendant was never a Marine nor had he ever

---

[2] Attached to this sentencing position are 9 exhibits.  The following is a description of the exhibits:  Exhibit 1 (a portion of the Fazer PPM); Exhibit 2 (a portion of the GEIC website); Exhibit 3 (copies of the diplomas seized from defendant's office by the FBI on April 15, 2015); Exhibit 4 (copies of the United States Marines-related paraphernalia seized from defendant's office by the FBI on April 15, 2015); Exhibit 5 (a portion of a draft transcript from a April 25, 2012, recorded meeting between defendant and GEIC victim, Andrew Gadd); Exhibit 6 (a portion of the IFW PPM); Exhibit 7 (a portion of a draft transcript from a January 7, 2015, recorded call between defendant and deceased victim Donald Carlin); Exhibit 8 (same); and Exhibit 9 (a sample of the victim impact statements that the government received).

4

1  worked for the CIA.

2      During the IFW scheme, defendant falsely stated to Missouri

3  farmers (who were victims) that he was a United States Secret Service

4  agent.  (PSR ¶ 29(b).)  The IFW PPM also falsely stated that a

5  retired United States Secret Service agent (James Davidson) was on

6  the board.  (Ex. 6 at 1-2.)  During the recorded meeting with Mr.

7  Gadd, defendant showed off a United States Secret Service pin that

8  Mr. Davidson had given him and claimed that if defendant was a crook,

9  he would not have the pin.  (Ex. 5 at 1.)  Defendant's use of the

10  trust the victims placed in Secret Service agents was particularly

11  ironic since the Secret Service was the agency that investigated

12  defendant in the late 1990s for his prior federal felonies related to

13  identity theft.

14      Defendant's schemes did not only rely on public institutions

15  like the Marines, CIA, Secret Service, and UCLA.  Defendant also

16  fraudulently used the credibility of private companies like General

17  Motors, General Electric, and Tesla to suggest these American icons

18  were interested in defendant's startups' technologies.  Again, this

19  was an effort to give legitimacy to defendant's fraudulent offerings.

20  At some point, defendant claimed that Tesla stole Fazer's technology

21  after Fazer presented it to Tesla.  During a January 7, 2015,

22  recorded call, defendant falsely said that Tesla turned Fazer down

23  but "basically" stole Fazer's technology (Ex. 7) and incorporated

24  Fazer's technology with a "somewhat changed design" into Tesla cars

25  (Ex. 8).  This assertion made no sense given that Fazer's purported

26  technology was to increase the gas mileage of a car and Tesla's

27  electric-powered cars use no gas.  But in short, even long after it

28  was clear that the investments had yielded no returns, defendant was

still telling false stories to lead victims to believe that they had merely been part of investments that had failed.

In mitigation, defendant did plead guilty and admit to his involvement in the three charged fraud schemes.  He also agreed to forfeiture of money seized and two cars.

Given these aggravating and mitigating circumstances, the government believes that a 78-month sentence is warranted.

**B.   A 78-month sentence is reasonable because it reflects the seriousness of the offense, promotes respect for the law, and provides a just punishment**

There is no question that defendant's offense and relevant conduct are serious.  The victim impact statements best illustrate the seriousness of defendant's schemes as well as the need for a sentence that both promotes respect for the law and provides just punishment.  The USPO summarized the statements received in paragraph 39 of the PSR.  The government has attached some of the more detailed statements that it received for the Court's consideration.  (Ex. 9.) Defendant's victims were from a range of backgrounds.  There was a group of modest Missouri farmers (Ex. 9 at 1-5) that believed IFW's technology was a "win-win."  The purported technology helped the environment by reducing waste (like tires used in their farm vehicles), created energy, and would earn the farmers substantial returns.  In the end, these victims lost all the money they invested and are rightly concerned that defendant has their personal identifying information—given his criminal history that includes identity theft.  The victims also included an elderly veteran (Ex. 9 at 6) as well as business people from across the United States (Ex. 9 at 7-9).  As the government noted in previous filings, some of the victims have passed away or were too ill to travel for proceedings in

1  this matter.

2  **C.    A 78-month sentence is reasonable because it protects the**
3  **public from defendant's crime and affords adequate**
   **deterrence of criminal conduct**

4  Defendant has a substantial criminal history dating from 1990

5  through 2011.  (PSR ¶¶ 60-64.)  The criminal convictions range from

6  violent crimes (like battery and fighting in public) to fraudulent

7  behavior (like forgery and identity theft).  What is more troubling

8  is the fact that defendant was aware of the FBI investigation and

9  continued to defraud victims.  Finally, defendant could have simply

10 not answered the USPO's questions about his date-of-birth and

11 birthplace during his presentence interview.  Yet, defendant gave the

12 USPO a false date-of-birth and birthplace.  That was obstruction of

13 justice.  To protect the public and deter defendant's fraudulent

14 behavior, a 78-month sentence is warranted.

15 **D.    A 78-month sentence is reasonable because it does not**
   **create unwarranted sentencing disparities**
16

17 A sentence within the Sentencing Guidelines range may be the

   best way to satisfy this factor.  See United States v. Mares, 402
18
   F.3d 511, 518-519 (5th Cir. 2005).  Thus, a low-end sentence is
19
   commensurate with what others in defendant's position would receive.
20
   See United States v. Blinkinsop, 606 F.3d 1110, 1116 (9th Cir. 2010)
21
   (noting that a within-Guidelines sentence is generally reasonable in
22
   the "mine run of cases").
23

   **III. CONCLUSION**
24

25 For these reasons, the government respectfully recommends that

   defendant be sentenced to 78 months of imprisonment.
26

27

28

1   TRACY L. WILKISON
    United States Attorney
2   SCOTT M. GARRINGER
    Assistant United States Attorney
3   Chief, Criminal Division
    MARK AVEIS (Cal. Bar No. 107881)
4   IAN V. YANNIELLO (Cal. Bar No. 265481)
    CAROLYN S. SMALL (Cal. Bar No. 304938)
5   Assistant United States Attorneys
         1100 United States Courthouse
6        312 North Spring Street
         Los Angeles, California 90012
7        Telephone: (213) 894-4477/3667/2041
         Facsimile: (213) 894-6269
8        E-mail:   mark.aveis@usdoj.gov
                   ian.yanniello@usdoj.gov
9                  carolyn.small@usdoj.gov

10  Attorneys for Plaintiff
    UNITED STATES OF AMERICA

11
                    UNITED STATES DISTRICT COURT
12
             FOR THE CENTRAL DISTRICT OF CALIFORNIA
13
    UNITED STATES OF AMERICA,          No. CR 18-124(A)-MWF
14
               Plaintiff,              GOVERNMENT'S POSITION IN SUPPORT
15                                     OF RESTITUTION; SUPPORTING
               v.                      DECLARATION OF SAM CHAN AND
16                                     EXHIBIT
    PHILIP JAMES LAYFIELD,
17       aka Philip Samuel Pesin,      Hearing date: May 12, 2022
                                       Time: 3:00 p.m.
18             Defendant.

19

20       The government, by and through its attorneys of record, hereby

21  submits its position in support of restitution to be ordered against

22  defendant Philip James Layfield.  The government submits that

23  defendant should be ordered to pay restitution in this case in the

24  total amount of $10,715,428.43.

25       The government's restitution submission is based upon the

26  evidence received at trial, the Court's statements on the record

27  during the sentencing hearing on February 17, 2022, the information

28  provided below, the attached supporting declaration of Sam Chan and

1   exhibit, the concurrently lodged, under seal, spreadsheet from the

2   California State Bar Client Security Fund, and upon such other and

3   further information or evidence as the Court may consider.

4       Dated: April 22, 2022              Respectfully submitted,

5                                          TRACY L. WILKISON
                                           United States Attorney
6
                                           SCOTT M. GARRINGER
7                                          Assistant United States Attorney
                                           Chief, Criminal Division
8

9                                          _____/s/_____
                                           MARK AVEIS
10                                         IAN V. YANNIELLO
                                           CAROLYN S. SMALL
11                                         Assistant United States Attorneys

12                                         Attorneys for Plaintiff
                                           UNITED STATES OF AMERICA
13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**TABLE OF CONTENTS**

DESCRIPTION                                                          PAGE

I.    SUMMARY AND APPLICABLE LAW...................................1

      A.    Procedural Posture.....................................1

      B.    The Restitution Victims................................1

            1.    Clients, Referral Counsel, and Litigation Lender.....1

            2.    Internal Revenue Service.........................2

            3.    State Bar Client Security Fund...................4

      C.    Chart of Restitution...................................5

II.   UNDISPUTED RESTITUTION......................................6

III.  DISPUTED RESTITUTION.......................................6

      A.    S.A. - $182,028.01.....................................6

      B.    P.C. - $213,810.83.....................................7

      C.    T.D.F. - $150,000.00, M.L.- $187,054.00................8

      D.    F.H. - $15,247.54......................................9

      E.    M.M. - $242,502.16.....................................9

      F.    W.M. and Estate of P.M. - $24,382.37 each.............10

      G.    U.S. Claims/Opco - $1,785,872.00......................10

      H.    IRS - $1,497,479.60 (total)...........................11

            1.    Income Tax - $1,340,019.44.......................11

            2.    Payroll Tax - $157,460.16........................13

      I.    California State Bar Client Security Fund -
            $3,427,496.45.........................................13

IV.   OTHER TERMS AND CONDITIONS OF RESTITUTION....................13

DECLARATION OF SPECIAL AGENT SAM CHAN............................16

i

**TABLE OF AUTHORITIES**

<u>DESCRIPTION</u>                                                                <u>PAGE</u>

**Cases**

<u>Brookman v. State Bar</u>,
  46 Cal. 3d 1004 (1988) ........................................ 5

<u>James v. United States</u>,
  366 U.S. 213 (1961) ........................................... 3

<u>McMillan v. Pennsylvania</u>,
  477 U.S. 79 (1986) ............................................ 4

<u>McNally v. United States</u>,
  483 U.S. 350 (1987) ........................................... 2

<u>Pasquantino v. United States</u>,
  544 U.S. 349 (2005) ........................................... 3

<u>State Bar of California v. Statile</u>,
  168 Cal. App.4th 650 (2008) ................................... 5

<u>United States v. Batson</u>,
  608 F.3d 630 (9th Cir. 2010) ............................... 2, 3

<u>United States v. Chalupnik</u>,
  514 F.3d 748 (8th Cir. 2008) .................................. 4

<u>United States v. Green</u>,
  722 F.3d 1146 (9th Cir. 2013) ................................ 12

<u>United States v. Hassebrock</u>,
  663 F.3d 906 (7th Cir. 2011) .................................. 3

<u>United States v. Perry</u>,
  714 F.3d 570 (8th Cir. 2013) .................................. 4

**Federal Statutes**

18 U.S.C. § 3563 ................................................. 2
18 U.S.C. § 3583 ................................................. 2
18 U.S.C. § 3612 ............................................ 14, 15
18 U.S.C. § 3663 ............................................. 1, 2
18 U.S.C. § 3664 ............................................. 4, 14
26 U.S.C. § 6601 ................................................ 13
26 U.S.C. § 7201 ................................................. 2
26 U.S.C. § 7202 ................................................. 2
26 U.S.C. § 7203 ................................................. 2

1

**<u>TABLE OF AUTHORITIES (CONTINUED)</u>**

2  <u>DESCRIPTION</u>                                                                    <u>PAGE</u>

3  **United States Sentencing Guidelines**

4  U.S.S.G. § 5E1.1 ............................................... 2

**Other Authorities**

5  Cal. Bus. & Prof. Code § 6140.5 ............................... 5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**I.    SUMMARY AND APPLICABLE LAW**

    **A.    Procedural Posture**

    The initial sentencing hearing in this case was held on February 17, 2022.  Prior to the sentencing hearing, the parties advised the Court that they had met and conferred and would need additional time to attempt to determine restitution without a hearing.  Thus, at the parties' joint request, the Court deferred its determination of restitution in this case to May 12, 2022.

    The parties have further met and conferred and agreed in part to restitution for certain victims.  This brief is intended to reflect the undisputed restitution based on the parties' agreement as well as to set forth the government's position for restitution in dispute.

    **B.    The Restitution Victims**

    The government believes that there are three groups of victims to whom restitution should be paid.

        1.    Clients, Referral Counsel, and Litigation Lender

    First, restitution must be paid to individuals or entities directly and proximately harmed by defendant's offense conduct, pursuant to the Mandatory Victim Restitution Act, 18 U.S.C. § 3663A *et seq* ("MVRA").  This group consists of defendant's former clients and referral counsel who were owed portions of the settlement proceeds that defendant embezzled from his trust account.  It also includes litigation lender U.S. Claims/Opco, whom defendant defrauded into advancing him money on the eve of defendant's relocation to Costa Rica.

    Clients, referral counsel, and U.S. Claims/Opco are "victims" to whom restitution is owed pursuant to the MVRA.  "[T]he term 'victim' means a person directly and proximately harmed as a result of the

1   commission of an offense for which restitution may be ordered

2   including, in the case of an offense that involves as an element a

3   scheme, conspiracy, or pattern of criminal activity, any person

4   directly harmed by the defendant's conduct in the course of the

5   scheme, conspiracy or pattern." 18 U.S.C. § 3663A(a)(2). The MVRA

6   makes restitution mandatory, as a separate term of the sentence, for

7   title 18 offenses against property (including any offense committed

8   by fraud or deceit). 18 U.S.C. § 3663A(c). *See also, McNally v.*

9   *United States*, 483 U.S. 350, 358 (1987)("the words 'to defraud'

10  commonly refer 'to wronging one in his property rights by dishonest

11  methods or schemes,' and 'usually signify the deprivation of

12  something of value by trick, deceit, chicane or overreaching.'")

13           2.   Internal Revenue Service

14       Second, restitution should be paid to the Internal Revenue

15  Service based on defendant's unpaid income and payroll taxes. For

16  the tax convictions, First Superseding Indictment, counts 26 and 28

17  (26 U.S.C. § 7201 and 7203), and failure to pay over payroll taxes,

18  count 27 (26 U.S.C. § 7202), restitution is discretionary and

19  awardable as a condition of supervised release. 18 U.S.C. § 3583(d);

20  U.S.S.G. § 5E1.1; *United States v. Batson*, 608 F.3d 630, 636 (9th

21  Cir. 2010)("[W]e hold that 18 U.S.C. § 3563(b)(2), which grants

22  federal courts broad discretion to order restitution as a condition

23  of probation, and 18 U.S.C. § 3583(d), which extends that grant to

24  supervised release, authorizes federal courts to order restitution as

25  a condition of supervised release for any criminal offense, including

26  those set forth in Title 26, for which supervised release is properly

27  imposed."). An award of restitution as a condition of supervised

28  release is subject to the same causation limitations as an award

1  under the MVRA. *United States v. Batson*, 608 F.3d at 637 ("[A]n

2  award of restitution ordered as a condition of supervised release can

3  compensate []only for the loss caused by the specific conduct that is

4  the basis of the offense of conviction (citation omitted)[.]").

5  Restitution for tax-related offense conduct that is awarded as a

6  condition of supervised release does not include relevant conduct

7  under the Sentencing Guidelines. *Id.* Accordingly, defendant cannot

8  be required to pay restitution ordered as a result of his tax-related

9  convictions until his period of supervised release begins. *United*

10  *States v. Hassebrock*, 663 F.3d 906, 924 (7th Cir. 2011).

