UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

- - -

THE HONORABLE JAMES V. SELNA, JUDGE PRESIDING

UNITED STATES OF AMERICA,      )CERTIFIED TRANSCRIPT
                    Plaintiff,  )
      vs.                       )
                                )  SACR-19-00061-JVS
MICHAEL JOHN AVENATTI,          )
                    Defendant.  )
------------------------------)

REPORTER'S TRANSCRIPT OF PROCEEDINGS

Santa Ana, California

December 5, 2022

SHARON A. SEFFENS, RPR
United States Courthouse
411 West 4th Street, Suite 1-1053
Santa Ana, CA  92701
(612) 804-8655

```
 1   APPEARANCES OF COUNSEL:

 2   For the Plaintiff:

 3   NICOLA T. HANNA
     United States Attorney
 4   BRANDON D. FOX
     Assistant United States Attorney
 5   Chief, Criminal Division
     RANEE A. KATZENSTEIN
 6   Assistant United States Attorney
     Major Frauds Section
 7   1100 United States Courthouse
     312 North Spring Street
 8   Los Angeles, CA  90012
     (213) 894-2432
 9
     BRETT A. SAGEL
10   Assistant United States Attorney
     Ronald Reagan Federal Building
11   411 West Fourth Street, Suite 8000
     Santa Ana, CA  92701
12   (714) 338-3598

13   For the Defendant:

14   MICHAEL JOHN AVENATTI, PRO SE

15   H. DEAN STEWARD, ADVISORY COUNSEL
     H. DEAN STEWARD LAW OFFICES
16   107 Avenida Miramar, Suite C
     San Clemente, CA  92672
17   (949) 481-4900

18

19

20

21

22

23

24

25
```

| | |
|---|---|
| 1 | SANTA ANA, CALIFORNIA; MONDAY DECEMBER 5, 2022; 9:08 A.M. |
| 2 | THE CLERK:  Item 1, SACR-19-00061-JVS, United |
| 09:08  3 | States of America versus Michael John Avenatti. |
| 09:08  4 | Appearances, counsel. |
| 09:08  5 | MR. SAGEL:  Good morning, Your Honor, Brett Sagel |
| 09:08  6 | and Ranee Katzenstein on behalf of the United States and |
| 09:08  7 | sitting behind me is Special Agent Remoun Karlous, Special |
| 09:08  8 | Agent James Kim and Special Agent Ryan Roberson of our |
| 09:08  9 | investigative team. |
| 09:08  10 | Seated to my left is victim Geoffrey Johnson. |
| 09:08  11 | Seated about two rows in is victim Alexis Gardner.  A couple |
| 09:09  12 | seats to the left of her is victim Long Tran and victim |
| 09:09  13 | Michelle Phan.  Victim Gregory Barella we were informed that |
| 09:09  14 | it would be a financial burden for him to travel from out of |
| 09:09  15 | state where he lives.  He is not present today and submits |
| 09:09  16 | on his previous impact statement. |
| 09:09  17 | Victim Johnson and Victim Gardner would like to |
| 09:09  18 | speak personally to their rights. |
| 09:09  19 | THE COURT:  Thank you.  Good morning. |
| 09:09  20 | MR. AVENATTI:  Good morning, Your Honor, defendant |
| 09:09  21 | Michael Avenatti present.  To my right is |
| 09:09  22 | Ms. Cummings-Cefali.  To my left is Mr. Steward, advisory |
| 09:09  23 | counsel.  I'm also joined here today by Ms. Barberena, and |
| 09:09  24 | Ms. Hernandez, two paralegals who have been assisting me in |
| 09:10  25 | this matter. |

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

09:10   1         I would also like, if Your Honor will permit, to

09:10   2   introduce five people that are here to support me.

09:10   3         THE COURT:  Very well.

09:10   4         MR. AVENATTI:  First, seated to the left of

09:10   5   Ms. Barberena is Mr. Frank Colapinto seated right here in

09:10   6   the second row.  Mr Colapinto is a former client of mine who

09:10   7   has known me for the better part of 17, 18 years.

09:10   8         Seated two seats over is Ms. Carlin-Avenatti;

09:10   9   Christine, my first wife, who has known me for 31 years.

09:10   10   Seated to her left is my friend Shannon Falk who I have

09:10   11   known for 31 years.

09:10   12         Seated to her left is Mr. Jay Manheimer who has

09:10   13   known me since 1986 so for the better part of 35, 36 years,

09:11   14   and seated to his left is Mr. Rick Kraemer who has known me

09:11   15   for 19 years and has been a member of the Southern

09:11   16   California legal community for approximately four decades.

09:11   17         THE COURT:  Good morning and welcome.

09:11   18         Have you all had a chance to review the draft

09:11   19   sentencing memorandum?

09:11   20         MR. SAGEL:  Yes, Your Honor.

09:11   21         MR. AVENATTI:  I have, Your Honor.  I don't know

09:11   22   how you want to proceed.

09:11   23         THE COURT:  Does the government have any

09:11   24   additional comments?

09:11   25         MR. SAGEL:  We will.  I guess the question is how

09:11    1    Your Honor wants to proceed.

09:11    2          THE COURT:  I would like to hear from the

09:11    3    government first.

09:11    4          MR. SAGEL:  Okay.  Do you want to deal with

09:11    5    guidelines and then 3553, everything all together?

09:11    6          THE COURT:  Everything all together.

09:11    7          MR. SAGEL:  We will have an opportunity to respond

09:11    8    as well?

09:11    9          THE COURT:  Yes.

09:11   10          MR. SAGEL:  Thank you, Your Honor.

09:12   11          Let me start with the guideline calculations which

09:12   12    is the first step in the sentencing procedures.  We would

09:12   13    agree with Your Honor's tentative as you have adopted

09:12   14    basically every enhancement and calculation that the

09:12   15    government has proposed with the one caveat of the

09:12   16    acceptance of responsibility.

09:12   17          I can address that now, but realistically we are

09:12   18    not arguing that the two points are necessary, per se, but I

09:12   19    think it will come in as it relates to the nature and

09:12   20    circumstances of the defendant in the 3553 analysis whether

09:12   21    you look at it as acceptance or in that part.

09:12   22          As it relates to the sentencing guidelines itself,

09:12   23    we will rest on what we have supplied in our papers, Your

09:12   24    Honor's tentative, which gets us to a guideline range total

09:13   25    offense level of 37 and a Criminal History III.  We also

09:13  1  agree with Your Honor's tentative on the criminal history
09:13  2  category which places him at Criminal History Category III.
09:13  3          I will make if I can for Your Honor just a couple
09:13  4  of comments, which I guess you could say corrections or
09:13  5  clarifications in the tentative as relates to a couple of
09:13  6  the calculations, and then I will move on from there.
09:13  7          THE COURT:  Well, there is obviously a typo in one
09:13  8  place or the other.  I was vacillating quite literally as I
09:13  9  completed and sent it out to you on Friday.  So whether a
09:13  10  three-level variance or four-level variance, I think I know
09:13  11  what my tentative thought is, and that's 168 months.
09:13  12          MR. SAGEL:  I appreciate that, and I will address
09:13  13  that and feel I've been doing this long enough that I'm not
09:14  14  going to tell a judge where he has a typo.
09:14  15          THE COURT:  You are welcome to.  I'm the world's
09:14  16  worst proofreader.
09:14  17          MR. SAGEL:  With that, Your Honor, on page 4 of
09:14  18  your tentative -- and, again, I don't think a couple of
09:14  19  these comments I'm going to be making will have any bearing
09:14  20  on the calculation itself.  It's just for factual accuracy.
09:14  21  On page 4 about five lines down, it says "prior to the
09:14  22  filing."  It was actually during the pendency of the
09:14  23  bankruptcy when he opened those two accounts, not prior to
09:14  24  the filing of the bankruptcy but during the pendency of the
09:14  25  bankruptcy.

```
09:14   1          And then in the next part of the sentence, you say
09:14   2     "the two bank accounts for receipt of the Phan and Gardner
09:14   3     settlement proceeds."  It's actually the Phan and Barela
09:14   4     settlement proceeds, which I think was a typo since you had
09:15   5     just referenced those two victim payments.
09:15   6          THE COURT:  Thank you.
09:15   7          MR. SAGEL:  On page 5 as it relates to the
09:15   8     obstruction of justice enhancement, as Your Honor has found,
09:15   9     the obstruction of justice enhancement applies for some of
09:15  10     the other reasons.  Again, my response isn't probably
09:15  11     material, but for factual accuracy sake, Your Honor has --
09:15  12     you point to as it relates to the tweet about Ms. Gardner
09:15  13     and her ex and whether or not there are two interpretations
09:15  14     to that.  You have a footnote saying:  "As the defendant
09:15  15     notes, the government expressed no objection to the
09:15  16     statement at that time."
09:15  17          The defendant writes that in his position, but
09:15  18     that's wrong and misleading, and we covered that in our
09:15  19     response.  You will see it in government's sentencing
09:15  20     Exhibit 33 in which we sent a letter to the defendant
09:15  21     telling him that his tweet violated his conditions of
09:16  22     pretrial release in that it was intimidating and threatening
09:16  23     a witness.
09:16  24          Not to argue the ruling per se but for accuracy
09:16  25     sake the footnote is incorrect.  For Rule 32 purposes, I'm
```

09:16  1  going backwards, and I will ask Your Honor how you want to
09:16  2  handle that.  Your Honor typically at the beginning of a
09:16  3  sentencing hearing asks the parties if they have had a
09:16  4  chance to review all the filings, and Your Honor has
09:16  5  reviewed everything that is pertinent.  Do we need to cover
09:16  6  that now?

09:16  7          THE COURT:  Well, when we get to sentencing, I
09:16  8  will query Mr. Avenatti with regard to that.  That's what I
09:16  9  usually do.

09:16  10         MR. SAGEL:  Okay.  I will start briefly on the
09:16  11 sentencing guidelines, and then I will move pretty much
09:17  12 immediately thereafter to the 3553 analysis, because I think
09:17  13 that's what we are talking about here or I believe is what
09:17  14 we are going to be talking about here.

09:17  15         The Court has already adopted -- in its tentative
09:17  16 has adopted the government's sentencing guideline
09:17  17 calculations with the exception of the acceptance of
09:17  18 responsibility.  What it really boils down to is whether or
09:17  19 not he gets two points for acceptance of responsibility, and
09:17  20 the overall analysis really isn't important per se as much
09:17  21 as whether he actually has remorse.  And I'll talk about
09:17  22 that and whether there is actual remorse.  So if Your Honor
09:17  23 gives him those two points and he lands in level 37, his
09:17  24 guideline range is 262 to 327 months, which is nearly 24 to
09:18  25 27 years for this case.  That's the starting point.

09:18  1          Now turning to the 3553 analysis and the conduct
09:18  2   in this case and the defendant in this case, defendant's
09:18  3   criminal conduct arose from calculated choices and egregious
09:18  4   violations of the trust placed in him by his legal clients.
09:18  5   The malevolence of defendant's actions are magnified by the
09:18  6   undisputed fact that he didn't need to do what he did in
09:18  7   this case.  He didn't turn to his criminal activity by
09:18  8   desperation, by need, by the inability to do anything else.
09:18  9          Despite the significant advantages that this
09:19  10  defendant had, a first-rate education, a thriving legal
09:19  11  career, he chose to commit the deplorable acts in this case
09:19  12  time and time again over years.  His criminal conduct was
09:19  13  not an aberration.  It was not a one-time thing.  He stole
09:19  14  from his clients.  He stole from Geoffrey Johnson, Alexis
09:19  15  Gardner, Gregory Barela, and Michelle Phan so he could live
09:19  16  an extravagant lifestyle.
09:19  17         To his core, defendant has always been and always
09:19  18  will be out for himself confident he can beat the system,
09:19  19  confident he can bamboozle his way out of anything.  He
09:19  20  thinks he is the smartest guy in the room without any
09:19  21  humility, incorrigible to a fault, the ultimate revisionist
09:19  22  of history.
09:20  23         It's been three-and-a-half years since just the
09:20  24  charges were filed in this case.  For some of these victims,
09:20  25  it's been that much longer since their money was stolen and

09:20  1    they were trying to get answers and over a period of time to

09:20  2    get anesthetized to what really happened here.  When Your

09:20  3    Honor is thinking about the conduct here and what to

09:20  4    sentence him for, think about the first time you heard about

09:20  5    his crimes, and you will realize the severity and just evil

09:20  6    of his crimes.

09:20  7           Geoffrey Johnson was a parapelegic that he was

09:20  8    representing because of what led to his parapelegia.  Four

09:20  9    years after the incident occurred in 2011, he finally gets a

09:20  10   settlement from the County of Los Angeles but isn't told

09:20  11   about it so the defendant can take all the money and lie to

09:21  12   Mr. Johnson and keep it all to himself and lie to

09:21  13   Mr. Johnson for four more years.  Mr. Johnson wasn't able to

09:21  14   buy his handicap accessible home or van or pay for his

09:21  15   living expenses.  He had to beg so that the defendant could

09:21  16   live his lifestyle.

09:21  17          Alexis Gardner was living in her car, essentially

09:21  18   homeless.  She thought she had found someone who was looking

09:21  19   out for her.  He stole her money immediately so he could buy

09:21  20   a private plane.

09:21  21          Gregory Barela went to him because he thought a

09:21  22   company had stolen from him, and he gets Mr. Avenatti to

09:21  23   represent him to undo that wrong.  It turns out he gets

09:21  24   stolen from again by the very person who was supposed to be

09:21  25   looking after him.

09:21 1    Michelle Phan wanted to extricate herself from a
09:21 2 stressful situation at her company.  She wanted to get out.
09:22 3 She turned to the defendant so that she could get out of her
09:22 4 company and get back to producing her own work, having her
09:22 5 own say.  And the defendant stole her money, stole
09:22 6 $4 million so he could buy his way out of bankruptcy.
09:22 7    Throughout this case, before, during, and after
09:22 8 trial and even up to this sentencing, defendant has blamed
09:22 9 everyone except himself.  He made baseless accusation after
09:22 10 baseless accusation against everybody -- the government,
09:22 11 government attorneys, former government attorneys, witnesses
09:22 12 in this case, countless misconduct claims, claiming this
09:23 13 case was the result of the former president, a former law
09:23 14 partner of his, that the government purposely hid evidence
09:23 15 from him.
09:23 16    But even now as the defendant stands convicted of
09:23 17 defrauding his clients and the IRS, even in his sentencing
09:23 18 papers, the government is vindictive, the probation officer
09:23 19 is punitive, unreasonable, and unjust, and he wants to spend
09:23 20 hundreds of pages focusing on other people's sentencings.
09:23 21    Section 3553 focuses on the defendant and the
09:23 22 defendant's conduct, his characteristics.
09:23 23    THE COURT:  Well, not exclusively.
09:23 24    MR. SAGEL:  3553(6), obviously similarly situated,
09:23 25 so primarily.  I'll put in the word "primarily."  At all

09:23  1    stages of the case, he wants to place the focus and

09:23  2    attention everywhere but himself.  Today the focus is where

09:24  3    it belongs, on him and his criminal conduct.

09:24  4         With a starting point of 262 to 327 months, we

09:24  5    then turn to not just the mitigating factors, but also the

09:24  6    factors in aggravation.  This Court has as you just

09:24  7    mentioned in its tentative at one point said a three-level

09:24  8    variance, which would get you to a range of 188 to 235, but

09:24  9    also references in the tentative 168 months.  So if there is

09:24  10   a delta between the 168 and 188, this is where I'm going to

09:24  11   focus, that the 188 months consecutive to his prior

09:24  12   sentences is the appropriate, just, and not greater than

09:25  13   necessary sentence for the defendant.

09:25  14        The 188-month sentence as I would point out and

09:25  15   Your Honor probably knows is the sentence that the probation

09:25  16   officer recommended.  The difference between the two is

09:25  17   obviously consecutive versus concurrent -- well, depending

09:25  18   on where Your Honor falls would be fully consecutive versus

09:25  19   what the probation officer recommends.

