CUAUHTEMOC ORTEGA (Bar No. 257443)
Federal Public Defender
MARGARET A. FARRAND (Bar No. 235295)
(E-Mail: Margaret_Farrand@fd.org)
Deputy Federal Public Defender
321 East 2nd Street
Los Angeles, California 90012-4202
Telephone: (213) 894-2854
Facsimile: (213) 894-0081

Attorneys for Defendant
MICHAEL J. AVENATTI

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

## WESTERN DIVISION

UNITED STATES OF AMERICA,

Plaintiff,

v.

MICHAEL J. AVENATTI,

Defendant.

Case No. 19-CR-61-JVS

**MOTION TO STAY RESTITUTION PURSUANT TO FEDERAL RULE OF CRIMINAL PROCEDURE 38(e) OR, IN THE ALTERNATIVE, STAY DISBURSEMENT OF FUNDS FROM THE COURT'S REGISTRY, PENDING APPEAL; [PROPOSED] ORDER**

**Hearing Date: March 13, 2023**
**Hearing Time: 9:00 a.m.**
**Hearing Location: 411 West Fourth Street, Santa Ana, CA, Courtroom 10C**

Defendant Michael J. Avenatti, by and through his counsel of record, Deputy Federal Public Defender Margaret A. Farrand, respectfully moves to stay this Court's restitution judgment pending appeal. In the alternative, he moves to stay—also pending resolution of the appeal—disbursement of restitution funds from the Court's registry. This request is made pursuant to Rule 38(e)(1) of the Federal Rules of Criminal Procedure and for good cause shown. It is based on the attached motion, all pleadings submitted to the Court in this action, and any other material the Court may choose to consider. The government opposes this motion. When asked for its position, government counsel stated, "As it relates to our *ex parte* application, the motion may be moot.  As it relates to enforcing the restitution order in whole, we will oppose the motion because the victims should not suffer any further delays in receiving any restitution and defendant has not identified any reason or basis that would prejudice defendant for the Court to use its discretion to stay the restitution order."

Respectfully submitted,

CUAUHTEMOC ORTEGA
Federal Public Defender

DATED:  February 9, 2023           By  */s/ Margaret A. Farrand*

MARGARET A. FARRAND
Deputy Federal Public Defender

Attorney for MICHAEL J. AVENATTI

ii

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.     INTRODUCTION

Michael Avenatti misappropriated settlement payments due to four of his clients. But all parties agree that at least some of those victims' actual losses were not equal to the misappropriated amounts. In fixing the amount of restitution at sentencing, this Court rightly recognized that the amount of misappropriated settlement payments must be offset by certain countervailing sums: Avenatti's agreed-on contingency fees, the costs and expenses he incurred in handling the clients' cases, and—in some cases— payments Avenatti made to the victims to assist with their living and other expenses before the misappropriation was discovered. The precise amount of the restitution due, and the appropriate amount of offsets, was vigorously contested through sentencing, and this Court's ultimate restitution order of $7,603,564.00 will likely continue to be contested on appeal. Because significant issues remain to be litigated on appeal regarding the propriety of the restitution amount—and to avoid millions of dollars being prematurely distributed or lost—Mr. Avenatti moves for this Court to stay its restitution award pending appeal pursuant to Federal Rule of Criminal Procedure 38(e)(1). In the alternative, he asks that this Court stay until conclusion of the appeal disbursement of restitution amounts from the court's registry or clerk's office.[1]

## II.    PROCEDURAL HISTORY

On June 16, 2022, Mr. Avenatti pled guilty to four counts of wire fraud (18 U.S.C. § 1343), as alleged in counts 5, 8,  9, and 10 of the Indictment, and one count of endeavoring to obstruct the administration of the Internal Revenue Service (26 U.S.C. § 7212(a)) as alleged in count 19 of the Indictment. (Docket Nos. 16, 955.) On December 5, 2022, the Court sentenced Mr. Avenatti to 168 months' imprisonment, consecutive to

---

[1] The government has filed an ex parte application to disburse $1.5 million from the IRS to victim Michelle Phan. (Docket 1987.) Mr. Avenatti opposes that ex parte application as an inappropriate subject of ex parte relief (as opposed to a noticed motion), as well as premature and improper, given that the restitution amount has not been decided on appeal. He will file a separate opposition.

