A. Barry Cappello (CSB No. 037835)
abc@cappellonoel.com
Lawrence J. Conlan (CSB No. 221350)
lconlan@cappellonoel.com
**CAPPELLO & NOËL LLP**
831 State Street
Santa Barbara, CA 93101-3227
Telephone: (805) 564-2444
Facsimile: (805) 965-5950

Attorneys for
Spring Creek Research LLC

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA
## SOUTHERN DIVISION

UNITED STATES OF AMERICA,

Plaintiff,

v.

MICHAEL JOHN AVENATTI,

Defendant.

Case No. 8:19-cr-0061-JVS

**DECLARATION OF WILLIAM PARRISH IN SUPPORT OF PETITIONER SPRING CREEK RESEARCH LLC'S BRIEF REGARDING PRIMACY OF INTEREST IN HONDA AIRCRAFT**

# <u>DECLARATION OF WILLIAM PARRISH</u>

I, WILLIAM PARRISH, declare and state:

1.      I am over 18 years of age and the Manager of Petitioner Spring Creek Research LLC ("Spring Creek"), a Petitioner/Claimant in this this action.  The matters set forth herein are of my own personal knowledge and, if called as a witness, I could and would testify competently thereto.

2.      I make this declaration in support of Spring Creek's brief to establish its primacy of interest in the Honda Aircraft, registration number N227WP, aircraft serial number 42000029, together with its tools and appurtenances, including any and all logbooks (hard copy or electronic) documenting engine and airframe maintenance, flights, number of hours flown, number of landings, and types and frequency of instrument approaches made by the aircraft (the "Honda Jet" or "jet").

3.      I began contemplating the joint purchase of a private jet with my then-attorney Michael Avenatti in approximately June 2016.

4.      On July 7, 2016, on behalf of Spring Creek, I wired $350,000 from my family trust account directly to the account of Honda Aircraft at Wells Fargo Bank NA, as a down payment on the Honda Jet that would be owned and operated by an LLC in which the members would include Spring Creek and an entity controlled by Michael Avenatti, ultimately, Avenatti & Associates.

5.      Passport 420 LLC ("Passport") was formed as of July 11, 2016, to own and operate the jet.  Attached hereto as **Exhibit A** is a true and correct copy of the Passport Operating Agreement.  It states, among other things, that Passport would exclusively lease the Honda Jet to its members; and that the members' interests were those of tenants-in-common as to the jet.  (See, page 1 of the Passport Operating Agreement.

6.      On January 18, 2017, on behalf of Spring Creek, I wired an additional $1,985,000 for the purchase of the jet from my family trust account into the bank

DECLARATION OF WILLIAM PARRISH IN SUPPORT
OF BRIEF REGARDING PRIMACY OF INTEREST
8:19-CR-0061

account of Passport which had been opened at California Bank & Trust.  Attached hereto as **Exhibit B** are true and correct copies of the two wire transfers I made to purchase Spring Creek's interest in the Honda Jet.

7.     The total net purchase price of the Honda Jet was $4,383,605, which included the base price, adjusted, plus options and tax.  Attached hereto as **Exhibit C** is a true and correct copy of the Honda Aircraft Company ("Honda") invoice showing Passport's purchase of the jet on January 27, 2017.

8.     Based on my contribution of $2,335,000, I hold a 52.7% ownership interest in Passport and the jet; a leasehold interest in the jet; and a tenant-in-common interest in the jet.

9.     I believed at all times that the Avenatti & Associates interest in the jet would be purchased with legitimate funds.

10.     I had no cause to believe Michael Avenatti would use money taken from others to purchase Avenatti & Associates' interest in the jet, and had no cause to believe that the jet would be subject to forfeiture.

11.     Spring Creek also has had a possessory interest in the jet since Passport took title.  I used, maintained and operated the jet on many trips after Passport took title.  During the time before the jet was seized, Spring Creek paid for many of the expenses of the jet, including but not limited to paying for the hangar expenses, insurance, property taxes, and jet operational and maintenance expenses.  Attached hereto as **Exhibit D** are true and correct copies of invoices and proof of payment for expenses items identified above.   Also attached is a true and correct copy of the Petition for Remission or Mitigation served on the Department of Justice on June 13, 2019, as **Exhibit E**.

12.     The jet was routinely hangared at Santa Barbara Airport.  I was there preparing to fly the jet when agents from the Department of Treasury seized it from me.  I was shown the warrant, but no more.  At that time, I was told by Special Agent James Kim of the Department of Treasury that I would be "made whole."

DECLARATION OF WILLIAM PARRISH IN SUPPORT
OF BRIEF REGARDING PRIMACY OF INTEREST
8:19-CR-0061

13.     Through my counsel, and as detailed in my counsel's declaration, Spring Creek immediately took steps to assert its ownership of the jet, to explain to the Government that: my family funds paid for Spring Creek's interest in the jet; that the funds used to pay for the jet's expenses were legitimate; that the jet needed to be carefully maintained, that Spring Creek and I were open to a potential sale of the jet so long as my ownership rights were recognized; and that I had already been subjected to the misconduct of Michael Avenatti in his role as my attorney, before he was terminated in August 2018.  As explained to the Government, Spring Creek has been harmed by the seizure of the jet which it had paid for and was using routinely, and has now lost use of for over four years since it was seized.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed on June 12, 2023 at Santa Barbara, California.

_____

William Parrish

# Exhibit A

LIMITED LIABILITY COMPANY OPERATING
AGREEMENT

OF

PASSPORT 420, LLC

Dated as of July 11, 2016

PP00001158

# PASSPORT 420, LLC

THIS LIMITED LIABILITY COMPANY OPERATING AGREEMENT (the "Agreement") of Passport 420, LLC (the "Company") is made as of July 11, 2016 between Spring Creek Research, LLC, 4185 La Ladera Road, Santa Barbara, California, 93110 ("Spring Creek") and Avenatti & Associates, APC, 520 Newport Center Drive, Suite 1400, Newport Beach, California 92660 ("AA") (each a "Member" and collectively, the "Members").

WHEREAS, the Members have caused to be formed a limited liability company pursuant to the laws of the state of Delaware, as they may be amended; and

WHEREAS, the Members desire to establish their respective rights and obligations in connection with forming such limited liability company; and

WHEREAS, the Members of the Company wish to set forth the terms and conditions of their ownership and operation of one Honda Aircraft Company, LLC ("HondaJet"), model HA-420, Serial Number SN42000029, U.S. Registration Number N227WP (the "Aircraft"); and

WHEREAS, within the next ten (10) business days, the Company will take assignment of that certain HondaJet Purchase Agreement dated October 11, 2006 between Avenatti & Associates, APC and HondaJet, as amended (the "Purchase Agreement"), for the purchase of the Aircraft; and

WHEREAS, the Company agrees to lease the Aircraft exclusively to the Members without flight crew, which shall be provided by each Member individually under separate agreement, in exchange for the Members' agreement to insure, operate and maintain the Aircraft and pay their individual charges and pro-rata amounts due under this Agreement, it being the intent of the parties that the Company is not providing transportation services for compensation to the Members, that the Members shall have Operational Control of all flights under this Agreement which shall be conducted under Part 91 of the Federal Aviation Regulations ("FAR"); and

WHEREAS, each Member's ownership interest in the Aircraft will be according to and the same as their ownership interest in the Company as set forth on Exhibit A (the "Ownership Interest"), provided, however, that by entering into this Agreement, the Members do not intend to create a syndicate, group, pool, or joint venture which is classifiable as an association, or any group operating under an agreement which creates an organization classifiable as an association; and

WHEREAS, The relationship of the Member among themselves shall be that of tenants-in-common with regard to the Aircraft and each Member agrees that the sole and adequate means by which it may divest its Ownership Interest in the Company and the Aircraft shall be the transfer of the interest in accordance with the terms and conditions of this Agreement.

1

PP00001159

NOW THEREFORE, in consideration of the mutual covenants and provisions hereinafter contained, the Members agree as follows:

1.  **Formation and Scope of Company.**

    1.1  **Establishment of Company Name.** The Members formed a limited liability company under the provisions of Delaware law by causing a Certificate of Formation to be filed on April 14, 2016 with the Secretary of State of Delaware for the purposes and on the terms herein set forth. The rights and liabilities of the Members shall be as provided in Delaware law, except as is otherwise expressly provided herein. The name of the Company shall be "Passport 420, LLC."

    1.2  **Term of Company.** The term of the Company shall commence on the date formation and shall continue until terminated in accordance with the provisions of Section 9 hereof or as otherwise provided by law.

    1.3  **Location of Offices.** The Company shall carry on its business from its principal office located at such address as the Members may from time to time determine by mutual agreement.

2.  **Sharing of Expenses.**

    2.1  **Equal Sharing of Expenses.** Except as expressly provided herein, all expenses from transactions entered into by, or on behalf, for the account or in the name of, the Company within the scope of this Agreement will be shared pro-rata according to each Member's Ownership Interest.

    2.2  **Distributions.** No distributions are anticipated provided, in accordance with Section 7 or upon mutual agreement of the Members, the Aircraft may be sold in accordance with Sections 10 and 11 of this Agreement and the proceeds of the sale shall be distributed pro-rata according to each Member's Ownership Interest, less any outstanding balances due by either Member.

    2.3  **Capital and Expense Requirements.** Initial capital requirements and subsequent payments to the Company shall be in accordance with Exhibit A. Thereafter, each Member agrees to provide its share of funding in such manner and at such times as the Members determine to be sufficient to conduct the affairs of the Company in an orderly manner.

3.  **Accounting and Reconciliation.** The Members shall share pro-rata in the fixed costs and expenses from Aircraft operations and forward their share to the Company, together with any individual costs and expenses incurred by them, on a monthly basis. The Members further agree to establish mutually satisfactory arrangements to conduct Company transactions in a commercially reasonable

2

PP00001160

manner.

3.1   The Company will prepare a quarterly accounting of the receipts and disbursements, which will be supplied to the Members within 30 days following the end of the quarter. An annual account reconciliation of hours of Aircraft use as determined by the Aircraft's hours meter ("Flight Hours") and individual charges under this Agreement shall be overseen by the Manager and shall be made available to each of the Members upon reasonable request.

3.2   The Company shall provide to each Member or its representative, access from time to time as each Member may reasonably request, during normal business hours, to permit inspections of all books and records relating to transactions conducted for the account of the Company.

4.   **Administration of the Aircraft Schedule.**

4.1   Each Member shall be entitled to an annual number of Flight Hours according to each Member's Ownership Interest in the Company, set forth on Exhibit A (individually, the "Member's Annual Flight Hours").

4.1.1   Each Member shall notify the other Member by email prior to scheduling use of the Aircraft and in the event the Members intend to schedule use on the same day, the Member with prior notice shall have priority in scheduling the Aircraft provided, in the event there is a material difference in the number of annual hours scheduled by the Members (greater than 20%), the Member with fewer hours of Aircraft use shall have priority.

4.1.2   No Member may schedule its Aircraft use for a period exceeding seven (7) calendar days in duration without first getting approval from the other Member.

4.1.3   If a Member (the "First Member") schedules Aircraft use that will cause the Aircraft to layover at a location away from the Operating Base set forth on Exhibit A for any period of time, the other Member (the "Second Member") may subsequently schedule one or more flights that will occur prior to the First Member's return to the Operating Base, provided:

4.1.3.1   Such flight(s) by the Second Member may not unreasonably delay or interfere with any scheduled flight of the First Member; and

4.1.3.2   All expenses and Flight Hour charges to ferry the Aircraft from the First Member's location to the operating base or other location where the Second Member will embark, and all

3

PP00001161

expenses and Flight Hour charges to ferry the Aircraft back to the First Member's location, shall be charged to the Second Member.

4.1.4 Flight Hours incurred for regulatory, certification, maintenance and test flight purposes of the Aircraft shall be for the account of the Company and not to the individual Members.

## 4.2 **Allocation and Payment of Charges.**

4.2.1 Each Member shall be individually responsible for its pro-rata share of charges to the Company for services and supplies necessary for the ownership and operation of the Aircraft according to each Member's Ownership Interest including but not limited to:

4.2.1.1 Any changes for Airworthiness Directives, Service Bulletins, Upgrades to the Aircraft, Regulatory compliance charges, or Annual Increases in Insurance Premiums for the Aircraft;

4.2.1.2 Any charges to maintain the Aircraft in a good and airworthy operating condition and in compliance with all applicable FAR and the Aircraft Operating Manual;

4.2.1.3 Any charges to maintain and preserve all Aircraft Documents in a complete, accurate, and up-to-date manner;

4.2.1.4 All regulatory and tax related charges due to the ownership and operation of the Company and the Aircraft, including but not limited to any property taxes and any costs, expenses, fees and taxes incurred in connection with any sales tax audit or reconciliation; and

5.2.1.4 Hanger space at the Operating Base; insurance on the Aircraft; and washing and maintenance of the Aircraft at the Operating Base.

4.2.2 Each Member shall be individually responsible for charges related to the individual flights of the Member including but not limited to:

4.2.2.1 All fuel, oil, lubricants, and other services and supplies required for the Member's individual operation of the Aircraft;

4.2.2.2 The services of pilots for all of Member's individual

4

operation of the Aircraft;

4.2.2.3 Charges related to extraordinary wear and damage caused by Member; and

4.2.2.4 Any financing or lease payment associated with a Member's ownership interest in the Aircraft or the Company.

4.3.1 In the event a Member moves the Aircraft to a maintenance facility, the charges and Flight Hours related to such flight shall be for the account of the Company.

4.3 **Payment of charges by the Members.** The Members shall pay their pro-rata share and individual charges within seven days of receipt of invoice from the Company.

4.3.1 The Members shall forward payment for their pro-rata share and individual charges by check or wire transfer to the Company.

4.3.2 Payments are delinquent after ninety days and are subject to a 15% per annum late charge.

4.3.3 The Members agree that Company is not providing transportation services to Members for compensation and payments of the Members are not made to Company for the purpose of reimbursement of charges paid by Company. Rather, each Member remains individually responsible for a pro-rata share of the cost of insuring and maintaining the Aircraft and charges related to Member's individual Aircraft use as invoiced by Company.

5. <u>Management of the Company.</u> The affairs of the Company shall be managed by a Manager.

5.1 The Manager shall have full and complete authority, power and discretion to manage and control the affairs of the Company, to make all decisions regarding such matters, and to perform any and all other acts and activities customary or incident to the Company's purpose. The actions of the Manager taken in accordance with this Agreement shall bind the Company. The Manager, or such person designated by the Manager, shall be an authorized person within the meaning of the Delaware Limited Liability Act to execute, deliver and file any certificates or documents, and any amendments of such certificates or documents, necessary for the Company to conduct its affairs in the state of Delaware and in any other jurisdiction in which the Company may wish to do so. The Manager may appoint, employ, or otherwise contract with other persons or entities for the transaction of the business of the Company or the performance of services

PP00001163

for or on behalf of the Company.

5.2 **Election of Manager.** A Manager shall be elected annually, either at a meeting or by written consent in lieu of a meeting, by a unanimous vote of all of the then Members in the Company.

5.3 **Reliance by Third Parties.** Any person or entity dealing with the Company may rely upon a certificate or document signed by the Manager as to any action of the Company, or as to the existence or non-existence of any facts that are germane to the affairs of the Company.

6. **Restrictions on Related Party Transactions.** No transaction will be consummated for the account of the Company from, or sold for the account of the Company to, any of the Members or any person, firm or corporation which is controlled by, controlling or under common control with a Member unless, in any such case, such Member has fully disclosed the particulars of such relationship and of such purchase or sale in writing to the other Members and obtained the written consent of such other Members to such transaction.

7. **Events of Default.** Without limiting in any way what may constitute a default by a party to this Agreement, the occurrence and continuation of any of the following shall constitute a default:

7.1 The failure of a Member to timely pay when due any amount required to be paid by Member under this Agreement or any other agreement related to the Aircraft or the use of the Aircraft including but not limited to any agreement with a financial institution providing financing for Member's Ownership Interest in the Aircraft.

7.2 The breach by a Member, of any representation or warranty or other provision of this Agreement or any other agreement related to the Aircraft or the use of the Aircraft including but not limited to any agreement with a financial institution providing financing for Member's Ownership Interest in the Aircraft.

7.3 If Member shall admit in writing its inability to pay, or fail to pay, debts generally as they become due; file a petition in bankruptcy or file an answer admitting or failing to deny the material allegations of such petition; make an assignment for the benefit of its creditors; consent to the appointment of, or possession by, a custodian for itself or for the whole or substantially all of its property; on a petition in bankruptcy filed against it, be adjudicated, or have an order for relief granted as, a bankrupt; or, file a petition or answer seeking reorganization or arrangement or other aid or relief under any any law for the relief of debtors or file an answer admitting, or fail to deny, the material allegations of a petition filed against it for any such relief.

6

8.   **Remedies for Default.**   In addition to any other remedies provided for in this Agreement or otherwise available to a non-defaulting Member at law or in equity (including, without limitation, reasonable attorney's fees, costs, and expenses), upon the occurrence of a default by a Member, such Member's rights to use of the Aircraft shall be suspended until the default is cured. Notwithstanding the foregoing, the defaulting Member shall remain liable and responsible during the continuation of any default for payment of all amounts for which such Member is liable under this Agreement, and/or all amounts for which such Member is liable under any other agreement related to the Aircraft or the use of the Aircraft.

9.   **Withdrawal and Termination.** Each Member hereby irrevocably waives any right it may have to demand the partition or sale for partition of the Aircraft under any laws of the State of California or any other jurisdiction.

   9.1   **Withdrawal upon Notice.** Either Member may withdraw as a Member of the Company at any time upon ninety days prior written notice of withdrawal to the other Member, provided the withdrawing Member shall complete the sale of its Ownership Interest in the Aircraft per Sections 10 and 11 of this Agreement.

   9.2   **Termination on Default.** This Agreement may be terminated by either Member, subject to completion of the sale of the Ownership Interests in the Aircraft per Sections 10 and 11 of this Agreement, upon written notice to the other at any time if:

      9.2.1   The non-terminating Member shall have materially breached any term or condition of this Agreement and not cured such breach within thirty (30) days of written notification by the terminating Member of such breach; or

      9.2.2   The non-terminating Member commits a regulatory violation under the FAR as adjudicated by a regulatory body.

   9.3   This Agreement shall terminate upon bankruptcy, death, dissolution, expulsion, incapacity or withdrawal of any Member, unless within ninety days after such event, the Company is continued by the vote or written consent of a majority in interest of all of the remaining Members. In the event this Agreement is terminated under this Section 9.3, the trustee, executor, heirs or other lawful successor in interest of such Member shall be authorized and obligated to complete the sale of its ownership interest in the Aircraft per Sections 10 and 11 of this Agreement.

   9.4   **Consequences of Withdrawal or Termination.** In the event of termination of this Agreement and sale of Ownership Interests in the Aircraft per Sections 10 and 11 of this Agreement, the Company shall thereupon be dissolved or in the alternative, a Member's right and obligations under this Agreement shall be terminated upon that Member's

7

PP00001165

withdrawal; provided, however, that all previously incurred obligations, liabilities and rights shall remain unimpaired (including without limitation the obligation to make reports and payments required under this Agreement), and settled in due course by the Members.

9.4.1   Termination of this Agreement or withdrawal will not relieve the Members of any individual obligation with respect to any third party for the account of the Company or for the individual Member's Aircraft usage prior to the effective date of termination.

9.4.2   Any other assets of the Company at the effective date of termination of this Agreement shall be disposed of for the account of the Company and dispersed pro-rata to the Members in such manner as the Members may mutually agree.

9.5   **Appraisal.** In the event of a Member's withdrawal or default or upon any of the events described in Section 9.3, or upon any other event that terminates continued membership of any Member, the withdrawing or terminating Member or their estate shall be entitled to receive the fair value of the Member's interest in the Company. In the event the withdrawing or terminating Member or the deceased Member's estate cannot reach immediate agreement with the Company about the fair value of the Member's interest, the fair value shall be determined by appraisal, provided, the value of the Aircraft shall be determined per Sections 10 and 11 of this Agreement.

10.   **Sale of Member's ownership interest in the Aircraft.**

10.1   **Notice of Intent to Sell.**   If at any time a Member intends to sell or otherwise divest itself of its respective Ownership Interest in the Aircraft, such Member (the "Selling Member") shall provide written notice of such intent to the other Member (the "Non-Selling Member").

10.2   **Determination of Fair Market Value.**   As soon as reasonably practicable after the date of any notice under Section 10.1, the Members shall determine the Fair Market Value of the Aircraft by mutual negotiation and agreement.

10.2.1 In the event the Members cannot agree on the Fair Market Value of the Aircraft within ten (10) days after the date of any notice under Section 10.1, the Members shall, within twenty (20) days after the date of the notice under Section 10.1, jointly select an established, reputable, independent, and qualified appraiser to determine the Fair Market Value of the Aircraft.

10.2.2 In the event the Members cannot agree on a single appraiser, the Fair Market Value of the Aircraft shall be determined by averaging

8

PP00001166

the fair market valuation appraisals of three (3) established, reputable, independent, and qualified appraisers, the first of whom shall be selected by the Selling Member, the second of whom shall be selected jointly by the Non-Selling Member, and the third of whom shall be selected jointly by the first two appraisers.

10.3 **Non-Selling Member's Option.** The Non-Selling Member shall have the option, exercisable by written notice delivered to the Selling Member within the first ten (10) Business Days following the determination of the Fair Market Value of the Aircraft, to purchase all, but not less than all, of the Selling Member's Ownership Interest in the Aircraft (the Non-Selling Member that elects to purchase the Selling Member's ownership interest in the Aircraft under this Section 10.3 or under Section 11.3 is a "Purchasing Member").

