# Exhibit 10

# LIMITED LIABILITY COMPANY OPERATING AGREEMENT

## OF

## PASSPORT 420, LLC

Dated as of July 11, 2016

CONFIDENTIAL

HACI 000531

# PASSPORT 420, LLC

THIS LIMITED LIABILITY COMPANY OPERATING AGREEMENT (the "Agreement") of Passport 420, LLC (the "Company") is made as of July 11, 2016 between Spring Creek Research, LLC, 4185 La Ladera Road, Santa Barbara, California, 93110 ("Spring Creek") and Avenatti & Associates, APC, 520 Newport Center Drive, Suite 1400, Newport Beach, California 92660 ("AA") (each a "Member" and collectively, the "Members").

WHEREAS, the Members have caused to be formed a limited liability company pursuant to the laws of the state of Delaware, as they may be amended; and

WHEREAS, the Members desire to establish their respective rights and obligations in connection with forming such limited liability company; and

WHEREAS, the Members of the Company wish to set forth the terms and conditions of their ownership and operation of one Honda Aircraft Company, LLC ("HondaJet"), model HA-420, Serial Number SN42000029, U.S. Registration Number N227WP (the "Aircraft"); and

WHEREAS, within the next ten (10) business days, the Company will take assignment of that certain HondaJet Purchase Agreement dated October 11, 2006 between Avenatti & Associates, APC and HondaJet, as amended (the "Purchase Agreement"), for the purchase of the Aircraft; and

WHEREAS, the Company agrees to lease the Aircraft exclusively to the Members without flight crew, which shall be provided by each Member individually under separate agreement, in exchange for the Members' agreement to insure, operate and maintain the Aircraft and pay their individual charges and pro-rata amounts due under this Agreement, it being the intent of the parties that the Company is not providing transportation services for compensation to the Members, that the Members shall have Operational Control of all flights under this Agreement which shall be conducted under Part 91 of the Federal Aviation Regulations ("FAR"); and

WHEREAS, each Member's ownership interest in the Aircraft will be according to and the same as their ownership interest in the Company as set forth on Exhibit A (the "Ownership Interest"), provided, however, that by entering into this Agreement, the Members do not intend to create a syndicate, group, pool, or joint venture which is classifiable as an association, or any group operating under an agreement which creates an organization classifiable as an association; and

WHEREAS, The relationship of the Member among themselves shall be that of tenants-in-common with regard to the Aircraft and each Member agrees that the sole and adequate means by which it may divest its Ownership Interest in the Company and the Aircraft shall be the transfer of the interest in accordance with the terms and conditions of this Agreement.

CONFIDENTIAL

HACI 000532

NOW THEREFORE, in consideration of the mutual covenants and provisions hereinafter contained, the Members agree as follows:

1. **Formation and Scope of Company.**

    1.1 **Establishment of Company Name.** The Members formed a limited liability company under the provisions of Delaware law by causing a Certificate of Formation to be filed on April 14, 2016 with the Secretary of State of Delaware for the purposes and on the terms herein set forth. The rights and liabilities of the Members shall be as provided in Delaware law, except as is otherwise expressly provided herein. The name of the Company shall be "Passport 420, LLC."

    1.2 **Term of Company.** The term of the Company shall commence on the date formation and shall continue until terminated in accordance with the provisions of Section 9 hereof or as otherwise provided by law.

    1.3 **Location of Offices.** The Company shall carry on its business from its principal office located at such address as the Members may from time to time determine by mutual agreement.

2. **Sharing of Expenses.**

    2.1 **Equal Sharing of Expenses.** Except as expressly provided herein, all expenses from transactions entered into by, or on behalf, for the account or in the name of, the Company within the scope of this Agreement will be shared pro-rata according to each Member's Ownership Interest.

    2.2 **Distributions.** No distributions are anticipated provided, in accordance with Section 7 or upon mutual agreement of the Members, the Aircraft may be sold in accordance with Sections 10 and 11 of this Agreement and the proceeds of the sale shall be distributed pro-rata according to each Member's Ownership Interest, less any outstanding balances due by either Member.

    2.3 **Capital and Expense Requirements.** Initial capital requirements and subsequent payments to the Company shall be in accordance with Exhibit A. Thereafter, each Member agrees to provide its share of funding in such manner and at such times as the Members determine to be sufficient to conduct the affairs of the Company in an orderly manner.

