JOHN P. REITMAN (State Bar No. 80579)
jreitman@landaufirm.com
MONICA RIEDER (State Bar No. 263250)
mrieder@landaufirm.com
LANDAU LAW LLP
141 S. Windsor Blvd.
Los Angeles, California 90004
Telephone: (310) 557-0050
           (310) 691-7737
Facsimile: (310) 557-0056

Special Litigation Attorneys for
Plaintiff Richard A. Marshack,
Chapter 7 Trustee for Eagan Avenatti, LLP

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| UNITED STATES OF AMERICA, | Case No. 8:19-cr-00061-JVS |
|---|---|
| Plaintiff, | **REPLY BRIEF OF RICHARD A. MARSHACK, IN HIS CAPACITY AS THE TRUSTEE OF THE CHAPTER 7 BANKRUPTCY ESTATE OF EAGAN AVENATTI, LLP, REGARDING ESTATE'S INTEREST IN HONDA JET; SUPPORTING DECLARATION OF JOHN P. REITMAN** |
| vs. | |
| MICHAEL JOHN AVENATTI, | |
| Defendant. | |
| | **Hearing Date, Time, and Location:** |
| | Date:   June 26, 2023 |
| | Time:   9:00 a.m. |
| | Place:  Courtroom 10C |
| |          411 West 4th Street |
| |          Santa Ana, CA 92701 |

LANDAU LAW LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

1

# TABLE OF CONTENTS

A.   Respective Contributions of Claimants' Funds to the Honda Jet ........... 2

    1.   EA Funds Transferred to Honda for the Honda Jet ($1,360,000) ................................................................................. 2

    2.   Gardner Funds Transferred to Honda for the Honda Jet ($1,675,000) ................................................................................. 6

    3.   Spring Creek Funds Allegedly Transferred to Honda for the Honda Jet (None Proven) ..................................................... 6

B.   The Estate's Claim Should Include The Attorneys' Fee Portion of the $2.5 Million Transfer ....................................................... 8

C.   Gardner Should Receive a Pro Rata Distribution Based on the Amount of Her Funds Contributed to the Honda Jet ($1,675,000) ..... 13

D.   No Distribution Should Be Made to Spring Creek Until After the Estate's and Gardner's Claims Have Been Paid in Full ....................... 14

E.   Because JFL's Judgment Lien Was Created After the Commission of the Crime at Issue, JFL's Interest Is Not Superior to the Government's ................................................................... 15

F.   Conclusion ......................................................................... 16

i

# TABLE OF AUTHORITIES

CASES

*Cal Pak Delivery, Inc. v. United Parcel Serv., Inc.*,
   52 Cal. App. 4th 1 (1997) ........................................................................ 9

*In re Gonzalez, Inc.*,
   2006 Bankr. LEXIS 4806 (B.A.P. 9th Cir. Oct. 27, 2006) ........................... 11, 12

*Jeffry v. Pounds*,
   67 Cal. App. 3d 6 (1977) ........................................................................ 9

*In re Par 5 Prop. Invs., LLC*,
   2022 Bankr. LEXIS 3045 (Bankr. E.D. Cal. Oct. 26, 2022) ........................... 11

*Phillips Chiropractic v. Ennix*,
   2009 Cal. App. Unpub. LEXIS 7297 (Sep. 10, 2009) ................................. 12

*Sheppard, Mullin, Richter & Hampton, LLP v. J-M Mfg. Co., Inc.*,
   6 Cal. 5th 59 (2018) ............................................................................. 9

*United States v. Bank*,
   2022 U.S. Dist. LEXIS 220303 (E.D. Va. Dec. 6, 2022) ........................... 15

*United States v. MM MR RM Corp.*,
   880 F. Supp. 2d 1109 (W.D. Wash. 2012) ........................................... 15

*United States v. Sohrab Sharma*,
   2023 U.S. Dist. LEXIS 16389 (S.D.N.Y. Jan. 31, 2023) ........................... 15

STATUTES

21 U.S.C. § 853(n)(6)(A) ........................................................................ 15

Cal. Code Civ. Proc. § 1021 ................................................................... 11

RULES

California Rule of Professional Conduct 4-100(A)(2) ............................... 12

LANDAU LAW LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

ii

**TO THE HONORABLE COURT AND ALL PARTIES IN INTEREST AND THEIR RESPECTIVE ATTORNEYS OF RECORD:**

Richard A. Marshack (the "Trustee"), the trustee of the chapter 7 bankruptcy estate (the "Estate") of Eagan Avenatti LLP ("EA"), hereby respectfully submits his brief regarding the respective claims of the Estate and claimants Alexis Gardner ("Gardner"), Spring Creek Research, LLC ("Spring Creek"), and Jason Frank Law, PLC ("JFL"), to the Honda aircraft with tail number N227WP and associated property that is the subject of the Court's August 9, 2022 *Preliminary Order of Forfeiture* [Docket 975] (collectively, the "Honda Jet").

