Andrew D. Stolper (SBN 205462)
astolper@lawfss.com
FRANK SIMS STOLPER, LLP
19800 MacArthur Blvd., Suite 855
Irvine, California 92612
Telephone:   (949) 201-2400
Facsimile:    (949) 201-2405

Attorneys for Claimant,
  JASON FRANK LAW, PLC

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>vs.<br><br>MICHAEL JOHN AVENATTI,<br><br>Defendant. | Case No.  8:19-CR-00061-JVS<br><br>**CLAIMANT JASON FRANK LAW, PLC'S <u>REPLY</u> BRIEF RE PRIMACY POSITION IN DISPUTED PROPERTY**<br><br>**[*Supplemental Declaration of Jason M. Frank and Declaration of Andrew D. Stolper filed concurrently herewith*]**<br><br>**Date:**          **June 26, 2023**<br>**Time:**          **9:00 a.m.**<br>**Courtroom:**   **10C** |

# **TABLE OF CONTENTS**

I.      The Rights of a Judgment Lien Creditor are Superior to Those of a Party That Later Obtains an Order Imposing a Constructive Trust. ....................................... 5

II.     The Additional Problems With Spring Creek and Gardener's Constructive Trust Theories............................................................................................................ 6

      A.      Spring Creek Did Not Directly Purchase the Disputed Property and Has No Basis for a Constructive Trust. ............................................................ 6

      B.      Gardner's "Constructive Trust" Theory is Complicated by the fact that her Counsel (the X-Law Group) Participated in the Theft of her Funds. ......... 9

      C.      Spring Creek Prevented the Sale of the Disputed Property, and It Should Be Responsible for the Resulting Maintenance and Storage Costs and Diminution in Value. ................................................................................. 13

III.    CONCLUSION........................................................................................... 15

# TABLE OF AUTHORITIES

**Page(s)**

**Federal Cases**

In re Advent Management Corp.,
   104 F.3d 293 (9th Cir. 1997) ............................................................7, 9

In re Advent Management Corp,
   178 B.R. 480 (9th Cir. BAP 1995) ......................................................5

In re Charlton,
   389 B.R. 97 (N.D. Cal. 2008) ........................................................6, 10

CHoPP Computer Corp. v. U.S.,
   5 F.3d 1344 (9th Cir. 1993) ..................................................... *passim*

In re Gardenhire,
   209 F.3d 1145 (9th Cir. 2000) ............................................................14

In re Goldberg,
   168 B.R. 382 (B.A.P. 9th Cir. 1994) ....................................................7

In re Imagine Fulfillment Services, LLC,
   489 B.R. 136 (C.D. Cal. 2013) ............................................................6

In re Lewis W. Shurtleff, Inc.,
   778 F.2d 1416 ....................................................................................13

In re Stewart,
   2008 WL 8462965 (9th Cir. BAP Jan. 14, 2008) ..............................11

U.S. v. Wilson,
   659 F.3d 947 (9th Cir. 2011) .................................................. 7, 9, 10, 13

**California Cases**

Pena v. Toney,
   98 Cal.App.3d 534 (1979) ..................................................................12

Rivero v. Thomas,
   86 Cal.App.225 (1948) ........................................................................7

Shoker v. Sup. Ct. of Alameda County,
   81 Cal.App.5th 271 (2022) ................................................................14

CLAIMAINT JASON FRANK LAW, PLC'S BRIEF RE PRIMACY POSITION IN DISPUTED PROPERTY

Toho-Towa Co., Ltd. v. Morgan Creek Productions, Inc.,
    217 Cal.App.4th 1096 (2013) ................................................................8

**Other State Cases**

In re Matter of Oxman,
    2012 WL 7828358 (Review Dept. State Bar Ct. of CA. Jan. 13, 2012.) ...........11

**California Statutes**

Cal. Civ. Proc. Code
    § 340.6(a)(2)..................................................................................10

CLAIMAINT JASON FRANK LAW, PLC'S BRIEF RE PRIMACY POSITION IN DISPUTED PROPERTY

Claimant Jason Frank Law, PLC ("JFL") hereby submits its Reply to the briefs filed by Claimants Richard A. Marshack as the Trustee of the Chapter 7 Bankruptcy Estate of Eagan Avenatti, LLP (the "Estate"), Spring Creek Research, LLC ("Spring Creek") and Alexis Gardner ("Gardner").

