Exhibit 17

# Honda Aircraft Company, LLC

6430 Ballinger Rd, Greensboro, NC 27410
Tel : 336-662-0246   Fax : 336-662-0852

| ACCOUNT STATUS FOR |
| --- |
| **AVENATTI & ASSOCIATES,**<br>A PROFESSIONAL CORP.<br>520 NEWPORT CENTER DR STE 1400<br>NEWPORT BEACH CA  92660-7610<br>USA |

| REPRESENTATIVE |
| --- |
| Will Cutter<br>wcutter@cutteraviation.com<br>602-690-5665 |

| ACCOUNT SUMMARY | |
| --- | --- |
| Statement of Account As Of : 11/18/2016 | |
| Contract Number : | 40000021 |
| | |
| Sold to Customer Number : | 10341 |
| Delivery Quarter : | Q2 2016 |
| Product Description : | HONDAJET HA-420 |

## Aircraft Financial Summary

| Description | Amount (USD) |
| --- | --- |
| Base Price | $3,650,000.00 |
| CPI - Price Adjustment | $338,355.00 |
| Options Price | $392,750.00 |
| **Estimated Price As Of Statement Date *** | **$4,381,105.00** |

## Contract Deposit Plan

| Description | Amount (USD) | Due Date | Status |
| --- | --- | --- | --- |
| First Deposit | $75,000.00 | 10/11/2006 | PAID |
| Second Deposit | $175,000.00 | 03/31/2014 | PAID |
| Third Deposit | $175,000.00 | 05/15/2014 | PAID |
| Fourth Deposit | $175,000.00 | 12/31/2015 | PAST DUE |
| Final Payment | TBD | Prior To Delivery | FUTURE |

\* Amount includes contractual escalation for price index changes as specified in the contract and known to us as of the statement date. Future escalation, if applicable, will be calculated as updates to the price index become available. Updated statements of account will be made available upon request. The final price you pay will be governed by the pricing terms of the contract.

CONFIDENTIAL

HACI 000036

Exhibit 18

**C|B** TRUST **CALIFORNIA BANK TRUST**

P.O. Box 489, Lawndale, CA 90260-0489

**Statement of Accounts**

Page 1 of 5

This Statement: January 31, 2017
Last Statement: December 30, 2016

Account ▮▮▮▮0661

**DIRECT INQUIRIES TO:**
Customer Service  1 (800) 400-6080

0036812                    4032-06-0000-CBT-PG0023-00003

AVENATTI & ASSOC A PROFESSIONAL CORP
520 NEWPORT CENTER DR STE 1400
NEWPORT BEACH CA  92660-7034

Irvine Branch
1900 Main St.   Suite 100
Irvine, CA 92614-0000
(949) 223-7500

---

**Happy New Year From All of Us at California Bank & Trust**

---

## SUMMARY OF ACCOUNT BALANCE

| Account Type | Account Number | Checking/Savings Ending Balance | Outstanding Balances Owed |
|---|---|---|---|
| Business Essentials Checking | ▮▮▮0661 | $167,623.26 | |

### BUSINESS ESSENTIALS CHECKING 3648940661                    104    3

| Previous Balance | Deposits/Credits | Charges/Debits | Checks Processed | Ending Balance |
|---|---|---|---|---|
| 1,944.54 | 1,684,980.00 | 1,512,101.28 | 7,200.00 | 167,623.26 |

**7 DEPOSITS/CREDITS**

| Date | Amount | Description |
|---|---|---|
| | | |

**37 CHARGES/DEBITS**

| 01/26 | 858,605.00 | WIRE/OUT-2017012600003322;BNF Honda Aircraft Company, LLC;OB  1303600880 |
|---|---|---|

A division of ZB, N.A. Member FDIC

## An Easy Approach To Balancing Your Account

**To reconcile your checkbook balance to your statement balance:** Mark off each entry in your check register that has been charged to your account during the statement period. List the checks you have written, but are not yet charged to your account in the "Checks Outstanding" column below. Then, follow the instructions in lines 1 through 10.

| CHECKS OUTSTANDING | | CHECKBOOK BALANCE | |
|---|---|---|---|
| **Check Number** | **Check Amount** | 1. LIST your checkbook balance. | |
| | | 2. ADD any deposits or other credits listed on the front of this statement which you have not recorded in your checkbook (such as payroll credits or other direct electronic deposits). | |
| | | 3. SUBTOTAL: | |
| | | 4. SUBTRACT any charges listed on the front of this statement which you have not recorded (such as service charges, automatic transfers, electronic transactions, etc). | |
| | | 5. ADJUSTED CHECKBOOK BALANCE: | ◄ |

*This balance should agree with line 10, below.*

| | | STATEMENT BALANCE | |
|---|---|---|---|
| | | 6. LIST your current statement balance as shown on the front of this statement. | |
| | | 7. ADD deposits made, but not shown on this statement. | |
| | | 8. SUBTOTAL: | |
| | | 9. SUBTRACT total from "Checks Outstanding." | |
| **TOTAL:** | | 10. ADJUSTED STATEMENT BALANCE: | |

*Transfer to Line 9.*    *This balance should agree with line 5, above.*

**PROMPTLY EXAMINE YOUR STATEMENT AND REPORT ANY PROBLEM**
You must promptly examine your account statements and report any discoverable errors, unauthorized signatures, alterations, missing endorsements, or unauthorized transfers. Failure to do so may result in your loss of certain rights or remedies. For example, you must identify the discoverable alteration or forgery of a check within 30 days of us sending you, or making available to you, the statement reflecting that check, and you must also immediately report to us what you find. Businesses should check their account transactions daily, for which various online services are available. For additional information, please see your deposit account agreement and application service agreement(s) for details. See also the consumer disclosures below.

**CONSUMER ACCOUNTS: IN CASE OF ERRORS OR QUESTIONS ABOUT YOUR ELECTRONIC TRANSFERS OR MONEY RESERVE TRANSACTIONS**
If you think your statement is wrong, or if you need more information about a transfer on this statement or on a receipt, please telephone or write us. Please use the telephone number or address listed on the front of this statement to contact us as you can. **We must hear from you no later than 60 days after we sent or made available the FIRST statement on which the problem or error appeared. The provisions in this paragraph do not apply to business or other non-personal accounts. The owners of those accounts must settle all unauthorized transactions or errors within 24 hours of receipt of the item posting in order to be returned.**

1. Tell us your name and account number.
2. Describe the error or transfer you are unsure about, and explain as clearly as you can why you believe there is an error or why you need more information.
3. Tell us the dollar amount of the suspected error.

We will investigate your complaint and correct any error promptly. If we take more than 10 business days to do this, we will recredit your account for the amount you think is in error, so that you will have use of the money during the time it takes us to complete our investigation.

**FOR MONEY RESERVE ACCOUNTS:**

**IN CASE OF ERRORS OR QUESTIONS ABOUT YOUR PERSONAL CREDIT LINE**
*(This is a Summary of Your Billing Rights).*
If you think your statement is wrong, or if you need more information about a transaction on your statement, write us at the address on the front of this statement as soon as possible. **We must hear from you no later than 60 days after we sent you the first statement on which the error or problem appeared.**

You can telephone us but doing so will not preserve your rights. In your letter, give us the following information.

1. Your name and account number.
2. The dollar amount of the suspected error.
3. Describe the error and explain, if you can, why you believe there is an error. If you need more information, describe the item you are unsure about.

You do not have to pay any amount in question while we are investigating, but you are still obligated to pay the parts of your bill that are not in question. The charge in question may remain on your statement, and we may continue to charge you interest on that amount. But, if we determine that we made a mistake, you will not have to pay the amount in question or any interest or other fees related to that amount. While we investigate your question, we cannot report you as delinquent or take any action to collect the amount you question. You must notify us in writing. You can telephone us, but doing so will not preserve your rights. Contact us at California Bank & Trust, PO Box 25787, Salt Lake City, UT 84125-0787.

**Balance Subject to Interest Rate:** We use the method called "average daily balance", (including current transactions) to calculate the daily balance. If you have any further questions about the method and how resulting interest charges are determined, please feel free to contact us at 1-800-400-6080.

**We may report information about your Money Reserve account to credit bureaus.** Late payments, missed payments, or other defaults on your account may be reflected in your credit report.

**Please notify us if we report any inaccurate information about your account(s) to a credit bureau.** Your written notice describing the specific inaccuracy should be sent to us at the following address: California Bank & Trust, PO Box 25787, Salt Lake City, UT 84125-0787.

*Thank you for banking with California Bank & Trust.*

**Become an Online Banking Customer for 24-hour account access.**

•Review account balances   •Review posted transactions   • Pay bills • Transfer funds
**Sign up today at www.calbanktrust.com or call 888-217-1265.**

0036812-0000001-0102760

**CALIFORNIA BANK & TRUST**

P.O. Box 489, Lawndale, CA  90260-0489

Page  3 of 5
January 31, 2017
AVENATTI & ASSOC A PROFESSIONAL CORP
▮▮▮0661

Continued ...

| Date | Amount | Description |
|------|--------|-------------|

---

### 3  CHECKS PROCESSED

| Number | Date | Amount | Number | Date | Amount | Number | Date | Amount |
|--------|------|--------|--------|------|--------|--------|------|--------|
| 1688 | 01/23 | 3,500.00 | 1689 | 01/24 | 300.00 | 1690 | 01/27 | 3,400.00 |

---

### AGGREGATE OVERDRAFT AND RETURNED ITEM FEES

| | Total for This Period | Total Year-to-Date |
|---|---|---|
| Total Overdraft Fees | $144.00 | $144.00 |
| Total Returned Item Fees | $0.00 | $0.00 |

To learn more about our other products and services that may lower the cost of managing account overdrafts or to discuss removing overdraft coverage from your account, please contact Customer Service or visit your local branch.

---

### DAILY BALANCES

| Date | Balance | Date | Balance | Date | Balance |
|------|---------|------|---------|------|---------|

A division of ZB, N.A. Member FDIC

This page intentionally left blank

0C36812400000C2401C2761

California Bank & Trust

This Statement:
January 31, 2017
Page  5 of  5

0036812-0000003-0102762

# Exhibit 19

# CHASE ⬡

JPMorgan Chase Bank, N.A.
P O Box 659754
San Antonio, TX 78265-9754

December 31, 2016 through January 31, 2017

Account Number:                  7608

## CUSTOMER SERVICE INFORMATION

| | |
|---|---|
| Web site: | **www.Chase.com** |
| Service Center: | **1-877-425-8100** |
| Deaf and Hard of Hearing: | 1-800-242-7383 |
| Para Espanol: | 1-888-622-4273 |
| International Calls: | 1-713-262-1679 |

00059885 DRE 703 210 03217 NNNNNNNNNN  1 000000000 60 0000

THE X-LAW GROUP, PC
IOLTA TRUST ACCOUNT
1910 W SUNSET BLVD STE 450
LOS ANGELES CA 90026-7118



## We changed how we explain ATM Withdrawal Limits

We revised the Deposit Account Agreement to change how we explain ATM withdrawal limits.

Below is the explanation provided in the Deposit Account Agreement for business accounts.

*Your ATM withdrawal limits may be different depending on which type of ATM you use:*

- *When you use a Staffed ATM, the following limitations apply and are separate from all other limits:*

   *Each cardholder can withdraw up to $3,000 each day from all linked accounts of each business. This separate limit does not apply to an Associate card.*

- *When you use an Enhanced ATM, the following limitations apply:*

   *All withdrawals made with any cardholder's ATM, debit or prepaid cards for the same business count toward every card's daily withdrawal limit.*

- *When you use non-Chase ATMs and Chase ATMs that are not Enhanced, you can withdraw up to the card's daily withdrawal limit. Withdrawals using other cards will not count towards that card's daily withdrawal limit.*

You can get the latest Deposit Account Agreement on chase.com, at a branch or by request when you call us. The parts of the Deposit Account Agreement that changed will be in the Change in Terms section.

If you have questions, please call the number on your statement.

## CHECKING SUMMARY   IOLTA Account

| | INSTANCES | AMOUNT |
|---|---|---|
| **Beginning Balance** | | **$24,450.74** |
| Deposits and Additions | ▮ | ▬▬▬ |
| Checks Paid | ▮ | ▬▬ |
| Electronic Withdrawals | ▮ | ▬▬▬ |
| Other Withdrawals | 1 | -2.62 |
| **Ending Balance** | ▮ | ▬▬▬ |
| | | |
| Interest Paid This Period | | $2.62 |
| Interest Paid Year-to-Date | | $2.62 |

Interest paid in 2016 for account 000000732357608 was $703.95.



December 31, 2016through January 31, 2017

Account Number: ▮▮▮▮7608

## DEPOSITS AND ADDITIONS

| DATE | DESCRIPTION | AMOUNT |
|---|---|---|
| 01/06 | ███████████████████ | ███ |
| 01/23 | ██████████████████████████ | ███ |
| 01/26 | Fedwire Credit Via: California Bank & Trust/122232109 B/O: State Bar of California Newport Beach CA 92660-7034 92660 Ref: Chase Nyc/Ctr/Bnf=The X-Law Group, PC IOLTA Trust Los Angeles, CA 9002 63262/Ac-000000007323 Rfb=21751607 Imad: 0126L4B74B1C000145 Trn: 3566609026Ff | 2,500,000.00 |
| 01/26 | ███ | ███ |
| 01/31 | ██████ | ███ |
| **Total Deposits and Additions** | | ███ |

## CHECKS PAID

| CHECK NO. | DESCRIPTION | DATE PAID | AMOUNT |
|---|---|---|---|
| 2034   ^ | | 01/09 | $71.40 |
| **Total Checks Paid** | | | **$71.40** |

If you see a description in the Checks Paid section, it means that we received only electronic information about the check, not the original or an image of the check. As a result, we're not able to return the check to you or show you an image.

^ An image of this check may be available for you to view on Chase.com.

## ELECTRONIC WITHDRAWALS

| DATE | DESCRIPTION | AMOUNT |
|---|---|---|
| 01/06 | ██████████████████████ | ███ |
| 01/24 | ████████████████████ | ███ |
| 01/26 | 01/26 Wire Transfer Via: Wells Fargo NA/121000248 A/C: Honda Aircraft Company, LLC Ref: Passport 420, LLC. Contract No. 4000316. Serial No. 42000029/Time/15:5 6 Imad: 0126B1Qgc08C031291 Trn: 4555400026Es | 2,500,000.00 |
| 01/30 | █████████████████ | ███ |
| **Total Electronic Withdrawals** | | ███ |

## OTHER WITHDRAWALS

| DATE | DESCRIPTION | AMOUNT |
|---|---|---|
| 01/31 | ██████████ | █ |
| **Total Other Withdrawals** | | **$2.62** |

## DAILY ENDING BALANCE

| DATE | AMOUNT |
|---|---|
| 01/06 | ████ |
| 01/09 | ████ |
| 01/23 | ████ |



December 31, 2016 through January 31, 2017

Account Number: ███████ 7608



## DAILY ENDING BALANCE *(continued)*

| DATE | AMOUNT |
|------|--------|
| 01/24 | ████ |
| 01/26 | ████ |
| 01/30 | ████ |
| 01/31 | ████ |

**IN CASE OF ERRORS OR QUESTIONS ABOUT YOUR ELECTRONIC FUNDS TRANSFERS:** Call or write us at the phone number or address on the front of this statement (non-personal accounts contact Customer Service) if you think your statement or receipt is incorrect or if you need more information about a transfer listed on the statement or receipt We must hear from you no later than 60 days after we sent you the FIRST statement on which the problem or error appeared. Be prepared to give us the following information:

- Your name and account number
- The dollar amount of the suspected error
- A description of the error or transfer you are unsure of, why you believe it is an error, or why you need more information.

We will investigate your complaint and will correct any error promptly. If we take more than 10 business days (or 20 business days for new accounts) to do this, we will credit your account for the amount you think is in error so that you will have use of the money during the time it takes us to complete our investigation.

**IN CASE OF ERRORS OR QUESTIONS ABOUT NON-ELECTRONIC TRANSACTIONS:** Contact the bank immediately if your statement is incorrect or if you need more information about any non-electronic transactions (checks or deposits) on this statement. If any such error appears, you must notify the bank in writing no later than 30 days after the statement was made available to you. For more complete details, see the Account Rules and Regulations or other applicable account agreement that governs your account.

