Filippo Marchino, Esq. (SBN 256011)
FM@XLAWX.com
Carlos X. Colorado, Esq. (SBN 231031)
CC@XLAWX.com
Thomas E. Gray, Esq. (SBN 299898)
TG@XLAWX.com
**THE X-LAW GROUP, P.C.**
625 Fair Oaks Ave, Suite 390
South Pasadena, CA 91030
Tel: (213) 599-3380
Fax: (213) 599-3370

Attorneys for Petitioner Alexis Gardner

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>Plaintiff,<br><br>v.<br><br>MICHAEL JOHN AVENATTI,<br><br>Defendant | Case No. 8:19-cr-00061-JVS<br><br>**PETITIONER ALEXIS GARDNER'S REPLY BRIEF REGARDING DISPOSITION OF ONE HONDA AIRCRAFT**<br><br>Date:     June 26, 2023<br>Time:     9:00 a.m.<br>Judge:    Honorable James V. Selna<br>Place:    Courtroom 10C<br>          411 W. Fourth St.<br>          Santa Ana, CA 92701 |

# TABLE OF CONTENTS

Page(s)

I.    INTRODUCTION .................................................................................1

II.   PROCEDURAL BACKGROUND .........................................................1

III.  THE LAW GOVERNING CRIMINAL FORFEITURE ..................................1

IV.   ARGUMENT ......................................................................................3

      A.    JFL Has No Interest In The Jet Because It Is A Mere Creditor.............3

      B.    Marshack Misstates Eagan Avenatti's Claim to the Jet.........................9

            a.    The Estate of EA is Not Entitled to *Any Portion of the Jet*.........9

            b.    EA Has No Interest in the Individual Transactions
                  Marshack Has Identified.............................................14

      C.    Spring Creek Misstates Its Claim to the Jet..........................................17

            a.    Spring Creek Has No Claim to the Jet........................................17

            b.    Even if Spring Creek Did Have an Interest in the Jet, It
                  Overstates its Interest............................................22

      D.    BECAUSE NONE OF THE OTHER PETITIONERS HAVE
            VALID CLAIMS, THE JET BELONGS TO GARDNER ..................25

V.    CONCLUSION ...................................................................................25

i

1

# TABLE OF AUTHORITIES

**Page(s)**

2

<u>Cases</u>

3

<u>Bd. of Trustees for Laborers Health & Welfare Tr. Fund for N. California v. Hill,</u>

4

    No. C 07-5849 CW, 2009 WL 774093 (N.D. Cal. Mar. 23, 2009) ...............24

<u>Berg & Berg Enterprises, LLC v. Boyle,</u>

5

    178 Cal. App. 4th 1020 (2009)........................................................................11

6

<u>Clark v. Millsap,</u>

7

    197 Cal. 765 (1926).........................................................................................16

<u>Combs v. Rockwell Intern. Corp.,</u>

8

    927 F.2d 486 (9th Cir. 1991)............................................................................4

9

<u>Commodity Futures Trading Comm'n v. Hudgins,</u>

10

    620 F. Supp. 2d 790 (E.D. Tex. 2009) ...........................................................24

11

<u>Commons v. Schine,</u>

    35 Cal. App. 3d 141 (1973)............................................................................11

12

<u>DSI Assocs. LLC v. United States,</u>

13

    496 F.3d 175 (2d Cir. 2007)...........................................................................14

14

<u>Great-W. Life & Annuity Ins. Co. v. Knudson,</u>

15

    534 U.S. 204 (2002) .......................................................................................10

16

<u>Hurley v. Southern Cal. Edison Co.,</u>

    183 F.2d 125 (9th Cir. 1950)............................................................................5

17

<u>Hutchinson v. Hensley Flying Service, Inc.,</u>

18

    210 F.3d 383 (9th Cir. 2000)............................................................................4

19

<u>In re 716 Third Ave. Holding Corp.,</u>

20

    340 F.2d 42 (2d Cir. 1964)...............................................................................8

<u>In re Salomon,</u>

21

    2010 WL 6259762

22

    (B.A.P. 9th Cir., June 21, 2010, No. ADV 07-90015-JM) ..............................8

23

<u>In re Shapow,</u>

    599 B.R. 51 (Bankr. C.D. Cal. 2019)............................................................18

24

<u>In re Wills,</u>

25

    243 B.R. 58 (B.A.P. 9th Cir. 1999)..................................................................8

26

<u>Kelly v. Primco Management, Inc.,</u>

    2015 WL 12655471 (C.D. Cal., Jan. 26, 2015, No. CV1407263BROSHX)....5

27

28

PETITIONER ALEXIS GARDNER'S REPLY BRIEF REGARDING DISPOSITION OF
ONE HONDA AIRCRAFT

Korea Supply Co. v. Lockheed Martin Corp.,
  29 Cal. 4th 1134 (2003)....................................................................10

Kremen v. Cohen,
  2000 WL 1811403 (N.D. Cal., Nov. 27, 2000, No. C 98-20718 JW) .............5

Mattel, Inc. v. MGA Ent., Inc.,
  616 F.3d 904 (9th Cir. 2010)............................................................22

Mitchell v. New York Life Insurance Company,
  2021 WL 4539869
  (C.D. Cal., Mar. 16, 2021, No. 220CV01789MCSAGRX) ............................5

Professional Seminar Consultants, Inc. v. Sino American Technology
Exchange Council, Inc.,
  727 F.2d 1470 (9th Cir. 1984)............................................................5

Rodriguez v. Disner,
  688 F.3d 645 (9th Cir. 2012)............................................................16

Taylor v. Fields,
  178 Cal. App. 3d 653 (Ct. App. 1986) ................................................11

United States v. $7,599,358.09,
  No. CIV.A. 10-5060 SRC, 2011 WL 3611451 (D.N.J. Aug. 15, 2011).........10

United States v. $822,694.81 in United States Currency,
  No. 3:13-CV-00545 (RNC), 2015 WL 13765353 (D. Conn. July 24, 2015) ...3

United States v. Calle Serna,
  No. 06-CR-91 (SLT), 2017 WL 3738413 (E.D.N.Y. Aug. 29, 2017)............14

United States v. Corpus,
  491 F.3d 205(5th Cir. 2007)............................................................12

United States v. Egan,
  811 F. Supp. 2d 829 (S.D.N.Y. 2011)..................................................3

United States v. Gagarin,
  950 F.3d 596 (9th Cir. 2020)............................................................25

United States v. Hooper,
  229 F.3d 818 (9th Cir. 2000)..............................................................2

United States v. Kennedy,
  201 F.3d 1324 (11th Cir. 2000)........................................................20

United States v. Morgan,
  224 F.3d 339 (4th Cir. 2000)............................................................13

PETITIONER ALEXIS GARDNER'S REPLY BRIEF REGARDING DISPOSITION OF
ONE HONDA AIRCRAFT

*United States v. Ovid*,
　No. 09-CR-216 JG ALC, 2012 WL 2087084 (E.D.N.Y. June 8, 2012)...........3

*United States v. Parenteau*,
　647 F. App'x 593 (6th Cir. 2016) ................................................................13

*United States v. PokerStars*,
　No. 11 CIV. 2564 LBS, 2012 WL 1659177 (S.D.N.Y. May 9, 2012) ..........10

*United States v. Reckmeyer*,
　836 F.2d 200 (4th Cir. 1987)......................................................................20

*United States v. Salti*,
　579 F.3d 656 (6th Cir. 2009)..........................................................................3

*United States v. Shor*,
　635 F. App'x 358 (9th Cir. 2015) ................................................................11

*United States v. Simmons*,
　No. 17-CR-127 (KMW), 2019 WL 3532113 (S.D.N.Y. Aug. 2, 2019) .........20

*United States v. Soreide*,
　461 F.3d 1351 (11th Cir. 2006)................................................................3, 20

*United States v. Two Bank Accts. Described as: Bank Acct. In amount of*
*$197,524.99 Bank of Am., Seattle, Wash.*,
　No. 06-4005, 2008 WL 5431199 (D.S.D. Dec. 31, 2008).......................18, 21

*United States v. Watkins*,
　320 F.3d 1279 (11th Cir. 2003).....................................................................3