11      The measure of restitution awardable for defendant's tax-related

12  convictions is the money actually due the government had defendant

13  timely and properly paid the taxes due and owing. *See, generally,*

14  *Pasquantino v. United States*, 544 U.S. 349, 355-56 (2005)(unpaid tax

15  constituted property under the wire fraud statute).  In a case

16  involving both embezzlement and tax evasion, such as this case,

17  defendant is not entitled to a tax credit for the amounts he

18  embezzled.  The Court will recall the substantial litigation over

19  tax-related jury instructions in which the Court instructed the jury

20  that defendant may be liable for tax evasion for embezzling money

21  from his clients to whom he, of course, owes restitution.  As the

22  Supreme Court stated,

> When a taxpayer acquires earnings, lawfully or unlawfully,
> without the consensual recognition, express or implied, of an
> obligation to repay and without restriction as to their
> disposition, he has received income which he is required to
> return, even though it may still be claimed that he is not
> entitled to retain the money, and even though he may still be
> adjudged liable to restore its equivalent.  (Citation omitted.)

23

24

25

26
*James v. United States*, 366 U.S. 213, 219 (1961).

27

28

1      Furthermore, the Court may impose pre-judgment interest, but not

2  penalties, as part of the tax-related restitution award in this case.

3  *United States v. Perry*, 714 F.3d 570, 577 (8th Cir. 2013)(affirming

4  inclusion of interest in restitution to IRS because the full loss to

5  the victim included the time value of money); *United States v.*

6  *Chalupnik*, 514 F.3d 748, 754 (8th Cir. 2008)("[W]hile the

7  availability of a civil remedy is relevant in determining who is

8  [restitution] victim, the amount of restitution that may be awarded

9  is limited to the victim's provable actual loss, even if more

10  punitive remedies would be available in a civil action.").

11      Finally, the government bears the burden of showing the amount

12  of tax loss for restitution by a preponderance of the evidence.  18

13  U.S.C. § 3664(e); *McMillan v. Pennsylvania*, 477 U.S. 79, 97-92

14  (1986).

15         3.  <u>State Bar Client Security Fund</u>

16      Third, restitution should be paid to the California State Bar's

17  Client Security Fund (the "Fund").  The Fund paid approximately $2.8

18  million to compensate 89 of defendant's former clients on account of

19  defendant's fraud.[1]  While Fund payments made to those former clients

20  identified herein reduce the amount of restitution due such clients,

21  defendant is nonetheless not entitled to what would essentially be a

22  double-credit; he is still required to pay the Fund as the subrogee

23  of the clients.  *See* 18 U.S.C. § 3664(f)(1)(A),(B)("In each order of

24  restitution, the court shall order restitution to each victim in the

25  full amount of each victim's losses as determined by the court [and

26

27      [1] *See* government's concurrently lodged, under seal, chart provided by Fund attorney Matthew Zawol.  This chart is identical to

28  the chart that the government submitted in support of its sentencing position (Dkt. 349-1), except that interest has been calculated to the date of the restitution hearing.

i]n no case shall the fact that a victim has received or is entitled to receive compensation with respect to a loss from insurance or any other source be considered in determining the amount of restitution."); *Brookman v. State Bar*, 46 Cal. 3d 1004, 1008 (1988)(attorney's obligation to repay amounts paid by the Fund to clients is "imposed in order to protect the public and to help rehabilitate the State Bar member.").  The Fund has full rights of subrogation against defendant to recover those amounts and defendant is estopped to claim that Fund payouts were improper.  California Business & Professions Code § 6140.5(c)("Upon making a payment to a person who has applied to the fund for payment to relieve or mitigate pecuniary losses caused by the dishonest conduct of an active member of the State Bar, the State Bar is subrogated, to the extent of that payment, to the rights of the applicant against any person or persons who, or entity that, caused the pecuniary loss.  The State Bar may bring an action to enforce those rights within three years from the date of payment to the applicant."); *State Bar of California v. Statile*, 168 Cal.App.4th 650, 662 (2008).

**C.   Chart of Restitution**

The following chart identifies the payees and amounts for whom the government seeks restitution:

|  |  |
|---|---|
| T.B. (client) | $42,874.25 |
| J.L. (referral counsel) | $83,300.00 |
| J.N. (client) | $2,135,893.41 |
| R.P. (client) | $460,105.44 |
| Da. S. (referral counsel) | $243,000.00 |
| S.A. (client) | $182,028.01 |
| P.C. (client) | $213,810.83 |

|  |  |
|---|---|
| T.D.F. (referral counsel) | $150,000.00 |
| M.L. (client) | $187,054.00 |
| F.H. (client) | $15,247.54 |
| M.M. (client) | $242,502.16 |
| W.M. (referral counsel) | $24,382.37 |
| P.M. (referral counsel) | $24,382.37 |
| U.S. Claims/Opco | $1,785,872.00 |
| IRS | $1,497,479.60 |
| CSB Fund | $3,427,496.45 |
| Total | $10,715,428.43 |

## II. UNDISPUTED RESTITUTION

The parties agree that restitution should be paid to the following individuals in the following amounts:

|  |  |
|---|---|
| T.B. (client) | $42,874.25 |
| J.L. (referral counsel) | $83,300.00 |
| J.N. (client) | $2,135,893.41 |
| R.P. (client) | $460,105.44 |
| Da. S. (referral counsel) | $243,000.00 |
| Total | $2,965,173.10 |

## III. DISPUTED RESTITUTION

The government submits that restitution should also be paid to the following payees in the following amounts, based upon applicable law, the evidence received at trial, the declaration of SA Chan, and other information, as summarized below.

### A.   S.A. - $182,028.01

At trial, the jury saw client "closing" statements prepared by defendant's former firm that showed total settlement proceeds received on behalf of certain clients as well as how the proceeds of

1    that settlement were to be disbursed, including to the client.

2    Testimony by IRS CI Special Agent ("SA") Chan linked those statements

3    to bank records, especially the firm's Interest-on-Lawyer's-Trust

4    Account ("IOLTA") at Esquire Bank (account ending in 2012).

5         As to client S.A., SA Chan testified that he: (1) examined IOLTA

6    records (all of which were received at trial) showing gross case

7    settlement proceeds of $1,250,000 deposited on behalf of S.A. on

8    April 1, 2016; (2) determined from those records that the full amount

9    of that deposit was spent-down within approximately two months of the

10   deposit with no payments to S.A.; (3) examined the Layfield &

11   Barrett-issued closing statement for S.A.'s case that earmarked over

12   $500,000 in net settlement proceeds due S.A.; (4) determined that

13   S.A. was due $182,028.01 in net settlement proceeds after L&B

14   payments to S.A. out of other clients' settlement proceeds; and (5)

15   examined Fund data[2] and ruled out that S.A. received any such

16   compensation.

17        **B.   P.C. - $213,810.83**

18        At trial, SA Chan testified that he: (1) examined IOLTA records

19   showing gross settlement proceeds of $600,000 deposited on behalf of

20   client P.C. on February 22, 2017; (2) determined from those records

21   that the full amount of that deposit was spent-down within less than

22   two months of the deposit with no payments to P.C.; (3) examined the

---

23

24        [2]   At sentencing, the government introduced information from the
     Fund.  (Dkt. 352).  The information identified approximately $2.7

25   million in payments made by the Fund to 89 of defendant's former
     clients.  The information, by client name and payment amount, was

26   authenticated by the declaration of Fund supervising attorney Matthew
     Zawol.  (Dkt. 352).  The government notes that, not only did

27   defendant did not object to any of that information at sentencing,
     but defendant relied on the same information in support his own

28   sentencing position.  (*See, e.g.,* Dkt. 354 at 8:17).  The government
     hereby incorporates by reference the entirety of the Fund information
     submitted for sentencing.

Layfield & Barrett-issued closing statement for client P.C.'s case that earmarked $317,560 in net settlement proceeds due P.C.; (4) and determined that P.C. was due $213,810.83 in net settlement proceeds after a reduction/payment of $103,749.25 to P.C. from the Fund.

At trial, P.C.'s referral counsel, J.L., also testified that neither P.C. nor J.L. received any money from the settlement of P.C.'s case.  As indicated in section II, above, defendant does not dispute that defendant should pay restitution to J.L.

**C.   T.D.F. - $150,000.00, M.L.- $187,054.00**

At trial, witness P.A. testified that she was employed by T.D.F., a law firm, and that client M.L. had retained T.D.F. to represent M.L. in a personal injury case.  P.A. further testified that T.D.F. referred M.L.'s case to defendant's firm in exchange for a referral fee to be paid upon the settlement of M.L.'s case.

SA Chan testified that he: (1) examined IOLTA records showing gross settlement proceeds of $750,000 deposited on behalf of client M.L. on March 18, 2016; (2) determined from those records that the full amount of that deposit was spent-down within a matter of a few months of the deposit with no payments to M.L.; (3) examined the Layfield & Barrett-issued closing statement for client M.L.'s case that earmarked $150,000 in net settlement proceeds due T.D.F. as its percentage of the attorney's fee due from the case settlement; (4) determined that no payments were made to T.D.F. from either the proceeds of the settlement of M.L.'s case or from any other source; (5) determined that M.L. received $100,000 from the Fund; and (6) determined that M.L. did receive $20,000 from other L&B clients several months after M.L.'s own settlement proceeds had been drawn-down, leaving a net $187,054 due M.L.

**D.   F.H. - $15,247.54**

Client F.H. testified at trial that he retained defendant's firm for compensation following a pedestrian-vehicle accident.  F.H. further testified that he had numerous exchanges with defendant's firm's employees, most notably D.K., seeking his part of the settlement of his case.  D.K. testified about one of the more egregious examples of defendant's fraud where defendant had directed D.K. and other employees to tell curious clients that they would be paid following completion of a phantom "accounting" that defendant would purportedly complete two days after he settled in Costa Rica. F.H. testified that he had to hire yet another lawyer to secure his settlement proceeds.  F.H.'s new lawyer, D.C., testified that defendant paid some of the money owed F.H. only after he threatened State Bar action against defendant.

The IOLTA records received in evidence showed that F.H.'s approximately $300,000 in settlement proceeds were deposited on December 28, 2016, and spent to zero within approximately 30 days, with no funds paid to F.H.  The records further showed that F.H. did receive approximately $182,000.  Fund records show that F.H. received another $100,000 in January 2020.  SA Chan reviewed the IOLTA and Fund records as well as the closing statement that witness D.K. sent to F.H. and determined a net due and owing F.H. of $15,247.54.

**E.   M.M. - $242,502.16**

M.M. testified at trial that he retained counsel to recover compensation for a vehicle accident on the Vincent-Thomas bridge for which M.M. suffered brain damage.  His counsel then referred the case to L&B firm in exchange for a referral fee.  The L&B-prepared closing statement was received in evidence and showed that L&B was entitled

to $98,125 for its attorney's fees against the approximately $991,000 settlement deposit of M.M.'s case.  M.M. testified that he received nothing out of that settlement deposit.

IOLTA records received at trial showed that M.M.'s $991,249.01 settlement was credited to the IOLTA on August 16, 2016.  Those same records showed a credit balance of $179,797.16 just before the deposit of M.M.'s settlement, and a balance of $54,615.52 seven days after M.M.'s settlement was deposited.  SA Chan testified that no part of M.M.'s settlement was paid to M.M.  Fund records show that M.M. received $100,000.  The victim impact statement from M.M.'s referral counsel, M.W., showed that M.M. received a settlement from M.W.'s insurance carrier of $100,000, leaving a net of $242,502.16 due to M.M.  *See* Chan Declaration, ¶ 4, attached hereto.

**F.   W.M. and Estate of P.M. - $24,382.37 each**

Former client T.B. testified at trial that, after he suffered medical malpractice for a botched hip surgery, he contacted family friends and attorneys W.M. and P.M.  W.M. and P.M. then referred T.B.'s case to L&B.  The government introduced the L&B-prepared closing statement for T.B.'s case that showed that W.M. and P.M. were each entitled to referral fees of $24,382.37.  SA Chan testified that he reviewed the IOLTA records and found no evidence of payment of those fees.  SA Chan also recently spoke to W.M., who told SA Chan that no referral fees for T.B.'s case were ever paid and that P.M. passed away after he and P.M. referred the case to L&B.

**G.   U.S. Claims/Opco - $1,785,872.00**

At trial, the government proved that defendant pledged attorney's fees that he expected from a future case settlement in exchange for a $700,000 advance from U.S. Claims/Opco.  The

10

obligation was memorialized in a "purchase, sale, assignment & equitable lien agreement" that identified the total advance plus origination cost of approximately $714,000.  The jury convicted defendant of the counts (16, 17) related to defendant defrauding U.S. Claims/Opco, based in part on evidence that defendant converted the advance proceeds – that defendant had represented would be for business use – to his personal use in Costa Rica.  Witness B.D., in-house counsel for U.S. Claims/Opco, authenticated the relevant advance documents and testified that defendant repaid no part of the $700,000 advance that defendant had obtained by fraud.  In connection with the L&B bankruptcy case, U.S. Claims/Opco filed a Proof of Claim under penalty of perjury that described the obligation, defendant's default, and the accruing interest on the advance of $714,350. Pursuant to that Proof of Claim, defendant owed U.S. Claims/Opco $1,035,808 as of December 31, 2018, with an additional $53,576 accruing every three months, or any portion thereof, thereafter until reaching a cap of $2,143,050.  *See* Proof of Claim no. 2092, *In re Layfield & Barrett APC*, no. 17-BK-19548 NB, filed April 23, 2018, attached hereto.  SA Chan has calculated, based on the foregoing advance documents and Proof of Claim that defendant owes restitution to U.S. Claims/Opco, as of May 12, 2022, of $1,785,872.00.

     **H.  IRS – $1,497,479.60 (total)**

         1.  <u>Income Tax</u> - $1,340,019.44

IRS revenue agent J.P. testified at trial to prove that defendant evaded the assessment of his income taxes as charged in counts 26 and 28.  Agent J.P. offered two scenarios that were based upon defendant's own belated tax returns and the tax due and owing for the income that defendant himself reported.  Agent J.P. offered a

third scenario that was based upon defendant's embezzlement of settlement funds due certain clients.[3]  Agent J.P. determined the tax due and owing as follows:

| Income/Source | Tax Due and Owing | Gov't Trial Exhibit |
|---|---|---|
| $1,762,000/defendant's 1040 filed September 2018 | $618,866 | 427 |
| $1,315,041/defendant's amended (1040x) filed October 2018 | $436,560 | 428 |
| $2,827,162/embezzlement of fees due certain clients[4] | $1,083,033 | 429 |

   The government was not required to prove the precise amount of tax due and owing, and the jury was only required to find some tax due and owing.  (Court's Instruction No. 17, Dkt. 315.)  The determination of the amount of tax restitution is solely for the sentencing judge.  *See, e.g., United States v. Green*, 722 F.3d 1146 (9th Cir. 2013)(holding that *Apprendi* does not apply to restitution determinations).  While the government established each of the tax scenarios by a preponderance of the evidence, the government submits that the Court should select the scenario that most closely tracks the evidence, namely, that defendant received income from embezzlement that yielded the tax due and owing of $1,083,033 (plus interest, see table below).  That figure not only most closely tracks

---

   [3]  Agent J.P. testified that, based on her review of IOLTA records, closing statements, and discussion with SA Chan, she determined the amount embezzled in tax year 2016 was $2,902,430.00, based on the following amounts due: client M.L., $287,054.00; referral counsel T.D.F., $150,000.00; client T.B., $42,874.00; client M.M. $442,502.00; and client J.N., $1,980,000.00.  The latter amount did not include amounts that defendant should have paid to MediCal pursuant to his fee agreement with J.N., also received in evidence.

   [4]  See note 3.

the totality of the trial evidence, but it gives appropriate weight to defendant's admissions from his own filed returns that he, in fact, did owe taxes.

The IRS is entitled to pre-judgment interest on the tax due and owing.  To May 12, 2022, the interest on each of the three scenarios is:

| Tax due and owing | Interest as of May 12, 2022 |
| --- | --- |
| $618,866 | $146,847.03 |
| $436,560 | $103,588.73 |
| $1,083,033 | $256,986.44 |

2.   <u>Payroll Tax</u> - $157,460.16

At trial, SA Chan testified that defendant failed to collect and pay over $128,763.74.  Interest on unpaid payroll taxes shall accrue from the due date until paid.  26 U.S.C. § 6601.  SA Chan has calculated that payroll tax, based upon the amount established at trial, plus interest at the applicable statutory rate as of May 12, 2022, is $157,460.16.