09:25  20        As Your Honor's tentative lays out and I think

09:25  21   will concede, the guideline calculations capture much of

09:25  22   this case, but there is more that the Court should consider

09:25  23   in aggravation, especially as it relates to the nature and

09:25  24   circumstances of the case, the characteristics of the

09:25  25   defendant, and some of the other 3553 factors that at a

09:25  1   minimum would not justify any further leniency and, in sum,
09:26  2   would justify a sentence of 188 months.
09:26  3        The Court listed several mitigating factors to get
09:26  4   to the three-level variance.  Generally speaking, we have
09:26  5   addressed most of them in our briefing.  I'm not going to
09:26  6   address them here.  We primarily oppose them or don't
09:26  7   believe there is a basis for it, but I won't repeat them now
09:26  8   unless Your Honor has any questions about those.
09:26  9        While it's detailed in the guideline calculations
09:26  10  for the criminal conduct, the one thing that is not at least
09:26  11  in the 3553 factors separate from it is the harm to the
09:26  12  victims.  Several of the victims submitted victim impact
09:26  13  statements, and two of them will probably speak here, too.
09:26  14  And the victims will be able to describe the harm they have
09:27  15  suffered far better than I ever would be able to articulate.
09:27  16       But the emotional damage that they have described
09:27  17  is particularly acute, because it was the very person that
09:27  18  that were relying on and had full trust and faith in who
09:27  19  violated and abused their trust.  That emotional damage is
09:27  20  not really accounted for in the guidelines through the loss
09:27  21  and abuse of trust and vulnerable victims.  Those
09:27  22  enhancements only generally touch upon what he did but do
09:27  23  not get to the core of the true victims in this case.
09:27  24       The unintended and nonmonetary harms that these
09:27  25  victims suffered are appropriate consideration for this

09:27  1   Court to consider under 3553.  The Court in your substantial
09:27  2   hardship analysis described how defendant claims he did good
09:28  3   for his victim clients, and I think Your Honor even agreed
09:28  4   that certainly with regards to Ms. Gardner and Mr. Johnson
09:28  5   initially defendant did good things for them.
09:28  6        Although he may have fronted some money to
09:28  7   Ms. Gardner and Mr. Johnson, maybe even substantial monies
09:28  8   prior to their settlements, the facts show that these really
09:28  9   are not him taking good care of his clients or doing goods
09:28  10  things or nothing that should support any leniency.
09:28  11       Your Honor saw that right before he received the
09:28  12  settlement money on Mr. Johnson's case he goes before
09:28  13  Judge Morrow and describes the need Mr. Johnson was in and
09:28  14  trying to get Judge Morrow to enforce or make the County of
09:28  15  Los Angeles pay the money sooner because Mr. Johnson needed
09:29  16  the money at that time.  You saw the e-mails he's sending to
09:29  17  opposing counsel about the need Mr. Johnson had for that
09:29  18  money.  The minute that the money comes in he doesn't tell
09:29  19  Mr. Johnson about the settlement or money.  He keeps the
09:29  20  $4 million for himself and for his businesses.
09:29  21       Your Honor saw on the same day that he finalized
09:29  22  the mediation for Ms. Garnder's case to take place in
09:29  23  January that later that day he sends the final assurance
09:29  24  letter to Honda Aircraft to make the final payment to
09:29  25  receive his private jet at the end of January, which at that

09:29  1    time was already three months late for him to buy.  He

09:29  2    needed Ms. Gardner's case to be able to buy the jet.  And

09:29  3    the minute on the same day he received Ms. Gardner's

09:29  4    settlement money, he used it to buy the jet.

09:29  5         Any purported good that defendant did for his

09:30  6    clients, including ahead of time for Mr. Johnson and

09:30  7    Ms. Gardner, in reality was just a short-term investment for

09:30  8    his long-term fraud.  He wasn't doing anything good for

09:30  9    them.  He was only doing good for himself.  He was receiving

09:30  10   e-mails on those same days, same time, from his office

09:30  11   manager telling him about his dire financial condition.  He

09:30  12   knew what he was going to do.  He was going to take their

09:30  13   money.

09:30  14        In addition, the guidelines do not capture many

09:30  15   other aggravating factors of the defendant's criminal

09:30  16   conduct that the Court should consider.  I will start with

09:30  17   Count 19 to which he has pled guilty to.  By Your Honor's

09:30  18   tentative, the advisory guideline range would be 51 to 63

09:30  19   months.  If he were just here on Count 19 alone, he would be

09:30  20   facing four to five years in jail.  And that tax count and

09:31  21   related conduct, which was a very complex scheme, doesn't

09:31  22   even add to the advisory guidelines, but there is

09:31  23   something --

09:31  24        THE COURT:  Well, that's the way the guidelines

09:31  25   work.

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

09:31  1          MR. SAGEL:  Correct, but you can consider them in

09:31  2  3553 --

09:31  3          THE COURT:  Oh, sure.

09:31  4          MR. SAGEL:  And using Your Honor's statement of

09:31  5  that's how the guidelines work, it's almost, hey, if you do

09:31  6  a lot of big crimes or one big crime, you can get away with

09:31  7  a lot of small crimes, and they aren't taken into account.

09:31  8  The guidelines can't capture everything, but Your Honor can.

09:31  9  And to look at his tax counts, at least in the sense of

09:31  10  what's the real effect of it, why is he doing it, it's

09:31  11  because he's all in on doing what he needs to do to enrich

09:31  12  himself.  He is not just stealing from his clients.  He will

09:31  13  steal from the Treasury.  He will steal from everywhere.  He

09:31  14  will take whatever money he wants for himself.

09:32  15          Your Honor saw as it relates to Mr. Johnson's

09:32  16  house that Mr. Johnson wanted to purchase, the defendant

09:32  17  forged loan documents that Mr. Johnson didn't even know

09:32  18  about.  That's aggravated identity theft.  There are other

09:32  19  crimes he committed in addition to the crimes he's charged

09:32  20  with just as part of his scheme that's not taken into

09:32  21  account.

09:32  22          It's not just the four or five victims we talked

09:32  23  about here, but it's all the other victims his conduct

09:32  24  indirectly affected.  He wreaked havoc on so many lives,

09:32  25  including as we will talk about when we get to restitution

09:32   1    others who have been having to pay for his criminal conduct.

09:32   2            Your Honor talks about in the tentative under the

09:32   3    sophisticated means section how his crime wasn't a one-stop

09:32   4    shop, not take the money and run.  But when you look at a

09:32   5    lot of the facts -- and I would agree with that.  If you

09:32   6    look at a lot of the facts in this case, you realize so many

09:32   7    of those additional acts don't get taken into account.

09:33   8            For example, using Your Honor's tentative, it only

09:33   9    requires one way in which he did something to get

09:33   10   obstruction of justice, one way to get a false statement in

09:33   11   a bankruptcy enhancement, one way to cause financial

09:33   12   hardships to a victim.  But in this case, he committed

09:33   13   multiple ways to justify the obstruction of justice

09:33   14   enhancements, multiple false statements in the bankruptcy to

09:33   15   justify that, and caused financial hardships to three of his

09:33   16   victims.  These aren't taken into account by the guidelines,

09:33   17   but Your Honor certainly can to show that the conduct is

09:33   18   even worse than the run-of-the-mill guideline analysis.

09:33   19           Turning to the history and characteristics of the

09:33   20   defendant, defendant has attempted for years at least

09:33   21   through this case and maybe even before to portray himself

09:34   22   as someone who represents David versus Goliath, as a fighter

09:34   23   for the little guys.  The defendant isn't a fighter.  He is

09:34   24   just a simple fraudster.  He doesn't fight for anyone but

09:34   25   himself.  Geoffrey Johnson, Alexis Gardner, Gregory Barela,

```
09:34    1    Michelle Phan were the little guys.  He didn't fight for
09:34    2    them.
09:34    3            The defendant constantly says legal career and
09:34    4    family are the most important things to him.  If those two
09:34    5    things actually were more important to him, he never would
09:34    6    have committed the crimes he did in this case because the
09:34    7    consequences for what he did are so obvious.  We know what
09:34    8    the most important thing to him is.  It's himself.
09:34    9            Defendant provided a handful of letters to the
09:35   10    Court, and he's attempted to portray his legal career in a
09:35   11    self-serving manner.  What is notable for the Court to look
09:35   12    at is over a 20-year legal career not a single colleague
09:35   13    from O'Melveny & Myers, Greene Broillet, Eagan Avenatti or
09:35   14    any of its various forms, or Global Baristas wrote anything
09:35   15    for him.  Not a single opposing counsel, not a judge.  What
09:35   16    his 20-year career you can see amounted to probably is not
09:35   17    even remotely close to what he wants to describe it as.  It
09:35   18    wasn't a professional, ethical, and outstanding career or at
09:35   19    least not said by anybody other than the defendant.
09:35   20            As I mentioned earlier as it relates to acceptance
09:36   21    of responsibility or more so remorse, defendant wants this
09:36   22    Court to believe he is remorseful.  His quote/unquote
09:36   23    remorse is only a recent vintage.  It's only because he got
09:36   24    caught, and he now faces the consequences now at long last
09:36   25    for his conduct.
```

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

09:36    1          He had countless opportunities over the years well

09:36    2    before he was even charged in this case to admit what he

09:36    3    did, try to make things right, and in every instance, he did

09:36    4    the opposite.  He was confronted in March 2019 of stealing

09:36    5    Mr. Johnson's money.  He perjured himself and then went to

09:36    6    Mr. Johnson's home to get Mr. Johnson to sign documents to

09:36    7    use as a defense against Mr. Johnson and to call Mr. Johnson

09:36    8    not credible.

09:37    9          He is not entitled to the benefit of showing

09:37   10    remorse having only done so when it's convenient and after

09:37   11    publicly trying to humiliate his victims for years.

09:37   12          THE COURT:  Does he have to have remorse in order

09:37   13    for acceptance of responsibility?

09:37   14          MR. SAGEL:  No, Your Honor.  That's why I'm

09:37   15    discussing it under the 3553 factors.

09:37   16          THE COURT:  That's fine.

09:37   17          MR. SAGEL:  In his voluminous filings totaling

09:37   18    probably upwards of a thousand pages between all the briefs

09:37   19    and their exhibits, the one thing you will notice is there

09:37   20    is not a single word about the victim impact statements or

09:37   21    the harms that the victim mentioned.  The only reference in

09:37   22    all these filings to the victim impact statements is his

09:37   23    attempt to strike Long Tran's statements.

09:38   24          If "integrity" is said to be defined by doing what

09:38   25    is right when nobody is looking, when the defendant thought

09:38   1   nobody was looking, he went out of his way to make sure

09:38   2   nobody could look by making sure no one could see what he

09:38   3   was doing.  His lack of integrity when exposed was shocking

09:38   4   and disturbing.

09:38   5          Your Honor, we briefed specific deterrence and

09:38   6   general deterrence quite extensively.  If there is anything

09:38   7   you want me to address on those or possibly in response -- I

09:38   8   will obviously stand on the deterrence arguments in our

09:38   9   papers.

09:38   10          I understand some of what Your Honor has in the

09:38   11   mitigation section, and I do agree that many defendants who

09:39   12   come before Your Honor certainly deserve considerations for

09:39   13   the obstacles they have overcome, the motivations that they

09:39   14   adopt to take on the criminal conduct that they do,

09:39   15   sometimes addictions, sometimes other things, but in this

09:39   16   case this is not a defendant who deserves that.  He had

09:39   17   strong family support.  He had exceptional educational

09:39   18   opportunities -- and when I say strong family support, at

09:39   19   least in the last 20 years -- exceptional educational

09:39   20   opportunities, financial stability or could have had

09:39   21   financial stability, but instead he chose to commit his

09:39   22   crimes repeatedly.

09:39   23          Your Honor, before I get to the end, there are

09:39   24   obviously other 3553(a) factors that we have briefed

09:40   25   extensively.  We obviously agree with Your Honor's analysis

09:40   1   under 3353(a)(6) and similarly situated.  I won't address

09:40   2   those now unless Your Honor has any questions.

09:40   3            I'm going to wrap up the 3553 arguments now and

09:40   4   ask for guidance on how you want to address restitution and

09:40   5   conditions of supervised release.

09:40   6            The Section 3553 analysis and specifically because

09:40   7   of the aggravating factors in this case -- the aggravating

09:40   8   factors far outweigh mitigating factors if there are any --

09:40   9   call for a significant sentence, and they do not support an

09:40   10  act of leniency.

09:40   11           Despite defendant's background and

09:40   12  accomplishments, in the end, the defendant is just another

09:40   13  criminal who thinks that the law is something that applies

09:40   14  to other people.  A sentence of 188 months consecutive to

09:41   15  the previously imposed sentences is necessary to disabuse

09:41   16  defendant of that notion.

09:41   17           Your Honor, I will defer to the Court if you want

09:41   18  me to address restitution or conditions of release now.

09:41   19           THE COURT:  Please.

09:41   20           MR. SAGEL:  I'm going to start with what I think

09:41   21  is the easier list.  Your Honor, the supervised release

09:41   22  conditions --

09:41   23           THE COURT:  I don't think I need much argument on

09:41   24  the supervised release terms.

09:41   25           MR. SAGEL:  Well, the ones that Your Honor

09:41    1    overruled I obviously won't address.

09:41    2            THE COURT:  I overruled all of them.  I just

09:41    3    didn't address them.

09:42    4            MR. SAGEL:  With regard to the restitution, Your

09:42    5    Honor, I have seen what Your Honor has, and I guess I might

09:42    6    ask a question first.  I'm not a hundred percent positive

09:42    7    what the restitution numbers are Your Honor is going with.

09:42    8    I would at least tell you that there are a couple factual

09:42    9    aspects that I think are incorrect and then a legal aspect

09:43   10    as well that may need clarification.

09:43   11            If you were to look at the first page of the

09:43   12    revised PSR recommendation letter, it sets forth the total

09:43   13    amount of the orders and so forth --

09:43   14            THE COURT:  Right.

09:43   15            MR. SAGEL:  -- with the exception -- there is a

09:43   16    small change in Alexis Gardner's restitution number that we

09:43   17    put in 1047, our filing at page 9.  There is approximately a

09:43   18    $6,000, $7,000 difference, which puts it at $1,432,585.

09:43   19            THE COURT:  Just a minute, please.  $1,432,585.

09:43   20            (Pause in proceedings)

09:44   21            MR. SAGEL:  So that's one.  And then Your Honor

09:44   22    says that Michael Eagan paid Johnson $150,000.  I will start

09:44   23    with the factual correction.  It's $1.5 million, not

09:44   24    $150,000.

09:44   25            Getting to the numbers -- and, again, I understand

09:44    1    where Your Honor has the rejected offsets, and we obviously
09:44    2    agree with that part of the equation.
09:44    3              THE COURT:  Well, to be clear, offsets argued as
09:44    4    self-help to get paid for other work that wasn't covered by
09:44    5    his contracts.
09:44    6              MR. SAGEL:  Correct.
09:44    7              THE COURT:  Those I have excluded.
09:44    8              MR. SAGEL:  Correct.  So I'm not going to contest
09:44    9    them.  We are in agreement obviously.
09:44   10              With regard to Mr. Johnson, what I would say is
09:45   11    the law is clear -- and it's in our briefing -- that 3663A
09:45   12    requires the Court to order full restitution first.  And if
09:45   13    a third party -- not a codefendant but a third party makes
09:45   14    any payment -- and the way this comes up most is an
09:45   15    insurance indemnifier or so forth.  Your Honor is still
09:45   16    ordering full restitution, and then changes the order to
09:45   17    victims, and then to any third-party indemnifier.  So it
09:45   18    doesn't reduce the amount of the restitution.
09:45   19              So any amount that Mr. Eagan pays -- and we also
09:45   20    broke that up, which is why there is a payment to
09:45   21    Mr. Johnson, and then Mr. Eagan only gets a fraction or a
09:45   22    portion, and I can get into that, but it's still the full
09:45   23    restitution, so it's not subtracted.  Then you need to say
09:45   24    how much is Mr. Johnson owed still?  And that's the
09:45   25    $900,000, because that's never made it into his pocket.

09:46　　1　　It's not a double recovery because he has never gotten that

09:46　　2　　money.  And then the remainder, the $671,000, would go to

09:46　　3　　Mr. Eagan after all other victims are paid.

09:46　　4　　　　　　With regard to the IRS number, I'm not going to

09:46　　5　　touch that because we obviously seem to be in agreement.

09:46　　6　　　　　　THE COURT:  Well, so is the defendant.

09:46　　7　　　　　　MR. SAGEL:  I agree.  I think now he is, yes.

09:46　　8　　　　　　With Mr. Barela, if I am understanding the numbers

09:46　　9　　in your chart -- again, I'm not sure which number you are

09:46　　10　　going with, but defendant is now after claiming he needed

09:46　　11　　the Tabs records to get the accurate calculations for costs

09:46　　12　　and expenses wants to use Mr. Drum's conservative numbers

09:46　　13　　for costs and expenses.  We now have the Tabs records which

09:46　　14　　match to the penny $111,113.22, which is the exact same

09:47　　15　　amount in the cashier's check he withdraws as case costs

09:47　　16　　from the Barela matter.

09:47　　17　　　　　　The Tabs records show exactly what the government

09:47　　18　　has been saying.  We were always overly conservative.  He

09:47　　19　　now has the Tabs records, and he doesn't want to use them

09:47　　20　　because they show what he actually spent on the case, and

09:47　　21　　they were less than what we had given him credit for.  So he

09:47　　22　　did not deserve the $180,000 in the Drum analysis.  What the

09:47　　23　　exhibits that are before the Court both from trial and as

09:47　　24　　the Tabs records show is his costs and expenses are

09:47　　25　　$111,113, not $108,000.

09:47  1          Ms. Phan's number is correct.

09:47  2          And I believe Mr. Johnson's number is about $17

09:47  3  off when you move the $150,000 back into it.  I'm not sure

09:47  4  where the math came from.