1

undischarged terms of imprisonment in separate cases adjudicated in New York, followed by three years of supervised release, and to pay a total of $7,603,564.00 in restitution.[2] (Docket Nos. 1053, 1060 (Amended Judgment).) Mr. Avenatti timely appealed. (Docket Nos. 1061 (Notice of Appeal), 1063 (Amended Notice of Appeal).)

### III.   LEGAL STANDARD

Rule 38(e)(1) of the Federal Rules of Criminal Procedure states that "[i]f the defendant appeals, the district court, or the court of appeals under Federal Rule of Appellate Procedure 8, may stay—on any terms considered appropriate—any sentence providing for restitution under 18 U.S.C. § 3556 or notice under 18 U.S.C. § 3555."

Courts considering whether to stay orders of restitution have applied the multi-factor test from *Hilton v. Braunskill*, 481 U.S. 770, 776 (1987): "(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies." *United States v. Alvarez*, 2015 WL 13187313 (S.D. Cal. 2015); *see also United States v. Singh*, 2022 WL 16855789 (E.D.N.Y. Nov. 10, 2022); *United States v. Yalincak*, 2015 WL 6456537 at *2 (D. Conn. Oct 26. 2015).

Rather than irreducible minima, these factors constitute a "sliding scale," whereby "the elements of the preliminary injunction test are balanced, so that a stronger showing of one element may offset a weaker showing of another." *Leiva-Perez v. Holder*, 640 F.3d 962 (9th Cir. 2011) (internal quotation omitted). "The whole idea is to hold the matter under review in abeyance because the appellate court lacks sufficient time to decide the merits." *Id.* at 967 (quoting *Nken v. Holder*, 556 U.S. 418, 432 (2009).) The district court may also grant a stay, in its discretion, based on fewer than all of the factors; for instance, if it finds that the applicant will suffer irreparable injury

---

[2] The Court also ordered Mr. Avenatti to pay an additional $3,207,144 to the Internal Revenue Service, as a condition of supervised release. (Docket No. 1060 at 3-4.)

2

1  absent a stay and that no other parties will be injured if a stay is granted. *Alvarez*, 2015
2  WL 13187313 at *2.

3  ## IV.   THIS COURT SHOULD EXERCISE ITS DISCRETION TO STAY
4  ## THE RESTITUTION ORDER PENDING APPEAL

5  The *Hilton* factors—both individually and on balance—support staying this
6  Court's restitution order until it becomes final on appeal.

7  **A.   Avenatti has shown a likelihood of success, or at least substantial**
8  **questions, as to the correctness of this Court's restitution award**

9  To satisfy the "strong showing" factor, a "petitioner[] need not demonstrate that
10  [he] is more likely than not [to] win on the merits." *Leiva-Perez*, 640 F.3d at 966.
11  Provided the other stay factors are satisfied, this factor demands only the existence of
12  "a substantial case on the merits," or that "serious legal questions are raised" regarding
13  the movant's claim for relief. *Id.* at 966-67.

14  At minimum, substantial questions exist here as to the appropriateness of the
15  restitution amount awarded at sentencing. The parties agreed that restitution was
16  limited to victims' actual losses. *See, e.g.*, Dkt. 1000 at 45; Dkt 1024; *see also United*
17  *States v. Anderson*, 741 F.3d 938, 951 (9th Cir. 2013) (restitution is limited to actual
18  loss because its goal is "to make the victim whole."); *United States v. Cloud*, 872 F.2d
19  846, 855 (9th Cir. 1989) (restitution is "limited by the victim's actual losses.") But the
20  amount of those losses was strongly contested. Mr. Avenatti argued, and presented
21  evidence, that the amounts of the settlements withheld from the victim clients should be
22  offset by his attorneys' fees, the amounts he expended in handling the cases, payments
23  Avenatti made to the clients, and—in some cases—the value of work he did for those
24  clients on other matters. (Docket 1024, Exhibit A (Calculation of Loss Amount).) The
25  government, for its part, agreed that it was appropriate to subtract attorney's fees, costs,
26  and expenses, but maintained it was not appropriate to offset for work Mr. Avenatti
27  performed for the clients on other matters. (*See* Docket 1000 [Government's

28

3

Sentencing Position] at 44-46; Docket 1000-1, [Declaration of Remoun Kalous re. Restitution Amounts].)