10.3.1 In the event this Agreement is amended to provide for additional members and more than one (1) Purchasing Member elects to purchase the Selling Member's Ownership Interest in the Aircraft, each Purchasing Member shall be entitled to purchase a pro-rata portion of the Selling Member's Ownership Interest in the Aircraft that bears the same ratio as each respective Purchasing Member's then-existing percentage Ownership Interest in the Aircraft bears to the total percentage Ownership Interest in the Aircraft then held by all the Purchasing Members combined.

10.3.2 The price at which the Purchasing Member(s) may purchase the Selling Member's Ownership Interest in the Aircraft (the "Option Price") shall be an amount equal to 98% of the Fair Market Value, multiplied by the Selling Member's percentage Ownership Interest in the Aircraft (it being agreed that such Option Price shall be deemed to be equal to the net amount that Selling Member would have received for its Ownership Interest in the Aircraft had the entire Aircraft been sold to a third-party on the open market at the Fair Market Value through a reputable brokerage firm, and the net sales proceeds after deducting sales commissions and other sales expenses totaling 2% of the sales price were shared by the Members pro-rata according to their respective Ownership Interest Percentages).

10.3.3 If one (1) or more Purchasing Members exercise the option under this Section 10.3 to purchase the Selling Member's Ownership Interest in the Aircraft, the closing of such transaction shall occur not later than 5:00 p.m. Pacific Time on the 10th Business Day after the end of the ten (10) Business Day option period provided for in Section 10.3, unless another closing date shall be established by mutual agreement of the Members.

9

PP00001167

10.4 **Procedures for Purchasing Member(s) of Selling Member's Aircraft Interest.** On the date of the closing of any sale of Selling Member's Ownership Interest in the Aircraft to Purchasing Member(s):

10.4.1 The Purchasing Member(s) shall deliver to Selling Member the Option Price by wire transfer of immediately available U.S. funds.

10.4.2 Selling Member shall deliver all right, title, and interest in and to the Selling Member's Ownership Interest in the Aircraft, free and clear of all Liens on the Aircraft, to the Purchasing Member(s) in such as the parties may mutually agree.

10.4.3 Selling Member shall execute and deliver to the Purchasing Member(s) a Warranty Bill of Sale in a form reasonably acceptable to Purchasing Member(s), transferring all of Selling Member's Ownership Interest in the Aircraft to the Purchasing Member(s).

10.4.4 The Purchasing Member(s) shall execute and deliver to Selling Member a Delivery Receipt in a form reasonably acceptable to Selling Member.

10.4.5 The Selling Member shall promptly execute and deliver to the Purchasing Member(s) such other notices, statements, documents and instruments and perform such other acts the Purchasing Member(s) deems necessary to protect, preserve and enforce its acquisition and ownership of Selling Member's Ownership Interest in the Aircraft.

11. **Sale of Entire Aircraft.**

11.1 **Solicitation of Third-Party Offers and Sale of Aircraft.** In the event no Non-Selling Member exercises its option under Section 10.3, the Members shall retain an aircraft broker to facilitate the sale of the entire Aircraft.

11.2 **Third Party Offer Equal to or in Excess of Fair Market Value.** In the event the Members receive a bona-fide offer from any third-party to purchase the Aircraft for a purchase price that equals or exceeds the Fair Market Value determined pursuant to Section 10.2, the Members shall accept such offer, subject to the provisions of Section 11.4 of this Agreement.

11.3 **Third Party Offer Less Than Fair Market Value.** In the event the Members receive a bona-fide offer from any third-party to purchase the Aircraft for a purchase price that the parties unanimously determine to be

PP00001168

reasonable and acceptable, but which is nevertheless less than the Fair Market Value determined pursuant to Section 10.2, each of the Non-Selling Members shall thereafter have an additional option, exercisable by written notice delivered to Selling Member within three (3) days after receipt of Selling Member's notice, to purchase all, but not less than all, of Selling Member's Ownership Interest in the Aircraft for a purchase price equal to 98% of the offered price, multiplied by the Selling Member's percentage Ownership Interest in the Aircraft.

11.3.1 In the event more than one (1) Purchasing Member (as defined in Section 10.3) elects to purchase the Selling Member's Ownership Interest in the Aircraft, each Purchasing Member shall be entitled to purchase a pro-rata portion of the Selling Member's Ownership Interest in the Aircraft that bears the same ratio as each respective Purchasing Members then-existing percentage Ownership Interest in the Aircraft bears to the total percentage Ownership Interest in the Aircraft then held by all the Purchasing Members combined.

11.3.2 The closing of any purchase by the Purchasing Member(s) of Selling Member's Ownership Interest in the Aircraft pursuant to this Section 11.3 shall occur not later than 5:00 p.m. Pacific Time on the 10th Business Day after the day the Non-Selling Member exercises its option under this Section 11.3, and shall be conducted in accordance with the procedures set forth in Section 10.4.

11.3.3 In the event no Non-Selling Member exercises its option hereunder, the Members shall accept the third-party offer, subject to the provisions of Section 11.4 of this Agreement.

11.4    **Comprehensive Aircraft Purchase Agreement.** Any acceptance of a bona-fide offer from a third-party for the purchase of the entire Aircraft will be subject to the condition that such offer is contingent upon negotiation and execution of a comprehensive Aircraft Sale Agreement.    The Members shall jointly negotiate any such Aircraft Sale Agreement in good faith.  The Members shall each pay a pro-rata portion of all expenses of any sale of the entire Aircraft pursuant to this Section 11, and shall each be entitled to a pro-rata share of the proceeds of any such sale, according to their respective percentage Ownership Interests in the Aircraft.

12.    **Representations and Warranties of Members.** The Members hereby represent and warrant as follows:

12.1    Notwithstanding that a Member shall have Operational Control of the Aircraft during that Member's individual flights, the Members agree that the Pilot in Command of any such flight may, in his or her sole discretion, terminate the flight, refuse to commence the flight, or take any other flight related action which in the judgment of the Pilot in Command is necessary

11

PP00001169

to ensure the safety of the Aircraft, the Flight Crew, and all persons and property on board the Aircraft, and no such action of the Pilot in Command may support or be the basis of any claim of any kind against the Members or the Company.

12.2    Member is, and throughout the Term hereof shall continue to be duly incorporated or organized, validly existing, and in good standing under the laws of the state of Member's formation, possessing perpetual existence as a legal entity, having the capacity to sue and be sued in its own name, having full power, legal right and authority to carry on its business as currently conducted, and to execute, deliver and perform the provisions of this Agreement.

12.3    The execution, delivery, and performance of this Agreement by Member have been duly authorized by all necessary company action and do not conflict with or result in any breach of any of the terms or constitute a default under any document, instrument, or agreement to which it is a party.

12.4    This Agreement constitutes the legal, valid and binding obligations of Member, and is enforceable against Member in accordance with the terms herein contained.

12.5    Member shall not create or place any Lien against the Aircraft other than a security interest in favor of a financial institution providing financing for the Member's Ownership Interest and/or the Aircraft (a "Financing") and each Member shall ensure that no Liens are created or placed against the Aircraft by third-parties as a result of its actions, and shall take all actions as may be necessary to discharge and satisfy in full any such Lien promptly after the same becomes known to it.  Under no circumstances may the balance owed under any Financing by a Member constitute more than forty percent (40%) of the value of the Aircraft as of January 1 of each calendar year as measured by the then most recent valuation published by Jet Aviva.

12.6    Member shall not divest itself of its Ownership Interest in the Company or the Aircraft except in accordance with the terms and conditions specified in this Agreement.

12.7    Member is, and throughout the Term hereof shall continue to be, either a citizen of the United States as defined in 49 U.S.C.§40102, as amended, or otherwise eligible to register the Aircraft in the United States.

12.8    Member shall not knowingly violate any regulatory, legal or insurance requirement applicable to the Aircraft and shall procure, maintain, and comply with all permits, licenses, and other authorizations required for use of the Aircraft by Member to ensure the proper operation, maintenance,

PP00001170

and repair of the Aircraft per the Aircraft manufacturer's and insurer's recommendations and applicable FARs.

13. **Section 1.761-2(a) Treatment.**    The Members intend that the Company be excluded from the application of all or part of subchapter K of chapter 1 of the Internal Revenue Code.

14. **Allocation of Tax Benefits and Obligations.** Each Member shall be entitled to its pro rata share of all tax benefits, if any, arising from its respective Ownership Interest in the Company and Aircraft. Each Member shall be responsible for, and shall pay promptly when due, all taxes which may be assessed or levied by any taxing jurisdictions as a result of the purchase, lease, use, storage, or other consumption by such Member of such Member's Ownership Interest; provided, however, that each Member shall have the right to dispute or contest in good faith and at such Member's sole expense the amount of any taxes assessed or imposed directly against such Member.  During the period that any such taxes are being disputed or contested in good faith, payment of such taxes in accordance with the terms of this Agreement may be delayed until a final determination of the amount due has been made so long as the delay in payment does not create a risk of a tax lien or forfeiture of the Aircraft.

15. **Insurance.**  The  Company shall maintain at all times  during  the  term  of this Agreement, with insurers of recognized responsibility, aircraft hull insurance and liability insurance in amounts not less than as listed on Exhibit B with respect to the Aircraft naming the Members as Loss Payees as their interests may appear. The Aircraft shall not be operated at any time, unless and until such insurance policies are in effect.

16. **No Assignment.** Neither Member may assign, transfer, license, sell or encumber this Agreement, the Aircraft or any rights or obligations hereunder, without the prior written consent of the other Member(s), which such consent shall not be unreasonably withheld, and any such non-permitted assignment, transfer, license, sale or encumbrance of the like, shall be null and void ab initio. Notwithstanding anything contained herein, each Member shall be permitted to assign, transfer and/or sell ("Transfer") its ownership interest in the Company to another entity controlled in whole or in part by the Member or, (i) in the case of Spring Creek's interest, controlled by William Parrish, and (ii) in the case of AA, controlled by Michael Avenatti.  The new Member shall assume the ownership interest subject to all rights, duties, obligations and terms of this Agreement.  In the event of such a Transfer, the transferring member shall notify the non-transferring member in writing within ten (10) business days of the Transfer.

17. **Notices.**   All notices or other communications required or permitted under this Agreement shall be in writing and will be directed to the Member at the above referenced address, and sent certified mail, return receipt requested, or by fax with confirmed receipt, or by recognized overnight delivery service, or by email. Such notices and communications shall be deemed received three (3) calendar

13

PP00001171

days after having been sent.

18. **Governing Law.** This Agreement and the respective rights of the Members hereunder shall be governed by and construed under the laws of the State of California and will bind and inure to the benefit of the Member's successors and permitted assigns.

19. **Counterparts.** This Agreement may be executed in counterparts and by fax.

20. **Entire Agreement, Amendments.** There are no representations, warranties, promises or inducements between the Members not contained in writing. This Agreement is the entire Agreement between the Members and supersedes all prior agreements relating to the subject matter of this Agreement and/or the Aircraft.  This Agreement may be changed only in a writing signed by a duly authorized representative of each of the Members, expressly referring to this Agreement.

21. **Arbitration.** The Members shall work together in good faith and shall endeavor to reach commercially reasonable solutions to all issues that may arise in their relationship hereunder.  Any disputes, claims or causes of actions between the Members arising out of this Agreement or the transactions contemplated hereby shall be fully and finally adjudicated and resolved by an arbitration commenced before JAMS located in Los Angeles, California and conducted under the JAMS arbitration rules then in effect.  The dispute shall be heard by one arbitrator jointly selected and paid for by the Members.

22. **Indemnification.**

   22.1 **Company Indemnification:** The Company may, and shall have the power to, indemnify and hold harmless, and advance expenses to, any Member, manager or other person, or any testator or intestate of such Member, manager or other person, from and against any and all claims and demands whatsoever relating to the operation of the business of the Company; provided, however, that no indemnification may be made to or on behalf of any Member, manager or other person if a judgment or other final adjudication adverse to such Member, manager or other person establishes (a) that his or her acts were committed in bad faith or were the result of active and deliberate dishonesty and were material to the cause of action so adjudicated or (b) that he or she personally gained in fact a financial profit or other advantage to which he or she was not legally entitled.

   22.2 **Member Indemnification:** In the event the Aircraft is sold as a result of a default, the Members agree that the defaulting Member shall reimburse the non-defaulting Member the non-defaulting Member's portion of the expenses incurred per Section 11.4 and any negative variance due to the difference between the sales price received upon sale of the of the Aircraft

14

PP00001172

pursuant to Section 11 and the Fair Market Value as determined in Section 10.2.

23. **Limitation of Liability.** Each Member agrees to indemnify and hold harmless the other Member and Manager and their respective officers, directors, partners, employees, shareholders, and affiliates from any claim, damage, loss, or reasonable expense, including reasonable attorney's fees, resulting from the bodily injury or property damage caused by an occurrence and arising out of the ownership, maintenance, or use of the Aircraft.

24. **Truth-In-Leasing Statement under FAR 91.23:** (a) The Aircraft, within the twelve month period preceding the date of this agreement, except to the extent the Aircraft is less than twelve months old, has been and during the lease term shall be, inspected and maintained in accordance with Part 91.409(f) (3) and all applicable requirements for maintenance and inspection thereunder have been complied with; (b) the Members certify and knowingly acknowledge that when they use the Aircraft under this Agreement under lease, the Member shall be known as, considered and in fact shall be the operator of such aircraft; (c) an explanation of factors bearing on operational control and pertinent FARs can be obtained from the nearest FAA Flight Standards District Office; and (d) the Members hereto certify that a true copy of this agreement shall be carried on the Aircraft at all times during any lease thereof, and shall be made available for inspection upon request by a representative of the FAA.

WHEREFORE, the parties hereto have executed this Agreement as of July 11, 2016.

Spring Creek Research, LLC        Avenatti & Associates, APC

By: _____      By: _____
     William Parrish, Member          Michael J. Avenatti, President

15

PP00001173

## Exhibit A

|  | Member<br>Spring Creek Research, LLC | Member<br>Avenatti & Associates, APC* |
|---|---|---|
| Initial Capital Contribution: | $350,000 | $1,000 |
| Ownership Interest: | 50% | 50% |
| Subsequent Capital Contribution | $1,950,000 | $1,831,105 |
| Maximum Annual Flight Hours: | 150 | 150 |

| | |
|---|---|
| Minimum Hull Insurance Limit: | $5,000,000 |
| Minimum Liability Insurance | $5,000,000 |
| Operating Base: | SBA |

*Member Avenatti & Associates, APC shall have the option to secure financing for its Subsequent Capital Contribution in accordance with the terms of this agreement as set forth above and, in the event of such financing, the Members agree that the Aircraft shall be subject to a priority security interest.  Member Avenatti & Associates, APC shall indemnify and hold harmless Member Spring Creek Research, LLC for any and all costs, including attorney's fees, incurred due to the repossession and/or sale of the Aircraft due to any default under any financing or security agreements.

16

PP00001174

**WAIVER OF NOTICE AND CONSENT TO ACTION
IN LIEU OF HOLDING MEMBERS MEETING OF
PASSPORT 420, LLC**

The undersigned, being all Members of the above named Limited Liability Company and pursuant to Section 5 of the Operating Agreement of Passport 420, LLC, dated July 11, 2016, **DO HEREBY WAIVE NOTICE** of a members meeting, and **CONSENT**, take and adopt, the following actions in writing in lieu of such meeting, on the 11th day of July, 2016:

- Appoint Michael Avenatti as Manager of Passport 420, LLC.

The undersigned agree that the foregoing constitutes a complete record of actions taken, adopted, approved and ratified by unanimous written consent of the Members in lieu of a members annual meeting.

WITNESS the below signature this 11th day of July, 2016.

**MEMBERS**

_____
William Parrish, Spring Creek Research, LLC

_____
Michael J. Avenatti, Avenatti & Associates, APC

I hereby accept the appointment as Manager of Passport 420, LLC pursuant to the terms set forth in the Operating Agreement of Passport 420, LLC dated July 11, 2016.

_____
Michael Avenatti

1

# Exhibit B

## Mandy Duong

| | |
|---|---|
| **From:** | gs-online-asset-transfer-requests@ny.email.gs.com |
| **Sent:** | Wednesday, January 18, 2017 8:54 AM |
| **To:** | wparrish@cox.net |
| **Subject:** | Asset Transfer Confirmation |

Dear Client,

An asset transfer request was submitted by you via the Goldman Sachs website on 18-Jan-2017 11:53 AM EST. Please review the details below to ensure accuracy:

| | |
|---|---|
| From Account | Parrish Trust - Margin xxx-xx994-5 |
| Amount | 1,985,000 |
| Bank Name | California Bank & Trust |
| Receiving Account Number/IBAN | xxxxxxxxx57 |
| Destination Country | usa |

Your request has been sent to your PWM team for processing. Additional instructions or authorization may be required for some requests.

If you did not submit this request, or if you have any questions regarding this notification please contact your Private Wealth Management team.

Sincerely,

Goldman Sachs Private Wealth Management

For your security, please do not reply to this e-mail. If you have any questions or concerns about this e-mail, please contact your Private Wealth Management team or log in to your account at www.goldman.com to send your PWM team a secure e-mail. For enhanced security when accessing your PWM accounts online, we recommend that you type or copy/paste the address directly into your browser. Please go to http://www.goldmansachs.com/privacy-and-security/how-you-can-protect-yourself.html to learn more about how you can protect your personal information from phishing and other threats.

# Exhibit C

# Honda Aircraft Company, LLC

6430 Ballinger Rd, Greensboro, NC 27410
Tel : 336-662-0246   Fax : 336-662-0852

| BILL TO | NOTICE OF PAYMENT DUE | |
|---|---|---|
| PASSPORT 420 LLC<br>520 NEWPORT CENTER DR<br>STE 1400<br>NEWPORT BEACH CA  92660-7020<br>USA | Contract Number : | 40000316 |
| | Document Number : | 90003409 |
| | Date : | 12/20/2016 |
| | Due Date : | At Delivery |
| | Sold To Customer Number : | 12391 |
| | Serial Number : | 42000029 |
| SOLD TO | REPRESENTATIVE | |
| PASSPORT 420 LLC<br>520 NEWPORT CENTER DR<br>STE 1400<br>NEWPORT BEACH CA  92660-7020<br>USA | Will Cutter<br>wcutter@cutteraviation.com<br>602-690-5665 | |

| HONDAJET HA-420 | Amount (USD) |
|---|---|
| Base Price | $3,650,000.00 |
| CPI-Price Adjustment | $338,355.00 |
| Gross Base Price | $3,988,355.00 |
| Options Price | $392,750.00 |
| NC Sales Tax | $2,500.00 |
| Total Net Price Due | $4,383,605.00 |
| Deposits Received | ($600,000.00) |
| Net Balance Due | $3,783,605.00 |

### PAYMENT BY WIRE TRANSFER

Honda Aircraft Company, LLC
Wells Fargo Bank N.A.
420 Montgomery Street
San Francisco, CA 94101
Account # 4126555366
ABA # 121000248
Intl. Swift # WFBIUS6S

All Accounts Due & Payable in US Dollars.  Please Include Customer Name, Customer Number, Contract Number and Document Number. Wire fees are the responsibility of sender.

USA PATRIOT ACT. The monetary requirements of the USA Patriot Act require Honda Aircraft Company to identify and review the connection between funds received and its customer, the Purchaser, as specifically listed in the Purchase Agreement. In the event Honda Aircraft Company receives funds from a source other than Purchaser, remitter may be requested to provide information documenting the connection to Purchaser.
NOTE: All monetary submissions will be subject to screening in compliance with the USA Patriot Act

Export Notice: These items are controlled by the U.S. Government and authorized for export only to the country of ultimate destination for use by the ultimate consignee or end-user(s) herein identified. They may not be resold, transferred, or otherwise disposed of, to any other country or to any person other than authorized ultimate consignee or end-user(s), either in their original form or after being incorporated into other items, without first obtaining approval from the U.S. government or as otherwise authorized by U.S. law and regulations.
ECCN: 9A991.b ; HTS: 8802.30.0030 ; COO: United States.



JAN 27 2017

Guilford   County, North Carolina

I certify that the following person(s) personally appeared before me this day, each acknowledging to me that he or she signed the foregoing document:

Christopher Belcher
*Name(s) of principal(s)*

Date: 1-27-2017

KELLY E. TOOLEY
NOTARY PUBLIC
GUILFORD COUNTY, NC

*Official Signature of Notary*

Kelly E. Tooley   Notary Public
*Notary's printed or typed name*

My commission expires: 6/10/2017



*ADDENDUM to HONDAJET PURCHASE AGREEMENT*
*No. 40000316*

<u>DELIVERY RECEIPT</u>

The undersigned Purchaser hereby accepts delivery of one (1) Honda Aircraft Company, LLC model HA-420 aircraft, bearing United States Registration Number N227WP (the "Aircraft"), manufactured in accordance with the HondaJet Retail Purchase Agreement, No. 40000316 between Purchaser and Seller, and Seller's Specification and Description dated January 2016 (the "Specification").

Purchaser hereby confirms acceptance and delivery of the Aircraft equipped as specified in the Agreement and Specification, and verifies that the Aircraft has been inspected and generally conforms to the same. Purchaser also confirms receipt of the appropriate, approved Flight Manual for the Aircraft.