3. **Accounting and Reconciliation.** The Members shall share pro-rata in the fixed costs and expenses from Aircraft operations and forward their share to the Company, together with any individual costs and expenses incurred by them, on a monthly basis. The Members further agree to establish mutually satisfactory arrangements to conduct Company transactions in a commercially reasonable

CONFIDENTIAL

HACI 000533

manner.

    3.1    The Company will prepare a quarterly accounting of the receipts and disbursements, which will be supplied to the Members within 30 days following the end of the quarter. An annual account reconciliation of hours of Aircraft use as determined by the Aircraft's hours meter ("Flight Hours") and individual charges under this Agreement shall be overseen by the Manager and shall be made available to each of the Members upon reasonable request.

    3.2    The Company shall provide to each Member or its representative, access from time to time as each Member may reasonably request, during normal business hours, to permit inspections of all books and records relating to transactions conducted for the account of the Company.

4. **Administration of the Aircraft Schedule.**

    4.1    Each Member shall be entitled to an annual number of Flight Hours according to each Member's Ownership Interest in the Company, set forth on Exhibit A (individually, the "Member's Annual Flight Hours").

        4.1.1 Each Member shall notify the other Member by email prior to scheduling use of the Aircraft and in the event the Members intend to schedule use on the same day, the Member with prior notice shall have priority in scheduling the Aircraft provided, in the event there is a material difference in the number of annual hours scheduled by the Members (greater than 20%), the Member with fewer hours of Aircraft use shall have priority.

        4.1.2 No Member may schedule its Aircraft use for a period exceeding seven (7) calendar days in duration without first getting approval from the other Member.

        4.1.3 If a Member (the "First Member") schedules Aircraft use that will cause the Aircraft to layover at a location away from the Operating Base set forth on Exhibit A for any period of time, the other Member (the "Second Member") may subsequently schedule one or more flights that will occur prior to the First Member's return to the Operating Base, provided:

            4.1.3.1 Such flight(s) by the Second Member may not unreasonably delay or interfere with any scheduled flight of the First Member; and

            4.1.3.2 All expenses and Flight Hour charges to ferry the Aircraft from the First Member's location to the operating base or other location where the Second Member will embark, and all

3

CONFIDENTIAL

HACI 000534

      expenses and Flight Hour charges to ferry the Aircraft back to the First Member's location, shall be charged to the Second Member.

  4.1.4 Flight Hours incurred for regulatory, certification, maintenance and test flight purposes of the Aircraft shall be for the account of the Company and not to the individual Members.

4.2 **Allocation and Payment of Charges.**

  4.2.1 Each Member shall be individually responsible for its pro-rata share of charges to the Company for services and supplies necessary for the ownership and operation of the Aircraft according to each Member's Ownership Interest including but not limited to:

    4.2.1.1 Any changes for Airworthiness Directives, Service Bulletins, Upgrades to the Aircraft, Regulatory compliance charges, or Annual Increases in Insurance Premiums for the Aircraft;

    4.2.1.2 Any charges to maintain the Aircraft in a good and airworthy operating condition and in compliance with all applicable FAR and the Aircraft Operating Manual;

    4.2.1.3 Any charges to maintain and preserve all Aircraft Documents in a complete, accurate, and up-to-date manner;

    4.2.1.4 All regulatory and tax related charges due to the ownership and operation of the Company and the Aircraft, including but not limited to any property taxes and any costs, expenses, fees and taxes incurred in connection with any sales tax audit or reconciliation; and

    5.2.1.4 Hanger space at the Operating Base; insurance on the Aircraft; and washing and maintenance of the Aircraft at the Operating Base.

  4.2.2 Each Member shall be individually responsible for charges related to the individual flights of the Member including but not limited to:

    4.2.2.1 All fuel, oil, lubricants, and other services and supplies required for the Member's individual operation of the Aircraft;

    4.2.2.2 The services of pilots for all of Member's individual

CONFIDENTIAL

HACI 000535

     operation of the Aircraft;

    4.2.2.3 Charges related to extraordinary wear and damage caused by Member; and

    4.2.2.4 Any financing or lease payment associated with a Member's ownership interest in the Aircraft or the Company.

  4.3.1 In the event a Member moves the Aircraft to a maintenance facility, the charges and Flight Hours related to such flight shall be for the account of the Company.