A. <u>Respective Contributions of Claimants' Funds to the Honda Jet</u>

Three of the claimants – the Estate, Gardner, and Spring Creek – essentially base their claims on the amount of their funds that were paid to Honda Aircraft Company, LLC ("Honda") for the Honda Jet. As set forth below, the present evidence supports a finding that $1,360,000 of the funds that were paid to Honda for the Honda Jet came from the Estate; $1,675,000 of the funds for the Honda Jet came from Gardner; and the amount of funds (if any) that came from Spring Creek has not been established (but could not, under any circumstances, be anywhere close to the $2,335,000 that Spring Creek has claimed).

1. **EA Funds Transferred to Honda for the Honda Jet ($1,360,000)**

In connection with reviewing the other claimants' briefs and preparing this brief, the Trustee conducted a detailed re-examination of the underlying documents (bank statements, the agreements and related documents produced by Honda, and EA's fee agreement with Gardner) and double-checked the figures included in the Trustee's opening brief [Docket No. 1102] (the "TOB") to ensure that all amounts mentioned in the Trustee's brief are accurate and well-supported by evidence. As set forth below, the information identified in that process indicates that the amounts described in the TOB should be adjusted slightly, resulting in a total contribution of

LANDAU LAW LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

$1,360,000 of EA funds to the Honda Jet, rather than $1,406,300 as set forth in the TOB.[1]

As set forth in the TOB, on June 2, 2014, Avenatti caused EA to transfer $525,000 of its funds to Honda. The EA bank statement evidencing this transfer is attached as Exhibit A of the accompanying declaration of John P. Reitman (the "Reitman Declaration").[2] At the time of that transfer, EA's former managing partner Michael Avenatti ("Avenatti"), through Avenatti & Associates, A Professional Corporation ("Avenatti & Associates"), had two separate contracts with Honda for the purchase of two separate planes, one with a contract number of 40000021 (the "-021 Contract") and one with a contract number of 40000022 (the "-022 Contract"). Reitman Declaration, Exhibit C (Bates page 22). It appears that, of the $525,000 of EA's funds that were transferred to Honda on June 2, 2014, $350,000 was applied to one contract and $175,000 was applied to the other contract. *Id.* (Bates pages 22-23).

The TOB identified $425,000 of the $525,000 as having been paid to Honda for the Honda Jet, based on a January 27, 2017 agreement between Avenatti & Associates and Honda under which deposits of $425,000 previously paid to Honda were credited to the purchase of the Honda Jet (the "Deposit Transfer Agreement"). Reitman Declaration, Exhibit C (Bates pages 24-25). In fact, a further review of the documents establishes that the entire $525,000 transferred from EA to Honda in June 2014 was applied to the purchase of the Honda Jet.

---

[1] As set forth in the TOB, the transfers of EA's funds to Honda for the Honda Jet gave EA a constructive trust interest in the Honda Jet because all of the transfers occurred at a time when EA was insolvent at least because it was not paying substantial debts to legitimate creditors as they became due, and accordingly the transfers (which were made solely for Michael Avenatti's personal benefit) were made in breach of Michael Avenatti's fiduciary duties to EA and its creditors. TOB, pages 3-5 and 8-10.

[2] The ultimate source of the $525,000 was two payments totaling approximately $20 million that EA received in May 2014 for fees awarded to EA in a case called *Scott v. Service Corp Int'l., et al.*, and accordingly the $525,000 consisted entirely of funds that belonged to EA. Reitman Declaration, ¶ 3 and Exhibit B.

Two separate agreements provide for the application of all prior payments under the -021 Contract and the -022 Contract to the purchase of the Honda Jet.  The Deposit Transfer Agreement provided that the deposits under the -021 Contract, which, at the time of the Deposit Transfer Agreement, totaled $425,000 (including either $175,000 or $350,000 of EA's money, apparently along with additional funds from another source) were to be credited to "Contract 40000316" – the contract under which the Honda Jet was purchased.  Reitman Declaration, Exhibit C (Bates pages 24-25 and 29).  Per a separate July 13, 2016 amendment/assignment between Honda, Avenatti & Associates, and Passport 420, LLC ("Passport 420") (the "Assignment Agreement"), the -022 Contract was assigned to Passport 420, LLC and became the contract under which the Honda Jet was purchased.  *Id.* (Bates pages 26-27); *see also id.* (Bates page 28) (providing that the plane purchased under the -022 contract would have the N227WP tail number currently assigned to the Honda Jet).  The Assignment Agreement provided that "all progress payments" previously made under the -022 Contract – which includes the remainder of EA's June 2, 2014 $525,000 payment to Honda – "shall be credited toward the purchase price to be paid by" Passport 420.  *Id.* (Bates page 26).  Accordingly, all of the payments made to Honda under either the -021 Contract or the -022 Contract (including the entirety of EA's funds paid to Honda in connection with those contracts) were applied to the purchase of the Honda Jet, and EA's constructive trust interest in the plane includes the entire $525,000 of EA's funds transferred to Honda on June 2, 2014.