## I.    The Rights of a Judgment Lien Creditor are Superior to Those of a Party That Later Obtains an Order Imposing a Constructive Trust.

Claimants the Estate, Gardner and Spring Creek are each seeking a Court order imposing a constructive trust in the Disputed Property for the amounts wrongfully taken from them by Michael Avenatti ("Avenatti").

A constructive trust is an equitable remedy that is inchoate until its existence is established by a court order.  In re Advent Management Corp, 178 B.R. 480, 488 (9th Cir. BAP 1995).  The Ninth Circuit held in CHoPP Computer Corp. v. U.S., 5 F.3d 1344 (9th Cir. 1993) that a constructive trust cannot be used to "interfere with a third-party's prior claim that has been reduced to a judgment and levied upon."  Id. at  1448-49 (interpreting California law).  In so holding, the Ninth Circuit recognized a constructive trust springs into existence the moment a wrongful taking occurs.  Id.  However, the Ninth Circuit concluded that the retroactive creation of a constructive trust cannot be used to defeat the claims of a prior secured judgment creditor and, allowing such a disruption in the standard treatment of competing creditors "would not be countenanced by California law."  Id. at 1348.

The Ninth Circuit explained that there is a "clear indication that California discourages the use of equitable remedies to ward off competing prior lienholders" and California's preference is that "all creditors adhere to even-handed collection rules." CHoPP,  5 F3d. at 1348-49 (citing Urez Corp. v. Sup. Ct., 134 Cal.App.3d 1141, 1148-49 (1987)).  Thus, it rejected the argument that the retroactive creation of an equitable lien or constructive trust could interfere with a third-party's prior secured judgment, even when the wrongful taking occurred prior to the judgment being obtained and levied upon. Id. Simply put, "[u]nder California law, the rights of a judgment lien creditor are superior

to those of a party that later obtains an order retroactively imposing a constructive trust." In re Charlton, 389 B.R. 97, 104 (N.D. Cal. 2008) (citing CHoPP, 5 F.3d at 1349).

As established in JFL's opening brief, JFL obtained a secured judgment lien against Avenatti by recording a Notice of Judgment Lien with the California Secretary of State on December 6, 2018.  Dkt. 1104-1, ¶ 12; Dkt. 1104-7.  Under California law, "[a] judgment lien attaches to **business personal property interests** owned by the judgment debtor when the judgment lien is filed, as well as to any lienable property later acquired by the judgment debtor."  In re Imagine Fulfillment Services, LLC, 489 B.R. 136, 144 (C.D. Cal. 2013) (emphasis added) (citing Cal. Civ. Proc. Code § 697.510(a).)  "[A] judgment lien takes effect on the date a judgment creditor files its Notice of Judgment Lien with the Secretary of State.  Id.  "Further, under California law, the first judgment lien to attach prevails over later-filed judgment liens."  Id. (citing Cal. Civ. Proc. Code § 697.600(a).)  Here, JFL is seeking to enforce its judgment lien against Avenatti's "business personal property" which is under the jurisdiction of this Court due to the Government's seizure and civil forfeiture action.

Based on the foregoing law, the other Claimants' requests that the Court create a constructive trust or equitable lien in their favor does not defeat JFL's superior rights as a prior secured judgment creditor.  CHoPP, 5 F.3d U.S. at 1348-49; Charlton, 389 B.R. at 104.

## II.  The Additional Problems With Spring Creek and Gardener's Constructive Trust Theories

Spring Creek and Gardner's "constructive trust" theories also raise additional issues.