 **JPMorgan Chase Bank, N.A. Member FDIC**



December 31, 2016 through January 31, 2017

Account Number: ███████ **7608**

This Page Intentionally Left Blank

Exhibit 20

```
##XXH1309DPCSTM          06291800270143512
```

Page 1     (0)

Account #: 270143512

This statement: June 29, 2018        Contact us:
Last statement: May 31, 2018        800 773-7100

Newport Center Office
500 Newport Center Drive
270                    0830N        Newport Beach, CA 92660
MICHAEL AVENATTI ESQ
ATTORNEY CLIENT TRUST ACCOUNT        cnb.com
520 NEWPORT CENTER DR SUITE 1400
NEWPORT BEACH CA 92660

Legal Services Trust Fund Acct

| Account Summary | | Account Activity | | |
|---|---|---|---|---|
| Account number | 270143512 | Beginning bal | (5/31/2018) | $4,044.60 |
| Minimum balance | $1,032.60 | Deposits | (0) | + 0.00 |
| Average balance | $3,869,149.12 | Electronic cr | (1) | + 17,000,000.00 |
| Avg. collect bal | $3,869,149.00 | Other credits | (1) | + 92.22 |
| Avg. bal for APY | $3,869,149.12 | Total credits | | + $17,000,092.22 |
| APY earned | 0.03% | Checks paid | (0) | - 0.00 |
| Interest earned | $92.22 | Electronic db | (11) | - 16,759,375.55 |
| Interest-bearing days | 29 | Other debits | (14) | - 252.22 |
| Interest paid YTD | $96.71 | Total debits | | - $16,759,627.77 |
| | | Ending balance | (6/29/2018) | $244,509.05 |

ELECTRONIC CREDITS

| Date | Description | Credits | Control Number |
|---|---|---|---|
| 6-18 | Incoming Wire-Dom | 17,000,000.00 | 180618000007604 |

OTHER CREDITS

| Date | Description | Reference | Credits | Control Number |
|---|---|---|---|---|
| 6-29 | Interest Credit | | 92.22 | 000000000000000 |

ELECTRONIC DEBITS

| Date | Description | Debits | Control Number |
|---|---|---|---|
| 6-11 | Tnet Wire Out-Dom | 3,000.00 | 180611000003937 |
| 6-18 | Tnet Wire Out-Dom | 1,200,000.00 | 180618000007616 |
| 6-20 | Tnet Wire Out-Dom | 12,375.24 | 180620000002836 |
| 6-25 | Tnet Wire Out-Dom | 4,000.00 | 180625000008474 |
| 6-25 | Tnet Wire Out-Dom | 6,177,003.07 | 180625000004873 |
| 6-25 | Tnet Wire Out-Dom | 9,122,996.92 | 180625000004872 |
| 6-26 | Tnet Wire Out-Dom | 50,000.00 | 180626000005635 |
| 6-26 | Wire Tsfr Debit | 50,000.00 | 180626000007842 |
| 6-27 | Tnet Wire Out-Dom | 30,000.00 | 180627000006676 |

```
##XXH1309DPCSTM          06291800270143512
```

```
          MICHAEL AVENATTI ESQ              Page 2
          June 29, 2018                     Account #: 270143512
```

```
ELECTRONIC DEBITS (Continued)
Date   Description                                     Debits   Control Number
6-27   Tnet Wire Out-Dom                          100,000.00   180627000004050
6-28   Tnet Wire Out-Dom                           10,000.32   180628000006306
```

```
OTHER DEBITS
Date   Description                        Reference   Debits   Control Number
6-11   Service Charge TNET WIRE OUT-DOM                 12.00   000000000000000
6-18   Service Charge INCOMING WIRE-DOM                 15.00   000000000000000
6-18   Service Charge TNET WIRE OUT-DOM                 12.00   000000000000000
6-20   Account Transfer Dr. TO ACC 00270143504          20.00   294000620080534
6-20   Service Charge TNET WIRE OUT-DOM                 12.00   000000000000000
6-25   Service Charge TNET WIRE OUT-DOM                 12.00   000000000000000
6-25   Service Charge TNET WIRE OUT-DOM                 12.00   000000000000000
6-26   Service Charge TNET WIRE OUT-DOM                 12.00   000000000000000
6-26   Service Charge WIRE TSFR DEBIT                    5.00   000000000000000
6-27   Service Charge TNET WIRE OUT-DOM                 12.00   000000000000000
6-28   Service Charge TNET WIRE OUT-DOM                 12.00   000000000000000
6-29   Interest Transfer TO ACCOUNT NO 0001338897       92.22   000000000000000
```

```
DAILY BALANCES
Date       Amount   Date          Amount   Date         Amount
05-31    4,044.60   06-20  15,788,598.36   06-27    254,521.37
06-11    1,032.60   06-25     484,562.37   06-28    244,509.05
06-18  15,801,005.60 06-26    384,545.37   06-29    244,509.05
```

Outgoing Wires

| Bank ID | Debit Account | Debit Party Name | Credit Account | Credit Party Name | Originator | Beneficiary | Tran Date | Tran Num | Amount |
|---|---|---|---|---|---|---|---|---|---|
| CNB | D/270143512 | MICHAEL AVENATTI ESQ | G/098102408287 | CUSTOMERS BANK | | Einbinder & Dunn LLP | 20180514 | 3876 | 27467.01 |
| CNB | D/270143512 | MICHAEL AVENATTI ESQ | G/098102408287 | ZB NA DBA CALIFORNIA BANK & TRUST | | Eagan Avenatti, LLP Trust | 20180515 | 2151 | 100000 |
| CNB | D/270143512 | MICHAEL AVENATTI ESQ | G/098102408287 | ZB NA DBA CALIFORNIA BANK & TRUST | | Eagan Avenatti, LLP Trust | 20180521 | 4156 | 100000 |
| CNB | D/270143512 | MICHAEL AVENATTI ESQ | G/098102408287 | CHASE MANHATTAN BANK | | Examiner The Movie, LLC | 20180521 | 4155 | 25000 |
| CNB | D/270143512 | MICHAEL AVENATTI ESQ | G/098102408287 | ZB NA DBA CALIFORNIA BANK & TRUST | | Eagan Avenatti, LLP Trust | 20180524 | 6997 | 100000 |
| CNB | D/270143512 | MICHAEL AVENATTI ESQ | G/098102408287 | BANK OF AMERICA, N.A., NY | | Talitha A Barela | 20180525 | 6653 | 30000 |
| CNB | D/270143512 | MICHAEL AVENATTI ESQ | G/098102408287 | BANK OF AMERICA, N.A., NY | | Talitha A Barela | 20180525 | 12003 | 30000 |
| CNB | D/270143512 | MICHAEL AVENATTI ESQ | G/098102408287 | ZB NA DBA CALIFORNIA BANK & TRUST | | Eagan Avenatti Trust | 20180531 | 3354 | 90000 |
| CNB | D/270143512 | MICHAEL AVENATTI ESQ | G/098102408287 | JPMORGAN CHASE BANK, NA | | Mareli Miniutti | 20180611 | 3937 | 3000 |
| CNB | D/270143512 | MICHAEL AVENATTI ESQ | G/098102408287 | ZB NA DBA CALIFORNIA BANK & TRUST | | Eagan Avenatti, LLP Trust | 20180618 | 7616 | 1200000 |
| CNB | D/270143512 | MICHAEL AVENATTI ESQ | G/098102408287 | BANK OF AMERICA, N.A., NY | | LA Girl Friday | 20180620 | 2836 | 12375.24 |
| CNB | D/270143512 | MICHAEL AVENATTI ESQ | G/098102408287 | BANK OF AMERICA, N.A., NY | | Joshua Viner | 20180625 | 4872 | 9122996.92 |
| CNB | D/270143512 | MICHAEL AVENATTI ESQ | G/098102408287 | BANK OF AMERICA, N.A., NY | | Jonathan Viner | 20180625 | 4873 | 6177003.07 |
| CNB | D/270143512 | MICHAEL AVENATTI ESQ | G/098102408287 | CAPITAL ONE, NA | | Pamela Baez | 20180625 | 8474 | 4000 |
| CNB | D/270143512 | MICHAEL AVENATTI ESQ | G/098102408287 | THE BOSTON PRIVATE BK. & TR CO | | Raines Feldman LLP | 20180626 | 5635 | 50000 |
| CNB | D/270143512 | MICHAEL AVENATTI ESQ | D/210289844 | BAKER KEENER & NAHRA LLP | | | 20180626 | 7842 | 50000 |
| CNB | D/270143512 | MICHAEL AVENATTI ESQ | G/098102408287 | ZB NA DBA CALIFORNIA BANK & TRUST | | Eagan Avenatti, LLP Trust | 20180627 | 4050 | 100000 |
| CNB | D/270143512 | MICHAEL AVENATTI ESQ | G/098102408287 | BANK OF AMERICA, N.A., NY | | Talitha A. Barela | 20180627 | 6676 | 30000 |
| CNB | D/270143512 | MICHAEL AVENATTI ESQ | G/098102408287 | WELLS FARGO BANK | | Honda Aircraft Company, LLC | 20180628 | 6306 | 10000.32 |
| CNB | D/270143512 | MICHAEL AVENATTI ESQ | G/098102408287 | JPMORGAN CHASE BANK, NA | | Mareli Miniutti | 20180702 | 6392 | 4000 |
| CNB | D/270143512 | MICHAEL AVENATTI ESQ | G/098102408287 | ZB NA DBA CALIFORNIA BANK & TRUST | | Eagan Avenatti, LLP Trust | 20180703 | 3750 | 100000 |
| CNB | D/270143512 | MICHAEL AVENATTI ESQ | G/098102408287 | JPMORGAN CHASE BANK, NA | | Kenny Nguyen | 20180703 | 4583 | 7428 |
| CNB | D/270143512 | MICHAEL AVENATTI ESQ | G/098102408287 | ZB NA DBA CALIFORNIA BANK & TRUST | | Mareli Miniutti | 20180709 | 2304 | 2500 |
| CNB | D/270143512 | MICHAEL AVENATTI ESQ | G/098102408287 | JPMORGAN CHASE BANK, NA | | Mareli Miniuti | 20180709 | 10050 | 2500 |
| CNB | D/270143512 | MICHAEL AVENATTI ESQ | G/098102408287 | ZB NA DBA CALIFORNIA BANK & TRUST | | Eagan Avenatti Trust | 20180711 | 1381 | 30000 |
| CNB | D/270143512 | MICHAEL AVENATTI ESQ | G/098102408287 | ZB NA DBA CALIFORNIA BANK & TRUST | | Eagan Avenatti, LLP Trust | 20180713 | 5047 | 84000 |
| CNB | D/270143512 | MICHAEL AVENATTI ESQ | G/098102408287 | JPMORGAN CHASE BANK, NA | | Mareli Miniutti | 20180713 | 4777 | 2500 |
| CNB | D/270143512 | MICHAEL AVENATTI ESQ | G/098102408287 | BANK OF AMERICA, N.A., NY | | Geoffrey Johnson | 20180720 | 6292 | 1900 |
| CNB | D/270143512 | MICHAEL AVENATTI ESQ | G/098102408287 | ZB NA DBA CALIFORNIA BANK & TRUST | | Eagan Avenatti LLP Client Trust | 20180726 | 1567 | 8000 |
| CNB | D/270143512 | MICHAEL AVENATTI ESQ | G/098102408287 | ZB NA DBA CALIFORNIA BANK & TRUST | | Eagan Avenatti LLP Client Trust | 20180801 | 5340 | 1400 |
| CNB | D/270143512 | MICHAEL AVENATTI ESQ | G/098102408287 | BANK OF AMERICA, N.A., NY | | Geoffrey Johnson | 20180810 | 1763 | 1900 |
| CNB | D/270143512 | MICHAEL AVENATTI ESQ | G/098102408287 | BANK OF AMERICA, N.A., NY | | Geoffrey Johnson | 20180815 | 3320 | 1900 |
| CNB | D/270143512 | MICHAEL AVENATTI ESQ | G/098102408287 | ZB NA DBA CALIFORNIA BANK & TRUST | | Eagan Avenatti, LLP Trust | 20180905 | 7842 | 50000 |
| CNB | D/270143512 | MICHAEL AVENATTI ESQ | G/098102408287 | ZB NA DBA CALIFORNIA BANK & TRUST | | Eagan Avenatti, LLP Trust | 20180914 | 7003 | 1750 |
| CNB | D/270143512 | MICHAEL AVENATTI ESQ | G/098102408287 | ZB NA DBA CALIFORNIA BANK & TRUST | | Eagan Avenatti, LLP Trust | 20180917 | 4250 | 4375 |

Incoming Wires

| Bank ID | Debit Account | Debit Party Name | Credit Account | Credit Party Name | Originator | Beneficiary | Tran Date | Tran Num | Amount |
|---|---|---|---|---|---|---|---|---|---|
| CNB | G/098102408287 | THE NORTHERN TRUST COMPANY | D/270143512 | MICHAEL AVENATTI ESQ | AYRES LAW OFFICES PC | | 20170517 | 3010 | 952994.57 |
| CNB | G/098102408287 | CHASE MANHATTAN BANK | D/270143512 | MICHAEL AVENATTI ESQ | JANKLOW & NESBIT ASSOCIATES | | 20180510 | 7504 | 6250 |
| CNB | G/098102408287 | CHASE MANHATTAN BANK | D/270143512 | MICHAEL AVENATTI ESQ | JANKLOW & NESBIT ASSOCIATES | | 20180511 | 4312 | 475000 |
| CNB | G/098102408287 | BANK OF AMERICA, N.A., NY | D/270143512 | MICHAEL AVENATTI ESQ | BANK OF AMERICA | | 20180525 | 8896 | 29955 |
| CNB | G/098102408287 | SILICON VALLEY BANK | D/270143512 | MICHAEL AVENATTI ESQ | WAG LABS, INC. | | 20180618 | 7604 | 17000000 |
| CNB | G/098102408287 | ZB NA DBA CALIFORNIA BANK & TRUST | D/270143512 | MICHAEL AVENATTI ESQ | CALIFORNIA BANK & TRUST | | 20180712 | 6759 | 2475 |
| CNB | G/098102408287 | CHASE MANHATTAN BANK | D/270143512 | MICHAEL AVENATTI ESQ | JANKLOW & NESBIT ASSOCIATES | | 20180803 | 5936 | 4375 |
| CNB | G/098102408287 | ZB NA DBA CALIFORNIA BANK & TRUST | D/270143512 | MICHAEL AVENATTI ESQ | GERAGOS & GERAGOS APC | | 20180905 | 7520 | 250000 |
| CNB | G/098102408287 | CHASE MANHATTAN BANK | D/270143512 | MICHAEL AVENATTI ESQ | JANKLOW & NESBIT ASSOCIATES | | 20180917 | 3192 | 4375 |

# Exhibit 21

CALIFORNIA | BANK
T R U S T
P.O. Box 489, Lawndale, CA 90260-0489

**Statement of Accounts**
Page 1 of 4
This Statement: January 31, 2017
Last Statement: December 30, 2016

Account ███████9257

**DIRECT INQUIRIES TO:**
Customer Service  1 (800) 400-6080

0043939          4032-06-0000-CBT-PG0023-00000

PASSPORT 420 LLC
520 NEWPORT CENTER DR STE 1400
NEWPORT BEACH CA 92660-7034

Irvine Branch
1900 Main St.   Suite 100
Irvine, CA 92614-0000
(949) 223-7500

Happy New Year From All of Us at California Bank & Trust

## SUMMARY OF ACCOUNT BALANCE

| Account Type | Account Number | Checking/Savings Ending Balance | Outstanding Balances Owed |
|---|---|---|---|
| Business Essentials Checking | ███████257 | $7,158.38 | |

## BUSINESS ESSENTIALS CHECKING 5792779257                    104    0

| Previous Balance | Deposits/Credits | Charges/Debits | Checks Processed | Ending Balance |
|---|---|---|---|---|
| 38.68 | 1,995,000.00 | 1,987,880.30 | 0.00 | 7,158.38 |

### 2 DEPOSITS/CREDITS

| Date | Amount | Description |
|---|---|---|
| 01/18 | 1,985,000.00 | WIRE/IN-2017011800004826;ORG PARRISH FAMILY TRUST 5/21/97;OB  1304201184 |
| 01/23 | 10,000.00 | ONLINE XFER FROM DDA AVENATTI & A ID: 000005048  2307903682 |

### 19 CHARGES/DEBITS

| Date | Amount | Description |
|---|---|---|
| 01/18 | 14.00 | WIRE FEE-INCOMING DOMESTIC |
| 01/20 | 1,891,802.50 | ONLINE XFER TO DDA EAGAN AVENAT ID: 000000361  2307602103 |
| 01/20 | 69,400.00 | ONLINE XFER TO DDA EAGAN AVENAT ID: 000003114  2307602115 |
| 01/20 | 10,000.00 | ONLINE XFER TO DDA EAGAN AVENAT ID: 000004766  2307602123 |
| 01/20 | 10,065.50 | ONLINE XFER TO DDA EAGAN AVENAT ID: 000000873  2307602133 |
| 01/20 | 2,680.00 | ONLINE XFER TO DDA EAGAN AVENAT ID: 000004248  2307602143 |
| 01/20 | 250.00 | ONLINE XFER TO DDA EAGAN AVENAT ID: 000006778  2307602577 |
| 01/25 | 921.90 | 24431060RWESMG94J 6487 AMERICAN AIR0012110870FORT WORTH TX  1206415284 |
| 01/26 | 4.74 | 24736930T03A1S64N 6487 SB AIRPORT GIFT SHOP GOLETA CA  1206415755 |
| 01/26 | 24.56 | 24164070TFF37DZVJ 6487 PHILLIP S SEAF12208526CHARLOTTE NC  1206415756 |
| 01/30 | 217.85 | 24391210WHVGEZBPL 6487 HERTZ RENT-A-CAR GREENSBORO NC  1207547946 |
| 01/30 | 608.92 | 24692160W009NL503 6487 MARRIOTT GREENSBORO-HIGREENSBORO NC  1207547947 |
| 01/30 | 49.00 | 24040480V6110SMXA 6461 LAX AIR FORD'S FILLINGLOS ANGELES CA  1207547942 |
| 01/30 | 3.45 | 24316050VFZ7FAKH3 6487 SHELL OIL 57543601801 GREENSBORO NC  1207547943 |
| 01/30 | 263.11 | 24717050W7JQYL6GH 6487 SIGNATURE FLIGHT SUPPOGREENSBORO NC  1207547944 |
| 01/30 | 1,016.28 | 24431050WWLF77J2T 6487 MOUNTAIN VIEW AEROMOTIALAMOSA CO  1207547945 |
| 01/30 | 489.94 | 24717050X4YK1HTA8 6487 SIGNATURE FLIGHT SUPPOSANTA ANA CA  1207516580 |
| 01/31 | 19.65 | 24164070Y20LNYWY8 6487 FEDEXOFFICE 00002006SANTA BARBARA CA  1206715696 |
| 01/31 | 48.90 | 24164070Y20LNZ8GN 6487 FEDEXOFFICE 00002006SANTA BARBARA CA  1206715695 |

### 0 CHECKS PROCESSED

There were no transactions this period.