*United States v. Watts*,
　786 F.3d 152 (2d Cir. 2015) ..........................................................................2

*United States v. White*,
　306 F. App'x 838 (5th Cir. 2007)................................................................20


**Statutes**

11 U.S.C. § 544(b)(1)......................................................................................11

21 U.S.C. § 853 ................................................................................................1

21 U.S.C. § 853(c)............................................................................................2

21 U.S.C. § 853(n)..........................................................................................14

21 U.S.C. § 853(n)(2)........................................................................................1

21 U.S.C. § 853(n)(5)........................................................................................2

21 U.S.C.§ 853(n)(6)..................................................................................passim

iv

21 U.S.C. § 853(n)(6)(A) ..................................................................2, 9, 12

21 U.S.C. § 853(n)(6)(B) ......................................................................2, 20

Cal. Civ. Proc. Code § 697.530.................................................................4

Cal. Evid. Code § 662 ...............................................................................18

**<u>Rules</u>**

Fed. R. Crim. P. 32.2(c)(B) ...................................................................8, 9

**<u>Other Authorities</u>**

<u>Restatement (Third) of Law Governing Lawyers</u> § 37 ...........................16

S.Rep. No. 225, reprinted in 1984 U.S.C.C.A.N. 3182, 3392 n. 47 ......13

## I.      INTRODUCTION

Of the four petitioners  who have submitted claims regarding the jet (Alexis Gardner ("Gardner"), Jason Frank Law ("JFL"), the estate of Eagan Avenatti LLP ("EA") and Spring Creek Research LLC ("SCR")), Petitioner Alexis Gardner is the only one with a claim to the jet that is consistent with the criminal forfeiture laws at issue here.  Unlike the other petitioners, Gardner is the only one whose claim has been endorsed by the government.  [Dkt. No. 1098 at 4 ("The government has reviewed the petitions and acknowledges that petitioner Alexis Gardner is a victim of the crimes to which defendant pled guilty, and thus has an interest in the Disputed Property superior to the government.")]  The claims of the other three petitioners are legally unsound, and actually directly at odds with the prior orders of the Court as well as their own prior statements.

## II.     PROCEDURAL BACKGROUND

This ancillary forfeiture proceeding is a result of the Court's order pursuant to 21 U.S.C. § 853.  [Dkt. No. 975 at 2.] The forfeiture arises out of "the offenses described in Counts Five, Eight, Nine, and Ten of the Indictment." [Id.] As the government explained, the relevant facts are Avenatti's embezzlement of $2,500,000[1] of the $2,750,000 Gardner had received as a settlement, which he accomplished by sending the money to the X-Law trust account and directing the firm to send it on to Honda Aircraft.  [Dkt. No. 974 at 6.]

## III.    THE LAW GOVERNING CRIMINAL FORFEITURE

Gardner and the other three petitioners have submitted petitions asserting an interest in the jet pursuant to 21 U.S.C. § 853(n)(2).  The Court will ultimately hold a hearing where "the petitioner may testify and present evidence and witnesses on his own behalf, and cross-examine witnesses who appear at the hearing."  21 U.S.C.

---

[1] As discussed below it appears that Avenatti may have caused the entire $2.75 Million (including the remaining $250,000) to go to Honda for the jet's purchase.

PETITIONER ALEXIS GARDNER'S REPLY BRIEF REGARDING DISPOSITION OF
ONE HONDA AIRCRAFT

§ 853(n)(5).  "In addition to testimony and evidence presented at the hearing, the court shall consider the relevant portions of the record of the criminal case which resulted in the order of forfeiture." Id.

In order to prevail, a petitioner must establish by a preponderance of the evidence that:

> (A) the petitioner has a legal right, title, or interest in the property, and such right, title, or interest renders the order of forfeiture invalid in whole or in part because the right, title, or interest was vested in the petitioner rather than the defendant or was superior to any right, title, or interest of the defendant at the time of the commission of the acts which gave rise to the forfeiture of the property under this section; or
>
> (B) the petitioner is a bona fide purchaser for value of the right, title, or interest in the property and was at the time of purchase reasonably without cause to believe that the property was subject to forfeiture under this section;

21 U.S.C.§ 853(n)(6).  "To make sense of [subsection (A)], it is necessary to read the temporal requirement – 'at the time of the commission of the acts which gave rise to the forfeiture'– as applying to both 'vested in the petitioner rather than the defendant' and the alternative 'or was superior to any right, title, or interest of the defendant.'"  United States v. Hooper, 229 F.3d 818, 821 (9th Cir. 2000).

> Subsection 853(n)(6)(A) works hand in hand with the "relation-back" doctrine embodied in § 853(c), which provides that all property subject to forfeiture based on a criminal offense "vests in the United States upon the commission of the [offense]." See 21 U.S.C. § 853(c). Because forfeitable property vests in the government immediately upon the commission of a criminal act, a third party may prevail under § 853(n)(6)(A) only by establishing that he had a legal interest in the forfeited property before the underlying crime was committed—that is, before the government's interest vested. Where, by contrast, the petitioner obtains his interest in the property after the commission of the crime giving rise to forfeiture, he may defend his right to the property only under § 853(n)(6)(B), by establishing that he acquired the interest as a bona fide purchaser for value without cause to believe that the property was forfeitable.

United States v. Watts, 786 F.3d 152, 166 (2d Cir. 2015).

PETITIONER ALEXIS GARDNER'S REPLY BRIEF REGARDING DISPOSITION OF
ONE HONDA AIRCRAFT

"[O]ne must assert something more than being a general creditor; he must show that his legal interest in the property in question is vested or is superior to that of the criminal owner under subsection (A)." <u>United States v. Salti</u>, 579 F.3d 656, 669–70 (6th Cir. 2009). "21 U.S.C. § 853(n)(6)(B) . . . exists only to protect subsequent purchasers of "*the defendant's interest*" in an asset." <u>United States v. Soreide</u>, 461 F.3d 1351, 1356 (11th Cir. 2006) (emphasis in original). "[U]nsecured creditors plainly fall outside the scope of § 853(n)(6)(B)", <u>United States v. Watkins</u>, 320 F.3d 1279, 1283–84 (11th Cir. 2003).

The Court lacks the ability to disregard a petitioner's legal interest in the property, even if it would result in some of the victims fortuitously being able to recover all of their losses and others being left with nothing. <u>United States v. Egan</u>, 811 F. Supp. 2d 829, 840 (S.D.N.Y. 2011) (rejecting government's request to instead distribute seized funds to victims on pro rata basis). "[C]ompelling a claimant who can trace her losses to share pro rata with other victims is 'contrary to basic property rights.'" <u>United States v. $822,694.81 in United States Currency</u>, No. 3:13-CV-00545 (RNC), 2015 WL 13765353, at *5 (D. Conn. July 24, 2015) (quoting <u>United States v. Ovid</u>, No. 09-CR-216 JG ALC, 2012 WL 2087084, at *7 (E.D.N.Y. June 8, 2012).

## IV.   ARGUMENT

### A. JFL Has No Interest In The Jet Because It Is A Mere Creditor

JFL's petition fails for myriad reasons. First, based on its brief, it is asserting an interest based on a judgment lien that did not arise until years after the crime was committed, thereby transferring any interest to the government. [Dkt. No. 1104 at 2-3.] Although Frank references money used to buy the jet coming from an account that also received money from the Eden class action settlement in 2014 [Dkt. No. 1104-1 at ¶ 25-27], that does not help him. Frank references referral fees and fees relating to the Eden case being owed to JFL under the independent contractor agreement ("ICA"), but does not explain how much was owed to him at any given

PETITIONER ALEXIS GARDNER'S REPLY BRIEF REGARDING DISPOSITION OF
ONE HONDA AIRCRAFT

time.  [Dkt. No. 1104-1 at ¶4.]  The ICA actually leaves the bonus for the Eden settlement to the "sole and absolute discretion of the Equity Partners [Eagan and Avenatti.]"  [Dkt. No. 1104-2 Ex. 1 at §3(B)(iii)].  Likewise, the profit share bonus provision discounts expenses paid by EA and left it to the Equity Partners to determine what expenses would be paid.  [Id. at § §3(B)(ii)(a)-(b).  It is unclear when and whether EA even made a profit.  The record is devoid of any such evidence.  Additionally, the ICA also did not require JFL to be paid *directly* out of the Eden settlement funds.  The net effect of all of this is that prior to Avenatti's embezzlement of Gardner's funds, JFL was, at best, a general creditor without the ability to trace any money used to purchase the aircraft to funds that were its property.