**I.   California State Bar Client Security Fund - $3,427,496.45[5]**

As stated above, defendant owes the Fund for money that the Fund paid out to defendant's former clients whom defendant defrauded.

**IV.  OTHER TERMS AND CONDITIONS OF RESTITUTION**

The government requests that the Court also make the following orders:

---

[5]  This figure includes principal payments by the Fund in the amount of $2,796,057.58; interest, accrued as of May 12, 2022, in the amount of $615,241.87; and a processing cost of $16,198.  *See* concurrently lodged chart.

13

1      Restitution, except for restitution owed the Internal

2   Revenue Service, shall be due during the period of imprisonment,

3   at the rate of not less than $25 per quarter, and pursuant to

4   the Bureau of Prisons' Inmate Financial Responsibility Program.

5   If any amount of the restitution remains unpaid after release

6   from custody, nominal monthly payments of at least 10% of

7   defendant's gross monthly income but not less than $150,

8   whichever is greater, shall be made during the period of

9   supervised release and shall begin 90 days after the

10  commencement of supervision.  The parties agree that nominal

11  restitution payments should be ordered because, and the Court

12  should find that, defendant's economic circumstances do not

13  allow for either immediate or future payment of the amount

14  ordered.

15

16      [The government requests that Court include standard

17  language for the priority of restitution payments: first, to

18  individual victims; then, to the corporate victim; then, to the

19  Fund; and then, to the United States government.  If the

20  defendant makes a partial payment, each payee shall receive

21  approximately proportional payment pursuant to such priority.][6]

22

23      Pursuant to 18 U.S.C. § 3612(f)(3)(A), interest on the

24  restitution ordered is waived because the defendant does not

25  have the ability to pay interest.

26

27      [6]  With respect to the individual victims specifically
    identified as restitution payees, pursuant to 18 U.S.C. § 3664(j)(1),
28  restitution shall first be paid to those individual victims before
    any restitution is paid to the Fund.

14

1        Payments may be subject to penalties for default and

2    delinquency pursuant to 18 U.S.C. § 3612(g).

3

4        Nothing in this order shall foreclose or limit the ability

5    of the Internal Revenue Service to examine and make adjustments

6    to defendant's return(s) for calendar year 2016 with respect to

7    returns already filed or to be filed.  Furthermore, nothing in

8    this order shall foreclose the right of the Internal Revenue

9    Service to assess civil penalties against defendant for any tax

10    year.

## DECLARATION OF SAM CHAN

I, Sam Chan, declare as follows:

1.   I am a special agent with IRS, Criminal Investigation.  I make this declaration in support of the government's restitution position for defendant Philip James Layfield ("defendant").  I have personal knowledge of the facts set forth herein, unless otherwise stated, and could and would testify to those facts fully and truthfully if called and sworn as a witness.  Because I am making this declaration for the limited purpose of addressing issues related to restitution, I have not included every fact known to me concerning this investigation.

2.   I testified as a witness at defendant's trial.  During my trial testimony, which I incorporate herein by reference, I explained my background and involvement in this case, and I summarized the voluminous records I reviewed in connection with this matter, including financial records showing defendant's receipt and expenditure of client settlement money and, in some cases, payments to or for the benefit of clients or referral counsel.

3.   Section III of the government's restitution position for sentencing identifies certain former clients, referral counsel, and litigation lender U.S. Claims/Opco; the amount due each for restitution; and the evidence to support those amounts.  The evidence and information described in Section III is true and correct to the best of my knowledge as: (1) I testified thereto as so described, (2) I have reviewed the evidence so described, and (3) the concurrently lodged and updated spreadsheet from the California State Bar Client Security Fund, showing principal and interest due as of May 12, 2022

1  for the 89 former clients of defendant who received Fund payouts, is

2  consistent with the previously filed Fund spreadsheet.

3       4.   Specifically with respect to client M.M. (Section III.E), I

4  determined the amount of restitution due M.M. based not only on the

5  foregoing, but on the Victim-Impact statement submitted by M.M.'s

6  former attorney, M.W., whom I know from the investigation to be one

7  of the attorneys that M.M. retained before the referral to

8  defendant's firm.   In M.W.'s Victim-Impact statement, M.W. stated

9  that M.M. sued him for malpractice for the same case in which

10 defendant was involved, from which M.M. received $100,000.   M.W. also

11 stated that he personally paid M.M. an additional approximately

12 $93,000.   I have, therefore, reduced the amount of restitution that I

13 believe is due M.M., from the L&B closing statement's net to M.M. of

14 $442,502.16, by $100,000 (the amount paid to M.M. by the Fund) and

15 another $100,000 (the amount paid to M.M. by M.W.'s insurer), for a

16 net due M.M. of $242,502.16.   I do not believe that defendant should

17 be credited for any amount that M.W. directly paid M.M. as that

18 amount (approximately $93,000) was not related to compensation owed

19 *by defendant*.

20      5.   Specifically with regard to the estate of P.M. (Section

21 III.F), I spoke to W.M., who told me that P.M. was his son and former

22 law partner who is deceased.   W.M. told me that he would distribute

23 P.M.'s restitution to P.M.'s heirs.

24      6.   Specifically with regard to U.S. Claims/Opco (Section

25 III.G), I reviewed the purchase agreement with U.S. Claims/Opco,

26 signed by defendant and that formed the basis for defendant's receipt

27 of approximately $700,000 on the eve of his departure for Costa Rica,

28 that was received in evidence at trial.   I also reviewed the U.S.

1   Claims/Opco sworn Proof of Claim in the Layfield & Barrett, APC,

2   bankruptcy case, no. 17-BK-19548-NB, Claim no. 209, filed April 23,

3   2018 (a true and correct copy of which is attached hereto as Exhibit

4   A).  Based on that evidence and information, I estimated restitution

5   due that victim by following the schedule for payment as submitted by

6   U.S. Claims/Opco in its Proof of Claim and adding $53,576 per the

7   purchase agreement's terms every three months, or portion thereof, to

8   May 12, 2022.

9        7.    Section III.H. describes the restitution that I believe is

10  due the Internal Revenue Service for defendant's personal income tax

11  due and owing for calendar year 2016 based on defendant's convictions

12  for tax evasion (counts 26 and 28) and failure to pay over payroll

13  tax for Qtr 2 for 2017 (count 27).  I received the information for

14  the interest due in the table at Section III.H.1, and the interest

15  due on the payroll liability, in Section III.H.2, from Revenue Agent

16  Sean Murphy whom I know to have been an IRS Revenue Agent for 12

17  years and whose position includes determining tax due and owing and

18  interest thereon.

19       I declare under penalty of perjury under the laws of the United

20  States of America that the foregoing is true and correct and that

21  this declaration is executed in Santa Ana, California, on April 21,

22  2022.

23

24                                          _____
                                            SAM CHAN
25

26

27

28

                                    3

1  STEPHANIE S. CHRISTENSEN
   Acting United States Attorney
2  BENJAMIN R. BARRON
   Assistant United States Attorney
3  Chief, Santa Ana Branch Office
   CHARLES E. PELL (Cal. SBN 210309)
4  Assistant United States Attorney
   Santa Ana Branch Office
5       411 West Fourth Street, Suite 8000
        Santa Ana, California 92701
6       Telephone: (714) 338-3542
        Facsimile: (714) 338-3561
7       E-mail:   charles.e.pell2@usdoj.gov

8  Attorneys for Plaintiff
   UNITED STATES OF AMERICA

9

10              UNITED STATES DISTRICT COURT

11          FOR THE CENTRAL DISTRICT OF CALIFORNIA

12                    SOUTHERN DIVISION

13  UNITED STATES OF AMERICA,        No. 8:22-cr-00077-DOC

14          Plaintiff,               GOVERNMENT'S SENTENCING POSITION
                                     FOR DEFENDANT ROBERT LOUIS CIRILLO
15          v.

16  ROBERT LOUIS CIRILLO,            Hearing Date: September 6, 2022
                                     Hearing Time: 7:30 a.m.
17          Defendant.

18

19

20

21

22       Pursuant to Rule 32 of the Federal Rules of Criminal Procedure,

23  plaintiff United States of America, by and through its counsel of

24  record, the acting United States Attorney for the Central District of

25  California and Assistant United States Attorney Charles E. Pell,

26  hereby files its sentencing position for defendant ROBERT LOUIS

27  CIRILLO.

28       This sentencing position is based upon the attached memorandum

1    of points and authorities, the files and records in this case, and

2    such further evidence and argument as the Court may permit.

3     Dated: August 30, 2022            Respectfully submitted,

4                                       STEPHANIE S. CHRISTENSEN
                                        Acting United States Attorney
5
                                        BENJAMIN R. BARRON
6                                       Assistant United States Attorney
                                        Chief, Santa Ana Branch Office
7

8                                       */s/ Charles E. Pell*
                                        CHARLES E. PELL
9                                       Assistant United States Attorney
                                        Santa Ana Branch Office
10
                                        Attorneys for Plaintiff
11                                      UNITED STATES OF AMERICA

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

2

1

<u>**MEMORANDUM OF POINTS AND AUTHORITIES**</u>

2 **I.   INTRODUCTION**

3      Defendant Robert Louis Cirillo victimized more than 100 people

4 to steal more than $3,000,000 from them in his investment fraud

5 scheme, which targeted Hispanics, many of whom were of limited means.

6 Late last year, defendant also participated in a conspiracy to

7 defraud an 82-year old victim of approximately $400,000 in a so-

8 called "Grandparent scam," where defendant received the proceeds.

9 Last, defendant failed to pay more than $675,000 taxes due from the

10 income from his fraudulent schemes.  The government respectfully

11 recommends that the Court sentence defendant to <u>87 months of</u>

12 <u>imprisonment</u>, which is the low end of the Guidelines range.

13      Defendant orchestrated and ran a huge investment fraud scheme

14 where he stole more than $3 million from over 100 victims by tricking

15 them into investing in his bogus construction loan scheme, using both

16 lies and fake documents.  What he failed to tell the victims was that

17 he was not using their money for purported investments, but rather,

18 he was spending their money on himself, including more than $1

19 million in cash withdrawals.  What he failed to tell the victims

20 about the Zurich bank statement with a $3mm account balance that he

21 showed to them was that it was fake – defendant had fabricated it.

22 What he failed to tell the victims was that they would never get

23 their money back, but that he would be millions of dollars richer.

24      Defendant's behavior was despicable, particularly because he was

25 engaging in an affinity crime by exploiting members of the Hispanic

26 community, most of whom were of modest means, and some of whom lost

27 their life savings to defendant.  It's heartbreaking to read the

28 victims' messages to defendant, where they were desperate and would

beg defendant for any of their money back, *e.g.*, "I just want you to know that I'm very bad economically and that I need my money as soon as possible I have my wife sick and my dad I have to operate in Mexico."  Defendant would further trick the victims by providing them with purported payment checks, which he knew would bounce because there were insufficient funds in the bank account(s).

When victims began to realize that defendant had defrauded them, defendant would threaten some of them to attempt to keep them quiet, including sending one victim a photograph of that victim's residence, which the victim interpreted as a threat by defendant against him. In another instance, defendant left a message about a victim, threatening that the victim could go "for the [expletive] hole in the [expletive] desert.  Tell him to test me."  Another victim wrote in her victim letter to this Court: "I had to change my cellphone number and my address because of the threats that [defendant] made me by phone and calls."

Further, in addition to his investment fraud scheme, in 2021, defendant participated in a scheme with others to defraud a senior citizen of approximately $400,000 in a so-called Grandparent scam, where the victim was tricked into sending money to defendant's bank account believing that it would help the victim's grandson, which was all a trick.  Defendant then used those fraudulently obtained funds for himself, including more than $65,000 transferred to defendant's TD Ameritrade account.

Defendant also failed to report any of the illicit income on his tax returns, causing a tax loss of approximately $675,000.

In addition to demonstrating his criminal character during the operation of his fraudulent schemes, defendant further spotlighted

his lack of respect for the law when discussing and/or engaging in
other frauds, including money laundering, identity theft, and
counterfeit currency.  For example, during the August 2019 search of
defendant's residence, agents found a photograph of a credit card in
someone else's name, which had resulted from a fraudulent application
defendant had caused in that identity.

Moreover, defendant's schemes were not a one-time affair, but
rather, defendant operated them for years victimized more than 100
people.  His schemes were also varied – from investment fraud to the
Grandfather scam to discussing other frauds.

Last, recently obtained information shows that even after
pleading guilty and while pending sentencing in this case, defendant
has not ceased his fraudulent behavior, but instead, he has
continued, including convincing a victim to give him hundreds of
dollars more and providing worthless checks to victims.  Further,
defendant attempted to obstruct justice by trying to destroy
evidence.  Defendant's continued fraudulent behavior highlights that
the sentence in this case needs to specifically deter defendant.

With the exception of Section 2B1.1(b)(2)(C)'s adjustment for
substantial financial hardship for 25 or more victims (which
defendant admitted in the plea agreement) and the applicable grouping
increase, the government does not object to the Guidelines
calculations of the Probation Office as set forth in the PSR.  With
the additional levels for the substantial financial hardship and
decreased levels for grouping, the government believes that the final
offense level is actually two level higher than calculated by the PSR
– 29/I, which equates to 87 to 108 months of imprisonment (instead of
the PSR's 70-87 month range).

Based upon the facts and applicable Section 3553(a) factors, including specific and general deterrence, the government believes that a low end sentence based upon a final offense level of 29/I is reasonable in this case: <u>87 months of imprisonment</u>, followed by 3 years of supervised release, and $3,835,358.53 in restitution.[1]

## II.   BACKGROUND

### A.   Plea agreement

Defendant pleaded guilty to all three counts of the information against him: securities fraud (count one), false tax return (count two), and wire fraud conspiracy (count three).  (PSR ¶¶ 1-3.)  The statutory maximum sentence that the Court can impose for all counts is 43 years of imprisonment (20 years for count one, three years for count two, and 20 years for count three), a three-year period of supervised release, a fine of $5,500,000 ($5,000,000 for count one, $250,000 for count two,[2] and $250,000 for count three), and mandatory special assessments of $300.  (*Id.* ¶¶ 167, 170, 176.)

In the plea agreement, the parties stipulated that the following guidelines calculations are correct, and agreed not to argue that additional offense characteristics, adjustments, and departures apply:

Count One (securities fraud):

| | | |
|---|---|---|
| Base Offense Level | 7 | U.S.S.G. § 2B1.1(a)(1) |

---

[1] The total restitution figure is comprised of the sum of the following: (1) $2,759,910.53 to the individual victims from count one; (2) $675,898 to the IRS for count two; and (3) $399,550 to victim D.Q. for count three.