09:48  5          THE COURT:  Well, the first column is Special

09:48  6  Agent Karlous's numbers.  The only adjustment is Footnote

09:48  7  16, which I credited the Eagan payment.

09:48  8          MR. SAGEL:  Somehow our numbers from Special Agent

09:48  9  Karlous is $17 less, so it would be $1,422,092.

09:48  10          THE COURT:  For whom?

09:48  11          MR. SAGEL:  That first column with Geoffrey

09:48  12  Johnson.

09:48  13          THE COURT:  Okay, $1,422,092.

09:48  14          MR. SAGEL:  And then one other I guess tangential

09:49  15  aspect to the restitution, as Your Honor knows from the

09:49  16  trial -- let me get the exhibit numbers so that I can -- as

09:49  17  Your Honor knows from the trial, Trial Exhibit 392 was the

09:49  18  check for $1,508,422.30 that the defendant had paid to the

09:49  19  IRS as one of his conditions to get out of the bankruptcy.

09:49  20  The government has been working with the IRS to get that

09:49  21  money back that was stolen from Ms. Phan to be repaid to

09:49  22  Ms. Phan.

09:49  23          What we basically encountered is we will be able

09:49  24  to do it, but we won't be able to do it until Your Honor

09:49  25  issues the restitution order so that they refund the money

09:49    1   to the Clerk of the Court.  We will submit an order for Your

09:49    2   Honor in the manner in which it can be attributed to the

09:49    3   restitution and returned to the victim.

09:50    4           THE COURT:  Well, if I order $4 million in

09:50    5   restitution, wouldn't she recover over and above that if she

09:50    6   got the IRS payment?

09:50    7           MR. SAGEL:  No, Your Honor, and that's why we are

09:50    8   also having it go through the court.  So that would be the

09:50    9   $1.5 million reduced from her $4 million.  And by having it

09:50   10   go through the Clerk of the Court, it can be calculated by

09:50   11   -- I'm drawing a blank on the name of the unit downstairs

09:50   12   that handles it, but it will be attributed to her

09:50   13   restitution, so it will instantly go down $1.5 million.

09:50   14           THE COURT:  Okay.  So I can enter a judgment for

09:50   15   this number and just let the bureaucracy process work?

09:50   16           MR. SAGEL:  Exactly.  And what we believe could

09:50   17   happen, although it's not of import -- we believe the same

09:50   18   analysis that we have been arguing under Johnson is that the

09:50   19   IRS is now a third-party basically paying.  So

09:50   20   realistically, the restitution award is still $4 million.

09:51   21   He owes the first $2.5 million to Michelle Phan and the

09:51   22   remaining $1.5 million to the IRS who has paid on his behalf

09:51   23   under I believe it's 3664(f)(1)(B) and (j)(1).  It doesn't

09:51   24   need to be determined today as we stand here.

09:52   25           With restitution, I don't think we need to rule on

09:52  1    that today.  It's for another day.

09:52  2              THE COURT:  I don't think it's for another day.

09:52  3              MR. SAGEL:  Well, how the $1.5 million gets

09:52  4    credited back.

09:52  5              THE COURT:  Okay.

09:52  6              MR. SAGEL:  I meant that part of the --

09:52  7              THE COURT:  Okay.

09:52  8              MR. SAGEL:  With regard to the PSR objections that

09:52  9    the defendant made, we will ask at some point obviously to

09:52  10   put on the record that you have considered them all, you

09:52  11   have resolved them all, or they are unnecessary under Rule

09:52  12   32.

09:52  13             With that, unless Your Honor has any questions, we

09:52  14   will submit on our papers, my argument, and I request to

09:52  15   respond if necessary.

09:52  16             THE COURT:  In its initial calculation, the

09:52  17   government calculated a guideline level 39, Criminal History

09:52  18   Category III, which produces a guideline range of 324 to

09:53  19   405.  The government's ultimate recommendation is 210

09:53  20   months.  What causes the government to move from 324 to 210?

09:53  21             MR. SAGEL:  That's a good question, Your Honor.

09:53  22   Under the 3553 analysis and the totality of the

09:53  23   circumstances, there are certain factors that we took into

09:53  24   account.  But, most importantly, what we tried to look into

09:53  25   in this case is what is the appropriate sentence for his

```
09:53    1    conduct in this case, and this case alone, and somewhat
09:53    2    ignoring the other two cases but also appreciating the fact
09:53    3    that he does have a five-year sentence out there for other
09:53    4    criminal conduct.
09:53    5           If you were to look at a combination of
09:54    6    situations, while we don't really believe he has accepted
09:54    7    his responsibility under the law but, again, we are not
09:54    8    arguing that, he did plead guilty.  He does have a sentence
09:54    9    out there, and in the end, what is a fair sentence for it
09:54   10    here?  His criminal history is not overstated.  However, if
09:54   11    you were to look at his criminal conduct here, if it was
09:54   12    standing alone, i.e., looking at him if he was
09:54   13    hypothetically Criminal History I and so forth, you get to
09:54   14    210 months.  And the other factors that I described are what
09:54   15    put us at the low end of that range rather than a mid or
09:54   16    high level which would otherwise usually be --
09:54   17           THE COURT:  Well, for Category I, Offense Level
09:54   18    39, I read 262 to 327.
09:54   19           MR. SAGEL:  Our initial analysis was assuming
09:54   20    acceptance of responsibility and would have been a level 37.
09:55   21           THE COURT:  Okay.
09:55   22           MR. SAGEL:  Does Your Honor have any further
09:55   23    questions?
09:55   24           THE COURT:  No.  Thank you.
09:55   25           MR. SAGEL:  Do you want the victims to speak at
```

09:55    1    this point or at what point?

09:55    2        THE COURT:  After I hear from Mr. Avenatti.  So we

09:55    3    don't have to interpret Mr. Avenatti, why don't we take a

09:55    4    ten-minute break here.

09:55    5        (Recess)

10:03    6        THE COURT:  Mr. Avenatti.

10:03    7        MR. AVENATTI:  Is it acceptable if I use the

10:03    8    podium?

10:04    9        THE COURT:  Please, the lectern.

10:04   10        MR. AVENATTI:  Your Honor, if it's acceptable to

10:04   11    the Court, I would like to start with just a brief

10:04   12    preliminary statement in response to what Mr. Sagel just

10:04   13    said.

10:04   14        THE COURT:  That's fine.

10:04   15        MR. AVENATTI:  I would then like to make some

10:04   16    general objections for the benefit of the Court relating to

10:04   17    the tentative.  I will then move into specific objections

10:04   18    that I have to portions of the tentative, and ultimately I

10:04   19    would like an opportunity to address the Court before you

10:05   20    impose sentence at a later point.

10:05   21        THE COURT:  That's fine.  That's what I was

10:05   22    thinking.  We will stick to the tentative, and you will have

10:05   23    a chance to allocute separately.

10:05   24        MR. AVENATTI:  Thank you, Your Honor.

10:05   25        I want to start and place the focus on what I

10:05    1    believe the focus should be on, and that is the four victims

10:05    2    in this case:  Ms. Gardner, Mr. Barela, Ms. Phan, and

10:05    3    Mr. Johnson.

10:05    4            I want to again apologize to each of them.  I

10:05    5    stand by the entirety of my written letter to them, which is

10:05    6    in the record.  I wrote it.  I meant everything I put in the

10:05    7    letter.  It was sincere, it was true, and it was heartfelt.

10:06    8            Your Honor, at no point in time did I set out to

10:06    9    bilk my clients.  I also stand by the entirety of the

10:06   10    opening paragraph of my sentencing submission at Docket

10:06   11    1016, as well as the statements that I wrote on page 14 of

10:06   12    that submission.

10:06   13            I likewise harmed the Internal Revenue Service,

10:06   14    and I accept responsibility for that.

10:06   15            I recognize that I harmed Ms. Gardner, Mr. Barela,

10:06   16    Ms. Phan, and Mr. Johnson, and I violated their trust.  I

10:06   17    stand by the statements that I made at the plea hearing and

10:06   18    my admission of guilt.

10:06   19            For all of this, Your Honor, I'm deeply remorseful

10:06   20    and contrite.  There is no doubt that all of them deserve

10:07   21    much better, and I hope that some day they will accept my

10:07   22    apologies and find it in their heart to forgive me.

10:07   23            I'm going to reserve other comments for my

10:07   24    allocution when Your Honor provides me that opportunity.

10:07   25            Turning to my preliminary objections, Your Honor,

10:07  1   for the benefit of the record, I object to the guideline

10:07  2   calculation as set forth in the tentative, each of the

10:07  3   enhancements, the criminal history determinations, and the

10:07  4   restitution calculation for each of reasons as set forth in

10:07  5   my filings at Dockets 1016, 1024, 1026, and 1048.  I'm going

10:07  6   to add some additional objections when we get to the

10:07  7   specifics of the tentative.

10:07  8        I renew my motion for an evidentiary hearing as

10:08  9   requested in Dockets 1016, 1024, and 1048.  I requested an

10:08  10  opportunity to present evidence demonstrating why the

10:08  11  enhancements, including the claimed loss amount and the

10:08  12  restitution amount, are not appropriate.

10:08  13       THE COURT:  Sir, what is it that you can add in an

10:08  14  evidentiary hearing that you didn't add in your original

10:08  15  motion for an evidentiary hearing which had a rather

10:08  16  extended appendices and detailed calculations?

10:08  17       MR. AVENATTI:  Your Honor, a lot of that

10:08  18  information that the government refutes and does not agree

10:08  19  with and the claims, there is no evidence for it.  What I

10:08  20  would seek to do in an evidentiary hearing is to provide

10:08  21  evidence relating to what I believe are valid amounts that

10:08  22  should be deducted from the loss amount in order to arrive

10:08  23  at an accurate loss amount, as well as amounts that should

10:09  24  be deducted from restitution.  Again, I will address that

10:09  25  when we get to the specific items in the tentative, Your

10:09    1    Honor.

10:09    2            I object, Your Honor, to any failure by the Court

10:09    3    to address my objections as set forth in any of my

10:09    4    sentencing submissions including at 1016, 1026, and 1048.

10:09    5            Likewise, Your Honor, I reassert each of the

10:09    6    objections and issues I raised in Dockets 1016, 1024, 1026

10:09    7    and 1048.  I'm happy to make a record of each of them if the

10:09    8    Court does not deem that sufficient for the record, but I

10:09    9    imagine that will not be necessary.

10:09   10            I further object, Your Honor, to each of the

10:10   11    enhancements with the exception of the special skill

10:10   12    enhancement, because the government has failed to meet its

10:10   13    burden of proof for each of those enhancements as required

10:10   14    under Ninth Circuit precedent, including United States

10:10   15    versus Lonich and United States versus Armstead as cited and

10:10   16    explained in my papers.

10:10   17            Your Honor, I also request that the PSR be amended

10:10   18    and corrected in accordance with each of my objections as

10:10   19    set forth in my filings at Dockets 1016, 1024, and 1028.

10:10   20    This includes, but is not limited to, those where the Court

10:10   21    states in its tentative, quote, "The Court notes," closed

10:10   22    quote, as well as those where the Court states, quote,

10:11   23    "corrections noted," closed quote.  It is important to me

10:11   24    that the PSR be accurate in all material respects, so I make

10:11   25    that request on the record.

10:11   1           I also object as to the inclusion of both the

10:11   2   bankruptcy enhancement under 2B1.1 and the obstruction

10:11   3   enhancements under 3D1.1 as being prohibited under the

10:11   4   guidelines and the commentary to the guidelines. It is not

10:11   5   appropriate in my view for both of those enhancements to be

10:11   6   applied in this case.

10:11   7           And then with that said, I would like to move if

10:11   8   the Court will allow me to the tentative and the comments of

10:11   9   Mr. Sagel.

10:12  10           THE COURT:  Very well.

10:12  11           MR. AVENATTI:  Your Honor, I would like to start

10:12  12   with the largest enhancement, and that is the loss

10:12  13   enhancement, which the tentative provides is 20 levels and

10:12  14   finds that the entire loss amount -- or the loss amount is

10:12  15   the entirety of the settlement amounts at issue.

10:12  16           I object to that determination, Your Honor, and I

10:12  17   would like to start with the fact that it is the

10:12  18   government's burden -- and the government's burden alone --

10:12  19   to prove loss, and I believe that burden is a clear and

10:12  20   convincing standard.  But under either a clear and

10:12  21   convincing standard or preponderance of the evidence

10:13  22   standard, Your Honor, they have failed to prove a loss

10:13  23   amount in the amount of $12,350,000.

10:13  24           Therefore, I assert, Your Honor, that there should

10:13  25   be no enhancement for loss and that the enhancement should

10:13  1   be zero or at most should be 16 levels for the reasons

10:13  2   stated in my papers, as well as the additional statements

10:13  3   I'm about to make and reasons I'm about to provide.

10:13  4             THE COURT:  Don't your very charts in Docket 1024

10:13  5   refute the notion that the loss could be zero?

10:13  6             MR. AVENATTI:  Your Honor, I provided a

10:13  7   preliminary --

10:13  8             THE COURT:  Sir, do your own charts contradict the

10:13  9   proposition that the loss is zero?

10:13  10            MR. AVENATTI:  But I don't think I have been clear

10:13  11   in my point to Your Honor.

10:14  12            THE COURT:  I think you have made the record -- at

10:14  13   least some record why it shouldn't be zero.

10:14  14            MR. AVENATTI:  My point is it's their sole

10:14  15   obligation to come to court and prove it.

10:14  16            THE COURT:  The Court can consider any evidence

10:14  17   before it, true, regardless of who offers it?

10:14  18            MR. AVENATTI:  True.

10:14  19            THE COURT:  At the end of the day, the question is

10:14  20   whether the record supports the evidentiary basis for the

10:14  21   finding, not who produced it.

10:14  22            MR. AVENATTI:  I understand, Your Honor.  I don't

10:14  23   necessarily disagree with that.

10:14  24            What I would like to do, though, is focus on what

10:14  25   is loss under the guidelines.  I would like to direct Your

10:14    1    Honor's attention if I could to the actual commentary for

10:14    2    the loss guideline.  I believe it's Application Note 3.  I'm

10:14    3    sure Your Honor is very familiar with it, and it discusses

10:14    4    loss under subsection (b)(1).

10:15    5          The general rule is that loss is the greater of

10:15    6    actual loss or intended loss.  Then the guideline commentary

10:15    7    defines "actual loss."  And actual loss means the reasonably

10:15    8    foreseeable pecuniary harm that resulted from the offense.

10:15    9          If we then look at the guideline and how it

10:15   10    defines reasonably foreseeable pecuniary harm, it basically

10:15   11    means harm that the defendant knew or under the

10:15   12    circumstances reasonably should have known was a potential

10:15   13    result of the offense.

10:15   14          THE COURT:  Let's take Ms. Phan.  She was paid

10:15   15    zero of the last $4 million.  Put aside any offsets or

10:15   16    whatever.  Wasn't your failure to pay foreseeable that she

10:15   17    would have a loss?

10:16   18          MR. AVENATTI:  In that instance, $4 million under

10:16   19    your statement, yes, Your Honor.

10:16   20          THE COURT:  Okay.

10:16   21          MR. AVENATTI:  But that's not true as it relates

10:16   22    to the full settlement amounts for the other three clients.

10:16   23    The full settlement amounts, Your Honor, do not meet the

10:16   24    standard of actual loss because --

10:16   25          THE COURT:  Do you reject the California

10:16  1    established law that your conduct caused the forfeiture and
10:16  2    gave up the right to collect fees and costs?  Do you
10:16  3    disagree with California law?
10:16  4              MR. AVENATTI:  I disagree with that proposition in
10:16  5    this context --
10:16  6              THE COURT:  What is the context?
10:16  7              MR. AVENATTI:  Your Honor, the context as I
10:16  8    explained in my papers is that, first of all, I don't think
10:16  9    California law is that clear.  Secondly, I would be still
10:16  10   entitled to quantum meruit.  Third, I would still be
10:16  11   entitled to the costs.  Fourth, I would still be entitled to
10:16  12   any monies paid to the clients prior to detection of the
10:17  13   fraud.  None of those deductions have been made by the
10:17  14   government.  They haven't proven a loss amount of
10:17  15   $12,350,000.
10:17  16             My point is that the reasonably foreseeable harm
10:17  17   at the time of the fraud was not the full amount of the
10:17  18   settlements.
10:17  19             THE COURT:  With the exception of Ms. Phan.
10:17  20             MR. AVENATTI:  With the exception of Ms. Phan with
10:17  21   the caveat relating to the other work which I understand
10:17  22   Your Honor has rejected.  But the government has given me no
10:17  23   credit for the fees, the costs, any monies paid to the
10:17  24   clients prior to detection.  It just simply can't be at the
10:17  25   time I committed fraud against the four clients, which I

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

```
10:17   1    have admitted to, that the reasonably foreseeable harm was
10:17   2    the entirety of the settlement amounts.  It was the amount
10:17   3    of money that was owed to the clients at that time and no
10:18   4    more.  So that is my first objection on loss and the
10:18   5    calculation of loss.
10:18   6            My second objection, Your Honor, is this issue of
10:18   7    credits against loss.  The guidelines are clear that loss
10:18   8    shall be reduced by the following:  the money returned and
10:18   9    the fair market value of the property returned and the
10:18   10   services rendered by the defendant or other persons acting
10:18   11   jointly with the defendant to the victim before the offense
10:18   12   was detected.  I have not been provided a credit for any of
10:18   13   those items.
10:18   14           Now, I understand the Court's tentative relating
10:19   15   to California law.  I don't believe that that applies in
10:19   16   this context.  But in any event, it does not account for any
10:19   17   money paid to the clients prior to detection, and there has
10:19   18   been no showing by the government of what the date of
10:19   19   detection was.
10:19   20           Your Honor, they simply have not met their burden
10:19   21   of proof to prove loss, and it's a 20-level enhancement that
10:19   22   greatly enhances my sentencing exposure.
10:19   23           THE COURT:  If we look at only Ms. Phan's
10:19   24   position, it would be an 18-level calculation, $4 million
10:19   25   falling in the range of $3.5 million to $9.5 million, level
```

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

10:19   1   18.