This conflict appears most starkly in the parties' dispute regarding the amount of restitution due to victim Phan. Avenatti represented Ms. Pham in connection with her exit from her beauty subscription service, Ipsy. (Docket 1024 at 11.) It was undisputed that Avenatti secured a common stock repurchase agreement between Phan and Ipsy in which Ipsy agreed to initially pay Phan $27,478,940, and subsequently pay an additional $8,146,288, to repurchase her shares. (*See* Docket 1000-1, Karlous Decl, ¶ 19; Docket 1024, Defendant's Motion for Evidentiary Hearing, 11-13.) It was also undisputed that Avenatti was entitled to a 7.5 percent contingency fee on the purchase price, and that Avenatti remitted to Pham (minus his contingency fee) all the settlement payments sent to her by Ipsy except for $4 million. (*See* Docket 1000-1, Karlous Decl.; Docket 1024, Defendant's Motion for Evidentiary Hearing, 11-13.)

The parties disagreed, however, as to whether Avenatti should receive an offset against that $4 million in the restitution calculation for additional amounts Avenatti was due from Phan pursuant to his fee agreement with her: specifically, a provision in the agreement providing that Avenatti would receive 7.5 percent of the "fair market value of any benefit, refund, carried interest, business accommodation, loan and/or funding received in connection with the settlement, judgment, or any other resolution of any of Clients' claims, divestiture, and/or exits as referenced above." (Docket 1024 at 12.) Avenatti presented evidence that, as part of the negotiated settlement he obtained on Ms. Phan's behalf, he was able to convince Ipsy to enter into additional agreements whereby Ms. Phan acquired additional assets at a significantly reduced price and also received additional benefits. (*Id.*) He further presented evidence that these assets and benefits included a cosmetics line known as "Em Cosmetics," as well as full rights to other valuable assets including trademarks, likeness, and image. (*Id.*) Avenatti argued that he never received 7.5 percent (or any portion) of the value of these assets from Ms. Phan, despite being contractually entitled to them, and that the assets were valued (on

4

information and belief) at well over $58 million—thus bringing Avenatti's 7.5 percent share to over the $4 million amount the government claimed Avenatti owed to Pham. (*Id.* (citing Sentencing Exhibit X and W).)

The government has the burden of proving the restitution amount by a preponderance of the evidence. *Anderson*, 741 F.3d at 951. Yet the government did nothing to refute Avenatti's claim that he was entitled to 7.5 percent of additional assets he secured for Ms. Phan, or that that percentage amounted to over $4 million; if anything, the government's exhibits support that conclusion. Avenatti's contract with Ms. Phan does indeed say that Avenatti is entitled to a 7.5 percent contingency fee of the "Recovery," which is defined to include not only "cash" received by Phan but also "the fair market value or any benefit, refund, carried interest, business accommodation, loan, and/or funding received in connection with the settlement, judgment, or any other resolution of any of Clients' claims, divestiture, and/or exits" from Ipsy. (Gov. Trial Ex. 266, at 3 [Feb. 9, 2017 Contract].) Nor did the government refute Avenatti's evidence that he in fact secured Ms. Phan additional valuable assets in connection with her exit from Ipsy, including ownership of Em Cosmetics. (Avenatti Under-Seal Sentencing Exhibit W [Draft agreements providing for Phan's acquisition of Em Cosmetics], Exhibit X (articles reporting that Phan acquired EM Cosmetics from Ipsy while "moving on from Ipsy" in 2017]). The government filed a responsive motion to Avenatti's motion for evidentiary hearing, but did not contest the arguments or evidence Avenatti's motion set forth in support of his claimed entitlement to a percentage of those assets. (*See* Docket 1034 (Government's Opposition to Defense Motion for Evidentiary Hearing); *see also* Docket 1023 at 4-6) (government arguing merely that Avenatti failed to sufficiently prove his entitlement to the assets). It contested neither the exhibits Avenatti cited to support his claim that Phan obtained an interest in EM Cosmetics or other assets, nor his claim that he was entitled to a portion of those assets' value.

This Court's restitution order rejected Avenatti's offset argument regarding Em Cosmetics and other assets, and did not reduce the $4 million restitution to Pham to reflect such amounts. Instead, it concluded that the value of those assets was not relevant to the restitution issue in this case because it "is a claim for other work not associated with the second part of the $8,146,000 payment [from Ipsy]." (Court's Tentative Ruling at 15.) The Court thus rejected it as a "claim[] for other unrelated work" outside the legal work underlying Avenatti's agreement with Ms. Phan. (District Court's Tentative Sentencing Position at 15.)