**Aircraft Information**

| Item | Serial Number |
|------|---------------|
| Airframe | 42000029 |
| Engine 1 | 883171 |
| Engine 2 | 883166 |
| Airframe/Engine Hours at Delivery | 13.8 |
| Airframe/Engine Cycles at Delivery | 11 |

**Delivery Information**

| | |
|------|---------------|
| Date of delivery: | January 27, 2017 |
| Delivery location (City, State): | Greensboro, NC |
| Warranty start/activation date: | January 27, 2017 |
| Date of departure: | January 27, 2017 |

Honda Aircraft Company, LLC ("Seller")

BY: _____
Name:   Christopher Belcher
Title:   Manager, Contracts

Passport 420, LLC ("Purchaser")

BY: _____
Name:   Michael Avenatti
Title:   Manager

Guilford County, North Carolina

I certify that the following person(s) personally appeared before me this day, each acknowledging to me that he or she signed the foregoing document:

Christopher Belcher   Michael Avenatti
*Name(s) of principal(s)*

Date: 1-27-2017

KELLY E. TOOLEY
NOTARY PUBLIC
GUILFORD COUNTY, NC

_____
*Official Signature of Notary*

Kelly E. Tooley , Notary Public
*Notary's printed or typed name*

My commission expires: 6-10-2017



*ADDENDUM to HONDAJET WHOLESALE PURCHASE AGREEMENT*
*No. 40000316*

### WARRANTY BILL OF SALE

KNOW ALL MEN BY THESE PRESENTS:

The undersigned, Honda Aircraft Company, LLC ("Seller"), is the owner of the full legal and beneficial title, free and clear of all liens and encumbrances, to the below-described airframe ("Airframe"), together with the two (2) engines described below ("Engines"), and all fixed equipment, parts, components and accessories installed thereon (collectively, the "Aircraft").

**Airframe Information**

| Manufacturer | Honda Aircraft Company, LLC |
|---|---|
| Model | HA-420 |
| Serial Number | 42000029 |
| Registration Number | N227WP |

**Engine Information**

| Manufacturer | GE Honda Aero Engines |
|---|---|
| Model | HF120 |
| Serial Number 1 | 883171 |
| Serial Number 2 | 883166 |

Further, for and in consideration of the sum of $10 and other good and valuable consideration, the receipt and sufficiency of which is hereby confirmed, Seller does on the date hereof grant, convey, transfer, bargain and sell, deliver and set over all right, title and interest in and to the Aircraft, fixed equipment, parts, components and accessories to the below listed Buyer, their successors and assigns, to have and to hold said Aircraft forever.

### BUYER: Passport 420, LLC

Further, Seller hereby states that it will defend such title against all liens, encumbrances, rights of others and demands whatsoever arising from or during the period of time that Seller was registered owner of the Aircraft.

Honda Aircraft Company, LLC ("Seller")

BY: _____
Name:   Christopher Belcher
Title:    Manager, Contracts
Date:    January 27, 2016

# Exhibit D

| Gogo Internet | | | |
|---|---|---|---|
| **Date** | **Document** | **Amount** | **Notes** |
| 4/20/2018 | Monthly Service Invoice | $2,489.05 | |
| 5/20/2018 | Monthly Service Invoice | $4,540.06 | |
| 6/20/2018 | Monthly Service Invoice | $6,591.07 | |
| 7/20/2018 | Monthly Service Invoice | $8,641.51 | |
| 8/20/2018 | Monthly Service Invoice | $10,691.95 | |
| | **Total** | $32,953.64 | |

| Honda Billing 1 | | | |
|---|---|---|---|
| **HAIC Accounts Receivable** | | | |
| **Date** | **Document** | **Amount** | **Notes** |
| 8/30/2018 | Honda Aircraft Receipt | $8,600.96 | |
| 10/24/2018 | Honda Aircraft Receipt | $877.99 | |
| 12/3/2018 | Honda Aircraft Receipt | $776.24 | |
| 1/16/2019 | Honda Aircraft Receipt | $2,426.42 | |
| 3/15/2019 | Honda Aircraft Receipt | $1,708.96 | |
| 4/9/2019 | Honda Aircraft Receipt | $12,775.75 | |
| 7/17/2019 | GE Honda Aero Engines | $954.39 | Note: 3 invoices from GE (6/25/19); (5/29/2019); (6/25/2019) - PAID |
| | **Total** | $28,120.71 | |

| Jeppesen | | | |
|---|---|---|---|
| **Date** | **Document** | **Amount** | **Notes** |
| 6/15/2018 | Jeppesen Payment Made | $1,230.00 | |
| 2/26/2019 | Jeppesen Payment Made | $1,230.00 | |
| | **Total** | $2,460.00 | |

| Ohman | | | |
|---|---|---|---|
| **Date** | **Document** | **Amount** | **Notes** |
| 12/15/2017 | The Renaissance Los Angeles Airport Hotel | $380.80 | |
| 12/17/2017 | Vinny's Pizza | $63.75 | |
| 12/18/2017 | Atlantic Aviation LAX | $232.00 | |
| 12/18/2017 | Atlantic Aviation Rental Agreement | $149.11 | |
| 1/26/2018 | Travel Expense - Tip Reimbursement | $365.00 | |
| 3/15/2019 | Aviation Consulting | $4,545.00 | |
| | Total | $5,735.66 | |

| Honda Billing Camp 1 + 2 | | | |
|---|---|---|---|
| Date | Document | Amount | Notes |
| 12/3/2019 | CSI, Inc. Invoice | $4,800.00 | |
| 12/31/2019 | CSI, Inc. Statement | $4,800.00 | |
| 1/31/2020 | CSI, Inc. Statement | $4,800.00 | |
| 2/29/2020 | CSI, Inc. Statement | $4,800.00 | |
| 3/31/2020 | CSI, Inc. Statement | $4,800.00 | |
| | Total | $24,000.00 | |

| Passport 420 Expenses | | | |
|---|---|---|---|
| Date | Document | Amount | Notes |
| 7/10/2018 | Attention to Detail | $325.00 | |
| 1/29/2018 | Mileage Plus United | $2,466.06 | |
| 2/11/2019 | Siruis XM | $19.41 | |
| 2/15/2019 | Signature Flight Support | $1,581.00 | |
| 2/19/2019 | Avionics and Maintenance | $1,937.50 | |
| 2/22/2019 | Amazon Mrktp | $9.90 | |
| 2/27/2019 | Jeppesen Sanderson | $1,230.00 | |
| 2/27/2019 | Siruis XM | $99.99 | |
| 3/11/2019 | Siruis XM | $19.41 | |
| 3/15/2019 | Check to Chris Ohman | $4,545.00 | |
| 3/15/2019 | Honda Aircraft | $1,708.96 | |
| 3/15/2019 | Signature Flight Support | $1,581.00 | |
| 3/18/2019 | Amazon Mrktp | $9.59 | |
| 3/27/2019 | Siruis XM | $99.99 | |
| 4/9/2019 | Honda Aircraft | $12,775.75 | |
| 4/10/2019 | Avionics and Maintenance | $2,044.91 | |
| 4/11/2019 | Siruis XM | $19.41 | |
| 4/15/2019 | Signature Flight Support | $1,581.00 | |
| 4/27/2019 | Siruis XM | $99.99 | |
| 5/11/2019 | Siruis XM | $19.41 | |
| 5/27/2019 | Siruis XM | $99.99 | |
| 6/11/2019 | Siruis XM | $19.41 | |
| 6/27/2019 | Siruis XM | $99.99 | |
| 7/11/2019 | Siruis XM | $19.41 | |
| 7/17/2019 | Honda Aircraft | $954.39 | |
| 7/27/2019 | Siruis XM | $99.99 | |
| 8/11/2019 | Siruis XM | $19.41 | |
| 8/27/2019 | Siruis XM | $99.99 | |
| 9/11/2019 | Siruis XM | $19.41 | |
| 9/27/2019 | Siruis XM | $99.99 | |

| | | |
|---|---|---|
| 10/11/2019 | Siruis XM | $19.41 |
| 10/27/2019 | Siruis XM | $99.99 |
| 11/11/2019 | Siruis XM | $19.41 |
| 11/27/2019 | Siruis XM | $99.99 |
| 12/3/2019 | Honda Aircraft | $776.24 |
| 12/11/2019 | Sirus XM | $19.04 |
| 12/14/2019 | Signature Flight Support | $1,581.00 |
| 12/27/2019 | Sirius XM | $99.99 |
| | Total | $36,420.33 |

# Exhibit E

## PETITION FOR REMISSION OR MITIGATION OF A CRIMINAL OR CIVIL FORFEITURE ACTION BY THE UNITED STATES DEPARTMENT OF JUSTICE

Note: This is a sample to assist potential petitioners. There is no legal form or format required for filing a petition. For more specific guidance on filing your petition, please consult Title 28, Code of Federal Regulations (C.F.R.) Section 9.4, which can be found at www.GPOaccess.gov.

To: The Attorney General of the United States    c/o US Attorney C.D. Cal. Nicola T. Hanna

From:   William Parrish, Spring Creek Research, LLC

c/o Lawrence J. Conlan, Cappello & Noël LLP, 831 State Street, Santa Barbara, CA 93101

**(Name and address of petitioner or petitioner's attorney or representative)**

**(Social Security Number / Taxpayer Identification Number of Petitioner)**

(805) 564-2444                                            lconlan@cappellonoel.com

**Phone Number**                                          **Email Address**

I am petitioning for the remission of the property described below because I am (check all that apply):

__  a victim of the crime underlying the forfeiture of the forfeited property, or related offense (*complete Sections I, III, and V*);

X  an owner of the forfeited property (*complete Sections I, II and V*); and/or

__  a lienholder of the forfeited property (*complete Sections I, II, and V*).

*If you would like to petition for the mitigation of the property (return of part of your interest in the property or return upon the imposition of certain conditions) because of extreme hardship, you must also complete Section IV.*

## SECTION I

Description of Property *(include specific information such as make, model, or serial numbers if applicable)*:    2016 Honda Jet, N227WP, Aircraft serial number: 42000029

| | |
|---|---|
| Seizing Agency: | Internal Revenue Service |
| Seizure Number/Asset ID Number: | |
| Date and Place of Seizure: | April 8, 2019, Santa Barbara Airport, Santa Barbara, CA |
| **Court Case Information** | |
| **Case Name:** | In the Matter of the Seizure of One Honda Aircraft |
| **Case Number:** | 8:19-MJ-00281 |
| **Judicial District:** | Central District California |

# SECTION II

Request for Remission - Owner or Lienholder

*This section should be completed by persons claiming an ownership interest in the property.*

I am requesting remission of this forfeiture pursuant to 28 C.F.R. § 9.5(a) because I have a valid, good faith, and legally cognizable interest in the seized property as owner or lienholder as described below: Please see Attachment A.

*Provide supporting documentation such as bills of sale, retail installment agreements, contracts, certificates of title, or mortgages.*

AND

1. _X_ I am innocent within the meaning of the innocent owner standard as provided in Title 18 U.S. Code Section 983(d), because:

   _X_ I did not know of the conduct giving rise to the forfeiture; or

   ___ Upon learning of the conduct giving rise to the forfeiture, I did all that reasonably could be expected under the circumstances to terminate such use of the property.

   Please explain answer: Please see Attachment A.

OR

2. ___ I was a bona fide purchaser or seller of the forfeited property for value without cause to believe that the property was subject to forfeiture at the time of the offense underlying the forfeiture.

OR

3. _ I held a legally cognizable interest in the forfeited property at the time of the offense underlying the forfeiture superior to that of the defendant.

   Please explain answer 2 or 3: _____

## SECTION III

Non-Owner Victim's Explanation of Loss

*This section should be completed by victim petitioners only.*

___ I am requesting remission of this forfeiture because I am a victim of the criminal offense underlying the forfeiture of this property or am the victim of a related offense and I have suffered a pecuniary loss as a result of the offense that resulted in the forfeiture.

In the space provide below, please explain how you are a victim of the criminal offense, or a related offense, underlying the forfeiture of this property.   Be as specific as possible and provide details such as significant dates, names of individuals whom you dealt with, the amount of money you claim to have lost (including specifics of the transactions resulting in the loss), and any other information that you believe would be helpful in verifying your loss.  Please attach documentation of your loss (copies only), including receipts, invoices, bank statements, wire transfer confirmation statements and cancelled checks, to your petition.

**Do not attach your original documents to the petition.**

_____

_____

_____

_____

_____

_____

_____

_____

Total Amount of Pecuniary Loss Claimed: _____

**(Do not include collateral expenses such as attorney fees, investigative costs, lost wages. Do not include non-pecuniary harms such as pain and suffering, emotional distress, etc.)**

## SECTION IV

Petition for Mitigation of the Forfeiture

*This section need be completed only by owner and lienholder petitioners seeking alternative relief to complete remission of the property.*

In the event that the Ruling Official determines that I do not qualify for remission of the property, I hereby request mitigation of the forfeiture to avoid extreme hardship. In support of my request, I would like the Ruling Official to consider the following extenuating circumstances:

Please see Attachment A.

## SECTION V

Declaration

*The declaration must be completed by all petitioners unless the petitioner is represented by an attorney. The attorney may complete the declaration if the petitioner completes the sworn notice of representation below.*

I understand that the information that I am providing in support of my petition will be relied upon for purposes of determining my right to receive a petition award. I hereby declare under penalty of perjury under the laws of the United States of America that I believe that the information I am providing in support of my petition is true and correct. I further certify that any documents I have submitted in support of my petition consist of unaltered copies of documents that are in my possession.

_____
Signature

Lawrence J. Conlan
Print Name

6/13/19
Date

## Sworn Notice of Representation

*This section must be completed only by petitioners who are represented by an attorney and whose attorney has executed the declaration provided above.*

I have retained the attorney who has completed the Declaration in Section V to represent me in this matter. I have reviewed the foregoing petition and found that its contents are accurate to the best of my information and belief. I declare under penalty of perjury that the foregoing information is true and correct.

_____
Signature

William Parrish
Print Name

6/13/19
Date

**The completed original petition for remission and all supporting documentation must be submitted to the United States Attorney for the judicial district in which the forfeiture proceedings took place. A copy of the petition for remission should be submitted to the seizing agency in the judicial district in which the seizure occurred.**

ATTACHMENT A

PETITION FOR REMISSION
AND/OR MITIGATION OF FORFEITURE

In the Matter of the Seizure of One Honda Aircraft, Registration number N227WP,
Aircraft Serial Number 42000029

Central District of California Case Number: 8-19-MJ-00281

SECTION II

Mr. William Parrish, through Spring Creek Research, LLC is a majority owner of
Passport 420, LLC, the legal owner and operator of a 2016 Honda Jet that was seized on April
10, 2019.  Mr. Parrish is requesting remission of the forfeiture of the aircraft pursuant to 28
C.F.R. § 9.5(a) because he has a valid, good faith, and legally cognizable interest in the seized
property as the majority owner of the property.

***Mr. Parrish is the majority owner of Passport 420, the entity that owns and operates the seized
Honda Jet aircraft***

Mr. Parrish owns 52.7% of Passport 420, LLC, through an entity he controls called
Spring Creek Research, LLC.  Passport 420 was formed in July 2016 to own and operate the
property at issue, a 2016 Honda Jet, Registration number N227WP, Aircraft Serial Number
42000029.  The other member of Passport 420 is Avenatti & Associates, APC, an entity
controlled originally by Michael Avenatti, Esq.  At the time Passport 420 was formed and the
aircraft was purchased, Avenatti was Mr. Parrish's lawyer.

***Mr. Parrish used his personal funds to acquire his interest in the aircraft***

Mr. Parrish began contemplating the joint purchase of a private aircraft with his then-
attorney Michael Avenatti in approximately June 2016.  On July 7, 2016, Mr. Parrish wired
$350,000 from his family trust account to the account of Honda Aircraft at Wells Fargo Bank
NA as a down payment on the Honda Jet that would be owned and operated by Mr. Parrish and
Avenatti.  They formed Passport 420, LLC, a Delaware Limited Liability Company, and entered
into an operating agreement for that company dated as of July 11, 2016.  A true and correct copy
of the Certificate of Formation from the State of Delaware for Passport 420 and a true and
correct copy of the Passport 420 Operating Agreement are attached to the Declaration of
Lawrence J. Conlan.  Mr. Parrish owns his interest in Passport 420 through Spring Creek
Research, LLC.

On January 18, 2017, Mr. Parrish wired an additional $1,985,000 for the purchase of the
aircraft from his family trust account into the account that had been opened at California Bank &
Trust in the name of Passport 420, LLC.  True and correct copies of the written confirmations of

Mr. Parrish's wire transfers for the purchase are attached to the Declaration of Lawrence J. Conlan. The total net purchase price of the aircraft was $4,383,605, which included the base price, adjusted, plus options and tax. A true and correct copy of the Honda Aircraft Company invoice is attached to the Declaration of Lawrence J. Conlan. Based on his total contribution of $2,311,000, Mr. Parrish in fact owns a 52.7% interest in the aircraft. A true and correct copy of an accounting of the aircraft purchase prepared by Mr. Parrish is attached to the Declaration of Lawrence J. Conlan.

***Mr. Parrish is a victim of Avenatti, who purported to act as his attorney but repeatedly betrayed Mr. Parrish's trust and confidence***

As set forth above, when Mr. Parrish acquired his interest in the aircraft, he did so with his own personal funds. He understood that he was purchasing the aircraft jointly with Avenatti, who at that time had been representing Mr. Parrish for several years and had gained Mr. Parrish's trust and confidence. Despite the position of trust that Avenatti held, he and his law firm failed adequately to advise Mr. Parrish of his rights and risks in the acquisition of the aircraft and at no time did he disclose to Mr. Parrish the source of funds he was using to purchase the Avenatti & Associates interest in Passport 420.

Mr. Parrish ultimately learned that during that time that Avenatti and his law firm Eagan Avenatti represented him, which lasted from 2008 until he was terminated in 2018, Avenatti, his firm and lawyers associated with that firm breached fiduciary duties to Mr. Parrish and committed legal malpractice in multiple ways. First, as alleged in the professional negligence action against Avenatti and other associated defendants recently filed in Santa Barbara Superior Court, Avenatti and his fellow lawyers' misconduct and malpractice has put Mr. Parrish at risk of potentially major liability in pending litigation in Orange County Superior Court that could exceed $10 million. A true and correct copy of the professional negligence case filed against Avenatti et al. is attached to the Declaration of Lawrence J. Conlan. That case arose from allegations that Avenatti stole $5 million in fees owed to Robert Stoll, an attorney Eagan Avenatti had joint ventured with to represent Mr. Parrish. After Mr. Parrish terminated Avenatti and his law firm in June 2018, he learned that evidence produced in the case showed that Avenatti had used the money for personal expenditures but lied to Mr. Parrish, telling him the money was held in an escrow account. Avenatti and his law firm also utterly failed to defend Mr. Parrish from Stoll's false accusations that he somehow allowed or consented to Avenatti stealing the money. Now, Mr. Parrish has had to incur substantial sums in attorney fees defending himself from Stoll's false accusations and Avenatti's malpractice.

Avenatti also betrayed Mr. Parrish's trust and confidence in other ways. In early 2013, while Eagan Avenatti was representing Mr. Parrish, Mr. Parrish was persuaded to loan Avenatti $1.5 million so Avenatti could purchase Tully's Coffee. Avenatti never repaid the money despite repeated promises that he would, and despite Avenatti's later promise that he would secure the debt with his interest in the Honda Jet. In August 2018, Mr. Parrish sued Avenatti individually on the debt and has now obtained a final judgment against Avenatti in excess of $2.1 million including interest and fees. A true and correct copy of the judgment against Avenatti is attached to the Declaration of Lawrence J. Conlan.

Finally, Avenatti's conduct in connection with the purchase of the now-seized aircraft has created even more problems for Mr. Parrish. Even though Mr. Parrish's ownership interest in Passport 420 and the aircraft is and has always been superior to Avenatti or any creditor of Avenatti, Mr. Parrish has now been deprived of his interest and his ability to use the aircraft because of Avenatti.

### Mr. Parrish is an innocent owner of the aircraft and his purchase and ownership is unrelated to any alleged criminal conduct of Michael Avenatti

At no time did Mr. Parrish have any personal knowledge of the source of funds that Avenatti may have used to purchase the Avenatti & Associates interest in the aircraft. Avenatti's conduct that led to the criminal charges against him, as described in various media reports and publicly available court filings concerning the funds allegedly used to purchase his interest in the aircraft, does not involve Mr. Parrish.

Mr. Parrish was informed of the seizure on April 10, 2019 by agents from the Department of Treasury when he arrived at Santa Barbara Airport to use his aircraft. Mr. Parrish was allowed to view the seizure warrant for the aircraft, but neither he nor Spring Creek has ever been provided with any other documentation concerning the seizure, including but not limited to any written notice of seizure and intent to forfeit the property under 28 C.F.R. section 9.4 (a).

When the aircraft was seized, the Treasury agents assured Mr. Parrish not to worry, and promised him that he would be "made whole." Beginning on April 11, 2019, the day after the aircraft was seized by the government, counsel for Mr. Parrish began communicating with attorneys at the United States Department of Justice in the Central District of California regarding Mr. Parrish's ownership of the aircraft. A true and correct copy of written communications with DOJ are attached to the Declaration of Lawrence J. Conlan.

On April 12, 2019, counsel for Mr. Parrish spoke by phone with Assistant United States Attorney Steven Welk who suggested the possibility of allowing Mr. Parrish and Avenatti's former spouse Lisa Storie-Avenatti to proceed with a private sale of the aircraft, which they had been negotiating at the time of the seizure. Ms. Storie-Avenatti purportedly had been assigned the Avenatti & Associates interest in Passport 420 pursuant to a stipulation and family court order entered in Orange County Superior Court in or about December 2018. A true and correct copy of written communications with DOJ are attached to the Declaration of Lawrence J. Conlan.