 4.3 **Payment of charges by the Members.** The Members shall pay their pro-rata share and individual charges within seven days of receipt of invoice from the Company.

  4.3.1 The Members shall forward payment for their pro-rata share and individual charges by check or wire transfer to the Company.

  4.3.2 Payments are delinquent after ninety days and are subject to a 15% per annum late charge.

  4.3.3 The Members agree that Company is not providing transportation services to Members for compensation and payments of the Members are not made to Company for the purpose of reimbursement of charges paid by Company. Rather, each Member remains individually responsible for a pro-rata share of the cost of insuring and maintaining the Aircraft and charges related to Member's individual Aircraft use as invoiced by Company.

5. **Management of the Company.** The affairs of the Company shall be managed by a Manager.

 5.1 The Manager shall have full and complete authority, power and discretion to manage and control the affairs of the Company, to make all decisions regarding such matters, and to perform any and all other acts and activities customary or incident to the Company's purpose. The actions of the Manager taken in accordance with this Agreement shall bind the Company. The Manager, or such person designated by the Manager, shall be an authorized person within the meaning of the Delaware Limited Liability Act to execute, deliver and file any certificates or documents, and any amendments of such certificates or documents, necessary for the Company to conduct its affairs in the state of Delaware and in any other jurisdiction in which the Company may wish to do so. The Manager may appoint, employ, or otherwise contract with other persons or entities for the transaction of the business of the Company or the performance of services

CONFIDENTIAL

HACI 000536

for or on behalf of the Company.

    5.2    **Election of Manager.** A Manager shall be elected annually, either at a meeting or by written consent in lieu of a meeting, by a unanimous vote of all of the then Members in the Company.

    5.3    **Reliance by Third Parties.** Any person or entity dealing with the Company may rely upon a certificate or document signed by the Manager as to any action of the Company, or as to the existence or non-existence of any facts that are germane to the affairs of the Company.

6.    **Restrictions on Related Party Transactions.** No transaction will be consummated for the account of the Company from, or sold for the account of the Company to, any of the Members or any person, firm or corporation which is controlled by, controlling or under common control with a Member unless, in any such case, such Member has fully disclosed the particulars of such relationship and of such purchase or sale in writing to the other Members and obtained the written consent of such other Members to such transaction.

7.    **Events of Default.** Without limiting in any way what may constitute a default by a party to this Agreement, the occurrence and continuation of any of the following shall constitute a default:

    7.1    The failure of a Member to timely pay when due any amount required to be paid by Member under this Agreement or any other agreement related to the Aircraft or the use of the Aircraft including but not limited to any agreement with a financial institution providing financing for Member's Ownership Interest in the Aircraft.

    7.2    The breach by a Member, of any representation or warranty or other provision of this Agreement or any other agreement related to the Aircraft or the use of the Aircraft including but not limited to any agreement with a financial institution providing financing for Member's Ownership Interest in the Aircraft.

    7.3    If Member shall admit in writing its inability to pay, or fail to pay, debts generally as they become due; file a petition in bankruptcy or file an answer admitting or failing to deny the material allegations of such petition; make an assignment for the benefit of its creditors; consent to the appointment of, or possession by, a custodian for itself or for the whole or substantially all of its property; on a petition in bankruptcy filed against it, be adjudicated, or have an order for relief granted as, a bankrupt; or, file a petition or answer seeking reorganization or arrangement or other aid or relief under any any law for the relief of debtors or file an answer admitting, or fail to deny, the material allegations of a petition filed against it for any such relief.

CONFIDENTIAL

HACI 000537

8. **Remedies for Default.** In addition to any other remedies provided for in this Agreement or otherwise available to a non-defaulting Member at law or in equity (including, without limitation, reasonable attorney's fees, costs, and expenses), upon the occurrence of a default by a Member, such Member's rights to use of the Aircraft shall be suspended until the default is cured. Notwithstanding the foregoing, the defaulting Member shall remain liable and responsible during the continuation of any default for payment of all amounts for which such Member is liable under this Agreement, and/or all amounts for which such Member is liable under any other agreement related to the Aircraft or the use of the Aircraft.