As set forth in the TOB, on January 20, 2017, $138,800 was transferred from an EA bank account to Honda.  Reitman Declaration, Exhibit D (Bates page 32).  Upon further examination of the relevant EA bank statement in light of Spring Creek's claim that $1,985,000 was transferred from William Parrish or his family trust ("Parrish") to Passport 420 on January 18, 2017, however, it appears that the $138,800 came from funds that were transferred into EA's bank account on January 20, 2017 from Passport 420.  *See id.* (Bates page 33) (on January 19, 2017, the

LANDAU LAW LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

4

"Daily Balance" of the relevant EA bank account was -$10,235.45); *id.* (Bates page 30) (six transfers totaling $1,984,197.50 were made from Passport 420 to the relevant EA bank account on January 20, 2017). Accordingly, the Estate is no longer asserting a constructive trust interest in the Honda Jet based on this $138,800 transfer.

As set forth in the TOB, and as the Court well knows, on January 26, 2017, $2,500,000 was transferred from EA to Honda through conduit The X-Law Group, PC ("X-Law"), and the source of those funds was settlement proceeds EA received in connection with a matter in which it represented Gardner. Reitman Declaration, Exhibits E and F. EA's fee agreement with Gardner (the "Gardner Agreement") provided that EA was entitled to a "Contingent Fee of thirty-three percent (33%)" of any recovery obtained by EA, as well as EA's costs and expenses. Reitman Declaration, Exhibit G (Bates pages 41-42). The Gardner Agreement provided that, if the recovery was divided into multiple payments, "[t]he attorney's fees will be paid out of the initial lump sum payment" and, if that "payment is insufficient to pay the attorney's fees in full, the balance will be paid from subsequent payments . . . before any distribution to Client." *Id.* According to the government's evidence and calculations, under the Gardner Agreement, EA was entitled to a contingency fee of "$990,000 (33% of the full $3,000,000)" and costs and expenses of "approximately $71,715, which includes the costs pursuant to the Tabs records ($19,780), as well as the payment of Gardner's rent and security deposit ($51,935)" – for a total of $1,061,715. Docket No. 1000-1, ECF page 5, lines 14-25. Since the Gardner Agreement provides for at least the attorney's fee portion of this amount to be paid before Gardner receives any recovery, the Trustee could have asserted a claim for $990,000 (or even $1,061,715) out of the $2,500,000. Instead, the Trustee calculated the Estate's share of the $2,500,000 by simply multiplying that amount by the contingency fee percentage, which the Trustee believes is a reasonable and conservative method of determining the amount of the $2,500,000 payment that

5

constitutes the Estate's funds.  The only adjustment required to the number provided in the TOB is that the Trustee's previous calculation was based on a contingency fee of 33.3%, instead of 33.0%, yielding a slightly high figure of $832,500, instead of the correct figure of $825,000.  Accordingly, the Estate has a constructive trust interest in the Honda Jet in the amount of $825,000 in connection with the January 26, 2017 transfer of $2,500,000 from EA to Honda.

As described in the TOB, the final transfer of EA's funds to Honda occurred on June 28, 2018, when Avenatti transferred $10,000 to Honda out of EA's 10% contingency fee share of settlement proceeds received by Avenatti in a personal account.  Reitman Declaration, Exhibit H.  No adjustment is required to this amount.

Accordingly, a total of $1,360,000 of the Estate's funds were paid to Honda for the Honda Jet ($525,000 + $825,000 + $10,000).

## 2. Gardner Funds Transferred to Honda for the Honda Jet ($1,675,000)

As stated in Section I.A above, the Trustee's calculations attribute 33% (i.e., EA's contingency fee portion) of the $2,500,000 transferred to Honda on January 26, 2017 to the Estate, with the remainder being allocated to Gardner.  As noted, however, the Trustee's calculations in the TOB were slightly off due to the use of 33.3% instead of 33.0% to calculate EA's contingency fee portion, which resulted in EA's share being slightly overstated and Gardner's share being slightly understated.  When Gardner's share is calculated using the correct 67% (instead of the 66.7% implicitly used in the calculation in the TOB), $1,675,000 of Gardner's funds were used to purchase the Honda Jet.

## 3. Spring Creek Funds Allegedly Transferred to Honda for the Honda Jet (None Proven)

Spring Creek has provided no evidence that any of its funds were used to purchase the Honda Jet.  While Spring Creek claims on page 16 of its brief [Docket No. 1103] (the "Spring Creek Brief") that "Spring Creek has traced its funds creating

6

LANDAU LAW LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

its direct 52.7% ownership interest in the Honda Jet to its wiring of legitimate funds to Honda ($350,000) on July 7, 2016; and to Passport ($1,985,000) on January 18, 2017," that assertion is incorrect and/or unsupported in at least four ways.

First, the Spring Creek Brief contains no mention of any funds being transferred from Spring Creek to anyone else. Instead, the funds transfers described in the Spring Creek Brief are transfers of funds from Parrish, not Spring Creek. *See* Spring Creek Brief, page 7 (describing transfers of $350,000 and $1,985,000 "from [Parrish's] family trust account"). No explanation is given as to how transfers of Parrish's funds to third parties could give Spring Creek an equitable ownership interest in any property that may have been purchased with Parrish's funds.