### A.  Spring Creek Did Not Directly Purchase the Disputed Property and Has No Basis for a Constructive Trust.

Spring Creek claims it has a constructive trust in the Disputed Property for the money it paid for the plane.  Dkt. 1103, pp. 21-22.  Under California law, a party seeking a constructive trust has the burden of proving their money was "specifically and directly"

exchanged for the property in question.  See In re Advent Management Corp., 104 F.3d 293, 296 (9th Cir. 1997).  Where, as here, the property was purchased with commingled funds, a party must trace the purchase of the property "'specifically and directly' back to the illegal transfers giving rise to the trust." Id. at 296.  The purpose of this "strict tracing" rule is to treat all creditors equally, and liberal tracing is only permitted when no creditors will be harmed.  In re Goldberg, 168 B.R. 382, 385 (B.A.P. 9th Cir. 1994); Rivero v. Thomas, 86 Cal.App.225, 238 (1948) (recognizing that liberal tracing rules may not be employed in cases impacting the rights of other creditors).  Indeed, in the Ninth Circuit, "courts generally will not indulge in tracing when doing so would allow one fraud victim to recover all of his losses at the expense of other victims." U.S. v. Wilson, 659 F.3d 947, 956 (9th Cir. 2011).

The following chart shows the various entities that directly paid money to Honda for the Disputed Property.

| Date | Source of Payment | Amount |
|---|---|---|
| 10/11/2006 | Avenatti & Associates | $75,000.00 |
| 3/31/2014 | Avenatti & Associates | $175,000.00 |
| 5/15/2014 | Avenatti & Associates | $175,000.00 |
| 6/2/2014 | Eagan Avenatti (8461) | $525,000.00 |
| 1/20/2017 | Eagan Avenatti (2851) | $138,800.00 |
| 1/26/2017 | Avenatti & Associates | $858,605.00 |
| 1/26/2017 | X-Law Group (Client Trust Act) | $2,500,000.00 |
| 6/28/2018 | Michael J. Avenatti, Esq. | $10,000.00 |

See Supplemental Declaration of Jason Frank ("Supp. Frank"), ¶¶ 2-7.  Spring Creek claims it paid over $2.3 million for the Disputed Property.  However, the evidence does not support Spring Creek's contentions.

First, William Parrish ("Parrish"), the manager of Spring Creek, claims his family trust (not Spring Creek) wired $350,000 directly to Honda as a downpayment on the Disputed Property on July 7, 2016.  Dkt. 1103-1, ¶ 4.  However, Parrish does not provide any documentary evidence of this payment, nor evidence showing that this payment was applied to the purchase of the Disputed Property.  Id.  For example, he does not provide

any bank statements, wire reports, email confirmations or receipts reflecting the alleged $350,000 payment to Honda, nor does he provide any records from Honda showing this alleged downpayment was used to purchase the Disputed Property.  Id.  JFL has reviewed the documents produced by Honda and has not found any evidence of this alleged payment from Parrish in Honda's records.  Supp. Frank, ¶ 8.

Second, Parrish claims his family trust (not Spring Creek)[1] wired an additional $1,985,000 into the bank account for Passport 420, LLC ("Passport 420").  Dkt. 1103-1, ¶ 5.  In support of this contention, Parrish provides an email confirmation showing $1,985,000 was indeed wired from the "Parrish Trust – Margin" account on January 18, 2017.  Dkt. 1103-1, Ex. B (Passport 420 Operating Agreement appointing  Ex. B.  In other words, the money was not sent to Honda, but was instead sent to Passport 420, a limited liability company in which Parrish had granted Avenatti "full and complete authority, power and discretion to manage and control the affairs of the Company, to make all decisions regarding such matters" and whose actions would "bind the Company." Id., Ex. A, p. 7, ¶ 5.1 and exhibit A thereto (Passport 420 Operating Agreement appointing Avenatti as the "Manager").