## An Easy Approach To Balancing Your Account

**To reconcile your checkbook balance to your statement balance:** Mark off each entry in your check register that has been charged to your account during the statement period. List the checks you have written, but are not yet charged to your account in the "Checks Outstanding" column below. Then, follow the instructions in lines 1 through 10.

| CHECKS OUTSTANDING | |
|---|---|
| Check Number | Check Amount |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| TOTAL: | |

*Transfer to Line 9.*

| CHECKBOOK BALANCE | |
|---|---|
| 1.  LIST your checkbook balance. | |
| 2.  ADD any deposits or other credits listed on the front of this statement which you have not recorded in your checkbook (such as payroll credits or other direct electronic deposits). | |
| 3.  SUBTOTAL: | |
| 4.  SUBTRACT any charges listed on the front of this statement which you have not recorded (such as service charges, automatic transfers, electronic transactions, etc). | |
| 5.  ADJUSTED CHECKBOOK BALANCE: | |

*This balance should agree with line 10, below.*

| STATEMENT BALANCE | |
|---|---|
| 6.  LIST your current statement balance as shown on the front of this statement. | |
| 7.  ADD deposits made, but not shown on this statement. | |
| 8.  SUBTOTAL: | |
| 9.  SUBTRACT total from "Checks Outstanding." | |
| 10.  ADJUSTED STATEMENT BALANCE: | |

*This balance should agree with line 5, above.*

**PROMPTLY EXAMINE YOUR STATEMENT AND REPORT ANY PROBLEM**
You must promptly examine your account statements and report any discoverable errors, unauthorized signatures, alterations, missing endorsements, or unauthorized transfers. Failure to do so may result in your loss of certain rights or remedies. For example, you must identify the discoverable alteration or forgery of a check within 30 days of us sending you, or making available to you, the statement reflecting that check, and you must also immediately report to us what you find. Businesses should check their account transactions daily, for which various online services are available. For additional information, please see your deposit account agreement and application service agreement(s) for details. See also the consumer disclosures below.

**CONSUMER ACCOUNTS: IN CASE OF ERRORS OR QUESTIONS ABOUT YOUR ELECTRONIC TRANSFERS OR MONEY RESERVE TRANSACTIONS**
If you think your statement is wrong, or if you need more information about a transfer on this statement or on a receipt, please telephone or write us. Please use the telephone number or address listed on the front of this statement to contact us as you can. **We must hear from you no later than 60 days after we sent or made available the FIRST statement on which the problem or error appeared. The provisions in this paragraph do not apply to business or other non-personal accounts. The owners of those accounts must settle all unauthorized transactions or errors within 24 hours of receipt of the item posting in order to be returned.**

1.  Tell us your name and account number.
2.  Describe the error or transfer you are unsure about, and explain as clearly as you can why you believe there is an error or why you need more information.
3.  Tell us the dollar amount of the suspected error.

We will investigate your complaint and correct any error promptly. If we take more than 10 business days to do this, we will recredit your account for the amount you think is in error, so that you will have use of the money during the time it takes us to complete our investigation.

**FOR MONEY RESERVE ACCOUNTS:**

**IN CASE OF ERRORS OR QUESTIONS ABOUT YOUR PERSONAL CREDIT LINE**
*(This is a Summary of Your Billing Rights).*
If you think your statement is wrong, or if you need more information about a transaction on your statement, write us at the address on the front of this statement as soon as possible. **We must hear from you no later than 60 days after we sent you the first statement on which the error or problem appeared.**

You can telephone us but doing so will not preserve your rights. In your letter, give us the following information.

1.  Your name and account number.
2.  The dollar amount of the suspected error.
3.  Describe the error and explain, if you can, why you believe there is an error. If you need more information, describe the item you are unsure about.

You do not have to pay any amount in question while we are investigating, but you are still obligated to pay the parts of your bill that are not in question. The charge in question may remain on your statement, and we may continue to charge you interest on that amount. But, if we determine that we made a mistake, you will not have to pay the amount in question or any interest or other fees related to that amount. While we investigate your question, we cannot report you as delinquent or take any action to collect the amount you question. You must notify us in writing. You can telephone us, but doing so will not preserve your rights. Contact us at California Bank & Trust, PO Box 25787, Salt Lake City, UT 84125-0787.

**Balance Subject to Interest Rate:** We use the method called "average daily balance", (including current transactions) to calculate the daily balance. If you have any further questions about the method and how resulting interest charges are determined, please feel free to contact us at 1-800-400-6080.

**We may report information about your Money Reserve account to credit bureaus.** Late payments, missed payments, or other defaults on your account may be reflected in your credit report.

**Please notify us if we report any inaccurate information about your account(s) to a credit bureau.** Your written notice describing the specific inaccuracy should be sent to us at the following address: California Bank & Trust, PO Box 25787, Salt Lake City, UT 84125-0787.

*Thank you for banking with California Bank & Trust.*

**Become an Online Banking Customer for 24-hour account access.**

•Review account balances •Review posted transactions • Pay bills • Transfer funds
**Sign up today at www.calbanktrust.com or call 888-217-1265.**

0043939-0000001-0125250



January 31, 2017
PASSPORT 420 LLC
█████9257

CALIFORNIA BANK
& TRUST

P.O. Box 489, Lawndale, CA 90260-0489

---

## AGGREGATE OVERDRAFT AND RETURNED ITEM FEES

|  | Total for This Period | Total Year-to-Date |
|---|---|---|
| Total Overdraft Fees | $0.00 | $0.00 |
| Total Returned Item Fees | $0.00 | $0.00 |

To learn more about our other products and services that may lower the cost of managing account
overdrafts or to discuss removing overdraft coverage from your account, please contact Customer
Service or visit your local branch.

---

## DAILY BALANCES

| Date | Balance | Date | Balance | Date | Balance |
|---|---|---|---|---|---|
| 01/18 | 1,985,024.68 | 01/25 | 9,904.78 | 01/30 | 7,226.93 |
| 01/20 | 826.68 | 01/26 | 9,875.48 | 01/31 | 7,158.38 |
| 01/23 | 10,826.68 | | | | |



California Bank & Trust

This page intentionally left blank

# Exhibit 22

1

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

- - -

THE HONORABLE JAMES V. SELNA, JUDGE PRESIDING

UNITED STATES OF AMERICA,      )CERTIFIED TRANSCRIPT
                    Plaintiff,  )
        vs.                     )
                                )   SACR-19-00061-JVS
MICHAEL JOHN AVENATTI,          )
                    Defendant.  )TRIAL DAY 20, VOL. 1
------------------------------)


REPORTER'S TRANSCRIPT OF PROCEEDINGS

Santa Ana, California

August 13, 2021


SHARON A. SEFFENS, RPR
United States Courthouse
411 West 4th Street, Suite 1-1053
Santa Ana, CA  92701
(714) 543-0870

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

2

```
1    APPEARANCES OF COUNSEL:

2    For the Plaintiff:

3    NICOLA T. HANNA
     United States Attorney
4    BRANDON D. FOX
     Assistant United States Attorney
5    Chief, Criminal Division
     ALEXANDER WYMAN
6    Assistant United States Attorney
     Major Frauds Section
7    1100 United States Courthouse
     312 North Spring Street
8    Los Angeles, CA  90012
     (213) 894-6683
9
     BRETT A. SAGEL
10   Assistant United States Attorney
     Ronald Reagan Federal Building
11   411 West Fourth Street, Suite 8000
     Santa Ana, CA  92701
12   (714) 338-3598

13   For the Defendant:

14   MICHAEL JOHN AVENATTI, PRO SE

15   H. DEAN STEWARD, ADVISORY COUNSEL
     H. DEAN STEWARD LAW OFFICES
16   107 Avenida Miramar, Suite C
     San Clemente, CA  92672
17   (949) 481-4900

18

19

20

21

22

23

24

25
```

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

3

```
                              I-N-D-E-X


PLAINTIFF'S
WITNESSES:              DIRECT   CROSS   REDIRECT   RECROSS

JOHN DRUM
   (Continued)            23       84

PLAINTIFF'S
EXHIBITS:                               MARKED   RECEIVED

Exhibit 359                                         46
Exhibit 382                                         46
Exhibit 371                                         54

DEFENSE
WITNESSES:            DIRECT   CROSS   REDIRECT   RECROSS

 (None)

DEFENSE
EXHIBITS:                                MARKED   RECEIVED

Exhibit 1080                               85
```

| | | |
|---|---|---|
| 09:05 | 1 | THE CLERK:  Item 1, SACR-19-00061-JVS, United |
| 09:05 | 2 | States of America versus Michael John Avenatti. |
| 09:05 | 3 | MR. WYMAN:  Good morning, Your Honor.  Alex Wyman |
| 09:05 | 4 | and Brett Sagel on behalf of the United States.  And with us |
| 09:05 | 5 | at counsel table is Special Remoun Karlous. |
| 09:05 | 6 | THE COURT:  Good morning. |
| 09:06 | 7 | MR. AVENATTI:  Good morning, Your Honor.  Michael |
| 09:06 | 8 | Avenatti, present with Mr. Dean Steward and |
| 09:06 | 9 | Ms. Cummings-Cefali.  Ms. Hernandez will be joining us |
| 09:06 | 10 | probably after the morning break. |
| 09:06 | 11 | THE COURT:  Very good. |
| 09:06 | 12 | Good morning, ladies and gentlemen. |
| 09:06 | 13 | THE JURY:  Good morning. |
| 09:06 | 14 | THE COURT:  Mr. Wyman. |
| 09:06 | 15 | JOHN DRUM, GOVERNMENT'S WITNESS, PREVIOUSLY SWORN |
| 09:06 | 16 | DIRECT EXAMINATION (Continued) |
| 09:06 | 17 | BY MR. WYMAN: |
| 09:06 | 18 | Q    Good morning, Mr. Drum. |
| 09:06 | 19 | A    Good morning. |
| 09:06 | 20 | Q    If you could please pull up Exhibit 48. |
| 09:06 | 21 | Do you recall yesterday afternoon, Mr. Drum, we |
| 09:06 | 22 | were discussing Exhibit 48, the spreadsheet that Judy |
| 09:06 | 23 | Regnier e-mailed to defendant? |
| 09:06 | 24 | A    Yes. |
| 09:06 | 25 | Q    And at the end of the calculations there, there was |

| | | |
|---|---|---|
| 09:32 | 1 | Q    Okay.  Let's turn now to Exhibits 430 through 438.  If |
| 09:33 | 2 | you could please let us know, which clients do those charts |
| 09:33 | 3 | relate to? |
| 09:33 | 4 | A    These relate to Alexis Gardner. |
| 09:33 | 5 | Q    Okay.  Let's start with Exhibit 430.  What is the title |
| 09:33 | 6 | of this chart? |
| 09:33 | 7 | A    Total amount due to Alexis Gardner as of January 25th, |
| 09:33 | 8 | 2017, and November 2020. |
| 09:33 | 9 | Q    Starting with the first row, what does that row |
| 09:33 | 10 | reflect? |
| 09:33 | 11 | A    That reflects a similar amount paid on January 25th, |
| 09:33 | 12 | 2017, for $2.75 million. |
| 09:33 | 13 | Q    Did you review bank records showing that the defendant |
| 09:33 | 14 | received the settlement amount on that date? |
| 09:33 | 15 | A    Yes. |
| 09:33 | 16 | Q    If you could please pull up what is already in evidence |
| 09:33 | 17 | as Exhibit 148, page 1. |
| 09:33 | 18 | A    (Witness complies.) |
| 09:33 | 19 | Q    And in the top left-hand corner, can you please let us |
| 09:33 | 20 | know what the name on the account is. |
| 09:34 | 21 | A    Eagan Avenatti, LLP, Attorney/Client Trust Account. |
| 09:34 | 22 | Q    And in the top right what are the last four digits of |
| 09:34 | 23 | the account number? |
| 09:34 | 24 | A    8671. |
| 09:34 | 25 | Q    If you could please go to the middle of the page now |

```
09:34   1    under deposits and credits.  What is reflected there?
09:34   2    A    That reflects a $2.75 million deposit from Hassan
09:34   3    Whiteside on January 25th, 2017.
09:34   4    Q    Okay.  Please go back to Exhibit 430 now.  The second
09:34   5    row below the settlement amount paid, what does that say?
09:34   6    A    That's your legal fees of $990,000.
09:34   7    Q    And where did that figure come from?
09:34   8    A    That came from the fee agreement, which was 33 percent
09:35   9    of the settlement amount, the total settlement amount of the
09:35   10   2.75 plus the amount due in November 2020 of $250,000.
09:35   11   Q    So that's 33 percent of the total of 3 million?
09:35   12   A    Yes.
09:35   13   Q    Then the next row says less case-related expenses.
09:35   14   What figure is reflected there?
09:35   15   A    $65,615.
09:35   16   Q    And how did you calculate that figure?
09:35   17   A    That figure was based on the amount identified in
09:35   18   QuickBooks related to Alexis Gardner.
09:35   19   Q    Right below that, what does the next row show?
09:35   20   A    Total due to client as of January 25th, 2017.
09:35   21   Q    How much is listed there?
09:35   22   A    Approximately $1.7 million.
09:35   23   Q    So based on your calculations and your review of the
09:35   24   fee agreement, is that how much your understanding was that
09:36   25   was owed to Ms. Gardner as of that date?
```

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

09:36  1          MR. AVENATTI:  Objection, leading.

09:36  2          THE COURT:  Overruled.

09:36  3          THE WITNESS:  Yes, that's correct.

09:36  4    BY MR. WYMAN:

09:36  5    Q    Below that, what do the next two rows show?

09:36  6    A    The next row is plus settlement amount due

09:36  7    November 2020, $250,000.  And then the following row is the

09:36  8    total due to Alexis Gardner as of November 2020, the amount

09:36  9    due in January 2017, and $250,000, and that totals to

09:36  10   $1.9 million.

09:36  11   Q    And the last row in red, what does that represent?

09:36  12   A    That says total client received from settlement of zero

09:36  13   dollars.  That represents that none of the amount that was

09:36  14   deposited into Alex Gardner's client trust account was paid

09:36  15   to Alexis Gardner.

09:36  16         MR. WYMAN:  Could you please go to Exhibit 431

09:37  17   now.  And if we could blow up the whole contents, please.

09:37  18   BY MR. WYMAN:

09:37  19   Q    What is the title of this chart?

09:37  20   A    Tracing of Alexis Gardner's first settlement payment.

09:37  21   Q    And in the top left-hand corner, is that the same

09:37  22   legend for color coding?

09:37  23   A    That's correct.

09:37  24   Q    Starting from the left, what does the first arrow going

09:37  25   to the right show?

```
09:37   1    A    That shows the first settlement payment on
09:37   2    January 25th, 2017.  It was deposited into EA 8671.
09:37   3    Q    Then if we could please go to the right, it looks like
09:37   4    there are three arrows going from that bubble; is that
09:37   5    right?
09:37   6    A    That's correct.
09:37   7    Q    So starting from the one on the bottom, the one going
09:37   8    down, what does that show?
09:37   9    A    That shows $2.5 million was withdrawn from the client
09:37  10    trust accounts 8671 and sent to X-Law Group.
09:38  11    Q    Then if we could please go to the right, what happens
09:38  12    after that 2.5 million was sent to the X-Law Group?
09:38  13    A    On the same day $2.5 million was sent to Honda Aircraft
09:38  14    Company.
09:38  15    Q    If we can go back to the middle, please, what does the
09:38  16    arrow in the middle going to the right show?
09:38  17    A    $250,000 withdrawal from the client trust account into
09:38  18    EA 2851.
09:38  19    Q    And then to the right of that, what happened to that
09:38  20    money?
09:38  21    A    On that same day $250,000 was withdrawn and deposited
09:38  22    into A&A 0661.
09:38  23         MR. WYMAN:  At this time, Your Honor, the
09:38  24    government would move two bank records into evidence,
09:38  25    Exhibits 359 and 382, for which the custodian declarations
```

09:38   1   for both is Exhibit 394, page 2.

09:39   2           MR. AVENATTI:  Objection, Your Honor.  Hearsay,

09:39   3   401, 403.

09:39   4           THE COURT:  The numbers again?

09:39   5           MR. WYMAN:  The exhibits are 359 and 382.

09:39   6           THE COURT:  359 and 382 will be received.  The

09:39   7   objection is overruled.

09:39   8           (Exhibits 359 and 382 received in evidence)

09:39   9           MR. WYMAN:  If we could please pull up

09:39   10   Exhibit 382, page 1.

09:39   11   BY MR. WYMAN:

09:39   12   Q     What is the name of this account?

09:39   13   A     Eagan Avenatti, LLP.

09:39   14   Q     And the last four in the top right-hand corner of the

09:39   15   account number?

09:39   16   A     2851.

09:39   17   Q     And then if you go down to the deposits and credits, is

09:39   18   there -- on January 26th, 2017, do you see a deposit for

09:40   19   $250,000 on that day?

09:40   20   A     Yes.

09:40   21           MR. WYMAN:  Then if we could please go to

09:40   22   Exhibit 359, page 1.

09:40   23   BY MR. WYMAN:

09:40   24   Q     What is the name of this account?

09:40   25   A     Avenatti & Associates, A Professional Corp.

47

```
09:40    1    Q    And in the top right what are the last four numbers of
09:40    2    this account number?
09:40    3    A    0661.
09:40    4    Q    And then down on this page do you see a deposit or
09:40    5    credit for $250,000?
09:40    6    A    Yes.
09:40    7    Q    On what date?
09:40    8    A    January 26th.
09:40    9              MR. WYMAN:   If we could please go back to
09:40   10    Exhibit 431 now.
09:40   11    BY MR. WYMAN:
09:40   12    Q    Are those the transfers reflected in the middle there
09:41   13    going to the right?
09:41   14    A    Yes.
09:41   15    Q    And then lastly, in the middle the arrow going up to
09:41   16    the green bubble, what does that show?
09:41   17    A    That shows that no money was withdrawn from the 8671
09:41   18    and sent to Alexis Gardner.
09:41   19              MR. WYMAN:   If we could please go to Exhibit 432
09:41   20    now.
09:41   21    BY MR. WYMAN:
09:41   22    Q    What is the title of this chart?
09:41   23    A    Activities of EA trust account 8671 after receiving
09:41   24    Alexis Gardner's first settlement payment.
09:41   25    Q    The first row in light blue looks like there is a
```

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

09:41   1    balance of zero.  Is that what that hash mark means?

09:41   2    A    Yes.  That's right.

09:41   3    Q    And then the first row below that, January 25th, 2017,

09:41   4    is that the day that the settlement amount came in?

09:41   5    A    Yes.