Second, by its own terms, the judgment lien only applies to personal property as defined in Cal. Civ. Proc. Code § 697.530 (West).  [Dkt. No. 1104-7 Ex. 6.] The jet did not belong to Avenatti: in fact, it was titled under and belonged to Passport 420 LLC [Ex. D to Ex. 1 to Request for Judicial Notice ("RJN") Ex. 2].  Passport 420 LLC was a valid and legal entity, which had valid ownership in the jet itself.

Even if the lien could be applied to Avenatti & Associates, it would still be insufficient, because that would just give JFL an interest in Passport 420, not the jet. That is materially different because JFL would have first to obtain the shares of Passport 420 that belonged to Avenatti & Associates and then proportionally share in whatever recovery Passport 420 obtained. What JFL cannot do, however, is short-circuit the process and seek a recovery from the asset directly when he has absolutely no privity with it.

Third, and perhaps most importantly, the judgment JFL relies on was obtained with questionable methods and is, itself, the result of fraud.  It is well known that claims based on forged document are subject to outright dismissal. Hutchinson v. Hensley Flying Service, Inc., 210 F.3d 383 (9th Cir. 2000); Combs v. Rockwell Intern. Corp., 927 F.2d 486, 488 (9th Cir. 1991); Professional Seminar Consultants, Inc. v. Sino American Technology Exchange Council, Inc., 727 F.2d

4

1470, 1474 (9th Cir. 1984). An instrument containing a forged signature that is passed as authentic is void *ab initio* and cannot be binding upon other parties. See, e.g., Hurley v. Southern Cal. Edison Co.,183 F.2d 125, 131 (9th Cir. 1950) (dividend orders in which grandmother forged grandson's signature not enforceable as to third parties); Mitchell v. New York Life Insurance Company, 2021 WL 4539869, at *5 (C.D. Cal., Mar. 16, 2021, No. 220CV01789MCSAGRX) (insurance policy containing forged signature void *ab initio*). An instrument containing a forged signature cannot be enforced against third parties. See, e.g., Kelly v. Primco Management, Inc., 2015 WL 12655471, at *7 (C.D. Cal., Jan. 26, 2015, No. CV1407263BROSHX) (forum selection clause is void if recording agreement in which it is expressed is a fabrication); Kremen v. Cohen, 2000 WL 1811403, at *4 (N.D. Cal., Nov. 27, 2000, No. C 98-20718 JW) (transfer of domain name based on forged letter is void).

To better understand the issues here, it is important to go back to the beginning. JFL is a professional corporation owned and operated by Jason M. Frank. Pursuant to a declaration filed in this case (Dkt 1104-1), JFL had a contract with Eagan Avenatti LLP that JFL alleges was routinely breached by EA.

At 7 of Dkt 1104-1, Jason Frank states, in pertinent part, as follows:
The JFL claims against EA were settled during the bankruptcy proceedings in December 2017, pursuant to which EA agreed, among other things, that JFL had an approved claim of $10 million against the firm. See In re Eagan Avenatti, LLP, Case No. 8:17-bk-11961-CB, Dkt. 412, ¶ 5.

[DKT 1104-1 p. 3]  Judge Bauer in fact entered an order approving the settlement. [Id.] Judge Bauer's approval in March of 2018 was based on a motion that had been filed to end the bankruptcy and based on a settlement agreement between, amongst others, JFL and EA. A true and correct copy, obtained from the bankruptcy docket [See RJN 7.] Notably, the settlement agreement has been the basis of all claims that JFL has levied against EA since 2019. [See RJN 8.]

The declaration of Jason M. Frank in support of his brief before this Court explains what occurred in the months after the entry of the settlement agreement:

PETITIONER ALEXIS GARDNER'S REPLY BRIEF REGARDING DISPOSITION OF ONE HONDA AIRCRAFT

> In May 2018, EA failed to pay the amounts owed to JFL under the settlement. Accordingly, the Bankruptcy Court entered a final judgment in favor of JFL and against EA in the amount of $10,000,000, not including interest or attorney fees or costs. See In re Eagan Avenatti, LLP, Case No. 8:17-bk-11961-CB, Dkt. 445. A copy of the Final Judgment against EA (the "Judgment Against EA") is attached as Exhibit 4.

[DKT 1104-1 p. 3] The final judgment referenced above was obtained following the filing of a motion "for entry of judgement against Eagan Avenatti LLP". That motion, was accompanied by a separate declaration of Jason M. Frank, dated May 18, 2018. In that declaration, Mr. Frank states, in pertinent part, as follows:

> On or about December 12, 2017, EA, Avenatti & Associates, APC, Michael Avenatti, and Michael Eagan (collectively defined in the Settlement as the "EA Parties"), on the one hand, and JFL, Jason Frank, Scott Sims, Andrew Stolper, and Frank Sims & Stolper LLP (collectively defined in the Settlement as the "JFL Parties"), on the other hand (collectively, the "Parties"), entered into a Settlement Agreement and Releases (the "JFL Settlement" or "Settlement").

[See RJN 9 Page 4]. The motion, the declaration and the resulting order are all consistent. [See RJN 9, 10, 11 respectively.] As indicated in the declaration of Frank from May 18, 2018, the settlement agreement included two sides: the EA side (comprised of Eagan Avenatti LLP, Michael Avenatti, Avenatti & Associates and Michael Q. Eagan) and the JFL side (comprised of JFL, Jason Frank, Scott Sims, Andrew Stolper and their new firm Frank Sims & Stolper LLP). All of these parties were material to the agreement. [See RJN 9  page 4, RJN 7 page 2]

It would be no surprise then that the same settlement agreement, on Page 14, under the heading "Execution/Counterparts" states, in pertinent part that:

> Execution/Counterparts. This Agreement may be executed in counterparts, and a facsimile or PDF signature shall have the same force and effect as an original signature penned in ink. When each of the Parties hereto has signed and delivered at least one such counterpart to all other Parties or their counsel, each counterpart shall be deemed an original, and when taken together with other signed counterparts, **shall constitute one fully executed agreement which shall be binding upon and effective as to all Parties**.

[See RJN 7, page 15– emphasis added]  By its own terms, the settlement agreement on which the current position of JFL is based on, was "binding upon and effective as to all Parties" only once "each of the Parties hereto has signed and delivered" a

signed document. The problem is that one of the material parties to the settlement agreement, Michael Eagan (hereinafter "Eagan", who was one of the two shareholders of Eagan Avenatti LLP), never actually signed the document.

In fact, Gardner recently learned that the settlement agreement contained a material forgery that was never disclosed by JFL (or anyone else) to any of the Courts that have previously considered the settlement agreement and, in reliance upon the same, issued orders affecting the rights of others including, but not limited to, Ms. Gardner[2].

On October 11, 2022, the government filed its Sentencing Memorandum as to Defendant Michael John Avenatti. [Dkt.1000] Attached to the filing was the Declaration of Special Agent Remoun Karlous and supporting exhibits. [Dkt.#1000-1]. Within the sentencing memorandum, was the following paragraph:

> Second, the enhancement applies if the defendant "produc[ed] or attempt[ed] to produce a false, altered, or counterfeit document or record during an official investigation or judicial proceeding." USSG § 3C1.1, comment. (n.4(C)). ***Defendant forged the signature of his law partner, Michael Eagan, on a settlement agreement to be used as part of the stipulation to dismiss the EA LLP bankruptcy proceedings. (Tr. Ex 342.) Defendant admitted that he forged Eagan's signature on the document during a recorded phone call with Eagan. (Sent. Ex 7.)*** (Footnote 11: Sentencing Exhibit 7 is a transcript of the recorded call between defendant and Michael Eagan on August 22, 2019. Upon the Court's request, the government will also file a copy of the recording itself.)