[2] The PSR concluded that the applicable fine for count two (26 U.S.C. § 7206(1)) was only $100,000.  (PSR ¶ 176.)  Section 7206 does provide for a fine of only $100,000.  However, under 18 U.S.C. § 3571, the applicable fine should be the higher general fine of $250,000 applicable to felonies, because Section 7206(1) does not exclude that general fine.

| | | |
|---|---|---|
| $1.5mm < loss < $3.5mm | +16 | U.S.S.G. § 2B1.1(b)(1)(I) |
| Substantial financial hardship ≥ 25 victims | +6 | U.S.S.G. § 2B1.1(b)(2)(C) |
| Sophisticated means | +2 | U.S.S.G. § 2B1.1(b)(10)(C) |

Count Two (false tax return):

| | | |
|---|---|---|
| Base Offense Level ($550k < tax loss < $1.5mm) | 20 | U.S.S.G. § 2T1.1(a)(1), 2T4.1(H) |
| >$10,000 criminal activity: | +2 | U.S.S.G. § 2T1.1(b)(1) |

Count Three (wire fraud conspiracy):

| | | |
|---|---|---|
| Base Offense Level | 7 | U.S.S.G. § 2B1.1(a)(1) |
| $250,000 < loss < $550,000 | +12 | U.S.S.G. § 2B1.1(b)(1)(G) |
| Sophisticated means | +2 | U.S.S.G. § 2B1.1(b)(10)(C) |
| Vulnerable victim | +2 | U.S.S.G. § 3A1.1(b)(1) |

   Combined offense level calculation:

| | | |
|---|---|---|
| Group One (counts 1 and 3): | 1 unit | U.S.S.G. § 3D1.4(a) |
| Group Two (count 2): | ½ unit | U.S.S.G. § 3D1.4(b) |
| Total Units: | 1½ units | |

**FINAL COMBINED OFFENSE LEVEL**

| | | |
|---|---|---|
| Total offense level count-1: | 31 | |
| Increase from grouping: | +1 | U.S.S.G. § 3D1.4 |
| Acceptance of responsibility: | −3 | U.S.S.G. § 3E1.1 |
| **Combined Total Offense Level:** | **29** | |

(PSR ¶¶ 6-8; Plea Agreement (DE6) ¶ 21.)

   **B.   Factual Background**

   Defendant agreed to the following facts as part of the plea agreement and change of plea hearing:

   **Securities/investment fraud scheme (count one)**

   •   From in or around 2014 through in or around 2021, within the Central District of California, defendant orchestrated and

operated a securities fraud scheme where he defrauded victims from Orange and San Bernardino Counties into investing money with him by making false promises of huge returns on their investments, when in fact, defendant was using the victim-investors' funds for personal expenses or to make small lulling payments to previous victim-investors.  During his fraudulent scheme, defendant tricked more than 100 victims into giving him a total of more than $3,200,000 for his bogus investments, with false promises and concealment of material facts.  Specifically, defendant solicited investments from the victim-investors by falsely telling the victim-investors that he would be investing their funds in short-term construction loans that would pay large return rates that varied from approximately 15% to 30% for a 30 to 90-day period.  However, those representations by defendant were false because defendant was not investing any of the investors' funds into any such construction loans or any other investment; instead, defendant was using most of the victim-investors' funds for his personal benefit.  Defendant was selling investments that constituted "securities" within the meaning of the Securities Exchange Act of 1934, which defendant knew while conducting his fraudulent scheme, especially because he previously had been a Series 7 licensed broker with FINRA (Financial Industry Regulatory Authority).  To effectuate his fraudulent scheme, defendant used different nominee entities, including Napoli Partners, Inc., Davinci Equity Partners, Inc., Genco Partners, Inc., Milano Partners, Inc., and Flamingo 9.

- During meetings with potential and existing investors, defendant would make false statements about how much he had in the bank for the purported investments and how well the purported

investments were doing.  To support those false representations and
to induce victim-investors to invest, defendant would show fake
documents to potential and existing victim-investors.  For example,
on different occasions in 2017 and 2018, defendant showed potential
and existing investors a fabricated Zurich bank statement in the name
of one of the entities he was using, DA VINCI EQUITY PARNTERS [sic]
INC., for the period 04/01/16 to 06/30/16, which showed an account
balance of $3,076,952.  A hard copy of this same false document was
found during the federal search of defendant's residence in August
2019.  Defendant also showed potential and existing investors a
similar fabricated Zurich bank statement in the name of NAPOLI
PARTNERS, INC. that showed an account balance of $3,303,207.  Those
statements were completely fabricated, because defendant had no such
accounts at Zurich Bank in the names of those entities, and defendant
never had anywhere near those amounts at any bank.  When defendant
was interviewed by federal agents during the August 2019 search of
his residence and again in June 2021, he admitted that those
documents were fabricated and that he had shown them to potential or
existing victim-investors to induce them to invest with him.

- Defendant never invested the victim-investors' funds
into any type of construction loan investment, contrary to what he
was telling potential and existing victim-investors.  Instead,
defendant would deposit the victim-investors' funds into various bank
accounts that he controlled, and thereafter, defendant would spend
those funds or withdraw them in cash, rather than using them for
legitimate investment.  For example, for Bank of America bank account
ending in 9750 in the name of Napoli Partners, Inc., from February
2015 to May 2016, approximately $1,134,000 was deposited, most of

which came from victim-investors, and by the end of May 2016, the

account was empty.  The withdrawals during that 18-month period

included approximately $369,000 in cash, $138,000 at Caesar's Palace

in Las Vegas, and more than $100,000 for credit card payments for

defendant's personal expenditures.  Likewise, for Wells Fargo Bank

account ending in 7063 in the name of Napoli Partners, Inc., from May

2016 to February 2018, approximately $2,460,000 was deposited, most

of which came from victim-investors, and by the end of February 2018,

the account was empty and closed.  During that approximate 19-month

period, defendant withdrew more than $1,000,000 in cash.  Moreover,

over a several day period in July 2017, defendant used scheme

proceeds to make a $12,000 cash down payment for a Jeep vehicle and a

$10,000 cash down payment for an Alfa Romeo vehicle.  Defendant also

used scheme proceeds to make more than $7,500 in car payments for

defendant's Alpha Romeo.

- Even though defendant knew that he would never pay the
victim-investors, defendant would continually promise the victims
that their payments would be coming the next week or the next month,
claiming that the investment would be paid sometime soon "100%"
"Guaranteed!!"

- During his fraudulent scheme, defendant would also
provide or cause to be provided purported investment payment checks
to victim-investors, even though defendant knew that at the time he
was providing those checks to the victim-investors, there were
insufficient funds in the bank accounts to cover those checks.  For
example, on or about August 15, 2018, defendant signed and provided
to victim-investor R.M. DA VINCI EQUITY PARTNERS INC check number
1052 from Comerica Bank account ending in 8688 in the amount of

$5,000 and check number 818 from defendant's Bank of America account ending in 2238 in the amount of $150,000. Both of those checks bounced when deposited by victim-investor R.M., because there were insufficient funds in those bank accounts, which defendant knew at the time he provided those checks to victim-investor R.M. Likewise, on or about September 13, 2018, defendant signed and provided to victim-investor F.P. GENCO PARTNERS, INC. check number 1060 from Citibank account ending in 3140 in the amount of $12,000, which also bounced because there were insufficient funds in that bank account. Further, from August through November 2018, defendant wrote a total of more than $75,000 in checks to victim-investor R.G., which defendant knew would not clear because the bank account had insufficient funds. During his fraudulent scheme, defendant provided at least 15 checks totaling more than $649,000 to victim-investors, even though defendant knew that there were insufficient funds for those checks to clear.

- Further, as part of his fraudulent scheme, to attempt to trick East West Bank into honoring a fraudulent check for $620,480 payable to DaVinci Equity Partners Inc., defendant caused a fraudulent letter dated in May 2019 to be created, which falsely represented that the check was payment of an invoice. Defendant deposited that fraudulent check, knowing it was fraudulent and that it contained forgeries in the names of D.B. and T.V.

To effectuate, and in connection with, his fraudulent scheme, defendant directly and indirectly used the means and instrumentalities of interstate commerce, including interstate wire communications and transfers. For example, as part of his securities/investment fraud scheme, on or about June 8, 2017,

1  defendant received a wire transfer of $25,000 from victim-investor
2  J.H. into one of the scheme bank accounts.

3      Defendant's scheme was also an "affinity crime," which exploited
4  the trust and friendship that exist in groups of people who have
5  something in common.  Here, in his fraudulent securities/investment
6  fraud scheme, defendant targeted members of the Hispanic community,
7  including by using respected and/or trusted leaders in the Hispanic
8  community to spread the word about defendant's scheme, convincing the
9  victim-investors – many of whom were of limited means – that his
10 investments were legitimate and worthwhile.

11     When victim-investors began to realize that defendant had
12 defrauded them, defendant would threaten some victim-investors to
13 attempt to keep them quiet.  For example, when defendant was notified
14 that a victim-investor may sue him, in July 2019, defendant told a
15 third party: "Let him get a lawyer and watch what happens, OK.  Wants
16 to make [expletive] problems for me, I'll cost him a million dollars
17 in lawyer fees.  You tell him I said that.  Or he could always elect
18 to go, rather to go, for the [expletive] hole in the [expletive]
19 desert.  Tell him to test me."  After an initial story in 2019, in
20 around July 2020, Spanish language channel Univision ran a story
21 about defendant's scheme, entitled "*La pirámide del fraude:
22 investigación de Univision 34 sobre inversiones dudosas gana premio
23 de periodismo*" (roughly translated as "The pyramid scheme: Univision
24 34's investigation into questionable investments wins journalism
25 award"), reporting that various victims had invested their life
26 savings with defendant, which they ending up losing, and quoting
27 various victims, including one who noted that s/he "was sad because
28 the little [money] s/he had was now gone."  Thereafter, some victim-

1  investors contacted defendant and informed him that they would be

2  reporting him to federal authorities, to which defendant responded:

3  "I'm not a thief go f[] yourself  go to the feds   better yet do it

4  tomorrow  you will be served so fast your f[]ing head will spin."

5  Moreover, shortly before a victim-investor was scheduled to go to a

6  meeting of victim-investors to discuss getting their money back from

7  defendant, in or around June 2019, defendant texted that victim-

8  investor a photograph of that victim-investor's residence, which the

9  victim-investor interpreted as a threat by defendant against him.

10  During the August 2019 search of defendant's residence, a copy of

11  that same photograph was found on one of defendant's digital devices.

12       •    In his fraudulent securities/investment fraud scheme,

13  defendant victimized more than 100 individuals, which resulted in

14  substantial financial hardship to more than 25 victims.   For

15  example, victim-investor M.Z. invested her life savings of $20,000

16  with defendant's scheme, which she had planned to use to retire.

17  When victim-investor M.Z. contacted defendant, defendant promised to

18  pay the investment proceeds to victim-investor M.Z. on a specific

19  date, but that date came and went, and like usual, defendant failed

20  to pay.  After that, defendant would not answer victim-investor

21  M.Z.'s calls, and he never paid.  The victim-investors would often

22  beg defendant for their money back, informing him how much they

23  really needed the money.  For example, on or about July 19, 2019,

24  victim-investor I.M. texted defendant: "With all that money I could

25  have done many things for my family and especially to my mom. You

26  have no idea how bad I need my money."  The day before, victim J.H.

27  sent defendant a similar text message: "Really hoping for good news,

28  Nadia's grandma (Mary's mom) is in the hospital and not doing well

I'd like to help out with if I can.  E-Jay is also struggling pretty bad."  On or about June 23, 2019, an victim-investor notified defendant that the victim-investor really needed the money back: "I just want you to know that I'm very bad economically and that I need my money as soon as possible I have my wife sick and my dad I have to operate in Mexico."

- While defendant was orchestrating his securities/investment fraud scheme, defendant would also communicate about other fraudulent schemes, money laundering, and identity theft. For example, in or around April 2019, defendant discussed laundering counterfeit money at a Las Vegas Casino, stating:

> I need you to make a call, I know you know
> people, and get me some counterfeit notes, some bills,
> hundreds, the good ones that pass the test.  If you
> could get them over to me by tomorrow, here at
> Caesar's Palace, in Las Vegas, if you could get like
> $50,000 worth, or $100,000 worth, I'll clean and wash
> the money here.  It will take me about three hours,
> and I'll send you half the money back.  Guaranteed.
> I'll clean and wash the money here, 'cause I can use
> it in the casino, and you make a quick $25,000
> tomorrow…

The next month, in or around May 2019, defendant discussed committing a different scheme – credit card fraud and identity theft, stating "you tell me what names you want them in, and um, then I can have the IDs sent to you…"  Defendant would trick victim-investors into using their mailing addresses to receive fraudulently obtained credit cards.  During the August 2019 search of defendant's residence,

1   agents found evidence of credit card/identity theft fraud, including

2   a photograph of a fraudulently obtained credit card in the name of

3   E.I., which had resulted from a fraudulent application defendant had

4   caused in that identity.

5         •   Defendant's securities/investment fraud scheme

6   involved sophisticated means, including using multiple nominee

7   entities and creating and using multiple fabricated bank documents.

8   (Plea Agreement (DE 6) at 9-20.)

9       **Grandparent distress fraud/wire fraud conspiracy (count three)**

10        •   In addition to and separate from his multi-million

11   dollar securities/investment fraud scheme, from in or around March

12   2021 to April 2021, defendant participated in a fraudulent scheme

13   with others to defraud victim D.Q., a senior citizen, of

14   approximately $400,000.  In that fraudulent scheme, defendant's co-

15   schemers tricked victim D.Q. into believing that his grandson had

16   been arrested by the Sacramento Police Department for possession of

17   illegal narcotics, which was false.  As part of that fraudulent

18   scheme and to trick victim D.Q., defendant's co-schemers also

19   pretended to be other people when communicating with victim D.Q.,

20   including posing as a sergeant with the Sacramento PD, a public

21   defender, and D.Q.'s grandson.  Through their fraudulent statements,

22   defendant's co-schemers convinced victim D.Q. to send a total of

23   approximately $400,000 in payments for his grandson's bail.  To

24   receive the victim's funds, defendant opened a bank account in the

25   name of a nominee entity by using his California driver's license,

26   which bank account only defendant controlled.  On or about March 17,

27   March 24, April 2, and April 14, 2021, victim D.Q. sent interstate

28   wire transfer payments to that bank account in the amounts of

$88,000, $95,000, $56,700, and $150,000, respectively.  Defendant then used the money from that account for his personal benefit, including more than $65,000 transferred directly to defendant's TD Ameritrade account and other personal expenditures.  Defendant knowingly participated in this fraudulent scheme to defraud victim D.Q. while defendant was in the Central District of California, and defendant acted with the intent to defraud and cheat. (*Id.* at 21-22.)

**False tax return**

- Instead of using the victim-investors' funds for investment or other legitimate business purposes, defendant used those funds for personal expenditures, which thus constituted taxable income to defendant that he was required to report to the IRS and for which he was required to pay federal income taxes.  Defendant willfully failed to report to the IRS any of that income or any of the money that he received, even though he knew that he was required to do so under federal tax law.  Further, although defendant hired a tax return preparer for some of the years at issue, he failed to tell his tax return preparer about any of the bank accounts and entities that he was using to receive the millions of dollars of income from his scheme, and defendant further intentionally concealed from her that he was using those funds for cash withdrawals and personal expenditures.  Instead, for tax years 2015 through 2017, defendant willfully filed false tax returns that failed to report a total of more than $3,000,000 in income, including failing to report approximately $742,271 in income for 2015, $692,707 for 2016, and $1,985,899 for 2017.  On or about June 25, 2018, defendant filed a Form 1040, U.S. Individual Income Tax Return, for himself and his

wife that reported total income of only $30,985, which defendant knew was false because it failed to report any of the more than $1,900,000 in income that he had received during 2017 from his fraudulent scheme.  Specifically, on line 12 of that tax return, entitled "Business income or (loss)," defendant listed only $33,985 in income, when the true figure was more than $1,900,000.  Because defendant reported such a low amount of income, he also claimed the EIC (Earned income credit), which is a credit designed to help low- to moderate-income workers and families get a tax break.  On that tax return, defendant listed his occupation as "INVESTMENT ADVISOR."  Defendant filed that tax return under the penalties of perjury, and on or about June 25, 2018, he signed IRS Form 8879 (IRS *e-file* Signature Authorization).  When filing his 2015, 2016, and 2017 false federal tax returns, defendant acted willfully, that is, defendant knew that federal tax law imposed a duty on him to accurately report the omitted income, but defendant nevertheless intentionally and voluntarily violated that duty.  Further demonstrating defendant's willfulness, while he was reporting only approximately $31,000 in income to the IRS for tax year 2017, defendant applied for an auto loan from Chase Bank in June 2017, wherein he represented that his yearly income was $150,000.

(*Id.* at 20-21.)