10:19   2           MR. AVENATTI:  If we looked at Ms. Phan and did

10:19   3   not provide me credit for the amounts that I claim I am due

10:19   4   as offsets as set forth in my papers.

10:19   5           THE COURT:  Why should you be credited for other

10:20   6   work that had nothing to do with the performance of the

10:20   7   obligation that entitled her to $4 million?  Why should be

10:20   8   credited for other work outside the scope of that

10:20   9   litigation?

10:20   10          MR. AVENATTI:  Because the guidelines do not limit

10:20   11  the offset in any way, shape, or form.  The guidelines do

10:20   12  not say the money returned, and the fair market value of the

10:20   13  property returned, and the services rendered by the

10:20   14  defendant or other persons acting jointly with the defendant

10:20   15  relating to the fraud at issue or relating to the conduct at

10:20   16  issue or any other limiting principal, Your Honor.  The

10:20   17  guidelines don't contain that limiting language.

10:20   18          THE COURT:  Basically, you are asking for me to

10:20   19  give you judgment on all this extra work.  Isn't that the

10:20   20  net of your position?

10:20   21          MR. AVENATTI:  No, Your Honor.  My position --

10:20   22  again, this is not my burden.  It is the government's

10:21   23  burden.

10:21   24          THE COURT:  Don't you have the burden to prove

10:21   25  offsets?

```
10:21    1           MR. AVENATTI:  No, I don't believe I do.  I don't
10:21    2   believe under the law of the Ninth Circuit and elsewhere I
10:21    3   have a burden to prove offsets to loss.  It is the
10:21    4   government's burdens under a clear and convincing standard
10:21    5   to come before the Court and present a loss calculation that
10:21    6   is accurate, that is supported, and that provides applicable
10:21    7   offsets pursuant to the guidelines, and they haven't done
10:21    8   that.
10:21    9           They have steadfastly refused to provide any
10:21   10   discount to the loss amount for anything including monies
10:21   11   paid to the clients prior to detection.  They haven't
10:21   12   established the detection date.  Again, it is their burden.
10:21   13           I can't think of a few things more important that
10:22   14   relates to this guideline calculation than ensuring that the
10:22   15   loss amount is accurate.  I have made numerous objections in
10:22   16   the record relating to this.  So that is my first specific
10:22   17   objection, Your Honor, to the tentative, namely, that
10:22   18   concerning loss.
10:22   19           Again, I'm not going to relodge or restate each of
10:22   20   my objections to the enhancements that I have already made
10:22   21   in my papers.  I think those are preserved for the benefit
10:22   22   of the record.
10:23   23           I do want to make a few points.  Relating to the
10:23   24   bankruptcy representations, there is a statement from Your
10:23   25   Honor that I do not deny the misrepresentations.  This is
```

10:23  1  relating to the filings or the information that should have

10:23  2  been filed in a bankruptcy proceeding.

10:23  3          To the extent that the Court is suggesting that I

10:23  4  am not denying that the information had to be disclosed, I

10:23  5  am denying that the information had to be disclosed, and I'm

10:23  6  also making the point that the government has not

10:23  7  established the necessity of the information having to be

10:23  8  disclosed, the legal necessity.  There is nothing in the

10:23  9  record establishing that fact.

10:23  10          THE COURT:  Can you not be held for making a

10:23  11  gratuitous false statement or gratuitous false admission to

10:23  12  the Bankruptcy Court?

10:24  13          MR. AVENATTI:  Your Honor, I can't answer that

10:24  14  without the context.  I'm sorry.

10:24  15          THE COURT:  Assume you had no obligation, but you

10:24  16  nevertheless made a false statement on a material omission.

10:24  17  Couldn't you be held for that?

10:24  18          MR. AVENATTI:  I don't know if that would be

10:24  19  enough to qualify for the enhancement, Your Honor.  I just

10:24  20  don't know the answer.  I'm not trying to be evasive.  I

10:24  21  just don't know the answer to that, Your Honor, but that's

10:24  22  not what we are specifically discussing here.

10:24  23          What we are discussing is whether I'm denying my

10:24  24  failure to include information that was filed in a

10:24  25  Bankruptcy Court.  My point is there has been no

10:24    1    establishment that I had an obligation to disclose that

10:24    2    information.

10:24    3              I will give you one example.  Ms. Phan was never a

10:24    4    client of the law firm.  She was a client of Michael

10:24    5    Avenatti.  The law firm was in bankruptcy, not me

10:24    6    personally.  So what possible obligation could I have to

10:25    7    disclose to the Bankruptcy Court on a schedule monies

10:25    8    received from a client that wasn't even a client of the

10:25    9    firm?  The answer is none.  The government makes this

10:25   10    statement that I failed to disclose this information, but

10:25   11    there is no showing that I actually had an obligation to,

10:25   12    Your Honor.

10:25   13              There is also a statement in the tentative that I

10:25   14    have asserted that my actions were taken on the advice of

10:25   15    counsel.  That's one of the things that I would have liked

10:25   16    to have presented at an evidentiary hearing if provided the

10:25   17    opportunity.  I will also state that this conduct has not

10:25   18    been proved by clear and convincing evidence.

10:25   19              THE COURT:  Does the bankruptcy misstatement

10:25   20    require clear and convincing evidence?

10:25   21              MR. AVENATTI:  Your Honor --

10:25   22              THE COURT:  Does it require clear and convincing

10:25   23    evidence?

10:25   24              MR. AVENATTI:  I believe it does.

10:26   25              THE COURT:  Does it disproportionately affect the

10:26  **1**    guideline calculation?

10:26  **2**         MR. AVENATTI:  It could depending on what the

10:26  **3**    ultimate guideline calculation is, but as set forth in the

10:26  **4**    tentative right now, likely not.

10:26  **5**         On the obstruction of justice enhancement, Your

10:26  **6**    Honor, I have already noted my objection pursuant to the

10:26  **7**    guidelines.  But separate and apart from that, Your Honor, I

10:26  **8**    will note that there has been no finding that the conduct at

10:26  **9**    issue, specifically perjury, was designed to obstruct

10:26  **10**   justice, and I will just refer the Court to Application Note

10:26  **11**   3C1.1.  I'll lodge that objection for the record.

10:27  **12**        Moving to the criminal history issue as laid out

10:27  **13**   in the tentative, Your Honor, there is temporal overlap in

10:27  **14**   the three cases as evidenced by the Indictments in the three

10:27  **15**   cases, and that would be the Nike-related case, the

10:27  **16**   Daniels-related case, and obviously this case, Your Honor.

10:27  **17**        If you look at the language in the Indictments, it

10:27  **18**   shows temporal overlap.  If you look at the language in the

10:27  **19**   government's sentencing positions in this case, the Nike

10:27  **20**   case, and in the Daniels case, there is also significant

10:27  **21**   overlap, not only temporally but also of relevant conduct.

10:27  **22**   And a review of the sentencing transcripts in the Daniels

10:28  **23**   and Nike cases also demonstrate that.

10:28  **24**        Your Honor, it was similar conduct, especially as

10:28  **25**   it relates to the Daniel's matter, a similar modus operandi.

10:28   1    And for each of those reasons, the criminal history is

10:28   2    overstated, Your Honor, at a level III.

10:28   3              THE COURT:  In assessing criminal history, don't I

10:28   4    have to take into account the extent you are a danger to the

10:28   5    community, and I make that judgment as of the date of

10:28   6    sentencing, true?

10:28   7              MR. AVENATTI:  Your Honor, I don't know frankly

10:28   8    whether that's true or not.  I don't.

10:28   9              THE COURT:  Isn't that a major factor in assessing

10:28   10   whether criminal history is too low or too high, what the

10:28   11   danger to the community is?

10:28   12             MR. AVENATTI:  Your Honor, I don't know.  I just

10:29   13   don't know.

10:29   14             THE COURT:  Okay.

10:29   15             MR. AVENATTI:  We also cited two excerpts from

10:29   16   former U.S. Attorney Berman's book and the statements within

10:29   17   that book, none of which have been refuted by the government

10:29   18   in this case, and those statements show the government had

10:29   19   every opportunity to bring one case.  They chose not to.

10:29   20   The two offices chose to bring three different cases

10:29   21   basically simultaneously in short order.

10:29   22             Your Honor, I don't believe that those facts lend

10:29   23   themselves to a determination of a Criminal History Category

10:29   24   III, especially, but not limited to, as it relates to the

10:29   25   Daniel's matter, which has a net loss amount of $149,000 and

10:30    1    could have and should have been combined with this case.

10:30    2            The fact that the government chose to divide this

10:30    3    conduct into three separate cases, three separate

10:30    4    prosecutions, three separate sentencings, should not result

10:30    5    in a Criminal History Category III for purposes of my

10:30    6    sentencing here today, because otherwise a system develops,

10:30    7    Your Honor, where the government can carve up Indictments

10:30    8    and prosecute individuals if they want to in multiple

10:30    9    matters, in multiple cases, and they can stack the cases

10:30    10   against those individuals and then claim that the criminal

10:30    11   history category rachets up with each successive

10:31    12   prosecution.

10:31    13           I don't believe that is the purpose of the

10:31    14   criminal history component of the guidelines.  I'm not going

10:31    15   to repeat my arguments in my papers in that regard.

10:31    16           I understand that Mr. Steward had provided an

10:31    17   e-mail to your clerk relating to certain sensitive

10:31    18   information being included or excluded from Your Honor's

10:31    19   final order.

10:31    20           THE COURT:  That's correct.

10:31    21           MR. AVENATTI:  I would make that request.

10:31    22           THE COURT:  I'm not sure what you want.  We will

10:31    23   send out what is my final version of the sentencing

10:31    24   memorandum, and you can file under seal any specific request

10:31    25   for exclusion.  But my view is the public has a right to

10:31  1  know on what basis I am imposing a sentence, particularly

10:32  2  where that sentence is substantially below what the nominal

10:32  3  guideline is.

10:32  4          MR. AVENATTI:  Understood, Your Honor.

10:32  5          THE COURT:  I mean, that's a protection for the

10:32  6  defense.  That's why we have open courts.

10:32  7          MR. AVENATTI:  There was a statement in the

10:32  8  tentative that I had a question on, Your Honor.  This was

10:32  9  under the need to afford deterrence of criminal conduct,

10:32  10  page 12.

10:32  11          THE COURT:  Right.

10:32  12          MR. AVENATTI:  There is a statement that reads:

10:32  13  "Moreover, the cases reported in the legal and general press

10:32  14  show that there is a need for general deterrence in the

10:32  15  legal community."  I took that to mean you are not referring

10:32  16  to this case, but you are referring to other cases.

10:32  17          THE COURT:  Correct.

10:32  18          MR. AVENATTI:  I don't know exactly what Your

10:32  19  Honor was referring to in that regard.

10:33  20          THE COURT:  I think what I am referring to is that

10:33  21  this fraud is not a unique fraud in that particular

10:33  22  community.

10:33  23          MR. AVENATTI:  In the legal community?

10:33  24          THE COURT:  In the legal community.

10:33  25          MR. AVENATTI:  So I understand that there has been

10:33    1    a lot of press, for instance, to the fraud relating to Mr.

10:33    2    Girardi here in the Southern California community.  Is this

10:33    3    what Your Honor is referring to among others?

10:33    4            THE COURT:  Among others.

10:33    5            MR. AVENATTI:  So, Your Honor, I would just object

10:33    6    on the basis that I don't believe that media attention of

10:33    7    other frauds by other lawyers in the legal community in

10:33    8    Southern California or elsewhere is a basis to determine

10:33    9    that there is a heightened need for general deterrence.  I

10:33   10    will state that objection on the record for the benefit of

10:33   11    the record, Your Honor.

10:34   12            I should not be held -- obviously, I'm here to be

10:34   13    held responsible for my conduct, but I should not suffer the

10:34   14    consequences or be held responsible for the conduct of other

10:34   15    lawyers, almost all of whom I have never met or have no idea

10:34   16    what they do or don't do in the course of their practice.

10:34   17            THE COURT:  If a particular problem is rampant in

10:34   18    the community and it would be obvious to anyone in the

10:34   19    public, why can't I take judicial notice of that fact?

10:34   20            MR. AVENATTI:  Your Honor, depending on the

10:34   21    particulars, perhaps you could.  I don't know what Your

10:34   22    Honor is referring to there, and I don't know if it's

10:34   23    applicable or analogous to this particular situation, Your

10:34   24    Honor.  Because of that, I object, as well as for the

10:35   25    reasons I have previously stated.

10:35  1              I would like to touch if I could briefly on

10:35  2      sentencing disparity, Your Honor.  I provided a number of

10:35  3      exhibits to the Court showing sentences in what I submit are

10:35  4      like cases.  I believe I have submitted information touching

10:35  5      on upwards of 45 or 50 different cases in one form or

10:35  6      another.

10:35  7              THE COURT:  I pointed out what I believe is a

10:35  8      defect in the aggregate that you produced from the Central

10:35  9      District's statistics prepared by the AO.

10:35  10             Do you disagree with my criticism of relying on

10:35  11     aggregate statistics?

10:36  12             MR. AVENATTI:  No.  I think in a vacuum without

10:36  13     any other information that would be error.  I agree with

10:36  14     Your Honor.  My focus is on all the other cases I have cited

10:36  15     to, which I think there is about 50.  I provided detailed

10:36  16     information about those cases.  I filed the sentencing

10:36  17     briefs by the government in those cases in many instances.

10:36  18     I also provided a chart to Your Honor relating to the loss

10:36  19     amounts in numerous high-profile cases and the resulting

10:36  20     sentences in those cases.  And that chart demonstrates even

10:36  21     using a loss amount of $12,350,000, which I submit is not

10:36  22     the loss amount for the reasons I have already stated, Your

10:36  23     Honor -- even using that loss amount, the sentence

10:37  24     recommended by Probation, as well as the sentence demanded

10:37  25     by the government, are literally off the chart as it relates

10:37   1   to other high-profile fraud cases.

10:37   2        Cases involving loss amounts of $12,350,000

10:37   3   generally do not bring sentences in the range of 14, 15

10:37   4   years, Your Honor.  In fact, I think that on an amount per

10:37   5   month basis what is being proposed or requested I should say

10:37   6   is about double what countless other fraudsters have

10:38   7   received around the country.  I know we provided that chart

10:38   8   to Your Honor as part of our sentencing disparity.

10:38   9        THE COURT:  I think there are significant

10:38   10  distinguishing factors.  It's one thing to scam the market

10:38   11  in a stock offering.  It's another to directly affect four

10:38   12  people and some of those people critically.  That's a major

10:38   13  distinction in my mind.

10:38   14       MR. AVENATTI:  Understood, Your Honor.  The fraud

10:38   15  cases that I cited to you are not just fraud on the market

10:38   16  cases, though.  Many of those cases involved PONSI schemes

10:38   17  with losses of hundreds of million of dollars and vulnerable

10:38   18  victims, including people that were elderly, handicapped,

10:38   19  and otherwise.  Again, we also provided a chart to Your

10:38   20  Honor that showed an analysis of various cases from around

10:38   21  the country, including some of which involved attorneys

10:39   22  taking money from clients.

10:39   23       So that really formed the backbone, that

10:39   24  information, for my disparity argument, and that any

10:39   25  sentence approaching what was requested by the government or

10:39  1    represented by Probation would create an unwarranted

10:39  2    disparity with those cases.

10:39  3              I would like to touch briefly if I could on the

10:39  4    service of sentence portion of the tentative relating to

10:39  5    concurrent versus consecutive.  As Your Honor knows, I

10:39  6    submit that the two matters in New York are relevant conduct

10:40  7    for the purpose of this determination.