That ruling is incorrect. At minimum, it raises at least substantial questions. The government's own Exhibit 266—Avenatti's fee contract with Pham—shows Avenatti was retained by Pham to procure not just the cash settlement amounts from Ipsy but generally "in connection with [Pham's] affirmative claims, divestiture, and exit from" Ipsy. (Gov. Trial Ex. 266 at 1.) The contract contemplates not just that Avenatti will secure cash payments for Ms. Phan, but also that he will secure additional "benefit[s], refund[s], carried interest, business accommodation, loan, and/or funding":  all of which are expressly included in the "Recovery" of which Avenatti was contractually entitled to receive a 7.5 percent contingency fee. (Gov. Trial Ex. 266 at 1.) Avenatti's sentencing exhibits W and X further show that Avenatti negotiated Ms. Phan's stock repurchase transaction as part of the same negotiation that resulted in Ms. Phan obtaining ownership of Em Cosmetics and regaining certain rights in her trademarks, likeness, and image. These benefits to Ms. Phan flowed from Avenatti's same retention—and the same legal work—that produced the cash payments from Ipsy. And they were all part of the "Recovery" defined in the fee contract, of which that contract entitled Avenatti to 7.5 percent. The court's ruling that the value of these additional benefits Avenatti obtained for Phan were mere "other unrelated work"—separate and apart from the cash payments—is incorrect. At minimum, it poses substantial questions as to whether Avenatti's contingency fee of 7.5 percent encompassed far more than the

1  7.5 percent of Ipsy's two cash payments that the court took as the basis for its

2  restitution award.

3         The parties also disagreed on the amount of restitution due to the other victim

4  clients. As to these victims—Johnson, Barela, and Gardner—the dispute primarily

5  concerned whether Avenatti was entitled to an offset for other work he had performed

6  on those clients' behalf. (*See* Docket 1024 [Avenatti restitution calculations]; Docket

7  1000-1 [Government Restitution Calculations]; Tentative Sentencing Order at 15.) The

8  Court excluded the amounts for work on other matters from the offsets, holding that

9  Avenatti's argument for including those amounts in the offsets amounted to

10 impermissible self-help. (Tentative Order at 15.)

11        But substantial questions exist as to the correctness of the court's bright line

12 distinction between—on the one hand—offsets for legal work associated with the

13 specific sums Avenatti failed to remit to the victim clients, and—on the other hand—

14 offsets for "other [legal] work" he performed for them. "Restitution is not intended to

15 provide a windfall for crime victims but rather to ensure that victims, to the greatest

16 extent possible, are made whole for their losses." *United States v. Moran*, 778 F.3d 942,

17 985 (11th Cir. 2015) (internal quotation omitted). "For this reason, *any value of the*

18 *services or items received by the victim* must be offset against the restitution order." *Id.*

19 (emphasis added). In Medicare fraud cases, courts have held it constitutes error not to

20 exclude amounts paid for medically necessary goods and services, because failing to

21 offset these costs "would result in the victims receiving funds that they would have

22 expended even absent the defendant's fraud." *Id.* at 985.

23        Here, Avenatti presented evidence that he provided specific amounts of valuable

24 legal services, without receiving compensation, to the same clients from whom he

25 withheld settlement payments. The court properly recognized the need to offset the

26 victims' restitution loss amounts by the amount of payments Avenatti made to them,

27 and the amounts Avenatti spent in handling their legal cases. As-yet uncompensated

28 legal work Avenatti performed for those clients in other matters is materially

7

indistinguishable from these other types of value the Court included in the offset amount. There is no logical reason the court should offset direct payments Avenatti made to clients, or attorneys' fees Avenatti earned in connection with the representations at issue, but not offset the value of legal services Avenatti performed to those same clients without being paid. Failure to offset such costs, just like failure to offset amounts Avenatti paid to the clients directly, would result in an improper windfall to the clients because it would "result in the victims receiving funds that they would have expended even absent the defendant's fraud." *Moran*, 778 F.3d at 985; *cf. United States v. Matsumaru*, 244 F. 3d 1092, 1109 (9th Cir. 2001) (where attorney fraudulently misled client to believe he would receive an entire business for $50,000, the district court clearly erred by failing to deduct from the restitution amount the "van and business license" that the victim did receive).