In the course of several other verbal and written communications with AUSA Welk, counsel for Mr. Parrish supplied a detailed explanation of Mr. Parrish's ownership interest and provided supporting documentation of the purchase, including wire transfer confirmations showing Mr. Parrish's use of more than $2 million of his personal funds to acquire his 52.7% interest in the aircraft. A true and correct copy of written communications with DOJ are attached to the Declaration of Lawrence J. Conlan Counsel for Mr. Parrish also proposed that it would be in the best interests of the government and Mr. Parrish to release the fully insured aircraft to Mr. Parrish, with a federal government lien in place, and allow it to be sold privately (and not as a government-seized asset). This would preserve the value of the aircraft and encourage maximum

liquidation value.  It would also allow Mr. Parrish to use the aircraft pending sale, as is his right.  Mr. Welk responded that he would discuss the proposal with his team, but to date no further direct response has been provided.  In subsequent communications with other parties claiming an interest, DOJ stated that "the government is unlikely ultimately to retain any of the realized value of the plane in the event of forfeiture beyond its out of pocket costs associated with retainer and maintenance." In other words, the government's interest on the aircraft is not superior to Mr. Parrish.

Since Mr. Parrish is the majority owner of the aircraft, and since Avenatti was at best a minority owner, Mr. Parrish should not be deprived of its use and his value due to the alleged criminal conduct of Michael Avenatti.  The property should be remitted to Mr. Parrish to allow it to be sold, in order to maximize the return of Mr. Parrish's legitimate investment and to provide maximum value to other victims/clients of Avenatti whose settlement proceeds were allegedly used to purchase Avenatti's interest in the jet.


**SECTION IV**

*Petition for Mitigation of the Forfeiture*

In the event that the Ruling Official determines that Mr. Parrish does not qualify for remission of the property, we hereby request mitigation of the forfeiture to avoid extreme hardship.  In support of Mr. Parrish's request, we ask the Ruling Official to consider the extenuating circumstances described above, and the following:

Mr. Parrish has already suffered significant and extreme hardship as a result of Avenatti's conduct.  If the seized aircraft is not remitted to Mr. Parrish, he will suffer additional extreme hardship and requests mitigation under these difficult circumstances.  Mr. Parrish proposes that the mitigation should take a form similar to his proposal for remission.  Mr. Parrish has suffered serious economic harm as a result of Avenatti's actions, and the harm Avenatti has caused to other victims should not take priority over Mr. Parrish.  All of Avenatti's victims would be best served by allowing Mr. Parrish to coordinate a private sale of the aircraft and maximize the liquidation value.  Mr. Parrish is in the best position to manage the marketing and sale process, which will enable prospective buyers to test-fly the aircraft, and minimize the likelihood of "fire sale" buyers who will undoubtedly see an opportunity to pay well below value for a government-seized asset.  This will allow Mr. Parrish to recoup his 52.7% interest in the aircraft from the sale price, and it will also allow the remaining proceeds to be returned to the government for distribution amongst Avenatti's other victims.

## DECLARATION OF LAWRENCE J. CONLAN

I, Lawrence J. Conlan say and declare as follows:

1.      I am over the age of 18 and legally competent to make this declaration.

2.      I have personal knowledge of the facts set forth in this declaration, and if called as a witness, I could and would testify competently to the matters set forth herein.

3.      A true and correct copy of the Certificate of Formation from the State of Delaware for Passport 420, LLC is attached hereto as **Exhibit A**.

4.      A true and correct copy of Passport 420 Operating Agreement is attached hereto as **Exhibit B**.

5.      A true and correct copy of William Parish's written confirmation of wire transfers for the purchase of the Honda Jet is attached hereto as **Exhibit C**.

6.      A true and correct copy of the Honda Aircraft Company purchase invoice is attached hereto as **Exhibit D**.

7.      A true and correct copy of an accounting of the aircraft purchase prepare by William J. Parrish is attached hereto as **Exhibit E**.

8.      A true and correct copy of the professional negligence complaint against Michael Avenatti et al. filed in Santa Barbara Superior Court is attached hereto as **Exhibit F**.

9.      A true and correct copy of the judgment entered in favor of Mr. Parrish and against Michael Avenatti in Case No. 18CV04106 is attached hereto as **Exhibit G**.

10.     A true and correct copy of my April 8, 2019 email correspondence with Julian Andre, Esq. of the Department of Justice is attached hereto as **Exhibit H**.

11.     A true and correct copy of email correspondence between Steven Welk, Esq. of the Department of Justice and Ira Bibbero, Esq. Counsel for Ms. Storie-Avenatti dated April 12, 2019, which followed my telephone call with Mr. Welk is attached hereto as **Exhibit I**.

12.     A true and correct copy of my May 2, 2019 email correspondence with Steven

Welk, Esq. is attached hereto as **Exhibit J**.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on June 13, 2019 at Santa Barbara, California.

_____

Lawrence J. Conlan

Exhibit A



# Delaware

Page 1

### The First State

I, JEFFREY W. BULLOCK, SECRETARY OF STATE OF THE STATE OF
DELAWARE, DO HEREBY CERTIFY THE ATTACHED IS A TRUE AND CORRECT
COPY OF THE CERTIFICATE OF FORMATION OF "PASSPORT 420, LLC",
FILED IN THIS OFFICE ON THE FOURTEENTH DAY OF APRIL, A.D. 2016,
AT 6:05 O`CLOCK P.M.

Jeffrey W. Bullock, Secretary of State

6016745  8100
SR# 20162305571

Authentication: 202151717
Date: 04-14-16

You may verify this certificate online at corp.delaware.gov/authver.shtml

State of Delaware
Secretary of State
Division of Corporations
Delivered 06:05 PM 04/14/2016
FILED 06:05 PM 04/14/2016
SR 20162305571 - File Number 6016745

## CERTIFICATE OF FORMATION

### OF

### PASSPORT 420, LLC

This Certificate of Formation of **Passport 420, LLC** (the "Company") is being duly executed and filed by Jack Cullen, as an authorized person, to form a limited liability company under the Delaware Limited Liability Company Act (6 Del.C. § 18-101, et seq.).

    1.     The name of the Company is:

**Passport 420, LLC**

    2.     The address of the registered office of the Company in the State of Delaware is 160 Greentree Drive, Suite 101, Dover, Delaware 19904.

    3.     The name and the address of the registered agent of the Company required to be maintained by Section 18-104 of the Delaware Limited Liability Company Act are National Registered Agents, Inc., 160 Greentree Drive, Suite 101, Dover, Delaware 19904, County of Kent.

    4.     The duration of the limited liability company shall be perpetual.

Executed on April 14, 2016.

Jack Cullen, Authorized Person

# Exhibit B

LIMITED LIABILITY COMPANY OPERATING
AGREEMENT

OF

PASSPORT 420, LLC

Dated as of July 11, 2016

# PASSPORT 420, LLC

THIS LIMITED LIABILITY COMPANY OPERATING AGREEMENT (the "Agreement") of Passport 420, LLC (the "Company") is made as of July 11, 2016 between Spring Creek Research, LLC, 4185 La Ladera Road, Santa Barbara, California, 93110 ("Spring Creek") and Avenatti & Associates, APC, 520 Newport Center Drive, Suite 1400, Newport Beach, California 92660 ("AA") (each a "Member" and collectively, the "Members").

WHEREAS, the Members have caused to be formed a limited liability company pursuant to the laws of the state of Delaware, as they may be amended; and

WHEREAS, the Members desire to establish their respective rights and obligations in connection with forming such limited liability company; and

WHEREAS, the Members of the Company wish to set forth the terms and conditions of their ownership and operation of one Honda Aircraft Company, LLC ("HondaJet"), model HA-420, Serial Number SN42000029, U.S. Registration Number N227WP (the "Aircraft"); and

WHEREAS, within the next ten (10) business days, the Company will take assignment of that certain HondaJet Purchase Agreement dated October 11, 2006 between Avenatti & Associates, APC and HondaJet, as amended (the "Purchase Agreement"), for the purchase of the Aircraft; and

WHEREAS, the Company agrees to lease the Aircraft exclusively to the Members without flight crew, which shall be provided by each Member individually under separate agreement, in exchange for the Members' agreement to insure, operate and maintain the Aircraft and pay their individual charges and pro-rata amounts due under this Agreement, it being the intent of the parties that the Company is not providing transportation services for compensation to the Members, that the Members shall have Operational Control of all flights under this Agreement which shall be conducted under Part 91 of the Federal Aviation Regulations ("FAR"); and

WHEREAS, each Member's ownership interest in the Aircraft will be according to and the same as their ownership interest in the Company as set forth on Exhibit A (the "Ownership Interest"), provided, however, that by entering into this Agreement, the Members do not intend to create a syndicate, group, pool, or joint venture which is classifiable as an association, or any group operating under an agreement which creates an organization classifiable as an association; and

WHEREAS, The relationship of the Member among themselves shall be that of tenants-in-common with regard to the Aircraft and each Member agrees that the sole and adequate means by which it may divest its Ownership Interest in the Company and the Aircraft shall be the transfer of the interest in accordance with the terms and conditions of this Agreement.

1

NOW THEREFORE, in consideration of the mutual covenants and provisions hereinafter contained, the Members agree as follows:

1.      **Formation and Scope of Company.**

    1.1    **Establishment of Company Name.** The Members formed a limited liability company under the provisions of Delaware law by causing a Certificate of Formation to be filed on April 14, 2016 with the Secretary of State of Delaware for the purposes and on the terms herein set forth. The rights and liabilities of the Members shall be as provided in Delaware law, except as is otherwise expressly provided herein. The name of the Company shall be "Passport 420, LLC."

    1.2    **Term of Company.** The term of the Company shall commence on the date formation and shall continue until terminated in accordance with the provisions of Section 9 hereof or as otherwise provided by law.

    1.3    **Location of Offices.** The Company shall carry on its business from its principal office located at such address as the Members may from time to time determine by mutual  agreement.

2.      **Sharing of Expenses.**

    2.1    **Equal Sharing of Expenses.**  Except as expressly provided herein, all expenses from transactions entered into by, or on behalf, for the account or in the name of, the Company within the scope of this Agreement will be shared pro-rata according to each Member's Ownership Interest.

    2.2    **Distributions.** No distributions are anticipated provided, in accordance with Section 7 or upon mutual agreement of the Members, the Aircraft may be sold in accordance with Sections 10 and 11 of this Agreement and the proceeds of the sale shall be distributed pro-rata according to each Member's Ownership Interest, less any outstanding balances due by either Member.

    2.3    **Capital and Expense Requirements.** Initial capital requirements and subsequent payments to the Company shall be in accordance with Exhibit A. Thereafter, each Member agrees to provide its share of funding in such manner and at such times as the Members determine to be sufficient to conduct the affairs of the Company in an orderly manner.

3.      **Accounting and Reconciliation.** The Members shall share pro-rata in the fixed costs and expenses from Aircraft operations and forward their share to the Company, together with any individual costs and expenses incurred by them, on a monthly basis. The Members further agree to establish mutually satisfactory arrangements to conduct Company transactions in a commercially reasonable

manner.

3.1 The Company will prepare a quarterly accounting of the receipts and disbursements, which will be supplied to the Members within 30 days following the end of the quarter. An annual account reconciliation of hours of Aircraft use as determined by the Aircraft's hours meter ("Flight Hours") and individual charges under this Agreement shall be overseen by the Manager and shall be made available to each of the Members upon reasonable request.

3.2 The Company shall provide to each Member or its representative, access from time to time as each Member may reasonably request, during normal business hours, to permit inspections of all books and records relating to transactions conducted for the account of the Company.

4. **Administration of the Aircraft Schedule.**

4.1 Each Member shall be entitled to an annual number of Flight Hours according to each Member's Ownership Interest in the Company, set forth on Exhibit A (individually, the "Member's Annual Flight Hours").

4.1.1 Each Member shall notify the other Member by email prior to scheduling use of the Aircraft and in the event the Members intend to schedule use on the same day, the Member with prior notice shall have priority in scheduling the Aircraft provided, in the event there is a material difference in the number of annual hours scheduled by the Members (greater than 20%), the Member with fewer hours of Aircraft use shall have priority.

4.1.2 No Member may schedule its Aircraft use for a period exceeding seven (7) calendar days in duration without first getting approval from the other Member.

4.1.3 If a Member (the "First Member") schedules Aircraft use that will cause the Aircraft to layover at a location away from the Operating Base set forth on Exhibit A for any period of time, the other Member (the "Second Member") may subsequently schedule one or more flights that will occur prior to the First Member's return to the Operating Base, provided:

4.1.3.1 Such flight(s) by the Second Member may not unreasonably delay or interfere with any scheduled flight of the First Member; and

4.1.3.2 All expenses and Flight Hour charges to ferry the Aircraft from the First Member's location to the operating base or other location where the Second Member will embark, and all

3

expenses and Flight Hour charges to ferry the Aircraft back to the First Member's location, shall be charged to the Second Member.

4.1.4 Flight Hours incurred for regulatory, certification, maintenance and test flight purposes of the Aircraft shall be for the account of the Company and not to the individual Members.

4.2 **Allocation and Payment of Charges.**

4.2.1 Each Member shall be individually responsible for its pro-rata share of charges to the Company for services and supplies necessary for the ownership and operation of the Aircraft according to each Member's Ownership Interest including but not limited to:

4.2.1.1 Any changes for Airworthiness Directives, Service Bulletins, Upgrades to the Aircraft, Regulatory compliance charges, or Annual Increases in Insurance Premiums for the Aircraft;

4.2.1.2 Any charges to maintain the Aircraft in a good and airworthy operating condition and in compliance with all applicable FAR and the Aircraft Operating Manual;

4.2.1.3 Any charges to maintain and preserve all Aircraft Documents in a complete, accurate, and up-to-date manner;

4.2.1.4 All regulatory and tax related charges due to the ownership and operation of the Company and the Aircraft, including but not limited to any property taxes and any costs, expenses, fees and taxes incurred in connection with any sales tax audit or reconciliation; and

5.2.1.4 Hanger space at the Operating Base; insurance on the Aircraft; and washing and maintenance of the Aircraft at the Operating Base.

4.2.2 Each Member shall be individually responsible for charges related to the individual flights of the Member including but not limited to:

4.2.2.1 All fuel, oil, lubricants, and other services and supplies required for the Member's individual operation of the Aircraft;

4.2.2.2 The services of pilots for all of Member's individual

4

operation of the Aircraft;

4.2.2.3 Charges related to extraordinary wear and damage caused by Member; and

4.2.2.4 Any financing or lease payment associated with a Member's ownership interest in the Aircraft or the Company.

4.3.1 In the event a Member moves the Aircraft to a maintenance facility, the charges and Flight Hours related to such flight shall be for the account of the Company.

4.3 **Payment of charges by the Members.** The Members shall pay their pro-rata share and individual charges within seven days of receipt of invoice from the Company.

4.3.1 The Members shall forward payment for their pro-rata share and individual charges by check or wire transfer to the Company.

4.3.2 Payments are delinquent after ninety days and are subject to a 15% per annum late charge.

4.3.3 The Members agree that Company is not providing transportation services to Members for compensation and payments of the Members are not made to Company for the purpose of reimbursement of charges paid by Company. Rather, each Member remains individually responsible for a pro-rata share of the cost of insuring and maintaining the Aircraft and charges related to Member's individual Aircraft use as invoiced by Company.

5. <u>**Management of the Company.**</u> The affairs of the Company shall be managed by a Manager.

5.1 The Manager shall have full and complete authority, power and discretion to manage and control the affairs of the Company, to make all decisions regarding such matters, and to perform any and all other acts and activities customary or incident to the Company's purpose. The actions of the Manager taken in accordance with this Agreement shall bind the Company. The Manager, or such person designated by the Manager, shall be an authorized person within the meaning of the Delaware Limited Liability Act to execute, deliver and file any certificates or documents, and any amendments of such certificates or documents, necessary for the Company to conduct its affairs in the state of Delaware and in any other jurisdiction in which the Company may wish to do so. The Manager may appoint, employ, or otherwise contract with other persons or entities for the transaction of the business of the Company or the performance of services

for or on behalf of the Company.

5.2   **Election of Manager.** A Manager shall be elected annually, either at a meeting or by written consent in lieu of a meeting, by a unanimous vote of all of the then Members in the Company.

5.3   **Reliance by Third Parties.** Any person or entity dealing with the Company may rely upon a certificate or document signed by the Manager as to any action of the Company, or as to the existence or non-existence of any facts that are germane to the affairs of the Company.

6.   **Restrictions on Related Party Transactions.** No transaction will be consummated for the account of the Company from, or sold for the account of the Company to, any of the Members or any person, firm or corporation which is controlled by, controlling or under common control with a Member unless, in any such case, such Member has fully disclosed the particulars of such relationship and of such purchase or sale in writing to the other Members and obtained the written consent of such other Members to such transaction.

7.   **Events of Default.** Without limiting in any way what may constitute a default by a party to this Agreement, the occurrence and continuation of any of the following shall constitute a default:

7.1   The failure of a Member to timely pay when due any amount required to be paid by Member under this Agreement or any other agreement related to the Aircraft or the use of the Aircraft including but not limited to any agreement with a financial institution providing financing for Member's Ownership Interest in the Aircraft.

7.2   The breach by a Member, of any representation or warranty or other provision of this Agreement or any other agreement related to the Aircraft or the use of the Aircraft including but not limited to any agreement with a financial institution providing financing for Member's Ownership Interest in the Aircraft.

7.3   If Member shall admit in writing its inability to pay, or fail to pay, debts generally as they become due; file a petition in bankruptcy or file an answer admitting or failing to deny the material allegations of such petition; make an assignment for the benefit of its creditors; consent to the appointment of, or possession by, a custodian for itself or for the whole or substantially all of its property; on a petition in bankruptcy filed against it, be adjudicated, or have an order for relief granted as, a bankrupt; or, file a petition or answer seeking reorganization or arrangement or other aid or relief under any any law for the relief of debtors or file an answer admitting, or fail to deny, the material allegations of a petition filed against it for any such relief.

6

8.   **Remedies for Default.**   In addition to any other remedies provided for in this Agreement or otherwise available to a non-defaulting Member at law or in equity (including, without limitation, reasonable attorney's fees, costs, and expenses), upon the occurrence of a default by a Member, such Member's rights to use of the Aircraft shall be suspended until the default is cured. Notwithstanding the foregoing, the defaulting Member shall remain liable and responsible during the continuation of any default for payment of all amounts for which such Member is liable under this Agreement, and/or all amounts for which such Member is liable under any other agreement related to the Aircraft or the use of the Aircraft.

9.   **Withdrawal and Termination.** Each Member hereby irrevocably waives any right it may have to demand the partition or sale for partition of the Aircraft under any laws of the State of California or any other jurisdiction.

   9.1   **Withdrawal upon Notice.** Either Member may withdraw as a Member of the Company at any time upon ninety days prior written notice of withdrawal to the other Member, provided the withdrawing Member shall complete the sale of its Ownership Interest in the Aircraft per Sections 10 and 11 of this Agreement.

   9.2   **Termination on Default.** This Agreement may be terminated by either Member, subject to completion of the sale of the Ownership Interests in the Aircraft per Sections 10 and 11 of this Agreement, upon written notice to the other at any time if:

      9.2.1   The non-terminating Member shall have materially breached any term or condition of this Agreement and not cured such breach within thirty (30) days of written notification by the terminating Member of such breach; or

      9.2.2   The non-terminating Member commits a regulatory violation under the FAR as adjudicated by a regulatory body.

   9.3   This Agreement shall terminate upon bankruptcy, death, dissolution, expulsion, incapacity or withdrawal of any Member, unless within ninety days after such event, the Company is continued by the vote or written consent of a majority in interest of all of the remaining Members.  In the event this Agreement is terminated under this Section 9.3, the trustee, executor, heirs or other lawful successor in interest of such Member shall be authorized and obligated to complete the sale of its ownership interest in the Aircraft per Sections 10 and 11 of this Agreement.

   9.4   **Consequences of Withdrawal or Termination.** In the event of termination of this Agreement and sale of Ownership Interests in the Aircraft per Sections 10 and 11 of this Agreement, the Company shall thereupon be dissolved or in the alternative, a Member's right and obligations under this Agreement shall be terminated upon that Member's

withdrawal; provided, however, that all previously incurred obligations, liabilities and rights shall remain unimpaired (including without limitation the obligation to make reports and payments required under this Agreement), and settled in due course by the Members.

9.4.1 Termination of this Agreement or withdrawal will not relieve the Members of any individual obligation with respect to any third party for the account of the Company or for the individual Member's Aircraft usage prior to the effective date of termination.

9.4.2 Any other assets of the Company at the effective date of termination of this Agreement shall be disposed of for the account of the Company and dispersed pro-rata to the Members in such manner as the Members may mutually agree.

9.5 **Appraisal.** In the event of a Member's withdrawal or default or upon any of the events described in Section 9.3, or upon any other event that terminates continued membership of any Member, the withdrawing or terminating Member or their estate shall be entitled to receive the fair value of the Member's interest in the Company. In the event the withdrawing or terminating Member or the deceased Member's estate cannot reach immediate agreement with the Company about the fair value of the Member's interest, the fair value shall be determined by appraisal, provided, the value of the Aircraft shall be determined per Sections 10 and 11 of this Agreement.

10. **Sale of Member's ownership interest in the Aircraft.**

10.1 **Notice of Intent to Sell.**  If at any time a Member intends to sell or otherwise divest itself of its respective Ownership Interest in the Aircraft, such Member (the "Selling Member") shall provide written notice of such intent to the other Member (the "Non-Selling Member").