9. **Withdrawal and Termination.** Each Member hereby irrevocably waives any right it may have to demand the partition or sale for partition of the Aircraft under any laws of the State of California or any other jurisdiction.

   9.1 **Withdrawal upon Notice.** Either Member may withdraw as a Member of the Company at any time upon ninety days prior written notice of withdrawal to the other Member, provided the withdrawing Member shall complete the sale of its Ownership Interest in the Aircraft per Sections 10 and 11 of this Agreement.

   9.2 **Termination on Default.** This Agreement may be terminated by either Member, subject to completion of the sale of the Ownership Interests in the Aircraft per Sections 10 and 11 of this Agreement, upon written notice to the other at any time if:

      9.2.1 The non-terminating Member shall have materially breached any term or condition of this Agreement and not cured such breach within thirty (30) days of written notification by the terminating Member of such breach; or

      9.2.2 The non-terminating Member commits a regulatory violation under the FAR as adjudicated by a regulatory body.

   9.3 This Agreement shall terminate upon bankruptcy, death, dissolution, expulsion, incapacity or withdrawal of any Member, unless within ninety days after such event, the Company is continued by the vote or written consent of a majority in interest of all of the remaining Members. In the event this Agreement is terminated under this Section 9.3, the trustee, executor, heirs or other lawful successor in interest of such Member shall be authorized and obligated to complete the sale of its ownership interest in the Aircraft per Sections 10 and 11 of this Agreement.

   9.4 **Consequences of Withdrawal or Termination.** In the event of termination of this Agreement and sale of Ownership Interests in the Aircraft per Sections 10 and 11 of this Agreement, the Company shall thereupon be dissolved or in the alternative, a Member's right and obligations under this Agreement shall be terminated upon that Member's

CONFIDENTIAL

HACI 000538

withdrawal; provided, however, that all previously incurred obligations, liabilities and rights shall remain unimpaired (including without limitation the obligation to make reports and payments required under this Agreement), and settled in due course by the Members.

    9.4.1 Termination of this Agreement or withdrawal will not relieve the Members of any individual obligation with respect to any third party for the account of the Company or for the individual Member's Aircraft usage prior to the effective date of termination.

    9.4.2 Any other assets of the Company at the effective date of termination of this Agreement shall be disposed of for the account of the Company and dispersed pro-rata to the Members in such manner as the Members may mutually agree.

9.5 **Appraisal.** In the event of a Member's withdrawal or default or upon any of the events described in Section 9.3, or upon any other event that terminates continued membership of any Member, the withdrawing or terminating Member or their estate shall be entitled to receive the fair value of the Member's interest in the Company. In the event the withdrawing or terminating Member or the deceased Member's estate cannot reach immediate agreement with the Company about the fair value of the Member's interest, the fair value shall be determined by appraisal, provided, the value of the Aircraft shall be determined per Sections 10 and 11 of this Agreement.

10. **Sale of Member's ownership interest in the Aircraft.**

    10.1 **Notice of Intent to Sell.** If at any time a Member intends to sell or otherwise divest itself of its respective Ownership Interest in the Aircraft, such Member (the "Selling Member") shall provide written notice of such intent to the other Member (the "Non-Selling Member").

    10.2 **Determination of Fair Market Value.** As soon as reasonably practicable after the date of any notice under Section 10.1, the Members shall determine the Fair Market Value of the Aircraft by mutual negotiation and agreement.

        10.2.1 In the event the Members cannot agree on the Fair Market Value of the Aircraft within ten (10) days after the date of any notice under Section 10.1, the Members shall, within twenty (20) days after the date of the notice under Section 10.1, jointly select an established, reputable, independent, and qualified appraiser to determine the Fair Market Value of the Aircraft.

        10.2.2 In the event the Members cannot agree on a single appraiser, the Fair Market Value of the Aircraft shall be determined by averaging

8

the fair market valuation appraisals of three (3) established, reputable, independent, and qualified appraisers, the first of whom shall be selected by the Selling Member, the second of whom shall be selected jointly by the Non-Selling Member, and the third of whom shall be selected jointly by the first two appraisers.