Second, only one of the transfers, the transfer of $350,000 that allegedly occurred on July 7, 2016, is identified as a transfer of funds to Honda – and Spring Creek has not provided any documentary evidence that the transfer occurred or that the funds were applied to the purchase of the Honda Jet. *See* Spring Creek Brief, page 15, lines 3-6 (citing only to Parrish's declaration to support the proposition that "[t]he evidence shows that on July 7, 2016, Mr. Parrish, on behalf of Spring Creek, wired $350,000 directly to Honda, as a down payment toward the purchase of the jet"); Docket No. 1103-1, ECF page 3, lines 1-3 ("Attached hereto as **Exhibit B** are true and correct copies of the two wire transfers I made to purchase Spring Creek's interest in the Honda Jet."); *id.*, ECF pages 24-25 (Exhibit B consists of a single page that relates solely to the $1,985,000 transfer).

Third, the only transfer of which Spring Creek has provided documentary evidence is a transfer of $1,985,000 from Parrish to Passport 420 on January 18, 2017, and Spring Creek has provided no evidence of the amount (if any) of Parrish's funds that were both subsequently transferred to Honda and applied to the purchase of the Honda Jet. As far as the Trustee is aware, Spring Creek also has not attempted to take any discovery (e.g., from Honda or from the banks at which the relevant accounts were maintained) to obtain such evidence. In place of actual evidence that

LANDAU LAW LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

7

any of the funds transferred from Parrish to Passport 420 were used to purchase the Honda Jet, Spring Creek simply describes the transfer from Parrish to Passport 420 and cites an assortment of California legal principles that have no bearing on the issue of whether any of Parrish's funds were transferred to Honda.  That is not sufficient to establish that any portion of the $1,985,000, much less all of it, was used to purchase the Honda Jet.

Fourth, if Spring Creek is correct that the total amount paid to purchase the Honda Jet was $4,383,605 (Spring Creek Brief, page 8, lines 4-11), it is literally impossible, in light of the actual documentary evidence, that anywhere close to $2,335,000 of Parrish's funds could have been used towards the purchase of the Honda Jet.  The documentary evidence attached to the Reitman Declaration establishes that, at a minimum, payments of $525,000 and $2,500,000 attributable to EA and Gardner were made towards the purchase of the Honda Jet – totaling $3,025,000.  Subtracting that amount from the purchase price of $4,383,605 leaves only $1,358,605 that could be attributable to other sources; meaning that even if every penny of the remaining amount was paid by Parrish (which Spring Creek has done nothing to establish), Parrish could not have contributed any more than about 30% of the funds for the Honda Jet.

In light of these numerous evidentiary deficiencies in Spring Creek's claim, the Court could properly conclude that none of Spring Creek's funds were used to purchase the Honda Jet.

**B.**     **The Estate's Claim Should Include The Attorneys' Fee Portion of the $2.5 Million Transfer**

For the reasons set forth below, both law and equity support the conclusion that 33% of the $2,500,000 transferred from EA to Honda on January 26, 2017, constituted EA's funds.

While Gardner argues that all of the $2,500,000 transferred to Honda should be treated as Gardner's money, on the grounds that EA's fees should be deemed

forfeited as a result of Avenatti's misconduct,[3] fee forfeiture would not be appropriate in these circumstances under applicable California law.  While Gardner is correct that courts may impose the forfeiture of fees in appropriate circumstances, the California Supreme Court has recently acknowledged that "forfeiture of compensation is, in the end, an equitable remedy."  *Sheppard, Mullin, Richter & Hampton, LLP v. J-M Mfg. Co., Inc.*, 6 Cal. 5th 59, 89 (2018).  Accordingly, "[t]he degree to which forfeiture is warranted as an equitable remedy will necessarily vary with the equities of the case."  *Id.* at 90.  The California Supreme Court also identified two principles underlying fee forfeiture – namely, that partial or complete forfeiture of fees is appropriate because services performed by a conflicted or otherwise unfaithful lawyer are worth less (or nothing), and that "forfeiture . . . serves as a deterrent to misconduct."  *Id.* at 89-90.  In keeping with the first principle, California courts have held that even where an attorney commits a severe ethical breach, the attorney may be compensated for services that were performed prior to the breach.  *See, e.g., Cal Pak Delivery, Inc. v. United Parcel Serv., Inc.*, 52 Cal. App. 4th 1, 7-18 (1997) (noting that forfeiture of attorney's fees is based "on the principle that payment is not due for services not properly performed" and reversing portion of trial court order disallowing fees for services performed prior to attorney's ethical breach, despite that attorney, who was counsel for class of plaintiffs, committed severe ethical breach by making settlement proposal to defendants under which counsel personally would receive $8 to $10 million and class would receive nothing); *Jeffry v. Pounds*, 67 Cal. App. 3d 6, 12 (1977) ("Plaintiffs are entitled to compensation for services supplied preceding the breach of professional conduct. . . . The trial court should limit plaintiffs' fee to the value of services rendered before the date of the violation, whatever that date was.").  Accordingly, California law does not support the forfeiture of fees where the services for which fees would be awarded

---

[3]  *See* Petitioner Alexis Gardner's Brief Regarding Disposition of One Honda Aircraft [Docket No. 1105] (the "Gardner Brief"), pages 4-6.

were completed before the ethical breach, forfeiture would not serve the purpose of deterrence, and/or forfeiture would cause an inequitable result.