Based on a review of Passport 420's bank statements, it appears Avenatti then immediately embezzled Parrish's money from the company.  Supp. Frank ¶ 9, Ex. 21. Specifically, the January 2017 bank statement for Passport 420 indicates that on June 20, 2017 – two days after receiving the wire from the Parrish Trust – Passport 420 wired most of this money ($1,984,197.50) to the bank account for Eagan Avenatti, LLP ("EA").  Id.

---

[1] Mr. Parrish apparently did not follow corporate formalities in treating Spring Creek as a separate corporate entity distinct from himself, in that he treats money paid by his family trust as if it was money paid by Spring Creek. Dkt. 1103-1, ¶¶ 4, 5.  If Spring Creek was truly a separate corporate entity, then the proper procedure would have been for Mr. Parrish to deposit his money into Spring Creek's corporate account as a capital contribution, and then have Spring Creek use that money to purchase its interest in the Disputed Property.  See, e.g., Toho-Towa Co., Ltd. v. Morgan Creek Productions, Inc., 217 Cal.App.4th 1096, 1107 (2013).

As such, Mr. Parrish is in the same boat as the many other victims of Avenatti. His family trust and Spring Creek likely have claims against Avenatti for embezzling money from Passport 420 and, perhaps, they have claims against EA for receipt of a fraudulent transfer. However, they have not established an equitable right to special treatment above the other victims of Avenatti's crimes because they cannot "specifically and directly" trace their funds to the purchase of the Disputed Property. Advent Management, 104 F.3d at 104 F.3d at 296; Wilson, 659 F.3d at 956.

## B. Gardner's "Constructive Trust" Theory is Complicated by the fact that her Counsel (the X-Law Group) Participated in the Theft of her Funds.

Gardner's lawyers – the X-Law Group, P.C. (the "X-Law Group") – ask the Court to essentially adjudicate Gardner's claims against the Estate outside of the bankruptcy proceedings. Specifically, they request the Court award her $2,500,000.00 in damages plus $1,604,166.67 in interest, without any setoff for the $98,000 in payments she received from EA and Avenatti (which Avenatti falsely claimed were being paid as part of a structured settlement), nor any setoff for the amounts she would have owed EA for attorney fees or costs (totaling approximately $1,055,615.00). See Dkt. 1105, p. 7; see also Supp. Frank, Ex. 22 (testimony of Government Accounting Expert John Drum), pp. 43:40-44:3, 48:16 - 53:15; Ex. 23 (Trial Exhibits 430 through 437 – Drum's charts reflecting the amounts due and the amounts paid to Alexis Gardner by EA). [2]

The X-Law Group argues that Gardner is entitled to a constructive trust in this amount because her settlement proceeds can be traced at least indirectly to the Disputed Property. Dkt. 1105, p. 8. The X-Law Group acknowledges that if the Court imposes a constructive trust in this amount, then 100% of the proceeds from the sale of the Disputed

---

[2] The attorney fees and costs that would have been owed by Gardner, and the payments she received from EA, are based on the evidence and testimony presented by the Government's accounting expert, John Drum, in the criminal trial against Avenatti. Supp. Frank, Ex. 22, pp. 43:40-44:3, 48:16 - 53:15; Ex. 23 (Trial Exhibits 430 through 437 reflecting the amounts due and the amounts paid to Alexis Gardner).

Property would be awarded to Gardner.  Id., p. 14.  In other words, the other victims and creditors of Avenatti would receive nothing from the sale.

In the Ninth Circuit, courts will not employ the equitable remedy of a constructive trust and "indulge in tracing when doing so would allow one fraud victim to recover all of his losses at the expense of other victims."  Wilson, 659 F.3d at 956.  Further, as established above, a constructive trust and equitable lien cannot be used to interfere with the rights of a prior judgement lien creditor, such as JFL.  CHoPP, 5 F.3d at 1348-49; Charlton, 389 B.R. at 104.  Thus, the X-Law Group's request for a constructive trust or equitable lien should be denied for that reason alone.