09:41   6    Q    And what do the three rows below that show?

09:41   7    A    The two rows below that show there are two withdraws,

09:42   8    one for $2.5 million sent to the X-Law Group, and one for

09:42   9    $250,000 sent to EA 2851.

09:42   10   Q    And as of January 26th, 2017, at the end of this chart,

09:42   11   how much is left of Ms. Gardner's settlement money in this

09:42   12   trust account?

09:42   13   A    Zero.

09:42   14   Q    Did any of the money in this chart go to Ms. Gardner?

09:42   15   A    No, it did not.

09:42   16   Q    Based on your e-mail review of the defendant's bank

09:42   17   records, are you aware that certain payments were made from

09:42   18   those accounts to Ms. Gardner?

09:42   19   A    Yes, I'm aware that payments were made to Ms. Gardner.

09:42   20         MR. WYMAN:  If we could please look at

09:42   21   Exhibit 433.

09:42   22   BY MR. WYMAN:

09:42   23   Q    What is the title of this chart?

09:42   24   A    Payments to Alexis Gardner.

09:42   25   Q    On the left-hand side at the top, it looks like there's

| | | |
|---|---|---|
| 09:42 | 1 | that same legend; is that right? |
| 09:42 | 2 | A   Yes. |
| 09:43 | 3 | Q   And if we could start here on the left, what does the |
| 09:43 | 4 | left portion of this chart show to the left of the dashed |
| 09:43 | 5 | line? |
| 09:43 | 6 | A   The left portion shows settlement payments.  So the top |
| 09:43 | 7 | one represents the payment from Hassan Whiteside to the |
| 09:43 | 8 | client trust account EA 8671, and the bottom set of bubbles |
| 09:43 | 9 | represents the Michelle Phan repurchase agreement payment |
| 09:43 | 10 | deposited into CNB 4705. |
| 09:43 | 11 | Q   And then to the right of the dashed line, what do these |
| 09:43 | 12 | bubbles and arrows reflect? |
| 09:43 | 13 | A   So the orange and yellow bubbles are either client |
| 09:43 | 14 | trust account or other Avenatti & Associates accounts, and |
| 09:43 | 15 | the arrows represent flows of money.  On the right-hand side |
| 09:43 | 16 | we have a green bubble for Alexis Gardner, and it shows that |
| 09:44 | 17 | she received payments from four different accounts. |
| 09:44 | 18 |         MR. WYMAN:  If we could please zoom back out so we |
| 09:44 | 19 | can see the full chart. |
| 09:44 | 20 | BY MR. WYMAN: |
| 09:44 | 21 | Q   It looks like there are no arrows from the EA 8671 |
| 09:44 | 22 | account that received the Hassan Whiteside payment to |
| 09:44 | 23 | Ms. Gardner.  What does that mean? |
| 09:44 | 24 | A   That means none of the amount that was deposited into |
| 09:44 | 25 | EA 8671 for settlement were paid to Ms. Gardner. |

| | | |
|---|---|---|
| 09:44 | 1 | Q    As with Mr. Johnson, did you conduct additional |
| 09:44 | 2 | analysis for the source of certain payments to Ms. Gardner? |
| 09:44 | 3 | A    Yes. |
| 09:44 | 4 | Q    Take a look at Exhibit 434. |
| 09:44 | 5 | A    (Witness complies.) |
| 09:44 | 6 | Q    What is the title of this chart? |
| 09:44 | 7 | A    GB account funds used to make a payment to Alexis |
| 09:44 | 8 | Gardner on April 14th, 2017. |
| 09:44 | 9 | Q    And can you please explain what this chart reflects. |
| 09:44 | 10 | A    So this chart reflects that Alexis Gardner received a |
| 09:44 | 11 | payment of $16,000 on April 14th, 2017.  She received that |
| 09:45 | 12 | payment from account A&A 0661, and I am able to trace the |
| 09:45 | 13 | source of that payment to a GB account. |
| 09:45 | 14 | Q    So starting from the left, what do these bars mean? |
| 09:45 | 15 | A    So starting with the left, the account from which |
| 09:45 | 16 | Ms. Gardner received her payments, A&A 0661 had a beginning |
| 09:45 | 17 | balance of $3,300.  And then on April 7th that account |
| 09:45 | 18 | received a deposit from GB 2240 of $185,000.  And then |
| 09:45 | 19 | approximately a week later that same account made a transfer |
| 09:45 | 20 | to Alexis Gardner of $16,000. |
| 09:45 | 21 |      MR. WYMAN:  If we could go to Exhibit 435 now. |
| 09:45 | 22 | BY MR. WYMAN: |
| 09:45 | 23 | Q    What is the title of this chart? |
| 09:45 | 24 | A    GB account funds used to make a payment to Alexis |
| 09:46 | 25 | Gardner on May 15th, 2017. |

09:46   1   Q      And what does this chart reflect?

09:46   2   A      So this chart reflects another $16,000 payment made to

09:46   3   Alexis Gardner, this time approximately a month after the

09:46   4   previous one, also from A&A 0661.   And I am able to trace

09:46   5   the source of that payment to a GB account.

09:46   6          So starting on the left, this account had a

09:46   7   balance of $5,300 on May 15th.   And then on that same day it

09:46   8   received a transfer from GB 2240 of $30,000 and then made a

09:46   9   payment to Alexis Gardner for $16,000.

09:46   10  Q      And at Exhibit 436, please, what is the title of this

09:46   11  chart?

09:46   12  A      GB account funds used to make a payment to Alexis

09:47   13  Gardner on January 16th, 2018.

09:47   14  Q      What does this chart reflect?

09:47   15  A      This chart reflects another $16,000 payment received by

09:47   16  Alexis Gardner on January 16th, 2018, this time from account

09:47   17  EA 3174.   And I am able to trace the source of that payment

09:47   18  to a GB account.   So starting on the left, on January 16th,

09:47   19  2018, the account from which Alexis Gardner received her

09:47   20  payment had a beginning balance of $155.   It received a

09:47   21  transfer from GB 3730 of 25,000 on that same day, and then

09:47   22  also on that same day that account made a transfer to Alexis

09:47   23  Gardner of $16,000.

09:47   24          MR. WYMAN:   Exhibit 437, please.

        25

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

52

| | | |
|---|---|---|
| 09:47 | 1 | BY MR. WYMAN: |
| 09:47 | 2 | Q    What is the title of Exhibit 437? |
| 09:48 | 3 | A    GB account funds used to make a payment to Alexis |
| 09:48 | 4 | Gardner on February 20th, 2018. |
| 09:48 | 5 | Q    And is this the same analysis showing the source of a |
| 09:48 | 6 | payment to Alexis Gardner? |
| 09:48 | 7 | A    Yes. |
| 09:48 | 8 | Q    What was the amount of that payment? |
| 09:48 | 9 | A    $16,000. |
| 09:48 | 10 | Q    And based on this tracing analysis, what was the source |
| 09:48 | 11 | of that money? |
| 09:48 | 12 | A    From Global Baristas account. |
| 09:48 | 13 |        MR. WYMAN:  Let's go lastly to Exhibit 438 on |
| 09:48 | 14 | Ms. Gardner. |
| 09:48 | 15 | BY MR. WYMAN: |
| 09:48 | 16 | Q    It looks like this is a two-page exhibit? |
| 09:48 | 17 | A    Yes. |
| 09:48 | 18 | Q    What is the title of the exhibit? |
| 09:48 | 19 | A    A portion of Michelle Phan's stock repurchase payment |
| 09:48 | 20 | was transferred to EA 4613. |
| 09:48 | 21 | Q    And would you please explain what is reflected on |
| 09:48 | 22 | page 1. |
| 09:48 | 23 | A    On page 1, that reflects starting with the left-hand |
| 09:48 | 24 | blue bar the balance in CNB 4705 that reflects the Michelle |
| 09:48 | 25 | Phan repurchase payments.  And then $200,000 of that money |

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

```
09:49   1   was withdrawn and transferred to account EA 4613.
09:49   2   Q    And on page 2, is this a continuation of page 1?
09:49   3   A    Yes, it's a continuation of page 1.  So on the
09:49   4   left-hand side we see that account EA 4613 had a beginning
09:49   5   balance of $1,500 before receiving the $200,000 deposit from
09:49   6   CNB 4705 on April 17th, 2018.  And then on that same day a
09:49   7   $34,000 withdraw was made and paid to Alexis Gardner.
09:49   8   Q    So based on this analysis, that $34,000 payment to
09:49   9   Alexis Gardner on April 17th, 2018, what was the source of
09:49  10   that money?
09:50  11   A    Michelle Phan's repurchase.
09:50  12   Q    Based on your analysis of the bank records associated
09:50  13   with Ms. Gardner, how much of the settlement money from
09:50  14   Hassan Whiteside went to Ms. Gardner?
09:50  15   A    None.  Zero.
09:50  16   Q    Turning now to Exhibits 439 through 443, which client
09:50  17   do these charts relate to?
09:50  18   A    Greg Barela.
09:50  19   Q    Starting with Exhibit 439, what is the title of this
09:50  20   chart?
09:50  21   A    Total amount due to Greg Barela as of January 5th,
09:50  22   2018, and January 2021.
09:50  23   Q    Focusing on the top, what does the first line reflect?
09:50  24   A    Settlement amount paid on January 5th, 2018, for
09:50  25   $1.6 million.
```

| | | |
|---|---|---|
| 10:01 | 1 | Q    And then to the right of the dashed line, what do these |
| 10:01 | 2 | bubbles show? |
| 10:01 | 3 | A    Those show two other client trust accounts, and the |
| 10:01 | 4 | arrows represent payments to Greg Barela. |
| 10:02 | 5 | Q    Are these the accounts from which Greg Barela received |
| 10:02 | 6 | payments? |
| 10:02 | 7 | A    Yes. |
| 10:02 | 8 | Q    As with Mr. Johnson and Ms. Gardner for the similar |
| 10:02 | 9 | charts you created, does this chart purport to reflect all |
| 10:02 | 10 | of the payments? |
| 10:02 | 11 | A    No.  It only reflects the accounts from which they |
| 10:02 | 12 | received the payment. |
| 10:02 | 13 |           MR. WYMAN:  If we could zoom back out, please. |
| 10:02 | 14 | BY MR. WYMAN: |
| 10:02 | 15 | Q    The bottom left-hand bubble there from Personalized |
| 10:02 | 16 | Beauty Discovery, why is that reflected in this chart? |
| 10:02 | 17 | A    That's reflected in this chart because payments to Greg |
| 10:02 | 18 | Barela can be traced to the Michelle Phan repurchase |
| 10:02 | 19 | agreement settlement amount. |
| 10:02 | 20 | Q    And then right above that we see the bubble from Brock |
| 10:02 | 21 | USA with an arrow to CNB 5566, and then there is no arrow |
| 10:02 | 22 | going to the right of the dashed line.  Why is that? |
| 10:02 | 23 | A    That reflects that none of the amounts that were paid |
| 10:02 | 24 | into the client trust account 5566 were ultimately paid to |
| 10:02 | 25 | Greg Barela. |

| | | |
|---|---|---|
| 10:03 | 1 | Q    As with Mr. Johnson and Ms. Gardner, did you conduct a |
| 10:03 | 2 | more detailed analysis to trace at least one of the payments |
| 10:03 | 3 | to Mr. Barela? |
| 10:03 | 4 | A    Yes. |
| 10:03 | 5 | Q    Would you please take a look at Exhibit 443. |
| 10:03 | 6 | A    (Witness complies.) |
| 10:03 | 7 | Q    What is the title of this chart? |
| 10:03 | 8 | A    A portion of Michelle Phan's stock repurchase payment |
| 10:03 | 9 | was transferred to EA 4613. |
| 10:03 | 10 | Q    And is this a two-page exhibit? |
| 10:03 | 11 | A    Yes. |
| 10:03 | 12 | Q    Starting with the first page, can you please explain |
| 10:03 | 13 | what this chart reflects. |
| 10:03 | 14 | A    Sure.  This reflects on the left-hand side the balance |
| 10:03 | 15 | of CNB 4705, which reflects Michelle Phan's stock repurchase |
| 10:03 | 16 | payment.  And on April 4th, 2018, this account CNB 4705 made |
| 10:03 | 17 | a transfer to account EA 4613 in the amount of approximately |
| 10:04 | 18 | $190,000. |
| 10:04 | 19 | Q    And then going to page 2, is this a continuation of |
| 10:04 | 20 | page 1? |
| 10:04 | 21 | A    That's correct. |
| 10:04 | 22 | Q    And what is shown on this page? |
| 10:04 | 23 | A    So the left-hand side shows that account EA 4613 which |
| 10:04 | 24 | received the $190,000 deposit on April 4th.  Prior to |
| 10:04 | 25 | receiving that deposit, that account had a balance of $60. |

| | | |
|---|---|---|
| 10:38 | 1 | bankruptcy counsel made to the IRS for approximately |
| 10:38 | 2 | $1.5 million. |
| 10:38 | 3 | BY MR. WYMAN: |
| 10:39 | 4 | Q    And then below that, the three green bubbles, what do |
| 10:39 | 5 | those arrows reflect? |
| 10:39 | 6 |             MR. AVENATTI:  Objection, Your Honor, 401, 403. |
| 10:39 | 7 |             THE COURT:  Overruled. |
| 10:39 | 8 |             THE WITNESS:  Those reflect the clients -- Greg |
| 10:39 | 9 | Barela, Geoffrey Johnson, Alexis Gardner -- receiving |
| 10:39 | 10 | payments from EA 4613. |
| 10:39 | 11 | BY MR. WYMAN: |
| 10:39 | 12 | Q    And the payments on this chart to Mr. Johnson, |
| 10:39 | 13 | Mr. Barela, and Ms. Gardner, are those the same payments |
| 10:39 | 14 | that are traceable to Ms. Phan's money that we discussed in |
| 10:39 | 15 | an earlier exhibit? |
| 10:39 | 16 |             MR. AVENATTI:  Same objections, Your Honor. |
| 10:39 | 17 |             THE COURT:  Overruled. |
| 10:39 | 18 |             THE WITNESS:  That's right. |
| 10:39 | 19 | BY MR. WYMAN: |
| 10:39 | 20 | Q    And this payment at the top sent to the IRS of |
| 10:39 | 21 | $1,508,422, what did you say the date was on that? |
| 10:39 | 22 | A    March 26th, 2018. |
| 10:40 | 23 |             MR. WYMAN:  Would you please pull up what's |
| 10:40 | 24 | already in evidence as Exhibit 392.  If you could blow up |
| 10:40 | 25 | the top of the check, please. |

```
10:53    1    Q    When you say defendants, do you mean clients?
10:53    2    A    I meant clients, yes.
10:53    3    Q    The bubbles on the right, the green bubbles, what names
10:53    4    are listed there?
10:53    5    A    Geoffrey Johnson, Alexis Gardner, Greg Barela, Michelle
10:53    6    Phan, Pratigya Phan, and Long Tran.
10:53    7    Q    We looked at a handful of -- or four charts that look
10:53    8    similar to this, one for each client.  Is this sort of like
10:53    9    a combination of those charts?
10:53   10    A    That's exactly right.
10:53   11    Q    Going back to the left side, the only bubbles I see,
10:54   12    arrows going to the right of the dashed line, are the ones
10:54   13    from CNB 4705 which received the payments from Personalized
10:54   14    Beauty Discovery.  What does that mean?
10:54   15    A    That means that payments associated with the
10:54   16    Personalized Beauty Discovery/Michelle Phan settlement were
10:54   17    paid to the client.
10:54   18    Q    Other than Ms. Phan who you testified a minute ago
10:54   19    received all but 4 million of her settlement money, did any
10:54   20    of these other clients receive a penny of their settlement
10:54   21    funds?
10:54   22    A    I believe Long Tran did.
10:54   23    Q    Thank you.  That's a good clarification.  I'm referring
10:54   24    to other than Michelle Phan, Long Tran, and Pratigya Phan,
10:55   25    who received money associated with their settlement with
```

| | | |
|---|---|---|
| 10:55 | 1 | Personalized Beauty Discovery, did any of the other |
| 10:55 | 2 | clients -- Mr. Johnson, Mr. Barela, Ms. Gardner -- receive a |
| 10:55 | 3 | penny of their settlement funds? |
| 10:55 | 4 | A    No.  That's why there are no arrows from those trust |
| 10:55 | 5 | accounts across the dotted line. |
| 10:55 | 6 |            MR. WYMAN:  Thank you, Mr. Drum.  No further |
| 10:55 | 7 | questions. |
| 10:55 | 8 |            THE COURT:  Mr. Avenatti. |
| 10:55 | 9 |                 CROSS-EXAMINATION |
| 10:55 | 10 | BY MR. AVENATTI: |
| 10:56 | 11 | Q    Mr. Drum, good morning. |
| 10:56 | 12 | A    Good morning. |
| 10:56 | 13 | Q    You and I have never communicated before, correct? |
| 10:57 | 14 | A    That's correct. |
| 10:57 | 15 | Q    What does CPA stand for? |
| 10:57 | 16 | A    Certified public accountant. |
| 10:57 | 17 | Q    And you're licensed in Illinois as a CPA; am I correct? |
| 10:57 | 18 | A    That's correct. |
| 10:57 | 19 | Q    And to get that license, you had to pass an exam that |
| 10:57 | 20 | had four parts; am I correct? |
| 10:57 | 21 | A    That's correct. |
| 10:57 | 22 | Q    Isn't it true that you barely passed that exam? |
| 10:57 | 23 | A    I don't believe that's true. |
| 10:57 | 24 |            MR. AVENATTI:  Your Honor, can I approach? |
| 10:57 | 25 |            THE COURT:  You may. |

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

**CERTIFICATE**


        I hereby certify that pursuant to Section 753,

Title 28, United States Code, the foregoing is a true and

correct transcript of the stenographically reported

proceedings held in the above-entitled matter and that the

transcript page format is in conformance with the

regulations of the Judicial Conference of the United States.