[DKT 1000; 11:23-12:6 – emphasis added]

Exhibit 7 of the sentencing [DKT 1000-2, page 59], is a transcript that was

---

[2] The settlement agreement doesn't just give JFL a right to a $10,000,000 judgment against EA. It does significantly more. First, it purports to give JFL a position as a secured creditor against EA's assets, to the detriment of all the victims of Avenatti, including Gardner. Second, it shields JFL from the repayment of fees to EA for work that the JFL partners had completed while employed by EA – estimated to be in excess of $5,000,000, which JFL kept. [See RJN 7 page 20]. Third, it insulates JFL from repaying to EA $4,151,009.60 that JFL diverted from EA in May of 2016. [See RJN 12, page 2]. Additionally, the Court should note that, any funds recovered by the Estate of EA from the jet would only go to compensate the Trustee, his counsel or JFL by virtue of his secured creditor position.

7

*transcribed* on August 22, 2019, of a phone call that was *recorded* on October 22, 2018 between Michael Q. Eagan and Michael Avenatti in which Avenatti admitted to Eagan that the settlement agreement referenced hereinabove contained a forged signature as to a material party-- Mr. Eagan.

Simply put, the net result of this discovery is that the settlement agreement Mr. Frank relies on is void ab initio and, therefore, any judgment based on the same should be voided as well[3]. At a minimum, for purposes of this Court's present allocation of interest in a jet, any rights asserted by JFL based on the settlement agreement and its progeny (i.e. the various orders and judgments obtained thereon) should be entirely disregarded.

Moreover, Ms. Gardner would like to ask this Court to either set a separate hearing to address this matter or, if this Court finds it more appropriate, refer this matter to the honorable Judge Scott C. Clarkson who currently oversees the Eagan Avenatti LLP bankruptcy for further briefing and proceedings. Federal Rule of Civil Procedure 52(a)(1) as incorporated by Federal Rule of Bankruptcy Procedure 705 requires the bankruptcy court's decisions to be supported by findings and conclusions. See In re Salomon, 2010 WL 6259762, at *4 (B.A.P. 9th Cir., June 21, 2010, No. ADV 07-90015-JM). Questions that imply underlying fraud require remand. See, e.g., In re Wills, 243 B.R. 58, 65 (B.A.P. 9th Cir. 1999) (proceeding had to be remanded to bankruptcy court for determination as to whether debtors acted with intent to hinder, delay or defraud); see also, generally, In re 716 Third Ave. Holding Corp., 340 F.2d 42, 47 (2d Cir. 1964) (specific findings on the basic facts essential to determination of the issues involved are required).

---

[3] If the Court does not deny JFL's petition outright, discovery should be conducted into these matters. Fed. R. Crim. P. 32.2(c)(B).

PETITIONER ALEXIS GARDNER'S REPLY BRIEF REGARDING DISPOSITION OF
ONE HONDA AIRCRAFT

## B. Marshack Misstates Eagan Avenatti's Claim to the Jet

### a. The Estate of EA is Not Entitled to *Any Portion of the Jet.*

Although Marshack correctly recognizes the general rule that constructive trust may form the basis of a petition under 21 U.S.C. § 853(n)(6)(A), his theory of *how* a constructive trust in favor of EA arose here is muddled, poorly supported by facts and is at odds with prior statements by the Trustee.

To begin however, the Trustee asserts that Avenatti breached his fiduciary duties to EA: but this assertion is convulsive in nature and unsubstantiated by the facts.  Based on Marshack's allegations, there were two equity partners at EA: Avenatti & Associates, which was ultimately controlled by Avenatti, who had a 75% ownership interest, and Michael Q. Eagan, who had a 25% interest.  [RJN Ex. 4 ¶ 7, 8, 9.]  Obviously Avenatti could approve of his own actions and, as the firm's managing partner, had the authority to act on behalf of EA.  [Dkt. No. 1102 at 2.] What the Trustee fails to establish in his filing is that *Eagan* disapproved of any of the uses of the purported EA funds for any payment of the jet.  If Eagan approved, of course, there could be no breach of fiduciary duty to EA, and there could be no constructive trust.

Further, it is also unclear whether and when Eagan ceased to be a partner at EA.  The Trustee has only alleged that he received payments until 2016, which would imply that he no longer had any ownership interest in the firm after that point. [RJN Ex. 4 ¶ 36.]

If Avenatti was the only person to ultimately own EA at the time a transfer was made, he obviously could not have breached his fiduciary duty to the firm.  The Trustee has failed to provide any EA partnership agreement or detailed transactional history of who EA paid and for what purpose over the years.[4]  Given that Avenatti

---

[4] If the Court does not deny Marshack's petition outright, discovery should be conducted into these matters. Fed. R. Crim. P. 32.2(c)(B).

PETITIONER ALEXIS GARDNER'S REPLY BRIEF REGARDING DISPOSITION OF ONE HONDA AIRCRAFT

& Associates had, at a minimum, a 75% ownership interest in EA, and that Avenatti was managing partner at EA, they were presumably entitled to substantial compensation from EA, including a substantial portion of the profits. In an EA bankruptcy filing Avenatti was stated to have been paid $1,000,000 in 2015 and $850,000 in 2016. [RJN Ex. 6 at 5.] By way of reference, JFL, under its ICA with EA, was supposed to receive $350,000 as a base salary, 20% of attorneys' fees received as origination fees, and a 25% of the profits of the firm. [Dkt. No. 1104-2 Ex. 1 § 3.] Simply put, Avenatti and/or Avenatti & Associates seemingly were entitled to some portion of EA's revenue and the Trustee has made no showing that the money he identifies as EA's was not in fact Avenatti's to legitimately take.

Marshack cannot assert a constructive trust when he cannot cleanly trace the funds at issue as belonging to EA and not being Avenatti's to take. "[A] constructive trust requires 'money or property identified as belonging in good conscience to the plaintiff [which can] clearly be traced to particular funds or property in the defendant's possession.'" <u>Korea Supply Co. v. Lockheed Martin Corp.</u>, 29 Cal. 4th 1134, 1150 (2003) (quoting <u>Great-W. Life & Annuity Ins. Co. v. Knudson</u>, 534 U.S. 204, 213 (2002)). Constructive trusts are not available when it is no longer possible to clearly trace funds, as when funds from several sources become comingled.

> In order to effectively trace trust funds commingled with other funds, the beneficiary must do more than simply trace the trust proceeds into the trustee's bank accounts. Where trust property is commingled with other property of the trustee (or property belonging to other trust beneficiaries), the beneficiary must trace its own trust property through the trustee's various dealings with it. ***Courts have recognized that, in the case of commingled cash, it is essentially impossible to perform such a tracing***.

<u>United States v. $7,599,358.09</u>, No. CIV.A. 10-5060 SRC, 2011 WL 3611451, at *2 (D.N.J. Aug. 15, 2011) (citations omitted, emphasis added); <u>see</u> <u>also</u> <u>United States v. PokerStars</u>, No. 11 CIV. 2564 LBS, 2012 WL 1659177, at *3 (S.D.N.Y. May 9, 2012) ("Because Full Tilt Poker and Absolute Poker deposited Webb's money into general bank accounts, and did not keep it segregated from other players' accounts—

10

or for that matter, from the companies' own assets—Webb cannot demonstrate that any of the money seized by the Government is actually his").

Further, constructive trust, as an equitable principle, requires the party asserting an interest in it come with clean hands; it is unavailable when the parties are *in pari delicto*.  Taylor v. Fields, 178 Cal. App. 3d 653, 666 (Ct. App. 1986). The doctrine is applicable to criminal forfeiture.  United States v. Shor, 635 F. App'x 358, 360 (9th Cir. 2015) ("Amani participated in the arms transaction, which he knew to be illegal, and Ivory Coast is vicariously liable for his actions. Accordingly, the *in pari delicto* doctrine bars Ivory Coast from recovering the money.")

It was not just *Avenatti* that stole Gardner's money, but also *Eagan Avenatti*, the entity that her retainer agreement was with.  [Dkt. No. 1105-2 Ex. A at 1.]. Again, Avenatti was the managing partner of EA and, via Avenatti & Associates, its majority owner if not its sole owner.  Marshack is attempting to recover for EA funds that formed part of the same transaction through which EA stole Gardner's settlement.  Marshack further asserts that "The transfers to Honda were solely for Avenatti's personal benefit." [Dkt. No. 1102 at 9.] That is not true.  In fact, as seen during the criminal trial, EA, through Avenatti, used the jet extensively for work.