**Applicable loss amounts**

The parties also agreed that the attempted loss from the securities fraud scheme is approximately $3,237,262, the applicable loss from defendant's wire fraud conspiracy is approximately $399,550, and the applicable tax loss is approximately $675,898. (*Id.* at 22.)

15

**III.  THE PSR'S CALCULATIONS AND RECOMMENDATION**

    **A.  PSR's Guideline calculations**

    The PSR calculates defendant's Guidelines sentencing range as 70 to 87 months of imprisonment, based upon a total offense level of 27 and criminal history category of I.  (PSR ¶ 168.)  The Probation Officer ultimately recommended a below Guidelines sentence of a 63 months of imprisonment.  (DE 17 at 2.)

    The PSR's Guidelines calculations are summarized as follows (PSR paragraph identified in parentheses):

    <u>Count 1 (securities fraud/investment fraud)</u>

| | | |
|---|---|---|
| Base Offense Level: | 7 | U.S.S.G. § 2B1.1(a)(1) (¶ 63) |
| $1.5mm < Loss < $3.5mm: | +16 | U.S.S.G. § 2B1.1(b)(1)(L) (¶ 65) |
| Financial hardship: | +2 | U.S.S.G. § 2B1.1(b)(2)(A) (¶ 68) |
| Sophisticated means: | <u>+2</u> | U.S.S.G. § 2B1.1(b)(10)(C) (¶ 71) |
| Subtotal | 27 | |

    <u>Count 2 (false tax return)</u>

| | | |
|---|---|---|
| Base offense level: | 20 | U.S.S.G. § 2T1.1(a)/2T4.1(I) (¶76) |
| >$10k criminal: | <u>+2</u> | U.S.S.G. § 2T1.1(b)(1) (¶ 77) |
| Subtotal | 22 | |

    <u>Count 3(wire fraud conspiracy)</u>

| | | |
|---|---|---|
| Base Offense Level: | 7 | U.S.S.G. § 2B1.1(a)(1) (¶ 82a) |
| $250k < Loss < $550k: | +12 | U.S.S.G. § 2B1.1(b)(1)(L) (¶ 82b) |
| Sophisticated means: | +2 | U.S.S.G. § 2B1.1(b)(10)(C) (¶ 82e) |
| Vulnerable victim: | <u>+2</u> | U.S.S.G. § 3A1.1 (¶ 85) |
| Subtotal | 23 | |

    <u>Multiple Count Adjustment</u>

| | | |
|---|---|---|
| Group One (count 1): | 1 unit | U.S.S.G. § 3D1.4(a) |
| Group Two (count 2): | ½ unit | U.S.S.G. § 3D1.4(b) |

1   Group Three (count 3):          ½ unit

2   Total Units:                    2 ½ units

3        Combined total offense level

4   Greatest group offense level:  27

5   Grouping increase:             +3  U.S.S.G. § 3D1.4

6   Acceptance of Responsibility   −3  U.S.S.G. § 3E1.1 (¶¶ 76-77)

7   **Total Offense Level:**          **77**

8   Criminal History Cat.:          I

9   Guidelines Range:              70 to 87 months

10       With the exception of the victim related adjustment and the

11  grouping increase, these are the same calculations agreed to by the

12  parties in the plea agreement.

13       **B.    Section 2B1.1(b)(2): substantial financial hardship to**

14            **victims**

15       In the plea agreement, defendant admitted that his securities

16  fraud/investment fraud offense "resulted in substantial financial

17  hardship to more than 25 victims," and that Section 2B1.1(b)(2)(C)'s

18  six level increase for substantial financial hardship to 25 or more

19  victims applies.  (DE 6 (Plea Agreement) at 18, 23.)  The PSR found

20  that only the two-level enhancement for one or more victims suffering

21  substantial financial hardship was applicable.  (DE 18 (PSR) ¶ 68.)

22       Pursuant to Section 2B1.1(b)(2), a 2-level enhancement is

23  applied if the offense (i) involved 10 or more victims; (ii) was

24  committed through mass marketing; or (iii) resulted in substantial

25  financial hardship to one or more victims.  (U.S.S.G.

26  § 2B1.1(b)(2)(A).)  Both subsections (i) and (iii) apply here because

27  there are more than 10 victims and the offense resulted in

28  substantial financial harm to one or more victims.

1    However, a larger increase applies if more victims experienced

2  substantial financial hardship.  Section 2B1.1(b)(2) provides for a

3  4-level increase if the offense resulted in substantial financial

4  hardship to five or more victims or a 6-level increase if the offense

5  resulted in substantial financial hardship to 25 or more victims.

6  (U.S.S.G. § 2B1.1(b)(2)(B)-(C).)  Application Note 4(F) identifies

7  several factors to consider when determining whether the offense

8  resulted in substantial financial hardship to a victim, including

9  suffering substantial loss of a retirement, education, or other

10  savings or investment fund; making substantial changes to his or her

11  employment, such as postponing his or her retirement plans; or making

12  substantial changes to his or her living arrangements, such as

13  relocating to a less expensive home.  (U.S.S.G. § 2B1.1, App.n.

14  4(F).)

15    Here, in the plea agreement and the change of plea hearing,

16  defendant admitted that "[i]n his fraudulent securities/investment

17  fraud scheme, defendant victimized more than 100 individuals, which

18  resulted in substantial financial hardship to more than 25 victims."

19  (DE 6 (Plea Agreement) at 18.).  Defendant also stipulated in the

20  plea agreement that the six-level increase for substantial financial

21  hardship for 25 or more victims applied in this case.  (*Id.* at 23.)

22    The factual basis also provides examples of how victims suffered

23  financial hardship, including:

- Victim M.Z.: invested her life savings, which she planned
  to use to retire.

- Victim I.M.: "You have no idea how bad I need my money."

- Victim J.H.: "Really hoping for good news, Nadia's grandma
  (Mary's mom) is in the hospital and not doing well  I'd

18

1            like to help out with if I can.  E-Jay is also struggling

2            pretty bad."

3        • Victim: "I just want you to know that I'm very bad

4          economically and that I need my money as soon as possible I

5          have my wife sick and my dad I have to operate in Mexico."

6      In addition, the recently filed under seal letters, several

7 victims wrote:

8        • Victim M.R.: "ran out of my life savings";

9        • Victim L.R.: "lost all my savings";

10      • Victim A.S.: invested her "hard-earned lifetime retirement

11        savings" and a personal loan from Bank of America;

12      • Victim M.Z.: invested "all of my money that I had been

13        setting for my retirement plan";

14      • Victim S.R.M.: invested part of her 401(k);

15      • Victim N.T.: invested the savings intended to cover wedding

16        expenses.

17      Therefore, the government believes that given (a) defendant's

18 specific admission that the offense "resulted in substantial

19 financial hardship to more than 25 victims"; (b) the facts regarding

20 the victims detailed in the factual basis who suffered substantial

21 financial hardship; and (c) the additional victims who in their

22 letters indicated substantial financial hardship, the Court can find

23 that Section 2B1.1(b)(2)(c)'s six-level increase applies for

24 substantial financial hardship to 25 or more victims.

25     **C.**   **Grouping calculation**

26      For Section 3D1.4's multiple count adjustment, the PSR concluded

27 that there were three separate groups: (1) Group#1 (count-1: offense

28 level 27); (2) Group#2 (count-2: offense level 22); and (3) Group#3

19

1   (count-1: offense level 23).  (PSR ¶ 89.)

2       That conclusion differs from the parties' agreement in the plea

3   agreement, which was that there were only two groups: (1) Group#1

4   (counts one and three); and (2) Group#2 (count two).

5       Section 3D1.2(d) provides that when the offense level is

6   determined largely on the basis of the total amount of harm or loss,

7   those counts should be grouped together.  That Section also

8   specifically provides that offenses covered by Section 2B1.1 are to

9   be grouped together under Section 3D1.2(d).  Example 3 of Application

10  Note 6 further provides as an example of when separate fraud

11  offenses/scheme should group: "The defendant is convicted of five

12  counts of mail fraud and ten counts of wire fraud.  Although the

13  counts arise from various schemes, each involves a monetary

14  objective.  All fifteen counts are to be grouped together."

15      That's the case here with counts one and three.  Both of those

16  counts are fraud offenses.  Both of those counts are governed by

17  Section 2B1.1, so should be grouped together.  Both of them involve a

18  monetary objective, so they should be grouped together.  Thus, under

19  Section 3D1.2(d), counts one and three should be grouped together in

20  one group.

21      Accordingly, the government believes that the correct grouping

22  is only 1½ units, instead of 2½ units:

23      <u>Combined offense level calculation</u>:

24      Group One (counts 1 and 3):   1 unit        U.S.S.G. § 3D1.4(a)

25      Group Two (count 2):          ½ unit        U.S.S.G. § 3D1.4(b)

26      Total Units:                  1½ units

27  **FINAL COMBINED OFFENSE LEVEL**

28      Total offense level count-1:    31

1    Increase from grouping:          +1            U.S.S.G. § 3D1.4

2    Acceptance of responsibility:    -3            U.S.S.G. § 3E1.1

3  **Combined Total Offense Level:       29**

4       Therefore, defendant's final Guidelines sentencing range for a

5  final offense level of 29 with Criminal History Category I is 87 to

6  108 months of imprisonment.

7  **IV.   VICTIM LETTERS**

8       The government will be filing, under seal, more than 10 letters

9  received from victims.  In addition to providing facts and statements

10 regarding their financial hardship (detailed *supra*), victims also

11 expressed their feelings and judgment about defendant, with several

12 examples here:

13        **Investment/securities fraud victims**

14        • <u>Victims J.H. and N.H.</u>: "Mr. Cirillo has no remorse for his

15          actions, and I believe he already has plans for his next

16          scheme to defraud more families of their money."

17        • <u>Victim E.S.</u>: "Robert is manipulative, cruel, and uncaring

18          for those he affects.  It makes me angry he has affected so

19          many families that have given their savings in hopes they

20          could grow that money more.  Instead we have been lied to

21          and cheated on.  We ask for justice, and hope all the money

22          from the people he had stolen from be returned.  I hope

23          Robert Louis Cirillo can not continue scamming hardworking

24          and honest people."

25        • <u>Victim T.S.</u>:  "[Defendant] is a manipulative and dishonest

26          person."

27        • <u>Victim M.G.L.</u>: "My friends would receive threatening text

28          messages from [defendant], after hearing these horrific

21

1    experiences my friends had to go through I began to fear
2    that if I reached out I would be receiving threatening
3    messages as well….. By means of this letter, I hereby
4    cordially request the [Court] I [name] remain anonymous at
5    the hearing of [defendant]  I fear [defendant] will do
6    something to me or would retaliate against me."

7    • S.R.M.: "I called [defendant] and I begged him to even give
8    me a few dlls.  A least [sic] $500.00 Dlls.  To complete
9    for the expenses for my Dads funeral that was on November
10    15, 2018.  [Defendant] replied that he was very sorry but
11    the money had a delayed and that he would pay later….. I
12    had to change my cellphone number and my address because of
13    the threats that [defendant] made me by phone and calls."

14    • Victim L.R.: "He just scammed me and made fun of me every
15    time I send him messages …. I was very stressed I had lost
16    all my savings I was craying [sic]  I knew they had robbed
17    me I did not sleep thinking about what I had done it is the
18    worst thing that has happened to me in my life."

19    • Victim M.R.: "I ran out of my life savings and learned the
20    lesson that one should not trust anoyene.  [sic]"

21    • Victim A.V.S.: "The money I invested with [defendant] was
22    my hard-earned lifetime retirement savings.  All these
23    caused by an unscrupulous individual that even thought
24    [sic] I begged him to pay back my invested money, he never
25    responded my several calls."

26    • Victim N.T.: "We had to pay our wedding venue on certain
27    date since we were under a contract and Robert just kept
28    postponing paying the loans. He even offered to pay

1     directly to our wedding venue but never did. He even asked

2     us to cancel our wedding, that is when we realized that we

3     were not going to get our money back, which created a big

4     problem to me and my husband, because in reality we had

5     given Robert all of our savings."

6   **Grandfather scam victim**

7    &bull; Victim D.Q.: "One of the defendant's three guilty pleas is

8     specific to me. I will never completely get over my losses,

9     of money and of self-esteem. The 100-plus victims of his

10     securities fraud – at least one of whom lost her life

11     savings – collectively lost ten times as much money as I

12     did.  Your honor, please impose a sentence that fits the

13     harm he caused to us all."

14 **V.   RECENT OBSTRUCTIVE AND FRAUDULENT ACTIONS BY DEFENDANT**

15   Even after the FBI and IRS-CI had investigated him and he had

16 pleaded guilty, while awaiting sentencing, defendant appears to have

17 still been up to no good.  That is, in July 2022, defendant asked one

18 of the victims of his securities/investment fraud scheme for money,

19 and the victim gave defendant more than $400.  But defendant kept

20 wanting more money from that victim.  For example, defendant called

21 the victim 12 times on the same day (August 19, 2022), and when

22 defendant failed to get more money, he called that same victim 11

23 more times the following day (August 20, 2022), continuing to try to

24 get more money from that victim.  Ultimately, the victim stopped

25 answering or giving defendant any more money.  Defendant also

26 provided that victim checks signed by defendant that were to be used

27 as purported payment to additional victims in the amounts of $8,000,

28 $8,000, $7,000, and $4,000, but when one of the victims deposited one

of those checks, it bounced (just like the purported payment checks defendant gave victims during the underlying scheme).

Even more troubling, when defendant believed that the Court and/or government became aware that he had provided those worthless checks to victims, defendant directed the victim to rip up those checks.

Thus, defendant appears to have not only continued in his fraudulent behavior – even while awaiting sentencing by the Court – but he also attempted to obstruct justice by trying to destroy evidence.

**VI. GOVERNMENT'S POSITION REGARDING SENTENCING**

    **A.   Summary of the Government's Position**

Defendant committed several serious federal felonies.  His securities/investment fraud scheme victimized more than 100 victims for more than $3 million.  Last year, he participated in a conspiracy to defraud an 82-year-old victim of approximately $400,000, which defendant spent for himself.  And he failed to report any of those millions of dollars of income to the IRS.

In addition to the seriousness of those felonies, their facts indicate that a sizable prison sentence is required to punish defendant, specifically deter him, and for general deterrence. Defendant admitted that his crime was an affinity crime that targeted members of the Hispanic community, and many of them were of limited means.  In the plea agreement, defendant admitted that from in or around March 2021 to April 2021, defendant participated in a fraudulent scheme with others to defraud victim D.Q., a senior citizen, of approximately $400,000.  The victim of defendant's Grandparent scam is 82 years old.  Defendant victimized more than 100

people, and even threatened some of them so they would keep quiet, including stating that if they made problems for him, they could go "for the [expletive] hole in the [expletive] desert."

Last, while awaiting sentencing after pleading guilty in this case, defendant continued in his fraudulent behavior by re-victimizing a prior victim by convincing that victim to give him hundreds of dollars, and again providing worthless checks to victims (that would again bounce).

Thus, the government recommends the low end of the Guidelines range as agreed by the parties: <u>87 months' imprisonment</u>, followed by three years of supervised release, and restitution.

**B.    The § 3553(a) factors call for the recommended sentence.**

Under 18 U.S.C. § 3553(a), the Court should impose a sentence "sufficient, but not greater than necessary, to comply with the purposes" of sentencing as set forth in § 3553(a)(2).  The Court is to consider various factors in determining the particular sentence, including:

> (1) the nature and circumstances of the offense and the history and characteristics of the defendant; [¶] (2) the need for the sentence imposed -- [¶] (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; [¶] (B) to afford adequate deterrence to criminal conduct; [and] (C) to protect the public from further crimes of the defendant; . . . [¶] (4) the kinds of sentence and the sentencing range established [in the Sentencing Guidelines]; . . . [¶] (6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and [¶] (7) the need to provide restitution to any victims of the offense.