10:40  8              Relating to the evidence of the temporal overlap,

10:40  9    the Nike Indictment relates to conduct that occurred in

10:40  10   March of 2019.  The Daniels Indictment, Count One, relates

10:40  11   to conduct that occurred July 2018 through 2019.  Count Two

10:40  12   relates to August 2018 to February 2019.  Counts One through

10:40  13   Ten in this case, Your Honor, according to the Indictment,

10:40  14   cover the time period January 2015 through March 2019.  All

10:40  15   three cases involved the attorney/client relationship, Your

10:40  16   Honor.  All three cases are fraud-based.  All three cases

10:41  17   involved a single defendant.

10:41  18              THE COURT:  I characterize the Nike case as

10:41  19   extortion based.

10:41  20              MR. AVENATTI:  Your Honor, a principal -- I know

10:41  21   Your Honor is aware of this.  A principal theory of that

10:41  22   case and one that was used to great effect at trial was the

10:41  23   honest services fraud count in that case.  That was a

10:41  24   significant part of that case both in the government's

10:41  25   opening, its presentation of evidence, as well as the

10:41    1    closing arguments of the government.  They made the honest
10:41    2    services fraud and my conduct as it related to Coach
10:41    3    Franklin a centerpiece of that case.
10:42    4            My position as I said, as I stated in the papers,
10:42    5    is that because of overlap and because those two cases are
10:42    6    relevant conduct under the guidelines, that any sentence in
10:42    7    this case should run concurrent and not consecutive with
10:42    8    those sentences.  I believe it's required.  But even if it's
10:42    9    not required, Your Honor, I still maintain that the Court
10:42   10    should order the sentence in this case to run concurrent
10:42   11    with those two sentences, and I'm going to address that
10:42   12    further when I allocute to the Court if that's acceptable.
10:42   13            THE COURT:  That's fine.
10:42   14            MR. AVENATTI:  May I get a drink of water?
10:42   15            THE COURT:  Sure.
10:43   16            MR. AVENATTI:  Your Honor, before I get to
10:43   17    restitution, I would like to touch on a few things that
10:43   18    Mr. Sagel mentioned in his presentation.
10:43   19            Number one, he discussed the footnote relating --
10:43   20    on page 5 relating to the no objection to the statement at
10:43   21    the time.  What I pointed out in my papers was that the
10:43   22    government made no objection to the statement to the L.A.
10:43   23    Times at the time, which is what you wrote actually in your
10:43   24    tentative to clarify that point.
10:44   25            Secondly, Mr. Sagel made a number of comments

10:44　1　minimizing the amount of money that was advanced or paid to
10:44　2　the clients prior to the settlement funds being received.
10:44　3　So these are monies directly advanced to the clients, as
10:44　4　well as monies that were advanced on their behalf, not just
10:44　5　for costs and fees associated with the cases but also for
10:44　6　living expenses, Your Honor.
10:44　7　　　　　And the evidence shows as it relates to
10:44　8　Mr. Johnson, for instance, that Mr. Johnson retained me on
10:45　9　November 8, 2011.  His settlement monies were ultimately
10:45　10　received on January 26, 2015.  So for the better part of
10:45　11　three years, Your Honor, I advanced not only the costs and
10:45　12　expenses associated with pursuing Mr. Johnson's civil case,
10:45　13　but also monies associated with retaining his criminal
10:45　14　defense lawyer, bailing him out of jail, and most
10:45　15　importantly, his living and day-to-day expenses, including,
10:45　16　Your Honor, approximately $37,000 a month at least I think
10:46　17　for the first maybe 12 or 18 months.  These are all expenses
10:46　18　detailed within Mr. Karlous's declaration.  This was not
10:46　19　some small amount of money over a finite period of time.  I
10:46　20　advanced a lot of money to Mr. Johnson for his benefit
10:46　21　during an extended period of time.
10:46　22　　　　　I'm not suggesting, Your Honor, that that somehow
10:46　23　excuses my conduct in ultimately taking the portion of money
10:46　24　he was entitled to.  That's not the purpose of me making
10:46　25　this statement.  I only provide this in response to what

10:46  1    Mr. Sagel said and as further evidence why this loss

10:47  2    calculation is not accurate.

10:47  3          Mr. Sagel also stated that not a single colleague,

10:47  4    judge, or opposing counsel provided a letter to the Court in

10:47  5    support of me.  I don't believe that's true, Your Honor.

10:47  6    Your Honor received letters from I believe approximately 19

10:47  7    people.  Some of them were friends.  Some of them were

10:47  8    attorneys I had worked with, for instance, Ricardo de Anda.

10:47  9    Some of them were clients, multiple clients, Ms. Deleon;

10:47  10   Ms. Enriquez; Mr. Clary; Mr. Frank Colapinto who is here;

10:48  11   Mr. Kraemer, who I consider a friend and a colleague,

10:48  12   someone who has worked with me for the better part of 16, 17

10:48  13   years.  So any claim that I have not received support before

10:48  14   the Court from individuals who I worked with or worked for

10:48  15   is simply not supported, Your Honor, by the record.

10:48  16          I will also state, Your Honor, that in a

10:48  17   high-profile matter that receives a lot of media attention,

10:48  18   a lot of individuals just don't want to write letters

10:49  19   because they don't want their name in the press.  The don't

10:49  20   want their name in tweets.  They just don't want the added

10:49  21   attention no matter what they may or may not think about the

10:49  22   defendant in those matters.  And a number of people

10:49  23   expressed that to me, as well as my advisory counsel and

10:49  24   others who were helping me ask for letters.

10:49  25          Turning if I could, Your Honor, to the restitution

10:49  1    issue, first of all, Your Honor, it's the government's

10:49  2    obligation to prove an exact amount for restitution.  I

10:49  3    don't believe they have met that burden.

10:50  4              THE COURT:  But don't your numbers after I

10:50  5    eliminate the offsets line up pretty much the way you laid

10:50  6    it out in your motion for an evidentiary hearing?

10:50  7              MR. AVENATTI:  Your Honor, they are fairly close,

10:50  8    but I believe I'm entitled to the offsets.  I realize the

10:50  9    Court disagrees.  I recognize that.  Separate and apart, I

10:50  10   want to note a couple of things.  First, $1,500,000 is

10:50  11   required to be deducted in full from Mr. Johnson's

10:50  12   restitution.  That is not a matter for another day.  I'm

10:50  13   entitled to an offset for the entire $1.5 million as I

10:50  14   explained in our filing.  I believe that was at 1026 --

10:50  15             Your Honor, can I have one minute?

10:51  16             (Defendant conferring)

10:51  17             MR. AVENATTI:  Your Honor, I explained that at

10:51  18   pages -- I attempted to explain at pages 6 and 7 of 1026,

10:51  19   namely, that I was due a credit for the full amount of all

10:51  20   monies paid to date by third parties with respect to the

10:51  21   losses as required by the statute.  And that's the full

10:51  22   amount, including the full amount paid by Mr. Eagan, not the

10:52  23   net amount received by Mr. Johnson.

10:52  24             I will further note, Your Honor, that on Friday

10:52  25   before we received the tentative, I submitted additional

10:52   1   exhibits to Your Honor.  Those exhibits deal primarily with

10:52   2   my request for restitution information from the government,

10:52   3   as well as counsel for Mr. Johnson and Mr. Barela.  The

10:52   4   government states that they don't know whether Mr. Barela

10:52   5   has received any monies from third parties.

10:52   6          That is suspicious to me, Your Honor, because I

10:52   7   believe Mr. Barela has received monies from third parties or

10:52   8   potentially has received monies from third parties.  And to

10:52   9   the extent that Mr. Barela or any of the other four victims

10:53  10   have received monies from third parties, I believe I'm

10:53  11   entitled to know that as it relates to determining

10:53  12   restitution.

10:53  13          Your Honor may recall that I only learned of the

10:53  14   $1.5 million paid by Mr. Eagan because I asked Mr. Johnson a

10:53  15   question during the trial relating to that.  I don't believe

10:53  16   that we can arrive at a correct restitution amount without

10:53  17   full disclosure as to which third parties other than

10:53  18   Mr. Eagan, if any, have paid any restitution to the clients,

10:53  19   Your Honor.

10:53  20          I initially objected to any continued restitution

10:53  21   hearing because it was represented that I was going to

10:54  22   receive all of the necessary information relating to

10:54  23   restitution.  I assert as laid out in Exhibit 1049, Your

10:54  24   Honor, that that has not occurred.

10:54  25          And I want to explain -- well, I guess let me ask

| | | |
|---|---|---|
|10:54|1|a question, because I may be able to avoid explaining|
|10:54|2|anything.  Is it Your Honor's intention to deduct the amount|
|10:54|3|paid by Mr. Eagan and not award any restitution to Mr. Eagan|
|10:54|4|because he is not before the Court, or is it Your Honor's|
|10:54|5|intention to change your position on that?  If so, there is|
|10:54|6|a detailed analysis I need to get into relating to this|
|10:54|7|$1.5 million.|
|10:54|8|            THE COURT:  I think the government is inviting me|
|10:54|9|to include Mr. Eagan as a secondary beneficiary of|
|10:55|10|restitution as the probation officer proposes.|
|10:55|11|            MR. AVENATTI:  Understood, Your Honor, which I|
|10:55|12|object to on pages 6 and 7.  But my point is this --|
|10:55|13|            THE COURT:  Well, I thought you were asking|
|10:55|14|whether I was going to go with an award for Mr. Eagan.|
|10:55|15|Listening to the government's argument and the probation|
|10:55|16|officer's reasoning, I think that's probably appropriate.|
|10:55|17|            MR. AVENATTI:  I asked a bad question.  Obviously|
|10:55|18|I object to that, to Mr. Eagan being included for the|
|10:55|19|reasons I have stated in my papers.|
|10:55|20|            The issue, Your Honor, is this.  Mr. Johnson under|
|10:55|21|the law is not entitled to a heightened restitution amount|
|10:55|22|due to attorneys' fees or the costs associated with the|
|10:55|23|litigation he pursued against Mr. Eagan.  That is included|
|10:56|24|in the government's analysis of restitution for Mr. Johnson.|
|10:56|25|There is no backup or supporting documentation for a number|

10:56  1   of these costs, so I don't have any idea whether they relate

10:56  2   to the litigation with Mr. Eagan or not.

10:56  3          If you look at the exhibits I attached to

10:56  4   Exhibit 1049, that's one of the things I was asking about.

10:56  5   I was asking, number one, did any third parties pay any of

10:56  6   the victims; and, number two -- I am paraphrasing -- can I

10:56  7   get some backup documentation for some of these claimed

10:56  8   litigation costs associated with pursuing Mr. Eagan?

10:56  9          I will just give you a couple of examples, Your

10:56  10  Honor, if I could.  This is attached to Mr. Karlous's

10:56  11  declaration.  One of the claimed alleged costs is finance

10:57  12  charges associated with a loan that Mr. Johnson evidently

10:57  13  took out from a lender who appears to have charged him about

10:57  14  a hundred percent interest, and that is listed as a cost in

10:57  15  connection with Mr. -- or attached to Mr. Karlous's

10:57  16  declaration.

10:57  17         There is another payment to Jason Frank and

10:57  18  Andrew Stolper's law firm.  I don't understand how that

10:57  19  payment could be deemed a cost associated with the

10:57  20  litigation of Mr. Johnson's claim against Mr. Eagan.  And

10:58  21  there is a host of other alleged costs that are claimed that

10:58  22  simply don't have adequate documentation, or really to be

10:58  23  clear, Your Honor, there is no documentation.  It's just a

10:58  24  list of the alleged costs with no support or anything else

10:58  25  behind it.  I shouldn't be required to pay restitution for

10:58    1    those items without adequate support and documentation
10:58    2    especially in light of the two examples that I have just
10:58    3    given.
10:58    4            Again, I know I have said this.  It's the
10:58    5    government's obligation to prove restitution.  They haven't
10:58    6    done so, and there was no response to my letter that I sent
10:58    7    weeks ago asking for this basic information on restitution.
10:58    8    I believe I was entitled to that information before a
10:59    9    restitution amount was arrived at, Your Honor.
10:59   10            I would like to address three of the proposed
10:59   11    conditions of supervised release if I could, Your Honor.
10:59   12            THE COURT:  Please.
10:59   13            MR. AVENATTI:  Unfortunately, when we filed our
10:59   14    oversized brief and we made an application and Your Honor
10:59   15    denied it, we then had to cut back the brief.  When we cut
10:59   16    back the brief, explanations for why I was objecting to
10:59   17    these conditions were left on the cutting room floor, if you
10:59   18    will.  In retrospect, that was a mistake, so I would like to
10:59   19    now explain why or the basis for a few of my objections if I
10:59   20    could.
11:00   21            Proposed Condition 8 provides that all sources of
11:00   22    income shall go to the restitution amount awarded in this
11:00   23    case.  My objection to that is two-fold.  First of all, I
11:00   24    believe under the law it has to be a percentage of income,
11:00   25    and it cannot be a hundred percent because then I have no

11:00  1    way of living.

11:00  2         Secondly, there are two other restitution orders

11:00  3    presently out there.  One relates to Nike in the amount I

11:00  4    believe of about $253,000.  I may be mistaken on the amount.

11:00  5    It may be a little more than that.  $257,000 I think it is.

11:01  6    The other relates to Ms. Daniels for $149,000.  If there is

11:01  7    a condition in this case that I have to pay hundred percent

11:01  8    of my income to the individuals in this case, I can't pay

11:01  9    any money to Nike or Ms. Daniels.

11:01  10        Now, I'm supportive because of the position of the

11:01  11   victims in this case that this restitution order -- and, in

11:01  12   fact, I will make the request that the restitution in this

11:01  13   order in this case come first, that any monies that are

11:01  14   available for restitution go to these four individuals

11:01  15   before Nike or Ms. Daniels.  I don't know if it's possible

11:01  16   to do that.  I don't know what the government's position is,

11:01  17   but that's the request I'm going to make on the record,

11:01  18   because I think these four individuals deserve that, and I

11:01  19   ask that be included if it's possible.  But all of that is

11:02  20   why I objected to Condition 8 as phrased, Your Honor.

11:02  21        Proposed Condition 4 relating to the filing and

11:02  22   the payment of taxes, Your Honor, my objection did not

11:02  23   relate to future years.  My objection related to past years.

11:02  24   To make a condition of supervised release that I have to pay

11:02  25   any past due amounts, I object to the extent that that is

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

11:02   1   suggesting that I have to pay that amount regardless of

11:02   2   ability to pay, because otherwise we are creating a

11:02   3   situation where if I don't have the money to pay the back

11:02   4   taxes, then I'm automatically in violation of the proposed

11:03   5   condition.  It's almost like a debtor's prison, Your Honor.

11:03   6   I'm sure that's not the intent, but as phrased, that could

11:03   7   be problematic.

11:03   8          Obviously, Your Honor, I'm not in a position to

11:03   9   pay monies for back taxes.  It would basically set me up for

11:03  10   failure in that regard.  It also predetermines I'm going to

11:03  11   violate probation because I don't have the money to pay

11:03  12   taxes.  So that was my objection relating to Proposed

11:03  13   Condition 4.

11:03  14          In addition, Your Honor, the condition relating to

11:03  15   the search of my electronic devices, et cetera, I believe

11:03  16   that almost uniformly, especially in the Ninth Circuit, that

11:03  17   a condition of that nature is reserved for individuals

11:03  18   accused of sexual exploitation or sex offenses against

11:04  19   minors.  I think it's a violation of my basic rights to

11:04  20   require or to have that as a supervised release condition

11:04  21   absent a particular showing.  I don't believe that showing

11:04  22   has been made in this case, Your Honor.

11:04  23          As it relates to the issue that Mr. Sagel

11:04  24   mentioned concerning the IRS and Ms. Phan, this is the first

11:04  25   that I have heard of that, Your Honor.  It wasn't in their

11:04  1    papers.  It wasn't in the restitution request or the

11:04  2    restitution analysis.  I'm unclear as to exactly what is

11:04  3    being requested, if anything, relating to this issue

11:04  4    concerning the IRS, so I would like to reserve the ability

11:04  5    to further address that.

11:04  6            If I could get some clarity as to what, if

11:05  7    anything, is being requested concerning the IRS and Ms. Phan

11:05  8    because I'm unclear -- maybe I just misunderstood, but I

11:05  9    don't know what exactly is being requested by the

11:05  10   government, Your Honor.

11:05  11           THE COURT:  Well, if I understand Mr. Sagel

11:05  12   correctly, they are in the process of getting some of her

11:05  13   funds from the IRS.  Once they come back, they go to the

11:05  14   Clerk of the Court who would apply those funds to your

11:05  15   restitution obligation to Ms. Phan, which would cause me

11:05  16   still to enter the number I have.  It's just looming out

11:05  17   there is the prospect of getting money back from the IRS or

11:05  18   U.S. Treasury, which would then be credited to your

11:05  19   restitution obligation.

11:05  20           MR. AVENATTI:  If that's the case, Your Honor,

11:05  21   then I don't think there's any need to deal with that as it

11:06  22   deals with restitution.  It wouldn't be any different from

11:06  23   any recovery from any third-party.