Because this Court's restitution calculation is subject to substantial question, the first *Hilton* factor supports staying the restitution award pending appeal.

**B.    Mr. Avenatti Faces the Possibility of Irreparable Injury Absent a Stay**

The second *Hilton* factor, irreparable injury to the applicant absent a stay, also weighs in Mr. Avenatti's favor. If a stay is not granted, the government may—and likely will—begin arranging to have sums of money transmitted to the client victims before the proper restitution amount has been finally decided on appeal. Indeed, the government expressed its intention to do so at the sentencing hearing, saying it was already working together with the IRS to transmit an approximately $1.5 million payment (previously made by Mr. Avenatti to the IRS) from the IRS to Michelle Phan, and has now filed an ex parte application to do just that. (Docket No. 1987.) Mr. Avenatti has additionally been ordered to make payments towards the restitution amount during his period of imprisonment. (Docket No. 1060, Amended Judgment.) If these amounts are disbursed to the victims before the appeal is decided, they may be spent and become unavailable before it is determined whether they were even appropriately awarded in the first place. If the restitution issue is ultimately resolved in

Mr. Avenatti's favor on appeal, he could be unable to recover the amounts he had already paid.

That result would constitute irreparable harm to Mr. Avenatti. As explained in his sentencing pleadings, he has very little left. His criminal convictions have cost him his career, reputation, professional relationships, and ability to ever practice law again. (*See* Docket 1016, Defendant's Sentencing Position, at 1.) He is an indigent defendant, and the Office of Probation and Pretrial Services has estimated that he has a significantly negative net worth. (Docket No. 1042 [Revised Presentence Report] at ¶ 247, pages 56-57.) Being deprived at this point of any amount of money to which he is, in fact, legally entitled threatens to impose a significant burden on Mr. Avenatti: one that, with his career and ability to earn money from the practice of law now destroyed, he is unlikely to be able to overcome.

**C.    Issuance Of The Stay Will Not Substantially Injure The Other Parties Interested In The Proceeding**

The third *Hilton* factor, potential injury to other interested parties, also supports a stay. The result of a stay will simply be that money does not flow to victims before it is finally decided it should, and in what amounts. It is undisputed that some victims have already received substantial sums of money in connection with the legal matters underlying Mr. Avenatti's counts of conviction, including receipt of over $27 million by Ms. Phan (*see* Docket No. 1000-1, ¶¶ 19-21)[3], and $1,500,000 paid to Mr. Johnson by Michael Q. Eagan. (*See* Docket No. 1000-1, ¶ 10.)

---

[3] Docket 1000-1 is a declaration by Special Agent Remoun Karlous. Agent Karlous states that Mr. Avenatti transferred to Ms. Phan an initial settlement payment from Ipsy of $27,478,940, minus Avenatti's 7.5 percent contingency fee of $2,787,650.87, and then subsequently transferred to Ms. Phan approximately $4,146,288 of Ipsy's second settlement payment. (Docket No. 1000-1, ¶¶ 19-20.) The total received by Ms. Phan thus amounts to $28,837,577.13.

9

**D.     The Public Interest Also Supports Staying the Restitution Order Pending Appeal**

Finally, the public interest weighs in favor of waiting until the appeal resolves to begin requiring payment from Mr. Avenatti or disbursing funds to victims. Whether and to what extent amounts paid, or services rendered, by fraud defendants to victim clients should be offset against restitution amounts is an important legal issue that should be resolved by the Ninth Circuit as applied to this case in due course, rather than being rushed or short-circuited by a premature restitution process. Waiting until the appeal resolves will promote clarity and fairness.

## V.     CONCLUSION

For the foregoing reasons, Mr. Avenatti respectfully requests that this Court stay its restitution order pending appeal or, alternatively, stay disbursement of restitution funds from the court clerk or court registry until Mr. Avenatti's appeal has concluded.

Respectfully submitted,

CUAUHTEMOC ORTEGA
Federal Public Defender

DATED:  February 9, 2023          By   */s/ Margaret A. Farrand*

MARGARET A. FARRAND
Deputy Federal Public Defender

Attorney for Defendant
MICHAEL AVENATTI

10