10.2 **Determination of Fair Market Value.**  As soon as reasonably practicable after the date of any notice under Section 10.1, the Members shall determine the Fair Market Value of the Aircraft by mutual negotiation and agreement.

10.2.1 In the event the Members cannot agree on the Fair Market Value of the Aircraft within ten (10) days after the date of any notice under Section 10.1, the Members shall, within twenty (20) days after the date of the notice under Section 10.1, jointly select an established, reputable, independent, and qualified appraiser to determine the Fair Market Value of the Aircraft.

10.2.2 In the event the Members cannot agree on a single appraiser, the Fair Market Value of the Aircraft shall be determined by averaging

8

the fair market valuation appraisals of three (3) established, reputable, independent, and qualified appraisers, the first of whom shall be selected by the Selling Member, the second of whom shall be selected jointly by the Non-Selling Member, and the third of whom shall be selected jointly by the first two appraisers.

10.3     **Non-Selling Member's Option.** The Non-Selling Member shall have the option, exercisable by written notice delivered to the Selling Member within the first ten (10) Business Days following the determination of the Fair Market Value of the Aircraft, to purchase all, but not less than all, of the Selling Member's Ownership Interest in the Aircraft (the Non-Selling Member that elects to purchase the Selling Member's ownership interest in the Aircraft under this Section 10.3 or under Section 11.3 is a "Purchasing Member").

10.3.1  In the event this Agreement is amended to provide for additional members and more than one (1) Purchasing Member elects to purchase the Selling Member's Ownership Interest in the Aircraft, each Purchasing Member shall be entitled to purchase a pro-rata portion of the Selling Member's Ownership Interest in the Aircraft that bears the same ratio as each respective Purchasing Member's then-existing percentage Ownership Interest in the Aircraft bears to the total percentage Ownership Interest in the Aircraft then held by all the Purchasing Members combined.

10.3.2  The price at which the Purchasing Member(s) may purchase the Selling Member's Ownership Interest in the Aircraft (the "Option Price") shall be an amount equal to 98% of the Fair Market Value, multiplied by the Selling Member's percentage Ownership Interest in the Aircraft (it being agreed that such Option Price shall be deemed to be equal to the net amount that Selling Member would have received for its Ownership Interest in the Aircraft had the entire Aircraft been sold to a third-party on the open market at the Fair Market Value through a reputable brokerage firm, and the net sales proceeds after deducting sales commissions and other sales expenses totaling 2% of the sales price were shared by the Members pro-rata according to their respective Ownership Interest Percentages).

10.3.3  If one (1) or more Purchasing Members exercise the option under this Section 10.3 to purchase the Selling Member's Ownership Interest in the Aircraft, the closing of such transaction shall occur not later than 5:00 p.m. Pacific Time on the 10th Business Day after the end of the ten (10) Business Day option period provided for in Section 10.3, unless another closing date shall be established by mutual agreement of the Members.

9

10.4 **Procedures for Purchasing Member(s) of Selling Member's Aircraft Interest.** On the date of the closing of any sale of Selling Member's Ownership Interest in the Aircraft to Purchasing Member(s):

10.4.1 The Purchasing Member(s) shall deliver to Selling Member the Option Price by wire transfer of immediately available U.S. funds.

10.4.2 Selling Member shall deliver all right, title, and interest in and to the Selling Member's Ownership Interest in the Aircraft, free and clear of all Liens on the Aircraft, to the Purchasing Member(s) in such as the parties may mutually agree.

10.4.3 Selling Member shall execute and deliver to the Purchasing Member(s) a Warranty Bill of Sale in a form reasonably acceptable to Purchasing Member(s), transferring all of Selling Member's Ownership Interest in the Aircraft to the Purchasing Member(s).

10.4.4 The Purchasing Member(s) shall execute and deliver to Selling Member a Delivery Receipt in a form reasonably acceptable to Selling Member.

10.4.5 The Selling Member shall promptly execute and deliver to the Purchasing Member(s) such other notices, statements, documents and instruments and perform such other acts the Purchasing Member(s) deems necessary to protect, preserve and enforce its acquisition and ownership of Selling Member's Ownership Interest in the Aircraft.

11. **Sale of Entire Aircraft.**

11.1 **Solicitation of Third-Party Offers and Sale of Aircraft.** In the event no Non-Selling Member exercises its option under Section 10.3, the Members shall retain an aircraft broker to facilitate the sale of the entire Aircraft.

11.2 **Third Party Offer Equal to or in Excess of Fair Market Value.** In the event the Members receive a bona-fide offer from any third-party to purchase the Aircraft for a purchase price that equals or exceeds the Fair Market Value determined pursuant to Section 10.2, the Members shall accept such offer, subject to the provisions of Section 11.4 of this Agreement.

11.3 **Third Party Offer Less Than Fair Market Value.** In the event the Members receive a bona-fide offer from any third-party to purchase the Aircraft for a purchase price that the parties unanimously determine to be

reasonable and acceptable, but which is nevertheless less than the Fair Market Value determined pursuant to Section 10.2, each of the Non-Selling Members shall thereafter have an additional option, exercisable by written notice delivered to Selling Member within three (3) days after receipt of Selling Member's notice, to purchase all, but not less than all, of Selling Member's Ownership Interest in the Aircraft for a purchase price equal to 98% of the offered price, multiplied by the Selling Member's percentage Ownership Interest in the Aircraft.

11.3.1 In the event more than one (1) Purchasing Member (as defined in Section 10.3) elects to purchase the Selling Member's Ownership Interest in the Aircraft, each Purchasing Member shall be entitled to purchase a pro-rata portion of the Selling Member's Ownership Interest in the Aircraft that bears the same ratio as each respective Purchasing Members then-existing percentage Ownership Interest in the Aircraft bears to the total percentage Ownership Interest in the Aircraft then held by all the Purchasing Members combined.

11.3.2 The closing of any purchase by the Purchasing Member(s) of Selling Member's Ownership Interest in the Aircraft pursuant to this Section 11.3 shall occur not later than 5:00 p.m. Pacific Time on the 10th Business Day after the day the Non-Selling Member exercises its option under this Section 11.3, and shall be conducted in accordance with the procedures set forth in Section 10.4.

11.3.3 In the event no Non-Selling Member exercises its option hereunder, the Members shall accept the third-party offer, subject to the provisions of Section 11.4 of this Agreement.

11.4 **Comprehensive Aircraft Purchase Agreement.** Any acceptance of a bona-fide offer from a third-party for the purchase of the entire Aircraft will be subject to the condition that such offer is contingent upon negotiation and execution of a comprehensive Aircraft Sale Agreement.   The Members shall jointly negotiate any such Aircraft Sale Agreement in good faith.   The Members shall each pay a pro-rata portion of all expenses of any sale of the entire Aircraft pursuant to this Section 11, and shall each be entitled to a pro-rata share of the proceeds of any such sale, according to their respective percentage Ownership Interests in the Aircraft.

12. **Representations and Warranties of Members.** The Members hereby represent and warrant as follows:

12.1 Notwithstanding that a Member shall have Operational Control of the Aircraft during that Member's individual flights, the Members agree that the Pilot in Command of any such flight may, in his or her sole discretion, terminate the flight, refuse to commence the flight, or take any other flight related action which in the judgment of the Pilot in Command is necessary

11

to ensure the safety of the Aircraft, the Flight Crew, and all persons and property on board the Aircraft, and no such action of the Pilot in Command may support or be the basis of any claim of any kind against the Members or the Company.

12.2   Member is, and throughout the Term hereof shall continue to be duly incorporated or organized, validly existing, and in good standing under the laws of the state of Member's formation, possessing perpetual existence as a legal entity, having the capacity to sue and be sued in its own name, having full power, legal right and authority to carry on its business as currently conducted, and to execute, deliver and perform the provisions of this Agreement.

12.3   The execution, delivery, and performance of this Agreement by Member have been duly authorized by all necessary company action and do not conflict with or result in any breach of any of the terms or constitute a default under any document, instrument, or agreement to which it is a party.

12.4   This Agreement constitutes the legal, valid and binding obligations of Member, and is enforceable against Member in accordance with the terms herein contained.

12.5   Member shall not create or place any Lien against the Aircraft other than a security interest in favor of a financial institution providing financing for the Member's Ownership Interest and/or the Aircraft (a "Financing") and each Member shall ensure that no Liens are created or placed against the Aircraft by third-parties as a result of its actions, and shall take all actions as may be necessary to discharge and satisfy in full any such Lien promptly after the same becomes known to it.   Under no circumstances may the balance owed under any Financing by a Member constitute more than forty percent (40%) of the value of the Aircraft as of January 1 of each calendar year as measured by the then most recent valuation published by Jet Aviva.

12.6   Member shall not divest itself of its Ownership Interest in the Company or the Aircraft except in accordance with the terms and conditions specified in this Agreement.

12.7   Member is, and throughout the Term hereof shall continue to be, either a citizen of the United States as defined in 49 U.S.C.§40102, as amended, or otherwise eligible to register the Aircraft in the United States.

12.8   Member shall not knowingly violate any regulatory, legal or insurance requirement applicable to the Aircraft and shall procure, maintain, and comply with all permits, licenses, and other authorizations required for use of the Aircraft by Member to ensure the proper operation, maintenance,

and repair of the Aircraft per the Aircraft manufacturer's and insurer's recommendations and applicable FARs.

13. **Section 1.761-2(a) Treatment.**   The Members intend that the Company be excluded from the application of all or part of subchapter K of chapter 1 of the Internal Revenue Code.

14. **Allocation of Tax Benefits and Obligations.** Each Member shall be entitled to its pro rata share of all tax benefits, if any, arising from its respective Ownership Interest in the Company and Aircraft.  Each Member shall be responsible for, and shall pay promptly when due, all taxes which may be assessed or levied by any taxing jurisdictions as a result of the purchase, lease, use, storage, or other consumption by such Member of such Member's Ownership Interest; provided, however, that each Member shall have the right to dispute or contest in good faith and at such Member's sole expense the amount of any taxes assessed or imposed directly against such Member.  During the period that any such taxes are being disputed or contested in good faith, payment of such taxes in accordance with the terms of this Agreement may be delayed until a final determination of the amount due has been made so long as the delay in payment does not create a risk of a tax lien or forfeiture of the Aircraft.

15. **Insurance.**  The  Company shall maintain at all times  during  the  term  of this Agreement, with insurers of recognized responsibility, aircraft hull insurance and liability insurance in amounts not less than as listed on Exhibit B with respect to the Aircraft naming the Members as Loss Payees as their interests may appear. The Aircraft shall not be operated at any time, unless and until such insurance policies are in effect.

16. **No Assignment.** Neither Member may assign, transfer, license, sell or encumber this Agreement, the Aircraft or any rights or obligations hereunder, without the prior written consent of the other Member(s), which such consent shall not be unreasonably withheld, and any such non-permitted assignment, transfer, license, sale or encumbrance of the like, shall be null and void ab initio. Notwithstanding anything contained herein, each Member shall be permitted to assign, transfer and/or sell ("Transfer") its ownership interest in the Company to another entity controlled in whole or in part by the Member or, (i) in the case of Spring Creek's interest, controlled by William Parrish, and (ii) in the case of AA, controlled by Michael Avenatti.  The new Member shall assume the ownership interest subject to all rights, duties, obligations and terms of this Agreement.  In the event of such a Transfer, the transferring member shall notify the non-transferring member in writing within ten (10) business days of the Transfer.

17. **Notices.**  All notices or other communications required or permitted under this Agreement shall be in writing and will be directed to the Member at the above referenced address, and sent certified mail, return receipt requested, or by fax with confirmed receipt, or by recognized overnight delivery service, or by email. Such notices and communications shall be deemed received three (3) calendar

days after having been sent.

18. **Governing Law.** This Agreement and the respective rights of the Members hereunder shall be governed by and construed under the laws of the State of California and will bind and inure to the benefit of the Member's successors and permitted assigns.

19. **Counterparts.** This Agreement may be executed in counterparts and by fax.

20. **Entire Agreement, Amendments.** There are no representations, warranties, promises or inducements between the Members not contained in writing. This Agreement is the entire Agreement between the Members and supersedes all prior agreements relating to the subject matter of this Agreement and/or the Aircraft.  This Agreement may be changed only in a writing signed by a duly authorized representative of each of the Members, expressly referring to this Agreement.

21. **Arbitration.** The Members shall work together in good faith and shall endeavor to reach commercially reasonable solutions to all issues that may arise in their relationship hereunder.  Any disputes, claims or causes of actions between the Members arising out of this Agreement or the transactions contemplated hereby shall be fully and finally adjudicated and resolved by an arbitration commenced before JAMS located in Los Angeles, California and conducted under the JAMS arbitration rules then in effect.  The dispute shall be heard by one arbitrator jointly selected and paid for by the Members.

22. **Indemnification.**

22.1 **Company Indemnification:** The Company may, and shall have the power to, indemnify and hold harmless, and advance expenses to, any Member, manager or other person, or any testator or intestate of such Member, manager or other person, from and against any and all claims and demands whatsoever relating to the operation of the business of the Company; provided, however, that no indemnification may be made to or on behalf of any Member, manager or other person if a judgment or other final adjudication adverse to such Member, manager or other person establishes (a) that his or her acts were committed in bad faith or were the result of active and deliberate dishonesty and were material to the cause of action so adjudicated or (b) that he or she personally gained in fact a financial profit or other advantage to which he or she was not legally entitled.

22.2 **Member Indemnification:** In the event the Aircraft is sold as a result of a default, the Members agree that the defaulting Member shall reimburse the non-defaulting Member the non-defaulting Member's portion of the expenses incurred per Section 11.4 and any negative variance due to the difference between the sales price received upon sale of the of the Aircraft

14

pursuant to Section 11 and the Fair Market Value as determined in
Section 10.2.

23.     **Limitation of Liability.** Each Member agrees to indemnify and hold harmless
the other Member and Manager and their respective officers, directors, partners,
employees, shareholders, and affiliates from any claim, damage, loss, or
reasonable expense, including reasonable attorney's fees, resulting from the
bodily injury or property damage caused by an occurrence and arising out of the
ownership, maintenance, or use of the Aircraft.

24.     **Truth-In-Leasing Statement under FAR 91.23:** (a) The Aircraft, within the
twelve month period preceding the date of this agreement, except to the extent
the Aircraft is less than twelve months old, has been and during the lease term
shall be, inspected and maintained in accordance with Part 91.409 (f) (3) and all
applicable requirements for maintenance and inspection thereunder have been
complied with; (b) the Members certify and knowingly acknowledge that when
they use the Aircraft under this Agreement under lease, the Member shall be
known as, considered and  in fact shall be the operator of such aircraft; (c) an
explanation of factors bearing on operational control and pertinent FARs can be
obtained from the nearest FAA Flight Standards District Office; and (d) the
Members hereto certify that a true copy of this agreement shall be carried on the
Aircraft at all times during any lease thereof, and shall be made available for
inspection upon request by a representative of the FAA.

WHEREFORE, the parties hereto have executed this Agreement as of July 11, 2016.

Spring Creek Research, LLC                     Avenatti & Associates, APC

By:_____                   By:_____
    William Parrish, Member                        Michael J. Avenatti, President

15

## Exhibit A

|  | **Member** Spring Creek Research, LLC | **Member** Avenatti & Associates, APC* |
|---|---|---|
| Initial Capital Contribution: | $350,000 | $1,000 |
| Ownership Interest: | 50% | 50% |
| Subsequent Capital Contribution | $1,950,000 | $1,831,105 |
| Maximum Annual Flight Hours: | 150 | 150 |

| | |
|---|---|
| Minimum Hull Insurance Limit: | $5,000,000 |
| Minimum Liability Insurance | $5,000,000 |
| Operating Base: | SBA |

*Member Avenatti & Associates, APC shall have the option to secure financing for its Subsequent Capital Contribution in accordance with the terms of this agreement as set forth above and, in the event of such financing, the Members agree that the Aircraft shall be subject to a priority security interest.   Member Avenatti & Associates, APC shall indemnify and hold harmless Member Spring Creek Research, LLC for any and all costs, including attorney's fees, incurred due to the repossession and/or sale of the Aircraft due to any default under any financing or security agreements.

**WAIVER OF NOTICE AND CONSENT TO ACTION
IN LIEU OF HOLDING MEMBERS MEETING OF
PASSPORT 420, LLC**

The undersigned, being all Members of the above named Limited Liability Company and pursuant to Section 5 of the Operating Agreement of Passport 420, LLC, dated July 11, 2016, **DO HEREBY WAIVE NOTICE** of a members meeting, and **CONSENT**, take and adopt, the following actions in writing in lieu of such meeting, on the 11th day of July, 2016:

- Appoint Michael Avenatti as Manager of Passport 420, LLC.

The undersigned agree that the foregoing constitutes a complete record of actions taken, adopted, approved and ratified by unanimous written consent of the Members in lieu of a members annual meeting.

WITNESS the below signature this 11th day of July, 2016.

**MEMBERS**

_____
William Parrish, Spring Creek Research, LLC

_____
Michael J. Avenatti, Avenatti & Associates, APC

I hereby accept the appointment as Manager of Passport 420, LLC pursuant to the terms set forth in the Operating Agreement of Passport 420, LLC dated July 11, 2016.

_____
Michael Avenatti

1

Exhibit C

## Mandy Duong

**From:** gs-online-asset-transfer-requests@ny.email.gs.com
**Sent:** Wednesday, January 18, 2017 8:54 AM
**To:** wparrish@cox.net
**Subject:** Asset Transfer Confirmation

Dear Client,

An asset transfer request was submitted by you via the Goldman Sachs website on 18-Jan-2017 11:53 AM EST. Please review the details below to ensure accuracy:

| | |
|---|---|
| From Account | Parrish Trust – Margin xxx-xx994-5 |
| Amount | 1,985,000 |
| Bank Name | California Bank & Trust |
| Receiving Account Number/IBAN | xxxxxxxxx57 |
| Destination Country | usa |

Your request has been sent to your PWM team for processing. Additional instructions or authorization may be required for some requests.

If you did not submit this request, or if you have any questions regarding this notification please contact your Private Wealth Management team.

Sincerely,

Goldman Sachs Private Wealth Management

For your security, please do not reply to this e-mail. If you have any questions or concerns about this e-mail, please contact your Private Wealth Management team or log in to your account at www.goldman.com to send your PWM team a secure e-mail. For enhanced security when accessing your PWM accounts online, we recommend that you type or copy/paste the address directly into your browser. Please go to http://www.goldmansachs.com/privacy-and-security/how-you-can-protect-yourself.html to learn more about how you can protect your personal information from phishing and other threats.

**Mandy Duong**

| | |
|---|---|
| **From:** | gs-online-asset-transfer-requests@ny.email.gs.com |
| **Sent:** | Tuesday, July 12, 2016 10:32 AM |
| **To:** | wparrish@cox.net |
| **Subject:** | Asset Transfer Confirmation |

Dear Client,

An asset transfer request was submitted by you via the Goldman Sachs website on 12-Jul-2016 1:30 PM EDT. Please review the details below to ensure accuracy:

| | |
|---|---|
| From Account | Parrish Trust – Margin xxx-xx994-5 |
| Amount | 350,000 |
| Bank Name | Wells Fargo Bank NA |
| Receiving Account Number/IBAN | xxxxxxx366 |
| Destination Country | USA |

Your request has been sent to your PWM team for processing. Additional instructions or authorization may be required for some requests.

If you did not submit this request, or if you have any questions regarding this notification please contact your Private Wealth Management team.

Sincerely,

Goldman Sachs Private Wealth Management

For your security, please do not reply to this e-mail. If you have any questions or concerns about this e-mail, please contact your Private Wealth Management team or log in to your account at www.goldman.com to send your PWM team a secure e-mail. For enhanced security when accessing your PWM accounts online, we recommend that you type or copy/paste the address directly into your browser. Please go to http://www.goldmansachs.com/privacy-and-security/how-you-can-protect-yourself.html to learn more about how you can protect your personal information from phishing and other threats.

Exhibit D

# Honda Aircraft Company, LLC

6430 Ballinger Rd, Greensboro, NC 27410
Tel : 336-662-0246   Fax : 336-662-0852

**BILL TO**

PASSPORT 420 LLC
520 NEWPORT CENTER DR
STE 1400
NEWPORT BEACH CA  92660-7020
USA

**SOLD TO**

PASSPORT 420 LLC
520 NEWPORT CENTER DR
STE 1400
NEWPORT BEACH CA  92660-7020
USA

**NOTICE OF PAYMENT DUE**

| | |
|---|---|
| Contract Number : | 40000316 |
| Document Number : | 90003409 |
| Date : | 12/20/2016 |
| Due Date : | At Delivery |
| Sold To Customer Number : | 12391 |
| Serial Number : | 42000029 |

**REPRESENTATIVE**

Will Cutter
wcutter@cutteraviation.com
602-690-5665

| HONDAJET HA-420 | Amount (USD) |
|---|---|
| Base Price | $3,650,000.00 |
| CPI-Price Adjustment | $338,355.00 |
| Gross Base Price | $3,988,355.00 |
| Options Price | $392,750.00 |
| NC Sales Tax | $2,500.00 |
| Total Net Price Due | $4,383,605.00 |
| Deposits Received | ($600,000.00) |
| Net Balance Due | $3,783,605.00 |

## PAYMENT BY WIRE TRANSFER

Honda Aircraft Company, LLC
Wells Fargo Bank N.A.
420 Montgomery Street
San Francisco, CA 94101
Account # 4126555366
ABA # 121000248
Intl. Swift # WFBIUS6S

All Accounts Due & Payable in US Dollars.  Please Include Customer Name, Customer Number, Contract Number and Document Number. Wire fees are the responsibility of sender.