10.3 **Non-Selling Member's Option.** The Non-Selling Member shall have the option, exercisable by written notice delivered to the Selling Member within the first ten (10) Business Days following the determination of the Fair Market Value of the Aircraft, to purchase all, but not less than all, of the Selling Member's Ownership Interest in the Aircraft (the Non-Selling Member that elects to purchase the Selling Member's ownership interest in the Aircraft under this Section 10.3 or under Section 11.3 is a "Purchasing Member").

   10.3.1 In the event this Agreement is amended to provide for additional members and more than one (1) Purchasing Member elects to purchase the Selling Member's Ownership Interest in the Aircraft, each Purchasing Member shall be entitled to purchase a pro-rata portion of the Selling Member's Ownership Interest in the Aircraft that bears the same ratio as each respective Purchasing Member's then-existing percentage Ownership Interest in the Aircraft bears to the total percentage Ownership Interest in the Aircraft then held by all the Purchasing Members combined.

   10.3.2 The price at which the Purchasing Member(s) may purchase the Selling Member's Ownership Interest in the Aircraft (the "Option Price") shall be an amount equal to 98% of the Fair Market Value, multiplied by the Selling Member's percentage Ownership Interest in the Aircraft (it being agreed that such Option Price shall be deemed to be equal to the net amount that Selling Member would have received for its Ownership Interest in the Aircraft had the entire Aircraft been sold to a third-party on the open market at the Fair Market Value through a reputable brokerage firm, and the net sales proceeds after deducting sales commissions and other sales expenses totaling 2% of the sales price were shared by the Members pro-rata according to their respective Ownership Interest Percentages).

   10.3.3 If one (1) or more Purchasing Members exercise the option under this Section 10.3 to purchase the Selling Member's Ownership Interest in the Aircraft, the closing of such transaction shall occur not later than 5:00 p.m. Pacific Time on the 10th Business Day after the end of the ten (10) Business Day option period provided for in Section 10.3, unless another closing date shall be established by mutual agreement of the Members.

10.4 **Procedures for Purchasing Member(s) of Selling Member's Aircraft Interest.** On the date of the closing of any sale of Selling Member's Ownership Interest in the Aircraft to Purchasing Member(s):

10.4.1 The Purchasing Member(s) shall deliver to Selling Member the Option Price by wire transfer of immediately available U.S. funds.

10.4.2 Selling Member shall deliver all right, title, and interest in and to the Selling Member's Ownership Interest in the Aircraft, free and clear of all Liens on the Aircraft, to the Purchasing Member(s) in such as the parties may mutually agree.

10.4.3 Selling Member shall execute and deliver to the Purchasing Member(s) a Warranty Bill of Sale in a form reasonably acceptable to Purchasing Member(s), transferring all of Selling Member's Ownership Interest in the Aircraft to the Purchasing Member(s).

10.4.4 The Purchasing Member(s) shall execute and deliver to Selling Member a Delivery Receipt in a form reasonably acceptable to Selling Member.

10.4.5 The Selling Member shall promptly execute and deliver to the Purchasing Member(s) such other notices, statements, documents and instruments and perform such other acts the Purchasing Member(s) deems necessary to protect, preserve and enforce its acquisition and ownership of Selling Member's Ownership Interest in the Aircraft.

11. **Sale of Entire Aircraft.**

    11.1 **Solicitation of Third-Party Offers and Sale of Aircraft.** In the event no Non-Selling Member exercises its option under Section 10.3, the Members shall retain an aircraft broker to facilitate the sale of the entire Aircraft.

    11.2 **Third Party Offer Equal to or in Excess of Fair Market Value.** In the event the Members receive a bona-fide offer from any third-party to purchase the Aircraft for a purchase price that equals or exceeds the Fair Market Value determined pursuant to Section 10.2, the Members shall accept such offer, subject to the provisions of Section 11.4 of this Agreement.

    11.3 **Third Party Offer Less Than Fair Market Value.** In the event the Members receive a bona-fide offer from any third-party to purchase the Aircraft for a purchase price that the parties unanimously determine to be

CONFIDENTIAL

HACI 000541

reasonable and acceptable, but which is nevertheless less than the Fair Market Value determined pursuant to Section 10.2, each of the Non-Selling Members shall thereafter have an additional option, exercisable by written notice delivered to Selling Member within three (3) days after receipt of Selling Member's notice, to purchase all, but not less than all, of Selling Member's Ownership Interest in the Aircraft for a purchase price equal to 98% of the offered price, multiplied by the Selling Member's percentage Ownership Interest in the Aircraft.