In the present case, all three of those factors weigh in favor of permitting the Estate to recover the attorney's fee portion of the $2,500,000 transfer. First, EA had successfully performed its services for Gardner – obtaining a total settlement of $3,000,000, with which Gardner has never expressed dissatisfaction – before Avenatti breached his duties by misappropriating Gardner's share of the initial settlement payment. Second, as stated in the TOB, any amounts paid to the Estate will be distributed to the creditors of the Estate in accordance with the Bankruptcy Code, and those creditors include both Gardner and other former clients of EA who were victimized in the same manner as Gardner (such as Geoffrey Johnson) but who do not happen to have a claim to the Honda Jet; and there is no chance that Avenatti will receive any distribution from the Estate. Accordingly, because the Estate's interests and Avenatti's are now completely divergent, and deeming EA's fees to be forfeited would punish the creditors of the Estate (including former EA clients who were victims of Avenatti's crimes) rather than Avenatti, forfeiture in these circumstances would not serve the purpose of deterring attorney misconduct. Finally, forfeiture would cause an inequitable result, because it would elevate Gardner over the other victims of Avenatti's wrongdoing who are among the creditors of the Estate. In connection with determining the restitution to be paid by Avenatti to Gardner, both the government and the Court acknowledged that it would be inequitable to treat Gardner as though she were entitled to the entire $3 million settlement amount without any offsets for EA's fees and costs. *See* Docket No. 1000-1, ECF page 5, line 14, through ECF page 6, line 10 (government witness deducting amounts due to EA for fees and costs from $3,000,000 settlement amount for purposes of calculating Gardner's restitution and recommending restitution of $1,460,785); Docket No. 1053, pages 13-14 (noting that restitution "has an equitable underpinning which gives the Court the ability to avoid double recoveries or

LANDAU LAW LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

windfalls" and approving government's recommended restitution for Gardner); Docket No. 1072, page 84 (ordering Avenatti to pay restitution of $1,432,585 to Gardner).  Similarly, here, it would both provide Gardner with an undue windfall and impose an unjust cost on the other victims of Avenatti's wrongdoing to disregard the provisions of the Gardner Agreement regarding the fees and costs owed to EA.  Accordingly, the Estate's claim should include the 33% contingency fee portion of the $2,500,000 transfer, rather than the entirety of the transfer being treated as Gardner's funds.

Contrary to Garder's argument,[4] under the Gardner Agreement EA's right to receive its contingency fee became fixed at the moment that EA received the settlement proceeds, and at that point the contingency fee portion of the settlement proceeds became EA's property (which EA was both entitled and obligated to remove from its trust account).  A law firm and its client may define in their agreement the time at which the law firm's right to fees becomes fixed, and when the parties have entered a contingency fee agreement that time is generally the moment when a recovery is obtained.  *See, e.g.,* Cal. Code Civ. Proc. § 1021 ("Except as attorney's fees are specifically provided for by statute, the measure and mode of compensation of attorneys and counselors at law is left to the agreement, express or implied, of the parties . . . ."); *In re Par 5 Prop. Invs., LLC*, 2022 Bankr. LEXIS 3045, at *29 (Bankr. E.D. Cal. Oct. 26, 2022) ("[A]ttorney and client are free to agree to the 'measure and mode' of attorney compensation.  Consequently, the attorney and client may prescribe when the attorney's interest in earned fees will 'become fixed' for purposes of CRPC 1.15(c)(2) (formerly CRPC 4-100).") (quoting Mark L. Tuft et al., *California Practice Guide: Professional Responsibility* § 9:162.3 (Rutter Group 2021)); *In re Gonzalez, Inc.*, 2006 Bankr. LEXIS 4806, at *11 (B.A.P. 9th Cir. Oct. 27, 2006) ("The Fee Agreement that Arias entered into with the

---

[4]  Gardner Brief, pages 6-8.