In addition, there is another glaring problem with the X-Law Group's request, especially when it is being made in the guise of reaching an equitable result.  The X-Law Group's brief studiously avoids the fact that the X-Law Group directly participated in the theft of Gardner's settlement money by concealing from Honda the source of the funds being used to pay for the Disputed Property.  Undoubtedly, the X-Law Group would significantly benefit from the Disputed Property being used to make Gardner whole, because otherwise the X-Law Group (and its malpractice insurer) would likely be liable for Gardner's damages.[3]  Further, the X-Law Group will likely take 33% to 40% of any money Gardner obtains from sale of the Disputed Property as a contingency fee.  Supp. Frank, Ex. 24 (Marchino Tr.), p. 51:14-18 (discussing standard contingency fee percentage).  In other words, if the Court adopted the X-Law Group's position, the lawyers who helped facilitate the theft of Gardner's money would actually profit from the sale of the Disputed Property, while all of Avenatti's other victims and creditors would be left in the cold.  This is not an equitable result.

---

[3] The statute of limitations for Gardner's claims against the X-Law Group are tolled because she is continuing to be represented by the firm. Cal. Civ. Proc. Code § 340.6(a)(2).

As the Court learned during the criminal trial, Avenatti did not directly pay Gardner's money to Honda for the Disputed Property. Instead, Avenatti transferred $2.5 million of her settlement proceeds from the EA Client Trust (IOLTA) Account to the X-Law Group's Client Trust (IOLTA) Account. Supp. Frank, ¶ 6, Ex. 19. The X-Law Group then wired that money from its Client Trust Account to Honda. Id. At the time, the X-Law Group's principal, Filippo Marchino ("Marchino"), was one of Gardner's attorneys. Id., Ex. 24 (Marchino Tr.), pp. 44:17-25, 50:2-4. Marchino admits he was aware Gardner's claims were settled at the time of this wire transfer, but he was purportedly not aware the $2.5 million came from Gardner's settlement. Id., pp. 57:25-58:22; 68:8-69:2. According to his testimony, Avenatti told Marchino that the money belonged to Parrish. Id. Avenatti allegedly told Marchino that EA could not send the money directly to Honda because Avenatti "had already paid his side, so Mr. Parrish's side had to come from a different firm." Id. Putting aside the fact that this explanation makes no sense, it does not explain why Marchino was using his Client Trust Account to facilitate this transaction given that Parrish was not a client of the X-Law Group.

As courts and the State Bar have recognized, client trust accounts are subject to abuse and can be used as a means to hide and launder money. See, e.g. In re Stewart, 2008 WL 8462965 at *7 (9th Cir. BAP Jan. 14, 2008); In re Matter of Oxman, 2012 WL 7828358 (Review Dept. State Bar Ct. of CA. Jan. 13, 2012.) The incident with Gardener's money was not the first time the X-Law Group used its Client Trust Account to help Avenatti. For example, on November 2, 2015, when Avenatti's coffee company (Global Baristas) was being investigated for tax evasion, Avenatti wired $4.6 million from Global Baristas' bank account to the X-Law Group's Client Trust Account. Supp. Frank, ¶ 13, Ex. 25. The next day, November 3, 2015, the X-Law Group disbursed $3.6 million of that money to a different corporate entity owned by Avenatti (GB Autosport). Id. Three days later, on November 6, 2015, the X-Law Group wired $800,000 to an escrow company (in two payments totaling $450,000 and $350,000 respectively). Id. Six days later, on November 12, 2015, the X-Law Group wired $100,000 to Gary Prim (the

owner of Avenatti's home).  Id.  And then, a month and a half later, on December 29, 2015, the X-Law Group wired another $100,000 to Prim.  Id., Ex. 26.