Date:  August 14, 2021



                        /s/   Sharon A. Seffens  8/14/21
                        _____
                        SHARON A. SEFFENS, U.S. COURT REPORTER


SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

# Exhibit 23

*Confidential*

**Exhibit 430:**
**Total Amount Due to Alexis Gardner as of 1/25/17 and November 2020**

| | | |
|---|---|---|
| **Settlement Amount Paid 1/25/17** | $ | **2,750,000** |
| Less: Legal Fees | $ | 990,000 |
| Less: Case-Related Expenses | $ | 65,615 |
| **Total Due to Client as of 1/25/17** | $ | **1,694,385** |
| Plus: Settlement Amount Due November 2020 | $ | 250,000 |
| **Total Due to Client as of November 2020** | $ | **1,944,385** |
| **Total Client Received from Settlement** | **$** | **-** |

Exhibit 430
Page 1 of 1

*Confidential*

Exhibit 431:
Tracing of Alexis Gardner's First Settlement Payment



Exhibit 431
Page 1 of 1

*Confidential*

**Exhibit 432:**
**Activities of EA Trust Account 8671 After Receiving Alexis Gardner's**
**First Settlement Payment**

| Date | Amount | Payee | Payor | Balance |
|---|---|---|---|---|
| Beginning Balance 1/25/17 | | | $ | - |
| 1/25/2017 | $ 2,750,000 | - | Hassan Whiteside | $ 2,750,000 |
| 1/26/2017 | $ (2,500,000) | X-Law Group | - | $ 250,000 |
| 1/26/2017 | $ (250,000) | EA 2851 | - | $ - |

Exhibit 432
Page 1 of 1



Exhibit 433:
Payments to Alexis Gardner

Confidential

Exhibit 433
Page 1 of 1



Exhibit 434:
GB Account Funds Used to Make a Payment to Alexis Gardner on 4/14/17
*A&A 0661 Balance*

Exhibit 434
Page 1 of 1

*Confidential*

Confidential



**Exhibit 435:**

**GB Account Funds Used to Make a Payment to Alexis Gardner on 5/15/17**

*alan e*

Exhibit 435
Page 1 of 1

*Confidential*



Exhibit 436:
GB Account Funds Used to Make a Payment to Alexis Gardner on 1/16/18
*alan e*

Exhibit 436
Page 1 of 1



Exhibit 437
Page 1 of 1

# Exhibit 24

1          **UNITED STATES DISTRICT COURT**

2     **CENTRAL DISTRICT OF CALIFORNIA - SOUTHERN DIVISION**

3        **HONORABLE JAMES V. SELNA, U.S. DISTRICT JUDGE**

4

5   UNITED STATES OF AMERICA,           )
                                         )
6                   Plaintiff,           )   **CERTIFIED TRANSCRIPT**
                                         )
7          vs.                           )   Case No.
                                         )   SACR-19-00061-JVS
8   MICHAEL JOHN AVENATTI,               )
                                         )   **TRIAL DAY 13**
9                   Defendant.           )   **VOLUME 2**
    _____)

10

11

12

13

14

15           REPORTER'S TRANSCRIPT OF PROCEEDINGS

16              TUESDAY, AUGUST 3, 2021

17                    1:31 P.M.

18              SANTA ANA, CALIFORNIA

19

20

21

22

23   _____

24           **DEBBIE HINO-SPAAN, CSR 7953, CRR**
              FEDERAL OFFICIAL COURT REPORTER
              411 WEST 4TH STREET, ROOM 1-053
25                 SANTA ANA, CA 92701
                  dhinospaan@yahoo.com

                  **UNITED STATES DISTRICT COURT**

```
 1                      APPEARANCES OF COUNSEL:

 2

 3    FOR THE PLAINTIFF:

 4            NICOLA T. HANNA
              United States Attorney
 5            BY:  BRETT SAGEL
                   Assistant United States Attorney
 6            411 West 4th Street
              Suite 8000
 7            Santa Ana, California 92701
              714-338-3598
 8            brett.sagel@usdoj.gov

 9            NICOLA T. HANNA
              United States Attorney
10            BY:  ALEXANDER WYMAN
                   Assistant United States Attorney
11            312 North Spring Street
              Suite 1100
12            Los Angeles, California 90012
              213-894-2435
13            alex.wyman@usdoj.gov

14    FOR THE DEFENDANT IN PRO SE:

15            MICHAEL JOHN AVENATTI, ESQ.

16

17    STANDBY COUNSEL FOR MR. AVENATTI:

              H. DEAN STEWARD LAW OFFICES
18            BY:  H. DEAN STEWARD, ESQ.
              17 Corporate Plaza
19            Suite 254
              Newport Beach, California 92660
20            949-481-4900
              deansteward7777@gmail.com
21

22

23

24

25
```

UNITED STATES DISTRICT COURT

```
 1                        I N D E X

 2   WITNESSES                                           PAGE

 3   ALEXIS GARDNER, CALLED BY THE GOVERNMENT
         Cross-Examination by Mr. Avenatti (resumed)      11
 4       Redirect Examination by Mr. Sagel                22
         Recross-Examination by Mr. Avenatti              35
 5
     FILIPPO MARCHINO, CALLED BY THE GOVERNMENT
 6       Direct Examination by Mr. Wyman                  44

 7

 8                        EXHIBITS

 9                                                WITHDRAWN
                                           IN         OR
10   EXHIBIT                            EVIDENCE   REJECTED

11   130      8/1/2016 e-mail from M.       56
              Avenatti to F. Marchino with
12            Attachment

13   152      Chase Statement for X Law     63
              Group Account 7608 – 1/31/2017
14
     153      1/26/2017 e-mail from Marchino 66
15            to Avenatti re info with
              Attachment
16
     167      E-mails                       72
17
     168      E-mails                       72
18
     265      3/1/2017 e-mail from Avenatti 79
19            to Tran re IPSY

20   266      8/15/2017 e-mail from Tran to 81
              Avenatti and Marchino re
21            Executed Fee Agreement

22   267      8/16/2017 e-mail from Avenatti 87
              to Tran and Marchino re
23            Signature Page with Attachment

24
     274      Tran Text Messages with       96
25            Marchino
```

**UNITED STATES DISTRICT COURT**

```
 1              Ms. Gardner, you'll be excused at this time, but
 2     you're subject to recall.
 3              THE WITNESS:  Okay.
 4              THE COURT:  Thank you.  You may step down.
02:48PM 5        THE COURTROOM DEPUTY:  Please stand behind the court
 6     reporter and raise your right hand.
 7         FILIPPO MARCHINO, GOVERNMENT WITNESS, WAS SWORN
 8              MR. WYMAN:  For the record, Your Honor, the
 9     United States will call Filippo Marchino as a witness.
02:49PM 10            THE COURTROOM DEPUTY:  Sir, if you could please
11     state and spell your first and last name.
12              THE WITNESS:  My first name is Filippo.  It's
13     F-i-l-i-p-p-o.  And my last name is Marchino, M-a-r-c-h-i-n-o.
14              THE COURTROOM DEPUTY:  Thank you.
02:49PM 15                    DIRECT EXAMINATION
16     BY MR. WYMAN:
17     Q    Good afternoon, Mr. Marchino.
18     A    Good afternoon.
19     Q    Where do you live?
02:49PM 20     A    Los Angeles.
21     Q    And what do you do for work?
22     A    I'm an attorney.
23     Q    What is the name of your law firm?
24     A    It's called The X-Law Group, PC, which stands for
02:49PM 25     "professional corporation."
```

```
 1   Q     What kind of law do you practice at The X-Law Group?
 2   A     Primarily, personal injury, catastrophic personal injury,
     and a little bit of class action work.
 3
 4   Q     Is that all civil litigation?
02:49PM
 5   A     Yes.  All plaintiff, civil.
 6   Q     And you said all on the plaintiff's side?
 7   A     Yes.
 8   Q     Do you ever partner with other law firms?
 9   A     Occasionally, yes.
02:50PM 10   Q     Have you ever partnered with the law firm Eagan Avenatti?
11   A     I have, yes.
12   Q     Who is your primary point of contact at Eagan Avenatti?
13   A     Michael Avenatti.
14   Q     Do you see Michael Avenatti in the courtroom here today?
02:50PM 15   A     I do.
16   Q     Can you please identify him for the record by where he is
17         standing and an article of clothing he's wearing?
18   A     Yes.  He just stood up and he's wearing a suit and tie
19         that's light blue.
02:50PM 20         THE COURT:  The record will indicate that the
21         witness has identified the defendant.
22         MR. WYMAN:  Thank you, Your Honor.
23   Q     Did you understand the defendant to be the owner of Eagan
24         Avenatti?
02:50PM 25   A     One of the principals, yes.
```

1    Q      When did you first work on a case with the defendant and
2    his law firm?
3    A      The first time I worked with them was against them in a
4    class action in 2011, I believe.
02:50PM 5    Q      And when is the first time that you partnered with the
6    law firm together?
7    A      I think the beginning of 2013, end of 2012.  Beginning of
8    2013 in a class action matter.
9    Q      What was your general arrangement with the firm when you
02:51PM 10   partnered with them that first time?
11   A      It was a series of class actions.  They were deriving from
12   basically a fraudulent advertising.  And I had brought the
13   clients and the class actions and we were going to split the
14   fees and work.  They were going to take the lead but I was
02:51PM 15   sourcing the case.
16   Q      At some point after that first time when you partnered
17   with them, did your firm reach a more formal arrangement with
18   Eagan Avenatti?
19   A      You mean on -- like, an ongoing arrangement?
02:51PM 20   Q      Yes.
21   A      Yes.  In 2015 -- sorry, in 2016.
22   Q      And, generally speaking, what was that arrangement?
23   A      The short of it is that we were going to transfer over the
24   people that were working with us to work with Eagan Avenatti.
02:52PM 25   And we were going to transfer over some of our personal injury

UNITED STATES DISTRICT COURT

1    cases.  And I was basically going to turn into a rainmaker for

2    Eagan Avenatti.

3    Q      When you say "transfer over people," are you referring to

4    both attorneys and staff at The X-Law Group?

02:52PM 5    A      Correct.  Yes.  We had a couple of attorneys and a couple

6    of staff that went to work for Eagan Avenatti.

7    Q      As part of this arrangement, did you share office space

8    with Eagan Avenatti?

9    A      So I -- I got an office in their main place in Newport.

02:52PM 10   We had an office in Los Angeles that we allowed them to use in

11   exchange for me retaining my personal office in L.A.

12   Q      In your office in Los Angeles, did the defendant have an

13   office in that office space?

14   A      So aside from my personal suite, there were some cubicle

02:53PM 15   spaces, like -- it was an open office, if you will, like a

16   modern space.  So there wasn't really an office for him.  But

17   every time he would come, he'd either use my office or the

18   conference room.

19   Q      Okay.  As part of that arrangement, it sounds like you

02:53PM 20   worked cases together more frequently at that point?

21   A      Sort of, yes.

22   Q      What do you mean by "sort of"?

23   A      So I transferred the cases to Eagan Avenatti.  So I would

24   still be involved in the ones that were technical, but I

02:53PM 25   started, you know, just working to source other cases.  At the

```
 1    same time, I would work -- well, I worked a couple of cases
 2    they already had, including the Kimberly-Clark class action.
 3    Q    Okay.  Once you reached that arrangement with the
 4    defendant and his law firm, who was paying the payroll expenses
 5    for the combined firms' employees?
 6    A    So the former employees of The X-Law Group had completely
 7    transferred over as Eagan Avenatti employees.  So they were on
 8    the payroll of Eagan Avenatti.  The office in L.A.'s rent was
 9    also being paid for by Eagan Avenatti.
10    Q    And the attorneys from X-Law Group who went over to Eagan
11    Avenatti, did they receive Eagan Avenatti e-mail addresses?
12    A    Yes.
13    Q    Did you also have an Eagan Avenatti e-mail address?
14    A    I did.
15    Q    And did the defendant and Eagan Avenatti also pay you a
16    salary?
17    A    For a few months they did.
18    Q    You said a few months?
19    A    Yeah.  I think it was about eight or ten months.
20    Q    And you mentioned that in your -- The X-Law Group office
21    in Los Angeles where you had conference rooms, that the
22    defendant would occasionally work there; is that right?
23    A    Yes.
24    Q    And was that prior to March of 2019?
25    A    Yes.
```

UNITED STATES DISTRICT COURT

```
 1   Q    To your knowledge, did the defendant also occasionally
 2   use that X-Law Group office in court filings?
 3   A    I believe so, yes.
 4   Q    In approximately March of 2019, did federal agents
 5   execute a search warrant at that office space of The X-Law
 6   Group?
 7   A    Yes.  It was, I think, March 25th.
 8   Q    I want to ask you about a few of the cases that you
 9   worked together with the defendant and Eagan Avenatti.
10   A    Sure.
11   Q    Did you ever work on a case involving a client named
12   Geoffrey Johnson?
13   A    No.
14   Q    Did you ever work on a case with an individual named
15   Alexis Gardner?
16   A    Yes.
17   Q    How about a client named Gregory Barela?
18   A    Can you say that again?
19   Q    Gregory Barela.
20   A    No.
21   Q    And lastly, did you work with the defendant on a matter
22   involving clients named Michelle Phan and Long Tran?
23   A    Yes.
24   Q    So you never did any legal work for Geoffrey Johnson or
25   Gregory Barela; is that right?
```

50

```
 1    A      That's correct.
 2    Q      Okay.  But you did work on Ms. Gardner's matter and then
 3    the Phan and Tran matter; is that right?
 4    A      That's also correct.
 5    Q      I want to talk about those two matters.  Let's start with
 6    Ms. Gardner.
 7           Approximately when did you work with Eagan Avenatti
 8    on Ms. Gardner's matter?
 9    A      From the -- I think the beginning of December of 2016
10    through January of 2017, give or take.
11    Q      Did Ms. Gardner hire Eagan Avenatti and you to negotiate
12    a settlement to resolve potential litigation with her
13    ex-boyfriend, Hassan Whiteside?
14    A      Yes.
15    Q      Was this case taken on a contingency basis?
16    A      As far as -- well, as far as I understand, yes.
17    Q      And what do you understand a contingency basis to mean?
18    A      A contingency -- typically a contingency contract in
19    personal injury involves an attorney fronting costs, an
20    attorney fronting labor, and only recovering both the costs and
21    the labor from a recovery, if any, in the case.
22    Q      And then as part of a contingency case, is there a
23    percentage fee that the attorney can receive?
24    A      There is.  So there's a distinction between the legal
25    costs and the legal fees.  The fees are normally fixed in a
```

02:56PM  (lines 5)
02:56PM  (line 10)
02:56PM  (line 15)
02:57PM  (line 20)
02:57PM  (line 25)

**UNITED STATES DISTRICT COURT**

1   percentage.  So it would be 30 percent, a third, 40 percent.

2   It truly depends.  The costs are whatever they are, and they

3   come out of the side of the plaintiff, or the client.

4   Q     And the amount of the contingency fee, is that usually

02:58PM 5   spelled out in the fee agreement?

6             MR. AVENATTI:  Objection, Your Honor.  Lacks

7   foundation.

8             THE COURT:  Overruled.

9             THE WITNESS:  It is.  It has to be, pursuant to

02:58PM 10   California State Bar rules.

11             MR. AVENATTI:  Move to strike, Your Honor.  Lacks

12   foundation.

13             THE COURT:  Denied.

14   Q     BY MR. WYMAN:  What was your understanding of what the

02:58PM 15   contingency fee percentage was in Ms. Gardner's case?

16   A     At the beginning, I was under the understanding it was

17   40 percent, because cases like that are typically signed up at

18   40 percent.  I later learned that it was actually a third.

19   Q     Did you have an agreement with the defendant about how

02:58PM 20   that contingency fee would be split between you and Eagan

21   Avenatti?

22   A     Yes.

23   Q     What was that agreement?

24   A     So for cases that were sourced by The X-Law Group -- and

02:58PM 25   there's a bit of a technical term, in a sense, of "source" --

**UNITED STATES DISTRICT COURT**

1    they were going to be split 50/50.

2    Q     And if you could explain briefly, what do you mean by

3    "sourced"?

4    A     So you can source a case directly, meaning I meet you at a

02:59PM 5    bar.  You tell me you were in a car accident.  I sign you up.

6    Or I can source it indirectly, which means I tell you that I

7    work with a firm.  You tell your buddy that was in the car

8    accident; he calls the firm directly.  So I indirectly sourced

9    it because it came through me, but the contact was direct with

02:59PM 10    the firm.

11    Q     I see.  Was Ms. Gardner's case one of the cases that was

12    sourced through you?

13    A     Indirectly so, yes.

14    Q     So for her case, you expected to receive half of the

02:59PM 15    contingency fee?

16    A     That's correct.

17    Q     When you were first hired by Ms. Gardner, I think you

18    said late 2016, where did you understand her to be living at

19    that time?

02:59PM 20    A     Well, nowhere.  She was living in a car.

21    Q     What, if anything, did you do to help her find a place to

22    stay?

23    A     I think my first contact with her was after she was -- she

24    retained the firm of Eagan Avenatti.  I was asked to find her a

03:00PM 25    place to stay, and we put her up at the Sofitel in L.A.

UNITED STATES DISTRICT COURT

| | | |
|---|---|---|
| 1 | Q | The Sofitel hotel? |
| 2 | A | Yeah. |
| 3 | Q | Did you also conduct an investigation in this matter? |
| 4 | A | I did, yeah. |
| 03:00PM 5 | Q | Did that investigation involve international travel? |
| 6 | A | It did. |
| 7 | Q | To what country? |
| 8 | A | Italy. |
| 9 | Q | Did you incur expenses as part of the work that you did |

03:00PM 10    on that case?

11    A    Yes.  I mean, I was -- I personally had fronted -- the

12    X-Law Group had fronted the hotel, the trip to Italy, all that.

13              MR. WYMAN:  Your Honor, this is a good breaking

14    point.

03:00PM 15              THE COURT:  That's fine.

16              Ladies and gentlemen, we'll take the afternoon break

17    here.  15 minutes.  Please remember the admonition not to

18    discuss the case with anyone, not to form any opinions on the

19    issues in the case until it's submitted to you, and please

03:01PM 20    don't do any research.