Marshack also asserts that when a partnership is insolvent, its partners owe a fiduciary duty to not dissipate assets to creditors.  [Dkt. No. 1102 at 8.]  However, the cases he cites only discuss duties *creditors* are owed by officers or directors of the insolvent corporation.  See Berg & Berg Enterprises, LLC v. Boyle, 178 Cal. App. 4th 1020, 1041 (2009); Commons v. Schine, 35 Cal. App. 3d 141, 145 (1973). He cites no authority granting a right to the *business* to pursue a constructive trust in such circumstances.[5]

---

[5] Marshack may believe that he can assert the interest of creditors by virtue of being the EA bankruptcy trustee.  See, e.g., 11 U.S.C. § 544(b)(1).  However, he only became Trustee *after* EA declared bankruptcy in 2019, years after Gardner's settlement funds were stolen in January of 2017, so this could not be a basis for his (footnote continued)

Further, the Trustee's argument is akin to a fraudulent/voidable transfer argument, which has been <u>rejected</u> in the criminal forfeiture context.  In <u>United States v. Corpus</u>, the property to be forfeited was land that had been the subject of a fraudulent transfer.  491 F.3d 205(5th Cir. 2007).  The petitioners were creditors whose claims arose before the land was transferred, but obtained a judgment against after the transfer occurred.  <u>Id.</u> at 207–08. The government took the position that "even if the transfer was fraudulent, [the Texas Uniform Fraudulent Transactions Act] does not give the [creditors] an equitable interest—let alone a superior interest—in the Cottonwood property because a defrauded creditor does not take legal or equitable title to property fraudulently conveyed." <u>Id.</u> at 210.  The Fifth Circuit agreed with the government, explaining that at the time of the transfer, the creditors were not judgment creditors or lien creditors of the transferors, but at best unsecured creditors with a pending breach of contract claim.  <u>Id.</u> at 211.  Following the general rule that an unsecured creditor has to show an interest in the *particular* piece of property, rather than just the debtor's estate, the court concluded that the petitioners were not entitled to the property.  <u>Id.</u> at 211.

> It explained that "[a]s between a transferor . . .and a transferee. . ., the transferee holds title to fraudulently conveyed property and a transferor may assert no right, title, or interest in the property. Even where a defrauded creditor sets aside a transfer as fraudulent, the defrauded creditor does not take legal or equitable title to the fraudulently transferred property. Instead, legal and equitable title remain with the debtor relative to a defrauded creditor. As such, even if the transfer to [the transferee] is set aside under TUFTA, the [creditor/petitioner] would not obtain a legal right or interest in the Cottonwood property.

<u>Id.</u> at  211–12 (citations omitted).  The creditors' interest, as discussed in <u>Berg</u> and <u>Commons</u>, would merely be that of general creditors without any interest in a particular piece of property.

---

ability to assert an interest in the plane.  21 U.S.C. § 853(n)(6)(A) [RJN Ex. 3.]

PETITIONER ALEXIS GARDNER'S REPLY BRIEF REGARDING DISPOSITION OF ONE HONDA AIRCRAFT

"Congress noted that § 853(n)(6) 'should be construed to deny relief to third parties acting as nominees of the defendant or who knowingly engage in sham or fraudulent transactions.'" <u>United States v. Morgan</u>, 224 F.3d 339, 343 (4th Cir. 2000) (quoting S.Rep. No. 225, reprinted in 1984 U.S.C.C.A.N. 3182, 3392 n. 47). "Failing to look beyond bare legal title or whether the petitioner has a property interest under state law would foster manipulation of ownership by persons engaged in criminal activity." <u>Id.</u> at 343.  Nor can a corporate entity that was actually controlled by the defendant assert a claim to the property subject to forfeiture. <u>United States v. Parenteau</u>, 647 F. App'x 593, 596–98 (6th Cir. 2016).  Evidence that the entity was dominated by the defendant, was a mere façade, that the defendant diverted funds from the entity for his personal use, and that the entity was a tool for the defendant's gain all support rejecting the petition of the entity.  <u>Id.</u> at 596, 598.

Based on the allegations of the various other petitioners, EA, and Avenatti & Associates are sham organizations ultimately controlled by Avenatti himself. Marshack himself has alleged that EA and Avenatti & Associates' "business affairs are inextricably entangled with EA's financial transactions" and that it is "nothing more than a dba for EA to practice law."  [RJN Ex. 5 ¶ 200.]

JFL has likewise alleged that "Avenatti is the sole shareholder of Avenatti & Associates, APC and the company operated as the alter ego of Avenatti" [Dkt. No. 1104 at 3], an allegation based on Frank's declaration [Dkt. No. 1104-1 ¶ 29.] Neither Gardner nor her counsel have any independent knowledge regarding these alter ego allegations but, based on these assertions, it follows that EA was Avenatti's alter ego, meaning that any claim to the jet by EA's estate is barred because EA was the alter ego of Avenatti.  It does not matter that Marshack is now the EA bankruptcy Trustee, because, as is noted above, the relevant question is what the property interests are at the time the crime was committed that results in the forfeiture.

The ultimate outcome from applying any of these doctrines is that Marshack cannot assert any interest.  Although this outcome "may [be] detrimental to the

bankruptcy estate, 'Congress did not intend section 853(n) to serve as a vehicle by which all innocent third parties who are aggrieved by an order of criminal forfeiture can petition for judicial relief.'" United States v. Calle Serna, No. 06-CR-91 (SLT), 2017 WL 3738413, at *6 (E.D.N.Y. Aug. 29, 2017) (quoting DSI Assocs. LLC v. United States, 496 F.3d 175, 186 (2d Cir. 2007)).  Although Marshack implies Avenatti's criminal victims would get the money he is seeking, it is unlikely that there would be anything left after the secured claims of JFL and the fees of Marshack and his attorneys.  [RJN Ex. 13, 14, 15, 16.]

### b.  EA Has No Interest in the Individual Transactions Marshack Has Identified.

Putting aside the fact that EA has no interest in *any part* of the jet for the reasons stated above, the Trustee's analysis of the individual transactions is flawed and, in one instance, contrary to prior statements.

### i.  The $425,000 Transfer on January 27, 2017

The first transfer that Marshack references as belonging to EA is dated January 27, 2017. But on that day there was no transfer from EA to Honda. Rather, Marshack explains the transaction as follows: "On June 2, 2014, Avenatti caused EA to transfer $525,000 of its funds to Honda (the "First Transfer"). Docket No. 989, ECF pages 62 & 193. On January 27, 2017, the parties agreed that $425,000 of that amount would be applied to the purchase of the Honda Jet. Docket No. 989, ECF pages 235-236." However, a cursory review of the relevant documents shows that this transaction is completely irrelevant for the purposes here.

The reference to pages 235 and 236 of the Dkt No. 989 is telling. It points to a purported contract between Honda and Avenatti & Associates, dated January 27, 2017, for the termination of a separate aircraft purchase order (contract number 40000021). While the documents show that there will be a transfer of funds, it does not state where the funds arise from: "[Avenatti & Associates] has requested a termination of the Agreement and transfer to the Remaining Contract of the deposits

paid under the Agreement in the amount of Four Hundred Twenty-Five Thousand Dollars and No Cents (USO $425,000.00) (the "Deposit"). As of the effective date of this Release, circumstances exist to allow termination of the Agreement, transfer of the Deposit, and release of the aircraft delivery commitment."

As mentioned above, in the documents cited by Marshack, there is no reference at all to EA, let alone to a wire from 2014 in the amount of $525,000. Quite the opposite actually: the references speak of only Avenatti & Associates and of deposits totaling $425,000 (not $525,000). Hence, the record is completely devoid of any substantiation of these $425,000 dollars belonging to EA. For all we know, those funds could have been obtained by Honda as a result of separate payments by Avenatti & Associates. Either way, Marshack cannot show any lineage to these funds, and much less that they were funds that belonged to EA. There is no real way of telling what the funds pertained to.  Thus, the Trustee has not established the interest by "by a preponderance of the evidence." 21 U.S.C. § 853(n)(6).