18 U.S.C. § 3553(a).

Here, application of those factors supports the conclusion that the recommended low-end Guidelines sentence is a reasonable and appropriate sentence for defendant.

25

        **1.**    <u>**Nature, Circumstances, and Seriousness of the Offenses**</u>

     Defendant committed serious crimes, involving actual loss exceeding $3,500,000, which he perpetrated by not only taking advantage of investment-victims, but also stinging a Grandfather of approximately $400,000.  All in all, these crimes – the millions dollar investment/securities fraud and the wire fraud conspiracy – did not have to happen.  Instead, defendant believed he would not be punished even though he used his abilities to cheat and steal from vulnerable victims, so the sentence in this case should show him and the public that that is not the case.

     Moreover, defendant's crimes did not occur just over a short period, or just a few victims.  Defendant engaged in his fraudulent scheme for more than five years, and victimized more than 100 victims.  And he did so not only by lying, but also by fabricating bank documents.

     Further, defendant also threatened victims to attempt to intimidate them from blowing the whistle on him.

        **2.**    <u>**Defendant's history and characteristics**</u>

     On balance, defendant's history and characteristics lack significant mitigation in this case.  Defendant has no criminal history, which is adequately taken into consideration by the Guidelines.  But looking at what he did shows that his behavior presents someone who needs to be sufficiently punished.

     Defendant has shown by his criminal behavior that he has contempt for the law and no concern for the victims he was hurting. While he was running his million dollars fraud scheme, defendant was scheming to commit other crimes, including laundering counterfeit money at a Las Vegas casino.  Further, defendant discussed committing

1   credit card and identity theft, and when agents search his residence

2   in August 2019, they found evidence of credit card/identity theft

3   fraud, including a photograph of a fraudulently obtained credit card

4   in the name of E.I., which resulted from a fraudulent application

5   defendant had caused in that identity.

6       As if that were not enough, defendant also participated in a

7   separate scheme where victim D.Q., a senior citizen, was defrauded

8   out of approximately $400,000.  In that fraudulent scheme,

9   defendant's co-schemers tricked victim D.Q. into believing that his

10  grandson had been arrested by the Sacramento Police Department for

11  possession of illegal narcotics, which was false, and they also

12  pretended to be other people when communicating with victim D.Q.,

13  including posing as a sergeant with the Sacramento PD, a public

14  defender, and D.Q.'s grandson.  The money then went to defendant's

15  bank account, which he used for his personal benefit.

16      Defendant's long-running and varied criminal behavior shows that

17  he needs to be adequately punished, so he stops victimizing other

18  people.

19              **3.   Adequate deterrence to defendant and the public**

20       In this case, general deterrence is important.  Not only was

21  this a large investment fraud scheme, but defendant also admitted

22  that his scheme was an "affinity crime," which exploited the trust

23  and friendship that exist in groups of people who have something in

24  common, and here he targeted members of the Hispanic community.  Due

25  to the size of defendant's fraud and the number of victims from the

26  Hispanic community, even a Spanish language channel ran a story about

27  defendant's fraudulent scheme before and after he was charged.  Thus,

28  the sentence in this case should be sufficient to deter others from

1    participating in similar affinity crimes.

2        Defendant has also shown through his varied criminal conduct

3    that he needs to be specifically deterred, including his continuing

4    to attempt to victimize others while awaiting sentencing in this

5    case.

6        Given defendant's conduct during the underlying

7    investment/securities fraud scheme – including the threatening

8    victims – as well as his additional separate crimes – including

9    victimizing a senior citizen for almost $400,000, defendant's

10   sentence must specifically deter him from criminal conduct.  Here,

11   that sentence must deter someone who orchestrated and operated an

12   investment fraud scheme that victimized more than 100 people for more

13   than $3,000,000, stole from a Grandfather, failed to report and pay

14   taxes of approximately $675,000, and attempted and discussed

15   committing other crimes such as money laundering and identity theft.

16       Further, as discussed above, even after the FBI and IRS-CI had

17   investigated him and he had pleaded guilty, while awaiting

18   sentencing, defendant appears to have still been up to no good.  For

19   example, in the last couple months, he convinced a victim to provide

20   him with several hundred dollars, and also provided purported payment

21   checks for victims, which of course would bounce (just like during

22   the scheme).

23       Thus, the government's recommended sentence for defendant was

24   carefully and individually fashioned to address both general and

25   specific deterrence.

26       **4.    <u>Need to Protect the Public from Defendant</u>**

27       The government agrees with Probation that supervision is

28   appropriate in this case.  Even though defendant lacks criminal

history, defendant's first criminal convictions were serious federal felonies that involved millions of dollars of fraudulent proceeds with more than 100 victims, as well as a tax offense.  The span of defendant's criminal behavior – both as to type of crimes and the length of the scheme – shows that the public needs to be protected from defendant, particularly as shown above that defendant appears to continue to attempt to victimize others.

Defendant has shown from his conduct that he is willing to victimize others, and in a variety of ways, so his sentence must be fashioned to protect the public from further crimes by defendant.

### 5.   Need to Avoid Unwarranted Sentence Disparities

The government's recommended sentence of approximately 7 years of imprisonment does not appear to be disparate for a millions dollar investment/securities fraud scheme, particularly when coupled with the wire fraud conspiracy and false tax return.  Moreover, the recommended sentence is a low end Guidelines sentence, which also appears not to be unreasonable for such a large scale fraud with many victims.

The government believes that based upon the facts in this case, the recommended sentence of 87 months of imprisonment, which is the low end of the applicable Guidelines range, adequately addresses the Section 3553(a) factors.

### C.   Restitution

In the plea agreement, defendant agreed to make full restitution.  The government respectfully recommends that defendant be ordered to pay restitution as follows:

- $2,759,910.53 to securities/investment fraud victims (count one);

1          • $675,898 to the IRS (count two); and

2          • $399,550 to victim D.Q. (count three).

3     **VII. CONCLUSION**

4          Defendant victimized hundreds of people – many of modest means –

5     over many years, to the tune of more than $3,000,000.  That involved

6     lying, over and over again.  More recently, last year, he

7     participated in a separate scheme to rip off a senior citizen of

8     $400,000 in a Grandfather scam.  Defendant was not destitute or

9     hurting – in fact, he owned an Alfa Romeo and a Mercedes Benz – but

10    he nonetheless chose to use his skills to effectuate his fraudulent

11    schemes.  Accordingly, defendant's particular financial condition at

12    the time of the fraudulent scheme is another reason justifying

13    sentencing him to a substantial term of imprisonment:

14              A crime of fraud by one who already has more than

15         enough—and who cannot argue that he suffered a

16         deprived or abusive childhood or the compulsion of an

17         expensive addiction—is simply a crime of greed.  A

18         crime of fraud by one who is otherwise successful,

19         apparently by legitimate means, is also particularly

20         disturbing.  Thus, in light of [defendant]'s history

21         and characteristics, this is a case of greed for the

22         sake of greed, not greed for the sake of gain.

23    United States v. Miell, 744 F. Supp. 2d 904, 955 (N.D. Iowa 2010)

24    (imposing sentence of 240 months of imprisonment).

25         General deterrence is an important consideration in this case.

26    Defendant's investment/securities fraud scheme exceeded $3,000,000

27    and had more than 100 victims.  Defendant targeted members of the

28    Hispanic community, and it was reported in the Hispanic media.  A

                                30

1    sizable sentence will send a strong and public message that fraud

2    will be swiftly and appropriately punished and that those engaging in

3    it can and will be held accountable, with many years in federal

4    prison, especially when targeting vulnerable victims or otherwise

5    engaging in affinity crimes.

6         Likewise, general deterrence also supports a sizable sentence

7    for defendant's Grandfather scam, which defendant participated

8    separately and in addition to his investment fraud scheme.  These

9    types of crimes targeting the elderly are becoming more and more

10   common, so the sentence in this case should send the message that

11   such crimes will receive swift and severe punishment.  Thus, the

12   crime against the 82 year old victim, as well as the affinity

13   character of his investment fraud scheme, merits a substantial prison

14   sentence, both for punishment and general and specific deterrence.

15        Last, defendant has demonstrated his disrespect for the law by

16   not only discussing and apparently engaging in other fraudulent

17   conduct, but also by failing to accurately report millions of dollars

18   in income to the IRS, as well as continuing to victimize others, as

19   recently as earlier this month.

20        In conclusion, based upon the applicable Section 3553(a)

21   factors, the government believes its recommended sentence is

22   appropriate here.

23        For the foregoing reasons, the government respectfully requests

24   that this Court impose the following sentence:

25        1.   87 months of imprisonment;

26        2.   Three years of supervised release;

27        3.   $3,835,358.53 total restitution ($2,759,910.53 total to the

28             investment/securities fraud victims; $399,550 to victim

31

1      D.Q., and $675,898 to the IRS); and

2      4.   $300 special assessment.

1  NICOLA T. HANNA
   United States Attorney
2  BRANDON D. FOX
   Assistant United States Attorney
3  Chief, Criminal Division
   SCOTT PAETTY (Cal. Bar No. 274719)
4  Assistant United States Attorney
   Major Frauds Section
5       1100 United States Courthouse
        312 North Spring Street
6       Los Angeles, California 90012
        Telephone:  (213) 894-6527
7       Facsimile:  (213) 894-6269
        Email:      scott.paetty@usdoj.gov
8
   Attorneys for Plaintiff
9  UNITED STATES OF AMERICA

10

11                    UNITED STATES DISTRICT COURT

12              FOR THE CENTRAL DISTRICT OF CALIFORNIA

   UNITED STATES OF AMERICA,          No. CR 18—39-GW
13
            Plaintiff,                GOVERNMENT'S SENTENCING POSITION;
14                                    DECLARATION OF SCOTT PAETTY;
            v.                        EXHIBITS
15
   EFSTRATIOS ARGYROPOULOS            Hearing: August 26, 2019
16    aka ("Elias"),                  Time:    8:00 a.m.
                                      Place:   Courtroom of the
17          Defendant.                Honorable George Wu

18

19

20       Plaintiff, United States of America, by and through its counsel

21  of record, the United States Attorney for the Central District of

22  California and Assistant United States Attorney Scott Paetty, hereby

23  files its sentencing position.  This sentencing position is supported

24  //

25  //

26

27

28

                                      1

1    by the attached memorandum of points and authorities, the Presentence

2    Investigation Report, the declaration of Scott Paetty and attached

3    exhibits filed under seal concurrently herewith, the files and

4    records in this case, and any further evidence and argument as the

5    Court may permit at the sentencing hearing.

6

7    Dated: August 12, 2019          Respectfully submitted,

8                                    NICOLA T. HANNA
                                     United States Attorney
9
                                     BRANDON D. FOX
10                                   Assistant United States Attorney
                                     Chief, Criminal Division
11

12                                   _____
                                     SCOTT PAETTY
13                                   Assistant United States Attorney

14                                   Attorneys for Plaintiff
                                     UNITED STATES OF AMERICA
15

16

17

18

19

20

21

22

23

24

25

26

27

28

**TABLE OF CONTENTS**

DESCRIPTION                                                              PAGE

MEMORANDUM OF POINTS AND AUTHORITIES.................................1

I.    INTRODUCTION....................................................1

II.   STATEMENT OF FACTS.............................................1

III.  ARGUMENT.........................................................4

      A.     Advisory Sentencing Guidelines...........................5

      B.     A Low-End Sentence of 63 Months in Prison is
             Reasonable and Appropriate Under the § 3553(a) Factors....6

IV.   RESTITUTION....................................................11

V.    CONCLUSION.....................................................12

**TABLE OF AUTHORITIES**

DESCRIPTION                                                                                    PAGE

**Cases**

United States v. Kriesel,

   508 F.3d 941 (9th Cir. 2007) ...................................... 10

United States v. Martin,

   520 F.3d 87 (1st Cir. 2008) ....................................... 8

United States v. Seljan,

   547 F.3d 993 (9th Cir. 2008) ...................................... 10

United States v. Warr,

   530 F.3d 1152 (9th Cir. 2008) ..................................... 10

**Statutes**

18 U.S.C. § 3553(a)........................................... 6, 7

18 U.S.C. § 3553(a)(1).......................................... 8

18 U.S.C. § 3553(a)(2)......................................... 10

18 U.S.C. § 3663A(c)(1)(B)..................................... 12

18 U.S.C. § 3664(f)(1)(A)...................................... 12

**Sentencing Guidelines**

USSG § 2B1.1(a)(1)............................................. 5

USSG § 2B1.1(b)(1)............................................. 1

USSG § 2B1.1(b)(1)(J)....................................... 1, 5

USSG § 2B1.1(b)(2)(A)......................................... 5

USSG § 2B1.1(b)(9)(C)......................................... 5

1

1

<u>**MEMORANDUM OF POINTS AND AUTHORITIES**</u>

2

**I.    INTRODUCTION**

3       On June 3, 2019, defendant Efstratios, aka "Elias," Argyropoulos

4  ("defendant") pleaded guilty pursuant to a plea agreement to one

5  count of wire fraud, in violation of 18 U.S.C. § 1343.  (PSR ¶¶ 1-2.)

6  On July 22, 2019, the United States Pretrial and Probation Office

7  ("USPO") filed a presentence report ("PSR," Docket No. 55),

8  calculating a total offense level of 24 (based in part on a 16-level

9  enhancement due to approximately $3.2 million in actual loss, <u>see</u> PSR

10 ¶ 37 (citing USSG § 2B1.1(b)(1)), a criminal history category of I,

11 and a recommended guideline range under the United States Sentencing

12 Guidelines ("USSG") of 51 to 63 months.  (PSR at 3.)  In its

13 sentencing recommendation letter, the USPO recommended a 51-month

14 prison term, followed by a two-year period of supervised release.

15 (Docket No. 54 at 2.)  As discussed below, the government submits

16 that the actual loss in this case is properly calculated at

17 $4,121,461.04, which results in an 18-level total offense level.

18 (<u>See</u> USSG § 2B1.1(b)(1)(J).)  Therefore, defendant's adjusted total

19 offense level is 26 with a guideline range of 63-78 months, and the

20 government submits that a low-end guidelines sentence of 63 months to

21 be followed by three years of supervised release is appropriate for

22 this case.  The government also seeks a restitution order in the

23 amount of $4,121,461.04.

24

**II.  STATEMENT OF FACTS**

25      In pleading guilty, defendant agreed that beginning at least in

26 or around October 2010 and continuing to in or around October 2015,

27 in Santa Barbara County, defendant, knowingly and with intent to

28 defraud, devised and executed a scheme to defraud investors. (Plea

1  Agreement, Docket No. 45 ¶ 10; PSR ¶¶ 15-23.)  Specifically,

2  defendant, as the president and sole shareholder of Prima Ventures

3  Corporation ("Prima"), a financial services firm, represented to

4  potential investors that he and Prima were licensed brokers, when

5  neither was licensed by the SEC to sell securities.  (PSR ¶ 15.)

6  Defendant, acting through Prima, told potential investors that he had

7  access to investment opportunities which offered high rates of return

8  on investment.  (PSR ¶ 16.)  For example, defendant said that he

9  would pool investors' money to purchase pre-initial public offering

10 ("pre-IPO") shares of companies, such as Facebook and Twitter, and

11 that he had access to other good investment opportunities, which he

12 could purchase for investors at bargain prices, with companies such

13 as Alibaba, E-Waste, and Etsy.  (PSR ¶ 17.)  Through these

14 representations, defendant raised over $5 million from investors.

15 (PSR ¶ 18.)  Defendant sometimes provided investors with receipts for

16 their investments, which described the amounts invested, share price,

17 and number of shares, but most often, defendant failed to purchase

18 the shares, and instead deposited the investors' money in Prima

19 accounts.  (Id.)  Defendant would then transfer these funds to his E-

20 Trade account, which he used to day-trade stocks other than those he

21 told investors he would purchase on their behalf, or to his personal

22 accounts, which defendant used to pay personal expenses, such as

23 cars, insurance, travel, utilities, and gambling.  (Id.)