11:06  24           THE COURT:  I don't think I need to do anything.

11:06  25           MR. AVENATTI:  I agree.  I think you arrive at the

11:06  1    proper restitution amount provided the government has proven
11:06  2    it as required, and then any credits that come off that
11:06  3    amount are handled I believe by way of the Clerk of the
11:06  4    Court.
11:06  5          Your Honor, as I detailed in 1024, which is the
11:06  6    request for the evidentiary hearing, I believe the
11:06  7    restitution amounts awarded should be in accordance with my
11:06  8    request in that document and the attached exhibits.  I agree
11:06  9    with Your Honor that it's close to what the government has
11:06  10   requested with a few exceptions that I believe we have
11:07  11   already discussed.
11:07  12         Your Honor, could I have one moment?
11:07  13         THE COURT:  Sure.
11:07  14         (Defendant conferring with standby counsel and
11:07  15   paralegal)
11:08  16         MR. AVENATTI:  Your Honor, just a few additional
11:08  17   points if I could.  First of all, I believe Your Honor was
11:08  18   correct when Your Honor stated that the government's request
11:08  19   of 210 was four levels lower than what the government was
11:08  20   requesting that the guideline calculation be.  I think
11:08  21   that's important as it relates to determining an appropriate
11:09  22   sentence.
11:09  23         Number two, Probation's initial recommendation of
11:09  24   151 months and then revised to a 180-month recommendation
11:09  25   both presupposes that the sentence would be concurrent as

```
11:09    1    opposed to consecutive.  I think that's a critical piece of
11:09    2    information as it relates to what the Court ultimately
11:09    3    imposes as a sentence in this case.  I think it is safe to
11:09    4    presume that if Probation knew that the sentence was going
11:09    5    to be consecutive that the recommendation would likely have
11:09    6    been significantly lower under that scenario.
11:09    7            In addition, I will note that when Probation made
11:10    8    the recommendation for 151 concurrent that that was based on
11:10    9    a guideline calculation of 37.  Probation then rejected
11:10   10    acceptance of responsibility and went to 39 and raised their
11:10   11    recommendation to 180.
11:10   12            Your Honor in its tentative has found 37, which I
11:10   13    don't believe is appropriate for all the reasons I have
11:10   14    already said, including loss.  But separate and apart from
11:10   15    that, we are now back to 37, and I think it's safe to
11:10   16    presume that the recommendation of Probation would then
11:10   17    decrease back to 151, which is what it was initially at 37.
11:10   18            With that, Your Honor, other than having an
11:11   19    opportunity to allocute to the Court and to Your Honor and
11:11   20    addressing anything that Mr. Sagel may say in response, I
11:11   21    have nothing further.
11:11   22            THE COURT:  He gets the last word I believe.
11:11   23            MR. AVENATTI:  Then with that, I will sit down,
11:11   24    Your Honor.
11:11   25            THE COURT:  Very good.
```

11:11    1              What do I do with the $1.5 million that Eagan

11:11    2    paid?

11:11    3              MR. SAGEL:  You treat it pursuant to the mandatory

11:11    4    Victim Restitution Act, and you order full restitution to be

11:11    5    paid by the defendant, which is the nearly

11:11    6    $1.4 million -- I don't have the exact number -- that is

11:11    7    due.  Then any third-party payment -- the first part is to

11:11    8    look at the full restitution number.  Then next is to look

11:12    9    at any third-party payment and make sure that there is no

11:12   10    windfall to the victims so they don't get double counting.

11:12   11              The reason for the split is while Mr. Eagan paid

11:12   12    $1.5 million -- and that was submitted to Your Honor -- not

11:12   13    all of it goes to Mr. Johnson.  Mr. Johnson only got

11:12   14    $691,000 of it or whatever the number is that's broken out

11:12   15    here.  So the remainder as of right now -- if Mr. Johnson is

11:12   16    owed $1.4 million, you subtract out what he has received,

11:12   17    and he gets the remainder first, and then anything after

11:12   18    that goes to Mr. Eagan.

11:12   19              Now, because $1.5 million would cover the

11:12   20    $1.42 million, someone theoretically is going to be out the

11:12   21    money, but Mr. Johnson is not getting a double counting

11:12   22    pursuant to the law.  Sadly, for Mr. Eagan, it's him.  But

11:13   23    when it comes down to it, Mr. Johnson is entitled to

11:13   24    $1.4 million and change.  The numbers that are in the PSR.

11:13   25    He hasn't gotten that.

11:13  1      THE COURT:  In paragraph ten of the special

11:14  2  agent's declaration, it say:  "Therefore, the Court should

11:14  3  order restitution for Johnson in the amount of $1,572,092.

11:14  4      MR. SAGEL:  Correct.  I must have misheard Your

11:14  5  Honor.  $671,000 is the remainder that he hasn't received --

11:14  6  I take that back.  $671,000 is the amount he has received,

11:14  7  which is why that goes to Mr. Eagan.  The remainder of that,

11:14  8  the $900,342, is what would go to Mr. Johnson because he has

11:14  9  not received it, and he would not have received a double

11:14  10  counting.

11:14  11      THE COURT:  Okay.

11:14  12      MR. SAGEL:  And those numbers have been adopted by

11:14  13  the Probation Office as well.

11:15  14      In light of Your Honor's question about the

11:15  15  restitution, I will start with -- I can respond to any of

11:15  16  the arguments, but most of them have been addressed in the

11:15  17  papers and by Your Honor's tentative.  If there is anything

11:15  18  you want me to address first, I can.

11:15  19      THE COURT:  Well, it seems to me that I should

11:15  20  adopt the number in the special agent's declaration of

11:15  21  $1,572,000 and order secondary restitution to Eagan in the

11:15  22  amount of $671,000.

11:15  23      MR. SAGEL:  That's correct.  That's our position,

11:15  24  Your Honor.

11:15  25      THE COURT:  Okay.  Then I don't see a need for a

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

11:15    1    further evidentiary hearing with regard to restitution.

11:15    2         MR. SAGEL:  I agree with that as well, Your Honor.

11:15    3         I will go through the categories.  Does Your Honor

11:16    4    want me to respond to anything on loss?

11:16    5         THE COURT:  No.

11:16    6         MR. SAGEL:  The bankruptcy representation, I will

11:16    7    just point out real quickly.  One example is Ms. Phan.  As

11:16    8    to Ms. Gardner and Mr. Barela, there's no doubt they were

11:16    9    Eagan Avenatti clients based on everything, and even

11:16   10    Ms. Phan's fee agreement has Eagan Avenatti on the fee

11:16   11    agreement.  Unless Your Honor has any questions, I will

11:16   12    submit on that.

11:16   13         One point, Your Honor, that I will make is the

11:16   14    defendant talked about I believe it's page 10 of your

11:16   15    tentative that he may or may not want under seal.

11:16   16         THE COURT:  Well, we will deal with it.  I want to

11:16   17    see what specifics he has in mind, and I will balance that

11:17   18    against the public's need to know.  But particularly where

11:17   19    on a docket a sentence is approximately half of what the low

11:17   20    guideline is, I think the public is entitled to know why I

11:17   21    did that.

11:17   22         MR. SAGEL:  I'm not disputing that at all.  I will

11:17   23    make one quick comment.  In the third paragraph, the last

11:17   24    two sentences --

11:17   25         THE COURT:  Just a minute.

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

11:17   1                    (Pause in proceedings)

11:17   2              THE COURT:  Okay, the third paragraph, the last

11:17   3   two sentences.

11:17   4              MR. SAGEL:  Those deal with a third party that I

11:17   5   don't even know.  I don't think that's fair for that

11:17   6   third-party that has no chance to respond to any comments

11:17   7   that that third-party should be included, because I don't

11:17   8   think it would affect his sentencing -- or at least should

11:17   9   not be publicly --

11:18   10             THE COURT:  The last two sentences in the third

11:18   11  paragraph?

11:18   12             MR. SAGEL:  It starts with "he," and then ends "in

11:18   13  custody."

11:18   14             THE COURT:  Okay, I agree.  I will delete that.

11:18   15             MR. SAGEL:  With regard to sentencing disparity,

11:18   16  Your Honor has covered it.  Even if he objects to what's in

11:18   17  the media outside this case -- he has even put in several

11:18   18  lawyer cases.  Your Honor can easily decipher that there's a

11:18   19  general deterrence need to stop these kind of cases which

11:18   20  are very difficult to investigate and prosecute because of

11:18   21  the attorney/client privilege that protects the information.

11:18   22  Easily Your Honor can use under the 3553 factors general

11:18   23  deterrence for other lawyers.

11:19   24             I'm skipping through everything else without

11:19   25  hearing anything.

11:19   1           With regard to -- do you need me to respond to any

11:19   2   of the comments about restitution?

11:19   3           THE COURT:  No.  Thank you.

11:19   4           MR. SAGEL:  With that, we will submit -- wait a

11:19   5   minute.

11:19   6           (Government counsel conferring).

11:19   7           MR. SAGEL:  Real quickly on the supervised release

11:19   8   conditions, I'm only -- I can address all of them that you

11:19   9   wish me to, but Supervised Release Condition 4, which is

11:19  10   objected to, considering the likely time he would get out on

11:19  11   supervision, which we are talking about potential

11:19  12   approximately 19 or 21 years from now, the government would

11:20  13   be okay with modifying Condition 4 to get rid of the first

11:20  14   clause.  It would be modified to:  The defendant shall

11:20  15   truthfully and timely file and pay taxes as required by law

11:20  16   during community supervision.  So it would not relate to any

11:20  17   of the taxes about the counts of conviction and the time of

11:20  18   conviction.

11:20  19           So the first part of "truthfully shall" could be

11:20  20   deleted and then inserted "as required by law."  So if he

11:20  21   doesn't have money to pay taxes or doesn't have income, the

11:20  22   law won't require it in 19 to 21 years from now.

11:20  23           THE COURT:  Just a minute.

11:20  24           (Pause in proceedings)

11:21  25           THE COURT:  Okay, deleting the past obligation.

11:21  1          MR. SAGEL:  Correct.

11:21  2          THE COURT:  Okay.

11:21  3          MR. SAGEL:  And then with Condition 8 -- and maybe

11:21  4   this is what Your Honor was referencing, and maybe again I

11:21  5   don't need to mention it.  I don't know if it's

11:21  6   misconstruing or just stating incorrectly Condition 8.  It

11:21  7   doesn't say all his income.  He keeps talking about income.

11:21  8   It specifically sets aside income tax refunds, lottery

11:21  9   winnings, inheritance, judgments, and other financial gains.

11:21  10  It's not about his income.  So we could add a clause,

11:21  11  "except pursuant to Court order or recognized living

11:21  12  expenses," but I don't think it's necessary because it's not

11:21  13  one hundred percent of his income.  It's just unforeseen

11:21  14  gains.  I don't think anything needs to be changed there.

11:21  15         THE COURT:  What's the priority among the three

11:22  16  cases in terms of those windfalls?

11:22  17         MR. SAGEL:  My first answer is I don't know.  I

11:22  18  believe by law it's just by what's ordered.  I don't know

11:22  19  that we can just say we agree obviously on behalf of these

11:22  20  victims here.

11:22  21         THE COURT:  I don't think I can do that.  One, I

11:22  22  don't have Nike in front of me, and I don't have Ms. Daniels

11:22  23  in front of me.

11:22  24         MR. SAGEL:  Right.  That's the problem we see.

11:22  25  Because they are ordered first, maybe they will all be paid

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

11:22   1    simultaneously, but I don't think Your Honor has the ability

11:22   2    to choose the order of restitution for victims.

11:22   3              The digital device condition, I think the record

11:22   4    is clear that between his moving money, hiding money, and

11:22   5    different things, I think it's appropriate even in this

11:22   6    context.

11:22   7              THE COURT:  The significance of his computer and

11:22   8    his firm's computers in this case would in and of itself

11:23   9    suggest that's an appropriate search term.

11:23   10             MR. SAGEL:  I agree, Your Honor.

11:23   11             Unless Your Honor has any other questions, I will

11:23   12   submit at this time.  And we do still believe that a

11:23   13   sentence of 188 months is the appropriate sentence in this

11:23   14   matter, consecutive.

11:23   15             THE COURT:  Do the victims still want to be heard?

11:23   16             MR. SAGEL:  I believe so.

11:23   17             THE COURT:  We will take a ten-minute break.  Then

11:23   18   I will hear from the victims, and then we will hear

11:23   19   Mr. Avenatti's allocution.

11:23   20             (Recess)

11:30   21             THE COURT:  All right, we will hear from the

11:30   22   victims at this time.

11:30   23             Do we have a portable mic?

11:30   24             MR. SAGEL:  I have it here, Your Honor.

11:30   25             THE COURT:  Mr. Johnson, do you want to lead off?

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

|       |    |                                                      |
|-------|----|------------------------------------------------------|
| 11:30 | 1  | MR. JOHNSON:  Yes, Your Honor. |
| 11:30 | 2  | MR. SAGEL:  Just for clarification, I have the |
| 11:30 | 3  | portable microphone for Mr. Johnson and for Ms. Gardner.  Do |
| 11:30 | 4  | you want her to come to the lectern or to use the |
| 11:30 | 5  | microphone? |
| 11:30 | 6  | THE COURT:  I think she should come to the |
| 11:30 | 7  | lectern. |
| 11:30 | 8  | State your name and then proceed. |
| 11:30 | 9  | MR. JOHNSON:  Jeffrey Jefferson. |
| 11:30 | 10 | I'm one of the victims of Michael Avenatti.  While |
| 11:30 | 11 | I previously submitted a written impact statement, I |
| 11:30 | 12 | appreciate the Court giving me an opportunity to make this |
| 11:30 | 13 | verbal statement.  I will keep my remarks brief and try as |
| 11:30 | 14 | much as possible not to duplicate my written statement. |
| 11:31 | 15 | Being here before the Court and facing Michael |
| 11:31 | 16 | Avenatti in person is hard for me.  I'm a pretty private |
| 11:31 | 17 | person, and I hope the Court understands that I am nervous. |
| 11:31 | 18 | I'm especially nervous, because when I testified at the |
| 11:31 | 19 | trial of Michael, he personally cross-examined me and was |
| 11:31 | 20 | very insulting and abusive to me.  For that reason, I almost |
| 11:31 | 21 | didn't agree to be here today, because seeing Michael again |
| 11:31 | 22 | is something I really didn't want to do.  Nevertheless, in |
| 11:31 | 23 | an attempt to get some closure, I would like to address the |
| 11:31 | 24 | Court and also Michael with respect to his sentencing. |
| 11:31 | 25 | I'm also doing this so that the Court and |

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

11:31   1   everybody else can see that I am a real person with real
11:31   2   feelings and that what Michael did has real lifelong
11:31   3   consequences.
11:31   4          This has been a long ordeal for me.  It's hard to
11:32   5   believe that it's been more than 11 years since I first met
11:32   6   Michael Avenatti when he agreed to represent me after I had
11:32   7   become paralyzed while in the custody of L.A. County.  Never
11:32   8   would I ever think that 11 years after that fateful
11:32   9   encounter I would be in court with Mr. Avenatti, but this
11:32  10   time at a hearing to determine his prison sentence for
11:32  11   defrauding me and other clients.
11:32  12          Next to the incident that caused me to become
11:32  13   paralyzed, meeting Michael and then having him steal my
11:32  14   money is the worst thing that has happened to me.  I trusted
11:32  15   Michael with all my heart, and it's difficult for me even
11:32  16   standing here right now to accept that he really did steal
11:33  17   my money from me, a paraplegic who was financially destitute
11:33  18   and then misled me about it for all those years.
11:33  19          The Court may recall in 2017 Michael led me on a
11:33  20   wild goose chase to buy a house with my settlement money
11:33  21   when in reality he had already spent all of my money.  Then
11:33  22   in early 2019 shortly before he was arrested, Michael came
11:33  23   to meet me in person and pressured me to sign a statement
11:33  24   that he had properly represented me and for me to release
11:33  25   all claims against him.

11:33   1          It's impossible for me to understand how someone

11:33   2   as talented as Michael could do what he did.  I did

11:33   3   eventually recover some money from a former law partner of

11:34   4   Michael's within only the last year or so net of the fees

11:34   5   and costs I had to pay my current attorneys.  This is much

11:34   6   less than what I would have received if Michael had simply

11:34   7   paid me my settlement from L.A. County back in 2015 when he

11:34   8   received that money.

11:34   9          But this is about more than money.  After

11:34   10  realizing what Michael has done to me, I'm not sure that I

11:34   11  can ever trust anyone again.  I have a recurring fear that

11:34   12  people will take advantage of me because of my disability.

11:34   13  I continue to have nightmares that people are out to get me.

11:34   14  My view of humanity has certainly changed and not for the

11:34   15  better.

11:34   16          I would like to forgive Michael.  I really would.