**USA PATRIOT ACT.** The monetary requirements of the USA Patriot Act require Honda Aircraft Company to identify and review the connection between funds received and its customer, the Purchaser, as specifically listed in the Purchase Agreement. In the event Honda Aircraft Company receives funds from a source other than Purchaser, remitter may be requested to provide information documenting the connection to Purchaser.
NOTE: All monetary submissions will be subject to screening in compliance with the USA Patriot Act

**Export Notice:** These items are controlled by the U.S. Government and authorized for export only to the country of ultimate destination for use by the ultimate consignee or end-user(s) herein identified. They may not be resold, transferred, or otherwise disposed of, to any other country or to any person other than the authorized ultimate consignee or end-user(s), either in their original form or after being incorporated into other items, without first obtaining approval from the U.S. government or as otherwise authorized by U.S. law and regulations.
ECCN: 9A991.b ; HTS: 8802.30.0030 ; COO: United States.



Guilford   County, North Carolina

I certify that the following person(s) personally appeared before me this day, each acknowledging to me that he or she signed the foregoing document:

Christopher Belcher
*Name(s) of principal(s)*

Date: 1-27-2017

**KELLY E. TOOLEY**
**NOTARY PUBLIC**
**GUILFORD COUNTY, NC**

*Official Signature of Notary*

Kelly E. Tooley   Notary Public
*Notary's printed or typed name*

My commission expires: 6/10/2017



*HondaJet*

*ADDENDUM to HONDAJET PURCHASE AGREEMENT*
*No. 40000316*

### DELIVERY RECEIPT

The undersigned Purchaser hereby accepts delivery of one (1) Honda Aircraft Company, LLC model HA-420 aircraft, bearing United States Registration Number N227WP (the "Aircraft"), manufactured in accordance with the HondaJet Retail Purchase Agreement, No. 40000316 between Purchaser and Seller, and Seller's Specification and Description dated January 2016 (the "Specification").

Purchaser hereby confirms acceptance and delivery of the Aircraft equipped as specified in the Agreement and Specification, and verifies that the Aircraft has been inspected and generally conforms to the same. Purchaser also confirms receipt of the appropriate, approved Flight Manual for the Aircraft.

**Aircraft Information**

| Item | Serial Number |
|---|---|
| Airframe | 42000029 |
| Engine 1 | 883171 |
| Engine 2 | 883166 |
| Airframe/Engine Hours at Delivery | 13.8 |
| Airframe/Engine Cycles at Delivery | 11 |

**Delivery Information**

| | |
|---|---|
| Date of delivery: | January 27, 2017 |
| Delivery location (City, State): | Greensboro, NC |
| Warranty start/activation date: | January 27, 2017 |
| Date of departure: | January 27, 2017 |

Honda Aircraft Company, LLC ("Seller")

BY: _____
Name:   Christopher Belcher
Title:    Manager, Contracts

Passport 420, LLC ("Purchaser")

BY: _____
Name:  Michael Avenatti
Title:   Manager

Guilford County, North Carolina

I certify that the following person(s) personally appeared before me this day, each acknowledging to me that he or she signed the foregoing document:

_Christopher Belcher    Michael Avenatti_
Name(s) of principal(s)

Date: 1-27-2017

KELLY E. TOOLEY
NOTARY PUBLIC
GUILFORD COUNTY, NC

_____
Official Signature of Notary

Kelly E. Tooley , Notary Public
Notary's printed or typed name

My commission expires: 6-10-2017



*ADDENDUM to HONDAJET WHOLESALE PURCHASE AGREEMENT*
*No. 40000316*

### WARRANTY BILL OF SALE

KNOW ALL MEN BY THESE PRESENTS:

The undersigned, Honda Aircraft Company, LLC ("Seller"), is the owner of the full legal and beneficial title, free and clear of all liens and encumbrances, to the below-described airframe ("Airframe"), together with the two (2) engines described below ("Engines"), and all fixed equipment, parts, components and accessories installed thereon (collectively, the "Aircraft").

**Airframe Information**

| Manufacturer | Honda Aircraft Company, LLC |
|---|---|
| Model | HA-420 |
| Serial Number | 42000029 |
| Registration Number | N227WP |

**Engine Information**

| Manufacturer | GE Honda Aero Engines |
|---|---|
| Model | HF120 |
| Serial Number 1 | 883171 |
| Serial Number 2 | 883166 |

Further, for and in consideration of the sum of $10 and other good and valuable consideration, the receipt and sufficiency of which is hereby confirmed, Seller does on the date hereof grant, convey, transfer, bargain and sell, deliver and set over all right, title and interest in and to the Aircraft, fixed equipment, parts, components and accessories to the below listed Buyer, their successors and assigns, to have and to hold said Aircraft forever.

### BUYER: Passport 420, LLC

Further, Seller hereby states that it will defend such title against all liens, encumbrances, rights of others and demands whatsoever arising from or during the period of time that Seller was registered owner of the Aircraft.

Honda Aircraft Company, LLC ("Seller")

BY:

Name:   Christopher Belcher
Title:     Manager, Contracts
Date:     January 27, 2016

# Exhibit E

| | | | |
|---|---|---|---|
| Honda Jet Price (tax inc) | 4,383,605 | | |
| TCASII Option Added | 138,800 | | |
| Total Price Paid by Passport 420 | 4,522,405 | | |
| | | | |
| Spring Creek/Parrish Payments | 350,000 | Apr-16 | To Honda Aircraft |
| | 1,985,000 | Jan-17 | To Passport 420 at Cal Bank and Trust |
| Total Payments | 2,335,000 | | |
| Less Operational Accnt deposit | 24,000 | Deposit at Passport 420 accnt Calif Bank & Trust | |
| Purchase Contribution | 2,311,000 | 52.7% | |

# Exhibit F

1   A. Barry Cappello (SBN 037835)
    abc@cappelloneel.com
2   Lawrence J. Conlan (SBN 221350)
    lconlan@cappelloneel.com
3   CAPPELLO & NOËL LLP
    831 State Street
4   Santa Barbara, California 93101
    Telephone:    (805) 564-2444
5   Facsimile:    (805) 965-5950

6   Attorneys for Plaintiff

7

8

9

10

ELECTRONICALLY FILED
Superior Court of California
County of Santa Barbara
Darrel E. Parker, Executive Officer
8/20/2018 3:47 PM
By: Narzralli Baksh, Deputy

**SUPERIOR COURT OF THE STATE OF CALIFORNIA**

**FOR THE COUNTY OF SANTA BARBARA**

11                                              18CV04106

12  WILLIAM PARRISH, an individual;        Case No.:

13          Plaintiff,                      **COMPLAINT FOR**
                                            **1.  BREACH OF FIDUCIARY DUTY**
14  vs.                                     **2.  BREACH OF PROMISSORY NOTE**
                                            **3.  ACCOUNT STATED**
15  MICHAEL J. AVENATTI, an individual; and **4.  OPEN BOOK ACCOUNT**
    DOES 1 through 20, inclusive,           **5.  COMMON COUNT– MONEY HAD**
16                                          **     AND RECEIVED**
            Defendants.                     **6.  COMMON COUNT – MONEY LENT**
17

18                                          **DEMAND FOR JURY TRIAL**

19

20

21

22

23

24

25

26

27

28

1    Plaintiff alleges:

2    1.    All allegations made in this complaint are based upon information and belief.  The

3  allegations of this complaint stated on information and belief are likely to have evidentiary support

4  after a reasonable opportunity for further investigation or discovery.

5               **NATURE OF ACTION**

6    2.    This action is about the avaricious disregard and abuse of trust cultivated by an

7  attorney in a decade long professional relationship with his client.  That attorney, Michael J.

8  Avenatti, Esq. ("Avenatti") repeatedly and routinely put his own financial interests ahead of his

9  client, Plaintiff William Parrish, in violation of Avenatti's fiduciary duties, the rules of professional

10  conduct governing attorneys in California, statutory law and basic contract principles.   After

11  assisting in obtaining a multi-million dollar settlement on behalf of Plaintiff and his business partner,

12  Avenatti continued to represent Plaintiff in a variety of other litigation matters and transactions, and

13  Plaintiff relied on what he rightfully assumed to be Avenatti's good advice and professional

14  judgment.  Avenatti took advantage of that trust, however, and persuaded Plaintiff to loan him

15  $1,500,000 in order to invest in a separate business venture.  Avenatti falsely promised Plaintiff that

16  he would repay the funds in 45 days, failed to explain to Plaintiff that he should seek the advice of

17  independent counsel, and then failed to properly document the loan.

18    3.    Plaintiff expressly told Avenatti that he agreed to make the loan based on his trust in

19  Avenatti as his attorney and Avenatti's assurances of prompt repayment of the full amount owed. At

20  Plaintiff's urging to properly document the loan, Avenatti subsequently drafted and executed a

21  Promissory Note which extended the due date through January 31, 2014 (and then by amendment

22  through January 31, 2017), and provided for 8% interest on the principal owed.  Avenatti did not

23  provide any security for the loan, although he promised he would grant Plaintiff security in the full

24  amount of the loan.  At no time did he explain to Plaintiff that he should seek independent legal

25  advice regarding the fact of the loan or the terms of the note.

26    4.    The California Rules of Professional Conduct expressly require that in a business

27  transaction such as this between an attorney and client, the terms of the transaction must be fair,

28  reasonable and fully disclosed to the client who then must provide his written consent.  Unsecured

1   loans by their nature are not fair or reasonable because they are a high risk to the lender.

2   Importantly, the attorney also must advise the client in writing to seek the advice of an independent

3   counsel in connection with the transaction.  Here, Avenatti totally disregarded Plaintiff's interests,

4   borrowed money from Plaintiff on terms that were neither fair nor reasonable nor fully disclosed nor

5   consented to in writing by Plaintiff.  In addition, Avenatti failed to comply with his duty to advise

6   Plaintiff in writing to seek the advice of an independent counsel. Avenatti further exploited

7   Plaintiff's trust by repeatedly assuring Plaintiff that he had the funds to pay off the loan in full and

8   such payment was imminent.  Finally, despite his ongoing and repeated assurance to repay the loan,

9   including in writing as recently as November 2017, and his assurances that there were no issues

10  regarding applicable statutes of limitations, Avenatti never repaid the loan. To date, Avenatti owes

11  Plaintiff the entire principal amount, plus interest.

12      5.      Plaintiff brings this action in order to make himself whole for all damages caused by

13  Avenatti, including principal and interest on the loan, other losses related to Plaintiff's inability to

14  use the funds for the last five years, and punitive damages as a result of Avenatti's fraudulent and

15  malicious breach of his fiduciary duties.

16                              **PARTIES**

17      6.      Plaintiff William Parrish ("Plaintiff") is an individual residing in the City of Santa

18  Barbara, County of Santa Barbara, State of California.

19      7.      Defendant Michael J. Avenatti ("Avenatti"), is an individual residing in the City of

20  Newport Beach, County of Orange, State of California. Avenatti is an attorney who represented

21  Plaintiff in several matters.

22      8.      Plaintiff is uncertain as to the identity or capacity of the defendants included herein as

23  DOES 1 through 20, inclusive, and therefore sues said defendants by their fictitious names.  Plaintiff

24  is informed and believe and thereon allege that said defendants, DOES 1 through 20, inclusive, and

25  each of them, are liable to Plaintiff on the facts herein alleged and will seek leave of this court to

26  amend this complaint when their true names are ascertained.

27      9.      Plaintiff is informed and believes and thereon alleges that each of the defendants is,

28  and at all material times was, the agent and employee of each of his, her, or their co-defendants, and

1    in committing the acts herein alleged, was acting in the scope of his, her, or their employment, or

2    his, her, or their authority as such agents and employees, with the permission and consent of his, her

3    or their co-defendants.

**VENUE**

5        10.    Venue is appropriate pursuant to Code of Civil Procedure sections 395(a) as the

6    underlying agreement was made, entered into and to be performed in Santa Barbara County, and the

7    liability and/or obligation that is the center of the dispute is located in Santa Barbara County.

**GENERAL ALLEGATIONS**

9        11.    Avenatti is an attorney licensed to practice law in the State of California.  Avenatti

10   acted as Plaintiff's attorney starting in approximately 2008. Avenatti represented Plaintiff in various

11   matters including, without limitation, *William Parrish et al vs. FLIR Systems, Inc. et al.* Case No.

12   1301514, filed July 10, 2008 ("*Parrish v. FLIR*"). Avenatti was, until he was recently terminated,

13   counsel of record for Plaintiff in litigation arising out of that action. Avenatti also has represented

14   Plaintiff in various other matters and transactions.  At all times relevant to this Complaint, Avenatti

15   and Plaintiff had an attorney-client relationship.

16       12.    In or about May 2011, Avenatti was one of the lawyers representing Plaintiff and his

17   business partner when they obtained a multi million dollar settlement in *Parrish v. FLIR*.  Litigation

18   continued in two additional matters and Avenatti was Plaintiff's lawyer.

19       13.    In or about June 2013, while still representing Plaintiff, Avenatti asked Plaintiff, his

20   client at the time, for a $1,500,000 unsecured loan to be repaid in 45 days.  Avenatti's stated purpose

21   for the loan was to purchase an interest in a coffee company. At no time has Plaintiff ever had an

22   interest in or connection to the coffee company, Tully's. Avenatti assured Plaintiff verbally and in

23   emails that the $1,500,000 would be repaid within 45 days.

24       14.    In a June 28, 2013 email from Avenatti to Plaintiff, Avenatti stated "I want to thank

25   you again for agreeing to loan me $1.5 million for 45 days (until August 15, 2013) so I can close

26   Tully's. You have no idea how much I appreciate you assisting me – you are a true friend." The 45-

27   day unsecured loan did not provide for any interest payment on the principal or any other

28   consideration to Plaintiff for loaning Avenatti $1,500,000.  At that point in time, the terms of the

3

1   loan were memorialized only in emails between Avenatti and his client and not by any separate

2   writing.

3        15.     Plaintiff trusted Avenatti as a result of: (a) their attorney-client relationship, (b)

4   Avenatti's involvement and assistance in obtaining a major settlement for Plaintiff and (c) Avenatti's

5   assurances that he had the ability to, and would, repay the loan in full within forty-five days.  On or

6   about July 1, 2013 Plaintiff wired $1,500,000 from his bank account to Avenatti's bank account.

7        16.     On or about December 16, 2013, Plaintiff explained to Avenatti that "[b]ecause you

8   are my attorney, with all the trust being an attorney implies, we forewent documentation of the short-

9   term loan to get you funds by your deadline … [however, the loan] really requires proper

10  documentation for my estate (as well as the IRS)." In this same email, Plaintiff also explained that if

11  Avenatti did not repay the loan imminently as promised, Plaintiff would suffer adverse financial

12  consequences because he would need to sell securities and other holdings, resulting in "unpleasant

13  ramifications" to Plaintiff's finances.  In fact, Plaintiff did later need to sell securities in order to help

14  fund a separate business venture.  Had Avenatti repaid the loan, the loaned funds would have been

15  used instead.

16       17.     Avenatti subsequently drafted a "NonNegotiable Promissory Note Due January 31,

17  2014" (the "Promissory Note") that he executed, bearing a date of July 1, 2013. In accordance with

18  the terms of the Promissory Note, Avenatti agreed to pay interest of 8.0% per annum on any unpaid

19  principal from the date the amount was loaned until paid in full. A true and correct copy of the

20  Promissory Note is attached as **Exhibit A** hereto and incorporated by reference.

21       18.     After Avenatti failed to repay the loan from his client despite ongoing and repeated

22  assurances that he would, Avenatti later amended the Promissory Note to extend the maturity date to

23  January 31, 2017. Avenatti made this amendment in handwriting by, among other things, crossing

24  out the "14" in the original date of January 31, 2014 and replacing it with a "17" to make the

25  Promissory Note due on January 31, 2017 (the "Amended Note"). Avenatti initialed these mark-ups.

26  He also executed the Amended Note by signing it and handwriting "Reaffirmed 7/25/16."  A true

27  and correct copy of the amended Promissory Note is attached as **Exhibit B** hereto and incorporated

28  by reference.

19.     Since the time Avenatti initially asked to borrow money from Plaintiff, Plaintiff repeatedly requested that Avenatti pay in full all amounts due on the Promissory Note.

20.     Avenatti repeatedly assured and represented to Plaintiff that he had the ability to pay off the full amount owed on the Promissory Note and routinely assured him that such payment would be imminent. For example, in a November 30, 2017 email from Plaintiff to Avenatti which Avenatti signed in agreement at a subsequent meeting between Plaintiff and Defendant, Avenatti represented that: (a)  he was responsible for paying off the full amount of principal and interest owed on the Promissory Note, and (b) he was "100% certain" that on January 15, 2018, Avenatti would receive a significant settlement from another matter, and he would use those funds to pay off the full amount owed on the Promissory Note by the end of January 2018.

21.     In the November 30, 2017 email, Plaintiff asked Avenatti, "[a]lso, as my counsel, please confirm that, since you dusted off the note with a new signature and payment date (although again now long passed), the note is not in jeopardy of passing a statute of limitation date." Avenatti confirmed that as Plaintiff's counsel, he was advising Plaintiff that any recovery on all amounts owed on the Promissory Note were not subject to a statute of limitation defense.

22.     Plaintiff did not sue Avenatti based on Avenatti's representations and assurances including, without limitation, the following: (a) Avenatti's representation that he had the funds to repay the loan in full and that repayment was imminent; and (b) Avenatti's representation that the statute of limitations was not a bar to any recovery from Avenatti on the loan.

23.     As of the date of filing of this Complaint, Avenatti has failed and refused to pay the Promissory Note off originally or as amended and has not paid the note as set forth above.

24.     As of the date of filing of this Complaint, Avenatti has failed to secure the loan, despite promises to do so.

25.     Avenatti has not repaid the full amount due, including the principal, and interest as required by the Promissory Note.

26.     The terms of the original 45-day loan from Plaintiff were not fair or reasonable or fully disclosed to Plaintiff because the loan only benefitted Avenatti at Plaintiff's expense in that it provided no consideration to Plaintiff in the form of interest on the principal or any other

1 consideration to Plaintiff in exchange for the loan and because the loan was unsecured and high risk.

2 Avenatti failed to fully disclose the risks to Plaintiff, as was his duty. As such, Avenatti acted in an

3 adverse manner contrary to the interests of Plaintiff.

4    27.    Avenatti unilaterally extended the term of the note and failed to reveal his own dire

5 financial situation, done for Avenatti's benefit and to the detriment of his client, Plaintiff.

6    28.    The terms of the Promissory Note were not fair or reasonable or fully disclosed to

7 Plaintiff because an unsecured note is a high-risk instrument and Avenatti failed to disclose this to

8 Plaintiff.  As such, Avenatti acted in an adverse manner contrary to Plaintiff's interests.

9    29.    At no time did Avenatti advise Plaintiff in writing that Plaintiff should seek the

10 advice of an independent lawyer of Plaintiff's choice in connection with this $1,500,000 loan. As

11 such, Avenatti acted in an adverse manner contrary to Plaintiff's interests, and for Avenatti's own

12 benefit.

13    30.    At no time did Avenatti request from Plaintiff or did Plaintiff provide his consent in

14 writing to the terms of the loan or the Promissory Note after full disclosure of the risks and rights. As

15 such, Avenatti acted in an adverse manner contrary to Plaintiff's interests, and for Avenatti's own

16 benefit.

17    31.    Plaintiff has been forced to file this action in order collect the sums due and owing to

18 him.

19                          **FIRST CAUSE OF ACTION**

20                          **(Breach of Fiduciary Duty)**

21    32.    Plaintiff realleges and incorporates herein by reference each and every allegation

22 herein, as though fully incorporated herein and made a part hereof.

23    33.    As set forth above, Plaintiff retained and employed Avenatti to represent Plaintiff in

24 connection with various matters starting in 2008.  Avenatti accepted this employment and agreed to

25 perform duties for Plaintiff as Plaintiff's attorney. Avenatti was in an attorney-client relationship

26 with Plaintiff based on trust and confidence, that derived from the fact that Avenatti represented

27 Plaintiff in various matters as set forth above; had drafted the Promissory Note, a legal document, in

28 connection with the loan; had advised Plaintiff on legal issues related to the Promissory Note; was

1  told by Plaintiff that Plaintiff was relying on Avenatti's trust as his attorney in connection with the

2  $1,500,000 loan.

3        34.    Attorneys owe their clients fiduciary duties to act in the utmost good faith, fidelity

4  and trust for the benefit of their clients.

5        35.    As Plaintiff's attorney, Avenatti owed Plaintiff fiduciary duties of an attorney to a

6  client, including the duty to act in the utmost good faith, fidelity and trust for the benefit of Plaintiff,

7  and to take no action to personally benefit.  By virtue of this special relationship that existed between

8  Avenatti and Plaintiff, Plaintiff had confidence in the integrity of Avenatti and trusted that Avenatti

9  would act in the utmost good faith, fidelity and trust and in a manner that was not adverse or

10  contrary to Plaintiff's interests. Avenatti knowingly acted against Plaintiff's interest in borrowing

11  funds from Plaintiff without informing Plaintiff of the risks associated with an unsecured loan such

12  as this, by initially borrowing $1,500,000 from Plaintiff on terms that only benefitted Avenatti and

13  failing to provide Plaintiff with any consideration in exchange, and by misrepresenting that he had

14  the funds to pay off the loan and that all amounts due on the loan would be paid in full when due,

15  when in fact Avenatti failed to pay the full amount owed on the loan.