    11.3.1 In the event more than one (1) Purchasing Member (as defined in Section 10.3) elects to purchase the Selling Member's Ownership Interest in the Aircraft, each Purchasing Member shall be entitled to purchase a pro-rata portion of the Selling Member's Ownership Interest in the Aircraft that bears the same ratio as each respective Purchasing Members then-existing percentage Ownership Interest in the Aircraft bears to the total percentage Ownership Interest in the Aircraft then held by all the Purchasing Members combined.

    11.3.2 The closing of any purchase by the Purchasing Member(s) of Selling Member's Ownership Interest in the Aircraft pursuant to this Section 11.3 shall occur not later than 5:00 p.m. Pacific Time on the 10th Business Day after the day the Non-Selling Member exercises its option under this Section 11.3, and shall be conducted in accordance with the procedures set forth in Section 10.4.

    11.3.3 In the event no Non-Selling Member exercises its option hereunder, the Members shall accept the third-party offer, subject to the provisions of Section 11.4 of this Agreement.

11.4 **Comprehensive Aircraft Purchase Agreement.** Any acceptance of a bona-fide offer from a third-party for the purchase of the entire Aircraft will be subject to the condition that such offer is contingent upon negotiation and execution of a comprehensive Aircraft Sale Agreement. The Members shall jointly negotiate any such Aircraft Sale Agreement in good faith. The Members shall each pay a pro-rata portion of all expenses of any sale of the entire Aircraft pursuant to this Section 11, and shall each be entitled to a pro-rata share of the proceeds of any such sale, according to their respective percentage Ownership Interests in the Aircraft.

12. **Representations and Warranties of Members.** The Members hereby represent and warrant as follows:

12.1 Notwithstanding that a Member shall have Operational Control of the Aircraft during that Member's individual flights, the Members agree that the Pilot in Command of any such flight may, in his or her sole discretion, terminate the flight, refuse to commence the flight, or take any other flight related action which in the judgment of the Pilot in Command is necessary

11

CONFIDENTIAL

to ensure the safety of the Aircraft, the Flight Crew, and all persons and property on board the Aircraft, and no such action of the Pilot in Command may support or be the basis of any claim of any kind against the Members or the Company.

12.2 Member is, and throughout the Term hereof shall continue to be duly incorporated or organized, validly existing, and in good standing under the laws of the state of Member's formation, possessing perpetual existence as a legal entity, having the capacity to sue and be sued in its own name, having full power, legal right and authority to carry on its business as currently conducted, and to execute, deliver and perform the provisions of this Agreement.

12.3 The execution, delivery, and performance of this Agreement by Member have been duly authorized by all necessary company action and do not conflict with or result in any breach of any of the terms or constitute a default under any document, instrument, or agreement to which it is a party.

12.4 This Agreement constitutes the legal, valid and binding obligations of Member, and is enforceable against Member in accordance with the terms herein contained.

12.5 Member shall not create or place any Lien against the Aircraft other than a security interest in favor of a financial institution providing financing for the Member's Ownership Interest and/or the Aircraft (a "Financing") and each Member shall ensure that no Liens are created or placed against the Aircraft by third-parties as a result of its actions, and shall take all actions as may be necessary to discharge and satisfy in full any such Lien promptly after the same becomes known to it. Under no circumstances may the balance owed under any Financing by a Member constitute more than forty percent (40%) of the value of the Aircraft as of January 1 of each calendar year as measured by the then most recent valuation published by Jet Aviva.

12.6 Member shall not divest itself of its Ownership Interest in the Company or the Aircraft except in accordance with the terms and conditions specified in this Agreement.

12.7 Member is, and throughout the Term hereof shall continue to be, either a citizen of the United States as defined in 49 U.S.C. §40102, as amended, or otherwise eligible to register the Aircraft in the United States.

12.8 Member shall not knowingly violate any regulatory, legal or insurance requirement applicable to the Aircraft and shall procure, maintain, and comply with all permits, licenses, and other authorizations required for use of the Aircraft by Member to ensure the proper operation, maintenance,

CONFIDENTIAL

HACI 000543

and repair of the Aircraft per the Aircraft manufacturer's and insurer's recommendations and applicable FARs.