11

LANDAU LAW LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

appellee stated that the appellee was entitled to '50% of any amount that is recovered' from the lawsuit between Arias and the debtor.  When Arias executed the settlement agreement and thereby 'recovered' $15,000, the condition precedent to the appellee's contractual right to 50 percent of its client's monetary recovery was satisfied.  In other words, the appellee's interest in its attorney's fees became due or fixed."); *Phillips Chiropractic v. Ennix*, 2009 Cal. App. Unpub. LEXIS 7297, at *10-*11 (Sep. 10, 2009) (holding that it was not wrongful for attorney to disburse his contingency fee from his trust account to himself because "[t]he portion of the settlement proceeds earned by and belonging to defendant, as the attorney, became fixed when defendant received the tortfeasor's insurance policy limits").  When settlement proceeds are received by a law firm and the law firm is entitled to a portion of the proceeds as a contingency fee under its agreement with its client, that portion of the proceeds constitutes the law firm's property and must be promptly removed from the law firm's trust account.  *See, e.g.,* Former California Rule of Professional Conduct 4-100(A)(2) ("In the case of funds belonging in part to a client and in part presently or potentially to the member or the law firm, the portion belonging to the member or law firm must be withdrawn at the earliest reasonable time after the member's interest in that portion becomes fixed."); *Gonzalez, supra,* 2006 Bankr. LEXIS 4806, at *11-*12 ("[U]pon recovery of the settlement funds, the appellee became the legal owner of the $7,500 and was entitled to withdraw the money from the [trust account]."); *Ennix, supra,* 2009 Cal. App. Unpub. LEXIS 7297, at *11 ("Defendant was duty bound not to commingle the fixed earned fees belonging to him with the remainder of the funds belonging to the client, and was required to remove the $5,000 attorney fees from the trust account at the earliest reasonable moment.").  The Gardner Agreement provided that (a) EA was entitled to a "Contingent Fee of thirty-three percent (33%)" of any recovery obtained by EA; (b) if the recovery was divided into multiple payments, "[t]he attorney's fees will be paid out of the initial lump sum payment"; and (c) if the initial lump sum payment

"is insufficient to pay the attorney's fees in full, the balance will be paid from subsequent payments . . . before any distribution to Client."  Reitman Declaration, Exhibit G (Bates page 41).  Accordingly, EA and Gardner agreed that EA's contingency fee would become fixed and payable in full upon receipt of the initial settlement payment.  Therefore, EA's contingency fee portion of the initial settlement payment became EA's property as soon as that payment was received, and 33% of that payment (including 33% of the $2,500,000 transferred to Honda) constituted EA's funds.

### C.   Gardner Should Receive a Pro Rata Distribution Based on the Amount of Her Funds Contributed to the Honda Jet ($1,675,000)

As acknowledged in the TOB, Gardner has an interest in the Honda Jet that is equal in priority to the Estate's interest, since both are constructive trust interests arising from the wrongful use of their funds to purchase the Honda Jet.  Although the Gardner Brief does not acknowledge it, the Estate and Gardner are also similarly situated with regard to the availability of other sources of recovery.  Just as the Trustee has done, Gardner could assert litigation claims for the return of her portion of the settlement funds paid to Honda.  Such claims likely are not mentioned in the Gardner Brief for the same reason that Gardner has not asserted them – because at least some of those claims would be against the very law firm who is currently representing her.  Gardner likely has claims against that law firm, X-Law, for its participation in the diversion of Gardner's portion of the settlement proceeds, and against Honda for its ultimate receipt of the funds.  To the extent that any claims against Honda are now time-barred, Gardner would have additional claims against X-Law for its malpractice in failing to advise her to pursue such claims.

Gardner and the Estate should therefore receive first-priority payments equivalent to the proportion of their funds used to purchase the Honda Jet, with Gardner's share based on the 67% of the $2,500,000 transfer that constituted her funds (i.e., $1,675,000).  (While the Gardner Brief seeks to inflate Gardner's claim

LANDAU LAW LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

by the addition of approximately $1.5 million in interest, the Gardner Brief cites no authority for the proposition that payment of interest is appropriate in these circumstances, and equity dictates that all claimants should receive full payment of the principal amount of their claims before an award of interest could be considered.)

Under the adjusted figures described herein, a total of $3,035,000 of the Estate's and Gardner's funds were paid to Honda for the Honda Jet, with the Estate contributing 45% of that amount and Gardner contributing 55% of that amount. Accordingly, under the law cited in the TOB, the Honda Jet should be sold, and 45% of the proceeds (i.e., the net proceeds remaining after payment of costs, etc.) should be distributed to the Trustee and 55% of the proceeds should be distributed to Gardner.

### D. No Distribution Should Be Made to Spring Creek Until After the Estate's and Gardner's Claims Have Been Paid in Full

Unlike the Estate and Gardner, Spring Creek does not have an interest in the Honda Jet that arose as a result of a crime committed by Avenatti. To the extent that any of Spring Creek's funds were transferred to Honda, including after passing through Avenatti's hands, for the purchase of the Honda Jet, such transfers were not wrongful, because that was the exact result Spring Creek intended and desired. To the extent that any of Spring Creek's funds were transferred to Avenatti and were not transferred to Honda, that may have been wrongful, but by definition it would not result in Spring Creek having any trust interest in the Honda Jet.

Accordingly, no distribution should be made to Spring Creek until after the Estate and Gardner have received full repayment of the amounts of their funds that were paid to Honda for the Honda Jet ($1,360,000 and $1,675,000, respectively). If substantial funds remain after the Estate's and Gardner's funds are fully repaid, the Court should require Spring Creek to provide admissible evidence regarding the amount of its own funds (if any) that were paid to Honda for the Honda Jet.