During the original EA bankruptcy in 2017, it also appeared that Avenatti and the X-Law Group were conspiring to provide the X-Law Group with a secured priority claim to help Avenatti and his firm avoid paying unsecured creditors.  Specifically, Avenatti claimed he assigned $17 million to the X-Law Group and listed the X-Law Group as a "secured creditor" on his initial bankruptcy schedules.  Supp. Frank, ¶¶ 15-18, Ex. 27 at 68:9-69:21, 70:2-73:18; Ex. 28.  Avenatti then had EA begin paying the X-Law Group's rent and salaries pursuant to a purported "oral agreement" reached between Avenatti and Marchino.  Id.., Ex. F at 68:9-69:21; 70:2-73:18.  Avenatti never explained what EA received in return from the X-Law Group that possibly could have been worth assigning the right to $17 million from EA *and* paying the X-Law Group's rent and salaries.  Id.  Notably, when Avenatti later sought to dismiss the bankruptcy case and agreed to pay off the claims of valid and approved creditors (backed with the security of consent judgments), EA specifically excluded the X-Law Group's claim.  See In re Eagan Avenatti, LLP, Case No. 8:17-bk-11961-CB, Dkt. 343, p. 5 n. 5.  Based on these facts, it appears obvious that the purported $17 million "secured" assignment to the X-Law Group was not a legitimate arrangement but was instead designed to prejudice the rights of EA's actual creditors.

This is all to say the X-Law Group's attempts to whitewash its involvement in the theft of Gardner's money should not be ignored by the Court.  The X-Law Group cites the decision in Pena v. Toney, 98 Cal.App.3d 534 (1979) for the proposition that a court can impose a constructive trust on property even if the stolen funds passed through the hands of several parties. Dkt. 1105, p. 8.  However, in Pena, there were no other creditors who would be harmed by the constructive trust.  Id., 98 Cal.App.3d at 541-42.  On the contrary, the court concluded there was "no other interested party" who had presented a viable claim to a right to the property and thus a constructive trust could be equitably imposed.  Id. (finding that the respondent never took title to the property, and, at most, he

had a contract to receive the property for which his proper remedy is a breach of contract action).  Here, in contrast, there are multiple Claimants who have presented a viable claim to the property.

In In re Lewis W. Shurtleff, Inc., 778 F.2d 1416 the Ninth Circuit recognized that balancing the equities of imposing a constructive trust is different when a court is considering the victim against the wrongdoer, versus the victim against other creditors. Id. at 1419-20 ("[A]lthough the equities clearly favor the appellant as against Frontier, the balance of equities between the appellants and Frontier's other creditors is far from clear.")  For this reason, in such situations, courts are advised to apply the standard "even handed" collection rules that apply to all creditors, rather than resort to equitable relief. Id.; CHoPP, 5 F.3d at 1348-49; Wilson, 659 F.3d at 956.

There is no question that Gardner is one of the most, if not *the most*, sympathetic victim of Avenatti's crimes.  She has been severely harmed both by the intentional acts of Avenatti and the X-Law Group's negligent and (hopefully unwitting) facilitation of that theft. At the same time, unlike most of Avenatti's other victims, Gardner has the benefit of having a solvent defendant (the X-Law Group) to potentially hold responsible for her losses.  But the reason California law and public policy requires that "all creditors adhere to even-handed collection rules" and "discourages the use of equitable remedies to ward off competing prior lienholders" is so innocent creditors are not pitted against one another in an effort to demonstrate who has it worse.  CHoPP,  5 F3d. at 1348-49. California developed these rules so courts can  dispassionately apply an orderly procedure to satisfy a party's debts, even in cases involving theft and fraud.  Id.  The Court should defer to those procedures here.

### C.   Spring Creek Prevented the Sale of the Disputed Property, and It Should Be Responsible for the Resulting Maintenance and Storage Costs and Diminution in Value.