21              So 15 minutes, please.

22              THE COURTROOM DEPUTY:  All rise.

23              **(Out of the presence of the jury.)**

24              THE COURT:  We'll be in recess.

03:01PM 25              Sir, you may step down.

54

| | |
|---|---|
| 1 | (Recess from 3:01 p.m. to 3:18 p.m.) |
| 2 | THE COURT:  Mr. Wyman. |
| 3 | MR. WYMAN:  Thank you, Your Honor. |
| 4 | Q    Mr. Marchino, I asked you before the break about whether |
| 03:18PM 5 | you ever worked on legal matters involving clients named |
| 6 | Geoffrey Johnson and Gregory Barela, and I believe you said |
| 7 | "no"; is that right? |
| 8 | A    Yeah.  That's correct. |
| 9 | Q    Just to clarify, are you familiar with the cases that The |
| 03:18PM 10 | X-Law Group works on, generally? |
| 11 | A    Yes. |
| 12 | Q    And, to your knowledge, did anyone at The X-Law Group |
| 13 | ever work on legal matters for Geoffrey Johnson or Gregory |
| 14 | Barela? |
| 03:18PM 15 | A    Not that I know of. |
| 16 | Q    Okay.  Thank you for that clarification. |
| 17 | Returning to Ms. Gardner's matter, in the time |
| 18 | leading up to when you began to represent her in 2016, did the |
| 19 | defendant ever talk to you about purchasing a private plane? |
| 03:19PM 20 | A    Yes. |
| 21 | Q    Can you please take a look at what has been marked as |
| 22 | Government's Exhibit 130.  It should be in Volume II of the |
| 23 | binder there. |
| 24 | A    Yes. |
| 03:19PM 25 | Q    Do you recognize this as an e-mail you received from the |

**UNITED STATES DISTRICT COURT**

```
 1   defendant with an attachment?

 2   A      Yes.

 3   Q      Is it a fair and accurate copy of that e-mail and

 4   attachment?

 5   A      It is.

 6             MR. WYMAN:  Your Honor, the Government moves to

 7   admit Exhibit 130.

 8             THE COURT:  Mr. Avenatti?

 9             MR. AVENATTI:  Objection, Your Honor.  Hearsay.

10   Both the e-mail and the attachment.

11             THE COURT:  I'll receive page 1 of Exhibit 130 for

12   the fact that Mr. Avenatti received it, not for the truth of

13   the content.

14             MR. WYMAN:  Your Honor, is page 2 not coming into

15   evidence?

16             THE COURT:  Correct.

17             MR. AVENATTI:  Your Honor, in that instance, I'd ask

18   that the bottom part of page 1 also not come in.

19             THE COURT:  Redact the bottom part of page 1,

20   please.  I think you can show the e-mail.  Well --

21             MR. WYMAN:  I can use the Elmo, Your Honor, and fold

22   the page in half, if that's the Court's ruling.

23             THE COURT:  I believe I was previously presented

24   with this issue.

25             MR. WYMAN:  You were, Your Honor, prior to openings,
```

03:19PM 5

03:20PM 10

03:20PM 15

03:20PM 20

03:21PM 25

**UNITED STATES DISTRICT COURT**

| | |
|---|---|
| 1 | and I believe Your Honor stated that we could bring it into |
| 2 | evidence. |
| 3 | THE COURT:  Okay.  It will be received but not for |
| 4 | the truth.  The entire exhibit but not the truth, the fact that |
| 03:21PM 5 | it was sent to Mr. Avenatti. |
| 6 | MR. WYMAN:  It is an e-mail from Mr. Avenatti, Your |
| 7 | Honor. |
| 8 | THE COURT:  Oh, I'm sorry.  Then it will be |
| 9 | received -- |
| 03:21PM 10 | MR. WYMAN:  And the attachment as well? |
| 11 | THE COURT:  -- for all purposes. |
| 12 | **(Exhibit Number 130 received.)** |
| 13 | Q    BY MR. WYMAN:  If we could focus on the top part.  What |
| 14 | is the date of this e-mail? |
| 03:21PM 15 | A    August 1st, 2016. |
| 16 | Q    And the subject? |
| 17 | A    It's a "Forward:  HondaJet 026." |
| 18 | MR. WYMAN:  And if we could please go now to page 2. |
| 19 | If we can zoom in on just page 2. |
| 03:22PM 20 | Q    What is the attachment to this e-mail? |
| 21 | A    It was a picture. |
| 22 | Q    What's it a picture of? |
| 23 | A    It's a picture of an aircraft, one of the Honda jets that |
| 24 | you were discussing. |
| 03:22PM 25 | Q    Okay.  You said "one of the Honda jets."  Were you |

**UNITED STATES DISTRICT COURT**

```
 1   discussing multiple ones?

 2   A     My understanding was that Mr. Avenatti had ordered two.

 3   Q     And when you say he ordered two, did you understand him

 4   to be under contract to purchase two planes?

 5   A     Yes.  That's what was my understanding of the term

 6   "order."

 7   Q     And with which company?

 8   A     Meaning?

 9   Q     Which company did he order the aircrafts from?

10   A     Honda.  They were identical.

11   Q     Were you ever part of the defendant's conversations with

12   Honda about his purchase of planes?

13   A     I was not.

14   Q     Apart from this e-mail, did you have other conversations

15   with the defendant about purchasing an aircraft?

16   A     Yes.

17   Q     Would you say it was a frequent topic of conversation?

18         MR. AVENATTI:  Objection.  Leading.

19         THE COURT:  Sustained.

20   Q     BY MR. WYMAN:  Did you have -- were some of these

21   additional conversations in late 2016?

22   A     I think by the time of this e-mail, they had lightened up.

23   It was more before this e-mail.  It was a frequent topic of

24   conversation.

25   Q     At some point did you learn that Ms. Gardner's case had
```

**UNITED STATES DISTRICT COURT**

58

```
          1    reached a settlement?

          2    A       Yes.

          3    Q       Who did you learn that from?

          4    A       Mr. Avenatti.

03:23PM   5    Q       What did he say to you?

          6    A       Well, I was in Italy for the mediation, basically.  My

          7    purpose was to be in Italy during the mediation.  So the

          8    morning after I learned that the case had settled.

          9    Q       And what did he tell you when he told you that the case

03:24PM  10    had settled?

         11    A       It was late night in L.A., was early morning in Italy, and

         12    he just said the case had settled and we would talk about it

         13    later.

         14    Q       Did he tell you how much the case had settled for?

03:24PM  15    A       Yes.  It was about 3 million.  But I can't remember an

         16    exact number.

         17    Q       Did he say how that money would be paid out under the

         18    settlement?

         19    A       No.

03:24PM  20    Q       Approximately when was that conversation?

         21    A       It would have been the morning after the mediation itself.

         22    So I think, like, January 6, 7, 8 of 2017, I think it is.

         23    Q       You mentioned earlier the fee arrangement that you had on

         24    this case with Eagan Avenatti.  When you spoke to him and

03:25PM  25    learned that the case had settled, did he say anything about
```

**UNITED STATES DISTRICT COURT**

```
 1    when your firms would be receiving your attorneys' fees?
 2    A      No, not in that conversation.
 3    Q      Did he subsequently tell you about that?
 4    A      At a subsequent point he did, yes.
 5    Q      What did he say?
 6    A      That there was going to be a structure of the settlement,
 7    and part of the settlement was going to be a lump sum for the
 8    attorneys' fees to be paid at sometime in the near future.
 9    Q      What do you mean when you say "there was going to be a
10    structure of the settlement"?
11    A      So at the beginning, I understood that there was a
12    settlement with a little carve out that was going to be paid
13    later on for compliance.  Meaning, if the client observes all
14    the terms, at the end he or she receives the last part of the
15    settlement.
16            So I understood that the first part -- well, I
17    assumed the first part was going to be just a lump sum.  And
18    then, instead, I was told that it was going to be a set of
19    periodic payments.  The only lump sum was going to be the
20    attorneys' fees.
21    Q      When was your understanding, based on that conversation,
22    of when you and the defendant would receive that lump sum for
23    attorneys' fees?
24    A      It was never really clear.  At some point in the near
25    future.  I understood it to be within the next three to six
```

03:25PM 5
03:25PM 10
03:25PM 15
03:26PM 20
03:26PM 25

**UNITED STATES DISTRICT COURT**

1    months kind of thing.

2    Q      And this conversation you're describing, when did that

3    take place?

4    A      Sometime in January after we got back from Italy.

03:26PM 5    Q      January 2017?

6    A      2017, yes.

7    Q      Did you ever see a written settlement agreement for

8    Ms. Gardner's matter?

9    A      I saw it once, but significantly after.

03:26PM 10   Q      Significantly after January 2017?

11   A      Yeah.  I mean, like, 2020 I saw it.

12   Q      Prior to March of 2019, had you ever seen it?

13   A      No.

14   Q      Prior to March of 2019, had you asked the defendant to

03:26PM 15   see it?

16   A      I don't think so, no.

17   Q      Do you know whether the defendant ever provided a

18   written -- a written settlement agreement to Ms. Gardner?

19   A      I understand he didn't.

03:27PM 20   Q      What's that understanding based on?

21   A      Ms. Gardner.

22   Q      Did she --

23          MR. AVENATTI:  Move to strike as lacking foundation

24   and based on hearsay, Your Honor.

03:27PM 25          THE COURT:  Sustained.  It will be stricken.


**UNITED STATES DISTRICT COURT**

```
 1   Q      BY MR. WYMAN:  Prior to March of 2019, did Ms. Gardner
 2   ever ask you for a copy of her settlement agreement?
 3   A      Prior to when?  Sorry.
 4   Q      March of 2019.
03:27PM  5   A      Not that I can recall.
 6   Q      The understanding you were describing a minute ago of
 7   what the settlement agreement provided, was that based on the
 8   conversation you had with the defendant?
 9   A      Yes.
03:27PM 10   Q      And you described the structure, as you called it.  At
11   the end of January of 2017, were you aware that Mr. Whiteside
12   had wired a total of $2.75 million of Ms. Gardner's settlement
13   funds into an Eagan Avenatti trust account?
14   A      I was not.
03:28PM 15   Q      Does The X-Law Group maintain bank records with Chase
16   Bank?
17   A      You mean bank accounts?  Yes.
18   Q      Yes.  Does that include attorney-client trust accounts?
19   A      Yes.
03:28PM 20   Q      Who has signatory authority over those bank accounts?
21   A      Only I do.
22   Q      Are you generally familiar with your firm's bank records
23   and finances?
24   A      Yes.  I handle them.  Nobody else.
03:28PM 25   Q      Can you please take a look at Government's Exhibit 152.
```

**UNITED STATES DISTRICT COURT**

```
  1      A      Okay.

  2      Q      Do you recognize this document?

  3      A      Yes.

  4      Q      What is it?

03:29PM 5   A   It's a December 31st through -- sorry, December 31st,

  6      2016, through January 31st, 2017, statement from our IOLTA

  7      trust account.

  8      Q      When you say "our," who are you referring to?

  9      A      The X-Law Group.

03:29PM 10  Q   Is this an account that you control?

 11      A      Yes.

 12             COURT REPORTER:  I'm sorry.  Can you repeat the

 13      question.

 14             MR. WYMAN:  Sorry.

03:29PM 15  Q   Is this an account that you control?

 16      A      Yes.

 17      Q      Do you see that the statement has redactions throughout?

 18      A      Yes.

 19      Q      Other than these redactions, is this a fair and accurate

03:30PM 20  copy of a bank statement from one of the Chase Bank accounts

 21      you control in the name of X-Law Group?

 22      A      Yes.  Just one clarification.  It's an IOLTA trust

 23      account; so it's not technically an account of The X-Law Group.

 24      But yes.

03:30PM 25  Q   Thank you for the clarification.
```

**UNITED STATES DISTRICT COURT**

1          Is IOLTA a type of attorney-client trust account?

2  A     It is.  I think it stands for interest only lawyer trust

3  account or something along those lines.  But it basically means

4  that it's not the firm's money, it's the client's money.

03:30PM 5          MR. WYMAN:  Your Honor, at this time the Government

6  moves to admit 152.

7          MR. AVENATTI:  Your Honor, I move to strike the last

8  portion as nonresponsive to the question.

9          THE COURT:  Denied.

03:30PM 10          MR. AVENATTI:  And the objection, Your Honor, to 152

11  is hearsay.  There's no custodial declaration in connection

12  with this document.  Lack of foundation, authentication.

13          THE COURT:  I believe it's relevant.  The law firm

14  controlling the firm's finances is sufficient foundation and

03:31PM 15  sufficient basis for him to authenticate it.  152 will be

16  received.

17          MR. WYMAN:  Thank you.  If we can please publish

18  page 1.

19          **(Exhibit Number 152 received.)**

03:31PM 20  Q     BY MR. WYMAN:  On the top left there, what is the name of

21  this account?

22  A     It's The X-Law Group, PC, IOLTA trust account.

23  Q     I believe you said it when you were identifying the

24  document, but at the top right, what month does this statement

03:31PM 25  refer to?

1    A      December 31st, 2016, through January 31st, 2017.  So

2    basically all of January 2017.

3    Q      Please go to page 2 of the exhibit.  I'd like to direct

4    your attention to the only unredacted line, under "Deposits and

03:31PM 5    Additions."  Do you see that?

6    A      I do.

7    Q      Do you see a January 26 wire there?

8    A      I do.

9    Q      How much is that wire for -- I'm sorry -- deposit for?

03:31PM 10   A      It's $2 and a half million.

11   Q      Do you recall receiving that transfer?

12   A      I do.

13   Q      Who sent you that $2.5 million?

14   A      Well, I understood Mr. Avenatti, from the trust account to

03:32PM 15   Eagan Avenatti.

16   Q      Did the defendant tell you why he was wiring $2.5 million

17   into your IOLTA trust account?

18   A      Yes.

19   Q      What did he tell you?

03:32PM 20   A      That it was for the purchase of part of the -- part of one

21   of the Honda jets.

22   Q      What, if anything, did he tell you to do with that money?

23   A      Wire it to Honda.

24   Q      A little bit further down on the same page, do you see

03:32PM 25   the heading "Electronic Withdrawals"?

**UNITED STATES DISTRICT COURT**

```
          1    A      I do.

          2    Q      And I see, it looks like there's a January 26th wire

          3    transfer there.  Do you see that?

          4    A      Yes.

03:32PM   5    Q      And what is the amount of that transfer?

          6    A      It's 2 and a half million.

          7    Q      Did you make this wire transfer?

          8    A      I did.  I went to the bank and did it.

          9    Q      And what was it for?

03:33PM  10    A      For the payment of -- well, I understood it to be for the

         11    payment of the Honda jet or part of the Honda jet.

         12    Q      And that understanding was based on what the defendant

         13    told you?

         14    A      Yes.

03:33PM  15    Q      The transfer information there -- I apologize, the screen

         16    is a little bit small so I'm going to ask you to read it for

         17    the jury.

         18           Can you please read what the transfer information

         19    says.

03:33PM  20    A      Yes.  It says, "Wells Fargo NA" --

         21    Q      You can skip the numbers.

         22    A      Okay.

         23           "Account holder, Honda Aircraft Company, LLC.

         24    Reference Passport 420, LLC; contract Number

03:33PM  25    4000316; serial Number 42000029."
```

**UNITED STATES DISTRICT COURT**

| | |
|---|---|
| 1 | Q    Is that information that you provided when you initiated |
| | this wire transfer? |
| 3 | A    I did. |
| 4 | Q    Where did that information come from? |
| 03:34PM 5 | A    It was e-mailed to me from Mr. Avenatti. |
| 6 | Q    Can you please take a look at Government's Exhibit 153 |
| 7 | now.  Do you recognize this as an e-mail exchange between you |
| 8 | and the defendant? |
| 9 | A    Yes. |
| 03:34PM 10 | Q    Is it a fair and accurate copy of that e-mail exchange |
| 11 | with an attachment? |
| 12 | A    Yes. |
| 13 |         MR. WYMAN:  The Government moves to admit |
| 14 | Exhibit 153. |
| 03:34PM 15 |         MR. AVENATTI:  Objection, Your Honor.  Hearsay as to |
| 16 | the e-mail and the attachment. |
| 17 |         THE COURT:  Mr. Avenatti's e-mail will be received |
| 18 | for the truth; Mr. Marchino's e-mail will be received just for |
| 19 | notice that Mr. Avenatti received it. |
| 03:35PM 20 |         **(Exhibit Number 153 received.)** |
| 21 | Q    BY MR. WYMAN:  Focus on the first e-mail from the |
| 22 | defendant at the bottom. |
| 23 |         MR. AVENATTI:  I'm sorry, Your Honor.  And the |
| 24 | attachment? |
| 03:35PM 25 |         THE COURT:  The attachment appears to be part of |

**UNITED STATES DISTRICT COURT**

```
 1      Mr. Marchino's e-mail.  So it will be received for notice, not
 2      the truth.
 3                  MR. WYMAN:  Thank you, Your Honor.
 4      Q     What is the date of the defendant's e-mail to you?
03:35PM  5      A     January 25th, 2017.
 6      Q     And the subject?
 7      A     "Info."
 8      Q     Can you please read the e-mail for the jury.
 9      A     Yeah.  It says:
03:35PM 10            "I have to list following Passport 420, LLC,
11      Contract Number 4000316; Serial Number 42000029."
12      Q     Is that the same information we saw in the bank statement
13      just a minute ago?
14      A     I believe it to be, yes.
03:36PM 15      Q     What did you write back in your response above this
16      e-mail?
17      A     "Good?" question mark.
18      Q     Is there an attachment to your e-mail?
19      A     There is.
03:36PM 20                  MR. WYMAN:  If you go to the top half of page 2.
21      Just the top half, please.
22      Q     What is this information in the top half?
23      A     It's the recipient of the wire transfer.  It's a
24      screenshot of my end of the sort of setting it up.
03:36PM 25      Q     And who is listed as the recipient name?
```