### ii.  The $138,880 Transfer on January 20, 2017

In his pleading before this Court, Marshack states that "On January 20, 2017, Avenatti caused EA to transfer $138,800 of its funds to Honda (the "Second Transfer"). Docket No. 989, ECF pages 154 & 215-218." However, a review of the bank accounts at issue (on page 152 of Dkt 989) shows that, on January 20, 2017, the bank account at issue (EA's operating account #2851) received a total of six (6) separate wires from Passport 420 LLC's bank account for a total of $1,984,198. [Dkt 989 page 152]. At the time of these time of the aforementioned six wires, the balance on the 2851 account was of $1,152.84[6]. [Dkt 989 page 155] On the same day, EA

---

[6] It is unclear if the "Daily Balances" indicated on EA's #2851 bank account statement refer to the opening or closing balance for the day. If it is the former, then the amount in the bank account was, in fact, $1,152.84. However, if they reflect the closing balance, then, at the time of the wires, the EA account #2851 was **overdrawn** of $10,235.45.

sent a wire transfer in the amount of $138,880 directly to Honda Aircraft.

Looking at the bank account of Passport 420 LLC, it is readily apparent that the six wires that arrived into EA's 2851 account on January 20, 2017 belonged to Mr. Parrish. In fact, a review of Dkt 989 page 16, will show that on January 18, 2017, Mr. Parrish's trust wired $1,985,000 to the bank account of Passport 420 LLC. [Dkt 989 at 16]

In summary, the $138,880 wire was not EA's funds, but rather funds that belonged to either Mr. Parrish or Passport 420 LLC--but certainly not to EA. This was recognized by Marshak when, in September of 2022, he filed a chart showing the flow of funds to Honda for the purchase of the jet. Under the heading "Source of Funds" Marshack identifies unequivocally "Parrish Family Trust." [Dkt 989 at 127.]

### iii. The $832,500 Transfer of Gardner's Stolen Money on January 26, 2017.

In asserting that EA is entitled to a $832,5000 contingent fee for its work stealing Gardner's settlement, Marshack finds himself parroting the position of Avenatti, a convicted felon.  [Dkt. No. 1102 at 4-5.]  He has no authority backing this position up, and this Court has already rejected this position:

> Avenatti claims that he is entitled to offset the fees and costs specified in his client agreements. (Motion for Evidentiary Hearing, Docket No. 1024, pp. 4-13 & Exhibits.) He ignores the fact that a lawyer by his conduct may forfeit his fees: "Fraud or unfairness on the part of the attorney will prevent him from recovering for services rendered; as will acts in violation or excess of authority, and acts of impropriety inconsistent with the character of the profession, and incompatible with the faithful discharge of its duties." Clark v. Millsap, 197 Cal. 765, 785 (1926) (internal quotation marks deleted). Clark fairly describes Avenatti's conduct in this case. The Ninth Circuit has recognized the propriety of forfeiture such as the one ordered here. See Rodriguez v. Disner, 688 F.3d 645, 655 (9th Cir. 2012). The Court has considered the factors in the Restatement (Third) of Law Governing Lawyers § 37, and finds that they support a forfeiture here

[Dkt. No. 1053 at 3.]  Gardner has already explained at length why the fees are

forfeited.  [Dkt. No. 1105 at 4-8.]  There is no way for Marshack to separate Avenatti's actions from EA.  Further, any attempt to seek a contingent fee fails because the fee never became fixed.

### iv.  The $10,000 on June 28, 2018 Transfer

Marshack asserts that "On June 18, 2018, Avenatti received in a personal account a deposit of $17,000,000, representing settlement funds received in connection with a settlement for EA's clients. Of that money, EA was entitled to $1,700,000 as its contingency fee" and Avenatti then "wired $10,000 of the funds remaining (which belonged to EA) to Honda on June 28, 2018." [Dkt. No. 1102 at 5.]  First, neither of the documents Marshack cites support his assertion that the funds received were *EA clients* or that EA was entitled to any contingent fee whatsoever.  There is no way of telling what the transaction pertained to.  Thus, the Trustee has not established the interest by "by a preponderance of the evidence." 21 U.S.C. § 853(n)(6).  Second, there is no indication that this payment went towards the purchase of the jet.  The jet was delivered a year and a half earlier on January 27, 2017, after it had been fully paid.  [Dkt. No. 1103-1 Ex. C.]

### C. Spring Creek Misstates Its Claim to the Jet

#### a.  Spring Creek Has No Claim to the Jet

Spring Creek plays fast and loose with the facts, and ignores that it is not the entity that would have an interest in the jet relating to funds it and/or Parrish contributed--that is *Passport 420*[7], not Spring Creek.  Under California law, "[t]he

---

[7] Parrish, who now controls Passport 420 as well [RJN Ex. 1 ¶ 18] made a tactical decision to **only** submit a petition on behalf of Spring Creek, rather than, for example, both it and Passport 420.  He has caused Passport 420 to file a separate lawsuit against Passport 420's insurer seeking compensation arising out of the seizure of the met.  [RJN Ex. 1.]  By structuring the lawsuits in this manner, Parrish would be able to double dip since the Spring Creek's recovery in this action would not reduce anything Passport 420 could recover in the Starr action.  Spring Creek lacks standing to bring a petition relating to Passport 420's ownership interests.
(footnote continued)

PETITIONER ALEXIS GARDNER'S REPLY BRIEF REGARDING DISPOSITION OF ONE HONDA AIRCRAFT

owner of the legal title to property is presumed to be the owner of the full beneficial title. This presumption may be rebutted only by clear and convincing proof." Cal. Evid. Code § 662. "Thus, in the absence of any showing to the contrary, the status declared by the instrument through which [the parties] acquired title is controlling. The presumption can be overcome only by evidence of an agreement or understanding between the parties that the title reflected in the deed is <u>not</u> what the parties intended. This standard requires evidence that is so clear as to leave no substantial doubt and sufficiently strong to command the unhesitating assent of every reasonable mind." <u>In re Shapow</u>, 599 B.R. 51, 79 (Bankr. C.D. Cal. 2019)(emphasis added).

Simply put, all of the documents at issue make clear that it was Passport 420, not Spring Creek that was purchasing the jet, and that any payments towards the jet were made with that intention. Spring Creek's position is one taken ex post facto following the seizure of the jet. Parrish admits the true purpose of the payments, stating that

> On July 7, 2016, on behalf of Spring Creek, I wired $350,000 from my family trust account directly to the account of Honda Aircraft at Wells Fargo Bank NA, as a down payment **on the Honda Jet that would be owned and operated by an LLC** in which the members would include Spring Creek and . . . Avenatti & Associates

Dkt. No. 1103-1 ¶ 4 (emphasis added). That LLC, of course, was Passport 420, which had been formed on April 14, 2016. [Ex. D to Ex. 1 to RJN Ex. 2.] Parrish himself acknowledges that the operating agreement specifies that Passport 420 would lease the jet to its members. [ Dkt. No. 1103-1 ¶ 5.] The operating agreement specifically states that "**Initial capital requirements** and subsequent payments **to**

---

United States v. Two Bank Accts. Described as: Bank Acct. In amount of $197,524.99 Bank of Am., Seattle, Wash., No. 06-4005, 2008 WL 5431199, at *6 (D.S.D. Dec. 31, 2008) ("[Petitioner] as a shareholder of the corporations, does not have an ownership interest in any specific property owned by the corporations").

PETITIONER ALEXIS GARDNER'S REPLY BRIEF REGARDING DISPOSITION OF
ONE HONDA AIRCRAFT

**the Company** shall be in accordance with Exhibit A." [Dkt. No. 1103-1 Ex. A § 2.3.]   The referenced exhibit specifies that Spring Creek was to make an initial capital contribution of $350,000 and subsequent capital contribution of $1,950,000. [Dkt. No. 1103-1 Ex. A to Ex. A.][8]   This was money going into Passport 420. If Spring Creek and Avenatti & Associates were actually the entities that were supposed to own the jet, there would be no need for Passport 420 to lease it to them, nor could it lease out something that it did not own.