24     After misappropriating investors' funds, defendant also engaged

25 in "lulling" activities; he offered investors an opportunity to keep

26 investing with him by rolling over their investments into shares of

27 another company or another investment vehicle.  (PSR ¶ 19.)  By so

28 doing, defendant continued the perception that investors' money was

still being properly invested, when in many instances in which investors agreed to new investments, defendant failed to make the described transfers. (PSR ¶ 19; Docket No. 45 at 11.) On occasions where investors requested payouts, defendant occasionally offered refunds; however, the refunds were not linked to the sale of any of the investors' shares in stock, but rather came from other sources, such as subsequent investor funds, in Ponzi-style payments. (PSR ¶¶ 20, 23.)

In January 2015, the Honorable R. Gary Klausner entered an order of permanent injunction against defendant in Sec. & Exch. Comm'n v. Argyropoulos, CV 14-9800. (PSR ¶ 21.) The injunction, among other things, precluded defendant from inducing the purchase or sale of a security without being licensed by the Securities and Exchange Commission ("SEC") or to obtain money be means of any untrue statement or material fact or to engage in a fraud. (Id.)

Nevertheless, and in violation of that order of this Court, defendant persisted in his scheme of fraudulently soliciting investors. (Id.) Through at least April 22, 2016, defendant participated, with others, in a fraudulent scheme to induce investors to invest in the Laurence Miles Trust. (PSR ¶ 22.) The scheme involved convincing investors to pay the medical bills of an ill woman who was the heiress to an estate worth over $1 billion dollars. (Id.) According to the fraudulent story, distribution of the estate was held up by lawsuits, but once the estate was settled, a huge payout would result for the investors. (Id.) Defendant instructed investors to send their payment to defendant through Prima. (Id.) In truth, there was no heiress, no trust, and no funds to be distributed to investors. (Id.)

3

1        As an example of defendant's fraudulent conduct, defendant

2    induced one victim-investor, A.A., to invest in both a fraudulent

3    stock scheme related to Alibaba as well as the Laurence Miles Trust

4    scheme.  As discussed in the factual basis to his plea agreement,

5    defendant misrepresented to victim A.A that defendant had access to

6    good investment opportunities, was a licensed broker, and would

7    purchase for A.A. 1,000 shares of Alibaba.  (Docket No. 45 at 11.)

8    Through these misrepresentations, defendant caused victim A.A. to

9    invest $75,000 with Prima.  (Id.)  Defendant did not actually

10    purchase shares in Alibaba in A.A.'s name as promised, however, but

11    instead misappropriated those funds to pay defendant's personal

12    expenses such as landscaping, utilities, legal fees related to an

13    investigation into defendant's investment activities by the SEC, and

14    to day trade in stocks unrelated to his promised purchase of Alibaba

15    shares for A.A.  (Id. at 11-12.)  In an effort to lull A.A. into

16    believing that he had purchased those Alibaba shares, and to conceal

17    his scheme to defraud A.A. with respect to the Alibaba shares,

18    defendant subsequently convinced A.A. to roll his investment into an

19    investment in the Laurence Miles Trust.  (Id. at 12.)  As with the

20    Alibaba shares, defendant did not in fact purchase for A.A. the 1,000

21    shares in the Laurence Miles Trust as he promised because the

22    Laurence Miles Trust was itself a fraudulent scheme.  (Id. at 12.)

23        As described below, defendant victimized approximately 130

24    victims as a result of his fraudulent conduct, violated a court order

25    in so doing, and caused actual losses of over $4.2 million dollars.

26    **III. ARGUMENT**

27        For the reasons set forth below, and consistent with the

28    parties' plea agreement, the government recommends that a sentence

that includes 63 months of imprisonment, three years of supervised release, a restitution order of $4,121,461.04, and special assessment of $100 is justified and appropriate.

**A.   Advisory Sentencing Guidelines**

As calculated by the PSR and agreed upon by the parties, the government submits that the following guidelines factors apply:

| Base Offense Level | 7 | USSG § 2B1.1(a)(1) |
|---|---|---|
| 10 or more victims | +2 | USSG § 2B1.1(b)(2)(A) |
| Violation of a Court Order | +2 | USSG § 2B1.1(b)(9)(C) |

(PSR ¶¶ 35, 38-39, Docket No. 45 ¶ 14.)  An 18-level enhancement for loss is also appropriate in this case.  Exhibit 1 to the Paetty declaration, filed under seal concurrently herewith, is a spreadsheet consisting of losses claimed by victim investors of defendant. Exhibit 1 contains columns depicting the victim's name, the dollar amount of his/her investment, any funds returned to the victim-investor, net loss (amount of investment minus amount returned), supporting documents with their corresponding bates ranges, and contact information.  (Paetty Decl., Ex. 1.)  The total net loss or, put another way, the actual loss sustained by the victim-investors is $4,121,461.04.  (Id.)  According to the Guidelines, an 18-level enhancement applies for cases involving losses between $3.5 million and $9.5 million.  See USSG § 2B1.1(b)(1)(J).

The government has also received victim impact statements from three victim-investors.  These statements are attached as Exhibit 2 to the Paetty declaration and filed under seal concurrently herewith. As discussed below, these statements reveal the seriousness of defendant's criminal conduct and highlight the pain defendant

5

1  inflicted on his victims due to the stress and financial consequences

2  of his lies and misrepresentations.

3      **B.   A Low-End Sentence of 63 Months in Prison is Reasonable and**

4         **Appropriate Under the § 3553(a) Factors**

5      The government recommends a low-end guidelines sentence of 63

6  months of imprisonment, three years of supervised release, and a

7  mandatory special assessment of $100.  The government's

8  recommendation is appropriate and justified in light of the factors

9  set forth under 18 U.S.C. § 3553(a).

10      The factors to be considered when imposing sentence, as set

11  forth in 18 U.S.C. § 3553(a), include:

12      (1) The nature and circumstances of the offense and the history

13  and characteristics of the defendant;

14      (2) The need for the sentence imposed –

15         (A) to reflect the seriousness of the offense, to promote

16      respect for the law, and to provide just punishment for the

17      offense;

18         (B) to afford adequate deterrence to criminal conduct;

19      [and]

20         (C) to protect the public from further crimes of the

21      defendant . . .

22      (3) The kinds of sentences available;

23      (4) [the applicable sentencing guidelines];

24      (5) [the applicable sentencing guidelines policy statement];

25      (6) The need to avoid unwarranted sentence disparities among

26  defendants who have been found guilty of similar conduct; and

27      (7) The need to provide restitution to the victims of the

28  offense.

18 U.S.C. § 3553(a).  The government submits that a low-end Guideline sentence accounts for all of the aggravating and mitigating factors in this case and is appropriate.

First, the nature and circumstances of the offense are serious. Defendant participated in a years-long scheme to defraud investors that preyed upon his victims' misplaced trust in him.  For example, defendant received money from investors, like victim T.D., for what T.D. thought was a "win-win opportunity" to purchase pre-IPO shares of promising stocks like Facebook, the proceeds of which were ear-marked for needs such as T.D.'s children's college expenses, but instead defendant used these purported investments to pay for his personal extravagances such as cars, travel, and gambling.  (See Ex. 2 to Paetty Decl. at 1; PSR ¶ 18.)  Defendant's fraud also caused harm by taking advantage of social circles that instilled trust, such as church gatherings, to forge relationships with his victims.  (Ex. 2 to Paetty Decl. at 6.)  Defendant then used these relationships to recruit other unsuspecting investors.  (Id.)  As victim M.M. recounted in his victim impact statement, it was "emotionally distressing" to discover that defendant took advantage of him after they met at church, in what M.M. thought was a safe environment. (Id.)  Defendant then compounded the pain and humiliation by using his connection to M.M. to defraud M.M.'s work colleagues, with whom M.M. associated on a daily basis.  (Id.)

Significantly, defendant also solicited investors, all of whom lost everything they invested, in the fraudulent Laurence Miles Trust immediately after defendant had agreed to settle the SEC case against him and had consented to an injunction the terms of which included precluding him from selling securities without a license or engaging

1  in fraud.  (PSR ¶ 21.)  In all, defendant cheated at approximately

2  130 victims victims of over $4.2 million. (Ex. 1 to Paetty Decl.)

3  This crime is undoubtedly serious and calls for a significant prison

4  term.

5      The most significant mitigating factor relating to defendant's

6  crime is defendant's early acceptance of responsibility. See United

7  States v. Martin, 520 F.3d 87, 93–94 (1st Cir. 2008).  Defendant

8  accepted responsibility by pleading guilty before trial.  By doing

9  so, defendant not only demonstrated his early acceptance of

10  responsibility for his crimes, but he saved government and Court

11  resources.  The government submits that the balance of these

12  aggravating and mitigating factors supports a low-end Guideline

13  sentence in this matter.

14      Second, defendant's history and characteristics are also

15  relevant. See 18 U.S.C. § 3553(a)(1).  Defendant is a 72-year-old man

16  with one prior conviction for grand theft in his criminal record for

17  which he was sentenced to 36 months probation. (PSR ¶¶ 51, 58.)

18  Because that prior conviction took place in 1998 and receives no

19  criminal history points, defendant is in criminal history category I.

20  (PSR ¶¶ 52-53.)  Despite defendant's minimal criminal history, his

21  past regulatory sanctions are highly relevant and support a

22  significant custodial sentence.  Defendant has flaunted the

23  securities laws for decades.  After training for and passing

24  examinations to become a licensed broker, defendant violated

25  financial industry regulations by depositing personal funds into a

26  customer's account to cover losses and was ultimately censured,

27  barred, and fined $200,000 for unauthorized transactions and

28  deceptive practices.  (PSR ¶¶ 64, 65 n.2-3.)  Nevertheless, defendant

1  continued to engage in the sale of fraudulent investment

2  opportunities while holding himself out as a licensed broker, despite

3  having his license taken away.  (PSR ¶ 15.)  Defendant's history of

4  noncompliance with court orders and deceitful actions related to

5  fraudulent investment schemes evince a disturbing lack of respect and

6  concern for the orders of this Court and the rules and regulations

7  that are essential to the healthy functioning of a free and open

8  market.

9       Moreover, defendant's actions after he signed a plea agreement

10  in this case are also concerning.  Defendant's plea agreement was

11  filed on May 3, 2019.  (Docket No. 45.)  Four days later, prior to

12  his change of plea hearing, defendant filed an ex parte application

13  with the Court requesting modification of his bond conditions to

14  allow him to travel to Greece, the country where he was born and from

15  which he could not be extradited.  (Docket No. 46.)  The government

16  opposed that request.  (Docket No. 52.)  The Court granted

17  defendant's application and issued an order modifying defendant's

18  bond to allow him to travel to Greece conditioned upon the posting of

19  a $3 million bond by defendant's son secured by the deeding of his

20  son's property to the Court.  (Docket No. 53.)  As it turns out, the

21  bond was not posted and defendant never travelled to Greece.  The

22  clear implication of this decision is that, with such dire

23  consequences to his son at stake, defendant balked at the trip

24  because he had no intention of returning to the United States to face

25  sentencing in this matter.

26       A significant mitigating factor related to defendant's history

27  and characteristics is his age.  Defendant is 72 years old and poses

28  a relatively low risk of recidivism.  See United States v. Warr, 530

F.3d 1152, 1163 (9th Cir. 2008) (referencing the "well-known, common sense proposition that younger offenders are more likely to recidivate"); see also United States v. Seljan, 547 F.3d 993, 1007 (9th Cir. 2008) (finding a sentence to be reasonable because, among other considerations, the district court acknowledged that the defendant's advanced age reduced the likelihood of recidivism); United States v. Kriesel, 508 F.3d 941, 950 (9th Cir. 2007) (noting that "recidivism rates vary with factors like the offender's age"). Accordingly, the government submits that a low-end Guideline sentence appropriately accounts for defendant's history and characteristics while also ensuring that it is no more than sufficient to deter future criminal conduct.

Third, the government's recommended low-end sentence of 63 months addresses the seriousness of the offense, promotes respect for the law, provides just punishment, affords adequate deterrence, and protects the public from further crimes of defendant. See 18 U.S.C. § 3553(a)(2). Given the instant offense and defendant's history, the government submits that a low-end sentence protects the public from further crimes for a significant period of time. Simultaneously, as set forth above, it will undoubtedly serve as a strong deterring message to defendant for his serious crimes. The low-end sentence also serves as a general deterrent to other individuals committing similar offenses. The seriousness of the crime merits a significant sentence and defendant's acceptance of responsibility merits a low-end Guideline sentence in this case.

Fourth, the government concludes, as did the United States Probation Office ("USPO"), that there appear to be no factors warranting a departure or variance outside of the applicable

Sentencing Guidelines range.  (PSR ¶¶ 106-107.)  Indeed, all relevant

offense characteristics are appropriately accounted for in the

Sentencing Guidelines range.  As such, the government believes that

the correct calculation of the Guidelines range appropriately

accounts for all aggravating and mitigating factors, thereby avoiding

unwarranted sentencing disparities with other defendants in similar

circumstances as defendant.

**IV.  RESTITUTION**

        In addition to the period of incarceration, defendant should be

ordered to make full restitution to the victims of his crimes.  As

set forth in the PSR, restitution is mandatory in this case pursuant

to 18 U.S.C. § 3663A.  (PSR ¶ 104.)  Moreover, defendant agreed that

restitution is appropriate in this case.  (See Plea Agreement, Docket

No. 52 ¶ 6.)  At the time the plea agreement was executed, defendant

believed that the amount of restitution due was at least $1,495,657,

while the government believed that restitution was approximately

$2,248,257.  (Id.)  The government has since obtained further

information described on Exhibit 1, which has been produced to

defendant, that shows defendant caused losses of approximately

$4,121,461.04 to approximately 130 victims.

        The Mandatory Victim Restitution Act ("MVRA"), 18 U.S.C. § 3663A

and § 3664, applies to "an offense against property under this title

. . . including any offense committed by fraud or deceit." 18 U.S.C.

§ 3663A(c)(1)(A)(ii).  Under the MVRA, a district court must order

restitution in such a case where "an identifiable victim or victims

has suffered a . . . pecuniary loss." 18 U.S.C. § 3663A(c)(1)(B).

With this statutory background, this Court is required to impose an

order of restitution in this case in favor of the victims for the

full amount of their losses, without consideration of the defendants'

ability to pay that amount.  18 U.S.C. § 3664(f)(1)(A); USSG § 5E1.1

(directing the sentencing court to enter a restitution order if there

is an identifiable victim).  The government is thus seeking a

restitution order in the amount of $4,121,461.04, payable to the

victims as identified in Exhibit 1.