11:34   17  At the same time, there are consequences for one's actions,

11:35   18  and Michael should face the fair consequences for his acts

11:35   19  against me and the other people he has victimized.  Michael

11:35   20  Avenatti really broke me.  Attorneys such as Michael who

11:35   21  often have control over what amounts to their clients' life

11:35   22  savings should be deterred from doing anything remotely like

11:35   23  what he did to me.  It will be some measure of justice that

11:35   24  Michael will not be a position to do this to anyone else for

11:35   25  a very, very Long time.

11:35   1          For those reasons and as elaborated in my written

11:35   2   statement, I respectfully request that the Court sentence

11:35   3   Michael Avenatti as recommended by the government.  I

11:35   4   sincerely thank the Court for its consideration.

11:36   5          THE COURT:  Thank you.

11:36   6          Ms. Gardner, would you state your name for the

11:36   7   record, please.

11:36   8          MS. GARDNER:  Good morning.  My name is Alexis

11:36   9   Gardner.  I'm a victim of fraud and embezzlement of my

11:36   10  client funds by my former attorney Michael Avenatti.

11:36   11         In meeting Michael, I sought to amicably settle a

11:36   12  financial interest that would affect the course of my life

11:36   13  as a student, as an entrepreneur, and as a young adult

11:36   14  seeking to transition out of adversity and into adulthood.

11:36   15  I now recognize through the court proceedings, through this

11:37   16  experience, that the person that I met and perceived to be

11:37   17  honorable and forthright was taking full advantage of me

11:37   18  from the moment that he met me.

11:37   19         Even in listening today and finding out that he

11:37   20  was three months behind to pay for this jet, that meant that

11:37   21  the moment he met me, within a month of the litigation he

11:37   22  did for me, he had full intention to take from me.  I feel

11:37   23  that my lack of education at the time was taken advantage

11:37   24  of.  I feel my lack of resources and also my perspective of

11:37   25  life in seeking to survive and seeking to thrive.  In my

11:37  1    five-year experience of knowing Michael, trusting Michael,
11:37  2    receiving counsel from Michael and having faith in his words
11:37  3    that he was honorable, it brings me great disdain to stand
11:38  4    before him today as a federal witness in a trial conducted
11:38  5    to convict the fraudulent misconduct, theft, embezzlement
11:38  6    and shame of a person that reassured me even more than my
11:38  7    friends and closest family members.
11:38  8          I constantly recollect on this quote that Michael
11:38  9    said about being the David going against Goliath and in
11:38  10   realizing it's like he was the Goliath.  He was the person
11:38  11   that was stepping on all the small people that were in a
11:38  12   sense hurting, that were poor, that were sick, that were
11:39  13   disabled, that were trying to better their lives.  He took
11:39  14   full advantage of his education from a prestigious
11:39  15   institution, from his resources, from the law, from every
11:39  16   experience he has had, and made a choice to do wrong by
11:39  17   these people.
11:39  18         Like I look at him today and I wonder how do you
11:39  19   look at me as a person and in the rut that I was in, the
11:39  20   deep hole that life had put me in, and think about flying a
11:39  21   in a jet with a couple seats?  How do you look at
11:39  22   Mr. Johnson in the same dynamic and Ms. Phan?
11:39  23         I have had anxiety.  I have dealt with fear that
11:40  24   people are following me.  After this case, I will have to
11:40  25   take on several civil cases to still try to recover funds

11:40  1    that were stolen from me from Mr. Avenatti, which brings me
11:40  2    fear of people that I don't even know.  I could walk past
11:40  3    these people on the street.  They want something from me
11:40  4    based on Michael, and I don't even know these people.
11:40  5           I've dealt with grief.  I have had nightmares.  I
11:40  6    have lost sleep.  My weight fluctuates.  I feel unsafe.  I
11:40  7    feel stalked.  And this is all because of someone that I
11:40  8    chose to trust.  It's constantly troubling.  It's constantly
11:40  9    depressing.  It constantly reminds me of the assault of my
11:40  10   trust so deeply that I fear kindness.  I fear people being
11:40  11   kind to me.  I don't know if it's real.  I don't know if I
11:41  12   can trust people down to my family.
11:41  13          And Michael reassured me for years.  You could
11:41  14   have never told me in meeting Michael Avenatti in a pressed
11:41  15   suit that five years later I would be standing in front of
11:41  16   him in his current attire.
11:41  17          I'm here as a witness to elaborate that we are
11:41  18   under unprecedented assault and attack by a psychotic con
11:41  19   man who fights only for himself by degrading the adversity
11:41  20   of the vulnerable, powerless, ambitious and suffering.  He
11:41  21   uses tactics of force, threat, manipulation, blackmail,
11:41  22   fraud, and deception that we know of ultimately taking
11:42  23   advantage of his victims, the legal system, the New York and
11:42  24   California Bar Association, the educational institution of
11:42  25   George Washington University, national news outlets, his

11:42   1   thousands of followers, his family, the court system, his
11:42   2   colleagues, and major corporations.  For what?  Fame?
11:42   3   Social gain?  Ambition?  In a world where I needed
11:42   4   protection, Michael chose to go this path, and it was
11:42   5   created on a trail of dishonesty and false credibility.
11:42   6           Additionally, by choosing to represent himself in
11:42   7   trial rather than seeking to make amends, or right his
11:42   8   wrongs, or put his clients at ease, he chose to allow us to
11:42   9   take the stand and interrogate us, to insult us, to add
11:42   10  insult to injury by turning the knife that he had already
11:43   11  wedged deep in our backs.
11:43   12          Michael used the direct act of signing my
11:43   13  agreement to accept his counsel, to accept his trust, to
11:43   14  immediately purchase an aircraft in his own interests.  My
11:43   15  adversity help him fly privately.  And in his own defense,
11:43   16  he chose tactics before the court to discredit my education,
11:43   17  my discernment, my character, my choices, my inadequacies,
11:43   18  my flaws, my pain, my regrets, and my hope.  He did all this
11:43   19  to protect himself, to make a fool of me.  He used
11:43   20  everything he knew about me and attempted to squeeze any
11:43   21  light I had remaining for personal gain.
11:43   22          Michael admitted guilt to his crimes and even
11:43   23  issued an impersonal blanket statement of apology in return.
11:43   24  He didn't even take the time to individually address us for
11:44   25  the things he had done to us, but what remains is his

11:44  1   choices.  Even today he stood before the Court and said that
11:44  2   he discredited California law.  He discredited the system.
11:44  3        I give true credit to the people that I think from
11:44  4   day one throughout this case, throughout this process, that
11:44  5   are representations of the people that when you seek true
11:44  6   help from someone, to see these faces still sitting here,
11:44  7   and from day one just the dynamic of helping someone like me
11:44  8   who had never been to court -- I never even had a speeding
11:44  9   ticket.  I had never been to court.  This is the highest
11:44  10  level of court you can pretty much go to in my opinion, and
11:45  11  I am grateful for the people that fought the good fight.
11:45  12        I stand here today before people who have known
11:45  13  Michael for years, for many years.  But in that same
11:45  14  retrospect, these are people that I am sure have eaten fancy
11:45  15  dinners with Michael, have ridden in a fancy car, have been
11:45  16  to his nice apartment that he had invited me to to have a
11:45  17  meeting with my mother and myself.  Everyone has become a
11:45  18  witness to this criminal and this crime.
11:45  19        You asked him today if he was a danger to society.
11:45  20  He said I don't know.  I know that I am not a danger to
11:45  21  society.  I know that.  I have to know that.  When I walk
11:45  22  outside, I know that I am not going to bring harm to the
11:45  23  people around me.  And I think that any person that can
11:45  24  legally vote, that can stand before you today, should be
11:46  25  able to say that I know that I am not a danger to those that

11:46  1    are around me.  That is the greatest responsibility in my

11:46  2    opinion of what the court system is.  It is to make sure

11:46  3    that criminals do not have a further opportunity to commit

11:46  4    crime and bring harm to people.

11:46  5           I am grateful for everyone's time today.  I'm

11:46  6    grateful for the tears you have watched me cry throughout

11:46  7    this journey and to be here today and to know that for a

11:46  8    very long time I don't have to worry about Michael Avenatti

11:46  9    bringing disruption or harm to my life and the lives of

11:46  10   innocent people that are just trying to live a better life.

11:46  11          Thank you.

11:46  12          THE COURT:  Thank you.

11:46  13          Mr. Avenatti.

11:47  14          MR. AVENATTI:  Your Honor, I'm deeply sorry and

11:47  15   remorseful for my criminal conduct.  I caused harm and

11:47  16   damage to four individuals who relied on me, needed me, and

11:47  17   who were not only my clients but my friends.  I cared about

11:47  18   them, helped them, and fiercely advocated for them, and yet

11:47  19   inexplicably I later took from them.  I will not stand here

11:47  20   and attempt to offer any excuses for my misconduct because

11:48  21   there are none.

11:48  22          My conduct has brought shame upon my family, my

11:48  23   friends, and my profession, a profession that I have loved

11:48  24   and valued for decades.  I will never have the privilege of

11:48  25   appearing as an advocate in a courtroom like this before a

11:48    1    judge like Your Honor.  I threw that privilege and my career
11:48    2    away, Your Honor.  And for all of this, there is no doubt
11:48    3    that I deserve punishment and to lose my freedom.
11:48    4          I have learned and continue to learn every day as
11:48    5    I sit in prison my lesson.  The events of the last four
11:48    6    years, including my incarceration, have deterred me from
11:49    7    ever committing any crimes in the future.  My lesson has
11:49    8    been costly but well deserved.
11:49    9          What I respectfully ask, Your Honor, is that in
11:49   10    imposing your sentence, you provide me with another chance
11:49   11    at life, another chance to do good for others, make a
11:49   12    positive difference in our society, and do right by the
11:49   13    people I have harmed, including Mr. Johnson and Ms. Gardner.
11:49   14          I ask that you allow me another chance to be a
11:49   15    father to my daughters and my young son who is eight and
11:50   16    deserves a father, another chance to be a friend, to be
11:50   17    someone who can help others, to be someone who can leave the
11:50   18    world a slightly better place than when he was born into it.
11:50   19          The total combined sentence of 14 or more years at
11:50   20    my age, Your Honor, will not give me any meaningful chance
11:50   21    at any of those things.  My history and past contributions
11:51   22    to society evidence the good I'm capable of if given that
11:51   23    chance and the human being I am at my core.
11:51   24          I'm not an evil or vile man.  Over the last 51
11:51   25    years I have had the privilege of helping thousands of

| | |
|---|---|
| 11:51 | 1 |
| 11:51 | 2 |
| 11:51 | 3 |
| 11:51 | 4 |
| 11:52 | 5 |

clients from all walks of life.  My work saved lives and families.  I helped many who needed the help the very most.

I ask that the Court consider the letters of support that have been filed and all of the good work I did across two decades.  As those letters and as some of the exhibits that I submitted show, I took on many clients and causes that no one else would touch.  Oftentimes, I accepted no fee.  Those causes included representing thousands of Jewish families whose loved ones had been dug up and scattered in a mass grave in Los Angeles, some of whose family members were Holocaust victims.  I was able to obtain a settlement valued at $85 million to provide them some peace.

I represented thousands of doctors and nurses who had been sold defective personal protective equipment that placed their lives at risk.  Because of my work in that case, tens of thousands of defective surgical gowns were removed from the national stockpile of the United States in the year 2017.  That work saved lives in light of the subsequent COVID-19 pandemic.  My work in that case also led to the Department of Justice obtaining a $20 million criminal fine within the last 12 months against the manufacturer of those gowns.

I represented thousands of investors who were victimized by a $200 million PONSI scheme.  I recovered

11:53  1   millions of dollars for those clients so they would not lose

11:53  2   everything and be destitute.

11:53  3          I filed a supplement with Your Honor relating to

11:53  4   other work that I have done under seal.  I hope the Court

11:54  5   had an opportunity to review that prior to today.

11:54  6          I represented a 21-year-old young woman who was

11:54  7   raped by a hotel employee while celebrating her mother's

11:54  8   birthday in Palm Springs.  I did that while I was out on

11:54  9   bail in this case.  My work allowed her to move on with her

11:54  10  life.

11:54  11         I represented a Guatemalan family who witnessed

11:54  12  and heard 12 family members burn to death in a passenger van

11:54  13  after it went off a rode in Arizona, had it's fuel tank

11:54  14  rupture and burst into flames.

11:54  15         I reunited over 70 children with their families

11:54  16  after they were stripped from their parents at the southern

11:54  17  border.  This included a young boy by the name of Anthony, a

11:55  18  10 year old, who I personally was able to get released to my

11:55  19  custody by agreeing to personally fly him back to Guatemala.

11:55  20  I believe you have a letter from his mother.

11:55  21         There are literally hundreds of other clients that

11:55  22  I helped across the two decades that I had the privilege of

11:55  23  calling myself a lawyer, and I was fortunate enough to

11:55  24  receive awards and a lot recognition for my work and

11:55  25  dedication.

| | |
|---|---|
| 11:55 | 1 |
| 11:55 | 2 |
| 11:55 | 3 |
| 11:55 | 4 |
| 11:56 | 5 |

11:55  1          Again, Your Honor, please know that I do not offer
11:55  2   these examples in any way, shape, or form to explain away my
11:55  3   misconduct here because it cannot be explained away.  I'm
11:55  4   merely offering them to show that I am not an evil or vile
11:56  5   man at my core.  I'm not a man who has lived a life of
11:56  6   criminality or a man who has not contributed to society in
11:56  7   helping others.  I offer those examples to show that I have
11:56  8   the capability and will to take advantage of another
11:56  9   opportunity if only the Court gives me that opportunity.
11:56  10  The 19 letters of support that I referenced further evidence
11:56  11  who I'm as a person, the good I have done and the good that
11:56  12  I could do if given a chance.
11:56  13         To quote Judge Rakoff, your colleague from the
11:57  14  Southern District of New York:  "If ever a man is to receive
11:57  15  credit for the good he has done and his immediate misconduct
11:57  16  assessed in the context of his overall life hither to, it
11:57  17  should be at the moment of the sentencing when his very
11:57  18  future hangs in the balance."
11:57  19         I respectfully ask the Court to allow me a future
11:57  20  and another chance.  I plead for the mercy of the Court,
11:57  21  Your Honor.
11:57  22         Thank you.
11:57  23         THE COURT:  Thank you.
11:57  24         Mr. Avenatti, have you reviewed the presentence
11:57  25  report and revised presentence report?

| | | |
|---|---|---|
| 11:57 | 1 | MR. AVENATTI:  Yes, Your Honor. |
| 11:57 | 2 | THE COURT:  And have you had an opportunity to |
| 11:58 | 3 | discuss that with your advisory counsel? |
| 11:58 | 4 | MR. AVENATTI:  Yes, sir. |
| 11:58 | 5 | THE COURT:  And have you reviewed the draft |
| 11:58 | 6 | sentencing memorandum that was distributed on Friday? |
| 11:58 | 7 | MR. AVENATTI:  The tentative, yes, Your Honor. |
| 11:58 | 8 | THE COURT:  Right. |
| 11:58 | 9 | MR. AVENATTI:  Yes. |
| 11:58 | 10 | THE COURT:  Have you discussed that with your |
| 11:58 | 11 | advisory counsel as well? |
| 11:58 | 12 | MR. AVENATTI:  Yes, Your Honor. |
| 11:58 | 13 | THE COURT:  I want to put in the public record in |
| 11:58 | 14 | the public context my final comments in the draft sentencing |
| 11:58 | 15 | memorandum.  As is the case with most human beings, there is |
| 11:58 | 16 | the ability to do great good on an individual level or even |
| 11:58 | 17 | a national or global scale, but there is also the ability to |
| 11:58 | 18 | do great evil through willfully inflicting great harm on |
| 11:58 | 19 | others through greed, arrogance, lying, uncaring, uncaring |
| 11:58 | 20 | dealing with others and blindsightedness. |
| 11:58 | 21 | As noted above, Avenatti has done many noble and |
| 11:58 | 22 | good things in his life, some reflected in this case, but he |
| 11:59 | 23 | has also done great evil for which he must answer.  His |
| 11:59 | 24 | actions in this case and in the relevant conduct show an |
| 11:59 | 25 | abandonment with some of the most basic principles of |

11:59   1   fairness.  It is all the more tragic where he received a

11:59   2   fine education and achieved academic excellence, was

11:59   3   presented with challenging opportunities at major law firms,

11:59   4   and had the opportunity to build a series of his own

11:59   5   successful firms.  It is now time to pay his debts to the

11:59   6   victims, the government, and to society.

11:59   7           Sir, if you rise, I will sentence you.

11:59   8           It is ordered that the defendant shall pay to the

11:59   9   United States a special assessment of $500, which is due

11:59   10  immediately.  Any unpaid balance shall be due during the

11:59   11  period of imprisonment, at the rate of not less than $25 per

11:59   12  quarter, and pursuant to the Bureau of Prisons' Inmate

11:59   13  Financial Responsibility Program.