16        36.    The conduct of attorneys with their clients is also governed by the California Rules of

17  Professional Conduct. Rule 3-300 is applicable to businesses transactions between attorneys and

18  their clients where the interests of the attorney and client are adverse, including unsecured loans

19  obtained by an attorney from his client. Here, Rule 3-300 is applicable to the loan transaction and

20  Promissory Note because Avenatti's interests are adverse to Plaintiff's as set forth above.

21        37.    Rule 3-300 provides that an attorney who engages in a business transaction with a

22  client has a duty to: (A) ensure that the transaction and its terms are fair and reasonable to the client

23  and fully disclosed to the client and transmitted in writing to the client in a manner which should

24  reasonably have been understood by the client; (B) advise the client in writing that the client may

25  seek the advice of an independent lawyer of the client's choice and is given a reasonable opportunity

26  to seek that advice; and (C) obtain the client's consent in writing to the terms of the transaction.

27        38.    Avenatti breached all three provisions of Rule 3-300 in connection with the

28  $1,500,000 loan. Avenatti breached Rule 3-300 (A) because the terms were not fair and reasonable

1  in that: the original loan only provided Avenatti with a benefit without providing a benefit or

2  consideration to Plaintiff; Avenatti failed to advise Plaintiff that unsecured loans such as this one

3  pose high risks for the lender, and failed to offer any collateral for securing repayment of the loan;

4  Avenatti acted in his own self-interest in extending the due date of the loan by three (3) years

5  without any further consideration to Plaintiff; Avenatti misrepresented to Plaintiff that he had the

6  funds to repay all amounts owed on the Promissory Note by the due date, that he would imminently

7  receive a settlement that would pay off the Note, that he would provide collateral, and/or failed to

8  disclose to Plaintiff that he did not have the funds to repay all amounts owed on the Promissory Note

9  by the due date.  In addition, Avenatti breached Rule 3-300 (A) because he did not fully disclose

10 these unfair and unreasonable terms to the client in writing in a manner which should reasonably

11 have been understood by the client.

12     39.   Avenatti breached Rule 3-300 (B) because he failed to advise Plaintiff in writing that

13 Plaintiff should seek the advice of an independent counsel in connection with this matter.

14     40.   Avenatti breached Rule 3-300 (C) because Plaintiff did not consent in writing to the

15 terms of the transaction in accordance with this Rule.

16     41.   California Business & Professions Code § 6103, which applies to California licensed

17 attorneys, provides "any violation of the oath taken by him, or of his duties as such attorney,

18 constitute causes for disbarment or suspension."  Avenatti violated this statute by not acting in the

19 utmost good faith, fidelity and trust for the benefit of Plaintiff as set forth above and as evidenced by

20 his violation of Rule 3-300 in connection with the $1,500,000 loan.

21     42.   California Business & Professions Code § 6106, which applies to California licensed

22 attorneys, provides that "[t]he commission of any act involving moral turpitude, dishonesty or

23 corruption, whether the act is committed in the course of his relations as an attorney or otherwise,

24 and whether the act is a felony or misdemeanor or not, constitutes a cause for disbarment or

25 suspension." Avenatti violated this statute because in entering into the loan with Plaintiff, he was

26 deceitful, dishonest and lacked integrity as set forth above and as evidenced by his violation of Rule

27 3-300.

28     43.   Avenatti breached his fiduciary duties to Plaintiff by not acting in the utmost good

1    faith, fidelity and trust for the benefit of Plaintiff as set forth above and as evidenced by his violation

2    of Rule 3-300 and the California Business & Professions Code §§ 6103 and 6106 as described above

3    in connection with the $1,500,000 loan that he never fully repaid.

4          44.      As a direct and proximate result of Avenatti's violation of his fiduciary duties as set

5    forth herein, Plaintiff has been damaged in a sum to be proven at trial.

6          45.      In carrying out the above conduct, Avenatti acted with oppression, fraud and malice.

7    The aforementioned conduct of Avenatti was willful and intentional. Plaintiff is therefore entitled to

8    an award of exemplary or punitive damages.

9                         **SECOND CAUSE OF ACTION**

10                        **(Breach of Promissory Note)**

11          46.      Plaintiff realleges and incorporates herein by reference each and every allegation

12    contained herein, as though fully incorporated herein and made a part hereof.

13          47.      For valuable consideration, at Santa Barbara County, California, Avenatti made,

14    executed, and delivered to Plaintiff the Promissory Note dated July 1, 2013 in the principal amount

15    of $1,500,000, originally payable to Plaintiff on January 31, 2014 and as amended by Avenatti

16    payable to Plaintiff on January 31, 2017, with interest thereon at the rate of eight percent (8%) per

17    annum from the date of the note until the loan is paid in full.

18          48.      The Promissory Note provides that in the event of any default by the maker, the payee

19    shall be entitled to recover any and all reasonable expenses and fees incurred by payee in connection

20    with any collection efforts.  Defendant has defaulted on the Promissory Note, and Plaintiff has and

21    continues to incur expenses and fees in connection with collection efforts, including attorney's fees

22    for legal action taken to enforce collection.  Under the terms of the Promissory Note, Plaintiff is

23    entitled to recover these attorney's fees from Defendant. Plaintiff has employed the law firm of

24    Cappello & Noel LLP to file and prosecute this action and has become obligated to pay the fees and

25    expenses for the law firm's services.

26          49.      Avenatti failed and refused, and continues to fail and refuse, to pay the Promissory

27    Note, and there is now due, owing, and unpaid from Defendant to Plaintiff the principal sum of

28    $1,500,000 together with interest thereon.

50.     As a proximate result of the Defendant's acts as alleged herein, Plaintiff has been damaged in the amount of $1,500,000, plus interest on the unpaid principal, plus legal fees as provided by contract.

## THIRD CAUSE OF ACTION

### (Account Stated)

51.     Plaintiff realleges and incorporates herein by reference each and every allegation contained herein, as though fully incorporated herein and made a part hereof.

52.     Within the past four years, at Santa Barbara, California, an account was stated in writing by and between Plaintiff and Defendant, and on such statement a balance in the principal amount of $1,500,000 plus interest, due to Plaintiff from Defendant. Defendant agreed to pay to Plaintiff said balance.

53.     Although demanded by Plaintiff from Defendant, the agreed balance has not been paid.

54.     There is now due, owing, and unpaid from Defendant to Plaintiff the principal sum of $1,500,000together with interest thereon and attorney fees as applicable.

## FOURTH CAUSE OF ACTION

### (Open Book Account)

55.     Plaintiff realleges and incorporates herein by reference each and every allegation contained herein as though fully incorporated herein and made a part hereof.

56.     Within the past four years, Defendant became indebted to Plaintiff on an open book account for money due in the sum of $1,500,000 at its special instance and request, and for which Avenatti agreed to pay the above sum.

57.     The whole of the above sum has not been paid although a demand therefore has been made, and there is now due, owing, and unpaid the sum of $1,500,000 with interest thereon.

58.     Plaintiff has incurred attorney's fees in connection with this matter, in an amount to be determined at trial, which fees Plaintiff is entitled to recover from Avenatti pursuant to agreement or as otherwise applicable.

**FIFTH CAUSE OF ACTION**

**(Common Count - Money Had and Received)**

59.     Plaintiff realleges and incorporates herein by reference each and every allegation contained herein as though fully incorporated herein and made a part hereof.

60.     On or about July 1, 2013, at Santa Barbara, California, Avenatti became indebted to Plaintiff in the sum of $1,500,000 for money had and received by Avenatti for the use and benefit of Avenatti.

61.     Avenatti failed and refused and continue to fail and refuse to pay and there is now due, owing, and unpaid from Avenatti to Plaintiff the sum of $1,500,000 together with interest thereon, and attorney fees as applicable.

**SIXTH CAUSE OF ACTION**

**(Common Count – Money Lent)**

62.     On or about July 1, 2013, at Santa Barbara, California, Avenatti became indebted to Plaintiff in the sum of $1,500,000 for money lent by Plaintiff to Avenatti at his request.

63.     Avenatti failed and refused and continues to fail and refuse to pay the indebtedness in full, and there is now due, owing, and unpaid from Avenatti to Plaintiff the principal sum of $1,500,000 together with interest thereon at the legal rate.

64.     The contract on which this action is based provides that in the event legal action is taken to enforce collection, the prevailing party is entitled to recover reasonable attorney fees.

**PRAYER**

WHEREFORE, Plaintiff prays for judgment against Defendant, on each cause of action, as follows:

1. For damages in the principal amount of $1,500,000;

2. For interest as set by contract;

3. For reasonable attorney's fees as provided by contract or otherwise;

4. For costs of suit incurred herein;

5. For punitive damages;

6. For such other further relief as the court may deem just and proper.

DATED: August 20, 2018                    CAPPELLO & NOËL LLP

                                          By:

                                          A. Barry Cappello
                                          Lawrence J. Conlan
                                          Attorneys for Plaintiff

**DEMAND FOR TRIAL BY JURY**

Plaintiff demands a trial by jury of all issues so triable in this action.

DATED:  August 20, 2018

CAPPELLO & NOËL LLP

By: _____
    A.  Barry Cappello
    Lawrence J. Conlan
    Attorneys for Plaintiff

13
COMPLAINT

# EXHIBIT A

## NONNEGOTIABLE PROMISSORY NOTE DUE JANUARY 31, 2014

$1,500,000.00

**Newport Beach, California**

**July 1, 2013**

   **FOR VALUE RECEIVED,** Michael J. Avenatti, an individual (collectively, the "Maker") unconditionally promises to pay to the order of William Parrish ("Payee"), in the manner and at the place hereinafter provided, the principal amount of One Million Five Hundred Thousand Dollars ($1,500,000.00) in one payment on January 31, 2014.

   Maker also promises to pay interest at a rate per annum equal to 8.0% on any unpaid principal amount from the date such amount(s) is loaned to Maker until paid in full.

   Interest on this Note shall be payable on the following dates: January 31, 2014. All computations of interest shall be made by Payee on the basis of a 365-day year, for the actual number of days elapsed in the relevant period (including the first day but excluding the last day).

   1. **Payments.** All payments of principal and interest in respect of this Note shall be made in lawful money of the United States of America at William Parrish; 6489 Calle Real Suite E; Goleta, CA 93117, or at such other place as Payee may direct. Whenever any payment on this Note is stated to be due on a day that is not a Business Day, such payment shall instead be made on the next Business Day, and such extension of time shall be included in the computation of interest payable on this Note. "Business Day" means any day other man a Saturday, Sunday or legal holiday under the laws of the State of California or any other day on which banking institutions located in such state are authorized or required by law or other governmental action to close.

   2. **Prepayments.** Maker shall have the right at any time and from time to time to prepay the principal of this Note in whole or in part without penalty.

   3. **Miscellaneous.**

   (a) All notices and other communications provided for hereunder shall be in writing (including telegraphic, telex, telefacsimile or cable communication) and mailed, telegraphed, telexed, telecopied, cabled or delivered as follows: if to Maker, at its address specified opposite its signature below; and if to Payee, at the address specified in Section 1 hereof, or in each case at such other address as shall be designated by Payee or Maker. All such notices and communications shall, when mailed, telegraphed, telexed, telecopied or cabled or sent by overnight courier, be effective when deposited in the mails, delivered to the telegraph company, cable company or overnight courier, as the case may be, or sent by telex of telecopier.

1

(b)     If any provision in or obligation under this Note shall be invalid, illegal or unenforceable in any jurisdiction, the validity, legality and enforceability of the remaining provisions or obligations, or of such provision or obligation in any other jurisdiction, shall not in any way be affected or impaired thereby.  Moreover, in the event any interest or fee provided for herein shall be deemed to be illegal or in violation of any state law, such interest or fee shall be reduced to the highest available rate or fee allowed under the law.

(c)     This Note shall be binding upon Maker and Payee and their respective successors and assigns. None of the terms or provisions of this Note maybe waived, altered, modified or amended except in writing duly signed for and on behalf of Maker and Payee.

(d)     Neither this Note nor the rights or obligations hereunder shall be assigned without the express written consent of Maker and Payee.

(e)     This Note shall be binding upon Maker and Payee and their respective successors and assigns. None of the terms or provisions of this Note maybe waived, altered, modified or amended except in writing duly signed for and on behalf of Maker and Payee.

(f)     In the event of any default by Maker, the Payee shall be entitled to recover any and all reasonable expenses and fees incurred by Payee in connection with any collection efforts.

**THIS NOTE AND THE RIGHTS AND OBLIGATIONS OF MAKER AND PAYEE HEREUNDER SHALL BE GOVERNED BY, AND SHALL BE CONSTRUED AND ENFORCED IN ACCORDANCE WITH, THE INTERNAL LAWS OF THE STATE OF CALIFORNIA WITHOUT REGARD TO CONFLICTS OF LAWS PRINCIPLES.**

IN WITNESS WHEREOF, Maker has caused this Note to be executed and delivered as of the day and year and at the place first above written.

"MAKER"

MICHAEL J. AVENATTI, individually

2

# EXHIBIT B

NONNEGOTIABLE PROMISSORY NOTE DUE JANUARY 31, 2014 17 (MTR)

$1,500,000.00

**Newport Beach, California**

**July 1, 2013**

      **FOR VALUE RECEIVED,** Michael J. Avenatti, an individual (collectively, the "Maker") unconditionally promises to pay to the order of William Parrish ("Payee"), in the manner and at the place hereinafter provided, the principal amount of One Million Five Hundred Thousand Dollars ($1,500,000.00) in one payment on January 31, 2014. 17 (MTR)

      Maker also promises to pay interest at a rate per annum equal to 8.0% on any unpaid principal amount from the date such amount(s) is loaned to Maker until paid in full. MTR

      Interest on this Note shall be payable on the following dates: January 31, 2014. 17 All computations of interest shall be made by Payee on the basis of a 365-day year, for the actual number of days elapsed in the relevant period (including the first day but excluding the last day).

      1.    **Payments.** All payments of principal and interest in respect of this Note shall be made in lawful money of the United States of America at William Parrish; 6489 Calle Real Suite E; Goleta, CA 93117, or at such other place as Payee may direct. Whenever any payment on this Note is stated to be due on a day that is not a Business Day, such payment shall instead be made on the next Business Day, and such extension of time shall be included in the computation of interest payable on this Note. "Business Day" means any day other man a Saturday, Sunday or legal holiday under the laws of the State of California or any other day on which banking institutions located in such state are authorized or required by law or other governmental action to close.

      2.    **Prepayments.** Maker shall have the right at any time and from time to time to prepay the principal of this Note in whole or in part without penalty.

      3.    **Miscellaneous.**

      (a)    All notices and other communications provided for hereunder shall be in writing (including telegraphic, telex, telefacsimile or cable communication) and mailed, telegraphed, telexed, telecopied, cabled or delivered as follows: if to Maker, at its address specified opposite its signature below; and if to Payee, at the address specified in Section 1 hereof, or in each case at such other address as shall be designated by Payee or Maker. All such notices and communications shall, when mailed, telegraphed, telexed, telecopied or cabled or sent by overnight courier, be effective when deposited in the mails, delivered to the telegraph company, cable company or overnight courier, as the case may be, or sent by telex of telecopier.

1

(b)    If any provision in or obligation under this Note shall be invalid, illegal or unenforceable in any jurisdiction, the validity, legality and enforceability of the remaining provisions or obligations, or of such provision or obligation in any other jurisdiction, shall not in any way be affected or impaired thereby.  Moreover, in the event any interest or fee provided for herein shall be deemed to be illegal or in violation of any state law, such interest or fee shall be reduced to the highest available rate or fee allowed under the law.

(c)    This Note shall be binding upon Maker and Payee and their respective successors and assigns. None of the terms or provisions of this Note maybe waived, altered, modified or amended except in writing duly signed for and on behalf of Maker and Payee.

(d)    Neither this Note nor the rights or obligations hereunder shall be assigned without the express written consent of Maker and Payee.

(e)    This Note shall be binding upon Maker and Payee and their respective successors and assigns. None of the terms or provisions of this Note maybe waived, altered, modified or amended except in writing duly signed for and on behalf of Maker and Payee.

(f)    In the event of any default by Maker, the Payee shall be entitled to recover any and all reasonable expenses and fees incurred by Payee in connection with any collection efforts.

**THIS NOTE AND THE RIGHTS AND OBLIGATIONS OF MAKER AND PAYEE HEREUNDER SHALL BE GOVERNED BY, AND SHALL BE CONSTRUED AND ENFORCED IN ACCORDANCE WITH, THE INTERNAL LAWS OF THE STATE OF CALIFORNIA WITHOUT REGARD TO CONFLICTS OF LAWS PRINCIPLES.**

IN WITNESS WHEREOF, Maker has caused this Note to be executed and delivered as of the day and year and at the place first above written.

"MAKER"

MICHAEL J. AVENATTI, individually

REAFFIRMED 7-25-16

2

Exhibit G

JUD-100

| ATTORNEY OR PARTY WITHOUT ATTORNEY *(Name, state bar number, and address)*: | FOR COURT USE ONLY |
|---|---|
| Lawrence J. Conlan (SBN 221350)<br>Cappello & Noël LLP<br>831 State Street, Santa Barbara<br>TELEPHONE NO.: (805) 564-2444    FAX NO. *(Optional):* (805) 965-5950<br>E-MAIL ADDRESS *(Optional):* lconlan@cappellonoel.com<br>ATTORNEY FOR *(Name):* PLAINIFF, William Parrish | ELECTRONICALLY FILED<br>Superior Court of California<br>County of Santa Barbara<br>Darrel E. Parker, Executive Officer<br>10/26/2018 10:51 AM<br>By: Sarah Sisto, Deputy |

SUPERIOR COURT OF CALIFORNIA, COUNTY OF Santa Barbara
STREET ADDRESS: 1100 Anacapa Street
MAILING ADDRESS: P.O. Box 21107
CITY AND ZIP CODE: Santa Barbara, 93121-1107
BRANCH NAME: Santa Barbara - Anacapa

PLAINTIFF: WILLIAM PARRISH

DEFENDANT: MICHAEL J. AVENATTI

| JUDGMENT | | CASE NUMBER: |
|---|---|---|
| [✓] By Clerk    [X] By Default    [ ] After Court Trial | | 18CV04106 |
| [ ] By Court    [ ] On Stipulation    Defendant Did Not Appear at Trial | | |

**JUDGMENT**

1. [✓] **BY DEFAULT**
   a. Defendant was properly served with a copy of the summons and complaint.
   b. Defendant failed to answer the complaint or appear and defend the action within the time allowed by law.
   c. Defendant's default was entered by the clerk upon plaintiff's application.
   d. [✓] **Clerk's Judgment** (Code Civ. Proc., § 585(a)).  Defendant was sued only on a contract or judgment of a court of this state for the recovery of money.
   e. [ ] **Court Judgment** (Code Civ. Proc., § 585(b)).  The court considered
      (1) [ ] plaintiff's testimony and other evidence.
      (2) [ ] plaintiff's written declaration (Code Civ. Proc., § 585(d)).

2. [ ] **ON STIPULATION**
   a. Plaintiff and defendant agreed (stipulated) that a judgment be entered in this case.  The court approved the stipulated judgment and
   b. [ ] the signed written stipulation was filed in the case.
   c. [ ] the stipulation was stated in open court   [ ] the stipulation was stated on the record.

3. [ ] **AFTER COURT TRIAL.** The jury was waived.  The court considered the evidence.
   a. The case was tried on *(date and time):*
      before *(name of judicial officer):*
   b. Appearances by:
      [ ] Plaintiff *(name each):*                        [ ] Plaintiff's attorney *(name each):*
         (1)                                                 (1)
         (2)                                                 (2)
      [ ] Continued on Attachment 3b.

      [ ] Defendant *(name each):*                        [ ] Defendant 's attorney *(name each):*
         (1)                                                 (1)
         (2)                                                 (2)
      [ ] Continued on Attachment 3b.

   c. [ ] Defendant did not appear at trial.  Defendant was properly served with notice of trial.

   d. [ ] A statement of decision  (Code Civ. Proc., § 632)  [ ] was not  [ ] was   requested.

Page 1 of 2

| PLAINTIFF: WILLIAM PARRISH | CASE NUMBER: |
|---|---|
| DEFENDANT: MICHAEL J. AVENATTI | 18CV04106 |

**JUDGMENT IS ENTERED AS FOLLOWS BY:** ☐ THE COURT   ☑ THE CLERK

4. ☐ **Stipulated Judgment.** Judgment is entered according to the stipulation of the parties.

5. **Parties.** Judgment is
   a. ☑ for plaintiff (name each):
      William Parrish
      and against defendant (names):
      Michael J. Avenatti
      ☐ Continued on Attachment 5a.

   b. ☐ for defendant (name each):

   c. ☐ for cross-complainant (name each):
      and against cross-defendant (name each):
      ☐ Continued on Attachment 5c.

   d. ☐ for cross-defendant (name each):

6. **Amount.**
   a. ☑ Defendant named in Item 5a above must pay plaintiff on the complaint:

   c. ☐ Cross-defendant named in item 5c above must pay cross-complainant on the cross-complaint:

| | | a. | | | | | c. | |
|---|---|---|---|---|---|---|---|---|
| (1) | ☑ | Damages | $ 1,500,000.00 | | (1) | ☐ | Damages | $ |
| (2) | ☑ | Prejudgment interest at the annual rate of 8 % | $ 674,136.99 | | (2) | ☐ | Prejudgment interest at the annual rate of % | $ |
| (3) | ☑ | Attorney fees | $ 19,050.00 | | (3) | ☐ | Attorney fees | $ |
| (4) | ☑ | Costs | $ 1,114.88 | | (4) | ☐ | Costs | $ |
| (5) | ☐ | Other (specify): | $ | | (5) | ☐ | Other (specify): | $ |
| (6) | | TOTAL | $ 2,194,301.87 | | (6) | | TOTAL | $ |

   b. ☐ Plaintiff to receive nothing from defendant named in item 5b.
      ☐ Defendant named in item 5b to recover costs $
      ☐ and attorney fees $

   d. ☐ Cross-complainant to receive nothing from cross-defendant named in item 5d.
      ☐ Cross-defendant named in item 5d to recover costs $
      ☐ and attorney fees $

7. ☑ Other (specify):
   Judgment supported by Declaration of Plaintiff William Parrish in support of application for entry of default judgment, filed on 10/25/2018.