13. **Section 1.761-2(a) Treatment.** The Members intend that the Company be excluded from the application of all or part of subchapter K of chapter 1 of the Internal Revenue Code.

14. **Allocation of Tax Benefits and Obligations.** Each Member shall be entitled to its pro rata share of all tax benefits, if any, arising from its respective Ownership Interest in the Company and Aircraft. Each Member shall be responsible for, and shall pay promptly when due, all taxes which may be assessed or levied by any taxing jurisdictions as a result of the purchase, lease, use, storage, or other consumption by such Member of such Member's Ownership Interest; provided, however, that each Member shall have the right to dispute or contest in good faith and at such Member's sole expense the amount of any taxes assessed or imposed directly against such Member. During the period that any such taxes are being disputed or contested in good faith, payment of such taxes in accordance with the terms of this Agreement may be delayed until a final determination of the amount due has been made so long as the delay in payment does not create a risk of a tax lien or forfeiture of the Aircraft.

15. **Insurance.** The Company shall maintain at all times during the term of this Agreement, with insurers of recognized responsibility, aircraft hull insurance and liability insurance in amounts not less than as listed on Exhibit B with respect to the Aircraft naming the Members as Loss Payees as their interests may appear. The Aircraft shall not be operated at any time, unless and until such insurance policies are in effect.

16. **No Assignment.** Neither Member may assign, transfer, license, sell or encumber this Agreement, the Aircraft or any rights or obligations hereunder, without the prior written consent of the other Member(s), which such consent shall not be unreasonably withheld, and any such non-permitted assignment, transfer, license, sale or encumbrance of the like, shall be null and void ab initio. Notwithstanding anything contained herein, each Member shall be permitted to assign, transfer and/or sell ("Transfer") its ownership interest in the Company to another entity controlled in whole or in part by the Member or, (i) in the case of Spring Creek's interest, controlled by William Parrish, and (ii) in the case of AA, controlled by Michael Avenatti. The new Member shall assume the ownership interest subject to all rights, duties, obligations and terms of this Agreement. In the event of such a Transfer, the transferring member shall notify the non-transferring member in writing within ten (10) business days of the Transfer.

17. **Notices.** All notices or other communications required or permitted under this Agreement shall be in writing and will be directed to the Member at the above referenced address, and sent certified mail, return receipt requested, or by fax with confirmed receipt, or by recognized overnight delivery service, or by email. Such notices and communications shall be deemed received three (3) calendar

days after having been sent.

18. **Governing Law.** This Agreement and the respective rights of the Members hereunder shall be governed by and construed under the laws of the State of California and will bind and inure to the benefit of the Member's successors and permitted assigns.

19. **Counterparts.** This Agreement may be executed in counterparts and by fax.

20. **Entire Agreement, Amendments.** There are no representations, warranties, promises or inducements between the Members not contained in writing. This Agreement is the entire Agreement between the Members and supersedes all prior agreements relating to the subject matter of this Agreement and/or the Aircraft. This Agreement may be changed only in a writing signed by a duly authorized representative of each of the Members, expressly referring to this Agreement.

21. **Arbitration.** The Members shall work together in good faith and shall endeavor to reach commercially reasonable solutions to all issues that may arise in their relationship hereunder. Any disputes, claims or causes of actions between the Members arising out of this Agreement or the transactions contemplated hereby shall be fully and finally adjudicated and resolved by an arbitration commenced before JAMS located in Los Angeles, California and conducted under the JAMS arbitration rules then in effect. The dispute shall be heard by one arbitrator jointly selected and paid for by the Members.

22. **Indemnification.**

    22.1 **Company Indemnification:** The Company may, and shall have the power to, indemnify and hold harmless, and advance expenses to, any Member, manager or other person, or any testator or intestate of such Member, manager or other person, from and against any and all claims and demands whatsoever relating to the operation of the business of the Company; provided, however, that no indemnification may be made to or on behalf of any Member, manager or other person if a judgment or other final adjudication adverse to such Member, manager or other person establishes (a) that his or her acts were committed in bad faith or were the result of active and deliberate dishonesty and were material to the cause of action so adjudicated or (b) that he or she personally gained in fact a financial profit or other advantage to which he or she was not legally entitled.