/ / /

Landau Law LLP
Attorneys at Law
Los Angeles, California

### E. Because JFL's Judgment Lien Was Created After the Commission of the Crime at Issue, JFL's Interest Is Not Superior to the Government's

JFL's claim, which is based on a judgment lien against Avenatti's personal property, is not superior to the government's for purposes of this forfeiture proceeding because it arose after the commission of the crime at issue.  Under the criminal forfeiture statute, a claimant's interest is superior to the government's only if the relevant "right, title, or interest was vested in the petitioner rather than the defendant or was superior to any right, title, or interest of the defendant at the time of the commission of the acts which gave rise to the forfeiture under this section."  21 U.S.C. § 853(n)(6)(A).  Accordingly, while a judgment lien can be an interest that is superior to the defendant's interest, it will only trump the government's interest if it arose before the commission of the crimes at issue.  *See, e.g., United States v. Sohrab Sharma*, 2023 U.S. Dist. LEXIS 16389, at *8 (S.D.N.Y. Jan. 31, 2023) ("Under § 853(c), the Government's interest vested upon the commission of the acts constituting the fraud, which took place approximately from July 2017 to April 2018.  Any interest Claimants gained in the Seized ETH as a result of the judgment liens vested years later.  The Government's interest is superior under § 853(n)."); *United States v. Bank*, 2022 U.S. Dist. LEXIS 220303, at *5-*6 (E.D. Va. Dec. 6, 2022) (holding that claimant lacked an interest in forfeited property because his judgment liens arose after the commission of the acts giving rise to forfeiture); *United States v. MM MR RM Corp.*, 880 F. Supp. 2d 1109, 1111 (W.D. Wash. 2012) (holding that attorneys did not have a right to forfeited property because their attorney liens attached to the property after the commission of the crime at issue).  In the present case, as noted in the TOB, the crime of which Avenatti was convicted that relates to the Honda Jet is wire fraud, pertaining to a wire transfer made on June 18, 2018.  Docket No. 974, pages 6-7; Docket No. 961, pages 19-21; Docket No. 1054.  According to JFL's brief, JFL's judgment lien did not attach to Avenatti's personal

property until "December 6, 2018 when the Notice of Judgment Lien was filed with the California Secretary of State."  Docket No. 1104, page 2, lines 25-27. Accordingly, JFL's interest is not superior to the government's and JFL is not entitled to a distribution from the proceeds of the Honda Jet.

### F.    Conclusion

For the reasons set forth above, the Trustee respectfully requests that the Court order the government to sell the Honda Jet and distribute the proceeds of the sale pro rata to the Estate and Gardner, with the Estate receiving 45% of the proceeds and Gardner receiving 55% of the proceeds.

DATED: June 19, 2023

Respectfully Submitted,
Landau Law LLP


By: _____/s/ John P. Reitman_____
John P. Reitman, Special Litigation Attorneys for Richard A. Marshack, Trustee of the Chapter 7 Bankruptcy Estate of Eagan Avenatti, LLP

16

### <u>DECLARATION OF JOHN P. REITMAN</u>

I, John P. Reitman, hereby declare as follows:

1.      I am a limited liability partner in Landau Law LLP, which serves as special litigation counsel to Richard A. Marshack (the "Trustee") in his capacity as the Chapter 7 trustee for the bankruptcy estate (the "Estate") of Eagan Avenatti, LLP ("EA").  Except as otherwise stated, the facts set forth in this declaration are true of my own personal knowledge and, if called as a witness, I could and would competently testify thereto under oath.

2.      Attached hereto as **Exhibit A** is a true and correct copy of the June 2014 statement for EA's bank account ending in -8461.  Exhibit A and all of the other EA bank documents attached to this declaration were obtained pursuant to a subpoena served on the bank and each such document as obtained was supported by a declaration signed under penalty of perjury by a custodian of the bank's business records testifying that the document was a true and correct copy of the bank's business record kept in the ordinary course of its business.

3.      Attached hereto as **Exhibit B** are true and correct copies of May 2014 and June 2014 statements for EA's bank accounts ending in -8461 and -2699.  The handwritten annotations on the statements are mine.  As indicated on the statements, and as I am aware from a review of other documents and the analysis of EA's former receiver, the ultimate source of the $525,000 transferred from EA to Honda Aircraft Company, LLC ("Honda") on June 2, 2014 was two payments totaling approximately $20 million that EA received in May 2014 for fees awarded to EA in a case called *Scott v. Service Corp Int'l, et al.*, and accordingly the $525,000 consisted entirely of funds that belonged to EA.

4.      Attached hereto as **Exhibit C** are true and correct copies of documents produced to the Trustee by Honda in the Trustee's litigation against Honda, *Marshack v. Honda Aircraft Company, LLC*, Adversary Proceeding No. 8:20-01150-SC in the United States Bankruptcy Court for the Central District of California.

17

5. Attached hereto as **Exhibit D** is a true and correct copy of the January 2017 statement for EA's bank account ending in -2851.

6. Attached hereto as **Exhibit E** is a true and correct copy of the January 2017 statement for EA's bank account ending in -8671.

7. Attached hereto as **Exhibit F** is a document that I am informed and believe is a true and correct copy of the January 2017 statement for a bank account of The X-Law Group, PC ending in -7608.