If the Court determines that Spring Creek is entitled to any portion of the proceeds from the sale of the Disputed Property, then the Court should deduct from Spring Creek's

share of the proceeds the maintenance and storage costs, and the diminution in value that occurred, after Spring Creek blocked the sale of the Disputed Property four years ago. As noted above, a constructive trust is an equitable remedy. <u>Shoker v. Sup. Ct. of Alameda County</u>, 81 Cal.App.5th 271, 278 (2022). As with all equitable remedies, it is subject to the time-honored maxim that "he who seeks equity must do equity." <u>In re Gardenhire</u>, 209 F.3d 1145, 1152, n. 11 (9th Cir. 2000).

On or about May 28, 2019, Assistant U.S. Attorney Steve Welk, Chief of the Asset Forfeiture Section, sent an email to all of the potential real parties in interest with respect to the Disputed Property, including all of the Claimants. Declaration of Andrew Stolper ("Stolper Dec."), ¶¶ 2-4, Ex. 1. In his email, Mr. Welk indicated that the Government was unlikely to retain any of the realized value of the Disputed Property in the event of a forfeiture beyond the Government's out-of-pockets costs associated with the retention and maintenance of the plane. <u>Id.</u> He further indicated that the question of how that value of the plane would be distributed to the potentially interested parties was likely going to be a complicated process and would not be resolved in the near term due to the pending criminal case against Avenatti. <u>Id.</u>

Mr. Welk proposed that the Disputed Property be sold by stipulation of all real parties in interest, with the net proceeds of the sale held by the Government as a "substitute res" pending resolution of the competing claims. Stolper Dec., ¶¶ 2-4, Ex. 1. This would "cut off" all further costs associated with the retention and maintenance of the plane, including the expected diminution in the plane's value that would occur over time as a depreciating asset. <u>Id.</u> The Government agreed that the proposed sale could be completed as a private sale conducted by a qualified licensed broker on terms that would be mutually acceptable to the parties, so long as the proposed terms were commercially reasonable and the Government's out-of-pocket costs were reimbursed out of the gross sale proceeds. <u>Id.</u> Mr. Welk explained that this was the most preferable option compared to the alternative "auction on the courthouse steps" or "fire sale" that would result if the parties refused to stipulate to the sale of the Disputed Property. <u>Id.</u>

Every Claimant agreed to Mr. Welk's proposal except Spring Creek and its owner, Parrish.  Stolper Dec., ¶ 5.  Instead, counsel for Spring Creek and Parrish stated that his clients would not consent to the sale unless all of the Claimants agreed that Spring Creek would receive fifty percent (50%) of the proceeds.  Id.  In other words, Spring Creek and Parrish were attempting to strong arm the other Claimants into waiving their challenges to Spring Creek's claims to the Disputed Property by threatening to "burn down the village" (oddly with Spring Creek and Parrish inside) unless Claimants acceded to their demands.  Id.  Claimants refused to waive their challenges, so Spring Creek refused to allow the sale to go forward by stipulation, thereby resulting in another four years of maintenance and storage costs, and the normal loss in value that depreciating assets like planes usually incur over time.  Id., ¶ 6.

Consequently, if Spring Creek is going to seek the equitable remedy of a constructive trust in the Disputed Property then equity demands that Spring Creek be held responsible for the losses it caused during the last four years by refusing to stipulate to an earlier sale.  It is not equitable to impose those losses and costs on the other Claimants who were willing to stipulate to a sale four years ago to avoid such predictable and predicated losses.

## III.   CONCLUSION

Avenatti harmed so many people that came into his orbit.  He left a complete mess in his wake.  The Court should follow the dispassionate and "even handed approach to creditors" that California law developed to resolve these types of messes.  CHoPP, 5 F3d. at 1348-49.


Dated: June 19, 2023                         FRANK SIMS & STOLPER LLP

                                             By:   /s/ Andrew D. Stolper
                                                   Andrew D. Stolper
                                                   Attorneys for Claimant
                                                   Jason Frank Law, PLC