**UNITED STATES DISTRICT COURT**

```
 1    A      Honda Aircraft Company, LLC.

 2    Q      And then at the bottom of the top half, where it says

 3    "message to recipient," is that that same information there

 4    again?

03:36PM  5    A      Yes.  It's the same one from the prior e-mail.

 6    Q      And on the bottom half, what is that information?

 7    A      It's the bank information of where the funds were sent to.

 8    Q      Based on what the defendant told you about this

 9    $2.5 million that he wired into your account, whose money did

03:37PM 10    you believe it was?

11    A      I believed it to belong to Mr. Bill Parrish, or William

12    Parrish.

13    Q      And who did you understand that to be?

14    A      Mr. Parrish is a longstanding client or was a longstanding

03:37PM 15    client of Eagan Avenatti.  They had done a case for him prior

16    to my time with Eagan Avenatti.

17    Q      And why did you understand that you were wiring

18    Mr. Parrish's money to Honda Aircraft?

19    A      Because that was the half of the plane that Mr. Parrish

03:37PM 20    was buying.  Mr. Avenatti and Mr. Parrish were buying it

21    together.  And I understood there could be a problem for

22    Mr. Avenatti to send the money directly, because he had already

23    paid his side, so Mr. Parrish's side had to come from a

24    different firm.

03:38PM 25    Q      And all of this understanding that you just described,
```

```
 1   where did that come from?

 2   A     From Mr. Avenatti.

 3   Q     At the time that you received this wire from the

 4   defendant on January 26, were you aware that he had received a

 5   wire payment from Hassan Whiteside of $2.75 million the day

 6   before?

 7   A     I was not.

 8   Q     Were you aware that prior to that transfer, the

 9   defendant's account had only 23 cents in it?

10   A     I did not know that.

11   Q     Had you known those things, would you have sent the wire

12   of $2.5 million to Honda?

13              MR. AVENATTI:  Speculation, Your Honor.  Conjecture.

14              THE COURT:  Sustained.

15   Q     BY MR. WYMAN:  Mr. Marchino, did you ever receive the

16   portion of the settlement funds that was owed to The X-Law

17   Group under your agreement with the defendant on Ms. Gardner's

18   settlement?

19   A     No.  The costs and the fees were never paid.

20   Q     Let's start with the fees.  You said the fees were never

21   paid --

22   A     Correct.

23   Q     -- to The X-Law Group?

24   A     Correct.

25   Q     Did you ever ask the defendant about that?
```

UNITED STATES DISTRICT COURT

```
 1   A      I did.

 2   Q      What did he say?

 3   A      I mean, it was varying.  Throughout 2017 and 2018 I asked

 4   for -- multiple times for the payments.

 5   Q      And did he ever give you an explanation as to why?

 6   A      There was always some delay.  There was a partial payment

 7   in June of 2018, but that was it.

 8   Q      And how much was that partial payment?

 9   A      It was 1 million.

10   Q      Now, you mentioned costs or expenses as well?

11   A      Yes.

12   Q      And I think you said earlier that you fronted some

13   expenses as part of your work for Ms. Gardner's case; right?

14   A      That's correct.

15   Q      I think you said the Sofitel hotel?

16   A      Yes.

17   Q      And the trip to Italy?

18   A      Yes.  There's also -- was that a question?

19   Q      No.  You answered my question.

20   A      Okay.

21   Q      Thank you.

22          Did you provide those expenses to the defendant's

23   paralegal, Judy Regnier?

24   A      I think I did, yeah.  I'm pretty sure I did.

25   Q      Can you please take a look at what's been marked as
```

03:39PM (5)
03:39PM (10)
03:39PM (15)
03:40PM (20)
03:40PM (25)

**UNITED STATES DISTRICT COURT**

```
 1    Government's Exhibit 167 and 168.  And it will actually be on

 2    the cart behind you.

 3              Before I ask you about these documents -- and, I'm

 4    sorry, were you able to locate them?

03:40PM  5    A    Yeah.  I have it here.

 6    Q    Okay.  Before I ask you about them, a couple of follow-up

 7    questions on the partial payment you described.

 8    A    Sure.

 9    Q    The partial payment from Eagan Avenatti, was that only

03:41PM 10    for your work on Ms. Gardner's case?

11    A    No.  No.  No.  No.  There was a multitude of cases.

12    Q    Okay.  So the $1 million you received wasn't just

13    attorneys' fees for The X-Law Group from Ms. Gardner's

14    settlement?

03:41PM 15    A    You're correct.  No.

16    Q    Do you have 167 and 168 in front of you?

17    A    I do.

18    Q    Do you recognize these documents?

19    A    I do.

03:41PM 20    Q    Are these e-mails with attachments that you sent to Judy

21    Regnier?

22    A    Yes.

23    Q    Are they fair and accurate copies of those e-mails and

24    attachments?

03:41PM 25    A    Yes, I believe them to be.
```

**UNITED STATES DISTRICT COURT**

1          MR. WYMAN:  Your Honor, the Government moves to

2    admit Exhibits 167 and 168.

3          MR. AVENATTI:  Objection, Your Honor.  Hearsay.

4          THE COURT:  They will be received but not for the

03:42PM 5    truth, simply for the fact that these e-mails were sent by

6    Mr. Marchino to Judy Regnier.  Not for the truth of the content

7    or any attachments.

8          MR. WYMAN:  Thank you.

9          MR. AVENATTI:  All right, Your Honor, in light of

03:42PM 10   that, I object to the attachments.  Same basis, hearsay.

11         THE COURT:  Same ruling.

12         **(Exhibit Numbers 167 and 168 received.)**

13   Q    BY MR. WYMAN:  Mr. Marchino, focusing first on

14   Exhibit 167, can you please read the date of that e-mail.

03:42PM 15   A    Sure.  It's January 23rd, 2017.

16   Q    And the subject line?

17   A    "Gardner."

18   Q    Are there attachments to this e-mail?

19   A    Two of them.

03:42PM 20   Q    What are the names of the attachment?

21   A    "Gardner expenses.pdf" and "Italy trip detail.pdf."

22   Q    Can you please read the message to Ms. Regnier.

23   A    Yes.  It's, "Judy, here are the expenses on Gardner."

24   Q    And if we can go to page 2, bearing in mind we're going

03:43PM 25   to get to 168.

73

1            At the time that you sent this e-mail, was this a

2    fair summary of the expenses that you and your firm had

3    incurred on the Gardner matter?

4    A    Yes.

03:43PM  5    Q    I want to ask you about a few of them.  I see in the

6    middle there, about five lines down, the Sofitel.

7    A    Yes.

8    Q    What is the Sofitel?

9    A    It's the hotel I mentioned earlier.

03:43PM 10    Q    And what is the amount listed for that?

11    A    $3,354.62.

12    Q    What is that expense related to?

13    A    It was the stay of Ms. Gardner at the Sofitel for X amount

14    of days, including, you know, food and that kind of stuff.

03:44PM 15    Q    Is that a cost that you personally incurred?

16    A    The X-Law Group did, yes.

17    Q    I also see charges for Airbnb and Gofer It!

18    A    Yes.

19    Q    What are those?

03:44PM 20    A    Gofer It! is a messenger service.  I can't remember what

21    was being messengered or -- well, sent.  And the Airbnb was

22    because Ms. Gardner moved from being in a hotel to being in an

23    apartment that we had rented for her.

24    Q    And the Airbnb, was that also an expense that The X-Law

03:44PM 25    Group paid?

**UNITED STATES DISTRICT COURT**

| | | |
|---|---|---|
| | 1 | A      Yes.   All of these were expenses that The X-Law Group |
| | 2 | fronted and were supposed to go to accounting, basically. |
| | 3 | Q      The last line says, "Trip, Italy."   How much did The |
| | 4 | X-Law Group expend on that trip? |
| 03:44PM | 5 | A      About $7,572.56. |
| | 6 | Q      Can you please turn now to Exhibit 168. |
| | 7 | A      Yes. |
| | 8 | Q      What is the date of this e-mail? |
| | 9 | A      January 28th, 2017. |
| 03:45PM | 10 | Q      And the subject line? |
| | 11 | A      "2nd reimbursement." |
| | 12 | Q      And can you please read your message in this e-mail. |
| | 13 | A      "Judy, not sure which ones of these you already |
| | 14 | have from Alfredo, but here they are.   These are not |
| 03:45PM | 15 | included in that first e-mail with Alexis's |
| | 16 | reimbursements.   Altogether it's $34,267.87.   Yours, |
| | 17 | Filippo." |
| | 18 | Q      So that amount there of a little over $34,000, was that |
| | 19 | the total amount of expenses that your firm, The X-Law Group, |
| 03:46PM | 20 | incurred in the Gardner matter? |
| | 21 | A      No.   So the -- this second tranche of stuff was not |
| | 22 | related to Ms. Gardner.   So the second set of 15,423.17 was not |
| | 23 | tied to Ms. Gardner. |
| | 24 | Q      And at the bottom of 167, if I could ask you to go back |
| 03:46PM | 25 | to that attachment.   There's a slightly smaller number at the |

**UNITED STATES DISTRICT COURT**

```
 1    bottom of page 2, about $18,844.  Is that the amount The X-Law
 2    Group incurred?
 3    A     Yes.  That's correct.
 4    Q     On the Gardner matter?
 5    A     Yes.
 6    Q     For all these expenses, at the Sofitel, the trip to
 7    Italy, the Airbnb, did the defendant ever pay you back for
 8    those expenses?
 9    A     No.
10    Q     Were you ever reimbursed for your expenses on this case
11    in full?
12    A     No.  But it wasn't Mr. Avenatti that was supposed to
13    reimburse them.  They were supposed to come from Eagan
14    Avenatti.  But, no, I never received it.
15    Q     Okay.  That's a good clarification.
16                So you never received your expenses from the
17    settlement funds; is that right?
18    A     That's correct.
19    Q     And I think you said earlier you never received your
20    attorneys' fees either?
21    A     That's correct.
22    Q     To your knowledge, did Ms. Gardner ever receive the
23    settlement funds that she was owed?
24                MR. AVENATTI:  Objection, Your Honor.  Calls for
25    speculation.  Conjecture.
```

**UNITED STATES DISTRICT COURT**

1    THE COURT:  Overruled.

2    THE WITNESS:  To my understanding, no.

3    THE COURT:  I want to go back to 167 and 168.  The

4  witness's testimony has now established that it's a list of

03:47PM 5  expenses that his firm incurred.  He prepared the list.  At

6  this point, with that foundation, I'm prepared to receive the

7  exhibits in full for the truth of the exhibits.

8    Mr. Avenatti?

9    MR. AVENATTI:  Your Honor, I'd lodge the objection

03:47PM 10  based on hearsay yet again.

11    THE COURT:  Okay.  It will be received in full.

12  Q    BY MR. WYMAN:  I'm going to shift gears now and ask you

13  about the other matter you described earlier involving Michelle

14  Phan and Long Tran.  Do you know who they are?

03:48PM 15  A    Yes.

16  Q    Let's start with Mr. Tran.  How long have you known Long

17  Tran?

18  A    Since, I think it was, 2000 or 2001.

19  Q    And how did you meet Michelle Phan?

03:48PM 20  A    Through Long -- or through Mr. Tran, I guess.

21  Q    What line of business did you understand Ms. Phan to be

22  in?

23  A    When I first met her, she was an influencer.  At the time,

24  I don't know if the term was actually "influencer," but that's

03:48PM 25  what she was.

UNITED STATES DISTRICT COURT

1              *CERTIFICATE OF OFFICIAL REPORTER*

2

3    COUNTY OF LOS ANGELES    )
                              )
4    STATE OF CALIFORNIA      )

5              I, DEBBIE HINO-SPAAN, FEDERAL OFFICIAL REALTIME

6    COURT REPORTER, in and for the United States District Court for

7    the Central District of California, do hereby certify that

8    pursuant to Section 753, Title 28, United States Code that the

9    foregoing is a true and correct transcript of the

10   stenographically reported proceedings held in the

11   above-entitled matter and that the transcript page format is in

12   conformance with the regulations of the Judicial Conference of

13   the United States.

14

15   *Date:  August 3, 2021*

16

17

18

19                         */S/ DEBBIE HINO-SPAAN*

20                         *Debbie Hino-Spaan, CSR No. 7953*
                           *Federal Official Court Reporter*
21

22

23

24

25

Exhibit 25



**CHASE** ◆

JPMorgan Chase Bank, N.A.
P O Box 659754
San Antonio, TX 78265-9754

October 31, 2015 through November 30, 2015

Account Number: ▮▮▮▮▮▮ 7608





00065740 DRE 703 210 33515 NNNNNNNNNNY  1 000000000 60 0000

THE X-LAW GROUP, PC
IOLTA TRUST ACCOUNT
1910 W SUNSET BLVD STE 450
LOS ANGELES CA 90026-3262

| CUSTOMER SERVICE INFORMATION | |
|---|---|
| Web site: | **www.Chase.com** |
| Service Center: | **1-877-425-8100** |
| Deaf and Hard of Hearing: | 1-800-242-7383 |
| Para Espanol: | 1-888-622-4273 |
| International Calls: | 1-713-262-1679 |

# CHECKING SUMMARY

IOLTA Account

| | INSTANCES | AMOUNT |
|---|---|---|
| **Beginning Balance** | | **$25.00** |
| Deposits and Additions | 2 | 4,600,029.21 |
| Electronic Withdrawals | 4 | - 4,500,000.00 |
| Fees and Other Withdrawals | 1 | - 29.21 |
| **Ending Balance** | **7** | **$100,025.00** |
| | | |
| Interest Earned This Period | | $29.21 |
| Interest Paid Year-to-Date | | $29.21 |

# DEPOSITS AND ADDITIONS

| DATE | DESCRIPTION | AMOUNT |
|---|---|---|
| 11/02 | Fedwire Credit Via: California Bank & Trust/122232109 B/O: Global Baristas US LLC Seattle WA 98121-2161 98121 Ref: Chase Nyc/Ctr/Bnf=The X-Law Group, PC IOLTA Trust Los Angeles, CA 9002 63262/Ac-000000007323 Rfb=19125732 Imad: 1102L4B74B1C000418 Trn: 7049109306Ff | $4,600,000.00 |
| 11/30 | Interest Payment | 29.21 |
| **Total Deposits and Additions** | | **$4,600,029.21** |

# ELECTRONIC WITHDRAWALS

| DATE | DESCRIPTION | AMOUNT |
|---|---|---|
| 11/03 | 11/03 Wire Transfer Via: F121000358/121000358 A/C: Gb Autosport LLC Imad: 1103B1Qgc08C020289 Trn: 4971600307Es | $3,600,000.00 |
| 11/06 | 11/06 Online Wire Transfer Via: CA Rep Bk Newp Bch/122244854 A/C: Blue Water Escrow Newport Beach CA 92660 US Ref: For Credit - 15-4457-Jm Imad: 1106B1Qgc08C009209 Trn: 4242900310Es | 450,000.00 |
| 11/06 | 11/06 Wire Transfer Via: CA Rep Bk Newp Bch/122244854 A/C: Blue Water Escrow Ref: For Credit To Escrow Number 15-4457-Jm Imad: 1106B1Qgc03C005214 Trn: 4713800310Es | 350,000.00 |
| 11/12 | 11/12 Wire Transfer Via: Bk Amer Nyc/026009593 A/C: Gary E Primm Imad: 1112B1Qgc07C006491 Trn: 5184500316Es | 100,000.00 |
| **Total Electronic Withdrawals** | | **$4,500,000.00** |

 **CHASE**

October 31, 2015 through November 30, 2015

Account Number: ▮▮▮▮▮7608

## FEES AND OTHER WITHDRAWALS

| DATE | DESCRIPTION | AMOUNT |
|------|-------------|--------|
| 11/30 | Trust Interest Transfer | $29.21 |
| **Total Fees & Other Withdrawals** | | **$29.21** |

## DAILY ENDING BALANCE

| DATE | AMOUNT |
|------|--------|
| 11/02 | $4,600,025.00 |
| 11/03 | 1,000,025.00 |
| 11/06 | 200,025.00 |
| 11/12 | 100,025.00 |
| 11/30 | 100,025.00 |

**IN CASE OF ERRORS OR QUESTIONS ABOUT YOUR ELECTRONIC FUNDS TRANSFERS:**  Call or write us at the phone number or address on the front of this statement (non-personal accounts contact Customer Service) if you think your statement or receipt is incorrect or if you need more information about a transfer listed on the statement or receipt We must hear from you no later than 60 days after we sent you the FIRST statement on which the problem or error appeared.  Be prepared to give us the following information:

- Your name and account number
- The dollar amount of the suspected error
- A description of the error or transfer you are unsure of, why you believe it is an error, or why you need more information.

We will investigate your complaint and will correct any error promptly.  If we take more than 10 business days (or 20 business days for new accounts) to do this, we will credit your account for the amount you think is in error so that you will have use of the money during the time it takes us to complete our investigation

**IN CASE OF ERRORS OR QUESTIONS ABOUT NON-ELECTRONIC TRANSACTIONS:**  Contact the bank immediately if your statement is incorrect or if you need more information about any non-electronic transactions (checks or deposits) on this statement.  If any such error appears, you must notify the bank in writing no later than 30 days after the statement was made available to you.  For more complete details, see the Account Rules and Regulations or other applicable account agreement that governs your account.

 **JPMorgan Chase Bank, N.A. Member FDIC**

Exhibit 26

# CHASE ◆

JPMorgan Chase Bank, N.A.
P O Box 659754
San Anton o, TX 78265-9754

December 01, 2015 through December 31, 2015

Account Number: ▮▮▮▮▮ 7608



00062939 DRE 703 210 00116 NYNYNNNNNNN  1 000000000 60 0000

THE X-LAW GROUP, PC
IOLTA TRUST ACCOUNT
1910 W SUNSET BLVD STE 450
LOS ANGELES CA 90026-3262

## CUSTOMER SERVICE INFORMATION

| | |
|---|---|
| Web site: | **www.Chase.com** |
| Service Center: | **1-877-425-8100** |
| Deaf and Hard of Hearing: | 1-800-242-7383 |
| Para Espanol: | 1-888-622-4273 |
| International Calls: | 1-713-262-1679 |

WE ARE UPDATING OUR DEPOSIT ACCOUNT AGREEMENT

On March 14, 2016, we will publish an updated version of our Deposit Account Agreement so that it is easier to understand. The updated agreement will be available on chase.com, at a branch or by request when you call us.