Parrish admits it was *Passport 420* that took title and he attaches documents showing this fact.  [Dkt. No. 1103-1 ¶ 11 and Ex. C.]  Parrish, as manager of Passport 420, obtained insurance for the aircraft and submitted a proof of loss demanding Passport 420 be paid $3,990,000 when the jet was seized by the government.[9]   [Ex. J to Ex. 1 to RJN Ex. 2 at 256, 259, 260; Ex. 6 to RJN Ex. 2 ; JRN Ex. 1 ¶ 21.] He has also taken the position that he, Passport 420, and Spring Creek are *all* its owners in litigation against the insurer due to its failure thus far to pay.  [RJN Ex. 1 ¶ 1.]

Nothing Spring Creek points to can negate these facts.  Spring Creek asserts that "Spring Creek was owed its interest in the aircraft from Passport, and Passport had a pre-existing obligation to perform" and that "Avenatti, as Passport's then-Manager, had no right to 'give away' more than the one-half he owned as a member of A&A."  [Dkt. No. 1103 at 16.]  None of this matters, however.  The jet purchase was not completed until *after* Gardner's money was stolen.

Whatever it is that Spring Creek believes Passport 420 was supposed to do with respect to the jet, it could not do until it received the jet from Honda.  Passport

---

[8] Spring Creek repeatedly states that it has a majority interest in the jet, but this same exhibit states that each member of Passport 420 has a 50% interest.  "The operating agreement itself states that each Member's ownership interest in the Aircraft will be according to and the same as their ownership interest In the Company as set forth on Exhibit A."  [Dkt. No. 1103-1 Ex. A at 11.]

[9] It is unclear how Passport 420 could have an insurable interest requiring that it be be paid pursuant to the insurance policy if it was <u>not</u> an owner of the jet.

PETITIONER ALEXIS GARDNER'S REPLY BRIEF REGARDING DISPOSITION OF ONE HONDA AIRCRAFT

420 acquired the jet, purchased with proceeds from the crime, after the crime, and therefore the forfeiture, had already occurred.  Again, Passport 420 might have a stronger argument to having an interest in the jet, but Parrish opted to have Spring Creek (rather than Passport 420) bring this petition.  Instead, Spring Creek is left with legally incoherent arguments that simultaneously require it to rely on the terms of the operating agreement to stake its claim to the jet, while ignoring that doing so would mean that Passport 420 would have been the entity that first acquired an interest in it.[10]

Spring Creek asserts it is a bona fide purchaser but "21 U.S.C. § 853(n)(6)(B) is of no help to [it] in this case. That provision exists only to protect subsequent purchasers of '*the defendant's interest*' in an asset." United States v. Soreide, 461 F.3d 1351, 1356 (11th Cir. 2006) (emphasis in original) (quoting United States v. Kennedy, 201 F.3d 1324, 1330 (11th Cir. 2000)); United States v. White, 306 F. App'x 838, 841 (5th Cir. 2007) ("The bona fide purchaser provision in 21 U.S.C. § 853(n)(6)(B) is applicable only to *purchases* of the forfeiter's interest in the asset.") (emphasis in original); United States v. Reckmeyer, 836 F.2d 200, 208 (4th Cir. 1987) (interpreting provision as applying to "all persons who give value to the defendant in an arms'-length transaction with the expectation that they would receive equivalent value in return"); United States v. Simmons, No. 17-CR-127 (KMW), 2019 WL 3532113, at *5 (S.D.N.Y. Aug. 2, 2019) (same).  Spring Creek is not asserting that it purchased Avenatti's interest in the jet.  Quite the opposite, in the same section in makes the bona fide purchaser argument, it states that "Spring Creek purchased its interest through and from Honda and Passport only, not Michael Avenatti. And Avenatti, the only criminal defendant here, never had any legitimate ownership in the jet as an individual."  [Dkt. No. 1103 at 17 (emphasis added).]

_____

[10] Spring Creek itself at one point claims that it "became a majority owner based on its acquisition from Honda **and** Passport."  [Dkt. No. 1103 at 18.]

PETITIONER ALEXIS GARDNER'S REPLY BRIEF REGARDING DISPOSITION OF ONE HONDA AIRCRAFT

Spring Creek's argument also fails because, even if it was somehow acquiring title to the jet, it was not *purchasing* the jet. It had contributed money capital to start up Passport 420. If Passport 420 is deemed to have then transferred ownership to Spring Creek, it was not paying Passport 420 for the jet. Nor was Spring Creek paying *anyone* for the jet (or to lease the jet). Both payments Parrish references were made by Parrish taking money from his family trust account.[11] [Dkt. No. 1103-1 ¶ 4, 6.] In addition, some of the money was sent by Parrish to Honda, while most was sent to Passport 420. Spring Creek never specifies whether it is arguing that the aircraft (or share in the aircraft) was being purchased for $350,000 from Honda, or $1,985,000 from Passport 420, but in either case in either case it would have been paying significantly less than 52% of the purchase price of the jet.

Additionally, Spring Creek's argument that it used the jet is completely irrelevant. [1103 at 18-19.] It is consistent with the operating agreement and therefore does nothing to contradict the notion that Passport 420, rather than Spring Creek has the stronger ownership interest. More importantly, it has nothing to do with the required analysis of whether Spring Creek had an interest at the time Avenatti stole Gardner's money. Obviously, Spring Creek's use of the jet postdates the acquisition of the jet using the stolen money.

Last, Spring Creek's constructive trust argument fails because, although the constructive trust doctrine exists in the forfeiture context, it cites neither legal authority nor makes any argument that it is applicable here. Instead, it just asserts in a conclusory manner that "a constructive trust arose in favor of Spring Creek, owed to it by non-criminal defendant Passport." [Dkt. No. 1103 at 21.] Again, there

---

[11] The distinction between corporate entities and their members or shareholders must be complied with in forfeiture actions and one cannot assert claims on behalf of the property rights of the other. United States v. Two Bank Accts. Described as: Bank Acct. In amount of $197,524.99 Bank of Am., Seattle, Wash., No. 06-4005, 2008 WL 5431199, at *5-6 (D.S.D. Dec. 31, 2008).

21

1   are issues with this because Spring Creek did not make any payments; Parrish made

2   the payments from his family trust account, and one was directly to Honda.  More

3   importantly, however, the elements of constructive trust are not met.

4          In California the elements for constructive trust are "(1) the existence of a res

5   (property or some interest in property); (2) the right to that res; and (3) the wrongful

6   acquisition or detention of the res by another party who is not entitled to it." Mattel,

7   Inc. v. MGA Ent., Inc., 616 F.3d 904, 909 (9th Cir. 2010).  Spring Creek's central

8   argument throughout its brief is that the money at issue was supposed to be used to

9   purchase a jet.  A jet was in fact purchased using money that Parrish sent.[12]  There

10  has been no wrongful acquisition or detention of the portion of Parrish's money that

11  ultimately wen into the jet.  It was used as it was supposed to be.

   **b. Even if Spring Creek Did Have an Interest in the Jet, It Overstates its Interest.**

   **i. Spring Creek Overstates its Contribution to the Purchase of the Jet.**

16         As indicated above, of the $1,985,000 dollars that Parrish's family trust sent

17  to Passport 420's bank account, only one payment (in the amount of $138,800) is

18  ultimately directly traceable to those funds. [Dkt 989 P. 37]. The only other payment,

19  with those funds, would have been the $858,605 payment made from the AA's 0661

20  account, but that was done only after the commingling of funds with Gardner's

21  remaining $250,000. [Dkt 989 P. 23, 37, 39]. Hence, it is impossible to determine

22  what portion of the $858,605 belonged to Parrish. However, even assuming the

23  entirety of those funds belonged to Parrish, and therefore ignoring the commingling

24  with Gardner's funds (which occurred prior to the wire), the total contribution of

25  Parrish towards the purchase of the jet would be the initial $350,000 wire directly to

27  [12] Some of the money was diverted, as will be explained below, but that is irrelevant
28  for the purposes here.

PETITIONER ALEXIS GARDNER'S REPLY BRIEF REGARDING DISPOSITION OF
ONE HONDA AIRCRAFT

Honda, followed by the $138,800 wire from EA (utilizing Passport 420's funds) and the $858,605 wire from Avenatti & Associates (utilizing commingled funds of Passport 420 and Gardner). That adds up to a total of $1,347,405, significantly less that its currently stated amount.