**V.    CONCLUSION**

For the foregoing reasons, the government believes that the

sentence recommended by the government is sufficient, but not greater

than necessary, to punish defendant and his crime, promote respect

for the law, and deter defendant and others from committing similar

crimes in the future.  See 18 U.S.C. § 3553(a).  The government thus

recommends that the Court sentence defendant to 63 months of

imprisonment, three years of supervised release, and a $100 special

assessment.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**EXHIBIT BBB**

| Case[*] | Description of Case | Loss Amount | Total Offense Level[1] | Sentence |
|---|---|---|---|---|
| *U.S. v. Newkirk,* 14-Cr-534-JSR (SDNY) | Defendant was an attorney convicted of wire fraud after a jury trial. He was acquitted of conspiracy and aggravated identity theft. He defrauded lenders of millions of dollars. His skills as an attorney were critical to the fraud and the government claimed that his crime was marked by lies to his law firm and victims. | Government alleged $37,400,000 | **35** | 6 months |
| *U.S. v. Weisberg,* 8-Cr-347-NGG (EDNY) | Defendant Martin Weisberg, a former partner in an international law firm was charged after it was alleged that he took money from one of his client's escrow accounts, advised the client that the funds could not accrue interest and then diverted the interest from the $30,000,000 escrow account for himself. | Probation determined $55,000,000 | **40** | 24 months |
| *U.S. v. Dargey,* 17-Cr-001-RSL (WDWA) | Defendant Dargey was a real estate developer who pled guilty to defrauding investors, federal regulators, and institutional investors. Dargey recruited numerous international investors to then qualify for residency. He represented that he was investing funds in compliance with this federal program but instead he used the funds for impermissible purposes not allowed under the federal program and deprived the victims of what they believed to be a path towards citizenship. | $24,242,220 | **33** | 48 months |
| *U.S. Alrahib,* 21-Cr-185-WBS (EDCA) | Defendant Alrahib pled guilty to conspiracy to commit mail fraud and was ordered to pay $10 million in restitution after he agreed that he led two conspiracies where he distributed non-cigarette tobacco products without collecting the required tax. The government determined that the defendant cost the State of California over $10 million in tax revenue. His plea agreement called for a loss amount of $9,500,000, the sophisticated means enhancement, an obstruction of justice enhancement and +4 for role in the offense. Defendant was also charged separately in the Southern | >$9,500,000 | **32** | 60 months |

---

[*] Attached to defendant's opening sentencing position as Exhibit B was a list and analysis of 36 comparable cases. The majority of cases cited in the instant chart were included in Exhibit B. However, the instant chart adds the defendants' total offense levels. The cases marked with an Asterix (*) were not included in defendant's original chart of comparable cases but are included now because they were referenced in the government's sentencing position as analogous matters.

[1] This information was gathered from the sentencing positions filed or the transcripts from the sentencings.

| | | | | |
|---|---|---|---|---|
| | District of Florida (19-Cr-21065), which resulted in a sentence of 60 months. The California matter was ordered to be served concurrently with the Florida case. Restitution was ordered in the amount of $10,039,126. | | | |
| *U.S. v. McFarland*, 17-Cr-600 (SDNY) | Notorious Defendant McFarland was charged and pled guilty in connection with two separate schemes whereby he defrauded and misled thousands of people, promising a luxurious musical festival ("the Fyre Festival") located in the Bahamas. He also induced investors by claiming that he had investment promises from capital firms, had earned millions in talent bookings, and provided them false documentation. | Government alleged >$26,000,000 | **36** | 72 months |
| *U.S. v. Shkreli*, 15-Cr-00637 (EDNY) | Defendant Shkreli (aka "Pharma Bro") was found guilty of multiple counts of securities fraud and conspiracy to commit securities fraud. He was the founder of a hedge fund and CEO of a biopharmaceutical company. He was found guilty of making false representations to induce investors to invest in his healthcare hedge fund. He sent investors fabricated performance updates and withdrew funds for his own personal benefit. Prior to trial, Defendant Shkreli made online threats against Hillary Clinton and was remanded into custody as a result. The government alleged that the offense involved more than 10 victims, employed sophisticated means, he was the leader or organizer, and that he obstructed justice. | Government alleged >$9,500,000 | **41** | 84 months |
| *U.S. v. Grusd* 15-Cr-02821 (SDCA) | Defendant Grusd was found guilty of 39 counts of fraud after a jury trial. Dr. Grusd and his companies paid kickbacks in exchange for client referrals from clinics throughout the San Diego and Imperial County areas. He was found to have fraudulently billed over $22 million. The district court made a finding that he lied and perjured himself at trial. At sentencing, the district court failed to provide Defendant Grusd with credit against the loss, determined the loss amount exceeded $22,000,000, and concluded that his net offense level was 39. After a successful appeal to the Ninth Circuit, the district court's sentence was vacated, and Grusd was resentenced to a total term of 48 months. | >$22,000,000 | **39** | 9 years, 364 days (resentenced to 48 months) |

| | | | | |
|---|---|---|---|---|
| *U.S. v. Benlevi*, 21-Cr-246-PA (CDCA) | After trial, Defendant Benlevi was found guilty of six counts of bank fraud, six counts of false statements to a financial institution, and four counts of conducting monetary transactions in criminally deprived property over $10,000. Between the period of April 2020 and May 2020, the defendant submitted 27 applications for SBA applications, each seeking $1 million in PPP loans. He made fraudulent representations about the value of each business and the amount of employees and their corresponding payroll. | Government alleged $9,500,000 – $25,000,000 | **34** | 135 months |
| *U.S. v. Ohanian*,* 19-cr-00284 (CDCA) | Defendant pled guilty to wire fraud where it was determined that the intended loss was $64,326,836.48. Ohanian misled clients and engaged in fraudulent conduct only five months after being sworn in to the California bar. He presented clients with counterfeit court orders containing forged judges' signatures and counterfeit government documents with forged seals. Defendant breached his plea agreement by continuing to defraud victims after entering into the agreement. He agreed to represent over 25 victims related to immigration issues. After taking their money, he did nothing to help them obtain green cards. He defrauded his own family members including his wife, father, aunt, uncle, and his friends. The government relies on this case as a comparable case to the instant matter; but it is drastically different. | Intended loss $64,326,863.48 | **45** | 180 months |
| *U.S. v. Layfield*,* 18-cr-00124 (CDCA) | Former attorney and accountant Layfield was convicted of 23 counts after testifying at his own trial. He committed misconduct against 89 victims, fled to Costa Rica, stole from his employees' retirement accounts, engaged in a separate fraudulent scheme while at counsel's table during his own trial, and caused a loss exceeding $7,000,000. He also caused the State Bar to pay millions to his victims prior to his sentencing, operated his law firm as an "abusive tyrant" and his own child refused to talk to him. | Intended loss $7,500,000 | **33** | 144 months |

**EXHIBIT CCC**

```
  TRMJA          *          INMATE EDUCATION DATA          *      11-09-2022
PAGE 001 OF 001 *              TRANSCRIPT                  *      14:23:56


REGISTER NO: 86743-054        NAME..: AVENATTI              FUNC: PRT
FORMAT.....: TRANSCRIPT        RSP OF: TRM-TERMINAL ISLAND FCI


-------------------------- EDUCATION INFORMATION --------------------------
FACL ASSIGNMENT DESCRIPTION                 START DATE/TIME STOP DATE/TIME
TRM  ESL HAS    ENGLISH PROFICIENT          02-26-2022 0001 CURRENT
TRM  GED HAS    COMPLETED GED OR HS DIPLOMA  02-26-2022 0001 CURRENT


--------------------------- EDUCATION COURSES ---------------------------
SUB-FACL   DESCRIPTION                  START DATE  STOP DATE EVNT AC LV  HRS
TRM        VT WELDING COURSE BY CONTRACT 06-03-2022 08-26-2022  P  W  I   54
TRM        S-OSHA10 CERTIFICATION        03-03-2022 04-04-2022  P  C  P   10
NYM M      ENTREPRENEURSHIP              02-22-2020 02-24-2020  P  C  P   12
```

```
G0000        TRANSACTION SUCCESSFULLY COMPLETED
```

11/09/2022

ADDITIONAL FSA CLASSES
NOT LISTED ON THE INMATE EDUCATION DATA TRANSCRIPT

**REGISTER NO:**  86743-054
**NAME:**  AVENATTI

| **FSA COURSE NAME** | **DATE COMPLETED** |
|---|---|
| K2 AWARENESS | 11-09-2022 |

**WAIT LIST**
ACT WORKKEYS
CRIMINAL THINKING

**EXHIBIT DDD**

# Forbes

PERSONAL FINANCE

## Federal Judges Keep Sending Defendants To Prison Even As Agency Challenges Abound

**Walter Pavlo** Contributor ⓘ
*I write and consult on federal criminal law and criminal justice.*

Follow

💬 0                                                    Nov 17, 2022, 07:00am EST



U.S. Senator Dick Durbin has been pushing for Bureau of Prisons reform and is hoping a new Director ... [+]  GETTY IMAGES

Recently, U.S. District Judge Mark Wolf (District of Massachusetts) sentenced Rudolph "Rudy" Meredith, a former Yale University women's soccer coach, to five months in prison for accepting bribes to help parents get their children into the Ivy League school. Meredith was one of over fifty people charged in the investigation known as "Varsity Blues". Prosecutors had recommended no prison time because of Meredith's extensive cooperation, however, Judge Wolf believed otherwise.

Judge Wolf, like many federal judges, is very intelligent. He graduated from Yale University, B.A. (1968) and Harvard Law School, J.D. (1971). In fact, according to an American Bar Association Profile of the Legal Profession 2022, eight of the nine current Supreme Court justices have law degrees from Harvard or Yale as do three of the four retired justices. Among the rest of the federal judiciary, Harvard and Yale are the most common law schools, according to the Federal Judicial Center. As of March 25, 2022, there were 111 federal judges with juris doctor degrees from Harvard. Another 72 were from Yale. Three other Ivy League schools are represented on the federal bench: 22 federal judges have J.D.s from Columbia, 15 from the University of Pennsylvania and 12 from Cornell. That makes 232 judges with Ivy League law degrees or about 18% of the federal judiciary. The conclusion is that these judges are smart so it is fair to ask if the prison sentences they impose would be different if they knew more facts about the state of our federal prison system?

Federal judges consider a number of factors when they sentence a person to prison but their primary guide is the Federal Sentencing Guidelines. In considering those guidelines judges also have used the common tenants of deterrence, retribution, incapacitation, and rehabilitation as part of their decision making. Whether the prison system is even capable of meeting its responsibilities for care of the inmate is often an afterthought, something that is taken for granted. In fact, there is rarely a representative from the Federal Bureau of Prisons (BOP) at the sentencing of a defendant. However, the crisis that is facing the BOP should give judges pause in handing down a term of incarceration when other alternatives are available.

Federal defendants sometimes spend years on some sort of supervision while their case makes it way through the judicial process. Some wear ankle monitors, have GPS tracking devices, are subject to visits from U.S. Probation and have special curfews. Then, after sentencing, many arrange personal transportation to prison so that they can self surrender and begin serving their sentence. Typically these are minimum security inmates such as Meredith. After that, it is up to the BOP to care for and monitor inmates but the Agency is in such chaos and judges should be provided information on the challenges at the BOP so that they can consider whether some other form of punishment is more appropriate, and humane, particularly when it comes to shorter sentences (under two years).

In the BOP's defense, sentences of under two years are so short that they cause spikes in work soon after the inmate arrives. Maureen Baird, a retired BOP Warden, was asked about those shorter sentences and she said, "the day that a short-time inmate walks into prison the BOP has to start making arrangements for them to return to society." As Baird explained, arranging halfway house, a home visit to check out the place where they will live and coordination with US Probation all takes a considerable amount of time and paperwork that must be done prior to release from prison.

The BOP does not turn anyone away from prison once a judge imposes a sentence. As Baird told me, "The only way to get out of the BOP is that the person has to get into a facility." Reentry programs like home confinement or living in the halfway house are of particular benefit to those who have been in prison many years as they reintegrate back into society. As a result, inmates with shorter sentences are less likely to get benefits of reentry programs and spend the majority of their sentence in prisons, a costly proposition especially for those who already have a home to back to. According to a recent posting in the Federal Register, in Fiscal Year (FY) 2019, the cost of incarceration for a Federal inmate in a Federal facility was $107.85 per day; in FY 2020, it was $120.59 per day. In contrast, according to the BOP, an inmate in home confinement costs an average of $55 per day—less than half of the cost of an inmate in secure custody in FY 2020.

Most all of those sentenced under federal law will be released, like Mr. Meredith, back to society within a short amount of time. Judges presume that the BOP has the ability to safely and humanely care for defendants sentenced to prison but there is significant data that states this is not so. In the case of one inmate in BOP care, Jimmy Monk was serving a 12 month sentence for a banking-related fraud but died in minimum security prison camp 60 days after arriving from COVID-19. In total, the BOP has had 309 COVID-19 related deaths of inmates and 11 of staff members.

The Office of Inspector General (OIG) cited the BOP for multiple failures in addressing the pandemic at FCC Butner, FCI Milan, and FCI Terminal Island, which was cited for a violation when one inmate was placed on a ventilator in a local hospital while his family was never even notified that he was ill from COVID-19. That inmate died in the hospital.

Staffing shortages were also cited in the OIG reports on the COVID-19 response but they are an ongoing problem with the BOP. Shane Fausey, the National President Council of Prison Locals, testified on September 29, 2022 before the Senate Judiciary Committee stating that it was no secret that the BOP is in the midst of a staffing crisis of "epic proportions". Fausey further said, "Excessive overtime, abusive mandatory double shifts of forced overtime, and augmentation [the practice of moving management and speciality staff to correctional officer positions as a result of staff shortage] became by-products of insufficient number of correctional officers resulting in countless assaults on Bureau employees, inmate homicides and a deterioration of conditions within our federal prisons and penitentiaries."

Prisons are also falling apart. Newly appointed BOP Director Colette Peters told the same Senate Judiciary Committee that of the 122 institutions operated by the BOP, almost one-third are more than 50 years old and about half are more than 30 years old. Peters' predecessor, Michael Carvajal, summed up the problem when he testified in July 2022 to a Senate committee saying, "The current backlog of major modernization and repair projects throughout the BOP is approximately $2 billion. However, over the last 10 years, the Bureau has received an average of $95 million annually to address these projects." USP Atlanta and MCC New York, both aging facilities, were closed last year for improvements after uncovering infrastructure issues and multiple instances of staff corruption.

Staff Corruption continues to be a problem for the BOP. An AP investigative report in 2021 stated that two-thirds of the criminal cases against Justice Department personnel in recent years have involved federal prison workers, who account for less than one-third of the department's workforce. After the report, Senators Dick Durbin and Chuck Grassley asked Attorney General Merrick Garland to take action to reform the BOP.

The trial of former warden Ray J. Garcia who headed the women's prison FCI Dublin, is scheduled to go on trial later this month for sexually assaulting multiple inmates at the institution. Other staff members at FCI Dublin and the prison chaplain were also indicted as part of the investigation. The Department of Justice issued a report in November 2022 addressing the problem of sexual misconduct by employees in the BOP. The conclusion of the report was the BOP should do more to prevent sexual assaults and should also do more to prosecute those responsible. Perhaps this more recent report will get more attention in the BOP than the one OIG did on the same topic in 2005 when sexual assaults of inmates were on the rise.

The BOP is having difficulty implementing the First Step Act, sweeping legislation that was supposed to allow inmates an opportunity to participate in programs and productive activities so that their time in prison could be reduced. Those with short sentences are not even receiving credits and staying their entire time in prison because the Agency is unable to accurately calculate the credits. One inmate I interviewed served her entire 6 month sentence in prison, receiving no credit for First Step Act credits. She did not want her identity revealed for fear of retaliation. Prisoners across the country are complaining that a new auto-calculator implemented in October is not calculating their First Step Act credits, resulting in prisoners unnecessarily staying months longer in prison than need be. This is also resulting in additional cases being filed in federal court on matters that could more efficiently be addressed by the BOP.

Lastly, the BOP continues to excessively use solitary confinement despite President Joe Biden's executive order to limit the practice, something Senator Dick Durbin has tried to address over many years. An NBC News analysis last month of BOP figures revealed that the number of inmates held in restrictive housing had gone up 7% since May 28, the same week Biden signed his executive order. The use of solitary confinement skyrocketed during COVID-19 as the BOP chose lockdowns despite having authority to release minimum security prisoners to home confinement under the CARES Act. While isolation is used for disciplinary infractions, it is also used for protective custody, pending investigations and minor infractions that could be punished with lesser measures.

Judges have the ability to send someone to home confinement instead of prison in many instances, particularly when the Federal Sentence Guidelines allow for such a sentence. The BOP has no such ability until the prisoner is in their facility. Even the BOP uses home confinement as part of its practices for those who are nearing the end of their sentence (the last 10% or capped at 6 months).

The BOP has a number of challenges it is facing and judges would better serve all of the criminal justice system by considering alternative sentences over sending defendants to overly stressed prisons.