12:00   14          It is ordered that the defendant shall pay

12:00   15  restitution pursuant to 18 USC Section 3663A as follows:

12:00   16          Victims:

12:00   17          Geoffrey Johnson $1,572,109

12:00   18          Michael Eagan $671,750.

12:00   19          Alexis Gardner $1,432,585.

12:00   20          Gregory Barela $598,887

12:00   21          Michelle Phan $4 million.

12:00   22          Restitution shall be due during the period of

12:00   23  imprisonment, at the rate of not less than $25 per quarter,

12:00   24  and pursuant to the Bureau of Prisons' Inmate Financial

12:01   25  Responsibility Program.  If any amount of restitution

1  remains unpaid after release from custody, nominal monthly
2  payments of at least ten percent of defendant's gross
3  monthly income but not less than $50, whichever is greater,
4  shall be made during the period of supervised release and
5  shall begin 30 days after the commencement of supervision.
6  Nominal restitution payments are ordered as the Court finds
7  that the defendant's economic circumstances do not allow for
8  either immediate or future payment of the amount ordered.
9          If the defendant makes a partial payment, each
10 payee shall receive approximately proportional payment
11 unless another priority or percentage payment is specified
12 in the judgment.  Pursuant to 18 USC Section 3664(j)(1),
13 Michael Q. Eagan shall begin receiving payment only after
14 victims Geoffrey Johnson, Alexis Gardner, Gregory Barela,
15 and Michelle Phan have been fully compensated for their
16 losses.
17         Pursuant to 18 USC Section 3612(f)(3)(A), interest
18 on the restitution ordered is waived because the defendant
19 does not the ability to pay interest.  Payments may be
20 subject to penalties for default and delinquency pursuant to
21 18 USC Section 3612(g).
22         The defendant shall comply with Second Amended
23 General Order 20-04.
24         Pursuant to guideline 5E1.2(a), all fines are
25 waived as the Court finds that the defendant has established

12:02  1    that he is unable to pay and is not likely to become able to

12:02  2    pay any fine.

12:02  3           The Court has found that the property identified

12:02  4    in the preliminary order of forfeiture is subject to

12:02  5    forfeiture.   The preliminary order is incorporated by

12:02  6    reference into this judgment and is final.

12:03  7           Pursuant to the Sentencing Reform Act of 1984, it

12:03  8    is the judgment of the Court that the defendant, Michael

12:03  9    John Avenatti, is hereby committed on Counts 5, 8 through

12:03  10   10, and 19 of the Indictment to the custody of the Bureau of

12:03  11   Prisons for a term of 168 months.   This term shall consist

12:03  12   of 168 months on each of Counts 5 and 8 through 10 of the

12:03  13   Indictment and 36 months on Count 19, all to be served

12:03  14   concurrently as to one another.

12:03  15          The foregoing term shall be served consecutively

12:03  16   to the undischarged terms of imprisonment imposed in United

12:03  17   States District Court, Southern District of New York, Docket

12:03  18   Nos. 1:19-CR-00373-PGG and 1:19-CR-0374-JMF.

12:03  19          The Court recommends that the Bureau of Prisons

12:04  20   conduct a mental health evaluation of the defendant and

12:04  21   provide all necessary treatment.   Further, the Court

12:04  22   recommends that the Bureau of Prisons evaluate Avenatti's

12:04  23   eligibility for the 500-hour Residential Drug Abuse Program.

12:04  24   I make that recommendation knowing that he is already in the

12:04  25   program.   In case there is any change of circumstance, my

12:04   1   recommendation would be of record.

12:04   2           Upon release from imprisonment, the defendant

12:04   3   shall be placed on supervised release for a term of three

12:04   4   years.  The term consists of three years on each of Counts 5

12:04   5   and 8 through 10 and one year on Count 19 of the Indictment,

12:04   6   all such terms to run concurrently under the following terms

12:04   7   and conditions:

12:04   8           1.  The defendant shall comply with the rules and

12:04   9   regulations of the United States Probation & Pretrial

12:04  10   Services Office and Second Amended General Order 20-04,

12:04  11   including the conditions of probation and supervised release

12:05  12   set forth in Section III of Second Amended General Order

12:05  13   20-04.

12:05  14           2.  The defendant shall refrain from any unlawful

12:05  15   use of a controlled substance.  The defendant shall submit

12:05  16   to one drug test within 15 days of release from custody and

12:05  17   at least two periodic drug tests thereafter, not to exceed

12:05  18   eight tests per month, as directed by the probation officer.

12:05  19           3.  During the period of community supervision,

12:05  20   the defendant shall pay the special assessment and

12:05  21   restitution in accordance with this judgment's orders

12:05  22   pertaining to such payment.

12:05  23           4.  The defendant shall truthfully and timely file

12:05  24   and pay taxes during the period of community supervision.

12:05  25   Further, the defendant shall show proof to the probation

12:05  1    officer of compliance with this order.

12:05  2          5.   The defendant shall provide the probation

12:05  3    officer with access to any and all business records, client

12:05  4    lists, and other records pertaining to the operation of any

12:06  5    business owned, in whole or in part, by the defendant as

12:06  6    directed by the probation officer.

12:06  7          6.   The defendant shall report this conviction to

12:06  8    the State Bar of California, and to any other state in which

12:06  9    the defendant has been licensed as an attorney, and

12:06  10   thereafter comply with any orders, including any employment

12:06  11   or business restrictions.  Further, the defendant shall show

12:06  12   proof to the probation officer of compliance with this

12:06  13   order.

12:06  14         7.   The defendant shall cooperate in the

12:06  15   collection of a DNA sample from the defendant.

12:06  16         8.   The defendant shall apply all monies received

12:06  17   from income tax refunds, lottery winnings, inheritance,

12:06  18   judgments, and any other financial gains to the

12:06  19   Court-ordered financial obligation.

12:06  20         9.   The defendant shall submit the defendant's

12:06  21   person, property, house, residence, vehicle, papers,

12:07  22   computers, cell phones, other electronic communications or

12:07  23   data storage devices or media, e-mail accounts, social media

12:07  24   accounts, cloud storage accounts, or other areas under the

12:07  25   defendant's control, to a search conducted by a United

12:07  1  States probation officer or law enforcement officer.

12:07  2  Failure to submit to search may be grounds for revocation.

12:07  3  The defendant shall warn any other occupants that the

12:07  4  premises may be subject to searches pursuant to this

12:07  5  condition.  Any search pursuant to this condition will be

12:07  6  conducted at a reasonable time and in a reasonable manner

12:07  7  upon reasonable suspicion that the defendant has violated a

12:07  8  condition of his supervision and that the areas to be

12:07  9  searched contain evidence of this violation.

12:07  10       10.  The defendant shall participate in mental

12:07  11  health treatment, which may include evaluation and

12:07  12  counseling, until discharged from the program by the

12:08  13  treatment provider with the approval of the probation

12:08  14  officer.

12:08  15       11.  As directed, defendant is ordered to pursue

12:08  16  treatment with the aftercare contractors during the period

12:08  17  of community supervision.  The defendant shall provide

12:08  18  payment and proof of payment as directed by the probation

12:08  19  officer.  If the defendant has no ability to pay, no payment

12:08  20  shall be required by the probation officer.  The defendant

12:09  21  shall pay all or part of the costs of the Court-ordered

12:09  22  treatment to the aftercare contractors during the period of

12:09  23  community supervision.  The defendant shall provide payment

12:09  24  and proof of payment as directed by the probation officer.

12:09  25  If the defendant has no ability to pay, no payment shall be

12:09   1    required.

12:09   2            12.   Pursuant to USSG Section 5E1.1(a)(2), the

12:09   3    defendant shall pay restitution in the total amount of

12:09   4    $3,207,144.   The amount of restitution shall be paid as

12:09   5    follows:   Internal Revenue Service, Attn:   MPU, Stop 151,

12:09   6    Restitution, 4800 Buford Highway, Chamblee, GA   30341.

12:10   7    Restitution shall be paid in full immediately.   The Court

12:10   8    finds from a consideration of the record that the

12:10   9    defendant's economic circumstances -- I'm going to delete

12:10   10   paragraph 12 in its entirety.   I think the obligation to pay

12:10   11   restitution is otherwise obvious.

12:10   12           The Court authorizes the Probation & Pretrial

12:10   13   Services Office to disclose the presentence report to the

12:10   14   substance abuse treatment provider to facilitate the

12:10   15   defendant's treatment for narcotic addiction or drug

12:10   16   dependency.   Further redisclosure of the presentence report

12:10   17   by the treatment provider is prohibited without the consent

12:10   18   of the sentencing judge.

12:10   19           The Court authorizes the probation officer to

12:10   20   disclose the presentence report and any previous mental

12:10   21   health evaluations or reports to the treatment provider.

12:11   22   The treatment provider may provide information (excluding

12:11   23   the presentence report) to State or local social service

12:11   24   agencies (such as the State of California, Department of

12:11   25   Social Services) for the purpose of the client's

```
12:11    1    rehabilitation.
12:11    2              Sir, you have a remaining right of appeal.  If you
12:11    3    wish to appeal the sentence imposed today, you have 14 days
12:11    4    within which to file a written Notice of Appeal.
12:11    5              Does the government have a motion at this point?
12:11    6              MR. SAGEL:  We do, Your Honor, but I also have a
12:11    7    couple of things to clarify from your sentence.
12:11    8              THE COURT:  Okay.
12:11    9              MR. SAGEL:  First, you mentioned the restitution
12:11   10    for Mr. Johnson.  The number you initially read is correct
12:11   11    for the full restitution.  Then you ordered a portion to
12:11   12    Michael Eagan but didn't reduce the amount for Mr. Johnson,
12:11   13    so $900,342 would be due to Mr. Johnson.
12:11   14              THE COURT:  Okay.  Let me make that correction,
12:11   15    restitution to Mr. Geoffrey Johnson in the amount of
12:12   16    $900,342.
12:12   17              MR. SAGEL:  With regard to Condition 12, you said
12:12   18    you were going to strike that.  Unfortunately, his
12:12   19    restitution on his Count 19 tax can only be applied as a
12:12   20    condition of release, so Your Honor would need to impose
12:12   21    Condition 12.
12:12   22              THE COURT:  Okay.  I'm not going to impose an
12:12   23    obligation to pay immediately on him.
12:12   24              MR. SAGEL:  I agree.  I see what Your Honor is
12:12   25    saying.  I think inserting the word -- the Court finds from
```

| | | |
|---|---|---|
| 12:12 | 1 | consideration of the record that defendant's economic |
| 12:12 | 2 | circumstances do not allow for full -- there should be a do |
| 12:12 | 3 | not instead of -- |
| 12:12 | 4 | THE COURT:  I read that.  If I didn't, the record |
| 12:12 | 5 | will catch it. |
| 12:12 | 6 | As far as Condition 12 goes, pursuant to USSG |
| 12:12 | 7 | Section 5E1.1(a)(2), the defendant shall pay restitution in |
| 12:13 | 8 | the total amount of $3,207,144.  The amount of restitution |
| 12:13 | 9 | shall be paid as follows:  Internal Revenue Service:  Attn: |
| 12:13 | 10 | MPU, Stop 151, Restitution, 4800 Buford Highway, Chamblee, |
| 12:13 | 11 | Georgia  30341. |
| 12:13 | 12 | MR. SAGEL:  And if Your Honor wants to put on the |
| 12:13 | 13 | record similarly that this restitution should be paid after |
| 12:13 | 14 | the individual victims of the wire fraud offense. |
| 12:13 | 15 | THE COURT:  Right.  Restitution to the government |
| 12:13 | 16 | shall be paid only after victims Johnson, Eagan, Gardner, |
| 12:13 | 17 | Barela, and Phan, are paid their due restitution. |
| 12:13 | 18 | MR. SAGEL:  Just a quick housekeeping matter, I'm |
| 12:13 | 19 | assuming Your Honor is adopting your findings in your |
| 12:13 | 20 | tentative. |
| 12:13 | 21 | THE COURT:  I will issue it, yes.  I mean, I have |
| 12:14 | 22 | to go back and clean up a few things, but that's going to be |
| 12:14 | 23 | my formal findings. |
| 12:14 | 24 | MR. SAGEL:  At this time, Your Honor, the |
| 12:14 | 25 | government will move to dismiss Counts 1 through 4, 6 |

| | | |
|---|---|---|
| 12:14 | 1 | through 7, 11 through 18, and 20 through 36. |
| 12:14 | 2 | THE COURT:  All remaining counts as to |
| 12:14 | 3 | Mr. Avenatti will be dismissed at this time. |
| 12:14 | 4 | MR. SAGEL:  And I will ask that Your Honor deny |
| 12:14 | 5 | all outstanding motions as moot at this time. |
| 12:14 | 6 | THE COURT:  All outstanding motions are denied, |
| 12:14 | 7 | including specifically the further request for an |
| 12:14 | 8 | evidentiary hearing. |
| 12:14 | 9 | MR. SAGEL:  At this time, the government has |
| 12:14 | 10 | nothing further. |
| 12:14 | 11 | THE COURT:  Mr. Avenatti. |
| 12:14 | 12 | MR. AVENATTI:  Thank you, Your Honor.  I have just |
| 12:14 | 13 | a few things.  First of all, in order to preserve the |
| 12:14 | 14 | record, I object to the revised restitution amount.  I think |
| 12:14 | 15 | it's pretty clear that I have already said what I needed to |
| 12:15 | 16 | say on restitution.  I just wanted the record to be clear |
| 12:15 | 17 | that I object to the revised restitution amount as adopted |
| 12:15 | 18 | by the Court in response to Mr. Sagel's comments. |
| 12:15 | 19 | Number two, I understand Your Honor is going to |
| 12:15 | 20 | issue a final order, but the offense level is still 37, |
| 12:15 | 21 | correct? |
| 12:15 | 22 | THE COURT:  The offense level is 37.  I'm going to |
| 12:15 | 23 | vary by four to get to 168. |
| 12:15 | 24 | MR. AVENATTI:  Furthermore, I would ask that the |
| 12:15 | 25 | judgment and commitment order recommend designation to the |

| | | |
|---|---|---|
| 12:15 | 1 | Federal Prison Camp at Lompoc, California, so I can be near |
| 12:15 | 2 | my family, please. |
| 12:15 | 3 | THE COURT:  I will happy to do that.  I will make |
| 12:15 | 4 | the recommendation.  It all depends on the availability of |
| 12:15 | 5 | space and how you are classified, but I will make that |
| 12:15 | 6 | recommendation. |
| 12:15 | 7 | MR. AVENATTI:  Your Honor, I would also request |
| 12:15 | 8 | that the Court order within 30 days the government return |
| 12:15 | 9 | any and all personal items seized from me, from my person, |
| 12:16 | 10 | from my residence, in connection with this case and that |
| 12:16 | 11 | those items be returned to Mr. Steward. |
| 12:16 | 12 | THE COURT:  What is the government's view?  Do you |
| 12:16 | 13 | need those materials for an appeal? |
| 12:16 | 14 | MR. SAGEL:  Protocol is usually -- I will have to |
| 12:16 | 15 | see what items we have that may fall within that request, |
| 12:16 | 16 | but generally we keep all items for one year after all |
| 12:16 | 17 | appeals are final.  If there is something that is absolutely |
| 12:16 | 18 | outside the scope of what is relevant to this case, we can |
| 12:16 | 19 | go through that and return that. |
| 12:16 | 20 | MR. AVENATTI:  One last question. When you |
| 12:16 | 21 | remanded me to custody, you ordered my bond discharged. |
| 12:16 | 22 | THE COURT:  Right. |
| 12:16 | 23 | MR. AVENATTI:  I believe that Pretrial Services |
| 12:16 | 24 | still has both of my passports.  I would like those returned |
| 12:16 | 25 | within 30 days to Mr. Stewart, please. |

```
12:16    1              THE COURT:  I will direct that the passports be
12:17    2    returned, and I thought there was a reconveyance that had
12:17    3    been issued.
12:17    4              MR. AVENATTI:  There was, and I appreciate that.
12:17    5    That has been taken care of.  I was just noting the fact
12:17    6    that the bond had been discharged.
12:17    7              THE COURT:  Right.
12:17    8              Okay, anything else for today?
12:17    9              MR. SAGEL:  Nothing from the government.
12:17   10              THE COURT:  Okay.  Thank you.
12:17   11              (Whereupon, the proceedings were concluded.)
12:17   12                          *    *    *
12:21   13
12:21   14
12:21   15
12:21   16
12:21   17
12:21   18
12:21   19
12:21   20
12:21   21
12:21   22
12:21   23
12:21   24
12:21   25
```

**CERTIFICATE**

I hereby certify that pursuant to Section 753, Title 28, United States Code, the foregoing is a true and correct transcript of the stenographically reported proceedings held in the above-entitled matter and that the transcript page format is in conformance with the regulations of the Judicial Conference of the United States.

Date:  January 31, 2023

/s/   Sharon A. Seffens  1/31/23
_____
SHARON A. SEFFENS, U.S. COURT REPORTER