Date: ☐ _____
                                    JUDICIAL OFFICER

Date: 10/26/2018   X Clerk, by   /s/ Sarah Sisto   , Deputy

**CLERK'S CERTIFICATE** (Optional)

(SEAL)

I certify that this is a true copy of the original judgment on file in the court.

Date:

Clerk, by _____ , Deputy

Page 2 of 2

JUD-100 [New January 1, 2002]   **JUDGMENT**

Exhibit H

**Mandy Duong**

| | |
|---|---|
| **From:** | Andre, Julian L. (USACAC) <Julian.L.Andre@usdoj.gov> |
| **Sent:** | Thursday, April 11, 2019 8:16 PM |
| **To:** | Lawrence J. Conlan |
| **Cc:** | Sagel, Brett (USACAC); Welk, Steven (USACAC) |
| **Subject:** | Re: US v Michael Avenatti; Parrish and FItzgibbons v. Michael Avenatti |

Larry,

The asset forfeiture matter is being handled by AUSA Steve Welk.  I have copied Steve here and his number is 213.894.6166.  Steve should be able to answer any questions you and your client have regarding the plane.

Brett and I will follow-up with you regarding the other issues you have raised next week once we have had more time to review the materials you submitted.

Thank you.

Julian

Julian L. André
Assistant United States Attorney
United States Courthouse, Suite 1100
312 N. Spring St. | Los Angeles, California 90012<x-apple-data-detectors://1/0>
T: 213.894.6683<tel:213.894.6683> | julian.l.andre@usdoj.gov<mailto:julian.l.andre@usdoj.gov>

On Apr 11, 2019, at 3:17 PM, Lawrence J. Conlan <lconlan@cappellonoel.com<mailto:lconlan@cappellonoel.com>> wrote:

Dear Julian and Brett:

Yesterday when my client William Parrish arrived at Santa Barbara Airport to fly his private plane to Orange County, he was informed by special agents from Treasury that his plane was being seized in connection with the case against Avenatti.  Mr. Parrish originally purchased the plane with Avenatti as a co-owner several years ago, but pursuant to a December 2018 Orange County court order Avenatti transferred his interest in the plane to his ex-wife, to liquidate as part of a support obligation.  As of the date of that order, Avenatti was no longer an owner of the plane.

Mr. Parrish, who has already been subjected to Avenatti's malpractice and misrepresentations, is now being injured again by the seizure of his property.

Today left a voicemail for Special Agent Jason Wallace of Treasury, who along with Special Agent James Kim was involved with the plane seizure.  I have not received a call back.  When Mr. Parrish explained to Mr. Kim that he is an owner of the plane, Mr. Kim assured him that he would be made whole.  I am trying to get some more information about the status of the plane and next steps here.

Let me know, please, if we can discuss this matter.

Best regards,

1

Larry Conlan

Lawrence J. Conlan | Cappello & Noël LLP
831 State Street | Santa Barbara, CA 93101
Tel: 805.564.2444 | Fax: 805.965.5950 | lconlan@cappellonoel.com<mailto:lnoel@cappellonoel.com>

From: Lawrence J. Conlan
Sent: Tuesday, April 9, 2019 12:37 PM
To: Andre, Julian L. (USACAC) <Julian.L.Andre@usdoj.gov<mailto:Julian.L.Andre@usdoj.gov>>; Sagel, Brett (USACAC)
<Brett.Sagel@usdoj.gov<mailto:Brett.Sagel@usdoj.gov>>
Subject: RE: US v Michael Avenatti; Parrish and FItzgibbons v. Michael Avenatti

Dear Julian and Brett:

Below is a Dropbox link that contains the State Bar Complaint (with exhibits) against Avenatti filed on behalf of Mr.
Parrish and Mr. Fitzgibbons, and a conformed copy of Mr. Parrish's civil complaint against Avenatti and the Judgment
entered on that complaint on 10/26/18.

https://www.dropbox.com/sh/7bat7x5pxluv48h/AAB7ygZlwN62MkMWWHNJ6pPra?dl=0

If you need hard copies we would be happy to mail them to you.  Once you've had a chance to review please let me
know if you have any questions or would like to see any other documents.  We can also make available documents form
the underlying Orange County litigation (Stoll) that is the subject of the malpractice complaint.

Best regards,

Larry Conlan

Lawrence J. Conlan | Cappello & Noël LLP
831 State Street | Santa Barbara, CA 93101
Tel: 805.564.2444 | Fax: 805.965.5950 | lconlan@cappellonoel.com<mailto:lnoel@cappellonoel.com>

From: Andre, Julian L. (USACAC) <Julian.L.Andre@usdoj.gov<mailto:Julian.L.Andre@usdoj.gov>>
Sent: Monday, April 8, 2019 12:06 PM
To: Lawrence J. Conlan <lconlan@cappellonoel.com<mailto:lconlan@cappellonoel.com>>; Sagel, Brett (USACAC)
<Brett.Sagel@usdoj.gov<mailto:Brett.Sagel@usdoj.gov>>
Subject: RE: US v Michael Avenatti; Parrish and FItzgibbons v. Michael Avenatti

Mr. Conlan:

Thank you for contacting us.  We have a copy of the complaint that was recently filed in Santa Barbara Superior Court,
but would be interested in reviewing any and all additional materials that you are willing to provide to us.

Julian L. André
Assistant United States Attorney
Major Frauds Section

2

United States Courthouse, Suite 1100
312 N. Spring St. | Los Angeles, California 90012
T: 213.894.6683 | julian.l.andre@usdoj.gov<mailto:julian.l.andre@usdoj.gov>

From: Lawrence J. Conlan <lconlan@cappellonoel.com<mailto:lconlan@cappellonoel.com>>
Sent: Monday, April 8, 2019 11:42 AM
To: Andre, Julian L. (USACAC) <JAndre1@usa.doj.gov<mailto:JAndre1@usa.doj.gov>>; Sagel, Brett (USACAC)
<BSagel@usa.doj.gov<mailto:BSagel@usa.doj.gov>>
Subject: US v Michael Avenatti; Parrish and FItzgibbons v. Michael Avenatti

Confidential

Dear Julian and Brett:

I represent William Parrish and E. Timothy Fitzgibbons in civil litigation against Michael Avenatti.  Last week in Santa
Barbara Superior Court we filed a professional negligence case against Avenatti and his former firm/partners that details
major ethical violations and other malfeasance.  Last month we submitted a formal complaint to the State Bar of
California on behalf of our clients, also concerning Avenatti.  Separately, last fall I obtained a judgment against Avenatti
in a different case in Santa Barbara, concerning a $1.5 million loan William Parrish made to Avenatti several years ago
(while Avenatti was representing him) for the purchase of Tully's Coffee, which was never repaid.  Avenatti is appealing
the judgment.

I believe there are similarities between Avenatti's handling of my clients and the manner in which he represented his
former client Mr. Barela, whose settlement proceeds are alleged to have been mishandled in your criminal complaint.
Avenatti's conduct with the settlement proceeds and attorney fees detailed in the malpractice complaint, as well as the
unpaid loan, may also be relevant to the tax evasion charges in your criminal complaint.

I would be happy to provide you with copies of our complaints and judgment if you are interested, and of course I'm
available to discuss these matters with you as well.

Best regards,

Larry Conlan

Lawrence J. Conlan | Cappello & Noël LLP
831 State Street | Santa Barbara, CA 93101
Tel: 805.564.2444 | Fax: 805.965.5950 | lconlan@cappellonoel.com<mailto:lnoel@cappellonoel.com>

# Exhibit I

## Mandy Duong

| | |
|---|---|
| **From:** | Welk, Steven (USACAC) <Steven.Welk@usdoj.gov> |
| **Sent:** | Friday, April 12, 2019 12:06 PM |
| **To:** | ibibbero@bgrfirm.com |
| **Cc:** | Lawrence J. Conlan; Keleshyan, Tina (USACAC) [Contractor] |
| **Subject:** | Avenatti airplane |

Mr. Bibbero,

This will follow up the voicemail I left for you a few minutes ago. I was advised this morning by Larry Conlan that you represent the ex-wife of Michael Avenatti with respect to her interest in an airplane acquired by Mr. Avenatti, together with Mr. Conlan's client, Mr. Parrish. As I suspect you know by now, the government seized that airplane earlier this week pursuant to a federal seizure warrant.

Mr. Conlan explained to me that the two of you had been engaged in negotiations on behalf of your respective clients to liquidate the airplane, and were working to identify a broker who would be charged with the marketing and sale. As I explained to Mr. Conlan, the government has a strong interest in liquidating the plane in order to avoid the costs associated with storage and maintenance over the course of what, if it is not settled quickly, may turn out to be lengthy litigation. The purpose of my call and email is to encourage you and Mr. Conlan to continue in your efforts to locate a broker to market and sell the aircraft, and send me a proposal for liquidation. So long as the proposal is commercially reasonable, adequately protects the government's interests, and provides that the net sale proceeds will be paid to the government as a substitute res, my inclination would be to enter into an agreement whereby the government and the parties would stipulate to sell the plane.

Obviously, this type of transaction has a lot of moving parts, and we will have to discuss the specific terms of any liquidation agreement. For my part, I understand that you and Mr. Conlan each represent a party who believes that he or she is a victim (in one way or another) of Mr. Avenatti. You should understand that while I represent the government in this matter, my interests include doing everything I can to see that a separate victim of Mr. Avenatti's is compensated for his/her losses associated with the acquisition of Mr. Avenatti's original interest in the airplane. While I assure you that we will eventually get to a point where we can have a conversation about our respective positions on how the proceeds of the sale should be divided, our immediate focus should be on selling the airplane so that we can then talk about the money. It goes without saying that it is in the best interests of all of the parties that we do what we can to reach an agreement on the liquidation of the plane before getting the court involved.

I'm happy to discuss the matter with you. Please give me a call at your convenience at (213) 894-6166. I look forward to hearing from you.

AUSA Steve Welk
Chief, Asset Forfeiture Section
Central District of California
(213) 894-6166

Exhibit J

## Mandy Duong

| | |
|---|---|
| **From:** | Lawrence J. Conlan |
| **Sent:** | Thursday, May 2, 2019 10:26 AM |
| **To:** | Welk, Steven (USACAC); Tina.Keleshyan@usdoj.gov |
| **Subject:** | RE: Avenatti airplane |
| **Attachments:** | FlightReady Airframe PERFORMANCE-P2- Service Plan Agreement_SN029_US_V01 04_ 2016-09-21.pdf; Honda delivery docs.pdf; Asset Transfer Confirmation; Asset Transfer Confirmation; Honda Jet Purchase Accounting.xlsx |

**Confidential**

Dear Steve:

Thanks again for taking the time to speak with me yesterday. As we discussed, the engines of the HondaJet need to be run at least once each month and the hours sent to Honda Aircraft to be in compliance with applicable service and warranty agreements. Not being in compliance would likely have a very major effect on the value of the aircraft. I am attaching a copy of the service plan agreement (unexecuted); an executed copy can be obtained through Honda Aircraft. Please contact Honda to get the particulars on maintaining the programs and warranty. The telephone number we have is 336-217-4707 and the email address is flightready@haci.honda.com.

Separately, I am also attaching documentation that shows Mr. Parrish's purchase and ownership of more than 52% of the interest in the jet. You will see from the Honda Aircraft Company invoice (p. 3 of 5 of pdf labeled Honda delivery docs) that:

- the total net price was $4,383,605.
- This included the base price, adjusted, plus options and tax.

Also attached are wire transfer confirmations showing:

- Mr. Parrish's 1/18/17 wire transfer of $1,985,000 from his family trust account at Goldman Sachs into what I understand to be the Passport 420 LLC account at California Bank & Trust;
- Mr. Parrish's 7/12/16 wire transfer of $350,000 from his family trust into what I understand to be the Honda Aircraft account at Wells Fargo Bank NA.

Finally, I am also including an accounting that details Mr. Parrish total payments and his 52.7% interest.

You and I also discussed the potential complications with a sale of the jet given the dispute between Ms. Storie-Avenatti, her lawyers, and Avenatti's former law partners over their claimed interests in the jet. For a number of reasons, it appears to me that Ms. Storie-Avenatti has no legitimate interest in the jet given that the interest was fraudulently assigned to her by Michael Avenatti who evidently used other people's money to purchase his "share" in Passport 420. To what extent his former law partners have an interest is subject to debate, in my view. Their claims of interest in the jet, whether valid or not, will only complicate any efforts to liquidate it as a seized asset and likely cause the value of it to be driven down in the eyes of prospective buyers. That would be a result that benefits no party on the seller side.

What is clear, however, is that Mr. Parrish paid for his interest with his own money, out of his own accounts, and there should be no dispute about his percentage ownership. Since Mr. Parrish is the legitimate owner of more than half of the jet, he feels particularly wronged by the seizure. He is very concerned that whatever value he may get from a sale will be reduced because of the stigma on the jet from the seizure. This is compounded by the fact that he has now been deprived of all ability to use the jet, which he is entitled to as a legitimate owner.

1

I would like to explore with you a solution that would benefit your office and client, as well as mine, and maximize the value of the recovery from an ultimate sale. We think it would make more sense, and would be fairer under the circumstances, if the government would consider liening the jet in the amount of the Avenatti interest, and then releasing it to Mr. Parrish as the majority owner. This would allow him to continue to use it while proceeding with the marketing and sale process, make it easier for prospective buyers to test-fly it, and minimize the likelihood of "fire sale" buyers seeing an opportunity to pay well below value for a government-seized asset. The jet is fully insured so the government's interest would be protected. Please consider this as an option here. We think it is an approach that will create the most upside for you and Mr. Parrish under less-than-ideal circumstances.

Best regards,

Larry Conlan



Lawrence J. Conlan | Cappello & Noël LLP
831 State Street | Santa Barbara, CA 93101
Tel: 805.564.2444 | Fax: 805.965.5950 | lconlan@cappellonoel.com

---

**From:** Welk, Steven (USACAC) <Steven.Welk@usdoj.gov>
**Sent:** Tuesday, April 30, 2019 3:36 PM
**To:** Lawrence J. Conlan <lconlan@cappellonoel.com>; Keleshyan, Tina (USACAC) [Contractor] <Tina.Keleshyan@usdoj.gov>
**Subject:** RE: Avenatti airplane

**Larry,**

**Sorry for the delay. There's been a little game of musical chairs going on with respect to counsel for one of the other real parties in interest, which I think is going to make an interlocutory sale a lot more complicated than it needs to be.**

**We've got time to talk tomorrow morning between 9:30 and noon, or Thursday morning between 9:30 and 11:30 am. Let us know what works for you, if either of those will work. Right now, we're also open on Friday pretty much all day.**

**Steve**

---

**From:** Lawrence J. Conlan <lconlan@cappellonoel.com>
**Sent:** Tuesday, April 30, 2019 2:21 PM
**To:** Welk, Steven (USACAC) <SWelk@usa.doj.gov>; Keleshyan, Tina (USACAC) [Contractor] <tkeleshyan@usa.doj.gov>
**Subject:** RE: Avenatti airplane

Steve,

Following up again. There is maintenance information about the jet that you need to know about and procedures that need to be followed in order to remain in compliance with the warranty and maintenance agreements. Not being in compliance will have a very major, negative effect on the value of the aircraft.

Please let me know when you are available to discuss this and to continue our discussion about a possible sale.

Thank you,
Larry Conlan

Lawrence J. Conlan | Cappello & Noël LLP
831 State Street | Santa Barbara, CA 93101
Tel: 805.564.2444 | Fax: 805.965.5950 | lconlan@cappellonoel.com

**From:** Lawrence J. Conlan
**Sent:** Monday, April 29, 2019 10:58 AM
**To:** Welk, Steven (USACAC) <Steven.Welk@usdoj.gov>; Tina.Keleshyan@usdoj.gov
**Subject:** RE: Avenatti airplane

Hi Steve,

I am following up on this again.  There' snot  a lot I can do at this point regarding potential sale of the jet until we have a chance to discuss.  I still have heard nothing from Ms. Storie-Avenatti's lawyers.  Are you free today to talk?

Thanks,
Larry

Lawrence J. Conlan | Cappello & Noël LLP
831 State Street | Santa Barbara, CA 93101
Tel: 805.564.2444 | Fax: 805.965.5950 | lconlan@cappellonoel.com

**From:** Lawrence J. Conlan
**Sent:** Monday, April 22, 2019 5:03 PM
**To:** Welk, Steven (USACAC) <Steven.Welk@usdoj.gov>; Tina.Keleshyan@usdoj.gov
**Subject:** RE: Avenatti airplane

Dear Steve,

I'm following up on our call the week before last regarding the seizure of the jet and Mr. Parrish's interest in it.  I've heard nothing from Lisa Storie-Avenatti's lawyers.  Are you free to talk tomorrow?

Thank you,

Larry Conlan

Lawrence J. Conlan | Cappello & Noël LLP
831 State Street | Santa Barbara, CA 93101
Tel: 805.564.2444 | Fax: 805.965.5950 | lconlan@cappellonoel.com

**From:** Lawrence J. Conlan
**Sent:** Tuesday, April 16, 2019 12:16 PM
**To:** Welk, Steven (USACAC) <Steven.Welk@usdoj.gov>; Tina.Keleshyan@usdoj.gov
**Subject:** RE: Avenatti airplane

Steve,

I have not seen a response from Ira on this, but I have some additional information about Passport 420 I would like to discuss with you.  Are you free this afternoon for a call?

Thanks,
Larry Conlan

Lawrence J. Conlan | Cappello & Noël LLP
831 State Street | Santa Barbara, CA 93101
Tel: 805.564.2444 | Fax: 805.965.5950 | lconlan@cappellonoel.com

---

**From:** Welk, Steven (USACAC) <Steven.Welk@usdoj.gov>
**Sent:** Friday, April 12, 2019 12:06 PM
**To:** ibibbero@bgrfirm.com
**Cc:** Lawrence J. Conlan <lconlan@cappellonoel.com>; Keleshyan, Tina (USACAC) [Contractor] <Tina.Keleshyan@usdoj.gov>
**Subject:** Avenatti airplane

**Mr. Bibbero,**

This will follow up the voicemail I left for you a few minutes ago.  I was advised this morning by Larry Conlan that you represent the ex-wife of Michael Avenatti with respect to her interest in an airplane acquired by Mr. Avenatti, together with Mr. Conlan's client, Mr. Parrish.  As I suspect you know by now, the government seized that airplane earlier this week pursuant to a federal seizure warrant.

Mr. Conlan explained to me that the two of you had been engaged in negotiations on behalf of your respective clients to liquidate the airplane, and were working to identify a broker who would be charged with the marketing and sale.  As I explained to Mr. Conlan, the government has a strong interest in liquidating the plane in order to avoid the costs associated with storage and maintenance over the course of what, if it is not settled quickly, may turn out to be lengthy litigation.  The purpose of my call and email is to encourage you and Mr. Conlan to continue in your efforts to locate a broker to market and sell the aircraft, and send me a proposal for liquidation.  So long as the proposal is commercially reasonable, adequately protects the government's interests, and provides that the net sale proceeds will be paid to the government as a substitute res, my inclination would be to enter into an agreement whereby the government and the parties would stipulate to sell the plane.

Obviously, this type of transaction has a lot of moving parts, and we will have to discuss the specific terms of any liquidation agreement.  For my part, I understand that you and Mr. Conlan each represent a party who believes that he or she is a victim (in one way or another) of Mr. Avenatti.  You should understand that while I represent the government in this matter, my interests include doing everything I can to see that a separate victim of Mr. Avenatti's is compensated for his/her losses associated with the acquisition of Mr. Avenatti's original interest in the airplane.  While I assure you that we will eventually get to a point where we can have a conversation about our respective positions on how the proceeds of the sale should be divided, our immediate focus should be on selling the airplane so that we can then talk about the money.  It goes without

4

saying that it is in the best interests of all of the parties that we do what we can to reach an agreement on the liquidation of the plane before getting the court involved.

I'm happy to discuss the matter with you.  Please give me a call at your convenience at (213) 894-6166.  I look forward to hearing from you.

AUSA Steve Welk
Chief, Asset Forfeiture Section
Central District of California
(213) 894-6166

1

2

## <u>CERTIFICATE OF SERVICE</u>

3

4      I, Lawrence J. Conlan, hereby certify that on June 12, 2023, I caused the
foregoing **DECLARATION OF WILLIAM PARRISH IN SUPPORT OF**

5      **PETITIONER SPRING CREEK RESEARCH LLC'S BRIEF REGARDING**
**PRIORITY OF INTEREST IN HONDA AIRCRAFT** to be sent electronically to

6      the registered participants as identified on the Notice of Electronic Filing.

7

8

9                          */s/ Lawrence J. Conlan*

10                          Lawrence J. Conlan

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DECLARATION OF WILLIAM PARRISH IN SUPPORT
OF BRIEF REGARDING PRIMACY OF INTEREST
8:19-CR-0061