    22.2 **Member Indemnification:** In the event the Aircraft is sold as a result of a default, the Members agree that the defaulting Member shall reimburse the non-defaulting Member the non-defaulting Member's portion of the expenses incurred per Section 11.4 and any negative variance due to the difference between the sales price received upon sale of the of the Aircraft

pursuant to Section 11 and the Fair Market Value as determined in Section 10.2.

23. **Limitation of Liability.** Each Member agrees to indemnify and hold harmless the other Member and Manager and their respective officers, directors, partners, employees, shareholders, and affiliates from any claim, damage, loss, or reasonable expense, including reasonable attorney's fees, resulting from the bodily injury or property damage caused by an occurrence and arising out of the ownership, maintenance, or use of the Aircraft.

24. **Truth-In-Leasing Statement under FAR 91.23:** (a) The Aircraft, within the twelve month period preceding the date of this agreement, except to the extent the Aircraft is less than twelve months old, has been and during the lease term shall be, inspected and maintained in accordance with Part 91.409 (f) (3) and all applicable requirements for maintenance and inspection thereunder have been complied with; (b) the Members certify and knowingly acknowledge that when they use the Aircraft under this Agreement under lease, the Member shall be known as, considered and in fact shall be the operator of such aircraft; (c) an explanation of factors bearing on operational control and pertinent FARs can be obtained from the nearest FAA Flight Standards District Office; and (d) the Members hereto certify that a true copy of this agreement shall be carried on the Aircraft at all times during any lease thereof, and shall be made available for inspection upon request by a representative of the FAA.

WHEREFORE, the parties hereto have executed this Agreement as of July 11, 2016.

Spring Creek Research, LLC

By: _____
William Parrish, Member

Avenatti & Associates, APC

By: _____
Michael J. Avenatti, President

15

CONFIDENTIAL

HACI 000546

## Exhibit A

|  | **Member**<br>Spring Creek Research, LLC | **Member**<br>Avenatti & Associates, APC* |
|---|---|---|
| Initial Capital Contribution: | $350,000 | $1,000 |
| Ownership Interest: | 50% | 50% |
| Subsequent Capital Contribution | $1,950,000 | $1,831,105 |
| Maximum Annual Flight Hours: | 150 | 150 |

| | |
|---|---|
| Minimum Hull Insurance Limit: | $5,000,000 |
| Minimum Liability Insurance | $5,000,000 |
| Operating Base: | SBA |

*Member Avenatti & Associates, APC shall have the option to secure financing for its Subsequent Capital Contribution in accordance with the terms of this agreement as set forth above and, in the event of such financing, the Members agree that the Aircraft shall be subject to a priority security interest. Member Avenatti & Associates, APC shall indemnify and hold harmless Member Spring Creek Research, LLC for any and all costs, including attorney's fees, incurred due to the repossession and/or sale of the Aircraft due to any default under any financing or security agreements.

CONFIDENTIAL

HACI 000547

## WAIVER OF NOTICE AND CONSENT TO ACTION
## IN LIEU OF HOLDING MEMBERS MEETING OF
## PASSPORT 420, LLC

The undersigned, being all Members of the above named Limited Liability Company and pursuant to Section 5 of the Operating Agreement of Passport 420, LLC, dated July 11, 2016, **DO HEREBY WAIVE NOTICE** of a members meeting, and **CONSENT**, take and adopt, the following actions in writing in lieu of such meeting, on the 11th day of July, 2016:

- Appoint Michael Avenatti as Manager of Passport 420, LLC.

The undersigned agree that the foregoing constitutes a complete record of actions taken, adopted, approved and ratified by unanimous written consent of the Members in lieu of a members annual meeting.

WITNESS the below signature this 11th day of July, 2016.

**MEMBERS**

_____
William Parrish, Spring Creek Research, LLC

_____
Michael J. Avenatti, Avenatti & Associates, APC


I hereby accept the appointment as Manager of Passport 420, LLC pursuant to the terms set forth in the Operating Agreement of Passport 420, LLC dated July 11, 2016.

_____
Michael Avenatti

1

CONFIDENTIAL

HACI 000548