8. Attached hereto as **Exhibit G** is a copy of the fee agreement between EA and Alexis Gardner ("Gardner"). Exhibit G was attached to Gardner's arbitration demand against EA and I am informed and believe it is a true and correct copy of that agreement.

9. Attached hereto as **Exhibit H** are documents that I am informed and believe are true and correct copies of a bank statement and wire transfer information relating to a bank account of Michael Avenatti ending in -3512.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on June 19, 2023, at Las Vegas, Nevada.

John P. Reitman

18

**PROOF OF SERVICE OF DOCUMENT**

I am over the age of 18 and not a party to this case.  My business address is:
**Landau Law LLP, 141 South Windsor Blvd., Los Angeles, California 90004.**

A true and correct copy of the foregoing document entitled (*specify*): ***Reply Brief of Richard A. Marshack, in his Capacity as the Trustee of the Chapter 7 Bankruptcy Estate of Eagan Avenatti, LLP, Regarding Estate's Interest in Honda Jet; Supporting Declaration of John P. Reitman*** will be served or was served in the manner stated below:

**1.  TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**:  The foregoing document will be served by the court via NEF and hyperlink to the document.  On **June 19, 2023,** I checked the CM/ECF docket for this case and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

☒ Service information continued on attached page

**2.  SERVED BY UNITED STATES MAIL**:  On _____, I served the following persons and/or entities at the last known addresses in this case by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows.  Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 12:00 noon on the following business day.

☐ Service information continued on attached page

**3.  SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL** (state method for each person or entity served): On **June 19, 2023**, I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method) facsimile transmission and/or email as follows.  Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge will be completed no later than 12:00 noon on the following business day.

☒ Service information continued on attached page

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

| June 19, 2023 | Hannah Richmond | */s/ Hannah Richmond* |
|---|---|---|
| *Date* | *Printed Name* | *Signature* |

LANDAU LAW LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

1

1. **SERVED BY THE COURT VIA NEF (continued):**

- **Daniel G. Boyle**
  daniel.boyle2@usdoj.gov,gabriela.arciniega@usdoj.gov,USACAC.Criminal@usdoj.gov,caseview.ecf@usdoj.gov,Tarleen.Khauv@usdoj.gov,shatera.taylor@usdoj.gov,Jonathan.Wettstein@usdoj.gov
- **A Barry Cappello**
  abc@cappellonoel.com,jorta@cappellonoel.com,mduong@cappellonoel.com.com,adickerson@cappellonoel.com,mmiller@cappellonoel.com,rlloyd@cappellonoel.com,krodriguez@cappellonoel.com
- **Carlos X Colorado**
  cc@xlawx.com
- **Lawrence J Conlan**
  lconlan@cappellonoel.com,mduong@cappellonoel.com,adickerson@cappellonoel.com,mmiller@cappellonoel.com,acohen@cappellonoel.com,krodriguez@cappellonoel.com,jorta@cappellonoel.com,rlloyd@cappellonoel.com
- **James Edmund Dochterman**
  james.dochterman@usdoj.gov,USACAC.Criminal@usdoj.gov,Luis.Chaves@usdoj.gov,cecilia.anderson@usdoj.gov,Paul.Read@usdoj.gov,CaseView.ECF@usdoj.gov
- **Margaret A. Farrand**
  Margaret_Farrand@fd.org,zzCAC_FPD_Document_Receiving@fd.org,cac_appointments@fd.org
- **Patrick R Fitzgerald**
  USACAC.Criminal@usdoj.gov,patrick.fitzgerald@usdoj.gov,CaseView.ECF@usdoj.gov
- **Thomas Edward Gray**
  tg@xlawx.com,TC@xlawx.com,MR@xlawx.com
- **Ranee Katzenstein**
  ranee.katzenstein@usdoj.gov,USACAC.Criminal@usdoj.gov,CaseView.ECF@usdoj.gov
- **Richard Lloyd**
  rlloyd@cappellonoel.com
- **Filippo Marchino**
  fm@xlawx.com,TG@xlawx.com,CC@xlawx.com,TC@xlawx.com,SG@xlawx.com,DB@xlawx.com
- **Jack Andrew Reitman**
  jareitman@gmail.com,elange@kdvlaw.com
- **John P Reitman**
  jreitman@landaufirm.com,srichmond@landaufirm.com,hrichmond@landaufirm.com,vrichmond@landaufirm.com,amendes@landaufirm.com
- **Brett A. Sagel**
  brett.sagel@usdoj.gov,USACAC.SACriminal@usdoj.gov,CaseView.ECF@usdoj.gov
- **H. Dean Steward**
  deansteward7777@gmail.com,courtneycummingsesq@outlook.com,workingwitheh@gmail.com,deansteward@fea.net

LANDAU LAW LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

- **Andrew D. Stolper**
  astolper@lawfss.com,mnowowiejski@lawfss.com,astolper@ecf.courtdrive.com

## 3. <u>SERVED BY PERSONAL DELIVERY (continued)</u>:

Honorable James V. Selna
Ronald Reagan Federal Building and United States Courthouse
411 West Fourth Street, Courtroom 10C
Santa Ana, CA 92701-4516