Please read the entire document, paying special attention to these sections:

- Deposit Records and Receipts (page 3): If you deposit an amount that is higher or lower than what is on the deposit receipt, we are not required to adjust your account for discrepancies of $10 or less. See below for the full paragraph that has changed.
- Linked Accounts (page 13): If the checking account linked to your other accounts closes, it is your responsibility to request any remaining eligible accounts to be linked.
- Closing Your Account (page 13): We are not required to close your account if you have pending transactions, or if the account is overdrawn or subject to legal process.
- Research, Legal Process and Requests for Information (page 15): If a legal hold is in effect, we will continue to charge any applicable fees even though the account cannot be closed. We may also remove your Overdraft Protection if a hold is placed, but you may ask us to relink your accounts after the hold is removed.
- Preauthorized (Recurring) Transfers and Stop Payment (page 22): We explain how to stop payment on a recurring transfer or payment.

This is the updated paragraph that you will find in the Deposits Records and Receipts section: If you make a deposit, we may provide a receipt, but the amount on your deposit receipt is based entirely on the deposit slip you complete. We may confirm the funds you deposit and, after review, may adjust your account for any errors including any errors on your deposit slip. We are not required to adjust your account for discrepancies of $10 or less. We may not adjust your account unless you notify us of the discrepancy within one year of the date of your account statement that shows the deposit. If you do not notify us of the error during this notice period, the deposit amount will be considered final. This means that if the actual amount deposited was less than the amount declared on the deposit receipt, the difference will become your property and if the actual amount deposited was more than the amount declared on the deposit receipt, the difference will become our property.

Please call us at the number on this statement if you have any questions.

 **CHASE**

December 01, 2015 through December 31, 2015
Account Number: ███████████ 7608

## CHECKING SUMMARY

IOLTA Account

| | INSTANCES | AMOUNT |
|---|---|---|
| **Beginning Balance** | | **$100,025.00** |
| Deposits and Additions | 1 | 7.65 |
| Electronic Withdrawals | 1 | - 100,000.00 |
| Fees and Other Withdrawals | 1 | - 7.65 |
| **Ending Balance** | **3** | **$25.00** |
| | | |
| Interest Earned This Period | | $7.65 |
| Interest Paid Year-to-Date | | $36.86 |

## DEPOSITS AND ADDITIONS

| DATE | DESCRIPTION | AMOUNT |
|---|---|---|
| 12/31 | Interest Payment | $7.65 |
| **Total Deposits and Additions** | | **$7.65** |

## ELECTRONIC WITHDRAWALS

| DATE | DESCRIPTION | AMOUNT |
|---|---|---|
| 12/29 | 12/29 Online Wire Transfer Via: Bk Amer Nyc/026009593 A/C: Gary E. Primm Newport Beach CA 92660 US Ref: Benefit of Mr. Gary E. Primm/Bnf/Benefit of Gary E. Primm Imad: 1229B1Qgc08C014693 Trn: 4654800363Es | $100,000.00 |
| **Total Electronic Withdrawals** | | **$100,000.00** |

## FEES AND OTHER WITHDRAWALS

| DATE | DESCRIPTION | AMOUNT |
|---|---|---|
| 12/31 | Trust Interest Transfer | $7.65 |
| **Total Fees & Other Withdrawals** | | **$7.65** |

## DAILY ENDING BALANCE

| DATE | AMOUNT |
|---|---|
| 12/29 | $25.00 |
| 12/31 | 25.00 |

---

**IN CASE OF ERRORS OR QUESTIONS ABOUT YOUR ELECTRONIC FUNDS TRANSFERS:**  Call or write us at the phone number or address on the front of this statement (non-personal accounts contact Customer Service) if you think your statement or receipt is incorrect or if you need more information about a transfer listed on the statement or receipt We must hear from you no later than 60 days after we sent you the FIRST statement on which the problem or error appeared.  Be prepared to give us the following information:
- Your name and account number
- The dollar amount of the suspected error
- A description of the error or transfer you are unsure of, why you believe it is an error, or why you need more information.

We will investigate your complaint and will correct any error promptly.  If we take more than 10 business days (or 20 business days for new accounts) to do this, we will credit your account for the amount you think is in error so that you will have use of the money during the time it takes us to complete our investigation

**IN CASE OF ERRORS OR QUESTIONS ABOUT NON-ELECTRONIC TRANSACTIONS:**  Contact the bank immediately if your statement is incorrect or if you need more information about any non-electronic transactions (checks or deposits) on this statement.  If any such error appears, you must notify the bank in writing no later than 30 days after the statement was made available to you.  For more complete details, see the Account Rules and Regulations or other applicable account agreement that governs your account.

 **JPMorgan Chase Bank, N.A. Member FDIC**

# Exhibit 27

**CERTIFIED COPY**

1          UNITED STATES BANKRUPTCY COURT

2          CENTRAL DISTRICT OF CALIFORNIA

3             SANTA ANA DIVISION

4

5   In re:                    )
                              )
6   EAGAN AVENATTI, LLP       )
                              ) Case No. 8:17-bk-11961-CB
7                             )
            Debtor.           )
8                             )
                              )
9   _____  )

10

11

12

13

14       341(a) CONTINUED MEETING of CREDITORS

15            July 14, 2017

16

17

18

19

20

21

22

23

24  Reported by: Joanna B. Brown, CSR No. 8570
    426862
25

**BARKLEY**
*Court Reporters*
barkley.com

SINCE 1972

(310) 207-8000 Los Angeles    (415) 433-5777 San Francisco    (949) 955-0400 Irvine         (858) 455-5444 San Diego
(310) 207-8000 Century City   (408) 885-0550 San Jose          (760) 322-2240 Palm Springs   (800) 222-1231 Carlsbad
(916) 922-5777 Sacramento     (800) 222-1231 Martinez          (702) 366-0500 Las Vegas      (800) 222-1231 Monterey
(951) 686-0606 Riverside      (818) 702-0202 Woodland Hills    (702) 366-0500 Henderson      (516) 277-9494 Garden City
(212) 808-8500 New York City  (347) 821-4611 Brooklyn          (518) 490-1910 Albany         (914) 510-9110 White Plains
(312) 379-5566 Chicago        00+1+800 222 1231 Paris          00+1+800 222 1231 Dubai       001+1+800 222 1231 Hong Kong

```
 1              UNITED STATES BANKRUPTCY COURT

 2              CENTRAL DISTRICT OF CALIFORNIA

 3                   SANTA ANA DIVISION

 4

 5    In re:                    )
                                )
 6    EAGAN AVENATTI, LLP       )
                                ) Case No. 8:17-bk-11961-CB
 7                              )
                  Debtor.       )
 8                              )
                                )
 9    _____  )

10

11

12

13

14           341(a) Continued Meeting of Creditors, taken

15    before the United States Department of Justice, Office

16    of the United States Trustee, Michael J. Hauser, at

17    411 West Fourth Street, Santa Ana, California,

18    beginning at 10:23 a.m. and ending at 2:27 p.m., on

19    Friday, July 14, 2017, before JOANNA B. BROWN,

20    Certified Shorthand Reporter No. 8570, RPR, CRR, RMR.

21

22

23

24

25
```

BARKLEY
Court Reporters

```
 1    you some portion of that back to you personally?

 2        A    Absolutely not.

 3        Q    Do you have that agreement with anyone?

 4             Do you have an agreement with any party that

 5    if they are awarded a portion of the fee in any of the

 6    Kimberly-Clark litigation, that they will pay some of

 7    that fee back to you personally?

 8        A    No.

 9        Q    Do you have agreement to share any portion of

10    the fee in the Kimberly-Clark/Bahamas class action with

11    Filippo Marchino?

12        A    There is an agreement in place relating to --

13    or between the firm and The X-Law Group relating to

14    various cases and The X-Law Group's right to fees from

15    those cases.  As I sit here right now, I do not recall

16    if the Bahamas case is one of those cases.

17        Q    And I believe at the last exam you were

18    requested to provide a copy of that in writing to

19    Mr. Hauser.  Did you provide that agreement?

20        A    I don't know that to be the case or not.  I

21    have not had a chance to review the audio or any

22    transcript from that prior proceeding.

23             MR. KHARASCH:  I don't recall.

24             THE WITNESS:  I don't recall that.

25    \\\
```

68

BARKLEY
Court Reporters

1   BY MR. FRANK:

2        Q    Let's ask it differently then.

3             This agreement, was it in writing with

4   The X-Law Group?

5        A    Yes.

6        Q    When was it reached?

7        A    Last year at some point.

8        Q    Summer?

9        A    I believe so.

10       Q    Can you give us any more specifics?  The

11  month?  July?  August?  September?

12       A    No.

13       Q    Was it after I left the firm?

14       A    After you were fired?

15       Q    Okay.  After I was fired if you'd like to

16  state it like that.

17       A    Well, you were terminated; right?

18             You remember being locked out.

19             MR. KHARASCH:  Let's just keep to the --

20             THE WITNESS:  Yeah, it was after you were

21  terminated from the firm.

22  BY MR. FRANK:

23       Q    And you have complete control to decide if I

24  should be terminated -- correct? -- at the firm.

25       A    Sir, I don't think that goes to the assets or

69

BARKLEY
Court Reporters

```
 1   liabilities of the --

 2        Q    All right.  When you negotiated this agreement

 3   with The X-Law Group, who was negotiating on behalf of

 4   Eagan Avenatti?

 5        A    I was.

 6        Q    Anyone else on behalf of Eagan Avenatti?

 7        A    No.

 8        Q    Who was negotiating it on behalf of

 9   The X-Law Group?

10        A    Mr. Marchino.

11        Q    And anybody else on behalf of The X-Law Group?

12        A    No.

13        Q    How long have you known Mr. Marchino?

14             MR. KHARASCH:  Just approximately.

15             THE WITNESS:  Five years approximately.

16   BY MR. FRANK:

17        Q    He's a friend of yours; correct?

18        A    Yes.

19        Q    And as part of this agreement, you gave him a

20   piece of your cases that you've estimated is worth

21   $17 million -- and by "him," I mean The X-Law Group --

22   correct?

23        A    I don't know that the estimate was included at

24   the time.  So, I mean, as phrased, I'll say no.

25        Q    Where is a copy -- do you have a copy of this
```

70

BARKLEY
Court Reporters

1    agreement?

2         A    There should be a copy at the firm's offices.

3         Q    One of these files, but you don't know where;

4    correct?

5              MR. HAUSER:   Sir, just to --

6              MR. FRANK:   That's fair.

7              MR. HAUSER:   -- kind of calm this thing down,

8    the fact of the matter is if you think -- if he says

9    it's at his office, it doesn't really matter --

10             MR. FRANK:   That's fine.

11             MR. HAUSER:   -- which file cabinet it's in.

12             MR. FRANK:   That's fair.

13             MR. HAUSER:   Okay.

14   BY MR. FRANK:

15        Q    This agreement provided that The X-Law Group

16   would get a piece of certain cases at Eagan Avenatti.

17   Was it a percentage?

18        A    As I recall, yes, but I haven't looked at the

19   agreement in the better part of a year.

20        Q    And in addition, as part of this agreement,

21   did you agree that you would start paying the attorneys

22   at The X-Law Group -- you would pay a portion or all of

23   their salaries?

24        A    Yes.

25        Q    And did you also agree to pay the rent for

71

BARKLEY
Court Reporters

1    their office in Los Angeles?

2        A    There was an oral agreement that we would do

3    so for a period of time.   Yes.

4        Q    So the agreement to pay The X-Law Group's rent

5    was an oral agreement separate and apart from this

6    written agreement to share fees?

7        A    I don't recall if it was included in the

8    written agreement or if it was a separate oral

9    agreement, Mr. Frank.

10       Q    And if you look at Schedule -- if you look at

11   the operating account, you have a list of employees,

12   your operating statement which I believe is

13   Docket 126 -- Docket No. 126.   If you'd turn to page --

14   I believe it's 5 of 6 -- or 5 of 16.   Excuse me.   And

15   I'm looking at the bottom.   It also says on the main

16   document "page 8 of 36" at the top.

17       A    Okay.

18       Q    Do you have it before you?

19       A    Yes.

20       Q    Can you please let us know which people on

21   this list are people from The X-Law Group.

22       A    I don't understand the question.

23       Q    There is a list of people that Eagan Avenatti

24   is paying salaries to; correct?

25       A    Yes.

72

341(a) MEETING OF CREDITORS

BARKLEY
Court Reporters

1    Q    Which of these people are people who work at

2    The X-Law Group?

3    A    Well, I don't know if they technically still

4    work at The X-Law Group or not, but a number of these

5    people at some point in time worked at The X-Law Group.

6    Q    Okay.  Who --

7    A    Is that your question?

8    Q    Who are those people?

9    A    Thomas Cassaro, Michael Diaz, Alfredo Garcia,

10   Mr. Marchino, Mr. Rogers -- I think that's it.

11   Q    Did you purchase The X-Law Group, meaning

12   Eagan Avenatti?  Let me strike that.

13        Did Eagan Avenatti purchase The X-Law Group as

14   part of this agreement?

15   A    No.

16   Q    So The X-Law Group still continues to operate

17   as a separate law firm?

18   A    Yes.

19   Q    By the way, on the top, there is a employee or

20   someone who gets payroll.  It says, "A driver to go."

21   What is that?

22   A    That is a car service that the firm uses from

23   time to time.

24   Q    You have a personal chauffeur named -- I

25   believe it's James Cameron; is that correct?

73

BARKLEY
Court Reporters

DEPOSITION OFFICER'S CERTIFICATE

STATE OF CALIFORNIA    )
                       ) ss.
COUNTY OF ORANGE       )



        I, Joanna B. Brown, hereby certify:

        I am a duly qualified Certified Shorthand
Reporter in the State of California, holder of
Certificate Number CSR 8570 issued by the Certified Court
Reporters' Board of California and which is in full
force and effect.  (Fed. R. Civ. P. 28(a)(1)).

        I am authorized to administer oaths or
affirmations pursuant to California Code of Civil
Procedure, Section 2093(b) and prior to being examined,
the witness was first duly sworn by me.  (Fed. R. Civ.
P. 28(a)(a)).

        I am not a relative or employee or attorney or
counsel of any of the parties, nor am I a relative or
employee of such attorney or counsel, nor am I
financially interested in this action.  (Fed. R. Civ. P.
28).

        I am the deposition officer that
stenographically recorded the testimony in the foregoing
deposition and the foregoing transcript is a true record

                      / / /


                      161

BARKLEY
Court Reporters

1  of the testimony given by the witness.  (Fed. R. Civ. P.

2  30(f)(1)).

3       Before completion of the deposition, review of

4  the transcript [  ] was [ XX ] was not requested.  If

5  requested, any changes made by the deponent (and

6  provided to the reporter) during the period allowed, are

7  appended hereto.  (Fed. R. Civ. P. 30(e)).

8

9  Dated: July 26, 2017

10

11  _____

12

13

14

15

16

17

18

19

20

21

22

23

24

25

162

BARKLEY
Court Reporters

# Exhibit 28

**Fill in this information to identify the case:**

| | |
|---|---|
| Debtor name | **Eagan Avenatti LLP** |
| United States Bankruptcy Court for the: | **MIDDLE DISTRICT OF FLORIDA** |
| Case number (if known) | **17-01329** |

☐ Check if this is an amended filing

Official Form 206D

## Schedule D: Creditors Who Have Claims Secured by Property

12/15

Be as complete and accurate as possible.

**1. Do any creditors have claims secured by debtor's property?**

☐ No. Check this box and submit page 1 of this form to the court with debtor's other schedules. Debtor has nothing else to report on this form.

■ Yes. Fill in all of the information below.

**Part 1: List Creditors Who Have Secured Claims**

**2. List in alphabetical order all creditors who have secured claims.** If a creditor has more than one secured claim, list the creditor separately for each claim.

| | | | Column A<br>Amount of claim<br>Do not deduct the value of collateral. | Column B<br>Value of collateral that supports this claim |
|---|---|---|---|---|
| **2.1** | **The X Law Group**<br>Creditor's Name<br>**Filippo Marchino**<br>**1910 West Sunset Blvd.**<br>**Suite 450**<br>**Los Angeles, CA 90026**<br>Creditor's mailing address | Describe debtor's property that is subject to a lien<br>**Professional Services in excess of $17,000,000** | **$17,000,000.00** | **Unknown** |

Creditor's email address, if known

**Date debt was incurred**

**Last 4 digits of account number**

| Do multiple creditors have an interest in the same property? | Describe the lien |
|---|---|
| ■ No | |
| ☐ Yes. Specify each creditor, including this creditor and its relative priority. | **Is the creditor an insider or related party?**<br>■ No<br>☐ Yes<br>**Is anyone else liable on this claim?**<br>■ No<br>☐ Yes. Fill out *Schedule H: Codebtors* (Official Form 206H)<br><br>**As of the petition filing date, the claim is:**<br>Check all that apply<br>☐ Contingent<br>■ Unliquidated<br>☐ Disputed |

**3.** Total of the dollar amounts from Part 1, Column A, including the amounts from the Additional Page, if any.

| $17,000,000.00 |
|---|

**Part 2: List Others to Be Notified for a Debt Already Listed in Part 1**

List in alphabetical order any others who must be notified for a debt already listed in Part 1. Examples of entities that may be listed are collection agencies, assignees of claims listed above, and attorneys for secured creditors.

If no others need to notified for the debts listed in Part 1, do not fill out or submit this page. If additional pages are needed, copy this page.

| Name and address | On which line in Part 1 did you enter the related creditor? | Last 4 digits of account number for this entity |
|---|---|---|

Software Copyright (c) 1996-2016 Best Case, LLC - www.bestcase.com          Best Case Bankruptcy