### ii. As an Entity that Assumed the Risk of the Jet Depreciating, Spring Creek Cannot Complain that the Jet May Have Decreased in Value.

Spring Creek demands that it be given the $2,335,000 that Parrish paid (which mostly did not all go into the purchase of the jet, as was noted above). Putting aside the magnitude of the number being incorrect, there is no logical basis for its argument. Spring Creek argues at length in its brief that really it is the owner of the jet and that "Ms. Gardner, the victim, had no interest in the jet and certainly did not intend to purchase it." Dkt. No. 1103 at 20.] Again, Gardner has a constructive trust interest, the same doctrine that both Marshack and Parrish (unsuccessfully) invoke. That Spring Creek wanted to purchase the jet and Gardner did not is precisely why Spring Creek has to accept the depreciation that jet may have suffered. Vehicles tend to depreciate over time and Spring Creek claims it has a tenant in common interest in the jet based on the Operating Agreement. [Dkt. No. 1103 at 18.]

Had the jet not been purchased with stolen money and never been seized, it would still depreciate, and still require maintenance. Spring Creek agreed to pay for maintenance of the aircraft. [Dkt. No. 103-1 Ex. A. § 5.2.1.4.] If nothing else, Spring Creek got to use the aircraft while it was presumably depreciating, before it was seized. That the aircraft might be sold one day was expressly contemplated in the Operating Agreement, as was the fact that the cause could be due to the manner in which Avenatti & Associates obtained funds for the aircraft. [Dkt. No. 103-1 Ex. A. § 7.1, 7.2, 10, Ex. A to Ex. A (explaining that Avenatti & Associates could finance its $1,831,105 contribution and referencing the fact that could lead to "repossession and/or sale of the Aircraft due to any default"). ]

23

PETITIONER ALEXIS GARDNER'S REPLY BRIEF REGARDING DISPOSITION OF ONE HONDA AIRCRAFT

On the other hand, Gardner did not choose to buy a depreciating asset, and the constructive trust doctrine protects her from the diminution in the aircraft's value. See Bd. of Trustees for Laborers Health & Welfare Tr. Fund for N. California v. Hill, No. C 07-5849 CW, 2009 WL 774093, at *2 (N.D. Cal. Mar. 23, 2009) ("the Restatement of Restitution indicates that, if a commingled fund—or property that is purchased with a commingled fund—diminishes in value, the party whose funds were wrongfully taken is entitled to an equitable lien in the entire amount of his or her original contribution") (citing Restatement (First) of Restitution § 210, comments c and d.); Commodity Futures Trading Comm'n v. Hudgins, 620 F. Supp. 2d 790, 795 (E.D. Tex. 2009) ("courts have applied constructive trust principles such that decreases in value of the home are first charged against the homeowner rather than the lien or constructive trust holder.")

Spring Creek's gripes with the government are legally irrelevant and speculative.  There is no evidence that the aircraft is in worse condition than what it would have been in if it had been maintained according to Parrish's wishes.  In fact, there is no evidence of its present condition at all.

### iii.  Spring Creek's Rights Are Not Superior to Gardner's

Spring Creek argues that its rights are superior to those of Gardner because her interest did not attach until January 26, 2017.  [Dkt. No. 1103 at 23.]  If Spring Creek has any rights at all, its rights would, at best, be equal in priority to those of Gardner.  Until the sale went through and the jet was delivered, any interest Spring Creek would have had would have been in the liquid funds, *not the jet*.  The same is true for Gardner's interest in her stolen settlement money.  However, since Spring Creek's preferred theory appears to be that it somehow acquired the jet from Passport 420, that would place its interest after Gardner's, because it could not have acquired its interest until after the jet was delivered to Passport 420, after Gardner's stolen money had already been used to pay for it.

PETITIONER ALEXIS GARDNER'S REPLY BRIEF REGARDING DISPOSITION OF ONE HONDA AIRCRAFT

### iv.  Gardner's Interest Has Nothing to do With the Court's Restitution Order.

Spring Creek asserts that "Ms. Gardner's restitutionary interest is capped at $1,432,585, and her rights should be limited to that sum." [Dkt. No. 1103 at 23.] It cites no legal authority for this argument and essentially inverts the rules for forfeiture.  A claim under 21 U.S.C.§ 853(n)(6) has nothing to do with whether a petitioner is a victim, but rather the petitioner has a property interest *under state law*. That Gardner is *also a victim* of Avenatti does not cause her rights to be diminished compared to someone like Spring Creek.  What the Court awarded Gardner as restitution has nothing to do with what her property interest is under California law. As the Court noted, California law bars the sort of offset that was made in the restitution calculation.  [Dkt. No. 1053 at 3.]  Restitution is different, and intended to put the victim back into the position she would have been in but for the defendant's criminal conduct.  See United States v. Gagarin, 950 F.3d 596, 607 (9th Cir. 2020).  But for Avenatti stealing the settlement from Gardner, he would not have forfeited the contingent fees due to the severe professional misconduct.  *But he did engage in such conduct*, meaning that he (or EA) was not entitled to any fee and that the portion of the settlement representing the contingent fee is part of the property that was stolen from Gardner and subsequently used to purchase the jet.

### D. BECAUSE NONE OF THE OTHER PETITIONERS HAVE VALID CLAIMS, THE JET BELONGS TO GARDNER

The government has stated that it "does not seek to retain the Disputed Property or, should an interlocutory sale be ordered, the proceeds of any sale of the same." [Dkt. No. 1098 at 11.]  Because Gardner is the only individual who has an interest in the jet, it should be awarded to her.

### V.    CONCLUSION

For foregoing reasons, Gardner is the only petitioner with an interest in the jet.

25

1

2    DATED: June 19, 2023                **THE X-LAW GROUP, P.C.**

3

4

5    By:_____

6    FILIPPO MARCHINO, ESQ.,
     Attorneys for Petitioner Alexis Gardner

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

PETITIONER ALEXIS GARDNER'S REPLY BRIEF REGARDING DISPOSITION OF
ONE HONDA AIRCRAFT

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## **PROOF OF SERVICE**

### **UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA**

At the time of service, I was over 18 years of age and **not a party to this action**.  I am employed in the County of Los Angeles, State of California.  My business address is 625 Fair Oaks Avenue, Suite 390, South Pasadena, CA 91030.

On June 19, 2023, I served the following document(s) described as **PETITIONER ALEXIS GARDNER'S REPLY BRIEF REGARDING DISPOSITION OF ONE HONDA AIRCRAFT** on the interested parties in this action as follows:

BRETT A. SAGEL
Assistant United States Attorney
Major Frauds Section
411 West Fourth Street Suite 8000
Santa Ana, CA 92701
Telephone: 714-338-3598
Faximile: 714-338-3708
Email: brett.sagel@usdoj.gov

RANEE KATZENSTEIN
Assistant United States Attorney
Major Frauds Section
312 North Spring Street 11th Floor
Los Angeles, CA 9001
Telephone: 213-894-2432
Faximile: 213-894-0141
Email: ranee.katzenstein@usdoj.gov

Attorneys for Plaintiff
United States of America

DANIEL G. BOYLE
Assistant United States Attorney
Asset Forfeiture Section
312 North Spring Street, 14th Floor
Los Angeles, CA 90012
Telephone: 213-894-2426|
Facsimile: 213-894-0142
E-Mail: daniel.boyle2@usdoj.gov

Attorneys for Plaintiff
United States of America

**[ X ] BY MAIL:**  I enclosed the document(s) in a sealed envelope or package addressed to the persons identified in the Service List and placed the envelope for collection and mailing, following our ordinary business practices.  I am readily familiar with my firm's practice for collecting and processing correspondence for mailing.  On the same day that the correspondence is placed for collection and mailing, it is deposited in the ordinary course of business with the United States Postal Service, in a sealed envelope with postage fully prepaid.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on June 19, 2023, at South Pasadena, California.

_Suzy Garcia_
_____
Declarant   Suzy Garcia

27

PETITIONER ALEXIS GARDNER'S REPLY BRIEF REGARDING DISPOSITION OF
ONE HONDA AIRCRAFT