Filippo Marchino, Esq. (SBN 256011)
FM@XLAWX.com
Carlos X. Colorado, Esq. (SBN 231031)
CC@XLAWX.com
Thomas E. Gray, Esq. (SBN 299898)
TG@XLAWX.com
**THE X-LAW GROUP, P.C.**
625 Fair Oaks Ave, Suite 390
South Pasadena, CA 91030
Tel: (213) 599-3380
Fax: (213) 599-3370

Attorneys for Petitioner Alexis Gardner

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>Plaintiff,<br><br>v.<br><br>MICHAEL JOHN AVENATTI,<br><br>Defendant | Case No. 8:19-cr-00061-JVS<br><br>**PETITIONER ALEXIS GARDNER'S REQUEST FOR JUDICIAL NOTICE IN SUPPORT OF REPLY BRIEF REGARDING DISPOSITION OF ONE HONDA AIRCRAFT**<br><br>Date:     June 26, 2023<br>Time:     9:00 a.m.<br>Judge:    Honorable James V. Selna<br>Place:    Courtroom 10C<br>          411 W. Fourth St.<br>          Santa Ana, CA 92701 |

Pursuant to Federal Rule of Evidence 201, Petitioner Alexis Gardner respectfully requests that this Court consider and take judicial notice of the exhibits attached hereto.

**Exhibit 1** is a true and correct copy of the Complaint filed by Passport 420, LLC, Spring Creek Research, LLC, and William Parrish in Passport 420, LLC v. Starr Indemnity & Liability Company Santa Barbara County Superior Court Case No. 19CV03596.

**Exhibit 2** is a true and correct copy of Appendix of Exhibits In Support Of Motion For Summary Adjudication Of Issues As Respects Second Cause Of Action And Punitive Damages, filed by Starr Indemnity & Liability Company in Passport 420, LLC v. Starr Indemnity & Liability Company Santa Barbara County Superior Court Case No. 19CV03596.

**Exhibit 3** is a true and correct copy of the Voluntary Petition for Non-Individuals Filing for Bankruptcy filed in In re Eagan Avenatti, LLP, United States Bankruptcy Court for the Central District of California Case No. 8:19-bk-13560-SC.

**Exhibit 4** is a true and correct copy of the Complaint filed by Richard A Marshack, Chapter 7 Trustee For Eagan Avenatti filed in Marshack v. Eagan, United States Bankruptcy Court for the Central District of California Case No. 8:21-ap-01081.

**Exhibit 5** is a true and correct copy of the Third Amended Complaint filed by Richard A Marshack, Chapter 7 Trustee For Eagan Avenatti filed in Marshack v. The X-Law Group, PC, United States Bankruptcy Court for the Central District of California Case No. 8:20-ap-01086-SC.

**Exhibit 6** is a true and correct copy of the Chapter 11 Case Management Summary filed in In re Eagan Avenatti, LLP, United States Bankruptcy Court for the Central District of California Case No. 8:17-bk-11961-CB .

**Exhibit 7** is a true and correct copy of the Settlement Agreement between,

1

PETITIONER ALEXIS GARDNER'S REQUEST FOR JUDICIAL NOTICE

amongst others, JFL and Eagan Avenatti, filed in <u>In re Eagan Avenatti, LLP</u>, United States Bankruptcy Court for the Central District of California Case No. 8:17-bk-11961-CB.

**Exhibit 8** is a true and correct copy of a sworn Declaration of Jason M. Frank, filed in <u>In re Eagan Avenatti, LLP</u>, United States Bankruptcy Court for the Central District of California Case No. 8:17-bk-11961-CB.

**Exhibit 9** is a true and correct copy of the Notice of Motion and Motion for Entry of Judgment Against Eagan Avenatti LLP and in Favor of Jason Frank Law PLC, filed in <u>In re Eagan Avenatti, LLP</u>, United States Bankruptcy Court for the Central District of California Case No. 8:17-bk-11961-CB.

**Exhibit 10** is a true and correct copy of the Declaration of Jason M. Frank in support of his Motion for Entry of Judgment Against Eagan Avenatti LLP and in Favor of Jason Frank Law PLC, filed in <u>In re Eagan Avenatti, LLP</u>, United States Bankruptcy Court for the Central District of California Case No. 8:17-bk-11961-CB

**Exhibit 11** is a true and correct copy of the Order granting the Motion for Entry of Judgment Against Eagan Avenatti LLP and in Favor of Jason Frank Law PLC, filed in <u>In re Eagan Avenatti, LLP</u>, United States Bankruptcy Court for the Central District of California Case No. 8:17-bk-11961-CB.

**Exhibit 12** is a true and correct copy of the "Amendment to Demand for Arbitration", filed as an exhibit to the Declaration of Jason M. Frank (RJN Ex. 8), in <u>In re Eagan Avenatti, LLP</u>, United States Bankruptcy Court for the Central District of California Case No. 8:17-bk-11961-CB.

**Exhibit 13** is a true and correct copy of Trustee's Motion For Order Approving Subordination Agreement With Jason Frank Law, PLC filed in <u>In re Eagan Avenatti, LLP</u>, United States Bankruptcy Court for the Central District of California Case No. 8:19-bk-13560-SC.

**Exhibit 14** is a true and correct copy of Order Granting Trustee's Motion To Approve Subordination Agreement With Jason Frank Law, Plc filed in <u>In re Eagan</u>

Avenatti, LLP, United States Bankruptcy Court for the Central District of California Case No. 8:19-bk-13560-SC.

**Exhibit 15** is a true and correct copy of Motion By Chapter 7 Trustee To Approve Amendment To Subordination Agreement Re: Judgment Lien Held By Jason Frank Law And Terms Of Employment Of Richard L. Kellner As Special Litigation Counsel filed in In re Eagan Avenatti, LLP, United States Bankruptcy Court for the Central District of California Case No. 8:19-bk-13560-SC.

**Exhibit 16** is a true and correct copy of Order Granting Motion To Approve Amendment To Subordination Agreement Re: Judgment Lien Held By Jason Frank Law And Terms Of Employment Of Richard L. Kellner As Special Litigation Counsel filed in In re Eagan Avenatti, LLP, United States Bankruptcy Court for the Central District of California Case No. 8:19-bk-13560-SC.

The doctrine of judicial notice permits a court to take as true "a fact that is not subject to reasonable dispute because it: (1) is generally known within the trial court's territorial jurisdiction; or (2) can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b). The court "***must*** take judicial notice if a party requests it and the court is supplied with the necessary information." Fed. R. Evid. 201(c)(2) (emphasis added).

Courts regularly take judicial notice of "undisputed matters of public record, including documents on file in federal or state courts." Harris v. Cty. of Orange, 682 F.3d 1126, 1132 (9th Cir. 2012) (internal citation omitted); Reed, 2014 WL 12638880, at *2-3 (taking judicial notice of documents filed in L.A. Superior Court to decide a motion to dismiss). This includes transcripts of court hearings and proceedings. See Reyn's Pasta Bella, LLC v. Visa USA, Inc., 442 F.3d 741, 746 n.6 (9th Cir. 2006) (taking judicial notice of a hearing transcript and briefs filed in courts); Business Solutions, LLC v. Ganatra, No. 18-cv-1426-DOC, 2019 WL 926351, at *3 (C.D. Cal. Jan. 7, 2019) (judicially noticing transcript of state-court hearing to decide motion to dismiss); Burbank-Glendale-Pasadena Airport Auth. v.

City of Burbank, 136 F.3d 1360, 1364 (9th Cir. 1998) (judicially noticing "pleadings filed in a related state court action").

Judicial notice of court filings is appropriate where the party shows that the documents "were in fact court documents and matters of public record." Reed, 2014 WL 12638880, at *3; Life Bliss Found. v. Sun TV Network Ltd., No. 13-cv-00393-VAP, 2014 WL 12589657, at *6 (C.D. Cal. Sept. 17, 2014) (taking judicial notice of court filings where defendants "provided reference and case numbers for the documents requested for judicial notice, showing that they were in fact court documents and matters of public record").

# I. GROUNDS FOR CONSIDERING THE ATTACHED EXHIBITS TO DECIDE THE MOTION TO DISMISS

The Court must take judicial notice of Exhibits 1-16, state and federal court records. Judicial notice is warranted because they are court filings or other court records. DJ St. Jon on Behalf of Herself and All Others Similarly Situated v. Tatro, No. 15-cv-2552, 2016 WL 1162678, at *4 (S.D. Cal. Mar. 23, 2016); Reyn's Pasta, 442 F.3d at 746 n.6 (recognizing that "[w]e may take judicial notice of court filings and other matters of public record"); Burbank-Glendale-Pasadena Airport Auth., 136 F.3d at 1364 (granting request to take judicial notice of pleadings filed in related state court action); McVey v. McVey, 26 F. Supp. 3d 980, 984 (C.D. Cal. 2014) ("[P]leadings filed and orders issued in related litigation are proper subjects of judicial notice under Rule 201.").

//

PETITIONER ALEXIS GARDNER'S REQUEST FOR JUDICIAL NOTICE

## II.   CONCLUSION

For the foregoing reasons, the Court should consider Exhibits 1-16.

DATED: June 19, 2023             **THE X-LAW GROUP, P.C.**

By: _____
FILIPPO MARCHINO, ESQ.,
Attorneys for Petitioner Alexis Gardner

PETITIONER ALEXIS GARDNER'S REQUEST FOR JUDICIAL NOTICE

# EXHIBIT 1

1  Jerold Oshinsky (Cal. Bar No. 250771)
2  joshinsky@kasowitz.com
   Kirsten C. Jackson (Cal. Bar No. 265952)
3  kjackson@kasowitz.com
   KASOWITZ BENSON TORRES LLP
4  2029 Century Park East, Suite 2000
   Los Angeles, CA 90067
5  Telephone: (424) 288-7900
   Facsimile: (424) 288-7901
6
   A. Barry Cappello (Cal. Bar No. 37385)
7  abc@cappellonoel.com
   Lawrence J. Conlan (Cal. Bar No. 221350)
8  lconlan@cappellonoel.com
   CAPPELLO & NOËL LLP
9  831 State Street
   Santa Barbara, CA 93101-3227
10 Telephone: (805) 564-2444
   Facsimile: (805) 965-5950
11
   Attorneys for Plaintiffs

ELECTRONICALLY FILED
Superior Court of California
County of Santa Barbara
Darrel E. Parker, Executive Officer
7/11/2019 3:34 PM
By: Elizabeth Spann, Deputy

## SUPERIOR COURT OF THE STATE OF CALIFORNIA

## FOR THE COUNTY OF SANTA BARBARA

| | |
|---|---|
| PASSPORT 420, LLC, a Delaware Limited Liability Company; SPRING CREEK RESEARCH, LLC, a California Limited Liability Company; and WILLIAM PARRISH, an Individual, <br><br> Plaintiffs, <br><br> vs. <br><br> STARR INDEMNITY & LIABILITY COMPANY, a Texas Corporation; AVENATTI & ASSOCIATES, APC, a California Professional Corporation; MICHAEL J. AVENATTI, an Individual; and DOES 1 through 10, <br><br> Defendants. | **CASE NO.:** 19CV03596 <br><br> **COMPLAINT FOR** <br><br> **(1) BREACH OF CONTRACT;** <br><br> **(2) TORTIOUS BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING;** <br><br> **(3) DECLARATORY RELIEF** <br><br> **DEMAND FOR JURY TRIAL** |

1

**COMPLAINT**

Plaintiffs complain of defendants and allege as follows:

## NATURE OF THIS ACTION

1.      This is an action by Plaintiffs Passport 420, LLC ("Passport"), Spring Creek Research, LLC ("Spring Creek") and William Parrish ("Mr. Parrish") (together, "Plaintiffs"), against Defendant Starr Indemnity & Liability Company ("Starr Indemnity"), Avenatti & Associates, APC ("Avenatti & Associates") and Michael J. Avenatti ("Mr. Avenatti") (together, "Defendants") in connection with losses resulting from the government seizure of the aircraft owned and operated by Plaintiffs.

## THE PARTIES

2.      Plaintiff Passport 420, LLC is a Delaware Limited Liability Company that operates in the State of California and the County of Santa Barbara.

3.      Plaintiff Spring Creek Research, LLC is a California Limited Liability Company that operates in the State of California and the County of Santa Barbara.

4.      Plaintiff William Parrish is an individual residing in the State of California and the County of Santa Barbara.

5.      Defendant Starr Indemnity is a Texas Corporation.  Defendant Starr Indemnity is registered with the California Secretary of State, and is authorized to do business throughout the State of California. Plaintiffs are informed and believe, and on that basis allege, that Defendant Starr Indemnity actually does substantial business in the State of California and the County of Santa Barbara, including providing insurance coverage to Plaintiffs in the State of California and the County of Santa Barbara.  Plaintiffs are also informed and believe, and on that basis allege, that Defendant Starr Indemnity's California offices are located at 6267 Carpinteria Avenue, Suite 101, Carpinteria, California 93013, in the County of Santa Barbara.

6.      Defendant Avenatti & Associates is a California Professional Corporation whose offices are located in Newport Beach, California.  Defendant Starr Indemnity has asserted that it is not responsible for the loss and damages alleged herein on the basis of conduct by Defendant Avenatti & Associates.  Plaintiffs are also informed and believe, and on that basis allege, that

Defendant Avenatti & Associates may incorrectly assert a claim, right, or interest in the insurance policy which is the subject of this action.

7.     Defendant Michael J. Avenatti is an individual residing in the State of California and, on information and belief, in the County of Los Angeles.  Defendant Starr Indemnity has asserted that it is not responsible for the loss and damages alleged herein on the basis of conduct by Mr. Avenatti.  Plaintiffs are also informed and believe, and on that basis allege, that Mr. Avenatti may incorrectly assert a claim, right, or interest in the insurance policy which is the subject of the action.

8.     Plaintiffs do not currently know the true names and capacities, whether individual, associate, partnership, corporate, or otherwise, of the defendants fictitiously designated as Does 1 through 10 and therefore sue those defendants by these fictitious names.  Plaintiffs are informed and believe, and on that basis allege, that Does 1 through 10, in some way currently unknown have underwritten, provided, procured, assisted in procuring or communicated regarding insurance coverage for Plaintiffs, or have participated in the decision by Defendant Starr Indemnity to deny coverage to Plaintiffs, or are otherwise responsible for the loss and damages alleged herein, and that Does 1 through 10 are authorized to, and are in fact, doing and transacting business in the State of California and the County of Santa Barbara.  Plaintiffs will seek leave of Court to amend this Complaint when the true names and capacities of these fictitiously named defendants have been ascertained.

## JURISDICTION AND VENUE

9.     Subject matter jurisdiction is proper in the Superior Court of the State of California for the County of Santa Barbara, which is a court of general jurisdiction.

10.     Personal jurisdiction over all Defendants is proper under California Code of Civil Procedure Section 410.10, which provides that California courts are authorized to exercise jurisdiction over parties "on any basis not inconsistent with the Constitution."

11.     Personal jurisdiction over non-resident Defendant Starr Indemnity is proper, as Defendant Starr Indemnity has purposeful contacts with the California forum.  Defendant Starr

**COMPLAINT**

Indemnity (a) has offices in California, including, on information and belief, an office located at 6267 Carpinteria Avenue, Suite 101, Carpinteria, California 93013, in the County of Santa Barbara, (b) does substantial, continuous and systematic business in the State of California, (c) has performed acts and consummated transactions in California giving rise to the allegations and claims in this Complaint, including selling insurance to California residents, including Plaintiffs, and (d) has performed activities out-of-state that were aimed at and had an effect in California, including denying the California Plaintiffs' claim for insurance coverage.

12.    Personal jurisdiction over California resident Defendant Avenatti & Associates is proper, as Avenatti & Associates is incorporated, headquartered and domiciled in California. Defendant Avenatti & Associates is registered with the California Secretary of State to do business in California.   Defendant Avenatti & Associates does substantial, continuous and systematic business in the State of California.

13.    Personal jurisdiction over Defendant Michael J. Avenatti is proper, as he is a California resident.  Mr. Avenatti also does substantial, continuous and systematic business in the State of California.

14.    Venue is proper under California Code of Civil Procedure Section 393 in the Superior Court of the State of California for the County of Santa Barbara because the wrongful conduct alleged herein took place, in whole or in part, in the County of Santa Barbara and the insurance contract at issue was entered into in the County of Santa Barbara with a Santa Barbara-based company, Passport.

## **FACTUAL ALLEGATIONS**

15.    Plaintiff William Parrish began contemplating the joint purchase of a private aircraft with his then-attorney Defendant Michael J. Avenatti in approximately June 2016.  On July 7, 2016, Mr. Parrish wired $350,000 from his family trust account to the account of Honda Aircraft at Wells Fargo Bank NA as a down payment on the Honda Jet that would be owned and operated by Mr. Parrish and Mr. Avenatti.

16.    Mr. Parrish and Mr. Avenatti formed Passport and entered into an operating

agreement dated July 11, 2016.  Mr. Parrish owns his interest in Passport through an entity called Spring Creek Research, LLC.  Mr. Avenatti purchased his interest in Passport through Avenatti & Associates, APC.

17.   On January 18, 2017, Mr. Parrish wired an additional $1,985,000 from his family trust account into the account that had been opened at California Bank & Trust in the name of Passport, for the purchase of the aircraft.  The total net purchase price of the Honda Jet was $4,383,605, which included the base price, adjusted, plus options and tax.  Taking into account a small rebate, Mr. Parrish holds a 52.7% ownership interest in the aircraft, based on his total contribution of $2,311,000.

18.   At the time Passport was formed, Mr. Avenatti, individually, became the manager for a term of one year.  By the summer of 2018, it became evident that Mr. Avenatti was not performing his duties as manager and had breached his fiduciary duties as an attorney for Mr. Parrish.  Accordingly, he was removed as manager on August 29, 2018, without objection, and Mr. Parrish, individually, assumed the role of manager.  At approximately the same time, Mr. Avenatti was terminated as Mr. Parrish's attorney.  From August 29, 2018, until the present, Mr. Parrish has handled all manager duties for Passport and funded operational and maintenance expenses for the Honda Jet.

19.   Defendant Starr Indemnity sold to Plaintiffs an Elite Comprehensive Corporate Aircraft Policy No. 1000320046-03 (the "Policy"), which provides coverage during the policy period from January 26, 2019 until January 26, 2020.  Plaintiff Passport is the "Named Insured." Plaintiff Spring Creek is the LLC Member designated by Passport's operating agreement to be the Loss Payee.  In turn, Plaintiff William Parrish is an LLC Member of Spring Creek.  Thus both Plaintiff Spring Creek and Plaintiff William Parrish are "Insureds" as that term is defined, in relevant part, by the Policy: "Insured means . . . for all coverage . . . any director, officer, partner, employee or stockholder of the Named Insured *while that person is acting within their official capacity as such*" (emphasis added).  A true and correct copy of the Policy is attached hereto as **Exhibit A**.

20.     Among other provisions, the insuring agreement in Endorsement No. 10 provides coverage up to $10 million for the "physical loss of . . . any scheduled aircraft . . . during the policy period arising out of any of the following perils:  (e) confiscation, nationalization, *seizure*, restraint, detention, appropriation, requisition for title, [or] use by . . . any government, public or local authority, whether civil, military, or de facto."  The Declarations Page of the Policy lists the Honda Jet as a "scheduled aircraft."  Endorsement No. 10 also provides coverage for extra expenses incurred following a seizure.

21.     The federal government seized the Honda Jet on April 10, 2019.  Subsequently, Plaintiffs provided a Sworn Statement in Proof of Loss to Defendant Starr Indemnity.  At a minimum, the seizure of the Honda Jet by the federal government is covered by the plain terms of the Policy's Endorsement No. 10, as it concerns the "seizure" of a "scheduled aircraft" by "any government" "during the policy period."

22.     Nonetheless, to date, Defendant Starr Indemnity has refused to acknowledge coverage for the federal government's seizure of the Honda Jet.  Defendant Starr Indemnity acknowledged that the seizure falls within the Policy's Endorsement No. 10, but asserts that coverage may be limited by the conduct of Mr. Avenatti in connection to the pending criminal charges against him in the Central District of California.  Plaintiffs have no knowledge or understanding of the criminal charges pending against Mr. Avenatti other than what is contained in public filings and media reports.  Irrespective of whether the criminal charges against Mr. Avenatti individually are proven, his alleged criminal acts are not attributable to Plaintiffs, and the seizure of the aircraft did not originate by any act, design or procurement of Plaintiffs, nor by any act of Mr. Avenatti in his capacity as the former manager of Plaintiff Passport (the term of which ended prior to the policy period).

23.     By issuing the Policy, Defendant Starr Indemnity agreed to provide coverage for the Plaintiffs against seizure of the Honda Jet.  Defendant Starr Indemnity cannot now renege on that agreement, as it appears to have done.  Regardless of whether the government seizure was lawful or legitimate, and regardless of whether Mr. Avenatti is found guilty of the crimes for which

he has been charged, the fact remains that the aircraft that Starr Indemnity insured has been seized by the federal government and is no longer in the possession or control of Plaintiffs. Plaintiffs are therefore unable to use the aircraft, and have been deprived of the value of their interest in it. Accordingly, by this lawsuit Plaintiffs demand that Defendant Starr Indemnity immediately pay this covered loss.

## FIRST CAUSE OF ACTION

### (Breach of Contract – Against Defendant Starr Indemnity and Does 1-10)

24.     Plaintiffs re-allege and incorporate by reference herein each allegation contained in paragraphs 1 through 23 above.

25.     Defendant Starr Indemnity had duties under the Policy, the law, and insurance industry custom and practice to, among other things, pay Plaintiffs for the loss of the Honda Jet. Defendant Starr Indemnity likewise was obligated to conduct a thorough investigation of all bases that might support Plaintiffs' claim for coverage, yet failed to do so.

26.     Defendant Starr Indemnity breached its duties under the Policy by failing to pay Plaintiffs for the loss of the Honda Jet; asserting grounds to avoid or limit coverage that it knew were not supported by, and are contrary to, the terms of the Policy, the law, industry custom and practice, the parties' course of dealings, and the facts; failing to conduct an adequate investigation of Plaintiffs' claims and asserting grounds to avoid coverage based on its inadequate investigation; failing to fully inquire into possible bases that might support coverage for Plaintiffs; and by giving greater consideration to its own interests than they gave to Plaintiffs' interests as Insureds.

27.     As a direct and proximate result of Defendant Starr Indemnity's breach of contract, Plaintiffs have suffered, and continue to suffer, damages in an amount in excess of the Court's jurisdictional limits. When the precise amount of Plaintiffs' damages are known, they will assert those damages accordingly.

## SECOND CAUSE OF ACTION

### (Breach of the Covenant of Good Faith and Fair Dealing – Against Defendant Starr Indemnity and Does 1-10)

**COMPLAINT**

28.     Plaintiffs re-allege and incorporate by reference herein each allegation contained in paragraphs 1 through 27 above.

29.     In breach of the implied covenant of good faith and fair dealing, Defendant Starr Indemnity did the things and committed the acts alleged above for the purpose of consciously withholding from Plaintiffs the rights and benefits to which they are entitled under Policy and without considering Plaintiffs' interests at least to the same extent as Defendant Starr Indemnity considered its own interests.

30.     As a direct and proximate result of Defendant Starr Indemnity's unreasonable acts, Plaintiffs have been damaged in an amount in excess of the Court's jurisdictional limits.  The actual amount of damages has not yet been precisely ascertained.  When the precise amount of Plaintiffs' damages are known, they will assert those damages accordingly.

31.     Defendant Starr Indemnity's acts are inconsistent with Plaintiffs' reasonable expectations, and are contrary to established insurance claims practices and legal requirements, and constitute bad faith.

32.     Pursuant to the holding in *Brandt   v. Superior Court*, 37 Cal. 3d 813 (1985), Plaintiffs are entitled to recover all attorneys' fees that they reasonably have incurred, and are incurring, in their efforts to obtain the benefits of the coverage that Defendant Starr Indemnity wrongfully has withheld, and is withholding, in bad faith, plus interest.  The total amount of these attorneys' fees is currently unknown.  When the precise amount of Plaintiffs' damages are known, they will assert those damages accordingly.

33.     Defendant Starr Indemnity's conduct is despicable and has been done with a conscious disregard of Plaintiffs' rights, constituting oppression, fraud, and/or malice.  Defendant Starr Indemnity engaged in a series of acts designed to deny wrongfully the benefits due under the Policy.   Specifically, Defendant Starr Indemnity, by acting as alleged above, in light of the information, facts, and law to the contrary, consciously disregarded Plaintiffs' rights and forced Plaintiffs to incur substantial financial loss, without sufficient assistance from it, thereby inflicting substantial financial damage on Plaintiffs. Defendant Starr Indemnity ignored Plaintiffs' interests

and concerns, with the requisite intent to injure, and acted fraudulently, within the meaning of California Civil Code 3294. Therefore, Plaintiffs are entitled to recover punitive damages from Defendant Starr Indemnity in an amount sufficient to punish and to make an example of it and in order to deter similar conduct.

### THIRD CAUSE OF ACTION

### (Declaratory Relief – Against All Defendants)

34.     Plaintiffs re-allege and incorporate by reference herein each allegation contained in paragraphs 1 through 33 above.

35.     An actual and justiciable controversy exists between Plaintiffs, on the one hand, and Defendants, on the other hand, as to (a) Defendant Starr Indemnity's obligations to provide coverage for the government seizure of the Honda Jet under the Policy, (b) whether the conduct of the Avenatti Defendants provides a basis for Defendant Starr Indemnity to deny coverage for the government seizure of the Honda Jet under the Policy, and (c) whether the Avenatti Defendants incorrectly assert a claim, right, or interest in the Policy. Plaintiffs seek a judicial declaration as to their rights and obligations against Defendants in connection with insurance coverage for substantial losses as alleged herein.

### ON THE FIRST CAUSE OF ACTION

1.     For damages, plus pre- and post-judgment interest, according to proof at the time of trial;

### ON THE SECOND CAUSE OF ACTION

2.     For damages, plus pre- and post-judgment interest, according to proof at the time of trial;

3.     For reasonable attorneys' fees incurred in obtaining the benefits due under the Policy, plus interest;

4.     For punitive damages;

### ON THE THIRD CAUSE OF ACTION

5.     For a declaration consistent with Plaintiffs' contentions above;

**COMPLAINT**

1

## ON ALL CAUSES OF ACTION

2      6.      For such just, other, further, and/or different relief as may be just and proper.

3

4

5      DATED:     July 11, 2019                  KASOWITZ BENSON TORRES LLP

6

7                                               By: _____
                                                    Jerold Oshinsky
8                                                   Attorneys for Plaintiffs

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**COMPLAINT**

## DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a trial by jury in this action.

DATED:   July 11, 2019          KASOWITZ BENSON TORRES LLP

By: _____
    Jerold Oshinsky
    Attorneys for Plaintiffs

---

11
**COMPLAINT**

# Exhibit A



Insuring
Your
Aviation
Risk

Count on a Starr Solution.

STARR
COMPANIES
GLOBAL INSURANCE & INVESTMENTS

STARR INDEMNITY & LIABILITY COMPANY
399 PARK AVENUE

NEW YORK, NY  10022

# STARR ELITE COMPREHENSIVE CORPORATE AIRCRAFT POLICY

ISSUED TO

**PASSPORT 420, LLC**

POLICY NUMBER

1000320046-03

# CONTENTS

**DECLARATIONS**                                                                                                 4

  Limits of the Company's Liability:                                                                            5

  Section One - Liability Coverages                                                                             5

    Coverage 1 - Liability for **Scheduled Aircraft**                                                           5
    Coverage 2 - Liability for the Use of **Non-Owned Aircraft**                                                5
    Coverage 3 - Liability for **Property Damage** to **Non-Owned Aircraft**, and **Temporary Substitute Aircraft**   5
    Coverage 4 - Liability for Charter Referral                                                                 5
    Coverage 5 - **Passenger** Voluntary Settlements for **Scheduled Aircraft** and **Non-Owned Aircraft**       6
    Coverage 6 - Liability for **Property Damage** to Hangars and Their Contents                                 6
    Coverage 7 - Liability for Fire Damage to Real Property                                                     6
    Coverage 8 - Liability for Cargo                                                                            6
    Coverage 9 - Liability Under Contractual Agreements                                                         7
    Coverage 10 - Liability for **Personal Injury** and in/excluding **Advertising Injury**                      7
    Coverage 11 - Liability for Alcohol Beverage Service                                                        7
    Coverage 12 - Liability for Incidental Medical Malpractice                                                  7
    Coverage 13 - Liability for the Use of **Premises**                                                          7
    Coverage 14 - Liability for the Operation of **Mobile Equipment**                                            7
    Coverage 15 - Liability for the Operation of an **Auto** while on Airport **Premises**                        7
    Coverage 16 - Liability for the Sale of **Aircraft** and Aircraft Products and Services                       7
    Coverage 17 - Liability for Hangarkeeper Operations                                                         8
    Coverage 18 - Liability for Garagekeeper Operations                                                         8

  Section Two - Defense, Settlement and Supplementary Payments                                                  8

  Section Three - **Physical Damage** Coverages                                                                  8

    Coverage 19 - **Physical Damage** Coverage for **Scheduled Aircraft** (including **Ingestion** and Emergency Landing)   8
    Coverage 20 - **Physical Damage** Coverage for **Spare Engines** and **Spare Parts** including Transit          8
    Coverage 21 - Automatic Insurance for Increased Value of **Scheduled Aircraft** or **Spare Engines** and **Spare Parts**   9
    Coverage 22 - **Physical Damage** Coverage for Mechanics Tools                                                9

  Section Four - Additional Coverages                                                                           9

    Coverage 23 - Temporary Replacement Parts Rental Expense                                                    9
    Coverage 24 - Replacement **Aircraft** Rental Expense                                                        9
    Coverage 25 - Search and Rescue Expenses                                                                   9
    Coverage 26 - Runway Foaming and Crash Control Expenses                                                    9
    Coverage 27 - Trip Interruption Expense Coverage                                                           9
    Coverage 28 - Automatic Insurance for Newly Acquired **Aircraft**                                          10
    Coverage 29 - Lay-Up Credit for **Scheduled Aircraft**                                                     10
    Coverage 30 - Personal Effects and Baggage Expense                                                        10

  Section Five - **Medical Expenses**                                                                          10

    Coverage 31 - Medical Payments for **Scheduled Aircraft** and **Non-Owned Aircraft**                       10
    Coverage 32 - **Premises** Medical Payments                                                               10

# INSURING AGREEMENTS

INSURING AGREEMENTS 11

Section One - Liability Coverages 11

Coverage 1 - Liability for **Scheduled Aircraft** 11
Coverage 2 - Liability for the Use of **Non-Owned Aircraft** 11
Coverage 3 - Liability for **Property Damage** to **Non-Owned Aircraft**, and **Temporary Substitute Aircraft** 12
Coverage 4 - Liability for Charter Referral 12
Coverage 5 - **Passenger** Voluntary Settlements for **Scheduled Aircraft** and **Non-Owned Aircraft** 13
Coverage 6 - Liability for **Property Damage** to Hangars and Their Contents 14
Coverage 7 - Liability for Fire Damage to Real Property 14
Coverage 8 - Liability for Cargo 14
Coverage 9 - Liability Under Contractual Agreements 15
Coverage 10 - Liability for **Personal Injury** and in/excluding **Advertising Injury** 16
Coverage 11 - Liability for Alcohol Beverage Service 19
Coverage 12 - Liability for Incidental Medical Malpractice 19
Coverage 13 - Liability for the Use of **Premises** 19
Coverage 14 - Liability for the Operation of **Mobile Equipment** 19
Coverage 15 - Liability for the Operation of an **Auto** while on Airport **Premises** 20
Coverage 16 - Liability for the Sale of **Aircraft** and Aircraft Products and Services 20
Coverage 17 - Liability for Hangarkeeper Operations 20
Coverage 18 - Liability for Garagekeeper Operations 21

Section Two - Defense, Settlement and Supplementary Payments 22

Section Three - **Physical Damage** Coverages 23

Coverage 19 - **Physical Damage** Coverage for **Scheduled Aircraft** (including **Ingestion** and Emergency Landing) 23
Coverage 20 - **Physical Damage** Coverage for **Spare Engines** and **Spare Parts** including Transit 23
Coverage 21 - Automatic Insurance for Increased Value of **Scheduled Aircraft** or **Spare Engines** and **Spare Parts** 23
Coverage 22 - **Physical Damage** Coverage for Mechanics Tools 24

Section Four - Additional Coverages 24

Coverage 23 - Temporary Replacement Parts Rental Expense 24
Coverage 24 - Replacement **Aircraft** Rental Expense 25
Coverage 25 - Search and Rescue Expenses 25
Coverage 26 - Runway Foaming and Crash Control Expenses 25
Coverage 27 - Trip Interruption Expense Coverage 26
Coverage 28 - Automatic Insurance for Newly Acquired **Aircraft** 26
Coverage 29 - Lay-Up Credit for **Scheduled Aircraft** 26
Coverage 30 - Personal Effects and Baggage Expense 26

Section Five - **Medical Expenses** 27

Coverage 31 - Medical Payments for **Scheduled Aircraft** and **Non-Owned Aircraft** 27
Coverage 32 - **Premises** Medical Payments 27

Section Six - Policy Definitions 27
Section Seven - Exclusions 31
Section Eight - Limit of the Company's Liability 33
Section Nine - Notice of Claims and Other Duties of an **Insured** 35
Section Ten - Other Conditions of Insurance 36

**★ Starr Indemnity & Liability Company**

## STARR ELITE COMPREHENSIVE CORPORATE AIRCRAFT POLICY

### DECLARATIONS

Policy Number   **1000320046-03**          Previous Policy Number   1000320046-02

This section along with the policy provisions and any endorsements attached hereto completes this Starr Elite Comprehensive Corporate Aircraft Policy (Policy), issued by the Company as indicated above (hereinafter called The Company).

Item 1. **Named Insured:**    **PASSPORT 420, LLC**

Item 2. Address:          4185 LA LADERA ROAD
                          SANTA BARBARA, CA  93110

Item 3. Policy Period:    From:  JANUARY 26, 2019
                          Until:  JANUARY 26, 2020

    both at 12:01 AM standard time at the first address shown in Item 2. above.

Item 4. Pilots:          AS ENDORSED

    The pilot warranty in Item 4, if any, shall not apply to Liability Coverage for **Non-Owned Aircraft**, **Temporary Substitute Aircraft** and Charter Referral. Additionally, the pilot warranty in Item 4, if any, shall not apply while the insured **aircraft** is under the care, custody or control of a repair station for the purpose of maintenance, repair or test flights.

Item 5. Limits of the Company's Liability:

The limit of the Company's liability provided by each Coverage will not exceed:

Section One - Liability Coverages

Coverage 1 - Liability for **Scheduled Aircraft**

| FAA Cert. Number | Make & Model | Year Built | Seats Crew / Pass | | **Aircraft** Liability Limit |
|---|---|---|---|---|---|
| N227WP | HONDA HONDA JET | 2016 | 1 | 6 | $  10,000,000. |
| | | | | | $ |
| | | | | | $ |
| | | | | | $ |
| | | | | | $ |
| | | | | | $ |
| | | | | | $ |
| | | | | | $ |

Coverage 2 - Liability for the Use of **Non-Owned Aircraft**

$ _____ 10,000,000.  Each **Occurrence**

Maximum Number of Seats:   __30__

Reporting Grace Period:   __30__  consecutive days

This limit is part of, and not in addition to, the limit provided for Coverage 1.

Coverage 3 - Liability for **Property Damage** to **Non-Owned Aircraft** and **Temporary Substitute Aircraft**

$ _____ 25,000,000.  Each **Occurrence**

This limit is part of, and not in addition to, the limit provided for Coverage 2.

Coverage 4 - Liability for Charter Referral

$ _____ 10,000,000.  Each **Occurrence**

This limit is part of, and not in addition to, the limit provided for Coverage 1.

Coverage 5 - **Passenger** Voluntary Settlements for **Scheduled Aircraft** and **Non-Owned Aircraft**

    A.   Settlement Limits:

        1.   With respect to any **Scheduled Aircraft** or **Temporary Substitute Aircraft**:

            Each Non-**Crew Member Passenger**: $ _____ 250,000. Each **Occurrence**

            Each **Crew Member**: $ _____ 250,000. Each **Occurrence**

        2.   With respect to any **Non-Owned Aircraft** except a **Temporary Substitute Aircraft**:

            Each Non-**Crew Member Passenger**: $ _____ 250,000. Each **Occurrence**

            Each **Crew Member**: $ _____ 250,000. Each **Occurrence**

            Total All **Non-Owned Aircraft Crew Members** and Non-**Crew Member Passengers** Combined: $ _____ 2,500,000. Each **Occurrence**

These limits are part of, and not in addition to, the limit provided for Coverage 1 or 2, whichever applies to the loss.

Coverage 6 - Liability for **Property Damage** to Hangars and Their Contents

    $ _____ 1,000,000. Each **Occurrence**

This limit is part of, and not in addition to, the limit provided for Coverage 1 or 2, whichever applies to the loss.

Coverage 7 - Liability for Fire Damage to Real Property

    $ _____ 1,000,000. Each **Occurrence**

This limit is part of, and not in addition to, the limit provided for Coverage 1 or 2, whichever applies to the loss.

Coverage 8 - Liability for Cargo

    $ _____ 500,000. Each **Occurrence**

    Deductible: $ _____ NIL Each **Occurrence**

This limit is part of, and not in addition to, the limit provided for Coverage 1 or 2, whichever applies to the loss.

Coverage 9 - Liability Under Contractual Agreements

$_____10,000,000.   Each **Occurrence**

This limit is part of, and not in addition to, the limit provided for Coverage 1 or 2, whichever applies to the loss.

Coverage 10 - Liability for **Personal Injury** and__IN__ cluding **Advertising Injury**

$_____10,000,000.   Each Offense and in the Annual Aggregate

This limit is part of, and not in addition to, the limit provided for Coverage 1 or 2, whichever applies to the loss.

Coverage 11 - Liability For Alcohol Beverage Service

$_____5,000,000.   Each **Occurrence**

This limit is part of, and not in addition to, the limit provided for Coverage 1 or 2, whichever applies to the loss.

Coverage 12 - Liability for Incidental Medical Malpractice

$_____10,000,000.   Each **Occurrence**

This limit is part of, and not in addition to, the limit provided for Coverage 1 or 2, whichever applies to the loss.

Coverage 13 - Liability for the Use of **Premises**

$_____10,000,000.   Each **Occurrence**

This limit is part of, and not in addition to, the limit provided for Coverage 1 or 2, whichever applies to the loss.

Coverage 14 - Liability for the Operation of **Mobile Equipment**

$_____10,000,000.   Each **Occurrence**

This limit is part of, and not in addition to, the limit provided for Coverage 13.

Coverage 15 - Liability for the Operation of an **Auto** while on Airport **Premises**

$_____10,000,000.   Each **Occurrence**

This limit is part of, and not in addition to, the limit provided for Coverage 13.

Coverage 16 - Liability for the Sale of **Aircraft** and Aircraft Products and Services

$_____10,000,000.   Each **Occurrence** and in the Annual Aggregate

This limit is part of, and not in addition to, the limit provided for Coverage 13.

Coverage 17 - Liability for Hangarkeeper Operations

$ _____ 25,000,000.  Each **Aircraft**        $ _____ 25,000,000.  Each **Occurrence**

Deductible: $ _____ NIL  Each **Aircraft**     $ _____ NIL  Each **Occurrence**

This limit is part of, and not in addition to, the limit provided for Coverage 13.

Coverage 18 - Liability for Garagekeepers

$ _____ 50,000.  Any One **Auto**           $ _____ 100,000.  Any One Loss

Deductible: $ _____ 1,500.  Each **Auto**

This limit is part of, and not in addition to, the limit provided for Coverage 13.

# Section Two - Defense, Settlement and Supplementary Payments

# Section Three - **Physical Damage** Coverages

Coverage 19 - **Physical Damage** Coverage for **Scheduled Aircraft** (including **Ingestion** and Emergency Landing)

| FAA Cert. Number | Make & Model | Insured Value | Deductible Not **In Motion** | Deductible **In Motion/ Ingestion** |
|---|---|---|---|---|
| N227WP | HONDA HONDA JET | $ 4,000,000. | $ $10,000. | $ $10,000. |
|  |  | $ | $ | $ |
|  |  | $ | $ | $ |
|  |  | $ | $ | $ |
|  |  | $ | $ | $ |
|  |  | $ | $ | $ |
|  |  | $ | $ | $ |
|  |  | $ | $ | $ |

Coverage 20 - **Physical Damage** Coverage for **Spare Engines** and **Spare Parts** Including Transit

$ _____ 1,000,000.  Each **Occurrence**

Deductible:

Not **In Motion** _____ NIL  Each **Occurrence**
$

**In Motion**    $ _____ NIL  Each **Occurrence**

Coverage 21 - Automatic Insurance for Increased Value of **Scheduled Aircraft** or **Spare Engines** and **Spare Parts**

    Maximum Automatic **Physical Damage** Limit for **Scheduled Aircraft**:

    $_____25,000,000.__ any one **aircraft** without prior approval

    Maximum Automatic **Physical Damage** Limit for **Spare Engines** and **Spare Parts**:

    $_____2,000,000.__ without prior approval of the Company

Coverage 22 - **Physical Damage** Coverage for Mechanics Tools

    $_____5,000.__ Each Employee    $_____25,000.__ Each **Occurrence**

    Deductible: $_____250.__ Each Employee/Each **Occurrence**

    This limit is part of, and not in addition to, the limit provided for Coverage 13.

## Section Four - Additional Coverages

Coverage 23 - Temporary Replacement Parts Rental Expense

    $_____250,000.__ Each Loss

    Minimum Repair Period:    __5__ days

    Maximum coverage period:    __60__ consecutive days

Coverage 24 - Replacement **Aircraft** Rental Expense

    $_____500,000.__ Each Loss

    Minimum Repair Period:    __5__ days

    Maximum coverage period:    __60__ consecutive days

Coverage 25 - Search and Rescue Expenses

    $_____1,000,000.__ Each Loss

Coverage 26 - Runway Foaming and Crash Control Expenses

    $_____1,000,000.__ Each Loss

Coverage 27 - Trip Interruption Expense Coverage

    $_____15,000.__ Each **Passenger**/Each Loss

Coverage 28 - Automatic Insurance for Newly Acquired **Aircraft**

    Maximum **Physical Damage** Limit $ _____ 25,000,000. any one **aircraft** without prior approval of the Company.

Coverage 29 - Lay-Up Credit for **Scheduled Aircraft**

    A pro-rated return of 60____ % of the applicable premium at policy expiration if the **scheduled aircraft** is laid up for 30____ or more consecutive days.

Coverage 30 - Personal Effects and Baggage Expense

    $ _____ 15,000. Each **Passenger**

## Section Five - **Medical Expenses**

Coverage 31 - Medical Payments for **Scheduled Aircraft** and **Non-Owned Aircraft**

    A.   With respect to any **Scheduled Aircraft** or **Temporary Substitute Aircraft**:

        Each Non-**Crew Member Passenger**:  $ _____ 25,000. Each **Occurrence**

        Each **Crew Member**:      $ _____ 25,000. Each **Occurrence**

    B.   With respect to any **Non-Owned Aircraft** except a **Temporary Substitute Aircraft**:

        Each Non-**Crew Member Passenger**:  $ _____ 25,000. Each **Occurrence**

        Each **Crew Member**:      $ _____ 25,000. Each **Occurrence**

Coverage 32 - **Premises** Medical Payments

    $ _____ 25,000. Each Person     $ _____ 250,000. Each **Occurrence**

Item 6.   Policy Premium:  $ 23,324.

Item 7.   Endorsements Attached as of Inception:   STARR ELITE CA PROVISIONS (12/06)
           STARR FORMS 10284, 10349, 10351, 10234, 10317, 10466, 10332, AVN48B, AVN52ECA, 10318, AVN46B, AVN38B, 10055, 10007, 20006, AVN2000A, 30002

Producer    TUTTON INSURANCE SERVICES, INC.
          2913 S. PULLMAN STREET
          SANTA ANA, CA  92705

Approved By    _____
                        (Authorized Representative)

Date of Issue    JANUARY 23, 2019  (CK)

In consideration of the payment of the premium and in reliance upon the truth of the statements, representations and the declarations made by the **Named Insured** and subject to all of the terms of the Policy including the applicable Limits of the Company's Liability under Item 5, the Company agrees with the **Named Insured** with respect to the coverages stated in the Declarations as follows:

# INSURING AGREEMENTS

## Section One - Liability Coverages

### Coverage 1 - Liability for **Scheduled Aircraft**

The Company will promptly pay on behalf of the **insured** all sums which the **insured** shall be legally obligated to pay as damages because of **bodily injury** or **property damage** caused by an **occurrence** during the policy period arising out of the ownership, maintenance or use of a **scheduled aircraft**.

### Coverage 2 - Liability for the Use of **Non-Owned Aircraft**

The Company will promptly pay on behalf of the "insured", as defined below, all sums which the "insured" becomes legally obligated to pay as damages because of **bodily injury** or **property damage** caused by an **occurrence** during the policy period arising out of the use of **non-owned aircraft** by or on behalf of the "insured".

    A.   For Coverage 2, the definition of "insured":

        1.   with respect to any **temporary substitute aircraft**, means the same as **insured**;

        2.   with respect to all other **non-owned aircraft**, means:

            a.   the **Named Insured** and,

            b.   any officer, director, stockholder, employee, partner, or agent of the **Named Insured** while that person is acting in their capacity as such.

        Regardless of Paragraphs 1. and 2. above, no person or organization will be an **insured** while using any **aircraft** that is owned in whole or in part by; or that is under any lease purchase option agreement by; or that is registered to that organization, person or, any household member of that person.

    B.   The insurance provided by Coverage 2 shall not apply to any claim or loss arising out of an **insured**'s product liability hazard including any products designed, manufactured, sold, distributed, serviced or handled by or on behalf of an **insured**.

    C.   The **Named Insured** shall promptly advise the Company of an exclusive lease of, or the use of, any **non-owned aircraft** that exceeds the reporting grace period shown in the Declarations. The Company may request additional information and charge an additional premium for this use. Inadvertent failure to report this use will not void this coverage provided that the **Named Insured** advises the Company as soon as possible after the omission is discovered.

    D.   The insurance provided by Coverage 2 is **excess insurance**.

**Coverage 3 - Liability for Property Damage to Non-Owned Aircraft and Temporary Substitute Aircraft**

The Company will promptly pay on behalf of the **insured** all sums which the "insured", as defined below, becomes legally obligated to pay as damages arising out of **property damage** caused by an **occurrence** during the policy period to **non-owned aircraft** or **temporary substitute aircraft**. This coverage section shall not apply while the **aircraft** is **in-flight** unless the **aircraft** is operated by a person employed as a professional pilot acting in the capacity as such.

    A.   For Coverage 3, the definition of "insured":

        1.   with respect to any **temporary substitute aircraft**, means the same as **insured**;

        2.   with respect to all other **non-owned aircraft**, means:

            a.   the **Named Insured** and,

            b.   any officer, director, stockholder, employee, partner, or agent of the **Named Insured** while that person is acting in their capacity as such.

        Regardless of Paragraphs 1. and 2. above, no person or organization will be an **insured** while using any **aircraft** that is:

            i.   owned in whole or in part by;

            ii.   that is under any lease purchase option agreement by;

            iii.   that is registered to

        that organization, person or, any household member of that person.

    B.   The insurance provided by Coverage 3 shall not apply to any claim or loss arising out of an **insured**'s product liability hazard including any products designed, manufactured, sold, distributed, serviced or handled by or on behalf of an **insured**.  This includes Liability for Hangarkeeper Operation provided under Coverage 17.

    C.   The **Named Insured** shall promptly advise the Company of an exclusive lease of, or the use of, any **non-owned aircraft** that exceeds the reporting grace period shown in the Declarations. The Company may request additional information and charge an additional premium for this use. Inadvertent failure to report this use will not void this coverage provided that the **Named Insured** advises the Company as soon as possible after the omission is discovered.

    D.   The insurance provided by Coverage 3 is **excess insurance**.

**Coverage 4 - Liability Coverage for Charter Referral**

The Company will promptly pay on behalf of the **Named Insured** all sums the **Named Insured** becomes legally obligated to pay as damages because of **bodily injury** or **property damage** caused by an **occurrence** and arising out of the **Named Insured**'s arrangement for use of a **non-owned aircraft** by and on behalf of another person or organization.

**Coverage 5 - Passenger Voluntary Settlements for Scheduled Aircraft and Non-Owned Aircraft**

Regardless of legal liability and without admitting to the liability of any party, the Company will offer to pay on behalf of the **insured** the sum requested by the **Named Insured** to, or for, the benefit of each covered **passenger** who sustains **bodily injury** caused by an **occurrence** during the policy period arising out of the ownership, maintenance or use of a **scheduled aircraft** or the use of **non-owned aircraft** by, or on behalf of, the **insured**.

If the **bodily injury**, directly and independently of all other causes, results in the death or dismemberment of the passenger, the Company will offer to pay up to the "settlement limit" as stated in the Declarations under Coverage 5.A.

**Conditions of Passenger Voluntary Settlements for Scheduled Aircraft and Non-Owned Aircraft**

A.  It is a condition of payment to or on behalf of any individual(s) that the individual(s) or the individual(s) legal representative will:

1.  if requested, authorize the Company to obtain medical reports and copies of records. The injured person will submit to examination by the physicians selected by the Company when the Company may reasonably require;

2.  if payment is to be made under paragraphs A, B, or C above, be required to execute a full release, approved by the Company, for all **bodily injury** claims by or on their behalf against any **insured** and the Company for which there is insurance under the Policy.

B.  If within 120 days the payment offer is not accepted or is rejected or if at any time a claim is made or civil action is filed by or on behalf of a **passenger** to whom  this coverage applies for **bodily injury** against any **insured**, Coverage 5 will not apply to or for the benefit of that **passenger**.

C.  Coverage 5 will not apply to or for the benefit of any **crew member** on any **non-owned aircraft** unless the Declarations indicates a specified **non-owned aircraft** "settlement limit" for **crew member** and:

1.  the **crew member** is a  professional pilot who is regularly employed by the **insured** and acting in the capacity as such, or

2.  the **crew member** would normally be operating a **scheduled aircraft**, but is operating a **non-owned aircraft** on behalf of the **insured**.

Definitions applicable to Coverage 5:

"Settlement Limit" means the maximum applicable limit the Company will pay to or for each **passenger** as shown in the Declarations under Coverage 5.A.

## Coverage 6 - Liability for **Property Damage** to Hangars and Their Contents

The Company will promptly pay on behalf of the **insured** all sums which the **insured** becomes legally obligated to pay for **property damage** to hangars and their contents not owned by an **insured** caused by an **occurrence** resulting from the **insured's aviation operations** during the policy period.

The insurance provided by Coverage 6 is **excess insurance** and will not apply to any loss or damage to property covered elsewhere in the Policy.

## Coverage 7 - Liability for Fire Damage to Property

The Company will promptly pay on behalf of the **insured** all sums which the **insured** becomes legally obligated to pay as damages because of **property damage** caused by an **occurrence** resulting from the **insured's aviation operations** during the policy period arising out of **property damage** to structures or portions thereof rented to or leased to the **Named Insured**, including fixtures permanently attached thereto, if such **property damage** arises out of fire. Coverage 7 shall not apply to liability assumed by the **insured** under any contract or agreement.

The insurance provided by Coverage 7 shall be **excess insurance** over any valid and collectible property insurance (including any deductible portion thereof), available to the **insured**, such as, but not limited to, Fire, Extended Coverage, Builder's Risk Coverage or Installation Risk Coverage.

## Coverage 8 - Liability for Cargo

The Company will promptly pay on behalf of the **insured** all sums which the **insured** becomes legally obligated to pay (less any applicable deductible) for the loss of, or **physical damage** to, the property of others caused by an **occurrence** during the policy period while the property is in the **insured**'s care, custody or control and it is on a covered **aircraft** or while it is in the custody of the **insured** on their **premises** prior to loading on or, after unloading from, a covered **aircraft**.

The insurance provided by Coverage 8 is **excess insurance**.

Coverage 8 will not apply to any loss, damage or claim caused by:

A.   any loss of market or any loss arising from delay whether or not the delay is caused by an **occurrence** covered by the Policy;

B.   any type of consequential loss;

C.   infidelity of the **insured**, its employees or agents;

D.   and confined to wear, tear, deterioration, extremes of temperature or pressure or due to the perishable or hazardous nature of the property;

E.   any loss in excess of the actual cost of reproducing or replacing destroyed or damaged manuscripts, notes, checks, securities, accounts, bills, deeds, or any other valuable papers; or

F.   the loss of or damage to the personal effects or baggage of any **passenger**.

Coverage 9 - Liability for Contractual Agreements

A.   The Company will promptly pay on behalf of the **insured** all sums which the **insured** becomes legally obligated to pay as damages because of **bodily injury** or **property damage** caused by an **occurrence** during the policy period arising out of liability assumed by the **Named Insured** or their legal representative in a contract or agreement relating to the ownership, maintenance or use of **scheduled aircraft** or the use of **non-owned aircraft** by the **insured**.

B.   The Company's Rights of Recovery section shown in Section Ten - Other Conditions of Insurance, Paragraph F., of the Policy will not apply to the extent that it is addressed in any contract or agreement that the **Named Insured** or its legal representative has entered into relating to **physical damage** of property insured by the Policy.

C.   The **Named Insured** agrees to submit a copy of all such contracts or agreements to the Company as soon as possible.  Inadvertent failure to do so will not void the insurance provided by Coverage 9 as long as the contract or agreement is submitted as soon as possible once the omission is discovered. The Company reserves the right to charge an additional premium for any such contract or

D.   agreement.

E.   The Company shall not require copies of temporary **aircraft** storage or minor servicing agreements, military or governmental agreements for the use of an airport, lease of premises agreements or agreements approved by the Company prior to the effective date of the Policy.

F.   The insurance provided by Coverage 9 shall not apply to any liability assumed:

1.   under any oral contract or agreement, unless the agreement is a contract which is required by a military or governmental body for the **insured**'s use of an airport or an agreement with another party relating to the temporary storage or minor servicing of a **scheduled aircraft** while it is away from its home base;

2.   under any written contract or agreement:

   a.   that is with or for the benefit of any **passenger**, **crew member** or their heirs.  However, subparagraph F. 1. above shall not apply:

      i.   if the contract or agreement is required by a military or governmental body for the **insured**'s use of an airport; or

      ii.   for the Company's right of recovery as stated under Coverage 9, paragraph B;

   b.   to the extent that it applies to major alterations or major repairs as defined in the Federal Aviation Regulations;

   c.   that is with or for the benefit of any manufacturer of an **aircraft** or any **aircraft** parts or equipment, or their employees or agents, to the extent that it relates to their products liability hazard;

   d.   that relates to the sale of an **aircraft**;

   e.   that is entered into after a loss to the extent that it relates to that loss.

Coverage 10 - Liability for **Personal Injury** or **Advertising Injury**, if included, on the Declarations page

The Company will promptly pay on behalf of the **insured** all sums which the **insured** becomes legally obligated to pay as damages because of **personal injury** or **advertising injury**, if included, to which this insurance applies resulting from the **insured**'s **aviation operations**.  The Company will have the right and duty to defend any suit seeking those damages.  The Company may at its discretion investigate any offense and settle any claim or suit that may result.  However:

    A.  The amount the Company will pay for damages is limited as described in Section One - Coverage 10; and

    B.  The Company's right and duty to defend end when it has exhausted the applicable limit of insurance in the payment of judgment(s) or settlement(s) under Coverage 10.

No other obligation or liability to pay sums or perform acts or services is covered unless explicitly provided for under Section Two - Defense, Settlement and Supplementary Payments.

The insurance provided by Coverage 10 applies to:

    A.  **Personal injury** caused by an offense arising out of the **insured**'s **aviation operations**, excluding advertising, publishing, broadcasting or telecasting done by or for the **insured**;

    B.  **Advertising injury**, if included, caused by an offense committed in the course of advertising the **insured**'s **aviation operations**, aviation goods, aviation products or aviation services, but only if the offense was committed in the coverage territory during the policy period.

The insurance provided by Coverage 10 shall not apply to:

    A.  Breach Of Contract

        **Advertising injury** or **personal injury** arising out of breach of contract.

    B.  Continuing Offenses

        **Advertising injury** or **personal injury** that arises out of that part of an offense that continues or resumes after the later of the end of the policy period of:

        1.  this insurance; or,

        2.  a subsequent, continuous renewal or replacement of this insurance, that:

            a.  is issued by the **insured**;

            b.  remains in force while the offense continues; and

        would otherwise apply to **advertising injury** and **personal injury**.

    C.  Contracts

        **Advertising injury** or **personal injury** for which the **insured** is obligated to pay damages by reason of assumption of liability in contract or agreement.

        This exclusion does not apply to the liability for damages that such **insured** would have in the absence of such contract or agreement.

D. Crime Or Fraud

**Advertising injury** or **personal injury** arising out of any criminal or fraudulent conduct committed by or with the consent or knowledge of the **insured**.

E. Expected Or Intended Injury

**Advertising injury** or **personal injury** arising out of an offense, committed by or on behalf of the **insured**, that:

1. is intended by such **insured**; or

2. would be expected from the standpoint of a reasonable person in the circumstances of such **insured**;

to cause injury.

F. Failure To Conform To Representations Or Warranties

**Advertising injury** or **personal injury** arising out of the failure of goods, products or services to conform with any electronic, oral, written or other representation or warranty of durability, fitness, performance, quality or use.

G. Internet Activities

**Advertising injury** or **personal injury** arising out of:

1. controlling, creating, designing or developing of another's Internet site;

2. controlling, creating, designing, developing, determining or providing the content or material of another's Internet site;

3. controlling, facilitating or providing, or failing to control, facilitate or provide, access to the Internet or another's Internet site; or

4. publication of content or material on or from the Internet, other than material developed by the **insured** or at the direction of the **insured**.

H. Media Type Business

**Advertising injury** or **personal injury** arising out of an offense committed by or on behalf of an **insured** whose business is advertising, broadcasting, cablecasting, publishing, telecasting or telemarketing.

This exclusion does not apply to **personal injury** caused by an offense described in subparagraphs A., B. or C. of the definition of **personal injury**.

I. Prior Offenses

**Advertising injury** or **personal injury** arising out of any offense first committed before the beginning of the policy period.

J. Publications With Knowledge Of Falsity

**Advertising injury** or **personal injury** arising out of any electronic, oral, written or other publication of content or material by or with the consent of the **insured**:

1. with knowledge of its falsity; or

2. if a reasonable person in the circumstances of such **insured** would have known such content or material to be false.

K. Employment-Related Practices

1. any damages sustained at any time by any person, whether or not sustained in the course of employment by any **insured**, arising out of any employment-related act, omission, policy, practice or representation directed at such person, occurring in whole or in part at any time by,

    a.   arrest, detention or imprisonment;

    b.   breach of any express or implied covenant;

    c.   coercion, criticism, humiliation, prosecution or retaliation;

    d.   defamation or disparagement;

    e.   demotion, discipline, evaluation or reassignment;

    f.   discrimination, harassment or segregation;

    g.   i.   eviction; or

          ii.   invasion or other violation of any right of occupancy;

    h.   failure or refusal to advance, compensate, employ or promote;

    i.   invasion or other violation of any right of privacy or publicity;

    j.   termination of employment; or

    k.   other employment-related act, omission, policy, practice, representation or relationship in connection with any insured at any time.

This exclusion applies:

1. whether the **insured** may be liable as an employer or in any other capacity; and

2. to any obligation to share damages with or repay someone else who must pay damages because of any of the foregoing.

L. Wrong Description Of Prices

**Advertising injury** or **personal injury** arising out of the wrong description of the price of goods, products or services.

M. Intellectual Property Laws And Rights

Any actual or alleged **bodily injury**, **property damage**, **advertising injury** or **personal injury** arising out of, giving rise to or in any way related to any actual or alleged:

1. assertion; or

2. infringement or violation;

by any person or organization (including any **insured**) of any **intellectual property law or right**, regardless of whether this insurance would otherwise apply to all or part of any such actual or alleged injury or damage in the absence of any such actual or alleged assertion, infringement or

This exclusion applies, unless such injury:

1. is caused by an offense described in the definition of **advertising injury**; and

2. does not arise out of, give rise to or in any way relate to any actual or alleged assertion, infringement or violation of any **intellectual property law or right**, other than one described in the definition of **advertising injury**.

## Coverage 11 - Liability for Alcohol Beverage Service

The Company will promptly pay on behalf of the **insured** all sums which the **insured** becomes legally obligated to pay as damages because of **bodily injury** or **property damage** caused by an **occurrence** resulting from the **insured's aviation operations** during the policy period arising out of the serving or giving of any alcoholic beverage at or from the **insured's premises** or any **aircraft** covered by the Policy.

The insurance provided by Coverage 11 is **excess insurance.**

## Coverage 12 - Liability for Incidental Medical Malpractice

The Company will promptly pay on behalf of the **insured** all sums which the **insured** becomes legally obligated to pay as damages because of **bodily injury** caused by an **occurrence** resulting from the **insured's aviation operations** during the policy period arising out of  "Incidental Medical Malpractice".

"Incidental Medical Malpractice" means injury arising out of the rendering of or failure to render, during the policy period, the following services:

A.    medical, automatic external defibrillator, surgical, dental, x-ray, or nursing service or treatment or the furnishing of food or beverages in connection therewith; or

B.    the furnishing or dispensing of drugs or medical, dental or surgical supplies or appliances.

C.    The insurance provided by Coverage 12 shall not apply to:

    1.    expenses incurred by the **insured** for first-aid to others at the time of an accident;

    2.    any **insured** engaged in the business or occupation of providing any of the services described under "Incidental Medical Malpractice" above;

    3.    injury caused by an indemnitee if such indemnitee is engaged in the business or occupation of providing any of the services described under "Incidental Medical Malpractice" above; or

    4.    the failure to render automatic external defibrillator treatment, if the **aircraft** or **premises** are not equipped with automatic external defibrillator units.

## Coverage 13 - Liability for Use of **Premises**

The Company will promptly pay on behalf of the **insured** all sums which the **insured** becomes legally obligated to pay as damages because of **bodily injury** or **property damage** caused by an **occurrence** resulting from the **insured's aviation operations** during the policy period arising out of the ownership, maintenance or use of **premises**.

The insurance provided by Coverage 13 is **excess insurance.**

## Coverage 14 - Liability for the Operation of **Mobile Equipment**

The Company will promptly pay on behalf of the **insured** all sums which the **insured** becomes legally obligated to pay as damages because of **bodily injury** or **property damage** caused by an **occurrence** resulting from the **insured's aviation operations** during the policy period arising out of ownership, maintenance or use of **mobile equipment**.

The insurance provided by Coverage 14 is **excess insurance.**

Coverage 15 - Liability for the Operation of an **Auto** while on Airport **Premises**

The Company will promptly pay on behalf of the **insured** all sums which the **insured** becomes legally obligated to pay as damages because of **bodily injury** or **property damage** caused by an **occurrence** resulting from the **insured's aviation operations** during the policy period arising out of ownership, lease, rental, arrangement or use of **autos** while on airport **premises** exclusive of any public roadways and parking areas.

The insurance provided by Coverage 15 is **excess insurance**.

Coverage 16 - Liability for the Sale of **Aircraft** and Aircraft Products and Services

The Company will promptly pay on behalf of the **insured** all sums which the **insured** becomes legally obligated to pay as damages because of **bodily injury** or **property damage** caused by an **occurrence** resulting from the **insured's aviation operations** during the policy period arising out of the:

A. sale or relinquishment from exclusive written lease, by the **named insured**, of a **scheduled aircraft** or any aircraft sold or relinquished prior to the policy period;

B. furnishing to others, by the **insured**, any materials, parts, equipment, fuel, maintenance, aircraft services, used for or in connection with aircraft, **premises** or **mobile equipment**;

C. furnishing to others, by the **insured**, of food or beverages in connection with the operation of **aircraft** or **premises**.

The insurance provided by Coverage 16 is **excess insurance** and will only apply if the **bodily injury** or **property damage** occurs away from the **insured's premises**, after physical possession of the aircraft, materials, parts, equipment, fuel, food or beverages have been relinquished to others and any services have been completed.

Coverage 17 - Liability for Hangarkeeper Operations

The Company will promptly pay on behalf of the **insured** all sums which the **insured** becomes legally obligated to pay as damages because of "loss" to **aircraft** (subject to the deductible shown in the Declarations if applicable unless such "loss" results from fire or explosion or while the **aircraft** is dismantled and being transported) occurring while such **aircraft** is in the care, custody or control of the **insured** for safekeeping, storage, service or repair.  However:

A. The amount the Company will pay for damages is limited as described under Declarations, "Item 5. Limits of the Company's Liability", Coverage 17;

B. If repairs are made by the **insured**, the Company will not pay more than:

1. the **insured's** actual net cost for necessary material and parts of like kind and quality; and

2. the **insured's** actual wages for labor at current straight time rates with no premium for overtime, plus 150% of such wages as an allowance for overhead and supervision.  No other obligation or liability to pay sums or perform acts or services is covered unless explicitly provided for under Section Two - Defense, Settlement and Supplementary Payments of Liability Claims.

C.   Coverage 17 applies to damages because of "loss" to **aircraft** only if the "loss" occurs during the policy period.

D.   The insurance provided by Coverage 17 shall not apply to:

    1.   the **insured**'s liability under any agreement to be responsible for "loss";

    2.   "loss" to robes, wearing apparel, personal effects or merchandise;

    3.   to "loss" or damage to **aircraft** or parts of any **aircraft**:

        a.   owned by, leased to, rented to or loaned to the **insured** or partner(s) of the **insured**;

        b.   owned by, leased to, rented to or loaned to an officer or employee of the **insured** unless the property is an **aircraft** in the **insured**'s custody under an agreement for which a charge has been made;

    4.   "loss" due to theft or conversion caused in any way by the **insured**'s employees, partners or shareholders;

    5.   "loss" to **insured**'s work, arising out of it or any part of it;

    6.   "loss" to **aircraft** while **in-flight**; or

    7.   liability for **property damage** to **non-owned aircraft** and **temporary substitute aircraft** under Coverage 3.

Definition applicable to Coverage 17:

"Loss" means direct and accidental loss of or damage to tangible property.

## Coverage 18 - Liability for Garagekeeper Operations

The Company will promptly pay on behalf of the **insured** all sums which the **insured** becomes legally obligated to pay as damages because of **property damage** to an **auto** occurring while such **auto** is in the care, custody or control of the **insured** for valet parking, towing, safekeeping, storage or while on airport **premises** for any other incidental use by the **insured**.

The insurance provided by Coverage 18 shall not apply to:

A.   the **insured**'s liability under any agreement to be responsible for "loss";

B.   "loss" to robes, wearing apparel, personal effects or merchandise;

C.   "loss" or damage to an **auto** or parts of any **auto**:

    1.   owned by, leased to, rented to or loaned to the **insured** or partner(s) of the **insured**;

    2.   owned by, leased to, rented to or loaned to an officer or employee of the **insured** unless the **auto** is in the **insured**'s custody due to towing, or for valet parking for which a charge has been made.

D.   "loss" due to theft or conversion caused in any way by the **insured**, its employees, its partners or shareholders.

Definition applicable to Coverage 18:

"Loss" means direct and accidental loss of or damage to tangible property.

## Section Two - Defense, Settlement and Supplementary Payments

A.   The Company has the right and duty to defend any suit against the **insured** seeking damages because of **bodily injury**, **personal injury**, **advertising injury**, or **property damage** covered by the Policy, even if any of the allegations of the suit are groundless, false or fraudulent. The Company may make any investigation and settlement of any claim or suit as it deems expedient. The Company will not be obligated to pay any expense, claim or judgment or to defend any suit after the applicable limit of liability has been exhausted by the payment of judgment(s) or settlement(s).

B.   The Company will promptly pay in addition to the applicable limit of liability:

   1.   all the Company's expenses and all costs taxed against the **insured** in any suit the Company is required to defend including:

      a.   any pre-judgment interest awarded against the **insured** on that part of the judgment the Company is required to pay under the  terms of the Policy;

      b.   all interest on the amount of any judgment that the Company is required to pay under the terms of the Policy which accrues  after the entry of the judgment and before the Company has paid, tendered or deposited in to court that portion of the judgement owed by the Company; and

      c.   any costs for arbitration alleging damages covered by the Policy which the **insured** must or may submit to;

   2.   premium on appeal bonds required or, premiums on bonds to release attachments in any suit defended by the Company for any amount not exceeding the applicable limit of liability;

   3.   the cost of bail bonds, up to $10,000 for each incident, required of the **insured** because of an **occurrence** or violation of law or a regulation for civil aviation arising out of  the **insured**'s **aviation operations** and involves the use of **aircraft** or **premises**.  However, the Company has no obligation to furnish or apply for any bail bonds;

   4.   all reasonable expenses incurred by the **insured** for first aid, medical and surgical relief that is imperative at the time of an accident because of **bodily injury** covered by the Policy;

   5.   all reasonable expenses incurred by the **insured** at the Company's request; however, the Company will not pay more than $500.00 per day for each of the **insured**'s employees for the loss of earnings, wages or salaries; and

   6.   all expenses incurred by the **insured** that have been approved in advance by the Company.

Section Three - **Physical Damage** Coverages

Coverage 19 - **Physical Damage** Coverage for **Scheduled Aircraft** (including **Ingestion** and Emergency Landing)

The Company will promptly pay for any **physical damage** to a **scheduled aircraft** that occurs during the policy period including its disappearance or theft, less any applicable deductible. A **scheduled aircraft** shall be considered missing under disappearance or stolen under theft if such **aircraft** is unable to be located for fifteen (15) days after reported missing or stolen. In addition, if an unexpected event causes a **scheduled aircraft** to make a landing in a location where it cannot safely depart and there is no **physical damage**, the Company will pay the reasonable costs of transporting the **scheduled aircraft** to the nearest suitable airport.

Coverage 20 - **Physical Damage** Coverage for **Spare Engines** and **Spare Parts** Including Transit

The Company will promptly pay for **physical damage** to or theft of **spare engines** and **spare parts** that are owned by the **Named Insured** or for which the **Named Insured** is legally responsible.

The insurance provided by Coverage 20 is **excess insurance**.

Coverage 21 - Automatic Insurance for Increased Value of **Scheduled Aircraft** or **Spare Engines** and **Spare Parts**

If the value of a **scheduled aircraft** is increased during the policy period because of modifications or the addition of equipment or, the **named insured** modifies or acquires additional **spare engines** or **spare parts**, the applicable insurance provided by the Policy under Section Three - **Physical Damage** Coverage will apply to the increased value. The amount of insurance in the Declarations will automatically increase by the actual cost to the **named insured** of the modifications, equipment or additional **spare engines** or **spare parts** as evidenced by the **named insured**'s records provided:

    A.   the **named insured** reports to the Company any increase in value as soon as possible after completion of modifications or additions;

    B.   that unless the Company has agreed in advance, the maximum automatic increase of value will not exceed:

        1.   the Maximum Automatic limit for **Physical Damage** to a **scheduled aircraft** shown in the Declarations, "Item 5. Limits of the Company's Liability" as shown under Coverage 21 in the Declarations; or

        2.   the Maximum Automatic Limit for **spare engines** and **spare parts** shown in the Declarations, "Item 5. Limits of the Company's Liability", as shown under Coverage 21 in the Declarations; and

    C.   any additional premiums for the increased limits are paid by the **named insured**.

Coverage 22 - **Physical Damage** Coverage for Mechanics Tools

This insurance is extended to cover tools of the **insured**'s employee mechanics against direct and accidental physical loss or damage from external causes while such tools are in the care, custody and control of the **named insured** or such employee while acting within the scope of employment.  The Company's liability shall not exceed the limits stated in the Declarations under Coverage 22.

The insurance provided by Coverage 22 shall not apply to claims caused by or arising from:

    A.  wear, tear, deterioration, rust, or inherent vice;

    B.  delay, depreciation, or loss of use;

    C.  mechanical, electrical, hydraulic, pneumatic or structural breakdown or failure;

    D.  artificial electric current;

    E.  extremes of temperature and humidity;

    F.  mysterious disappearance, loss or shortage disclosed upon taking inventory;

    G.  infidelity, dishonesty of the **insured** or anyone in the service of the **insured**;

    H.  wrongful taking or secretion by any person or organization in lawful possession thereof; or

    I.  failure to save and protect such property from further loss or harm after an **occurrence** to which this endorsement applies.

## Section Four - Additional Coverages

### Coverage 23 - Temporary Replacement Parts Rental Expense

If a **scheduled aircraft** suffers a **physical damage** loss covered by the Policy, the Company will promptly pay the **named insured**'s additional expenses of renting or leasing, for the period of repair, temporary replacement component part(s), to replace the part(s) damaged in the loss. This includes the **named insured**'s cost of installation, removal and transportation. Coverage 23 will not apply unless the actual time required for the repair exceeds the minimum required repair period shown for Coverage 23 in the Declarations. Coverage 23 shall not apply to rental expense incurred after the maximum coverage period has expired. The maximum coverage period begins immediately following the minimum required repair period.

## Coverage 24 - Replacement **Aircraft** Rental Expense

If a **scheduled aircraft** suffers a **physical damage** loss covered under the Policy, the Company will promptly pay the **named insured**'s **extra expense** of leasing or renting a **temporary substitute aircraft** while the **scheduled aircraft** is being repaired.

The insurance provided by Coverage 24 shall not apply to **extra expense** incurred:

    A.  unless the actual time required to repair the damaged **aircraft** exceeds the minimum required repair period shown under this coverage in the Declarations;

    B.  if another **aircraft** is available at no extra charge for its use;

    C.  if the **named insured** acquires through ownership, lease, lease-purchase option, or otherwise, a permanent replacement for the damaged **aircraft**;

    D.  if the **scheduled aircraft** is a **total loss** and the Company has offered the **named insured** a proof of loss;

    E.  beyond the maximum coverage period shown under Coverage 24 as shown in the Declarations. The maximum coverage period begins immediately following the minimum required repair period and is to run consecutively without interruption;

    F.  unless such **extra expense** is actually incurred by the **named insured**; or

    G.  for replacement of any commercial revenue generating charter or Title 14 CFR Part 135 operation, unless such flight is solely for the **aircraft** owner's personal use.

## Coverage 25 - Search and Rescue Expense

The Company will promptly reimburse the **insured** for its actual incurred expenses for search and rescue operations performed by or at the request of the **named insured**.

The insurance provided by Coverage 25 shall not apply to any claim, cost or expense:

    A.  for any governmental or military search and rescue operations;

    B.  arising out of any loss or damage to any equipment used in connection with the search and rescue operations;

    C.  arising out of the injury or death of any persons involved in the search and rescue operations;

    D.  incurred after it is reasonably assumed that there are no survivors; or

    E.  associated with salvaging the **aircraft** or any other property.

## Coverage 26 - Runway Foaming and Crash Control Expense

The Company will promptly reimburse the **insured** for their actual incurred cost of runway or **aircraft** foaming and, fire, crash control, or rescue expenses, for the purpose of minimizing a **physical damage** or **bodily injury** loss covered by the Policy.

## Coverage 27 - Trip Interruption Expense

The Company will promptly reimburse the **insured** for their reasonable expenses of food, travel by commercial carrier and lodging of **passenger**s, incurred from the place where an **aircraft** suffers a covered **physical damage** loss to the intended final destination of the damaged **aircraft**, or back to the place they originally boarded the **aircraft** if the trip is discontinued.

The insurance provided by Coverage 27 shall not apply to any cost or expense for replacement **aircraft** rental for which payment is expected or made under Coverage 24.

## Coverage 28 - Automatic Insurance for Newly Acquired **Aircraft**

If, during the policy period, the **named insured** becomes the owner or exclusive lessee of an additional **aircraft** and is required to provide **aircraft** liability and/or **aircraft physical damage** insurance and, as soon as possible, reports the acquisition to the Company, the insurance afforded by the Policy will apply to the additional **aircraft** incepting at the time of acquisition. Unless the **named insured** and the Company agree otherwise, the coverage and limits of liability pertaining to the additional **aircraft** will be the same as is provided for other **scheduled aircraft**. If more than one **aircraft** is scheduled in Coverage 1 and more than one liability limit is scheduled, the lowest liability limit in the schedule will apply to the newly acquired **aircraft**. The insured value of the additional **aircraft** will be the actual cost of the **aircraft** to the **named insured** but not exceeding the Maximum **Physical Damage** Limit shown under Coverage 28 in the Declarations. The **named insured** agrees to pay any additional premium required because of the addition of the newly acquired **aircraft**.

## Coverage 29 - Lay-Up Credit For **Scheduled Aircraft**

If a **scheduled aircraft** is not used **in-flight** for more than the minimum lay-up period shown in the Declarations the **named insured** agrees to notify the Company as soon as practicable. At the end of the policy period, the Company will return a pro-rata percentage credit of the applicable premium for the entire period of the lay-up as shown under Coverage 29 in the Declarations.

The insurance provided by Coverage 29 shall not apply to any **scheduled aircraft** laid up because of any loss or damage covered by the Policy.

## Coverage 30 - Personal Effects and Baggage Expense

The Company will promptly pay on behalf of or reimburse the **named insured** for all sums which the **named insured** is liable for or pays to others for the loss of or **physical damage** to the personal effects and baggage of a **passenger**. Coverage 30 will only apply if the loss or damage occurred during the policy period and while the personal effects and baggage were in the care, custody or control of an **insured**.

## Section Five - **Medical Expense**

### Coverage 31 - Medical Payments for **Scheduled Aircraft** and **Non-Owned Aircraft**

Regardless of liability, the Company will promptly pay all the reasonable **medical expenses** incurred within one year from the date of injury for each covered **passenger** who sustains **bodily injury** caused by an **occurrence** during the policy period.

The insurance provided by Coverage 31 shall not apply for the benefit of a **crew member** on **non-owned aircraft** unless the Declarations shows a specific limit for **crew member** under the **non-owned aircraft** section of Coverage 31 and:

    A.   the **crew member** is an officer, director, stockholder, employee, partner, or agent of the **named insured** while acting in the scope of employment, or

    B.   the person is a **crew member** who would normally be operating a **scheduled aircraft** but is operating a **non-owned aircraft** on behalf of the **named insured**.

### Coverage 32 - **Premises** Medical Payments

The Company will promptly pay all reasonable **medical expenses** incurred within one year from the date of injury for each person who sustains **bodily injury** caused by an **occurrence** during the policy period arising out of the **insured**'s **aviation operations** and ownership, maintenance or use of **premises**.

The following provisions apply to Coverage 31 and 32:

    A.   medical payments will not be made to anyone until all medical benefits available under a workers compensation or similar law have been exhausted;

    B.   as soon as possible, the injured person or someone on their behalf will give the Company written proof of claim, under oath if required, and will, if requested by the Company, authorize the Company to obtain medical reports and copies of records. The injured person will submit to examination by physicians selected by the Company if and when the Company may reasonably require;

    C.   the Company may pay the injured person or any person or organization rendering the services. Any payments made under these sections do not constitute an admission of liability of any **insured**, person, organization, or of the Company; and

    D.   the total liability of the Company for all **medical expenses** incurred by or on behalf of each covered **passenger** or person who sustains **bodily injury** will not exceed the applicable Limit of Liability as stated in the Declarations under Coverage 32 for that **passenger** or person.

## Section Six - Policy Definitions

When appearing in bold print in the Policy the following definitions apply:

"**Advertisement**" means an electronic, oral, written or other notice, about goods, products or services, designed for the specific purpose of attracting the general public or a specific market segment to use such goods, products or services.

**Advertisement** does not include any e-mail address, Internet domain name or other electronic address or metalanguage.

"**Advertising injury**" means injury, other than **bodily injury**, **property damage** or **personal injury**, sustained by a person or organization and caused by an offense of infringing, in that particular part of the **insured**'s **advertisement** of goods, products or services, that are:

    A. copyrighted **advertisement**; or

    B. registered collective mark, registered service mark or other registered trademarked name, slogan, symbol or title.

"**Aircraft**" means any **scheduled aircraft** and any other **aircraft** for which insurance is provided under the Policy. The definition includes the **aircraft**'s propulsion system, and parts and equipment installed in or on the **aircraft**. Parts that are temporarily removed are also included in the definition even if replaced by similar parts.  Tools and repair equipment standard for the **aircraft** and normally carried on the **aircraft** are also included within the definition.

"**Auto**" means a land motor vehicle, trailer or semi-trailer designed for travel on public roads, including any attached machinery or equipment. But **auto** does not include **mobile equipment**.

"**Aviation operations**" means all operations arising from the ownership, maintenance or use of locations or **aircraft** for aviation activities including that portion of roads or other accesses that adjoin these locations. **Aviation operations** include all operations necessary or incidental to aviation activities.

"**Bodily injury**" means physical injury sustained by any person, caused by an **occurrence** during the policy period, including sickness, disease, mental anguish and death at any time resulting therefrom.

"**Crew member**" means any **passenger** such as the **pilot-in-command**, co-pilot, flight engineer or flight attendant, who is required for or assisting in **aircraft** operations.

"**Extra expense**" means that portion of the actual incurred cost of leasing or renting a replacement **aircraft** which exceeds the cost of operating **aircraft** the **named insured** would have incurred if the **scheduled aircraft** had not been damaged.

"**Excess insurance**" means insurance that only applies when all other valid and collectible insurance, including any formal self-insurance program or self-insured retention plan, available to the **named insured/insured** has been exhausted (other than insurance specifically purchased by the **named insured** to apply as excess over this Policy). If no such insurance or self-insurance exists, excess insurance coverage provided by this policy shall act as primary. If the other insurance is written through the Company as primary insurance, the total limit of the Company's or Companies' liability will not exceed the greatest or greater limit on any one Policy.

"**In-flight**" means, with respect to fixed-wing **aircraft**, the time commencing from the start of the take-off run of the **aircraft** and continuing until it has completed its landing roll. With respect to an **aircraft** that is a rotorcraft, it is any time the rotors are moving under power for lift-off or flight, until the rotors cease revolving after landing. With respect to any other **aircraft**, it is any time the **aircraft** is off a supporting surface as a result of propulsion, buoyancy or aerodynamic reaction.

"**In-motion**" means anytime the **aircraft** is moving under its own power or the momentum generated therefrom or, while it is **in-flight**. With respect to an **aircraft** that is a rotorcraft, it is anytime the rotors are moving under power or the momentum generated therefrom.

"**Ingestion**" means **physical damage** to a turbine engine or turbine auxiliary power unit, if they are included within the definition of **aircraft**, caused by objects or substances that are not or were not part of the engine or its accessories, which is the result of a single incident of sufficient severity to require, or would require if its severity were known at the time, immediate repair before further use.

"**Insured**" means:

A. for all coverage:

    1. the **named insured**;

    2. any director, officer, partner, employee, agent or stockholder of the **Named Insured** while that person is acting within their official capacity as such;

B. for all Section One - Liability Coverages except Coverage 2, 3 and 5 (**Non-owned aircraft** Liability Coverage and Products Liability Coverages) means:

    1. any person or organization while riding in, using or legally responsible for a **scheduled aircraft** or **temporary substitute aircraft** provided that the use is within the scope of the permission of the **named insured**; and

    2. any other person or organization but, only for their legal liability covered by the Policy which arises solely out of the acts or omissions of a person or organization in A. above.

C. other than any persons or organizations described in paragraph A. above, none of the following is considered an **insured** regardless of subparagraph B. 1. above:

    1. any person or organization or their agents or employees engaged in the design, manufacture, maintenance, repair, or sale of **aircraft**, **aircraft** engines, components or accessories, or engaged in the operation of any **aircraft**, airport, hangar, flight school, flight service, or piloting service, with respect to any **occurrence** arising out of such activity, and

    2. the owner, lessor or their agents or employees, of any **non-owned aircraft** covered by the Policy.

"**Intellectual property law or right**" means any:

A. certification mark, copyright, patent or trademark (including collective or service marks);

B. right to, or judicial or statutory law recognizing an interest in, any trade secret or confidential or proprietary non-personal information;

C. other right to, or judicial or statutory law recognizing an interest in, any expression, idea, likeness, name, slogan, style of doing business, symbol, title, trade dress or other intellectual property; or,

D. other judicial or statutory law concerning piracy, unfair competition or other similar practices.

"**Medical expense**" means expenses for necessary medical, surgical, x-ray and dental services, including prosthetic devices and necessary ambulance, hospital, professional nursing and/or funeral services.

"**Mobile equipment**" means a land vehicle (including any machinery or apparatus attached), whether or not self-propelled, used in connection with the maintenance or operation of **aircraft** or **premises** that is:

A. not subject to motor vehicle registration;

B. used exclusively on **premises** owned by or rented to the **named insured** including the roadways or property immediately adjoining; or

C. designed for use principally off public roads.

"**Named Insured**" means the person(s) or organization(s) shown in Item 1. of the Declarations.

"**Non-owned aircraft**" means any **aircraft** except:

A.   an **aircraft** owned in whole or in part by or registered to the **named insured**;

B.   a **scheduled aircraft**; or

C.   an **aircraft** having a seating configuration exceeding the maximum number of seats shown in the Declarations for Coverage 2 (regardless of the actual number of **passenger**s on the **aircraft**).

"**Occurrence**" means an accident, including continuous or repeated exposure to conditions,  which results in **bodily injury** or **property damage** neither expected nor intended by the  **insured**.  However, the definition includes **bodily injury** or **property damage** resulting  from the efforts to prevent dangerous interference with any **aviation operations**.

"**Partial loss**" means any **physical damage** loss which is not a **total loss**.

"**Passenger**" means any person in, on or boarding the **aircraft** for the purpose of riding, flying in or exiting from it after a ride, flight or attempted flight.

"**Personal injury**" means means injury, other than **bodily injury**, **property damage** or **advertising injury**, caused by an offense of:

A.   false arrest, false detention or other false imprisonment;

B.   malicious prosecution;

C.   wrongful entry into, wrongful eviction of a person from or other violation of a person's right of private occupancy of dwelling, **premises** or room that such person occupies, if committed by or on behalf of its landlord, lessor or owner; or

D.   electronic, oral, written or other publication of material that:

1.   libels or slanders a person or organization (which does  not include disparagement of goods, products, property or services); or

2.   violates a person's right of privacy.

"**Physical damage**" means accidental, direct physical loss of or damage to **scheduled aircraft**, **spare engines** or **spare parts** during the policy period including **ingestion**, but it does not include the loss of use or any residual depreciation in value either before or after any repairs have been made.

"**Pilot-in-command**" means the pilot aboard the **aircraft** who is responsible for its **in-flight** operation.

"**Premises**" means the portions of airports, buildings or areas used by the **Named Insured** directly in connection with the ownership, operation, maintenance or use of any **aircraft** and the **Named Insured**'s **aviation operations**.

"**Property damage**" means accidental damage to or destruction of the tangible property of others caused by an **occurrence** during the policy period and the resultant loss of use of the property. **Property damage** also includes the loss of use of the tangible property of others that is not physically damaged but that is caused by an **occurrence** during the policy period.

"**Salvage value**" means the value of the damaged property prior to any repairs.

"**Scheduled aircraft**" means any **aircraft** listed under Coverage 1 - Liability for **Scheduled Aircraft** and Coverage 19 - **Physical Damage** Coverage for **Scheduled Aircraft** in the Declarations or any **aircraft** covered under Coverage 28 - Automatic Insurance for Newly Acquired **Aircraft**.

"**Spare engines**" means propulsion engines and auxiliary power units which have been or which are intended to be installed in or on a **scheduled aircraft** or **temporary substitute aircraft** and which are not included within the policy definition of an **aircraft**.

"**Spare parts**" means parts or accessories, except **spare engines**, specifically designed for installation in or on **aircraft** or **mobile equipment** which are not included within the policy definition of an **aircraft** or **mobile equipment**.

"**Temporary substitute aircraft**" means any **non-owned aircraft** used in place of a **scheduled aircraft** that is temporarily withdrawn from use because of its damage, breakdown, repair, modification, inspection, servicing, loss or destruction.

"**Total loss**" means any **physical damage** loss for which the cost to repair when added to the **salvage value** equals or exceeds:
  A.  the insured value of a **scheduled aircraft**, or

  B.  the actual cash value of any other insured property.

Theft or disappearance of the entire **aircraft** is considered a **total loss**.


## Section Seven - Exclusions

The insurance provided by the Policy shall not apply:

  A.  to liability assumed by the **insured** in any type of agreement except as provided by Coverage 9 - Liability for Contractual Agreements;

  B.  to any obligation which the **insured** or its insurance carrier may be held liable under any workers' compensation, unemployment compensation, disability benefits law or under any similar law;

  C.  to **bodily injury** or **personal injury** to any employee of the **insured** arising out of and in the course of their employment by the **insured**, or to any claims for **bodily injury** as a consequence thereof. This exclusion shall not apply to liability assumed by the **insured** in any agreement required by a military or governmental authority as a prerequisite for using an airport or an airport facility, nor will this exclusion apply to Coverage 5 - **Passenger** Voluntary Settlements;

  D.  to illegal, criminal or dishonest acts or activities, alleged or otherwise, committed by or at the direction of or with the knowledge and consent of directors or officers of the **insured** and with the knowledge at the time that such act was illegal or criminal, but with respect to the **named insured** this exclusion shall apply only if such activities or acts are with the knowledge and consent of an officer or director of the **named insured**;

  E.  to any claim, loss or expense arising out of any hostile detonation of any weapon of war employing atomic or nuclear fission and/or fusion or other like reaction or radioactive force or matter;

F.   to any **insured** while the **aircraft** is **in-flight** if piloted by other than the pilot or pilots designated under Item 4 of the Declarations;

G.   under all Section One - Liability Coverage and Section Two - Defense, Settlement and Supplementary Payments of Liability Claims, for **property damage** to property owned, occupied, used, rented, transported by or in the care, custody, or control of an **insured** except as provided under Coverage 2, 3, 6, 7, 8,17 and 18;

H.   under Section One - Liability Coverage and Section Two - Defense, Settlement and Supplementary Payments of Liability Claims or Section Five - **Medical Expenses**, to any **insured** who is also **insured** under any contract of nuclear energy liability insurance, in effect at the time of the **occurrence**, issued by the Nuclear Energy Liability Insurance Association or the Mutual Atomic Energy Liability Underwriters that covers the claim, loss, damage or expense or would cover the claim, loss, damage or expense if such policy's limits of liability were not exhausted;

I.   under all Section Three - **Physical Damage** Coverage, to any loss, damage, claim or expense:

which is due and confined to wear and tear, deterioration, mechanical or electrical breakdown of the insured property, its equipment, components or accessories, or to tires, unless the damage is caused by fire, malicious mischief, vandalism or theft or unless the loss or damage is the direct result of other **physical damage**, including **ingestion**, covered by the Policy. Damage resulting from the breakdown, failure or malfunction of an engine component, accessory or part is considered mechanical breakdown of the entire engine;

J.   claims or damage resulting from:

1.   war, whether declared or undeclared, invasion, acts of foreign enemies, hostilities, civil war, rebellion, revolution, insurrection, martial law, military or usurped power or attempts at usurpation of power;

2.   confiscation, nationalization, seizure, restraint, detention, appropriation, requisition for title, used by or under the order of any government, public or local authority, whether civil, military or *de facto*;

3.   claims arising while the insured property is outside the control of the **insured** because of any of the above perils;

K.   to an **aircraft**'s turbine engine (including a turbine powered auxiliary power unit) caused by heat resulting from starting, attempted starting, operation or shutdown thereof;

L.   caused by any type of radioactive contamination;

M.   caused by the embezzlement, secretion or conversion of the insured property; or

N.   due to depreciation in the value of, or arising from the loss of use of the insured property.

## Section Eight - Limit of the Company's Liability

A.  Other Insurance

Except with respect to coverage provided by the Policy as **excess insurance**, if there is other insurance including any formal self-insurance program or self-insured retention plan, in the **insured**'s name or otherwise, against any loss, liability, or expense covered by the Policy, the Company will not be liable under the Policy for a greater proportion of such loss, liability or expense than the applicable limit of the Company's liability under the Policy bears to the total applicable limits of all other valid and collectible insurance.

B.  Total Liability for Section One - Liability Coverage

The limits apply separately to each insured **aircraft** and each **insured** but, regardless of the number of **insured**s under the Policy, persons or organizations who sustain **bodily injury**, **personal injury** or **property damage**, claims made, or suits brought because of **bodily injury**, **personal injury** or **property damage**, the Company's total liability for all damages, including damages for care and loss of services, as the result of any one **occurrence** will not exceed the limit of liability stated in the Declarations as applicable to "each **occurrence**", and in the annual aggregate if specified. For the purpose of determining the limit of the Company's total liability, all **bodily injury**, **personal injury** and **property damage** arising out of continuous or repeated exposure to the same general conditions will be considered arising out of one **occurrence**.

C.  Total Liability for Section Three - **Physical Damage** Coverage

1.  In the event of a **total loss**, the Company will promptly pay the **named insured**:

    a.  the Insured Value of the **scheduled aircraft** as shown under Coverage 19 of the Declarations;

    b.  the **named insured**'s financial interest in any **spare engine** or **spare part** (less any applicable deductible) but, not exceeding its actual cash value or the limits for the applicable coverage in the Declarations, whichever is less. In addition, the Company will promptly refund the pro-rated unearned premium for any **scheduled aircraft** that is a **total loss**. At the time of payment of a **total loss** by the Company, the Company's exposure, under Coverage 19, ceases.

2.  In the event of a **partial loss**, the Company's Liability shall not exceed:

    a.  the total of the following items, less any applicable deductible, if the repairs are made by an **insured**:

        i.   the **insured**'s net costs for necessary material and parts of like kind and quality;

        ii.  "Transportation Costs" (as defined below);

        iii. the reasonable costs of food, lodging, and transportation of the **insured**'s employees required for the actual period of repair if the loss occurs away from the **insured**'s base of operations and

        iv.  actual wages paid for labor at the current straight time rates at the place of repair plus the reasonable cost of required supervision and overhead;

    b.  the total of the following items, less any applicable deductible, if  the  repairs are made by other than the **insured**:

        i.  the net cost to the **insured**, to make repairs with material and parts of like kind and quality;

        ii.  the reasonable transportation, food and lodging expenses for a necessary representative(s) of the **insured** to inspect or authorize repairs and/or test fly the **aircraft** but not exceeding 5% of the repair cost estimate or $5,000., whichever is less. This paragraph will not apply unless the **aircraft** is being repaired away from its primary base of operations;

        iii.  any additional "Transportation Costs" incurred.

"Transportation Costs" means the cost of transportation, by the least expensive reasonable means of:

    A.  damaged parts from the site of the loss to and from the most practicable place for repair;

    B.  replacement parts from the nearest available source to the site of the loss; or

    C.  the damaged property to the most practicable place for repair and, then, to the site of the loss or to the **insured**'s home airport, whichever is closer.

3.  In no event will the Company's liability for a **partial loss** exceed the insured value of the **scheduled aircraft**; or with respect to Coverage 20, the **named insured**'s financial interest in any **spare engine** or **spare part**, its actual cash value, or the applicable limit of liability shown under Coverage 20 in the Declarations, whichever is less.

4.  In the event of a **partial loss**, whether or not such loss is covered by the Policy, the Insured Value of the **scheduled aircraft** will automatically be reduced at the time of the loss by the amount of the loss. When repairs begin, the insured value will automatically increase by the value of the completed repairs until the insured value of the **scheduled aircraft** is fully restored.

5.  If the Company pays a claim, whether for a **partial loss** or a **total loss**, the Company is entitled to all salvage.  There will, however, be no abandonment of the salvage to the Company without its prior consent.

6.  The Company has the right to return stolen property any time before the loss is paid with payment for any resultant **physical damage**.

7.  The amount specified as a deductible (if any) for **scheduled aircraft** does not apply to a **total loss**, constructive **total loss** or any loss caused by fire, lightning, explosion, transportation of parts, theft, robbery or pilferage. However, any **partial loss** caused by fire or explosion, resulting directly or indirectly from the collision or crash of an **aircraft** while **in-motion**, will be subject to the **in-motion** deductible, if any. **Scheduled aircraft** deductibles will not apply in the event of a collision with any other **aircraft** insured through the Company under another policy.

D.  Total Liability for Section Four -  Additional Coverage

The total liability of the Company for all costs or expenses incurred by or on behalf of the **named insured** will not exceed the Limit of Liability stated in the Declarations that applies to each applicable coverage

E.  Severability of Interests

The limits and coverage apply separately to each **insured**, but the inclusion within the Policy of more than one **insured** will not increase the applicable limits of the Company's total liability.

F.  Two or More **Aircraft** Insured by the Policy

In the event that two or more **aircraft** are insured by the Policy, the applicable limits of liability and deductibles (if any) will apply separately to each.

## Section Nine - Notice of Claims and Other Duties of an **Insured**

In the event of any accident, **occurrence**, claim, suit or loss, the **insured**(s) and/or the **insured**'s legal representative(s) agree to:

A.  not assume any obligation or liability, nor offer to pay any reward except at the **insured**'s expense, nor incur any expense other than those items listed in Section Two - Defense, Settlement and Supplementary Payments of the Policy;

B.  promptly contact the Company and follow up with prompt written notice including (if known) the:

1.  time, place and description of events;

2.  names and locations of **passenger**s, witnesses, injured or deceased persons, and

3.  location and description of any damaged property and/or **aircraft**;

C.  immediately forward to the Company every demand, notice, summons, legal paper, or any other process they receive;

D.  cooperate and assist the Company in all matters of any claim or suit;

E.  do nothing after the accident or loss to harm the Company's right of recovery against any person or organization who may be liable to the **insured**;

F.  authorize the Company to obtain any records relating to a loss;

G.  not abandon the **aircraft** or any other salvage without the Company's prior consent;

H.  take all reasonable precautions to protect the **aircraft** or other insured property after any accident or loss. Reasonable expenses incurred in providing such protection will be reimbursed by the Company. Any further loss or damage due to the **insured**'s failure to reasonably protect the insured property will not be covered by the Policy;

I.   promptly report any suspected theft or vandalism to the local police;

J.   allow the Company the option to inspect any **aircraft** or insured property before any repairs begin or its disposal;

K.   file with the Company within ninety (90) days after the loss a sworn proof of loss including the information and in the form the Company reasonably requires and, upon the Company's request, submit to examination under oath;

L.   exhibit the damaged property and produce for the Company's examination all pertinent records and invoices, permitting copies to be made, at reasonable times and places as the Company designates;

M.   if requested, provide clear title to the Company for any salvaged property at the time **total loss** payment is made by the Company;

N.   allow the Company to inspect **aircraft** records, repair and service invoices, sales receipts, and log books as may be required in the settlement of any claim.

## Section Ten - Other Conditions of Insurance

A.   Appraisal of Loss

If the **named insured** and the Company fail to agree on the amount of a loss, either may, within sixty (60) days after a proof of loss is filed, demand an appraisal of the loss. The **named insured** and the Company will each select a competent aircraft appraiser and the appraisers will select a competent and disinterested umpire. The appraisers will judge the amount of the loss. If they do not agree, they will submit their difference to the umpire. Agreement in writing of any two of the three will determine the amount of the loss. The **named insured** and the Company will each pay their chosen appraiser and will bear equally the expenses of the appraisal and the umpire. The Company will not be held to have waived any of its rights by any act relating to appraisal.

B.   Action Against the Company

No action will be taken against the Company unless, prior to such action, the **insured** has fully complied with all of the terms and conditions of the Policy and the amount of loss has been determined as set forth below:

1.   Liability Coverages - With respect to Section One - Liability Coverage, no action will lie against the Company until the amount of the **insured**'s obligation to pay has been finally determined either by judgment against the **insured** after actual trial or, by written agreement of the **insured**, the claimant and the Company. Any person, organization or their legal representative who has secured such judgment or written agreement will be entitled to recover under the Policy to the extent of the coverage provided by the Policy.  No person or organization shall have any right under the Policy to join the Company as a party to any action against the **insured** to determine the **insured**'s liability, nor will the Company be impleaded by the **insured** or its legal representative. Bankruptcy or insolvency of the **insured** or of the **insured**'s estate will not relieve the Company of any of its obligations under the Policy.

2. **Physical Damage** Coverages - With respect to Section Three - **Physical Damage** Coverage, no action will lie against the Company, nor will payment for loss be required, until thirty (30) days after the required proof of loss is filed with the Company and the amount of loss is determined as described in Section Three - **Physical Damage** Coverage of the Policy. Any action against the Company must be taken within one year after the date of the loss.

3. Additional Coverages - With respect to Section Four - Additional Coverages, no action will lie against the Company, nor will payment for loss be required, until thirty (30) days after any required proofs of claims have been filed with the Company. Any action against the Company must be taken within one year after the date of the loss.

C. Cancellation and Non-Renewal of the Policy

1. Cancellation - The Policy may be cancelled by the **named insured** by mailing prior written notice to the Company stating when the cancellation will be effective. The Policy may be cancelled by the Company by mailing to the first **named insured** at the first address shown under Item 2. of the Declarations stating when, not less than ninety (90) days thereafter, the cancellation will be effective. However, only ten (10) days prior written notice will be provided if the cancellation is for non-payment of any premium due. The effective date and hour of cancellation stated in the notice will become the end of the policy period.

   If the **named insured** cancels the Policy, earned premium will be computed in accordance with the customary short rate table and procedure. If the Company cancels, earned premium will be computed on a pro-rata basis. Premium adjustment may be made either at the time cancellation is effective or as soon as practicable after cancellation becomes effective, but payment or tender of unearned premium by the Company is not a condition required for the cancellation to be effective.

2. Non-Renewal - The Company will mail written notice to the first **named insured** at least sixty (60) days prior to the expiration date of the Policy in the event either decides not to renew the Policy.

   The proof of mailing or delivering notice of non-renewal or cancellation to the first **named insured** by the Company will be sufficient proof of notice to all **insured**s.

D. Certificates of Insurance

   A Certificate of Insurance issued by the Company for or on behalf of the **named insured**, including any certificates required by military or governmental authorities, automatically provides the insurance as is evidenced in that certificate.

E. Changing the Policy

   Nothing in the Policy can be changed or waived except by the Company's written endorsement, approved and signed by the Company.

F. Company's Rights of Recovery

   In the event of any payment made under the Policy, the Company will assume all of the **insured**'s rights of recovery against any person or organization. The **insured** will execute and deliver instruments and papers and do whatever else is necessary to enforce those rights.

G.  Cross Liability

The Policy will cover claims by one **insured** against another **insured**.  However, in no event will this provision increase or change the limits of the Company's liability nor will it change any of the Declarations, Insuring Agreements, Exclusions, Conditions, Limits of Liability or other terms of the Policy.

H.  Financial Responsibility Laws

(applicable to Section One - Liability Coverages)

When the Policy is certified as proof of financial responsibility under the provisions of any **aircraft** financial responsibility law, the insurance afforded by the Policy for **bodily injury** or **property damage** will comply as necessary with the provisions of the law but, in no event in excess of the limits of liability stated in the Declarations of the Policy. The **named insured** agrees to reimburse the Company for any payment made which the Company would not have been obligated to make under the terms of the Policy except for the agreement in this paragraph.

I.  Inspection

The Company, or their authorized representative, shall be permitted to inspect the insured property and any of its records during the policy period and for one year afterward.

J.  Mexican Operations Warning

Although the Policy provides coverage in Mexico, the Mexican Government requires proof of **aircraft** liability written through a Mexican insurance company. If the **insured** does not have proof of Mexican liability insurance, the **aircraft** can be confiscated by the Mexican authorities and any **passengers** jailed or detained.

It is a good practice to contact the **insured**'s agent or broker to arrange coverage if any flights are planned into or near Mexican Airspace. Mexican liability coverage is available through the Company if needed.

K.  Policy Compliance with State Law

If the terms of the Policy conflict with the **named insured**'s state or province law, the Policy terms are deemed amended as necessary to comply with that law.

L.  Policy Territory

The insurance provided by the policy shall be effective worldwide.

Payment of loss under the policy shall only be made in full compliance with all United States of America economic or trade sanction laws or regulations, including, but not limited to, sanctions, laws and regulations administered and enforced by the U.S. Treasury Department's Office of Foreign Assets Control ("OFAC").

M.  Transfer of the Policy to Others

Interest in the Policy may not be transferred without prior written agreement from the Company. If the **named insured** dies or is judged legally bankrupt or insolvent and the **named insured** or their legal representative notifies the Company within sixty (60) days of the judgment or death, effective the date of the judgment or death, the **named insured** will become:

1.  any person or organization having custody of the **scheduled aircraft** until a legal agent is appointed; or,

2.  the **named insured**'s legal representative.

N.  Acceptance of Policy

By acceptance of the Policy, the **named insured** agrees that the statements in the Declarations are its representations, that the Policy is issued in reliance upon the truth of the representations and that the Policy embodies all agreements by and between the **named insured** and the Company or any of its agents.

In Witness Whereof, the company issuing this policy has caused this policy to be signed by its authorized officers, but this policy shall not be valid unless also signed by a duly authorized representative of the company.

Steve Blakey - President                    Nehemiah E. Ginsburg - General Counsel

**STARR INDEMNITY & LIABILITY COMPANY**

## ADDITIONAL INSURED ENDORSEMENT

This policy is amended as follows:

The provisions of this endorsement shall apply with respect to:  N227WP

(Only the clause(s) indicated by an "X" shall apply.)

☐   The scheduled persons or organizations are included as additional insured.

☐   The scheduled persons or organizations are the registered owner of _____
and are included as additional insured.

☐   The scheduled persons or organizations are included as additional insured but only as respects liability
coverages.

☒   The scheduled persons or organizations are included as additional insured under liability coverages, but only as
respects operations of the **named insured**.

☐   The scheduled persons or organizations are included as additional insured but only as respects operations of the
**named insured**.

The insurance extended by this endorsement shall not apply to, and no person or organization named in the
schedule shall be insured for **bodily injury** or **property damage** which arises from the design, manufacture,
modification, repair, sale, or servicing of aircraft by that person or organization.

Schedule:

Name
Address       SIGNATURE FLIGHT SUPPORT CORPORATION*
              515 MARXMILLER PLACE
              SANTA BARBARA, CA  93117

Name
Address

Name
Address

All other provisions of this policy remain the same.

This endorsement becomes effective_____ JANUARY 26, 2019 _____to be attached to and hereby made a part of:
Policy No. _____1000320046-03_____
Issued to   PASSPORT 420, LLC

By STARR INDEMNITY & LIABILITY COMPANY

Endorsement No. _____1_____

Date of Issue _____JANUARY 23, 2019  (CK)_____        By ___ _____
                                                          (Authorized Representative)

Starr 10284 (3/06)

**HOLDING CORPORATION - NAMED INSURED BODILY INJURY EXCLUSION**

This policy is amended as follows:

This policy does not apply under all Section One - Liability Coverages and Section Two - Defense, Settlement and Supplementary Payments for **bodily injury** or death to any person who is an owner, partner, officer, director, member or employee of the **Named Insured**.

All other provisions of this policy remain the same.

This endorsement becomes effective _____JANUARY 26, 2019_____ to be attached to and hereby made a part of:
Policy No. _____1000320046-03_____
Issued to  PASSPORT 420, LLC

By  STARR INDEMNITY & LIABILITY COMPANY

Endorsement No. _____2_____

Date of Issue _____JANUARY 23, 2019  (CK)_____          By _____
                                                              (Authorized Representative)

Starr 10349 (5/06)

# KNOWLEDGE OF OCCURRENCE

This policy is amended as follows:

KNOWLEDGE OF **OCCURRENCE**

It is agreed that knowledge of an **occurrence** by an agent, servant or employee of the **Insured** will not in itself constitute knowledge by the **Insured** unless such notice has been received by the **Insured**'s Insurance Administrator.

**INSURED'**S INADVERTENT FAILURE TO REPORT

Notwithstanding any other provision(s) of this policy, inadvertent errors or omissions and/or failure in furnishing information, notification or reports required will not prejudice the coverage afforded by this policy provided the **Insured** notifies the Company within a reasonable time after the error or omission is discovered.

**INSURED'**S FAILURE TO NOTIFY

The **Insured**'s rights under this policy will not be affected if it fails to give notice of an accident or **occurrence** solely because it reasonably believed that the accident or **occurrence** was not covered under this policy.

All other provisions of this policy remain the same.

This endorsement becomes effective_____ JANUARY 26, 2019 _____to be attached to and hereby made a part of:
Policy No. _____1000320046-03_____
Issued to   PASSPORT 420, LLC

By STARR INDEMNITY & LIABILITY COMPANY

Endorsement No. _____3_____

Date of Issue _____JANUARY 23, 2019  (CK)_____            By _____
                                                                    (Authorized Representative)

Starr 10351 (5/06)

## LOSS PAYEE ENDORSEMENT

In consideration of additional premium of $ _____INCLUDED_____ , this policy is amended as follows:

Any loss under **physical damage** coverage is payable as interest may appear to the **named insured** and the following Loss Payee:

As respects ___N227WP_____

SIGNATURE FLIGHT SUPPORT CORPORATION*
515 MARXMILLER PLACE
SANTA BARBARA, CA  93117

All other provisions of this policy remain the same.

This endorsement becomes effective_____JANUARY 26, 2019_____to be attached to and hereby made a part of:
Policy No. ____1000320046-03____
Issued to ___PASSPORT 420, LLC_____

By STARR INDEMNITY & LIABILITY COMPANY_____

Endorsement No. _____4_____

Date of Issue ___JANUARY 23, 2019  (CK)____            By _____

                                                                (Authorized Representative)

Starr 10234 (3/06)

## PILOT WARRANTY ENDORSEMENT

This policy is COMPLETED     as follows with respect to Item 4. Pilots as set forth on the Declarations Page:

WITH RESPECT TO N227WP:

BILL PARRISH, CHRIS OHMAN, OR;

ANY PILOT WHO HOLDS A COMMERCIAL PILOT CERTIFICATE OR BETTER WITH MULTI-ENGINE AND INSTRUMENT RATINGS, IS TYPE RATED IN THE MAKE AND MODEL AIRCRAFT OPERATED AND HAS A MINIMUM OF THE FOLLOWING HOURS OF FLIGHT AS RECORDED IN HIS/HER LOGBOOK. IT IS FURTHER REQUIRED THAT SUCH PILOT(S) MUST HAVE SUCCESSFULLY COMPLETED A MOTION BASED SIMULATOR TRAINING COURSE SPECIFICALLY DESIGNED FOR THE MAKE AND MODEL AIRCRAFT OPERATED WITHIN THE PRECEDING 12 MONTHS OF POLICY INCEPTION AND ANNUALLY THEREAFTER.

5,000 TOTAL LOGGED FLYING HOURS
2,500 HOURS IN MULTI-ENGINE AIRCRAFT
500     HOURS IN TURBOPROP OR TURBOFAN POWERED AIRCRAFT
350     HOURS IN THE MAKE MODEL AIRCRAFT OPERATED

The pilot warranty set forth above shall not apply to Liability Coverage for **Non-Owned Aircraft**, **Temporary Substitute Aircraft** and Charter Referral.  Additionally, the pilot warranty in set forth above shall not apply while the insured **aircraft** is under the care, custody or control of a repair station for the purpose of maintenance, repair or test flights.

All other provisions of this policy remain the same.

This endorsement becomes effective_____JANUARY 26, 2019_____to be attached to and hereby made a part of:
Policy No. ____1000320046-03____
Issued to   PASSPORT 420, LLC

By STARR INDEMNITY & LIABILITY COMPANY

Endorsement No. _____5_____

Date of Issue ____JANUARY 23, 2019  (CK)____          By _____
                                                                                        (Authorized Representative)

Starr 10317 (6/06)

## PRIMARY AND NON-CONTRIBUTORY ENDORSEMENT

This policy is amended as follows:

With the respect to the following scheduled persons or organizations, all coverages shall be primary and non-contributory with respect to any other insurance policies held by the following scheduled persons or organizations.

Schedule:

SIGNATURE FLIGHT SUPPORT CORPORATION, ITS PARENT, SUBSIDIARY, RELATED AND AFFILIATED COMPANIES AND THE AUTHORITY
515 MARXMILLER PLACE
SANTA BARBARA, CA 93117

All other provisions of this policy remain the same.

This endorsement becomes effective_____JANUARY 26, 2019_____to be attached to and hereby made a part of:
Policy No. ____1000320046-03____
Issued to  PASSPORT 420, LLC

By STARR INDEMNITY & LIABILITY COMPANY

Endorsement No. _____6_____

Date of Issue ___JANUARY 23, 2019  (CK)___          By _____
                                                              (Authorized Representative)

Starr 10466 (6/07)

## WAIVER OF SUBROGATION - PHYSICAL DAMAGE

In consideration of additional premium of $ ____INCLUDED____ , this policy is amended as follows:

We hereby waive our right of subrogation against the following as respects loss arising under **physical damage** coverage as set forth under this policy; provided, however, that this waiver shall not prejudice our right of recourse for damages arising from the design, manufacture, modification, repair, sale or servicing of the **aircraft** by the following:

SIGNATURE FLIGHT SUPPORT CORPORATION*
515 MARXMILLER PLACE
SANTA BARBARA, CA  93117

All other provisions of this policy remain the same.

This endorsement becomes effective ____JANUARY 26, 2019____ to be attached to and hereby made a part of:
Policy No. ____1000320046-03____
Issued to  PASSPORT 420, LLC

By  STARR INDEMNITY & LIABILITY COMPANY

Endorsement No. _____7_____

Date of Issue ____JANUARY 23, 2019  (CK)____          By _____
                                                                                    (Authorized Representative)

Starr 10332 (5/06)

## WAR, HI-JACKING AND OTHER PERILS EXCLUSION CLAUSE (AVIATION)

This policy is amended as follows:

In the event any of the provisions of this endorsement are in conflict with any provisions, exclusions, conditions or terms forming part of this policy, this endorsement shall take precedence.

This policy does not cover claims caused by:

(a)  War, invasion, acts of foreign enemies, hostilities (whether war be declared or not), civil war, rebellion, revolution, insurrection, martial law, military or usurped power or attempts at usurpation of power;

(b)  Any hostile detonation of any weapon of war employing atomic or nuclear fission and/or fusion or other like reaction or radioactive force or matter;

(c)  Strikes, riots, civil commotions or labor disturbances;

(d)  Any act of one or more persons, whether or not agents of a sovereign power, for political or terrorist purposes and whether the loss or damage resulting therefrom is accidental or intentional;

(e)  Any malicious act or act of sabotage;

(f)  Confiscation, nationalization, seizure, restraint, detention, appropriation, requisition for title or use by or under the order of any Government (whether civil, military or de facto) or public or local authority;

(g)  Hi-jacking or any unlawful seizure or wrongful exercise of control of the aircraft or crew in flight (including any attempt at such seizure or control) made by any person or persons on board the aircraft acting without the consent of the Insured.

Furthermore, this policy does not cover claims arising whilst the aircraft is outside the control of the Insured by reason of any of the above perils.

The aircraft shall be deemed to have been restored to the control of the Insured on the safe return of the aircraft to the Insured at an airfield not excluded by the geographical limits of this policy, and entirely suitable for the operation of the aircraft (such safe return shall require that the aircraft be parked with engines shut down and under no duress).

All other provisions of this policy remain the same.

This endorsement becomes effective_____JANUARY 26, 2019_____to be attached to and hereby made a part of:
Policy No. _____1000320046-03_____
Issued to  PASSPORT 420, LLC

By STARR INDEMNITY & LIABILITY COMPANY

Endorsement No. _____8_____

Date of Issue _____JANUARY 23, 2019  (CK)_____          By _____

                                                                    (Authorized Representative)

AVN48B (2/06)

## EXTENDED COVERAGE ENDORSEMENT (AVIATION LIABILITIES) - CALIFORNIA

In consideration of an additional premium of $ ___INCLUDED___ , this policy is amended as follows:

The policy of which this Endorsement forms part includes War, Hi-jacking and Other Perils Exclusion Clause AVN48B:

1. With effect from ___JANUARY 26, 2019___ , all sub-paragraphs other than __(b)__ of War, Hi-jacking and Other Perils Exclusion Clause AVN48B are deleted SUBJECT TO all terms and conditions of this Endorsement.

2. EXCLUSION applicable only to any coverage extended in respect of the deletion of sub-paragraph (a) of War, Hi-jacking and Other Perils Exclusion Clause AVN48B:

   Coverage shall not include liability for damage to any form of property on the ground situated outside Canada and the United States of America unless caused by or arising out of the use of aircraft.

3. LIMITATION OF LIABILITY

   The limit of the Company's liability in respect of the coverage provided by this Endorsement shall be US$ ___10,000,000.___ or the applicable policy limit, whichever the lesser, any one occurrence and in the annual aggregate (the "sub-limit"). This sub-limit shall apply within the full policy limit and not in addition thereto.

   To the extent coverage is afforded to an Insured under the policy, this sub-limit shall not apply to such Insured's liability:

   (a) to the passengers (and for their baggage and personal effects) of any aircraft operator to whom the policy affords cover for liability to its passengers arising out of its operation of aircraft;

   (b) for cargo and mail while it is on board the aircraft of any aircraft operator to whom the policy affords cover for liability for such cargo and mail arising out of its operations of aircraft.

   Notwithstanding any other liability for which coverage is afforded under this policy, coverage provided under this Endorsement shall apply solely to the following:

   > SECTION ONE - LIABILITY COVERAGES.
   > SECTION FOUR - ADDITIONAL COVERAGES UNDER COVERAGE 25: SEARCH AND RESCUE EXPENSES, COVERAGE 26: RUNWAY FOAMING AND CRASH CONTROL EXPENSES AND COVERAGE 27: TRIP INTERRUPTION EXPENSE COVERAGE.
   > SECTION FIVE - **MEDICAL EXPENSES**.

4. AUTOMATIC TERMINATION

   To the extent provided below, coverage extended by this Endorsement shall TERMINATE AUTOMATICALLY in the following circumstances:

   (i) All coverage

      - upon the outbreak of war (whether there be a declaration of war or not) between any two or more of the following countries: France, the People's Republic of China, the Russian Federation, the United Kingdom, the United States of America;

(ii)   Any coverage extended in respect of the deletion of sub-paragraph (a) of  War, Hi-jacking and Other Perils Exclusion Clause AVN48B

- upon the hostile detonation of any weapon of war employing atomic or nuclear fission and/or fusion or other like reaction or radioactive force or matter wheresoever or whensoever such detonation may occur and whether or not the insured aircraft may be involved;

(iii)   All coverage in respect of any of the insured aircraft requisitioned for either title or use

- upon such requisition.

PROVIDED THAT if an insured aircraft is in the air when (i), (ii) or (iii) occurs, then the coverage provided by this Endorsement (unless otherwise cancelled, terminated or suspended) shall continue in respect of such an aircraft until completion of its first landing thereafter and any passengers have disembarked.

5.   REVIEW AND CANCELLATION

(a)   Review of Premium and/or Geographical Limits (7 Days)

The Company may give notice to review premium and/or geographical limits - such notice to become effective on the expiry of seven days from 23.59 hours G.M.T. on the day on which notice is given.

(b)   Limited Cancellation (48 hours)

Following a hostile detonation as specified in paragraph 4. (ii) above, the Company may give notice of cancellation of one or more parts of the coverage provided by paragraph 1. of this Endorsement by reference to sub-paragraphs (c), (d), (e), (f) and/or (g) of  War, Hi-jacking and Other Perils Exclusion Clause AVN48B - such notice to become effective on the expiry of forty-eight hours from 23.59 hours G.M.T. on the day on which notice is given.

(c)   Cancellation (7 Days)

The coverage provided by this Endorsement may be cancelled by either the Company or the Insured by giving notice to become effective on the expiry of seven days from 23.59 hours G.M.T. on the day on which such notice is given.

(d)   Notices

All notices referred to herein shall be in writing.

All other provisions of this policy remain the same.

This endorsement becomes effective _____ JANUARY 26, 2019 _____ to be attached to and hereby made a part of:
Policy No. ___ 1000320046-03 ___
Issued to  PASSPORT 420, LLC

By   STARR INDEMNITY & LIABILITY COMPANY

Endorsement No. _____ 9 _____

Date of Issue _____ JANUARY 23, 2019  (CK) _____          By _____
                                                                          (Authorized Representative)

AVN52ECA   (12/06)          Page 2

# EXTENDED COVERAGE ENDORSEMENT

## WAR RISK FOR PHYSICAL DAMAGE COVERAGE, EXTORTION, AND HI-JACKING EXTRA EXPENSE COVERAGE

In consideration of $ _____ INCLUDED _____ additional premium, this policy is amended as follows:

This coverage is subject to all the terms and conditions shown both in this policy as well as this endorsement. It does not change any coverage or terms except as specifically stated below. The **insured** is responsible for using all reasonable efforts to ensure that all required permits for **aircraft** operations as well as all state and local laws are complied within the country of operation or the country where a loss or expense is incurred.

### SECTION ONE

### WAR RISK COVERAGE FOR AIRCRAFT PHYSICAL DAMAGE

The Company will pay for the physical loss of or **physical damage** to any **scheduled aircraft** (unless excluded by Exclusion (G) below) that is caused by an **occurrence** during the policy period arising out of any of the following perils:

(a)  war, whether declared or undeclared, invasion, acts of foreign enemies, hostilities, civil war, rebellion, revolution, insurrection, martial law, military or usurped power or any attempt of usurpation of power;

(b)  any strikes, riots, civil commotions or labor disturbances;

(c)  any act of one or more persons, whether or not agents of a sovereign power, for political or terrorist purposes and whether the loss or damage resulting therefrom is accidental or intentional;

(d)  any malicious act or act of sabotage;

(e)  confiscation, nationalization, seizure, restraint, detention, appropriation, requisition for title, use by, or under the order of any government, public or local authority, whether civil, military or de facto;

(f)  hi-jacking or any unlawful seizure or wrongful exercise of control of a **scheduled aircraft** or crew **in-flight** (including any attempt at such seizure or control) made by any person or persons on board the **scheduled aircraft** acting without the consent of the **insured**.

This section also covers the physical loss of or **physical damage** to a **scheduled aircraft** while that **scheduled aircraft** is outside the control of the **insured** because of any of the above perils. The **aircraft** will be covered until its safe return to the **insured**.

The **scheduled aircraft** shall be deemed to have been restored to the control of the **insured** on the safe return of the **scheduled aircraft** to the **insured** at an airfield not excluded by the geographical limits of this endorsement and entirely suitable for the operation of the **aircraft** (such safe return shall require that the **aircraft** be parked with engines shut down and under no duress).

### SECTION TWO

### "EXTORTION, HI-JACKING, AND CONFISCATION EXPENSE COVERAGE"

#### Extortion, Expense Coverage

Subject to the limits described below, the Company will reimburse the **named insured** for ninety percent (90%) of any payment properly made for threats made during the policy period against any **scheduled aircraft** covered by this endorsement.

**Hi-jacking and Confiscation Expense Coverage**

Subject to the limits described below, the Company will reimburse the **named insured** for ninety percent (90%) of any required extra expenses incurred following any type of confiscation or hi-jacking that takes place during the policy period as described in paragraphs (e) and (f) of SECTION ONE of this endorsement.

**Limits of the Company's Liability for Section Two Coverages**

The most that the Company will reimburse the **named insured** for any one **occurrence** is an amount equal to ninety percent (90%) of the net cost to the **named insured** of any payment(s) made but not exceeding:

(A)   ninety percent (90%) of the Insured Value of the **scheduled aircraft** involved, or

(B)   $1,000,000.00,

whichever is less.

The **insured** warrants that the remaining ten percent (10%) of any payment made is not insured elsewhere.

For the purpose of this coverage, any series of related events, losses or expenses connected to any hi-jacking, extortion, or confiscation will be considered one **occurrence**.

**Exclusions Applicable to All Coverages Provided by this Endorsement**

This endorsement will not cover any loss, damage or expense arising out of:

(A)   war, whether declared or undeclared between any of the following countries:  The United Kingdom, The United States of America, France, The Russian Federation, or The Peoples Republic of China.  If any **scheduled aircraft** covered by this endorsement is in the air when an outbreak of war occurs, this exclusion will not apply until that **scheduled aircraft** completes its first landing;

(B)   detonation, whether hostile or otherwise, of any weapon of war employing atomic or nuclear fission and/or fusion or any other similar reaction;

(C)   any loss or damage caused by radioactive force or matter;

(D)   any failure to provide any type of bond, security or any other financial cause whether or not required under a court order;

(E)   the repossession or any attempt at repossession by any person or organization having any legal title or lien on the **scheduled aircraft** or any other type of legal contractual relationship with the **insured**;

(F)   any type of delay, loss of use or any other type of consequential loss whether or not the **scheduled aircraft** is lost or damaged except as specifically provided under the SECTION TWO coverages of this endorsement;

(G)   any **occurrence** involving the following **scheduled aircraft** (if any) which the **named insured** has elected not to cover by this endorsement:

| Year | Make and Model | Registration No. | Year | Make and Model | Registration No. |
|------|----------------|------------------|------|----------------|------------------|
|      |                |                  |      |                |                  |

**AUTOMATIC TERMINATION OF COVERAGE, CANCELLATION, AND AMENDMENT OF TERMS**

**Cancellation or Amendment of Terms by Notice**

The applicable sections of Item C. 1. Cancellation, of Section Ten - Other Conditions of Insurance, of this policy are changed to read:

The coverage provided by this endorsement can be cancelled, non-renewed or the rate of premium or geographical limits changed by the Company with the mailing or delivering of seven (7) days prior written notice to the first **named insured** at the first address shown in Item 2. of the Declarations. The proof of delivery or mailing to the first **named insured** will be sufficient proof of notice to all **named insureds**.

**Automatic Termination of Coverage**

All coverages provided by this endorsement will automatically terminate without any prior notice to the **named insured** if any of the following events occur:

1.  Any hostile detonation, of any weapon of war employing atomic or nuclear fission and/or fusion or radioactive force or matter, whenever the detonation occurs whether or not a **scheduled aircraft** covered by this endorsement is involved.

2.  War, whether declared or undeclared, between any of the following countries: The United Kingdom, The United States of America, France, The Russian Federation, or the Peoples Republic of China. If any **scheduled aircraft** covered by this endorsement is in the air when an outbreak of war occurs, coverage for that **scheduled aircraft** will only apply until that **aircraft** completes its first landing.

---

COVERAGE AS PROVIDED UNDER THIS ENDORSEMENT SHALL EXCLUDE ALL REQUIREMENTS OF THE TERRORISM RISK INSURANCE ACT OF 2002.

---

All other provisions of this policy remain the same.

This endorsement becomes effective _____JANUARY 26, 2019_____ to be attached to and hereby made a part of:
Policy No. _____1000320046-03_____
Issued to _PASSPORT 420, LLC_____

By _STARR INDEMNITY & LIABILITY COMPANY_____

Endorsement No. _____10_____

Date of Issue ___JANUARY 23, 2019  (CK)___        By _____
                                                              (Authorized Representative)

## NOISE AND POLLUTION AND OTHER PERILS EXCLUSION CLAUSE

This policy is amended as follows:

In the event any of the provisions of this endorsement are in conflict with any provisions, exclusions, conditions or terms forming part of this policy, this endorsement shall take precedence.

1.  This policy does not cover claims directly or indirectly occasioned by, happening through or in consequence of:

    (a)  noise (whether audible to the human ear or not), vibration, sonic boom and any phenomena associated therewith,

    (b)  pollution and contamination of any kind whatsoever,

    (c)  electrical and electromagnetic interference,

    (d)  interference with the use of property;

    unless caused by or resulting in a crash, fire, explosion or collision or a recorded in-flight emergency causing abnormal aircraft operation.

2.  With respect to any provision in the policy concerning any duty of the Company to investigate or defend claims, such provision shall not apply and the Company shall not be required to defend:

    (a)  claims excluded by paragraph 1., or

    (b)  a claim or claims covered by the policy when combined with any claims excluded by paragraph 1. (referred to below as "Combined Claims").

3.  In respect of any Combined Claims, the Company shall (subject to proof of loss and the limits of the policy) reimburse the Insured for that portion of the following items which may be allocated to the claims covered by the policy:

    (a)  damages awarded against the Insured and

    (b)  defense fees and expenses incurred by the Insured.

4.  Nothing herein shall override any radioactive contamination or other exclusion clause attached to or forming part of this policy.

All other provisions of this policy remain the same.

This endorsement becomes effective____JANUARY 26, 2019____ to be attached to and hereby made a part of:
Policy No. ____1000320046-03____
Issued to  PASSPORT 420, LLC

By STARR INDEMNITY & LIABILITY COMPANY

Endorsement No. ____11____

Date of Issue ____JANUARY 23, 2019  (CK)____        By _____
                                                              (Authorized Representative)

AVN46B (2/06)

## NUCLEAR RISKS EXCLUSION CLAUSE

This policy is amended as follows:

In the event any of the provisions of this endorsement are in conflict with any provisions, exclusions, conditions or terms forming part of this policy, this endorsement shall take precedence.

1.   This policy does not cover:

   (i)   loss or destruction of or damage to any property whatsoever or any loss or expense whatsoever resulting or arising therefrom or any consequential loss

   (ii)   any legal liability of whatsoever nature

   directly or indirectly caused by or contributed to by or arising from:

   (a)   the radioactive, toxic, explosive or other hazardous properties of any explosive nuclear assembly or nuclear component thereof;

   (b)   the radioactive properties of, or a combination of radioactive properties with toxic, explosive or other hazardous properties of, any other radioactive material in the course of carriage as cargo, including storage or handling incidental thereto;

   (c)   ionizing radiations or contamination by radioactivity from, or the toxic, explosive or other hazardous properties of, any other radioactive source whatsoever.

2.   It is understood and agreed that such radioactive material or other radioactive source in paragraph 1. (b) and (c) above shall not include:

   (i)   depleted uranium and natural uranium in any form;

   (ii)   radioisotopes which have reached the final stage of fabrication so as to be usable for any scientific, medical, agricultural, commercial, educational or industrial purpose.

3.   This policy, however, does not cover loss of or destruction of or damage to any property or any consequential loss or any legal liability of whatsoever nature with respect to which:

   (i)   the Insured under this policy is also an insured or an additional insured under any other insurance policy, including any nuclear energy liability policy; or

   (ii)   any person or organization is required to maintain financial protection pursuant to legislation in any country; or

   (iii)   the Insured under this policy is, or had this policy not been issued would be, entitled to indemnification from any government or agency thereof.

4. Loss, destruction, damage, expense or legal liability in respect of the nuclear risks not excluded by reason of paragraph 2. shall (subject to all other terms, conditions, limitations, warranties and exclusions of this policy) be covered, provided that:

(i) in the case of any claim in respect of radioactive material in the course of carriage as cargo, including storage or handling incidental thereof, such carriage shall in all respects have complied with the full International Civil Aviation Organization "Technical Instructions for the Safe Transport of Dangerous Goods by Air", unless the carriage shall have been subject to any more restrictive legislation, when it shall in all respects have complied with such legislation;

(ii) this policy shall only apply to an incident happening during the period of this policy and where any claim by the Insured against the Company or by any claimant against the Insured arising out of such incident shall have been made within three years after the date thereof;

(iii) in the case of any claim for the loss of or destruction of or damage to or loss of use of an aircraft caused by or contributed to by radioactive contamination, the level of such contamination shall have exceeded the maximum permissible level set out in the following scale:

| Emitter<br><br>(IAEA Health and Safety Regulations | Maximum permissible level<br>of non-fixed radioactive<br>surface contamination<br>(Averaged over 300 $cm^2$) |
|---|---|
| Beta, gamma and low toxicity alpha emitters | Not exceeding 4 Becquerels / $cm^2$<br>($10^{-4}$ microcuries / $cm^2$) |
| All other alpha emitters | Not exceeding 0.4 Becquerels / $cm^2$<br>($10^{-5}$ microcuries / $cm^2$) |

(iv) the cover afforded hereby may be cancelled at any time by the Company giving seven days' notice of cancellation.

All other provisions of this policy remain the same.

This endorsement becomes effective _____JANUARY 26, 2019_____ to be attached to and hereby made a part of:
Policy No. _____1000320046-03_____
Issued to _PASSPORT 420, LLC_____

By _STARR INDEMNITY & LIABILITY COMPANY_____

Endorsement No. _____12_____

Date of Issue _____JANUARY 23, 2019  (CK)_____          By _____
                                                              (Authorized Representative)

AVN38B (2/06)                    Page 2

## TERRORISM EXCLUSION
(Terrorism Risk Insurance Act)

This policy is amended as follows:

This policy does not cover claims caused by any losses, damages, or injuries arising directly or indirectly as a result of any certified "Act of Terrorism" defined by Section 102. Definitions of the Terrorism Risk Insurance Act and any revisions or amendments thereto.

Solely with respect to this endorsement and to ensure compliance with the Terrorism Risk Insurance Act, an "Act of Terrorism" shall mean:

(1) Act of Terrorism:
   (A) Certification - The term "act of terrorism" means any act that is certified by the Secretary of the Treasury in consultation with the Secretary of Homeland Security, and the Attorney General of the United States:
      (i) to be an act of terrorism;
      (ii) to be a violent act or an act that is dangerous to:
         (I) human life;
         (II) property; or
         (III) infrastructure;
      (iii) to have resulted in damage within the United States, or outside of the United States in the case of:
         (I) an air carrier or vessel defined as one principally based in the United States, on which United States income tax is paid, and whose insurance coverage is subject to regulation in the United States; or
         (II) the premises of a United States mission; and
      (iv) to have been committed by an individual or individuals as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States Government by coercion.
   (B) Limitation - No act shall be certified by the Secretary as an act of terrorism if:
      (i) the act is committed as part of the course of a war declared by the Congress, except that this clause shall not apply with respect to any coverage for workers' compensation; or
      (ii) property and casualty insurance losses resulting from the act, in the aggregate, do not exceed the Program Trigger.
   (C) Determinations Final - Any certification of, or determination not to certify, an act of terrorism under this paragraph shall be final, and shall not be subject to judicial review.
   (D) Timing of certification - Not later than 9 months after the report required under section 107 of the Terrorism Risk Insurance Program Reauthorization Act of 2015 is submitted to the appropriate committees of Congress, the Secretary shall issue final rules governing the certification process, including establishing a timeline for which an act is eligible for certification by the Secretary on whether an act is an act of terrorism under this paragraph.
   (E) Nondelegation - The Secretary may not delegate or designate to any other officer, employee, or person, any determination under this paragraph of whether, during the effective period of the Program, an act of terrorism has occurred.

> THE PROVISIONS OF THIS ENDORSEMENT SHALL APPLY SOLELY TO THE TERRORISM RISK INSURANCE ACT, ITS REVISIONS AND/OR AMENDMENTS AND SHALL IN NO WAY CONFLICT WITH THOSE OF AVN48B AND AMENDMENTS THERETO.

All other provisions of this policy remain the same.

This endorsement becomes effective_____JANUARY 26, 2019_____to be attached to and hereby made a part of:
Policy No. ____1000320046-03____
Issued to  PASSPORT 420, LLC

By STARR INDEMNITY & LIABILITY COMPANY

Endorsement No. _____13_____

Date of Issue _____JANUARY 23, 2019  (CK)_____    By _____
                                                                 (Authorized Representative)

Starr 10055 (1/15)

**ASBESTOS EXCLUSION ENDORSEMENT**

This policy does not cover any claims of any kind whatsoever directly or indirectly relating to, arising out of or in consequence of:

1.   The actual, alleged or threatened exposure to or presence of asbestos in any form whatsoever, including, but not limited to, asbestos fibers or asbestos dust, or any material or product containing, or alleged to contain, asbestos; or

2.   Any obligations, request, demand, order, or statutory or regulatory requirement that any insured or others test for, monitor, clean up, remove, contain, treat, neutralize, protect against or in any other way respond to the actual, alleged or threatened exposure to or presence of asbestos in any form whatsoever, including, but not limited to, asbestos fibers or asbestos dust, or any material or product containing, or alleged to contain, asbestos.

However, the exclusion shall not apply to any claim for asbestos exposure caused by or resulting from a crash, fire, explosion, or collision or a recorded in flight emergency causing abnormal aircraft operations.

Notwithstanding any other provisions of this Policy, Insurers will have no duty to investigate, defend or pay defense costs in respect of any claim excluded in whole or in part under paragraphs 1. or 2. hereof.

All other provisions of this policy remain the same.

This endorsement becomes effective_____JANUARY 26, 2019_____to be attached to and hereby made a part of:
Policy No. _____1000320046-03_____
Issued to  PASSPORT 420, LLC

By STARR INDEMNITY & LIABILITY COMPANY

Endorsement No. _____14_____

Date of Issue _____JANUARY 23, 2019  (CK)_____          By _____
                                                                                          (Authorized Representative)

Starr 10007 (2/06)

## CALIFORNIA CANCELLATION / NONRENEWAL ENDORSEMENT - AVIATION

Wherever used in this endorsement: 1) "we", "us", "our", and "Insurer" mean the insurance company which issued this policy; and 2) "you", "your", "Named Insured", "First Named Insured", and "Insured" mean the Named Corporation, Named Organization, Named Sponsor, Named Insured, or Insured stated in the Declarations page; and 3) "Other Insured(s)" means all other persons or entities afforded coverage under the policy.

In consideration of the premium charged, the cancellation clause is replaced with the following:

<u>CANCELLATION</u>

The First Named Insured shown in the declarations may cancel the policy by mailing or delivering to the Insurer advance written notice of cancellation.

If the policy has been in effect for more than sixty (60) days or if it is a renewal, effective immediately, the Insurer may not cancel the policy unless such cancellation is based on one or more of the following reasons:

1. Nonpayment of premium, including payment due on a prior policy issued by the Insurer and due during the current policy term covering the same risks.

2. A judgement by a court or an administrative tribunal that the named Insured has violated any law of this state or of the United States having as one of its necessary elements an act which materially increases any of the risks insured against.

3. Discovery of fraud or material misrepresentation by either of the following:

   a) The Insured or Other Insured(s) or his or her representative in obtaining the insurance; or

   b) The named Insured or his or her representative in pursuing a claim under the policy.

4. Discovery of willful or grossly negligent acts or omissions, or of any violations of state laws or regulations establishing safety standards, by the named Insured or Other Insured(s) or a representative of same, which materially increase any of the risks insured against.

5. Failure by the named Insured or Other Insured(s) or a representative of same to implement reasonable loss control requirements which were agreed to by the Insured as a condition of policy issuance or which were conditions precedent to the use by the Insurer of a particular rate or rating plan if the failure materially increases any of the risks insured against.

6. A determination by the commissioner that the loss of, or changes in, an insurer's reinsurance covering all or part of the risk would threaten the financial integrity or solvency of the Insurer.

7. A determination by the commissioner that a continuation of the policy coverage could place the Insurer in violation of the laws of this state or the state of its domicile or that the continuation of coverage would threaten the solvency of the Insurer.

8. A change by the named Insured or Other Insured(s) or a representative of same in the activities or property of the commercial or industrial enterprise which results in a material added risk, a materially increased risk or a materially changed risk, unless the added, increased, or changed risk is included in the policy.

Notice of cancellation shall be delivered or mailed to the producer of record and the Named Insured at least thirty (30) days prior to the effective date of cancellation. Where cancellation is for nonpayment of premium or fraud, notice shall be given no less than ten (10) days prior to the effective date of cancellation.

If this policy is cancelled, we will send the first named Insured any premium refund due.  The refund, if any, will be computed on a pro rata basis.  However, the refund may be less than pro rata if we made a loan to you for the purpose of payment of premiums for this policy.  The cancellation will be effective even if we have not make or offered a refund.

NONRENEWAL

If the Insurer decides not to renew the policy, the Insurer shall mail or deliver to the producer of record and the named Insured notice of nonrenewal at least sixty (60) days but no more than 120 days prior to the end of the policy period.  The notice shall contain the reason for nonrenewal of the policy.

RENEWAL

If a policy has been in effect for more than sixty (60) days or if the policy is a renewal, effective immediately no increase in premium, reduction in limits, or change in the conditions of coverage shall be effective during the policy period unless based upon one of the following reasons:

1.  Discovery of willful or grossly negligent acts or omissions, or of any violations of state laws or regulations establishing safety standards by the named Insured or Other Insured(s) which materially increase any of the risks or hazards insured against.

2.  Failure by the named Insured or Other Insured(s) to implement reasonable loss control requirements which were agreed to by the Insured as a condition of policy issuance or which were conditions precedent to the use by the Insurer of a particular rate or rating plan, if the failure materially increases any of the risks insured against.

3.  A determination by the commissioner that loss of or changes in an insurer's reinsurance covering all or part of the risk covered by the policy would threaten the financial integrity or solvency of the Insurer unless the change in the terms or conditions or rate upon which the premium is based is permitted.

4.  A change by the named Insured or Other Insured(s) in the activities or property of the commercial or industrial enterprise which results in a materially added risk, a materially increased risk, or materially changed risk, unless the added, increased, or changed risk is included in the policy.

Written notice shall be mailed or delivered to the named Insured and the producer of record at least thirty (30) days prior to the effective date of any increase, reduction or change.

All other provisions of this policy remain the same.

This endorsement becomes effective_____ JANUARY 26, 2019 _____to be attached to and hereby made a part of:
Policy No. ____1000320046-03____
Issued to  PASSPORT 420, LLC

By STARR INDEMNITY & LIABILITY COMPANY

Endorsement No. ____15____

Date of Issue ____JANUARY 23, 2019  (CK)____          By _____

                                                              (Authorized Representative)

Starr 20006 (12/11)              Page 2

## DATE RECOGNITION EXCLUSION CLAUSE

This Policy does not cover any claim, damage, injury, loss, cost, expense or liability (whether in contract, tort, negligence, product liability, misrepresentation, fraud or otherwise) of any nature whatsoever arising from or occasioned by or in consequence of (whether directly or indirectly and whether wholly or partly):

(a)  the failure or inability of any computer hardware, software, integrated circuit, chip or information technology equipment or system (whether in the possession of the Insured or of any third party) accurately or completely to process, recognize, exchange or transfer year, date or time data or information in connection with any change of year, date or time;

whether on or before or after such change of year, date or time;

(b)  any implemented or attempted change or modification of any computer hardware, software, integrated circuit, chip or information technology equipment or system (whether in the possession of the Insured or of any third party) in anticipation of or in response to any such change of year, date or time, or any advice given or services performed in connection with any such change or modification;

(c)  any non-use or unavailability for use of any property or equipment of any kind whatsoever resulting from any act, failure to act or decision of the Insured or of any third party related to any such change of year, date or time;

and any provision in this Policy concerning any duty of the Company to investigate or defend claims shall not apply to any claims so excluded.

All other provisions of this policy remain the same.

This endorsement becomes effective____ JANUARY 26, 2019 ____to be attached to and hereby made a part of:
Policy No. ___ 1000320046-03 ___
Issued to  PASSPORT 420, LLC

By STARR INDEMNITY & LIABILITY COMPANY

Endorsement No. ____ 16 ____

Date of Issue ___ JANUARY 23, 2019  (CK) ___          By _____
(Authorized Representative)

AVN2000A (2/06)

## AVIATION DATE RECOGNITION ENDORSEMENT WITH LIMITED COVERAGE GRANT
## AIRCRAFT OPERATORS OPTION 4

This Policy does not cover any claim, damage, injury, loss, cost, expense or liability (whether in contract, tort, negligence, product liability, misrepresentation, fraud or otherwise) of any nature whatsoever arising from or occasioned by or in consequence of (whether directly or indirectly and whether wholly or partly):

a)   the failure or inability of any computer hardware, software, integrated circuit, chip, computer component or other information technology equipment or system (whether in the possession of the **Insured** or of any third party) accurately or completely to process, recognize, exchange or transfer year, date or time data or information in connection with:

- the change of year from 1999 to 2000; and/or
- the change of date from 21 August 1999 to 22 August 1999; and/or
- any other change of year, date or time;

whether on or before or after such change of year, date or time;

b)   any implemented or attempted change or modification of any computer hardware, software, integrated circuit, chip, computer component or other information technology equipment or system (whether in the possession of the **Insured** or of any third party) in anticipation of or in response to any such change of year, date or time, or any advice given or services performed in connection with any such change or modification;

c)   any non-use or unavailability for use of any property or equipment of any kind whatsoever resulting from any act, failure to act or decision of the **Insured** or of any third party related to any such change of year, date or time;

and any provision in this Policy concerning any duty of the Company to investigate or defend claims shall not apply to any claims so excluded.


HOWEVER, in consideration of the additional premium of $ <u>INCLUDED</u> , it is hereby understood and agreed that this endorsement shall not apply to:

1.   any accidental loss of or damage to an **aircraft** defined in the policy schedule (insured **aircraft**); and

2.   any sums which the **Insured** shall become legally liable to pay, and (if so required by the Policy) shall pay (including costs awarded against the **Insured**) in respect of:

(a)   accidental **bodily injury** (fatal or otherwise) to **passenger**s directly caused by an accident to an insured **aircraft**; and/or
(b)   loss of or damage to baggage and personal articles of **passenger**s, mail and cargo directly caused by an accident to an insured **aircraft**; and/or
(c)   accidental **bodily injury** (fatal or otherwise) and accidental damage to property directly caused by an insured **aircraft** or by any person or object falling therefrom.

PROVIDED THAT:

1.  Coverage provided pursuant to this endorsement shall be subject to all terms, conditions, limitations, exclusions and cancellation provisions of this Policy (except as specifically provided herein), and nothing in this endorsement extends coverage beyond that which is provided by the Policy.

2.  Nothing in this endorsement shall provide any coverage in respect of grounding and/or loss of use of any **aircraft** which has not been physically damaged or destroyed in the accident giving rise to a claim under the Policy.

All other provisions of this policy remain the same.

This endorsement becomes effective _____ JANUARY 26, 2019 _____ to be attached to and hereby made a part of:
Policy No.  ___ 1000320046-03 ___
Issued to  PASSPORT 420, LLC

By STARR INDEMNITY & LIABILITY COMPANY

Endorsement No.  _____ 17 _____

Date of Issue  JANUARY 23, 2019  (CK)          By _____
                                                              (Authorized Representative)

Starr 30002 (5/06)                    Page 2



**STARR**
C O M P A N I E S
GLOBAL INSURANCE & INVESTMENTS

## 3353 Peachtree Road, N.E.
## Suite 1000
## Atlanta, GA 30326
## (Phone) 404-946-1400 (Fax) 404-946-1497

In the event of a claim, please submit your notice of loss to the following email inbox which will generate a return email with your claims adjustor, contact information and claim number within 24 hours:

aviationclaimreports@starrcompanies.com

In the event of a claim emergency, please contact:

Jeffrey Greenawalt:
Cell: (214) 223-0202

Or

Jacy Watt:
Cell: (404) 401-8851
Office: (404) 946-1414

**EXHIBIT 2**

ELECTRONICALLY FILED
Superior Court of California
County of Santa Barbara
Darrel E. Parker, Executive Officer
4/10/2023 8:00 AM
By: Narzralli Baksh , Deputy

1  Ralph S. LaMontagne, Jr. [State Bar No. 91536]
   *rlamontagne@l-a-lawoffices.com*
2  Eric A. Amador [State Bar No. 143395]
   *eamador@l-a-lawoffices.com*
3  LaMONTAGNE & AMADOR LLP
4  150 S. Los Robles Avenue, Suite 940
   Pasadena, California 91101
5  Telephone:  (626) 765-6800
   Facsimile:  (626) 765-6801
6
7  Michael J. Terhar [State Bar No. 89491]
   *mterhar@cunninghamswaim.com*
8  Carl J. Basile [State Bar No. 251267]
   *cbasile@cunninghamswaim.com*
9  Cunningham Swaim LLP
   2 North Lake Ave., Suite 550
10 Pasadena, California  91101
   Telephone:  (626) 765-3000
11
12 Attorneys for Defendant
   STARR INDEMNITY & LIABILITY COMPANY
13
                **SUPERIOR COURT OF THE STATE OF CALIFORNIA**
14
                    **COUNTY OF SANTA BARBARA**
15

| | |
|---|---|
| 16  PASSPORT 420, LLC, a Delaware Limited Liability Company; SPRING CREEK RESEARCH, LLC, a California Limited Liability Company; and WILLIAM PARRISH, an Individual, | )  Case No. 19CV03596 |
| 17 | ) |
| | ) **APPENDIX OF EXHIBITS IN SUPPORT** |
| 18 | ) **OF MOTION FOR SUMMARY** |
| | ) **ADJUDICATION OF ISSUES AS** |
| 19              Plaintiffs, | ) **RESPECTS SECOND CAUSE OF** |
| | ) **ACTION AND PUNITIVE DAMAGES** |
| 20       vs. | ) |
| 21 | ) |
| | ) Date:  July 3, 2023 |
| 22  STARR INDEMNITY & LIABILITY COMPANY, a Texas Corporation; AVENATTI & ASSOCIATES, APC, a California Professional Corporation; MICHAEL J. AVENATTI, an Individual; and DOES 1 through 10, | ) Time:  10:00 a.m. |
| 23 | ) Dept:  5 |
| | ) |
| 24 | ) Judge:  Hon. Colleen K. Sterne |
| | ) Dept:    5 |
| | ) Complaint Filed: July 11, 2019 |
| 25              Defendants. | ) Trial Date: July 24, 2023 |
| | ) |

26
27
28

Appendix of Exhibits in Support of  Motion for Summary Adjudication Of Issues As Respects
Second Cause Of Action And Punitive Damages

244185

0001

1    Defendant, Starr Indemnity & Liability Company, respectfully offers the exhibits listed

2    below in support of its accompanying Motion for Summary Adjudication of Issue as Respects

3    Second Cause of Action and Punitive Damages:

4    **CHRONOLOGICAL**

5    **EXHIBIT**   **DESCRIPTION**                                                      **BATES NO.**

6    Exhibit 1     Starr Indemnity & Liability Company's Request for Admissions          0007
               to Plaintiff, Passport 420, LLC, A Delaware Limited Liability
7              Company Set One dated January 24, 2020, including its exhibits:

8              Exhibit A -    Certificate of Formation of Passport 420, LLC             0018

9              Exhibit B -    Limited Liability Operating Agreement of                  0021
               Passport 420, LLC
10

11             Exhibit C -    Invoice from Honda Aircraft Company, LLC, for             0040
               purchase of aircraft
12

13             Exhibit D -    Aircraft Title Status Report                             0044

               Exhibit E -    Letter from attorney A. Barry Cappello to                0046
14             Michael Avenatti dated August 29, 2018

15             Exhibit F -    Starr Elite Comprehensive Corporate Aircraft             0050
               Policy No. 1000320046-01
16

17             Exhibit G -    Aircraft Insurance Application dated March 1,             0120
               2017
18

19             Exhibit H -    Starr Elite Comprehensive Corporate Aircraft             0132
               Policy No. 1000320046-02

20             Exhibit I -    Starr Elite Comprehensive Corporate Aircraft             0196
               Policy No. 1000320046-03
21

22             Exhibit J -    Aircraft Insurance Application dated January 16,          0261
               2019
23

               Exhibit K -    Verified Complaint for Forfeiture                        0270
24

25             Exhibit L -    Indictment                                              0280

26             Exhibit M -    Crossclaim of Alexis Gardner                            0342

               Exhibit N -    Complaint of William Parrish against Michael            0384
27             Avenatti (1)

28

LAW OFFICES
LAMONTAGNE &
AMADOR LLP

Appendix of Exhibits in Support of Motion for Summary Adjudication Of Issues As Respects
Second Cause Of Action And Punitive Damages

244185

| | | | |
|---|---|---|---|
| | | Exhibit O - Complaint of William Parrish against Michael Avenatti (2) | 0417 |
| | Exhibit 2 | Objections and Responses of Passport 420, LLC to Requests for Admission Propounded by Starr Indemnity & Liability Company, Set No. One, dated March 6, 2020 | 0438 |
| | Exhibit 3 | Pertinent pages from the transcript of the deposition of Michael Avenatti in *Eagan Avenatti v. Robert J. Stoll, Jr.*, Orange County Superior Court case no. 30-2011-00483570, taken on April 22, 2015 | 0449 |
| | Exhibit 4 | Pertinent pages from the transcript of the deposition of William Parrish in *Eagan Avenatti v. Robert J. Stoll, Jr.*, Orange County Superior Court case no. 30-2011-00483570, taken on January 18, 2016 | 0452 |
| | Exhibit 5 | Complaint of Passport 420, LLC, in this action, filed on July 11, 2019 (sans exhibits) | 0455 |
| | Exhibit 6 | Sworn Proof of Loss, dated May 1, 2019 | 0467 |
| | Exhibit 7 | Letter dated June 3, 2019, from attorney Lawrence Conlan to Shari Thompson (without attachments) | 0472 |
| | Exhibit 8 | Letter dated June 26, 2019, from attorney Roger Clark to attorney Lawrence Conlan | 0476 |
| | Exhibit 9 | Letter dated November 2, 2021 from Shari Thompson to attorney Matthew L. Hofer | 0484 |
| | Exhibit 10 | Eagan Avenatti – Alexis Gardner Attorney-Client Fee Contract (Contingency) dated December 5, 2016 (USDC Trial Ex. 132) | 0497 |
| | Exhibit 11 | Pertinent pages from transcript of July 29, 2021 and 30, 2021, testimony of attorney Joel Weiner from the criminal trial of Michael Avenatti | 0501 |
| | Exhibit 12 | December 22, 2016, email from Michael Avenatti to Eagan-Avenatti office manager Judy Regnier (USDC Trial Ex. 137) | 0507 |
| | Exhibit 13 | Pertinent pages from the transcript of the July 27, 2021, testimony of Regnier from the criminal trial of Michael Avenatti | 0514 |
| | Exhibit 14 | January 31, 2017, statement from California Bank & Trust for Eagan Avenatti client trust account (USDC Trial Ex. 148) | 0522 |
| | Exhibit 15 | Record of January 25, 2017 $2,750,000 wire transfer from Hassan Whiteside to Eagan Avenatti trust account (USDC Trial | 0527 |

3

LAW OFFICES
LaMontagne &
Amador LLP

Appendix of Exhibits in Support of Motion for Summary Adjudication Of Issues As Respects Second Cause Of Action And Punitive Damages

244185

0003

| | | | |
|---|---|---|---|
| 1 | | Ex. 149) | |
| 2 | Exhibit 16 | Pertinent pages from the transcript of the July 30, 2021 and August 3, 2021, testimony of Alexis Gardner from the criminal trial of Michael Avenatti | 0530 |
| 4 | Exhibit 17 | JP Morgan Chase Bank, N.A., account statement for the X-Law Group, PC, reflecting receipt of a January 26, 2017 $2,500,000 wire transfer (USDC Trial Ex. 152) | 0537 |
| 6 | Exhibit 18 | Pertinent pages from the transcript of the August 3, 2021, testimony of Filippo Marchino from the criminal trial of Michael Avenatti | 0542 |
| 9 | Exhibit 19 | January 26, 2017, email from Marchino to Michael Avenatti asking to confirm the form of a wire transfer to Honda Aircraft Company (USDC Trial Ex. 153) | 0554 |
| 11 | Exhibit 20 | Pertinent pages from the transcript of the August 13, 2021, testimony of forensic accounting expert John Drum from the criminal trial of Michael Avenatti | 0557 |
| 13 | Exhibit 21 | Exhibit 431 from the criminal trial of Michael Avenatti | 0564 |

**ALPHABETICAL**

| **EXHIBIT** | **DESCRIPTION** | **BATES NO.** |
|---|---|---|
| Exhibit 5 | Complaint of Passport 420, LLC, in this action, filed on July 11, 2019 (sans exhibits) | 0455 |
| Exhibit 12 | December 22, 2016, email from Michael Avenatti to Eagan-Avenatti office manager Judy Regnier (USDC Trial Ex. 137) | 0507 |
| Exhibit 10 | Eagan Avenatti – Alexis Gardner Attorney-Client Fee Contract (Contingency) dated December 5, 2016 (USDC Trial Ex. 132) | 0497 |
| Exhibit 21 | Exhibit 431 from the criminal trial of Michael Avenatti | 0564 |
| Exhibit 19 | January 26, 2017, email from Marchino to Michael Avenatti asking to confirm the form of a wire transfer to Honda Aircraft Company (USDC Trial Ex. 153) | 0554 |
| Exhibit 14 | January 31, 2017, statement from California Bank & Trust for Eagan Avenatti client trust account (USDC Trial Ex. 148) | 0522 |
| Exhibit 17 | JP Morgan Chase Bank, N.A., account statement for the X-Law Group, PC, reflecting receipt of a January 26, 2017 $2,500,000 wire transfer (USDC Trial Ex. 152) | 0537 |
| Exhibit 8 | Letter dated June 26, 2019, from attorney Roger Clark to attorney | 0476 |

LAW OFFICES
LAMONTAGNE &
AMADOR LLP

244185

4

Appendix of Exhibits in Support of Motion for Summary Adjudication Of Issues As Respects Second Cause Of Action And Punitive Damages

0004

| | | | |
|---|---|---|---|
| 1 | | Lawrence Conlan | |
| 2 | Exhibit 7 | Letter dated June 3, 2019, from attorney Lawrence Conlan to Shari Thompson (without attachments) | 0472 |
| 3 | | | |
| 4 | Exhibit 9 | Letter dated November 2, 2021 from Shari Thompson to attorney Matthew L. Hofer | 0484 |
| 5 | Exhibit 2 | Objections and Responses of Passport 420, LLC to Requests for Admission Propounded by Starr Indemnity & Liability Company, Set No. One, dated March 6, 2020 | 0438 |
| 6 | | | |
| 7 | | | |
| 8 | Exhibit 20 | Pertinent pages from the transcript of the August 13, 2021, testimony of forensic accounting expert John Drum from the criminal trial of Michael Avenatti | 0557 |
| 9 | | | |
| 10 | Exhibit 18 | Pertinent pages from the transcript of the August 3, 2021, testimony of Filippo Marchino from the criminal trial of Michael Avenatti | 0542 |
| 11 | | | |
| 12 | Exhibit 3 | Pertinent pages from the transcript of the deposition of Michael Avenatti in *Eagan Avenatti v. Robert J. Stoll, Jr.*, Orange County Superior Court case no. 30-2011-00483570, taken on April 22, 2015 | 0449 |
| 13 | | | |
| 14 | | | |
| 15 | Exhibit 4 | Pertinent pages from the transcript of the deposition of William Parrish in *Eagan Avenatti v. Robert J. Stoll, Jr.*, Orange County Superior Court case no. 30-2011-00483570, taken on January 18, 2016 | 0452 |
| 16 | | | |
| 17 | | | |
| 18 | Exhibit 13 | Pertinent pages from the transcript of the July 27, 2021, testimony of Regnier from the criminal trial of Michael Avenatti | 0514 |
| 19 | Exhibit 16 | Pertinent pages from the transcript of the July 30, 2021 and August 3, 2021, testimony of Alexis Gardner from the criminal trial of Michael Avenatti | 0530 |
| 20 | | | |
| 21 | | | |
| 22 | Exhibit 11 | Pertinent pages from transcript of July 29, 2021 and 30, 2021, testimony of attorney Joel Weiner from the criminal trial of Michael Avenatti | 0501 |
| 23 | | | |
| 24 | Exhibit 15 | Record of January 25, 2017 $2,750,000 wire transfer from Hassan Whiteside to Eagan Avenatti trust account (USDC Trial Ex. 149) | 0527 |
| 25 | | | |
| 26 | Exhibit 1 | Starr Indemnity & Liability Company's Request for Admissions to Plaintiff, Passport 420, LLC, A Delaware Limited Liability Company Set One dated January 24, 2020, including its exhibits: | 0007 |
| 27 | | | |
| 28 | | Exhibit A -    Certificate of Formation of Passport 420, LLC | 0018 |

LAW OFFICES
LaMONTAGNE &
AMADOR LLP

244185

Appendix of Exhibits in Support of  Motion for Summary Adjudication Of Issues As Respects Second Cause Of Action And Punitive Damages

| | | | |
|---|---|---|---|
| Exhibit B - | Limited Liability Operating Agreement of Passport 420, LLC | 0021 |
| Exhibit C - | Invoice from Honda Aircraft Company, LLC, for purchase of aircraft | 0040 |
| Exhibit D - | Aircraft Title Status Report | 0044 |
| Exhibit E - | Letter from attorney A. Barry Cappello to Michael Avenatti dated August 29, 2018 | 0046 |
| Exhibit F - | Starr Elite Comprehensive Corporate Aircraft Policy No. 1000320046-01 | 0050 |
| Exhibit G - | Aircraft Insurance Application dated March 1, 2017 | 0120 |
| Exhibit H - | Starr Elite Comprehensive Corporate Aircraft Policy No. 1000320046-02 | 0132 |
| Exhibit I - | Starr Elite Comprehensive Corporate Aircraft Policy No. 1000320046-03 | 0196 |
| Exhibit J - | Aircraft Insurance Application dated January 16, 2019 | 0261 |
| Exhibit K - | Verified Complaint for Forfeiture | 0270 |
| Exhibit L - | Indictment | 0280 |
| Exhibit M - | Crossclaim of Alexis Gardner | 0342 |
| Exhibit N - Avenatti (1) | Complaint of William Parrish against Michael | 0384 |
| Exhibit O - Avenatti (2) | Complaint of William Parrish against Michael | 0417 |
| Exhibit 6 | Sworn Proof of Loss, dated May 1, 2019 | 0467 |

Dated:  April 8, 2023

LaMONTAGNE & AMADOR LLP

By _____

RALPH S. LaMONTAGNE, JR.
ERIC A. AMADOR
Attorneys for Defendant
STARR INDEMNITY & LIABILITY COMPANY

LAW OFFICES
LaMONTAGNE &
AMADOR LLP

Appendix of Exhibits in Support of  Motion for Summary Adjudication Of Issues As Respects Second Cause Of Action And Punitive Damages

244185

0006

# EXHIBIT 1

0001

0001



ROGER W. CLARK, ESQ. (#108982)
Email: rclark@cgold.cc
ROBERT D. GOLDBERG, ESQ. (#137356)
Email: rgoldberg@cgold.cc
**THE CLARK LAW GROUP**
11355 W. Olympic Boulevard, Suite 303
Los Angeles, California 90064
Telephone: (310) 478-0077
Facsimile: (310) 478-0099

Attorneys for Defendant:
**STARR INDEMNITY & LIABILITY COMPANY**

## SUPERIOR COURT OF THE STATE OF CALIFORNIA

### FOR THE COUNTY OF SANTA BARBARA

|  |  |
|---|---|
| PASSPORT 420, LLC a Delaware Limited Liability Company; SPRING CREEK RESEARCH, LLC, a California Limited Liability Company; and WILLIAM PARRISH, an Individual, <br><br> Plaintiffs, <br><br> vs. <br><br> STARR INDEMNITY & LIABILITY COMPANY, a Texas Corporation; AVENATTI & ASSOCIATES, APC, a California Professional Corporation; MICHAEL J. AVENATTI, an Individual; and DOES 1 through 10, <br><br> Defendant(s). | CASE NO. 19CV03596 <br><br> **STARR INDEMNITY & LIABILITY COMPANY'S REQUEST FOR ADMISSIONS TO PLAINTIFF, PASSPORT 420, LLC, A DELAWARE LIMITED LIABILITY COMPANY SET ONE** |

PROPOUNDING PARTY:   Defendant STARR INDEMNITY & LIABILITY COMPANY

RESPONDING PARTY:   Plaintiff PASSPORT 420, LLC, a Delaware Limited Liability Company

SET NO.:   ONE (1)

1

---

STARR INDEMNITY & LIABILITY COMPANY'S REQUEST FOR ADMISSIONS
TO PASSPORT 420, LLC, A DELAWARE LIMITED LIABILITY COMPANY, SET ONE

TO ALL PARTIES AND TO THEIR RESPECTIVE COUNSEL OF RECORD:

PLEASE TAKE NOTICE that pursuant to California *Code of Civil Procedure*, §2033.010 et seq., Defendant STARR INDEMNITY & LIABILITY COMPANY (hereinafter "STARR" or "DEFENDANT") requests that Plaintiff PASSPORT 420, LLC, a Delaware Limited Liability Company, (hereinafter "PLAINTIFF" or "PASSPORT") respond to the Request for Admissions Propounded to Passport 420, LLC, a Limited Liability Company, Set One, as required pursuant to §2033.010 et seq, separately and fully, in writing, under oath, and verify the responses under oath, within thirty-five (35) days after service hereof.

**YOUR FAILURE TO TIMELY RESPOND TO THESE REQUESTS FOR ADMISSIONS, OR TO FULLY RESPOND, MAY RESULT IN THE REQUESTS FOR ADMISSIONS BEING CONCLUSIVELY DEEMED ADMITTED FOR PURPOSES OF TRIAL.**

If your response to any Request is other than an unqualified admission, state exactly and in detail the factual basis for your response.

## REQUESTS FOR ADMISSIONS

**REQUEST NO. 1**

Admit that Passport 420, LLC was organized on or about April 14, 2016, pursuant to a Certificate of Formation duly executed and filed under the Delaware Limited Liability Company Act, attached hereto as Exhibit "A".

///

///

2

THE CLARK LAW GROUP
ATTORNEYS AT LAW
100 WILSHIRE BOULEVARD, SUITE 700
SANTA MONICA, CA 90401
(310) 478-0077    (310) 478-0099 FAX

0003
0003

**REQUEST NO. 2**

Admit that Exhibit "B" is a true and accurate copy of the "Limited Liability Company Operating Agreement" for Passport 420, LLC entered into as of July 11, 2016 between Avenatti & Associates and Spring Creek Research, LLC.

**REQUEST NO. 3**

Admit that on or about January 27, 2017 Passport 420, LLC took delivery of the 2016 Honda Jet, Model HA-420, Serial Number SN42000029, RegistrationN227WP, for a total net price due of $4,383,605.00, pursuant to Exhibit "C".

**REQUEST NO. 4**

Admit that the Limited Liability Company Operating Agreement attached as Exhibit "B" was fully executed.

**REQUEST NO. 5**

Admit that the signatures on the Limited Liability Company Operating Agreement attached as Exhibit "B" of William Parrish are the true signatures of William Parrish.

**REQUEST NO. 6**

Admit that the 2016 Honda Jet, Model HA-420, Serial Number SR42000029, Registration N227WP, was titled to Passport 420, LLC as the registered owner with no liens or encumbrances as reflected in the  Aircraft Title Status Report attached hereto as Exhibit "D".

//

3

THE CLARK LAW GROUP
ATTORNEYS AT LAW
100 WILSHIRE BOULEVARD, SUITE 700
SANTA MONICA, CA 90401
(310) 478-0077   (310) 478-0099 FAX

0004
0004

**REQUEST NO. 7**

Admit that Michael Avenatti was appointed manager of Passport 420, LLC pursuant to the Limited Liability Company Operating Agreement for Passport 420, LLC attached as Exhibit "B".

**REQUEST NO. 8**

Admit that Michael Avenatti signed as "Purchaser" for the Honda Jet, Model HA-420, Serial Number SN42000029, Registration N227WP in his capacity as manager of Passport 420, LLC as reflected in Exhibit "C".

**REQUEST NO. 9**

Admit that prior to August 29, 2018 Michael Avenatti as manager had full and complete authority, power and discretion to manage and control the affairs of Passport 420, LLC pursuant to the Limited Liability Company Operating Agreement attached as Exhibit "B".

**REQUEST NO. 10**

Admit that pursuant to the Limited Liability Company Operating Agreement attached as Exhibit "B" that "the actions of the manager taken in accordance with this agreement shall bind the company."

**REQUEST NO. 11**

Admit that on or about August 29, 2018 William Parrish issued to Michael Avenatti a "Notice of Default" attached hereto as Exhibit "E" pursuant to the Limited Liability Company Operating Agreement attached as Exhibit "B".

4

0005
0005

THE CLARK LAW GROUP
ATTORNEYS AT LAW
100 WILSHIRE BOULEVARD, SUITE 700
SANTA MONICA, CA 90401
(310) 478-0077   (310) 478-0099 FAX

**REQUEST NO. 12**

Admit that William Parrish assumed the role of manager of Passport 420, LLC effective on or about August 29, 2018.

**REQUEST NO. 13**

Admit that after issuing the Notice of Default by William Parrish, a Notice of Intent to Sell to Other Member was not issued by Spring Creek Research, LLC to Avenatti & Associates.

**REQUEST NO. 14**

Admit that Michael Avenatti embezzled approximately $2,500,000.00 from his client, Alexis Gardner.

**REQUEST NO. 15**

Admit that Michael Avenatti used the money he embezzled from his client Alexis Gardner to contribute towards the purchase of the 2016 Honda Jet, Model HA-420, Serial Number SR42000029, Registration N227WP.

**REQUEST NO. 16**

Admit that Exhibit "F" is a true and accurate copy of Starr Elite Comprehensive Corporate Aircraft Policy issued to Passport 420, LLC, Policy Number 1000320046-01 with effective dates from January 26, 2017 until January 26, 2018.

///
///

5

0006
0006

**REQUEST NO. 17**

Admit that Exhibit "G" is a true and accurate copy of the "Aircraft Insurance Application" submitted on behalf of Passport 420, LLC, that led to the issuance of the Starr Elite Comprehensive Corporate Aircraft Policy attached as Exhibit "F".

**REQUEST NO. 18**

Admit that Exhibit "H" is a true and accurate copy of Starr Elite Comprehensive Corporate Aircraft Policy issued to Passport 420, LLC, Policy Number 1000320046-02 with effective dates from January 26, 2018 until January 26, 2019.

**REQUEST NO. 19**

Admit that Exhibit "I" is a true and accurate copy of Starr Elite Comprehensive Company Aircraft Policy issued to Passport 420, LLC, Policy Number 1000320046-03 with effective dates from January 26, 2019 until January 26, 2020.

**REQUEST NO. 20**

Admit that Exhibit "J" is a true and accurate copy of the "Aircraft Insurance Application" submitted on behalf of Passport 420, LLC, that led to the issuance of the Starr Elite Comprehensive Corporate Aircraft Policy attached as Exhibit "J".

///
///
///
///

6

THE CLARK LAW GROUP
ATTORNEYS AT LAW
100 WILSHIRE BOULEVARD, SUITE 700
SANTA MONICA, CA 90401
(310) 478-0077   (310) 478-0099 Fax

0007
0007

**REQUEST NO. 21**

Admit that Passport 420, LLC is the only loss payee for money to be paid under Exhibit "I" for a physical damage loss to the 2016 Honda Jet, Model HA-420, Serial Number SR42000029, Registration N227WP.

**REQUEST NO. 22**

Admit that William Parrish is not a loss payee for money to be paid under Exhibit "I" for a physical damage loss to the 2016 Honda Jet Model HA-420, Serial Number SR42000029, Registration N227WP.

**REQUEST NO. 23**

Admit that Spring Creek Research, LLP is not a loss payee for money to be paid under Exhibit "I" for a physical damage loss to the 2016 Honda Jet Model HA-420, Serial Number SR42000029, Registration N227WP.

**REQUEST NO. 24**

Admit that Alexis Gardner claims an interest in the assets of Passport 420, LLC, including any benefits that might be paid under Exhibit "I" for a physical damage loss to the 2016 Honda Jet Model HA-420, Serial Number SR42000029, Registration N227WP.

**REQUEST NO. 25**

Admit that Michael Avenatti assigned to Lisa-Storie Avenatti the membership interest of Avenatti & Associates in Passport 420, LLC.

7

0008
0008

**REQUEST NO. 26**

Admit that Exhibit "K" is a true and accurate copy of the Civil Forfeiture Complaint served by the United States of America upon Passport 420, LLC, Spring Creek Research, LLC and William Parrish, among others.

**REQUEST NO. 27**

Admit that Exhibit "L" is a true and accurate copy of an indictment filed by the United States of America upon Michael Avenatti in the United States District Court, Central District of California.

**REQUEST NO. 28**

Admit that Exhibit "M" is a true and accurate copy of a "Cross-Claim" filed by Alexis Gardner against Passport 420, LLC, among others, in the United States District Court, Central District of California.

**REQUEST NO. 29**

Admit that Exhibit "N" is a true and accurate copy of a complaint filed by William Parrish against Michael Avenatti titled *WILLIAM PARRISH, an individual; E. TIMOTHY FITZGIBBONS, an individual, Plaintiffs, vs. MICHAEL AVENATTI, individually; MICHAEL EAGAN, individually; EAGAN AVENATTI, LLP, a California limited liability partnership; AVENATTI & ASSOCIATES, APC, a California professional corporation; JASON FRANK, individually; JASON FRANK LAW, PLC, a California professional law corporation; SCOTT SIMS, individually; ALEXANDER CONTI; individually; and DOES 1 through 20, inclusive, Defendants,* Superior Court of the State of California for the County of Santa Barbara, Case No.: 19CV01686.

THE CLARK LAW GROUP
ATTORNEYS AT LAW
100 WILSHIRE BOULEVARD, SUITE 700
SANTA MONICA, CA 90401
(310) 478-0077   (310) 478-0099 FAX

8

**REQUEST NO. 30**

Admit that Exhibit "O" is a true and accurate copy of a complaint filed by William Parrish against Michael Avenatti titled *WILLIAM PARRISH, an individual; Plaintiff, vs. MICHAEL J. AVENATTI, an individual; and DOES 1 through 20, inclusive, Defendants,* Superior Court of the State of California for the County of Santa Barbara, Case No.: 18CV04106.

Dated: January 24, 2020                    THE CLARK LAW GROUP

By: _____
ROGER W. CLARK, ESQ. (#108982)
Email: rclark@cgold.cc
ROBERT D. GOLDBERG, ESQ. (#137356)
Email: rgoldberg@cgold.cc
**THE CLARK LAW GROUP**
100 Wilshire Boulevard, Suite 700
Santa Monica, California 90401
Telephone: (310) 478-0077
Attorneys for Defendant,
**STARR INDEMNITY & LIABILITY COMPANY**

C:\Users\CLARKADMIN\SyncedFolder\Share\data\AAA WORK\19-1915\DISCOVERY - STATE\RFA to Passport 420 - Set 1.doc

9

0010
0010

**PROOF OF SERVICE** - *By Electronic Mail and/or U.S. Mail*

STATE OF CALIFORNIA, COUNTY OF LOS ANGELES

I am employed in the County of Los Angeles, State of California. I am over the age of 18 and not a party to the within action; my business address is that of The Clark Law Group, located at 100 Wilshire Boulevard, Suite 700, Santa Monica, California 90401

On _January 24, 2020,_ I served the foregoing document described as: **STARR INDEMNITY & LIABILITY COMPANY'S REQUEST FOR ADMISSIONS TO PLAINTIFF, PASSPORT 420, LLC, A DELAWARE LIMITED LIABILITY COMPANY, SET ONE;** on all interested parties in this action by sending via electronic mail and by placing true copies thereof enclosed in sealed envelopes addressed as follows:

A.Barry Cappello, Esq.                      Attorneys for Plaintiffs
Lawrence J. Conlan, Esq.
CAPPELLO & NOEL, LLP
831 State Street
Santa Barbara, CA 93101-3227

Linda Kornfeld, Esq.                        Attorneys for Plaintiffs
Anna K. Milunas, Esq.
BLANK ROME, LLP
2029 Century Park East, 6th Floor
Los Angeles, CA 90067

____   **(BY ELECTRONIC TRANSMISSION-VIA ELECTRONIC MAIL)** I caused all of the pages of the above-entitled document, excluding exhibits, to be sent to the indicated recipient(s) noted above **via** electronic transmission (ELECTRONIC MAIL) at the indicated email address(es).

**_X_   (BY MAIL)** I deposited such envelope in the mail at Agoura Hills, California. The envelope was mailed with postage thereon fully prepaid.

I am "readily familiar" with the firm's practice of collection and processing correspondence for mailing. Under that practice it would be deposited with U.S. postal service on that same day with postage thereon fully prepaid at Agoura Hills, California in the ordinary course of business. I am aware that on motion of the party served, service is presumed invalid if postal cancellation date or postage meter date is more than one day after date of deposit for mailing in affidavit.

Executed on _January 24, 2020_ at Agoura Hills, California.

_X_ (State)          I declare under penalty of perjury under the laws of the State of California that the above is true and correct.

_KATHY CLARK_                      _KClark_
Type or Print Name                Signature

THE CLARK LAW GROUP
ATTORNEYS AT LAW
100 WILSHIRE BOULEVARD, SUITE 700
SANTA MONICA, CA 90401
(310) 478-0077   (310) 478-0099 FAX

0011
0011

EXHIBIT "A"

0012

0012



Page 1

I, JEFFREY W. BULLOCK, SECRETARY OF STATE OF THE STATE OF DELAWARE, DO HEREBY CERTIFY THE ATTACHED IS A TRUE AND CORRECT COPY OF THE CERTIFICATE OF FORMATION OF "PASSPORT 420, LLC", FILED IN THIS OFFICE ON THE FOURTEENTH DAY OF APRIL, A.D. 2016, AT 6:05 O`CLOCK P.M.

*Jeffrey W. Bullock, Secretary of State*

6016745  8100
SR# 20162305571

Authentication: 202151717
Date: 04-14-16

You may verify this certificate online at corp.delaware.gov/authver.shtml

0013
0013

State of Delaware
Secretary of State
Division of Corporations
Delivered  06:05 PM 04/14/2016
FILED  06:05 PM 04/14/2016
SR 20162305571 - File Number  6016745

## CERTIFICATE OF FORMATION

### OF

### PASSPORT 420, LLC

This Certificate of Formation of **Passport 420, LLC** (the "Company") is being duly executed and filed by Jack Cullen, as an authorized person, to form a limited liability company under the Delaware Limited Liability Company Act (6 Del.C. § 18-101, et seq.).

1.      The name of the Company is:

**Passport 420, LLC**

2.      The address of the registered office of the Company in the State of Delaware is 160 Greentree Drive, Suite 101, Dover, Delaware 19904.

3.      The name and the address of the registered agent of the Company required to be maintained by Section 18-104 of the Delaware Limited Liability Company Act are National Registered Agents, Inc., 160 Greentree Drive, Suite 101, Dover, Delaware 19904, County of Kent.

4.      The duration of the limited liability company shall be perpetual.

Executed on April 14, 2016.

Jack Cullen, Authorized Person

0014
0014

# EXHIBIT "B"

0015

0015

LIMITED LIABILITY COMPANY OPERATING
AGREEMENT

OF

PASSPORT 420, LLC

Dated as of July 11, 2016

# PASSPORT 420, LLC

THIS LIMITED LIABILITY COMPANY OPERATING AGREEMENT (the "Agreement") of Passport 420, LLC (the "Company") is made as of July 11, 2016 between Spring Creek Research, LLC, 4185 La Ladera Road, Santa Barbara, California, 93110 ("Spring Creek") and Avenatti & Associates, APC, 520 Newport Center Drive, Suite 1400, Newport Beach, California 92660 ("AA") (each a "Member" and collectively, the "Members").

WHEREAS, the Members have caused to be formed a limited liability company pursuant to the laws of the state of Delaware, as they may be amended; and

WHEREAS, the Members desire to establish their respective rights and obligations in connection with forming such limited liability company; and

WHEREAS, the Members of the Company wish to set forth the terms and conditions of their ownership and operation of one Honda Aircraft Company, LLC ("HondaJet"), model HA-420, Serial Number SN42000029, U.S. Registration Number N227WP (the "Aircraft"); and

WHEREAS, within the next ten (10) business days, the Company will take assignment of that certain HondaJet Purchase Agreement dated October 11, 2006 between Avenatti & Associates, APC and HondaJet, as amended (the "Purchase Agreement"), for the purchase of the Aircraft; and

WHEREAS, the Company agrees to lease the Aircraft exclusively to the Members without flight crew, which shall be provided by each Member individually under separate agreement, in exchange for the Members' agreement to insure, operate and maintain the Aircraft and pay their individual charges and pro-rata amounts due under this Agreement, it being the intent of the parties that the Company is not providing transportation services for compensation to the Members, that the Members shall have Operational Control of all flights under this Agreement which shall be conducted under Part 91 of the Federal Aviation Regulations ("FAR"); and

WHEREAS, each Member's ownership interest in the Aircraft will be according to and the same as their ownership interest in the Company as set forth on Exhibit A (the "Ownership Interest"), provided, however, that by entering into this Agreement, the Members do not intend to create a syndicate, group, pool, or joint venture which is classifiable as an association, or any group operating under an agreement which creates an organization classifiable as an association; and

WHEREAS, The relationship of the Member among themselves shall be that of tenants-in-common with regard to the Aircraft and each Member agrees that the sole and adequate means by which it may divest its Ownership Interest in the Company and the Aircraft shall be the transfer of the interest in accordance with the terms and conditions of this Agreement.

1

NOW THEREFORE, in consideration of the mutual covenants and provisions hereinafter contained, the Members agree as follows:

1.  **Formation and Scope of Company.**

    1.1  **Establishment of Company Name.** The Members formed a limited liability company under the provisions of Delaware law by causing a Certificate of Formation to be filed on April 14, 2016 with the Secretary of State of Delaware for the purposes and on the terms herein set forth. The rights and liabilities of the Members shall be as provided in Delaware law, except as is otherwise expressly provided herein. The name of the Company shall be "Passport 420, LLC."

    1.2  **Term of Company.** The term of the Company shall commence on the date formation and shall continue until terminated in accordance with the provisions of Section 9 hereof or as otherwise provided by law.

    1.3  **Location of Offices.** The Company shall carry on its business from its principal office located at such address as the Members may from time to time determine by mutual  agreement.

2.  **Sharing of Expenses.**

    2.1  **Equal Sharing of Expenses.**  Except as expressly provided herein, all expenses from transactions entered into by, or on behalf, for the account or in the name of, the Company within the scope of this Agreement will be shared pro-rata according to each Member's Ownership Interest.

    2.2  **Distributions.** No distributions are anticipated provided, in accordance with Section 7 or upon mutual agreement of the Members, the Aircraft may be sold in accordance with Sections 10 and 11 of this Agreement and the proceeds of the sale shall be distributed pro-rata according to each Member's Ownership Interest, less any outstanding balances due by either Member.

    2.3  **Capital and Expense Requirements.** Initial capital requirements and subsequent payments to the Company shall be in accordance with Exhibit A. Thereafter, each Member agrees to provide its share of funding in such manner and at such times as the Members determine to be sufficient to conduct the affairs of the Company in an orderly manner.

3.  **Accounting and Reconciliation.** The Members shall share pro-rata in the fixed costs and expenses from Aircraft operations and forward their share to the Company, together with any individual costs and expenses incurred by them, on a monthly basis. The Members further agree to establish mutually satisfactory arrangements to conduct Company transactions in a commercially reasonable

2

manner.

3.1 The Company will prepare a quarterly accounting of the receipts and disbursements, which will be supplied to the Members within 30 days following the end of the quarter. An annual account reconciliation of hours of Aircraft use as determined by the Aircraft's hours meter ("Flight Hours") and individual charges under this Agreement shall be overseen by the Manager and shall be made available to each of the Members upon reasonable request.

3.2 The Company shall provide to each Member or its representative, access from time to time as each Member may reasonably request, during normal business hours, to permit inspections of all books and records relating to transactions conducted for the account of the Company.

**4.     Administration of the Aircraft Schedule.**

4.1 Each Member shall be entitled to an annual number of Flight Hours according to each Member's Ownership Interest in the Company, set forth on Exhibit A (individually, the "Member's Annual Flight Hours").

4.1.1 Each Member shall notify the other Member by email prior to scheduling use of the Aircraft and in the event the Members intend to schedule use on the same day, the Member with prior notice shall have priority in scheduling the Aircraft provided, in the event there is a material difference in the number of annual hours scheduled by the Members (greater than 20%), the Member with fewer hours of Aircraft use shall have priority.

4.1.2 No Member may schedule its Aircraft use for a period exceeding seven (7) calendar days in duration without first getting approval from the other Member.

4.1.3 If a Member (the "First Member") schedules Aircraft use that will cause the Aircraft to layover at a location away from the Operating Base set forth on Exhibit A for any period of time, the other Member (the "Second Member") may subsequently schedule one or more flights that will occur prior to the First Member's return to the Operating Base, provided:

4.1.3.1 Such flight(s) by the Second Member may not unreasonably delay or interfere with any scheduled flight of the First Member; and

4.1.3.2 All expenses and Flight Hour charges to ferry the Aircraft from the First Member's location to the operating base or other location where the Second Member will embark, and all

3

expenses and Flight Hour charges to ferry the Aircraft back to the First Member's location, shall be charged to the Second Member.

4.1.4 Flight Hours incurred for regulatory, certification, maintenance and test flight purposes of the Aircraft shall be for the account of the Company and not to the individual Members.

**4.2   Allocation and Payment of Charges.**

4.2.1   Each Member shall be individually responsible for its pro-rata share of charges to the Company for services and supplies necessary for the ownership and operation of the Aircraft according to each Member's Ownership Interest including but not limited to:

4.2.1.1 Any changes for Airworthiness Directives, Service Bulletins, Upgrades to the Aircraft, Regulatory compliance charges, or Annual Increases in Insurance Premiums for the Aircraft;

4.2.1.2 Any charges to maintain the Aircraft in a good and airworthy operating condition and in compliance with all applicable FAR and the Aircraft Operating Manual;

4.2.1.3 Any charges to maintain and preserve all Aircraft Documents in a complete, accurate, and up-to-date manner;

4.2.1.4 All regulatory and tax related charges due to the ownership and operation of the Company and the Aircraft, including but not limited to any property taxes and any costs, expenses, fees and taxes incurred in connection with any sales tax audit or reconciliation; and

5.2.1.4 Hanger space at the Operating Base; insurance on the Aircraft; and washing and maintenance of the Aircraft at the Operating Base.

4.2.2   Each Member shall be individually responsible for charges related to the individual flights of the Member including but not limited to:

4.2.2.1 All fuel, oil, lubricants, and other services and supplies required for the Member's individual operation of the Aircraft;

4.2.2.2 The services of pilots for all of Member's individual

4

0020
0020

operation of the Aircraft;

4.2.2.3 Charges related to extraordinary wear and damage caused by Member; and

4.2.2.4 Any financing or lease payment associated with a Member's ownership interest in the Aircraft or the Company.

4.3.1 In the event a Member moves the Aircraft to a maintenance facility, the charges and Flight Hours related to such flight shall be for the account of the Company.

4.3 **Payment of charges by the Members.** The Members shall pay their pro-rata share and individual charges within seven days of receipt of invoice from the Company.

4.3.1 The Members shall forward payment for their pro-rata share and individual charges by check or wire transfer to the Company.

4.3.2 Payments are delinquent after ninety days and are subject to a 15% per annum late charge.

4.3.3 The Members agree that Company is not providing transportation services to Members for compensation and payments of the Members are not made to Company for the purpose of reimbursement of charges paid by Company. Rather, each Member remains individually responsible for a pro-rata share of the cost of insuring and maintaining the Aircraft and charges related to Member's individual Aircraft use as invoiced by Company.

5.    **Management of the Company.** The affairs of the Company shall be managed by a Manager.

5.1    The Manager shall have full and complete authority, power and discretion to manage and control the affairs of the Company, to make all decisions regarding such matters, and to perform any and all other acts and activities customary or incident to the Company's purpose.  The actions of the Manager taken in accordance with this Agreement shall bind the Company.  The Manager, or such person designated by the Manager, shall be an authorized person within the meaning of the Delaware Limited Liability Act to execute, deliver and file any certificates or documents, and any amendments of such certificates or documents, necessary for the Company to conduct its affairs in the state of Delaware and in any other jurisdiction in which the Company may wish to do so.  The Manager may appoint, employ, or otherwise contract with other persons or entities for the transaction of the business of the Company or the performance of services

0021
0021

for or on behalf of the Company.

5.2 **Election of Manager.** A Manager shall be elected annually, either at a meeting or by written consent in lieu of a meeting, by a unanimous vote of all of the then Members in the Company.

5.3 **Reliance by Third Parties.** Any person or entity dealing with the Company may rely upon a certificate or document signed by the Manager as to any action of the Company, or as to the existence or non-existence of any facts that are germane to the affairs of the Company.

6. **Restrictions on Related Party Transactions.** No transaction will be consummated for the account of the Company from, or sold for the account of the Company to, any of the Members or any person, firm or corporation which is controlled by, controlling or under common control with a Member unless, in any such case, such Member has fully disclosed the particulars of such relationship and of such purchase or sale in writing to the other Members and obtained the written consent of such other Members to such transaction.

7. **Events of Default.** Without limiting in any way what may constitute a default by a party to this Agreement, the occurrence and continuation of any of the following shall constitute a default:

7.1 The failure of a Member to timely pay when due any amount required to be paid by Member under this Agreement or any other agreement related to the Aircraft or the use of the Aircraft including but not limited to any agreement with a financial institution providing financing for Member's Ownership Interest in the Aircraft.

7.2 The breach by a Member, of any representation or warranty or other provision of this Agreement or any other agreement related to the Aircraft or the use of the Aircraft including but not limited to any agreement with a financial institution providing financing for Member's Ownership Interest in the Aircraft.

7.3 If Member shall admit in writing its inability to pay, or fail to pay, debts generally as they become due; file a petition in bankruptcy or file an answer admitting or failing to deny the material allegations of such petition; make an assignment for the benefit of its creditors; consent to the appointment of, or possession by, a custodian for itself or for the whole or substantially all of its property; on a petition in bankruptcy filed against it, be adjudicated, or have an order for relief granted as, a bankrupt; or, file a petition or answer seeking reorganization or arrangement or other aid or relief under any any law for the relief of debtors or file an answer admitting, or fail to deny, the material allegations of a petition filed against it for any such relief.

6

8. **Remedies for Default.**   In addition to any other remedies provided for in this Agreement or otherwise available to a non-defaulting Member at law or in equity (including, without limitation, reasonable attorney's fees, costs, and expenses), upon the occurrence of a default by a Member, such Member's rights to use of the Aircraft shall be suspended until the default is cured. Notwithstanding the foregoing, the defaulting Member shall remain liable and responsible during the continuation of any default for payment of all amounts for which such Member is liable under this Agreement, and/or all amounts for which such Member is liable under any other agreement related to the Aircraft or the use of the Aircraft.

9. **Withdrawal and Termination.** Each Member hereby irrevocably waives any right it may have to demand the partition or sale for partition of the Aircraft under any laws of the State of California or any other jurisdiction.

9.1 **Withdrawal upon Notice.** Either Member may withdraw as a Member of the Company at any time upon ninety days prior written notice of withdrawal to the other Member, provided the withdrawing Member shall complete the sale of its Ownership Interest in the Aircraft per Sections 10 and 11 of this Agreement.

9.2 **Termination on Default.** This Agreement may be terminated by either Member, subject to completion of the sale of the Ownership Interests in the Aircraft per Sections 10 and 11 of this Agreement, upon written notice to the other at any time if:

9.2.1 The non-terminating Member shall have materially breached any term or condition of this Agreement and not cured such breach within thirty (30) days of written notification by the terminating Member of such breach; or

9.2.2 The non-terminating Member commits a regulatory violation under the FAR as adjudicated by a regulatory body.

9.3 This Agreement shall terminate upon bankruptcy, death, dissolution, expulsion, incapacity or withdrawal of any Member, unless within ninety days after such event, the Company is continued by the vote or written consent of a majority in interest of all of the remaining Members. In the event this Agreement is terminated under this Section 9.3, the trustee, executor, heirs or other lawful successor in interest of such Member shall be authorized and obligated to complete the sale of its ownership interest in the Aircraft per Sections 10 and 11 of this Agreement.

9.4 **Consequences of Withdrawal or Termination.** In the event of termination of this Agreement and sale of Ownership Interests in the Aircraft per Sections 10 and 11 of this Agreement, the Company shall thereupon be dissolved or in the alternative, a Member's right and obligations under this Agreement shall be terminated upon that Member's

0023
0023

withdrawal; provided, however, that all previously incurred obligations, liabilities and rights shall remain unimpaired (including without limitation the obligation to make reports and payments required under this Agreement), and settled in due course by the Members.

9.4.1 Termination of this Agreement or withdrawal will not relieve the Members of any individual obligation with respect to any third party for the account of the Company or for the individual Member's Aircraft usage prior to the effective date of termination.

9.4.2 Any other assets of the Company at the effective date of termination of this Agreement shall be disposed of for the account of the Company and dispersed pro-rata to the Members in such manner as the Members may mutually agree.

9.5 **Appraisal.** In the event of a Member's withdrawal or default or upon any of the events described in Section 9.3, or upon any other event that terminates continued membership of any Member, the withdrawing or terminating Member or their estate shall be entitled to receive the fair value of the Member's interest in the Company. In the event the withdrawing or terminating Member or the deceased Member's estate cannot reach immediate agreement with the Company about the fair value of the Member's interest, the fair value shall be determined by appraisal, provided, the value of the Aircraft shall be determined per Sections 10 and 11 of this Agreement.

10. **Sale of Member's ownership interest in the Aircraft.**

10.1 **Notice of Intent to Sell.**  If at any time a Member intends to sell or otherwise divest itself of its respective Ownership Interest in the Aircraft, such Member (the "Selling Member") shall provide written notice of such intent to the other Member (the "Non-Selling Member").

10.2 **Determination of Fair Market Value.**  As soon as reasonably practicable after the date of any notice under Section 10.1, the Members shall determine the Fair Market Value of the Aircraft by mutual negotiation and agreement.

10.2.1 In the event the Members cannot agree on the Fair Market Value of the Aircraft within ten (10) days after the date of any notice under Section 10.1, the Members shall, within twenty (20) days after the date of the notice under Section 10.1, jointly select an established, reputable, independent, and qualified appraiser to determine the Fair Market Value of the Aircraft.

10.2.2 In the event the Members cannot agree on a single appraiser, the Fair Market Value of the Aircraft shall be determined by averaging

8

the fair market valuation appraisals of three (3) established, reputable, independent, and qualified appraisers, the first of whom shall be selected by the Selling Member, the second of whom shall be selected jointly by the Non-Selling Member, and the third of whom shall be selected jointly by the first two appraisers.

10.3 **Non-Selling Member's Option.** The Non-Selling Member shall have the option, exercisable by written notice delivered to the Selling Member within the first ten (10) Business Days following the determination of the Fair Market Value of the Aircraft, to purchase all, but not less than all, of the Selling Member's Ownership Interest in the Aircraft (the Non-Selling Member that elects to purchase the Selling Member's ownership interest in the Aircraft under this Section 10.3 or under Section 11.3 is a "Purchasing Member").

10.3.1 In the event this Agreement is amended to provide for additional members and more than one (1) Purchasing Member elects to purchase the Selling Member's Ownership Interest in the Aircraft, each Purchasing Member shall be entitled to purchase a pro-rata portion of the Selling Member's Ownership Interest in the Aircraft that bears the same ratio as each respective Purchasing Member's then-existing percentage Ownership Interest in the Aircraft bears to the total percentage Ownership Interest in the Aircraft then held by all the Purchasing Members combined.

10.3.2 The price at which the Purchasing Member(s) may purchase the Selling Member's Ownership Interest in the Aircraft (the "Option Price") shall be an amount equal to 98% of the Fair Market Value, multiplied by the Selling Member's percentage Ownership Interest in the Aircraft (it being agreed that such Option Price shall be deemed to be equal to the net amount that Selling Member would have received for its Ownership Interest in the Aircraft had the entire Aircraft been sold to a third-party on the open market at the Fair Market Value through a reputable brokerage firm, and the net sales proceeds after deducting sales commissions and other sales expenses totaling 2% of the sales price were shared by the Members pro-rata according to their respective Ownership Interest Percentages).

10.3.3 If one (1) or more Purchasing Members exercise the option under this Section 10.3 to purchase the Selling Member's Ownership Interest in the Aircraft, the closing of such transaction shall occur not later than 5:00 p.m. Pacific Time on the 10th Business Day after the end of the ten (10) Business Day option period provided for in Section 10.3, unless another closing date shall be established by mutual agreement of the Members.

0025
0025

10.4 **Procedures for Purchasing Member(s) of Selling Member's Aircraft Interest.** On the date of the closing of any sale of Selling Member's Ownership Interest in the Aircraft to Purchasing Member(s):

10.4.1 The Purchasing Member(s) shall deliver to Selling Member the Option Price by wire transfer of immediately available U.S. funds.

10.4.2 Selling Member shall deliver all right, title, and interest in and to the Selling Member's Ownership Interest in the Aircraft, free and clear of all Liens on the Aircraft, to the Purchasing Member(s) in such as the parties may mutually agree.

10.4.3 Selling Member shall execute and deliver to the Purchasing Member(s) a Warranty Bill of Sale in a form reasonably acceptable to Purchasing Member(s), transferring all of Selling Member's Ownership Interest in the Aircraft to the Purchasing Member(s).

10.4.4 The Purchasing Member(s) shall execute and deliver to Selling Member a Delivery Receipt in a form reasonably acceptable to Selling Member.

10.4.5 The Selling Member shall promptly execute and deliver to the Purchasing Member(s) such other notices, statements, documents and instruments and perform such other acts the Purchasing Member(s) deems necessary to protect, preserve and enforce its acquisition and ownership of Selling Member's Ownership Interest in the Aircraft.

11. **Sale of Entire Aircraft.**

11.1 **Solicitation of Third-Party Offers and Sale of Aircraft.** In the event no Non-Selling Member exercises its option under Section 10.3, the Members shall retain an aircraft broker to facilitate the sale of the entire Aircraft.

11.2 **Third Party Offer Equal to or in Excess of Fair Market Value.** In the event the Members receive a bona-fide offer from any third-party to purchase the Aircraft for a purchase price that equals or exceeds the Fair Market Value determined pursuant to Section 10.2, the Members shall accept such offer, subject to the provisions of Section 11.4 of this Agreement.

11.3 **Third Party Offer Less Than Fair Market Value.** In the event the Members receive a bona-fide offer from any third-party to purchase the Aircraft for a purchase price that the parties unanimously determine to be

0026
0026

reasonable and acceptable, but which is nevertheless less than the Fair Market Value determined pursuant to Section 10.2, each of the Non-Selling Members shall thereafter have an additional option, exercisable by written notice delivered to Selling Member within three (3) days after receipt of Selling Member's notice, to purchase all, but not less than all, of Selling Member's Ownership Interest in the Aircraft for a purchase price equal to 98% of the offered price, multiplied by the Selling Member's percentage Ownership Interest in the Aircraft.

11.3.1 In the event more than one (1) Purchasing Member (as defined in Section 10.3) elects to purchase the Selling Member's Ownership Interest in the Aircraft, each Purchasing Member shall be entitled to purchase a pro-rata portion of the Selling Member's Ownership Interest in the Aircraft that bears the same ratio as each respective Purchasing Members then-existing percentage Ownership Interest in the Aircraft bears to the total percentage Ownership Interest in the Aircraft then held by all the Purchasing Members combined.

11.3.2 The closing of any purchase by the Purchasing Member(s) of Selling Member's Ownership Interest in the Aircraft pursuant to this Section 11.3 shall occur not later than 5:00 p.m. Pacific Time on the 10th Business Day after the day the Non-Selling Member exercises its option under this Section 11.3, and shall be conducted in accordance with the procedures set forth in Section 10.4.

11.3.3 In the event no Non-Selling Member exercises its option hereunder, the Members shall accept the third-party offer, subject to the provisions of Section 11.4 of this Agreement.

11.4 **Comprehensive Aircraft Purchase Agreement.** Any acceptance of a bona-fide offer from a third-party for the purchase of the entire Aircraft will be subject to the condition that such offer is contingent upon negotiation and execution of a comprehensive Aircraft Sale Agreement.  The Members shall jointly negotiate any such Aircraft Sale Agreement in good faith.  The Members shall each pay a pro-rata portion of all expenses of any sale of the entire Aircraft pursuant to this Section 11, and shall each be entitled to a pro-rata share of the proceeds of any such sale, according to their respective percentage Ownership Interests in the Aircraft.

12. **Representations and Warranties of Members.** The Members hereby represent and warrant as follows:

12.1 Notwithstanding that a Member shall have Operational Control of the Aircraft during that Member's individual flights, the Members agree that the Pilot in Command of any such flight may, in his or her sole discretion, terminate the flight, refuse to commence the flight, or take any other flight related action which in the judgment of the Pilot in Command is necessary

11

0027
0027

to ensure the safety of the Aircraft, the Flight Crew, and all persons and property on board the Aircraft, and no such action of the Pilot in Command may support or be the basis of any claim of any kind against the Members or the Company.

12.2 Member is, and throughout the Term hereof shall continue to be duly incorporated or organized, validly existing, and in good standing under the laws of the state of Member's formation, possessing perpetual existence as a legal entity, having the capacity to sue and be sued in its own name, having full power, legal right and authority to carry on its business as currently conducted, and to execute, deliver and perform the provisions of this Agreement.

12.3 The execution, delivery, and performance of this Agreement by Member have been duly authorized by all necessary company action and do not conflict with or result in any breach of any of the terms or constitute a default under any document, instrument, or agreement to which it is a party.

12.4 This Agreement constitutes the legal, valid and binding obligations of Member, and is enforceable against Member in accordance with the terms herein contained.

12.5 Member shall not create or place any Lien against the Aircraft other than a security interest in favor of a financial institution providing financing for the Member's Ownership Interest and/or the Aircraft (a "Financing") and each Member shall ensure that no Liens are created or placed against the Aircraft by third-parties as a result of its actions, and shall take all actions as may be necessary to discharge and satisfy in full any such Lien promptly after the same becomes known to it. Under no circumstances may the balance owed under any Financing by a Member constitute more than forty percent (40%) of the value of the Aircraft as of January 1 of each calendar year as measured by the then most recent valuation published by Jet Aviva.

12.6 Member shall not divest itself of its Ownership Interest in the Company or the Aircraft except in accordance with the terms and conditions specified in this Agreement.

12.7 Member is, and throughout the Term hereof shall continue to be, either a citizen of the United States as defined in 49 U.S.C.§40102, as amended, or otherwise eligible to register the Aircraft in the United States.

12.8 Member shall not knowingly violate any regulatory, legal or insurance requirement applicable to the Aircraft and shall procure, maintain, and comply with all permits, licenses, and other authorizations required for use of the Aircraft by Member to ensure the proper operation, maintenance,

12

and repair of the Aircraft per the Aircraft manufacturer's and insurer's recommendations and applicable FARs.

13. **Section 1.761-2(a) Treatment.** The Members intend that the Company be excluded from the application of all or part of subchapter K of chapter 1 of the Internal Revenue Code.

14. **Allocation of Tax Benefits and Obligations.** Each Member shall be entitled to its pro rata share of all tax benefits, if any, arising from its respective Ownership Interest in the Company and Aircraft. Each Member shall be responsible for, and shall pay promptly when due, all taxes which may be assessed or levied by any taxing jurisdictions as a result of the purchase, lease, use, storage, or other consumption by such Member of such Member's Ownership Interest; provided, however, that each Member shall have the right to dispute or contest in good faith and at such Member's sole expense the amount of any taxes assessed or imposed directly against such Member. During the period that any such taxes are being disputed or contested in good faith, payment of such taxes in accordance with the terms of this Agreement may be delayed until a final determination of the amount due has been made so long as the delay in payment does not create a risk of a tax lien or forfeiture of the Aircraft.

15. **Insurance.** The Company shall maintain at all times during the term of this Agreement, with insurers of recognized responsibility, aircraft hull insurance and liability insurance in amounts not less than as listed on Exhibit B with respect to the Aircraft naming the Members as Loss Payees as their interests may appear. The Aircraft shall not be operated at any time, unless and until such insurance policies are in effect.

16. **No Assignment.** Neither Member may assign, transfer, license, sell or encumber this Agreement, the Aircraft or any rights or obligations hereunder, without the prior written consent of the other Member(s), which such consent shall not be unreasonably withheld, and any such non-permitted assignment, transfer, license, sale or encumbrance of the like, shall be null and void ab initio. Notwithstanding anything contained herein, each Member shall be permitted to assign, transfer and/or sell ("Transfer") its ownership interest in the Company to another entity controlled in whole or in part by the Member or, (i) in the case of Spring Creek's interest, controlled by William Parrish, and (ii) in the case of AA, controlled by Michael Avenatti. The new Member shall assume the ownership interest subject to all rights, duties, obligations and terms of this Agreement. In the event of such a Transfer, the transferring member shall notify the non-transferring member in writing within ten (10) business days of the Transfer.

17. **Notices.** All notices or other communications required or permitted under this Agreement shall be in writing and will be directed to the Member at the above referenced address, and sent certified mail, return receipt requested, or by fax with confirmed receipt, or by recognized overnight delivery service, or by email. Such notices and communications shall be deemed received three (3) calendar

13

0029
0029

days after having been sent.

18. **Governing Law.** This Agreement and the respective rights of the Members hereunder shall be governed by and construed under the laws of the State of California and will bind and inure to the benefit of the Member's successors and permitted assigns.

19. **Counterparts.** This Agreement may be executed in counterparts and by fax.

20. **Entire Agreement, Amendments.** There are no representations, warranties, promises or inducements between the Members not contained in writing. This Agreement is the entire Agreement between the Members and supersedes all prior agreements relating to the subject matter of this Agreement and/or the Aircraft. This Agreement may be changed only in a writing signed by a duly authorized representative of each of the Members, expressly referring to this Agreement.

21. **Arbitration.** The Members shall work together in good faith and shall endeavor to reach commercially reasonable solutions to all issues that may arise in their relationship hereunder. Any disputes, claims or causes of actions between the Members arising out of this Agreement or the transactions contemplated hereby shall be fully and finally adjudicated and resolved by an arbitration commenced before JAMS located in Los Angeles, California and conducted under the JAMS arbitration rules then in effect. The dispute shall be heard by one arbitrator jointly selected and paid for by the Members.

22. **Indemnification.**

22.1 **Company Indemnification:** The Company may, and shall have the power to, indemnify and hold harmless, and advance expenses to, any Member, manager or other person, or any testator or intestate of such Member, manager or other person, from and against any and all claims and demands whatsoever relating to the operation of the business of the Company; provided, however, that no indemnification may be made to or on behalf of any Member, manager or other person if a judgment or other final adjudication adverse to such Member, manager or other person establishes (a) that his or her acts were committed in bad faith or were the result of active and deliberate dishonesty and were material to the cause of action so adjudicated or (b) that he or she personally gained in fact a financial profit or other advantage to which he or she was not legally entitled.

22.2 **Member Indemnification:** In the event the Aircraft is sold as a result of a default, the Members agree that the defaulting Member shall reimburse the non-defaulting Member the non-defaulting Member's portion of the expenses incurred per Section 11.4 and any negative variance due to the difference between the sales price received upon sale of the of the Aircraft

0030
0030

pursuant to Section 11 and the Fair Market Value as determined in Section10.2.

23.  **Limitation of Liability.**  Each Member agrees to indemnify and hold harmless the other Member and Manager and their respective officers, directors, partners, employees, shareholders, and affiliates from any claim, damage, loss, or reasonable expense, including reasonable attorney's fees, resulting from the bodily injury or property damage caused by an occurrence and arising out of the ownership, maintenance, or use of the Aircraft.

24.  **Truth-In-Leasing Statement under FAR 91.23:** (a) The Aircraft, within the twelve month period preceding the date of this agreement, except to the extent the Aircraft is less than twelve months old, has been and during the lease term shall be, inspected and maintained in accordance with Part 91.409 (f) (3) and all applicable requirements for maintenance and inspection thereunder have been complied with; (b) the Members certify and knowingly acknowledge that when they use the Aircraft under this Agreement under lease, the Member shall be known as, considered and  in fact shall be the operator of such aircraft; (c) an explanation of factors bearing on operational control and pertinent FARs can be obtained from the nearest FAA Flight Standards District Office; and (d) the Members hereto certify that a true copy of this agreement shall be carried on the Aircraft at all times during any lease thereof, and shall be made available for inspection upon request by a representative of the FAA.

WHEREFORE, the parties hereto have executed this Agreement as of July 11, 2016.

Spring Creek Research, LLC                      Avenatti & Associates, APC

By: _____                      By: _____
William Parrish, Membeier                      Michael J. Avenatti, President

15

0031
0031

**Exhibit A**

|  | **Member**<br>Spring Creek Research, LLC | **Member**<br>Avenatti & Associates, APC* |
|---|---|---|
| Initial Capital Contribution: | $350,000 | $1,000 |
| Ownership Interest: | 50% | 50% |
| Subsequent Capital Contribution | $1,950,000 | $1,831,105 |
| Maximum Annual Flight Hours: | 150 | 150 |

| | |
|---|---|
| Minimum Hull Insurance Limit: | $5,000,000 |
| Minimum Liability Insurance | $5,000,000 |
| Operating Base: | SBA |

*Member Avenatti & Associates, APC shall have the option to secure financing for its Subsequent Capital Contribution in accordance with the terms of this agreement as set forth above and, in the event of such financing, the Members agree that the Aircraft shall be subject to a priority security interest.  Member Avenatti & Associates, APC shall indemnify and hold harmless Member Spring Creek Research, LLC for any and all costs, including attorney's fees, incurred due to the repossession and/or sale of the Aircraft due to any default under any financing or security agreements.

16

0032
0032

**WAIVER OF NOTICE AND CONSENT TO ACTION
IN LIEU OF HOLDING MEMBERS MEETING OF
PASSPORT 420, LLC**

The undersigned, being all Members of the above named Limited Liability Company and pursuant to Section 5 of the Operating Agreement of Passport 420, LLC, dated July 11, 2016, **DO HEREBY WAIVE NOTICE** of a members meeting, and **CONSENT**, take and adopt, the following actions in writing in lieu of such meeting, on the 11th day of July, 2016:

* Appoint Michael Avenatti as Manager of Passport 420, LLC.

The undersigned agree that the foregoing constitutes a complete record of actions taken, adopted, approved and ratified by unanimous written consent of the Members in lieu of a members annual meeting.

WITNESS the below signature this 11th day of July, 2016.

**MEMBERS**

_____
William Parrish, Spring Creek Research, LLC

_____
Michael J. Avenatti, Avenatti & Associates, APC

I hereby accept the appointment as Manager of Passport 420, LLC pursuant to the terms set forth in the Operating Agreement of Passport 420, LLC dated July 11, 2016.

_____
Michael Avenatti

1

0033
0033

# EXHIBIT "C"

0034

0034

# Honda Aircraft Company, LLC

6430 Ballinger Rd, Greensboro, NC 27410
Tel : 336-662-0246   Fax : 336-662-0852

| BILL TO | NOTICE OF PAYMENT DUE | |
|---|---|---|
| PASSPORT 420 LLC<br>520 NEWPORT CENTER DR<br>STE 1400<br>NEWPORT BEACH CA  92660-7020<br>USA | Contract Number : | 40000316 |
| | Document Number : | 90003409 |
| | Date : | 12/20/2016 |
| | Due Date : | At Delivery |
| | Sold To Customer Number : | 12391 |
| | Serial Number : | 42000029 |
| **SOLD TO** | **REPRESENTATIVE** | |
| PASSPORT 420 LLC<br>520 NEWPORT CENTER DR<br>STE 1400<br>NEWPORT BEACH CA  92660-7020<br>USA | Will Cutter<br>wcutter@cutteraviation.com<br>602-690-5665 | |

| HONDAJET HA-420 | Amount (USD) |
|---|---|
| Base Price | $3,650,000.00 |
| CPI-Price Adjustment | $338,355.00 |
| Gross Base Price | $3,988,355.00 |
| Options Price | $392,750.00 |
| NC Sales Tax | $2,500.00 |
| Total Net Price Due | $4,383,605.00 |
| Deposits Received | ($600,000.00) |
| **Net Balance Due** | **$3,783,605.00** |

### PAYMENT BY WIRE TRANSFER

Honda Aircraft Company, LLC
Wells Fargo Bank N.A.
420 Montgomery Street
San Francisco, CA 94101
Account # 4126555366
ABA # 121000248
Intl. Swift # WFBIUS6S

All Accounts Due & Payable in US Dollars.  Please include Customer Name, Customer Number, Contract Number and Document Number. Wire fees are the responsibility of sender.

**USA PATRIOT ACT.** The monetary requirements of the USA Patriot Act require Honda Aircraft Company to identify and review the connection between funds received and its customer, the Purchaser, as specifically listed in the Purchase Agreement. In the event Honda Aircraft Company receives funds from a source other than Purchaser, remitter may be requested to provide information documenting the connection to Purchaser.
**NOTE:** All monetary submissions will be subject to screening in compliance with the USA Patriot Act

**Export Notice:** These items are controlled by the U.S. Government and authorized for export only to the country of ultimate destination for use by the ultimate consignee or end-user(s) herein identified. They may not be resold, transferred, or otherwise disposed of, to any other country or to any person other than the authorized ultimate consignee or end-user(s), either in their original form or after being incorporated into other items, without first obtaining approval from the U.S. government or as otherwise authorized by U.S. law and regulations.
ECCN: 9A991.b ; HTS: 8802.30.0030 ; COO: United States.



Guilford _____ County, North Carolina

I certify that the following person(s) personally appeared before me this day, each acknowledging to me that he or she signed the foregoing document:

_Christopher Belcher_
Name(s) of principal(s)

Date: 1-27-2017

**KELLY E. TOOLEY**
**NOTARY PUBLIC**
**GUILFORD COUNTY, NC**

_Kelly E. Tooley_
Official Signature of Notary

Kelly E. Tooley _____ Notary Public
Notary's printed or typed name

My commission expires: 6/10/2017

0035
0035



*HondaJet*

*ADDENDUM to HONDAJET PURCHASE AGREEMENT*
*No. 40000316*

### DELIVERY RECEIPT

The undersigned Purchaser hereby accepts delivery of one (1) Honda Aircraft Company, LLC model HA-420 aircraft, bearing United States Registration Number N227WP (the "Aircraft"), manufactured in accordance with the HondaJet Retail Purchase Agreement, No. 40000316 between Purchaser and Seller, and Seller's Specification and Description dated January 2016 (the "Specification").

Purchaser hereby confirms acceptance and delivery of the Aircraft equipped as specified in the Agreement and Specification, and verifies that the Aircraft has been inspected and generally conforms to the same. Purchaser also confirms receipt of the appropriate, approved Flight Manual for the Aircraft.

**Aircraft Information**

| Item | Serial Number |
|---|---|
| Airframe | 42000029 |
| Engine 1 | 883171 |
| Engine 2 | 883166 |
| Airframe/Engine Hours at Delivery | 13.8 |
| Airframe/Engine Cycles at Delivery | 11 |

**Delivery Information**

| Date of delivery: | January 27, 2017 |
|---|---|
| Delivery location (City, State): | Greensboro, NC |
| Warranty start/activation date: | January 27, 2017 |
| Date of departure: | January 27, 2017 |

Honda Aircraft Company, LLC ("Seller")

BY: _____
Name:   Christopher Belcher
Title:    Manager, Contracts

Passport 420, LLC ("Purchaser")

BY: _____
Name:   Michael Avenatti
Title:    Manager

_Guilford_ County, North Carolina

I certify that the following person(s) personally appeared before me this day, each acknowledging to me that he or she signed the foregoing document:

_Christopher Belcher   Michael Avenatti,_
*Name(s) of principal(s)*

Date: 1-27-2017

```
KELLY E. TOOLEY
NOTARY PUBLIC
GUILFORD COUNTY, NC
```

_____
*Official Signature of Notary*

Kelly E Tooley , Notary Public
*Notary's printed or typed name*

My commission expires: 6-10-2017



*HondaJet*

*ADDENDUM to HONDAJET WHOLESALE PURCHASE AGREEMENT
No. 40000316*

<u>WARRANTY BILL OF SALE</u>

KNOW ALL MEN BY THESE PRESENTS:

The undersigned, Honda Aircraft Company, LLC ("Seller"), is the owner of the full legal and
beneficial title, free and clear of all liens and encumbrances, to the below-described airframe
("Airframe"), together with the two (2) engines described below ("Engines"), and all fixed
equipment, parts, components and accessories installed thereon (collectively, the "Aircraft").

### Airframe Information

| Manufacturer | Honda Aircraft Company, LLC |
| --- | --- |
| Model | HA-420 |
| Serial Number | 42000029 |
| Registration Number | N227WP |

### Engine Information

| Manufacturer | GE Honda Aero Engines |
| --- | --- |
| Model | HF120 |
| Serial Number 1 | 883171 |
| Serial Number 2 | 883166 |

Further, for and in consideration of the sum of $10 and other good and valuable consideration,
the receipt and sufficiency of which is hereby confirmed, Seller does on the date hereof grant,
convey, transfer, bargain and sell, deliver and set over all right, title and interest in and to the
Aircraft, fixed equipment, parts, components and accessories to the below listed Buyer, their
successors and assigns, to have and to hold said Aircraft forever.

<u>BUYER: Passport 420, LLC</u>

Further, Seller hereby states that it will defend such title against all liens, encumbrances, rights
of others and demands whatsoever arising from or during the period of time that Seller was
registered owner of the Aircraft.

Honda Aircraft Company, LLC ("Seller")

BY:

Name:   Christopher Belcher
Title:    Manager, Contracts
Date:    January 27, 2016

# EXHIBIT "D"

0038

0038



# aero-space Reports

**P.O. Box 720452 * Oklahoma City, Oklahoma 73172 * Office: (405) 722-1030/(800)765-2336**
**Email: info@aerospacereports.com**            **Fax: (405)728-2336**

## Aircraft Title Status Report - Account #: 1410

**Issued To**

| | |
|---|---|
| **Name:** | Attn: Lex Brown<br>Starr Aviation Agency, Inc. |
| **Address:** | 3353 Peachtree Road N.E., Suite 1000<br>Atlanta, GA 30326 |

Dated this 23rd day of April, 2019 as of 7:29 AM Central Time.

### 1. Aircraft:

**FAA Registration #:** N227WP

**MFG:** HONDA AIRCRAFT CO., LLC        **Model:** HA-420            **Date of Purchase:** 01/27/17

**Serial#:** 42000029                          Type Ownership: LLC

**Registered Owner:** Passport 420, LLC*
520 Newport Center Drive, Suite 1400
Newport Beach, CA 92660

Previous Owner:    Honda Aircraft Company, LLC
6430 Ballinger Road
Greensboro, NC 27410

### 2. Liens or Encumbrances        No liens of record.

### 3. Other Information or Remarks

*LLC is managed by Manager, Michael Avenatti, who may act independently.

**Aero-Space Reports**

NS \ KB

This report contains information acquired through examination of the records maintained by the FAA, including the indices of in-process documents. Because our examination is limited to records maintained by the FAA, this report does not cover any liens, claims, encumbrances or judgments that have not been filed with the FAA, or have not been indexed by the FAA under the description shown on this report.

EXHIBIT "E"

0040

0040



**CAPPELLO**
**&NOËL** LLP
**T R I A L   L A W Y E R S**

A .  B A R R Y  C A P P E L L O

August 29, 2018

Michael Avenatti, Esq.
Avenatti & Associates, APC
520 Newport Center Drive, Suite 1400
Newport Beach, CA 92660

Re:   **Notice of Default under Limited Liability Company Operating Agreement of Passport 420, LLC dated as of July 11, 2016**

Dear Mr. Avenatti:

We are the attorneys for William Parrish.  As you know, during the course of your attorney-client relationship with Mr. Parrish, you persuaded him to join you in the purchase of a private jet, and you subsequently formed a limited liability company ("Passport 420") with Mr. Parrish.  We understand that you prepared the corporate documentation, including the operating agreement, and after drafting the operating agreement, you installed yourself as the manager. The purpose of forming Passport 420 was to acquire, own and operate a HondaJet for use by Avenatti & Associates and Spring Creek Research, LLC ("Spring Creek"), an entity controlled by Mr. Parrish.  At no time did you advise Mr. Parrish to seek independent counsel to advise him of the risks of entering into this business transaction with you.  On or about April 14, 2016, you filed with the State of Delaware a Certificate of Formation for Passport 420, a company in which Avenatti & Associates and Spring Creek were the sole members.

Your conduct in entering into that transaction has caused serious and ongoing harm to Mr. Parrish.  In addition to your failure to make adequate disclosures to Mr. Parrish, you have failed in your role as LLC manager, and repeatedly breached your fiduciary duties to Mr. Parrish as his attorney, including but not limited by violating California Rule of Professional Conduct 3-300 ("Rule 3-300").  **This letter serves as notice to you that based on your malfeasance and failure to follow the operating agreement, Mr. Parrish is stepping in to assume the role of manager of Passport 420.**

Because you were acting as an attorney for Mr. Parrish and his company Spring Creek when Passport 420 was formed, you indisputably owed a fiduciary duty of the highest character to them. See *Yorn v. Superior Court* (1979) 90 Cal.App.3d 669, 675 ("Few precepts are more firmly entrenched than that the fiduciary relationship between attorney and client is of the very highest character."); *Beery v. State Bar* (1987) 43 Cal.3d 802, 811 (should a client seek legal

831 S t r e e t  S t r e e t ,  S a n t a  B a r b a r a ,  C a l i f o r n i a  93101-3227   a b c @ c a p p e l l o n o e l . c o m

T e l .  (805) 564-2444   F a x  (805) 965-5950   w w w . c a p p e l l o n o e l . c o m

August 29, 2018
Page 2

representation at the same time he enters into a business transaction with the lawyer, an attorney-client relationship exists for purposes of Rule 3-300). At the time of the Passport 420 transaction, Mr. Parrish was your client.  Attorneys owe their clients utmost good faith, fidelity and trust when carrying out the performance of legal services.  *Flatt v. Superior Court* (1994) 9 Cal. 4th 275.  As fiduciaries, attorneys routinely gain the trust and confidence of their clients. Serious concerns regarding abuse of this trust and confidence arise when attorneys enter into business relationships with clients. *Rodgers v. State Bar* (1989) 48 Cal.3d 300, 388 ("There is always a danger to the fiduciary relationship between an attorney and his client when the two enter into business dealings. Such transactions are *scrutinized with the utmost strictness for any unfairness. The burden of proof is on the attorney to show that the dealing between him and his client were fair and reasonable.*") (emphasis added).  Moreover, "[a]n attorney's violation of the duty arising in a fiduciary or confidential relationship warrants discipline even in the absence of an attorney-client relationship." *Id.* at 813 (citations omitted).

The conduct of attorneys with their clients is also governed by the Rules of Professional Conduct, which were enacted in part to address concerns about lawyers doing business with their clients.  Rule 3-300 makes it a disciplinable offense for an attorney to enter into a business transaction with a client unless certain criteria are strictly followed.  Violations of the professional rules are further evidence of your fiduciary breaches.

Without limitation, the Operating Agreement you drafted did not comply with Rule 3-300 as follows:

- Pursuant to the Operating Agreement, Exh. A, Avenatti & Associates and Spring Creek have equal 50/50 Ownership Interest in Passport 420 and have rights to the same amount of flight hours (150 maximum annual flight hours), despite Spring Creek's initial and subsequent capital contribution amounting to $2,300,000.00 while Avenatti & Associates' initial and subsequent capital contribution only amounted to $1,832,105.00. This is evidence that you acted in your own self-interest while drafting this agreement.  In addition, you did not advise Spring Creek of the adverse consequences of equal ownership in a limited liability company. Accordingly, you violated Rule 3-300 (A) because the transaction and the terms were not fair or reasonable or fully disclosed.

- You were appointed the initial Manager of Passport 420 and remained, defiantly, as Manager despite the agreement's provision that requires the manager to be elected annually.  Under the guise of acting as manager, you have refused to step down, while utterly failing in that role and contrary to Mr. Parrish's demand that he be named manager for the benefit of the LLC.  For example, recently the databases of the HondaJet were out of date rendering the jet not airworthy because of nonpayment of the subscription fees that as Manager, you were responsible for paying in a timely manner.  Likewise, the aircraft maintenance agreement was recently put at risk because payments were overdue. As Manager, you were responsible for making maintenance payments in a timely manner yet failed to do so.  You also failed in your obligations to make property tax payments

August 29, 2018
Page 3

and internet service payments, risking delinquency.  In the operating agreement that you drafted, you failed to provide for removal of a Manager for cause or disability and other reasons. Without limitation, you failed to advise Mr. Parrish or Spring Creek of the adverse consequences to Spring Creek of these provisions. In addition, this is evidence of your self interest in attempting to limit the means for your removal as Manager, and failing to disclose that you would ignore the provision requiring annual election of the Manager.  As such, you violated Rule 3-300 (A) because the transaction and the terms were not fair or reasonable or fully disclosed.

- You also violated Rule 3-300 (B) because you failed to advise in writing that Spring Creek may seek the advice of an independent lawyer of the client's choice and is given a reasonable opportunity to seek that advice in connection with the formation of Passport 420 and the drafting of the Operating Agreement.

- You also violated Rule 3-300 (C) because Spring Creek never consented in writing to the terms of the transaction after full and fair disclosure of the terms, which were not fair or reasonable to Spring Creek.

Again, you are now on notice that based on your defaults under the operating agreement and the breaches of your fiduciary duties to Mr. Parrish and Spring Creek, including your refusal to comply with Mr. Parrish's recent request to elect him as Manager of Passport 420, Mr. Parrish will now assume the role of Manager and all responsibilities and rights that go with it. Mr. Parrish will invoice Avenatti & Associates monthly for its financial obligations as member, and we expect that if that entity wishes to remain a member, you will ensure that it stays up to date with those obligations.  In the event that you fail to do so, Spring Creek will move to dissociate Avenatti & Associates from Passport 420.

Govern yourself accordingly.

Sincerely,

CAPPELLO & NOËL LLP

A.  Barry Cappello

# EXHIBIT "F"

0044

0044



STARR INDEMNITY & LIABILITY COMPANY
90 PARK AVENUE, 7TH FLOOR
NEW YORK, NY  10016

# STARR ELITE COMPREHENSIVE
# CORPORATE AIRCRAFT POLICY

ISSUED TO

**PASSPORT 420, LLC**

POLICY NUMBER

1000320046-01

Starr Elite CA Declarations (5/O9)  -1-

0046
0046

# CONTENTS

DECLARATIONS      4

Limits of the Company's Liability:      5

Section One - Liability Coverages      5

Coverage 1 - Liability for **Scheduled Aircraft**      5
Coverage 2 - Liability for the Use of **Non-Owned Aircraft**      5
Coverage 3 - Liability for **Property Damage** to **Non-Owned Aircraft**, and **Temporary Substitute Aircraft**      5
Coverage 4 - Liability for Charter Referral      5
Coverage 5 - **Passenger** Voluntary Settlements for **Scheduled Aircraft** and **Non-Owned Aircraft**      6
Coverage 6 - Liability for **Property Damage** to Hangars and Their Contents      6
Coverage 7 - Liability for Fire Damage to Real Property      6
Coverage 8 - Liability for Cargo      6
Coverage 9 - Liability Under Contractual Agreements      7
Coverage 10 - Liability for **Personal Injury** and in/excluding **Advertising Injury**      7
Coverage 11 - Liability for Alcohol Beverage Service      7
Coverage 12 - Liability for Incidental Medical Malpractice      7
Coverage 13 - Liability for the Use of **Premises**      7
Coverage 14 - Liability for the Operation of **Mobile Equipment**      7
Coverage 15 - Liability for the Operation of an **Auto** while on Airport **Premises**      7
Coverage 16 - Liability for the Sale of **Aircraft** and Aircraft Products and Services      7
Coverage 17 - Liability for Hangarkeeper Operations      8
Coverage 18 - Liability for Garagekeeper Operations      8

Section Two **-** Defense, Settlement and Supplementary Payments      8

Section Three - **Physical Damage** Coverages      8

Coverage 19 - **Physical Damage** Coverage for **Scheduled Aircraft** (including **Ingestion** and Emergency Landing)      8
Coverage 20 - **Physical Damage** Coverage for Spare Engines and **Spare Parts** including Transit      8
Coverage 21 - Automatic Insurance for Increased Value of **Scheduled Aircraft** or **Spare Engines** and **Spare Parts**      9
Coverage 22 - **Physical Damage** Coverage for Mechanics Tools      9

Section Four **-** Additional Coverages      9

Coverage 23 - Temporary Replacement Parts Rental Expense      9
Coverage 24 - Replacement **Aircraft** Rental Expense      9
Coverage 25 - Search and Rescue Expenses      9
Coverage 26 - Runway Foaming and Crash Control Expenses      9
Coverage 27 - Trip Interruption Expense Coverage      9
Coverage 28 - Automatic Insurance for Newly Acquired **Aircraft**      10
Coverage 29 - Lay-Up Credit for **Scheduled Aircraft**      10
Coverage 30 - Personal Effects and Baggage Expense      10

Section Five - **Medical Expenses**      10

Coverage 31 - Medical Payments for **Scheduled Aircraft** and **Non-Owned Aircraft**      10
Coverage 32 - **Premises** Medical Payments      10

## INSURING AGREEMENTS

INSURING AGREEMENTS ... 11

Section One - Liability Coverages ... 11

Coverage 1 - Liability for **Scheduled Aircraft** ... 11
Coverage 2 - Liability for the Use of **Non-Owned Aircraft** ... 11
Coverage 3 - Liability for **Property Damage** to **Non-Owned Aircraft**, and **Temporary Substitute Aircraft** ... 12
Coverage 4 - Liability for Charter Referral ... 12
Coverage 5 - **Passenger** Voluntary Settlements for **Scheduled Aircraft** and **Non-Owned Aircraft** ... 13
Coverage 6 - Liability for **Property Damage** to Hangars and Their Contents ... 14
Coverage 7 - Liability for Fire Damage to Real Property ... 14
Coverage 8 - Liability for Cargo ... 14
Coverage 9 - Liability Under Contractual Agreements ... 15
Coverage 10 - Liability for **Personal Injury** and in/excluding **Advertising Injury** ... 16
Coverage 11 - Liability for Alcohol Beverage Service ... 19
Coverage 12 - Liability for Incidental Medical Malpractice ... 19
Coverage 13 - Liability for the Use of **Premises** ... 19
Coverage 14 - Liability for the Operation of **Mobile Equipment** ... 19
Coverage 15 - Liability for the Operation of an **Auto** while on Airport **Premises** ... 20
Coverage 16 - Liability for the Sale of **Aircraft** and Aircraft Products and Services ... 20
Coverage 17 - Liability for Hangarkeeper Operations ... 20
Coverage 18 - Liability for Garagekeeper Operations ... 21

Section Two - Defense, Settlement and Supplementary Payments ... 22

Section Three - **Physical Damage** Coverages ... 23

Coverage 19 - **Physical Damage** Coverage for **Scheduled Aircraft** (including **Ingestion** and Emergency Landing) ... 23
Coverage 20 - **Physical Damage** Coverage for **Spare Engines** and **Spare Parts** including Transit ... 23
Coverage 21 - Automatic Insurance for Increased Value of **Scheduled Aircraft** or **Spare Engines** and **Spare Parts** ... 23
Coverage 22 - **Physical Damage** Coverage for Mechanics Tools ... 24

Section Four - Additional Coverages ... 24

Coverage 23 - Temporary Replacement Parts Rental Expense ... 24
Coverage 24 - Replacement **Aircraft** Rental Expense ... 25
Coverage 25 - Search and Rescue Expenses ... 25
Coverage 26 - Runway Foaming and Crash Control Expenses ... 25
Coverage 27 - Trip Interruption Expense Coverage ... 26
Coverage 28 - Automatic Insurance for Newly Acquired **Aircraft** ... 26
Coverage 29 - Lay-Up Credit for **Scheduled Aircraft** ... 26
Coverage 30 - Personal Effects and Baggage Expense ... 26

Section Five - **Medical Expenses** ... 27

Coverage 31 - Medical Payments for **Scheduled Aircraft** and **Non-Owned Aircraft** ... 27
Coverage 32 - **Premises** Medical Payments ... 27

Section Six - Policy Definitions ... 27
Section Seven - Exclusions ... 31
Section Eight - Limit of the Company's Liability ... 33
Section Nine - Notice of Claims and Other Duties of an **Insured** ... 35
Section Ten - Other Conditions of Insurance ... 36

0048
0048



**Starr Indemnity & Liability Company**

## STARR ELITE COMPREHENSIVE CORPORATE AIRCRAFT POLICY

### DECLARATIONS

Policy Number     **1000320046-01**          Previous Policy Number          NEW

This section along with the policy provisions and any endorsements attached hereto completes this Starr Elite Comprehensive Corporate Aircraft Policy (Policy), issued by the Company as indicated above (hereinafter called The Company).

Item 1. **Named Insured**:     **PASSPORT 420, LLC**

Item 2. Address:          520 NEWPORT CENTER DRIVE STE. 1400
                          NEWPORT BEACH, CA  92660

Item 3. Policy Period:    From:  JANUARY 26, 2017
                          Until:  JANUARY 26, 2018

        both at 12:01 AM standard time at the first address shown in Item 2. above.

Item 4. Pilots:          AS ENDORSED

        The pilot warranty in Item 4, if any, shall not apply to Liability Coverage for **Non-Owned Aircraft**, **Temporary Substitute Aircraft** and Charter Referral.  Additionally, the pilot warranty in Item 4, if any, shall not apply while the insured **aircraft** is under the care, custody or control of a repair station for the purpose of maintenance, repair or test flights.

Starr Elite CA Declarations (5/09)          -4-

0049
0049

Item 5. Limits of the Company's Liability:

The limit of the Company's liability provided by each Coverage will not exceed:

Section One - Liability Coverages

Coverage 1 - Liability for **Scheduled Aircraft**

| FAA Cert. Number | Make & Model | Year Built | Seats Crew / Pass | | **Aircraft** Liability Limit |
|---|---|---|---|---|---|
| N227WP | HONDA AIRCRAFT COMPANY LLC HONDA JET | 2016 | 1 | 6 | $ 5,000,000. |
| | | | | | $ |
| | | | | | $ |
| | | | | | $ |
| | | | | | $ |
| | | | | | $ |
| | | | | | $ |
| | | | | | $ |

Coverage 2 - Liability for the Use of **Non-Owned Aircraft**

$ _____ 5,000,000. Each **Occurrence**

Maximum Number of Seats:   30

Reporting Grace Period:   30   consecutive days

This limit is part of, and not in addition to, the limit provided for Coverage 1.

Coverage 3 - Liability for **Property Damage** to **Non-Owned Aircraft** and **Temporary Substitute Aircraft**

$ _____ 25,000,000. Each **Occurrence**

This limit is part of, and not in addition to, the limit provided for Coverage 2.

Coverage 4 - Liability for Charter Referral

$ _____ 5,000,000. Each **Occurrence**

This limit is part of, and not in addition to, the limit provided for Coverage 1.

0050
0050

Coverage 5 - **Passenger** Voluntary Settlements for **Scheduled Aircraft** and **Non-Owned Aircraft**

    A.   Settlement Limits:

        1.   With respect to any **Scheduled Aircraft** or **Temporary Substitute Aircraft**:

            Each Non-**Crew Member Passenger**:  $     250,000.  Each **Occurrence**

            Each **Crew Member**:  $     250,000.  Each **Occurrence**

        2.   With respect to any **Non-Owned Aircraft** except a **Temporary Substitute Aircraft**:

            Each Non-**Crew Member Passenger**:  $     250,000.  Each **Occurrence**

            Each **Crew Member**:  $     250,000.  Each **Occurrence**

            Total All **Non-Owned Aircraft Crew Members** and Non-**Crew Member Passengers** Combined:  $     2,500,000.  Each **Occurrence**

    These limits are part of, and not in addition to, the limit provided for Coverage 1 or 2, whichever applies to the loss.

Coverage 6 - Liability for **Property Damage** to Hangars and Their Contents

    $     1,000,000.  Each **Occurrence**

    This limit is part of, and not in addition to, the limit provided for Coverage 1 or 2, whichever applies to the loss.

Coverage 7 - Liability for Fire Damage to Real Property

    $     1,000,000.  Each **Occurrence**

    This limit is part of, and not in addition to, the limit provided for Coverage 1 or 2, whichever applies to the loss.

Coverage 8 - Liability for Cargo

    $     500,000.  Each **Occurrence**

    Deductible:  $     NIL  Each **Occurrence**

    This limit is part of, and not in addition to, the limit provided for Coverage 1 or 2, whichever applies to the loss.

0051
0051

Coverage 9 - Liability Under Contractual Agreements

$_____5,000,000.  Each **Occurrence**

This limit is part of, and not in addition to, the limit provided for Coverage 1 or 2, whichever applies to the loss.

Coverage 10 - Liability for **Personal Injury** and IN cluding **Advertising Injury**

$_____25,000,000.  Each Offense and in the Annual Aggregate

This limit is part of, and not in addition to, the limit provided for Coverage 1 or 2, whichever applies to the loss.

Coverage 11 - Liability For Alcohol Beverage Service

$_____5,000,000.  Each **Occurrence**

This limit is part of, and not in addition to, the limit provided for Coverage 1 or 2, whichever applies to the loss.

Coverage 12 - Liability for Incidental Medical Malpractice

$_____5,000,000.  Each **Occurrence**

This limit is part of, and not in addition to, the limit provided for Coverage 1 or 2, whichever applies to the loss.

Coverage 13 - Liability for the Use of **Premises**

$_____5,000,000.  Each **Occurrence**

This limit is part of, and not in addition to, the limit provided for Coverage 1 or 2, whichever applies to the loss.

Coverage 14 - Liability for the Operation of **Mobile Equipment**

$_____5,000,000.  Each **Occurrence**

This limit is part of, and not in addition to, the limit provided for Coverage 13.

Coverage 15 - Liability for the Operation of an **Auto** while on Airport **Premises**

$_____5,000,000.  Each **Occurrence**

This limit is part of, and not in addition to, the limit provided for Coverage 13.

Coverage 16 - Liability for the Sale of **Aircraft** and Aircraft Products and Services

$_____5,000,000.  Each **Occurrence** and in the Annual Aggregate

This limit is part of, and not in addition to, the limit provided for Coverage 13.

0052
0052

Coverage 17 - Liability for Hangarkeeper Operations

$ _____ 25,000,000.  Each **Aircraft**          $ _____ 25,000,000.  Each **Occurrence**

Deductible: $ _____ NIL  Each **Aircraft**            $ _____ NIL  Each **Occurrence**

This limit is part of, and not in addition to, the limit provided for Coverage 13.

Coverage 18 - Liability for Garagekeepers

$ _____ 50,000.  Any One **Auto**          $ _____ 100,000.  Any One Loss

Deductible: $ _____ 1,500.  Each **Auto**

This limit is part of, and not in addition to, the limit provided for Coverage 13.

## Section Two - Defense, Settlement and Supplementary Payments

## Section Three - **Physical Damage** Coverages

Coverage 19 - **Physical Damage** Coverage for **Scheduled Aircraft** (including **Ingestion** and Emergency Landing)

| FAA Cert. Number | Make & Model | Insured Value | Deductible | |
|---|---|---|---|---|
| | | | Not **In Motion** | **In Motion/ Ingestion** |
| N227WP | HONDA AIRCRAFT COMPANY LLC HONDA JET | $ 5,600,000. | $ N/A | $ N/A |
| | | $ | $ | $ |
| | | $ | $ | $ |
| | | $ | $ | $ |
| | | $ | $ | $ |
| | | $ | $ | $ |
| | | $ | $ | $ |
| | | $ | $ | $ |

Coverage 20 - **Physical Damage** Coverage for **Spare Engines** and **Spare Parts** Including Transit

$ _____ 1,000,000.  Each **Occurrence**

Deductible:

Not  **In  Motion** _____ NIL  Each **Occurrence**
$

**In Motion** _____ $ _____ NIL  Each **Occurrence**

0053
0053

Coverage 21 - Automatic Insurance for Increased Value of **Scheduled Aircraft** or **Spare Engines** and **Spare Parts**

Maximum Automatic **Physical Damage** Limit for **Scheduled Aircraft**:

$_____25,000,000._ any one **aircraft** without prior approval

Maximum Automatic **Physical Damage** Limit for **Spare Engines** and **Spare Parts**:

$_____2,000,000._ without prior approval of the Company

Coverage 22 - **Physical Damage** Coverage for Mechanics Tools

$_____5,000._ Each Employee        $_____25,000._ Each **Occurrence**

Deductible: $_____250._ Each Employee/Each **Occurrence**

This limit is part of, and not in addition to, the limit provided for Coverage 13.

Section Four - Additional Coverages

Coverage 23 - Temporary Replacement Parts Rental Expense

$_____250,000._ Each Loss

Minimum Repair Period:        _5_ days

Maximum coverage period:        _60_ consecutive days

Coverage 24 - Replacement **Aircraft** Rental Expense

$_____500,000._ Each Loss

Minimum Repair Period:        _5_ days

Maximum coverage period:        _60_ consecutive days

Coverage 25 - Search and Rescue Expenses

$_____1,000,000._ Each Loss

Coverage 26 - Runway Foaming and Crash Control Expenses

$_____1,000,000._ Each Loss

Coverage 27 - Trip Interruption Expense Coverage

$_____15,000._ Each **Passenger**/Each Loss

0054
0054

Coverage 28 - Automatic Insurance for Newly Acquired **Aircraft**

Maximum **Physical Damage** Limit $ _____ 25,000,000. any one **aircraft** without prior approval of the Company.

Coverage 29 - Lay-Up Credit for **Scheduled Aircraft**

A pro-rated return of 60_____ % of the applicable premium at policy expiration if the **scheduled aircraft** is laid up for 30_____ or more consecutive days.

Coverage 30 - Personal Effects and Baggage Expense

$ _____ 15,000. Each **Passenger**

Section Five - **Medical Expenses**

Coverage 31 - Medical Payments for **Scheduled Aircraft** and **Non-Owned Aircraft**

A.   With respect to any **Scheduled Aircraft** or **Temporary Substitute Aircraft**:

Each Non-**Crew Member Passenger**: $ _____ 25,000. Each **Occurrence**

Each **Crew Member**:                          $ _____ 25,000. Each **Occurrence**

B.   With respect to any **Non-Owned Aircraft** except a **Temporary Substitute Aircraft**:

Each Non-**Crew Member Passenger**: $ _____ 25,000. Each **Occurrence**

Each **Crew Member**:                          $ _____ 25,000. Each **Occurrence**

Coverage 32 - **Premises** Medical Payments

$ _____ 25,000. Each Person          $ _____ 250,000. Each **Occurrence**

Item 6.   Policy Premium:     $ 20,281.

Item 7.   Endorsements Attached as of Inception:        STARR ELITE CA PROVISIONS (12/06)
STARR  FORMS  10284,  10351,  10234,  10317,  10466,  10332,  AVN48B,  AVN52ECA,  10318,
AVN46B, AVN38B, 10055, 10007, 20006, AVN2000A, 30002

Producer     TUTTON INSURANCE SERVICES, INC.
2913 S. PULLMAN STREET
SANTA ANA, CA  92705

Approved By   _____
(Authorized Representative)

Date of Issue          JANUARY 27, 2017  (BM)

Starr Elite CA Declarations (5/09)               -10-

0055
0055

In consideration of the payment of the premium and in reliance upon the truth of the statements, representations and the declarations made by the **Named Insured** and subject to all of the terms of the Policy including the applicable Limits of the Company's Liability under Item 5, the Company agrees with the **Named Insured** with respect to the coverages stated in the Declarations as follows:

## INSURING AGREEMENTS

Section One - Liability Coverages

Coverage 1 - Liability for **Scheduled Aircraft**

The Company will promptly pay on behalf of the **insured** all sums which the **insured** shall be legally obligated to pay as damages because of **bodily injury** or **property damage** caused by an **occurrence** during the policy period arising out of the ownership, maintenance or use of a **scheduled aircraft**.

Coverage 2 - Liability for the Use of **Non-Owned Aircraft**

The Company will promptly pay on behalf of the "insured", as defined below, all sums which the **"insured"** becomes legally obligated to pay as damages because of **bodily injury** or **property damage** caused by an **occurrence** during the policy period arising out of the use of **non-owned aircraft** by or on behalf of the "insured".

 A. For Coverage 2, the definition of "insured"**:**

  1. with respect to any **temporary substitute aircraft**, means the same as **insured**;

  2. with respect to all other **non-owned aircraft**, means:

   a. the **Named Insured** and,

   b. any officer, director, stockholder, employee, partner, or agent of the **Named Insured** while that person is acting in their capacity as such.

  Regardless of Paragraphs 1. and 2. above, no person or organization will be an **insured** while using any **aircraft** that is owned in whole or in part by; or that is under any lease purchase option agreement by; or that is registered to that organization, person or, any household member of that person.

 B. The insurance provided by Coverage 2 shall not apply to any claim or loss arising out of an **insured**'s product liability hazard including any products designed, manufactured, sold, distributed, serviced or handled by or on behalf of an **insured**.

 C. The **Named Insured** shall promptly advise the Company of an exclusive lease of, or the use of, any **non-owned aircraft** that exceeds the reporting grace period shown in the Declarations. The Company may request additional information and charge an additional premium for this use. Inadvertent failure to report this use will not void this coverage provided that the **Named Insured** advises the Company as soon as possible after the omission is discovered.

 D. The insurance provided by Coverage 2 is **excess insurance**.

Starr Elite CA Provisions (5/09)   -11-

**Coverage 3 - Liability for Property Damage to Non-Owned Aircraft and Temporary Substitute Aircraft**

The Company will promptly pay on behalf of the **insured** all sums which the "insured", as defined below, becomes legally obligated to pay as damages arising out of **property damage** caused by an **occurrence** during the policy period to **non-owned aircraft** or **temporary substitute aircraft**. This coverage section shall not apply while the **aircraft** is **in-flight** unless the **aircraft** is operated by a person employed as a professional pilot acting in the capacity as such.

    A.   For Coverage 3, the definition of "insured":

        1.   with respect to any **temporary substitute aircraft**, means the same as **insured**;

        2.   with respect to all other **non-owned aircraft**, means:

            a.   the **Named Insured** and,

            b.   any officer, director, stockholder, employee, partner, or agent of the **Named Insured** while that person is acting in their capacity as such.

        Regardless of Paragraphs 1. and 2. above, no person or organization will be an **insured** while using any **aircraft** that is:

            i.   owned in whole or in part by;

            ii.   that is under any lease purchase option agreement by;

            iii.   that is registered to

        that organization, person or, any household member of that person.

    B.   The insurance provided by Coverage 3 shall not apply to any claim or loss arising out of an **insured**'s product liability hazard including any products designed, manufactured, sold, distributed, serviced or handled by or on behalf of an **insured**.  This includes Liability for Hangarkeeper Operation provided under Coverage 17.

    C.   The **Named Insured** shall promptly advise the Company of an exclusive lease of, or the use of, any **non-owned aircraft** that exceeds the reporting grace period shown in the Declarations. The Company may request additional information and charge an additional premium for this use. Inadvertent failure to report this use will not void this coverage provided that the **Named Insured** advises the Company as soon as possible after the omission is discovered.

    D.   The insurance provided by Coverage 3 is **excess insurance**.

**Coverage 4 - Liability Coverage for Charter Referral**

The Company will promptly pay on behalf of the **Named Insured** all sums the **Named Insured** becomes legally obligated to pay as damages because of **bodily injury** or **property damage** caused by an **occurrence** and arising out of the **Named Insured**'s arrangement for use of a **non-owned aircraft** by and on behalf of another person or organization.

0057
0057

Coverage 5 - **Passenger** Voluntary Settlements for **Scheduled Aircraft** and **Non-Owned Aircraft**

Regardless of legal liability and without admitting to the liability of any party, the Company will offer to pay on behalf of the **insured** the sum requested by the **Named Insured** to, or for, the benefit of each covered **passenger** who sustains **bodily injury** caused by an **occurrence** during the policy period arising out of the ownership, maintenance or use of a **scheduled aircraft** or the use of **non-owned aircraft** by, or on behalf of, the **insured**.

If the **bodily injury**, directly and independently of all other causes, results in the death or dismemberment of the passenger, the Company will offer to pay up to the "settlement limit" as stated in the Declarations under Coverage 5.A.

Conditions of **Passenger** Voluntary Settlements for **Scheduled Aircraft** and **Non-Owned Aircraft**

A.  It is a condition of payment to or on behalf of any individual(s) that the individual(s) or the individual(s) legal representative will:

 1.  if requested, authorize the Company to obtain medical reports and copies of records.  The injured person will submit to examination by the physicians selected by the Company when the Company may reasonably require;

 2.  if payment is to be made under paragraphs A, B, or C above, be required to execute a full release, approved by the Company, for all **bodily injury** claims by or on their behalf against any **insured** and the Company for which there is insurance under the Policy.

B.  If within 120 days the payment offer is not accepted or is rejected or if at any time a claim is made or civil action is filed by or on behalf of a **passenger** to whom  this coverage applies for **bodily injury** against any **insured**, Coverage 5 will not apply to or for the benefit of that **passenger**.

C.  Coverage 5 will not apply to or for the benefit of any **crew member** on any **non-owned aircraft** unless the Declarations indicates a specified **non-owned aircraft** "settlement limit" for **crew member** and:

 1.  the **crew member** is a  professional pilot who is regularly employed by the **insured** and acting in the capacity as such, or

 2.  the **crew member** would normally be operating a **scheduled aircraft**, but is operating a **non-owned aircraft** on behalf of the **insured**.

Definitions applicable to Coverage 5:

"Settlement Limit" means the maximum applicable limit the Company will pay to or for each **passenger** as shown in the Declarations under Coverage 5.A.

0058
0058

Coverage 6 - Liability for **Property Damage** to Hangars and Their Contents

The Company will promptly pay on behalf of the **insured** all sums which the **insured** becomes legally obligated to pay for **property damage** to hangars and their contents not owned by an **insured** caused by an **occurrence** resulting from the **insured's aviation operations** during the policy period.

The insurance provided by Coverage 6 is **excess insurance** and will not apply to any loss or damage to property covered elsewhere in the Policy.

Coverage 7 - Liability for Fire Damage to Property

The Company will promptly pay on behalf of the **insured** all sums which the **insured** becomes legally obligated to pay as damages because of **property damage** caused by an **occurrence** resulting from the **insured's aviation operations** during the policy period arising out of **property damage** to structures or portions thereof rented to or leased to the **Named Insured**, including fixtures permanently attached thereto, if such **property damage** arises out of fire. Coverage 7 shall not apply to liability assumed by the **insured** under any contract or agreement.

The insurance provided by Coverage 7 shall be **excess insurance** over any valid and collectible property insurance (including any deductible portion thereof), available to the **insured**, such as, but not limited to, Fire, Extended Coverage, Builder's Risk Coverage or Installation Risk Coverage.

Coverage 8 - Liability for Cargo

The Company will promptly pay on behalf of the **insured** all sums which the **insured** becomes legally obligated to pay (less any applicable deductible) for the loss of, or **physical damage** to, the property of others caused by an **occurrence** during the policy period while the property is in the **insured**'s care, custody or control and it is on a covered **aircraft** or while it is in the custody of the **insured** on their **premises** prior to loading on or, after unloading from, a covered **aircraft**.

The insurance provided by Coverage 8 is **excess insurance**.

Coverage 8 will not apply to any loss, damage or claim caused by:

   A.   any loss of market or any loss arising from delay whether or not the delay is caused by an **occurrence** covered by the Policy;

   B.   any type of consequential loss;

   C.   infidelity of the **insured**, its employees or agents;

   D.   and confined to wear, tear, deterioration, extremes of temperature or pressure or due to the perishable or hazardous nature of the property;

   E.   any loss in excess of the actual cost of reproducing or replacing destroyed or damaged manuscripts, notes, checks, securities, accounts, bills, deeds, or any other valuable papers; or

   F.   the loss of or damage to the personal effects or baggage of any **passenger**.

Coverage 9 - Liability for Contractual Agreements

A. The Company will promptly pay on behalf of the **insured** all sums which the **insured** becomes legally obligated to pay as damages because of **bodily injury** or **property damage** caused by an **occurrence** during the policy period arising out of liability assumed by the **Named Insured** or their legal representative in a contract or agreement relating to the ownership, maintenance or use of **scheduled aircraft** or the use of **non-owned aircraft** by the **insured**.

B. The Company's Rights of Recovery section shown in Section Ten - Other Conditions of Insurance, Paragraph F., of the Policy will not apply to the extent that it is addressed in any contract or agreement that the **Named Insured** or its legal representative has entered into relating to **physical damage** of property insured by the Policy.

C. The **Named Insured** agrees to submit a copy of all such contracts or agreements to the Company as soon as possible.  Inadvertent failure to do so will not void the insurance provided by Coverage 9 as long as the contract or agreement is submitted as soon as possible once the omission is discovered. The Company reserves the right to charge an additional premium for any such contract or
D. agreement.

E. The Company shall not require copies of temporary **aircraft** storage or minor servicing agreements, military or governmental agreements for the use of an airport, lease of premises agreements or agreements approved by the Company prior to the effective date of the Policy.

F. The insurance provided by Coverage 9 shall not apply to any liability assumed:

   1. under any oral contract or agreement, unless the agreement is a contract which is required by a military or governmental body for the **insured**'s use of an airport or an agreement with another party relating to the temporary storage or minor servicing of a **scheduled aircraft** while it is away from its home base;

   2. under any written contract or agreement:

      a. that is with or for the benefit of any **passenger**, **crew member** or their heirs.  However, subparagraph F. 1. above shall not apply:

         i. if the contract or agreement is required by a military or governmental body for the **insured**'s use of an airport; or

         ii. for the Company's right of recovery as stated under Coverage 9, paragraph B;

      b. to the extent that it applies to major alterations or major repairs as defined in the Federal Aviation Regulations;

      c. that is with or for the benefit of any manufacturer of an **aircraft** or any **aircraft** parts or equipment, or their employees or agents, to the extent that it relates to their products liability hazard;

      d. that relates to the sale of an **aircraft**;

      e. that is entered into after a loss to the extent that it relates to that loss.

0060
0060

Coverage 10 - Liability for **Personal Injury** or **Advertising Injury**, if included, on the Declarations page

The Company will promptly pay on behalf of the **insured** all sums which the **insured** becomes legally obligated to pay as damages because of **personal injury** or **advertising injury**, if included, to which this insurance applies resulting from the **insured**'s **aviation operations**.  The Company will have the right and duty to defend any suit seeking those damages.  The Company may at its discretion investigate any offense and settle any claim or suit that may result.  However:

    A.   The amount the Company will pay for damages is limited as described in Section One - Coverage 10; and

    B.   The Company's right and duty to defend end when it has exhausted the applicable limit of insurance in the payment of judgment(s) or settlement(s) under Coverage 10.

No other obligation or liability to pay sums or perform acts or services is covered unless explicitly provided for under Section Two - Defense, Settlement and Supplementary Payments.

The insurance provided by Coverage 10 applies to:

    A.   **Personal injury** caused by an offense arising out of the **insured**'s **aviation operations**, excluding advertising, publishing, broadcasting or telecasting done by or for the **insured**;

    B.   **Advertising injury**, if included, caused by an offense committed in the course of advertising the **insured**'s **aviation operations**, aviation goods, aviation products or aviation services, but only if the offense was committed in the coverage territory during the policy period.

The insurance provided by Coverage 10 shall not apply to:

    A. Breach Of Contract

       **Advertising injury** or **personal injury** arising out of breach of contract.

    B. Continuing Offenses

       **Advertising injury** or **personal injury** that arises out of that part of an offense that continues or resumes after the later of the end of the policy period of:

       1.   this insurance; or,

       2.   a subsequent, continuous renewal or replacement of this insurance, that:

          a.   is issued by the **insured**;

          b.   remains in force while the offense continues; and

       would otherwise apply to **advertising injury** and **personal injury**.

    C. Contracts

       **Advertising injury** or **personal injury** for which the **insured** is obligated to pay damages by reason of assumption of liability in contract or agreement.

       This exclusion does not apply to the liability for damages that such **insured** would have in the absence of such contract or agreement.

0061
0061

D. Crime Or Fraud

**Advertising injury** or **personal injury** arising out of any criminal or fraudulent conduct committed by or with the consent or knowledge of the **insured**.

E. Expected Or Intended Injury

**Advertising injury** or **personal injury** arising out of an offense, committed by or on behalf of the **insured**, that:

1. is intended by such **insured**; or

2. would be expected from the standpoint of a reasonable person in the circumstances of such **insured**;

to cause injury.

F. Failure To Conform To Representations Or Warranties

**Advertising injury** or **personal injury** arising out of the failure of goods, products or services to conform with any electronic, oral, written or other representation or warranty of durability, fitness, performance, quality or use.

G. Internet Activities

**Advertising injury** or **personal injury** arising out of:

1. controlling, creating, designing or developing of another's Internet site;

2. controlling, creating, designing, developing, determining or providing the content or material of another's Internet site;

3. controlling, facilitating or providing, or failing to control, facilitate or provide, access to the Internet or another's Internet site; or

4. publication of content or material on or from the Internet, other than material developed by the **insured** or at the direction of the **insured**.

H. Media Type Business

**Advertising injury** or **personal injury** arising out of an offense committed by or on behalf of an **insured** whose business is advertising, broadcasting, cablecasting, publishing, telecasting or telemarketing.

This exclusion does not apply to **personal injury** caused by an offense described in subparagraphs A., B. or C. of the definition of **personal injury**.

I. Prior Offenses

**Advertising injury** or **personal injury** arising out of any offense first committed before the beginning of the policy period.

J. Publications With Knowledge Of Falsity

**Advertising injury** or **personal injury** arising out of any electronic, oral, written or other publication of content or material by or with the consent of the **insured**:

1. with knowledge of its falsity; or

2. if a reasonable person in the circumstances of such **insured** would have known such content or material to be false.

K. Employment-Related Practices

1. any damages sustained at any time by any person, whether or not sustained in the course of employment by any **insured**, arising out of any employment-related act, omission, policy, practice or representation directed at such person, occurring in whole or in part at any time by,

   a. arrest, detention or imprisonment;

   b. breach of any express or implied covenant;

   c. coercion, criticism, humiliation, prosecution or retaliation;

   d. defamation or disparagement;

   e. demotion, discipline, evaluation or reassignment;

   f. discrimination, harassment or segregation;

   g. i. eviction; or

      ii. invasion or other violation of any right of occupancy;

   h. failure or refusal to advance, compensate, employ or promote;

   i. invasion or other violation of any right of privacy or publicity;

   j. termination of employment; or

   k. other employment-related act, omission, policy, practice, representation or relationship in connection with any insured at any time.

This exclusion applies:

1. whether the **insured** may be liable as an employer or in any other capacity; and

2. to any obligation to share damages with or repay someone else who must pay damages because of any of the foregoing.

L. Wrong Description Of Prices

**Advertising injury** or **personal injury** arising out of the wrong description of the price of goods, products or services.

M. Intellectual Property Laws And Rights

Any actual or alleged **bodily injury**, **property damage**, **advertising injury** or **personal injury** arising out of, giving rise to or in any way related to any actual or alleged:

1. assertion; or

2. infringement or violation;

by any person or organization (including any **insured**) of any **intellectual property law or right**, regardless of whether this insurance would otherwise apply to all or part of any such actual or alleged injury or damage in the absence of any such actual or alleged assertion, infringement or

This exclusion applies, unless such injury:

1. is caused by an offense described in the definition of **advertising injury**; and

2. does not arise out of, give rise to or in any way relate to any actual or alleged assertion, infringement or violation of any **intellectual property law or right**, other than one described in the definition of **advertising injury**.

0063
0063

Coverage 11 - Liability for Alcohol Beverage Service

The Company will promptly pay on behalf of the **insured** all sums which the **insured** becomes legally obligated to pay as damages because of **bodily injury** or **property damage** caused by an **occurrence** resulting from the **insured**'s **aviation operations** during the policy period arising out of the serving or giving of any alcoholic beverage at or from the **insured**'s **premises** or any **aircraft** covered by the Policy.

The insurance provided by Coverage 11 is **excess insurance**.

Coverage 12 - Liability for Incidental Medical Malpractice

The Company will promptly pay on behalf of the **insured** all sums which the **insured** becomes legally obligated to pay as damages because of **bodily injury** caused by an **occurrence** resulting from the **insured**'s **aviation operations** during the policy period arising out of  "Incidental Medical Malpractice".

"Incidental Medical Malpractice" means injury arising out of the rendering of or failure to render, during the policy period, the following services:

    A.  medical, automatic external defibrillator, surgical, dental, x-ray, or nursing service or treatment or the furnishing of food or beverages in connection therewith; or

    B.  the furnishing or dispensing of drugs or medical, dental or surgical supplies or appliances.

    C.  The insurance provided by Coverage 12 shall not apply to:

        1.  expenses incurred by the **insured** for first-aid to others at the time of an accident;

        2.  any **insured** engaged in the business or occupation of providing any of the services described under "Incidental Medical Malpractice" above;

        3.  injury caused by an indemnitee if such indemnitee is engaged in the business or occupation of providing any of the services described under "Incidental Medical Malpractice" above; or

        4.  the failure to render automatic external defibrillator treatment, if the **aircraft** or **premises** are not equipped with automatic external defibrillator units.

Coverage 13 - Liability for Use of **Premises**

The Company will promptly pay on behalf of the **insured** all sums which the **insured** becomes legally obligated to pay as damages because of **bodily injury** or **property damage** caused by an **occurrence** resulting from the **insured**'s **aviation operations** during the policy period arising out of the ownership, maintenance or use of **premises**.

The insurance provided by Coverage 13 is **excess insurance**.

Coverage 14 - Liability for the Operation of **Mobile Equipment**

The Company will promptly pay on behalf of the **insured** all sums which the **insured** becomes legally obligated to pay as damages because of **bodily injury** or **property damage** caused by an **occurrence** resulting from the **insured**'s **aviation operations** during the policy period arising out of ownership, maintenance or use of **mobile equipment**.

The insurance provided by Coverage 14 is **excess insurance**.

0064
0064

Coverage 15 - Liability for the Operation of an **Auto** while on Airport **Premises**

The Company will promptly pay on behalf of the **insured** all sums which the **insured** becomes legally obligated to pay as damages because of **bodily injury** or **property damage** caused by an **occurrence** resulting from the **insured**'s **aviation operations** during the policy period arising out of ownership, lease, rental, arrangement or use of **autos** while on airport **premises** exclusive of any public roadways and parking areas.

The insurance provided by Coverage 15 is **excess insurance**.

Coverage 16 - Liability for the Sale of **Aircraft** and Aircraft Products and Services

The Company will promptly pay on behalf of the **insured** all sums which the **insured** becomes legally obligated to pay as damages because of **bodily injury** or **property damage** caused by an **occurrence** resulting from the **insured**'s **aviation operations** during the policy period arising out of the:

    A.   sale or relinquishment from exclusive written lease, by the **named insured**, of a **scheduled aircraft** or any aircraft sold or relinquished prior to the policy period;

    B.   furnishing to others, by the **insured**, any materials, parts, equipment, fuel, maintenance, aircraft services, used for or in connection with aircraft, **premises** or **mobile equipment**;

    C.   furnishing to others, by the **insured**, of food or beverages in connection with the operation of **aircraft** or **premises**.

The insurance provided by Coverage 16 is **excess insurance** and will only apply if the **bodily injury** or **property damage** occurs away from the **insured**'s **premises**, after physical possession of the aircraft, materials, parts, equipment, fuel, food or beverages have been relinquished to others and any services have been completed.

Coverage 17 - Liability for Hangarkeeper Operations

The Company will promptly pay on behalf of the **insured** all sums which the **insured** becomes legally obligated to pay as damages because of "loss" to **aircraft** (subject to the deductible shown in the Declarations if applicable unless such "loss" results from fire or explosion or while the **aircraft** is dismantled and being transported) occurring while such **aircraft** is in the care, custody or control of the **insured** for safekeeping, storage, service or repair.  However:

    A.   The amount the Company will pay for damages is limited as described under Declarations, "Item 5. Limits of the Company's Liability", Coverage 17;

    B.   If repairs are made by the **insured**, the Company will not pay more than:

        1.   the **insured**'s actual net cost for necessary material and parts of like kind and quality; and

        2.   the **insured**'s actual wages for labor at current straight time rates with no premium for overtime, plus 150% of such wages as an allowance for overhead and supervision.  No other obligation or liability to pay sums or perform acts or services is covered unless explicitly provided for under Section Two - Defense, Settlement and Supplementary Payments of Liability Claims.

0065
0065

C. Coverage 17 applies to damages because of "loss" to **aircraft** only if the "loss" occurs during the policy period.

D. The insurance provided by Coverage 17 shall not apply to:

1. the **insured**'s liability under any agreement to be responsible for "loss";

2. "loss" to robes, wearing apparel, personal effects or merchandise;

3. to "loss" or damage to **aircraft** or parts of any **aircraft**:

   a. owned by, leased to, rented to or loaned to the **insured** or partner(s) of the **insured**;

   b. owned by, leased to, rented to or loaned to an officer or employee of the **insured** unless the property is an **aircraft** in the **insured**'s custody under an agreement for which a charge has been made;

4. "loss" due to theft or conversion caused in any way by the **insured**'s employees, partners or shareholders;

5. "loss" to **insured**'s work, arising out of it or any part of it;

6. "loss" to **aircraft** while **in-flight**; or

7. liability for **property damage** to **non-owned aircraft** and **temporary substitute aircraft** under Coverage 3.

Definition applicable to Coverage 17:

"Loss" means direct and accidental loss of or damage to tangible property.

## Coverage 18 - Liability for Garagekeeper Operations

The Company will promptly pay on behalf of the **insured** all sums which the **insured** becomes legally obligated to pay as damages because of **property damage** to an **auto** occurring while such **auto** is in the care, custody or control of the **insured** for valet parking, towing, safekeeping, storage or while on airport **premises** for any other incidental use by the **insured**.

The insurance provided by Coverage 18 shall not apply to:

A. the **insured**'s liability under any agreement to be responsible for "loss";

B. "loss" to robes, wearing apparel, personal effects or merchandise;

C. "loss" or damage to an **auto** or parts of any **auto**:

   1. owned by, leased to, rented to or loaned to the **insured** or partner(s) of the **insured**;

   2. owned by, leased to, rented to or loaned to an officer or employee of the **insured** unless the **auto** is in the **insured**'s custody due to towing, or for valet parking for which a charge has been made.

D. "loss" due to theft or conversion caused in any way by the **insured**, its employees, its partners or shareholders.

Definition applicable to Coverage 18:

"Loss" means direct and accidental loss of or damage to tangible property.

## Section Two - Defense, Settlement and Supplementary Payments

A.   The Company has the right and duty to defend any suit against the **insured** seeking damages because of **bodily injury**, **personal injury**, **advertising injury**, or **property damage** covered by the Policy, even if any of the allegations of the suit are groundless, false or fraudulent. The Company may make any investigation and settlement of any claim or suit as it deems expedient. The Company will not be obligated to pay any expense, claim or judgment or to defend any suit after the applicable limit of liability has been exhausted by the payment of judgment(s) or settlement(s).

B.   The Company will promptly pay in addition to the applicable limit of liability:

1.   all the Company's expenses and all costs taxed against the **insured** in any suit the Company is required to defend including:

   a.   any pre-judgment interest awarded against the **insured** on that part of the judgment the Company is required to pay under the  terms of the Policy;

   b.   all interest on the amount of any judgment that the Company is required to pay under the terms of the Policy which accrues  after the entry of the judgment and before the Company has paid, tendered or deposited in to court that portion of the judgement owed by the Company; and

   c.   any costs for arbitration alleging damages covered by the Policy which the **insured** must or may submit to;

2.   premium on appeal bonds required or, premiums on bonds to release attachments in any suit defended by the Company for any amount not exceeding the applicable limit of liability;

3.   the cost of bail bonds, up to $10,000 for each incident, required of the **insured** because of an **occurrence** or violation of law or a regulation for civil aviation arising out of  the **insured**'s **aviation operations** and involves the use of **aircraft** or **premises**.  However, the Company has no obligation to furnish or apply for any bail bonds;

4.   all reasonable expenses incurred by the **insured** for first aid, medical and surgical relief that is imperative at the time of an accident because of **bodily injury** covered by the Policy;

5.   all reasonable expenses incurred by the **insured** at the Company's request; however, the Company will not pay more than $500.00 per day for each of the **insured**'s employees for the loss of earnings, wages or salaries; and

6.   all expenses incurred by the **insured** that have been approved in advance by the Company.

0067
0067

Section Three - **Physical Damage** Coverages

Coverage 19 - **Physical Damage** Coverage for **Scheduled Aircraft** (including **Ingestion** and Emergency Landing)

The Company will promptly pay for any **physical damage** to a **scheduled aircraft** that occurs during the policy period including its disappearance or theft, less any applicable deductible. A **scheduled aircraft** shall be considered missing under disappearance or stolen under theft if such **aircraft** is unable to be located for fifteen (15) days after reported missing or stolen.  In addition, if an unexpected event causes a **scheduled aircraft** to make a landing in a location where it cannot safely depart and there is no **physical damage**, the Company will pay the reasonable costs of transporting the **scheduled aircraft** to the nearest suitable airport.

Coverage 20 - **Physical Damage** Coverage for **Spare Engines** and **Spare Parts** Including Transit

The Company will promptly pay for **physical damage** to or theft of **spare engines** and **spare parts** that are owned by the **Named Insured** or for which the **Named Insured** is legally responsible.

The insurance provided by Coverage 20 is **excess insurance**.

Coverage 21 - Automatic Insurance for Increased Value of **Scheduled Aircraft** or **Spare Engines** and **Spare Parts**

If the value of a **scheduled aircraft** is increased during the policy period because of modifications or the addition of equipment or, the **named insured** modifies or acquires additional **spare engines** or **spare parts**, the applicable insurance provided by the Policy under Section Three - **Physical Damage** Coverage will apply to the increased value. The amount of insurance in the Declarations will automatically increase by the actual cost to the **named insured** of the modifications, equipment or additional **spare engines** or **spare parts** as evidenced by the **named insured**'s records provided:

    A.   the **named insured** reports to the Company any increase in value as soon as possible after completion of modifications or additions;

    B.   that unless the Company has agreed in advance, the maximum automatic increase of value will not exceed:

        1.   the Maximum Automatic limit for **Physical Damage** to a **scheduled aircraft** shown in the Declarations, "Item 5. Limits of the Company's Liability" as shown under Coverage 21 in the Declarations; or

        2.   the Maximum Automatic Limit for **spare engines** and **spare parts** shown in the Declarations, "Item 5. Limits of the Company's Liability", as shown under Coverage 21 in the Declarations; and

    C.   any additional premiums for the increased limits are paid by the **named insured.**

0068
0068

Coverage 22 - **Physical Damage** Coverage for Mechanics Tools

This insurance is extended to cover tools of the **insured**'s employee mechanics against direct and accidental physical loss or damage from external causes while such tools are in the care, custody and control of the **named insured** or such employee while acting within the scope of employment.  The Company's liability shall not exceed the limits stated in the Declarations under Coverage 22.

The insurance provided by Coverage 22 shall not apply to claims caused by or arising from:

A.   wear, tear, deterioration, rust, or inherent vice;

B.   delay, depreciation, or loss of use;

C.   mechanical, electrical, hydraulic, pneumatic or structural breakdown or failure;

D.   artificial electric current;

E.   extremes of temperature and humidity;

F.   mysterious disappearance, loss or shortage disclosed upon taking inventory;

G.   infidelity, dishonesty of the **insured** or anyone in the service of the **insured**;

H.   wrongful taking or secretion by any person or organization in lawful possession thereof; or

I.   failure to save and protect such property from further loss or harm after an **occurrence** to which this endorsement applies.

## Section Four - Additional Coverages

Coverage 23 - Temporary Replacement Parts Rental Expense

If a **scheduled aircraft** suffers a **physical damage** loss covered by the Policy, the Company will promptly pay the **named insured**'s additional expenses of renting or leasing, for the period of repair, temporary replacement component part(s), to replace the part(s) damaged in the loss. This includes the **named insured**'s cost of installation, removal and transportation. Coverage 23 will not apply unless the actual time required for the repair exceeds the minimum required repair period shown for Coverage 23 in the Declarations. Coverage 23 shall not apply to rental expense incurred after the maximum coverage period has expired. The maximum coverage period begins immediately following the minimum required repair period.

0069
0069

Coverage 24 - Replacement **Aircraft** Rental Expense

If a **scheduled aircraft** suffers a **physical damage** loss covered under the Policy, the Company will promptly pay the **named insured**'s **extra expense** of leasing or renting a **temporary substitute aircraft** while the **scheduled aircraft** is being repaired.

The insurance provided by Coverage 24 shall not apply to **extra expense** incurred:

    A.   unless the actual time required to repair the damaged **aircraft** exceeds the minimum required repair period shown under this coverage in the Declarations;

    B.   if another **aircraft** is available at no extra charge for its use;

    C.   if the **named insured** acquires through ownership, lease, lease-purchase option, or otherwise, a permanent replacement for the damaged **aircraft**;

    D.   if the **scheduled aircraft** is a **total loss** and the Company has offered the **named insured** a proof of loss;

    E.   beyond the maximum coverage period shown under Coverage 24 as shown in the Declarations. The maximum coverage period begins immediately following the minimum required repair period and is to run consecutively without interruption;

    F.   unless such **extra expense** is actually incurred by the **named insured**; or

    G.   for replacement of any commercial revenue generating charter or Title 14 CFR Part 135 operation, unless such flight is solely for the **aircraft** owner's personal use.

Coverage 25 - Search and Rescue Expense

The Company will promptly reimburse the **insured** for its actual incurred expenses for search and rescue operations performed by or at the request of the **named insured**.

The insurance provided by Coverage 25 shall not apply to any claim, cost or expense:

    A.   for any governmental or military search and rescue operations;

    B.   arising out of any loss or damage to any equipment used in connection with the search and rescue operations;

    C.   arising out of the injury or death of any persons involved in the search and rescue operations;

    D.   incurred after it is reasonably assumed that there are no survivors; or

    E.   associated with salvaging the **aircraft** or any other property.

Coverage 26 - Runway Foaming and Crash Control Expense

The Company will promptly reimburse the **insured** for their actual incurred cost of runway or **aircraft** foaming and, fire, crash control, or rescue expenses, for the purpose of minimizing a **physical damage** or **bodily injury** loss covered by the Policy.

0070
0070

## Coverage 27 - Trip Interruption Expense

The Company will promptly reimburse the **insured** for their reasonable expenses of food, travel by commercial carrier and lodging of **passenger**s, incurred from the place where an **aircraft** suffers a covered **physical damage** loss to the intended final destination of the damaged **aircraft**, or back to the place they originally boarded the **aircraft** if the trip is discontinued.

The insurance provided by Coverage 27 shall not apply to any cost or expense for replacement **aircraft** rental for which payment is expected or made under Coverage 24.

## Coverage 28 - Automatic Insurance for Newly Acquired **Aircraft**

If, during the policy period, the **named insured** becomes the owner or exclusive lessee of an additional **aircraft** and is required to provide **aircraft** liability and/or **aircraft physical damage** insurance and, as soon as possible, reports the acquisition to the Company, the insurance afforded by the Policy will apply to the additional **aircraft** incepting at the time of acquisition. Unless the **named insured** and the Company agree otherwise, the coverage and limits of liability pertaining to the additional **aircraft** will be the same as is provided for other **scheduled aircraft**. If more than one **aircraft** is scheduled in Coverage 1 and more than one liability limit is scheduled, the lowest liability limit in the schedule will apply to the newly acquired **aircraft**. The insured value of the additional **aircraft** will be the actual cost of the **aircraft** to the **named insured** but not exceeding the Maximum **Physical Damage** Limit shown under Coverage 28 in the Declarations. The **named insured** agrees to pay any additional premium required because of the addition of the newly acquired **aircraft**.

## Coverage 29 - Lay-Up Credit For **Scheduled Aircraft**

If a **scheduled aircraft** is not used **in-flight** for more than the minimum lay-up period shown in the Declarations the **named insured** agrees to notify the Company as soon as practicable. At the end of the policy period, the Company will return a pro-rata percentage credit of the applicable premium for the entire period of the lay-up as shown under Coverage 29 in the Declarations.

The insurance provided by Coverage 29 shall not apply to any **scheduled aircraft** laid up because of any loss or damage covered by the Policy.

## Coverage 30 - Personal Effects and Baggage Expense

The Company will promptly pay on behalf of or reimburse the **named insured** for all sums which the **named insured** is liable for or pays to others for the loss of or **physical damage** to the personal effects and baggage of a **passenger**. Coverage 30 will only apply if the loss or damage occurred during the policy period and while the personal effects and baggage were in the care, custody or control of an **insured**.

0071
0071

Section Five - **Medical Expense**

Coverage 31 - Medical Payments for **Scheduled Aircraft** and **Non-Owned Aircraft**

Regardless of liability, the Company will promptly pay all the reasonable **medical expenses** incurred within one year from the date of injury for each covered **passenger** who sustains **bodily injury** caused by an **occurrence** during the policy period.

The insurance provided by Coverage 31 shall not apply for the benefit of a **crew member** on **non-owned aircraft** unless the Declarations shows a specific limit for **crew member** under the **non-owned aircraft** section of Coverage 31 and:

   A.  the **crew member** is an officer, director, stockholder, employee, partner, or agent of the **named insured** while acting in the scope of employment, or

   B.  the person is a **crew member** who would normally be operating a **scheduled aircraft** but is operating a **non-owned aircraft** on behalf of the **named insured**.

Coverage 32 - **Premises** Medical Payments

The Company will promptly pay all reasonable **medical expenses** incurred within one year from the date of injury for each person who sustains **bodily injury** caused by an **occurrence** during the policy period arising out of the **insured**'s **aviation operations** and ownership, maintenance or use of **premises**.

The following provisions apply to Coverage 31 and 32:

   A.  medical payments will not be made to anyone until all medical benefits available under a workers compensation or similar law have been exhausted;

   B.  as soon as possible, the injured person or someone on their behalf will give the Company written proof of claim, under oath if required, and will, if requested by the Company, authorize the Company to obtain medical reports and copies of records. The injured person will submit to examination by physicians selected by the Company if and when the Company may reasonably require;

   C.  the Company may pay the injured person or any person or organization rendering the services.  Any payments made under these sections do not constitute an admission of liability of any **insured**, person, organization, or of the Company; and

   D.  the total liability of the Company for all **medical expenses** incurred by or on behalf of each covered **passenger** or person who sustains **bodily injury** will not exceed the applicable Limit of Liability as stated in the Declarations under Coverage 32 for that **passenger** or person.

Section Six - Policy Definitions

When appearing in bold print in the Policy the following definitions apply:

"**Advertisement**" means an electronic, oral, written or other notice, about goods, products or services, designed for the specific purpose of attracting the general public or a specific market segment to use such goods, products or services.

**Advertisement** does not include any e-mail address, Internet domain name or other electronic address or metalanguage.

0072
0072

"**Advertising injury**" means injury, other than **bodily injury**, **property damage** or **personal injury**, sustained by a person or organization and caused by an offense of infringing, in that particular part of the **insured**'s **advertisement** of goods, products or services, that are:

  A. copyrighted **advertisement**; or

  B. registered collective mark, registered service mark or other registered trademarked name, slogan, symbol or title.

"**Aircraft**" means any **scheduled aircraft** and any other **aircraft** for which insurance is provided under the Policy. The definition includes the **aircraft**'s propulsion system, and parts and equipment installed in or on the **aircraft**. Parts that are temporarily removed are also included in the definition even if replaced by similar parts.  Tools and repair equipment standard for the **aircraft** and normally carried on the **aircraft** are also included within the definition.

"**Auto**" means a land motor vehicle, trailer or semi-trailer designed for travel on public roads, including any attached machinery or equipment. But **auto** does not include **mobile equipment**.

"**Aviation operations**" means all operations arising from the ownership, maintenance or use of locations or **aircraft** for aviation activities including that portion of roads or other accesses that adjoin these locations. **Aviation operations** include all operations necessary or incidental to aviation activities.

"**Bodily injury**" means physical injury sustained by any person, caused by an **occurrence** during the policy period, including sickness, disease, mental anguish and death at any time resulting therefrom.

"**Crew member**" means any **passenger** such as the **pilot-in-command**, co-pilot, flight engineer or flight attendant, who is required for or assisting in **aircraft** operations.

"**Extra expense**" means that portion of the actual incurred cost of leasing or renting a replacement **aircraft** which exceeds the cost of operating **aircraft** the **named insured** would have incurred if the **scheduled aircraft** had not been damaged.

"**Excess insurance**" means insurance that only applies when all other valid and collectible insurance, including any formal self-insurance program or self-insured retention plan, available to the **named insured**/**insured** has been exhausted (other than insurance specifically purchased by the **named insured** to apply as excess over this Policy). If no such insurance or self-insurance exists, excess insurance coverage provided by this policy shall act as primary. If the other insurance is written through the Company as primary insurance, the total limit of the Company's or Companies' liability will not exceed the greatest or greater limit on any one Policy.

"**In-flight**" means, with respect to fixed-wing **aircraft**, the time commencing from the start of the take-off run of the **aircraft** and continuing until it has completed its landing roll. With respect to an **aircraft** that is a rotorcraft, it is any time the rotors are moving under power for lift-off or flight, until the rotors cease revolving after landing. With respect to any other **aircraft**, it is any time the **aircraft** is off a supporting surface as a result of propulsion, buoyancy or aerodynamic reaction.

"**In-motion**" means anytime the **aircraft** is moving under its own power or the momentum generated therefrom or, while it is **in-flight**. With respect to an **aircraft** that is a rotorcraft, it is anytime the rotors are moving under power or the momentum generated therefrom.

0073
0073

"**Ingestion**" means **physical damage** to a turbine engine or turbine auxiliary power unit, if they are included within the definition of **aircraft**, caused by objects or substances that are not or were not part of the engine or its accessories, which is the result of a single incident of sufficient severity to require, or would require if its severity were known at the time, immediate repair before further use.

"**Insured**" means:

    A.  for all coverage:

        1.  the **named insured**;

        2.  any director, officer, partner, employee, agent or stockholder of the **Named Insured** while that person is acting within their official capacity as such;

    B.  for all Section One - Liability Coverages except Coverage 2, 3 and 5 (**Non-owned aircraft** Liability Coverage and Products Liability Coverages) means:

        1.  any person or organization while riding in, using or legally responsible for a **scheduled aircraft** or **temporary substitute aircraft** provided that the use is within the scope of the permission of the **named insured**; and

        2.  any other person or organization but, only for their legal liability covered by the Policy which arises solely out of the acts or omissions of a person or organization in A. above.

    C.  other than any persons or organizations described in paragraph A. above, none of the following is considered an **insured** regardless of subparagraph B. 1. above:

        1.  any person or organization or their agents or employees engaged in the design, manufacture, maintenance, repair, or sale of **aircraft**, **aircraft** engines, components or accessories, or engaged in the operation of any **aircraft**, airport, hangar, flight school, flight service, or piloting service, with respect to any **occurrence** arising out of such activity, and

        2.  the owner, lessor or their agents or employees, of any **non-owned aircraft** covered by the Policy.

"**Intellectual property law or right**" means any:

    A.  certification mark, copyright, patent or trademark (including collective or service marks);

    B.  right to, or judicial or statutory law recognizing an interest in, any trade secret or confidential or proprietary non-personal information;

    C.  other right to, or judicial or statutory law recognizing an interest in, any expression, idea, likeness, name, slogan, style of doing business, symbol, title, trade dress or other intellectual property; or,

    D.  other judicial or statutory law concerning piracy, unfair competition or other similar practices.

"**Medical expense**" means expenses for necessary medical, surgical, x-ray and dental services, including prosthetic devices and necessary ambulance, hospital, professional nursing and/or funeral services.

"**Mobile equipment**" means a land vehicle (including any machinery or apparatus attached), whether or not self-propelled, used in connection with the maintenance or operation of **aircraft** or **premises** that is:

    A.  not subject to motor vehicle registration;

    B.  used exclusively on **premises** owned by or rented to the **named insured** including the roadways or property immediately adjoining; or

    C.  designed for use principally off public roads.

0074
0074

"**Named Insured**" means the person(s) or organization(s) shown in Item 1. of the Declarations.

"**Non-owned aircraft**" means any **aircraft** except:

    A.  an **aircraft** owned in whole or in part by or registered to the **named insured**;

    B.  a **scheduled aircraft**; or

    C.  an **aircraft** having a seating configuration exceeding the maximum number of seats shown in the Declarations for Coverage 2 (regardless of the actual number of **passengers** on the **aircraft**).

"**Occurrence**" means an accident, including continuous or repeated exposure to conditions, which results in **bodily injury** or **property damage** neither expected nor intended by the **insured**. However, the definition includes **bodily injury** or **property damage** resulting from the efforts to prevent dangerous interference with any **aviation operations**.

"**Partial loss**" means any **physical damage** loss which is not a **total loss**.

"**Passenger**" means any person in, on or boarding the **aircraft** for the purpose of riding, flying in or exiting from it after a ride, flight or attempted flight.

"**Personal injury**" means means injury, other than **bodily injury**, **property damage** or **advertising injury**, caused by an offense of:

    A.  false arrest, false detention or other false imprisonment;

    B.  malicious prosecution;

    C.  wrongful entry into, wrongful eviction of a person from or other violation of a person's right of private occupancy of dwelling, **premises** or room that such person occupies, if committed by or on behalf of its landlord, lessor or owner; or

    D.  electronic, oral, written or other publication of material that:

        1.  libels or slanders a person or organization (which does not include disparagement of goods, products, property or services); or

        2.  violates a person's right of privacy.

"**Physical damage**" means accidental, direct physical loss of or damage to **scheduled aircraft**, **spare engines** or **spare parts** during the policy period including **ingestion**, but it does not include the loss of use or any residual depreciation in value either before or after any repairs have been made.

"**Pilot-in-command**" means the pilot aboard the **aircraft** who is responsible for its **in-flight** operation.

"**Premises**" means the portions of airports, buildings or areas used by the **Named Insured** directly in connection with the ownership, operation, maintenance or use of any **aircraft** and the **Named Insured**'s **aviation operations**.

"**Property damage**" means accidental damage to or destruction of the tangible property of others caused by an **occurrence** during the policy period and the resultant loss of use of the property. **Property damage** also includes the loss of use of the tangible property of others that is not physically damaged but that is caused by an **occurrence** during the policy period.

0075
0075

"**Salvage value**" means the value of the damaged property prior to any repairs.

"**Scheduled aircraft**" means any **aircraft** listed under Coverage 1 - Liability for **Scheduled Aircraft** and Coverage 19 - **Physical Damage** Coverage for **Scheduled Aircraft** in the Declarations or any **aircraft** covered under Coverage 28 - Automatic Insurance for Newly Acquired **Aircraft**.

"**Spare engines**" means propulsion engines and auxiliary power units which have been or which are intended to be installed in or on a **scheduled aircraft** or **temporary substitute aircraft** and which are not included within the policy definition of an **aircraft**.

"**Spare parts**" means parts or accessories, except **spare engines**, specifically designed for installation in or on **aircraft** or **mobile equipment** which are not included within the policy definition of an **aircraft** or **mobile equipment**.

"**Temporary substitute aircraft**" means any **non-owned aircraft** used in place of a **scheduled aircraft** that is temporarily withdrawn from use because of its damage, breakdown, repair, modification, inspection, servicing, loss or destruction.

"**Total loss**" means any **physical damage** loss for which the cost to repair when added to the **salvage value** equals or exceeds:
A.  the insured value of a **scheduled aircraft**, or

B.  the actual cash value of any other insured property.

Theft or disappearance of the entire **aircraft** is considered a **total loss**.

## Section Seven - Exclusions

The insurance provided by the Policy shall not apply:

A.  to liability assumed by the **insured** in any type of agreement except as provided by Coverage 9 - Liability for Contractual Agreements;

B.  to any obligation which the **insured** or its insurance carrier may be held liable under any workers' compensation, unemployment compensation, disability benefits law or under any similar law;

C.  to **bodily injury** or **personal injury** to any employee of the **insured** arising out of and in the course of their employment by the **insured**, or to any claims for **bodily injury** as a consequence thereof. This exclusion shall not apply to liability assumed by the **insured** in any agreement required by a military or governmental authority as a prerequisite for using an airport or an airport facility, nor will this exclusion apply to Coverage 5 - **Passenger** Voluntary Settlements;

D.  to illegal, criminal or dishonest acts or activities, alleged or otherwise, committed by or at the direction of or with the knowledge and consent of directors or officers of the **insured** and with the knowledge at the time that such act was illegal or criminal, but with respect to the **named insured** this exclusion shall apply only if such activities or acts are with the knowledge and consent of an officer or director of the **named insured**;

E.  to any claim, loss or expense arising out of any hostile detonation of any weapon of war employing atomic or nuclear fission and/or fusion or other like reaction or radioactive force or matter;

Starr Elite CA Provisions (5/09)                    -31-

0076
0076

F.  to any **insured** while the **aircraft** is **in-flight** if piloted by other than the pilot or pilots designated under Item 4 of the Declarations;

G.  under all Section One - Liability Coverage and Section Two - Defense, Settlement and Supplementary Payments of Liability Claims, for **property damage** to property owned, occupied, used, rented, transported by or in the care, custody, or control of an **insured** except as provided under Coverage 2, 3, 6, 7, 8,17 and 18;

H.  under all Section One - Liability Coverage and Section Two - Defense, Settlement and Supplementary Payments of Liability Claims or Section Five - **Medical Expenses**, to any **insured** who is also **insured** under any contract of nuclear energy liability insurance, in effect at the time of the **occurrence**, issued by the Nuclear Energy Liability Insurance Association or the Mutual Atomic Energy Liability Underwriters that covers the claim, loss, damage or expense or would cover the claim, loss, damage or expense if such policy's limits of liability were not exhausted;

I.  under all Section Three - **Physical Damage** Coverage, to any loss, damage, claim or expense:

   which is due and confined to wear and tear, deterioration, mechanical or electrical breakdown of the insured property, its equipment, components or accessories, or to tires, unless the damage is caused by fire, malicious mischief, vandalism or theft or unless the loss or damage is the direct result of other **physical damage**, including **ingestion**, covered by the Policy. Damage resulting from the breakdown, failure or malfunction of an engine component, accessory or part is considered mechanical breakdown of the entire engine;

J.  claims or damage resulting from:

   1.  war, whether declared or undeclared, invasion, acts of foreign enemies, hostilities, civil war, rebellion, revolution, insurrection, martial law, military or usurped power or attempts at usurpation of power;

   2.  confiscation, nationalization, seizure, restraint, detention, appropriation, requisition for title, used by or under the order of any government, public or local authority, whether civil, military or *de facto*;

   3.  claims arising while the insured property is outside the control of the **insured** because of any of the above perils;

K.  to an **aircraft**'s turbine engine (including a turbine powered auxiliary power unit) caused by heat resulting from starting, attempted starting, operation or shutdown thereof;

L.  caused by any type of radioactive contamination;

M.  caused by the embezzlement, secretion or conversion of the insured property; or

N.  due to depreciation in the value of, or arising from the loss of use of the insured property.

0077
0077

## Section Eight - Limit of the Company's Liability

A. Other Insurance

Except with respect to coverage provided by the Policy as **excess insurance**, if there is other insurance including any formal self-insurance program or self-insured retention plan, in the **insured**'s name or otherwise, against any loss, liability, or expense covered by the Policy, the Company will not be liable under the Policy for a greater proportion of such loss, liability or expense than the applicable limit of the Company's liability under the Policy bears to the total applicable limits of all other valid and collectible insurance.

B. Total Liability for Section One - Liability Coverage

The limits apply separately to each insured **aircraft** and each **insured** but, regardless of the number of **insured**s under the Policy, persons or organizations who sustain **bodily injury**, **personal injury** or **property damage**, claims made, or suits brought because of **bodily injury**, **personal injury** or **property damage**, the Company's total liability for all damages, including damages for care and loss of services, as the result of any one **occurrence** will not exceed the limit of liability stated in the Declarations as applicable to "each **occurrence**", and in the annual aggregate if specified. For the purpose of determining the limit of the Company's total liability, all **bodily injury**, **personal injury** and **property damage** arising out of continuous or repeated exposure to the same general conditions will be considered arising out of one **occurrence**.

C. Total Liability for Section Three - **Physical Damage** Coverage

1. In the event of a **total loss**, the Company will promptly pay the **named insured**:

    a. the Insured Value of the **scheduled aircraft** as shown under Coverage 19 of the Declarations;

    b. the **named insured**'s financial interest in any **spare engine** or **spare part** (less any applicable deductible) but, not exceeding its actual cash value or the limits for the applicable coverage in the Declarations, whichever is less. In addition, the Company will promptly refund the pro-rated unearned premium for any **scheduled aircraft** that is a **total loss**. At the time of payment of a **total loss** by the Company, the Company's exposure, under Coverage 19, ceases.

2. In the event of a **partial loss**, the Company's Liability shall not exceed:

    a. the total of the following items, less any applicable deductible, if the repairs are made by an **insured**:

        i. the **insured**'s net costs for necessary material and parts of like kind and quality;

        ii. "Transportation Costs" (as defined below);

        iii. the reasonable costs of food, lodging, and transportation of the **insured**'s employees required for the actual period of repair if the loss occurs away from the **insured**'s base of operations and

        iv. actual wages paid for labor at the current straight time rates at the place of repair plus the reasonable cost of required supervision and overhead;

0078
0078

b.   the total of the following items, less any applicable deductible, if the repairs are made by other than the **insured**:

    i.   the net cost to the **insured**, to make repairs with material and parts of like kind and quality;

    ii.   the reasonable transportation, food and lodging expenses for a necessary representative(s) of the **insured** to inspect or authorize repairs and/or test fly the **aircraft** but not exceeding 5% of the repair cost estimate or $5,000., whichever is less. This paragraph will not apply unless the **aircraft** is being repaired away from its primary base of operations;

    iii.   any additional "Transportation Costs" incurred.

"Transportation Costs" means the cost of transportation, by the least expensive reasonable means of:

    A.   damaged parts from the site of the loss to and from the most practicable place for repair;

    B.   replacement parts from the nearest available source to the site of the loss; or

    C.   the damaged property to the most practicable place for repair and, then, to the site of the loss or to the **insured**'s home airport, whichever is closer.

3.   In no event will the Company's liability for a **partial loss** exceed the insured value of the **scheduled aircraft**; or with respect to Coverage 20, the **named insured**'s financial interest in any **spare engine** or **spare part**, its actual cash value, or the applicable limit of liability shown under Coverage 20 in the Declarations, whichever is less.

4.   In the event of a **partial loss**, whether or not such loss is covered by the Policy, the Insured Value of the **scheduled aircraft** will automatically be reduced at the time of the loss by the amount of the loss. When repairs begin, the insured value will automatically increase by the value of the completed repairs until the insured value of the **scheduled aircraft** is fully restored.

5.   If the Company pays a claim, whether for a **partial loss** or a **total loss**, the Company is entitled to all salvage. There will, however, be no abandonment of the salvage to the Company without its prior consent.

6.   The Company has the right to return stolen property any time before the loss is paid with payment for any resultant **physical damage**.

7.   The amount specified as a deductible (if any) for **scheduled aircraft** does not apply to a **total loss**, constructive **total loss** or any loss caused by fire, lightning, explosion, transportation of parts, theft, robbery or pilferage. However, any **partial loss** caused by fire or explosion, resulting directly or indirectly from the collision or crash of an **aircraft** while **in-motion**, will be subject to the **in-motion** deductible, if any. **Scheduled aircraft** deductibles will not apply in the event of a collision with any other **aircraft** insured through the Company under another policy.

D.   Total Liability for Section Four -  Additional Coverage

The total liability of the Company for all costs or expenses incurred by or on behalf of the **named insured** will not exceed the Limit of Liability stated in the Declarations that applies to each applicable coverage

E.   Severability of Interests

The limits and coverage apply separately to each **insured**, but the inclusion within the Policy of more than one **insured** will not increase the applicable limits of the Company's total liability.

F.   Two or More **Aircraft** Insured by the Policy

In the event that two or more **aircraft** are insured by the Policy, the applicable limits of liability and deductibles (if any) will apply separately to each.

## Section Nine - Notice of Claims and Other Duties of an **Insured**

In the event of any accident, **occurrence**, claim, suit or loss, the **insured**(s) and/or the **insured**'s legal representative(s) agree to:

A.   not assume any obligation or liability, nor offer to pay any reward except at the **insured**'s expense, nor incur any expense other than those items listed in Section Two - Defense, Settlement and Supplementary Payments of the Policy;

B.   promptly contact the Company and follow up with prompt written notice including (if known) the:

1.   time, place and description of events;

2.   names and locations of **passenger**s, witnesses, injured or deceased persons, and

3.   location and description of any damaged property and/or **aircraft**;

C.   immediately forward to the Company every demand, notice, summons, legal paper, or any other process they receive;

D.   cooperate and assist the Company in all matters of any claim or suit;

E.   do nothing after the accident or loss to harm the Company's right of recovery against any person or organization who may be liable to the **insured**;

F.   authorize the Company to obtain any records relating to a loss;

G.   not abandon the **aircraft** or any other salvage without the Company's prior consent;

H.   take all reasonable precautions to protect the **aircraft** or other insured property after any accident or loss. Reasonable expenses incurred in providing such protection will be reimbursed by the Company. Any further loss or damage due to the **insured**'s failure to reasonably protect the insured property will not be covered by the Policy;

0080
0080

I.   promptly report any suspected theft or vandalism to the local police;

J.   allow the Company the option to inspect any **aircraft** or insured property before any repairs begin or its disposal;

K.   file with the Company within ninety (90) days after the loss a sworn proof of loss including the information and in the form the Company reasonably requires and, upon the Company's request, submit to examination under oath;

L.   exhibit the damaged property and produce for the Company's examination all pertinent records and invoices, permitting copies to be made, at reasonable times and places as the Company designates;

M.   if requested, provide clear title to the Company for any salvaged property at the time **total loss** payment is made by the Company;

N.   allow the Company to inspect **aircraft** records, repair and service invoices, sales receipts, and log books as may be required in the settlement of any claim.

## Section Ten - Other Conditions of Insurance

A.   Appraisal of Loss

If the **named insured** and the Company fail to agree on the amount of a loss, either may, within sixty (60) days after a proof of loss is filed, demand an appraisal of the loss. The **named insured** and the Company will each select a competent aircraft appraiser and the appraisers will select a competent and disinterested umpire. The appraisers will judge the amount of the loss. If they do not agree, they will submit their difference to the umpire. Agreement in writing of any two of the three will determine the amount of the loss. The **named insured** and the Company will each pay their chosen appraiser and will bear equally the expenses of the appraisal and the umpire. The Company will not be held to have waived any of its rights by any act relating to appraisal.

B.   Action Against the Company

No action will be taken against the Company unless, prior to such action, the **insured** has fully complied with all of the terms and conditions of the Policy and the amount of loss has been determined as set forth below:

1.   Liability Coverages - With respect to Section One - Liability Coverage, no action will lie against the Company until the amount of the **insured**'s obligation to pay has been finally determined either by judgment against the **insured** after actual trial or, by written agreement of the **insured**, the claimant and the Company. Any person, organization or their legal representative who has secured such judgment or written agreement will be entitled to recover under the Policy to the extent of the coverage provided by the Policy.  No person or organization shall have any right under the Policy to join the Company as a party to any action against the **insured** to determine the **insured**'s liability, nor will the Company be impleaded by the **insured** or its legal representative. Bankruptcy or insolvency of the **insured** or of the **insured**'s estate will not relieve the Company of any of its obligations under the Policy.

0081
0081

2. **Physical Damage** Coverages - With respect to Section Three - **Physical Damage** Coverage, no action will lie against the Company, nor will payment for loss be required, until thirty (30) days after the required proof of loss is filed with the Company and the amount of loss is determined as described in Section Three - **Physical Damage** Coverage of the Policy. Any action against the Company must be taken within one year after the date of the loss.

3. Additional Coverages - With respect to Section Four - Additional Coverages, no action will lie against the Company, nor will payment for loss be required, until thirty (30) days after any required proofs of claims have been filed with the Company. Any action against the Company must be taken within one year after the date of the loss.

C. Cancellation and Non-Renewal of the Policy

1. Cancellation - The Policy may be cancelled by the **named insured** by mailing prior written notice to the Company stating when the cancellation will be effective. The Policy may be cancelled by the Company by mailing to the first **named insured** at the first address shown under Item 2. of the Declarations stating when, not less than ninety (90) days thereafter, the cancellation will be effective. However, only ten (10) days prior written notice will be provided if the cancellation is for non-payment of any premium due. The effective date and hour of cancellation stated in the notice will become the end of the policy period.

   If the **named insured** cancels the Policy, earned premium will be computed in accordance with the customary short rate table and procedure. If the Company cancels, earned premium will be computed on a pro-rata basis. Premium adjustment may be made either at the time cancellation is effective or as soon as practicable after cancellation becomes effective, but payment or tender of unearned premium by the Company is not a condition required for the cancellation to be effective.

2. Non-Renewal - The Company will mail written notice to the first **named insured** at least sixty (60) days prior to the expiration date of the Policy in the event either decides not to renew the Policy.

   The proof of mailing or delivering notice of non-renewal or cancellation to the first **named insured** by the Company will be sufficient proof of notice to all **insured**s.

D. Certificates of Insurance

   A Certificate of Insurance issued by the Company for or on behalf of the **named insured**, including any certificates required by military or governmental authorities, automatically provides the insurance as is evidenced in that certificate.

E. Changing the Policy

   Nothing in the Policy can be changed or waived except by the Company's written endorsement, approved and signed by the Company.

F. Company's Rights of Recovery

   In the event of any payment made under the Policy, the Company will assume all of the **insured**'s rights of recovery against any person or organization. The **insured** will execute and deliver instruments and papers and do whatever else is necessary to enforce those rights.

0082
0082

G. Cross Liability

The Policy will cover claims by one **insured** against another **insured**. However, in no event will this provision increase or change the limits of the Company's liability nor will it change any of the Declarations, Insuring Agreements, Exclusions, Conditions, Limits of Liability or other terms of the Policy.

H. Financial Responsibility Laws

(applicable to Section One - Liability Coverages)

When the Policy is certified as proof of financial responsibility under the provisions of any **aircraft** financial responsibility law, the insurance afforded by the Policy for **bodily injury** or **property damage** will comply as necessary with the provisions of the law but, in no event in excess of the limits of liability stated in the Declarations of the Policy. The **named insured** agrees to reimburse the Company for any payment made which the Company would not have been obligated to make under the terms of the Policy except for the agreement in this paragraph.

I. Inspection

The Company, or their authorized representative, shall be permitted to inspect the insured property and any of its records during the policy period and for one year afterward.

J. Mexican Operations Warning

Although the Policy provides coverage in Mexico, the Mexican Government requires proof of **aircraft** liability written through a Mexican insurance company. If the **insured** does not have proof of Mexican liability insurance, the **aircraft** can be confiscated by the Mexican authorities and any **passenger**s jailed or detained.

It is a good practice to contact the **insured**'s agent or broker to arrange coverage if any flights are planned into or near Mexican Airspace. Mexican liability coverage is available through the Company if needed.

K. Policy Compliance with State Law

If the terms of the Policy conflict with the **named insured**'s state or province law, the Policy terms are deemed amended as necessary to comply with that law.

L. Policy Territory

The insurance provided by the policy shall be effective worldwide.

Payment of loss under the policy shall only be made in full compliance with all United States of America economic or trade sanction laws or regulations, including, but not limited to, sanctions, laws and regulations administered and enforced by the U.S. Treasury Department's Office of Foreign Assets Control ("OFAC").

0083
0083

M.  Transfer of the Policy to Others

Interest in the Policy may not be transferred without prior written agreement from the Company. If the **named insured** dies or is judged legally bankrupt or insolvent and the **named insured** or their legal representative notifies the Company within sixty (60) days of the judgment or death, effective the date of the judgment or death, the **named insured** will become:

1.  any person or organization having custody of the **scheduled aircraft** until a legal agent is appointed; or,

2.  the **named insured**'s legal representative.

N.  Acceptance of Policy

By acceptance of the Policy, the **named insured** agrees that the statements in the Declarations are its representations, that the Policy is issued in reliance upon the truth of the representations and that the Policy embodies all agreements by and between the **named insured** and the Company or any of its agents.

In Witness Whereof, the company issuing this policy has caused this policy to be signed by its authorized officers, but this policy shall not be valid unless also signed by a duly authorized representative of the company.

Charles Dangelo - President          Nehemiah E. Ginsburg - General Counsel

**STARR INDEMNITY & LIABILITY COMPANY**

0084
0084

## ADDITIONAL INSURED ENDORSEMENT

This policy is amended as follows:

The provisions of this endorsement shall apply with respect to:  N227WP

(Only the clause(s) indicated by an "X" shall apply.)

☐   The scheduled persons or organizations are included as additional insured.

☐   The scheduled persons or organizations are the registered owner of _____
and are included as additional insured.

☐   The scheduled persons or organizations are included as additional insured but only as respects liability coverages.

☒   The scheduled persons or organizations are included as additional insured under liability coverages, but only as respects operations of the **named insured**.

☐   The scheduled persons or organizations are included as additional insured but only as respects operations of the **named insured**.

The insurance extended by this endorsement shall not apply to, and no person or organization named in the schedule shall be insured for **bodily injury** or **property damage** which arises from the design, manufacture, modification, repair, sale, or servicing of aircraft by that person or organization.

Schedule:

Name    SIGNATURE FLIGHT SUPPORT CORPORATION*
Address  515 MARXMILLER PLACE
         SANTA BARBARA, CA  93117

Name
Address

Name
Address

All other provisions of this policy remain the same.

This endorsement becomes effective _____ JANUARY 26, 2017 _____ to be attached to and hereby made a part of:
Policy No.  1000320046-01
Issued to  PASSPORT 420, LLC

By STARR INDEMNITY & LIABILITY COMPANY

Endorsement No.    1

Date of Issue    JANUARY 27, 2017  (BM)                By __ _____
                                                          (Authorized Representative)

Starr 10284 (3/06)

0085
0085

## KNOWLEDGE OF OCCURRENCE

This policy is amended as follows:

KNOWLEDGE OF **OCCURRENCE**

It is agreed that knowledge of an **occurrence** by an agent, servant or employee of the **Insured** will not in itself constitute knowledge by the **Insured** unless such notice has been received by the **Insured**'s Insurance Administrator.

**INSURED**'S INADVERTENT FAILURE TO REPORT

Notwithstanding any other provision(s) of this policy, inadvertent errors or omissions and/or failure in furnishing information, notification or reports required will not prejudice the coverage afforded by this policy provided the **Insured** notifies the Company within a reasonable time after the error or omission is discovered.

**INSURED**'S FAILURE TO NOTIFY

The **Insured**'s rights under this policy will not be affected if it fails to give notice of an accident or **occurrence** solely because it reasonably believed that the accident or **occurrence** was not covered under this policy.

All other provisions of this policy remain the same.

This endorsement becomes effective   JANUARY 26, 2017   to be attached to and hereby made a part of:
Policy No.   1000320046-01
Issued to   PASSPORT 420, LLC

By STARR INDEMNITY & LIABILITY COMPANY

Endorsement No.   2

Date of Issue   JANUARY 27, 2017  (BM)                 By _____
                                                            (Authorized Representative)

Starr 10351 (5/06)

0086
0086

## LOSS PAYEE ENDORSEMENT

In consideration of additional premium of $ _____ INCLUDED _____ , this policy is amended as follows:

Any loss under **physical damage** coverage is payable as interest may appear to the **named insured** and the following Loss Payee:

As respects   N227WP

SIGNATURE FLIGHT SUPPORT CORPORATION*
515 MARXMILLER PLACE
SANTA BARBARA, CA  93117

All other provisions of this policy remain the same.

This endorsement becomes effective _____ JANUARY 26, 2017 _____ to be attached to and hereby made a part of:
Policy No. _____ 1000320046-01 _____
Issued to  PASSPORT 420, LLC

By STARR INDEMNITY & LIABILITY COMPANY

Endorsement No. _____ 3 _____

Date of Issue _____ JANUARY 27, 2017  (BM) _____          By _____
                                                              (Authorized Representative)

Starr 10234 (3/06)

0087
0087

## PILOT WARRANTY ENDORSEMENT

This policy is COMPLETED     as follows with respect to Item **4**. Pilots as set forth on the Declarations Page:

WITH RESPECT TO N227WP:

BILL PARRISH\*, CHRIS OHMAN, OR;

ANY PILOT WHO HOLDS A COMMERCIAL PILOT CERTIFICATE OR BETTER WITH MULTI-ENGINE AND INSTRUMENT RATINGS, IS TYPE RATED IN THE MAKE AND MODEL AIRCRAFT OPERATED AND HAS A MINIMUM OF THE FOLLOWING HOURS OF FLIGHT AS RECORDED IN HIS/HER LOGBOOK.  IT IS FURTHER REQUIRED THAT SUCH PILOT(S) MUST HAVE SUCCESSFULLY COMPLETED A MOTION BASED SIMULATOR TRAINING COURSE SPECIFICALLY DESIGNED FOR THE MAKE AND MODEL AIRCRAFT OPERATED WITHIN THE PRECEDING 12 MONTHS OF POLICY INCEPTION AND ANNUALLY THEREAFTER.

5,000 TOTAL LOGGED FLYING HOURS
2,500 HOURS IN MULTI-ENGINE AIRCRAFT
500 HOURS IN TURBOPROP OR TURBOFAN POWERED AIRCRAFT
350 HOURS IN THE MAKE MODEL AIRCRAFT OPERATED

\*BILL PARRISH IS APPROVED TO CONDUCT SINGLE PILOT OPERATIONS AFTER OBTAINING 25 DUAL HOURS IN THE MAKE AND MODEL AIRCRAFT WITH CHRIS OHMAN OR A PILOT MEETING THE ABOVE OPEN PILOT WARRANTY.

The pilot warranty set forth above shall not apply to Liability Coverage for **Non-Owned Aircraft**, **Temporary Substitute Aircraft** and Charter Referral.  Additionally, the pilot warranty in set forth above shall not apply while the insured **aircraft** is under the care, custody or control of a repair station for the purpose of maintenance, repair or test flights.

All other provisions of this policy remain the same.

This endorsement becomes effective _____ JANUARY 26, 2017 _____ to be attached to and hereby made a part of:
Policy No. _____ 1000320046-01 _____
Issued to  PASSPORT 420, LLC

By STARR INDEMNITY & LIABILITY COMPANY

Endorsement No. _____ 4 _____

Date of Issue _____ JANUARY 27, 2017  (BM) _____          By _____
                                                                    (Authorized Representative)

Starr 10317 (6/06)

0088
0088

## PRIMARY AND NON-CONTRIBUTORY ENDORSEMENT

This policy is amended as follows:

With the respect to the following scheduled persons or organizations, all coverages shall be primary and non-contributory with respect to any other insurance policies held by the following scheduled persons or organizations.

Schedule:

SIGNATURE FLIGHT SUPPORT CORPORATION, ITS PARENT, SUBSIDIARY, RELATED AND AFFILIATED COMPANIES AND THE AUTHORITY
515 MARXMILLER PLACE
SANTA BARBARA, CA 93117

All other provisions of this policy remain the same.

This endorsement becomes effective _____ JANUARY 26, 2017 _____ to be attached to and hereby made a part of:
Policy No. _____ 1000320046-01 _____
Issued to _ PASSPORT 420, LLC _____

By STARR INDEMNITY & LIABILITY COMPANY _____

Endorsement No. _____ 5 _____

Date of Issue _ JANUARY 27, 2017  (BM) _____     By _____
                                                              (Authorized Representative)

Starr 10466 (6/07)

## WAIVER OF SUBROGATION - PHYSICAL DAMAGE

In consideration of additional premium of $ ___INCLUDED___ , this policy is amended as follows:

We hereby waive our right of subrogation against the following as respects loss arising under **physical damage** coverage as set forth under this policy; provided, however, that this waiver shall not prejudice our right of recourse for damages arising from the design, manufacture, modification, repair, sale or servicing of the **aircraft** by the following:

SIGNATURE FLIGHT SUPPORT CORPORATION*
515 MARXMILLER PLACE
SANTA BARBARA, CA  93117

All other provisions of this policy remain the same.

This endorsement becomes effective ___JANUARY 26, 2017___ to be attached to and hereby made a part of:
Policy No. ___1000320046-01___
Issued to  PASSPORT 420, LLC

By  STARR INDEMNITY & LIABILITY COMPANY

Endorsement No. ___6___

Date of Issue ___JANUARY 27, 2017  (BM)___        By _____
                                                                    (Authorized Representative)

Starr 10332 (5/06)

0090
0090

## WAR, HI-JACKING AND OTHER PERILS EXCLUSION CLAUSE (AVIATION)

This policy is amended as follows:

In the event any of the provisions of this endorsement are in conflict with any provisions, exclusions, conditions or terms forming part of this policy, this endorsement shall take precedence.

This policy does not cover claims caused by:

(a)   War, invasion, acts of foreign enemies, hostilities (whether war be declared or not), civil war, rebellion, revolution, insurrection, martial law, military or usurped power or attempts at usurpation of power;

(b)   Any hostile detonation of any weapon of war employing atomic or nuclear fission and/or fusion or other like reaction or radioactive force or matter;

(c)   Strikes, riots, civil commotions or labor disturbances;

(d)   Any act of one or more persons, whether or not agents of a sovereign power, for political or terrorist purposes and whether the loss or damage resulting therefrom is accidental or intentional;

(e)   Any malicious act or act of sabotage;

(f)   Confiscation, nationalization, seizure, restraint, detention, appropriation, requisition for title or use by or under the order of any Government (whether civil, military or de facto) or public or local authority;

(g)   Hi-jacking or any unlawful seizure or wrongful exercise of control of the aircraft or crew in flight (including any attempt at such seizure or control) made by any person or persons on board the aircraft acting without the consent of the Insured.

Furthermore, this policy does not cover claims arising whilst the aircraft is outside the control of the Insured by reason of any of the above perils.

The aircraft shall be deemed to have been restored to the control of the Insured on the safe return of the aircraft to the Insured at an airfield not excluded by the geographical limits of this policy, and entirely suitable for the operation of the aircraft (such safe return shall require that the aircraft be parked with engines shut down and under no duress).

All other provisions of this policy remain the same.

This endorsement becomes effective ___JANUARY 26, 2017___ to be attached to and hereby made a part of:
Policy No. ___1000320046-01___
Issued to ___PASSPORT 420, LLC___

By STARR INDEMNITY & LIABILITY COMPANY

Endorsement No. ___7___

Date of Issue ___JANUARY 27, 2017  (BM)___          By _____
                                                        (Authorized Representative)

AVN48B (2/06)

## EXTENDED COVERAGE ENDORSEMENT  (AVIATION LIABILITIES) - CALIFORNIA

In consideration of an additional premium of $ _____INCLUDED_____ , this policy is amended as follows:

The policy of which this Endorsement forms part includes War, Hi-jacking and Other Perils Exclusion Clause AVN48B:

1.  With effect from ___JANUARY 26, 2017___ , all sub-paragraphs other than __(b)__ of  War, Hi-jacking and Other Perils Exclusion Clause AVN48B are deleted SUBJECT TO all terms and conditions of this Endorsement.

2.  EXCLUSION applicable only to any coverage extended in respect of the deletion of sub-paragraph (a) of War, Hi-jacking and Other Perils Exclusion Clause AVN48B:

    Coverage shall not include liability for damage to any form of property on the ground situated outside Canada and the United States of America unless caused by or arising out of the use of aircraft.

3.  LIMITATION OF LIABILITY

    The limit of the Company's liability in respect of the coverage provided by this Endorsement shall be US$ ___50,000,000.___ or the applicable policy limit, whichever the lesser, any one occurrence and in the annual aggregate (the "sub-limit").  This sub-limit shall apply within the full policy limit and not in addition thereto.

    To the extent coverage is afforded to an Insured under the policy, this sub-limit shall not apply to such Insured's liability:

    (a)  to the passengers (and for their baggage and personal effects) of any aircraft operator to whom the policy affords cover for liability to its passengers arising out of its operation of aircraft;

    (b)  for cargo and mail while it is on board the aircraft of any aircraft operator to whom the policy affords cover for liability for such cargo and mail arising out of its operations of aircraft.

    Notwithstanding any other liability for which coverage is afforded under this policy, coverage provided under this Endorsement shall apply solely to the following:

    > SECTION ONE - LIABILITY COVERAGES.
    > SECTION FOUR - ADDITIONAL COVERAGES UNDER COVERAGE 25: SEARCH AND RESCUE EXPENSES, COVERAGE 26:  RUNWAY FOAMING AND CRASH CONTROL EXPENSES AND COVERAGE 27:  TRIP INTERRUPTION EXPENSE COVERAGE.
    > SECTION FIVE - **MEDICAL EXPENSES**.

4.  AUTOMATIC TERMINATION

    To the extent provided below, coverage extended by this Endorsement shall TERMINATE AUTOMATICALLY in the following circumstances:

    (i)   All coverage

          - upon the outbreak of war (whether there be a declaration of war or not) between any two or more of the following countries:  France, the People's Republic of China, the Russian Federation, the United Kingdom, the United States of America;

AVN52ECA (12/06)       Page 1 of Endorsement No. ___8___

(ii)   Any coverage extended in respect of the deletion of sub-paragraph (a) of  War, Hi-jacking and Other Perils Exclusion Clause AVN48B

- upon the hostile detonation of any weapon of war employing atomic or nuclear fission and/or fusion or other like reaction or radioactive force or matter wheresoever or whensoever such detonation may occur and whether or not the insured aircraft may be involved;

(iii)   All coverage in respect of any of the insured aircraft requisitioned for either title or use

- upon such requisition.

PROVIDED THAT if an insured aircraft is in the air when (i), (ii) or (iii) occurs, then the coverage provided by this Endorsement (unless otherwise cancelled, terminated or suspended) shall continue in respect of such an aircraft until completion of its first landing thereafter and any passengers have disembarked.

5.   REVIEW AND CANCELLATION

(a)   Review of Premium and/or Geographical Limits (7 Days)

The Company may give notice to review premium and/or geographical limits - such notice to become effective on the expiry of seven days from 23.59 hours G.M.T. on the day on which notice is given.

(b)   Limited Cancellation (48 hours)

Following a hostile detonation as specified in paragraph 4. (ii) above, the Company may give notice of cancellation of one or more parts of the coverage provided by paragraph 1. of this Endorsement by reference to sub-paragraphs (c), (d), (e), (f) and/or (g) of  War, Hi-jacking and Other Perils Exclusion Clause AVN48B - such notice to become effective on the expiry of forty-eight hours from 23.59 hours G.M.T. on the day on which notice is given.

(c)   Cancellation (7 Days)

The coverage provided by this Endorsement may be cancelled by either the Company or the Insured by giving notice to become effective on the expiry of seven days from 23.59 hours G.M.T. on the day on which such notice is given.

(d)   Notices

All notices referred to herein shall be in writing.

All other provisions of this policy remain the same.

This endorsement becomes effective _____JANUARY 26, 2017_____ to be attached to and hereby made a part of:

Policy No. ____1000320046-01____

Issued to ____PASSPORT 420, LLC____

By __STARR INDEMNITY & LIABILITY COMPANY__

Endorsement No. _____8_____

Date of Issue ____JANUARY 27, 2017  (BM)____          By _____

                                                                                                 (Authorized Representative)

AVN52ECA   (12/06)                    Page 2

## EXTENDED COVERAGE ENDORSEMENT

## WAR RISK FOR PHYSICAL DAMAGE COVERAGE, EXTORTION, AND HI-JACKING EXTRA EXPENSE COVERAGE

In consideration of $ _____INCLUDED_____ additional premium, this policy is amended as follows:

This coverage is subject to all the terms and conditions shown both in this policy as well as this endorsement. It does not change any coverage or terms except as specifically stated below. The **insured** is responsible for using all reasonable efforts to ensure that all required permits for **aircraft** operations as well as all state and local laws are complied within the country of operation or the country where a loss or expense is incurred.

### SECTION ONE

### WAR RISK COVERAGE FOR AIRCRAFT PHYSICAL DAMAGE

The Company will pay for the physical loss of or **physical damage** to any **scheduled aircraft** (unless excluded by Exclusion (G) below) that is caused by an **occurrence** during the policy period arising out of any of the following perils:

(a) war, whether declared or undeclared, invasion, acts of foreign enemies, hostilities, civil war, rebellion, revolution, insurrection, martial law, military or usurped power or any attempt of usurpation of power;

(b) any strikes, riots, civil commotions or labor disturbances;

(c) any act of one or more persons, whether or not agents of a sovereign power, for political or terrorist purposes and whether the loss or damage resulting therefrom is accidental or intentional;

(d) any malicious act or act of sabotage;

(e) confiscation, nationalization, seizure, restraint, detention, appropriation, requisition for title, use by, or under the order of any government, public or local authority, whether civil, military or de facto;

(f) hi-jacking or any unlawful seizure or wrongful exercise of control of a **scheduled aircraft** or crew **in-flight** (including any attempt at such seizure or control) made by any person or persons on board the **scheduled aircraft** acting without the consent of the **insured**.

This section also covers the physical loss of or **physical damage** to a **scheduled aircraft** while that **scheduled aircraft** is outside the control of the **insured** because of any of the above perils. The **aircraft** will be covered until its safe return to the **insured**.

The **scheduled aircraft** shall be deemed to have been restored to the control of the **insured** on the safe return of the **scheduled aircraft** to the **insured** at an airfield not excluded by the geographical limits of this endorsement and entirely suitable for the operation of the **aircraft** (such safe return shall require that the **aircraft** be parked with engines shut down and under no duress).

### SECTION TWO

### "EXTORTION, HI-JACKING, AND CONFISCATION EXPENSE COVERAGE"

#### Extortion, Expense Coverage

Subject to the limits described below, the Company will reimburse the **named insured** for ninety percent (90%) of any payment properly made for threats made during the policy period against any **scheduled aircraft** covered by this endorsement.

Starr 10318 (5/06)        Page 1 of Endorsement No. __9__

0094
0094

**Hi-jacking and Confiscation Expense Coverage**

Subject to the limits described below, the Company will reimburse the **named insured** for ninety percent (90%) of any required extra expenses incurred following any type of confiscation or hi-jacking that takes place during the policy period as described in paragraphs (e) and (f) of SECTION ONE of this endorsement.

**Limits of the Company's Liability for Section Two Coverages**

The most that the Company will reimburse the **named insured** for any one **occurrence** is an amount equal to ninety percent (90%) of the net cost to the **named insured** of any payment(s) made but not exceeding:

(A)   ninety percent (90%) of the Insured Value of the **scheduled aircraft** involved, or

(B)   $1,000,000.00,

whichever is less.

The **insured** warrants that the remaining ten percent (10%) of any payment made is not insured elsewhere.

For the purpose of this coverage, any series of related events, losses or expenses connected to any hi-jacking, extortion, or confiscation will be considered one **occurrence**.

**Exclusions Applicable to All Coverages Provided by this Endorsement**

This endorsement will not cover any loss, damage or expense arising out of:

(A)   war, whether declared or undeclared between any of the following countries:  The United Kingdom, The United States of America, France, The Russian Federation, or The Peoples Republic of China.  If any **scheduled aircraft** covered by this endorsement is in the air when an outbreak of war occurs, this exclusion will not apply until that **scheduled aircraft** completes its first landing;

(B)   detonation, whether hostile or otherwise, of any weapon of war employing atomic or nuclear fission and/or fusion or any other similar reaction;

(C)   any loss or damage caused by radioactive force or matter;

(D)   any failure to provide any type of bond, security or any other financial cause whether or not required under a court order;

(E)   the repossession or any attempt at repossession by any person or organization having any legal title or lien on the **scheduled aircraft** or any other type of legal contractual relationship with the **insured;**

(F)   any type of delay, loss of use or any other type of consequential loss whether or not the **scheduled aircraft** is lost or damaged except as specifically provided under the SECTION TWO coverages of this endorsement;

(G)   any **occurrence** involving the following **scheduled aircraft** (if any) which the **named insured** has elected not to cover by this endorsement:

| Year | Make and Model | Registration No. | Year | Make and Model | Registration No. |
|------|----------------|------------------|------|----------------|------------------|
|      |                |                  |      |                |                  |

0095
0095

**AUTOMATIC TERMINATION OF COVERAGE, CANCELLATION, AND AMENDMENT OF TERMS**

**Cancellation or Amendment of Terms by Notice**

The applicable sections of Item C. 1. Cancellation, of Section Ten - Other Conditions of Insurance, of this policy are changed to read:

The coverage provided by this endorsement can be cancelled, non-renewed or the rate of premium or geographical limits changed by the Company with the mailing or delivering of seven (7) days prior written notice to the first **named insured** at the first address shown in Item 2. of the Declarations. The proof of delivery or mailing to the first **named insured** will be sufficient proof of notice to all **named insureds**.

**Automatic Termination of Coverage**

All coverages provided by this endorsement will automatically terminate without any prior notice to the **named insured** if any of the following events occur:

1.  Any hostile detonation, of any weapon of war employing atomic or nuclear fission and/or fusion or radioactive force or matter, whenever the detonation occurs whether or not a **scheduled aircraft** covered by this endorsement is involved.

2.  War, whether declared or undeclared, between any of the following countries:  The United Kingdom, The United States of America, France, The Russian Federation, or the Peoples Republic of China.  If any **scheduled aircraft** covered by this endorsement is in the air when an outbreak of war occurs, coverage for that **scheduled aircraft** will only apply until that **aircraft** completes its first landing.

| |
|---|
| COVERAGE AS PROVIDED UNDER THIS ENDORSEMENT SHALL EXCLUDE ALL REQUIREMENTS OF THE TERRORISM RISK INSURANCE ACT OF 2002. |

All other provisions of this policy remain the same.

This endorsement becomes effective ____JANUARY 26, 2017____ to be attached to and hereby made a part of:

Policy No. ____1000320046-01____

Issued to ____PASSPORT 420, LLC____

By ____STARR INDEMNITY & LIABILITY COMPANY____

Endorsement No. ____9____

Date of Issue ____JANUARY 27, 2017  (BM)____      By _____

(Authorized Representative)

Starr 10318 (5/06)          Page 3

0096
0096

## NOISE AND POLLUTION AND OTHER PERILS EXCLUSION CLAUSE

This policy is amended as follows:

In the event any of the provisions of this endorsement are in conflict with any provisions, exclusions, conditions or terms forming part of this policy, this endorsement shall take precedence.

1.  This policy does not cover claims directly or indirectly occasioned by, happening through or in consequence of:

    (a)  noise (whether audible to the human ear or not), vibration, sonic boom and any phenomena associated therewith,

    (b)  pollution and contamination of any kind whatsoever,

    (c)  electrical and electromagnetic interference,

    (d)  interference with the use of property;

    unless caused by or resulting in a crash, fire, explosion or collision or a recorded in-flight emergency causing abnormal aircraft operation.

2.  With respect to any provision in the policy concerning any duty of the Company to investigate or defend claims, such provision shall not apply and the Company shall not be required to defend:

    (a)  claims excluded by paragraph 1., or

    (b)  a claim or claims covered by the policy when combined with any claims excluded by paragraph 1. (referred to below as "Combined Claims").

3.  In respect of any Combined Claims, the Company shall (subject to proof of loss and the limits of the policy) reimburse the Insured for that portion of the following items which may be allocated to the claims covered by the policy:

    (a)  damages awarded against the Insured and

    (b)  defense fees and expenses incurred by the Insured.

4.  Nothing herein shall override any radioactive contamination or other exclusion clause attached to or forming part of this policy.

All other provisions of this policy remain the same.

This endorsement becomes effective_____JANUARY 26, 2017_____ to be attached to and hereby made a part of:
Policy No.____1000320046-01____
Issued to__PASSPORT 420, LLC__

By STARR INDEMNITY & LIABILITY COMPANY

Endorsement No.____10____

Date of Issue__JANUARY 27, 2017  (BM)__          By _____
                                                                     (Authorized Representative)

AVN46B (2/06)

0097
0097

## NUCLEAR RISKS EXCLUSION CLAUSE

This policy is amended as follows:

In the event any of the provisions of this endorsement are in conflict with any provisions, exclusions, conditions or terms forming part of this policy, this endorsement shall take precedence.

1.  This policy does not cover:

    (i)   loss or destruction of or damage to any property whatsoever or any loss or expense whatsoever resulting or arising therefrom or any consequential loss

    (ii)  any legal liability of whatsoever nature

    directly or indirectly caused by or contributed to by or arising from:

    (a)   the radioactive, toxic, explosive or other hazardous properties of any explosive nuclear assembly or nuclear component thereof;

    (b)   the radioactive properties of, or a combination of radioactive properties with toxic, explosive or other hazardous properties of, any other radioactive material in the course of carriage as cargo, including storage or handling incidental thereto;

    (c)   ionizing radiations or contamination by radioactivity from, or the toxic, explosive or other hazardous properties of, any other radioactive source whatsoever.

2.  It is understood and agreed that such radioactive material or other radioactive source in paragraph 1. (b) and (c) above shall not include:

    (i)   depleted uranium and natural uranium in any form;

    (ii)  radioisotopes which have reached the final stage of fabrication so as to be usable for any scientific, medical, agricultural, commercial, educational or industrial purpose.

3.  This policy, however, does not cover loss of or destruction of or damage to any property or any consequential loss or any legal liability of whatsoever nature with respect to which:

    (i)   the Insured under this policy is also an insured or an additional insured under any other insurance policy, including any nuclear energy liability policy; or

    (ii)  any person or organization is required to maintain financial protection pursuant to legislation in any country; or

    (iii) the Insured under this policy is, or had this policy not been issued would be, entitled to indemnification from any government or agency thereof.

0098
0098

4.  Loss, destruction, damage, expense or legal liability in respect of the nuclear risks not excluded by reason of paragraph 2. shall (subject to all other terms, conditions, limitations, warranties and exclusions of this policy) be covered, provided that:

(i)  in the case of any claim in respect of radioactive material in the course of carriage as cargo, including storage or handling incidental thereof, such carriage shall in all respects have complied with the full International Civil Aviation Organization "Technical Instructions for the Safe Transport of Dangerous Goods by Air", unless the carriage shall have been subject to any more restrictive legislation, when it shall in all respects have complied with such legislation;

(ii)  this policy shall only apply to an incident happening during the period of this policy and where any claim by the Insured against the Company or by any claimant against the Insured arising out of such incident shall have been made within three years after the date thereof;

(iii)  in the case of any claim for the loss of or destruction of or damage to or loss of use of an aircraft caused by or contributed to by radioactive contamination, the level of such contamination shall have exceeded the maximum permissible level set out in the following scale:

| Emitter<br><br>(IAEA Health and Safety Regulations | Maximum permissible level<br>of non-fixed radioactive<br>surface contamination<br>(Averaged over 300 cm$^2$) |
|---|---|
| Beta, gamma and low toxicity alpha emitters | Not exceeding 4 Becquerels / cm$^2$<br>($10^{-4}$ microcuries / cm$^2$) |
| All other alpha emitters | Not exceeding 0.4 Becquerels / cm$^2$<br>($10^{-5}$ microcuries / cm$^2$) |

(iv)  the cover afforded hereby may be cancelled at any time by the Company giving seven days' notice of cancellation.

All other provisions of this policy remain the same.

This endorsement becomes effective ___JANUARY 26, 2017___ to be attached to and hereby made a part of:

Policy No. ___1000320046-01___

Issued to ___PASSPORT 420, LLC___

By ___STARR INDEMNITY & LIABILITY COMPANY___

Endorsement No. ___11___

Date of Issue ___JANUARY 27, 2017  (BM)___

By _____
(Authorized Representative)

AVN38B (2/06)                    Page 2

0099
0099

## TERRORISM EXCLUSION
### (Terrorism Risk Insurance Act)

This policy is amended as follows:

This policy does not cover claims caused by any losses, damages, or injuries arising directly or indirectly as a result of any certified "Act of Terrorism" defined by Section 102. Definitions of the Terrorism Risk Insurance Act and any revisions or amendments thereto.

Solely with respect to this endorsement and to ensure compliance with the Terrorism Risk Insurance Act, an "Act of Terrorism" shall mean:

(1)  Act of Terrorism:
   (A)  Certification - The term "act of terrorism" means any act that is certified by the Secretary of the Treasury in consultation with the Secretary of Homeland Security, and the Attorney General of the United States:
      (i)   to be an act of terrorism;
      (ii)  to be a violent act or an act that is dangerous to:
         (I)   human life;
         (II)  property; or
         (III) infrastructure;
      (iii) to have resulted in damage within the United States, or outside of the United States in the case of:
         (I)   an air carrier or vessel defined as one principally based in the United States, on which United States income tax is paid, and whose insurance coverage is subject to regulation in the United States; or
         (II)  the premises of a United States mission; and
      (iv)  to have been committed by an individual or individuals as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States Government by coercion.
   (B)  Limitation - No act shall be certified by the Secretary as an act of terrorism if:
      (i)   the act is committed as part of the course of a war declared by the Congress, except that this clause shall not apply with respect to any coverage for workers' compensation; or
      (ii)  property and casualty insurance losses resulting from the act, in the aggregate, do not exceed the Program Trigger.
   (C)  Determinations Final - Any certification of, or determination not to certify, an act of terrorism under this paragraph shall be final, and shall not be subject to judicial review.
   (D)  Timing of certification - Not later than 9 months after the report required under section 107 of the Terrorism Risk Insurance Program Reauthorization Act of 2015 is submitted to the appropriate committees of Congress, the Secretary shall issue final rules governing the certification process, including establishing a timeline for which an act is eligible for certification by the Secretary on whether an act is an act of terrorism under this paragraph.
   (E)  Nondelegation - The Secretary may not delegate or designate to any other officer, employee, or person, any determination under this paragraph of whether, during the effective period of the Program, an act of terrorism has occurred.

THE PROVISIONS OF THIS ENDORSEMENT SHALL APPLY SOLELY TO THE TERRORISM RISK INSURANCE ACT, ITS REVISIONS AND/OR AMENDMENTS AND SHALL IN NO WAY CONFLICT WITH THOSE OF AVN48B AND AMENDMENTS THERETO.

All other provisions of this policy remain the same.

This endorsement becomes effective _____ JANUARY 26, 2017 _____ to be attached to and hereby made a part of:

Policy No. ___ 1000320046-01 ___

Issued to ___ PASSPORT 420, LLC ___

By STARR INDEMNITY & LIABILITY COMPANY

Endorsement No. ___ 12 ___

Date of Issue ___ JANUARY 27, 2017  (BM) ___          By _____

                                                                                    (Authorized Representative)

Starr 10055 (1/15)

0100
0100

## ASBESTOS EXCLUSION ENDORSEMENT

This policy does not cover any claims of any kind whatsoever directly or indirectly relating to, arising out of or in consequence of:

1.  The actual, alleged or threatened exposure to or presence of asbestos in any form whatsoever, including, but not limited to, asbestos fibers or asbestos dust, or any material or product containing, or alleged to contain, asbestos; or

2.  Any obligations, request, demand, order, or statutory or regulatory requirement that any insured or others test for, monitor, clean up, remove, contain, treat, neutralize, protect against or in any other way respond to the actual, alleged or threatened exposure to or presence of asbestos in any form whatsoever, including, but not limited to, asbestos fibers or asbestos dust, or any material or product containing, or alleged to contain, asbestos.

However, the exclusion shall not apply to any claim for asbestos exposure caused by or resulting from a crash, fire, explosion, or collision or a recorded in flight emergency causing abnormal aircraft operations.

Notwithstanding any other provisions of this Policy, Insurers will have no duty to investigate, defend or pay defense costs in respect of any claim excluded in whole or in part under paragraphs 1. or 2. hereof.

All other provisions of this policy remain the same.

This endorsement becomes effective _____JANUARY 26, 2017_____ to be attached to and hereby made a part of:
Policy No. ___1000320046-01___
Issued to  PASSPORT 420, LLC

By STARR INDEMNITY & LIABILITY COMPANY

Endorsement No. _____13_____

Date of Issue ___JANUARY 27, 2017  (BM)___          By _____
                                                          (Authorized Representative)

Starr 10007 (2/06)

## CALIFORNIA CANCELLATION / NONRENEWAL ENDORSEMENT - AVIATION

Wherever used in this endorsement:  1) "we", "us", "our", and "Insurer" mean the insurance company which issued this policy;  and 2) "you", "your", "Named Insured", "First Named Insured", and "Insured" mean the Named Corporation, Named Organization, Named Sponsor, Named Insured, or Insured stated in the Declarations page;  and 3) "Other Insured(s)" means all other persons or entities afforded coverage under the policy.

In consideration of the premium charged, the cancellation clause is replaced with the following:

<u>CANCELLATION</u>

The First Named Insured shown in the declarations may cancel the policy by mailing or delivering to the Insurer advance written notice of cancellation.

If the policy has been in effect for more than sixty (60) days or if it is a renewal, effective immediately, the Insurer may not cancel the policy unless such cancellation is based on one or more of the following reasons:

1. Nonpayment of premium, including payment due on a prior policy issued by the Insurer and due during the current policy term covering the same risks.

2. A judgement by a court or an administrative tribunal that the named Insured has violated any law of this state or of the United States having as one of its necessary elements an act which materially increases any of the risks insured against.

3. Discovery of fraud or material misrepresentation by either of the following:

   a)   The Insured or Other Insured(s) or his or her representative in obtaining the insurance; or

   b)   The named Insured or his or her representative in pursuing a claim under the policy.

4. Discovery of willful or grossly negligent acts or omissions, or of any violations of state laws or regulations establishing safety standards, by the named Insured or Other Insured(s) or a representative of same, which materially increase any of the risks insured against.

5. Failure by the named Insured or Other Insured(s) or a representative of same to implement reasonable loss control requirements which were agreed to by the Insured as a condition of policy issuance or which were conditions precedent to the use by the Insurer of a particular rate or rating plan if the failure materially increases any of the risks insured against.

6. A determination by the commissioner that the loss of, or changes in, an insurer's reinsurance covering all or part of the risk would threaten the financial integrity or solvency of the Insurer.

7. A determination by the commissioner that a continuation of the policy coverage could place the Insurer in violation of the laws of this state or the state of its domicile or that the continuation of coverage would threaten the solvency of the Insurer.

8. A change by the named Insured or Other Insured(s) or a representative of same in the activities or property of the commercial or industrial enterprise which results in a material added risk, a materially increased risk or a materially changed risk, unless the added, increased, or changed risk is included in the policy.

Notice of cancellation shall be delivered or mailed to the producer of record and the Named Insured at least thirty (30) days prior to the effective date of cancellation.  Where cancellation is for nonpayment of premium or fraud, notice shall be given no less than ten (10) days prior to the effective date of cancellation.

Starr 20006 (12/11)     Page 1 of Endorsement No. ___14___

If this policy is cancelled, we will send the first named Insured any premium refund due.  The refund, if any, will be computed on a pro rata basis.  However, the refund may be less than pro rata if we made a loan to you for the purpose of payment of premiums for this policy.  The cancellation will be effective even if we have not make or offered a refund.

NONRENEWAL

If the Insurer decides not to renew the policy, the Insurer shall mail or deliver to the producer of record and the named Insured notice of nonrenewal at least sixty (60) days but no more than 120 days prior to the end of the policy period.  The notice shall contain the reason for nonrenewal of the policy.

RENEWAL

If a policy has been in effect for more than sixty (60) days or if the policy is a renewal, effective immediately no increase in premium, reduction in limits, or change in the conditions of coverage shall be effective during the policy period unless based upon one of the following reasons:

1.  Discovery of willful or grossly negligent acts or omissions, or of any violations of state laws or regulations establishing safety standards by the named Insured or Other Insured(s) which materially increase any of the risks or hazards insured against.

2.  Failure by the named Insured or Other Insured(s) to implement reasonable loss control requirements which were agreed to by the Insured as a condition of policy issuance or which were conditions precedent to the use by the Insurer of a particular rate or rating plan, if the failure materially increases any of the risks insured against.

3.  A determination by the commissioner that loss of or changes in an insurer's reinsurance covering all or part of the risk covered by the policy would threaten the financial integrity or solvency of the Insurer unless the change in the terms or conditions or rate upon which the premium is based is permitted.

4.  A change by the named Insured or Other Insured(s) in the activities or property of the commercial or industrial enterprise which results in a materially added risk, a materially increased risk, or materially changed risk, unless the added, increased, or changed risk is included in the policy.

Written notice shall be mailed or delivered to the named Insured and the producer of record at least thirty (30) days prior to the effective date of any increase, reduction or change.

All other provisions of this policy remain the same.

This endorsement becomes effective _____JANUARY 26, 2017_____ to be attached to and hereby made a part of:
Policy No. ___1000320046-01___
Issued to ___PASSPORT 420, LLC___

By STARR INDEMNITY & LIABILITY COMPANY

Endorsement No. ____14____

Date of Issue ___JANUARY 27, 2017  (BM)___

By _____
                                    (Authorized Representative)

Starr 20006 (12/11)                    Page 2

0103
0103

## DATE RECOGNITION EXCLUSION CLAUSE

This Policy does not cover any claim, damage, injury, loss, cost, expense or liability (whether in contract, tort, negligence, product liability, misrepresentation, fraud or otherwise) of any nature whatsoever arising from or occasioned by or in consequence of (whether directly or indirectly and whether wholly or partly):

(a)   the failure or inability of any computer hardware, software, integrated circuit, chip or information technology equipment or system (whether in the possession of the Insured or of any third party) accurately or completely to process, recognize, exchange or transfer year, date or time data or information in connection with any change of year, date or time;

whether on or before or after such change of year, date or time;

(b)   any implemented or attempted change or modification of any computer hardware, software, integrated circuit, chip or information technology equipment or system (whether in the possession of the Insured or of any third party) in anticipation of or in response to any such change of year, date or time, or any advice given or services performed in connection with any such change or modification;

(c)   any non-use or unavailability for use of any property or equipment of any kind whatsoever resulting from any act, failure to act or decision of the Insured or of any third party related to any such change of year, date or time;

and any provision in this Policy concerning any duty of the Company to investigate or defend claims shall not apply to any claims so excluded.

All other provisions of this policy remain the same.

This endorsement becomes effective _____JANUARY 26, 2017_____ to be attached to and hereby made a part of:
Policy No. ___1000320046-01___
Issued to ___PASSPORT 420, LLC___

By STARR INDEMNITY & LIABILITY COMPANY

Endorsement No. ___15___

Date of Issue ___JANUARY 27, 2017  (BM)___          By _____
                                                                   (Authorized Representative)

AVN2000A (2/06)

**AVIATION DATE RECOGNITION ENDORSEMENT WITH LIMITED COVERAGE GRANT AIRCRAFT OPERATORS OPTION 4**

This Policy does not cover any claim, damage, injury, loss, cost, expense or liability (whether in contract, tort, negligence, product liability, misrepresentation, fraud or otherwise) of any nature whatsoever arising from or occasioned by or in consequence of (whether directly or indirectly and whether wholly or partly):

a)   the failure or inability of any computer hardware, software, integrated circuit, chip, computer component or other information technology equipment or system (whether in the possession of the **Insured** or of any third party) accurately or completely to process, recognize, exchange or transfer year, date or time data or information in connection with:

- the change of year from 1999 to 2000; and/or
- the change of date from 21 August 1999 to 22 August 1999; and/or
- any other change of year, date or time;

whether on or before or after such change of year, date or time;

b)   any implemented or attempted change or modification of any computer hardware, software, integrated circuit, chip, computer component or other information technology equipment or system (whether in the possession of the **Insured** or of any third party) in anticipation of or in response to any such change of year, date or time, or any advice given or services performed in connection with any such change or modification;

c)   any non-use or unavailability for use of any property or equipment of any kind whatsoever resulting from any act, failure to act or decision of the **Insured** or of any third party related to any such change of year, date or time;

and any provision in this Policy concerning any duty of the Company to investigate or defend claims shall not apply to any claims so excluded.

HOWEVER, in consideration of the additional premium of $ INCLUDED , it is hereby understood and agreed that this endorsement shall not apply to:

1.   any accidental loss of or damage to an **aircraft** defined in the policy schedule (insured **aircraft**); and

2.   any sums which the **Insured** shall become legally liable to pay, and (if so required by the Policy) shall pay (including costs awarded against the **Insured**) in respect of:

(a)   accidental **bodily injury** (fatal or otherwise) to **passenger**s directly caused by an accident to an insured **aircraft**; and/or

(b)   loss of or damage to baggage and personal articles of **passenger**s, mail and cargo directly caused by an accident to an insured **aircraft**; and/or

(c)   accidental **bodily injury** (fatal or otherwise) and accidental damage to property directly caused by an insured **aircraft** or by any person or object falling therefrom.

PROVIDED THAT:

1.  Coverage provided pursuant to this endorsement shall be subject to all terms, conditions, limitations, exclusions and cancellation provisions of this Policy (except as specifically provided herein), and nothing in this endorsement extends coverage beyond that which is provided by the Policy.

2.  Nothing in this endorsement shall provide any coverage in respect of grounding and/or loss of use of any **aircraft** which has not been physically damaged or destroyed in the accident giving rise to a claim under the Policy.

All other provisions of this policy remain the same.

This endorsement becomes effective _____ JANUARY 26, 2017 _____ to be attached to and hereby made a part of:
Policy No. _____ 1000320046-01 _____
Issued to  PASSPORT 420, LLC

By STARR INDEMNITY & LIABILITY COMPANY

Endorsement No. _____ 16 _____

Date of Issue _____ JANUARY 27, 2017  (BM) _____          By _____
                                                              (Authorized Representative)

Starr 30002 (5/06)                Page 2

0106
0106



## 3353 Peachtree Road, N.E.
## Suite 1000
## Atlanta, GA 30326
## (Phone) 404-946-1400 (Fax) 404-946-1497

In the event of a claim, please submit your notice of loss to the following email inbox which will generate a return email with your claims adjustor, contact information and claim number within 24 hours:

aviationclaimreports@starrcompanies.com

In the event of a claim emergency, please contact:

Jeffrey Greenawalt:
Cell: (214) 223-0202

Or

Jacy Watt:
Cell: (404) 401-8851
Office: (404) 946-1414

## AMENDMENT OF DECLARATIONS ENDORSEMENT - CALIFORNIA

In consideration of ___AN ADDITIONAL___ premium of $ ___INCLUDED___ , this policy is amended as follows:

COVERAGE PROVIDED BY THIS ENDORSEMENT SHALL APPLY ONLY WHILE CHRIS OHMAN OR A PROFESSIONAL PILOT MEETING THE OPEN PILOT WARRANTY IS ACTING AS PILOT IN COMMAND.  FOR ANY OTHER OPERATIONS, INCLUDING SINGLE PILOT OPERATIONS BY BILL PARRISH, COVERAGES AS OUTLINED ON THE ORIGINAL DECLARATIONS PAGE OF THIS POLICY SHALL APPLY.

Coverage Limits set forth on the Declarations are amended to read:
(Only those Coverages with an amount(s) and/or data below shall be amended.)

Section One - Liability Coverages

Coverage 1 - Liability for **Scheduled Aircraft**

| FAA Cert. Number | Make & Model | Year Built | Seats Crew / Pass | | **Aircraft** Liability Limit |
|---|---|---|---|---|---|
| N227WP | HONDA JET | 2016 | 1 | 6 | $ 50,000,000. |
| | | | | | $ |
| | | | | | $ |
| | | | | | $ |
| | | | | | $ |
| | | | | | $ |
| | | | | | $ |
| | | | | | $ |

Coverage 2 - Liability for the Use of **Non-Owned Aircraft**

$ _____50,000,000.__ Each **Occurrence**

Maximum Number of Seats: ___30___

Reporting Grace Period: ___30___ consecutive days

This limit is part of, and not in addition to, the limit provided for Coverage **1**.

Coverage 3 - Liability for **Property Damage** to **Non-Owned Aircraft** and **Temporary Substitute Aircraft**

$_____ Each **Occurrence**

This limit is part of, and not in addition to, the limit provided for Coverage **2**.

Coverage 4 - Liability for Charter Referral

$_____ Each **Occurrence**

This limit is part of, and not in addition to, the limit provided for Coverage **1**.

0108
0108

Coverage 5 - Passenger Voluntary Settlements for **Scheduled Aircraft** and **Non-Owned Aircraft**

    A.  Settlement Limits:

        1.  With respect to any **Scheduled Aircraft** or **Temporary Substitute Aircraft**:

            Each Non-**Crew Member Passenger:**  $_____  Each **Occurrence**

            Each **Crew Member:**  $_____  Each **Occurrence**

        2.  With respect to any **Non-Owned Aircraft** except a **Temporary Substitute Aircraft**:

            Each Non-**Crew Member Passenger:**  $_____  Each **Occurrence**

            Each **Crew Member:**  $_____  Each **Occurrence**

            Total All **Non-Owned Aircraft Crew Members** and Non-**Crew Member Passengers** Combined:  $_____  Each **Occurrence**

    B.  Maximum Weekly Indemnity Limit:  $_____  Each **Passenger**

    C.  Maximum Indemnity Period:  _____ consecutive weeks

    These limits are part of, and not in addition to, the limit provided for Coverage 1 or 2, whichever applies to the loss.

Coverage 6 - Liability for **Property Damage** to Hangars and Their Contents

    $_____  Each **Occurrence**

    This limit is part of, and not in addition to, the limit provided for Coverage 1 or 2, whichever applies to the loss.

Coverage 7 - Liability for Fire Damage to Real Property

    $_____  Each **Occurrence**

    This limit is part of, and not in addition to, the limit provided for Coverage 1 or 2, whichever applies to the loss.

Coverage 8 - Liability for Cargo

    $_____  Each **Occurrence**

    Deductible: $_____  Each **Occurrence**

    This limit is part of, and not in addition to, the limit provided for Coverage 1 or 2, whichever applies to the loss.

0109
0109

Coverage 9 - Liability Under Contractual Agreements

$_____ 50,000,000. Each **Occurrence**

This limit is part of, and not in addition to, the limit provided for Coverage 1 or 2, whichever applies to the loss.

Coverage 10 - Liability for **Personal Injury** and ____ cluding **Advertising Injury**

$_____ Each Offense and in the Annual Aggregate

This limit is part of, and not in addition to, the limit provided for Coverage 1 or 2, whichever applies to the loss.

Coverage 11 - Liability For Alcohol Beverage Service

$_____ 50,000,000. Each **Occurrence**

This limit is part of, and not in addition to, the limit provided for Coverage 1 or 2, whichever applies to the loss.

Coverage 12 - Liability for Incidental Medical Malpractice

$_____ 50,000,000. Each **Occurrence**

This limit is part of, and not in addition to, the limit provided for Coverage 1 or 2, whichever applies to the loss.

Coverage 13 - Liability for the Use of **Premises**

$_____ 50,000,000. Each **Occurrence**

This limit is part of, and not in addition to, the limit provided for Coverage 1 or 2, whichever applies to the loss.

Coverage 14 - Liability for the Operation of **Mobile Equipment**

$_____ 50,000,000. Each **Occurrence**

This limit is part of, and not in addition to, the limit provided for Coverage 13.

Coverage 15 - Liability for the Operation of an **Auto** while on Airport **Premises**

$_____ 50,000,000. Each **Occurrence**

This limit is part of, and not in addition to, the limit provided for Coverage 13.

Coverage 16 - Liability for the Sale of **Aircraft** and Aircraft Products and Services

$_____ 50,000,000. Each **Occurrence** and in the Annual Aggregate

This limit is part of, and not in addition to, the limit provided for Coverage 13.

MW00826 (2/17)     Page 3 of Endorsement No.   17____

Coverage 17 - Liability for Hangarkeeper Operations

$_____ Each **Aircraft**         $_____ Each **Occurrence**

Deductible: $_____ Each **Aircraft**         $_____ Each **Occurrence**

This limit is part of, and not in addition to, the limit provided for Coverage 13.

Coverage 18 - Liability for Garagekeeper Operations

$_____ Any One **Auto**         $_____ Any One Loss

Deductible: $_____ Each **Auto**

This limit is part of, and not in addition to, the limit provided for Coverage 13.

## Section Two - Defense, Settlement and Supplementary Payments

## Section Three - **Physical Damage** Coverages

Coverage 19 - **Physical Damage** Coverage for **Scheduled Aircraft** (including **Ingestion** and Emergency Landing

| FAA Cert. Number | Make & Model | Insured Value | Deductible Not **In Motion** | In Motion/ Ingestion |
|---|---|---|---|---|
| N227WP | HONDA JET | $5,600,000. | $NIL | $NIL |
|  |  | $ | $ | $ |
|  |  | $ | $ | $ |
|  |  | $ | $ | $ |
|  |  | $ | $ | $ |
|  |  | $ | $ | $ |
|  |  | $ | $ | $ |
|  |  | $ | $ | $ |

Coverage 20 - **Physical Damage** Coverage for **Spare Engines** and **Spare Parts** including Transit

$_____ Each **Occurrence**

Deductible:

Not **In Motion** $_____ Each **Occurrence**

**In Motion**      $_____ Each **Occurrence**

MW00826 (2/17)     Page 4 of Endorsement No.   17____

0111
0111

Coverage 21 - Automatic Insurance for Increased Value of **Scheduled Aircraft** or **Spare Engines** and **Spare Parts**

Maximum Automatic **Physical Damage** Limit for **Scheduled Aircraft**:

$_____ any one **aircraft** without prior approval

Maximum Automatic **Physical Damage** Limit for **Spare Engines** and **Spare Parts**:

$_____ without prior approval of the Company

Coverage 22 - **Physical Damage** Coverage for Mechanics Tools

$_____ Each Employee      $_____ Each **Occurrence**

Deductible:  $_____ Each Employee/Each **Occurrence**

This limit is part of, and not in addition to, the limit provided for Coverage 13.

Section Four - Additional Coverages

Coverage 23 - Temporary Replacement Parts Rental Expense

$_____ Each Loss

Minimum Repair Period:              _____ days

Maximum coverage period:              _____ consecutive days

Coverage 24 - Replacement **Aircraft** Rental Expense

$_____ Each Loss

Minimum Repair Period:              _____ days

Maximum coverage period:              _____ consecutive days

Coverage 25 - Search and Rescue Expenses

$_____ Each Loss

Coverage 26 - Runway Foaming and Crash Control Expenses

$_____ Each Loss

Coverage 27 - Trip Interruption Expense Coverage

$_____ Each **Passenger**/Each Loss

0112
0112

Coverage 28 - Automatic Insurance for Newly Acquired **Aircraft**

Maximum **Physical Damage** Limit $_____ any one **aircraft** without prior approval of the Company.

Coverage 29 - Lay-Up Credit for **Scheduled Aircraft**

A pro-rated return of _____% of the applicable premium at policy expiration if the **scheduled aircraft** is laid up for _____ or more consecutive days.

Coverage 30 - Personal Effects and Baggage Expense

$_____ Each **Passenger**

Section Five - **Medical Expenses**

Coverage 31 - Medical Payments for **Scheduled Aircraft** and **Non-Owned Aircraft**

A.  With respect to any **Scheduled Aircraft** or **Temporary Substitute Aircraft**:

Each Non-**Crew Member Passenger**: $_____ Each **Occurrence**

Each **Crew Member**: $_____ Each **Occurrence**

B.  With respect to any **Non-Owned Aircraft** except a **Temporary Substitute Aircraft**:

Each Non-**Crew Member Passenger**: $_____ Each **Occurrence**

Each **Crew Member**: $_____ Each **Occurrence**

Coverage 32 - **Premises** Medical Payments

$_____ Each Person        $_____ Each **Occurrence**

All other provisions of this policy remain the same.

This endorsement becomes effective __JANUARY 26, 2017__ to be attached to and hereby made a part of:
Policy No. __1000320046-01__
Issued to __PASSPORT 420, LLC__

By _STARR INDEMNITY & LIABILITY COMPANY_

Endorsement No. _____17_____

Date of Issue __FEBRUARY 3, 2017 (KP)__        By _____
(Authorized Representative)

MW00826 (2/17)        Page 6

0113
0113

EXHIBIT "G"

0114

0114



**STARR COMPANIES**
GLOBAL INSURANCE & INVESTMENTS

**AIRCRAFT INSURANCE APPLICATION**

*Underwriting the future*

NAME OF APPLICANT (Including D/B/A'S and Holding Companies):
PASSPORT 420, LLC

ADDRESS: 520 NEWPORT CENTER DRIVE, SUITE 1400, NEWPORT BEACH, CA 92660

BUSINESS OR CORPORATION OF APPLICANT:

APPLICANT IS: ☐ INDIVIDUAL(S)   ☐ CORPORATION   ☐ PARTNERSHIP   ☐ HOLDING COMPANY   ☐ OTHER

IF THE APPLICANT IS A HOLDING COMPANY, LIST THE OWNER OF THE HOLDING COMPANY ALONG WITH OCCUPATION OR BUSINESS:

IS APPLICANT INCORPORATED SOLELY FOR THE OWNERSHIP OF THE AIRCRAFT? ☒ YES ☐ NO

INSURANCE IS REQUESTED FROM 12:01 A.M. 01/26/2017   TO 12:01 A.M. 01/26/2018

**AIRCRAFT INFORMATION** | PLEASE INDICATE THE NUMBER OF AIRCRAFT REQUIRING COVERAGE:   1

NOTE: IF THE FLEET EXCEEDS 10 AIRCRAFT, PLEASE ATTACH A FLEET ADDENDUM.

| Aircraft Reg. No. | Year, Make, and Model | Seating Capacity Crew | Seating Capacity PAX | Aircraft Base Airport | Aircraft Insured Value Requested | Liability Limit Requested | Storage Hangared | Storage Tied |
|---|---|---|---|---|---|---|---|---|
| 1. N227WP | 2016 HONDA JET | 1 | 6 | SBA | $5,600,000 | $50,000,000 | ✓ | |

| Aircraft Reg. No. | Estimated Annual Utilization | % of Utilization P&B | Charter Air Taxi | Commercial | Average PAX Load | Average PAX Profile (Employee/Guest) | Owned/Financed/Leased/Lienholder/Lessor | Amount Financed if Applicable |
|---|---|---|---|---|---|---|---|---|
| 1. N227WP | 250 Hours | | | | 1 | Employee | | |

**PHYSICAL DAMAGE COVERAGE**

| Aircraft Reg. No. | Coverage Type Ground and in Flight | Coverage Type Not in Flight | Coverage Type Not in Motion | REQUESTED DEDUCTIBLES IN MOTION Amount ($) or % | | NOT IN MOTION (Amount ($) or %) | |
|---|---|---|---|---|---|---|---|
| 1. N227WP | ✓ | | | $ 0 | % | $ 0 | % |

**PILOT INFORMATION** | LIST ALL PILOTS WHO OPERATE APPLICANT'S AIRCRAFT. PILOTS LISTED WITHIN THIS APPLICATION ARE ONLY CONSIDERED FOR INSURANCE IF A COMPLETED PILOT QUESTIONNAIRE FORM IS ATTACHED.

| NAME OF PILOT | DATE OF BIRTH | FULL TIME/CONTRACT | PIC/SIC | PIC MM | SIC MM |
|---|---|---|---|---|---|
| 1. CHRIS OHMAN | 3/21/1972 | Full Time | PIC | | |
| 2. BILL PARRISH | 1/26/1953 | | PIC | | |
| 3. | | | | | |
| 4. | | | | | |

**GENERAL INFORMATION**

HOW LONG HAS APPLICANT OWNED OR OPERATED AIRCRAFT?  1 Month

ARE ANY AIRCRAFT OPERATED ON A SINGLE PILOT BASIS?  ☒ YES  ☐ NO     IF YES, PLEASE ANSWER THE FOLLOWING:

ANNUAL SINGLE PILOT HOURS: 250 Hours

AVERAGE PAX LOAD DURING SINGLE PILOT OPERATIONS: 1

ANY SINGLE PILOT AIR CHARTER OR COMMERCIAL OPERATION HOURS?  ☐ YES  ☒ NO     IF YES, ANNUAL USAGE:

DO ANY OWNERS OR NON-PROFESSIONAL PILOTS OPERATE AIRCRAFT TO BE INSURED?  ☒ YES  ☐ NO

IF YES, DESCRIBE:
Bill Parrish is Owner Operator

DOES THE APPLICANT OPERATE AIRCRAFT NOT INSURED ON THIS POLICY?  ☒ YES  ☐ NO

IF YES, DESCRIBE:
Bill Parrish Operates Phenom 100 - N27WP

DO ANY EMPLOYEES OF THE APPLICANT (INCLUDING PILOTS) OPERATE AIRCRAFT NOT INSURED ON THIS POLICY IN THE COURSE OF THE APPLICANT'S BUSINESS?
☐ YES  ☒ NO
IF YES, DESCRIBE:

DO ANY OF THE APPLICANTS CHARTER AIRCRAFT?  ☐ YES  ☒ NO
IF YES, DESCRIBE:

DOES THE APPLICANT PARTICIPATE IN ANY DRY LEASE, WET LEASE, TIME SHARE, RENTAL AGREEMENTS OR ANY OPERATION OF THE AIRCRAFT IN WHICH A CHARGE IS MADE?
☐ YES  ☒ NO
IF YES, DESCRIBE:

DO YOU ANTICIPATE USE OF TEMPORARY SUBSTITUTE AIRCRAFT DURING SERVICING OR MAINTENANCE OF APPLICANT'S AIRCRAFT?
☐ YES  ☒ NO
IF YES, DESCRIBE PURPOSE, TYPES OF AIRCRAFT TO BE USED AND ANTICIPATED ANNUAL UTILIZATION:

AREAS OF AIRCRAFT OPERATION:  ☒ U.S.A.  ☐ ALASKA  ☐ CANADA  ☐ MEXICO  ☐ OTHER COUNTRIES (LIST BELOW):

**MAINTENANCE**

DOES APPLICANT PERFORM THEIR OWN MAINTENANCE?  ☐ YES  ☒ NO

NAME OF MAINTENANCE SUPERVISOR AND NUMBER OF YEARS IN THIS POSITION:

HAS APPLICANT'S MAINTENANCE PERSONNEL COMPLETED MANUFACTURER'S MAINTENANCE SCHOOLS FOR AIRCRAFT TYPE INSURED?
☐ YES  ☐ NO
IF YES, DESCRIBE:

DO APPLICANTS MAINTENANCE PERSONNEL RECEIVE RECURRENT TRAINING?  ☐ YES  ☐ NO
IF YES, DESCRIBE:

ARE AIRCRAFT OPERATED UNDER ANY SPECIAL MAINTENANCE PROGRAM?  ☒ YES  ☐ NO
IF YES, DESCRIBE:
Honda Aircraft Company and Cutter Aviation perform all Maintenance on Aircraft

OUTSIDE MAINTENANCE PERFORMED BY:

DO MAINTENANCE PERSONNEL SERVICE, MAINTAIN OR REPAIR AIRCRAFT BELONGING TO OTHERS  ☐ YES  ☐ NO
IF YES, DESCRIBE:

**PREMISES**

0116
0116

PLEASE LIST AIRPORTS IN WHICH AIRCRAFT IS ROUTINELY HANGARED:
SBA

TYPE OF HANGAR CONSTRUCTION:

WHAT TYPE OF SUPPRESSION SYSTEM EXISTS WITHIN THE APPLICANT'S HANGAR(S):

PRIMARY HANGAR IS: [ ] OWNED    [ ] LEASED    NAME OF LANDLORD: Signature Flight Support

DO YOU HANGAR, TIE-DOWN OR MOVE ANY AIRCRAFT BELONGING TO OTHERS: [ ] YES  [■] NO
IF YES, DESCRIBE:

DOES APPLICANT HAVE ANY RETAIL FUEL AND OIL SALES?  [ ] YES  [■] NO
IF YES, INCLUDE ANNUAL GALLONAGE.

---

**INSURANCE AND CLAIMS HISTORY**

HAS ANY DAMAGE BEEN SUSTAINED OR CLAIMS BY OTHERS ARISING FROM THE OPERATION OF ANY AIRCRAFT OWNED BY OR IN THE CUSTODY OF THE APPLICANT?
[ ] YES  [■] NO
IF YES, DESCRIBE:

HAS ANY INSURANCE COMPANY OR UNDERWRITER AT ANY TIME CANCELLED OR REFUSED TO RENEW A POLICY HELD BY THE APPLICANT OR ANY OF THE PILOTS NAMED HEREIN IN REGARDS TO ANY TYPE OF INSURANCE?
[ ] YES  [■] NO
IF YES, DESCRIBE:

NAME OF CURRENT OR MOST RECENT AVIATION INSURANCE COMPANY (IF NONE, SO STATE): NONE NEW PURCHASE

CURRENT POLICY EXPIRATION DATE.

---

ANY PERSON WHO KNOWINGLY AND WITH INTENT TO DEFRAUD ANY INSURANCE COMPANY OR OTHER PERSON, FILES AN APPLICATION FOR INSURANCE OR STATEMENT OF CLAIM CONTAINING ANY MATERIALLY FALSE INFORMATION OR CONCEALS FOR THE PURPOSE OF MISLEADING INFORMATION CONCERNING ANY FACT MATERIAL THERETO COMMITS A FRAUDULENT INSURANCE ACT, WHICH IS A CRIME AND SUBJECTS SUCH PERSON TO CRIMINAL AND CIVIL PENALTIES, INCLUDING BUT NOT LIMITED TO FINES, DENIAL OF INSURANCE BENEFITS, CIVIL DAMAGES, CRIMINAL PROSECUTION AND CONFINEMENT IN STATE PRISON.

APPLICABLE IN:

ALABAMA
ANY PERSON WHO KNOWINGLY PRESENTS A FALSE OR FRAUDULENT CLAIM FOR PAYMENT OF A LOSS OR BENEFIT OR WHO KNOWINGLY PRESENTS FALSE INFORMATION IN AN APPLICATION FOR INSURANCE IS GUILTY OF A CRIME AND MAY BE SUBJECT TO RESTITUTION FINES OR CONFINEMENT IN PRISON, OR ANY COMBINATION THEREOF.

ARKANSAS
PRESENTS FALSE INFORMATION IN AN APPLICATION FOR INSURANCE IS GUILTY OF A CRIME, AND MAY BE SUBJECT TO FINES AND CONFINEMENT IN PRISON.

COLORADO
IT IS UNLAWFUL TO KNOWINGLY PROVIDE FALSE, INCOMPLETE, OR MISLEADING FACTS OR INFORMATION TO AN INSURANCE COMPANY FOR THE PURPOSE OF DEFRAUDING OR ATTEMPTING TO DEFRAUD THE COMPANY. PENALTIES MAY INCLUDE IMPRISONMENT, FINES AND DENIAL OF INSURANCE AND CIVIL DAMAGES. ANY INSURANCE COMPANY OR AGENT OF AN INSURANCE COMPANY WHO KNOWINGLY PROVIDES FALSE, INCOMPLETE, OR MISLEADING FACTS OR INFORMATION TO A POLICYHOLDER OR CLAIMANT FOR THE PURPOSE OF DEFRAUDING OR ATTEMPTING TO DEFRAUD THE POLICYHOLDER OR CLAIMANT WITH REGARD TO A SETTLEMENT OR AWARD PAYABLE FROM INSURANCE PROCEEDS SHALL BE REPORTED TO THE COLORADO DIVISION OF INSURANCE WITHIN THE DEPARTMENT OF REGULATORY AGENCIES.

DISTRICT OF COLUMBIA
WARNING. IT IS A CRIME TO PROVIDE FALSE OR MISLEADING INFORMATION TO AN INSURER FOR THE PURPOSE OF DEFRAUDING THE INSURER OR ANY OTHER PERSON. PENALTIES INCLUDE IMPRISONMENT AND/OR FINES. IN ADDITION, AN INSURER MAY DENY INSURANCE BENEFITS IF FALSE INFORMATION MATERIALLY RELATED TO A CLAIM WAS PROVIDED BY THE APPLICANT.

0117
0117

**FLORIDA**
ANY PERSON WHO KNOWINGLY AND WITH INTENT TO INJURE, DEFRAUD, OR DECEIVE ANY INSURER FILES A STATEMENT OF CLAIM OR AN APPLICATION CONTAINING ANY FALSE, INCOMPLETE, OR MISLEADING INFORMATION, IS GUILTY OF A FELONY OF THE THIRD DEGREE.

**KENTUCKY**
ANY PERSON WHO KNOWINGLY AND WITH INTENT TO DEFRAUD ANY INSURANCE COMPANY OR OTHER PERSON FILES AN APPLICATION FOR INSURANCE CONTAINING ANY MATERIALLY FALSE INFORMATION OR CONCEALS, FOR THE PURPOSE OF MISLEADING, INFORMATION CONCERNING ANY FACT MATERIAL THERETO COMMITS A FRAUDULENT INSURANCE ACT, WHICH IS A CRIME.

**LOUISIANA**
ANY PERSON WHO KNOWINGLY PRESENTS A FALSE OR FRAUDULENT CLAIM FOR PAYMENT OF A LOSS OR BENEFIT OR KNOWINGLY PRESENTS FALSE INFORMATION IN AN APPLICATION FOR INSURANCE IS GUILTY OF A CRIME AND MAY BE SUBJECT TO FINES AND CONFINEMENT IN PRISON.

**MAINE**
IT IS A CRIME TO KNOWINGLY PROVIDE FALSE, INCOMPLETE OR MISLEADING INFORMATION TO INSURANCE COMPANY FOR THE PURPOSE OF DEFRAUDING THE COMPANY. PENALTIES MAY INCLUDE IMPRISONMENT, FINES OR A DENIAL OF INSURANCE BENEFITS.

**MARYLAND**
ANY PERSON WHO KNOWINGLY OR WILLFULLY PRESENTS A FALSE OR FRAUDULENT CLAIM FOR PAYMENT OF A LOSS OR BENEFIT OR WHO KNOWINGLY OR WILLFULLY PRESENTS FALSE INFORMATION IN AN APPLICATION FOR INSURANCE IS GUILTY OF A CRIME AND MAY BE SUBJECT TO FINES AND CONFINEMENT IN PRISON.

**NEW JERSEY**
ANY PERSON WHO INCLUDES ANY FALSE OR MISLEADING INFORMATION ON AN APPLICATION FOR AN INSURANCE POLICY IS SUBJECT TO CRIMINAL AND CIVIL PENALTIES.

**NEW MEXICO**
ANY PERSON WHO KNOWINGLY PRESENTS A FALSE OR FRAUDULENT CLAIM FOR PAYMENT OF A LOSS OR BENEFIT OR KNOWINGLY PRESENTS FALSE INFORMATION IN AN APPLICATION FOR INSURANCE IS GUILTY OF A CRIME AND MAY BE SUBJECT TO CIVIL FINES AND CRIMINAL PENALTIES.

**NEW YORK**
ANY PERSON WHO KNOWINGLY AND WITH INTENT TO DEFRAUD ANY INSURANCE COMPANY OR OTHER PERSON FILES AN APPLICATION FOR INSURANCE OR STATEMENT OF CLAIM CONTAINING ANY MATERIALLY FALSE INFORMATION, OR CONCEALS FOR THE PURPOSE OF MISLEADING, INFORMATION CONCERNING ANY FACT MATERIAL THERETO, COMMITS A FRAUDULENT INSURANCE ACT, WHICH IS A CRIME AND SHALL ALSO BE SUBJECT TO A CIVIL PENALTY NOT TO EXCEED FIVE THOUSAND DOLLARS AND THE STATED VALUE OF THE CLAIM FOR EACH SUCH VIOLATION.

**OHIO**
ANY PERSON WHO, WITH THE INTENT TO DEFRAUD OR KNOWING THAT HE IS FACILITATING A FRAUD AGAINST AN INSURER, SUBMITS AN APPLICATION OR FILES A CLAIM CONTAINING A FALSE OR DECEPTIVE STATEMENT IS GUILTY OF INSURANCE FRAUD.

**OKLAHOMA**
WARNING: ANY PERSON WHO KNOWINGLY, AND WITH INTENT TO INJURE, DEFRAUD OR DECEIVE ANY INSURER, MAKES ANY CLAIM FOR THE PROCEEDS OF AN INSURANCE POLICY CONTAINING ANY FALSE, INCOMPLETE OR MISLEADING INFORMATION IS GUILTY OF A FELONY.

**OREGON**
ANY PERSON WHO KNOWINGLY AND WITH INTENT TO DEFRAUD ANY INSURANCE COMPANY OR OTHER PERSON, FILES AN APPLICATION FOR INSURANCE CONTAINING ANY FALSE INFORMATION, OR CONCEALS FOR THE PURPOSE OF MISLEADING INFORMATION CONCERNING ANY MATERIAL FACT THERETO, MAY BE GUILTY OF AN INSURANCE FRAUD.

**PENNSYLVANIA**
ANY PERSON WHO KNOWINGLY AND WITH INTENT TO DEFRAUD ANY INSURANCE COMPANY OR OTHER PERSON FILES AN APPLICATION FOR INSURANCE OR STATEMENT OF CLAIM CONTAINING ANY MATERIALLY FALSE INFORMATION OR CONCEALS FOR THE PURPOSE OF MISLEADING, INFORMATION CONCERNING ANY FACT MATERIAL THERETO COMMITS A FRAUDULENT INSURANCE ACT, WHICH IS A CRIME AND SUBJECTS SUCH PERSON TO CRIMINAL AND CIVIL PENALTIES.

**TENNESSEE, VIRGINIA AND WASHINGTON**
IT IS A CRIME TO KNOWINGLY PROVIDE FALSE, INCOMPLETE OR MISLEADING INFORMATION TO INSURANCE COMPANY FOR THE PURPOSE OF DEFRAUDING THE COMPANY. PENALTIES INCLUDE IMPRISONMENT, FINES AND DENIAL OF INSURANCE BENEFITS.

**RHODE ISLAND AND WEST VIRGINIA**
ANY PERSON WHO KNOWINGLY PRESENTS A FALSE OR FRAUDULENT CLAIM FOR PAYMENT OF A LOSS OR BENEFIT OR KNOWINGLY PRESENTS FALSE INFORMATION IN AN APPLICATION FOR INSURANCE IS GUILTY OF A CRIME AND MAY BE SUBJECT TO FINES AND CONFINEMENT IN PRISON.

---

All particulars herein are declared to be true and complete to the best of my/our knowledge and no information has been withheld or suppressed and I/we agree that this application and the terms and conditions of the policy in use by the insurer shall be the basis of any contract between me/us and the insurer. I hereby authorize the insurer to investigate all or any qualifications or statements contained herein.

Applicant's Signature(s): _Chris Obbser_   Date: 3/1/2017

---

STARR COMPANIES - AIRCRAFT INSURANCE **APPLICATION**

0118
0118

THIS APPLICATION DOES NOT COMMIT THE INSURER TO ANY LIABILITY NOR MAKE THE APPLICANT LIABLE FOR ANY PREMIUM UNLESS AND UNTIL THE INSURER AGREES TO EFFECT THIS INSURANCE.

NAME OF PERSON COMPLETING APPLICATION: *CHRIS OHMAN*

RELATION TO APPLICANT / NAMED INSURED: *OPERATIONS MANAGER*

NAME OF AGENT OR BROKER: TUTTON INSURANCE SERVICES, INC.

ADDRESS: 2913 S. PULLMAN ST. SANTA ANA, CA 92705

ARE YOU THE HOLDING PRODUCER. ☒ YES ☐ NO     IF YES, FOR HOW MANY YEARS: 1

0119
0119



**STARR** COMPANIES
GLOBAL INSURANCE & INVESTMENTS

**PILOT QUESTIONNAIRE**

*Underwriting the future*

| | |
|---|---|
| NAME OF POLICYHOLDER/AIRCRAFT OWNER: PASSPORT 420, LLC | |
| NAME OF PILOT: CHRIS OHMAN | DATE OF BIRTH: March 21, 1972 |
| ADDRESS: 428 Peach Grove Lane, Santa Barbara, CA 93105 | |
| PRESENT EMPLOYER: Eagan Avenatti LLP | DATE EMPLOYED: October 1, 2016 |
| ADDRESS: 520 Newport Center Drive, Suite 1400, Newport Beach, CA 92660 | |

POSITION(S) HELD:
Operations Manager / Pilot

IS PILOTING AIRCRAFT YOUR PRIMARY PROFESSION?   ☒ YES   ☐ NO
IF NO, DESCRIBE:


ARE YOU A FULL-TIME EMPLOYEE FOR THIS OPERATION OR CONTRACT PILOT?   ☒ FULL-TIME EMPLOYEE   ☐ CONTRACT

IF YOU ARE A CONTRACT PILOT, WHO ELSE DO YOU FLY FOR?


WHAT PERCENTAGE OF YOUR PILOTING TIME IS SPENT FLYING FOR OTHER OPERATIONS?
10 %

| | |
|---|---|
| FAA CERTIFICATE NO. 3422042 | DATE FIRST CERTIFIED AS PILOT: 3/26/1999 |

CLASS OF MEDICAL CERTIFICATE HELD: Second Class

DATE OF LAST FAA PHYSICAL EXAMINATION: July 13, 2016

PHYSICAL IMPAIRMENTS, IF ANY:


WAIVERS, LIMITATIONS OR CONDITIONS SPECIFIED ON MEDICAL CERTIFICATES, IF ANY:
SODA 40D51525 (Defective Visual Acuity, Right Eye Distant Vision 20/30 And Near Vision 20/60)

| PREVIOUS EMPLOYERS | POSITION | DATES |
|---|---|---|
| CKE Restaurants Holdings, Inc. | Pilot | 2006 - 2016 |
| The Air Group, Inc. | Pilot | 2000 - 2006 |
| Applied Magnetics Corporation | EPA Compliance / System Tech | 1994 - 2000 |

**EDUCATION**

CHECK HIGHEST YEAR COMPLETED:
HIGH SCHOOL: ☐1 ☐2 ☐3 ☒4      COLLEGE: ☐1 ☐2 ☐3 ☒4      GRADUATE SCHOOL: ☐1 ☐2 ☐3 ☐4

| Level of School | Name of School | Attended From | Attended To | Did you graduate/ complete course? |
|---|---|---|---|---|
| COLLEGE | University of California, Santa Barbara | 1995 | 1996 | Yes |
| GRADUATE SCHOOL | | | | |
| BUSINESS OR TECHNICAL SCHOOL | | | | |

**CURRENT CERTIFICATES & RATINGS**

0120
0120

| | | | |
|---|---|---|---|
| ☒ ATP | ☒ INSTRUMENT: CLASS | ☒ PRIVATE | ☐ STUDENT |
| ☒ COMMERCIAL | ☒ MULTI-ENGINE: LAND | ☐ ROTORCRAFT | ☐ OTHER: |
| ☐ GLIDER | ☐ MULTI-ENGINE: SEA | ☒ SINGLE ENGINE: LAND | ☐ OTHER: |
| ☐ INSTRUCTOR: CLASS | ☒ NIGHT | ☐ SINGLE ENGINE: SEA | ☐ OTHER: |
| ☐ TYPE RATING (SPECIFY EACH AIRCRAFT BELOW): HA-420, HS-125, CE-750 | | | |

DATE OF LAST LOGGED SATISFACTORILY ACCOMPLISHED BIENNIAL FLIGHT REVIEW:  10/18/2016

MAKE & MODEL: HA-420

DATE OF LAST LOGGED SATISFACTORILY ACCOMPLISHED PILOT PROFICIENCY EXAM: 10/18/2016

MAKE & MODEL: HA-420

### FLIGHT AND GROUND SCHOOL TRAINING COURSES (SPECIFIC TO MAKE & MODEL AIRCRAFT APPLYING FOR)

| | INITIAL TYPE TRAINING | RECURRENT TRAINING | FULL AXIS MOTION FLIGHT SIMULATOR TRAINING | IN AIRCRAFT TRAINING | GROUND SCHOOL ONLY |
|---|---|---|---|---|---|
| TYPE OF AIRCRAFT | HA-420 | | | | |
| NAME OF FACILITY | FSI | | | | |
| FREQUENCY | | | | | |
| LAST SUCCESSFUL COMPLETION DATE | 10/18/2016 | | | | |

### LOGGED PILOT HOURS

TOTAL PILOT IN-COMMAND HOURS FOR ALL AIRCRAFT:

| MAKE/MODEL TO BE FLOWN | PICS OR SIC OR LISTED M/M | TOTAL TIME | PIC HRS | SIC HRS | LAST 12 MONTHS | LAST 90 DAYS |
|---|---|---|---|---|---|---|
| 1.  HA-420 | 50.2 | 50.2 | 50.2 | | 50.2 | 35.5 |
| 2. | | | | | | |
| 3. | | | | | | |
| 4. | | | | | | |

| | | |
|---|---|---|
| SINGLE ENGINE FIXED | 850 | |
| SINGLE ENGINE RETRACTABLE | 275 | |
| MULTIENGINE | 5800 | |
| TURBINE | 6700 | |
| PISTON ROTORWING | | |
| TURBINE ROTORWING | | |
| SLUNG LOAD ROTORWING | | |

### ANSWER EACH QUESTION

HAVE YOU EVER HAD AN AIRCRAFT CLAIM INCIDENT OR ACCIDENT?  ☐ YES  ☒ NO
   IF YES, DESCRIBE:

HAVE YOU EVER BEEN CITED OR FINED FOR VIOLATION OF AN AVIATION REGULATION?  ☐ YES  ☒ NO
   IF YES, DESCRIBE:

HAS YOUR PILOT CERTIFICATE EVER BEEN SUSPENDED OR REVOKED?  ☐ YES  ☒ NO

STARR COMPANIES - PILOT QUESTIONNAIRE

0121
0121

IF YES, DESCRIBE:

---

HAVE YOU EVER BEEN CONVICTED OF A FELONY OR ARE YOU UNDER INDICTMENT FOR A FELONY? ☐ YES  ☒ NO

IF YES, DESCRIBE:

---

HAVE YOU EVER BEEN CONVICTED OF DRIVING A MOTOR VEHICLE UNDER THE INFLUENCE OF ALCOHOL OR NARCOTICS, OR CONVICTED OF RECKLESS DRIVING?

☐ YES  ☒ NO

IF YES, DESCRIBE:

---

HAS YOUR DRIVER'S LICENSE EVEN BEEN SUSPENDED OR REVOKED?  ☐ YES  ☒ NO

IF YES, DESCRIBE:

---

HAVE YOU EVER BEEN CONVICTED OF OR ARE YOU UNDER INDICTMENT IN A LEGAL ACTION INVOLVING DRUGS OR NARCOTICS?

☐ YES  ☒ NO

IF YES, DESCRIBE:

---

HAVE YOU EVER EXPERIENCED OR BEEN TREATED FOR A CHEMICAL DEPENDENCY?  ☐ YES  ☒ NO

IF YES, DESCRIBE:

---

ARE YOU REGULARLY USING ANY MEDICATION?  ☐ YES  ☒ NO

IF YES, DESCRIBE:

---

HAVE YOU EVER BEEN DISCHARGED OR ASKED TO RESIGN?  ☐ YES  ☒ NO

IF YES, DESCRIBE:

---

ANY PERSON WHO KNOWINGLY AND WITH INTENT TO DEFRAUD ANY INSURANCE COMPANY OR OTHER PERSON, FILES AN APPLICATION FOR INSURANCE OR STATEMENT OF CLAIM CONTAINING ANY MATERIALLY FALSE INFORMATION OR CONCEALS FOR THE PURPOSE OF MISLEADING INFORMATION CONCERNING ANY FACT MATERIAL THERETO COMMITS A FRAUDULENT INSURANCE ACT, WHICH IS A CRIME AND SUBJECTS SUCH PERSON TO CRIMINAL AND CIVIL PENALTIES, INCLUDING BUT NOT LIMITED TO FINES, DENIAL OF INSURANCE BENEFITS, CIVIL DAMAGES, CRIMINAL PROSECUTION AND CONFINEMENT IN STATE PRISON.

APPLICABLE IN:

ALABAMA
ANY PERSON WHO KNOWINGLY PRESENTS A FALSE OR FRAUDULENT CLAIM FOR PAYMENT OF A LOSS OR BENEFIT OR WHO KNOWINGLY PRESENTS FALSE INFORMATION IN AN APPLICATION FOR INSURANCE IS GUILTY OF A CRIME AND MAY BE SUBJECT TO RESTITUTION FINES OR CONFINEMENT IN PRISON, OR ANY COMBINATION THEREOF.

ARKANSAS
PRESENTS FALSE INFORMATION IN AN APPLICATION FOR INSURANCE IS GUILTY OF A CRIME AND MAY BE SUBJECT TO FINES AND CONFINEMENT IN PRISON.

COLORADO
IT IS UNLAWFUL TO KNOWINGLY PROVIDE FALSE, INCOMPLETE, OR MISLEADING FACTS OR INFORMATION TO AN INSURANCE COMPANY FOR THE PURPOSE OF DEFRAUDING OR ATTEMPTING TO DEFRAUD THE COMPANY. PENALTIES MAY INCLUDE IMPRISONMENT, FINES, AND DENIAL OF INSURANCE AND CIVIL DAMAGES. ANY INSURANCE COMPANY OR AGENT OF AN INSURANCE COMPANY WHO KNOWINGLY PROVIDES FALSE, INCOMPLETE, OR MISLEADING FACTS OR INFORMATION TO A POLICYHOLDER OR CLAIMANT FOR THE PURPOSE OF DEFRAUDING OR ATTEMPTING TO DEFRAUD THE POLICYHOLDER OR CLAIMANT WITH REGARD TO A SETTLEMENT OR AWARD PAYABLE FROM INSURANCE PROCEEDS SHALL BE REPORTED TO THE COLORADO DIVISION OF INSURANCE WITHIN THE DEPARTMENT OF REGULATORY AGENCIES.

DISTRICT OF COLUMBIA

0122
0122

WARNING: IT IS A CRIME TO PROVIDE FALSE OR MISLEADING INFORMATION TO AN INSURER FOR THE PURPOSE OF DEFRAUDING THE INSURER OR ANY OTHER PERSON. PENALTIES INCLUDE IMPRISONMENT AND/OR FINES. IN ADDITION, AN INSURER MAY DENY INSURANCE BENEFITS IF FALSE INFORMATION MATERIALLY RELATED TO A CLAIM WAS PROVIDED BY THE APPLICANT

**FLORIDA**
ANY PERSON WHO KNOWINGLY AND WITH INTENT TO INJURE, DEFRAUD, OR DECEIVE ANY INSURER FILES A STATEMENT OF CLAIM OR AN APPLICATION CONTAINING ANY FALSE, INCOMPLETE, OR MISLEADING INFORMATION, IS GUILTY OF A FELONY OF THE THIRD DEGREE

**KENTUCKY**
ANY PERSON WHO KNOWINGLY AND WITH INTENT TO DEFRAUD ANY INSURANCE COMPANY OR OTHER PERSON FILES AN APPLICATION FOR INSURANCE CONTAINING ANY MATERIALLY FALSE INFORMATION OR CONCEALS, FOR THE PURPOSE OF MISLEADING, INFORMATION CONCERNING ANY FACT MATERIAL THERETO COMMITS A FRAUDULENT INSURANCE ACT, WHICH IS A CRIME

**LOUISIANA**
ANY PERSON WHO KNOWINGLY PRESENTS A FALSE OR FRAUDULENT CLAIM FOR PAYMENT OF A LOSS OR BENEFIT OR KNOWINGLY PRESENTS FALSE INFORMATION IN AN APPLICATION FOR INSURANCE IS GUILTY OF A CRIME AND MAY BE SUBJECT TO FINES AND CONFINEMENT IN PRISON.

**MAINE**
IT IS A CRIME TO KNOWINGLY PROVIDE FALSE, INCOMPLETE OR MISLEADING INFORMATION TO INSURANCE COMPANY FOR THE PURPOSE OF DEFRAUDING THE COMPANY. PENALTIES MAY INCLUDE IMPRISONMENT, FINES OR A DENIAL OF INSURANCE BENEFITS.

**MARYLAND**
ANY PERSON WHO KNOWINGLY OR WILLFULLY PRESENTS A FALSE OR FRAUDULENT CLAIM FOR PAYMENT OF A LOSS OR BENEFIT OR WHO KNOWINGLY OR WILLFULLY PRESENTS FALSE INFORMATION IN AN APPLICATION FOR INSURANCE IS GUILTY OF A CRIME AND MAY BE SUBJECT TO FINES AND CONFINEMENT IN PRISON.

**NEW JERSEY**
ANY PERSON WHO INCLUDES ANY FALSE OR MISLEADING INFORMATION ON AN APPLICATION FOR AN INSURANCE POLICY IS SUBJECT TO CRIMINAL AND CIVIL PENALTIES.

**NEW MEXICO**
ANY PERSON WHO KNOWINGLY PRESENTS A FALSE OR FRAUDULENT CLAIM FOR PAYMENT OF A LOSS OR BENEFIT OR KNOWINGLY PRESENTS FALSE INFORMATION IN AN APPLICATION FOR INSURANCE IS GUILTY OF A CRIME AND MAY BE SUBJECT TO CIVIL FINES AND CRIMINAL PENALTIES.

**NEW YORK**
ANY PERSON WHO KNOWINGLY AND WITH INTENT TO DEFRAUD ANY INSURANCE COMPANY OR OTHER PERSON FILES AN APPLICATION FOR INSURANCE OR STATEMENT OF CLAIM CONTAINING ANY MATERIALLY FALSE INFORMATION, OR CONCEALS FOR THE PURPOSE OF MISLEADING, INFORMATION CONCERNING ANY FACT MATERIAL THERETO, COMMITS A FRAUDULENT INSURANCE ACT, WHICH IS A CRIME AND SHALL ALSO BE SUBJECT TO A CIVIL PENALTY NOT TO EXCEED FIVE THOUSAND DOLLARS AND THE STATED VALUE OF THE CLAIM FOR EACH SUCH VIOLATION.

**OHIO**
ANY PERSON WHO, WITH THE INTENT TO DEFRAUD OR KNOWING THAT HE IS FACILITATING A FRAUD AGAINST AN INSURER, SUBMITS AN APPLICATION OR FILES A CLAIM CONTAINING A FALSE OR DECEPTIVE STATEMENT IS GUILTY OF INSURANCE FRAUD.

**OKLAHOMA**
WARNING: ANY PERSON WHO KNOWINGLY, AND WITH INTENT TO INJURE, DEFRAUD OR DECEIVE ANY INSURER, MAKES ANY CLAIM FOR THE PROCEEDS OF AN INSURANCE POLICY CONTAINING ANY FALSE, INCOMPLETE OR MISLEADING INFORMATION IS GUILTY OF A FELONY.

**OREGON**
ANY PERSON, WHO KNOWINGLY AND WITH INTENT TO DEFRAUD ANY INSURANCE COMPANY OR OTHER PERSON, FILES AN APPLICATION FOR INSURANCE CONTAINING ANY FALSE INFORMATION, OR CONCEALS FOR THE PURPOSE OF MISLEADING INFORMATION CONCERNING ANY MATERIAL FACT THERETO, MAY BE GUILTY OF AN INSURANCE FRAUD.

**PENNSYLVANIA**
ANY PERSON WHO KNOWINGLY AND WITH INTENT TO DEFRAUD ANY INSURANCE COMPANY OR OTHER PERSON FILES AN APPLICATION FOR INSURANCE OR STATEMENT OF CLAIM CONTAINING ANY MATERIALLY FALSE INFORMATION OR CONCEALS FOR THE PURPOSE OF MISLEADING, INFORMATION CONCERNING ANY FACT MATERIAL THERETO COMMITS A FRAUDULENT INSURANCE ACT, WHICH IS A CRIME AND SUBJECTS SUCH PERSON TO CRIMINAL AND CIVIL PENALTIES.

**TENNESSEE, VIRGINIA AND WASHINGTON**
IT IS A CRIME TO KNOWINGLY PROVIDE FALSE, INCOMPLETE OR MISLEADING INFORMATION TO INSURANCE COMPANY FOR THE PURPOSE OF DEFRAUDING THE COMPANY. PENALTIES INCLUDE IMPRISONMENT, FINES AND DENIAL OF INSURANCE BENEFITS.

**RHODE ISLAND AND WEST VIRGINIA**
ANY PERSON WHO KNOWINGLY PRESENTS A FALSE OR FRAUDULENT CLAIM FOR PAYMENT OF A LOSS OR BENEFIT OR KNOWINGLY PRESENTS FALSE INFORMATION IN AN APPLICATION FOR INSURANCE IS GUILTY OF A CRIME AND MAY BE SUBJECT TO FINES AND CONFINEMENT IN PRISON.

0123
0123

All particulars herein are declared to be true and complete to the best of my/our knowledge and no information has been withheld or suppressed and I/we agree that this application and the terms and conditions of the policy in use by the Insurer shall be the basis of any contract between me/us and the insurer. I hereby authorize the Insurer to investigate all or any qualifications or statements contained herein.

| Applicant's Signature(s): | *Chris Ohman* | Date: | 02/28/2017 |
|---|---|---|---|

THIS APPLICATION DOES NOT COMMIT THE INSURER TO ANY LIABILITY NOR MAKE THE APPLICANT LIABLE FOR ANY PREMIUM UNLESS AND UNTIL THE INSURER AGREES TO EFFECT THIS INSURANCE

NAME OF PERSON COMPLETING APPLICATION:

RELATION TO APPLICANT / NAMED INSURED:

NAME OF AGENT OR BROKER: TUTTON INSURANCE SERVICES INC.

ADDRESS: 2913 S. PULLMAN ST., SANTA ANA, CA 92705

ARE YOU THE HOLDING PRODUCER: ☒ YES  [ ] NO    IF YES, FOR HOW MANY YEARS: 1

0124
0124



POLICYHOLDER DISCLOSURE
NOTICE OF TERRORISM
INSURANCE COVERAGE

You are hereby notified that under the Terrorism Risk Insurance Act, as amended, you have a right to purchase insurance coverage for losses resulting from acts of terrorism. As defined in Section 102(1) of the Act. The term "act of terrorism" means any act or acts that are certified by the Secretary of the Treasury—in consultation with the Secretary of Homeland Security, and the Attorney General of the United States—to be an act of terrorism; to be a violent act or an act that is dangerous to human life, property, or infrastructure; to have resulted in damage within the United States, or outside the United States in the case of certain air carriers or vessels or the premises of a United States mission; and to have been committed by an individual or individuals as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States Government by coercion.

YOU SHOULD KNOW THAT WHERE COVERAGE IS PROVIDED BY THIS POLICY FOR LOSSES RESULTING FROM CERTIFIED ACTS OF TERRORISM, SUCH LOSSES MAY BE PARTIALLY REIMBURSED BY THE UNITED STATES GOVERNMENT UNDER A FORMULA ESTABLISHED BY FEDERAL LAW. HOWEVER, YOUR POLICY MAY CONTAIN OTHER EXCLUSIONS WHICH MIGHT AFFECT YOUR COVERAGE, SUCH AS AN EXCLUSION FOR NUCLEAR EVENTS. UNDER THE FORMULA, THE UNITED STATES GOVERNMENT GENERALLY REIMBURSES 85% THROUGH 2015, 84% BEGINNING ON JANUARY 1, 2016, 83% BEGINNING ON JANUARY 1, 2017, 82% BEGINNING ON JANUARY 1, 2018, 81% BEGINNING ON JANUARY 1, 2019, AND 80% BEGINNING ON JANUARY 1, 2020, OF COVERED TERRORISM LOSSES EXCEEDING THE STATUTORILY ESTABLISHED DEDUCTIBLE PAID BY THE INSURANCE COMPANY PROVIDING THE COVERAGE. THE PREMIUM CHARGED FOR THIS COVERAGE IS PROVIDED BELOW AND DOES NOT INCLUDE ANY CHARGES FOR THE PORTION OF LOSS THAT MAY BE COVERED BY THE FEDERAL GOVERNMENT UNDER THE ACT.

YOU SHOULD ALSO KNOW THAT THE TERRORISM RISK INSURANCE ACT, AS AMENDED, CONTAINS A $100 BILLION CAP THAT LIMITS U.S. GOVERNMENT REIMBURSEMENT AS WELL AS INSURERS' LIABILITY FOR LOSSES RESULTING FROM CERTIFIED ACTS OF TERRORISM WHEN THE AMOUNT OF SUCH LOSSES IN ANY ONE CALENDAR YEAR EXCEEDS $100 BILLION. IF THE AGGREGATE INSURED LOSSES FOR ALL INSURERS EXCEED $100 BILLION, YOUR COVERAGE MAY BE REDUCED.

Acceptance or Rejection of Terrorism Insurance Coverage          482.00

☐ I hereby elect to purchase terrorism coverage for a prospective premium of $ _____

☒ I hereby decline to purchase terrorism coverage for certified acts of terrorism. I understand that I will have no coverage for losses resulting from certified acts of terrorism.

_Chris Ohman_
Policyholder/Applicant's Signature

CHRIS OHMAN
Print Name

Hart Indemnity & Liability Company
Insurance Company

n/a
Policy Number

1/25/2017
Date

Page 6 of 6   Passport 420, LLC

0125
0125

EXHIBIT "H"



STARR INDEMNITY & LIABILITY COMPANY
90 PARK AVENUE, 7TH FLOOR
NEW YORK, NY  10016

## STARR ELITE COMPREHENSIVE CORPORATE AIRCRAFT POLICY

ISSUED TO

**PASSPORT 420, LLC**

POLICY NUMBER

1000320046-02

0128
0128

# CONTENTS

**DECLARATIONS**   4

   Limits of the Company's Liability:   5

   Section One - Liability Coverages   5

      Coverage 1 - Liability for **Scheduled Aircraft**   5
      Coverage 2 - Liability for the Use of **Non-Owned Aircraft**   5
      Coverage 3 - Liability for **Property Damage** to **Non-Owned Aircraft**, and **Temporary Substitute Aircraft**   5
      Coverage 4 - Liability for Charter Referral   5
      Coverage 5 - **Passenger** Voluntary Settlements for **Scheduled Aircraft** and **Non-Owned Aircraft**   6
      Coverage 6 - Liability for **Property Damage** to Hangars and Their Contents   6
      Coverage 7 - Liability for Fire Damage to Real Property   6
      Coverage 8 - Liability for Cargo   6
      Coverage 9 - Liability Under Contractual Agreements   7
      Coverage 10 - Liability for **Personal Injury** and in/excluding **Advertising Injury**   7
      Coverage 11 - Liability for Alcohol Beverage Service   7
      Coverage 12 - Liability for Incidental Medical Malpractice   7
      Coverage 13 - Liability for the Use of **Premises**   7
      Coverage 14 - Liability for the Operation of **Mobile Equipment**   7
      Coverage 15 - Liability for the Operation of an **Auto** while on Airport **Premises**   7
      Coverage 16 - Liability for the Sale of **Aircraft** and Aircraft Products and Services   7
      Coverage 17 - Liability for Hangarkeeper Operations   8
      Coverage 18 - Liability for Garagekeeper Operations   8

   Section Two - Defense, Settlement and Supplementary Payments   8

   Section Three - **Physical Damage** Coverages   8

      Coverage 19 - **Physical Damage** Coverage for **Scheduled Aircraft** (including **Ingestion** and Emergency Landing)   8
      Coverage 20 - **Physical Damage** Coverage for **Spare Engines** and **Spare Parts** including Transit   8
      Coverage 21 - Automatic Insurance for Increased Value of **Scheduled Aircraft** or **Spare Engines** and **Spare Parts**   9
      Coverage 22 - **Physical Damage** Coverage for Mechanics Tools   9

   Section Four - Additional Coverages   9

      Coverage 23 - Temporary Replacement Parts Rental Expense   9
      Coverage 24 - Replacement **Aircraft** Rental Expense   9
      Coverage 25 - Search and Rescue Expenses   9
      Coverage 26 - Runway Foaming and Crash Control Expenses   9
      Coverage 27 - Trip Interruption Expense Coverage   9
      Coverage 28 - Automatic Insurance for Newly Acquired **Aircraft**   10
      Coverage 29 - Lay-Up Credit for **Scheduled Aircraft**   10
      Coverage 30 - Personal Effects and Baggage Expense   10

   Section Five - **Medical Expenses**   10

      Coverage 31 - Medical Payments for **Scheduled Aircraft** and **Non-Owned Aircraft**   10
      Coverage 32 - **Premises** Medical Payments   10

0129
0129

## INSURING AGREEMENTS 11

Section One - Liability Coverages 11

Coverage 1 - Liability for **Scheduled Aircraft** 11
Coverage 2 - Liability for the Use of **Non-Owned Aircraft** 11
Coverage 3 - Liability for **Property Damage** to **Non-Owned Aircraft**, and **Temporary Substitute Aircraft** 12
Coverage 4 - Liability for Charter Referral 12
Coverage 5 - **Passenger** Voluntary Settlements for **Scheduled Aircraft** and **Non-Owned Aircraft** 13
Coverage 6 - Liability for **Property Damage** to Hangars and Their Contents 14
Coverage 7 - Liability for Fire Damage to Real Property 14
Coverage 8 - Liability for Cargo 14
Coverage 9 - Liability Under Contractual Agreements 15
Coverage 10 - Liability for **Personal Injury** and in/excluding **Advertising Injury** 16
Coverage 11 - Liability for Alcohol Beverage Service 19
Coverage 12 - Liability for Incidental Medical Malpractice 19
Coverage 13 - Liability for the Use of **Premises** 19
Coverage 14 - Liability for the Operation of **Mobile Equipment** 19
Coverage 15 - Liability for the Operation of an **Auto** while on Airport **Premises** 20
Coverage 16 - Liability for the Sale of **Aircraft** and Aircraft Products and Services 20
Coverage 17 - Liability for Hangarkeeper Operations 20
Coverage 18 - Liability for Garagekeeper Operations 21

Section Two - Defense, Settlement and Supplementary Payments 22

Section Three - **Physical Damage** Coverages 23

Coverage 19 - **Physical Damage** Coverage for **Scheduled Aircraft** (including **Ingestion** and Emergency Landing) 23
Coverage 20 - **Physical Damage** Coverage for **Spare Engines** and **Spare Parts** including Transit 23
Coverage 21 - Automatic Insurance for Increased Value of **Scheduled Aircraft** or **Spare Engines** and **Spare Parts** 23
Coverage 22 - **Physical Damage** Coverage for Mechanics Tools 24

Section Four - Additional Coverages 24

Coverage 23 - Temporary Replacement Parts Rental Expense 24
Coverage 24 - Replacement **Aircraft** Rental Expense 25
Coverage 25 - Search and Rescue Expenses 25
Coverage 26 - Runway Foaming and Crash Control Expenses 25
Coverage 27 - Trip Interruption Expense Coverage 26
Coverage 28 - Automatic Insurance for Newly Acquired **Aircraft** 26
Coverage 29 - Lay-Up Credit for **Scheduled Aircraft** 26
Coverage 30 - Personal Effects and Baggage Expense 26

Section Five - **Medical Expenses** 27

Coverage 31 - Medical Payments for **Scheduled Aircraft** and **Non-Owned Aircraft** 27
Coverage 32 - **Premises** Medical Payments 27

Section Six - Policy Definitions 27
Section Seven - Exclusions 31
Section Eight - Limit of the Company's Liability 33
Section Nine - Notice of Claims and Other Duties of an **Insured** 35
Section Ten - Other Conditions of Insurance 36

0130
0130


**Starr Indemnity & Liability Company**

## STARR ELITE COMPREHENSIVE CORPORATE AIRCRAFT POLICY

### DECLARATIONS

Policy Number ___**1000320046-02**___          Previous Policy Number ___1000320046-01___

This section along with the policy provisions and any endorsements attached hereto completes this Starr Elite Comprehensive Corporate Aircraft Policy (Policy), issued by the Company as indicated above (hereinafter called The Company).

Item 1. **Named Insured**:          **PASSPORT 420, LLC**

Item 2. Address:          520 NEWPORT CENTER DRIVE STE. 1400
                                     NEWPORT BEACH, CA  92660

Item 3. Policy Period:     From:  JANUARY 26, 2018
                                     Until:   JANUARY 26, 2019

          both at 12:01 AM standard time at the first address shown in Item 2. above.

Item 4. Pilots:          AS ENDORSED

          The pilot warranty in Item 4, if any, shall not apply to Liability Coverage for **Non-Owned Aircraft**, **Temporary Substitute Aircraft** and Charter Referral.  Additionally, the pilot warranty in Item 4, if any, shall not apply while the insured **aircraft** is under the care, custody or control of a repair station for the purpose of maintenance, repair or test flights.

0131
0131

Item 5. Limits of the Company's Liability:

The limit of the Company's liability provided by each Coverage will not exceed:

Section One - Liability Coverages

Coverage 1 - Liability for **Scheduled Aircraft**

| FAA Cert. Number | Make & Model | Year Built | Seats Crew / Pass | | **Aircraft** Liability Limit |
|---|---|---|---|---|---|
| N227WP | HONDA AIRCRAFT COMPANY LLC HONDA JET | 2016 | 1 | 6 | $ 25,000,000. |
| | | | | | $ |
| | | | | | $ |
| | | | | | $ |
| | | | | | $ |
| | | | | | $ |
| | | | | | $ |
| | | | | | $ |

Coverage 2 - Liability for the Use of **Non-Owned Aircraft**

$ _____ 5,000,000.   Each **Occurrence**

Maximum Number of Seats:   __30__

Reporting Grace Period:   __30__   consecutive days

This limit is part of, and not in addition to, the limit provided for Coverage 1.

Coverage 3 - Liability for **Property Damage** to **Non-Owned Aircraft** and **Temporary Substitute Aircraft**

$ _____ 25,000,000.   Each **Occurrence**

This limit is part of, and not in addition to, the limit provided for Coverage 2.

Coverage 4 - Liability for Charter Referral

$ _____ 5,000,000.   Each **Occurrence**

This limit is part of, and not in addition to, the limit provided for Coverage 1.

0132
0132

Coverage 5 - **Passenger** Voluntary Settlements for **Scheduled Aircraft** and **Non-Owned Aircraft**

    A.   Settlement Limits:

        1.   With respect to any **Scheduled Aircraft** or **Temporary Substitute Aircraft**:

           Each Non-**Crew Member Passenger**:  $_____250,000.  Each **Occurrence**

           Each **Crew Member**:  $_____250,000.  Each **Occurrence**

        2.   With respect to any **Non-Owned Aircraft** except a **Temporary Substitute Aircraft**:

           Each Non-**Crew Member Passenger**:  $_____250,000.  Each **Occurrence**

           Each **Crew Member**:  $_____250,000.  Each **Occurrence**

           Total All **Non-Owned Aircraft Crew Members** and Non-**Crew Member Passengers** Combined:  $_____2,500,000.  Each **Occurrence**

    These limits are part of, and not in addition to, the limit provided for Coverage 1 or 2, whichever applies to the loss.

Coverage 6 - Liability for **Property Damage** to Hangars and Their Contents

    $_____1,000,000.  Each **Occurrence**

    This limit is part of, and not in addition to, the limit provided for Coverage 1 or 2, whichever applies to the loss.

Coverage 7 - Liability for Fire Damage to Real Property

    $_____1,000,000.  Each **Occurrence**

    This limit is part of, and not in addition to, the limit provided for Coverage 1 or 2, whichever applies to the loss.

Coverage 8 - Liability for Cargo

    $_____500,000.  Each **Occurrence**

    Deductible:  $_____NIL  Each **Occurrence**

    This limit is part of, and not in addition to, the limit provided for Coverage 1 or 2, whichever applies to the loss.

0133
0133

Coverage 9 - Liability Under Contractual Agreements

$ _____ 5,000,000.  Each **Occurrence**

This limit is part of, and not in addition to, the limit provided for Coverage 1 or 2, whichever applies to the loss.

Coverage 10 - Liability for **Personal Injury** and__IN__cluding **Advertising Injury**

$ _____ 25,000,000.  Each Offense and in the Annual Aggregate

This limit is part of, and not in addition to, the limit provided for Coverage 1 or 2, whichever applies to the loss.

Coverage 11 - Liability For Alcohol Beverage Service

$ _____ 5,000,000.  Each **Occurrence**

This limit is part of, and not in addition to, the limit provided for Coverage 1 or 2, whichever applies to the loss.

Coverage 12 - Liability for Incidental Medical Malpractice

$ _____ 5,000,000.  Each **Occurrence**

This limit is part of, and not in addition to, the limit provided for Coverage 1 or 2, whichever applies to the loss.

Coverage 13 - Liability for the Use of **Premises**

$ _____ 5,000,000.  Each **Occurrence**

This limit is part of, and not in addition to, the limit provided for Coverage 1 or 2, whichever applies to the loss.

Coverage 14 - Liability for the Operation of **Mobile Equipment**

$ _____ 5,000,000.  Each **Occurrence**

This limit is part of, and not in addition to, the limit provided for Coverage 13.

Coverage 15 - Liability for the Operation of an **Auto** while on Airport **Premises**

$ _____ 5,000,000.  Each **Occurrence**

This limit is part of, and not in addition to, the limit provided for Coverage 13.

Coverage 16 - Liability for the Sale of **Aircraft** and Aircraft Products and Services

$ _____ 5,000,000.  Each **Occurrence** and in the Annual Aggregate

This limit is part of, and not in addition to, the limit provided for Coverage 13.

0134
0134

Coverage 17 - Liability for Hangarkeeper Operations

$ _____ 25,000,000. Each **Aircraft**          $ _____ 25,000,000. Each **Occurrence**

Deductible: $ _____ NIL Each **Aircraft**          $ _____ NIL Each **Occurrence**

This limit is part of, and not in addition to, the limit provided for Coverage 13.

Coverage 18 - Liability for Garagekeepers

$ _____ 50,000. Any One **Auto**          $ _____ 100,000. Any One Loss

Deductible: $ _____ 1,500. Each **Auto**

This limit is part of, and not in addition to, the limit provided for Coverage 13.

Section Two - Defense, Settlement and Supplementary Payments

Section Three - **Physical Damage** Coverages

Coverage 19 - **Physical Damage** Coverage for **Scheduled Aircraft** (including **Ingestion** and Emergency Landing)

|  |  |  | Deductible | |
|---|---|---|---|---|
| FAA Cert. Number | Make & Model | Insured Value | Not **In Motion** | **In Motion**/ **Ingestion** |
| N227WP | HONDA AIRCRAFT COMPANY LLC HONDA JET | $ 5,100,000. | $ $10,000. | $ $10,000. |
|  |  | $ | $ | $ |
|  |  | $ | $ | $ |
|  |  | $ | $ | $ |
|  |  | $ | $ | $ |
|  |  | $ | $ | $ |
|  |  | $ | $ | $ |
|  |  | $ | $ | $ |

Coverage 20 - **Physical Damage** Coverage for **Spare Engines** and **Spare Parts** Including Transit

$ _____ 1,000,000. Each **Occurrence**

Deductible:

Not **In Motion** _____ NIL Each **Occurrence**
$

**In Motion** $ _____ NIL Each **Occurrence**

0135
0135

Coverage 21 - Automatic Insurance for Increased Value of **Scheduled Aircraft** or **Spare Engines** and **Spare Parts**

Maximum Automatic **Physical Damage** Limit for **Scheduled Aircraft**:

$_____25,000,000.  any one **aircraft** without prior approval

Maximum Automatic **Physical Damage** Limit for **Spare Engines** and **Spare Parts**:

$_____2,000,000.  without prior approval of the Company

Coverage 22 - **Physical Damage** Coverage for Mechanics Tools

$_____5,000.  Each Employee        $_____25,000.  Each **Occurrence**

Deductible:  $_____250.  Each Employee/Each **Occurrence**

This limit is part of, and not in addition to, the limit provided for Coverage 13.

Section Four - Additional Coverages

Coverage 23 - Temporary Replacement Parts Rental Expense

$_____250,000.  Each Loss

Minimum Repair Period:                5     days

Maximum coverage period:            60     consecutive days

Coverage 24 - Replacement **Aircraft** Rental Expense

$_____500,000.  Each Loss

Minimum Repair Period:                5     days

Maximum coverage period:            60     consecutive days

Coverage 25 - Search and Rescue Expenses

$_____1,000,000.  Each Loss

Coverage 26 - Runway Foaming and Crash Control Expenses

$_____1,000,000.  Each Loss

Coverage 27 - Trip Interruption Expense Coverage

$_____15,000.  Each **Passenger**/Each Loss

0136
0136

Coverage 28 - Automatic Insurance for Newly Acquired **Aircraft**

Maximum **Physical Damage** Limit $            25,000,000.  any one **aircraft** without prior approval of the Company.

Coverage 29 - Lay-Up Credit for **Scheduled Aircraft**

A pro-rated return of 60        % of the applicable premium at policy expiration if the **scheduled aircraft** is laid up for 30        or more consecutive days.

Coverage 30 - Personal Effects and Baggage Expense

$            15,000.  Each **Passenger**

## Section Five - **Medical Expenses**

Coverage 31 - Medical Payments for **Scheduled Aircraft** and **Non-Owned Aircraft**

A.  With respect to any **Scheduled Aircraft** or **Temporary Substitute Aircraft**:

Each Non-**Crew Member Passenger**:  $            25,000.  Each **Occurrence**

Each **Crew Member**:            $            25,000.  Each **Occurrence**

B.  With respect to any **Non-Owned Aircraft** except a **Temporary Substitute Aircraft**:

Each Non-**Crew Member Passenger**:  $            25,000.  Each **Occurrence**

Each **Crew Member**:            $            25,000.  Each **Occurrence**

Coverage 32 - **Premises** Medical Payments

$            25,000.  Each Person            $            250,000.  Each **Occurrence**

Item 6.   Policy Premium:   $ 25,051.

Item 7.   Endorsements Attached as of Inception:       STARR ELITE CA PROVISIONS (12/06)
STARR FORMS 10284, 10351, 10234, 10317, 10466, 10332, AVN48B, AVN52ECA, 10318, AVN46B, AVN38B, 10055, 10007, 20006, AVN2000A, 30002

Producer      TUTTON INSURANCE SERVICES, INC.
2913 S. PULLMAN STREET
SANTA ANA, CA  92705

Approved By  _____
(Authorized Representative)

Date of Issue      JANUARY 30, 2018  (BM)

Starr Elite CA Declarations (5/09)            -10-

0137
0137

In consideration of the payment of the premium and in reliance upon the truth of the statements, representations and the declarations made by the **Named Insured** and subject to all of the terms of the Policy including the applicable Limits of the Company's Liability under Item 5, the Company agrees with the **Named Insured** with respect to the coverages stated in the Declarations as follows:

## INSURING AGREEMENTS

Section One - Liability Coverages

Coverage 1 - Liability for **Scheduled Aircraft**

The Company will promptly pay on behalf of the **insured** all sums which the **insured** shall be legally obligated to pay as damages because of **bodily injury** or **property damage** caused by an **occurrence** during the policy period arising out of the ownership, maintenance or use of a **scheduled aircraft**.

Coverage 2 - Liability for the Use of **Non-Owned Aircraft**

The Company will promptly pay on behalf of the "insured", as defined below,  all sums which the **"insured"** becomes legally obligated to pay as damages because of **bodily injury** or **property damage** caused by an **occurrence** during the policy period arising out of the use of **non-owned aircraft** by or on behalf of the "insured".

    A.  For Coverage 2, the definition of "insured":

        1.  with respect to any **temporary substitute aircraft**, means the same as **insured**;

        2.  with respect to all other **non-owned aircraft**, means:

            a.  the **Named Insured** and,

            b.  any officer, director, stockholder, employee, partner, or agent of the **Named Insured** while that person is acting in their capacity as such.

        Regardless of Paragraphs 1. and 2. above, no person or organization will be an **insured** while using any **aircraft** that is owned in whole or in part by; or that is under any lease purchase option agreement by; or that is registered to that organization, person or, any household member of that person.

    B.  The insurance provided by Coverage 2 shall not apply to any claim or loss arising out of an **insured**'s product liability hazard including any products designed, manufactured, sold, distributed, serviced or handled by or on behalf of an **insured**.

    C.  The **Named Insured** shall promptly advise the Company of an exclusive lease of, or the use of, any **non-owned aircraft** that exceeds the reporting grace period shown in the Declarations. The Company may request additional information and charge an additional premium for this use. Inadvertent failure to report this use will not void this coverage provided that the **Named Insured** advises the Company as soon as possible after the omission is discovered.

    D.  The insurance provided by Coverage 2 is **excess insurance**.

0138
0138

**Coverage 3 - Liability for Property Damage to Non-Owned Aircraft and Temporary Substitute Aircraft**

The Company will promptly pay on behalf of the **insured** all sums which the "insured", as defined below, becomes legally obligated to pay as damages arising out of **property damage** caused by an **occurrence** during the policy period to **non-owned aircraft** or **temporary substitute aircraft**. This coverage section shall not apply while the **aircraft** is **in-flight** unless the **aircraft** is operated by a person employed as a professional pilot acting in the capacity as such.

    A.   For Coverage 3, the definition of "insured":

        1.   with respect to any **temporary substitute aircraft**, means the same as **insured**;

        2.   with respect to all other **non-owned aircraft**, means:

            a.   the **Named Insured** and,

            b.   any officer, director, stockholder, employee, partner, or agent of the **Named Insured** while that person is acting in their capacity as such.

        Regardless of Paragraphs 1. and 2. above, no person or organization will be an **insured** while using any **aircraft** that is:

            i.   owned in whole or in part by;

            ii.   that is under any lease purchase option agreement by;

            iii.   that is registered to

        that organization, person or, any household member of that person.

    B.   The insurance provided by Coverage 3 shall not apply to any claim or loss arising out of an **insured**'s product liability hazard including any products designed, manufactured, sold, distributed, serviced or handled by or on behalf of an **insured**.  This includes Liability for Hangarkeeper Operation provided under Coverage 17.

    C.   The **Named Insured** shall promptly advise the Company of an exclusive lease of, or the use of, any **non-owned aircraft** that exceeds the reporting grace period shown in the Declarations. The Company may request additional information and charge an additional premium for this use. Inadvertent failure to report this use will not void this coverage provided that the **Named Insured** advises the Company as soon as possible after the omission is discovered.

    D.   The insurance provided by Coverage 3 is **excess insurance**.

**Coverage 4 - Liability Coverage for Charter Referral**

The Company will promptly pay on behalf of the **Named Insured** all sums the **Named Insured** becomes legally obligated to pay as damages because of **bodily injury** or **property damage** caused by an **occurrence** and arising out of the **Named Insured**'s arrangement for use of a **non-owned aircraft** by and on behalf of another person or organization.

0139
0139

Coverage 5 - **Passenger** Voluntary Settlements for **Scheduled Aircraft** and **Non-Owned Aircraft**

Regardless of legal liability and without admitting to the liability of any party, the Company will offer to pay on behalf of the **insured** the sum requested by the **Named Insured** to, or for, the benefit of each covered **passenger** who sustains **bodily injury** caused by an **occurrence** during the policy period arising out of the ownership, maintenance or use of a **scheduled aircraft** or the use of **non-owned aircraft** by, or on behalf of, the **insured**.

If the **bodily injury**, directly and independently of all other causes, results in the death or dismemberment of the passenger, the Company will offer to pay up to the "settlement limit" as stated in the Declarations under Coverage 5.A.

Conditions of **Passenger** Voluntary Settlements for **Scheduled Aircraft** and **Non-Owned Aircraft**

A.   It is a condition of payment to or on behalf of any individual(s) that the individual(s) or the individual(s) legal representative will:

   1.   if requested, authorize the Company to obtain medical reports and copies of records.  The injured person will submit to examination by the physicians selected by the Company when the Company may reasonably require;

   2.   if payment is to be made under paragraphs A, B, or C above, be required to execute a full release, approved by the Company, for all **bodily injury** claims by or on their behalf against any **insured** and the Company for which there is insurance under the Policy.

B.   If within 120 days the payment offer is not accepted or is rejected or if at any time a claim is made or civil action is filed by or on behalf of a **passenger** to whom  this coverage applies for **bodily injury** against any **insured**, Coverage 5 will not apply to or for the benefit of that **passenger**.

C.   Coverage 5 will not apply to or for the benefit of any **crew member** on any **non-owned aircraft** unless the Declarations indicates a specified **non-owned aircraft** "settlement limit" for **crew member** and:

   1.   the **crew member** is a  professional pilot who is regularly employed by the **insured** and acting in the capacity as such, or

   2.   the **crew member** would normally be operating a **scheduled aircraft**, but is operating a **non-owned aircraft** on behalf of the **insured**.

Definitions applicable to Coverage 5:

"Settlement Limit" means the maximum applicable limit the Company will pay to or for each **passenger** as shown in the Declarations under Coverage 5.A.

0140
0140

Coverage 6 - Liability for **Property Damage** to Hangars and Their Contents

The Company will promptly pay on behalf of the **insured** all sums which the **insured** becomes legally obligated to pay for **property damage** to hangars and their contents not owned by an **insured** caused by an **occurrence** resulting from the **insured's aviation operations** during the policy period.

The insurance provided by Coverage 6 is **excess insurance** and will not apply to any loss or damage to property covered elsewhere in the Policy.

Coverage 7 - Liability for Fire Damage to Property

The Company will promptly pay on behalf of the **insured** all sums which the **insured** becomes legally obligated to pay as damages because of **property damage** caused by an **occurrence** resulting from the **insured's aviation operations** during the policy period arising out of **property damage** to structures or portions thereof rented to or leased to the **Named Insured**, including fixtures permanently attached thereto, if such **property damage** arises out of fire. Coverage 7 shall not apply to liability assumed by the **insured** under any contract or agreement.

The insurance provided by Coverage 7 shall be **excess insurance** over any valid and collectible property insurance (including any deductible portion thereof), available to the **insured**, such as, but not limited to, Fire, Extended Coverage, Builder's Risk Coverage or Installation Risk Coverage.

Coverage 8 - Liability for Cargo

The Company will promptly pay on behalf of the **insured** all sums which the **insured** becomes legally obligated to pay (less any applicable deductible) for the loss of, or **physical damage** to, the property of others caused by an **occurrence** during the policy period while the property is in the **insured**'s care, custody or control and it is on a covered **aircraft** or while it is in the custody of the **insured** on their **premises** prior to loading on or, after unloading from, a covered **aircraft**.

The insurance provided by Coverage 8 is **excess insurance**.

Coverage 8 will not apply to any loss, damage or claim caused by:

A.   any loss of market or any loss arising from delay whether or not the delay is caused by an **occurrence** covered by the Policy;

B.   any type of consequential loss;

C.   infidelity of the **insured**, its employees or agents;

D.   and confined to wear, tear, deterioration, extremes of temperature or pressure or due to the perishable or hazardous nature of the property;

E.   any loss in excess of the actual cost of reproducing or replacing destroyed or damaged manuscripts, notes, checks, securities, accounts, bills, deeds, or any other valuable papers; or

F.   the loss of or damage to the personal effects or baggage of any **passenger**.

0141
0141

Coverage 9 - Liability for Contractual Agreements

A. The Company will promptly pay on behalf of the **insured** all sums which the **insured** becomes legally obligated to pay as damages because of **bodily injury** or **property damage** caused by an **occurrence** during the policy period arising out of liability assumed by the **Named Insured** or their legal representative in a contract or agreement relating to the ownership, maintenance or use of **scheduled aircraft** or the use of **non-owned aircraft** by the **insured**.

B. The Company's Rights of Recovery section shown in Section Ten - Other Conditions of Insurance, Paragraph F., of the Policy will not apply to the extent that it is addressed in any contract or agreement that the **Named Insured** or its legal representative has entered into relating to **physical damage** of property insured by the Policy.

C. The **Named Insured** agrees to submit a copy of all such contracts or agreements to the Company as soon as possible. Inadvertent failure to do so will not void the insurance provided by Coverage 9 as long as the contract or agreement is submitted as soon as possible once the omission is discovered. The Company reserves the right to charge an additional premium for any such contract or
D. agreement.

E. The Company shall not require copies of temporary **aircraft** storage or minor servicing agreements, military or governmental agreements for the use of an airport, lease of premises agreements or agreements approved by the Company prior to the effective date of the Policy.

F. The insurance provided by Coverage 9 shall not apply to any liability assumed:

1. under any oral contract or agreement, unless the agreement is a contract which is required by a military or governmental body for the **insured**'s use of an airport or an agreement with another party relating to the temporary storage or minor servicing of a **scheduled aircraft** while it is away from its home base;

2. under any written contract or agreement:

   a. that is with or for the benefit of any **passenger**, **crew member** or their heirs. However, subparagraph F. 1. above shall not apply:

      i. if the contract or agreement is required by a military or governmental body for the **insured**'s use of an airport; or

      ii. for the Company's right of recovery as stated under Coverage 9, paragraph B;

   b. to the extent that it applies to major alterations or major repairs as defined in the Federal Aviation Regulations;

   c. that is with or for the benefit of any manufacturer of an **aircraft** or any **aircraft** parts or equipment, or their employees or agents, to the extent that it relates to their products liability hazard;

   d. that relates to the sale of an **aircraft**;

   e. that is entered into after a loss to the extent that it relates to that loss.

Starr Elite CA Provisions (5/09)                    -15-

0142
0142

Coverage 10 - Liability for **Personal Injury** or **Advertising Injury**, if included, on the Declarations page

The Company will promptly pay on behalf of the **insured** all sums which the **insured** becomes legally obligated to pay as damages because of **personal injury** or **advertising injury**, if included, to which this insurance applies resulting from the **insured**'s **aviation operations**. The Company will have the right and duty to defend any suit seeking those damages. The Company may at its discretion investigate any offense and settle any claim or suit that may result. However:

    A.  The amount the Company will pay for damages is limited as described in Section One - Coverage 10; and

    B.  The Company's right and duty to defend end when it has exhausted the applicable limit of insurance in the payment of judgment(s) or settlement(s) under Coverage 10.

No other obligation or liability to pay sums or perform acts or services is covered unless explicitly provided for under Section Two - Defense, Settlement and Supplementary Payments.

The insurance provided by Coverage 10 applies to:

    A.  **Personal injury** caused by an offense arising out of the **insured**'s **aviation operations**, excluding advertising, publishing, broadcasting or telecasting done by or for the **insured**;

    B.  **Advertising injury**, if included, caused by an offense committed in the course of advertising the **insured**'s **aviation operations**, aviation goods, aviation products or aviation services, but only if the offense was committed in the coverage territory during the policy period.

The insurance provided by Coverage 10 shall not apply to:

    A. Breach Of Contract

    **Advertising injury** or **personal injury** arising out of breach of contract.

    B. Continuing Offenses

    **Advertising injury** or **personal injury** that arises out of that part of an offense that continues or resumes after the later of the end of the policy period of:

        1.  this insurance; or,

        2.  a subsequent, continuous renewal or replacement of this insurance, that:

            a.  is issued by the **insured**;

            b.  remains in force while the offense continues; and

    would otherwise apply to **advertising injury** and **personal injury**.

    C. Contracts

    **Advertising injury** or **personal injury** for which the **insured** is obligated to pay damages by reason of assumption of liability in contract or agreement.

    This exclusion does not apply to the liability for damages that such **insured** would have in the absence of such contract or agreement.

0143
0143

D. Crime Or Fraud

**Advertising injury** or **personal injury** arising out of any criminal or fraudulent conduct committed by or with the consent or knowledge of the **insured.**

E. Expected Or Intended Injury

**Advertising injury** or **personal injury** arising out of an offense, committed by or on behalf of the **insured**, that:

1. is intended by such **insured;** or

2. would be expected from the standpoint of a reasonable person in the circumstances of such **insured;**

to cause injury.

F. Failure To Conform To Representations Or Warranties

**Advertising injury** or **personal injury** arising out of the failure of goods, products or services to conform with any electronic, oral, written or other representation or warranty of durability, fitness, performance, quality or use.

G. Internet Activities

**Advertising injury** or **personal injury** arising out of:

1. controlling, creating, designing or developing of another's Internet site;

2. controlling, creating, designing, developing, determining or providing the content or material of another's Internet site;

3. controlling, facilitating or providing, or failing to control, facilitate or provide, access to the Internet or another's Internet site; or

4. publication of content or material on or from the Internet, other than material developed by the **insured** or at the direction of the **insured.**

H. Media Type Business

**Advertising injury** or **personal injury** arising out of an offense committed by or on behalf of an **insured** whose business is advertising, broadcasting, cablecasting, publishing, telecasting or telemarketing.

This exclusion does not apply to **personal injury** caused by an offense described in subparagraphs A., B. or C. of the definition of **personal injury.**

I. Prior Offenses

**Advertising injury** or **personal injury** arising out of any offense first committed before the beginning of the policy period.

J. Publications With Knowledge Of Falsity

**Advertising injury** or **personal injury** arising out of any electronic, oral, written or other publication of content or material by or with the consent of the **insured:**

1. with knowledge of its falsity; or

2. if a reasonable person in the circumstances of such **insured** would have known such content or material to be false.

0144
0144

K. Employment-Related Practices

1. any damages sustained at any time by any person, whether or not sustained in the course of employment by any **insured**, arising out of any employment-related act, omission, policy, practice or representation directed at such person, occurring in whole or in part at any time by,

   a. arrest, detention or imprisonment;

   b. breach of any express or implied covenant;

   c. coercion, criticism, humiliation, prosecution or retaliation;

   d. defamation or disparagement;

   e. demotion, discipline, evaluation or reassignment;

   f. discrimination, harassment or segregation;

   g. i. eviction; or

      ii. invasion or other violation of any right of occupancy;

   h. failure or refusal to advance, compensate, employ or promote;

   i. invasion or other violation of any right of privacy or publicity;

   j. termination of employment; or

   k. other employment-related act, omission, policy, practice, representation or relationship in connection with any insured at any time.

This exclusion applies:

1. whether the **insured** may be liable as an employer or in any other capacity; and

2. to any obligation to share damages with or repay someone else who must pay damages because of any of the foregoing.

L. Wrong Description Of Prices

**Advertising injury** or **personal injury** arising out of the wrong description of the price of goods, products or services.

M. Intellectual Property Laws And Rights

Any actual or alleged **bodily injury**, **property damage**, **advertising injury** or **personal injury** arising out of, giving rise to or in any way related to any actual or alleged:

1. assertion; or

2. infringement or violation;

by any person or organization (including any **insured**) of any **intellectual property law or right**, regardless of whether this insurance would otherwise apply to all or part of any such actual or alleged injury or damage in the absence of any such actual or alleged assertion, infringement or

This exclusion applies, unless such injury:

1. is caused by an offense described in the definition of **advertising injury**; and

2. does not arise out of, give rise to or in any way relate to any actual or alleged assertion, infringement or violation of any **intellectual property law or right**, other than one described in the definition of **advertising injury**.

Coverage 11 - Liability for Alcohol Beverage Service

The Company will promptly pay on behalf of the **insured** all sums which the **insured** becomes legally obligated to pay as damages because of **bodily injury** or **property damage** caused by an **occurrence** resulting from the **insured**'s **aviation operations** during the policy period arising out of the serving or giving of any alcoholic beverage at or from the **insured**'s **premises** or any **aircraft** covered by the Policy.

The insurance provided by Coverage 11 is **excess insurance**.

Coverage 12 - Liability for Incidental Medical Malpractice

The Company will promptly pay on behalf of the **insured** all sums which the **insured** becomes legally obligated to pay as damages because of **bodily injury** caused by an **occurrence** resulting from the **insured**'s **aviation operations** during the policy period arising out of  "Incidental Medical Malpractice".

"Incidental Medical Malpractice" means injury arising out of the rendering of or failure to render, during the policy period, the following services:

A.   medical, automatic external defibrillator, surgical, dental, x-ray, or nursing service or treatment or the furnishing of food or beverages in connection therewith; or

B.   the furnishing or dispensing of drugs or medical, dental or surgical supplies or appliances.

C.   The insurance provided by Coverage 12 shall not apply to:

  1.   expenses incurred by the **insured** for first-aid to others at the time of an accident;

  2.   any **insured** engaged in the business or occupation of providing any of the services described under "Incidental Medical Malpractice" above;

  3.   injury caused by an indemnitee if such indemnitee is engaged in the business or occupation of providing any of the services described under "Incidental Medical Malpractice" above; or

  4.   the failure to render automatic external defibrillator treatment, if the **aircraft** or **premises** are not equipped with automatic external defibrillator units.

Coverage 13 - Liability for Use of **Premises**

The Company will promptly pay on behalf of the **insured** all sums which the **insured** becomes legally obligated to pay as damages because of **bodily injury** or **property damage** caused by an **occurrence** resulting from the **insured**'s **aviation operations** during the policy period arising out of the ownership, maintenance or use of **premises**.

The insurance provided by Coverage 13 is **excess insurance**.

Coverage 14 - Liability for the Operation of **Mobile Equipment**

The Company will promptly pay on behalf of the **insured** all sums which the **insured** becomes legally obligated to pay as damages because of **bodily injury** or **property damage** caused by an **occurrence** resulting from the **insured**'s **aviation operations** during the policy period arising out of ownership, maintenance or use of **mobile equipment**.

The insurance provided by Coverage 14 is **excess insurance**.

0146
0146

**Coverage 15 - Liability for the Operation of an Auto while on Airport Premises**

The Company will promptly pay on behalf of the **insured** all sums which the **insured** becomes legally obligated to pay as damages because of **bodily injury** or **property damage** caused by an **occurrence** resulting from the **insured's aviation operations** during the policy period arising out of ownership, lease, rental, arrangement or use of **autos** while on airport **premises** exclusive of any public roadways and parking areas.

The insurance provided by Coverage 15 is **excess insurance**.

**Coverage 16 - Liability for the Sale of Aircraft and Aircraft Products and Services**

The Company will promptly pay on behalf of the **insured** all sums which the **insured** becomes legally obligated to pay as damages because of **bodily injury** or **property damage** caused by an **occurrence** resulting from the **insured's aviation operations** during the policy period arising out of the:

   A.   sale or relinquishment from exclusive written lease, by the **named insured**, of a **scheduled aircraft** or any aircraft sold or relinquished prior to the policy period;

   B.   furnishing to others, by the **insured**, any materials, parts, equipment, fuel, maintenance, aircraft services, used for or in connection with aircraft, **premises** or **mobile equipment**;

   C.   furnishing to others, by the **insured**, of food or beverages in connection with the operation of **aircraft** or **premises**.

The insurance provided by Coverage 16 is **excess insurance** and will only apply if the **bodily injury** or **property damage** occurs away from the **insured's premises**, after physical possession of the aircraft, materials, parts, equipment, fuel, food or beverages have been relinquished to others and any services have been completed.

**Coverage 17 - Liability for Hangarkeeper Operations**

The Company will promptly pay on behalf of the **insured** all sums which the **insured** becomes legally obligated to pay as damages because of "loss" to **aircraft** (subject to the deductible shown in the Declarations if applicable unless such "loss" results from fire or explosion or while the **aircraft** is dismantled and being transported) occurring while such **aircraft** is in the care, custody or control of the **insured** for safekeeping, storage, service or repair.  However:

   A.   The amount the Company will pay for damages is limited as described under Declarations, "Item 5. Limits of the Company's Liability", Coverage 17;

   B.   If repairs are made by the **insured**, the Company will not pay more than:

      1.   the **insured's** actual net cost for necessary material and parts of like kind and quality; and

      2.   the **insured's** actual wages for labor at current straight time rates with no premium for overtime, plus 150% of such wages as an allowance for overhead and supervision.  No other obligation or liability to pay sums or perform acts or services is covered unless explicitly provided for under Section Two - Defense, Settlement and Supplementary Payments of Liability Claims.

0147
0147

C. Coverage 17 applies to damages because of "loss" to **aircraft** only if the "loss" occurs during the policy period.

D. The insurance provided by Coverage 17 shall not apply to:

1. the **insured**'s liability under any agreement to be responsible for "loss";

2. "loss" to robes, wearing apparel, personal effects or merchandise;

3. to "loss" or damage to **aircraft** or parts of any **aircraft**:

   a. owned by, leased to, rented to or loaned to the **insured** or partner(s) of the **insured**;

   b. owned by, leased to, rented to or loaned to an officer or employee of the **insured** unless the property is an **aircraft** in the **insured**'s custody under an agreement for which a charge has been made;

4. "loss" due to theft or conversion caused in any way by the **insured**'s employees, partners or shareholders;

5. "loss" to **insured**'s work, arising out of it or any part of it;

6. "loss" to **aircraft** while **in-flight**; or

7. liability for **property damage** to **non-owned aircraft** and **temporary substitute aircraft** under Coverage 3.

Definition applicable to Coverage 17:

"Loss" means direct and accidental loss of or damage to tangible property.

## Coverage 18 - Liability for Garagekeeper Operations

The Company will promptly pay on behalf of the **insured** all sums which the **insured** becomes legally obligated to pay as damages because of **property damage** to an **auto** occurring while such **auto** is in the care, custody or control of the **insured** for valet parking, towing, safekeeping, storage or while on airport **premises** for any other incidental use by the **insured**.

The insurance provided by Coverage 18 shall not apply to:

A. the **insured**'s liability under any agreement to be responsible for "loss";

B. "loss" to robes, wearing apparel, personal effects or merchandise;

C. "loss" or damage to an **auto** or parts of any **auto**:

   1. owned by, leased to, rented to or loaned to the **insured** or partner(s) of the **insured**;

   2. owned by, leased to, rented to or loaned to an officer or employee of the **insured** unless the **auto** is in the **insured**'s custody due to towing, or for valet parking for which a charge has been made.

D. "loss" due to theft or conversion caused in any way by the **insured**, its employees, its partners or shareholders.

Definition applicable to Coverage 18:

"Loss" means direct and accidental loss of or damage to tangible property.

Starr Elite CA Provisions (5/09)                    -21-

0148
0148

## Section Two - Defense, Settlement and Supplementary Payments

A.  The Company has the right and duty to defend any suit against the **insured** seeking damages because of **bodily injury**, **personal injury**, **advertising injury**, or **property damage** covered by the Policy, even if any of the allegations of the suit are groundless, false or fraudulent. The Company may make any investigation and settlement of any claim or suit as it deems expedient. The Company will not be obligated to pay any expense, claim or judgment or to defend any suit after the applicable limit of liability has been exhausted by the payment of judgment(s) or settlement(s).

B.  The Company will promptly pay in addition to the applicable limit of liability:

1.  all the Company's expenses and all costs taxed against the **insured** in any suit the Company is required to defend including:

    a.  any pre-judgment interest awarded against the **insured** on that  part of the judgment the Company is required to pay under the  terms of the Policy;

    b.  all interest on the amount of any judgment that the Company is required to pay under the terms of the Policy which accrues  after the entry of the judgment and before the Company has paid, tendered or deposited in to court that portion of the judgement owed by the Company; and

    c.  any costs for arbitration alleging damages covered by the Policy which the **insured** must or may submit to;

2.  premium on appeal bonds required or, premiums on bonds to release attachments in any suit defended by the Company for any amount not exceeding the applicable limit of liability;

3.  the cost of bail bonds, up to $10,000 for each incident, required of the **insured** because of an **occurrence** or violation of law or a regulation for civil aviation arising out of  the **insured**'s **aviation operations** and involves the use of  **aircraft** or **premises**.  However, the Company has no obligation to furnish or apply for any bail bonds;

4.  all reasonable expenses incurred by the **insured** for first aid, medical and surgical relief that is imperative at the time of an accident because of **bodily injury** covered by the Policy;

5.  all reasonable expenses incurred by the **insured** at the Company's request; however, the Company will not pay more than $500.00 per day for each of the **insured**'s employees for the loss of earnings, wages or salaries; and

6.  all expenses incurred by the **insured** that have been approved in advance by the Company.

0149
0149

Section Three - **Physical Damage** Coverages

Coverage 19 - **Physical Damage** Coverage for **Scheduled Aircraft** (including **Ingestion** and Emergency Landing)

The Company will promptly pay for any **physical damage** to a **scheduled aircraft** that occurs during the policy period including its disappearance or theft, less any applicable deductible. A **scheduled aircraft** shall be considered missing under disappearance or stolen under theft if such **aircraft** is unable to be located for fifteen (15) days after reported missing or stolen.  In addition, if an unexpected event causes a **scheduled aircraft** to make a landing in a location where it cannot safely depart and there is no **physical damage**, the Company will pay the reasonable costs of transporting the **scheduled aircraft** to the nearest suitable airport.

Coverage 20 - **Physical Damage** Coverage for **Spare Engines** and **Spare Parts** Including Transit

The Company will promptly pay for **physical damage** to or theft of **spare engines** and **spare parts** that are owned by the **Named Insured** or for which the **Named Insured** is legally responsible.

The insurance provided by Coverage 20 is **excess insurance**.

Coverage 21 - Automatic Insurance for Increased Value of **Scheduled Aircraft** or **Spare Engines** and **Spare Parts**

If the value of a **scheduled aircraft** is increased during the policy period because of modifications or the addition of equipment or, the **named insured** modifies or acquires additional **spare engines** or **spare parts**, the applicable insurance provided by the Policy under Section Three - **Physical Damage** Coverage will apply to the increased value. The amount of insurance in the Declarations will automatically increase by the actual cost to the **named insured** of the modifications, equipment or additional **spare engines** or **spare parts** as evidenced by the **named insured**'s records provided:

    A.   the **named insured** reports to the Company any increase in value as soon as possible after completion of modifications or additions;

    B.   that unless the Company has agreed in advance, the maximum automatic increase of value will not exceed:

        1.   the Maximum Automatic limit for **Physical Damage** to a **scheduled aircraft** shown in the Declarations, "Item 5. Limits of the Company's Liability" as shown under Coverage 21 in the Declarations; or

        2.   the Maximum Automatic Limit for **spare engines** and **spare parts** shown in the Declarations, "Item 5. Limits of the Company's Liability", as shown under Coverage 21 in the Declarations; and

    C.   any additional premiums for the increased limits are paid by the **named insured**.

0150
0150

Coverage 22 - **Physical Damage** Coverage for Mechanics Tools

This insurance is extended to cover tools of the **insured**'s employee mechanics against direct and accidental physical loss or damage from external causes while such tools are in the care, custody and control of the **named insured** or such employee while acting within the scope of employment.  The Company's liability shall not exceed the limits stated in the Declarations under Coverage 22.

The insurance provided by Coverage 22 shall not apply to claims caused by or arising from:

    A.   wear, tear, deterioration, rust, or inherent vice;

    B.   delay, depreciation, or loss of use;

    C.   mechanical, electrical, hydraulic, pneumatic or structural breakdown or failure;

    D.   artificial electric current;

    E.   extremes of temperature and humidity;

    F.   mysterious disappearance, loss or shortage disclosed upon taking inventory;

    G.   infidelity, dishonesty of the **insured** or anyone in the service of the **insured**;

    H.   wrongful taking or secretion by any person or organization in lawful possession thereof; or

    I.   failure to save and protect such property from further loss or harm after an **occurrence** to which this endorsement applies.

## Section Four - Additional Coverages

### Coverage 23 - Temporary Replacement Parts Rental Expense

If a **scheduled aircraft** suffers a **physical damage** loss covered by the Policy, the Company will promptly pay the **named insured**'s additional expenses of renting or leasing, for the period of repair, temporary replacement component part(s), to replace the part(s) damaged in the loss. This includes the **named insured**'s cost of installation, removal and transportation. Coverage 23 will not apply unless the actual time required for the repair exceeds the minimum required repair period shown for Coverage 23 in the Declarations. Coverage 23 shall not apply to rental expense incurred after the maximum coverage period has expired. The maximum coverage period begins immediately following the minimum required repair period.

Coverage 24 - Replacement **Aircraft** Rental Expense

If a **scheduled aircraft** suffers a **physical damage** loss covered under the Policy, the Company will promptly pay the **named insured**'s **extra expense** of leasing or renting a **temporary substitute aircraft** while the **scheduled aircraft** is being repaired.

The insurance provided by Coverage 24 shall not apply to **extra expense** incurred:

    A.  unless the actual time required to repair the damaged **aircraft** exceeds the minimum required repair period shown under this coverage in the Declarations;

    B.  if another **aircraft** is available at no extra charge for its use;

    C.  if the **named insured** acquires through ownership, lease, lease-purchase option, or otherwise, a permanent replacement for the damaged **aircraft**;

    D.  if the **scheduled aircraft** is a **total loss** and the Company has offered the **named insured** a proof of loss;

    E.  beyond the maximum coverage period shown under Coverage 24 as shown in the Declarations. The maximum coverage period begins immediately following the minimum required repair period and is to run consecutively without interruption;

    F.  unless such **extra expense** is actually incurred by the **named insured**; or

    G.  for replacement of any commercial revenue generating charter or Title 14 CFR Part 135 operation, unless such flight is solely for the **aircraft** owner's personal use.

Coverage 25 - Search and Rescue Expense

The Company will promptly reimburse the **insured** for its actual incurred expenses for search and rescue operations performed by or at the request of the **named insured**.

The insurance provided by Coverage 25 shall not apply to any claim, cost or expense:

    A.  for any governmental or military search and rescue operations;

    B.  arising out of any loss or damage to any equipment used in connection with the search and rescue operations;

    C.  arising out of the injury or death of any persons involved in the search and rescue operations;

    D.  incurred after it is reasonably assumed that there are no survivors; or

    E.  associated with salvaging the **aircraft** or any other property.

Coverage 26 - Runway Foaming and Crash Control Expense

The Company will promptly reimburse the **insured** for their actual incurred cost of runway or **aircraft** foaming and, fire, crash control, or rescue expenses, for the purpose of minimizing a **physical damage** or **bodily injury** loss covered by the Policy.

0152
0152

Coverage 27 - Trip Interruption Expense

The Company will promptly reimburse the **insured** for their reasonable expenses of food, travel by commercial carrier and lodging of **passenger**s, incurred from the place where an **aircraft** suffers a covered **physical damage** loss to the intended final destination of the damaged **aircraft**, or back to the place they originally boarded the **aircraft** if the trip is discontinued.

The insurance provided by Coverage 27 shall not apply to any cost or expense for replacement **aircraft** rental for which payment is expected or made under Coverage 24.

Coverage 28 - Automatic Insurance for Newly Acquired **Aircraft**

If, during the policy period, the **named insured** becomes the owner or exclusive lessee of an additional **aircraft** and is required to provide **aircraft** liability and/or **aircraft physical damage** insurance and, as soon as possible, reports the acquisition to the Company, the insurance afforded by the Policy will apply to the additional **aircraft** incepting at the time of acquisition. Unless the **named insured** and the Company agree otherwise, the coverage and limits of liability pertaining to the additional **aircraft** will be the same as is provided for other **scheduled aircraft**. If more than one **aircraft** is scheduled in Coverage 1 and more than one liability limit is scheduled, the lowest liability limit in the schedule will apply to the newly acquired **aircraft**. The insured value of the additional **aircraft** will be the actual cost of the **aircraft** to the **named insured** but not exceeding the Maximum **Physical Damage** Limit shown under Coverage 28 in the Declarations. The **named insured** agrees to pay any additional premium required because of the addition of the newly acquired **aircraft**.

Coverage 29 - Lay-Up Credit For **Scheduled Aircraft**

If a **scheduled aircraft** is not used **in-flight** for more than the minimum lay-up period shown in the Declarations the **named insured** agrees to notify the Company as soon as practicable. At the end of the policy period, the Company will return a pro-rata percentage credit of the applicable premium for the entire period of the lay-up as shown under Coverage 29 in the Declarations.

The insurance provided by Coverage 29 shall not apply to any **scheduled aircraft** laid up because of any loss or damage covered by the Policy.

Coverage 30 - Personal Effects and Baggage Expense

The Company will promptly pay on behalf of or reimburse the **named insured** for all sums which the **named insured** is liable for or pays to others for the loss of or **physical damage** to the personal effects and baggage of a **passenger**. Coverage 30 will only apply if the loss or damage occurred during the policy period and while the personal effects and baggage were in the care, custody or control of an **insured**.

0153
0153

Section Five - **Medical Expense**

Coverage 31 - Medical Payments for **Scheduled Aircraft** and **Non-Owned Aircraft**

Regardless of liability, the Company will promptly pay all the reasonable **medical expenses** incurred within one year from the date of injury for each covered **passenger** who sustains **bodily injury** caused by an **occurrence** during the policy period.

The insurance provided by Coverage 31 shall not apply for the benefit of a **crew member** on **non-owned aircraft** unless the Declarations shows a specific limit for **crew member** under the **non-owned aircraft** section of Coverage 31 and:

A. the **crew member** is an officer, director, stockholder, employee, partner, or agent of the **named insured** while acting in the scope of employment, or

B. the person is a **crew member** who would normally be operating a **scheduled aircraft** but is operating a **non-owned aircraft** on behalf of the **named insured**.

Coverage 32 - **Premises** Medical Payments

The Company will promptly pay all reasonable **medical expenses** incurred within one year from the date of injury for each person who sustains **bodily injury** caused by an **occurrence** during the policy period arising out of the **insured**'s **aviation operations** and ownership, maintenance or use of **premises**.

The following provisions apply to Coverage 31 and 32:

A. medical payments will not be made to anyone until all medical benefits available under a workers compensation or similar law have been exhausted;

B. as soon as possible, the injured person or someone on their behalf will give the Company written proof of claim, under oath if required, and will, if requested by the Company, authorize the Company to obtain medical reports and copies of records. The injured person will submit to examination by physicians selected by the Company if and when the Company may reasonably require;

C. the Company may pay the injured person or any person or organization rendering the services. Any payments made under these sections do not constitute an admission of liability of any **insured**, person, organization, or of the Company; and

D. the total liability of the Company for all **medical expenses** incurred by or on behalf of each covered **passenger** or person who sustains **bodily injury** will not exceed the applicable Limit of Liability as stated in the Declarations under Coverage 32 for that **passenger** or person.

Section Six - Policy Definitions

When appearing in bold print in the Policy the following definitions apply:

**"Advertisement"** means an electronic, oral, written or other notice, about goods, products or services, designed for the specific purpose of attracting the general public or a specific market segment to use such goods, products or services.

**Advertisement** does not include any e-mail address, Internet domain name or other electronic address or metalanguage.

0154
0154

"**Advertising injury**" means injury, other than **bodily injury**, **property damage** or **personal injury**, sustained by a person or organization and caused by an offense of infringing, in that particular part of the **insured**'s **advertisement** of goods, products or services, that are:

A. copyrighted **advertisement**; or

B. registered collective mark, registered service mark or other registered trademarked name, slogan, symbol or title.

"**Aircraft**" means any **scheduled aircraft** and any other **aircraft** for which insurance is provided under the Policy. The definition includes the **aircraft**'s propulsion system, and parts and equipment installed in or on the **aircraft**. Parts that are temporarily removed are also included in the definition even if replaced by similar parts.  Tools and repair equipment standard for the **aircraft** and normally carried on the **aircraft** are also included within the definition.

"**Auto**" means a land motor vehicle, trailer or semi-trailer designed for travel on public roads, including any attached machinery or equipment. But **auto** does not include **mobile equipment**.

"**Aviation operations**" means all operations arising from the ownership, maintenance or use of locations or **aircraft** for aviation activities including that portion of roads or other accesses that adjoin these locations. **Aviation operations** include all operations necessary or incidental to aviation activities.

"**Bodily injury**" means physical injury sustained by any person, caused by an **occurrence** during the policy period, including sickness, disease, mental anguish and death at any time resulting therefrom.

"**Crew member**" means any **passenger** such as the **pilot-in-command**, co-pilot, flight engineer or flight attendant, who is required for or assisting in **aircraft** operations.

"**Extra expense**" means that portion of the actual incurred cost of leasing or renting a replacement **aircraft** which exceeds the cost of operating **aircraft** the **named insured** would have incurred if the **scheduled aircraft** had not been damaged.

"**Excess insurance**" means insurance that only applies when all other valid and collectible insurance, including any formal self-insurance program or self-insured retention plan, available to the **named insured**/**insured** has been exhausted (other than insurance specifically purchased by the **named insured** to apply as excess over this Policy). If no such insurance or self-insurance exists, excess insurance coverage provided by this policy shall act as primary. If the other insurance is written through the Company as primary insurance, the total limit of the Company's or Companies' liability will not exceed the greatest or greater limit on any one Policy.

"**In-flight**" means, with respect to fixed-wing **aircraft**, the time commencing from the start of the take-off run of the **aircraft** and continuing until it has completed its landing roll. With respect to an **aircraft** that is a rotorcraft, it is any time the rotors are moving under power for lift-off or flight, until the rotors cease revolving after landing. With respect to any other **aircraft**, it is any time the **aircraft** is off a supporting surface as a result of propulsion, buoyancy or aerodynamic reaction.

"**In-motion**" means anytime the **aircraft** is moving under its own power or the momentum generated therefrom or, while it is **in-flight**. With respect to an **aircraft** that is a rotorcraft, it is anytime the rotors are moving under power or the momentum generated therefrom.

0155
0155

"**Ingestion**" means **physical damage** to a turbine engine or turbine auxiliary power unit, if they are included within the definition of **aircraft**, caused by objects or substances that are not or were not part of the engine or its accessories, which is the result of a single incident of sufficient severity to require, or would require if its severity were known at the time, immediate repair before further use.

"**Insured**" means:

    A.   for all coverage:

        1.   the **named insured**;

        2.   any director, officer, partner, employee, agent or stockholder of the **Named Insured** while that person is acting within their official capacity as such;

    B.   for all Section One - Liability Coverages except Coverage 2, 3 and 5 (**Non-owned aircraft** Liability Coverage and Products Liability Coverages) means:

        1.   any person or organization while riding in, using or legally responsible for a **scheduled aircraft** or **temporary substitute aircraft** provided that the use is within the scope of the permission of the **named insured**; and

        2.   any other person or organization but, only for their legal liability covered by the Policy which arises solely out of the acts or omissions of a person or organization in A. above.

    C.   other than any persons or organizations described in paragraph A. above, none of the following is considered an **insured** regardless of subparagraph B. 1. above:

        1.   any person or organization or their agents or employees engaged in the design, manufacture, maintenance, repair, or sale of **aircraft**, **aircraft** engines, components or accessories, or engaged in the operation of any **aircraft**, airport, hangar, flight school, flight service, or piloting service, with respect to any **occurrence** arising out of such activity, and

        2.   the owner, lessor or their agents or employees, of any **non-owned aircraft** covered by the Policy.

"**Intellectual property law or right**" means any:

    A.   certification mark, copyright, patent or trademark (including collective or service marks);

    B.   right to, or judicial or statutory law recognizing an interest in, any trade secret or confidential or proprietary non-personal information;

    C.   other right to, or judicial or statutory law recognizing an interest in, any expression, idea, likeness, name, slogan, style of doing business, symbol, title, trade dress or other intellectual property; or,

    D.   other judicial or statutory law concerning piracy, unfair competition or other similar practices.

"**Medical expense**" means expenses for necessary medical, surgical, x-ray and dental services, including prosthetic devices and necessary ambulance, hospital, professional nursing and/or funeral services.

"**Mobile equipment**" means a land vehicle (including any machinery or apparatus attached), whether or not self-propelled, used in connection with the maintenance or operation of **aircraft** or **premises** that is:

    A.   not subject to motor vehicle registration;

    B.   used exclusively on **premises** owned by or rented to the **named insured** including the roadways or property immediately adjoining; or

    C.   designed for use principally off public roads.

0156
0156

"**Named Insured**" means the person(s) or organization(s) shown in Item 1. of the Declarations.

"**Non-owned aircraft**" means any **aircraft** except:

    A.   an **aircraft** owned in whole or in part by or registered to the **named insured**;

    B.   a **scheduled aircraft**; or

    C.   an **aircraft** having a seating configuration exceeding the maximum number of seats shown in the Declarations for Coverage 2 (regardless of the actual number of **passenger**s on the **aircraft**).

"**Occurrence**" means an accident, including continuous or repeated exposure to conditions, which results in **bodily injury** or **property damage** neither expected nor intended by the **insured**. However, the definition includes **bodily injury** or **property damage** resulting from the efforts to prevent dangerous interference with any **aviation operations**.

"**Partial loss**" means any **physical damage** loss which is not a **total loss**.

"**Passenger**" means any person in, on or boarding the **aircraft** for the purpose of riding, flying in or exiting from it after a ride, flight or attempted flight.

"**Personal injury**" means means injury, other than **bodily injury**, **property damage** or **advertising injury**, caused by an offense of:

    A.   false arrest, false detention or other false imprisonment;

    B.   malicious prosecution;

    C.   wrongful entry into, wrongful eviction of a person from or other violation of a person's right of private occupancy of dwelling, **premises** or room that such person occupies, if committed by or on behalf of its landlord, lessor or owner; or

    D.   electronic, oral, written or other publication of material that:

        1.   libels or slanders a person or organization (which does not include disparagement of goods, products, property or services); or

        2.   violates a person's right of privacy.

"**Physical damage**" means accidental, direct physical loss of or damage to **scheduled aircraft**, **spare engines** or **spare parts** during the policy period including **ingestion**, but it does not include the loss of use or any residual depreciation in value either before or after any repairs have been made.

"**Pilot-in-command**" means the pilot aboard the **aircraft** who is responsible for its **in-flight** operation.

"**Premises**" means the portions of airports, buildings or areas used by the **Named Insured** directly in connection with the ownership, operation, maintenance or use of any **aircraft** and the **Named Insured**'s **aviation operations**.

"**Property damage**" means accidental damage to or destruction of the tangible property of others caused by an **occurrence** during the policy period and the resultant loss of use of the property. **Property damage** also includes the loss of use of the tangible property of others that is not physically damaged but that is caused by an **occurrence** during the policy period.

0157
0157

"**Salvage value**" means the value of the damaged property prior to any repairs.

"**Scheduled aircraft**" means any **aircraft** listed under Coverage 1 - Liability for **Scheduled Aircraft** and Coverage 19 - **Physical Damage** Coverage for **Scheduled Aircraft** in the Declarations or any **aircraft** covered under Coverage 28 - Automatic Insurance for Newly Acquired **Aircraft**.

"**Spare engines**" means propulsion engines and auxiliary power units which have been or which are intended to be installed in or on a **scheduled aircraft** or **temporary substitute aircraft** and which are not included within the policy definition of an **aircraft**.

"**Spare parts**" means parts or accessories, except **spare engines**, specifically designed for installation in or on **aircraft** or **mobile equipment** which are not included within the policy definition of an **aircraft** or **mobile equipment**.

"**Temporary substitute aircraft**" means any **non-owned aircraft** used in place of a **scheduled aircraft** that is temporarily withdrawn from use because of its damage, breakdown, repair, modification, inspection, servicing, loss or destruction.

"**Total loss**" means any **physical damage** loss for which the cost to repair when added to the **salvage value** equals or exceeds:

    A.  the insured value of a **scheduled aircraft**, or

    B.  the actual cash value of any other insured property.

Theft or disappearance of the entire **aircraft** is considered a **total loss**.


## Section Seven - Exclusions

The insurance provided by the Policy shall not apply:

    A.  to liability assumed by the **insured** in any type of agreement except as provided by Coverage 9 - Liability for Contractual Agreements;

    B.  to any obligation which the **insured** or its insurance carrier may be held liable under any workers' compensation, unemployment compensation, disability benefits law or under any similar law;

    C.  to **bodily injury** or **personal injury** to any employee of the **insured** arising out of and in the course of their employment by the **insured**, or to any claims for **bodily injury** as a consequence thereof. This exclusion shall not apply to liability assumed by the **insured** in any agreement required by a military or governmental authority as a prerequisite for using an airport or an airport facility, nor will this exclusion apply to Coverage 5 - **Passenger** Voluntary Settlements;

    D.  to illegal, criminal or dishonest acts or activities, alleged or otherwise, committed by or at the direction of or with the knowledge and consent of directors or officers of the **insured** and with the knowledge at the time that such act was illegal or criminal, but with respect to the **named insured** this exclusion shall apply only if such activities or acts are with the knowledge and consent of an officer or director of the **named insured**;

    E.  to any claim, loss or expense arising out of any hostile detonation of any weapon of war employing atomic or nuclear fission and/or fusion or other like reaction or radioactive force or matter;

0158
0158

F.   to any **insured** while the **aircraft** is **in-flight** if piloted by other than the pilot or pilots designated under Item 4 of the Declarations;

G.   under all Section One - Liability Coverage and Section Two - Defense, Settlement and Supplementary Payments of Liability Claims, for **property damage** to property owned, occupied, used, rented, transported by or in the care, custody, or control of an **insured** except as provided under Coverage 2, 3, 6, 7, 8, 17 and 18;

H.   under Section One - Liability Coverage and Section Two - Defense, Settlement and Supplementary Payments of Liability Claims or Section Five - **Medical Expenses**, to any **insured** who is also **insured** under any contract of nuclear energy liability insurance, in effect at the time of the **occurrence**, issued by the Nuclear Energy Liability Insurance Association or the Mutual Atomic Energy Liability Underwriters that covers the claim, loss, damage or expense or would cover the claim, loss, damage or expense if such policy's limits of liability were not exhausted;

I.   under all Section Three - **Physical Damage** Coverage, to any loss, damage, claim or expense:

   which is due and confined to wear and tear, deterioration, mechanical or electrical breakdown of the insured property, its equipment, components or accessories, or to tires, unless the damage is caused by fire, malicious mischief, vandalism or theft or unless the loss or damage is the direct result of other **physical damage**, including **ingestion**, covered by the Policy. Damage resulting from the breakdown, failure or malfunction of an engine component, accessory or part is considered mechanical breakdown of the entire engine;

J.   claims or damage resulting from:

   1.   war, whether declared or undeclared, invasion, acts of foreign enemies, hostilities, civil war, rebellion, revolution, insurrection, martial law, military or usurped power or attempts at usurpation of power;

   2.   confiscation, nationalization, seizure, restraint, detention, appropriation, requisition for title, used by or under the order of any government, public or local authority, whether civil, military or *de facto*;

   3.   claims arising while the insured property is outside the control of the **insured** because of any of the above perils;

K.   to an **aircraft**'s turbine engine (including a turbine powered auxiliary power unit) caused by heat resulting from starting, attempted starting, operation or shutdown thereof;

L.   caused by any type of radioactive contamination;

M.   caused by the embezzlement, secretion or conversion of the insured property; or

N.   due to depreciation in the value of, or arising from the loss of use of the insured property.

0159
0159

## Section Eight - Limit of the Company's Liability

A. Other Insurance

Except with respect to coverage provided by the Policy as **excess insurance**, if there is other insurance including any formal self-insurance program or self-insured retention plan, in the **insured**'s name or otherwise, against any loss, liability, or expense covered by the Policy, the Company will not be liable under the Policy for a greater proportion of such loss, liability or expense than the applicable limit of the Company's liability under the Policy bears to the total applicable limits of all other valid and collectible insurance.

B. Total Liability for Section One - Liability Coverage

The limits apply separately to each insured **aircraft** and each **insured** but, regardless of the number of **insured**s under the Policy, persons or organizations who sustain **bodily injury**, **personal injury** or **property damage**, claims made, or suits brought because of **bodily injury**, **personal injury** or **property damage**, the Company's total liability for all damages, including damages for care and loss of services, as the result of any one **occurrence** will not exceed the limit of liability stated in the Declarations as applicable to "each **occurrence**", and in the annual aggregate if specified. For the purpose of determining the limit of the Company's total liability, all **bodily injury**, **personal injury** and **property damage** arising out of continuous or repeated exposure to the same general conditions will be considered arising out of one **occurrence**.

C. Total Liability for Section Three - **Physical Damage** Coverage

1. In the event of a **total loss**, the Company will promptly pay the **named insured**:

   a. the Insured Value of the **scheduled aircraft** as shown under Coverage 19 of the Declarations;

   b. the **named insured**'s financial interest in any **spare engine** or **spare part** (less any applicable deductible) but, not exceeding its actual cash value or the limits for the applicable coverage in the Declarations, whichever is less. In addition, the Company will promptly refund the pro-rated unearned premium for any **scheduled aircraft** that is a **total loss**. At the time of payment of a **total loss** by the Company, the Company's exposure, under Coverage 19, ceases.

2. In the event of a **partial loss**, the Company's Liability shall not exceed:

   a. the total of the following items, less any applicable deductible, if the repairs are made by an **insured**:

      i. the **insured**'s net costs for necessary material and parts of like kind and quality;

      ii. "Transportation Costs" (as defined below);

      iii. the reasonable costs of food, lodging, and transportation of the **insured**'s employees required for the actual period of repair if the loss occurs away from the **insured**'s base of operations and

      iv. actual wages paid for labor at the current straight time rates at the place of repair plus the reasonable cost of required supervision and overhead;

0160
0160

b. the total of the following items, less any applicable deductible, if the repairs are made by other than the **insured**:

    i. the net cost to the **insured**, to make repairs with material and parts of like kind and quality;

    ii. the reasonable transportation, food and lodging expenses for a necessary representative(s) of the **insured** to inspect or authorize repairs and/or test fly the **aircraft** but not exceeding 5% of the repair cost estimate or $5,000., whichever is less. This paragraph will not apply unless the **aircraft** is being repaired away from its primary base of operations;

    iii. any additional "Transportation Costs" incurred.

"Transportation Costs" means the cost of transportation, by the least expensive reasonable means of:

    A. damaged parts from the site of the loss to and from the most practicable place for repair;

    B. replacement parts from the nearest available source to the site of the loss; or

    C. the damaged property to the most practicable place for repair and, then, to the site of the loss or to the **insured**'s home airport, whichever is closer.

3. In no event will the Company's liability for a **partial loss** exceed the insured value of the **scheduled aircraft**; or with respect to Coverage 20, the **named insured**'s financial interest in any **spare engine** or **spare part**, its actual cash value, or the applicable limit of liability shown under Coverage 20 in the Declarations, whichever is less.

4. In the event of a **partial loss**, whether or not such loss is covered by the Policy, the Insured Value of the **scheduled aircraft** will automatically be reduced at the time of the loss by the amount of the loss. When repairs begin, the insured value will automatically increase by the value of the completed repairs until the insured value of the **scheduled aircraft** is fully restored.

5. If the Company pays a claim, whether for a **partial loss** or a **total loss**, the Company is entitled to all salvage. There will, however, be no abandonment of the salvage to the Company without its prior consent.

6. The Company has the right to return stolen property any time before the loss is paid with payment for any resultant **physical damage**.

7. The amount specified as a deductible (if any) for **scheduled aircraft** does not apply to a **total loss**, constructive **total loss** or any loss caused by fire, lightning, explosion, transportation of parts, theft, robbery or pilferage. However, any **partial loss** caused by fire or explosion, resulting directly or indirectly from the collision or crash of an **aircraft** while **in-motion**, will be subject to the **in-motion** deductible, if any. **Scheduled aircraft** deductibles will not apply in the event of a collision with any other **aircraft** insured through the Company under another policy.

0161
0161

D.   Total Liability for Section Four -  Additional Coverage

The total liability of the Company for all costs or expenses incurred by or on behalf of the **named insured** will not exceed the Limit of Liability stated in the Declarations that applies to each applicable coverage

E.   Severability of Interests

The limits and coverage apply separately to each **insured**, but the inclusion within the Policy of more than one **insured** will not increase the applicable limits of the Company's total liability.

F.   Two or More **Aircraft** Insured by the Policy

In the event that two or more **aircraft** are insured by the Policy, the applicable limits of liability and deductibles (if any) will apply separately to each.

## Section Nine - Notice of Claims and Other Duties of an **Insured**

In the event of any accident, **occurrence**, claim, suit or loss, the **insured**(s) and/or the **insured**'s legal representative(s) agree to:

A.   not assume any obligation or liability, nor offer to pay any reward except at the **insured**'s expense, nor incur any expense other than those items listed in Section Two - Defense, Settlement and Supplementary Payments of the Policy;

B.   promptly contact the Company and follow up with prompt written notice including (if known) the:

1.   time, place and description of events;

2.   names and locations of **passenger**s, witnesses, injured or deceased persons, and

3.   location and description of any damaged property and/or **aircraft**;

C.   immediately forward to the Company every demand, notice, summons, legal paper, or any other process they receive;

D.   cooperate and assist the Company in all matters of any claim or suit;

E.   do nothing after the accident or loss to harm the Company's right of recovery against any person or organization who may be liable to the **insured**;

F.   authorize the Company to obtain any records relating to a loss;

G.   not abandon the **aircraft** or any other salvage without the Company's prior consent;

H.   take all reasonable precautions to protect the **aircraft** or other insured property after any accident or loss. Reasonable expenses incurred in providing such protection will be reimbursed by the Company. Any further loss or damage due to the **insured**'s failure to reasonably protect the insured property will not be covered by the Policy;

0162
0162

I.  promptly report any suspected theft or vandalism to the local police;

J.  allow the Company the option to inspect any **aircraft** or insured property before any repairs begin or its disposal;

K.  file with the Company within ninety (90) days after the loss a sworn proof of loss including the information and in the form the Company reasonably requires and, upon the Company's request, submit to examination under oath;

L.  exhibit the damaged property and produce for the Company's examination all pertinent records and invoices, permitting copies to be made, at reasonable times and places as the Company designates;

M.  if requested, provide clear title to the Company for any salvaged property at the time **total loss** payment is made by the Company;

N.  allow the Company to inspect **aircraft** records, repair and service invoices, sales receipts, and log books as may be required in the settlement of any claim.

## Section Ten - Other Conditions of Insurance

A.  Appraisal of Loss

If the **named insured** and the Company fail to agree on the amount of a loss, either may, within sixty (60) days after a proof of loss is filed, demand an appraisal of the loss. The **named insured** and the Company will each select a competent aircraft appraiser and the appraisers will select a competent and disinterested umpire. The appraisers will judge the amount of the loss. If they do not agree, they will submit their difference to the umpire. Agreement in writing of any two of the three will determine the amount of the loss. The **named insured** and the Company will each pay their chosen appraiser and will bear equally the expenses of the appraisal and the umpire. The Company will not be held to have waived any of its rights by any act relating to appraisal.

B.  Action Against the Company

No action will be taken against the Company unless, prior to such action, the **insured** has fully complied with all of the terms and conditions of the Policy and the amount of loss has been determined as set forth below:

1.  Liability Coverages - With respect to Section One - Liability Coverage, no action will lie against the Company until the amount of the **insured**'s obligation to pay has been finally determined either by judgment against the **insured** after actual trial or, by written agreement of the **insured**, the claimant and the Company. Any person, organization or their legal representative who has secured such judgment or written agreement will be entitled to recover under the Policy to the extent of the coverage provided by the Policy.  No person or organization shall have any right under the Policy to join the Company as a party to any action against the **insured** to determine the **insured**'s liability, nor will the Company be impleaded by the **insured** or its legal representative. Bankruptcy or insolvency of the **insured** or of the **insured**'s estate will not relieve the Company of any of its obligations under the Policy.

0163
0163

2.  **Physical Damage** Coverages - With respect to Section Three - **Physical Damage** Coverage, no action will lie against the Company, nor will payment for loss be required, until thirty (30) days after the required proof of loss is filed with the Company and the amount of loss is determined as described in Section Three - **Physical Damage** Coverage of the Policy. Any action against the Company must be taken within one year after the date of the loss.

3.  Additional Coverages - With respect to Section Four - Additional Coverages, no action will lie against the Company, nor will payment for loss be required, until thirty (30) days after any required proofs of claims have been filed with the Company. Any action against the Company must be taken within one year after the date of the loss.

C.  Cancellation and Non-Renewal of the Policy

1.  Cancellation - The Policy may be cancelled by the **named insured** by mailing prior written notice to the Company stating when the cancellation will be effective. The Policy may be cancelled by the Company by mailing to the first **named insured** at the first address shown under Item 2. of the Declarations stating when, not less than ninety (90) days thereafter, the cancellation will be effective. However, only ten (10) days prior written notice will be provided if the cancellation is for non-payment of any premium due. The effective date and hour of cancellation stated in the notice will become the end of the policy period.

    If the **named insured** cancels the Policy, earned premium will be computed in accordance with the customary short rate table and procedure. If the Company cancels, earned premium will be computed on a pro-rata basis. Premium adjustment may be made either at the time cancellation is effective or as soon as practicable after cancellation becomes effective, but payment or tender of unearned premium by the Company is not a condition required for the cancellation to be effective.

2.  Non-Renewal - The Company will mail written notice to the first **named insured** at least sixty (60) days prior to the expiration date of the Policy in the event either decides not to renew the Policy.

    The proof of mailing or delivering notice of non-renewal or cancellation to the first **named insured** by the Company will be sufficient proof of notice to all **insureds**.

D.  Certificates of Insurance

    A Certificate of Insurance issued by the Company for or on behalf of the **named insured**, including any certificates required by military or governmental authorities, automatically provides the insurance as is evidenced in that certificate.

E.  Changing the Policy

    Nothing in the Policy can be changed or waived except by the Company's written endorsement, approved and signed by the Company.

F.  Company's Rights of Recovery

    In the event of any payment made under the Policy, the Company will assume all of the **insured**'s rights of recovery against any person or organization. The **insured** will execute and deliver instruments and papers and do whatever else is necessary to enforce those rights.

G.  Cross Liability

The Policy will cover claims by one **insured** against another **insured**.  However, in no event will this provision increase or change the limits of the Company's liability nor will it change any of the Declarations, Insuring Agreements, Exclusions, Conditions, Limits of Liability or other terms of the Policy.

H.  Financial Responsibility Laws

(applicable to Section One - Liability Coverages)

When the Policy is certified as proof of financial responsibility under the provisions of any **aircraft** financial responsibility law, the insurance afforded by the Policy for **bodily injury** or **property damage** will comply as necessary with the provisions of the law but, in no event in excess of the limits of liability stated in the Declarations of the Policy. The **named insured** agrees to reimburse the Company for any payment made which the Company would not have been obligated to make under the terms of the Policy except for the agreement in this paragraph.

I.  Inspection

The Company, or their authorized representative, shall be permitted to inspect the insured property and any of its records during the policy period and for one year afterward.

J.  Mexican Operations Warning

Although the Policy provides coverage in Mexico, the Mexican Government requires proof of **aircraft** liability written through a Mexican insurance company. If the **insured** does not have proof of Mexican liability insurance, the **aircraft** can be confiscated by the Mexican authorities and any **passenger**s jailed or detained.

It is a good practice to contact the **insured**'s agent or broker to arrange coverage if any flights are planned into or near Mexican Airspace. Mexican liability coverage is available through the Company if needed.

K.  Policy Compliance with State Law

If the terms of the Policy conflict with the **named insured**'s state or province law, the Policy terms are deemed amended as necessary to comply with that law.

L.  Policy Territory

The insurance provided by the policy shall be effective worldwide.

Payment of loss under the policy shall only be made in full compliance with all United States of America economic or trade sanction laws or regulations, including, but not limited to, sanctions, laws and regulations administered and enforced by the U.S. Treasury Department's Office of Foreign Assets Control ("OFAC").

0165
0165

M.  Transfer of the Policy to Others

Interest in the Policy may not be transferred without prior written agreement from the Company. If the **named insured** dies or is judged legally bankrupt or insolvent and the **named insured** or their legal representative notifies the Company within sixty (60) days of the judgment or death, effective the date of the judgment or death, the **named insured** will become:

1.  any person or organization having custody of the **scheduled aircraft** until a legal agent is appointed; or,

2.  the **named insured**'s legal representative.

N.  Acceptance of Policy

By acceptance of the Policy, the **named insured** agrees that the statements in the Declarations are its representations, that the Policy is issued in reliance upon the truth of the representations and that the Policy embodies all agreements by and between the **named insured** and the Company or any of its agents.

In Witness Whereof, the company issuing this policy has caused this policy to be signed by its authorized officers, but this policy shall not be valid unless also signed by a duly authorized representative of the company.

Charles Dangelo - President                    Nehemiah E. Ginsburg - General Counsel

**STARR INDEMNITY & LIABILITY COMPANY**

0166
0166

## ADDITIONAL INSURED ENDORSEMENT

This policy is amended as follows:

The provisions of this endorsement shall apply with respect to:  N227WP

(Only the clause(s) indicated by an "X" shall apply.)

☐   The scheduled persons or organizations are included as additional insured.

☐   The scheduled persons or organizations are the registered owner of _____
and are included as additional insured.

☐   The scheduled persons or organizations are included as additional insured but only as respects liability coverages.

☒   The scheduled persons or organizations are included as additional insured under liability coverages, but only as respects operations of the **named insured**.

☐   The scheduled persons or organizations are included as additional insured but only as respects operations of the **named insured**.

The insurance extended by this endorsement shall not apply to, and no person or organization named in the schedule shall be insured for **bodily injury** or **property damage** which arises from the design, manufacture, modification, repair, sale, or servicing of aircraft by that person or organization.

Schedule:

Name       SIGNATURE FLIGHT SUPPORT CORPORATION*
Address    515 MARXMILLER PLACE
            SANTA BARBARA, CA  93117

Name
Address

Name
Address

All other provisions of this policy remain the same.

This endorsement becomes effective _____ JANUARY 26, 2018 _____ to be attached to and hereby made a part of:
Policy No. _____ 1000320046-02 _____
Issued to  PASSPORT 420, LLC

By STARR INDEMNITY & LIABILITY COMPANY

Endorsement No. _____ 1

Date of Issue _____ JANUARY 30, 2018  (BM) _____       By ___ [signature]

                                   (Authorized Representative)

Starr 10284 (3/06)

## KNOWLEDGE OF OCCURRENCE

This policy is amended as follows:

KNOWLEDGE OF **OCCURRENCE**

It is agreed that knowledge of an **occurrence** by an agent, servant or employee of the **Insured** will not in itself constitute knowledge by the **Insured** unless such notice has been received by the **Insured**'s Insurance Administrator.

**INSURED**'S INADVERTENT FAILURE TO REPORT

Notwithstanding any other provision(s) of this policy, inadvertent errors or omissions and/or failure in furnishing information, notification or reports required will not prejudice the coverage afforded by this policy provided the **Insured** notifies the Company within a reasonable time after the error or omission is discovered.

**INSURED**'S FAILURE TO NOTIFY

The **Insured's** rights under this policy will not be affected if it fails to give notice of an accident or **occurrence** solely because it reasonably believed that the accident or **occurrence** was not covered under this policy.

All other provisions of this policy remain the same.

This endorsement becomes effective ___JANUARY 26, 2018___ to be attached to and hereby made a part of:
Policy No. ___1000320046-02___
Issued to ___PASSPORT 420, LLC___

By STARR INDEMNITY & LIABILITY COMPANY

Endorsement No. ___2___

Date of Issue ___JANUARY 30, 2018  (BM)___   By ___[signature]___
(Authorized Representative)

Starr 10351 (5/06)

0168
0168

## LOSS PAYEE ENDORSEMENT

In consideration of additional premium of $ _____INCLUDED_____ , this policy is amended as follows:

Any loss under **physical damage** coverage is payable as interest may appear to the **named insured** and the following Loss Payee:

As respects   N227WP

SIGNATURE FLIGHT SUPPORT CORPORATION*
515 MARXMILLER PLACE
SANTA BARBARA, CA  93117

All other provisions of this policy remain the same.

This endorsement becomes effective_____JANUARY 26, 2018_____to be attached to and hereby made a part of:
Policy No. ____1000320046-02____
Issued to   PASSPORT 420, LLC

By STARR INDEMNITY & LIABILITY COMPANY

Endorsement No. ____3____

Date of Issue ____JANUARY 30, 2018  (BM)____          By _____
                                                              (Authorized Representative)

Starr 10234 (3/06)

**PILOT WARRANTY ENDORSEMENT**

This policy is COMPLETED     as follows with respect to Item 4. Pilots as set forth on the Declarations Page:

WITH RESPECT TO N227WP:

BILL PARRISH, CHRIS OHMAN, OR;

ANY PILOT WHO HOLDS A COMMERCIAL PILOT CERTIFICATE OR BETTER WITH MULTI-ENGINE AND INSTRUMENT RATINGS, IS TYPE RATED IN THE MAKE AND MODEL AIRCRAFT OPERATED AND HAS A MINIMUM OF THE FOLLOWING HOURS OF FLIGHT AS RECORDED IN HIS/HER LOGBOOK. IT IS FURTHER REQUIRED THAT SUCH PILOT(S) MUST HAVE SUCCESSFULLY COMPLETED A MOTION BASED SIMULATOR TRAINING COURSE SPECIFICALLY DESIGNED FOR THE MAKE AND MODEL AIRCRAFT OPERATED WITHIN THE PRECEDING 12 MONTHS OF POLICY INCEPTION AND ANNUALLY THEREAFTER.

5,000 TOTAL LOGGED FLYING HOURS
2,500 HOURS IN MULTI-ENGINE AIRCRAFT
500 HOURS IN TURBOPROP OR TURBOFAN POWERED AIRCRAFT
350 HOURS IN THE MAKE MODEL AIRCRAFT OPERATED

The pilot warranty set forth above shall not apply to Liability Coverage for **Non-Owned Aircraft**, **Temporary Substitute Aircraft** and Charter Referral.  Additionally, the pilot warranty in set forth above shall not apply while the insured **aircraft** is under the care, custody or control of a repair station for the purpose of maintenance, repair or test flights.

All other provisions of this policy remain the same.

This endorsement becomes effective       JANUARY 26, 2018       to be attached to and hereby made a part of:
Policy No.     1000320046-02
Issued to   PASSPORT 420, LLC

By STARR INDEMNITY & LIABILITY COMPANY

Endorsement No.      4

Date of Issue     JANUARY 30, 2018  (BM)                    By _____
                                                                 (Authorized Representative)

Starr 10317 (6/06)

## PRIMARY AND NON-CONTRIBUTORY ENDORSEMENT

This policy is amended as follows:

With the respect to the following scheduled persons or organizations, all coverages shall be primary and non-contributory with respect to any other insurance policies held by the following scheduled persons or organizations.

Schedule:

SIGNATURE FLIGHT SUPPORT CORPORATION, ITS PARENT, SUBSIDIARY, RELATED AND AFFILIATED COMPANIES AND THE AUTHORITY
515 MARXMILLER PLACE
SANTA BARBARA, CA 93117

All other provisions of this policy remain the same.

This endorsement becomes effective ___JANUARY 26, 2018___ to be attached to and hereby made a part of:
Policy No. ___1000320046-02___
Issued to ___PASSPORT 420, LLC___

By STARR INDEMNITY & LIABILITY COMPANY

Endorsement No. ___5___

Date of Issue ___JANUARY 30, 2018  (BM)___           By _____
                                                              (Authorized Representative)

Starr 10466 (6/07)

0171
0171

## WAIVER OF SUBROGATION - PHYSICAL DAMAGE

In consideration of additional premium of $ ___INCLUDED___ , this policy is amended as follows:

We hereby waive our right of subrogation against the following as respects loss arising under **physical damage** coverage as set forth under this policy; provided, however, that this waiver shall not prejudice our right of recourse for damages arising from the design, manufacture, modification, repair, sale or servicing of the **aircraft** by the following:

SIGNATURE FLIGHT SUPPORT CORPORATION *
515 MARXMILLER PLACE
SANTA BARBARA, CA  93117

All other provisions of this policy remain the same.

This endorsement becomes effective ___JANUARY 26, 2018___ to be attached to and hereby made a part of:
Policy No.  ___1000320046-02___
Issued to  PASSPORT 420, LLC

By  STARR INDEMNITY & LIABILITY COMPANY

Endorsement No. ____6____

Date of Issue  ___JANUARY 30, 2018  (BM)___        By _____
                                                        (Authorized Representative)

Starr 10332 (5/06)

## WAR, HI-JACKING AND OTHER PERILS EXCLUSION CLAUSE (AVIATION)

This policy is amended as follows:

In the event any of the provisions of this endorsement are in conflict with any provisions, exclusions, conditions or terms forming part of this policy, this endorsement shall take precedence.

This policy does not cover claims caused by:

(a) War, invasion, acts of foreign enemies, hostilities (whether war be declared or not), civil war, rebellion, revolution, insurrection, martial law, military or usurped power or attempts at usurpation of power;

(b) Any hostile detonation of any weapon of war employing atomic or nuclear fission and/or fusion or other like reaction or radioactive force or matter;

(c) Strikes, riots, civil commotions or labor disturbances;

(d) Any act of one or more persons, whether or not agents of a sovereign power, for political or terrorist purposes and whether the loss or damage resulting therefrom is accidental or intentional;

(e) Any malicious act or act of sabotage;

(f) Confiscation, nationalization, seizure, restraint, detention, appropriation, requisition for title or use by or under the order of any Government (whether civil, military or de facto) or public or local authority;

(g) Hi-jacking or any unlawful seizure or wrongful exercise of control of the aircraft or crew in flight (including any attempt at such seizure or control) made by any person or persons on board the aircraft acting without the consent of the Insured.

Furthermore, this policy does not cover claims arising whilst the aircraft is outside the control of the Insured by reason of any of the above perils.

The aircraft shall be deemed to have been restored to the control of the Insured on the safe return of the aircraft to the Insured at an airfield not excluded by the geographical limits of this policy, and entirely suitable for the operation of the aircraft (such safe return shall require that the aircraft be parked with engines shut down and under no duress).

All other provisions of this policy remain the same.

This endorsement becomes effective _____ JANUARY 26, 2018 _____ to be attached to and hereby made a part of:
Policy No. _____ 1000320046-02 _____
Issued to   PASSPORT 420, LLC

By STARR INDEMNITY & LIABILITY COMPANY

Endorsement No. _____ 7 _____

Date of Issue   JANUARY 30, 2018  (BM)            By _____

(Authorized Representative)

AVN48B (2/06)

0173
0173

**EXTENDED COVERAGE ENDORSEMENT  (AVIATION LIABILITIES) - CALIFORNIA**

In consideration of an additional premium of $ ___INCLUDED___ , this policy is amended as follows:

The policy of which this Endorsement forms part includes War, Hi-jacking and Other Perils Exclusion Clause AVN48B:

1.   With effect from  ___JANUARY 26, 2018___ , all sub-paragraphs other than __(b)__ of War, Hi-jacking and Other Perils Exclusion Clause AVN48B are deleted SUBJECT TO all terms and conditions of this Endorsement.

2.   EXCLUSION applicable only to any coverage extended in respect of the deletion of sub-paragraph (a) of War, Hi-jacking and Other Perils Exclusion Clause AVN48B:

Coverage shall not include liability for damage to any form of property on the ground situated outside Canada and the United States of America unless caused by or arising out of the use of aircraft.

3.   LIMITATION OF LIABILITY

The limit of the Company's liability in respect of the coverage provided by this Endorsement shall be US$ ___50,000,000.___ or the applicable policy limit, whichever the lesser, any one occurrence and in the annual aggregate (the "sub-limit").  This sub-limit shall apply within the full policy limit and not in addition thereto.

To the extent coverage is afforded to an Insured under the policy, this sub-limit shall not apply to such Insured's liability:

(a)   to the passengers (and for their baggage and personal effects) of any aircraft operator to whom the policy affords cover for liability to its passengers arising out of its operation of aircraft;

(b)   for cargo and mail while it is on board the aircraft of any aircraft operator to whom the policy affords cover for liability for such cargo and mail arising out of its operations of aircraft.

Notwithstanding any other liability for which coverage is afforded under this policy, coverage provided under this Endorsement shall apply solely to the following:

        SECTION ONE - LIABILITY COVERAGES.
        SECTION FOUR - ADDITIONAL COVERAGES UNDER COVERAGE 25: SEARCH AND RESCUE
        EXPENSES, COVERAGE 26:  RUNWAY FOAMING AND CRASH CONTROL EXPENSES AND COVERAGE
        27: TRIP INTERRUPTION EXPENSE COVERAGE.
        SECTION FIVE - **MEDICAL EXPENSES**.

4.   AUTOMATIC TERMINATION

To the extent provided below, coverage extended by this Endorsement shall TERMINATE AUTOMATICALLY in the following circumstances:

(i)   All coverage

        - upon the outbreak of war (whether there be a declaration of war or not) between any two or more of the following countries:  France, the People's Republic of China, the Russian Federation, the United Kingdom, the United States of America;

AVN52ECA (12/06)        Page 1 of Endorsement No.  ___8___

(ii)   Any coverage extended in respect of the deletion of sub-paragraph (a) of  War, Hi-jacking and Other Perils Exclusion Clause AVN48B

- upon the hostile detonation of any weapon of war employing atomic or nuclear fission and/or fusion or other like reaction or radioactive force or matter wheresoever or whensoever such detonation may occur and whether or not the insured aircraft may be involved;

(iii)   All coverage in respect of any of the insured aircraft requisitioned for either title or use

- upon such requisition.

PROVIDED THAT if an insured aircraft is in the air when (i), (ii) or (iii) occurs, then the coverage provided by this Endorsement (unless otherwise cancelled, terminated or suspended) shall continue in respect of such an aircraft until completion of its first landing thereafter and any passengers have disembarked.

5.   REVIEW AND CANCELLATION

(a)   Review of Premium and/or Geographical Limits (7 Days)

The Company may give notice to review premium and/or geographical limits - such notice to become effective on the expiry of seven days from 23.59 hours G.M.T. on the day on which notice is given.

(b)   Limited Cancellation (48 hours)

Following a hostile detonation as specified in paragraph 4. (ii) above, the Company may give notice of cancellation of one or more parts of the coverage provided by paragraph 1. of this Endorsement by reference to sub-paragraphs (c), (d), (e), (f) and/or (g) of  War, Hi-jacking and Other Perils Exclusion Clause AVN48B - such notice to become effective on the expiry of forty-eight hours from 23.59 hours G.M.T. on the day on which notice is given.

(c)   Cancellation (7 Days)

The coverage provided by this Endorsement may be cancelled by either the Company or the Insured by giving notice to become effective on the expiry of seven days from 23.59 hours G.M.T. on the day on which such notice is given.

(d)   Notices

All notices referred to herein shall be in writing.

All other provisions of this policy remain the same.

This endorsement becomes effective ___JANUARY 26, 2018___ to be attached to and hereby made a part of:
Policy No. ___1000320046-02___
Issued to  PASSPORT 420, LLC

By _STARR INDEMNITY & LIABILITY COMPANY_

Endorsement No. ___8___

Date of Issue  JANUARY 30, 2018  (BM)          By _____
                                                          (Authorized Representative)

AVN52ECA  (12/06)          Page 2

0175
0175

## EXTENDED COVERAGE ENDORSEMENT

## WAR RISK FOR PHYSICAL DAMAGE COVERAGE, EXTORTION, AND HI-JACKING EXTRA EXPENSE COVERAGE

In consideration of $ _____ INCLUDED _____ additional premium, this policy is amended as follows:

This coverage is subject to all the terms and conditions shown both in this policy as well as this endorsement. It does not change any coverage or terms except as specifically stated below.  The **insured** is responsible for using all reasonable efforts to ensure that all required permits for **aircraft** operations as well as all state and local laws are complied within the country of operation or the country where a loss or expense is incurred.

### SECTION ONE

### WAR RISK COVERAGE FOR AIRCRAFT PHYSICAL DAMAGE

The Company will pay for the physical loss of or **physical damage** to any **scheduled aircraft** (unless excluded by Exclusion (G) below) that is caused by an **occurrence** during the policy period arising out of any of the following perils:

(a)  war, whether declared or undeclared, invasion, acts of foreign enemies, hostilities, civil war, rebellion, revolution, insurrection, martial law, military or usurped power or any attempt of usurpation of power;

(b)  any strikes, riots, civil commotions or labor disturbances;

(c)  any act of one or more persons, whether or not agents of a sovereign power, for political or terrorist purposes and whether the loss or damage resulting therefrom is accidental or intentional;

(d)  any malicious act or act of sabotage;

(e)  confiscation, nationalization, seizure, restraint, detention, appropriation, requisition for title, use by, or under the order of any government, public or local authority, whether civil, military or de facto;

(f)  hi-jacking or any unlawful seizure or wrongful exercise of control of a **scheduled aircraft** or crew **in-flight** (including any attempt at such seizure or control) made by any person or persons on board the **scheduled aircraft** acting without the consent of the **insured**.

This section also covers the physical loss of or **physical damage** to a **scheduled aircraft** while that **scheduled aircraft** is outside the control of the **insured** because of any of the above perils.  The **aircraft** will be covered until its safe return to the **insured**.

The **scheduled aircraft** shall be deemed to have been restored to the control of the **insured** on the safe return of the **scheduled aircraft** to the **insured** at an airfield not excluded by the geographical limits of this endorsement and entirely suitable for the operation of the **aircraft** (such safe return shall require that the **aircraft** be parked with engines shut down and under no duress).

### SECTION TWO

### "EXTORTION, HI-JACKING, AND CONFISCATION EXPENSE COVERAGE"

#### Extortion, Expense Coverage

Subject to the limits described below, the Company will reimburse the **named insured** for ninety percent (90%) of any payment properly made for threats made during the policy period against any **scheduled aircraft** covered by this endorsement.

Starr 10318 (5/06)        Page 1 of Endorsement No.   9

0176
0176

### Hi-jacking and Confiscation Expense Coverage

Subject to the limits described below, the Company will reimburse the **named insured** for ninety percent (90%) of any required extra expenses incurred following any type of confiscation or hi-jacking that takes place during the policy period as described in paragraphs (e) and (f) of SECTION ONE of this endorsement.

### Limits of the Company's Liability for Section Two Coverages

The most that the Company will reimburse the **named insured** for any one **occurrence** is an amount equal to ninety percent (90%) of the net cost to the **named insured** of any payment(s) made but not exceeding:

(A)   ninety percent (90%) of the Insured Value of the **scheduled aircraft** involved, or

(B)   $1,000,000.00,

whichever is less.

The **insured** warrants that the remaining ten percent (10%) of any payment made is not insured elsewhere.

For the purpose of this coverage, any series of related events, losses or expenses connected to any hi-jacking, extortion, or confiscation will be considered one **occurrence**.

### Exclusions Applicable to All Coverages Provided by this Endorsement

This endorsement will not cover any loss, damage or expense arising out of:

(A)   war, whether declared or undeclared between any of the following countries:  The United Kingdom, The United States of America, France, The Russian Federation, or The Peoples Republic of China.  If any **scheduled aircraft** covered by this endorsement is in the air when an outbreak of war occurs, this exclusion will not apply until that **scheduled aircraft** completes its first landing;

(B)   detonation, whether hostile or otherwise, of any weapon of war employing atomic or nuclear fission and/or fusion or any other similar reaction;

(C)   any loss or damage caused by radioactive force or matter;

(D)   any failure to provide any type of bond, security or any other financial cause whether or not required under a court order;

(E)   the repossession or any attempt at repossession by any person or organization having any legal title or lien on the **scheduled aircraft** or any other type of legal contractual relationship with the **insured**;

(F)   any type of delay, loss of use or any other type of consequential loss whether or not the **scheduled aircraft** is lost or damaged except as specifically provided under the SECTION TWO coverages of this endorsement;

(G)   any **occurrence** involving the following **scheduled aircraft** (if any) which the **named insured** has elected not to cover by this endorsement:

| Year | Make and Model | Registration No. | Year | Make and Model | Registration No. |
|------|----------------|------------------|------|----------------|------------------|
|      |                |                  |      |                |                  |

Starr 10318 (5/06)        Page 2 of Endorsement No.___9___

0177
0177

**AUTOMATIC TERMINATION OF COVERAGE, CANCELLATION, AND AMENDMENT OF TERMS**

**Cancellation or Amendment of Terms by Notice**

The applicable sections of Item C. 1. Cancellation, of Section Ten - Other Conditions of Insurance, of this policy are changed to read:

The coverage provided by this endorsement can be cancelled, non-renewed or the rate of premium or geographical limits changed by the Company with the mailing or delivering of seven (7) days prior written notice to the first **named insured** at the first address shown in Item 2. of the Declarations. The proof of delivery or mailing to the first **named insured** will be sufficient proof of notice to all **named insureds**.

**Automatic Termination of Coverage**

All coverages provided by this endorsement will automatically terminate without any prior notice to the **named insured** if any of the following events occur:

1.  Any hostile detonation, of any weapon of war employing atomic or nuclear fission and/or fusion or radioactive force or matter, whenever the detonation occurs whether or not a **scheduled aircraft** covered by this endorsement is involved.

2.  War, whether declared or undeclared, between any of the following countries:  The United Kingdom, The United States of America, France, The Russian Federation, or the Peoples Republic of China.  If any **scheduled aircraft** covered by this endorsement is in the air when an outbreak of war occurs, coverage for that **scheduled aircraft** will only apply until that **aircraft** completes its first landing.

COVERAGE AS PROVIDED UNDER THIS ENDORSEMENT SHALL EXCLUDE ALL REQUIREMENTS OF THE TERRORISM RISK INSURANCE ACT OF 2002.

All other provisions of this policy remain the same.

This endorsement becomes effective ___JANUARY 26, 2018___ to be attached to and hereby made a part of:
Policy No. ___1000320046-02___
Issued to ___PASSPORT 420, LLC___

By ___STARR INDEMNITY & LIABILITY COMPANY___

Endorsement No. ___9___

Date of Issue ___JANUARY 30, 2018  (BM)___

By _____
(Authorized Representative)

Starr 10318 (5/06)          Page 3

0178
0178

## NOISE AND POLLUTION AND OTHER PERILS EXCLUSION CLAUSE

This policy is amended as follows:

In the event any of the provisions of this endorsement are in conflict with any provisions, exclusions, conditions or terms forming part of this policy, this endorsement shall take precedence.

1.  This policy does not cover claims directly or indirectly occasioned by, happening through or in consequence of:

    (a)  noise (whether audible to the human ear or not), vibration, sonic boom and any phenomena associated therewith,

    (b)  pollution and contamination of any kind whatsoever,

    (c)  electrical and electromagnetic interference,

    (d)  interference with the use of property;

    unless caused by or resulting in a crash, fire, explosion or collision or a recorded in-flight emergency causing abnormal aircraft operation.

2.  With respect to any provision in the policy concerning any duty of the Company to investigate or defend claims, such provision shall not apply and the Company shall not be required to defend:

    (a)  claims excluded by paragraph 1., or

    (b)  a claim or claims covered by the policy when combined with any claims excluded by paragraph 1. (referred to below as "Combined Claims").

3.  In respect of any Combined Claims, the Company shall (subject to proof of loss and the limits of the policy) reimburse the Insured for that portion of the following items which may be allocated to the claims covered by the policy:

    (a)  damages awarded against the Insured and

    (b)  defense fees and expenses incurred by the Insured.

4.  Nothing herein shall override any radioactive contamination or other exclusion clause attached to or forming part of this policy.

All other provisions of this policy remain the same.

This endorsement becomes effective ___JANUARY 26, 2018___ to be attached to and hereby made a part of:
Policy No. ___1000320046-02___
Issued to ___PASSPORT 420, LLC___

By STARR INDEMNITY & LIABILITY COMPANY

Endorsement No. ___10___

Date of Issue ___JANUARY 30, 2018  (BM)___          By _____
                                                              (Authorized Representative)

AVN46B (2/06)

0179
0179

**NUCLEAR RISKS EXCLUSION CLAUSE**

This policy is amended as follows:

In the event any of the provisions of this endorsement are in conflict with any provisions, exclusions, conditions or terms forming part of this policy, this endorsement shall take precedence.

1.   This policy does not cover:

(i)   loss or destruction of or damage to any property whatsoever or any loss or expense whatsoever resulting or arising therefrom or any consequential loss

(ii)   any legal liability of whatsoever nature

directly or indirectly caused by or contributed to by or arising from:

(a)   the radioactive, toxic, explosive or other hazardous properties of any explosive nuclear assembly or nuclear component thereof;

(b)   the radioactive properties of, or a combination of radioactive properties with toxic, explosive or other hazardous properties of, any other radioactive material in the course of carriage as cargo, including storage or handling incidental thereto;

(c)   ionizing radiations or contamination by radioactivity from, or the toxic, explosive or other hazardous properties of, any other radioactive source whatsoever.

2.   It is understood and agreed that such radioactive material or other radioactive source in paragraph 1. (b) and (c) above shall not include:

(i)   depleted uranium and natural uranium in any form;

(ii)   radioisotopes which have reached the final stage of fabrication so as to be usable for any scientific, medical, agricultural, commercial, educational or industrial purpose.

3.   This policy, however, does not cover loss of or destruction of or damage to any property or any consequential loss or any legal liability of whatsoever nature with respect to which:

(i)   the Insured under this policy is also an insured or an additional insured under any other insurance policy, including any nuclear energy liability policy; or

(ii)   any person or organization is required to maintain financial protection pursuant to legislation in any country; or

(iii)   the Insured under this policy is, or had this policy not been issued would be, entitled to indemnification from any government or agency thereof.

0180
0180

4.  Loss, destruction, damage, expense or legal liability in respect of the nuclear risks not excluded by reason of paragraph 2. shall (subject to all other terms, conditions, limitations, warranties and exclusions of this policy) be covered, provided that:

(i)  in the case of any claim in respect of radioactive material in the course of carriage as cargo, including storage or handling incidental thereof, such carriage shall in all respects have complied with the full International Civil Aviation Organization "Technical Instructions for the Safe Transport of Dangerous Goods by Air", unless the carriage shall have been subject to any more restrictive legislation, when it shall in all respects have complied with such legislation;

(ii)  this policy shall only apply to an incident happening during the period of this policy and where any claim by the Insured against the Company or by any claimant against the Insured arising out of such incident shall have been made within three years after the date thereof;

(iii)  in the case of any claim for the loss of or destruction of or damage to or loss of use of an aircraft caused by or contributed to by radioactive contamination, the level of such contamination shall have exceeded the maximum permissible level set out in the following scale:

| Emitter (IAEA Health and Safety Regulations) | Maximum permissible level of non-fixed radioactive surface contamination (Averaged over 300 $cm^2$) |
|---|---|
| Beta, gamma and low toxicity alpha emitters | Not exceeding 4 Becquerels / $cm^2$ ($10^{-4}$ microcuries / $cm^2$) |
| All other alpha emitters | Not exceeding 0.4 Becquerels / $cm^2$ ($10^{-5}$ microcuries / $cm^2$) |

(iv)  the cover afforded hereby may be cancelled at any time by the Company giving seven days' notice of cancellation.

All other provisions of this policy remain the same.

This endorsement becomes effective _____ JANUARY 26, 2018 _____ to be attached to and hereby made a part of:
Policy No.  1000320046-02
Issued to  PASSPORT 420, LLC

By  STARR INDEMNITY & LIABILITY COMPANY

Endorsement No.  11

Date of Issue  JANUARY 30, 2018  (BM)

By _____
(Authorized Representative)

AVN38B (2/06)            Page 2

### TERRORISM EXCLUSION
(Terrorism Risk Insurance Act)

This policy is amended as follows:

This policy does not cover claims caused by any losses, damages, or injuries arising directly or indirectly as a result of any certified "Act of Terrorism" defined by Section 102. Definitions of the Terrorism Risk Insurance Act and any revisions or amendments thereto.

Solely with respect to this endorsement and to ensure compliance with the Terrorism Risk Insurance Act, an "Act of Terrorism" shall mean:

(1)  Act of Terrorism:
    (A)  Certification - The term "act of terrorism" means any act that is certified by the Secretary of the Treasury in consultation with the Secretary of Homeland Security, and the Attorney General of the United States:
        (i)  to be an act of terrorism;
        (ii)  to be a violent act or an act that is dangerous to:
            (I)  human life;
            (II)  property; or
            (III)  infrastructure;
        (iii)  to have resulted in damage within the United States, or outside of the United States in the case of:
            (I)  an air carrier or vessel defined as one principally based in the United States, on which United States income tax is paid, and whose insurance coverage is subject to regulation in the United States; or
            (II)  the premises of a United States mission; and
        (iv)  to have been committed by an individual or individuals as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States Government by coercion.
    (B)  Limitation - No act shall be certified by the Secretary as an act of terrorism if:
        (i)  the act is committed as part of the course of a war declared by the Congress, except that this clause shall not apply with respect to any coverage for workers' compensation; or
        (ii)  property and casualty insurance losses resulting from the act, in the aggregate, do not exceed the Program Trigger.
    (C)  Determinations Final - Any certification of, or determination not to certify, an act of terrorism under this paragraph shall be final, and shall not be subject to judicial review.
    (D)  Timing of certification - Not later than 9 months after the report required under section 107 of the Terrorism Risk Insurance Program Reauthorization Act of 2015 is submitted to the appropriate committees of Congress, the Secretary shall issue final rules governing the certification process, including establishing a timeline for which an act is eligible for certification by the Secretary on whether an act is an act of terrorism under this paragraph.
    (E)  Nondelegation - The Secretary may not delegate or designate to any other officer, employee, or person, any determination under this paragraph of whether, during the effective period of the Program, an act of terrorism has occurred.

THE PROVISIONS OF THIS ENDORSEMENT SHALL APPLY SOLELY TO THE TERRORISM RISK INSURANCE ACT, ITS REVISIONS AND/OR AMENDMENTS AND SHALL IN NO WAY CONFLICT WITH THOSE OF AVN48B AND AMENDMENTS THERETO.

All other provisions of this policy remain the same.

This endorsement becomes effective _____JANUARY 26, 2018_____ to be attached to and hereby made a part of:
Policy No. \_\_\_\_1000320046-02\_\_\_\_
Issued to \_\_PASSPORT 420, LLC\_\_

By STARR INDEMNITY & LIABILITY COMPANY

Endorsement No. \_\_\_\_12\_\_\_\_

Date of Issue \_\_\_JANUARY 30, 2018  (BM)\_\_\_

By _____
(Authorized Representative)

Starr 10055 (1/15)

0182
0182

## ASBESTOS EXCLUSION ENDORSEMENT

This policy does not cover any claims of any kind whatsoever directly or indirectly relating to, arising out of or in consequence of:

1.  The actual, alleged or threatened exposure to or presence of asbestos in any form whatsoever, including, but not limited to, asbestos fibers or asbestos dust, or any material or product containing, or alleged to contain, asbestos; or

2.  Any obligations, request, demand, order, or statutory or regulatory requirement that any insured or others test for, monitor, clean up, remove, contain, treat, neutralize, protect against or in any other way respond to the actual, alleged or threatened exposure to or presence of asbestos in any form whatsoever, including, but not limited to, asbestos fibers or asbestos dust, or any material or product containing, or alleged to contain, asbestos.

However, the exclusion shall not apply to any claim for asbestos exposure caused by or resulting from a crash, fire, explosion, or collision or a recorded in flight emergency causing abnormal aircraft operations.

Notwithstanding any other provisions of this Policy, Insurers will have no duty to investigate, defend or pay defense costs in respect of any claim excluded in whole or in part under paragraphs 1. or 2. hereof.

All other provisions of this policy remain the same.

This endorsement becomes effective _____ JANUARY 26, 2018 _____ to be attached to and hereby made a part of:
Policy No. _____ 1000320046-02 _____
Issued to  PASSPORT 420, LLC

By STARR INDEMNITY & LIABILITY COMPANY

Endorsement No. _____ 13 _____

Date of Issue _____ JANUARY 30, 2018  (BM) _____          By _____

(Authorized Representative)

Starr 10007 (2/06)

0183
0183

## CALIFORNIA CANCELLATION / NONRENEWAL ENDORSEMENT - AVIATION

Wherever used in this endorsement:  1) "we", "us", "our", and "Insurer" mean the insurance company which issued this policy;  and 2) "you", "your", "Named Insured", "First Named Insured", and "Insured" mean the Named Corporation, Named Organization, Named Sponsor, Named Insured, or Insured stated in the Declarations page;  and 3) "Other Insured(s)" means all other persons or entities afforded coverage under the policy.

In consideration of the premium charged, the cancellation clause is replaced with the following:

CANCELLATION

The First Named Insured shown in the declarations may cancel the policy by mailing or delivering to the Insurer advance written notice of cancellation.

If the policy has been in effect for more than sixty (60) days or if it is a renewal, effective immediately, the Insurer may not cancel the policy unless such cancellation is based on one or more of the following reasons:

1.  Nonpayment of premium, including payment due on a prior policy issued by the Insurer and due during the current policy term covering the same risks.

2.  A judgement by a court or an administrative tribunal that the named Insured has violated any law of this state or of the United States having as one of its necessary elements an act which materially increases any of the risks insured against.

3.  Discovery of fraud or material misrepresentation by either of the following:

    a)   The Insured or Other Insured(s) or his or her representative in obtaining the insurance; or

    b)   The named Insured or his or her representative in pursuing a claim under the policy.

4.  Discovery of willful or grossly negligent acts or omissions, or of any violations of state laws or regulations establishing safety standards, by the named Insured or Other Insured(s) or a representative of same, which materially increase any of the risks insured against.

5.  Failure by the named Insured or Other Insured(s) or a representative of same to implement reasonable loss control requirements which were agreed to by the Insured as a condition of policy issuance or which were conditions precedent to the use by the Insurer of a particular rate or rating plan if the failure materially increases any of the risks insured against.

6.  A determination by the commissioner that the loss of, or changes in, an insurer's reinsurance covering all or part of the risk would threaten the financial integrity or solvency of the Insurer.

7.  A determination by the commissioner that a continuation of the policy coverage could place the Insurer in violation of the laws of this state or the state of its domicile or that the continuation of coverage would threaten the solvency of the Insurer.

8.  A change by the named Insured or Other Insured(s) or a representative of same in the activities or property of the commercial or industrial enterprise which results in a material added risk, a materially increased risk or a materially changed risk, unless the added, increased, or changed risk is included in the policy.

Notice of cancellation shall be delivered or mailed to the producer of record and the Named Insured at least thirty (30) days prior to the effective date of cancellation.  Where cancellation is for nonpayment of premium or fraud, notice shall be given no less than ten (10) days prior to the effective date of cancellation.

Starr 20006 (12/11)     Page 1 of Endorsement No.      14

If this policy is cancelled, we will send the first named Insured any premium refund due.  The refund, if any, will be computed on a pro rata basis.  However, the refund may be less than pro rata if we made a loan to you for the purpose of payment of premiums for this policy.  The cancellation will be effective even if we have not make or offered a refund.

NONRENEWAL

If the Insurer decides not to renew the policy, the Insurer shall mail or deliver to the producer of record and the named Insured notice of nonrenewal at least sixty (60) days but no more than 120 days prior to the end of the policy period.  The notice shall contain the reason for nonrenewal of the policy.

RENEWAL

If a policy has been in effect for more than sixty (60) days or if the policy is a renewal, effective immediately no increase in premium, reduction in limits, or change in the conditions of coverage shall be effective during the policy period unless based upon one of the following reasons:

1.  Discovery of willful or grossly negligent acts or omissions, or of any violations of state laws or regulations establishing safety standards by the named Insured or Other Insured(s) which materially increase any of the risks or hazards insured against.

2.  Failure by the named Insured or Other Insured(s) to implement reasonable loss control requirements which were agreed to by the Insured as a condition of policy issuance or which were conditions precedent to the use by the Insurer of a particular rate or rating plan, if the failure materially increases any of the risks insured against.

3.  A determination by the commissioner that loss of or changes in an insurer's reinsurance covering all or part of the risk covered by the policy would threaten the financial integrity or solvency of the Insurer unless the change in the terms or conditions or rate upon which the premium is based is permitted.

4.  A change by the named Insured or Other Insured(s) in the activities or property of the commercial or industrial enterprise which results in a materially added risk, a materially increased risk, or materially changed risk, unless the added, increased, or changed risk is included in the policy.

Written notice shall be mailed or delivered to the named Insured and the producer of record at least thirty (30) days prior to the effective date of any increase, reduction or change.

All other provisions of this policy remain the same.

This endorsement becomes effective _____ JANUARY 26, 2018 _____ to be attached to and hereby made a part of:
Policy No. ____ 1000320046-02 ____
Issued to   PASSPORT 420, LLC

By STARR INDEMNITY & LIABILITY COMPANY

Endorsement No. ____ 14 ____

Date of Issue   JANUARY 30, 2018  (BM)                    By _____
                                                                (Authorized Representative)

Starr 20006 (12/11)                    Page 2

0185
0185

## DATE RECOGNITION EXCLUSION CLAUSE

This Policy does not cover any claim, damage, injury, loss, cost, expense or liability (whether in contract, tort, negligence, product liability, misrepresentation, fraud or otherwise) of any nature whatsoever arising from or occasioned by or in consequence of (whether directly or indirectly and whether wholly or partly):

(a)   the failure or inability of any computer hardware, software, integrated circuit, chip or information technology equipment or system (whether in the possession of the Insured or of any third party) accurately or completely to process, recognize, exchange or transfer year, date or time data or information in connection with any change of year, date or time;

whether on or before or after such change of year, date or time;

(b)   any implemented or attempted change or modification of any computer hardware, software, integrated circuit, chip or information technology equipment or system (whether in the possession of the Insured or of any third party) in anticipation of or in response to any such change of year, date or time, or any advice given or services performed in connection with any such change or modification;

(c)   any non-use or unavailability for use of any property or equipment of any kind whatsoever resulting from any act, failure to act or decision of the Insured or of any third party related to any such change of year, date or time;

and any provision in this Policy concerning any duty of the Company to investigate or defend claims shall not apply to any claims so excluded.

All other provisions of this policy remain the same.

This endorsement becomes effective _____ JANUARY 26, 2018 _____ to be attached to and hereby made a part of:
Policy No. ___ 1000320046-02 ___
Issued to   PASSPORT 420, LLC

By STARR INDEMNITY & LIABILITY COMPANY

Endorsement No. _____ 15 _____

Date of Issue ___ JANUARY 30, 2018  (BM) ___          By _____

                                                           (Authorized Representative)

AVN2000A (2/06)

## AVIATION DATE RECOGNITION ENDORSEMENT WITH LIMITED COVERAGE GRANT
## AIRCRAFT OPERATORS OPTION 4

This Policy does not cover any claim, damage, injury, loss, cost, expense or liability (whether in contract, tort, negligence, product liability, misrepresentation, fraud or otherwise) of any nature whatsoever arising from or occasioned by or in consequence of (whether directly or indirectly and whether wholly or partly):

a)  the failure or inability of any computer hardware, software, integrated circuit, chip, computer component or other information technology equipment or system (whether in the possession of the **Insured** or of any third party) accurately or completely to process, recognize, exchange or transfer year, date or time data or information in connection with:

- the change of year from 1999 to 2000; and/or
- the change of date from 21 August 1999 to 22 August 1999; and/or
- any other change of year, date or time;

whether on or before or after such change of year, date or time;

b)  any implemented or attempted change or modification of any computer hardware, software, integrated circuit, chip, computer component or other information technology equipment or system (whether in the possession of the **Insured** or of any third party) in anticipation of or in response to any such change of year, date or time, or any advice given or services performed in connection with any such change or modification;

c)  any non-use or unavailability for use of any property or equipment of any kind whatsoever resulting from any act, failure to act or decision of the **Insured** or of any third party related to any such change of year, date or time;

and any provision in this Policy concerning any duty of the Company to investigate or defend claims shall not apply to any claims so excluded.

HOWEVER, in consideration of the additional premium of $ INCLUDED , it is hereby understood and agreed that this endorsement shall not apply to:

1.  any accidental loss of or damage to an **aircraft** defined in the policy schedule (insured **aircraft**); and

2.  any sums which the **Insured** shall become legally liable to pay, and (if so required by the Policy) shall pay (including costs awarded against the **Insured**) in respect of:

(a)  accidental **bodily injury** (fatal or otherwise) to **passenger**s directly caused by an accident to an insured **aircraft**; and/or
(b)  loss of or damage to baggage and personal articles of **passenger**s, mail and cargo directly caused by an accident to an insured **aircraft**; and/or
(c)  accidental **bodily injury** (fatal or otherwise) and accidental damage to property directly caused by an insured **aircraft** or by any person or object falling therefrom.

0187
0187

PROVIDED THAT:

1.  Coverage provided pursuant to this endorsement shall be subject to all terms, conditions, limitations, exclusions and cancellation provisions of this Policy (except as specifically provided herein), and nothing in this endorsement extends coverage beyond that which is provided by the Policy.

2.  Nothing in this endorsement shall provide any coverage in respect of grounding and/or loss of use of any **aircraft** which has not been physically damaged or destroyed in the accident giving rise to a claim under the Policy.

All other provisions of this policy remain the same.

This endorsement becomes effective ___JANUARY 26, 2018___ to be attached to and hereby made a part of:
Policy No. ___1000320046-02___
Issued to ___PASSPORT 420, LLC___

By STARR INDEMNITY & LIABILITY COMPANY

Endorsement No. ___16___

Date of Issue ___JANUARY 30, 2018  (BM)___          By _____
                                                              (Authorized Representative)

Starr 30002 (5/06)              Page 2

0188
0188



## 3353 Peachtree Road, N.E.
## Suite 1000
## Atlanta, GA 30326
## (Phone) 404-946-1400 (Fax) 404-946-1497

In the event of a claim, please submit your notice of loss to the following email inbox which will generate a return email with your claims adjustor, contact information and claim number within 24 hours:

aviationclaimreports@starrcompanies.com

In the event of a claim emergency, please contact:

Jeffrey Greenawalt:
Cell: (214) 223-0202

Or

Jacy Watt:
Cell: (404) 401-8851
Office: (404) 946-1414

# EXHIBIT "I"

0190



**Insuring Your Aviation Risk**

**Count on a Starr Solution.**

STARR INDEMNITY & LIABILITY COMPANY
399 PARK AVENUE

NEW YORK, NY  10022


# STARR ELITE COMPREHENSIVE
# CORPORATE AIRCRAFT POLICY


ISSUED TO

**PASSPORT 420, LLC**


POLICY NUMBER

1000320046-03

0192
0192

# CONTENTS

DECLARATIONS                                                                                      4

Limits of the Company's Liability:                                                               5

Section One - Liability Coverages                                                                5

    Coverage 1 - Liability for **Scheduled Aircraft**                                           5
    Coverage 2 - Liability for the Use of **Non-Owned Aircraft**                                5
    Coverage 3 - Liability for **Property Damage** to **Non-Owned Aircraft**, and **Temporary Substitute Aircraft**   5
    Coverage 4 - Liability for Charter Referral                                                  5
    Coverage 5 - **Passenger** Voluntary Settlements for **Scheduled Aircraft** and **Non-Owned Aircraft**   6
    Coverage 6 - Liability for **Property Damage** to Hangars and Their Contents                 6
    Coverage 7 - Liability for Fire Damage to Real Property                                      6
    Coverage 8 - Liability for Cargo                                                             6
    Coverage 9 - Liability Under Contractual Agreements                                          7
    Coverage 10 - Liability for **Personal Injury** and in/excluding **Advertising Injury**      7
    Coverage 11 - Liability for Alcohol Beverage Service                                         7
    Coverage 12 - Liability for Incidental Medical Malpractice                                   7
    Coverage 13 - Liability for the Use of **Premises**                                          7
    Coverage 14 - Liability for the Operation of **Mobile Equipment**                            7
    Coverage 15 - Liability for the Operation of an **Auto** while on Airport **Premises**        7
    Coverage 16 - Liability for the Sale of **Aircraft** and Aircraft Products and Services       7
    Coverage 17 - Liability for Hangarkeeper Operations                                          8
    Coverage 18 - Liability for Garagekeeper Operations                                          8

Section Two - Defense, Settlement and Supplementary Payments                                     8

Section Three - **Physical Damage** Coverages                                                    8

    Coverage 19 - **Physical Damage** Coverage for **Scheduled Aircraft** (including **Ingestion** and Emergency Landing)   8
    Coverage 20 - **Physical Damage** Coverage for **Spare Engines** and **Spare Parts** including Transit   8
    Coverage 21 - Automatic Insurance for Increased Value of **Scheduled Aircraft** or **Spare Engines** and **Spare Parts**   9
    Coverage 22 - **Physical Damage** Coverage for Mechanics Tools                                9

Section Four - Additional Coverages                                                              9

    Coverage 23 - Temporary Replacement Parts Rental Expense                                     9
    Coverage 24 - Replacement **Aircraft** Rental Expense                                        9
    Coverage 25 - Search and Rescue Expenses                                                     9
    Coverage 26 - Runway Foaming and Crash Control Expenses                                      9
    Coverage 27 - Trip Interruption Expense Coverage                                             9
    Coverage 28 - Automatic Insurance for Newly Acquired **Aircraft**                            10
    Coverage 29 - Lay-Up Credit for **Scheduled Aircraft**                                       10
    Coverage 30 - Personal Effects and Baggage Expense                                           10

Section Five - **Medical Expenses**                                                              10

    Coverage 31 - Medical Payments for **Scheduled Aircraft** and **Non-Owned Aircraft**         10
    Coverage 32 - **Premises** Medical Payments                                                  10

0193
0193

# INSURING AGREEMENTS 11

## Section One - Liability Coverages 11

Coverage 1 - Liability for **Scheduled Aircraft** 11
Coverage 2 - Liability for the Use of **Non-Owned Aircraft** 11
Coverage 3 - Liability for **Property Damage** to **Non-Owned Aircraft**, and **Temporary Substitute Aircraft** 12
Coverage 4 - Liability for Charter Referral 12
Coverage 5 - **Passenger** Voluntary Settlements for **Scheduled Aircraft** and **Non-Owned Aircraft** 13
Coverage 6 - Liability for **Property Damage** to Hangars and Their Contents 14
Coverage 7 - Liability for Fire Damage to Real Property 14
Coverage 8 - Liability for Cargo 14
Coverage 9 - Liability Under Contractual Agreements 15
Coverage 10 - Liability for **Personal Injury** and in/excluding **Advertising Injury** 16
Coverage 11 - Liability for Alcohol Beverage Service 19
Coverage 12 - Liability for Incidental Medical Malpractice 19
Coverage 13 - Liability for the Use of **Premises** 19
Coverage 14 - Liability for the Operation of **Mobile Equipment** 19
Coverage 15 - Liability for the Operation of an **Auto** while on Airport **Premises** 20
Coverage 16 - Liability for the Sale of **Aircraft** and Aircraft Products and Services 20
Coverage 17 - Liability for Hangarkeeper Operations 20
Coverage 18 - Liability for Garagekeeper Operations 21

## Section Two - Defense, Settlement and Supplementary Payments 22

## Section Three - **Physical Damage** Coverages 23

Coverage 19 - **Physical Damage** Coverage for **Scheduled Aircraft** (including **Ingestion** and Emergency Landing) 23
Coverage 20 - **Physical Damage** Coverage for **Spare Engines** and **Spare Parts** including Transit 23
Coverage 21 - Automatic Insurance for Increased Value of **Scheduled Aircraft** or **Spare Engines** and **Spare Parts** 23
Coverage 22 - **Physical Damage** Coverage for Mechanics Tools 24

## Section Four - Additional Coverages 24

Coverage 23 - Temporary Replacement Parts Rental Expense 24
Coverage 24 - Replacement **Aircraft** Rental Expense 25
Coverage 25 - Search and Rescue Expenses 25
Coverage 26 - Runway Foaming and Crash Control Expenses 25
Coverage 27 - Trip Interruption Expense Coverage 26
Coverage 28 - Automatic Insurance for Newly Acquired **Aircraft** 26
Coverage 29 - Lay-Up Credit for **Scheduled Aircraft** 26
Coverage 30 - Personal Effects and Baggage Expense 26

## Section Five - **Medical Expenses** 27

Coverage 31 - Medical Payments for **Scheduled Aircraft** and **Non-Owned Aircraft** 27
Coverage 32 - **Premises** Medical Payments 27

Section Six - Policy Definitions 27
Section Seven - Exclusions 31
Section Eight - Limit of the Company's Liability 33
Section Nine - Notice of Claims and Other Duties of an **Insured** 35
Section Ten - Other Conditions of Insurance 36

0194
0194

**Starr Indemnity & Liability Company**

## STARR ELITE COMPREHENSIVE CORPORATE AIRCRAFT POLICY

### DECLARATIONS

Policy Number    **1000320046-03**        Previous Policy Number    1000320046-02

This section along with the policy provisions and any endorsements attached hereto completes this Starr Elite Comprehensive Corporate Aircraft Policy (Policy), issued by the Company as indicated above (hereinafter called The Company).

Item 1. **Named Insured**:    **PASSPORT 420, LLC**

Item 2. Address:       4185 LA LADERA ROAD
SANTA BARBARA, CA  93110

Item 3. Policy Period:    From:   JANUARY 26, 2019
                   Until:   JANUARY 26, 2020

both at 12:01 AM standard time at the first address shown in Item 2. above.

Item 4. Pilots:      AS ENDORSED

The pilot warranty in Item 4, if any, shall not apply to Liability Coverage for **Non-Owned Aircraft**, **Temporary Substitute Aircraft** and Charter Referral.  Additionally, the pilot warranty in Item 4, if any, shall not apply while the insured **aircraft** is under the care, custody or control of a repair station for the purpose of maintenance, repair or test flights.

0195
0195

## Item 5. Limits of the Company's Liability:

The limit of the Company's liability provided by each Coverage will not exceed:

### Section One - Liability Coverages

#### Coverage 1 - Liability for **Scheduled Aircraft**

| FAA Cert. Number | Make & Model | Year Built | Seats Crew / Pass | | **Aircraft** Liability Limit |
|---|---|---|---|---|---|
| N227WP | HONDA HONDA JET | 2016 | 1 | 6 | $ 10,000,000. |
| | | | | | $ |
| | | | | | $ |
| | | | | | $ |
| | | | | | $ |
| | | | | | $ |
| | | | | | $ |
| | | | | | $ |

#### Coverage 2 - Liability for the Use of **Non-Owned Aircraft**

$ _____ 10,000,000. Each **Occurrence**

Maximum Number of Seats:   __30__

Reporting Grace Period:   __30__   consecutive days

This limit is part of, and not in addition to, the limit provided for Coverage 1.

#### Coverage 3 - Liability for **Property Damage** to **Non-Owned Aircraft** and **Temporary Substitute Aircraft**

$ _____ 25,000,000. Each **Occurrence**

This limit is part of, and not in addition to, the limit provided for Coverage 2.

#### Coverage 4 - Liability for Charter Referral

$ _____ 10,000,000. Each **Occurrence**

This limit is part of, and not in addition to, the limit provided for Coverage 1.

Starr Elite CA Declarations (5/09)                -5-

0196
0196

Coverage 5 - **Passenger** Voluntary Settlements for **Scheduled Aircraft** and **Non-Owned Aircraft**

A.  Settlement Limits:

1.  With respect to any **Scheduled Aircraft** or **Temporary Substitute Aircraft**:

Each Non-**Crew Member Passenger**:  $ _____ 250,000.  Each **Occurrence**

Each **Crew Member**:  $ _____ 250,000.  Each **Occurrence**

2.  With respect to any **Non-Owned Aircraft** except a **Temporary Substitute Aircraft**:

Each Non-**Crew Member Passenger**:  $ _____ 250,000.  Each **Occurrence**

Each **Crew Member**:  $ _____ 250,000.  Each **Occurrence**

Total All **Non-Owned Aircraft Crew Members** and Non-**Crew Member Passengers** Combined:  $ _____ 2,500,000.  Each **Occurrence**

.

These limits are part of, and not in addition to, the limit provided for Coverage 1 or 2, whichever applies to the loss.

Coverage 6 - Liability for **Property Damage** to Hangars and Their Contents

$ _____ 1,000,000.  Each **Occurrence**

This limit is part of, and not in addition to, the limit provided for Coverage 1 or 2, whichever applies to the loss.

Coverage 7 - Liability for Fire Damage to Real Property

$ _____ 1,000,000.  Each **Occurrence**

This limit is part of, and not in addition to, the limit provided for Coverage 1 or 2, whichever applies to the loss.

Coverage 8 - Liability for Cargo

$ _____ 500,000.  Each **Occurrence**

Deductible:  $ _____ NIL  Each **Occurrence**

This limit is part of, and not in addition to, the limit provided for Coverage 1 or 2, whichever applies to the loss.

0197
0197

Coverage 9 - Liability Under Contractual Agreements

$ _____ 10,000,000. Each **Occurrence**

This limit is part of, and not in addition to, the limit provided for Coverage 1 or 2, whichever applies to the loss.

Coverage 10 - Liability for **Personal Injury** and__IN__ cluding **Advertising Injury**

$ _____ 10,000,000. Each Offense and in the Annual Aggregate

This limit is part of, and not in addition to, the limit provided for Coverage 1 or 2, whichever applies to the loss.

Coverage 11 - Liability For Alcohol Beverage Service

$ _____ 5,000,000. Each **Occurrence**

This limit is part of, and not in addition to, the limit provided for Coverage 1 or 2, whichever applies to the loss.

Coverage 12 - Liability for Incidental Medical Malpractice

$ _____ 10,000,000. Each **Occurrence**

This limit is part of, and not in addition to, the limit provided for Coverage 1 or 2, whichever applies to the loss.

Coverage 13 - Liability for the Use of **Premises**

$ _____ 10,000,000. Each **Occurrence**

This limit is part of, and not in addition to, the limit provided for Coverage 1 or 2, whichever applies to the loss.

Coverage 14 - Liability for the Operation of **Mobile Equipment**

$ _____ 10,000,000. Each **Occurrence**

This limit is part of, and not in addition to, the limit provided for Coverage 13.

Coverage 15 - Liability for the Operation of an **Auto** while on Airport **Premises**

$ _____ 10,000,000. Each **Occurrence**

This limit is part of, and not in addition to, the limit provided for Coverage 13.

Coverage 16 - Liability for the Sale of **Aircraft** and Aircraft Products and Services

$ _____ 10,000,000. Each **Occurrence** and in the Annual Aggregate

This limit is part of, and not in addition to, the limit provided for Coverage 13.

Starr Elite CA Declarations (5/09)                    -7-

0198
0198

Coverage 17 - Liability for Hangarkeeper Operations

$ _____25,000,000.__ Each **Aircraft**          $ _____25,000,000.__ Each **Occurrence**

Deductible:  $ _____NIL__ Each **Aircraft**          $ _____NIL__ Each **Occurrence**

This limit is part of, and not in addition to, the limit provided for Coverage 13.

Coverage 18 - Liability for Garagekeepers

$ _____50,000.__ Any One **Auto**          $ _____100,000.__ Any One Loss

Deductible:  $ _____1,500.__ Each **Auto**

This limit is part of, and not in addition to, the limit provided for Coverage 13.

## Section Two - Defense, Settlement and Supplementary Payments

## Section Three - **Physical Damage** Coverages

Coverage 19 - **Physical Damage** Coverage for **Scheduled Aircraft** (including **Ingestion** and Emergency Landing)

| FAA Cert. Number | Make & Model | Insured Value | Deductible Not **In Motion** | Deductible **In Motion/ Ingestion** |
|---|---|---|---|---|
| N227WP | HONDA HONDA JET | $ 4,000,000. | $ $10,000. | $ $10,000. |
|  |  | $ | $ | $ |
|  |  | $ | $ | $ |
|  |  | $ | $ | $ |
|  |  | $ | $ | $ |
|  |  | $ | $ | $ |
|  |  | $ | $ | $ |
|  |  | $ | $ | $ |

Coverage 20 - **Physical Damage** Coverage for **Spare Engines** and **Spare Parts** Including Transit

$ _____1,000,000.__ Each **Occurrence**

Deductible:

Not **In Motion** _____NIL__ Each **Occurrence**
$
**In Motion**          $ _____NIL__ Each **Occurrence**

0199
0199

Coverage 21 - Automatic Insurance for Increased Value of **Scheduled Aircraft** or **Spare Engines** and **Spare Parts**

    Maximum Automatic **Physical Damage** Limit for **Scheduled Aircraft**:

    $ <u>          25,000,000.</u>  any one **aircraft** without prior approval

    Maximum Automatic **Physical Damage** Limit for **Spare Engines** and **Spare Parts**:

    $ <u>          2,000,000.</u>  without prior approval of the Company

Coverage 22 - **Physical Damage** Coverage for Mechanics Tools

    $ <u>        5,000.</u> Each Employee      $ <u>        25,000.</u> Each **Occurrence**

    Deductible: $ <u>    250.</u> Each Employee/Each **Occurrence**

    This limit is part of, and not in addition to, the limit provided for Coverage 13.

## Section Four - Additional Coverages

Coverage 23 - Temporary Replacement Parts Rental Expense

    $ <u>      250,000.</u> Each Loss

    Minimum Repair Period:    <u> 5 </u>  days

    Maximum coverage period:    <u> 60 </u>  consecutive days

Coverage 24 - Replacement **Aircraft** Rental Expense

    $ <u>      500,000.</u> Each Loss

    Minimum Repair Period:    <u> 5 </u>  days

    Maximum coverage period:    <u> 60 </u>  consecutive days

Coverage 25 - Search and Rescue Expenses

    $ <u>      1,000,000.</u> Each Loss

Coverage 26 - Runway Foaming and Crash Control Expenses

    $ <u>      1,000,000.</u> Each Loss

Coverage 27 - Trip Interruption Expense Coverage

    $ <u>      15,000.</u> Each **Passenger**/Each Loss

0200
0200

Coverage 28 - Automatic Insurance for Newly Acquired **Aircraft**

Maximum **Physical Damage** Limit $ _____ 25,000,000. any one **aircraft** without prior approval of the Company.

Coverage 29 - Lay-Up Credit for **Scheduled Aircraft**

A pro-rated return of 60_____ % of the applicable premium at policy expiration if the **scheduled aircraft** is laid up for 30_____ or more consecutive days.

Coverage 30 - Personal Effects and Baggage Expense

$ _____ 15,000. Each **Passenger**

## Section Five - **Medical Expenses**

Coverage 31 - Medical Payments for **Scheduled Aircraft** and **Non-Owned Aircraft**

A.   With respect to any **Scheduled Aircraft** or **Temporary Substitute Aircraft**:

Each Non-**Crew Member Passenger**:  $ _____ 25,000.  Each **Occurrence**

Each **Crew Member**:                           $ _____ 25,000.  Each **Occurrence**

B.   With respect to any **Non-Owned Aircraft** except a **Temporary Substitute Aircraft**:

Each Non-**Crew Member Passenger**:  $ _____ 25,000.  Each **Occurrence**

Each **Crew Member**:                           $ _____ 25,000.  Each **Occurrence**

Coverage 32 - **Premises** Medical Payments

$ _____ 25,000.  Each Person          $ _____ 250,000.  Each **Occurrence**

Item 6.   Policy Premium:   $ 23,324.

Item 7.   Endorsements Attached as of Inception:      STARR ELITE CA PROVISIONS (12/06)
STARR FORMS 10284, 10349, 10351, 10234, 10317, 10466, 10332, AVN48B, AVN52ECA, 10318, AVN46B, AVN38B, 10055, 10007, 20006, AVN2000A, 30002

Producer      TUTTON INSURANCE SERVICES, INC.
2913 S. PULLMAN STREET
SANTA ANA, CA  92705

Approved By   _____
(Authorized Representative)

Date of Issue   _____ JANUARY 23, 2019  (CK) _____

Starr Elite CA Declarations (5/09)                    -10-

0201
0201

In consideration of the payment of the premium and in reliance upon the truth of the statements, representations and the declarations made by the **Named Insured** and subject to all of the terms of the Policy including the applicable Limits of the Company's Liability under Item 5, the Company agrees with the **Named Insured** with respect to the coverages stated in the Declarations as follows:

# INSURING AGREEMENTS

## Section One - Liability Coverages

### Coverage 1 - Liability for **Scheduled Aircraft**

The Company will promptly pay on behalf of the **insured** all sums which the **insured** shall be legally obligated to pay as damages because of **bodily injury** or **property damage** caused by an **occurrence** during the policy period arising out of the ownership, maintenance or use of a **scheduled aircraft**.

### Coverage 2 - Liability for the Use of **Non-Owned Aircraft**

The Company will promptly pay on behalf of the "insured", as defined below,  all sums which the **"insured"** becomes legally obligated to pay as damages because of **bodily injury** or **property damage** caused by an **occurrence** during the policy period arising out of the use of **non-owned aircraft** by or on behalf of the "insured".

    A.  For Coverage 2, the definition of "insured":

        1.  with respect to any **temporary substitute aircraft**, means the same as **insured**;

        2.  with respect to all other **non-owned aircraft**, means:

            a.  the **Named Insured** and,

            b.  any officer, director, stockholder, employee, partner, or agent of the **Named Insured** while that person is acting in their capacity as such.

        Regardless of Paragraphs 1. and 2. above, no person or organization will be an **insured** while using any **aircraft** that is owned in whole or in part by; or that is under any lease purchase option agreement by; or that is registered to that organization, person or, any household member of that person.

    B.  The insurance provided by Coverage 2 shall not apply to any claim or loss arising out of an **insured**'s product liability hazard including any products designed, manufactured, sold, distributed, serviced or handled by or on behalf of an **insured**.

    C.  The **Named Insured** shall promptly advise the Company of an exclusive lease of, or the use of, any **non-owned aircraft** that exceeds the reporting grace period shown in the Declarations. The Company may request additional information and charge an additional premium for this use. Inadvertent failure to report this use will not void this coverage provided that the **Named Insured** advises the Company as soon as possible after the omission is discovered.

    D.  The insurance provided by Coverage 2 is **excess insurance**.

0202
0202

Coverage 3 - Liability for **Property Damage** to **Non-Owned Aircraft** and **Temporary Substitute Aircraft**

The Company will promptly pay on behalf of the **insured** all sums which the "insured", as defined below, becomes legally obligated to pay as damages arising out of **property damage** caused by an **occurrence** during the policy period to **non-owned aircraft** or **temporary substitute aircraft**. This coverage section shall not apply while the **aircraft** is **in-flight** unless the **aircraft** is operated by a person employed as a professional pilot acting in the capacity as such.

    A.  For Coverage 3, the definition of "insured":

        1.  with respect to any **temporary substitute aircraft**, means the same as **insured**;

        2.  with respect to all other **non-owned aircraft**, means:

            a.  the **Named Insured** and,

            b.  any officer, director, stockholder, employee, partner, or agent of the **Named Insured** while that person is acting in their capacity as such.

        Regardless of Paragraphs 1. and 2. above, no person or organization will be an **insured** while using any **aircraft** that is:

            i.  owned in whole or in part by;

            ii.  that is under any lease purchase option agreement by;

            iii.  that is registered to

        that organization, person or, any household member of that person.

    B.  The insurance provided by Coverage 3 shall not apply to any claim or loss arising out of an **insured**'s product liability hazard including any products designed, manufactured, sold, distributed, serviced or handled by or on behalf of an **insured**.  This includes Liability for Hangarkeeper Operation provided under Coverage 17.

    C.  The **Named Insured** shall promptly advise the Company of an exclusive lease of, or the use of, any **non-owned aircraft** that exceeds the reporting grace period shown in the Declarations. The Company may request additional information and charge an additional premium for this use. Inadvertent failure to report this use will not void this coverage provided that the **Named Insured** advises the Company as soon as possible after the omission is discovered.

    D.  The insurance provided by Coverage 3 is **excess insurance**.

## Coverage 4 - Liability Coverage for Charter Referral

The Company will promptly pay on behalf of the **Named Insured** all sums the **Named Insured** becomes legally obligated to pay as damages because of **bodily injury** or **property damage** caused by an **occurrence** and arising out of the **Named Insured**'s arrangement for use of a **non-owned aircraft** by and on behalf of another person or organization.

Coverage 5 - **Passenger** Voluntary Settlements for **Scheduled Aircraft** and **Non-Owned Aircraft**

Regardless of legal liability and without admitting to the liability of any party, the Company will offer to pay on behalf of the **insured** the sum requested by the **Named Insured** to, or for, the benefit of each covered **passenger** who sustains **bodily injury** caused by an **occurrence** during the policy period arising out of the ownership, maintenance or use of a **scheduled aircraft** or the use of **non-owned aircraft** by, or on behalf of, the **insured**.

If the **bodily injury**, directly and independently of all other causes, results in the death or dismemberment of the passenger, the Company will offer to pay up to the "settlement limit" as stated in the Declarations under Coverage 5.A.

Conditions of **Passenger** Voluntary Settlements for **Scheduled Aircraft** and **Non-Owned Aircraft**

A.   It is a condition of payment to or on behalf of any individual(s) that the individual(s) or the individual(s) legal representative will:

   1.   if requested, authorize the Company to obtain medical reports and copies of records.  The injured person will submit to examination by the physicians selected by the Company when the Company may reasonably require;

   2.   if payment is to be made under paragraphs A, B, or C above, be required to execute a full release, approved by the Company, for all **bodily injury** claims by or on their behalf against any **insured** and the Company for which there is insurance under the Policy.

B.   If within 120 days the payment offer is not accepted or is rejected or if at any time a claim is made or civil action is filed by or on behalf of a **passenger** to whom  this coverage applies for **bodily injury** against any **insured**, Coverage 5 will not apply to or for the benefit of that **passenger**.

C.   Coverage 5 will not apply to or for the benefit of any **crew member** on any **non-owned aircraft** unless the Declarations indicates a specified **non-owned aircraft** "settlement limit" for **crew member** and:

   1.   the **crew member** is a  professional pilot who is regularly employed by the **insured** and acting in the capacity as such, or

   2.   the **crew member** would normally be operating a **scheduled aircraft**, but is operating a **non-owned aircraft** on behalf of the **insured**.

Definitions applicable to Coverage 5:

"Settlement Limit" means the maximum applicable limit the Company will pay to or for each **passenger** as shown in the Declarations under Coverage 5.A.

0204
0204

Coverage 6 - Liability for **Property Damage** to Hangars and Their Contents

The Company will promptly pay on behalf of the **insured** all sums which the **insured** becomes legally obligated to pay for **property damage** to hangars and their contents not owned by an **insured** caused by an **occurrence** resulting from the **insured's aviation operations** during the policy period.

The insurance provided by Coverage 6 is **excess insurance** and will not apply to any loss or damage to property covered elsewhere in the Policy.

Coverage 7 - Liability for Fire Damage to Property

The Company will promptly pay on behalf of the **insured** all sums which the **insured** becomes legally obligated to pay as damages because of **property damage** caused by an **occurrence** resulting from the **insured's aviation operations** during the policy period arising out of **property damage** to structures or portions thereof rented to or leased to the **Named Insured**, including fixtures permanently attached thereto, if such **property damage** arises out of fire. Coverage 7 shall not apply to liability assumed by the **insured** under any contract or agreement.

The insurance provided by Coverage 7 shall be **excess insurance** over any valid and collectible property insurance (including any deductible portion thereof), available to the **insured**, such as, but not limited to, Fire, Extended Coverage, Builder's Risk Coverage or Installation Risk Coverage.

Coverage 8 - Liability for Cargo

The Company will promptly pay on behalf of the **insured** all sums which the **insured** becomes legally obligated to pay (less any applicable deductible) for the loss of, or **physical damage** to, the property of others caused by an **occurrence** during the policy period while the property is in the **insured**'s care, custody or control and it is on a covered **aircraft** or while it is in the custody of the **insured** on their **premises** prior to loading on or, after unloading from, a covered **aircraft**.

The insurance provided by Coverage 8 is **excess insurance**.

Coverage 8 will not apply to any loss, damage or claim caused by:

A.  any loss of market or any loss arising from delay whether or not the delay is caused by an **occurrence** covered by the Policy;

B.  any type of consequential loss;

C.  infidelity of the **insured**, its employees or agents;

D.  and confined to wear, tear, deterioration, extremes of temperature or pressure or due to the perishable or hazardous nature of the property;

E.  any loss in excess of the actual cost of reproducing or replacing destroyed or damaged manuscripts, notes, checks, securities, accounts, bills, deeds, or any other valuable papers; or

F.  the loss of or damage to the personal effects or baggage of any **passenger**.

0205
0205

Coverage 9 - Liability for Contractual Agreements

A. The Company will promptly pay on behalf of the **insured** all sums which the **insured** becomes legally obligated to pay as damages because of **bodily injury** or **property damage** caused by an **occurrence** during the policy period arising out of liability assumed by the **Named Insured** or their legal representative in a contract or agreement relating to the ownership, maintenance or use of **scheduled aircraft** or the use of **non-owned aircraft** by the **insured**.

B. The Company's Rights of Recovery section shown in Section Ten - Other Conditions of Insurance, Paragraph F., of the Policy will not apply to the extent that it is addressed in any contract or agreement that the **Named Insured** or its legal representative has entered into relating to **physical damage** of property insured by the Policy.

C. The **Named Insured** agrees to submit a copy of all such contracts or agreements to the Company as soon as possible.  Inadvertent failure to do so will not void the insurance provided by Coverage 9 as long as the contract or agreement is submitted as soon as possible once the omission is discovered.  The Company reserves the right to charge an additional premium for any such contract or

D. agreement.

E. The Company shall not require copies of temporary **aircraft** storage or minor servicing agreements, military or governmental agreements for the use of an airport, lease of premises agreements or agreements approved by the Company prior to the effective date of the Policy.

F. The insurance provided by Coverage 9 shall not apply to any liability assumed:

1. under any oral contract or agreement, unless the agreement is a contract which is required by a military or governmental body for the **insured**'s use of an airport or an agreement with another party relating to the temporary storage or minor servicing of a **scheduled aircraft** while it is away from its home base;

2. under any written contract or agreement:

    a. that is with or for the benefit of any **passenger**, **crew member** or their heirs.  However, subparagraph F. 1. above shall not apply:

        i. if the contract or agreement is required by a military or governmental body for the **insured**'s use of an airport; or

        ii. for the Company's right of recovery as stated under Coverage 9, paragraph B;

    b. to the extent that it applies to major alterations or major repairs as defined in the Federal Aviation Regulations;

    c. that is with or for the benefit of any manufacturer of an **aircraft** or any **aircraft** parts or equipment, or their employees or agents, to the extent that it relates to their products liability hazard;

    d. that relates to the sale of an **aircraft**;

    e. that is entered into after a loss to the extent that it relates to that loss.

0206
0206

Coverage 10 - Liability for **Personal Injury** or **Advertising Injury**, if included, on the Declarations page

The Company will promptly pay on behalf of the **insured** all sums which the **insured** becomes legally obligated to pay as damages because of **personal injury** or **advertising injury**, if included, to which this insurance applies resulting from the **insured**'s **aviation operations**.  The Company will have the right and duty to defend any suit seeking those damages.  The Company may at its discretion investigate any offense and settle any claim or suit that may result.  However:

    A.   The amount the Company will pay for damages is limited as described in Section One - Coverage 10; and

    B.   The Company's right and duty to defend end when it has exhausted the applicable limit of insurance in the payment of judgment(s) or settlement(s) under Coverage 10.

No other obligation or liability to pay sums or perform acts or services is covered unless explicitly provided for under Section Two - Defense, Settlement and Supplementary Payments.

The insurance provided by Coverage 10 applies to:

    A.   **Personal injury** caused by an offense arising out of the **insured**'s **aviation operations**, excluding advertising, publishing, broadcasting or telecasting done by or for the **insured**;

    B.   **Advertising injury**, if included, caused by an offense committed in the course of advertising the **insured**'s **aviation operations**, aviation goods, aviation products or aviation services, but only if the offense was committed in the coverage territory during the policy period.

The insurance provided by Coverage 10 shall not apply to:

    A. Breach Of Contract

       **Advertising injury** or **personal injury** arising out of breach of contract.

    B. Continuing Offenses

       **Advertising injury** or **personal injury** that arises out of that part of an offense that continues or resumes after the later of the end of the policy period of:

       1.   this insurance; or,

       2.    a subsequent, continuous renewal or replacement of this insurance, that:

          a.   is issued by the **insured**;

          b.   remains in force while the offense continues; and

       would otherwise apply to **advertising injury** and **personal injury**.

    C. Contracts

       **Advertising injury** or **personal injury** for which the **insured** is obligated to pay damages by reason of assumption of liability in contract or agreement.

       This exclusion does not apply to the liability for damages that such **insured** would have in the absence of such contract or agreement.

0207
0207

D. Crime Or Fraud

**Advertising injury** or **personal injury** arising out of any criminal or fraudulent conduct committed by or with the consent or knowledge of the **insured**.

E. Expected Or Intended Injury

**Advertising injury** or **personal injury** arising out of an offense, committed by or on behalf of the **insured**, that:

1. is intended by such **insured**; or

2. would be expected from the standpoint of a reasonable person in the circumstances of such **insured**;

to cause injury.

F. Failure To Conform To Representations Or Warranties

**Advertising injury** or **personal injury** arising out of the failure of goods, products or services to conform with any electronic, oral, written or other representation or warranty of durability, fitness, performance, quality or use.

G. Internet Activities

**Advertising injury** or **personal injury** arising out of:

1. controlling, creating, designing or developing of another's Internet site;

2. controlling, creating, designing, developing, determining or providing the content or material of another's Internet site;

3. controlling, facilitating or providing, or failing to control, facilitate or provide, access to the Internet or another's Internet site; or

4. publication of content or material on or from the Internet, other than material developed by the **insured** or at the direction of the **insured**.

H. Media Type Business

**Advertising injury** or **personal injury** arising out of an offense committed by or on behalf of an **insured** whose business is advertising, broadcasting, cablecasting, publishing, telecasting or telemarketing.

This exclusion does not apply to **personal injury** caused by an offense described in subparagraphs A., B. or C. of the definition of **personal injury**.

I. Prior Offenses

**Advertising injury** or **personal injury** arising out of any offense first committed before the beginning of the policy period.

J. Publications With Knowledge Of Falsity

**Advertising injury** or **personal injury** arising out of any electronic, oral, written or other publication of content or material by or with the consent of the **insured**:

1. with knowledge of its falsity; or

2. if a reasonable person in the circumstances of such **insured** would have known such content or material to be false.

0208
0208

K. Employment-Related Practices

1.  any damages sustained at any time by any person, whether or not sustained in the course of employment by any **insured**, arising out of any employment-related act, omission, policy, practice or representation directed at such person, occurring in whole or in part at any time by,

    a.  arrest, detention or imprisonment;

    b.  breach of any express or implied covenant;

    c.  coercion, criticism, humiliation, prosecution or retaliation;

    d.  defamation or disparagement;

    e.  demotion, discipline, evaluation or reassignment;

    f.  discrimination, harassment or segregation;

    g.  i.   eviction; or

        ii.  invasion or other violation of any right of occupancy;

    h.  failure or refusal to advance, compensate, employ or promote;

    i.  invasion or other violation of any right of privacy or publicity;

    j.  termination of employment; or

    k.  other employment-related act, omission, policy, practice, representation or relationship in connection with any insured at any time.

This exclusion applies:

1.  whether the **insured** may be liable as an employer or in any other capacity; and

2.  to any obligation to share damages with or repay someone else who must pay damages because of any of the foregoing.

L. Wrong Description Of Prices

**Advertising injury** or **personal injury** arising out of the wrong description of the price of goods, products or services.

M. Intellectual Property Laws And Rights

Any actual or alleged **bodily injury**, **property damage**, **advertising injury** or **personal injury** arising out of, giving rise to or in any way related to any actual or alleged:

1.  assertion; or

2.  infringement or violation;

by any person or organization (including any **insured**) of any **intellectual property law or right**, regardless of whether this insurance would otherwise apply to all or part of any such actual or alleged injury or damage in the absence of any such actual or alleged assertion, infringement or

This exclusion applies, unless such injury:

1.  is caused by an offense described in the definition of **advertising injury**; and

2.  does not arise out of, give rise to or in any way relate to any actual or alleged assertion, infringement or violation of any **intellectual property law or right**, other than one described in the definition of **advertising injury**.

0209
0209

Coverage 11 - Liability for Alcohol Beverage Service

The Company will promptly pay on behalf of the **insured** all sums which the **insured** becomes legally obligated to pay as damages because of **bodily injury** or **property damage** caused by an **occurrence** resulting from the **insured**'s **aviation operations** during the policy period arising out of the serving or giving of any alcoholic beverage at or from the **insured**'s **premises** or any **aircraft** covered by the Policy.

The insurance provided by Coverage 11 is **excess insurance**.

Coverage 12 - Liability for Incidental Medical Malpractice

The Company will promptly pay on behalf of the **insured** all sums which the **insured** becomes legally obligated to pay as damages because of **bodily injury** caused by an **occurrence** resulting from the **insured**'s **aviation operations** during the policy period arising out of  "Incidental Medical Malpractice".

"Incidental Medical Malpractice" means injury arising out of the rendering of or failure to render, during the policy period, the following services:

    A.   medical, automatic external defibrillator, surgical, dental, x-ray, or nursing service or treatment or the furnishing of food or beverages in connection therewith; or

    B.   the furnishing or dispensing of drugs or medical, dental or surgical supplies or appliances.

    C.   The insurance provided by Coverage 12 shall not apply to:

        1.   expenses incurred by the **insured** for first-aid to others at the time of an accident;

        2.   any **insured** engaged in the business or occupation of providing any of the services described under "Incidental Medical Malpractice" above;

        3.   injury caused by an indemnitee if such indemnitee is engaged in the business or occupation of providing any of the services described under "Incidental Medical Malpractice" above; or

        4.   the failure to render automatic external defibrillator treatment, if the **aircraft** or **premises** are not equipped with automatic external defibrillator units.

Coverage 13 - Liability for Use of **Premises**

The Company will promptly pay on behalf of the **insured** all sums which the **insured** becomes legally obligated to pay as damages because of **bodily injury** or **property damage** caused by an **occurrence** resulting from the **insured**'s **aviation operations** during the policy period arising out of the ownership, maintenance or use of **premises**.

The insurance provided by Coverage 13 is **excess insurance**.

Coverage 14 - Liability for the Operation of **Mobile Equipment**

The Company will promptly pay on behalf of the **insured** all sums which the **insured** becomes legally obligated to pay as damages because of **bodily injury** or **property damage** caused by an **occurrence** resulting from the **insured**'s **aviation operations** during the policy period arising out of ownership, maintenance or use of **mobile equipment**.

The insurance provided by Coverage 14 is **excess insurance**.

0210
0210

Coverage 15 - Liability for the Operation of an **Auto** while on Airport **Premises**

The Company will promptly pay on behalf of the **insured** all sums which the **insured** becomes legally obligated to pay as damages because of **bodily injury** or **property damage** caused by an **occurrence** resulting from the **insured**'s **aviation operations** during the policy period arising out of ownership, lease, rental, arrangement or use of **autos** while on airport **premises** exclusive of any public roadways and parking areas.

The insurance provided by Coverage 15 is **excess insurance**.

## Coverage 16 - Liability for the Sale of **Aircraft** and Aircraft Products and Services

The Company will promptly pay on behalf of the **insured** all sums which the **insured** becomes legally obligated to pay as damages because of **bodily injury** or **property damage** caused by an **occurrence** resulting from the **insured**'s **aviation operations** during the policy period arising out of the:

    A.   sale or relinquishment from exclusive written lease, by the **named insured**, of a **scheduled aircraft** or any aircraft sold or relinquished prior to the policy period;

    B.   furnishing to others, by the **insured**, any materials, parts, equipment, fuel, maintenance, aircraft services, used for or in connection with aircraft, **premises** or **mobile equipment**;

    C.   furnishing to others, by the **insured**, of food or beverages in connection with the operation of **aircraft** or **premises**.

The insurance provided by Coverage 16 is **excess insurance** and will only apply if the **bodily injury** or **property damage** occurs away from the **insured**'s **premises**, after physical possession of the aircraft, materials, parts, equipment, fuel, food or beverages have been relinquished to others and any services have been completed.

## Coverage 17 - Liability for Hangarkeeper Operations

The Company will promptly pay on behalf of the **insured** all sums which the **insured** becomes legally obligated to pay as damages because of "loss" to **aircraft** (subject to the deductible shown in the Declarations if applicable unless such "loss" results from fire or explosion or while the **aircraft** is dismantled and being transported) occurring while such **aircraft** is in the care, custody or control of the **insured** for safekeeping, storage, service or repair.  However:

    A.   The amount the Company will pay for damages is limited as described under Declarations, "Item 5. Limits of the Company's Liability", Coverage 17;

    B.   If repairs are made by the **insured**, the Company will not pay more than:

        1.   the **insured**'s actual net cost for necessary material and parts of like kind and quality; and

        2.   the **insured**'s actual wages for labor at current straight time rates with no premium for overtime, plus 150% of such wages as an allowance for overhead and supervision.  No other obligation or liability to pay sums or perform acts or services is covered unless explicitly provided for under Section Two - Defense, Settlement and Supplementary Payments of Liability Claims.

0211
0211

C. Coverage 17 applies to damages because of "loss" to **aircraft** only if the "loss" occurs during the policy period.

D. The insurance provided by Coverage 17 shall not apply to:

    1. the **insured**'s liability under any agreement to be responsible for "loss";

    2. "loss" to robes, wearing apparel, personal effects or merchandise;

    3. to "loss" or damage to **aircraft** or parts of any **aircraft**:

        a. owned by, leased to, rented to or loaned to the **insured** or partner(s) of the **insured**;

        b. owned by, leased to, rented to or loaned to an officer or employee of the **insured** unless the property is an **aircraft** in the **insured**'s custody under an agreement for which a charge has been made;

    4. "loss" due to theft or conversion caused in any way by the **insured**'s employees, partners or shareholders;

    5. "loss" to **insured**'s work, arising out of it or any part of it;

    6. "loss" to **aircraft** while **in-flight**; or

    7. liability for **property damage** to **non-owned aircraft** and **temporary substitute aircraft** under Coverage 3.

Definition applicable to Coverage 17:

"Loss" means direct and accidental loss of or damage to tangible property.

## Coverage 18 - Liability for Garagekeeper Operations

The Company will promptly pay on behalf of the **insured** all sums which the **insured** becomes legally obligated to pay as damages because of **property damage** to an **auto** occurring while such **auto** is in the care, custody or control of the **insured** for valet parking, towing, safekeeping, storage or while on airport **premises** for any other incidental use by the **insured**.

The insurance provided by Coverage 18 shall not apply to:

A. the **insured**'s liability under any agreement to be responsible for "loss";

B. "loss" to robes, wearing apparel, personal effects or merchandise;

C. "loss" or damage to an **auto** or parts of any **auto**:

    1. owned by, leased to, rented to or loaned to the **insured** or partner(s) of the **insured**;

    2. owned by, leased to, rented to or loaned to an officer or employee of the **insured** unless the **auto** is in the **insured**'s custody due to towing, or for valet parking for which a charge has been made.

D. "loss" due to theft or conversion caused in any way by the **insured**, its employees, its partners or shareholders.

Definition applicable to Coverage 18:

"Loss" means direct and accidental loss of or damage to tangible property.

0212
0212

Section Two - Defense, Settlement and Supplementary Payments

A.   The Company has the right and duty to defend any suit against the **insured** seeking damages because of **bodily injury**, **personal injury**, **advertising injury**, or **property damage** covered by the Policy, even if any of the allegations of the suit are groundless, false or fraudulent. The Company may make any investigation and settlement of any claim or suit as it deems expedient. The Company will not be obligated to pay any expense, claim or judgment or to defend any suit after the applicable limit of liability has been exhausted by the payment of judgment(s) or settlement(s).

B.   The Company will promptly pay in addition to the applicable limit of liability:

    1.   all the Company's expenses and all costs taxed against the **insured** in any suit the Company is required to defend including:

       a.   any pre-judgment interest awarded against the **insured** on that part of the judgment the Company is required to pay under the terms of the Policy;

       b.   all interest on the amount of any judgment that the Company is required to pay under the terms of the Policy which accrues after the entry of the judgment and before the Company has paid, tendered or deposited in to court that portion of the judgement owed by the Company; and

       c.   any costs for arbitration alleging damages covered by the Policy which the **insured** must or may submit to;

    2.   premium on appeal bonds required or, premiums on bonds to release attachments in any suit defended by the Company for any amount not exceeding the applicable limit of liability;

    3.   the cost of bail bonds, up to $10,000 for each incident, required of the **insured** because of an **occurrence** or violation of law or a regulation for civil aviation arising out of the **insured**'s **aviation operations** and involves the use of **aircraft** or **premises**. However, the Company has no obligation to furnish or apply for any bail bonds;

    4.   all reasonable expenses incurred by the **insured** for first aid, medical and surgical relief that is imperative at the time of an accident because of **bodily injury** covered by the Policy;

    5.   all reasonable expenses incurred by the **insured** at the Company's request; however, the Company will not pay more than $500.00 per day for each of the **insured**'s employees for the loss of earnings, wages or salaries; and

    6.   all expenses incurred by the **insured** that have been approved in advance by the Company.

0213
0213

Section Three - **Physical Damage** Coverages

Coverage 19 - **Physical Damage** Coverage for **Scheduled Aircraft** (including **Ingestion** and Emergency Landing)

The Company will promptly pay for any **physical damage** to a **scheduled aircraft** that occurs during the policy period including its disappearance or theft, less any applicable deductible. A **scheduled aircraft** shall be considered missing under disappearance or stolen under theft if such **aircraft** is unable to be located for fifteen (15) days after reported missing or stolen.  In addition, if an unexpected event causes a **scheduled aircraft** to make a landing in a location where it cannot safely depart and there is no **physical damage**, the Company will pay the reasonable costs of transporting the **scheduled aircraft** to the nearest suitable airport.

Coverage 20 - **Physical Damage** Coverage for **Spare Engines** and **Spare Parts** Including Transit

The Company will promptly pay for **physical damage** to or theft of **spare engines** and **spare parts** that are owned by the **Named Insured** or for which the **Named Insured** is legally responsible.

The insurance provided by Coverage 20 is **excess insurance**.

Coverage 21 - Automatic Insurance for Increased Value of **Scheduled Aircraft** or **Spare Engines** and **Spare Parts**

If the value of a **scheduled aircraft** is increased during the policy period because of modifications or the addition of equipment or, the **named insured** modifies or acquires additional **spare engines** or **spare parts**, the applicable insurance provided by the Policy under Section Three - **Physical Damage** Coverage will apply to the increased value. The amount of insurance in the Declarations will automatically increase by the actual cost to the **named insured** of the modifications, equipment or additional **spare engines** or **spare parts** as evidenced by the **named insured**'s records provided:

    A.   the **named insured** reports to the Company any increase in value as soon as possible after completion of modifications or additions;

    B.   that unless the Company has agreed in advance, the maximum automatic increase of value will not exceed:

        1.   the Maximum Automatic limit for **Physical Damage** to a **scheduled aircraft** shown in the Declarations, "Item 5. Limits of the Company's Liability" as shown under Coverage 21 in the Declarations; or

        2.   the Maximum Automatic Limit for **spare engines** and **spare parts** shown in the Declarations, "Item 5. Limits of the Company's Liability", as shown under Coverage 21 in the Declarations; and

    C.   any additional premiums for the increased limits are paid by the **named insured**.

0214
0214

Coverage 22 - **Physical Damage** Coverage for Mechanics Tools

This insurance is extended to cover tools of the **insured**'s employee mechanics against direct and accidental physical loss or damage from external causes while such tools are in the care, custody and control of the **named insured** or such employee while acting within the scope of employment.  The Company's liability shall not exceed the limits stated in the Declarations under Coverage 22.

The insurance provided by Coverage 22 shall not apply to claims caused by or arising from:

    A.   wear, tear, deterioration, rust, or inherent vice;

    B.   delay, depreciation, or loss of use;

    C.   mechanical, electrical, hydraulic, pneumatic or structural breakdown or failure;

    D.   artificial electric current;

    E.   extremes of temperature and humidity;

    F.   mysterious disappearance, loss or shortage disclosed upon taking inventory;

    G.   infidelity, dishonesty of the **insured** or anyone in the service of the **insured**;

    H.   wrongful taking or secretion by any person or organization in lawful possession thereof; or

    I.   failure to save and protect such property from further loss or harm after an **occurrence** to which this endorsement applies.

## Section Four - Additional Coverages

### Coverage 23 - Temporary Replacement Parts Rental Expense

If a **scheduled aircraft** suffers a **physical damage** loss covered by the Policy, the Company will promptly pay the **named insured**'s additional expenses of renting or leasing, for the period of repair, temporary replacement component part(s), to replace the part(s) damaged in the loss. This includes the **named insured**'s cost of installation, removal and transportation. Coverage 23 will not apply unless the actual time required for the repair exceeds the minimum required repair period shown for Coverage 23 in the Declarations. Coverage 23 shall not apply to rental expense incurred after the maximum coverage period has expired. The maximum coverage period begins immediately following the minimum required repair period.

0215
0215

Coverage 24 - Replacement **Aircraft** Rental Expense

If a **scheduled aircraft** suffers a **physical damage** loss covered under the Policy, the Company will promptly pay the **named insured**'s **extra expense** of leasing or renting a **temporary substitute aircraft** while the **scheduled aircraft** is being repaired.

The insurance provided by Coverage 24 shall not apply to **extra expense** incurred:

    A.   unless the actual time required to repair the damaged **aircraft** exceeds the minimum required repair period shown under this coverage in the Declarations;

    B.   if another **aircraft** is available at no extra charge for its use;

    C.   if the **named insured** acquires through ownership, lease, lease-purchase option, or otherwise, a permanent replacement for the damaged **aircraft**;

    D.   if the **scheduled aircraft** is a **total loss** and the Company has offered the **named insured** a proof of loss;

    E.   beyond the maximum coverage period shown under Coverage 24 as shown in the Declarations. The maximum coverage period begins immediately following the minimum required repair period and is to run consecutively without interruption;

    F.   unless such **extra expense** is actually incurred by the **named insured**; or

    G.   for replacement of any commercial revenue generating charter or Title 14 CFR Part 135 operation, unless such flight is solely for the **aircraft** owner's personal use.

Coverage 25 - Search and Rescue Expense

The Company will promptly reimburse the **insured** for its actual incurred expenses for search and rescue operations performed by or at the request of the **named insured**.

The insurance provided by Coverage 25 shall not apply to any claim, cost or expense:

    A.   for any governmental or military search and rescue operations;

    B.   arising out of any loss or damage to any equipment used in connection with the search and rescue operations;

    C.   arising out of the injury or death of any persons involved in the search and rescue operations;

    D.   incurred after it is reasonably assumed that there are no survivors; or

    E.   associated with salvaging the **aircraft** or any other property.

Coverage 26 - Runway Foaming and Crash Control Expense

The Company will promptly reimburse the **insured** for their actual incurred cost of runway or **aircraft** foaming and, fire, crash control, or rescue expenses, for the purpose of minimizing a **physical damage** or **bodily injury** loss covered by the Policy.

0216
0216

## Coverage 27 - Trip Interruption Expense

The Company will promptly reimburse the **insured** for their reasonable expenses of food, travel by commercial carrier and lodging of **passenger**s, incurred from the place where an **aircraft** suffers a covered **physical damage** loss to the intended final destination of the damaged **aircraft**, or back to the place they originally boarded the **aircraft** if the trip is discontinued.

The insurance provided by Coverage 27 shall not apply to any cost or expense for replacement **aircraft** rental for which payment is expected or made under Coverage 24.

## Coverage 28 - Automatic Insurance for Newly Acquired **Aircraft**

If, during the policy period, the **named insured** becomes the owner or exclusive lessee of an additional **aircraft** and is required to provide **aircraft** liability and/or **aircraft physical damage** insurance and, as soon as possible, reports the acquisition to the Company, the insurance afforded by the Policy will apply to the additional **aircraft** incepting at the time of acquisition. Unless the **named insured** and the Company agree otherwise, the coverage and limits of liability pertaining to the additional **aircraft** will be the same as is provided for other **scheduled aircraft**. If more than one **aircraft** is scheduled in Coverage 1 and more than one liability limit is scheduled, the lowest liability limit in the schedule will apply to the newly acquired **aircraft**. The insured value of the additional **aircraft** will be the actual cost of the **aircraft** to the **named insured** but not exceeding the Maximum **Physical Damage** Limit shown under Coverage 28 in the Declarations. The **named insured** agrees to pay any additional premium required because of the addition of the newly acquired **aircraft**.

## Coverage 29 - Lay-Up Credit For **Scheduled Aircraft**

If a **scheduled aircraft** is not used **in-flight** for more than the minimum lay-up period shown in the Declarations the **named insured** agrees to notify the Company as soon as practicable. At the end of the policy period, the Company will return a pro-rata percentage credit of the applicable premium for the entire period of the lay-up as shown under Coverage 29 in the Declarations.

The insurance provided by Coverage 29 shall not apply to any **scheduled aircraft** laid up because of any loss or damage covered by the Policy.

## Coverage 30 - Personal Effects and Baggage Expense

The Company will promptly pay on behalf of or reimburse the **named insured** for all sums which the **named insured** is liable for or pays to others for the loss of or **physical damage** to the personal effects and baggage of a **passenger**. Coverage 30 will only apply if the loss or damage occurred during the policy period and while the personal effects and baggage were in the care, custody or control of an **insured**.

0217
0217

## Section Five - **Medical Expense**

### Coverage 31 - Medical Payments for **Scheduled Aircraft** and **Non-Owned Aircraft**

Regardless of liability, the Company will promptly pay all the reasonable **medical expenses** incurred within one year from the date of injury for each covered **passenger** who sustains **bodily injury** caused by an **occurrence** during the policy period.

The insurance provided by Coverage 31 shall not apply for the benefit of a **crew member** on **non-owned aircraft** unless the Declarations shows a specific limit for **crew member** under the **non-owned aircraft** section of Coverage 31 and:

    A.  the **crew member** is an officer, director, stockholder, employee, partner, or agent of the **named insured** while acting in the scope of employment, or

    B.  the person is a **crew member** who would normally be operating a **scheduled aircraft** but is operating a **non-owned aircraft** on behalf of the **named insured**.

### Coverage 32 - **Premises** Medical Payments

The Company will promptly pay all reasonable **medical expenses** incurred within one year from the date of injury for each person who sustains **bodily injury** caused by an **occurrence** during the policy period arising out of the **insured**'s **aviation operations** and ownership, maintenance or use of **premises**.

The following provisions apply to Coverage 31 and 32:

    A.  medical payments will not be made to anyone until all medical benefits available under a workers compensation or similar law have been exhausted;

    B.  as soon as possible, the injured person or someone on their behalf will give the Company written proof of claim, under oath if required, and will, if requested by the Company, authorize the Company to obtain medical reports and copies of records. The injured person will submit to examination by physicians selected by the Company if and when the Company may reasonably require;

    C.  the Company may pay the injured person or any person or organization rendering the services.  Any payments made under these sections do not constitute an admission of liability of any **insured**, person, organization, or of the Company; and

    D.  the total liability of the Company for all **medical expenses** incurred by or on behalf of each covered **passenger** or person who sustains **bodily injury** will not exceed the applicable Limit of Liability as stated in the Declarations under Coverage 32 for that **passenger** or person.

## Section Six - Policy Definitions

When appearing in bold print in the Policy the following definitions apply:

**"Advertisement"** means an electronic, oral, written or other notice, about goods, products or services, designed for the specific purpose of attracting the general public or a specific market segment to use such goods, products or services.

**Advertisement** does not include any e-mail address, Internet domain name or other electronic address or metalanguage.

0218
0218

"**Advertising injury**" means injury, other than **bodily injury**, **property damage** or **personal injury**, sustained by a person or organization and caused by an offense of infringing, in that particular part of the **insured**'s **advertisement** of goods, products or services, that are:

A. copyrighted **advertisement**; or

B. registered collective mark, registered service mark or other registered trademarked name, slogan, symbol or title.

"**Aircraft**" means any **scheduled aircraft** and any other **aircraft** for which insurance is provided under the Policy. The definition includes the **aircraft**'s propulsion system, and parts and equipment installed in or on the **aircraft**. Parts that are temporarily removed are also included in the definition even if replaced by similar parts.  Tools and repair equipment standard for the **aircraft** and normally carried on the **aircraft** are also included within the definition.

"**Auto**" means a land motor vehicle, trailer or semi-trailer designed for travel on public roads, including any attached machinery or equipment. But **auto** does not include **mobile equipment**.

"**Aviation operations**" means all operations arising from the ownership, maintenance or use of locations or **aircraft** for aviation activities including that portion of roads or other accesses that adjoin these locations. **Aviation operations** include all operations necessary or incidental to aviation activities.

"**Bodily injury**" means physical injury sustained by any person, caused by an **occurrence** during the policy period, including sickness, disease, mental anguish and death at any time resulting therefrom.

"**Crew member**" means any **passenger** such as the **pilot-in-command**, co-pilot, flight engineer or flight attendant, who is required for or assisting in **aircraft** operations.

"**Extra expense**" means that portion of the actual incurred cost of leasing or renting a replacement **aircraft** which exceeds the cost of operating **aircraft** the **named insured** would have incurred if the **scheduled aircraft** had not been damaged.

"**Excess insurance**" means insurance that only applies when all other valid and collectible insurance, including any formal self-insurance program or self-insured retention plan, available to the **named insured**/**insured** has been exhausted (other than insurance specifically purchased by the **named insured** to apply as excess over this Policy). If no such insurance or self-insurance exists, excess insurance coverage provided by this policy shall act as primary. If the other insurance is written through the Company as primary insurance, the total limit of the Company's or Companies' liability will not exceed the greatest or greater limit on any one Policy.

"**In-flight**" means, with respect to fixed-wing **aircraft**, the time commencing from the start of the take-off run of the **aircraft** and continuing until it has completed its landing roll. With respect to an **aircraft** that is a rotorcraft, it is any time the rotors are moving under power for lift-off or flight, until the rotors cease revolving after landing. With respect to any other **aircraft**, it is any time the **aircraft** is off a supporting surface as a result of propulsion, buoyancy or aerodynamic reaction.

"**In-motion**" means anytime the **aircraft** is moving under its own power or the momentum generated therefrom or, while it is **in-flight**. With respect to an **aircraft** that is a rotorcraft, it is anytime the rotors are moving under power or the momentum generated therefrom.

0219
0219

"**Ingestion**" means **physical damage** to a turbine engine or turbine auxiliary power unit, if they are included within the definition of **aircraft**, caused by objects or substances that are not or were not part of the engine or its accessories, which is the result of a single incident of sufficient severity to require, or would require if its severity were known at the time, immediate repair before further use.

"**Insured**" means:

A.   for all coverage:

    1.   the **named insured**;

    2.   any director, officer, partner, employee, agent or stockholder of the **Named Insured** while that person is acting within their official capacity as such;

B.   for all Section One - Liability Coverages except Coverage 2, 3 and 5 (**Non-owned aircraft** Liability Coverage and Products Liability Coverages) means:

    1.   any person or organization while riding in, using or legally responsible for a **scheduled aircraft** or **temporary substitute aircraft** provided that the use is within the scope of the permission of the **named insured**; and

    2.   any other person or organization but, only for their legal liability covered by the Policy which arises solely out of the acts or omissions of a person or organization in A. above.

C.   other than any persons or organizations described in paragraph A. above, none of the following is considered an **insured** regardless of subparagraph B. 1. above:

    1.   any person or organization or their agents or employees engaged in the design, manufacture, maintenance, repair, or sale of **aircraft**, **aircraft** engines, components or accessories, or engaged in the operation of any **aircraft**, airport, hangar, flight school, flight service, or piloting service, with respect to any **occurrence** arising out of such activity, and

    2.   the owner, lessor or their agents or employees, of any **non-owned aircraft** covered by the Policy.

"**Intellectual property law or right**" means any:

A.   certification mark, copyright, patent or trademark (including collective or service marks);

B.   right to, or judicial or statutory law recognizing an interest in, any trade secret or confidential or proprietary non-personal information;

C.   other right to, or judicial or statutory law recognizing an interest in, any expression, idea, likeness, name, slogan, style of doing business, symbol, title, trade dress or other intellectual property; or,

D.   other judicial or statutory law concerning piracy, unfair competition or other similar practices.

"**Medical expense**" means expenses for necessary medical, surgical, x-ray and dental services, including prosthetic devices and necessary ambulance, hospital, professional nursing and/or funeral services.

"**Mobile equipment**" means a land vehicle (including any machinery or apparatus attached), whether or not self-propelled, used in connection with the maintenance or operation of **aircraft** or **premises** that is:

A.   not subject to motor vehicle registration;

B.   used exclusively on **premises** owned by or rented to the **named insured** including the roadways or property immediately adjoining; or

C.   designed for use principally off public roads.

0220
0220

"**Named Insured**" means the person(s) or organization(s) shown in Item 1. of the Declarations.

"**Non-owned aircraft**" means any **aircraft** except:

    A.  an **aircraft** owned in whole or in part by or registered to the **named insured**;

    B.  a **scheduled aircraft**; or

    C.  an **aircraft** having a seating configuration exceeding the maximum number of seats shown in the Declarations for Coverage 2 (regardless of the actual number of **passenger**s on the **aircraft**).

"**Occurrence**" means an accident, including continuous or repeated exposure to conditions,  which results in **bodily injury** or **property damage** neither expected nor intended by the  **insured**.  However, the definition includes **bodily injury** or **property damage** resulting  from the efforts to prevent dangerous interference with any **aviation operations**.

"**Partial loss**" means any **physical damage** loss which is not a **total loss**.

"**Passenger**" means any person in, on or boarding the **aircraft** for the purpose of riding, flying in or exiting from it after a ride, flight or attempted flight.

"**Personal injury**" means means injury, other than **bodily injury**, **property damage** or **advertising injury**, caused by an offense of:

    A.  false arrest, false detention or other false imprisonment;

    B.  malicious prosecution;

    C.  wrongful entry into, wrongful eviction of a person from or other violation of a person's right of private occupancy of dwelling, **premises** or room that such person occupies, if committed by or on behalf of its landlord, lessor or owner; or

    D.  electronic, oral, written or other publication of material that:

        1.  libels or slanders a person or organization (which does not include disparagement of goods, products, property or services); or

        2.  violates a person's right of privacy.

"**Physical damage**" means accidental, direct physical loss of or damage to **scheduled aircraft**, **spare engines** or **spare parts** during the policy period including **ingestion**, but it does not include the loss of use or any residual depreciation in value either before or after any repairs have been made.

"**Pilot-in-command**" means the pilot aboard the **aircraft** who is responsible for its **in-flight** operation.

"**Premises**" means the portions of airports, buildings or areas used by the **Named Insured** directly in connection with the ownership, operation, maintenance or use of any **aircraft** and the **Named Insured**'s **aviation operations**.

"**Property damage**" means accidental damage to or destruction of the tangible property of others caused by an **occurrence** during the policy period and the resultant loss of use of the property. **Property damage** also includes the loss of use of the tangible property of others that is not physically damaged but that is caused by an **occurrence** during the policy period.

0221
0221

"**Salvage value**" means the value of the damaged property prior to any repairs.

"**Scheduled aircraft**" means any **aircraft** listed under Coverage 1 - Liability for **Scheduled Aircraft** and Coverage 19 - **Physical Damage** Coverage for **Scheduled Aircraft** in the Declarations or any **aircraft** covered under Coverage 28 - Automatic Insurance for Newly Acquired **Aircraft**.

"**Spare engines**" means propulsion engines and auxiliary power units which have been or which are intended to be installed in or on a **scheduled aircraft** or **temporary substitute aircraft** and which are not included within the policy definition of an **aircraft**.

"**Spare parts**" means parts or accessories, except **spare engines**, specifically designed for installation in or on **aircraft** or **mobile equipment** which are not included within the policy definition of an **aircraft** or **mobile equipment**.

"**Temporary substitute aircraft**" means any **non-owned aircraft** used in place of a **scheduled aircraft** that is temporarily withdrawn from use because of its damage, breakdown, repair, modification, inspection, servicing, loss or destruction.

"**Total loss**" means any **physical damage** loss for which the cost to repair when added to the **salvage value** equals or exceeds:

    A.  the insured value of a **scheduled aircraft**, or

    B.  the actual cash value of any other insured property.

Theft or disappearance of the entire **aircraft** is considered a **total loss**.


## Section Seven - Exclusions

The insurance provided by the Policy shall not apply:

    A.  to liability assumed by the **insured** in any type of agreement except as provided by Coverage 9 - Liability for Contractual Agreements;

    B.  to any obligation which the **insured** or its insurance carrier may be held liable under any workers' compensation, unemployment compensation, disability benefits law or under any similar law;

    C.  to **bodily injury** or **personal injury** to any employee of the **insured** arising out of and in the course of their employment by the **insured**, or to any claims for **bodily injury** as a consequence thereof. This exclusion shall not apply to liability assumed by the **insured** in any agreement required by a military or governmental authority as a prerequisite for using an airport or an airport facility, nor will this exclusion apply to Coverage 5 - **Passenger** Voluntary Settlements;

    D.  to illegal, criminal or dishonest acts or activities, alleged or otherwise, committed by or at the direction of or with the knowledge and consent of directors or officers of the **insured** and with the knowledge at the time that such act was illegal or criminal, but with respect to the **named insured** this exclusion shall apply only if such activities or acts are with the knowledge and consent of an officer or director of the **named insured**;

    E.  to any claim, loss or expense arising out of any hostile detonation of any weapon of war employing atomic or nuclear fission and/or fusion or other like reaction or radioactive force or matter;

0222
0222

F.   to any **insured** while the **aircraft** is **in-flight** if piloted by other than the pilot or pilots designated under Item 4 of the Declarations;

G.   under all Section One - Liability Coverage and Section Two - Defense, Settlement and Supplementary Payments of Liability Claims, for **property damage** to property owned, occupied, used, rented, transported by or in the care, custody, or control of an **insured** except as provided under Coverage 2, 3, 6, 7, 8,17 and 18;

H.   under Section One - Liability Coverage and Section Two - Defense, Settlement and Supplementary Payments of Liability Claims or Section Five - **Medical Expenses**, to any **insured** who is also **insured** under any contract of nuclear energy liability insurance, in effect at the time of the **occurrence**, issued by the Nuclear Energy Liability Insurance Association or the Mutual Atomic Energy Liability Underwriters that covers the claim, loss, damage or expense or would cover the claim, loss, damage or expense if such policy's limits of liability were not exhausted;

I.   under all Section Three - **Physical Damage** Coverage, to any loss, damage, claim or expense:

which is due and confined to wear and tear, deterioration, mechanical or electrical breakdown of the insured property, its equipment, components or accessories, or to tires, unless the damage is caused by fire, malicious mischief, vandalism or theft or unless the loss or damage is the direct result of other **physical damage**, including **ingestion**, covered by the Policy. Damage resulting from the breakdown, failure or malfunction of an engine component, accessory or part is considered mechanical breakdown of the entire engine;

J.   claims or damage resulting from:

1.   war, whether declared or undeclared, invasion, acts of foreign enemies, hostilities, civil war, rebellion, revolution, insurrection, martial law, military or usurped power or attempts at usurpation of power;

2.   confiscation, nationalization, seizure, restraint, detention, appropriation, requisition for title, used by or under the order of any government, public or local authority, whether civil, military or *de facto*;

3.   claims arising while the insured property is outside the control of the **insured** because of any of the above perils;

K.   to an **aircraft**'s turbine engine (including a turbine powered auxiliary power unit) caused by heat resulting from starting, attempted starting, operation or shutdown thereof;

L.   caused by any type of radioactive contamination;

M.   caused by the embezzlement, secretion or conversion of the insured property; or

N.   due to depreciation in the value of, or arising from the loss of use of the insured property.

0223
0223

Section Eight - Limit of the Company's Liability

A.   Other Insurance

Except with respect to coverage provided by the Policy as **excess insurance**, if there is other insurance including any formal self-insurance program or self-insured retention plan, in the **insured**'s name or otherwise, against any loss, liability, or expense covered by the Policy, the Company will not be liable under the Policy for a greater proportion of such loss, liability or expense than the applicable limit of the Company's liability under the Policy bears to the total applicable limits of all other valid and collectible insurance.

B.   Total Liability for Section One - Liability Coverage

The limits apply separately to each insured **aircraft** and each **insured** but, regardless of the number of **insured**s under the Policy, persons or organizations who sustain **bodily injury**, **personal injury** or **property damage**, claims made, or suits brought because of **bodily injury**, **personal injury** or **property damage**, the Company's total liability for all damages, including damages for care and loss of services, as the result of any one **occurrence** will not exceed the limit of liability stated in the Declarations as applicable to "each **occurrence**", and in the annual aggregate if specified. For the purpose of determining the limit of the Company's total liability, all **bodily injury**, **personal injury** and **property damage** arising out of continuous or repeated exposure to the same general conditions will be considered arising out of one **occurrence**.

C.   Total Liability for Section Three - **Physical Damage** Coverage

1.   In the event of a **total loss**, the Company will promptly pay the **named insured**:

a.   the Insured Value of the **scheduled aircraft** as shown under Coverage 19 of the Declarations;

b.   the **named insured**'s financial interest in any **spare engine** or **spare part** (less any applicable deductible) but, not exceeding its actual cash value or the limits for the applicable coverage in the Declarations, whichever is less. In addition, the Company will promptly refund the pro-rated unearned premium for any **scheduled aircraft** that is a **total loss**. At the time of payment of a **total loss** by the Company, the Company's exposure, under Coverage 19, ceases.

2.   In the event of a **partial loss**, the Company's Liability shall not exceed:

a.   the total of the following items, less any applicable deductible, if the repairs are made by an **insured**:

i.   the **insured**'s net costs for necessary material and parts of like kind and quality;

ii.   "Transportation Costs" (as defined below);

iii.   the reasonable costs of food, lodging, and transportation of the **insured**'s employees required for the actual period of repair if the loss occurs away from the **insured**'s base of operations and

iv.   actual wages paid for labor at the current straight time rates at the place of repair plus the reasonable cost of required supervision and overhead;

0224
0224

    b.  the total of the following items, less any applicable deductible, if the repairs are made by other than the **insured**:

        i.  the net cost to the **insured**, to make repairs with material and parts of like kind and quality;

        ii.  the reasonable transportation, food and lodging expenses for a necessary representative(s) of the **insured** to inspect or authorize repairs and/or test fly the **aircraft** but not exceeding 5% of the repair cost estimate or $5,000., whichever is less. This paragraph will not apply unless the **aircraft** is being repaired away from its primary base of operations;

        iii.  any additional "Transportation Costs" incurred.

"Transportation Costs" means the cost of transportation, by the least expensive reasonable means of:

    A.  damaged parts from the site of the loss to and from the most practicable place for repair;

    B.  replacement parts from the nearest available source to the site of the loss; or

    C.  the damaged property to the most practicable place for repair and, then, to the site of the loss or to the **insured**'s home airport, whichever is closer.

3.  In no event will the Company's liability for a **partial loss** exceed the insured value of the **scheduled aircraft**; or with respect to Coverage 20, the **named insured**'s financial interest in any **spare engine** or **spare part**, its actual cash value, or the applicable limit of liability shown under Coverage 20 in the Declarations, whichever is less.

4.  In the event of a **partial loss**, whether or not such loss is covered by the Policy, the Insured Value of the **scheduled aircraft** will automatically be reduced at the time of the loss by the amount of the loss. When repairs begin, the insured value will automatically increase by the value of the completed repairs until the insured value of the **scheduled aircraft** is fully restored.

5.  If the Company pays a claim, whether for a **partial loss** or a **total loss**, the Company is entitled to all salvage.  There will, however, be no abandonment of the salvage to the Company without its prior consent.

6.  The Company has the right to return stolen property any time before the loss is paid with payment for any resultant **physical damage**.

7.  The amount specified as a deductible (if any) for **scheduled aircraft** does not apply to a **total loss**, constructive **total loss** or any loss caused by fire, lightning, explosion, transportation of parts, theft, robbery or pilferage. However, any **partial loss** caused by fire or explosion, resulting directly or indirectly from the collision or crash of an **aircraft** while **in-motion**, will be subject to the **in-motion** deductible, if any. **Scheduled aircraft** deductibles will not apply in the event of a collision with any other **aircraft** insured through the Company under another policy.

0225
0225

D.  Total Liability for Section Four -  Additional Coverage

The total liability of the Company for all costs or expenses incurred by or on behalf of the **named insured** will not exceed the Limit of Liability stated in the Declarations that applies to each applicable coverage

E.  Severability of Interests

The limits and coverage apply separately to each **insured**, but the inclusion within the Policy of more than one **insured** will not increase the applicable limits of the Company's total liability.

F.  Two or More **Aircraft** Insured by the Policy

In the event that two or more **aircraft** are insured by the Policy, the applicable limits of liability and deductibles (if any) will apply separately to each.

## Section Nine - Notice of Claims and Other Duties of an **Insured**

In the event of any accident, **occurrence**, claim, suit or loss, the **insured**(s) and/or the **insured**'s legal representative(s) agree to:

A.  not assume any obligation or liability, nor offer to pay any reward except at the **insured**'s expense, nor incur any expense other than those items listed in Section Two - Defense, Settlement and Supplementary Payments of the Policy;

B.  promptly contact the Company and follow up with prompt written notice including (if known) the:

1.  time, place and description of events;

2.  names and locations of **passenger**s, witnesses, injured or deceased persons, and

3.  location and description of any damaged property and/or **aircraft**;

C.  immediately forward to the Company every demand, notice, summons, legal paper, or any other process they receive;

D.  cooperate and assist the Company in all matters of any claim or suit;

E.  do nothing after the accident or loss to harm the Company's right of recovery against any person or organization who may be liable to the **insured**;

F.  authorize the Company to obtain any records relating to a loss;

G.  not abandon the **aircraft** or any other salvage without the Company's prior consent;

H.  take all reasonable precautions to protect the **aircraft** or other insured property after any accident or loss. Reasonable expenses incurred in providing such protection will be reimbursed by the Company. Any further loss or damage due to the **insured**'s failure to reasonably protect the insured property will not be covered by the Policy;

0226
0226

I.   promptly report any suspected theft or vandalism to the local police;

J.   allow the Company the option to inspect any **aircraft** or insured property before any repairs begin or its disposal;

K.   file with the Company within ninety (90) days after the loss a sworn proof of loss including the information and in the form the Company reasonably requires and, upon the Company's request, submit to examination under oath;

L.   exhibit the damaged property and produce for the Company's examination all pertinent records and invoices, permitting copies to be made, at reasonable times and places as the Company designates;

M.   if requested, provide clear title to the Company for any salvaged property at the time **total loss** payment is made by the Company;

N.   allow the Company to inspect **aircraft** records, repair and service invoices, sales receipts, and log books as may be required in the settlement of any claim.

## Section Ten - Other Conditions of Insurance

A.   Appraisal of Loss

If the **named insured** and the Company fail to agree on the amount of a loss, either may, within sixty (60) days after a proof of loss is filed, demand an appraisal of the loss. The **named insured** and the Company will each select a competent aircraft appraiser and the appraisers will select a competent and disinterested umpire. The appraisers will judge the amount of the loss. If they do not agree, they will submit their difference to the umpire. Agreement in writing of any two of the three will determine the amount of the loss. The **named insured** and the Company will each pay their chosen appraiser and will bear equally the expenses of the appraisal and the umpire. The Company will not be held to have waived any of its rights by any act relating to appraisal.

B.   Action Against the Company

No action will be taken against the Company unless, prior to such action, the **insured** has fully complied with all of the terms and conditions of the Policy and the amount of loss has been determined as set forth below:

1.   Liability Coverages - With respect to Section One - Liability Coverage, no action will lie against the Company until the amount of the **insured**'s obligation to pay has been finally determined either by judgment against the **insured** after actual trial or, by written agreement of the **insured**, the claimant and the Company. Any person, organization or their legal representative who has secured such judgment or written agreement will be entitled to recover under the Policy to the extent of the coverage provided by the Policy.  No person or organization shall have any right under the Policy to join the Company as a party to any action against the **insured** to determine the **insured**'s liability, nor will the Company be impleaded by the **insured** or its legal representative. Bankruptcy or insolvency of the **insured** or of the **insured**'s estate will not relieve the Company of any of its obligations under the Policy.

0227

0227

2. **Physical Damage** Coverages - With respect to Section Three - **Physical Damage** Coverage, no action will lie against the Company, nor will payment for loss be required, until thirty (30) days after the required proof of loss is filed with the Company and the amount of loss is determined as described in Section Three - **Physical Damage** Coverage of the Policy. Any action against the Company must be taken within one year after the date of the loss.

3. Additional Coverages - With respect to Section Four - Additional Coverages, no action will lie against the Company, nor will payment for loss be required, until thirty (30) days after any required proofs of claims have been filed with the Company. Any action against the Company must be taken within one year after the date of the loss.

C. Cancellation and Non-Renewal of the Policy

1. Cancellation - The Policy may be cancelled by the **named insured** by mailing prior written notice to the Company stating when the cancellation will be effective. The Policy may be cancelled by the Company by mailing to the first **named insured** at the first address shown under Item 2. of the Declarations stating when, not less than ninety (90) days thereafter, the cancellation will be effective. However, only ten (10) days prior written notice will be provided if the cancellation is for non-payment of any premium due. The effective date and hour of cancellation stated in the notice will become the end of the policy period.

   If the **named insured** cancels the Policy, earned premium will be computed in accordance with the customary short rate table and procedure. If the Company cancels, earned premium will be computed on a pro-rata basis. Premium adjustment may be made either at the time cancellation is effective or as soon as practicable after cancellation becomes effective, but payment or tender of unearned premium by the Company is not a condition required for the cancellation to be effective.

2. Non-Renewal - The Company will mail written notice to the first **named insured** at least sixty (60) days prior to the expiration date of the Policy in the event either decides not to renew the Policy.

   The proof of mailing or delivering notice of non-renewal or cancellation to the first **named insured** by the Company will be sufficient proof of notice to all **insured**s.

D. Certificates of Insurance

   A Certificate of Insurance issued by the Company for or on behalf of the **named insured**, including any certificates required by military or governmental authorities, automatically provides the insurance as is evidenced in that certificate.

E. Changing the Policy

   Nothing in the Policy can be changed or waived except by the Company's written endorsement, approved and signed by the Company.

F. Company's Rights of Recovery

   In the event of any payment made under the Policy, the Company will assume all of the **insured**'s rights of recovery against any person or organization. The **insured** will execute and deliver instruments and papers and do whatever else is necessary to enforce those rights.

0228
0228

G. Cross Liability

The Policy will cover claims by one **insured** against another **insured**. However, in no event will this provision increase or change the limits of the Company's liability nor will it change any of the Declarations, Insuring Agreements, Exclusions, Conditions, Limits of Liability or other terms of the Policy.

H. Financial Responsibility Laws

(applicable to Section One - Liability Coverages)

When the Policy is certified as proof of financial responsibility under the provisions of any **aircraft** financial responsibility law, the insurance afforded by the Policy for **bodily injury** or **property damage** will comply as necessary with the provisions of the law but, in no event in excess of the limits of liability stated in the Declarations of the Policy. The **named insured** agrees to reimburse the Company for any payment made which the Company would not have been obligated to make under the terms of the Policy except for the agreement in this paragraph.

I. Inspection

The Company, or their authorized representative, shall be permitted to inspect the insured property and any of its records during the policy period and for one year afterward.

J. Mexican Operations Warning

Although the Policy provides coverage in Mexico, the Mexican Government requires proof of **aircraft** liability written through a Mexican insurance company. If the **insured** does not have proof of Mexican liability insurance, the **aircraft** can be confiscated by the Mexican authorities and any **passenger**s jailed or detained.

It is a good practice to contact the **insured**'s agent or broker to arrange coverage if any flights are planned into or near Mexican Airspace. Mexican liability coverage is available through the Company if needed.

K. Policy Compliance with State Law

If the terms of the Policy conflict with the **named insured**'s state or province law, the Policy terms are deemed amended as necessary to comply with that law.

L. Policy Territory

The insurance provided by the policy shall be effective worldwide.

Payment of loss under the policy shall only be made in full compliance with all United States of America economic or trade sanction laws or regulations, including, but not limited to, sanctions, laws and regulations administered and enforced by the U.S. Treasury Department's Office of Foreign Assets Control ("OFAC").

M.   Transfer of the Policy to Others

Interest in the Policy may not be transferred without prior written agreement from the Company. If the **named insured** dies or is judged legally bankrupt or insolvent and the **named insured** or their legal representative notifies the Company within sixty (60) days of the judgment or death, effective the date of the judgment or death, the **named insured** will become:

1.   any person or organization having custody of the **scheduled aircraft** until a legal agent is appointed; or,

2.   the **named insured**'s legal representative.

N.   Acceptance of Policy

By acceptance of the Policy, the **named insured** agrees that the statements in the Declarations are its representations, that the Policy is issued in reliance upon the truth of the representations and that the Policy embodies all agreements by and between the **named insured** and the Company or any of its agents.


In Witness Whereof, the company issuing this policy has caused this policy to be signed by its authorized officers, but this policy shall not be valid unless also signed by a duly authorized representative of the company.


Steve Blakey - President                    Nehemiah E. Ginsburg - General Counsel
**STARR INDEMNITY & LIABILITY COMPANY**

0230
0230

## ADDITIONAL INSURED ENDORSEMENT

This policy is amended as follows:

The provisions of this endorsement shall apply with respect to: <u>N227WP</u>

(Only the clause(s) indicated by an "X" shall apply.)

☐ The scheduled persons or organizations are included as additional insured.

☐ The scheduled persons or organizations are the registered owner of _____
and are included as additional insured.

☐ The scheduled persons or organizations are included as additional insured but only as respects liability coverages.

☒ The scheduled persons or organizations are included as additional insured under liability coverages, but only as respects operations of the **named insured**.

☐ The scheduled persons or organizations are included as additional insured but only as respects operations of the **named insured**.

The insurance extended by this endorsement shall not apply to, and no person or organization named in the schedule shall be insured for **bodily injury** or **property damage** which arises from the design, manufacture, modification, repair, sale, or servicing of aircraft by that person or organization.

Schedule:

Name    SIGNATURE FLIGHT SUPPORT CORPORATION*
Address  515 MARXMILLER PLACE
        SANTA BARBARA, CA  93117

Name
Address

Name
Address

All other provisions of this policy remain the same.

This endorsement becomes effective <u>JANUARY 26, 2019</u> to be attached to and hereby made a part of:
Policy No. <u>1000320046-03</u>
Issued to <u>PASSPORT 420, LLC</u>

By <u>STARR INDEMNITY & LIABILITY COMPANY</u>

Endorsement No. <u>1</u>

Date of Issue <u>JANUARY 23, 2019  (CK)</u>          By ___ _____ ____
                                                  (Authorized Representative)

Starr 10284 (3/06)

0231
0231

## HOLDING CORPORATION - NAMED INSURED BODILY INJURY EXCLUSION

This policy is amended as follows:

This policy does not apply under all Section One - Liability Coverages and Section Two - Defense, Settlement and Supplementary Payments for **bodily injury** or death to any person who is an owner, partner, officer, director, member or employee of the **Named Insured**.

All other provisions of this policy remain the same.

This endorsement becomes effective _____JANUARY 26, 2019_____ to be attached to and hereby made a part of:
Policy No. ____1000320046-03____
Issued to __PASSPORT 420, LLC__

By __STARR INDEMNITY & LIABILITY COMPANY__

Endorsement No. _____2_____

Date of Issue ___JANUARY 23, 2019  (CK)___          By _____
                                                            (Authorized Representative)

Starr 10349 (5/06)

0232
0232

**KNOWLEDGE OF OCCURRENCE**

This policy is amended as follows:


KNOWLEDGE OF **OCCURRENCE**

It is agreed that knowledge of an **occurrence** by an agent, servant or employee of the **Insured** will not in itself constitute knowledge by the **Insured** unless such notice has been received by the **Insured**'s Insurance Administrator.

**INSURED**'S INADVERTENT FAILURE TO REPORT

Notwithstanding any other provision(s) of this policy, inadvertent errors or omissions and/or failure in furnishing information, notification or reports required will not prejudice the coverage afforded by this policy provided the **Insured** notifies the Company within a reasonable time after the error or omission is discovered.

**INSURED**'S FAILURE TO NOTIFY

The **Insured**'s rights under this policy will not be affected if it fails to give notice of an accident or **occurrence** solely because it reasonably believed that the accident or **occurrence** was not covered under this policy.


All other provisions of this policy remain the same.

This endorsement becomes effective_____JANUARY 26, 2019_____to be attached to and hereby made a part of:
Policy No. _____1000320046-03_____
Issued to  PASSPORT 420, LLC

By STARR INDEMNITY & LIABILITY COMPANY


Endorsement No. _____3_____

Date of Issue ___JANUARY 23, 2019  (CK)___        By _____
                                                                        (Authorized Representative)

Starr 10351 (5/06)

0233
0233

**LOSS PAYEE ENDORSEMENT**

In consideration of additional premium of $ _____ INCLUDED _____ , this policy is amended as follows:

Any loss under **physical damage** coverage is payable as interest may appear to the **named insured** and the following Loss Payee:

As respects   N227WP

SIGNATURE FLIGHT SUPPORT CORPORATION*
515 MARXMILLER PLACE
SANTA BARBARA, CA  93117

All other provisions of this policy remain the same.

This endorsement becomes effective____JANUARY 26, 2019____to be attached to and hereby made a part of:
Policy No. ____1000320046-03____
Issued to   PASSPORT 420, LLC

By STARR INDEMNITY & LIABILITY COMPANY

Endorsement No. _____4_____

Date of Issue   JANUARY 23, 2019  (CK)                By _____
                                                        (Authorized Representative)

Starr 10234 (3/06)

0234
0234

## PILOT WARRANTY ENDORSEMENT

This policy is COMPLETED     as follows with respect to Item 4. Pilots as set forth on the Declarations Page:

WITH RESPECT TO N227WP:

BILL PARRISH, CHRIS OHMAN, OR;

ANY PILOT WHO HOLDS A COMMERCIAL PILOT CERTIFICATE OR BETTER WITH MULTI-ENGINE AND INSTRUMENT RATINGS, IS TYPE RATED IN THE MAKE AND MODEL AIRCRAFT OPERATED AND HAS A MINIMUM OF THE FOLLOWING HOURS OF FLIGHT AS RECORDED IN HIS/HER LOGBOOK.  IT IS FURTHER REQUIRED THAT SUCH PILOT(S) MUST HAVE SUCCESSFULLY COMPLETED A MOTION BASED SIMULATOR TRAINING COURSE SPECIFICALLY DESIGNED FOR THE MAKE AND MODEL AIRCRAFT OPERATED WITHIN THE PRECEDING 12 MONTHS OF POLICY INCEPTION AND ANNUALLY THEREAFTER.

5,000 TOTAL LOGGED FLYING HOURS
2,500 HOURS IN MULTI-ENGINE AIRCRAFT
500       HOURS IN TURBOPROP OR TURBOFAN POWERED AIRCRAFT
350       HOURS IN THE MAKE MODEL AIRCRAFT OPERATED

The pilot warranty set forth above shall not apply to Liability Coverage for **Non-Owned Aircraft**, **Temporary Substitute Aircraft** and Charter Referral.  Additionally, the pilot warranty in set forth above shall not apply while the insured **aircraft** is under the care, custody or control of a repair station for the purpose of maintenance, repair or test flights.

All other provisions of this policy remain the same.

This endorsement becomes effective____JANUARY 26, 2019____to be attached to and hereby made a part of:
Policy No. ____1000320046-03____
Issued to   PASSPORT 420, LLC

By STARR INDEMNITY & LIABILITY COMPANY

Endorsement No. _____5_____

Date of Issue ____JANUARY 23, 2019  (CK)____        By _____
                                                                                    (Authorized Representative)

Starr 10317 (6/06)

0235
0235

**PRIMARY AND NON-CONTRIBUTORY ENDORSEMENT**

This policy is amended as follows:

With the respect to the following scheduled persons or organizations, all coverages shall be primary and non-contributory with respect to any other insurance policies held by the following scheduled persons or organizations.

Schedule:

SIGNATURE FLIGHT SUPPORT CORPORATION, ITS PARENT, SUBSIDIARY, RELATED AND AFFILIATED COMPANIES AND THE AUTHORITY
515 MARXMILLER PLACE
SANTA BARBARA, CA 93117

All other provisions of this policy remain the same.

This endorsement becomes effective _____ JANUARY 26, 2019 _____ to be attached to and hereby made a part of:
Policy No. _____ 1000320046-03 _____
Issued to _____ PASSPORT 420, LLC _____

By STARR INDEMNITY & LIABILITY COMPANY _____

Endorsement No. _____ 6 _____

Date of Issue _____ JANUARY 23, 2019  (CK) _____          By _____
                                                                    (Authorized Representative)

Starr 10466 (6/07)

0236
0236

**WAIVER OF SUBROGATION - PHYSICAL DAMAGE**

In consideration of additional premium of $ ____INCLUDED____ , this policy is amended as follows:

We hereby waive our right of subrogation against the following as respects loss arising under **physical damage** coverage as set forth under this policy; provided, however, that this waiver shall not prejudice our right of recourse for damages arising from the design, manufacture, modification, repair, sale or servicing of the **aircraft** by the following:

SIGNATURE FLIGHT SUPPORT CORPORATION*
515 MARXMILLER PLACE
SANTA BARBARA, CA  93117

All other provisions of this policy remain the same.

This endorsement becomes effective ____JANUARY 26, 2019____ to be attached to and hereby made a part of:
Policy No. ____1000320046-03____
Issued to  PASSPORT 420, LLC

By  STARR INDEMNITY & LIABILITY COMPANY

Endorsement No. _____7_____

Date of Issue ____JANUARY 23, 2019  (CK)____       By _____
                                                                          (Authorized Representative)

Starr 10332 (5/06)

0237
0237

## WAR, HI-JACKING AND OTHER PERILS EXCLUSION CLAUSE (AVIATION)

This policy is amended as follows:

In the event any of the provisions of this endorsement are in conflict with any provisions, exclusions, conditions or terms forming part of this policy, this endorsement shall take precedence.

This policy does not cover claims caused by:

(a) War, invasion, acts of foreign enemies, hostilities (whether war be declared or not), civil war, rebellion, revolution, insurrection, martial law, military or usurped power or attempts at usurpation of power;

(b) Any hostile detonation of any weapon of war employing atomic or nuclear fission and/or fusion or other like reaction or radioactive force or matter;

(c) Strikes, riots, civil commotions or labor disturbances;

(d) Any act of one or more persons, whether or not agents of a sovereign power, for political or terrorist purposes and whether the loss or damage resulting therefrom is accidental or intentional;

(e) Any malicious act or act of sabotage;

(f) Confiscation, nationalization, seizure, restraint, detention, appropriation, requisition for title or use by or under the order of any Government (whether civil, military or de facto) or public or local authority;

(g) Hi-jacking or any unlawful seizure or wrongful exercise of control of the aircraft or crew in flight (including any attempt at such seizure or control) made by any person or persons on board the aircraft acting without the consent of the Insured.

Furthermore, this policy does not cover claims arising whilst the aircraft is outside the control of the Insured by reason of any of the above perils.

The aircraft shall be deemed to have been restored to the control of the Insured on the safe return of the aircraft to the Insured at an airfield not excluded by the geographical limits of this policy, and entirely suitable for the operation of the aircraft (such safe return shall require that the aircraft be parked with engines shut down and under no duress).

All other provisions of this policy remain the same.

This endorsement becomes effective ___JANUARY 26, 2019___ to be attached to and hereby made a part of:
Policy No. ___1000320046-03___
Issued to ___PASSPORT 420, LLC___

By _STARR INDEMNITY & LIABILITY COMPANY_

Endorsement No. ___8___

Date of Issue ___JANUARY 23, 2019  (CK)___          By _____
                                                           (Authorized Representative)

AVN48B (2/06)

**EXTENDED COVERAGE ENDORSEMENT (AVIATION LIABILITIES) - CALIFORNIA**

In consideration of an additional premium of $ _____INCLUDED_____ , this policy is amended as follows:

The policy of which this Endorsement forms part includes War, Hi-jacking and Other Perils Exclusion Clause AVN48B:

1.  With effect from ___JANUARY 26, 2019___ , all sub-paragraphs other than __(b)__ of War, Hi-jacking and Other Perils Exclusion Clause AVN48B are deleted SUBJECT TO all terms and conditions of this Endorsement.

2.  EXCLUSION applicable only to any coverage extended in respect of the deletion of sub-paragraph (a) of War, Hi-jacking and Other Perils Exclusion Clause AVN48B:

    Coverage shall not include liability for damage to any form of property on the ground situated outside Canada and the United States of America unless caused by or arising out of the use of aircraft.

3.  LIMITATION OF LIABILITY

    The limit of the Company's liability in respect of the coverage provided by this Endorsement shall be US$ ___10,000,000.___ or the applicable policy limit, whichever the lesser, any one occurrence and in the annual aggregate (the "sub-limit"). This sub-limit shall apply within the full policy limit and not in addition thereto.

    To the extent coverage is afforded to an Insured under the policy, this sub-limit shall not apply to such Insured's liability:

    (a) to the passengers (and for their baggage and personal effects) of any aircraft operator to whom the policy affords cover for liability to its passengers arising out of its operation of aircraft;

    (b) for cargo and mail while it is on board the aircraft of any aircraft operator to whom the policy affords cover for liability for such cargo and mail arising out of its operations of aircraft.

    Notwithstanding any other liability for which coverage is afforded under this policy, coverage provided under this Endorsement shall apply solely to the following:

    > SECTION ONE - LIABILITY COVERAGES.
    > SECTION FOUR - ADDITIONAL COVERAGES UNDER COVERAGE 25: SEARCH AND RESCUE EXPENSES, COVERAGE 26: RUNWAY FOAMING AND CRASH CONTROL EXPENSES AND COVERAGE 27: TRIP INTERRUPTION EXPENSE COVERAGE.
    > SECTION FIVE - **MEDICAL EXPENSES**.

4.  AUTOMATIC TERMINATION

    To the extent provided below, coverage extended by this Endorsement shall TERMINATE AUTOMATICALLY in the following circumstances:

    (i) All coverage

    - upon the outbreak of war (whether there be a declaration of war or not) between any two or more of the following countries: France, the People's Republic of China, the Russian Federation, the United Kingdom, the United States of America;

AVN52ECA (12/06)      Page 1 of Endorsement No. ___9___

0239
0239

(ii)  Any coverage extended in respect of the deletion of sub-paragraph (a) of  War, Hi-jacking and Other Perils Exclusion Clause AVN48B

- upon the hostile detonation of any weapon of war employing atomic or nuclear fission and/or fusion or other like reaction or radioactive force or matter wheresoever or whensoever such detonation may occur and whether or not the insured aircraft may be involved;

(iii)  All coverage in respect of any of the insured aircraft requisitioned for either title or use

- upon such requisition.

PROVIDED THAT if an insured aircraft is in the air when (i), (ii) or (iii) occurs, then the coverage provided by this Endorsement (unless otherwise cancelled, terminated or suspended) shall continue in respect of such an aircraft until completion of its first landing thereafter and any passengers have disembarked.

5.  REVIEW AND CANCELLATION

(a)  Review of Premium and/or Geographical Limits (7 Days)

The Company may give notice to review premium and/or geographical limits - such notice to become effective on the expiry of seven days from 23.59 hours G.M.T. on the day on which notice is given.

(b)  Limited Cancellation (48 hours)

Following a hostile detonation as specified in paragraph 4. (ii) above, the Company may give notice of cancellation of one or more parts of the coverage provided by paragraph 1. of this Endorsement by reference to sub-paragraphs (c), (d), (e), (f) and/or (g) of  War, Hi-jacking and Other Perils Exclusion Clause AVN48B - such notice to become effective on the expiry of forty-eight hours from 23.59 hours G.M.T. on the day on which notice is given.

(c)  Cancellation (7 Days)

The coverage provided by this Endorsement may be cancelled by either the Company or the Insured by giving notice to become effective on the expiry of seven days from 23.59 hours G.M.T. on the day on which such notice is given.

(d)  Notices

All notices referred to herein shall be in writing.

All other provisions of this policy remain the same.

This endorsement becomes effective ____JANUARY 26, 2019____ to be attached to and hereby made a part of:
Policy No. ___1000320046-03___
Issued to ___PASSPORT 420, LLC___

By ___STARR INDEMNITY & LIABILITY COMPANY___

Endorsement No. ____9____

Date of Issue ___JANUARY 23, 2019  (CK)___          By _____
                                                                          (Authorized Representative)

AVN52ECA   (12/06)                Page 2

0240
0240

**EXTENDED COVERAGE ENDORSEMENT**

**WAR RISK FOR PHYSICAL DAMAGE COVERAGE,
EXTORTION, AND HI-JACKING EXTRA EXPENSE COVERAGE**

In consideration of $ _____ INCLUDED _____ additional premium, this policy is amended as follows:

This coverage is subject to all the terms and conditions shown both in this policy as well as this endorsement. It does not change any coverage or terms except as specifically stated below. The **insured** is responsible for using all reasonable efforts to ensure that all required permits for **aircraft** operations as well as all state and local laws are complied within the country of operation or the country where a loss or expense is incurred.

**SECTION ONE**

**WAR RISK COVERAGE FOR AIRCRAFT PHYSICAL DAMAGE**

The Company will pay for the physical loss of or **physical damage** to any **scheduled aircraft** (unless excluded by Exclusion (G) below) that is caused by an **occurrence** during the policy period arising out of any of the following perils:

(a)   war, whether declared or undeclared, invasion, acts of foreign enemies, hostilities, civil war, rebellion, revolution, insurrection, martial law, military or usurped power or any attempt of usurpation of power;

(b)   any strikes, riots, civil commotions or labor disturbances;

(c)   any act of one or more persons, whether or not agents of a sovereign power, for political or terrorist purposes and whether the loss or damage resulting therefrom is accidental or intentional;

(d)   any malicious act or act of sabotage;

(e)   confiscation, nationalization, seizure, restraint, detention, appropriation, requisition for title, use by, or under the order of any government, public or local authority, whether civil, military or de facto;

(f)   hi-jacking or any unlawful seizure or wrongful exercise of control of a **scheduled aircraft** or crew **in-flight** (including any attempt at such seizure or control) made by any person or persons on board the **scheduled aircraft** acting without the consent of the **insured**

This section also covers the physical loss of or **physical damage** to a **scheduled aircraft** while that **scheduled aircraft** is outside the control of the **insured** because of any of the above perils. The **aircraft** will be covered until its safe return to the **insured**

The **scheduled aircraft** shall be deemed to have been restored to the control of the **insured** on the safe return of the **scheduled aircraft** to the **insured** at an airfield not excluded by the geographical limits of this endorsement and entirely suitable for the operation of the **aircraft** (such safe return shall require that the **aircraft** be parked with engines shut down and under no duress).

**SECTION TWO**

**"EXTORTION, HI-JACKING, AND CONFISCATION EXPENSE COVERAGE"**

**Extortion, Expense Coverage**

Subject to the limits described below, the Company will reimburse the **named insured** for ninety percent (90%) of any payment properly made for threats made during the policy period against any **scheduled aircraft** covered by this endorsement.

0241
0241

**Hi-jacking and Confiscation Expense Coverage**

Subject to the limits described below, the Company will reimburse the **named insured** for ninety percent (90%) of any required extra expenses incurred following any type of confiscation or hi-jacking that takes place during the policy period as described in paragraphs (e) and (f) of SECTION ONE of this endorsement.

### Limits of the Company's Liability for Section Two Coverages

The most that the Company will reimburse the **named insured** for any one **occurrence** is an amount equal to ninety percent (90%) of the net cost to the **named insured** of any payment(s) made but not exceeding:

(A)  ninety percent (90%) of the Insured Value of the **scheduled aircraft** involved, or

(B)  $1,000,000.00,

whichever is less.

The **insured** warrants that the remaining ten percent (10%) of any payment made is not insured elsewhere.

For the purpose of this coverage, any series of related events, losses or expenses connected to any hi-jacking, extortion, or confiscation will be considered one **occurrence**.

### Exclusions Applicable to All Coverages Provided by this Endorsement

This endorsement will not cover any loss, damage or expense arising out of:

(A)  war, whether declared or undeclared between any of the following countries:  The United Kingdom, The United States of America, France, The Russian Federation, or The Peoples Republic of China.  If any **scheduled aircraft** covered by this endorsement is in the air when an outbreak of war occurs, this exclusion will not apply until that **scheduled aircraft** completes its first landing;

(B)  detonation, whether hostile or otherwise, of any weapon of war employing atomic or nuclear fission and/or fusion or any other similar reaction;

(C)  any loss or damage caused by radioactive force or matter;

(D)  any failure to provide any type of bond, security or any other financial cause whether or not required under a court order;

(E)  the repossession or any attempt at repossession by any person or organization having any legal title or lien on the **scheduled aircraft** or any other type of legal contractual relationship with the **insured**;

(F)  any type of delay, loss of use or any other type of consequential loss whether or not the **scheduled aircraft** is lost or damaged except as specifically provided under the SECTION TWO coverages of this endorsement;

(G)  any **occurrence** involving the following **scheduled aircraft** (if any) which the **named insured** has elected not to cover by this endorsement:

| Year | Make and Model | Registration No. | Year | Make and Model | Registration No. |
|------|----------------|------------------|------|----------------|------------------|
|      |                |                  |      |                |                  |

Starr 10318 (5/06)      Page 2 of Endorsement No.   10

0242
0242

**AUTOMATIC TERMINATION OF COVERAGE, CANCELLATION, AND AMENDMENT OF TERMS**

### Cancellation or Amendment of Terms by Notice

The applicable sections of Item C. 1. Cancellation, of Section Ten - Other Conditions of Insurance, of this policy are changed to read:

The coverage provided by this endorsement can be cancelled, non-renewed or the rate of premium or geographical limits changed by the Company with the mailing or delivering of seven (7) days prior written notice to the first **named insured** at the first address shown in Item 2. of the Declarations.  The proof of delivery or mailing to the first **named insured** will be sufficient proof of notice to all **named insureds**.

### Automatic Termination of Coverage

All coverages provided by this endorsement will automatically terminate without any prior notice to the **named insured** if any of the following events occur:

1.  Any hostile detonation, of any weapon of war employing atomic or nuclear fission and/or fusion or radioactive force or matter, whenever the detonation occurs whether or not a **scheduled aircraft** covered by this endorsement is involved.

2.  War, whether declared or undeclared, between any of the following countries:  The United Kingdom, The United States of America, France, The Russian Federation, or the Peoples Republic of China.  If any **scheduled aircraft** covered by this endorsement is in the air when an outbreak of war occurs, coverage for that **scheduled aircraft** will only apply until that **aircraft** completes its first landing.

---

COVERAGE AS PROVIDED UNDER THIS ENDORSEMENT SHALL EXCLUDE ALL REQUIREMENTS OF THE TERRORISM RISK INSURANCE ACT OF 2002.

---

All other provisions of this policy remain the same.

This endorsement becomes effective _____JANUARY 26, 2019_____ to be attached to and hereby made a part of:
Policy No. _____1000320046-03_____
Issued to _PASSPORT 420, LLC_

By _STARR INDEMNITY & LIABILITY COMPANY_

Endorsement No. _____10_____

Date of Issue _JANUARY 23, 2019  (CK)_        By _____
                                                        (Authorized Representative)

Starr 10318 (5/06)        Page 3

0243
0243

## NOISE AND POLLUTION AND OTHER PERILS EXCLUSION CLAUSE

This policy is amended as follows:

In the event any of the provisions of this endorsement are in conflict with any provisions, exclusions, conditions or terms forming part of this policy, this endorsement shall take precedence.

1.  This policy does not cover claims directly or indirectly occasioned by, happening through or in consequence of:

    (a)  noise (whether audible to the human ear or not), vibration, sonic boom and any phenomena associated therewith,

    (b)  pollution and contamination of any kind whatsoever,

    (c)  electrical and electromagnetic interference,

    (d)  interference with the use of property;

    unless caused by or resulting in a crash, fire, explosion or collision or a recorded in-flight emergency causing abnormal aircraft operation.

2.  With respect to any provision in the policy concerning any duty of the Company to investigate or defend claims, such provision shall not apply and the Company shall not be required to defend:

    (a)  claims excluded by paragraph 1., or

    (b)  a claim or claims covered by the policy when combined with any claims excluded by paragraph 1. (referred to below as "Combined Claims").

3.  In respect of any Combined Claims, the Company shall (subject to proof of loss and the limits of the policy) reimburse the Insured for that portion of the following items which may be allocated to the claims covered by the policy:

    (a)  damages awarded against the Insured and

    (b)  defense fees and expenses incurred by the Insured.

4.  Nothing herein shall override any radioactive contamination or other exclusion clause attached to or forming part of this policy.

All other provisions of this policy remain the same.

This endorsement becomes effective ____JANUARY 26, 2019____ to be attached to and hereby made a part of:
Policy No. ____1000320046-03____
Issued to ___PASSPORT 420, LLC_____

By _STARR INDEMNITY & LIABILITY COMPANY_____

Endorsement No. _____11_____

Date of Issue ___JANUARY 23, 2019  (CK)___           By _____
                                                              (Authorized Representative)

AVN46B (2/06)

0244
0244

**NUCLEAR RISKS EXCLUSION CLAUSE**

This policy is amended as follows:

In the event any of the provisions of this endorsement are in conflict with any provisions, exclusions, conditions or terms forming part of this policy, this endorsement shall take precedence.

1.   This policy does not cover:

    (i)   loss or destruction of or damage to any property whatsoever or any loss or expense whatsoever resulting or arising therefrom or any consequential loss

    (ii)   any legal liability of whatsoever nature

    directly or indirectly caused by or contributed to by or arising from:

        (a)   the radioactive, toxic, explosive or other hazardous properties of any explosive nuclear assembly or nuclear component thereof;

        (b)   the radioactive properties of, or a combination of radioactive properties with toxic, explosive or other hazardous properties of, any other radioactive material in the course of carriage as cargo, including storage or handling incidental thereto;

        (c)   ionizing radiations or contamination by radioactivity from, or the toxic, explosive or other hazardous properties of, any other radioactive source whatsoever.

2.   It is understood and agreed that such radioactive material or other radioactive source in paragraph 1. (b) and (c) above shall not include:

    (i)   depleted uranium and natural uranium in any form;

    (ii)   radioisotopes which have reached the final stage of fabrication so as to be usable for any scientific, medical, agricultural, commercial, educational or industrial purpose.

3.   This policy, however, does not cover loss of or destruction of or damage to any property or any consequential loss or any legal liability of whatsoever nature with respect to which:

    (i)   the Insured under this policy is also an insured or an additional insured under any other insurance policy, including any nuclear energy liability policy; or

    (ii)   any person or organization is required to maintain financial protection pursuant to legislation in any country; or

    (iii)   the Insured under this policy is, or had this policy not been issued would be, entitled to indemnification from any government or agency thereof.

4.   Loss, destruction, damage, expense or legal liability in respect of the nuclear risks not excluded by reason of paragraph 2. shall (subject to all other terms, conditions, limitations, warranties and exclusions of this policy) be covered, provided that:

(i)   in the case of any claim in respect of radioactive material in the course of carriage as cargo, including storage or handling incidental thereof, such carriage shall in all respects have complied with the full International Civil Aviation Organization "Technical Instructions for the Safe Transport of Dangerous Goods by Air", unless the carriage shall have been subject to any more restrictive legislation, when it shall in all respects have complied with such legislation;

(ii)   this policy shall only apply to an incident happening during the period of this policy and where any claim by the Insured against the Company or by any claimant against the Insured arising out of such incident shall have been made within three years after the date thereof;

(iii)   in the case of any claim for the loss of or destruction of or damage to or loss of use of an aircraft caused by or contributed to by radioactive contamination, the level of such contamination shall have exceeded the maximum permissible level set out in the following scale:

| Emitter (IAEA Health and Safety Regulations) | Maximum permissible level of non-fixed radioactive surface contamination (Averaged over 300 $cm^2$) |
|---|---|
| Beta, gamma and low toxicity alpha emitters | Not exceeding 4 Becquerels / $cm^2$ ($10^{-4}$ microcuries / $cm^2$) |
| All other alpha emitters | Not exceeding 0.4 Becquerels / $cm^2$ ($10^{-5}$ microcuries / $cm^2$) |

(iv)   the cover afforded hereby may be cancelled at any time by the Company giving seven days' notice of cancellation.

All other provisions of this policy remain the same.

This endorsement becomes effective _____JANUARY 26, 2019_____ to be attached to and hereby made a part of:
Policy No. ____1000320046-03____
Issued to  PASSPORT 420, LLC _____

By __STARR INDEMNITY & LIABILITY COMPANY_____

Endorsement No. _____12_____

Date of Issue ___JANUARY 23, 2019  (CK)____        By _____
                                                                          (Authorized Representative)

AVN38B (2/06)                    Page 2

0246
0246

**TERRORISM EXCLUSION**
(Terrorism Risk Insurance Act)

This policy is amended as follows:

This policy does not cover claims caused by any losses, damages, or injuries arising directly or indirectly as a result of any certified "Act of Terrorism" defined by Section 102. Definitions of the Terrorism Risk Insurance Act and any revisions or amendments thereto.

Solely with respect to this endorsement and to ensure compliance with the Terrorism Risk Insurance Act, an "Act of Terrorism" shall mean:

(1) Act of Terrorism:
    (A) Certification - The term "act of terrorism" means any act that is certified by the Secretary of the Treasury in consultation with the Secretary of Homeland Security, and the Attorney General of the United States:
        (i) to be an act of terrorism;
        (ii) to be a violent act or an act that is dangerous to:
            (I) human life;
            (II) property; or
            (III) infrastructure;
        (iii) to have resulted in damage within the United States, or outside of the United States in the case of:
            (I) an air carrier or vessel defined as one principally based in the United States, on which United States income tax is paid, and whose insurance coverage is subject to regulation in the United States; or
            (II) the premises of a United States mission; and
        (iv) to have been committed by an individual or individuals as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States Government by coercion.
    (B) Limitation - No act shall be certified by the Secretary as an act of terrorism if:
        (i) the act is committed as part of the course of a war declared by the Congress, except that this clause shall not apply with respect to any coverage for workers' compensation; or
        (ii) property and casualty insurance losses resulting from the act, in the aggregate, do not exceed the Program Trigger.
    (C) Determinations Final - Any certification of, or determination not to certify, an act of terrorism under this paragraph shall be final, and shall not be subject to judicial review.
    (D) Timing of certification - Not later than 9 months after the report required under section 107 of the Terrorism Risk Insurance Program Reauthorization Act of 2015 is submitted to the appropriate committees of Congress, the Secretary shall issue final rules governing the certification process, including establishing a timeline for which an act is eligible for certification by the Secretary on whether an act is an act of terrorism under this paragraph.
    (E) Nondelegation - The Secretary may not delegate or designate to any other officer, employee, or person, any determination under this paragraph of whether, during the effective period of the Program, an act of terrorism has occurred.

> THE PROVISIONS OF THIS ENDORSEMENT SHALL APPLY SOLELY TO THE TERRORISM RISK INSURANCE ACT, ITS REVISIONS AND/OR AMENDMENTS AND SHALL IN NO WAY CONFLICT WITH THOSE OF AVN48B AND AMENDMENTS THERETO.

All other provisions of this policy remain the same.

This endorsement becomes effective _____JANUARY 26, 2019_____ to be attached to and hereby made a part of:
Policy No. _____1000320046-03_____
Issued to _PASSPORT 420, LLC_

By _STARR INDEMNITY & LIABILITY COMPANY_

Endorsement No. _____13_____

Date of Issue _____JANUARY 23, 2019  (CK)_____      By _____
                                                    (Authorized Representative)

Starr 10055 (1/15)

0247
0247

## ASBESTOS EXCLUSION ENDORSEMENT

This policy does not cover any claims of any kind whatsoever directly or indirectly relating to, arising out of or in consequence of:

1.  The actual, alleged or threatened exposure to or presence of asbestos in any form whatsoever, including, but not limited to, asbestos fibers or asbestos dust, or any material or product containing, or alleged to contain, asbestos; or

2.  Any obligations, request, demand, order, or statutory or regulatory requirement that any insured or others test for, monitor, clean up, remove, contain, treat, neutralize, protect against or in any other way respond to the actual, alleged or threatened exposure to or presence of asbestos in any form whatsoever, including, but not limited to, asbestos fibers or asbestos dust, or any material or product containing, or alleged to contain, asbestos.

However, the exclusion shall not apply to any claim for asbestos exposure caused by or resulting from a crash, fire, explosion, or collision or a recorded in flight emergency causing abnormal aircraft operations.

Notwithstanding any other provisions of this Policy, Insurers will have no duty to investigate, defend or pay defense costs in respect of any claim excluded in whole or in part under paragraphs 1. or 2. hereof.

All other provisions of this policy remain the same.

This endorsement becomes effective _____ JANUARY 26, 2019 _____ to be attached to and hereby made a part of:
Policy No. _____ 1000320046-03 _____
Issued to   PASSPORT 420, LLC

By STARR INDEMNITY & LIABILITY COMPANY

Endorsement No. _____ 14 _____

Date of Issue _____ JANUARY 23, 2019  (CK) _____          By _____
                                                                              (Authorized Representative)

Starr 10007 (2/06)

0248
0248

**CALIFORNIA CANCELLATION / NONRENEWAL ENDORSEMENT - AVIATION**

Wherever used in this endorsement:  1) "we", "us", "our", and "Insurer" mean the insurance company which issued this policy;  and 2) "you", "your", "Named Insured", "First Named Insured", and "Insured" mean the Named Corporation, Named Organization, Named Sponsor, Named Insured, or Insured stated in the Declarations page;  and 3) "Other Insured(s)" means all other persons or entities afforded coverage under the policy.

In consideration of the premium charged, the cancellation clause is replaced with the following:

<u>CANCELLATION</u>

The First Named Insured shown in the declarations may cancel the policy by mailing or delivering to the Insurer advance written notice of cancellation.

If the policy has been in effect for more than sixty (60) days or if it is a renewal, effective immediately, the Insurer may not cancel the policy unless such cancellation is based on one or more of the following reasons:

1.  Nonpayment of premium, including payment due on a prior policy issued by the Insurer and due during the current policy term covering the same risks.

2.  A judgement by a court or an administrative tribunal that the named Insured has violated any law of this state or of the United States having as one of its necessary elements an act which materially increases any of the risks insured against.

3.  Discovery of fraud or material misrepresentation by either of the following:

    a)  The Insured or Other Insured(s) or his or her representative in obtaining the insurance; or

    b)  The named Insured or his or her representative in pursuing a claim under the policy.

4.  Discovery of willful or grossly negligent acts or omissions, or of any violations of state laws or regulations establishing safety standards, by the named Insured or Other Insured(s) or a representative of same, which materially increase any of the risks insured against.

5.  Failure by the named Insured or Other Insured(s) or a representative of same to implement reasonable loss control requirements which were agreed to by the Insured as a condition of policy issuance or which were conditions precedent to the use by the Insurer of a particular rate or rating plan if the failure materially increases any of the risks insured against.

6.  A determination by the commissioner that the loss of, or changes in, an insurer's reinsurance covering all or part of the risk would threaten the financial integrity or solvency of the Insurer.

7.  A determination by the commissioner that a continuation of the policy coverage could place the Insurer in violation of the laws of this state or the state of its domicile or that the continuation of coverage would threaten the solvency of the Insurer.

8.  A change by the named Insured or Other Insured(s) or a representative of same in the activities or property of the commercial or industrial enterprise which results in a material added risk, a materially increased risk or a materially changed risk, unless the added, increased, or changed risk is included in the policy.

Notice of cancellation shall be delivered or mailed to the producer of record and the Named Insured at least thirty (30) days prior to the effective date of cancellation.  Where cancellation is for nonpayment of premium or fraud, notice shall be given no less than ten (10) days prior to the effective date of cancellation.

Starr 20006 (12/11)    Page 1 of Endorsement No. ___15___

If this policy is cancelled, we will send the first named Insured any premium refund due.  The refund, if any, will be computed on a pro rata basis.  However, the refund may be less than pro rata if we made a loan to you for the purpose of payment of premiums for this policy.  The cancellation will be effective even if we have not make or offered a refund.

NONRENEWAL

If the Insurer decides not to renew the policy, the Insurer shall mail or deliver to the producer of record and the named Insured notice of nonrenewal at least sixty (60) days but no more than 120 days prior to the end of the policy period.  The notice shall contain the reason for nonrenewal of the policy.

RENEWAL

If a policy has been in effect for more than sixty (60) days or if the policy is a renewal, effective immediately no increase in premium, reduction in limits, or change in the conditions of coverage shall be effective during the policy period unless based upon one of the following reasons:

1.  Discovery of willful or grossly negligent acts or omissions, or of any violations of state laws or regulations establishing safety standards by the named Insured or Other Insured(s) which materially increase any of the risks or hazards insured against.

2.  Failure by the named Insured or Other Insured(s) to implement reasonable loss control requirements which were agreed to by the Insured as a condition of policy issuance or which were conditions precedent to the use by the Insurer of a particular rate or rating plan, if the failure materially increases any of the risks insured against.

3.  A determination by the commissioner that loss of or changes in an insurer's reinsurance covering all or part of the risk covered by the policy would threaten the financial integrity or solvency of the Insurer unless the change in the terms or conditions or rate upon which the premium is based is permitted.

4.  A change by the named Insured or Other Insured(s) in the activities or property of the commercial or industrial enterprise which results in a materially added risk, a materially increased risk, or materially changed risk, unless the added, increased, or changed risk is included in the policy.

Written notice shall be mailed or delivered to the named Insured and the producer of record at least thirty (30) days prior to the effective date of any increase, reduction or change.

All other provisions of this policy remain the same.

This endorsement becomes effective _____JANUARY 26, 2019_____to be attached to and hereby made a part of:
Policy No. _____1000320046-03_____
Issued to   PASSPORT 420, LLC

By STARR INDEMNITY & LIABILITY COMPANY

Endorsement No. _____15_____

Date of Issue _____JANUARY 23, 2019  (CK)_____          By _____
                                                                      (Authorized Representative)

Starr 20006 (12/11)                    Page 2

0250
0250

# DATE RECOGNITION EXCLUSION CLAUSE

This Policy does not cover any claim, damage, injury, loss, cost, expense or liability (whether in contract, tort, negligence, product liability, misrepresentation, fraud or otherwise) of any nature whatsoever arising from or occasioned by or in consequence of (whether directly or indirectly and whether wholly or partly):

(a)  the failure or inability of any computer hardware, software, integrated circuit, chip or information technology equipment or system (whether in the possession of the Insured or of any third party) accurately or completely to process, recognize, exchange or transfer year, date or time data or information in connection with any change of year, date or time;

  whether on or before or after such change of year, date or time;

(b)  any implemented or attempted change or modification of any computer hardware, software, integrated circuit, chip or information technology equipment or system (whether in the possession of the Insured or of any third party) in anticipation of or in response to any such change of year, date or time, or any advice given or services performed in connection with any such change or modification;

(c)  any non-use or unavailability for use of any property or equipment of any kind whatsoever resulting from any act, failure to act or decision of the Insured or of any third party related to any such change of year, date or time;

and any provision in this Policy concerning any duty of the Company to investigate or defend claims shall not apply to any claims so excluded.

All other provisions of this policy remain the same.

This endorsement becomes effective    JANUARY 26, 2019    to be attached to and hereby made a part of:
Policy No.    1000320046-03
Issued to   PASSPORT 420, LLC

By STARR INDEMNITY & LIABILITY COMPANY

Endorsement No.    16

Date of Issue    JANUARY 23, 2019  (CK)    By _____
                                            (Authorized Representative)

AVN2000A (2/06)

0251
0251

**AVIATION DATE RECOGNITION ENDORSEMENT WITH LIMITED COVERAGE GRANT**
**AIRCRAFT OPERATORS OPTION 4**

This Policy does not cover any claim, damage, injury, loss, cost, expense or liability (whether in contract, tort, negligence, product liability, misrepresentation, fraud or otherwise) of any nature whatsoever arising from or occasioned by or in consequence of (whether directly or indirectly and whether wholly or partly):

a)   the failure or inability of any computer hardware, software, integrated circuit, chip, computer component or other information technology equipment or system (whether in the possession of the **Insured** or of any third party) accurately or completely to process, recognize, exchange or transfer year, date or time data or information in connection with:

> - the change of year from 1999 to 2000; and/or
> - the change of date from 21 August 1999 to 22 August 1999; and/or
> - any other change of year, date or time;

whether on or before or after such change of year, date or time;

b)   any implemented or attempted change or modification of any computer hardware, software, integrated circuit, chip, computer component or other information technology equipment or system (whether in the possession of the **Insured** or of any third party) in anticipation of or in response to any such change of year, date or time, or any advice given or services performed in connection with any such change or modification;

c)   any non-use or unavailability for use of any property or equipment of any kind whatsoever resulting from any act, failure to act or decision of the **Insured** or of any third party related to any such change of year, date or time;

and any provision in this Policy concerning any duty of the Company to investigate or defend claims shall not apply to any claims so excluded.


HOWEVER, in consideration of the additional premium of $ _INCLUDED_ , it is hereby understood and agreed that this endorsement shall not apply to:

1.   any accidental loss of or damage to an **aircraft** defined in the policy schedule (insured **aircraft**); and

2.   any sums which the **Insured** shall become legally liable to pay, and (if so required by the Policy) shall pay (including costs awarded against the **Insured**) in respect of:

(a)   accidental **bodily injury** (fatal or otherwise) to **passenger**s directly caused by an accident to an insured **aircraft**; and/or
(b)   loss of or damage to baggage and personal articles of **passenger**s, mail and cargo directly caused by an accident to an insured **aircraft**; and/or
(c)   accidental **bodily injury** (fatal or otherwise) and accidental damage to property directly caused by an insured **aircraft** or by any person or object falling therefrom.

0252
0252

PROVIDED THAT:

1.  Coverage provided pursuant to this endorsement shall be subject to all terms, conditions, limitations, exclusions and cancellation provisions of this Policy (except as specifically provided herein), and nothing in this endorsement extends coverage beyond that which is provided by the Policy.

2.  Nothing in this endorsement shall provide any coverage in respect of grounding and/or loss of use of any **aircraft** which has not been physically damaged or destroyed in the accident giving rise to a claim under the Policy.

All other provisions of this policy remain the same.

This endorsement becomes effective _____JANUARY 26, 2019_____to be attached to and hereby made a part of:
Policy No. ____1000320046-03____
Issued to ___PASSPORT 420, LLC_____

By STARR INDEMNITY & LIABILITY COMPANY_____

Endorsement No. ____17_____

Date of Issue ___JANUARY 23, 2019  (CK)____          By _____
                                                                        (Authorized Representative)

Starr 30002 (5/06)                    Page 2

0253
0253



## 3353 Peachtree Road, N.E.
## Suite 1000
## Atlanta, GA 30326
## (Phone) 404-946-1400 (Fax) 404-946-1497

In the event of a claim, please submit your notice of loss to the following email inbox which will generate a return email with your claims adjustor, contact information and claim number within 24 hours:

aviationclaimreports@starrcompanies.com

In the event of a claim emergency, please contact:

Jeffrey Greenawalt:
Cell: (214) 223-0202

Or

Jacy Watt:
Cell: (404) 401-8851
Office: (404) 946-1414

EXHIBIT "J"



**AIRCRAFT INSURANCE APPLICATION**

*Underwriting the future*

NAME OF APPLICANT (Including D/B/A'S and Holding Companies):
Passport 420, LLC

ADDRESS: ~~620 Newport Center Drive, Suite 1400, Newport Beach, CA 92660~~  4185 La Ladera Rd

BUSINESS OR CORPORATION OF APPLICANT: Infa Red Production & Attorney   Santa Barbara CA

APPLICANT IS: ☐ INDIVIDUAL(S)   ☒ CORPORATION LLC   ☐ PARTNERSHIP   ☐ HOLDING COMPANY   ☒ OTHER   93110

IF THE APPLICANT IS A HOLDING COMPANY, LIST THE OWNER OF THE HOLDING COMPANY ALONG WITH OCCUPATION OR BUSINESS:

IS APPLICANT INCORPORATED SOLELY FOR THE OWNERSHIP OF THE AIRCRAFT?   ☒ YES   ☐ NO

INSURANCE IS REQUESTED FROM 12:01 A.M.   01/26/2019   TO 12:01 A.M.   01/26/2020

| AIRCRAFT INFORMATION | PLEASE INDICATE THE NUMBER OF AIRCRAFT REQUIRING COVERAGE: | 1 |
|---|---|---|

NOTE: IF THE FLEET EXCEEDS 10 AIRCRAFT, PLEASE ATTACH A FLEET ADDENDUM.

| Aircraft Reg. No. | Year, Make, and Model | Seating Capacity Crew | Seating Capacity PAX | Aircraft Base Airport | Aircraft Insured Value Requested | Liability Limit Requested | Storage Hangared | Storage Tied |
|---|---|---|---|---|---|---|---|---|
| 1. N227WP | 2016 Honda Jet | 1 | 6 | SBA | ~~$5,100,000~~ 4,000,000 | ~~$50,000,000~~ 25,000,000 | ✓ | |

| Aircraft Reg. No. | Estimated Annual Utilization | % of Utilization P&B | % of Utilization Charter Air Taxi | % of Utilization Commerical | Average PAX Load | Average PAX Profile (Employee Guest) | Owned/Financed/Leased/ Lienholder/Lessor | Amount Financed If Applicable |
|---|---|---|---|---|---|---|---|---|
| 1. N227WP | 100 | 100% | | | 2 | 20/80 | Owned | — |

| PHYSICAL DAMAGE COVERAGE | | | | | |
|---|---|---|---|---|---|

| Aircraft Reg. No. | Coverge Type Ground and in Flight | Coverge Type Not in Flight | Coverge Type Not in Motion | REQUESTED DEDUCTIBLES IN MOTION Amount ($) or % | REQUESTED DEDUCTIBLES NOT IN MOTION Amount ($) or % |
|---|---|---|---|---|---|
| 1. N227WP | ✓ | | | $ 10,000   % | $ 10,000   % |

| PILOT INFORMATION | List ALL PILOTS WHO OPERATE APPLICANT'S AIRCRAFT. PILOTS LISTED WITHIN THIS APPLICATION ARE ONLY CONSIDERED FOR INSURANCE IF A COMPLETED PILOT QUESTIONNAIRE FORM IS ATTACHED. |
|---|---|

| NAME OF PILOT | DATE OF BIRTH | FULL TIME/CONTRACT | PIC/SIC | PIC MM | SIC MM |
|---|---|---|---|---|---|
| 1. Bill Parrish | 1/26/52 | 805 637-526 | | | |
| ~~2. Chris Ohman~~ | | | | | |
| 3. | | | | | |
| 4. | | | | | |

| GENERAL INFORMATION | |
|---|---|

HOW LONG HAS APPLICANT OWNED OR OPERATED AIRCRAFT?   2yrs

ARE ANY AIRCRAFT OPERATED ON A SINGLE PILOT BASES: ☒ YES   ☐ NO   IF YES, PLEASE ANSWER THE FOLLOWING:

ANNUAL SINGLE PILOT HOURS:   100

AVERAGE PAX LOAD DURING SINGLE PILOT OPERATIONS:   2

ANY SINGLE PILOT AIR CHARTER OR COMMERCIAL OPERATION HOURS?   ☐ YES   ☒ NO   IF YES, ANNUAL USAGE:

DO ANY OWNERS OR NON-PROFESSIONAL PILOTS OPERATE AIRCRAFT TO BE INSURED?   ☒ YES   ☐ NO

IF YES, DESCRIBE:   William Parrish

DOES THE APPLICANT OPERATE AIRCRAFT NOT INSURED ON THIS POLICY?   ☒ YES   ☒ NO   A3t

0256
0256

IF YES, DESCRIBE:

A36 Bonanza    PIC 2850hrs

DO ANY EMPLOYEES OF THE APPLICANT (INCLUDING PILOTS) OPERATE AIRCRAFT NOT INSURED ON THIS POLICY IN THE COURSE OF THE APPLICANT'S BUSINESS?

☐ YES  ☒ NO

IF YES, DESCRIBE:

DO ANY OF THE APPLICANTS CHARTER AIRCRAFT?  ☐ YES  ☒ NO

IF YES, DESCRIBE:

DOES THE APPLICANT PARTICIPATE IN ANY DRY LEASE, WET LEASE, TIME SHARE, RENTAL AGREEMENTS OR ANY OPERATION OF THE AIRCRAFT IN WHICH A CHARGE IS MADE?

☐ YES  ☒ NO

IF YES, DESCRIBE:

DO YOU ANTICIPATE USE OF TEMPORARY SUBSTITUTE AIRCRAFT DURING SERVICING OR MAINTENANCE OF APPLICANT'S AIRCRAFT?

☐ YES  ☒ NO

IF YES, DESCRIBE PURPOSE, TYPES OF AIRCRAFT TO BE USED AND ANTICIPATED ANNUAL UTILIZATION:

AREAS OF AIRCRAFT OPERATION:  ☒ U.S.A.  ☐ ALASKA  ☐ CANADA  ☐ MEXICO  ☒ OTHER COUNTRIES (LIST BELOW):

USA, Canada, Mexico

## MAINTENANCE

DOES APPLICANT PERFORM THEIR OWN MAINTENANCE?  ☐ YES  ☒ NO

NAME OF MAINTENANCE SUPERVISOR AND NUMBER OF YEARS IN THIS POSITION:

HAS APPLICANT'S MAINTENANCE PERSONNEL COMPLETED MANUFACTURER'S MAINTENANCE SCHOOLS FOR AIRCRAFT TYPE INSURED?

☐ YES  ☐ NO

IF YES, DESCRIBE:

DO APPLICANTS MAINTENANCE PERSONNEL RECEIVE RECURRENT TRAINING?  ☐ YES  ☐ NO

IF YES, DESCRIBE:

ARE AIRCRAFT OPERATED UNDER ANY SPECIAL MAINTENANCE PROGRAM?  ☒ YES  ☐ NO

IF YES, DESCRIBE:   CAMP    HACI Engine + Aircraft

OUTSIDE MAINTENANCE PERFORMED BY:   Honda Aircraft

DO MAINTENANCE PERSONNEL SERVICE, MAINTAIN OR REPAIR AIRCRAFT BELONGING TO OTHERS  ☐ YES  ☐ NO

IF YES, DESCRIBE:

## PREMISES

0257
0257

PLEASE LIST AIRPORTS IN WHICH AIRCRAFT IS ROUTINELY HANGARED:
Santa Barbara

TYPE OF HANGAR CONSTRUCTION:

WHAT TYPE OF SUPPRESSION SYSTEM EXISTS WITHIN THE APPLICANT'S HANGAR(S):

PRIMARY HANGAR IS: ☐ OWNED  ☒ LEASED    NAME OF LANDLORD: *Signature*

DO YOU HANGAR, TIE-DOWN OR MOVE ANY AIRCRAFT BELONGING TO OTHERS: ☐ YES  ☒ NO
IF YES, DESCRIBE:

DOES APPLICANT HAVE ANY RETAIL FUEL AND OIL SALES?  ☐ YES  ☒ NO
IF YES, INCLUDE ANNUAL GALLONAGE:

**INSURANCE AND CLAIMS HISTORY**

HAS ANY DAMAGE BEEN SUSTAINED OR CLAIMS BY OTHERS ARISING FROM THE OPERATION OF ANY AIRCRAFT OWNED BY OR IN THE CUSTODY OF THE APPLICANT?
☐ YES  ☒ NO
IF YES, DESCRIBE:

HAS ANY INSURANCE COMPANY OR UNDERWRITER AT ANY TIME CANCELLED OR REFUSED TO RENEW A POLICY HELD BY THE APPLICANT OR ANY OF THE PILOTS NAMED HEREIN IN REGARDS TO ANY TYPE OF INSURANCE?
☐ YES  ☒ NO
IF YES, DESCRIBE:

NAME OF CURRENT OR MOST RECENT AVIATION INSURANCE COMPANY (IF NONE, SO STATE): Starr Indemnity & Liability Company

CURRENT POLICY EXPIRATION DATE:  January 26, 2019

**ANY PERSON WHO KNOWINGLY AND WITH INTENT TO DEFRAUD ANY INSURANCE COMPANY OR OTHER PERSON, FILES AN APPLICATION FOR INSURANCE OR STATEMENT OF CLAIM CONTAINING ANY MATERIALLY FALSE INFORMATION OR CONCEALS FOR THE PURPOSE OF MISLEADING INFORMATION CONCERNING ANY FACT MATERIAL THERETO COMMITS A FRAUDULENT INSURANCE ACT, WHICH IS A CRIME AND SUBJECTS SUCH PERSON TO CRIMINAL AND CIVIL PENALTIES, INCLUDING BUT NOT LIMITED TO FINES, DENIAL OF INSURANCE BENEFITS, CIVIL DAMAGES, CRIMINAL PROSECUTION AND CONFINEMENT IN STATE PRISON.**

**APPLICABLE IN:**

**ALABAMA**
ANY PERSON WHO KNOWINGLY PRESENTS A FALSE OR FRAUDULENT CLAIM FOR PAYMENT OF A LOSS OR BENEFIT OR WHO KNOWINGLY PRESENTS FALSE INFORMATION IN AN APPLICATION FOR INSURANCE IS GUILTY OF A CRIME AND MAY BE SUBJECT TO RESTITUTION FINES OR CONFINEMENT IN PRISON, OR ANY COMBINATION THEREOF.

**ARKANSAS**
PRESENTS FALSE INFORMATION IN AN APPLICATION FOR INSURANCE IS GUILTY OF A CRIME AND MAY BE SUBJECT TO FINES AND CONFINEMENT IN PRISON.

**COLORADO**
IT IS UNLAWFUL TO KNOWINGLY PROVIDE FALSE, INCOMPLETE, OR MISLEADING FACTS OR INFORMATION TO AN INSURANCE COMPANY FOR THE PURPOSE OF DEFRAUDING OR ATTEMPTING TO DEFRAUD THE COMPANY. PENALTIES MAY INCLUDE IMPRISONMENT, FINES, AND DENIAL OF INSURANCE AND CIVIL DAMAGES. ANY INSURANCE COMPANY OR AGENT OF AN INSURANCE COMPANY WHO KNOWINGLY PROVIDES FALSE, INCOMPLETE, OR MISLEADING FACTS OR INFORMATION TO A POLICYHOLDER OR CLAIMANT FOR THE PURPOSE OF DEFRAUDING OR ATTEMPTING TO DEFRAUD THE POLICYHOLDER OR CLAIMANT WITH REGARD TO A SETTLEMENT OR AWARD PAYABLE FROM INSURANCE PROCEEDS SHALL BE REPORTED TO THE COLORADO DIVISION OF INSURANCE WITHIN THE DEPARTMENT OF REGULATORY AGENCIES.

**DISTRICT OF COLUMBIA**
WARNING: IT IS A CRIME TO PROVIDE FALSE OR MISLEADING INFORMATION TO AN INSURER FOR THE PURPOSE OF DEFRAUDING THE INSURER OR ANY OTHER PERSON. PENALTIES INCLUDE IMPRISONMENT AND/OR FINES. IN ADDITION, AN INSURER MAY DENY INSURANCE BENEFITS IF FALSE INFORMATION MATERIALLY RELATED TO A CLAIM WAS PROVIDED BY THE APPLICANT.

0258
0258

**FLORIDA**
ANY PERSON WHO KNOWINGLY AND WITH INTENT TO INJURE, DEFRAUD, OR DECEIVE ANY INSURER FILES A STATEMENT OF CLAIM OR AN APPLICATION CONTAINING ANY FALSE, INCOMPLETE, OR MISLEADING INFORMATION, IS GUILTY OF A FELONY OF THE THIRD DEGREE.

**KENTUCKY**
ANY PERSON WHO KNOWINGLY AND WITH INTENT TO DEFRAUD ANY INSURANCE COMPANY OR OTHER PERSON FILES AN APPLICATION FOR INSURANCE CONTAINING ANY MATERIALLY FALSE INFORMATION OR CONCEALS, FOR THE PURPOSE OF MISLEADING, INFORMATION CONCERNING ANY FACT MATERIAL THERETO COMMITS A FRAUDULENT INSURANCE ACT, WHICH IS A CRIME.

**LOUISIANA**
ANY PERSON WHO KNOWINGLY PRESENTS A FALSE OR FRAUDULENT CLAIM FOR PAYMENT OF A LOSS OR BENEFIT OR KNOWINGLY PRESENTS FALSE INFORMATION IN AN APPLICATION FOR INSURANCE IS GUILTY OF A CRIME AND MAY BE SUBJECT TO FINES AND CONFINEMENT IN PRISON.

**MAINE**
IT IS A CRIME TO KNOWINGLY PROVIDE FALSE, INCOMPLETE OR MISLEADING INFORMATION TO INSURANCE COMPANY FOR THE PURPOSE OF DEFRAUDING THE COMPANY. PENALTIES MAY INCLUDE IMPRISONMENT, FINES OR A DENIAL OF INSURANCE BENEFITS.

**MARYLAND**
ANY PERSON WHO KNOWINGLY OR WILLFULLY PRESENTS A FALSE OR FRAUDULENT CLAIM FOR PAYMENT OF A LOSS OR BENEFIT OR WHO KNOWINGLY OR WILLFULLY PRESENTS FALSE INFORMATION IN AN APPLICATION FOR INSURANCE IS GUILTY OF A CRIME AND MAY BE SUBJECT TO FINES AND CONFINEMENT IN PRISON.

**NEW JERSEY**
ANY PERSON WHO INCLUDES ANY FALSE OR MISLEADING INFORMATION ON AN APPLICATION FOR AN INSURANCE POLICY IS SUBJECT TO CRIMINAL AND CIVIL PENALTIES.

**NEW MEXICO**
ANY PERSON WHO KNOWINGLY PRESENTS A FALSE OR FRAUDULENT CLAIM FOR PAYMENT OF A LOSS OR BENEFIT OR KNOWINGLY PRESENTS FALSE INFORMATION IN AN APPLICATION FOR INSURANCE IS GUILTY OF A CRIME AND MAY BE SUBJECT TO CIVIL FINES AND CRIMINAL PENALTIES.

**NEW YORK**
ANY PERSON WHO KNOWINGLY AND WITH INTENT TO DEFRAUD ANY INSURANCE COMPANY OR OTHER PERSON FILES AN APPLICATION FOR INSURANCE OR STATEMENT OF CLAIM CONTAINING ANY MATERIALLY FALSE INFORMATION, OR CONCEALS FOR THE PURPOSE OF MISLEADING, INFORMATION CONCERNING ANY FACT MATERIAL THERETO, COMMITS A FRAUDULENT INSURANCE ACT, WHICH IS A CRIME AND SHALL ALSO BE SUBJECT TO A CIVIL PENALTY NOT TO EXCEED FIVE THOUSAND DOLLARS AND THE STATED VALUE OF THE CLAIM FOR EACH SUCH VIOLATION.

**OHIO**
ANY PERSON WHO, WITH THE INTENT TO DEFRAUD OR KNOWING THAT HE IS FACILITATING A FRAUD AGAINST AN INSURER, SUBMITS AN APPLICATION OR FILES A CLAIM CONTAINING A FALSE OR DECEPTIVE STATEMENT IS GUILTY OF INSURANCE FRAUD.

**OKLAHOMA**
WARNING: ANY PERSON WHO KNOWINGLY, AND WITH INTENT TO INJURE, DEFRAUD OR DECEIVE ANY INSURER, MAKES ANY CLAIM FOR THE PROCEEDS OF AN INSURANCE POLICY CONTAINING ANY FALSE, INCOMPLETE OR MISLEADING INFORMATION IS GUILTY OF A FELONY.

**OREGON**
ANY PERSON, WHO KNOWINGLY AND WITH INTENT TO DEFRAUD ANY INSURANCE COMPANY OR OTHER PERSON, FILES AN APPLICATION FOR INSURANCE CONTAINING ANY FALSE INFORMATION, OR CONCEALS FOR THE PURPOSE OF MISLEADING INFORMATION CONCERNING ANY MATERIAL FACT THERETO, MAY BE GUILTY OF AN INSURANCE FRAUD.

**PENNSYLVANIA**
ANY PERSON WHO KNOWINGLY AND WITH INTENT TO DEFRAUD ANY INSURANCE COMPANY OR OTHER PERSON FILES AN APPLICATION FOR INSURANCE OR STATEMENT OF CLAIM CONTAINING ANY MATERIALLY FALSE INFORMATION OR CONCEALS FOR THE PURPOSE OF MISLEADING, INFORMATION CONCERNING ANY FACT MATERIAL THERETO COMMITS A FRAUDULENT INSURANCE ACT, WHICH IS A CRIME AND SUBJECTS SUCH PERSON TO CRIMINAL AND CIVIL PENALTIES.

**TENNESSEE, VIRGINIA AND WASHINGTON**
IT IS A CRIME TO KNOWINGLY PROVIDE FALSE, INCOMPLETE OR MISLEADING INFORMATION TO INSURANCE COMPANY FOR THE PURPOSE OF DEFRAUDING THE COMPANY. PENALTIES INCLUDE IMPRISONMENT, FINES AND DENIAL OF INSURANCE BENEFITS.

**RHODE ISLAND AND WEST VIRGINIA**
ANY PERSON WHO KNOWINGLY PRESENTS A FALSE OR FRAUDULENT CLAIM FOR PAYMENT OF A LOSS OR BENEFIT OR KNOWINGLY PRESENTS FALSE INFORMATION IN AN APPLICATION FOR INSURANCE IS GUILTY OF A CRIME AND MAY BE SUBJECT TO FINES AND CONFINEMENT IN PRISON.

---

All particulars herein are declared to be true and complete to the best of my/our knowledge and no information has been withheld or suppressed and I/we agree that this application and the terms and conditions of the policy in use by the insurer shall be the basis of any contract between me/us and the insurer. I hereby authorize the insurer to investigate all or any qualifications or statements contained herein.

**Applicant's Signature(s):**   _[signature]_                Date: 1 / 6 / 19

STARR COMPANIES - AIRCRAFT INSURANCE APPLICATION                Page 4 of 5

THIS APPLICATION DOES NOT COMMIT THE INSURER TO ANY LIABILITY NOR MAKE THE APPLICANT LIABLE FOR ANY PREMIUM UNLESS AND UNTIL THE INSURER AGREES TO EFFECT THIS INSURANCE.

**NAME OF PERSON COMPLETING APPLICATION:** William Parrish

**RELATION TO  APPLICANT / NAMED INSURED:** Same

NAME OF AGENT OR BROKER: Tutton Insurance Services, Inc.

ADDRESS: 2913 S. Pullman Street, Santa Ana, CA 92705

ARE YOU THE HOLDING PRODUCER: ☑ YES  ☐ NO      IF YES, FOR HOW MANY YEARS: 2

0260
0260



STARR
AVIATION

3353 Peachtree Road, NE, Suite 1000
Atlanta, GA 30326
Return to: AviationSubmissions@cvstarrco.com

## PILOT QUALIFICATIONS

### GENERAL PILOT INFORMATION

Named Insured/Aircraft Owner/Policyholder: Passport 420, LLC

Make & Model of Aircraft to be Flown: 1. Honda Jet 2.          3.          4.

Your Name: Bill Parrish Address: 4185 La Ladera Rd Santa Barbara, CA 93110

Date of Birth: 1/26/52      Education: High School 1 2 3 ④ College 1 2 3 ④ Graduate School 1 2 3 ④

Occupation: Elect Engr      Employer: Thermal Seek      How long: 6 yrs

Is piloting aircraft your primary profession: Yes/No  If No, Describe:

Are you a full time employee for this operation or contract pilot: ~~Full Time Employee/Contract~~

If Contract Pilot, who else do you fly for:          What percent of your piloting time is spent flying for this operation:

List Employers & Positions Held Over the Past 5 Years if your position is a professional pilot:
- -
- -

Airman Certificate - Number: 3359240      Limitations:
Medical - Class: 3rd      Limitations: glasses  Expiration Date: 11/16/19

### CURRENT CERTIFICATES & RATINGS

- ☐ Student:  Since (date)
- ☐ Private
- ☐ Commercial
- ☐ Sr. Commercial
- ☒ Airline (ATP)
- ☐ Instructor: Class
- ☐ Instrument: Class
- ☐ Night
- ☒ Single Engine – Land
- ☐ Single Engine – Sea
- ☐ Center Line Thrust
- ☒ Multi Engine – Land
- ☐ Multi Engine – Sea
- ☒ Type Aircraft rated in: HDJT  EMB500
- ☐ Rotorcraft
- ☐ Glider
- ☐ A & P Mechanic
- ☐ Other

Date of last logged satisfactorily accomplished Biennial Flight Review:          Make & Model:

Date of last logged satisfactorily accomplished Pilot Proficiency Exam: 10/31/18  Make & Model: Hondajet HDJT

### FLIGHT & GROUND SCHOOL TRAINING COURSES (Specific to Make & Model Aircraft which you are applying to fly)

Type of Aircraft HDJT  Name of Facility FlightSafety  Frequency annual  Last successful completion date 10/31/18

1.
☐ Initial Type Training  ☒ Recurrent Training  ☒ Full-axis Motion Flight Simulator Training  ☐ In Aircraft Training  ☐ Ground School Only

2.
☐ Initial Type Training  ☐ Recurrent Training  ☐ Full-axis Motion Flight Simulator Training  ☐ In Aircraft Training  ☐ Ground School Only

3.
☐ Initial Type Training  ☐ Recurrent Training  ☐ Full-axis Motion Flight Simulator Training  ☐ In Aircraft Training  ☐ Ground School Only

4.
☐ Initial Type Training  ☐ Recurrent Training  ☐ Full-axis Motion Flight Simulator Training  ☐ In Aircraft Training  ☐ Ground School Only

1 of 3



STARK AVIATION
A Holding Company of C.V. Stark & Co., Inc.
3353 Peachtree Road, NE, Suite 1000
Atlanta, GA 30326
Return to: AviationSubmissions@cvstarrco.com

**NAME:**

**LOGGED PILOT HOURS**
Total Pilot In-Command Hours for All Aircraft: _4600_

**ITEMIZATION OF HOURS**

| CLASS<br>MAKE/MODEL TO BE FLOWN | Total | PIC | SIC | Last 90 days | Last 12 months |
|---|---|---|---|---|---|
| 1. #DS7 | 190 | | | 25 | 100 |
| 2. | | | | | |
| 3. | | | | | |
| 4. | | | | | |
| SINGLE ENGINE FIXED | 300 | | | | |
| SINGLE ENGINE RETRACTABLE | 2850 | | | | 20 |
| MULTIENGINE | 1500 | | | 25 | 100 |
| TURBINE | 1800 | | | 25 | 100 |
| PISTON ROTORWING | | | | | |
| TURBINE ROTORWING | | | | | |
| TOTAL HOURS ALL AIRCRAFT | 4600 | | | 25 | 110 |

List the makes/models of all aircraft flown in the last twelve months other than as listed in 1-4 above and the hours of flight in each for the last twelve months: A36 Bonanza   20

**ANSWER ALL QUESTIONS**
Any person who knowingly and with intent to defraud any insurance company or other person who files an application for insurance containing any false information, or conceals for the purpose of misleading, information concerning any fact material thereto, commits a fraudulent insurance act, which is a crime.

1. Have you ever had an aircraft, claim incident, or accident? ☐ YES ☒ NO
2. Have you ever been cited or fined for violation of an aviation regulation? ☐ YES ☒ NO
3. Has your pilot certificate ever been suspended or revoked? ☐ YES ☒ NO
4. Have you ever been convicted of a felony or are you under indictment for a felony? ☐ YES ☒ NO
5. Have you ever been convicted of driving a motor vehicle under the influence of alcohol or narcotics, or of reckless driving? ☐ YES ☒ NO
6. Has your drivers' license ever been suspended or revoked? ☐ YES ☒ NO
7. Have you ever been convicted of or are you under indictment in a legal action involving drugs or narcotics? ☐ YES ☒ NO
8. Have you ever had or been treated for a chemical dependency? ☐ YES ☒ NO
9. Are you regularly using any medication? ☒ YES ☐ NO

2 of 3



STARR
AVIATION

A Member Company of C V Starr & Co. Inc

3353 Peachtree Road, NE, Suite 1000
Atlanta, GA 30326
**Return to: AviationSubmissions@cvstarrco.com**

Explain fully each "YES" answer:        Continue on additional pages as needed.

ALL OF THE INFORMATION HEREIN IS TRUE & CORRECT TO THE BEST OF MY KNWLEDGE AND I HAVE NOT KNOWINGLY OR INTENTIONALLY CONCEALED OR MISREPRESENTED ANY FACT.  THIS FORM WILL BECOME PART OF THE INSURANCE APPLICATION AND AS SUCH ALL FRAUD STATEMENTS ARE APPLICABLE

_____      1 / 16 / 9

Pilot Signature                  Today's Date    (d/m/y)

3 of 3

0263
0263

EXHIBIT "K"

0264

0264

1  NICOLA T. HANNA
   United States Attorney
2  BRANDON D. FOX
   Assistant United States Attorney
3  Chief, Criminal Division
4  STEVEN R. WELK (CBN 149883)
   Assistant United States Attorney
5  Chief, Asset Forfeiture Section
6      312 North Spring Street, 14th Floor
       Los Angeles, California 90012
7      Telephone:  (213) 894-6166
       Facsimile:  (213) 894-0142
8      E-mail: Steven.Welk@usdoj.gov
9
   Attorneys for Plaintiff
10 UNITED STATES OF AMERICA
11

12                UNITED STATES DISTRICT COURT

13         FOR THE CENTRAL DISTRICT OF CALIFORNIA

14                     WESTERN DISTRICT

15

16 UNITED STATES OF AMERICA,          )  NO. 8:19-CV-1988
                                      )
17            Plaintiff,              )  VERIFIED COMPLAINT FOR
                                      )  FORFEITURE
18            v.                      )
                                      )  [18 U.S.C. §§ 981(a)(1)(C) and
19 ONE HONDA AIRCRAFT,                )  (a)(1)(A)]
                                      )
20            Defendant.              )
                                      )        [I.R.S.]
21 _____  )

22

23        The United States of America brings this claim against the defendant one

24 Honda aircraft, described more specifically below ("defendant aircraft"), and

25 alleges as follows:

26                     JURISDICTION AND VENUE

27        1.    This is a civil forfeiture action brought pursuant to 18 U.S.C.

28 §§ 981(a)(1)(C) and (a)(1)(A).

                                      1

2.     This court has jurisdiction over the matter under 28 U.S.C. §§ 1345 and 1355.

3.     Venue lies in this district pursuant to 28 U.S.C. § 1395(b).

<u>PERSONS AND ENTITIES</u>

4.     The plaintiff is the United States of America.

5.     The defendant is one Honda aircraft, registration number N227WP, aircraft serial number 42000029, together with its tools and appurtenances, including any and all logbooks (hard copy and/or electronic) documenting engine and airframe maintenance, flights, number of hours flown, number of landings, and types and frequency of instrument approaches made by the aircraft.

6.     The interests of the following may be adversely affected by these proceedings: Michael J. Avenatti ("Avenatti"); Lisa Storie-Avenatti; William Parish; Spring Creek Research, LLC ("Spring Creek"); Eagan Avenatti, LLP ("EA LLP"); Brian Weiss, Receiver; Avenatti & Associates, APC ("A&A"); a law firm identified herein as Law Firm 1; Passport 420, LLC ("Passport 420"); Jason Frank; and the individual identified herein as Client 2.

7.     The defendant aircraft was seized pursuant to a federal seizure warrant in this district on April 10, 2019, and is in the custody of Internal Revenue Service ("IRS"), where it shall remain subject to this court's jurisdiction during the pendency of this action.

<u>FACTS SUPPORTING FORFEITURE</u>

8.     The government alleges that Avenatti's acquisition of the defendant aircraft was part of a fraud scheme by which he misappropriated funds of one or more clients and/or associates, including the individual identified herein as Client 2.

9.     Since at least 2000, Avenatti has been, and remains, an attorney licensed to practice law in the State of California, and has practiced law through A&A and EA LLP, which operated in Newport Beach and Los Angeles,

California.  Avenatti was the sole owner of A&A, which owned at least 75 percent of EA LLP.

10.     Avenatti was also the principal owner and Chief Executive Officer of Global Baristas US LLC ("GBUS"), which operated Tully's Coffee ("Tully's") stores in Washington and California.  In 2013, Avenatti's company, Global Baristas LLC ("GB LLC"), acquired TC Global Inc., which previously operated Tully's, out of bankruptcy for approximately $9.2 million.  Avenatti's company, A&A, also owned 100 percent of Doppio Inc., which in turn owned 80 percent of GB LLC. GB LLC wholly owned GBUS, which handled the day-to-day business operations of Tully's.

11.     Prior to January 2017, Avenatti was retained by Client 2 to provide legal services in connection with a legal matter in which Client 2 and Individual 1 were adverse.

12.     On January 7, 2017, Avenatti negotiated a settlement on behalf of Client 2 with Individual 1.  Under the terms of the settlement agreement, Individual 1 was required to make an initial payment to Client 2 of $2,750,000 by January 28, 2017, and an additional payment of $250,000 on November 1, 2020, if certain additional specified conditions were met, for a total of $3,000,000.  Client 2 was entitled to receive the initial $2,750,000 settlement payment, less EA LLP's attorneys' fees (*i.e.*, 33 percent of the total $3,000,000 settlement amount), costs and expenses.

13.     Avenatti failed to provide a copy of the final settlement agreement to Client 2 and misrepresented the terms of the agreement to Client 2.  Specifically, Avenatti falsely represented to Client 2 that the entirety of the initial settlement payment from Individual 1 would be applied to Avenatti's and EA LLP's outstanding attorneys' fees of approximately $990,000, and that Client 2's portion of the $3,000,000 settlement would be paid by Individual 1 to Client 2 over an 8 year period through approximately 96 monthly payments.  Avenatti knew when he

0267
0267

1   made these representations that the settlement agreement required Individual 1 to

2   make the initial $2,750,000 settlement payment, which far exceeded the money

3   owed to EA LLP for attorneys' fees, and that Individual 1 was not required to

4   make any monthly payments to Client 2 thereafter.

5        14.    On January 25, 2017, Individual 1 transferred the $2,750,000

6   settlement payment into a California Bank & Trust ("CB&T") attorney trust

7   account ending in 8671, held in the name of "The State Bar of California, Eagan

8   Avenatti LLP, Attorney Client Trust Account" ("EA 8671"), where the funds were

9   required to be held in trust for Client 2.  Avenatti concealed and failed to disclose

10  to Client 2 that EA LLP had received the initial $2,750,000 settlement payment.

11  Further, Avenatti and EA LLP retained and failed to transfer Client 2's portion of

12  the $2,750,000 settlement payment to Client 2.  Instead, Avenatti misappropriated

13  Client 2's portion of the settlement funds and diverted some or all of said funds to

14  acquire an interest in the defendant aircraft.

15       15.    On or about January 26, 2017, Avenatti transferred $2,500,000 of the

16  Client 2 settlement proceeds to a Chase Bank account number ending in 7608

17  ("Chase 7608"), an attorney trust account held in the name of another law firm

18  ("Law Firm 1").  Avenatti then directed Law Firm 1 to transfer the entire

19  $2,500,000 to Honda Aircraft Company, LLC ("Honda"), to be applied toward the

20  purchase of the defendant aircraft, which was titled in the name of Passport 420,

21  LLC, a company partially owned, and controlled by Avenatti.  Law Firm 1 in fact

22  transferred the $2,500,000 to Honda, which payment was applied to the purchase

23  of the defendant aircraft.

24       16.    Specifically, Avenatti instructed Law Firm 1 to transfer the funds

25  received from EA 8671, from Chase 7608 to Honda, with instructions to the effect

26  that that funds were to be applied toward "Passport 420, LLC, Contract No.

27  4000316, Serial No. 42000029," the contract for the acquisition of the defendant

28  aircraft.  Avenatti's instructions included the account and routing numbers for a

4

1  Wells Fargo Bank account held by Honda.  Avenatti then routed the remaining
2  $250,000 of the Client 2 settlement proceeds from EA 8671 to a CB&T account
3  ending in 2851, held in the name of EA LLP ("EA 2851"), and then to a CB&T
4  account ending in 0661, held in the name of A&A ("A&A 0661").  Avenatti
5  concealed and failed to disclose to Client 2 that Avenatti had used the settlement
6  proceeds in this manner.

7      17.    In order to lull Client 2 and prevent Client 2 from discovering that
8  Avenatti had misappropriated Client 2's portion of the settlement proceeds,
9  Avenatti committed the following acts:

10         a.    Between March 15, 2017 and June 18, 2018, Avenatti caused
11  approximately 11 payments totaling approximately $194,000 to be deposited into
12  Client 2's bank account.  Avenatti falsely represented to Client 2 that these
13  payments constituted monthly settlement payments that were purportedly due from
14  Individual 1.  For example, on February 20, 2018, Avenatti caused a $16,000
15  cashier's check drawn on a CB&T attorney trust account ending in 4613 held in
16  the name of "State Bar of California, Eagan Avenatti LLP, Attorney Client Trust
17  Account" ("EA 4613"), to be deposited into Client 2's bank account, which check
18  falsely identified Individual 1 as the "remitter."

19         b.    Between June 2018 and March 2019, during which time
20  Avenatti stopped making the purported monthly payments to Client 2, he falsely
21  represented to Client 2 that Individual 1 was not complying with the settlement
22  agreement, and that Avenatti was working on obtaining the missing monthly
23  settlement payments.

24         c.    On March 24, 2019, at a meeting with Client 2 at Avenatti's
25  residence in Los Angeles, California, Avenatti falsely represented to Client 2 that
26  Client 2 would soon be receiving a payment from Individual 1 to make up for the
27  purportedly missing monthly settlement payments for July 2018 through March
28  2019.

0269
0269

<u>Avenatti's Acquisition of the Defendant Aircraft</u>

18.     According to an Aircraft Bill of Sale generated on January 27, 2017, "Passport 420 LLC," located at 520 Newport Center Drive, Newport Beach, CA (the address of the EA LLP at the time) acquired the defendant aircraft from Honda.  Spring Creek[1] and A&A are identified as the sole members of Passport 420, and Avenatti is listed as the manager.

19.     Passport 420 was the holder of a CB&T account ending in 9257 ("Passport 9257").  CB&T records for that account list the 520 Newport Center Drive address for Passport 420.  The signors for Passport 9257 are Avenatti and a paralegal who worked for Avenatti and EA LLP.

20.     On January 18, 2017, Passport 9257 received a wire transfer of $1,985,000 from the Parrish Family Trust, the owners of Spring Creek.  On January 20, 2017, there were six outgoing online wire transfers from Passport 9257, totaling $1,984,198, to EA 2851.  Thereafter, between January 20 and 26, 2017, there were four online transfers from EA 2851, totaling $1,641,680, to A&A 0661.  On January 26, 2017, $858,605.00 was wired from A&A 0661 to Honda. The remaining Parrish Family funds were commingled with funds from other sources, which commingled funds were used, at least in part, for personal expenses of Avenatti.

/ / /

/ / /

_____

[1] Spring Creek is a client of Avenatti, and co-owner (with Avenatti) of the defendant aircraft.  The government is informed and believes that the money transferred by Spring Creek was intended as payment for a partial interest in the defendant aircraft.

6

21.    The chart below summarizes the payments made to Honda for the purchase of the defendant aircraft.

| Transaction Date | Amount | Payor (Account) | Recipient |
|---|---|---|---|
| 1/20/2017 | $138,800 | EAGAN AVENATTI, LLP (EA 2851) | Honda Aircraft Company, LLC |
| 1/26/2017 | $2,500,000 | Law Firm 1 (Chase 7608) | Honda Aircraft Company, LLC |
| 1/26/2017 | $858,605 | AVENATTI & ASSOC., A PROFESSIONAL CORP. (A&A 0661) | Honda Aircraft Company, LLC |

<u>Criminal History</u>

22.    On March 22, 2019, a criminal complaint was filed against Avenatti in this district (*United States v. Michael John Avenatti*, case number 8:19-CR-00061-JVS).  On April 10, 2019, Avenatti was indicted for, among other things, wire fraud and bank fraud, based in part on the facts alleged above.

FIRST CLAIM FOR RELIEF

23.    Based on the above, plaintiff alleges that the defendant aircraft is traceable to proceeds of one or more violations of 18 U.S.C. § 1343 (wire fraud), a specified unlawful activity ("SUA""), as defined at 18 U.S.C. §§ 1956(c)(7)(A) and 1961(1)(B), rendering it subject to forfeiture to the United States pursuant to 18 U.S.C. § 981(A)(1)(C).

SECOND CLAIM FOR RELIEF

24.    Based on the above, plaintiff alleges that the defendant aircraft was acquired with proceeds of SUA, including but not limited to one or more violations of 18 U.S.C. § 1343, and was involved in one or more financial transactions that

7

0271
0271

1  were in violation of 18 U.S.C. §§ 1956 and/or 1957 (money laundering), rendering

2  it subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(A).

3       WHEREFORE, plaintiff United States of America prays that:

4      (a)    due process issue to enforce the forfeiture of the defendant aircraft;

5      (b)    due notice be given to all interested parties to appear and show cause

6  why forfeiture should not be decreed;

7      (c)    that this Court decree forfeiture of the defendant aircraft to the United

8  States of America for disposition according to law; and

9      (d)    for such other and further relief as this Court may deem just and

10  proper, together with the costs and disbursements of this action.

11

12  DATED: October 18, 2019     NICOLA T. HANNA

13         United States Attorney
       BRANDON D. FOX

14         Assistant United States Attorney
       Chief, Criminal Division

15

16             /s/ Steven R. Welk

17         STEVEN R. WELK
       Assistant United States Attorney
       Chief, Asset Forfeiture Section

18

19         Attorneys for Plaintiff
       UNITED STATES OF AMERICA

20

21

22

23

24

25

26

27

28

0272
0272

<u>VERIFICATION</u>

I, Remoun Karlous, hereby declare that:

1.      I am a Special Agent with the Internal Revenue Service – Criminal Investigations and am familiar with this investigation.

2.      I have read the above Verified Complaint for Forfeiture and know its contents.  It is based upon my own personal knowledge and reports provided to me by other law enforcement agents, which I believe to be reliable.

3.      Everything contained in the Complaint is true and correct, to the best of my knowledge and belief.

I declare under penalty of perjury that the foregoing is true and correct.

Executed October 17, 2019 in Los Angeles, California.

REMOUN KARLOUS

9

0273
0273

# EXHIBIT "L"

0274

0274

FILED - SOUTHERN DIVISION
CLERK, U.S. DISTRICT COURT

APR 1 0 2019

CENTRAL DISTRICT OF CALIFORNIA
BY                          DEPUTY

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

September 2018 Grand Jury

UNITED STATES OF AMERICA,

      Plaintiff,

      v.

MICHAEL JOHN AVENATTI,

      Defendant.

SA CR No. 19 SACR19-00061 JVS

I N D I C T M E N T

[18 U.S.C. § 1343: Wire Fraud; 26 U.S.C. § 7202: Willful Failure to Collect and Pay Over Withheld Taxes; 26 U.S.C. § 7212(a): Endeavoring to Obstruct the Administration of the Internal Revenue Code; 26 U.S.C. § 7203: Willful Failure to File Tax Return; 18 U.S.C. § 1344(1): Bank Fraud; 18 U.S.C. § 1028A(a)(1): Aggravated Identity Theft; 18 U.S.C. § 152(3): False Declaration in Bankruptcy; 18 U.S.C. § 152(2): False Testimony Under Oath in Bankruptcy; 18 U.S.C. § 2(b): Causing an Act to Be Done; 18 U.S.C. §§ 981(a)(1)(C), 982, 1028 and 28 U.S.C. § 2461(c): Criminal Forfeiture]

      The Grand Jury charges:

COUNTS ONE THROUGH TEN

[18 U.S.C. § 1343]

**A.    INTRODUCTORY ALLEGATIONS**

1.   At all relevant times:

a.   Defendant MICHAEL JOHN AVENATTI ("AVENATTI") was a resident of Orange and Los Angeles Counties, within the Central District of California.

b.   Defendant AVENATTI was an attorney licensed to practice law in the State of California.  Defendant AVENATTI provided legal services to clients in exchange for attorneys' fees.

c.   Defendant AVENATTI practiced law through Eagan Avenatti LLP ("EA LLP") and Avenatti & Associates, APC ("A&A").  EA LLP and A&A's principal offices were located in Newport Beach and Los Angeles, California.

d.   A&A was a professional corporation organized in California.  Defendant AVENATTI was A&A's Chief Executive Officer ("CEO"), Secretary, Chief Financial Officer, and sole director. Defendant AVENATTI owned 100 percent of A&A.

e.   EA LLP was a limited liability partnership organized in California.  Defendant AVENATTI was EA LLP's managing member and managing partner.  Through A&A, defendant AVENATTI owned at least 75 percent of EA LLP.

f.   Defendant AVENATTI was also the effective owner and controlled a number of other entities, including:

i.   Global Baristas US LLC ("GBUS"), which operated Tully's Coffee ("Tully's") stores in Washington and California;

ii.  Global Baristas, LLC ("GB LLC"), which wholly owned GBUS;

2

iii. GB Autosport, LLC ("GB Auto"), which managed defendant AVENATTI's car racing team; and

iv.  Passport 420, LLC ("Passport 420"), which held title to a private airplane defendant AVENATTI used.

g.  Defendant AVENATTI was a signatory on and exercised control over the following bank accounts, which were all maintained in Orange and Los Angeles Counties, within the Central District of California:

i.  California Bank & Trust ("CB&T") attorney trust account ending in x8541 in the name of "The State Bar of California, Eagan Avenatti LLP, Attorney Client Trust Fund" ("EA Trust Account 8541").

ii.  CB&T attorney trust account ending in x3714 in the name of "The State Bar of California, Eagan Avenatti LLP, Attorney Client Trust Account" ("EA Trust Account 3714").

iii. CB&T attorney trust account ending in x4613 in the name of "State Bar of California, Eagan Avenatti LLP, Attorney Client Trust Account" ("EA Trust Account 4613").

iv.  CB&T attorney trust account ending in x8671 in the name of "The State Bar of California, Eagan Avenatti LLP, Attorney Client Trust Account" ("EA Trust Account 8671").

v.  CB&T account ending in x2851 in the name of "Eagan Avenatti LLP" ("EA Account 2851").

vi.  CB&T account ending in x8461 in the name of "Eagan Avenatti LLP, Operating Account" ("EA Account 8461").

vii. CB&T account ending in x0313 in the name of "Eagan Avenatti LLP, Debtor-in-Possession Case 8:17-BK-11961-CB, General Account" ("EA DIP Account 0313").

0277
0277

1          viii.    CB&T account ending in x0661 in the name of

2    "Avenatti & Assoc. A Professional Corp." ("A&A Account 0661").

3          ix.  City National Bank ("CNB") attorney trust account

4    ending in x5566 in the name of "Michael J. Avenatti, Attorney Client

5    Trust Account" ("Avenatti Trust Account 5566").

6          x.    CNB attorney trust account ending in x4705 in the

7    name of "Michael J. Avenatti, Esq., Attorney Client Trust Account"

8    ("Avenatti Trust Account 4705").

9          xi.  CB&T account ending in x2240 in the name of

10   "Global Baristas US LLC, Operating Account" ("GBUS Operating Account

11   2240").

12         xii. CB&T account ending in x3730 in the name of

13   "Global Baristas LLC" ("GB LLC Account 3730").

14       h.   Defendant AVENATTI was a signatory on and exercised

15   control over a KeyBank account ending in x6193 in the name of "Global

16   Baristas US LLC" ("GBUS KeyBank Account 6193"), which was maintained

17   in Seattle, Washington.

18       i.   As a member of the State Bar of California, defendant

19   AVENATTI was obligated to comply with the California Rules of

20   Professional Conduct.  Defendant AVENATTI was required, among other

21   things, to promptly notify a client of the receipt of any funds the

22   client was entitled to receive, and to promptly pay or deliver to the

23   client or such payees as designated by the client any such funds that

24   defendant AVENATTI held in trust for the client upon the client's

25   request.

26       j.   Money transmitted through the Fedwire Funds Transfer

27   System (the "Fedwire system") was routed from its origin to its

28   destination through Texas and New Jersey.

                                    4

0278
0278

k.   A "Special Needs Trust" was a specialized trust that
allowed for a disabled person to maintain his or her eligibility for
public assistance benefits, despite having assets that would
otherwise make the person ineligible for those benefits.

2.   "Client 1" was an individual who resided in Los Angeles
County, within the Central District of California.  Beginning as
early as in or about 2012 and continuing until in or about March
2019, defendant AVENATTI and EA LLP had a formal attorney-client
relationship with Client 1.  Specifically, defendant AVENATTI and EA
LLP agreed to represent Client 1 in connection with a lawsuit against
the County of Los Angeles and others, alleging violations of Client
1's constitutional rights that led to severe emotional distress and
severe physical injuries, including paraplegia (the "L.A. County
Lawsuit").

3.   "Client 2" was an individual who resided in Los Angeles
County, within the Central District of California.  Beginning as
early as in or about December 2016 and continuing until in or about
March 2019, defendant AVENATTI and EA LLP had a formal attorney-
client relationship with Client 2.  Specifically, defendant AVENATTI
and EA LLP agreed to represent Client 2 in connection with potential
litigation against an individual with whom Client 2 had a personal
relationship ("Individual 1").

4.   "Client 3" was an individual who resided in Orange County,
within the Central District of California.  Beginning as early as in
or about July 2014 and continuing until in or about November 2018,
defendant AVENATTI and EA LLP had a formal attorney-client
relationship with Client 3.  Specifically, defendant AVENATTI and EA

5

1   LLP agreed to represent Client 3 in connection with an intellectual

2   property dispute against a Colorado-based company ("Company 1").

3       5.   "Client 4" and "Client 5" were both individuals who resided

4   in Los Angeles County, within the Central District of California.

5   Beginning as early as in or about August 2017 and continuing until in

6   or about August 2018, defendant AVENATTI had a formal attorney-client

7   relationship with both Client 4 and Client 5.   Specifically,

8   defendant AVENATTI agreed to represent both Client 4 and Client 5 in

9   connection with their separation and divestment from one of the

10  companies in which Client 4 and Client 5 owned shares ("Company 2").

11  **B.   THE SCHEME TO DEFRAUD**

12      6.   Beginning as early as in or about January 2015 and

13  continuing through at least in or about March 2019, in Orange and Los

14  Angeles Counties, within the Central District of California, and

15  elsewhere, defendant AVENATTI, knowingly and with intent to defraud,

16  devised, participated in, and executed a scheme to defraud victim-

17  clients to whom defendant AVENATTI had agreed to provide legal

18  services, including, but not limited to, Client 1, Client 2, Client

19  3, Client 4, and Client 5, as to material matters, and to obtain

20  money and property from such victim-clients by means of material

21  false and fraudulent pretenses, representations, and promises, and

22  the concealment of material facts that defendant AVENATTI had a duty

23  to disclose.

24  **C.   THE MANNER AND MEANS OF THE SCHEME TO DEFRAUD**

25      7.   The fraudulent scheme operated, in substance, in the

26  following manner:

27

28

a. Defendant AVENATTI would negotiate a settlement on behalf of a client that would require the payment of funds to the client.

b. Defendant AVENATTI would misrepresent, conceal, and falsely describe to the client the true terms of the settlement and/or the disposition the settlement proceeds.

c. Defendant AVENATTI would cause the settlement proceeds to be deposited in or transferred to attorney trust accounts defendant AVENATTI controlled.

d. Defendant AVENATTI would embezzle and misappropriate settlement proceeds to which he was not entitled.

e. Defendant AVENATTI would lull the client to prevent the client from discovering the embezzlement and misappropriation by, among other things, falsely denying the settlement proceeds had been paid, sending funds to the client under the false pretense that such funds were "advances" on the purportedly yet-to-be received settlement proceeds, and falsely claiming that payment of the settlement proceeds to the client had been delayed for legitimate reasons and would occur at a later time.

**Embezzlement of Client 1's Funds**

f. On or about January 21, 2015, defendant AVENATTI negotiated a settlement of the L.A. County Lawsuit on behalf of Client 1. Under the terms of the negotiated settlement agreement, the County of Los Angeles agreed to pay $4,000,000 to Client 1 in exchange for Client 1 dismissing the L.A. County Lawsuit. Client 1 was entitled to receive the $4,000,000 settlement payment, less EA LLP's attorneys' fees, costs, and expenses.

7

1    g.    In or around January 2015, defendant AVENATTI told
2  Client 1 that the County of Los Angeles had agreed to a settlement.
3  Defendant AVENATTI falsely represented to Client 1 that the
4  settlement agreement had to remain confidential, the County of Los
5  Angeles could not pay the settlement to Client 1 in one lump-sum, and
6  the settlement proceeds could not be paid until the County of Los
7  Angeles approved a Special Needs Trust for Client 1.  In truth and in
8  fact, as defendant AVENATTI then well knew, the settlement agreement
9  did not contain a confidentiality provision, the County of Los
10  Angeles had agreed to make a lump-sum $4,000,000 settlement payment
11  to Client 1, and the settlement payment from the County of Los
12  Angeles was not conditioned on the approval of a Special Needs Trust
13  for Client 1.

14    h.    On or about January 26, 2015, defendant AVENATTI
15  caused the approximately $4,000,000 settlement payment to be
16  deposited into EA Trust Account 8541 to be held in trust for Client
17  1.  Knowing that the full settlement amount had been paid by the
18  County of Los Angeles, defendant AVENATTI concealed and failed to
19  disclose to Client 1 that EA LLP had received the $4,000,000
20  settlement payment.  Further, defendant AVENATTI and EA LLP retained
21  and did not transfer Client 1's portion of the settlement payment to
22  Client 1.

23    i.    Between on or about January 26, 2015, and on or about
24  March 30, 2015, defendant AVENATTI caused approximately $3,125,000 of
25  the $4,000,000 settlement payment to be transferred from EA Trust
26  Account 8541 to EA Account 2851.  Thereafter, defendant AVENATTI
27  caused substantial portions of the settlement proceeds to be
28  transferred from EA Account 2851 to A&A Account 0661, and then

8

1  further transferred to other bank accounts defendant AVENATTI

2  controlled, including defendant AVENATTI's personal bank account and

3  bank accounts associated with GBUS and GB Auto, or used to pay

4  defendant AVENATTI's personal expenses.  By no later than July 6,

5  2015, defendant AVENATTI had drained all of the settlement proceeds

6  out of EA Trust Account 8541.  Defendant AVENATTI concealed and

7  failed to disclose to Client 1 that the entire $4,000,000 settlement

8  payment had been expended and that substantial portions of the

9  settlement proceeds had been used for defendant AVENATTI's own

10  purposes.

11            j.    In order to lull Client 1 and prevent Client 1 from

12  discovering that defendant AVENATTI had embezzled Client 1's portion

13  of the $4,000,000 settlement payment, defendant AVENATTI committed

14  and caused to be committed the following acts:

15            i.    Starting as early as in or about July 2015 and

16  continuing to in or about March 2019, defendant AVENATTI caused at

17  least 69 payments, each ranging from approximately $1,000 to

18  approximately $1,900 and together totaling at least approximately

19  $124,000, to be made to Client 1.  During this same time period,

20  defendant AVENATTI also caused payments to be made to various

21  assisted living facilities to pay for rent on Client 1's behalf.

22  Defendant AVENATTI falsely represented to Client 1 that the payments

23  made to Client 1 and to the assisted living facilities where Client 1

24  resided were "advances" on the settlement payment from the County of

25  Los Angeles, which defendant AVENATTI falsely represented had not yet

26  been received.

27            ii.   In or about 2017, after Client 1 told defendant

28  AVENATTI that Client 1 wanted to purchase his own residence,

9

0283
0283

defendant AVENATTI agreed to help Client 1 find a real estate broker and purchase a house.  Defendant AVENATTI represented and promised to Client 1 that Client 1 would be able to use the settlement proceeds to fund the purchase of a house.  After Client 1 was in escrow on the purchase of a house, however, defendant AVENATTI falsely told Client 1 that Client 1 could not purchase the house after all because the County of Los Angeles still had not approved the Special Needs Trust and therefore could not make the settlement payment to Client 1.  Client 1 was unable to close escrow and did not purchase the house.

iii. On or about November 26, 2018, defendant AVENATTI told Client 1 that defendant AVENATTI would respond on Client 1's behalf to a request that Client 1 provide the United States Social Security Administration ("SSA") information it requested to evaluate Client 1's continued eligibility for Supplemental Security Income ("SSI") benefits, including information regarding the settlement agreement with the County of Los Angeles, the purported Special Needs Trust, and the monthly payments from defendant AVENATTI.  Knowing full well that the requested information could lead to inquiries that could reveal that defendant AVENATTI had embezzled Client 1's portion of the settlement proceeds, defendant AVENATTI failed to provide the requested information to SSA, which resulted in Client 1's SSI benefits being discontinued in or about February 2019.

k.   On or about March 22, 2019, defendant AVENATTI was questioned regarding the alleged embezzlement of the Client 1 Settlement Proceeds during a public judgment-debtor examination conducted in federal court in Los Angeles, California.  Shortly thereafter, in order to lull Client 1 and prevent Client 1 from discovering that defendant AVENATTI had embezzled Client 1's portion

10

of the $4,000,000 settlement, defendant AVENATTI falsely told Client 1 that the County of Los Angeles had finally approved the Special Needs Trust for Client 1 and that Client 1 would begin receiving settlement payments from the County of Los Angeles through the Special Needs Trust.

l.   In order to further lull Client 1 and to attempt to establish a defense against any claims Client 1 could bring against defendant AVENATTI, on or about March 23, 2019, and on or about March 24, 2019, defendant AVENATTI caused Client 1 to sign a document defendant AVENATTI claimed was necessary to effectuate the settlement agreement and finalize the Special Needs Trust that defendant AVENATTI claimed was required before Client 1 could begin receiving payments due under the settlement, and a document stating that Client 1 was satisfied with defendant AVENATTI's representation of Client 1.

**Embezzlement of Client 2's Funds**

m.   On or about January 7, 2017, defendant AVENATTI negotiated a settlement on behalf of Client 2 with Individual 1. Under the terms of the settlement agreement, Individual 1 was required to make an initial payment to Client 2 of approximately $2,750,000 by on or about January 28, 2017, and an additional payment to Client 2 of approximately $250,000 on or about November 1, 2020, if certain additional specified conditions were met, for a total of approximately $3,000,000.  Client 2 was entitled to receive the initial $2,750,000 settlement payment, less EA LLP's attorneys' fees (i.e., 33 percent of the total $3,000,000 settlement amount), costs, and expenses.

n.   In order to conceal the true details of the settlement agreement from Client 2, defendant AVENATTI did not provide a copy of

11

0285
0285

the settlement agreement to Client 2.  Rather, in or about January 2017, defendant AVENATTI falsely represented to Client 2 that Individual 1 would make an initial lump-sum payment, the entirety of which would be used to pay EA LLP's attorney fees (i.e., 33 percent of the total settlement amount) and costs, and then approximately 96 monthly payments over the course of the next eight years by which the remaining settlement funds would be paid to Client 2.  In truth and in fact, as defendant AVENATTI then well knew, the actual settlement agreement required Individual 1 to make the initial $2,750,000 settlement payment, which far exceeded the money owed to EA LLP for attorneys' fees, by on or about January 28, 2017, and Individual 1 was not required to make any monthly payments to Client 2 thereafter.

o.   On or about January 25, 2017, defendant AVENATTI caused the initial $2,750,000 settlement payment from Individual 1 to be transferred to EA Trust Account 8671 to be held in trust for Client 2.  Defendant AVENATTI concealed and failed to disclose to Client 2 that EA LLP had received the initial $2,750,000 settlement payment.  Further, defendant AVENATTI and EA LLP retained and did not transfer Client 2's portion of the $2,750,000 settlement payment to Client 2.

p.   On or about January 26, 2017, defendant AVENATTI caused $2,500,000 of the $2,750,000 settlement payment to be transferred to an attorney trust account for another law firm ("Law Firm 1").  That same day, defendant AVENATTI caused Law Firm 1 to transfer the entire $2,500,000 to Honda Aircraft Company, LLC, to purchase a private airplane for defendant AVENATTI's company, Passport 420.  Defendant AVENATTI also caused the remaining $250,000 of the $2,750,000 settlement payment to be transferred first to EA

0286
0286

Account 2851 and then to A&A Account 0661.  Defendant AVENATTI concealed and failed to disclose to Client 2 that defendant AVENATTI had used the settlement proceeds in this manner.

q.   In order to lull Client 2 and prevent Client 2 from discovering that defendant AVENATTI had embezzled Client 2's portion of the initial $2,750,000 settlement payment, defendant AVENATTI committed and caused to be committed the following acts:

i.   Between on or about March 15, 2017, and on or about June 18, 2018, defendant AVENATTI caused approximately 11 payments totaling approximately $194,000 to be deposited into Client 2's bank account.  Defendant AVENATTI falsely represented to Client 2 that these payments constituted the monthly settlement payments that were purportedly due from Individual 1.  For example, on or about February 20, 2018, defendant AVENATTI caused a $16,000 cashier's check drawn on EA Account 4613 to be deposited into Client 2's bank account, which falsely identified Individual 1 as the "remitter."

ii.   Between in or about June 2018 and in or about March 2019, after defendant AVENATTI stopped making the purported monthly payments to Client 2, defendant AVENATTI falsely represented to Client 2 that Individual 1 was not complying with the settlement agreement and falsely told Client 2 that defendant AVENATTI was working on obtaining the missing monthly settlement payments purportedly due to Client 2 from Individual 1.

iii. On or about March 24, 2019, at a meeting with Client 2 at defendant AVENATTI's residence in Los Angeles, California, defendant AVENATTI falsely represented to Client 2 that Client 2 would soon be receiving a payment from Individual 1 to make

13

1  up for the purportedly missing monthly settlement payments from

2  Individual 1 for July 2018 through March 2019.

3  **Embezzlement of Client 3's Funds**

4       r.  Between on or about December 22, 2017, and on or about

5  December 28, 2017, defendant AVENATTI negotiated a settlement

6  agreement with Company 1 on behalf of Client 3.  The settlement

7  agreement required Company 1 to make an initial payment of $1,600,000

8  by January 10, 2018, and three additional payments of $100,000 by

9  January 10 of 2019, 2020, and 2021, respectively, for a total of

10  $1,900,000.  Client 3 was entitled to receive the initial $1,600,000

11  settlement payment, less EA LLP's attorneys' fees of $760,000 (i.e.,

12  40 percent of the total $1,900,000 settlement amount), costs, and

13  expenses.

14       s.  On or about December 28, 2017, at a meeting with

15  Client 3 at EA LLP's offices in Newport Beach, California, to discuss

16  the proposed settlement agreement with Company 1, defendant AVENATTI

17  provided an altered copy of the settlement agreement to Client 3 for

18  Client 3's review, which copy falsely represented the payment

19  schedule as $1,600,000 due by March 10, 2018, and $100,000 due by

20  March 10 of each of the three subsequent years.  That same day,

21  defendant AVENATTI emailed the attorney for Company 1 the signature

22  page for the actual settlement agreement, bearing Client 3's

23  signature.

24       t.  On or about December 29, 2017, defendant AVENATTI

25  received a complete copy of the fully executed settlement agreement

26  with Client 3's and Company 1's signatures from Company 1's attorney,

27  which included the payment schedule that had actually been negotiated

28  by defendant AVENATTI but had been concealed from Client 3, namely,

14

1   an initial $1,600,000 payment due by January 10, 2018, and additional

2   payments of $100,000 due by January 10 of each of the three

3   subsequent years.

4        u.   On or about January 2, 2018, defendant AVENATTI

5   emailed instructions to Company 1's attorney to wire the initial

6   $1,600,000 settlement payment to Avenatti Trust Account 5566.

7        v.   On or about January 5, 2018, as instructed by

8   defendant AVENATTI, Company 1 wired the initial $1,600,000 settlement

9   payment to Avenatti Trust Account 5566 to be held in trust for Client

10  3.  Defendant AVENATTI concealed and failed to disclose to Client 3

11  that defendant AVENATTI had received the initial $1,600,000

12  settlement payment from Company 1.  Further, defendant AVENATTI

13  retained Client 3's portion of the $1,600,000 settlement payment and

14  did not transfer Client 3's portion of the $1,600,000 settlement

15  payment to Client 3.

16       w.   Between on or about January 5, 2018, and on or about

17  March 14, 2018, defendant AVENATTI caused approximately $1,599,400 of

18  the initial $1,600,000 settlement payment to be used for his own

19  purposes, including to pay for expenses relating to GBUS.  Defendant

20  AVENATTI concealed and failed to disclose to Client 3 that defendant

21  AVENATTI used the settlement proceeds for his own purposes.

22       x.   In order to lull Client 3 and prevent Client 3 from

23  discovering that defendant AVENATTI had embezzled Client 3's portion

24  of the initial $1,600,000 settlement payment, defendant AVENATTI

25  committed and caused to be committed the following acts:

26       i.   Between on or about March 10, 2018, and in or

27  about November 2018, defendant AVENATTI falsely represented to Client

28  3 that Company 1 had not made the initial $1,600,000 settlement

15

1   payment, and that defendant AVENATTI was working on obtaining the

2   purportedly missing $1,600,000 settlement payment from Company 1.

3              ii.   Between in or about April 2018 and in or about

4   November 2018, defendant AVENATTI caused multiple payments totaling

5   approximately $130,000 to be paid to Client 3 and/or Client 3's

6   spouse, which payments defendant AVENATTI falsely claimed represented

7   "advances" on Client 3's portion of the $1,600,000 settlement payment

8   from Company 1, so that Client 3 could meet certain financial

9   obligations while Client 3 was purportedly "waiting" for his portion

10  of the $1,600,000 settlement payment from Company 1.

11                    **Embezzlement of Client 4's Funds**

12             y.   On or about September 17, 2017, defendant AVENATTI

13  negotiated a "Common Stock Repurchase Agreement" with Company 2 on

14  behalf of Client 4 and Client 5.   Under the terms of Client 4's

15  Common Stock Repurchase Agreement, Company 2 agreed to repurchase

16  from Client 4 361,565 shares of Company 2 for approximately

17  $27,478,940, and thereafter an additional 107,188 shares of Company 2

18  for approximately $8,146,288, which resulted in a total repurchase

19  amount of approximately $35,625,228.

20             z.   On or about September 18, 2017, Company 2 wired

21  approximately $27,414,668 to Avenatti Trust Account 4705.

22  Approximately $2,787,651 of this amount constituted defendant

23  AVENATTI's and/or EA LLP's attorneys' fees (i.e., 7.5 percent of the

24  total $35,625,228 repurchase amount), costs, and expenses.   Between

25  on or about September 21, 2017, and on or about October 3, 2017,

26  defendant AVENATTI caused the remainder of the initial $27,414,668

27  payment to be transferred to bank accounts associated with Client 4.

28

aa.   On or about March 13, 2018, after Company 2 informed Client 4 and Client 5 that Company 2 was ready to repurchase the remaining 107,188 shares of Company 2 from Client 4 as contemplated in the Common Stock Purchase Agreement, defendant AVENATTI told Client 5 that Company 2 should wire the remaining $8,146,288 payment due to Client 4 to Avenatti Trust Account 4705, and that defendant AVENATTI would then wire the $8,146,288 payment from Avenatti Trust Account 4705 to Client 4.

bb.   On or about March 14, 2018, following defendant AVENATTI's instructions, Company 2 transferred approximately $8,146,288 to Avenatti Trust Account 4705 to be held in trust for Client 4.   Defendant AVENATTI retained and did not transfer the $8,146,288 payment to Client 4 as defendant AVENATTI had promised to do.

cc.   Between on or about March 15, 2018, and on or about May 4, 2018, defendant AVENATTI caused approximately $4,000,000 out of the $8,146,288 payment from Company 2 due to Client 4 to be used for defendant AVENATTI's own purposes, including the following:

i.   On or about March 15, 2018, defendant AVENATTI caused approximately $3,000,000 of Client 4's funds to be transferred to EA Trust Account 4613.   Later that same day, defendant AVENATTI then caused approximately $2,828,423 to be transferred from EA Trust Account 4613 to an attorney trust account for SulmeyerKupetz, a law firm representing A&A and defendant AVENATTI in bankruptcy proceedings involving EA LLP, so that SulmeyerKupetz could use the money to pay some of EA LLP's creditors in the bankruptcy proceedings, including the Internal Revenue Service.

ii.   Between on or about March 20, 2018, and on or about May 1, 2018, defendant AVENATTI caused a total of approximately $780,000 of Client 4's funds to be paid to EA Trust Account 4613, which defendant AVENATTI then used for his own purposes, including transferring the funds to bank accounts associated with defendant AVENATTI's other companies, namely, GBUS, GB LLC, A&A, and Passport 420.

iii. Between on or about March 20, 2018, and May 1, 2018, defendant AVENATTI caused a total of approximately $260,000 of Client 4's funds to be paid to EA DIP Account 0313.

iv.   In order to lull Client 1 and prevent Client 1 from discovering that defendant AVENATTI had embezzled Client 1's portion of the $4,000,000 settlement payment from the County of Los Angeles, on or about April 9, 2018, defendant AVENATTI used Client 4's funds, which had been transferred from Avenatti Trust Account 4705 to EA DIP Account 0313 and then to EA Trust Account 4613, to make an approximately $1,900 payment to Client 1.

v.   In order to lull Client 2 and prevent Client 2 from discovering that defendant AVENATTI had embezzled Client 2's portion of the $2,750,000 settlement payment from Individual 1, on or about April 17, 2018, defendant AVENATTI used Client 4's funds, which had been transferred from Avenatti Trust Account 4705 to EA Trust Account 4613, to make an approximately $34,000 payment to Client 2.

dd.   Between on or about March 14, 2018, and on or about May 3, 2018, defendant AVENATTI failed to disclose to Client 4 and Client 5 that defendant AVENATTI had used approximately $4,000,000 of Client 4's funds for defendant AVENATTI's own purposes.

18

0292
0292

ee.   In order to lull Client 4 and Client 5 and prevent them from discovering that defendant AVENATTI had embezzled approximately $4,000,000 from the approximately $8,146,288 payment defendant AVENATTI received from Company 2, between on or about March 14, 2018, and on or about May 3, 2018, defendant AVENATTI falsely represented and promised Client 4 and Client 5 that defendant AVENATTI would transfer Client 4's funds to Client 4 at a later date, and that defendant AVENATTI needed to go to the bank to fill out paperwork to effectuate the wire transfers.  In truth and in fact, as defendant AVENATTI then well knew, he had already caused approximately $4,000,000 of Client 4's funds to be transferred or paid to other bank accounts defendant AVENATTI controlled, and then used for defendant AVENATTI's own purposes.

ff.   In order to lull Client 4 and Client 5 and prevent them from discovering that he had embezzled approximately $4,000,000 of Client 4's funds, on or about May 4, 2018, defendant AVENATTI caused two wire transfers in the amounts of $4,000,000 and $146,288 to be sent from Avenatti Trust Account 4705 to a bank account associated with Client 4.  Defendant AVENATTI retained and failed to transfer to Client 4 the remainder of the $8,146,288 payment that Company 2 had transferred on or about March 14, 2018, to Avenatti Trust Account 4705 for the benefit of Client 4.

gg.   Between on or about May 4, 2018, and on or about June 4, 2018, defendant AVENATTI and another attorney with whom defendant AVENATTI worked ("Attorney 1") falsely represented to Client 4 and Client 5 that the entire $8,146,288 payment from Company 2 had been transferred to Client 4 in three separate wire transfers. For example, in response to a request from Client 5 that defendant

19

0293
0293

AVENATTI provide the wire transfer information for the remaining $4,000,000 of Client 4's funds, on or about May 11, 2018, defendant AVENATTI emailed Attorney 1 a wire transfer confirmation document purporting to reflect a second $4,000,000 wire transfer to Client 4. In truth and in fact, as defendant AVENATTI then well knew, defendant AVENATTI had never transferred the remaining $4,000,000 to Client 4, defendant AVENATTI had already used the remaining $4,000,000 for his own purposes, and the wire transfer confirmation document that defendant AVENATTI provided on or about May 11, 2018, related to the first $4,000,000 wire transfer from Avenatti Trust Account 4705 that Client 4 had already received on May 4, 2018.

**D.   THE USE OF THE WIRES**

8.   On or about the following dates, within the Central District of California, and elsewhere, defendant AVENATTI, for the purpose of executing the above-described scheme to defraud, transmitted and caused to be transmitted by means of wire and radio communications in interstate commerce the following items:

| COUNT | DATE | ITEM WIRED |
|-------|------|-----------|
| ONE | 1/30/2015 | Wire transfer of approximately $250,000 sent from A&A Account 0661 through the Fedwire system to GBUS's Homestreet bank account in Seattle, Washington. |
| TWO | 2/10/2015 | Wire transfer of approximately $50,000 from A&A Account 0661 through the Fedwire system to defendant AVENATTI's personal Bank of America bank account. |
| THREE | 1/26/2017 | Wire transfer of approximately $2,500,000 from EA Trust Account 8671 through the Fedwire system to Law Firm 1's JP Morgan Chase Bank, N.A. ("Chase") IOLTA trust account. |

0294
0294

| COUNT | DATE | ITEM WIRED |
|-------|------|-----------|
| FOUR | 1/5/2018 | Wire transfer of approximately $1,600,000 sent from Company 1's Silicon Valley Bank account through the Fedwire system to Avenatti Trust Account 5566. |
| FIVE | 1/10/2018 | Wire transfer of approximately $60,000 sent from Avenatti CNB Trust Account 5566 through the Fedwire system to EA Trust Account 3714. |
| SIX | 3/15/2018 | Wire transfer of approximately $3,000,000 from Avenatti Trust Account 4705 through the Fedwire system to EA CB&T Trust Account 4613. |
| SEVEN | 3/15/2018 | Wire transfer of approximately $2,828,423 from EA CB&T Trust Account 4613 through the Fedwire system to an attorney trust account for SulmeyerKupetz at CNB. |
| EIGHT | 3/20/2018 | Wire transfer of approximately $200,000 from Avenatti CNB Trust Account 4705 through the Fedwire system to EA Trust Account 4613. |
| NINE | 6/18/2018 | Wire transfer of approximately $16,000 from EA Trust Account 4613 through the Fedwire system to Client 2's Chase bank account. |
| TEN | 7/13/2018 | Wire transfer of approximately $1,900 from EA Trust Account 4613 through the Fedwire system to Client 1's Bank of America bank account. |

21

0295
0295

COUNTS ELEVEN THROUGH EIGHTEEN

[26 U.S.C. § 7202; 18 U.S.C. § 2(b)]

**A.   INTRODUCTORY ALLEGATIONS**

**Background**

9.   The Grand Jury re-alleges and incorporates by reference paragraph 1 through 7 of this Indictment as though fully set forth herein.

10.   At all relevant times:

a.   GBUS was a limited liability company organized in Washington, which operated Tully's stores in Washington and California.  Until in or around November 2017, GBUS's corporate office was in Seattle, Washington.

b.   GB LLC was a limited liability company organized in Washington.  Defendant MICHAEL JOHN AVENATTI ("AVENATTI") was the sole managing member of GB LLC.

c.   GB Auto was a limited liability company organized in Washington.  Defendant AVENATTI was the sole manager of GB Auto.

d.   Doppio, Inc. ("Doppio") was a for-profit corporation incorporated in Washington.  Defendant AVENATTI was the sole governor of Doppio.

e.   Defendant AVENATTI was the effective owner of GBUS. In or around June 2013, defendant AVENATTI's company GB LLC acquired TC Global Inc., which previously operated Tully's, at a bankruptcy auction for approximately $9.15 million, namely, $6.95 million in cash and $2.2 million in assumed liabilities.  On or about June 25, 2013, defendant AVENATTI caused a wire transfer in the amount of $7,000,000 from EA Trust Account 8541 to a bank account for Foster Pepper PLLC, the law firm representing GB LLC in Tully's bankruptcy

22

auction.  A&A owned 100 percent of Doppio, which in turn owned at least 80 percent of GB LLC.  GB LLC wholly owned GBUS, which handled the day-to-day business operations of Tully's.

f.    Defendant AVENATTI served as GBUS's CEO, for which he was paid a yearly salary of approximately $250,000.  As GBUS's CEO, defendant AVENATTI exercised control over every aspect of GBUS's business affairs, including approving payments GBUS made and controlling GBUS's bank accounts.  Defendant AVENATTI managed and exercised control over GBUS's business affairs from Orange and Los Angeles Counties, within the Central District of California, and elsewhere.

g.    The Internal Revenue Service ("IRS") was an agency of the United States within the Department of Treasury of the United States and was responsible for enforcing and administering the tax laws of the United States.

11.   Beginning in or about February 2015 and continuing until at least in or about July 2018, GBUS maintained multiple bank accounts at CB&T in Orange County, California, including GBUS's payroll account ending in x2976 ("GBUS Payroll Account 2976") and GBUS Operating Account 2240.  Defendant AVENATTI and an EA LLP employee ("EA Employee 1") were the only signatories on GBUS Payroll Account 2976 and GBUS Operating Account 2240.

12.   In addition to defendant AVENATTI's yearly salary as GBUS's CEO, between as early as in or about September 2015 and continuing until at least in or about December 2017, defendant AVENATTI caused GBUS to make substantial payments for defendant AVENATTI's personal benefit and the benefit of other entities defendant AVENATTI

23

1  controlled, while, at the same time, failing to pay over to the IRS

2  payroll taxes withheld from GBUS employees' paychecks.  For example:

3          a.   Between on or about September 1, 2015, and on or about

4  December 31, 2017, defendant AVENATTI caused a net of approximately

5  $2.5 million to be transferred from GBUS's and GB LLC's bank accounts

6  to bank accounts associated with A&A and EA LLP.

7          b.   On or about March 30, 2016, defendant AVENATTI caused

8  GBUS to transfer $200,000 to the G.P. Family Trust as payment for two

9  months of rent for defendant AVENATTI's residence in Newport Beach,

10 California.

11         c.   In order to lull Client 1 and prevent Client 1 from

12 discovering that defendant AVENATTI had embezzled Client 1's portion

13 of the $4,000,000 settlement payment from the County of Los Angeles,

14 on or about April 7, 2016, defendant AVENATTI used GBUS funds, which

15 had been transferred from GBUS Account 2240 to EA Account 2851, to

16 make an approximately $1,900 payment to Client 1.

17         d.   In order to lull Client 2 and prevent Client 2 from

18 discovering that defendant AVENATTI had embezzled Client 2's portion

19 of the initial $2,750,000 settlement payment from Individual 1,

20 defendant AVENATTI caused GBUS funds to be used to make payments to

21 Client 2, including the following:

22              i.   On or about April 14, 2017, defendant AVENATTI

23 used GBUS funds, which had been transferred from GBUS Account 2240 to

24 A&A Account 0661, to make an approximately $16,000 payment to Client

25 2.

26              ii.  On or about May 15, 2017, defendant AVENATTI used

27 GBUS funds, which had been transferred from GBUS Account 2240 to A&A

28 Account 0661, to make an approximately $16,000 payment to Client 2.

24

**Federal Payroll Taxes**

13. At all relevant times:

    a. Title 26 of the United States Code imposed four types of tax with respect to wages paid to employees: (1) income tax; (2) Social Security tax; (3) Medicare tax; and (4) federal unemployment tax (collectively, "payroll taxes").

    b. Federal income tax was imposed upon employees based upon the amount of wages they received.

    c. Social Security tax and Medicare tax were imposed by the Federal Insurance Contributions Act (collectively referred to as "FICA taxes"). FICA taxes were imposed separately on employees and on employers.

    d. Federal unemployment tax was imposed under the Federal Unemployment Tax Act ("FUTA"). FUTA taxes were imposed solely on employers.

**GBUS's Obligation to Collect, Truthfully Account For, and Pay Over to the IRS Federal Payroll Taxes**

14. At all relevant times:

    a. GBUS was required to withhold employee income taxes and FICA taxes from the wages paid to its employees, and to pay over the withheld amounts to the IRS. The employee income taxes and FICA taxes that GBUS was required to withhold and pay over to the IRS were commonly referred to as "trust fund taxes" because of the provision in the Internal Revenue Code requiring that such taxes "shall be held to be a special fund in trust for the United States."

    b. GBUS was required to make deposits of payroll taxes, including trust fund taxes, to the IRS on a periodic basis. In addition, GBUS was required to file, following the end of each

calendar quarter, an Employer's Quarterly Federal Tax Return (Form 941), setting forth for the quarter the total amount of wages and other compensation subject to withholding paid by GBUS, the total amount of income tax withheld, the amount of Social Security and Medicare taxes (i.e., FICA taxes) due, and the total federal tax deposits.

c.   Defendant AVENATTI was a "responsible person" for GBUS, that is, defendant AVENATTI had the corporate responsibility to collect, truthfully account for, and pay over to the IRS GBUS's payroll taxes.

15.   Beginning in or about June 2013 and continuing until at least in or about October 2017, GBUS withheld tax payments from its employees' paychecks, including federal income taxes and FICA taxes.

16.   Beginning in or about September 2015 and continuing until at least in or about October 2017, GBUS failed to pay over to the IRS payroll taxes due and owing, including federal income taxes and FICA taxes GBUS withheld from its employees' paychecks.  In total, between in or around September 2015 and in or around October 2017, GBUS failed to pay over to the IRS at least approximately $3,207,144 in federal payroll taxes, including at least approximately $2,390,048 in trust fund taxes that GBUS withheld from its employees' paychecks.

17.   Beginning in or about January 2016 and continuing until at least in or about October 2017, GBUS failed to timely file its quarterly employment tax returns (Forms 941) with the IRS for the fourth quarter of 2015 through the third quarter of 2017, inclusive.

**B.   FAILURE TO ACCOUNT FOR AND PAY OVER PAYROLL TAXES**

18.   Beginning in or about October 2015 and continuing until at least on or about October 31, 2017, in Orange County, within the

26

Central District of California, and elsewhere, defendant AVENATTI, a responsible person of GBUS, willfully failed and willfully caused GBUS to fail to pay over to the United States, namely, the IRS, all of the federal income taxes and FICA taxes (i.e., trust fund taxes) that GBUS withheld from GBUS employees' total taxable wages, which were due and owing to the United States by the dates set forth below and in the amounts set forth below, for each of the following calendar year quarters:

| COUNT | QUARTER AND YEAR | QUARTERLY DUE DATE | APPROXIMATE TRUST FUND TAXES DUE AND OWING |
|---|---|---|---|
| ELEVEN | Fourth Quarter of 2015 | 1/31/2016 | $292,724 |
| TWELVE | First Quarter of 2016 | 4/30/2016 | $382,100 |
| THIRTEEN | Second Quarter of 2016 | 7/31/2016 | $297,791 |
| FOURTEEN | Third Quarter of 2016 | 10/31/2016 | $333,969 |
| FIFTEEN | Fourth Quarter of 2016 | 1/31/2017 | $277,681 |
| SIXTEEN | First Quarter of 2017 | 4/30/2017 | $309,702 |
| SEVENTEEN | Second Quarter of 2017 | 7/31/2017 | $345,094 |
| EIGHTEEN | Third Quarter of 2017 | 10/31/2017 | $150,989 |

0301
0301

COUNT NINETEEN

[26 U.S.C. § 7212(a)]

**A.     INTRODUCTORY ALLEGATIONS**

19.   The Grand Jury re-alleges and incorporates by reference paragraphs 1 through 7 and 10 through 17 of this Indictment as though fully set forth herein.

20.   In or about September 2016, the IRS initiated a collection action relating to GBUS's failure to file its quarterly employment tax returns (Forms 941) and pay over to the IRS payroll taxes that were due and owing, including federal income taxes and FICA taxes that GBUS had withheld (collectively, "trust fund taxes") from GBUS employees' paychecks.

21.   On or about October 7, 2016, an IRS Revenue Officer ("IRS RO-1") spoke with defendant MICHAEL JOHN AVENATTI ("AVENATTI") and other GBUS employees regarding the IRS's collection action and advised them that since approximately September 2015 GBUS had not paid over to the IRS any federal payroll taxes.

22.   On or about June 26, 2017, IRS RO-1 filed a notice of federal tax lien against GBUS in King County in the State of Washington.  The federal tax lien indicated that GBUS owed the IRS approximately $4,998,227 in unpaid federal payroll taxes.  A copy of the federal tax lien notice was also mailed to GBUS.

23.   Between in or about August 2017 and in or about January 2018, IRS RO-1 issued levy notices to a number of financial institutions and companies associated with GBUS.  The levy notices indicated that GBUS owed the IRS as much as approximately $5,210,769. Each levy notice required the recipient of the levy notice to turn over to the United States Treasury GBUS's property and rights to

28

property, such as money, credits, and bank deposits, that the recipient of the levy had or was already obligated to pay to GBUS. Banks, savings and loans, and credit unions were obligated to hold any funds subject to the levy notices for 21 days before sending payment to the United States Treasury.  Copies of the levy notices issued by IRS RO-1 were mailed to GBUS.

24.  Beginning as early as in or about August 2017, defendant AVENATTI knew that the IRS had issued levies to certain financial institutions at which GBUS maintained bank accounts.

**B.   THE ATTEMPT TO OBSTRUCT AND IMPEDE THE ADMINISTRATION OF THE INTERNAL REVENUE LAWS**

25.  Beginning on or about October 7, 2016, and continuing until at least in or around September 2018, in Orange and Los Angeles Counties, within the Central District of California, and elsewhere, defendant AVENATTI corruptly obstructed and impeded, and corruptly endeavored to obstruct and impede, the due administration of the internal revenue laws of the United States.

26.  The attempt to obstruct and impede the due administration of the internal revenue laws of the United States operated, in substance, in the following manner:

a.   On or about October 7, 2016, defendant AVENATTI made false statements to IRS RO-1 in connection with the IRS's collection action, including that:  (i) defendant AVENATTI was not personally involved in GBUS's finances; and (ii) defendant AVENATTI was unaware that since approximately September 2015 GBUS had failed to pay over to the IRS any federal payroll taxes.  In truth and in fact, as defendant AVENATTI then well knew, (i) defendant AVENATTI was personally involved in GBUS's finances in that he had authority to

29

0303
0303

approve payments on behalf of GBUS and had control over GBUS's bank accounts; and (ii) defendant AVENATTI was aware that since approximately September 2015 GBUS had failed to pay over to the IRS any federal payroll taxes because, among other reasons, on or about November 5, 2015, GBUS's controller had sent defendant AVENATTI an email explaining to defendant AVENATTI the "implications" of GBUS not paying to the IRS its payroll taxes in a timely manner, and, between in or about September 2015 and in or about October 2016, defendant AVENATTI had refused to authorize GBUS to pay over to the IRS the federal payroll taxes that GBUS had withheld from its employees' paychecks.

b.   In order to further obstruct and impede the IRS's collection action and the IRS's efforts to collect the payroll taxes that GBUS owed to the IRS, defendant AVENATTI directed GBUS employees to stop depositing cash receipts from the Tully's stores into GBUS KeyBank Account 6193, which defendant AVENATTI knew was already subject to IRS levy notices, and instructed GBUS employees to instead deposit all cash receipts from Tully's stores into a little-used Bank of America account for a separate entity defendant AVENATTI controlled, GB Auto.  Defendant AVENATTI did so by, among other acts, the following:

i.   In or about September 2017, defendant AVENATTI directed and instructed a GBUS employee ("GBUS Employee 1") to tell the Tully's stores that the stores could no longer make cash deposits into GBUS KeyBank Account 6193 and should hold all of the stores' cash deposits.

ii.   On or about September 7, 2017, defendant AVENATTI sent GBUS Employee 1 a text message containing the bank

30

account information for the GB Auto account at Bank of America (the "GB Auto Account"), in order to cause the cash deposits from the Tully's stores to be made into the GB Auto Account.

        iii. On or about September 18, 2017, after receiving a text message from GBUS Employee 1 asking if the Tully's stores were able to deposit at KeyBank yet, defendant AVENATTI responded via text message "Not yet but hopefully in next two days.  Can you collect deposits tmrw and deposit pls?"

        iv.  On or about September 28, 2017, defendant AVENATTI sent a text message to GBUS Employee 1 and another GBUS employee ("GBUS Employee 2"), asking, "When are we depositing again?" and, later that same day, another text message, stating, "It is important that these deposits be made regularly.  Thanks."

        v.  Between on or about September 7, 2017, and in or about December 2017, GBUS Employee 1, acting at defendant AVENATTI's direction, made approximately 27 cash deposits totaling approximately $859,784 into the GB Auto Account.  After approximately 24 of the cash deposits, GBUS Employee 1 sent defendant AVENATTI a text message attaching a photograph of the deposit slip.

        c.   In order to further obstruct and impede the IRS's collection action and the IRS's efforts to collect the payroll taxes that GBUS owed to the IRS, defendant AVENATTI caused GBUS's credit card processing company, TSYS Merchant Solutions ("TSYS"), to change the company name, Employer Identification Number ("EIN"), and bank account information associated with GBUS's merchant credit card processing accounts ("merchant accounts"), which defendant AVENATTI knew were already subject to IRS levy notices.  Defendant AVENATTI did so by, among other acts, the following:

0305
0305

i.   On or about September 28, 2017, defendant AVENATTI received an email from GBUS Employee 2, which stated, among other things, "9.25.17 tsys – $22,135.19 IRS levy."

ii.   On or about September 29, 2017, defendant AVENATTI received an email from GBUS Employee 2 titled "Levies," which stated that "IRS took as [sic] additional $23,763.02 from tsys yesterday."

iii. On or about September 29, 2017, defendant AVENATTI directed a TSYS representative ("TSYS Rep. 1") to change the company name associated with the merchant accounts from "Global Baristas US LLC" to "Global Baristas, LLC" and to change the EIN from GBUS's EIN to GB LLC's EIN.

iv.   On or about October 2, 2017, defendant AVENATTI sent TSYS Rep. 1 an email regarding changes to the merchant accounts and said "we need this done ASAP."

v.   On or about October 3, 2017, defendant AVENATTI entered into a new Merchant Transaction Processing Agreement with TSYS on behalf of GB LLC.

vi.   On or about October 3, 2017, defendant AVENATTI and EA Employee 1 opened a new bank account, GB LLC Account 3730, for GB LLC at CB&T in Orange County, California.  Later that day, EA LLP Employee 1 emailed TSYS Rep. 1 the bank account and routing number for GB CB&T Account 3730, which was to be the new bank account into which the proceeds of the credit card transactions were to be deposited.

d.   In order to further obstruct and impede the IRS's collection action and the IRS's efforts to collect the payroll taxes that GBUS owed to the IRS, in or about December 2017, after TSYS

32

closed GBUS and GB LLC's merchant accounts, defendant AVENATTI caused

GBUS to open new merchant accounts with Chase for the Tully's stores

under the name GB LLC and directed Chase to deposit all credit card

receipts in to GB LLC Account 3730.

      e.   In order to further obstruct and impede the IRS's

efforts to collect the payroll taxes that GBUS owed to the IRS,

defendant AVENATTI changed the name of the contracting party on

various contracts with The Boeing Company ("Boeing"), which had

agreed to allow GBUS to operate Tully's stores at Boeing facilities

in Washington.  Defendant AVENATTI did so by, among other acts, the

following:

      i.   In or about November 2016, approximately one

month after defendant AVENATTI learned of the IRS's collection

action, defendant AVENATTI caused the contracting party's name on a

contract with Boeing to be changed from "Global Baristas US LLC" to

"GB Hospitality LLC," even though, as defendant AVENATTI then well

knew, GBUS operated the Tully's stores at the Boeing facilities and

"GB Hospitality LLC" had never been registered with any government

agency and had never operated.

      ii.   In or about September 2017 and in or about

October 2017, after IRS RO-1 had issued levy notices to Boeing and

numerous financial institutions at which GBUS maintained accounts,

defendant AVENATTI, having agreed on behalf of GBUS to sell Boeing

two Tully's coffee kiosks and other Tully's equipment in exchange for

a payment from Boeing of approximately $155,010 and forgiveness of

certain debts, directed a Boeing attorney to change the seller's name

from "GB Hospitality, LLC" to "Global Baristas, LLC" on the two bills

of sales relating to the transaction.  Defendant AVENATTI further

instructed Boeing to transfer the approximately $155,010 payment to EA Trust Account 8671, rather than to GBUS's bank account.  Defendant AVENATTI then transferred the approximately $155,010 payment from EA Trust Account 8671 to A&A Account 0661, from which defendant AVENATTI used a substantial portion of the proceeds of the sale for defendant AVENATTI's personal purposes, including to: (1) transfer approximately $15,000 to a personal bank account; (2) pay approximately $13,073 for rent at defendant AVENATTI's residential apartment in Los Angeles, California; and (3) pay approximately $8,459 that defendant AVENATTI owed to Neiman Marcus.

   f. After learning of the IRS's collection action, defendant AVENATTI used GBUS funds that should and could have been used to pay over to the IRS federal incomes taxes and FICA taxes that had been withheld from GBUS employees' paychecks for his own personal benefit and the benefit of other entities defendant AVENATTI controlled, including, but not limited to, the following:

   i. Between in or about October 2016 and in or about December 2017, defendant AVENATTI caused a net of approximately $1.6 million to be transferred from GBUS's and GB LLC's bank accounts to bank accounts associated with defendant AVENATTI's other companies, namely, A&A and EA LLP.

   ii. In order to lull Client 1 and prevent Client 1 from discovering that defendant AVENATTI had embezzled Client 1's portion of the $4,000,000 settlement payment from the County of Los Angeles, defendant AVENATTI used GBUS funds, including credit card receipts from Tully's stores that Chase deposited into GB LLC Account 3730, to make the following additional payments to Client 1:

(I)   On or about January 19, 2018, defendant AVENATTI used GBUS funds, which had been transferred from GB LLC Account 3730 and/or KeyBank Account 6193 to EA Trust Account 3714, to make an approximately $1,900 payment to Client 1.

(II) On or about February 15, 2018, defendant AVENATTI used GBUS funds, which had been transferred from GB LLC Account 3730 and/or GBUS KeyBank Account 6193 to EA Trust Account 4613, to make an approximately $1,900 payment to Client 1.

iii. In order to lull Client 2 and prevent Client 2 from discovering that defendant AVENATTI had embezzled Client 2's portion of the initial $2,750,000 settlement payment from Individual 1, defendant AVENATTI used GBUS funds, including credit card receipts from Tully's stores that Chase deposited into GB LLC Account 3730, to make the following additional payments to Client 2:

(I)   On or about January 16, 2018, defendant AVENATTI used GBUS funds, which had been transferred from GB LLC Account 3730 and/or GBUS KeyBank Account 6193 to EA Trust Account 3714, to make an approximately $16,000 payment to Client 2.

(II) On or about February 20, 2018, defendant AVENATTI used GBUS funds, which had been transferred from GB LLC Account 3730 and/or GBUS KeyBank Account 6193 to EA Trust Account 4613, to make an approximately $16,000 payment to Client 2.

35

COUNTS TWENTY THROUGH TWENTY-THREE

[26 U.S.C. § 7203]

**A.    INTRODUCTORY ALLEGATIONS**

27.   The Grand Jury re-alleges and incorporates by reference paragraphs 1 through 7, 10 through 17, 20 through 24, and 26 of this Indictment as though fully set forth herein.

28.   On or about October 15, 2010, defendant MICHAEL JOHN AVENATTI ("AVENATTI") filed his U.S. Individual Income Tax Return (Form 1040) for the 2009 calendar year, which claimed defendant AVENATTI had total income of $1,939,942 and that defendant AVENATTI owed the IRS approximately $569,630 in taxes for the 2009 calendar year.  Defendant AVENATTI, however, did not pay the remaining tax due for the 2009 calendar year until November 2015, when he sold his residence in Laguna Beach, California, upon which there was an IRS tax lien.

29.   On or about October 11, 2011, defendant AVENATTI filed his U.S. Individual Income Tax Return (Form 1040) for the 2010 calendar year, which claimed defendant AVENATTI had total income of $1,154,800 and that defendant AVENATTI owed the IRS approximately $281,786 in taxes for the 2010 calendar year.  Defendant AVENATTI, however, did not pay the remaining taxes due to the IRS for the 2010 calendar year until November 2015, when he sold his residence in Laguna Beach, California, upon which there was an IRS tax lien.

30.   The 2010 Form 1040 was the last U.S. Individual Income Tax Return defendant AVENATTI filed with the IRS.

**B.    THE WILLFUL FAILURES TO FILE TAX RETURNS**

31.   During the calendar years set forth below, defendant AVENATTI, who resided in Orange and Los Angeles Counties, within the

36

Central District of California, had and received gross income in excess of the amounts ("threshold gross income amounts") set forth below.  By reason of such gross income, defendant AVENATTI was required by law, following the close of each of the calendar years set forth below and on or before the dates set forth below ("due dates"), to make an income tax return to the IRS Center, at Fresno, California, to a person assigned to receive returns at the local office of the IRS in the Central District of California, or to another IRS officer permitted by the Commissioner of the Internal Revenue, stating specifically the items of his gross income and any deductions and credits to which he was entitled.  Well knowing and believing all of the foregoing, defendant AVENATTI willfully failed, on or about the due dates set forth below, in the Central District of California and elsewhere, to make an income tax return.

| COUNT | CALENDAR YEAR | THRESHHOLD GROSS INCOME AMOUNT | DUE DATE |
|-------|---------------|-------------------------------|----------|
| TWENTY | 2014 | $20,300 | October 15, 2015, pursuant to a request for an automatic extension of time filed on defendant AVENATTI's behalf |
| TWENTY-ONE | 2015 | $20,600 | October 17, 2016, pursuant to a request for an automatic extension of time filed on defendant AVENATTI's behalf |
| TWENTY-TWO | 2016 | $20,700 | April 15, 2017 |
| TWENTY-THREE | 2017 | $20,800 | April 16, 2018 |

0311
0311

COUNTS TWENTY-FOUR THROUGH TWENTY-SIX

[26 U.S.C. § 7203]

**A.    INTRODUCTORY ALLEGATIONS**

32.   The Grand Jury re-alleges and incorporates by reference paragraphs 1 through 7, 10 through 17, 20 through 24, 26, and 28 through 30 of this Indictment as though fully set forth herein.

33.   On or about March 17, 2014, EA LLP filed its 2011 U.S. Return of Partnership Income federal tax return (Form 1065), and defendant MICHAEL JOHN AVENATTI ("AVENATTI") signed the return on or about March 12, 2014, as the general partner or member manager.  The return listed A&A as the designated Tax Matters Partner ("TMP") before the IRS, and defendant AVENATTI as the TMP representative.

34.   On or about October 8, 2014, EA LLP filed its 2012 U.S. Return of Partnership Income federal tax return (Form 1065), and defendant AVENATTI signed the return on or about October 1, 2014, as the general partner or member manager.  The return listed A&A as the designated TMP before the IRS.

35.   The 2012 Form 1065 for EA LLP was the last U.S. Return of Partnership Income for EA LLP filed with the IRS.

**B.    THE WILLFUL FAILURES TO FILE TAX RETURNS**

36.   During the calendar years set forth below, defendant AVENATTI conducted a business as a partnership under the name of EA LLP, with its principal place of business in Orange County, within the Central District of California.  Defendant AVENATTI therefore was required by law, following the close of each of the calendar years set forth below and on or before the dates set forth below ("due dates"), to make, for and on behalf of the partnership, a partnership return of income to the IRS Center, at Ogden, Utah, to a person

38

assigned to receive returns at the local office of the IRS in the

Central District of California, or to another IRS officer permitted

by the Commissioner of the Internal Revenue, stating specifically the

items of the partnership's gross income and the deductions and

credits allowed by law.  Well knowing and believing all of the

foregoing, defendant AVENATTI willfully failed, on or about the due

dates set forth below, in the Central District of California and

elsewhere, to make a partnership return.

| COUNT | CALENDAR YEAR | DUE DATE |
|---|---|---|
| TWENTY-FOUR | 2015 | September 15, 2016, pursuant to a request for an automatic extension of time filed on EA LLP's behalf. |
| TWENTY-FIVE | 2016 | September 15, 2017, pursuant to a request for an automatic extension of time filed on EA LLP's behalf. |
| TWENTY-SIX | 2017 | March 15, 2018. |

0313
0313

COUNTS TWENTY-SEVEN THROUGH TWENTY-NINE

[26 U.S.C. § 7203]

**A.    INTRODUCTORY ALLEGATIONS**

37.   The Grand Jury re-alleges and incorporates by reference paragraphs 1 through 7, 10 through 17, 20 through 24, 26, 28 through 30, and 33 through 35 of this Indictment as though fully set forth herein.

38.   On or about September 15, 2010, defendant MICHAEL JOHN AVENATTI ("AVENATTI") filed a 2009 U.S. Income Tax Return for an S Corporation (Form 1120S) for A&A, which claimed A&A had total income of $3,391,224 and ordinary business income of $1,578,558 for the 2009 calendar year.   The return listed defendant AVENATTI as the President of A&A.

39.   On or about September 30, 2011, defendant AVENATTI filed a 2010 U.S. Income Tax Return for an S Corporation (Form 1120S) for A&A, which claimed A&A had total income of $1,421,028 and ordinary business income of $821,634 for the 2010 calendar year.   The return listed defendant AVENATTI as the President of A&A.

40.   The 2010 Form 1120S for A&A was the last U.S. Income Tax Return for an S Corporation (Form 1120S) that defendant AVENATTI filed for A&A with the IRS.

**B.    THE WILLFUL FAILURE TO FILE TAX RETURN**

41.   During the calendar years set forth below, defendant AVENATTI was the President and CEO of A&A, with its principal place of business in Orange County, within the Central District of California.   Defendant AVENATTI therefore was required by law, following the close of each of the calendar years set forth below and on or before the dates set forth below ("due dates"), to make an

40

0314
0314

income tax return, for and on behalf of the corporation, to the IRS Center, at Ogden, Utah, to a person assigned to receive returns at the local office of the IRS in the Central District of California, or to another IRS officer permitted by the Commissioner of the Internal Revenue, stating specifically the items of the corporation's gross income and the deductions and credits allowed by law.  Well knowing and believing all of the foregoing, defendant AVENATTI willfully failed, on or about the due dates set forth below, in the Central District of California and elsewhere, to make an income tax return at the time required by law.

| COUNT | CALENDAR YEAR | DUE DATE |
|---|---|---|
| TWENTY-SEVEN | 2015 | September 15, 2016, pursuant to a request for an automatic extension of time filed on A&A's behalf. |
| TWENTY-EIGHT | 2016 | September 15, 2017, pursuant to a request for an automatic extension of time filed on A&A's behalf. |
| TWENTY-NINE | 2017 | March 15, 2018. |

41

COUNTS THIRTY AND THIRTY-ONE

[18 U.S.C. §§ 1344(1), 2(b)]

**A.   INTRODUCTORY ALLEGATIONS**

42.   The Grand Jury re-alleges and incorporates by reference paragraphs 1, 10, 28 through 30, 33 through 35, and 38 through 40 of this Indictment as though fully set forth herein.

43.   Between in or about January 2014 and in or about April 2016, defendant MICHAEL JOHN AVENATTI ("AVENATTI") operated and controlled GB LLC and EA LLP from EA LLP's offices in Newport Beach, California.

44.   At all times relevant to this Indictment, The Peoples Bank was a financial institution located in Biloxi, Mississippi, the accounts and deposits of which were insured by the Federal Deposit Insurance Corporation.

**B.   THE SCHEME TO DEFRAUD**

45.   Beginning in or about January 2014, and continuing through in or about April 2016, in Orange County, within the Central District of California, and elsewhere, defendant AVENATTI, together with others known and unknown to the Grand Jury, knowingly and with intent to defraud, executed and attempted to execute a scheme to defraud The Peoples Bank as to material matters.

46.   The fraudulent scheme operated, in substance, in the following manner:

a.   Between in or about January 2014 and in or about December 2014, defendant AVENATTI sought and obtained the following three loans from The Peoples Bank on behalf of the following companies that defendant AVENATTI controlled:

42

0316
0316

i.   In or about January 2014, defendant AVENATTI sought and obtained a $850,000 loan to GB LLC (the "January 2014 GB LLC Loan");

ii.   In or about March 2014, defendant AVENATTI sought and obtained a $2,750,000 loan to EA LLP (the "March 2014 EA LLP Loan"), from which defendant AVENATTI used approximately $884,166 to pay off the January 2014 GB LLC Loan; and

iii.   In or about December 2014, defendant AVENATTI sought and obtained a $500,000 loan to EA LLP (the "December 2014 EA LLP Loan").

b.   In order to obtain the March 2014 EA LLP Loan and the December 2014 EA LLP Loan from The Peoples Bank, defendant AVENATTI omitted and concealed material facts, and provided The Peoples Bank with materially false financial information, including, but not limited to, false and fraudulent individual and partnership tax returns, and false and fraudulent balance sheets and financial statements, as described below.

c.   In support of the application for the March 2014 EA LLP Loan, defendant AVENATTI submitted to The Peoples Bank a 2011 U.S. Individual Income Tax Return (Form 1040) (the "Peoples Bank 2011 Form 1040") stating that defendant AVENATTI had an adjusted gross income for the 2011 calendar year of approximately $4,562,881, and had a tax due and owing to the IRS for the 2011 calendar year of approximately $1,506,707.  In truth and in fact, as defendant AVENATTI then well knew, defendant AVENATTI had not filed the Peoples Bank 2011 Form 1040 with the IRS, had not filed any 2011 U.S. Individual Income Tax Return with the IRS, and had not paid to the

43

1  IRS the $1,506,707 defendant AVENATTI purportedly owed for the 2011

2  calendar year.

3         d.    In support of the application for the March 2014 EA

4  LLP Loan, on or about March 11, 2014, defendant AVENATTI submitted to

5  The Peoples Bank a personal financial statement as of March 11, 2014,

6  in which defendant AVENATTI failed to disclose to The Peoples Bank

7  that defendant AVENATTI still owed the IRS approximately $850,438 in

8  unpaid personal income taxes, plus interest and penalties, for the

9  2009 and 2010 calendar years.

10        e.    In support of the application for the March 2014 EA

11  LLP Loan, on or about March 11, 2014, defendant AVENATTI submitted to

12  The Peoples Bank a Balance Sheet for January 2014 through March 10,

13  2014 for EA LLP, which stated, among other things, that EA LLP had

14  approximately $508,299 in its operating account, EA Account 8461, as

15  of March 10, 2014.  In truth and in fact, as defendant AVENATTI then

16  well knew, the balance in EA Account 8461 as of March 10, 2014, was

17  approximately $43,013.

18        f.    In support of the application for the March 2014 EA

19  LLP Loan, on or about March 13, 2014, defendant AVENATTI submitted to

20  The Peoples Bank a 2012 U.S. Partnership Return (Form 1065) for EA

21  LLP (the "Peoples Bank 2012 Form 1065"), which stated that in the

22  2012 calendar year EA LLP had total income of approximately

23  $11,426,021, and ordinary business income of approximately

24  $5,819,458.  In truth and in fact, as defendant AVENATTI then well

25  knew, the Peoples Bank 2012 Form 1065, had not been filed with the

26  IRS.  Rather, in or about October 2014, defendant AVENATTI caused a

27  different 2012 U.S. Partnership Return (Form 1065) to be filed with

28

0318
0318

the IRS (the "IRS 2012 Form 1065"), which differed materially from the Peoples Bank 2012 EA 1065 in the following ways:

i.   The Peoples Bank 2012 Form 1065 stated that in the 2012 calendar year EA LLP had total income of approximately $11,426,021, whereas the IRS 2012 Form 1065 stated that in the 2012 calendar year EA LLP had gross receipts and total income of approximately $6,212,605.

ii.   The Peoples Bank 2012 Form 1065 stated that in the 2012 calendar year EA LLP had ordinary business income of approximately $5,819,458, whereas the IRS 2012 Form 1065 stated that EA LLP had an ordinary business loss of approximately $2,128,849.

g.   In reliance on the false and fraudulent information defendant AVENATTI submitted to The Peoples Bank in support of the March 2014 EA LLP Loan, on or about March 14, 2014, The Peoples Bank approved the March 2014 EA LLP Loan and transferred approximately $1,824,584 to EA Account 8461.

h.   In support of the application for the December 2014 EA LLP Loan, on or about November 16, 2014, defendant AVENATTI submitted to The Peoples Bank a Balance Sheet for January 2014 through September 2014 for EA LLP, which stated, among other things, that EA LLP had approximately $712,729 in EA Account 8461 as of September 30, 2014.   In truth and in fact, as defendant AVENATTI then well knew, the balance in EA Account 8461 as of September 30, 2014, was approximately $27,710.

i.   In support of the application for the December 2014 EA LLP Loan, on or about November 22, 2014, defendant AVENATTI submitted to The Peoples Bank a personal financial statement as of November 1, 2014, in which defendant AVENATTI failed to disclose to The Peoples

45

1  Bank that defendant AVENATTI still owed the IRS approximately

2  $850,438 in unpaid personal income taxes, plus interest and

3  penalties, for the 2009 and 2010 calendar years.

4        j.   In support of the application for the December 2014 EA

5  LLP Loan, on or about December 1, 2014, defendant AVENATTI submitted

6  to The Peoples Bank a 2012 U.S. Individual Income Tax Return (Form

7  1040) (the "Peoples Bank 2012 Form 1040"), stating that defendant

8  AVENATTI had total income for the 2012 calendar year of approximately

9  $5,423,099, and had paid to the IRS $1,600,000 in estimated tax

10  payments.  In truth and in fact, as defendant AVENATTI then well

11  knew, defendant AVENATTI had not filed the Peoples Bank 2012 Form

12  1040 with the IRS, had not filed any 2012 U.S. Individual Income Tax

13  Return with the IRS, and had not made any payments to the IRS towards

14  his 2012 individual tax liability.

15        k.   In support of the application for the December 2014 EA

16  LLP Loan, on or about December 1, 2014, defendant AVENATTI submitted

17  to The Peoples Bank a 2013 U.S. Individual Income Tax Return (Form

18  1040) (the "Peoples Bank 2013 Form 1040"), stating that defendant

19  AVENATTI had total income for the 2013 calendar year of approximately

20  $4,082,803, and had paid to the IRS approximately $1,250,000 in

21  estimated tax payments and approximately $103,511 in withholdings.

22  In truth and in fact, as defendant AVENATTI then well knew, defendant

23  AVENATTI had not filed the Peoples Bank 2013 Form 1040 with the IRS,

24  had not filed any 2013 U.S. Individual Income Tax Return with the

25  IRS, had not made any estimated tax payments to the IRS towards his

26  2013 individual tax liability, and did not have any tax withholdings

27  during the 2013 calendar year.

28

0320
0320

1          l.   In order to obtain the December 2014 EA LLP Loan, on

2   or about December 12, 2014, defendant AVENATTI, on behalf of EA LLP,

3   signed a commercial pledge agreement whereby EA LLP agreed to

4   "Assignment of the First $500,000 Plus Interest of Settlement

5   Proceeds in the Meridian related cases, said attorney's fees to be

6   $10.8 million plus out of pocket costs for class counsel [EA LLP]."

7   On or about March 31, 2015, after EA LLP received a $3,034,514 wire

8   transfer from the trustee of the Meridian settlement, defendant

9   AVENATTI concealed and did not disclose, and caused EA LLP to conceal

10  and not disclose, the receipt of the funds to The Peoples Bank, and

11  did not distribute and caused EA LLP not to distribute the first

12  $500,000 to The Peoples Bank as defendant AVENATTI on behalf of EA

13  LLP had agreed to do.

14         m.   In reliance on the false and fraudulent information

15  defendant AVENATTI submitted to The Peoples Bank in support of the

16  March 2014 EA LLP Loan and the December 2014 EA LLP Loan, on or about

17  December 12, 2014, The Peoples Bank approved the December 2014 EA LLP

18  Loan and transferred approximately $494,500 to EA Account 8461.

19  **C.   EXECUTIONS OF THE SCHEME TO DEFRAUD**

20       47.  On or about the dates set forth below, in Orange County,

21  within the Central District of California, and elsewhere, defendant

22  AVENATTI, together with others known and unknown to the Grand Jury,

23  executed the fraudulent scheme by committing and willfully causing

24  others to commit the following acts:

| COUNT | DATE | ACT |
|-------|------|-----|
| THIRTY | 3/14/2014 | Receipt of March 2014 EA LLP Loan proceeds in the amount of approximately $1,824,584. |

28

0321
0321

| COUNT | DATE | ACT |
|-------|------|-----|
| THIRTY-ONE | 12/12/2014 | Receipt of December 2014 EA LLP Loan proceeds in the amount of approximately $494,500. |

48

COUNT THIRTY-TWO

[18 U.S.C. §§ 1028A(a)(1), 2(b)]

48.   The Grand Jury re-alleges and incorporates by reference paragraphs 1, 10, 28 through 30, 33 through 35, 38 through 40, and 43 through 46 of this Indictment as though fully set forth herein.

49.   On or about December 1, 2014, in Orange County, within the Central District of California, and elsewhere, defendant MICHAEL JOHN AVENATTI ("AVENATTI") knowingly transferred, possessed, and used, and willfully caused to be transferred, possessed, and used, without lawful authority, a means of identification that defendant AVENATTI knew belonged to another person, namely, the name and preparer tax identification number ("PTIN") of M.H., during and in relation to the offense of Bank Fraud, a felony violation of Title 18, United States Code, Section 1344(1), as charged in Count Thirty-One of this Indictment.

49

0323
0323

COUNT THIRTY-THREE

[18 U.S.C. §§ 152(3), 2(b)]

**A.   INTRODUCTORY ALLEGATIONS**

50.  The Grand Jury re-alleges and incorporates by reference paragraphs 1 through 7 of this Indictment as though fully set forth herein.

51.  In or about February 2016, J.F., a former partner at EA LLP, filed an arbitration claim against EA LLP and defendant MICHAEL JOHN AVENATTI ("AVENATTI").  In or about February 2017, the arbitration panel ordered the depositions of defendant AVENATTI and EA Employee 1 to take place on March 3, 2017.

52.  On or about March 1, 2017, a creditor of EA LLP, filed an involuntary Chapter 11 bankruptcy petition against EA LLP in the Middle District of Florida.  By law, the filing of the bankruptcy petition created an automatic stay under Section 362 of Title 11 of the arbitration between J.F. and EA LLP and defendant AVENATTI.

53.  On or about March 8, 2017, in response to an emergency motion filed by J.F. for relief from the automatic stay, the Bankruptcy Court in the Middle District of Florida ordered that unless EA LLP consented to the bankruptcy by March 10, 2017, the Court would grant relief from the automatic stay and thereby allow the arbitration to proceed.

54.  On or about March 10, 2017, EA LLP consented to an order for relief under Chapter 11 of Title 11 and, as a result, EA LLP became a debtor in possession in bankruptcy.

55.  On about April 11, 2017, defendant AVENATTI certified and declared under penalty of perjury as the managing partner of EA LLP that the United States Trustee Financial Requirements Checklist,

50

0324
0324

1   Certifications, and any Attachments Thereto, were true and correct to
2   the best of his knowledge and belief.  Defendant AVENATTI on behalf
3   of EA LLP further certified that he had "read and underst[ood] the
4   United States Trustee Chapter 11 'Operating Guidelines and Reporting
5   Requirements for Debtors in Possession and Trustees'" and "agree[d]
6   to perform in accordance with said guidelines and requirements."
7   Specifically, defendant AVENATTI certified as the managing partner of
8   EA LLP that he understood, among other things, that EA LLP was
9   required to: (a) close all pre-petition bank accounts controlled by
10  the debtor, EA LLP; (b) immediately open new debtor-in-possession
11  ("DIP") operating, payroll, and tax accounts; and (c) deposit all
12  business revenues into the DIP operating account.
13      56.   On or about April 20, 2017, the EA LLP Chapter 11
14  bankruptcy was transferred from the Middle District of Florida to the
15  Central District of California as In re: Eagan Avenatti LLP, bearing
16  case number 8:17-bk-11961-CB.  In the bankruptcy case, EA LLP was the
17  debtor in possession, and all property and assets in which the debtor
18  had any ownership or interest at the time of the filing of the
19  bankruptcy petition as well as any interest in property that the
20  debtor acquired after the commencement of the bankruptcy case was the
21  "bankruptcy estate," and was under the management and control of the
22  debtor in possession.
23      57.   On or about May 12, 2017, the Office of the United States
24  Trustee in the Central District of California provided defendant
25  AVENATTI the Guidelines and Requirements for Chapter 11 Debtors in
26  Possession (the "Guidelines and Requirements"), which required EA LLP
27  to close all existing bank accounts and open new DIP general,
28

0325
0325

1  payroll, and tax bank accounts, and to file a declaration regarding

2  EA LLP's compliance with the Guidelines and Requirements.

3      58.   On or about May 30, 2017, defendant AVENATTI signed under

4  penalty of perjury as the managing partner of EA LLP a "Declaration

5  of Debtor Regarding Compliance with the United States Trustee

6  Guidelines and Requirements for Chapter 11 Debtors in Possession,"

7  which included the following information:

8          a.   Defendant AVENATTI, on behalf of EA LLP, confirmed

9  that EA LLP had closed all pre-petition bank accounts, and provided

10 the account information for EA LLP's three new DIP bank accounts.

11         b.   Defendant AVENATTI, on behalf of EA LLP, provided the

12 United States Trustee with evidence that EA LLP had closed EA LLP's

13 prior general account and opened three new DIP bank accounts.

14         c.   In response to the requirement that EA LLP list the

15 last two years for which EA LLP filed federal and state tax returns,

16 defendant AVENATTI, on behalf of EA LLP, stated that neither "[t]he

17 Debtor nor its accountant has copies of its 2014 and 2015 federal or

18 state income tax returns.  The Debtor will seek to obtain copies of

19 them from the IRS and the State of California."

20     59.   Pursuant to the Guidelines and Requirements, EA LLP had

21 additional and ongoing requirements during the course of the

22 bankruptcy, including the following:

23         a.   Before any insiders, including the owners, partners,

24 officers, directors, and shareholders of EA LLP and relatives of

25 insiders, could receive compensation from the bankruptcy estate, EA

26 LLP was required to provide notice to the creditors and the United

27 States Trustee.  No such compensation could be paid to any insiders

28 until 15 days after service of the notice and (i) no objection had

0326
0326

1  been received by the Bankruptcy Court; or (ii) if an objection had

2  been received, the Bankruptcy Court had resolved the objection.

3          b.   EA LLP was required to file Monthly Operating Reports

4  ("MOR") to include, among other things, "information regarding bank

5  accounts over which the debtor ha[d] possession, custody, control,

6  access or signatory authority, even if the account [was] not in the

7  debtor's name and whether or not the account contain[ed] only post-

8  petition income."  EA LLP was "required to report all of [its]

9  financial information in the MOR."

10     60.  From on or about May 25, 2017, through on or about February

11  15, 2018, defendant AVENATTI signed under penalty of perjury and

12  filed MORs for EA LLP for eleven months, namely, March 2017 through

13  January 2018, inclusive, which included the following information:

14          a.   The first page of each MOR stated that "All receipts

15  must be deposited into the general account," and required EA LLP to

16  itemize: (i) the beginning balance of the general account for the

17  month at issue; (ii) all receipts EA LLP obtained during the month;

18  (iii) all of the disbursements EA LLP made during the month,

19  including transfers to other DIP accounts; and (iv) the ending

20  balance of the general account for the month at issue.

21          b.   Each MOR required EA LLP to include all receipts and

22  expenditures during the monthly reporting period, as well as the

23  cumulative post-petition amounts.  On all eleven MORs that defendant

24  AVENATTI signed under penalty of perjury on behalf of EA LLP,

25  defendant AVENATTI claimed zero payroll was made to insiders.

26  Immediately above the penalty of perjury declaration, each MOR sought

27  answers to several questions, including whether EA LLP provided

28  compensation or remuneration to any officers, directors, principals,

53

or other insiders without appropriate authorization during the reporting period.  On all eleven MORs that defendant AVENATTI signed under penalty of perjury on behalf of EA LLP, defendant AVENATTI answered "no" to the question whether any compensation or remuneration was made to any officers, directors, principals, or other insiders.

**B.   FALSE DECLARATION**

61.   On or about June 19, 2017, in Orange County, within the Central District of California, defendant AVENATTI knowingly and fraudulently made and willfully caused to be made a materially false declaration and statement under penalty of perjury within the meaning of Title 28, United States Code, Section 1746, in and in relation to a case under Title 11 of the United States Code, namely, In re: Eagan Avenatti LLP, No. 8:17-bk-11961-CB in United States Bankruptcy Court for the Central District of California, by submitting and declaring under penalty of perjury to be true and complete the Monthly Operating Report for EA LLP for the period May 1, 2017, through May 30, 2017 (the "May 2017 MOR"), in which defendant AVENATTI, as the Managing Partner for EA LLP, falsely stated that EA LLP's "Receipts During Current Period; Accounts Receivable – Post Filing" were $409,953.70, whereas, in truth and in fact, as defendant AVENATTI then well knew, EA LLP's receipts during the May 2017 MOR period, accounts receivable – post filing were greater than $409,953.70.

54

0328
0328

COUNT THIRTY-FOUR

[18 U.S.C. § 152(3), 2(b)]

62.  The Grand Jury re-alleges and incorporates by reference paragraphs 1 through 7 and 51 through 60 of this Indictment as though fully set forth herein.

63.  On or about October 16, 2017, in Orange County, within the Central District of California, defendant MICHAEL JOHN AVENATTI ("AVENATTI") knowingly and fraudulently made and willfully caused to be made a materially false declaration and statement under penalty of perjury within the meaning of Title 28, United States Code, Section 1746, in and in relation to a case under Title 11 of the United States Code, namely, In re: Eagan Avenatti LLP, No. 8:17-bk-11961-CB in United States Bankruptcy Court for the Central District of California, by submitting and declaring under penalty of perjury to be true and complete the Monthly Operating Report for EA LLP for the period September 1, 2017, through September 30, 2017 ("September 2017 MOR"), in which defendant AVENATTI, as the Managing Partner for EA LLP, falsely stated that EA LLP's "Receipts During Current Period; Accounts Receivable – Post Filing" were $829,635.28, whereas, in truth and in fact, as defendant AVENATTI then well knew, EA LLP's receipts during the September 2017 MOR period, accounts receivable – post filing were greater than $829,635.28.

55

0329
0329

COUNT THIRTY-FIVE

[18 U.S.C. § 152(3), 2(b)]

64.   The Grand Jury re-alleges and incorporates by reference paragraphs 1 through 7 and 51 through 60 of this Indictment as though fully set forth herein.

65.   On or about February 15, 2018, in Orange County, within the Central District of California, defendant MICHAEL JOHN AVENATTI ("AVENATTI") knowingly and fraudulently made and willfully caused to be made a materially false declaration and statement under penalty of perjury within the meaning of Title 28, United States Code, Section 1746, in and in relation to a case under Title 11 of the United States Code, namely, In re: Eagan Avenatti LLP, No. 8:17-bk-11961-CB in United States Bankruptcy Court for the Central District of California, by submitting and declaring under penalty of perjury to be true and complete the Monthly Operating Report for EA LLP for the period January 1, 2018, through January 31, 2018 ("January 2018 MOR"), in which defendant AVENATTI, as the Managing Partner for EA LLP, falsely stated that EA LLP's "Receipts During Current Period; Accounts Receivable – Post Filing" were $232,221.11, whereas, in truth and in fact, as defendant AVENATTI then well knew, EA LLP's receipts during the January 2018 MOR period, accounts receivable – post filing were greater than $232,221.11.

COUNT THIRTY-SIX

[18 U.S.C. § 152(2)]

66.   The Grand Jury re-alleges and incorporates by reference paragraphs 1 through 7 and 51 through 60 of this Indictment as though fully set forth herein.

67.   On or about June 12, 2017, in Orange County, within the Central District of California, defendant MICHAEL JOHN AVENATTI ("AVENATTI") knowingly and fraudulently made a false oath as to a material matter in and in relation to a case under Title 11 of the United States Code, namely, In re: Eagan Avenatti LLP, No. 8:17-bk-11961-CB in United States Bankruptcy Court for the Central District of California, in that defendant AVENATTI testified under oath at the Section 341(a) debtor's examination and stated "no" when asked whether the debtor, EA LLP, received any counsel fees from the Super Bowl NFL litigation.  In truth and in fact, as defendant AVENATTI well knew at the time he made the false oath, defendant AVENATTI and EA LLP had received fees from the Super Bowl NFL litigation, namely, two wire transfers totaling approximately $1,361,000, including attorneys' fees, on or about May 17, 2017.

57

FORFEITURE ALLEGATION ONE

[18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c)]

68.  Pursuant to Rule 32.2 of the Federal Rules of Criminal Procedure, notice is hereby given that the United States of America will seek forfeiture as part of any sentence, pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c), in the event of the defendant's conviction of the offenses set forth in any of Counts One through Ten, Thirty, Thirty-One, or Thirty-Three through Thirty-Six of this Indictment.

69.  Defendant shall forfeit to the United States of America the following:

a.  all right, title, and interest in any and all property, real or personal, constituting or derived from any proceeds obtained, directly or indirectly, as a result of the offense, or property traceable to such proceeds; and

b.  To the extent such property is not available for forfeiture, a sum of money equal to the total value of the property described in subparagraph (a).

70.  Pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 28, United States Code, Section 2461(c), the defendant shall forfeit substitute property, up to the value of the property described in the preceding paragraph if, as the result of any act or omission of the defendant, the property described in the preceding paragraph or any portion thereof (a) cannot be located upon the exercise of due diligence; (b) has been transferred, sold to, or deposited with a third party; (c) has been placed beyond the jurisdiction of the court; (d) has been substantially diminished in

58

1  value; or (e) has been commingled with other property that cannot be

2  divided without difficulty.

59

FORFEITURE ALLEGATION TWO

[18 U.S.C. §§ 982 and 1028, and 28 U.S.C. §2461(c)]

71.  Pursuant to Rule 32.2 of the Federal Rules of Criminal Procedure, notice is hereby given that the United States of America will seek forfeiture as part of any sentence, pursuant to Title 18, United States Code, Sections 982 and 1028, and Title 28, United States Code, Section 2461(c), in the event of defendant's conviction of the offense set forth in Count Thirty-Two of this Indictment.

72.  Defendant, if so convicted, shall forfeit to the United States of America the following:

a.  All right, title and interest in any and all property, real or personal, constituting or derived from any proceeds obtained, directly or indirectly, as a result of the offense, and any property traceable thereto;

b.  Any personal property used or intended to be used to commit the offense; and

c.  To the extent such property is not available for forfeiture, a sum of money equal to the total value of the property described in subparagraphs (a) and (b).

73.  Pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 18, United States Code, Sections 982(b) and 1028(g), the defendant, if so convicted, shall forfeit substitute property, up to the total value of the property described in the preceding paragraph if, as the result of any act or omission of the defendant, the property described in the preceding paragraph, or any portion thereof: (a) cannot be located upon the exercise of due diligence; (b) has been transferred, sold to or deposited with a third party; (c) has been placed beyond the jurisdiction of the

60

0334
0334

1   court; (d) has been substantially diminished in value; or (e) has

2   been commingled with other property that cannot be divided without

3   difficulty.

4                                       A TRUE BILL

5

6                                      /S/

7                                 Foreperson

8   NICOLA T. HANNA
    United States Attorney

9

10

11   LAWRENCE S. MIDDLETON
    Assistant United States Attorney

12   Chief, Criminal Division

13   RANEE A. KATZENSTEIN
    Assistant United States Attorney

14   Chief, Major Frauds Section

15   JULIAN L. ANDRÉ
    Assistant United States Attorney

16   Major Frauds Section

17   BRETT A. SAGEL
    Assistant United States Attorney

18   Santa Ana Branch Office

19

20

21

22

23

24

25

26

27

28

                                61

EXHIBIT "M"

0336

0336

Filippo Marchino, Esq. (SBN 256011)
FM@XLAWX.com
Damon Rogers, Esq. (SBN 263853)
DR@XLAWX.com
Thomas E. Gray, Esq. (SBN 299898)
TG@XLAWX.com
**THE X-LAW GROUP, P.C.**
625 Fair Oaks Ave, Suite 390
South Pasadena, CA 91030
Tel: (213) 599-3380
Fax: (213) 599-3370

Attorneys for Defendant/Cross-Claimant
Alexis Gardner

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| STARR INDEMNITY & LIABILITY COMPANY, a Texas Corporation<br><br>    Plaintiff,<br><br>    v.<br><br>MICHAEL   J.   AVENATTI,   an individual and citizen of California; PASSPORT 420, LLC, a Delaware limited liability company; WILLIAM PARRISH, an individual and citizen of California;   SPRING   CREEK RESEARCH, LLC, a California limited liability   company;   ALEXIS GARDNER, an individual and citizen of Georgia; and the UNITED STATES OF AMERICA;   and   DOES   1   to   25, inclusive<br><br>    Defendants. | Case No. 8:19-CV-01704-DOC-JDE<br><br>**CROSSCLAIM**<br><br>**JURY TRIAL DEMANDED** |
| ALEXIS GARDNER, an individual and citizen of Georgia | |

---

**CROSSCLAIM**

Cross-Claimant,

v.

STARR INDEMNITY & LIABILITY COMPANY, a Texas Corporation; PASSPORT 420, LLC, a Delaware limited liability company; WILLIAM PARRISH, an individual and citizen of California; SPRING CREEK RESEARCH, LLC, a California limited liability company; Avenatti & Associates, APC, a California professional corporation; and the UNITED STATES OF AMERICA

Cross-Defendants.

**CROSSCLAIM**

0338
0338

**INTRODUCTION**

1.      Defendant/Cross-Claimant Alexis Gardner ("Cross-Claimant" or "Gardner") brings this Cross-Complaint against Plaintiff/Cross-Defendant Starr Indemnity & Liability Company ("Starr"), Defendant/Cross-Defendant Passport 420, LLC ("Passport 420"), Defendant/Cross-Defendant William Parrish ("Parrish"), Defendant/Cross-Defendant Spring Creek Research, LLC, Defendant/Cross-Defendant Avenatti & Associates, APC ("AA"), and Defendant/Cross-Defendant The United States of America.

2.      This Cross-Complaint arises out of the misappropriation of $2,500,000 belonging to Ms. Gardner, by her attorney Michael Avenatti, for the benefit of Passport 420 as funds to purchase a jet.

3.      The jet in question, a Honda Aircraft Co. LLC HA-420 jet, serial number 42000029, and with tail number N227WP, shall be hereinafter referred to as the "Subject Aircraft".

**PARTIES**

4.      Defendant/Cross-Claimant Alexis Gardner "Gardner" is a resident and citizen of the State of Georgia.

5.      Plaintiff/Cross-Defendant Starr Indemnity & Liability Company ("Starr") is a Texas corporation with its principal place of business in New York.

6.      Defendant/Cross-Defendant Passport 420, LLC ("Passport 420") is a Delaware limited liability company.  Its principal place of business, as listed on the FAA registry, is 520 Newport Center Dr, Ste 1400, Newport Beach, California.

7.      On information and belief, the two members of Passport 420, at the time of its formation in 2016 and at the time it purchased the Subject Aircraft with money of Gardner, were Spring Creek Research, LLC and Avenatti & Associates, APC.

8.      Avenatti served as Passport 420's manager during all relevant time periods.

3

**CROSSCLAIM**

9.     Defendant/Cross-Defendant William Parrish ("Parrish") is citizen of the State of California and resident of Santa Barbara County, California.   Parrish became the manager of Passport 420 in 2018.

10.     Defendant/Cross-Defendant Spring Creek Research, LLC ("Spring Creek") is a California limited liability company with its principal place of business in Santa Barbara County, California.   Spring Creek is owned by Parrish.

11.     Defendant/Cross-Defendant Avenatti & Associates, APC ("AA") is a California professional corporation with its principal place of business within this judicial district.   AA was owned and controlled by Avenatti when he served as Gardner's attorney and, unbeknownst to her, misappropriated her money so that Passport 420 could purchase a plane.

12.     Defendant/Cross-Defendant The United States of America has seized the Subject Aircraft and filed a civil forfeiture complaint against it.

13.     Starr, Passport 420, Parrish, Spring Creek, AA, and the United States of America shall be collectively referred to as "Cross-Defendants."

## JURISDICTION AND VENUE

14.     This Court has subject matter jurisdiction over Plaintiff's claims because they are so related to the claims in Starr's Complaint as to form part of the same case or controversy, pursuant to 28 U.S.C. § 1367(a).   In addition, this Court has jurisdiction over Plaintiff's claims pursuant to 28 U.S.C. § 1332 because no defendant is a citizen of the same state as any plaintiff and because the amount in controversy exceeds $75,000, exclusive of interest and costs.   Finally, this Court also has subject matter jurisdiction over Plaintiff's federal claims for relief under 18 U.S.C. §1961 et seq pursuant to 28 § 1331 and over Plaintiff's state law claims, because they are so related to her federal law claims as to form part of the same case or controversy, pursuant to 28 U.S.C. § 1367(a).

15.     Venue is proper pursuant to 28 U.S.C. § 1391(b) & (c) because a

4

**CROSSCLAIM**

substantial part of the events or omissions giving rise to the claim occurred in this judicial district and because Cross-Defendants are subject to the Court's personal jurisdiction in this judicial district.

**FACTUAL ALLEGATIONS**

**I.    Avenatti's Criminal Enterprise.**

16.    Eagan Avenatti, LLP ("EA") was a well-regarded plaintiffs' law firm that obtained significant jury verdicts and settlements for its clients in high profile, high stakes litigation.   For example, in 2014 it settled a class action against a cemetery for more than $80 million.  In 2017 it obtained a $454 million jury verdict in another consumer class action, the largest jury verdict that year in the State of California and the third largest in the United States.  However, under this veneer of prestige and success, there was a darker truth: EA's managing Partner, Michael Avenatti, was embezzling millions of dollars in settlement money from his clients.

17.    Unbeknownst to everyone, EA was simultaneously run by Avenatti as a legitimate law firm and a means to enrich himself through criminal activity. Avenatti's modus operandi was to use the skill and expertise of the attorneys and staff employed at EA to obtain significant settlements on behalf of his clients.  Then, once the case was in the process of settling, he would create two parallel settlement agreements.  The first, which was the one the opposing party actually signed and was the "real" settlement agreement, would provide for one lump sum payment. The second agreement, which would be provided to or explained orally to the client, would change the payment terms so that it appeared that the defendant would be making periodic payments to the plaintiff, Avenatti's client.

18.    Under the terms of the "real" settlement agreements, the defendant would be required to send the lump sum payment check to EA, where he would deposit the money in a client trust account.   However, rather than deduct his contingent fee percentage from the lump sum and remit the balance to the client, as

he was obligated to, Avenatti instead turned these client trust accounts into his personal piggy banks and spent on personal matters the portions of the settlement funds that rightfully belonged to his clients.  Avenatti would then send deminimus periodic payments to his clients as provided for in the fake settlement agreements. He would often cease to even make these payments and would then pretend that the defendant was being difficult and not making the "required" periodic payment.  He would pretend to assist his clients in getting the defendants to restart making their payments.   Of course, as Avenatti knew, the defendants had already paid the settlement in full and had no further obligations to make additional payments.

19.    Through this pattern of conduct, Avenatti was able to lull clients into believing that he was representing their interests for a number of years even as he deprived them of their settlements.  Given the forged settlement agreements, the plausible explanations he provided to his clients for why they were not receiving their settlement money, and EA's continued success in litigating high profile cases, clients had no reason to realize that their money had in fact been stolen by their attorney.  In addition, because Avenatti handled settlement negotiations by himself and only involved one paralegal, who served as both the firm's office manager and bookkeeper, in his criminal scheme, all of the other attorneys and staff at EA remained ignorant of his wrongdoing up until March 2019, when he was arrested for his crimes and subsequently indicted.

## II.   Passport 420 Purchases a Jet with Gardner's Money.

20.    In 2016 Parrish and Avenatti decided to jointly purchase a  private jet and created Passport 420 to own it.  Avenatti was selected as the manager of Passport 420.

21.    On or about January 7, 2017 Gardner, one of Avenatti and EA's clients, entered into a  confidential settlement agreement with another individual (the

"Individual").[1]

22.    Avenatti did not provide Gardner with a copy of the actual settlement agreement.   Instead, he falsely represented to Gardner that the Individual would make two separate transactions in fulfillment of the settlement agreement. First, the Individual would make approximately 96 monthly payments to Gardner over the course of the next eight years. Second, at some point within the first year, the Individual would make a lump-sum payment, the entirety of which would be used to pay EA's attorney fees and costs.

23.    Under the terms of the actual settlement agreement, this Individual was required to make an initial payment of $2,750,000 on or about January 28, 2017 to Gardner with a subsequent payment of $250,000 at a later date, set for the fall of 2020.

24.    On or about January 25, 2017, unbeknownst to Gardner, the Individual made the first single initial $2,750,000 settlement payment to EA Trust Account 8671 to be held in trust for Gardner.   Avenatti concealed and failed to disclose to Gardner that EA had received this initial $2,750,000 settlement payment.   Neither Avenatti nor EA ever transferred any of Gardner's settlement payment to her, nor did they obtain her permission to divert the funds anywhere else.

25.    On or about January 26, 2017, Avenatti caused $2,500,000 of Gardner's funds to be transferred to Honda Aircraft Company, LLC so that Passport 420, the company he was running as its manager, could purchase the Subject Aircraft. According to the invoice from Honda Aircraft Company, LLC, the total price of the the Subject Aircraft was $4,363,605.

26.    Avenatti also moved the remaining $250,000 of the settlement payment

---

[1] To be clear, neither the identity of the Individual, nor the nature of the settlement agreement have any relevance to Gardner's claims here.  Neither the Individual nor the Individual's counsel were aware of or participated in Avenatti's wrongdoing.

7

**CROSSCLAIM**

1   out of the trust account and into another EA account, before it was moved to an AA

2   account.

3       27.   Between March 2017 and June 2018 Avenatti caused approximately 11

4   payments to be deposited into Gardner's account, which he represented to Gardner

5   as being the monthly settlement payments from the Individual.   These payments

6   were not made using money from the settlement payment intended for Gardner,

7   however.   For example, some of the payments were made using money from Global

8   Baristas US LLC and/or its owner Global Baristas, LLC, including credit card

9   receipts from Tullly's stores.   From June 2018 until March 2019, Avenatti stopped

10   making these payments and instead falsely represented to Gardner that Avenatti was

11   working to obtain the missing monthly settlement payments.   To accomplish this,

12   Avenatti spoke to Gardner by phone, as he had on a number of occasions previously,

13   in order to convince her that she was in fact supposed to receive monthly periodic

14   payments.

15

16   **III.  Gardner's Damages.**

17       28.   As was discussed above, Gardner never received any money from the

18   $2,750,000 settlement payment that was supposed to be made to her because it was

19   instead taken by Avenatti, with $2,500,000 spent by Passport 420 in the course of

20   purchasing its jet and the other $250,000 taken by Avenatti, AA and/or EA and used

21   for presently unknown purposes, but possibly for the further benefit of Passport 420.

22   The periodic payments Gardner received from Avenatti should not be treated as an

23   offset to the full amount owed because the money did not come from her settlement

24   funds.   Further, because of the severe ethical misconduct of Avenatti and his law

25   firms, Gardner is entitled to one hundred percent of the settlement funds as damages

26   without any contingent fee deduction.   In addition, Gardner is entitled to

27   prejudgment interest and punitive damages.

28       29.   Further, to the extent that Gardner is granted relief in the form of a

8

**CROSSCLAIM**

constructive trust providing her with an ownership interest in the Subject Aircraft, her percentage ownership interest should be calculated using the current price the plane would be sold for, not the price paid by Passport 420.  Additionally, the amount of money that was taken from her to purchase the plane should include interest on this amount.

30.   While Parrish, Spring Creek, Avenatti, AA, EA and any and all other parties with a claimed interest in Passport 420 assumed the risk of the plane depreciating over time, Gardner did not.  On information and belief, based on the price that similar used jets sell and the amount of Gardner's money that was used by Passport 420 to purchase the jet plus interest on that money, the current value of the Subject Aircraft is about the same as Gardner's compensatory damages and Gardner should be awarded a 100% ownership interest in the Subject Aircraft.

31.   Gardner is not required to elect among the different remedies available to her at this time and intends to pursue each and every remedy through trial.

**IV.  The Insurance Coverage Dispute.**

32.   The allegations of this section are alleged on information and belief based upon the allegations Starr makes in its Complaint.

33.   On information and belief, Starr issued a Starr Elite Comprehensive Corporate Aircraft Policy to Passport 420, Policy Number 1000320046-01 with effective dates from January 26, 2017 until January 26, 28018 ("Policy 1").  Policy 1 was issued pursuant to an "Aircraft Insurance Application" submitted by applicant Passport 420.

34.   On information and belief, Starr issued a Starr Elite Comprehensive Corporate Aircraft Policy to Passport 420, Policy Number 1000320046-02 with effective dates from January 26, 2018 until January 26, 2019 ("Policy 2"). Policy 2 was issued pursuant to an "Aircraft Insurance Application" submitted by applicant Passport 420

9

**CROSSCLAIM**

35.   On information and belief, Starr issued a Starr Elite Comprehensive Corporate Aircraft Policy to Passport 420, Policy Number 1000320046-03 with effective dates from January 26, 2019 until January 26, 2020 ("Policy 3"). Policy 3 was issued pursuant to an "Aircraft Insurance Application" submitted by applicant Passport 420.

36.   Policy 1, Policy 2, and Policy 3 will be referred to collectively as "the Policies."

37.   Each of the Policies scheduled as an insured aircraft the Subject Aircraft, providing certain coverages pursuant to the terms, conditions, exclusions and languages of the Policies.

38.   As was stated above, Passport 420 purchased the Subject Aircraft using Gardner's money.

39.   Further, as was stated above, because Gardner's money was used by Passport 420 to purchase the Subject Aircraft, Gardner has a substantial ownership interest in it.

40.   On information and belief, based on the lawsuit Passport 420 LLC v. Starr Indemnity & Liability Company, Santa Barbara Superior Court Case Number 19CV93596, Parrish is claiming that any proceeds that might come due under the Policies shall be paid to him individually, or to Spring Creek Research, or the Parrish Family Trust date 1997, rather than to Passport 420, the ostensibly titled owner of the Subject Aircraft or Gardner.

41.   Avenatti & Associates, APC is the other member of Passport 420 and, on information and belief, may attempt to assert that it has an ownership interest in the Subject Aircraft as a basis for seeking any insurance payment from the Policies.

42.   The United States of America has filed a criminal indictment against Avenatti in this District, alleging that it is seeking forfeiture as part of any sentence in the event of Avenatti's conviction of all right, title, and interest in the property derived from any proceeds obtained directly or indirectly as a result of any offense

10

**CROSSCLAIM**

or property traceable to such proceeds.  On April 10, 2019 the IRS took possession of the Subject Aircraft.

43.   On information and belief, the United States of America, through the Internal Revenue Service, has taken possession of the Subject Aircraft for security for payment of certain taxes that are allegedly due and unpaid; or alternatively, the Internal Revenue Service claims that certain taxes are due and unpaid and the Subject Aircraft may serve as security for payment of some or all of those taxes. Upon information and belief, the United States of America may claim some interest in the Policies.

44.   On October 18, 2019, the United States of America filed a civil forfeiture complaint pertaining to the Subject Aircraft.

45.   After the Subject Aircraft was seized on April 10, 2019, Parrish filed with Starr a "Proof of Claim" requesting that Starr issue to him in his individual capacity a payment for the taking of the Subject Aircraft under Endorsement 10 of Policy 3, titled Extended Coverage Endorsement: War Risk For Physical Damage Coverage, Extortion, and Hi-Jacking Extra Expense Coverage (sometimes "War Risk Coverage Endorsement"). The demand has been made even though William Parrish is not the owner of the Subject Aircraft and payment should be directed instead to those with an ownership interest in the Subject Aircraft.

46.   The term "Physical Damage" is defined by the Policies to mean "accidental, direct physical loss of or damage to scheduled aircraft, spare engines or spare parts during the policy period including ingestion, but it does not include the loss of use or any residual depreciation in value either before or after any repairs have been made."

47.   The Subject Aircraft has an agreed-upon value in Policy 3 stated at $4,000,000.00.

48.   Exclusion D of The Policies (set forth in Section Seven - Exclusions on

11

**CROSSCLAIM**

Page 31 of The Policies) state: "The insurance provided by the Policy shall not apply: to illegal, criminal or dishonest acts or activities, alleged or otherwise, committed by or at the direction of or with the knowledge and consent of directors or officers of the insured and with the knowledge at the time that such act was illegal or criminal, but with respect to the named insured this exclusion shall apply only if such activities or acts are with the knowledge and consent of an officer or director of the named insured."

49.   Pursuant to the War Risk Coverage Endorsement the coverage provided therein will not cover any loss, damage or expense arising out of the "repossession or any attempt at repossession by any person or organization having any legal title or lien on the scheduled aircraft or any other type of legal contractual relationship with the insured."

50.   Pursuant to the War Risk Coverage Endorsement the coverage provided therein will not cover any loss, damage or expense arising out of "any failure to provide any type of bond, security or any other financial cause whether or not required under a court order." (Page 2 of the War Risk Coverage Endorsement, Exclusion (D)).

**FIRST CLAIM FOR RELIEF**

**DECLARATORY RELIEF REGARDING OWNERSHIP OF THE SUBJECT AIRCRAFT**

**(Against Cross-Defendants Passport 420, Parrish, Spring Creek Research, AA, and the United States of America)**

51.   The allegations of paragraphs 1 through 50 are re-alleged and incorporated herein by reference.

52.   Upon information and belief Passport 420, Parrish, Spring Creek Research, Passport 420, Parrish, Spring Creek Research, AA, and the United States

12

**CROSSCLAIM**

0348
0348

of America all believe that they are entitled to an ownership interest in the Subject Aircraft and that Gardner is not entitled to an ownership interest in the Subject Aircraft.

53.   Gardner contends that because $2,500,000 of money undisputedly belonging to her was used by Passport 420 to purchase the Subject Aircraft, there is a constructive trust providing her with a majority ownership interest in the HondaJet HA-420.  Further, her percentage ownership interest should be calculated using the current price the plane would be sold for, not the price paid by Passport 420.  The amount of money that was taken from Gardner to purchase the plane should additionally include interest on this amount at the maximum rate permitted by law. While Parrish, Spring Creek, and all others claiming an interest in Passport 420 assumed the risk of the plane depreciating over time, Gardner did not.   On information and belief, based on the price that similar used jets and the amount of Gardner's money that was used by Passport 420 to purchase the jet plus interest on that money, Gardner should be awarded a 100% ownership interest in the Subject Aircraft.

54.   Accordingly, an actual controversy has arisen and now exists between Gardner and Passport 420, Parrish, Spring Creek Research, Passport 420, Parrish, Spring Creek Research, AA, and the United States of America, for which Gardner seeks a declaration of rights.

## SECOND CLAIM FOR RELIEF
## DECLARATORY RELIEF REGARDING INSURANCE POLICIES
### (Against All Cross-Defendants)

55.   The allegations of paragraphs 1 through 54 are re-alleged and incorporated herein by reference.

56.   Upon information and belief, based on the allegations in its complaint, Starr contends that it is either entitled to rescind the Policies or otherwise not pay

13

**CROSSCLAIM**

1    out a claim under the Policies as a result of the Subject Aircraft's seizure by the

2    United States of America.

3        57.    Further, on information and belief, Parrish, Spring Creek Research,

4    Passport 420, Parrish, Spring Creek Research, AA, and the United States of America

5    all assert they are entitled to any insurance payment made by Starr pursuant to the

6    Policies and any the proceeds resulting from the return of premiums for the Policies

7    if they are rescinded.

8        58.    Gardner contends that because $2,500,000 of her money was used by

9    Passport 420 to purchase the Subject Aircraft, there is a constructive trust providing

10   her with an ownership interest in the Subject Aircraft.   Further, her percentage

11   ownership interest should be calculated using the current price the plane would be

12   sold for, not the price paid by Passport 420.  The amount of money that was taken

13   from her to purchase the plane should additionally include interest on this amount.

14   While Parrish, Spring Creek, and all others claiming interest in Passport 420

15   assumed the risk of the plane depreciating over time, Gardner did not.   On

16   information and belief, based on the price that similar used jets sell and the amount

17   of Gardner's money that was used by Passport 420 to purchase the jet plus interest

18   on that money, Gardner should be awarded a 100% ownership interest in the Subject

19   Aircraft.

20       59.    Because Gardner has an ownership interest in the Subject Aircraft, it

21   follows that if an insurance payment is made pursuant to the Policies or if the

22   Policies are rescinded and the premiums returned, some or all of this money belongs

23   to her.

24       60.    Accordingly, an actual controversy has arisen and now exists between

25   Gardner and Starr, Passport 420, Parrish, Spring Creek Research, Passport 420,

26   Parrish, Spring Creek Research, AA, and the United States of America, for which

27   Gardner seeks a declaration of rights.

28

---

14

**CROSSCLAIM**

### THIRD CLAIM FOR RELIEF

### UNJUST ENRICHMENT/RESTITUTIONARY DISGORGEMENT

### (Against Passport 420)

61.   The allegations of paragraphs 1 through 60 are re-alleged and incorporated herein by reference.

62.   Passport 420 received a benefit in the form of the $2,500,000 payment towards the purchase of the Subject Aircraft that was made from the proceeds of Gardner's settlement.

63.   It would be unjust for Passport 420 to retain the money taken out of the settlement funds of Gardner.

64.   Passport 420's conduct was a substantial factor in causing Gardner injury and Gardner is therefore entitled to damages.

65.   A constructive trust must be imposed that would provide Gardner with an ownership interest in the Subject Aircraft.

66.   Passport 420, acting through its manager Avenatti, acted in conscious disregard for Gardner's rights, and put its own interests ahead of the interests of Gardner when it took her settlement money and used the money to purchase the Subject Aircraft, which constitutes malice.

67.   Passport 420, acting through its manager Avenatti engaged in despicable conduct that subjected Gardner to cruel and unjust hardship in conscious disregard of her rights, which constitutes Oppression.

68.   Avenatti, the manager of Passport 420, intentionally misrepresented and/or concealed material information regarding the fact that Gardner had in fact been paid a $2,750,000 payment, but that Passport 420 had spent that money so that it could purchase the Subject Aircraft.  This constitutes fraud.

69.   Therefore, Passport 420, acting through its managers, including Avenatti,  acted with oppression, fraud, and/or malice and Gardner is therefore entitled to punitive damages in an amount according to proof at trial.

15

**CROSSCLAIM**

### FOURTH CLAIM FOR RELIEF

### AIDING AND ABETTING CONVERSION

(Against Passport 420)

70.   The allegations of paragraphs 1 through 69 are re-alleged and incorporated herein by reference.

71.   Avenatti and EA received Gardner's settlement money in a client trust account.

72.   Avenatti and EA intentionally and substantially interfered with Gardner's settlement money by embezzling it and causing the settlement money to be used to purchase the Subject Aircraft for the benefit of Passport 420.

73.   Gardner did not consent to any of this.

74.   Because its manager was Avenatti, Passport 420 knew that Avenatti and EA were converting and/or going to convert Gardner's settlement money.

75.   Passport 420 gave substantial assistance and/or encouragement to Avenatti and EA.  Among other things, Avenatti and EA were able to hide Gardner's funds in Passport 420 in the form of the Aircraft, which was purchased with money stolen from Gardner and owned by Passport 420.  Avenatti was then able to use the Aircraft for his own benefit.

76.   These events were a substantial factor in causing Gardner injury and Gardner is therefore entitled to damages.

77.   A constructive trust must be imposed that would provide Gardner with an ownership interest in the Subject Aircraft.

78.   Passport 420, acting through its manager Avenatti, acted in conscious disregard for Gardner's rights and put its own interests ahead of the interests of Gardner when it took her settlement money and used the money to purchase the Subject Aircraft, which constitutes malice.

79.   Passport 420, acting through its manager Avenatti, engaged in despicable conduct that subjected Gardner to cruel and unjust hardship in conscious disregard

16

**CROSSCLAIM**

1  of her rights, which constitutes Oppression.

2      80.   Avenatti, the manager of Passport 420, intentionally misrepresented
3  and/or concealed material information regarding the fact that Gardner had in fact
4  been paid a $2,750,000 payment, but that Passport 420 had spent that money so that
5  it could purchase the Subject Aircraft.  This constitutes fraud.

6      81.   Therefore, Passport 420, acting through its managers, including
7  Avenatti,  acted with oppression, fraud, and/or malice and Gardner is therefore
8  entitled to punitive damages in an amount according to proof at trial.

9

10              **FIFTH CLAIM FOR RELIEF**
11          **CONSPIRACY TO COMMIT CONVERSION**
12                 (Against Passport 420)

13      82.   The allegations of paragraphs 1 through 81 are re-alleged and
14  incorporated herein by reference.

15      83.   Avenatti and EA received Gardner's settlement money in a client trust
16  account.

17      84.   Avenatti and EA intentionally and substantially interfered with
18  Gardner's settlement money by embezzling it and causing the settlement money to
19  be used to purchase the Subject Aircraft for the benefit of Passport 420.

20      85.   Gardner did not consent to any of this.

21      86.   Because its manager was Avenatti, Passport 420 knew that Avenatti and
22  EA were converting and/or going to convert Gardner's settlement money for the
23  benefit of Passport 420.

24      87.   Passport 420 agreed with Avenatti and EA and intended that Avenatti
25  and EA make affirmative misrepresentations to Gardner.  Among other things,
26  Avenatti and EA were able to hide Gardner's funds in Passport 420 in the form of
27  the Aircraft, which was purchased with money stolen from Gardner and owned by
28  Passport 420.  Avenatti was then able to use the Aircraft for his own benefit.

17
**CROSSCLAIM**

88.   These events were a substantial factor in causing Gardner injury and Gardner is therefore entitled to damages.

89.   A constructive trust must be imposed that would provide Gardner with an ownership interest in the Subject Aircraft.

90.   Passport 420, acting through its manager Avenatti, acted in conscious disregard for Gardner's rights and put its own interests ahead of the interests of Gardner when it took Gardner's monies and used them  to purchase the Subject Aircraft, which constitutes malice.

91.   Passport 420, acting through its manager Avenatti engaged in despicable conduct that subjected Gardner to cruel and unjust hardship in conscious disregard of her rights, which constitutes Oppression.

92.   Avenatti, the manager of Passport 420, intentionally misrepresented and/or concealed material information regarding the fact that Gardner had in fact been paid a $2,750,000 payment, but that Passport 420 had spent that money so that it could purchase the Subject Aircraft.  This constitutes fraud.

93.   Therefore, Passport 420, acting through its manager Avenatti, acted with oppression, fraud, and/or malice and Gardner is therefore entitled to punitive damages in an amount according to proof at trial.

## SIXTH CLAIM FOR RELIEF
## RECEIVING STOLEN PROPERTY (PENAL CODE § 496)
### (Against Passport 420)

94.   The allegations of paragraphs 1 through 93 are re-alleged and incorporated herein by reference.

95.   Avenatti and EA received Gardner's settlement money in a client trust account.

96.   Avenatti and EA embezzled the settlement money and caused some of the settlement money to be used so that Passport 420 could purchase the Subject

18

CROSSCLAIM

Aircraft.

97.    Passport 420 therefore either bought or received stolen property or concealed, withheld, or aided in concealing or withholding Gardner's settlement money.

98.    Because its manager was Avenatti, Passport 420 knew that the settlement money was stolen and belonged to Gardner.

99.    These events were a substantial factor in causing Gardner injury and Gardner is therefore entitled to damages.  Under Penal Code § 496 these damages are three times the amount of actual damages.

100. A constructive trust must be imposed that would provide Gardner with an ownership interest in the Subject Aircraft.

101. Passport 420, acting through its manager Avenatti, acted in conscious disregard for Gardner's rights and put its own interests ahead of the interests of Gardner when it took her settlement money and used the money to purchase the Subject Aircraft, which constitutes malice.

102. Passport 420, acting through its manager Avenatti engaged in despicable conduct that subjected Gardner to cruel and unjust hardship in conscious disregard of her rights, which constitutes Oppression.

103. Avenatti, the manager of Passport 420, intentionally misrepresented and/or concealed material information regarding the fact that Gardner had in fact been paid a $2,750,000 payment, but that Passport 420 had spent that money so that it could purchase the Subject Aircraft.  This constitutes fraud.

104. Therefore, Passport 420, acting through its manager Avenatti, acted with oppression, fraud, and/or malice and Gardner is therefore entitled to punitive damages in an amount according to proof at trial.

//

//

19

**CROSSCLAIM**

## SEVENTH CLAIM FOR RELIEF

## AIDING AND ABETTING BREACH OF FIDUCIARY DUTY

### (Against Passport 420)

105. The allegations of paragraphs 1 through 104 are re-alleged and incorporated herein by reference.

106. Avenatti and EA owed Gardner a fiduciary duty because they were in an attorney-client relationship with Gardner. Their fiduciary duty required them to follow the California Rules of Professional Conduct and other authorities regulating attorney behavior.

107. These ethical duties include, but are not limited to, Former California Rules of Professional Conduct Rule 4-100's rules governing trust funds and notifying clients of receipt of client funds. Specifically, Avenatti and EA failed to notify Gardner of receipt of the settlement money, failed to hold the settlement money in a trust account until disbursed to Gardner, and failed to obtain Gardner's permission and authorization for the movement and disbursement of the funds.

108. In pursuing their own interest of single minded avarice by seizing Gardner's settlement funds, which did not belong to them, and by putting that interest ahead of Gardner's interest, Avenatti and EA also violated their fiduciary duty of loyalty that all attorneys owe to their clients.

109. Because its manager was Avenatti, Passport 420 knew that Avenatti and EA were breaching and/or going to breach their fiduciary duties owed to Gardner.

110. Passport 420 gave substantial assistance and/or encouragement to Avenatti and EA. Among other things, Avenatti and EA were able to hide Gardner's funds in Passport 420 in the form of the Aircraft, which was purchased with money stolen from Gardner and owned by Passport 420. Avenatti was then able to use the Aircraft for his own benefit.

111. These events were a substantial factor in causing Gardner injury and Gardner is therefore entitled to damages.

**CROSSCLAIM**

112. A constructive trust must be imposed that would provide Gardner with an ownership interest in the Subject Aircraft.

113. Passport 420, acting through its manager Avenatti, acted in conscious disregard for Gardner's rights and put its own interests ahead of the interests of Gardner when it took her settlement money and used the money to purchase the Subject Aircraft, which constitutes malice.

114. Passport 420, acting through its manager Avenatti engaged in despicable conduct that subjected Gardner to cruel and unjust hardship in conscious disregard of her rights, which constitutes Oppression.

115. Avenatti, the manager of Passport 420, intentionally misrepresented and/or concealed material information regarding the fact that Gardner had in fact been paid a $2,750,000 payment, but that Passport 420 had spent that money so that it could purchase the Subject Aircraft.  This constitutes fraud.

116. Therefore, Passport 420, acting through its manager Avenatti, acted with oppression, fraud, and/or malice and Gardner is therefore entitled to punitive damages in an amount according to proof at trial.

## EIGHTH CLAIM FOR RELIEF
## AIDING AND ABETTING PROFESSIONAL MALPRACTICE
### (Against Passport 420)

117. The allegations of paragraphs 1 through 116 are re-alleged and incorporated herein by reference.

118. Avenatti and EA were in attorney-client relationships with Gardner.

119. Accordingly, Avenatti and EA owed Gardner the duty of all attorneys to use such skill, prudence, and diligence as members of their profession commonly possess and exercise.

120. In addition, Avenatti and EA are required to comply with their ethical duties as attorneys.  These ethical duties include, but are not limited to, Former

21

**CROSSCLAIM**

California Rules of Professional Conduct Rule 4-100's rules governing trust funds and notifying clients of receipt of client funds. Specifically, Avenatti and EA failed to notify Gardner of receipt of the settlement money, failed to hold the settlement money in a trust account until disbursed to Gardner, and failed to obtain Gardner's permission and authorization for the movement and disbursement of the funds.

121. Because its manager was Avenatti, Passport 420 knew that Avenatti and EA were committing and/or going to commit legal malpractice against their client Gardner.

122. Passport 420 gave substantial assistance and/or encouragement to Avenatti and EA. Among other things, Avenatti and EA were able to hide Gardner's funds in Passport 420 in the form of the Aircraft, which was purchased with money stolen from Gardner and owned by Passport 420. Avenatti was then able to use the Aircraft for his own benefit.

123. These events were a substantial factor in causing Gardner injury and Gardner is therefore entitled to damages.

124. A constructive trust must be imposed that would provide Gardner with an ownership interest in the Subject Aircraft.

125. Passport 420, acting through its manager Avenatti, acted in conscious disregard for Gardner's rights and put its own interests ahead of the interests of Gardner when it took her settlement money and used the money to purchase the Subject Aircraft, which constitutes malice.

126. Passport 420, acting through its manager Avenatti engaged in despicable conduct that subjected Gardner to cruel and unjust hardship in conscious disregard of her rights, which constitutes Oppression.

127. Avenatti, the manager of Passport 420, intentionally misrepresented and/or concealed material information regarding the fact that Gardner had in fact been paid a $2,750,000 payment, but that Passport 420 had spent that money so that it could purchase the Subject Aircraft. This constitutes fraud.

22

**CROSSCLAIM**

128. Therefore, Passport 420, acting through its manager Avenatti, acted with oppression, fraud, and/or malice and Gardner is therefore entitled to punitive damages in an amount according to proof at trial.

## NINTH CLAIM FOR RELIEF
## AIDING AND ABETTING AFFIRMATIVE MISREPRESENTATION
### (Against Passport 420)

129. The allegations of paragraphs 1 through 128 are re-alleged and incorporated herein by reference.

130. Avenatti and EA represented to Gardner that Avenatti would serve as Gardner's attorney and that Avenatti and EA would provide her with legal services. Implicit was the representation that Avenatti and EA would represent Gardner's interests, uphold the fiduciary duties owed to her, and comply with the California Rules of Professional Conduct.

131. Avenatti and EA's representations were false. Instead of representing Gardner's interests, they were only concerned with their own: namely taking Gardner's settlement funds so that Passport 420 could use the money to purchase a plane.

132. Both before and after Avenatti and EA embezzled Gardner's settlement, they made additional representations that the settlement provided for 96 monthly payments to Gardner over the course of the eight years following the mediation. They also represented that the monthly payments that they were making to Gardner were actually from the Individual and that, once they ceased making these payments, the reason why the payments had stopped was because the Individual had stopped making them.

133. These representations were false as well. In fact, under the terms of the settlement agreement, the Individual was required to make an initial payment of $2,750,000 on or about January 28, 2017 to Gardner with a subsequent payment, at

23

**CROSSCLAIM**

a later date in 2020, of $250,000.  The monthly payments were actually being made by Avenatti and EA to maintain the façade that the Individual was making the monthly payments.  This allowed them to take the settlement money from Gardner without her realizing what was occurring.  Similarly, when the monthly payments stopped, their explanation was false as well, but was once again intended to hide the truth from Gardner.

134.  Avenatti and EA either knew that their representations were false when they made them or made the representations recklessly and without regard for their truth.

135.  Avenatti and EA intended that Gardner rely on the representations.

136.  Gardner reasonably relied on Avenatti and EA's representations.

137.  Passport 420 knew that Avenatti and EA were making and/or going to make affirmative misrepresentations to Gardner by virtue of the fact that it was managed by Avenatti.

138.  Passport 420 gave substantial assistance and/or encouragement  to Avenatti and EA.  Among other things, Avenatti and EA were able to hide Gardner's funds in Passport 420 in the form of the Aircraft, which was purchased with money stolen from Gardner and owned by Passport 420.  Avenatti was then able to use the Aircraft for his own benefit.

139.  These events were a substantial factor in causing Gardner injury and Gardner is therefore entitled to damages.

140. A constructive trust must be imposed that would provide Gardner with an ownership interest in the Subject Aircraft.

141. Passport 420, acting through its manager Avenatti, acted in conscious disregard for Gardner's rights and put its own interests ahead of the interests of Gardner when it took her settlement money and used the money to purchase the Subject Aircraft, which constitutes malice.

142. Passport 420, acting through its manager Avenatti engaged in despicable

24

**CROSSCLAIM**

1   conduct that subjected Gardner to cruel and unjust hardship in conscious disregard

2   of her rights, which constitutes Oppression.

3        143. Avenatti, the manager of Passport 420, intentionally misrepresented

4   and/or concealed material information regarding the fact that Gardner had in fact

5   been paid a $2,750,000 payment, but that Passport 420 had spent that money so that

6   it could purchase the Subject Aircraft.  This constitutes fraud.

7        144. Therefore, Passport 420, acting through its manager Avenatti, acted with

8   oppression, fraud, and/or malice and Gardner is therefore entitled to punitive

9   damages in an amount according to proof at trial.

10

11                        **TENTH CLAIM FOR RELIEF**

12        **CONSPIRACY TO COMMIT AFFIRMATIVE MISREPRESENTATION**

13                              **(Against Passport 420)**

14        145. The allegations of paragraphs 1 through 144 are re-alleged and

15   incorporated herein by reference.

16        146. Avenatti and EA represented to Gardner that Avenatti would serve as

17   Gardner's attorney and that Avenatti and EA would provide her with legal services.

18   Implicit was the representation that Avenatti and EA would represent Gardner's

19   interests, uphold the fiduciary duties owed to her, and comply with the California

20   Rules of Professional Conduct.

21        147. Avenatti and EA's representations were false.  Instead of representing

22   Gardner's interests, they were only concerned with their own: namely taking

23   Gardner's settlement funds so that Passport 420 could use the money to purchase a

24   plane.

25        148. Both before and after Avenatti and EA embezzled Gardner's settlement,

26   they made additional representations that the settlement provided for 96 monthly

27   payments to Gardner over the course of the eight years following the mediation.

28   They also represented that the monthly payments that they were making to Gardner

                                        25
                                  **CROSSCLAIM**

were actually from the Individual and that, once they ceased making these payments, the reason why the payments had stopped was because the Individual had stopped making them.

149.  These representations were false as well.  In fact, under the terms of the settlement agreement, the Individual was required to make an initial payment of $2,750,000 on or about January 28, 2017 to Gardner with a subsequent payment, at a later date in 2020, of $250,000.  The monthly payments were actually being made by Avenatti and EA to maintain the façade that the Individual was making the monthly payments.  This allowed them to take the settlement money from Gardner without her realizing what was occurring.  Similarly, when the monthly payments stopped, their explanation was false as well, but was once again intended to hide the truth from Gardner.

150.  Avenatti and EA either knew that their representations were false when they made them or made the representations recklessly and without regard for their truth.

151.  Avenatti and EA intended that Gardner rely on the representations.

152.  Gardner reasonably relied on Avenatti and EA's representations.

153.  Passport 420 knew that Avenatti and EA were making and/or going to make affirmative misrepresentations to Gardner by virtue of the fact that Avenatti served as Passport 420's manager.

154.  Passport 420 agreed with Avenatti and EA and intended that Avenatti and EA make affirmative misrepresentations to Gardner.  Among other things, Avenatti and EA were able to hide Gardner's funds in Passport 420 in the form of the Aircraft, which was purchased with money stolen from Gardner and owned by Passport 420.  Avenatti was then able to use the Aircraft for his own benefit.

155.  These events were a substantial factor in causing Gardner injury and Gardner is therefore entitled to damages.

156. A constructive trust must be imposed that would provide Gardner with

26

**CROSSCLAIM**

1    an ownership interest in the Subject Aircraft.

2         157. Passport 420, acting through its manager Avenatti, acted in conscious

3    disregard for Gardner's rights and put its own interests ahead of the interests of

4    Gardner when it took her settlement money and used the money to purchase the

5    Subject Aircraft, which constitutes malice.

6         158. Passport 420, acting through its manager Avenatti engaged in despicable

7    conduct that subjected Gardner to cruel and unjust hardship in conscious disregard

8    of her rights, which constitutes Oppression.

9         159. Avenatti, the manager of Passport 420, intentionally misrepresented

10   and/or concealed material information regarding the fact that Gardner had in fact

11   been paid a $2,750,000 payment, but that Passport 420 had spent that money so that

12   it could purchase the Subject Aircraft.  This constitutes fraud.

13        160. Therefore, Passport 420, acting through its manager Avenatti, acted with

14   oppression, fraud, and/or malice and Gardner is therefore entitled to punitive

15   damages in an amount according to proof at trial.

16

17              **ELEVENTH CLAIM FOR RELIEF**

18   **AIDING AND ABETTING NEGLIGENT MISREPRESENTATION**

19                  **(Against Passport 420)**

20        161.  The allegations of paragraphs 1 through 160 are re-alleged and

21   incorporated herein by reference.

22        162.  Avenatti and EA represented to Gardner that Avenatti would serve as

23   Gardner's attorney and that Avenatti and EA would provide her with legal services.

24   Implicit was the representation that Avenatti and EA would represent Gardner's

25   interests, uphold the fiduciary duties owed to her, and comply with the California

26   Rules of Professional Conduct.

27        163.  Avenatti and EA's representations were false.  Instead of representing

28   Gardner's interests, they were only concerned with their own: namely taking

27

**CROSSCLAIM**

Gardner's settlement funds so that Passport 420 could use the money to purchase the Subject Airplane.

164. Both before and after Avenatti and EA embezzled Gardner's settlement, they made additional representations that the settlement provided for 96 monthly payments to Gardner over the course of the eight years following the mediation. They also represented that the monthly payments that they were making to Gardner were actually from the Individual and that, once they ceased making these payments, the reason why the payments had stopped was because the Individual had stopped making them.

165. These representations were false as well. In fact, under the terms of the settlement agreement, the Individual was required to make an initial payment of $2,750,000 on or about January 28, 2017 to Gardner with a subsequent payment, at a later date in 2020, of $250,000. The monthly payments were actually being made by Avenatti and EA to maintain the façade that the Individual was making the monthly payments. This allowed them to take the settlement money from Gardner without her realizing what was occurring. Similarly, when the monthly payments stopped, their explanation was false as well, but was once again intended to hide the truth from Gardner.

166. Regardless of whether Avenatti and EA honestly believed that the representations were true, Avenatti and EA had no reasonable grounds for believing the representations were true when they made them.

167. Avenatti and EA intended that Gardner rely on these representations.

168. Gardner reasonably relied on Avenatti and EA's representations.

169. Passport 420 knew that Avenatti and EA were making and/or going to make negligent misrepresentations to Gardner by virtue of the fact that Passport 420 was managed by Avenatti.

170. Passport 420 gave substantial assistance and/or encouragement to Avenatti and EA. Among other things, Avenatti and EA were able to hide Gardner's

**CROSSCLAIM**

funds in Passport 420 in the form of the Aircraft, which was purchased with money stolen from Gardner and owned by Passport 420.  Avenatti was then able to use the Aircraft for his own benefit.

171. These events were a substantial factor in causing Gardner injury and Gardner is therefore entitled to damages.

172. A constructive trust must be imposed that would provide Gardner with an ownership interest in the Subject Aircraft.

173. Passport 420, acting through its manager Avenatti, acted in conscious disregard for Gardner's rights and put its own interests ahead of the interests of Gardner when it took her settlement money and used the money to purchase the Subject Aircraft, which constitutes malice.

174. Passport 420, acting through its manager Avenatti engaged in despicable conduct that subjected Gardner to cruel and unjust hardship in conscious disregard of her rights, which constitutes Oppression.

175. Avenatti, the manager of Passport 420, intentionally misrepresented and/or concealed material information regarding the fact that Gardner had in fact been paid a $2,750,000 payment, but that Passport 420 had spent that money so that it could purchase the Subject Aircraft.  This constitutes fraud.

176. Therefore, Passport 420, acting through its manager Avenatti, acted with oppression, fraud, and/or malice and Gardner is therefore entitled to punitive damages in an amount according to proof at trial.

### TWELFTH CLAIM FOR RELIEF
### CONSPIRACY TO COMMIT NEGLIGENT MISREPRESENTATION
### (Against Passport 420)

177. The allegations of paragraphs 1 through 176 are re-alleged and incorporated herein by reference.

178. Avenatti and EA represented to Gardner that Avenatti would serve as

29

Gardner's attorney and that Avenatti and EA would provide her with legal services. Implicit was the representation that Avenatti and EA would represent Gardner's interests, uphold the fiduciary duties owed to her, and comply with the California Rules of Professional Conduct.

179.  Avenatti and EA's representations were false.  Instead of representing Gardner's interests, they were only concerned with their own: namely taking Gardner's settlement funds so that Passport 420 could use the money to purchase the Subject Aircraft.

180.  Both before and after Avenatti and EA embezzled Gardner's settlement, they made additional representations that the settlement provided for 96 monthly payments to Gardner over the course of the eight years following the mediation. They also represented that the monthly payments that they were making to Gardner were actually from the Individual and that, once they ceased making these payments, the reason why the payments had stopped was because the Individual had stopped making them.

181.  These representations were false as well.  In fact, under the terms of the settlement agreement, the Individual was required to make an initial payment of $2,750,000 on or about January 28, 2017 to Gardner with a subsequent payment, at a later date in 2020, of $250,000.  The monthly payments were actually being made by Avenatti and EA to maintain the façade that the Individual was making the monthly payments.  This allowed them to take the settlement money from Gardner without her realizing what was occurring.  Similarly, when the monthly payments stopped, their explanation was false as well, but was once again intended to hide the truth from Gardner.

182. Regardless of whether Avenatti and EA honestly believed that the representations were true, Avenatti and EA had no reasonable grounds for believing the representations were true when they made them.

183.  Avenatti and EA intended that Gardner rely on these representations.

30

**CROSSCLAIM**

184. Gardner reasonably relied on Avenatti and EA's representations.

185. Passport 420 knew that Avenatti and EA were making and/or going to make negligent misrepresentations to Gardner by virtue of the fact that Avenatti served as Passport 420's manager.

186. Passport 420 agreed with Avenatti and EA and intended that Avenatti and EA make affirmative misrepresentations to Gardner..  Among other things, Avenatti and EA were able to hide Gardner's funds in Passport 420 in the form of the Aircraft, which was purchased with money stolen from Gardner and owned by Passport 420.  Avenatti was then able to use the Aircraft for his own benefit.

187. These events were a substantial factor in causing Gardner injury and Gardner is therefore entitled to damages.

188. A constructive trust must be imposed that would provide Gardner with an ownership interest in the Subject Aircraft.

189. Passport 420, acting through its manager Avenatti, acted in conscious disregard for Gardner's rights and put its own interests ahead of the interests of Gardner when it took her settlement money and used the money to purchase the Subject Aircraft, which constitutes malice.

190. Passport 420, acting through its manager Avenatti engaged in despicable conduct that subjected Gardner to cruel and unjust hardship in conscious disregard of her rights, which constitutes Oppression.

191. Avenatti, the manager of Passport 420, intentionally misrepresented and/or concealed material information regarding the fact that Gardner had in fact been paid a $2,750,000 payment, but that Passport 420 had spent that money so that it could purchase the Subject Aircraft.  This constitutes fraud.

192. Therefore, Passport 420, acting through its manager Avenatti, acted with oppression, fraud, and/or malice and Gardner is therefore entitled to punitive damages in an amount according to proof at trial.

**CROSSCLAIM**

0367
0367

### THIRTEENTH CLAIM FOR RELIEF
### AIDING AND ABETTING FRAUDULENT CONCEALMENT
#### (Against Passport 420)

193. The allegations of paragraphs 1 through 192 are re-alleged and incorporated herein by reference.

194. Gardner was in a fiduciary and attorney-client relationship with Avenatti and EA.

195. Avenatti and EA intentionally failed to disclose certain facts that were known only to them, namely that rather than fulfill their obligations to represent Gardner's interests, uphold the fiduciary duties owed to her, and comply with the California Rules of Professional Conduct, they actually intended to embezzle any settlement they obtained for her for the benefit of Passport 420.

196. Once the settlement was entered into, Avenatti and EA intentionally failed to disclose the true terms of the settlement, including that the Individual was required to make an initial payment of $2,750,000 on or about January 28, 2017 to Gardner with a subsequent payment at a later date, set for 2020. The monthly payments were actually being made by Avenatti and EA to maintain the façade that the Individual was making the monthly payments. This allowed Avenatti and EA to take the settlement money from Gardner without her realizing what was occurring. Similarly, when the monthly payments stopped, their explanation was false as well, but was once again intended to hide the truth from Gardner.

197. Gardner was unaware of these facts.

198. Avenatti and EA intended to deceive Gardner by concealing the facts.

199. Had the omitted information been disclosed, Gardner reasonably would have behaved differently. Among other things, she would not have retained Avenatti and EA. Had she learned the truth after she entered into her settlement with the Individual, she would have demanded her settlement money and not have permitted Avenatti and EA to embezzle her money and cause Passport 420 to use it to purchase

32

**CROSSCLAIM**

1   the Subject Aircraft.  She also would not have permitted Avenatti and EA to send

2   her periodic monthly payments in lieu of the actual payments provided for under the

3   terms of the settlement.

4        200.  Passport 420 knew that Avenatti and EA were making and/or going to

5   fraudulently conceal material information from Gardner by virtue of the fact that it

6   was managed by Avenatti.

7        201.  Passport 420 gave substantial assistance and/or encouragement  to

8   Avenatti and EA.  Among other things, Avenatti and EA were able to hide Gardner's

9   funds in Passport 420 in the form of the Aircraft, which was purchased with money

10   stolen from Gardner and owned by Passport 420.  Avenatti was then able to use the

11   Aircraft for his own benefit.

12        202.  These events were a substantial factor in causing Gardner injury and

13   Gardner is therefore entitled to damages.

14        203. A constructive trust must be imposed that would provide Gardner with

15   an ownership interest in the Subject Aircraft.

16        204. Passport 420, acting through its manager Avenatti, acted in conscious

17   disregard for Gardner's rights and put its own interests ahead of the interests of

18   Gardner when it took her settlement money and used the money to purchase the

19   Subject Aircraft, which constitutes malice.

20        205. Passport 420, acting through its manager Avenatti engaged in despicable

21   conduct that subjected Gardner to cruel and unjust hardship in conscious disregard

22   of her rights, which constitutes Oppression.

23        206. Avenatti, the manager of Passport 420, intentionally misrepresented

24   and/or concealed material information regarding the fact that Gardner had in fact

25   been paid a $2,750,000 payment, but that Passport 420 had spent that money so that

26   it could purchase the Subject Aircraft.  This constitutes fraud.

27        207. Therefore, Passport 420, acting through its manager Avenatti, acted with

28   oppression, fraud, and/or malice and Gardner is therefore entitled to punitive

33

**CROSSCLAIM**

1    damages in an amount according to proof at trial.

2

3                    **FOURTEENTH CLAIM FOR RELIEF**

4         **CONSPIRACY TO COMMIT FRAUDULENT CONCEALMENT**

5                          **(Against Passport 420)**

6         208. The allegations of paragraphs 1 through 207 are re-alleged and

7    incorporated herein by reference.

8         209.  Gardner was in a fiduciary and attorney-client relationship with Avenatti

9    and EA.

10        210.  Avenatti and EA intentionally failed to disclose certain facts that were

11   known only to them, namely that rather than fulfill their obligations to represent

12   Gardner's interests, uphold the fiduciary duties owed to her, and comply with the

13   California Rules of Professional Conduct, they actually intended to embezzle any

14   settlement they obtained for her, for the benefit of Passport 420.

15        211.  Once the settlement was entered into, Avenatti and EA intentionally

16   failed to disclose the true terms of the settlement, including that the Individual was

17   required to make an initial payment of $2,750,000 on or about January 28, 2017 to

18   Gardner with a subsequent payment at a later date.  The monthly payments were

19   actually being made by Avenatti and EA to maintain the façade that the Individual

20   was making the monthly payments.  This allowed them to take the settlement money

21   from Gardner without her realizing what was occurring.  Similarly, when the

22   monthly payments stopped, their explanation was false as well, but was once again

23   intended to hide the truth from Gardner.

24        212.  Gardner was unaware of these facts.

25        213.  Avenatti and EA intended to deceive Gardner by concealing the facts.

26        214.  Had the omitted information been disclosed, Gardner reasonably would

27   have behaved differently. Among other things, she would not have retained Avenatti

28   and EA.  Had she learned the truth after she entered into her settlement with the

                                      34
                                 **CROSSCLAIM**

other individual, she would have demanded her settlement money and not have permitted Avenatti and EA to embezzle her money and cause Passport 420 to use it to purchase the Subject Aircraft.  She also would not have permitted Avenatti and EA to send her periodic monthly payments in lieu of the actual payments provided for under the terms of the settlement.

215.  Passport 420 knew that Avenatti and EA were making and/or going to fraudulently conceal material information from Gardner by virtue of the fact that Avenatti served as Passport 420's manager.

216.  Passport 420 agreed with Avenatti and EA and intended that Avenatti and EA fraudulently conceal the truth from Gardner.  Among other things, Avenatti and EA were able to hide Gardner's funds in Passport 420 in the form of the Aircraft, which was purchased with money stolen from Gardner and owned by Passport 420.  Avenatti was then able to use the Aircraft for his own benefit.

217.  These events were a substantial factor in causing Gardner injury and Gardner is therefore entitled to damages.

218. A constructive trust must be imposed that would provide Gardner with an ownership interest in the Subject Aircraft.

219. Passport 420, acting through its manager Avenatti, acted in conscious disregard for Gardner's rights and put its own interests ahead of the interests of Gardner when it took her settlement money and used the money to purchase the Subject Aircraft, which constitutes malice.

220. Passport 420, acting through its manager Avenatti engaged in despicable conduct that subjected Gardner to cruel and unjust hardship in conscious disregard of her rights, which constitutes Oppression.

221. Avenatti, the manager of Passport 420, intentionally misrepresented and/or concealed material information regarding the fact that Gardner had in fact been paid a $2,750,000 payment, but that Passport 420 had spent that money so that it could purchase the Subject Aircraft.  This constitutes fraud.

35

**CROSSCLAIM**

222. Therefore, Passport 420, acting through its manager Avenatti, acted with oppression, fraud, and/or malice and Gardner is therefore entitled to punitive damages in an amount according to proof at trial.

### FIFTEENTH CLAIM FOR RELIEF
### RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT §
### 18 U.S.C. § 1961 *ET SEQ.*
### (Against Passport 420)

223. The allegations of paragraphs 1 through 222 are re-alleged and incorporated herein by reference.

224. Passport 420 is a "person" under 18 U.S.C. § 1961(3) because it is capable of holding, and does hold, "a legal or beneficial interest in property."

225. Section 1962(c) makes it "unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity."

226. Section 1962(d) makes it unlawful for "any person to conspire to violate" Section 1962(c), among other provisions.

227. At all relevant times, Passport 420, along with other individuals and entities, including unknown third parties, operated an association-in-fact enterprise, which was formed for the purpose of allowing Avenatti and the other members to enrich themselves at the expense of third parties, including Gardner. Other members of the enterprise include, amongst others, Avenatti, EA, and Avenatti & Associates, APC.

228. The enterprise will be referred to herein as the "Avenatti Enterprise."

229. Each of the members of the Avenatti Enterprise are conspirators with the others and aided and abetted each other in furtherance of the objectives of the Avenatti Enterprise.

0372
0372

230. The members of the Avenatti Enterprise maintained throughout its duration a pattern of racketeering activity and acquired and/or maintained, directly or indirectly, an interest in or control in the Avenatti Enterprise.  Many of the payments made to lull Gardner into believing that she was in fact receiving periodic settlement payments under the terms of her settlement agreement, were made through the Fedwire system.

231. In addition, Passport 420, who was employed by or associated with the Avenatti Enterprise, engaged in and/or conducted activities that affected interstate commerce as well.  For example, it purchased the Subject Aircraft from Honda Aircraft Company, which is headquartered in North Carolina and took possession of the Subject Aircraft in North Carolina as well.  In doing so, Passport 420, directly or indirectly, conducted or participated in the conduct of the Avenatti Enterprise through a pattern of racketeering activity.

232. On information and belief, the actions of the members of the Avenatti Enterprise's pattern of racketeering activity included wire fraud under 18 U.S.C. § 1343.  Specifically, they devised and/or intended to devise a scheme or artifice to defraud.  In addition, it included money laundering under 18 U.S.C. §§ 1956 and/or 1957.

233. This scheme entailed a series of misrepresentations and/or concealment, as discussed above, to create the illusion that Avenatti's clients, including Gardner, had entered into settlements that would provide for numerous small periodic payments when in fact they had actually entered into settlements for either one lump sum payment or only a few substantial payments.

234. For brevity, the facts of Avenatti's indictment (attached hereto as Exhibit A, and incorporated hereto by reference) indicate the details of the multi-year conduct of the Avenatti Enterprise, including Passport 420, in defrauding Avenatti's clients, including Gardner, of their monies.

235. This allowed Avenatti and other members of the Avenatti Enterprise, like

37

**CROSSCLAIM**

Passport 420, to embezzle the actual settlement payments intended for Avenatti's clients and use the funds for their own benefit or for the benefit of Avenatti. Members of the Avenatti Enterprise would then provide funds to be sent to Avenatti's clients to lull them into believing that they were receiving periodic settlement payments so that they would not learn the truth about the settlements.

236.  Avenatti's clients relied on Avenatti's statements about the nature of the settlements and the falsified settlement agreements he showed them.  In relying on Avenatti's statements and in the case of some clients falsified settlement agreements, the clients suffered damages in the form of the difference between the settlement payments they were actually entitled to and the fake settlement payment Avenatti sent them so that they would not realize the truth.

237. In the case of Gardner in addition to or in the alternative to damages, a constructive trust must be imposed that would provide Gardner with an ownership interest in the Subject Aircraft.

238.  In the case of Gardner, Avenatti and EA intentionally failed to disclose the true terms of the settlement, including that the Individual  was required to make an initial payment of $2,750,000 on or about January 28, 2017 to Gardner with a subsequent payment at a later date.  Instead of receiving this, Gardner received monthly payments that were actually being made by Avenatti and EA to maintain the façade that the Individual was making the monthly payments.  This allowed them to embezzle the settlement money from Gardner without her realizing what was occurring.  Avenatti and EA accomplished this in part through oral communications through the phone with Gardner in which Avenatti lulled her into believing that she was in fact supposed to be receiving periodic payments.  Similarly, when the monthly payments stopped, the explanation was false as well, but was once again intended to hide the truth from Gardner.  Once again, these communications largely occurred by phone between Avenatti and Gardner.

239. Members of the Avenatti Enterprise used or caused others to use the

38

**CROSSCLAIM**

wires in interstate commerce in order to further and execute the fraudulent scheme. For example, Avenatti called Gardner on many occasions in order to mislead her into believing that nothing was awry. The wires were also used in interstate commerce in the Fedwire system. For example, on or about June 18, 2018 a payment of approximately $16,000 was made from EA Trust Account 4613 through the Fedwire system to Gardner's Chase bank account. This was one of the periodic payments that was used to lull Gardner into believing that she was in fact receiving periodic payments from the Individual agreement.

240. Moreover, on information and belief, Passport 420's purchase of the Subject Aircraft was largely accomplished through the wires. The payment of the Subject Aircraft was made by wire transfer to Honda Aircraft Company, LLC. Moreover, given the fact that Passport 420 and its members are located in Southern California and Honda Aircraft Company, LLC is headquartered in North Carolina, which is also the location where the Subject Aircraft was manufactured and where Passport 320 took possession of it, on information and belief many of the communications with Honda Aircraft Company, LLC that were necessary for purchasing and taking possession of the Subject Aircraft occurred through the wires, whether by email or phone. Among other things, Avenatti and EA were able to hide Gardner's funds in Passport 420 in the form of the Aircraft, which was purchased with money stolen from Gardner and owned by Passport 420. Avenatti was then able to use the Aircraft for his own benefit.

241. In addition Passport 420 was involved in one or more financial transactions in violation of 18 U.S.C. §§ 1956 and/or § 1957 (money laundering). Passport 420 purchased the Subject Aircraft knowing that the transaction was designed in whole or in part to conceal or disguise the location, source, ownership, and/or the proceeds of the wire fraud that resulted in Gardner losing her settlement funds. Further Passport 420 knowingly engaged in a monetary transaction with the stolen settlement money, which is worth more than $10,000.

39

**CROSSCLAIM**

**PRAYER FOR RELIEF**

WHEREFORE, Cross-Claimant Gardner prays for judgment against Cross-Defendants as follows:

Cross-Claimant Gardner seeks to recover the following damages and obtain the following relief from Cross-Defendants:

(a)  Economic loss and damages suffered by Cross-Claimant Gardner;

(b)  Restitution;

(c)  Recognition of a constructive trust granting Cross-Claimant Gardner an ownership interest in HondaJet HA-420, Serial Number SN42000029, Registration N227WP

(d)  Punitive damages;

(e)  All reasonable and necessary attorneys' fees;

(f)  Court costs;

(g)  Pre and post-judgment interest;

(h)  A declaratory judgment as to whether and to whom any claims under the Policies should be paid out, or alternatively whether and to whom any premiums should be returned;

(i)  A declaratory judgment as to the amount of Cross-Claimant Gardner's ownership interest in HondaJet HA-420, Serial Number SN42000029, Registration N227WP;

(j)  Nominal damages;

(k)  And such other relief to which Cross-Claimant Gardner may show herself justly entitled.

DATED: December 20, 2019          **THE X-LAW GROUP, P.C.**

By:_____//s//_____
                FILIPPO MARCHINO, ESQ.,
                Attorneys for Cross-Claimant Gardner

40

**CROSSCLAIM**

1

2                           **JURY DEMAND**

3

4         Cross-Claimant hereby demands a trial by jury on all issues so triable.

5

6

7    DATED: December 20, 2019            **THE X-LAW GROUP, P.C.**

8

9

10                          By:_____//s//_____

11                              FILIPPO MARCHINO, ESQ.,
                               Attorneys for Cross-Claimant Gardner
12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

---

41

**CROSSCLAIM**

0377
0377

EXHIBIT "N"

0378

0378

ELECTRONICALLY FILED
Superior Court of California
County of Santa Barbara
Darrel E. Parker, Executive Officer
4/2/2019 8:00 AM
By: Narzralli Baksh, Deputy

1    A. Barry Cappello (SBN 037835)
abc@cappellonoel.com
2    Leila J. Noël (SBN 114307)
lnoel@cappellonoel.com
3    Lawrence J. Conlan (SBN 221350)
lconlan@cappellonoel.com
4    **CAPPELLO & NOËL LLP**
831 State Street
5    Santa Barbara, CA 93101
Telephone:    (805) 564-2444
6    Facsimile:     (805) 965-5950

7    Attorneys for Plaintiffs

8

9              **SUPERIOR COURT OF THE STATE OF CALIFORNIA**

10                 **FOR THE COUNTY OF SANTA BARBARA**

11

12    WILLIAM PARRISH, an individual; E.
TIMOTHY FITZGIBBONS, an individual

13

14             Plaintiffs,

15    vs.

16    MICHAEL AVENATTI, individually;
MICHAEL EAGAN, individually; EAGAN
17    AVENATTI, LLP, a California limited liability
partnership; AVENATTI & ASSOCIATES,
18    APC, a California professional corporation;
JASON FRANK, individually; JASON FRANK
19    LAW, PLC, a California professional law
corporation; SCOTT SIMS, individually;
20    ALEXANDER CONTI, individually; and DOES
1 through 20, inclusive.

21

22            Defendants.

Case No.:    19CV01686

**COMPLAINT FOR:**
   1.   **Professional Negligence**
   2.   **Breach of Fiduciary Duty**
   3.   **Fraud – Concealment**
   4.   **Conversion**
   5.   **Promissory Estoppel**

**DEMAND FOR JURY TRIAL**

23

24

25

26

27

28

CAPPELLO
& NOËL llp
RIAL LAWYERS

COMPLAINT

1    Plaintiffs William Parrish and E. Timothy Fitzgibbons allege:

2        1.      All allegations made in this complaint are based upon information and belief.  The

3    allegations of this complaint stated on information and belief are likely to have evidentiary support

4    after a reasonable opportunity for further investigation or discovery.

5                            **NATURE OF THE CASE**

6        2.      This case arises from the egregious professional misconduct and dereliction of duty

7    by lawyer Michael J. Avenatti, his law firms, law partners and employees.  As described in this

8    complaint, the outrageous manner in which these lawyers violated Plaintiffs' trust is an affront to the

9    legal profession.

10       3.      Plaintiffs (also referred to herein as the "Clients") are former employees of FLIR

11   Systems, Inc.  In 2006, they left their employment to start a new business venture, and FLIR sued

12   them.  They prevailed at trial and FLIR was found to have litigated in bad faith.  In 2008 the Clients

13   retained three law firms – Eagan Avenatti LLP, Panish Shea & Boyle LLP and Stoll, Nussbaum &

14   Polakov ("SNP" or "Stoll") – to jointly represent them and sue FLIR for malicious prosecution in

15   Santa Barbara Superior Court.  In 2011, FLIR agreed to pay $39 million to settle the case.  The

16   parties and lawyers all agreed that FLIR would wire the settlement funds directly into the Eagan

17   Avenatti trust account.  That seemingly simple transaction spawned seven years of unnecessary

18   litigation rife with undisclosed conflicts of interest and ethical violations by Avenatti and his co-

19   defendants/law firm/partners/employees Eagan Avenatti, LLP ("EA"), Michael Eagan, Avenatti &

20   Associates, Jason Frank, Jason Frank Law, PLC, Scott Sims, and Alexander Conti (with Avenatti,

21   collectively, the "EA Defendants").

22       4.      Unknown to Plaintiffs, shortly after the settlement with FLIR was reached Robert

23   Stoll of SNP objected to the deposit of the settlement funds from FLIR directly into EA's Trust

24   Account.  The EA Defendants also did not advise Plaintiffs that Plaintiffs faced potential exposure to

25   Stoll and his law firm for agreeing that the FLIR settlement funds could be deposited into EA's trust

26   account.  The EA Defendants then also concealed from Plaintiffs that they had unilaterally

27   transferred disputed settlement funds designated for attorneys' fees from the EA trust account to the

28   EA operating account, and that those disputed funds were then used for Avenatti's/EA Defendants'

COMPLAINT

1    own interests.  The mishandling of the settlement proceeds soon became the subject of litigation in

2    which Plaintiffs were represented by the EA Defendants.

3         5.      Plaintiffs had grown to trust Avenatti and his co-defendants because of their

4    assistance in obtaining the settlement from FLIR, but the EA Defendants violated that trust by failing

5    to give competent advice about how the settlement funds should be handled, and by secretly

6    diverting the disputed funds.  To make matters worse, the EA Defendants purported to defend

7    Plaintiffs in the litigation with Stoll and SNP but failed to disclose numerous conflicts of interest,

8    failed to keep the Plaintiffs informed of significant developments, failed to act competently, took

9    positions which were flatly antagonistic to the Plaintiffs, and failed to account to Plaintiffs or to

10   return Plaintiffs' files after being terminated in late summer 2018.  In addition, during the lengthy

11   (and still ongoing) Stoll Litigation over the disputed funds, Avenatti entered into business

12   transactions with Plaintiff Parrish on terms that were unfair, unreasonable, and not fully disclosed,

13   without advising Mr. Parrish that he should seek independent counsel.

14        6.      Because the EA Defendants continued to represent Plaintiffs in the Stoll Litigation

15   until their termination in approximately August, 2018; because Plaintiffs did not discover the

16   misdeeds of the EA Defendants and that the EA Defendants had concealed their diversion of funds

17   until approximately August, 2018; because Plaintiffs incurred damages when they engaged new

18   counsel; and/or for other reasons, any applicable statutes of limitations for claims against the EA

19   Defendants are tolled during this time period.

20        7.      As a result of the breaches of fiduciary duty, incompetence, negligence, and

21   malfeasance of Avenatti and all the EA Defendants, Plaintiffs have been subjected to ongoing

22   litigation by Stoll and SNP.  Plaintiffs only became aware of the misconduct of Avenatti and all the

23   EA Defendants in late summer 2018, when Plaintiffs engaged alternative counsel.

24                                          **PARTIES**

25        8.      Plaintiff William Parrish ("Parrish") is an individual residing in the City of Santa

26   Barbara, County of Santa Barbara, State of California.

27        9.      Plaintiff E. Timothy Fitzgibbons ("Fitzgibbons") is an individual residing in the City

28   of San Clemente, County of Orange, State of California. Parrish and Fitzgibbons, collectively, are

                                            2
                                        COMPLAINT

0381

0381

1 | herein referred to herein as the "Plaintiffs" or the "Clients."

2 |     10.    Defendant Eagan Avenatti, LLP ("EA"), is a limited liability partnership existing

3 | under the laws of the State of California, with principal offices in Orange County and/or Los

4 | Angeles County. On information and belief, at all times relevant to this Complaint, EA employed

5 | defendants Michael J. Avenatti ("Avenatti"), Michael Eagan, Jason Frank Law, PLC, Jason Frank,

6 | Alexander Conti and Scott Sims.

7 |     11.    Defendant Avenatti & Associates, A Professional Corporation ("AA") is a duly

8 | organized corporation existing under the laws of the State of California, with principal place of

9 | business in Los Angeles County. On information and belief, AA is the majority owner of EA with

10 | ultimate control over EA.

11 |     12.    Defendant Michael J. Avenatti ("Avenatti"), is an individual residing in the City of

12 | Los Angeles, County of Los Angeles, State of California. Avenatti is an attorney licensed to practice

13 | law in California and represented Plaintiffs in several matters.  Upon information and belief, at all

14 | times relevant to this Complaint, Avenatti was the managing partner, and an owner, equity partner

15 | and/or agent of Defendant EA, and in engaging in the misconduct herein alleged was acting within

16 | the scope of such employment and agency.

17 |     13.    Upon information and belief, at all times material to this Complaint, Avenatti was

18 | also the sole owner, officer, director and/or manager of defendant AA. As the sole owner, officer,

19 | director and/or manager of AA, Avenatti dominated and controlled the actions and decisions of EA

20 | by actively participating in, cooperating with, directing, sanctioning and otherwise implementing

21 | directly EA's negligent and otherwise wrongful conduct described in this Complaint.

22 |     14.    Upon information and belief, AA and EA are the alter egos of each other, and of

23 | Avenatti, in that there exists, and at all times mentioned herein there existed, a unity of interest and

24 | ownership between and among Avenatti, AA and EA such that any corporate individuality and

25 | separateness between and among Avenatti, AA and EA has ceased and that each is the alter ego of

26 | the other in that each is so completely controlled, dominated, managed and operated by Avenatti that

27 | each functions as a mere instrumentality through which Avenatti conducts his business.

28 |     15.    Upon information and belief, AA's primary business is EA, as described in the

3<br/>COMPLAINT

0382

0382

1   California Secretary of State filings for AA.  Among other things, AA and EA are both owned and

2   controlled by Michael Avenatti, they use funds in each other's bank operating accounts

3   interchangeably, they operate out of the same office, have the same phone number, have many of the

4   same employees, and Michael Avenatti uses email signatures for these companies interchangeably.

5       16.    Adherence to the fiction of the existence of AA or EA as an entity separate and

6   distinct from Avenatti  or each other would permit an abuse of the letter and spirit of the corporate

7   and/or limited partnership laws, would sanction fraud, and would promote injustice in that Plaintiffs

8   could be denied a full recovery in the event that the assets of Avenatti, AA or EA are insufficient to

9   satisfy a judgment entered against him/it in this action.

10      17.    Alternatively, AA and EA are and were engaged in a joint venture, and each was

11  agent, joint venturer and representative of the other as to matters relating to the conduct described in

12  this Complaint.  By virtue of this joint venture relationship, in which each agreed that they had a

13  community of interest in their joint undertaking, each had an understanding as to the sharing of

14  profits and losses, and each had a right of joint control, they are jointly liable to Plaintiffs for their

15  conduct as alleged herein.

16      18.    Defendant Michael Eagan ("Eagan") is an individual residing in San Francisco

17  County, State of California and is an attorney licensed to practice law in California.  At all times

18  material to this Complaint, Eagan was an owner, equity partner and/or agent of Defendant EA, and

19  in engaging in the misconduct herein alleged, was acting within the scope of such employment and

20  agency.

21      19.    Defendant Jason Frank is an individual residing in Orange County, State of California

22  and is an attorney licensed to practice law in California.  At all times relevant to this Complaint,

23  Jason Frank was the sole owner, employee, officer, director and/or manager of Defendant Jason

24  Frank Law, PLC, an entity located in Orange County, and in engaging in the misconduct herein

25  alleged, was acting within the scope of such employment and agency.

26      20.    At all times relevant to this Complaint, Jason Frank and Jason Frank Law, PLC were

27  also owners, partners and/or agents of Defendant EA through an independent contract agreement

28  between Jason Frank, Jason Frank Law, PLC and EA. In engaging in the misconduct herein alleged,

4
COMPLAINT

1  Jason Frank and Jason Frank Law, PLC were acting within the scope of such employment and
2  agency. Jason Frank and Jason Frank Law, PLC are collectively referred to as "Jason Frank
3  Defendants."

4    21.   Defendant Scott Sims ("Sims") is an individual residing in Orange County, State of
5  California and is an attorney licensed to practice law in California.  At all times relevant to this
6  Complaint, Sims was an owner, partner and/or agent of Defendant EA, and in engaging in the
7  misconduct herein alleged, was acting within the scope of such employment and agency.

8    22.   Defendant Alexander Conti ("Conti") is an individual residing in Orange County,
9  State of California and is an attorney licensed to practice law in California.  At all times relevant to
10 this Complaint, Defendant Conti was an employee and/or agent of Defendant EA, and in engaging in
11 the misconduct herein alleged, was acting within the scope of such employment and agency.

12   23.   EA, AA,  Avenatti, Michael Eagan, Jason Frank Law, PLC, Jason Frank, Alexander
13 Conti and Scott Sims are referred herein collectively, as the "EA Defendants."  Plaintiffs are
14 informed and believe that Avenatti, Eagan, Jason Frank Law, PLC, Jason Frank, and Sims are also
15 joint venturers who have shared in the profits and/or losses of EA.  Avenatti, Eagan, Jason Frank
16 Law, PLC, Jason Frank and Sims are referred to herein collectively, as "EA Partners." Upon
17 information and belief, EA Partners shared in the profits and/or losses of Eagan Avenatti.

18   24.   Plaintiffs are uncertain as to the identity or capacity of the defendants included herein
19 as DOES 1 through 20, inclusive, and therefore sue said defendants by their fictitious names.
20 Plaintiffs are informed and believe and thereon allege that said defendants, DOES 1 through 20,
21 inclusive, and each of them, are liable to Plaintiffs on the facts herein alleged and Plaintiffs will seek
22 leave of this court to amend this complaint when their true names are ascertained.

23                              **VENUE**

24   25.   Venue is appropriate in Santa Barbara County because the retention of Defendants as
25 attorneys for the FLIR litigation occurred in Santa Barbara County, and Defendants' services
26 rendered to Plaintiffs in the FLIR litigation were made, entered into and performed in Santa Barbara
27 County.

28

0384

0384

**GENERAL ALLEGATIONS**

26.     As explained herein, the genesis of this action is attorney misconduct in failing to advise Plaintiffs about the consequences of their assent to a seemingly simple transaction – the transfer of settlement funds from their former employer FLIR into a law firm trust account.  The EA Defendants failed to properly advise Plaintiffs.  Had they properly advised Plaintiffs, the subsequent Stoll Litigation would never have been filed.

27.     This action also arises from the ongoing attorney misconduct by the EA Defendants, who represented the Plaintiffs until they were fired in late summer, 2018, in the Stoll Litigation (i.e., the Orange County Superior Court case entitled *Stoll v. Eagan Avenatti, et al.*, Case No. 30-2013-00627604, [consolidated with *Eagan Avenatti, LLP v. Stoll, Nussbaum & Polakov*, Case No. 30-2011-00483570-CU-CO-CJC]) and in other legal work for Plaintiffs in which the EA Defendants utterly abused the trust Plaintiffs had placed in them, established by their longstanding attorney-client relationship.

**The FLIR Litigation and the EA Defendants' Unilateral Disposition of the Disputed Attorney's Fees Allegedly Due to Their FLIR Litigation Co-Counsel**

28.     In 2006, Plaintiffs were sued by their prior employer in *FLIR Systems, Inc., et al. v. Parrish, et al.*, Santa Barbara Superior Court Case No. 1220581.  Plaintiffs prevailed in that suit, and later sought counsel to represent them to pursue a malicious prosecution case against FLIR.

29.     Plaintiffs engaged EA, Panish, and SNP and Stoll (collectively, the "Attorneys"), jointly to represent them pursuant to a July 21, 2008 Attorney-Client Fee Contract (Contingency) (the "Joint Retainer") between the Clients and the Attorneys.  Attached hereto as Exhibit "A" is a true copy of the Joint Retainer.  Pursuant to the Joint Retainer, the Attorneys filed the lawsuit titled *Parrish et al. v. FLIR Systems, Inc. et al,*. Case No. 1301514, on July 10, 2008 (the "FLIR Litigation").

30.     About a year and a half after executing the Joint Retainer and filing the complaint in the FLIR Litigation, the Attorneys separately entered into an Attorneys' Fee Sharing Agreement among themselves only for the apportionment of the attorneys' fees among the Attorneys in connection with their joint representation of the Clients in the FLIR Litigation (the "Attorneys' Fee

6
COMPLAINT

1   Sharing Agreement).

2       31.     Plaintiffs were not and are not parties to the Attorneys' Fee Sharing Agreement. That

3   Agreement simply provides specific terms regarding sharing of fees between the three law firms, as

4   expressly found by the trial court in its 9/19/2014 Minute Order on EA's Motion for Judgment on

5   the Pleadings in the FLIR Litigation, and as admitted subsequently by Stoll. Attached hereto as

6   Exhibit "B" is a true copy of the Attorneys' Fee Sharing Agreement.

7       32.     On or about May 17, 2011, the Clients entered into a $39 million settlement

8   agreement with FLIR. That settlement amount included $15.3 million (approximately 40%) in

9   contingent attorneys' fees that were owed to the Attorneys, jointly, under the Joint Retainer (the

10  "Attorneys' Fees"). The Attorneys and parties understood that the settlement agreement also

11  included a term for a wire deposit of the entire settlement amount from FLIR directly into the EA

12  trust account.

13      33.     On or about May 17, 2011, Stoll and SNP sent Panish and Avenatti a letter requesting

14  that the FLIR settlement fees be deposited into Panish's trust account, not EA's. **This letter was not**

15  **sent or copied to the Clients**, and the Clients were not told of it by any of their counsel. On May

16  19, 2011, Avenatti sent Stoll and SNP a letter stating that the settlement funds would be deposited in

17  the EA trust account on or about May 31, 2011. **This letter also was not sent or copied to the**

18  **Clients**.

19      34.     Stoll's actual involvement in the FLIR Litigation was minimal, and when he did offer

20  advice it was not thoughtful or helpful. For that reason, the Clients did not want him involved in

21  contemplated litigation against Latham & Watkins, LLP, which had represented FLIR in the original

22  lawsuit, so they fired him on or about May 30, 2011.

23      35.     On May 31, 2011, the entire $39 million FLIR settlement, including the $15.3 million

24  in attorneys' fees, was wired directly from FLIR to EA's client trust account. On the same day,

25  Avenatti paid the Clients their proper share of the FLIR settlement proceeds. Stoll and SNP have

26  never disputed that the Clients only received the monies properly due to them from the FLIR

27  settlement funds, or that the full portion of all amounts owed for attorney's fees was deposited under

28  the settlement agreement into the EA trust account.

7

COMPLAINT

0386

0386

36.   Unknown to the Clients, EA's trust and operating account bank records show that on May 31, 2011, the $39 million of FLIR settlement proceeds were wired directly into EA's client trust account; approximately $23.5 million was wired to the Clients; and the remainder was transferred by Avenatti into EA's operating account.

37.   Plaintiffs are informed and believe that funds in a law firm's client trust account are held by the law firm in trust while funds in a law firm's operating account are the property of the law firm. Plaintiffs are further informed and believe that, upon unilaterally transferring the balance of the settlement proceeds to EA's operating account, Avenatti and the EA Defendants improperly converted any funds which they had not earned, or that were in dispute. The balance of the settlement proceeds EA transferred from its trust account to its operating account included *all* the Attorneys' Fees jointly owed to the Attorneys in the FLIR Litigation, including any share owed to Panish and SNP pursuant to the Attorneys' Fee Sharing Agreement. This commingling of funds was done without Plaintiffs' knowledge or consent.

38.   Plaintiffs are informed and believe that Avenatti paid Panish attorneys' fees from the EA operating account, initially attempting to pay Panish more than his percentage under the Attorneys' Fee Sharing Agreement, but refused to give Stoll any of the settlement funds despite Stoll's request for his portion of the fees, under the Attorneys' Fee Sharing Agreement (the "Disputed Fees"). These Disputed Fees amounted to approximately $5.4 million.

39.   Upon information and belief, after Avenatti and the EA Defendants transferred the Disputed Fees and EA's fees from EA's client trust account to its operating account, the Disputed Fees were used for the benefit of EA, AA, Avenatti and others.

40.   Plaintiffs are informed and believe that Avenatti knew or should have known that his unilateral transfer of Disputed Fees and EA's fees from EA's trust account to EA's operating account was improper.  Plaintiffs are informed and believe that Avenatti testified under oath later in a separate case that California attorneys have ethical obligations precluding them from disbursing settlement funds or making use of such funds without providing adequate notice and protection to prior counsel, as well as an affirmative obligation to segregate any monies that may be subject to the prior counsel's lien, and to escrow those funds until the issue is resolved.  He also testified that

0387

0387

1  subsequent counsel cannot take it upon themselves to decide what portion of the fees and costs are in

2  dispute and disburse 90 percent of the fees for their own benefit.  Plaintiffs are informed and believe

3  that this testimony was given in June 2017.

4      41.    Plaintiffs are also informed and believe that an attorney who fails to ensure the

5  payment of a valid lien breaches both a duty to the lienholder and an ethical duty to the client to

6  perform services competently as refusing to ensure payment could expose the client to collection

7  efforts. See *In re Riley*, 3 Cal. State Bar Ct. Rptr. 91, 112 (1994); See also Cal. Rules of Prof'l

8  Conduct, Rule 3-110. Avenatti knew or should have known that the entire amount of the Disputed

9  Fees and EA fees should have been held in a trust account pending resolution of his co-counsel's fee

10  dispute, but failed to do so and instead spent the fees to benefit EA, AA, and Avenatti. As a direct

11  result of Avenatti's:  (a) failure to advise Plaintiffs that SNP objected to the deposit of settlement

12  funds into EA's trust account and wanted an alternative deposit procedure; (b) failure to segregate

13  the Disputed Fees and EA fees in a trust account, after deposit; (c) secret conversion of the Disputed

14  Fees for his and his law firms' benefit; and (d) failure to ensure payment of SNP/Stoll's lien by

15  converting the Disputed Fees, the Clients were subsequently sued by Stoll over fees the Clients had

16  already paid.

17      42.    The EA Defendants all knew or should have known of Avenatti's improper transfer

18  of the Disputed Fees from EA's client trust account to its operating account, but failed to disclose

19  this to the Clients, to the Clients' detriment.

20      43.    By improperly transferring the Disputed Fees from the client trust account and

21  commingling them with funds in the operating account, the EA Defendants obtained an adverse

22  pecuniary interest to the Clients as this exposed the Clients to a potential lawsuit for fees the Clients

23  owed under the Joint Retainer and already had paid to the Attorneys, jointly. The EA Defendants

24  failed to disclose to the Clients that: (a) they had improperly commingled the Disputed Fees by

25  transferring the Attorneys fees from the client trust account to the operating account; (b) by

26  commingling the funds, the EA Defendants had acquired an adverse pecuniary interest to the

27  Clients; (c) the Clients faced potential liability for EA's  conduct; (d) EA's acquisition of the adverse

28  interest was not fair or reasonable to the Clients, who were then exposed to potential liability for fees

9

COMPLAINT

1  they had already paid; and (e) the Clients should seek the advice of an independent lawyer as to this

2  unilateral transfer of funds from trust account to operating account.

3       44.     The EA Defendants failed to obtain the Clients' informed written consent to the

4  acquisition of their adverse pecuniary interest. Accordingly, the EA Defendants acted adversely to

5  the Clients, contrary to the Clients' interest, and for the EA Defendants' own benefit, breaching

6  fiduciary duties owed to the Clients. The EA Defendants' adverse actions then continued into the

7  subsequent Stoll Litigation.

8       **The Stoll Litigation and Plaintiffs' Continuing Attorney-Client Relationship with the**

9                                    **EA Defendants**

10      45.     Immediately after the FLIR settlement, the Clients proceeded with Avenatti's advice

11 to pursue a second malicious prosecution action, against Latham & Watkins, the law firm that

12 represented FLIR in the lawsuit against the Clients (the "Latham Litigation"). EA represented the

13 Clients in the Latham Litigation, which resulted in a dismissal of Plaintiffs' claims and an award of

14 $1.8 million in attorneys' fees to Latham. Plaintiffs ultimately fired EA in August 2018. The

15 Latham Litigation concluded on or about December 5, 2018 when Latham & Watkins filed an

16 Acknowledgment of Satisfaction of Judgment. Throughout their representation of the Clients in the

17 Latham Litigation, the EA Defendants continually focused the Plaintiffs' attention on the Latham

18 Litigation, reiterating that the Latham Litigation was the Clients' only significant legal matter, and

19 diverting the Clients' attention from the also-pending Stoll Litigation.

20      46.     The Stoll Litigation began on or about June 14, 2011, when EA filed a Complaint for

21 Declaratory Relief against Stoll and SNP, titled *Eagan Avenatti, LLP v. Robert J. Stoll, et al.*,

22 Orange County Superior Court Case No. 30-2011 00483570 (the "EA Complaint"). The EA

23 Complaint alleged that Stoll and SNP were only entitled to attorneys' fees based on quantum meruit

24 from the Clients.

25      47.     On or about July 7, 2011, SNP filed a cross-complaint in the Stoll Litigation against

26 EA, and also named the Clients as defendants ("Stoll Cross-Complaint"). SNP alleged that the

27 Clients acted with oppression, fraud and malice by "converting" SNP's fees, and alleged that the

28 Clients were liable for punitive damages. A judgment against the Clients that includes punitive

10
COMPLAINT

0389

0389

1   damages could amount to more than ten million dollars.  The EA Defendants represented the

2   Plaintiffs/Clients in defending against the Stoll Cross-Complaint, and told Plaintiffs repeatedly that

3   the Stoll claims were "nothing to worry about."

4       48.    On or about January 30, 2013, SNP filed a separate Complaint for Fraudulent

5   Conveyance and other claims against Avenatti, EA, AA and Lisa Storie-Avenatti, Orange County

6   Superior Court Case No. 30-2103-00627604-CU-FR-CJC (the "SNP Fraudulent Conveyance

7   Complaint").

8       49.    In or about December 2015, SNP's expert, Dr. Barbara Luna, issued a report and

9   declaration and gave deposition testimony that traced the Disputed Fees and determined that they

10   were transferred from EA's client trust account into EA's operating account and then further

11   disbursed for Avenatti, EA, AA and Avenatti's wife's benefit.  The EA Defendants never gave the

12   Clients a copy of Dr. Luna's deposition testimony, her declaration, or her report, and never advised

13   the Clients of Dr. Luna's findings or of the allegations in the SNP Fraudulent Conveyance

14   Complaint.

15       50.    The SNP Fraudulent Conveyance Complaint was consolidated with the Stoll

16   Ligitation. As a result, the consolidated Stoll Litigation included the following parties, all of whom

17   were concurrently represented by the EA Defendants:  the Plaintiffs/Clients, Avenatti, EA, and AA,

18   all of whom are cross-defendants in the Stoll Cross-Complaint; and Avenatti, EA, AA and Lisa

19   Storie-Avenatti, all of whom are defendants in the SNP Fraudulent Conveyance Complaint.

20   Avenatti, EA, AA and Lisa Storie-Avenatti are collectively referred to herein as the "Avenatti Co-

21   Defendants."

22       51.    Upon information and belief, Avenatti and EA represented both the Clients and the

23   Avenatti Co-Defendants in the Stoll Litigation as counsel of record, and Avenatti/EA and the Clients

24   had an attorney-client relationship. Avenatti had extensive involvement in the Stoll Litigation and

25   submitted numerous declarations under penalty of perjury, was a key fact witness who testified

26   under oath regarding material facts at his deposition, signed numerous substantive pleadings for both

27   the Clients and the Avenatti Co-Defendants, represented both the Clients and the Avenatti Co-

28   Defendants at various hearings and depositions, and responded to discovery requests and

11<br>COMPLAINT

1  propounded discovery on behalf of both the Clients' and the Avenatti Co-Defendants'.

2    52.    Upon information and belief, Eagan represented both the Clients and the Avenatti Co-

3  Defendants in the Stoll Litigation as counsel of record. During that time, Eagan and the Clients had

4  an attorney-client relationship.

5    53.    Upon information and belief, the Jason Frank Defendants also represented both the

6  Clients and the Avenatti Co-Defendants in the Stoll Litigation as follows: the Jason Frank

7  Defendants represented both the Clients and the Avenatti Co-Defendants in key depositions,

8  including conducting the deposition of Robert Stoll on April 21, 2015 on behalf of the Clients and

9  the Avenatti Co-Defendants. During the deposition of Robert Stoll, among other things, Jason Frank

10  waived the Clients' attorney-client privilege with regards to the Clients' communications with Stoll,

11  without the Clients' informed, written consent. During that time, the Jason Frank Defendants and the

12  Clients had an attorney-client relationship.

13    54.    Upon information and belief, Sims also represented both the Clients and the Avenatti

14  Co-Defendants in the Stoll Litigation as counsel of record. Sims has had extensive involvement in

15  the Stoll Litigation and has submitted numerous declarations under penalty of perjury as counsel of

16  record for both the Clients and the Avenatti Co-Defendants. Sims is a fact witness in the Stoll

17  Litigation and has testified under oath regarding material facts at his deposition. Sims also signed

18  numerous substantive pleadings for the Clients and the Avenatti Co-Defendants. Sims represented

19  both the Clients and the Avenatti Co-Defendants at various hearings and depositions, and Sims

20  responded to discovery requests and propounded discovery on the Clients' and the Avenatti Co-

21  Defendants' behalf. During that time, Sims and the Clients had an attorney-client relationship.

22    55.    Upon information and belief, Conti also represented both the Clients and the Co-

23  Defendants in the Stoll Litigation. Conti signed numerous substantive pleadings on the Clients' and

24  the Avenatti Co-Defendants' behalf in the Stoll Litigation and represented the Clients and the

25  Avenatti Co-Defendants at various hearings. During that time, Conti and the Clients had an attorney-

26  client relationship.

27    56.    The EA Defendants have a legal, business, financial, professional and personal

28  relationship with parties and witnesses in the Stoll Litigation because, among other things: (a)

1  Avenatti, AA and EA are named defendants and Avenatti is a key fact witness who has provided

2  sworn testimony on material facts in this matter: (b) Avenatti is the managing partner/owner and an

3  employee of his law firms, defendants EA and AA, while Eagan, Jason Frank Defendants and Sims

4  are employees and partners/owners of defendant EA and Conti is an employee of EA; (c) Avenatti is

5  married to defendant Lisa Storie-Avenatti; and (d) the EA Defendants were in an attorney-client

6  relationship with the Avenatti Co-Defendants.

7  **Non-disclosures and Breaches of Fiduciary Duty Owed to Plaintiffs**

8  **(by the EA) Defendants**

9      57.     The EA Defendants never informed the Clients in writing of the above-cited

10  conflicting relationships or of the actual and reasonably foreseeable adverse consequences to the

11  Clients of the EA Defendants' representation of the Clients in the Stoll Litigation in which they each

12  had legal, business, financial, professional and/or personal relationships with multiple parties and

13  witnesses.

14      58.     The Clients had actual and/or potential conflicts of interest with the Avenatti Co-

15  Defendants because, among other things, when Avenatti transferred the Disputed Fees from the EA

16  client trust account to the EA operating account for the benefit of the EA Defendants/the Avenatti

17  Co-Defendant, the EA Defendants and the Avenatti Co-Defendants acquired a pecuniary interest

18  adverse to the Clients which exposed the Clients to potential liability to Stoll/SNP.

19      59.     **EA Defendants Exploited the Conflicts of Interest to Plaintiffs' Detriment**. The

20  EA Defendants exploited for their own benefit the serious conflicts between them, the Avenatti Co-

21  Defendants and the Clients. As only a few examples:

22          a.  The EA Defendants took the position early in the Stoll Litigation, without the

23              Clients' knowledge or consent, that the *Clients* were liable to Stoll for the

24              Disputed Fees and that Stoll must pursue the recovery of the Disputed Fees from

25              the Clients, rather than from Avenatti, the EA Defendants, or Lisa Storie-

26              Avenatti, even though the Clients had already paid the full amount of attorneys'

27              fees into a trust account, and the EA Defendants had already converted the

28              Disputed Fees and used them for their own and others' benefit. The EA

13

COMPLAINT

0392

0392

1    Defendants did this in various filed pleadings that were prejudicial to the

2    Clients' defense and beneficial to the EA Defendants.

3    b.   Avenatti falsely testified at his deposition, at which no attorney appeared on

4    behalf of the Clients, that the *Clients* directed the distribution of the Attorneys'

5    Fees. This allegation was repeated in responses to Special Interrogatories dated

6    September 17, 2015 and signed by Sims on behalf of EA in the Stoll Litigation.

7    These false statements directly conflict with the Clients' testimony and sworn

8    declarations under oath that they did *not* direct distribution of the Attorneys'

9    Fees, and this false testimony undermines the Clients' defense in the Stoll

10   Litigation, to the benefit of the EA Defendants.

11   c.   The EA Defendants repeatedly argued for their own benefit and against the

12   Clients' interest in numerous pleadings, by, among other things, alleging that the

13   Clients were parties to the Attorneys' Fee Sharing Agreement.  In making this

14   allegation, the EA Defendants attempted to pin liability on the Clients by

15   arguing that it was the Clients' responsibility to ensure payment to each attorney,

16   individually, in accordance with that agreement. But the Clients only had an

17   obligation to pay the Attorneys, jointly, pursuant to the Joint Retainer. The

18   Clients' obligation to pay the Attorneys jointly was fully discharged upon the

19   wiring of the entire FLIR settlement proceeds, into EA's client trust account.

20   How the fee portion was distributed amongst counsel, after it was wired *in trust*

21   to one of three co-counsel's trust accounts, was between the Attorneys only, and

22   subject to their fiduciary and/or other duties owed to each other, and any

23   suggestion to the contrary is incorrect, not in accordance with court findings, and

24   adverse to the Clients' interests and defense.

25   60.     The EA Defendants failed to inform the Clients of the relevant circumstances and of

26   the actual and reasonably foreseeable adverse consequences to the Clients of their conflicted

27   representation, and failed to obtain the Clients' informed written consent to their conflicted ongoing

28   representation of both the Clients and the Stoll Co-Defendants.

14<br>COMPLAINT

61.   **EA Defendants' Misrepresentations About the Disputed Fees.** Throughout EA's
representation of the Clients, Avenatti repeatedly assured the Clients both orally and in writing that
there was "nothing to worry about" with regards to the Stoll Litigation because, among other things,
the entire amount of the Disputed Fees (a) were safely deposited in EA's client trust account and
would remain so pending resolution of the Stoll Litigation, and (b) the Disputed Fees held in the
client trust account would cover any adverse judgment against the Clients in the Stoll Litigation.
These assurances were untrue on several counts, including that EA had already converted the
Disputed Fees.

62.   **EA Defendants' Purported Indemnification of the Clients.** Avenatti further
assured the Clients they had "nothing to worry about" with regards to the Stoll Litigation because
EA would defend the Clients and indemnify them for any judgment against them. Avenatti drafted a
proposed indemnification agreement that he sent to the Clients on or about May 13, 2015 (the
"Indemnification Agreement").

63.   Avenatti told the Clients that the Indemnification Agreement was valid *but that they
should not sign it*, purportedly so it would not be discoverable in the Stoll litigation and that would
be to their benefit. Since Avenatti was their attorney, the Clients trusted that he was acting in their
best interest, and pursuant to his instructions they did not execute it.  At no time did Avenatti or the
EA Defendants advise Plaintiffs that they would use the purported "indemnification" to repeatedly
undermine the Plaintiffs' defense for the benefit of the EA Defendants, and to hide from the
Plaintiffs their continued beneficial use of the Disputed Fees.

64.   The EA Defendants knew or should have known, but failed to disclose, among other
things, that (a) their defense of the Clients in the Stoll Litigation was conflicted, (b) the unexecuted
Indemnification Agreement may not be valid because it was not executed, (c) Avenatti had
comingled the Disputed Fees and they no longer were in the client trust account and the
Indemnification Agreement would purportedly indemnify the Clients for *Avenatti's own misdeeds in
converting the Disputed Fees,* (d) the purported indemnification promise was a ploy to enable the
EA Defendants to undermine Plaintiffs' defense, and (e) the Indemnification Agreement, even if
valid, was likely worthless because there was a serious risk that upon final resolution of the Stoll

15
COMPLAINT

0394

0394

1    Litigation, the EA Defendants may not have the funds to cover any potential judgment against the

2    Clients, including a judgment for punitive damages that could amount to more than ten million

3    dollars.[1] As described, the terms of the Indemnification Agreement were not fair nor reasonable nor

4    fully disclosed. Further, the EA Defendants failed to advise the Clients in writing that they may seek

5    the advice of an independent lawyer of their choice and failed to obtain the Clients' informed written

6    consent to the terms of the Indemnification Agreement.

7        65.    The Clients reasonably trusted and relied on the EA Defendants as a result of, inter

8    alia, (a) Avenatti's assurances to the Clients as described above that the EA Defendants would

9    faithfully defend and indemnify the Clients and that the Disputed Fees would remain safely in their

10   client trust account pending resolution of the Stoll Litigation, (b) their ongoing attorney-client

11   relationship with the EA Defendants, including EA's representation of the Clients in the Latham

12   Litigation and other business transactions, and (c) the EA Defendants' involvement and assistance in

13   obtaining a $39 million settlement for the Clients in the FLIR Litigation.

14       66.    **EA Defendants' Ongoing Failure to Keep the Clients Informed.** During the

15   course of the Stoll Litigation, the EA Defendants failed to keep the Clients reasonably apprised of

16   significant developments relating to the representation and failed to act with competence in

17   defending the Plaintiffs. For example, among other things:

18            a.    The EA Defendants failed to disclose that they had filed a malpractice cross-

19                  complaint on the Clients' behalf against Stoll, without full disclosure to the

20                  Clients, and failed to provide the Clients with a copy of the malpractice cross-

21                  complaint. Thereafter, the EA Defendants also failed to disclose to the Clients

22                  that they had not opposed Stoll's demurrer and then not appeared at the hearing

23

24   [1] Since the commencement of the Stoll Litigation, Avenatti and EA have had several very substantial
     judgments against them including, without limitation, a $10 million judgment against EA, a $5
25   million judgment against Avenatti in favor of Jason Frank Defendants, and a $2 million judgment
     against Avenatti in favor of Mr. Parrish based on a $1.5 Million Unsecured Loan (discussed below).
26   Plaintiffs are informed and believe that EA has been a judgment debtor in bankruptcy proceedings
     and both EA and Avenatti have failed to pay these judgments to date, despite court orders and
27   collection efforts.

28

                                    16
                               COMPLAINT

1   on the demurer to that cross-complaint, which was then dismissed with

2   prejudice.

3      b.   The EA Defendants failed to advise the Clients of a Code of Civil Procedure

4   Section 998 Offer made by SNP in the Stoll Litigation.

5      c.   The EA Defendants routinely filed discovery responses on the Clients' behalf

6   without ever forwarding the responses to the Clients for their input, review

7   and/or approval.

8      d.   The EA Defendants, in discovery responses submitted on the Clients' behalf,

9   stipulated that the Clients had the ability to pay a punitive damages award,

10  without the Clients' knowledge or consent.

11     e.   The EA Defendants waived the Clients' right to a jury trial within five years of

12  commencement of an action without the Clients' knowledge or consent, pending

13  the outcome of an appeal that, if determined in the EA Defendants favor, would

14  result in a dismissal of Stoll's claims against the EA Defendants, but would *not*

15  affect Stoll's claims against the Clients. This waiver benefited the EA

16  Defendants at the Clients' expense.

17  67.    **EA Defendants' Failure to Act Competently.** The EA Defendants also failed to act

18  competently throughout their representation of the Clients in the Stoll Litigation, until their

19  termination in August 2018. For example, among other things:

20     a.   The EA Defendants failed to have counsel representing the Clients at key

21  depositions in the Stoll Litigation. In fact, no attorney made an appearance for

22  the Clients at the April 22, 2015 deposition of Avenatti, the November 5, 2015

23  deposition of Brian Panish, the October 16, 2015 deposition of Scott Sims (a

24  former EA attorney) or the October 23, 2015 deposition of Ellen A. Pansky. Ms.

25  Pansky is an ethics expert whom Avenatti consulted with and who advised

26  Avenatti on whether the Disputed Fees needed to be held in trust in a designated

27  manner. Because no one was representing the Clients at her deposition, Ms.

28  Pansky was not asked to opine on Avenatti's duty to segregate the entire amount

17
COMPLAINT

0396

0396

1   of the Disputed Fees in a client trust account, a key component of the Clients'
2   defense.

3        b.  The EA Defendants also failed to file a timely motion to compel arbitration,
4            resulting in a waiver of the Clients' right to arbitration.

5        c.  The EA Defendants also failed to appear on the Clients' behalf at hearings on
6            substantive matters.

7        d.  The EA Defendants also failed to file substantive defensive motion(s) on the
8            Clients' behalf, including a demurrer or a motion for summary
9            judgment/adjudication.

10                  **Avenatti Also Entangled Plaintiff Parrish in**
11             **Two Unrelated Business Ventures Without Proper Disclosure**

12       68.   In or about June 2013, at the same time that the EA Defendants were purporting to
13   represent Clients in the Stoll Litigation, and while Avenatti was the managing partner and/or
14   controlling owner of EA, Avenatti improperly requested that Plaintiff Parrish provide him an
15   unsecured loan in the amount of $1.5 million.  Plaintiff Parrish agreed, based on his trust of Avenatti
16   and the EA Defendants, and the EA Defendants' success in the FLIR Litigation, and loaned Avenatti
17   the $1.5 million.  At no time did Avenatti disclose to Mr. Parrish that this loan was high risk, and the
18   loan was not documented with any formal note at the time the loan was made.  Although Avenatti
19   eventually sent Plaintiff a Promissory Note, the terms of the note were not fair or reasonable to the
20   Client; the Client was not advised in writing that he should seek the advice of an independent
21   counsel; and the Client was not able to consent after such disclosures, because the disclosures were
22   never made.

23       69.   In addition to the improper unsecured loan, and as but one more example of
24   Avenatti's pattern of legal malpractice, as the EA Defendants were representing the Clients in the
25   Stoll Litigation, and while Avenatti was in debt to Mr. Parrish, Avenatti also persuaded Mr. Parrish
26   to jointly purchase a private jet with him.  This deal was done without proper disclosure to Mr.
27   Parrish of the unfairness of the deal terms or the conflicts inherent in the LLC operating agreement,
28   and without advising Mr. Parrish to obtain the advice of separate counsel as to the fairness or other

                                    18
                               COMPLAINT

0397

0397

1    issues involved with the transaction.

2        **After the Clients Terminated the EA Defendants in August 2018, the EA Defendants**

3        **Refused to Turn Over the Clients' Entire Files, Causing Further Harm and Prejudice**

4        **to the Clients**

5        70.    The Clients consulted new counsel on another matter in the summer of 2018, while

6    the EA Defendants' representation of the Clients in the Stoll Litigation was still ongoing. Upon

7    consulting new counsel, the Clients learned for the first time of the EA Defendants' shocking trail of

8    misdeeds and self-dealing as described herein. On August 2, 2018, the Clients terminated the EA

9    Defendants from further representation of the Clients in any matters, including the Stoll Litigation.

10       71.    The Clients then requested that Avenatti and the EA Defendants provide a full

11   accounting of the FLIR settlement funds.  Avenatti and the EA Defendants have refused to do so.

12       72.    Clients also requested that Avenatti provide them with a complete copy of their files.

13   Avenatti failed to promptly produce the file, and the Clients were forced to make further requests for

14   their file. Several months after their initial request, Avenatti produced an incomplete copy of the

15   Clients' file which failed to include substantive materials, including but not limited to the following:

16   correspondence relating to the Stoll Litigation (including emails, letters, memorandum, notes and

17   faxes); documents produced in the Stoll Litigation, including documents produced by Avenatti's law

18   firms; and client papers relating to EA and Avenatti's representation of the Clients in other matters.

19   In addition, EA produced only a fraction of the over 1,800 pleadings in the case that have been filed

20   over the seven years of litigation.

21       73.    This failure to produce the complete client papers relating to the Stoll Litigation has

22   harmed Plaintiffs.  It is critical to have the Clients' complete file to properly prepare their defense

23   and the failure of these defendants to produce the file has severely and adversely affected the

24   Plaintiffs and their ability to defend against Stoll's claims.

25       74.    After terminating the EA Defendants from further representation of them, the Clients

26   discovered, among other things, that (a) the EA Defendants had converted the Disputed Fees by

27   comingling them with funds in their operating account and then using them for their own benefit,

28   and (b) the EA Defendants' representation of the Clients was rife with undisclosed conflicts, the

19
COMPLAINT

0398

0398

1    taking of positions antagonistic to the Clients, and other acts of attorney misconduct described

2    herein.

3        75.    Plaintiffs are informed and believe that the EA Defendants' conduct was part and

4    parcel of their ongoing business practice of utilizing settlement funds for their own benefit, and for

5    as long as they could until caught, all at the expense of their clients, including the Plaintiffs herein.

6        76.    The Clients were forced to obtain new unconflicted counsel to defend them in the

7    Stoll Litigation and to attempt to remediate the EA Defendants' misconduct which had tarnished

8    their litigation position for over seven years. As a result, the Clients have incurred, and continue to

9    incur, ongoing costs and attorneys' fees related to this new representation, to rectify the damage

10   done to the Clients from the EA Defendants' failure to advise initially that there was any problem

11   with the original deposit of attorney's fees into EA's client trust account, and the EA Defendants'

12   purported "defense" of the Clients in the Stoll Litigation.

13       77.    Although Plaintiffs have demanded an accounting of the Disputed Fees, the EA

14   Defendants have refused to render any such account, or to confirm that they wrongfully comingled

15   the Disputed Fees with their own operating account, and thereafter utilized those funds for their own

16   benefit.

17       78.    As a result of the defendants' conduct, Plaintiffs have incurred damages including,

18   but not limited to, attorneys' fees incurred by Plaintiffs beginning as of approximately August 2018,

19   when Plaintiffs engaged unconflicted counsel to represent them in the Stoll Litigation.  Plaintiffs

20   assert these claims at this point out of abundance of caution, since payment of these attorneys' fees

21   are actual and substantial damages accrued, and on which the claims in this Complaint may be pled,

22   notwithstanding that other damages may not have accrued as yet, including but not limited to the

23   amount of any judgment awarded against Plaintiffs in the Stoll Litigation, which potentially could

24   exceed $10 million.

25                            **FIRST CAUSE OF ACTION**

26              **(Professional Negligence – Against the EA Defendants and Does 1-20)**

27       79.    Plaintiffs reallege and incorporate herein by reference each and every allegation as

28   though fully incorporated herein.

                                    20
                                 COMPLAINT

80. As set forth above, at all times relevant to this Complaint, the EA Defendants were in an attorney-client relationship with the Clients.

81. The EA Defendants, and each of them, had a duty to use such skill, prudence, and diligence as members of the legal profession commonly possess and exercise, in providing legal services to the Clients herein. The Clients relied on the EA Defendants as their attorneys to use reasonable care and skill in performing their legal services for the Clients.

82. During the course of the EA Defendants' representation of the Clients, the EA Defendants failed to exercise reasonable care and skill in performing legal services for the Plaintiffs and were negligent and careless in their representation of the Clients by, among other things:

    a. failing to advise Plaintiffs that Stoll and SNP objected to the deposit of the FLIR settlement funds into the EA client trust account, so that an alternative deposit could be made;

    b. improperly transferring the Disputed Fees from EA's client trust account into its operating account, failing to disclose this improper transfer and/or misrepresenting that the Disputed Fees remained in EA's client trust account, and failing to advise the Clients of their potential exposure to Stoll from the procedure of deposit directly to the EA trust account;

    c. failing to disclose to the Clients their conflicted representation of the Clients, failing to advise the Clients of their right to obtain the advice of independent counsel and failing to obtain the Clients' informed written consent to their representation;

    d. failing to advise the Clients to seek the advice of independent counsel in connection with the purported agreement to indemnify the Clients for any judgment against them in the Stoll Litigation, failing to advise the Clients that an unexecuted indemnification may not be valid, failing to disclose to the Clients that EA's purported indemnification agreement was to indemnify the Clients for EA Defendants' own misdeeds, rather than any improper conduct on the part of the Clients, and failing to advise the Clients of the risk that the

COMPLAINT

0400

0400

1    EA Defendants may not have the finances to cover an adverse judgment

2    against the Clients which may include a judgment for punitive damages;

3    e.   failing to inform the Clients of significant developments in the Stoll Litigation

4    including but not limited to Dr. Luna's tracing of the Disputed Fees from

5    EA's client trust account into EA's operating account and ultimate

6    disbursement for Avenatti, his law firm's and his wife's benefit, and

7    submitting discovery responses on the Clients' behalf without ever forwarding

8    the response to them for their input, review and/or approval;

9    f.   failing to have the Clients represented at key depositions in the Stoll

10   Litigation, failing to allege proper claims in the Plaintiffs' defense as part of

11   the Clients' cross-complaint, failing to appear to defend the Clients' cross-

12   complaint against demurrer, failing to advocate on the Clients' behalf and/or

13   acting to the Clients' detriment as described herein;

14   g.   failing to account to Plaintiffs upon demand;

15   h.   failing promptly to provide the Clients with their file so new, unconflicted

16   counsel could properly prepare for the upcoming trial; and

17   i.   failing otherwise adequately to advise the Clients, represent the Clients

18   competently, and protect the Clients' interests.

19   83.    As a result of the EA Defendants' conduct, among other things, Plaintiffs were sued

20   by Stoll/SNP for Disputed Fees which Plaintiffs had already paid, and Plaintiffs were embroiled in

21   over seven years of unnecessary litigation with Stoll/SNP in which their litigation position was

22   repeatedly compromised by the EA Defendants.

23   84.    As a direct and proximate result of the EA Defendants' conduct, Plaintiffs have been

24   damaged in an amount to be proven at trial, but which exceeds the jurisdictional limits of this Court,

25   and the Defendants' conduct was a substantial factor in causing Plaintiffs' harm.

26   85.    In doing the acts herein alleged, defendants acted fraudulently, willfully, maliciously,

27   and oppressively, and Plaintiffs are therefore entitled to punitive damages.

28                                   **SECOND CAUSE OF ACTION**

0401

0401

**(Breach of Fiduciary Duty – Against the EA Defendants and Does 1-20)**

86.     Plaintiffs reallege and incorporate herein by reference each and every allegation as though fully incorporated herein.

87.     As set forth above, at all times relevant to this Complaint, the EA Defendants were in an attorney-client relationship with the Clients, and Plaintiffs reposed trust and confidence in them as a result.

88.     As Plaintiffs' attorneys, the EA Defendants owed Plaintiffs the fiduciary duties of care, loyalty, faith, and full disclosure to their clients.  These duties included, but were not limited to, the obligations to act prudently in representing the client, to discharge their actions in good faith, to act in the best interests of the client, to put the interests of the client before their own, and to refrain from exploiting the client or taking action for their own benefit which conflicted with the interests of the client.

89.     These defendants breached their fiduciary duties owed to the Plaintiffs by, among other things:

     a.   Concealing from Plaintiffs that SNP/Stoll objected to the deposit of settlement funds in EA's trust account;

     b.   Not keeping the attorneys' fees paid by the Plaintiffs jointly to all of their Attorneys in a segregated trust account pending resolution of the Disputed Fees issue, which they should have done to protect the Plaintiffs' position as against Plaintiffs' other lienholder-co-counsel;

     c.   Concealing from Plaintiffs that they transferred Disputed Fees from their trust account to their operating account;

     d.   Utilizing the Disputed Fees for their own benefit instead of protecting the Plaintiffs by keeping the Disputed Fees segregated;

     e.   Concealing their adverse financial interest in the Disputed Fees from the Plaintiffs;

     f.   Failing to ensure payment of a lien against fees despite Plaintiffs' having paid those fees to them in trust for distribution;

0402

0402

g. Failing to resolve the Stoll Litigation promptly because they wanted to exploit their beneficial use of the Disputed Fees for the longest time possible;

h. Hiding significant litigation matters from Plaintiffs in the Stoll Litigation, and failing to keep Plaintiffs informed with respect to the Stoll Litigation;

i. Taking litigation positions in favor of themselves which conflicted with the Plaintiffs' defense in the Stoll Litigation, without disclosure to or consent from the Plaintiffs;

j. Promising to defend and indemnify the Plaintiffs in the Stoll Litigation as part of a scheme in which they could purportedly "defend" the Plaintiffs while keeping the Plaintiffs misinformed, thereby allowing them to damage the Plaintiffs' litigation position to their own benefit, and to continue to use the Disputed Fees for as long as possible;

k. Sending Plaintiffs a draft indemnification agreement while, at the same time, advising Plaintiffs not to sign it for spurious reasons;

l. Failing to protect the Plaintiffs during the Stoll Litigation at depositions, at hearings, in discovery matters, and in other written documents, in order to advance their own conflicted positions at the Plaintiffs' expense, rather than truly defend the Plaintiffs' positions, and to retain the benefit of the use of the Disputed Fees for as long as possible;

m. Entering into stipulations adverse to Plaintiffs without disclosure to and informed consent from the Plaintiffs;

n. Lulling Plaintiffs into believing that the Stoll Litigation was nothing to worry about;

o. Failing to disclose all potential and actual conflicts of interest and to obtain the Plaintiffs' written consent after full disclosure and failing to advise Plaintiffs that they could seek outside unconflicted counsel's advice on these matters;

p. Subjecting Plaintiffs to over seven years of unnecessary litigation in order to retain the beneficial use of the Disputed Fees for as long as possible, to the

0403

0403

1               Plaintiffs' detriment;

2          q.  Subjecting Plaintiffs to a potential multi-million judgment for payment of

3             Disputed Fees which the Plaintiffs had already paid;

4          r.  Refusing to account to the Plaintiffs after being asked to do so;

5          s.  Refusing to turn over the Plaintiffs' files after being asked to do so;

6          t.  Otherwise obtaining benefits at the expense of Plaintiffs gaining an unfair

7             advantage over the Plaintiffs, and otherwise ignoring their duty of loyalty to

8             Plaintiffs.

9     90.    Plaintiffs are informed and believe that the EA Partners, who all shared in the profits

10 and/or losses of EA, were aware of and obtained benefits from the transfer of the Disputed Fees into

11 the EA operating account. None of these defendants subsequently informed Plaintiffs of this

12 improper transfer while representing the Plaintiffs during the Stoll Litigation. None of these

13 defendants attempted to resolve the Stoll Litigation in a prompt or reasonable manner.

14     91.    Plaintiffs are informed and believe that the EA Defendants' breaches of fiduciary

15 duty constitute violations of the California Rules of Professional Conduct, including but not limited

16 to, Rules 3-110, 3-300, 3-310, 3-500, 3-700, and 4-100. Plaintiffs are further informed and believe

17 that the above-cited breaches of fiduciary duty also constitute violations of the California Business

18 and Professions Code, including but not limited to, Sections 6068(m), 6091, 6103, and 6106.

19     92.    As a proximate result of the breaches of fiduciary duty as alleged herein, Plaintiffs

20 have sustained damages in an amount to be determined at trial, but which exceeds the jurisdictional

21 limits of this Court.

22     93.    In doing the acts herein alleged, defendants acted fraudulently, willfully, maliciously,

23 and oppressively, and Plaintiffs are therefore entitled to punitive damages.

24                     **THIRD CAUSE OF ACTION**

25          **(Concealment – Against the EA Defendants and Does 1-20)**

26     94.    Plaintiffs reallege and incorporate herein by reference each and every allegation

27 contained herein, as though fully incorporated herein and made a part hereof.

28     95.    As alleged herein, the defendants concealed or suppressed the material facts that

0404

0404

1  Stoll/SNP had objected to the deposit of settlement funds into the EA trust account, and that the

2  defendants had improperly comingled and converted the Disputed Fees after Plaintiffs deposited

3  them with the defendants in trust.

4      96.    Defendants concealed or suppressed the above material facts by repeatedly assuring

5  the Plaintiffs that the Disputed Fees remained in the EA trust account, and telling Plaintiffs other

6  facts to mislead Plaintiffs and prevent Plaintiffs from discovering the concealed or suppressed facts,

7  and/or by concealing or suppressing material facts which the defendants were bound to disclose,

8  including but not limited to providing Plaintiffs with a copy of Dr. Luna's deposition testimony, her

9  declaration, or her report, and failing to advise the Plaintiffs of the allegations in the Stoll Fraudulent

10  Conveyance Complaint.

11      97.    Defendants concealed or suppressed these facts with the intent to defraud and to

12  induce Plaintiffs to act in the manner alleged herein.

13      98.    At the time Plaintiffs took the actions they did, Plaintiffs were unaware of the

14  concealed or suppressed facts, and would not have taken the actions if they had known the true facts.

15      99.    In justifiable reliance on the defendants' conduct the Plaintiffs were induced to rely

16  on and trust the EA Defendants to continue to represent and defend them properly in the Stoll

17  Litigation; to forego seeking other counsel who could have represented them in the Stoll Litigation

18  with such skill, prudence and diligence as members of the legal profession commonly possess and

19  exercise, rather than accepting the purported "defense" by the EA Defendants who exploited

20  Plaintiffs for their own benefit and damaged Plaintiffs' litigation positions; and to forego demanding

21  that the EA Defendants pay SNP the Disputed Fees.

22      100.    As a direct and proximate result of Plaintiffs' reliance on these defendants' conduct,

23  Plaintiffs have been damaged in an amount to be proven at trial, but which exceeds the jurisdictional

24  limits of this Court.

25      101.    In doing the acts herein alleged, defendants acted fraudulently, willfully, maliciously,

26  and oppressively, and Plaintiffs are therefore entitled to punitive damages.

27                    **FOURTH CAUSE OF ACTION**

28

0405

0405

**(Conversion – Against the EA Defendants and Does 1-20)**

102.   Plaintiffs reallege and incorporate herein by reference each and every allegation contained herein as though fully incorporated herein and made a part hereof.

103.   The Plaintiffs contend that they never owned, possessed, or had a right to possess the Disputed Fees, they do not believe the Disputed Fees belonged to or were controlled by them, and Plaintiffs did not convert the Disputed Fees.

104.   However, if it is determined in the Stoll Litigation that the Plaintiffs did in fact have ownership, possession or a right to possess the Disputed Fees, or that the Disputed Fees belonged to or were controlled by the Plaintiffs, then, alternatively, Plaintiffs are informed and believe and thereupon allege in this cause of action that the EA Defendants converted those Disputed Fees

105.   The EA Defendants substantially interfered with the Disputed Fees by knowingly and intentionally: (a) taking possession of the Disputed Fees by unilaterally transferring them to the EA operating account and thereafter using them for the benefit of Avenatti, EA and Lisa Storie-Avenatti; (b) preventing Plaintiffs from having access to the Disputed Fees; (c) disposing of the Disputed Fees by using those funds for the benefit of Avenatti, EA and Lisa Storie-Avenatti; and/or (d) refusing to return the Disputed Fees to Plaintiffs after return was demanded.

106.   Plaintiffs did not consent to the defendants' conduct as alleged herein.

107.   As a proximate and legal result of defendants' conduct, Plaintiffs have been harmed in an amount to be proven at trial, but which exceeds the jurisdictional limits of this Court, and the Defendants' conduct was a substantial factor in causing Plaintiffs' harm.

108.   In doing the acts herein alleged, defendants acted fraudulently, willfully, maliciously, and oppressively, and Plaintiffs are therefore entitled to punitive damages.

## FIFTH CAUSE OF ACTION

### (Promissory Estoppel -- Against EA Defendants and Does 1-20)

109.   Plaintiffs reallege and incorporate herein by reference each and every allegation contained herein, as though fully incorporated herein and made a part hereof.

110.   As alleged herein, Plaintiffs and the EA Defendants entered into an agreement whereby the EA Defendants promised fully to defend and indemnify the Plaintiffs in the Stoll

27
COMPLAINT

0406

0406

1  Litigation.

2      111.   At the time these defendants made this promise, the defendants should have expected

3  that the promise would induce action on the part of the Plaintiffs, and the promise in fact did induce

4  that action when Plaintiffs reposed their trust and confidence in the EA Defendants to properly

5  defend and indemnify them, and continued to retain the EA Defendants for over seven years of

6  litigation in which, unknown to the Plaintiffs, the EA Defendants repeatedly undermined Plaintiffs,

7  concealed matters from Plaintiffs, and took positions antagonistic to the Plaintiffs.

8      112.   Plaintiffs performed all conditions, covenants and promises required by them on their

9  part to be performed in accordance with the terms and conditions of the defendants' promise.

10      113.   The defendants breached their promise as alleged herein by their conduct, including

11  but not limited to the following:

12          a.  Concealing their diversion of the Disputed Fees;

13          b.  Improperly compromising the Plaintiffs' defense for their own benefit and the

14             detriment of the Plaintiffs;

15          c.  Failing to disclose significant and critical litigation and related matters to the

16             Plaintiffs;

17          d.  Exploiting the Plaintiffs' trust so as to allow unnecessary continuation of the

18             Stoll Litigation and the defendants' continued beneficial use of the Disputed

19             Fees;

20          e.  Incurring awards of judgments against the defendants that adversely affect the

21             defendants' ability to indemnify the Plaintiffs; and,

22          f.  Otherwise failing to comply with their duties to defend and indemnify the

23             Plaintiffs.

24      114.   As a proximate result of the defendants' breach of agreement, Plaintiffs have been

25  damaged in an amount to be proven at trial, but which exceeds the jurisdictional limits of this Court.

26  Injustice can be avoided only by enforcing the defendants' promises, representations, and assurances

27  completely.

28

COMPLAINT

0407

0407

1

**PRAYER**

2          WHEREFORE, Plaintiffs pray for judgment against Defendants, on each cause of action, as

3    follows:

4          **ON THE FIRST, SECOND AND THIRD CAUSES OF ACTION:**

5          1. For compensatory damages in an amount to be proved at trial, including but not limited to

6    an amount equal to any judgment against the Plaintiffs in the Stoll Litigation;

7          2. For Plaintiffs' attorneys' fees and costs incurred beginning as of approximately August,

8    2018 in the Stoll Litigation as provided by contract or otherwise;

9          3. For punitive damages in an amount to be proved at trial.

10         **ON THE FOURTH CAUSE OF ACTION**

11         1. For an amount representing the amount of the Disputed Fees deposited in the EA trust

12   account by Plaintiffs, with appropriate interest thereon from the date of the deposit;

13         2. For special damages resulting from the Defendants' conduct, including but not limited to

14   any amount by which Plaintiffs' interests were damaged in the Stoll Litigation;

15         3. For reasonable compensation for the time and money spent by Plaintiffs in attempting to

16   recover the Disputed Fees;

17         4. For punitive damages.

18         **ON THE FIFTH CAUSE OF ACTION**

19         1. For compensatory damages in an amount to be proved at trial, including but not limited to

20            an amount equal to any judgment against the Plaintiffs in the Stoll Litigation;

21         2. For Plaintiffs' attorneys' fees and costs incurred beginning as of approximately August

22            2018 in the Stoll Litigation as provided by contract or otherwise.

23         **ON ALL CAUSES OF ACTION**

24         1.   For pre- and post-judgment interest, as applicable;

25         2.   For attorneys' fees on all applicable claims;

26         3.   For such other further relief as the Court may deem just and proper.

27

28

29
COMPLAINT

0408

0408



1   DATED: April 1, 2019         By:
2                                   A Barry Cappello
                                    Leila J. Noel
3                                   Lawrence J. Conlan
                                    Attorneys for Plaintiffs
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

                              30
                           COMPLAINT

1

## DEMAND FOR TRIAL BY JURY

2      Plaintiffs demand a trial by jury of all issues so triable in this action.

3

4    DATED: April 1, 2019                    By:

5                                            A Barry Cappello
                                             Leila J. Noel
6                                            Lawrence J. Conlan
                                             Attorneys for Plaintiffs
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

31
COMPLAINT

0410

0410

EXHIBIT "O"

0411

0411

1  A. Barry Cappello (SBN 037835)
   abc@cappellonoel.com
2  Lawrence J. Conlan (SBN 221350)
   lconlan@cappellonoel.com
3  CAPPELLO & NOËL LLP
   831 State Street
4  Santa Barbara, California 93101
   Telephone:    (805) 564-2444
5  Facsimile:    (805) 965-5950

6  Attorneys for Plaintiff

ELECTRONICALLY FILED
Superior Court of California
County of Santa Barbara
Darrel E. Parker, Executive Officer
8/20/2018 3:47 PM
By: Narzralli Baksh, Deputy

7

8

9         SUPERIOR COURT OF THE STATE OF CALIFORNIA

10            FOR THE COUNTY OF SANTA BARBARA

11                                        18CV04106
                                    Case No.:
12 WILLIAM PARRISH, an individual;

13                                  COMPLAINT FOR
          Plaintiff,                1. BREACH OF FIDUCIARY DUTY
14                                  2. BREACH OF PROMISSORY NOTE
   vs.                              3. ACCOUNT STATED
15                                  4. OPEN BOOK ACCOUNT
   MICHAEL J. AVENATTI, an individual; and  5. COMMON COUNT– MONEY HAD
16 DOES 1 through 20, inclusive,        AND RECEIVED
                                    6. COMMON COUNT – MONEY LENT
17        Defendants.

18                                  DEMAND FOR JURY TRIAL

19

20

21

22

23

24

25

26

27

28

CAPPELLO
& NOËL LLP
TRIAL LAWYERS

COMPLAINT

0412

0412

Plaintiff alleges:

1.     All allegations made in this complaint are based upon information and belief. The allegations of this complaint stated on information and belief are likely to have evidentiary support after a reasonable opportunity for further investigation or discovery.

## NATURE OF ACTION

2.     This action is about the avaricious disregard and abuse of trust cultivated by an attorney in a decade long professional relationship with his client. That attorney, Michael J. Avenatti, Esq. ("Avenatti") repeatedly and routinely put his own financial interests ahead of his client, Plaintiff William Parrish, in violation of Avenatti's fiduciary duties, the rules of professional conduct governing attorneys in California, statutory law and basic contract principles. After assisting in obtaining a multi-million dollar settlement on behalf of Plaintiff and his business partner, Avenatti continued to represent Plaintiff in a variety of other litigation matters and transactions, and Plaintiff relied on what he rightfully assumed to be Avenatti's good advice and professional judgment. Avenatti took advantage of that trust, however, and persuaded Plaintiff to loan him $1,500,000 in order to invest in a separate business venture. Avenatti falsely promised Plaintiff that he would repay the funds in 45 days, failed to explain to Plaintiff that he should seek the advice of independent counsel, and then failed to properly document the loan.

3.     Plaintiff expressly told Avenatti that he agreed to make the loan based on his trust in Avenatti as his attorney and Avenatti's assurances of prompt repayment of the full amount owed. At Plaintiff's urging to properly document the loan, Avenatti subsequently drafted and executed a Promissory Note which extended the due date through January 31, 2014 (and then by amendment through January 31, 2017), and provided for 8% interest on the principal owed. Avenatti did not provide any security for the loan, although he promised he would grant Plaintiff security in the full amount of the loan. At no time did he explain to Plaintiff that he should seek independent legal advice regarding the fact of the loan or the terms of the note.

4.     The California Rules of Professional Conduct expressly require that in a business transaction such as this between an attorney and client, the terms of the transaction must be fair, reasonable and fully disclosed to the client who then must provide his written consent. Unsecured

1
COMPLAINT

0413

0413

1    loans by their nature are not fair or reasonable because they are a high risk to the lender.

2    Importantly, the attorney also must advise the client in writing to seek the advice of an independent

3    counsel in connection with the transaction.  Here, Avenatti totally disregarded Plaintiff's interests,

4    borrowed money from Plaintiff on terms that were neither fair nor reasonable nor fully disclosed nor

5    consented to in writing by Plaintiff.  In addition, Avenatti failed to comply with his duty to advise

6    Plaintiff in writing to seek the advice of an independent counsel. Avenatti further exploited

7    Plaintiff's trust by repeatedly assuring Plaintiff that he had the funds to pay off the loan in full and

8    such payment was imminent.  Finally, despite his ongoing and repeated assurance to repay the loan,

9    including in writing as recently as November 2017, and his assurances that there were no issues

10   regarding applicable statutes of limitations, Avenatti never repaid the loan. To date, Avenatti owes

11   Plaintiff the entire principal amount, plus interest.

12       5.    Plaintiff brings this action in order to make himself whole for all damages caused by

13   Avenatti, including principal and interest on the loan, other losses related to Plaintiff's inability to

14   use the funds for the last five years, and punitive damages as a result of Avenatti's fraudulent and

15   malicious breach of his fiduciary duties.

16                                  **PARTIES**

17       6.    Plaintiff William Parrish ("Plaintiff") is an individual residing in the City of Santa

18   Barbara, County of Santa Barbara, State of California.

19       7.    Defendant Michael J. Avenatti ("Avenatti"), is an individual residing in the City of

20   Newport Beach, County of Orange, State of California. Avenatti is an attorney who represented

21   Plaintiff in several matters.

22       8.    Plaintiff is uncertain as to the identity or capacity of the defendants included herein as

23   DOES 1 through 20, inclusive, and therefore sues said defendants by their fictitious names.  Plaintiff

24   is informed and believe and thereon allege that said defendants, DOES 1 through 20, inclusive, and

25   each of them, are liable to Plaintiff on the facts herein alleged and will seek leave of this court to

26   amend this complaint when their true names are ascertained.

27       9.    Plaintiff is informed and believes and thereon alleges that each of the defendants is,

28   and at all material times was, the agent and employee of each of his, her, or their co-defendants, and

2
COMPLAINT

1  in committing the acts herein alleged, was acting in the scope of his, her, or their employment, or

2  his, her, or their authority as such agents and employees, with the permission and consent of his, her

3  or their co-defendants.

4                                    **VENUE**

5        10.      Venue is appropriate pursuant to Code of Civil Procedure sections 395(a) as the

6  underlying agreement was made, entered into and to be performed in Santa Barbara County, and the

7  liability and/or obligation that is the center of the dispute is located in Santa Barbara County.

8                            **GENERAL ALLEGATIONS**

9        11.      Avenatti is an attorney licensed to practice law in the State of California. Avenatti

10  acted as Plaintiff's attorney starting in approximately 2008. Avenatti represented Plaintiff in various

11  matters including, without limitation, *William Parrish et al vs. FLIR Systems, Inc. et al.* Case No.

12  1301514, filed July 10, 2008 ("*Parrish v. FLIR*"). Avenatti was, until he was recently terminated,

13  counsel of record for Plaintiff in litigation arising out of that action. Avenatti also has represented

14  Plaintiff in various other matters and transactions. At all times relevant to this Complaint, Avenatti

15  and Plaintiff had an attorney-client relationship.

16        12.      In or about May 2011, Avenatti was one of the lawyers representing Plaintiff and his

17  business partner when they obtained a multi million dollar settlement in *Parrish v. FLIR*. Litigation

18  continued in two additional matters and Avenatti was Plaintiff's lawyer.

19        13.      In or about June 2013, while still representing Plaintiff, Avenatti asked Plaintiff, his

20  client at the time, for a $1,500,000 unsecured loan to be repaid in 45 days. Avenatti's stated purpose

21  for the loan was to purchase an interest in a coffee company. At no time has Plaintiff ever had an

22  interest in or connection to the coffee company, Tully's. Avenatti assured Plaintiff verbally and in

23  emails that the $1,500,000 would be repaid within 45 days.

24        14.      In a June 28, 2013 email from Avenatti to Plaintiff, Avenatti stated "I want to thank

25  you again for agreeing to loan me $1.5 million for 45 days (until August 15, 2013) so I can close

26  Tully's. You have no idea how much I appreciate you assisting me – you are a true friend." The 45-

27  day unsecured loan did not provide for any interest payment on the principal or any other

28  consideration to Plaintiff for loaning Avenatti $1,500,000. At that point in time, the terms of the

                                    3
                              COMPLAINT

1  loan were memorialized only in emails between Avenatti and his client and not by any separate
2  writing.

3      15.    Plaintiff trusted Avenatti as a result of: (a) their attorney-client relationship, (b)
4  Avenatti's involvement and assistance in obtaining a major settlement for Plaintiff and (c) Avenatti's
5  assurances that he had the ability to, and would, repay the loan in full within forty-five days.  On or
6  about July 1, 2013 Plaintiff wired $1,500,000 from his bank account to Avenatti's bank account.

7      16.    On or about December 16, 2013, Plaintiff explained to Avenatti that "[b]ecause you
8  are my attorney, with all the trust being an attorney implies, we forewent documentation of the short-
9  term loan to get you funds by your deadline ... [however, the loan] really requires proper
10  documentation for my estate (as well as the IRS)." In this same email, Plaintiff also explained that if
11  Avenatti did not repay the loan imminently as promised, Plaintiff would suffer adverse financial
12  consequences because he would need to sell securities and other holdings, resulting in "unpleasant
13  ramifications" to Plaintiff's finances.  In fact, Plaintiff did later need to sell securities in order to help
14  fund a separate business venture.  Had Avenatti repaid the loan, the loaned funds would have been
15  used instead.

16      17.    Avenatti subsequently drafted a "NonNegotiable Promissory Note Due January 31,
17  2014" (the "Promissory Note") that he executed, bearing a date of July 1, 2013. In accordance with
18  the terms of the Promissory Note, Avenatti agreed to pay interest of 8.0% per annum on any unpaid
19  principal from the date the amount was loaned until paid in full. A true and correct copy of the
20  Promissory Note is attached as **Exhibit A** hereto and incorporated by reference.

21      18.    After Avenatti failed to repay the loan from his client despite ongoing and repeated
22  assurances that he would, Avenatti later amended the Promissory Note to extend the maturity date to
23  January 31, 2017. Avenatti made this amendment in handwriting by, among other things, crossing
24  out the "14" in the original date of January 31, 2014 and replacing it with a "17" to make the
25  Promissory Note due on January 31, 2017 (the "Amended Note"). Avenatti initialed these mark-ups.
26  He also executed the Amended Note by signing it and handwriting "Reaffirmed 7/25/16." A true
27  and correct copy of the amended Promissory Note is attached as **Exhibit B** hereto and incorporated
28  by reference.

4
COMPLAINT

0416

0416

19.     Since the time Avenatti initially asked to borrow money from Plaintiff, Plaintiff repeatedly requested that Avenatti pay in full all amounts due on the Promissory Note.

20.     Avenatti repeatedly assured and represented to Plaintiff that he had the ability to pay off the full amount owed on the Promissory Note and routinely assured him that such payment would be imminent. For example, in a November 30, 2017 email from Plaintiff to Avenatti which Avenatti signed in agreement at a subsequent meeting between Plaintiff and Defendant, Avenatti represented that: (a) he was responsible for paying off the full amount of principal and interest owed on the Promissory Note, and (b) he was "100% certain" that on January 15, 2018, Avenatti would receive a significant settlement from another matter, and he would use those funds to pay off the full amount owed on the Promissory Note by the end of January 2018.

21.     In the November 30, 2017 email, Plaintiff asked Avenatti, "[a]lso, as my counsel, please confirm that, since you dusted off the note with a new signature and payment date (although again now long passed), the note is not in jeopardy of passing a statute of limitation date." Avenatti confirmed that as Plaintiff's counsel, he was advising Plaintiff that any recovery on all amounts owed on the Promissory Note were not subject to a statute of limitation defense.

22.     Plaintiff did not sue Avenatti based on Avenatti's representations and assurances including, without limitation, the following: (a) Avenatti's representation that he had the funds to repay the loan in full and that repayment was imminent; and (b) Avenatti's representation that the statute of limitations was not a bar to any recovery from Avenatti on the loan.

23.     As of the date of filing of this Complaint, Avenatti has failed and refused to pay the Promissory Note off originally or as amended and has not paid the note as set forth above.

24.     As of the date of filing of this Complaint, Avenatti has failed to secure the loan, despite promises to do so.

25.     Avenatti has not repaid the full amount due, including the principal, and interest as required by the Promissory Note.

26.     The terms of the original 45-day loan from Plaintiff were not fair or reasonable or fully disclosed to Plaintiff because the loan only benefitted Avenatti at Plaintiff's expense in that it provided no consideration to Plaintiff in the form of interest on the principal or any other

5
COMPLAINT

consideration to Plaintiff in exchange for the loan and because the loan was unsecured and high risk. Avenatti failed to fully disclose the risks to Plaintiff, as was his duty. As such, Avenatti acted in an adverse manner contrary to the interests of Plaintiff.

27.    Avenatti unilaterally extended the term of the note and failed to reveal his own dire financial situation, done for Avenatti's benefit and to the detriment of his client, Plaintiff.

28.    The terms of the Promissory Note were not fair or reasonable or fully disclosed to Plaintiff because an unsecured note is a high-risk instrument and Avenatti failed to disclose this to Plaintiff. As such, Avenatti acted in an adverse manner contrary to Plaintiff's interests.

29.    At no time did Avenatti advise Plaintiff in writing that Plaintiff should seek the advice of an independent lawyer of Plaintiff's choice in connection with this $1,500,000 loan. As such, Avenatti acted in an adverse manner contrary to Plaintiff's interests, and for Avenatti's own benefit.

30.    At no time did Avenatti request from Plaintiff or did Plaintiff provide his consent in writing to the terms of the loan or the Promissory Note after full disclosure of the risks and rights. As such, Avenatti acted in an adverse manner contrary to Plaintiff's interests, and for Avenatti's own benefit.

31.    Plaintiff has been forced to file this action in order collect the sums due and owing to him.

### FIRST CAUSE OF ACTION

**(Breach of Fiduciary Duty)**

32.    Plaintiff realleges and incorporates herein by reference each and every allegation herein, as though fully incorporated herein and made a part hereof.

33.    As set forth above, Plaintiff retained and employed Avenatti to represent Plaintiff in connection with various matters starting in 2008. Avenatti accepted this employment and agreed to perform duties for Plaintiff as Plaintiff's attorney. Avenatti was in an attorney-client relationship with Plaintiff based on trust and confidence, that derived from the fact that Avenatti represented Plaintiff in various matters as set forth above; had drafted the Promissory Note, a legal document, in connection with the loan; had advised Plaintiff on legal issues related to the Promissory Note; was

0418

0418

1   told by Plaintiff that Plaintiff was relying on Avenatti's trust as his attorney in connection with the

2   $1,500,000 loan.

3       34.     Attorneys owe their clients fiduciary duties to act in the utmost good faith, fidelity

4   and trust for the benefit of their clients.

5       35.     As Plaintiff's attorney, Avenatti owed Plaintiff fiduciary duties of an attorney to a

6   client, including the duty to act in the utmost good faith, fidelity and trust for the benefit of Plaintiff,

7   and to take no action to personally benefit.  By virtue of this special relationship that existed between

8   Avenatti and Plaintiff, Plaintiff had confidence in the integrity of Avenatti and trusted that Avenatti

9   would act in the utmost good faith, fidelity and trust and in a manner that was not adverse or

10  contrary to Plaintiff's interests. Avenatti knowingly acted against Plaintiff's interest in borrowing

11  funds from Plaintiff without informing Plaintiff of the risks associated with an unsecured loan such

12  as this, by initially borrowing $1,500,000 from Plaintiff on terms that only benefitted Avenatti and

13  failing to provide Plaintiff with any consideration in exchange, and by misrepresenting that he had

14  the funds to pay off the loan and that all amounts due on the loan would be paid in full when due,

15  when in fact Avenatti failed to pay the full amount owed on the loan.

16      36.     The conduct of attorneys with their clients is also governed by the California Rules of

17  Professional Conduct. Rule 3-300 is applicable to businesses transactions between attorneys and

18  their clients where the interests of the attorney and client are adverse, including unsecured loans

19  obtained by an attorney from his client. Here, Rule 3-300 is applicable to the loan transaction and

20  Promissory Note because Avenatti's interests are adverse to Plaintiff's as set forth above.

21      37.     Rule 3-300 provides that an attorney who engages in a business transaction with a

22  client has a duty to: (A) ensure that the transaction and its terms are fair and reasonable to the client

23  and fully disclosed to the client and transmitted in writing to the client in a manner which should

24  reasonably have been understood by the client; (B) advise the client in writing that the client may

25  seek the advice of an independent lawyer of the client's choice and is given a reasonable opportunity

26  to seek that advice; and (C) obtain the client's consent in writing to the terms of the transaction.

27      38.     Avenatti breached all three provisions of Rule 3-300 in connection with the

28  $1,500,000 loan. Avenatti breached Rule 3-300 (A) because the terms were not fair and reasonable

---

7

COMPLAINT

1   in that: the original loan only provided Avenatti with a benefit without providing a benefit or

2   consideration to Plaintiff; Avenatti failed to advise Plaintiff that unsecured loans such as this one

3   pose high risks for the lender, and failed to offer any collateral for securing repayment of the loan;

4   Avenatti acted in his own self-interest in extending the due date of the loan by three (3) years

5   without any further consideration to Plaintiff; Avenatti misrepresented to Plaintiff that he had the

6   funds to repay all amounts owed on the Promissory Note by the due date, that he would imminently

7   receive a settlement that would pay off the Note, that he would provide collateral, and/or failed to

8   disclose to Plaintiff that he did not have the funds to repay all amounts owed on the Promissory Note

9   by the due date.  In addition, Avenatti breached Rule 3-300 (A) because he did not fully disclose

10  these unfair and unreasonable terms to the client in writing in a manner which should reasonably

11  have been understood by the client.

12      39.    Avenatti breached Rule 3-300 (B) because he failed to advise Plaintiff in writing that

13  Plaintiff should seek the advice of an independent counsel in connection with this matter.

14      40.    Avenatti breached Rule 3-300 (C) because Plaintiff did not consent in writing to the

15  terms of the transaction in accordance with this Rule.

16      41.    California Business & Professions Code § 6103, which applies to California licensed

17  attorneys, provides "any violation of the oath taken by him, or of his duties as such attorney,

18  constitute causes for disbarment or suspension." Avenatti violated this statute by not acting in the

19  utmost good faith, fidelity and trust for the benefit of Plaintiff as set forth above and as evidenced by

20  his violation of Rule 3-300 in connection with the $1,500,000 loan.

21      42.    California Business & Professions Code § 6106, which applies to California licensed

22  attorneys, provides that "[t]he commission of any act involving moral turpitude, dishonesty or

23  corruption, whether the act is committed in the course of his relations as an attorney or otherwise,

24  and whether the act is a felony or misdemeanor or not, constitutes a cause for disbarment or

25  suspension." Avenatti violated this statute because in entering into the loan with Plaintiff, he was

26  deceitful, dishonest and lacked integrity as set forth above and as evidenced by his violation of Rule

27  3-300.

28      43.    Avenatti breached his fiduciary duties to Plaintiff by not acting in the utmost good

8
COMPLAINT

1  faith, fidelity and trust for the benefit of Plaintiff as set forth above and as evidenced by his violation

2  of Rule 3-300 and the California Business & Professions Code §§ 6103 and 6106 as described above

3  in connection with the $1,500,000 loan that he never fully repaid.

4      44.    As a direct and proximate result of Avenatti's violation of his fiduciary duties as set

5  forth herein, Plaintiff has been damaged in a sum to be proven at trial.

6      45.    In carrying out the above conduct, Avenatti acted with oppression, fraud and malice.

7  The aforementioned conduct of Avenatti was willful and intentional. Plaintiff is therefore entitled to

8  an award of exemplary or punitive damages.

9  **SECOND CAUSE OF ACTION**

10  **(Breach of Promissory Note)**

11      46.    Plaintiff realleges and incorporates herein by reference each and every allegation

12  contained herein, as though fully incorporated herein and made a part hereof.

13      47.    For valuable consideration, at Santa Barbara County, California, Avenatti made,

14  executed, and delivered to Plaintiff the Promissory Note dated July 1, 2013 in the principal amount

15  of $1,500,000, originally payable to Plaintiff on January 31, 2014 and as amended by Avenatti

16  payable to Plaintiff on January 31, 2017, with interest thereon at the rate of eight percent (8%) per

17  annum from the date of the note until the loan is paid in full.

18      48.    The Promissory Note provides that in the event of any default by the maker, the payee

19  shall be entitled to recover any and all reasonable expenses and fees incurred by payee in connection

20  with any collection efforts. Defendant has defaulted on the Promissory Note, and Plaintiff has and

21  continues to incur expenses and fees in connection with collection efforts, including attorney's fees

22  for legal action taken to enforce collection. Under the terms of the Promissory Note, Plaintiff is

23  entitled to recover these attorney's fees from Defendant. Plaintiff has employed the law firm of

24  Cappello & Noel LLP to file and prosecute this action and has become obligated to pay the fees and

25  expenses for the law firm's services.

26      49.    Avenatti failed and refused, and continues to fail and refuse, to pay the Promissory

27  Note, and there is now due, owing, and unpaid from Defendant to Plaintiff the principal sum of

28  $1,500,000 together with interest thereon.

9

COMPLAINT

50.     As a proximate result of the Defendant's acts as alleged herein, Plaintiff has been damaged in the amount of $1,500,000, plus interest on the unpaid principal, plus legal fees as provided by contract.

## THIRD CAUSE OF ACTION

### (Account Stated)

51.     Plaintiff realleges and incorporates herein by reference each and every allegation contained herein, as though fully incorporated herein and made a part hereof.

52.     Within the past four years, at Santa Barbara, California, an account was stated in writing by and between Plaintiff and Defendant, and on such statement a balance in the principal amount of $1,500,000 plus interest, due to Plaintiff from Defendant. Defendant agreed to pay to Plaintiff said balance.

53.     Although demanded by Plaintiff from Defendant, the agreed balance has not been paid.

54.     There is now due, owing, and unpaid from Defendant to Plaintiff the principal sum of $1,500,000together with interest thereon and attorney fees as applicable.

## FOURTH CAUSE OF ACTION

### (Open Book Account)

55.     Plaintiff realleges and incorporates herein by reference each and every allegation contained herein as though fully incorporated herein and made a part hereof.

56.     Within the past four years, Defendant became indebted to Plaintiff on an open book account for money due in the sum of $1,500,000 at its special instance and request, and for which Avenatti agreed to pay the above sum.

57.     The whole of the above sum has not been paid although a demand therefore has been made, and there is now due, owing, and unpaid the sum of $1,500,000 with interest thereon.

58.     Plaintiff has incurred attorney's fees in connection with this matter, in an amount to be determined at trial, which fees Plaintiff is entitled to recover from Avenatti pursuant to agreement or as otherwise applicable.

0422

0422

**FIFTH CAUSE OF ACTION**

**(Common Count - Money Had and Received)**

59.    Plaintiff realleges and incorporates herein by reference each and every allegation contained herein as though fully incorporated herein and made a part hereof.

60.    On or about July 1, 2013, at Santa Barbara, California, Avenatti became indebted to Plaintiff in the sum of $1,500,000 for money had and received by Avenatti for the use and benefit of Avenatti.

61.    Avenatti failed and refused and continue to fail and refuse to pay and there is now due, owing, and unpaid from Avenatti to Plaintiff the sum of $1,500,000 together with interest thereon, and attorney fees as applicable.

**SIXTH CAUSE OF ACTION**

**(Common Count – Money Lent)**

62.    On or about July 1, 2013, at Santa Barbara, California, Avenatti became indebted to Plaintiff in the sum of $1,500,000 for money lent by Plaintiff to Avenatti at his request.

63.    Avenatti failed and refused and continues to fail and refuse to pay the indebtedness in full, and there is now due, owing, and unpaid from Avenatti to Plaintiff the principal sum of $1,500,000 together with interest thereon at the legal rate.

64.    The contract on which this action is based provides that in the event legal action is taken to enforce collection, the prevailing party is entitled to recover reasonable attorney fees.

**PRAYER**

WHEREFORE, Plaintiff prays for judgment against Defendant, on each cause of action, as follows:

   1.  For damages in the principal amount of $1,500,000;

   2.  For interest as set by contract;

   3.  For reasonable attorney's fees as provided by contract or otherwise;

   4.  For costs of suit incurred herein;

   5.  For punitive damages;

11

COMPLAINT

1    6. For such other further relief as the court may deem just and proper.

2

3

4    DATED:  August 20, 2018                    CAPPELLO & NOËL LLP

5

6                                               By: 

7                                               A.  Barry Cappello
                                                Lawrence J. Conlan
8                                               Attorneys for Plaintiff

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

                                    12
                                 COMPLAINT

0424

0424

1

**DEMAND FOR TRIAL BY JURY**

2      Plaintiff demands a trial by jury of all issues so triable in this action.

3

4   DATED:  August 20, 2018                    CAPPELLO & NOËL LLP

5

6                                             By: 

7                                                 A.  Barry Cappello
                                                  Lawrence J. Conlan
8                                                 Attorneys for Plaintiff

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

13
COMPLAINT

0425

0425

# EXHIBIT A

0426

0426

## NONNEGOTIABLE PROMISSORY NOTE DUE JANUARY 31, 2014

$1,500,000.00

**Newport Beach, California**

**July 1, 2013**

**FOR VALUE RECEIVED,** Michael J. Avenatti, an individual (collectively, the "Maker") unconditionally promises to pay to the order of William Parrish ("Payee"), in the manner and at the place hereinafter provided, the principal amount of One Million Five Hundred Thousand Dollars ($1,500,000.00) in one payment on January 31, 2014.

Maker also promises to pay interest at a rate per annum equal to 8.0% on any unpaid principal amount from the date such amount(s) is loaned to Maker until paid in full.

Interest on this Note shall be payable on the following dates: January 31, 2014. All computations of interest shall be made by Payee on the basis of a 365-day year, for the actual number of days elapsed in the relevant period (including the first day but excluding the last day).

1.        **Payments.** All payments of principal and interest in respect of this Note shall be made in lawful money of the United States of America at William Parrish; 6489 Calle Real Suite E; Goleta, CA  93117, or at such other place as Payee may direct. Whenever any payment on this Note is stated to be due on a day that is not a Business Day, such payment shall instead be made on the next Business Day, and such extension of time shall be included in the computation of interest payable on this Note. "Business Day" means any day other man a Saturday, Sunday or legal holiday under the laws of the State of California or any other day on which banking institutions located in such state are authorized or required by law or other governmental action to close.

2.        **Prepayments.** Maker shall have the right at any time and from time to time to prepay the principal of this Note in whole or in part without penalty.

3.        **Miscellaneous.**

(a)        All notices and other communications provided for hereunder shall be in writing (including telegraphic, telex, telefacsimile or cable communication) and mailed, telegraphed, telexed, telecopied, cabled or delivered as follows: if to Maker, at its address specified opposite its signature below; and if to Payee, at the address specified in Section 1 hereof, or in each case at such other address as shall be designated by Payee or Maker. All such notices and communications shall, when mailed, telegraphed, telexed, telecopied or cabled or sent by overnight courier, be effective when deposited in the mails, delivered to the telegraph company, cable company or overnight courier, as the case may be, or sent by telex of telecopier.

(b)     If any provision in or obligation under this Note shall be invalid, illegal or unenforceable in any jurisdiction, the validity, legality and enforceability of the remaining provisions or obligations, or of such provision or obligation in any other jurisdiction, shall not in any way be affected or impaired thereby. Moreover, in the event any interest or fee provided for herein shall be deemed to be illegal or in violation of any state law, such interest or fee shall be reduced to the highest available rate or fee allowed under the law.

(c)     This Note shall be binding upon Maker and Payee and their respective successors and assigns. None of the terms or provisions of this Note maybe waived, altered, modified or amended except in writing duly signed for and on behalf of Maker and Payee.

(d)     Neither this Note nor the rights or obligations hereunder shall be assigned without the express written consent of Maker and Payee.

(e)     This Note shall be binding upon Maker and Payee and their respective successors and assigns. None of the terms or provisions of this Note maybe waived, altered, modified or amended except in writing duly signed for and on behalf of Maker and Payee.

(f)     In the event of any default by Maker, the Payee shall be entitled to recover any and all reasonable expenses and fees incurred by Payee in connection with any collection efforts.

**THIS NOTE AND THE RIGHTS AND OBLIGATIONS OF MAKER AND PAYEE HEREUNDER SHALL BE GOVERNED BY, AND SHALL BE CONSTRUED AND ENFORCED IN ACCORDANCE WITH, THE INTERNAL LAWS OF THE STATE OF CALIFORNIA WITHOUT REGARD TO CONFLICTS OF LAWS PRINCIPLES.**

IN WITNESS WHEREOF, Maker has caused this Note to be executed and delivered as of the day and year and at the place first above written.

"MAKER"

MICHAEL N. AVENATTI, individually

2

# EXHIBIT B

0429

0429

**NONNEGOTIABLE PROMISSORY NOTE DUE JANUARY 31, 2014** 17 (MATK)

$1,500,000.00

Newport Beach, California

July 1, 2013

        **FOR VALUE RECEIVED,** Michael J. Avenatti, an individual (collectively, the "Maker") unconditionally promises to pay to the order of William Parrish ("Payee"), in the manner and at the place hereinafter provided, the principal amount of One Million Five Hundred Thousand Dollars ($1,500,000.00) in one payment on January 31, 2014. 17 (MATK)

        Maker also promises to pay interest at a rate per annum equal to 8.0% on any unpaid principal amount from the date such amount(s) is loaned to Maker until paid in full. (MATK)

        Interest on this Note shall be payable on the following dates: January 31, 2014. 17 All computations of interest shall be made by Payee on the basis of a 365-day year, for the actual number of days elapsed in the relevant period (including the first day but excluding the last day).

        1.    **Payments.** All payments of principal and interest in respect of this Note shall be made in lawful money of the United States of America at William Parrish; 6489 Calle Real Suite E; Goleta, CA 93117, or at such other place as Payee may direct. Whenever any payment on this Note is stated to be due on a day that is not a Business Day, such payment shall instead be made on the next Business Day, and such extension of time shall be included in the computation of interest payable on this Note. "Business Day" means any day other man a Saturday, Sunday or legal holiday under the laws of the State of California or any other day on which banking institutions located in such state are authorized or required by law or other governmental action to close.

        2.    **Prepayments.** Maker shall have the right at any time and from time to time to prepay the principal of this Note in whole or in part without penalty.

        3.    **Miscellaneous.**

        (a)    All notices and other communications provided for hereunder shall be in writing (including telegraphic, telex, telefacsimile or cable communication) and mailed, telegraphed, telexed, telecopied, cabled or delivered as follows: if to Maker, at its address specified opposite its signature below; and if to Payee, at the address specified in Section 1 hereof, or in each case at such other address as shall be designated by Payee or Maker. All such notices and communications shall, when mailed, telegraphed, telexed, telecopied or cabled or sent by overnight courier, be effective when deposited in the mails, delivered to the telegraph company, cable company or overnight courier, as the case may be, or sent by telex of telecopier.

1

(b)  ·  If any provision in or obligation under this Note shall be invalid, illegal or unenforceable in any jurisdiction, the validity, legality and enforceability of the remaining provisions or obligations, or of such provision or obligation in any other jurisdiction, shall not in any way be affected or impaired thereby.  Moreover, in the event any interest or fee provided for herein shall be deemed to be illegal or in violation of any state law, such interest or fee shall be reduced to the highest available rate or fee allowed under the law.

(c)  This Note shall be binding upon Maker and Payee and their respective successors and assigns. None of the terms or provisions of this Note maybe waived, altered, modified or amended except in writing duly signed for and on behalf of Maker and Payee.

(d)  Neither this Note nor the rights or obligations hereunder shall be assigned without the express written consent of Maker and Payee.

(e)  This Note shall be binding upon Maker and Payee and their respective successors and assigns. None of the terms or provisions of this Note maybe waived, altered, modified or amended except in writing duly signed for and on behalf of Maker and Payee.

(f)  In the event of any default by Maker, the Payee shall be entitled to recover any and all reasonable expenses and fees incurred by Payee in connection with any collection efforts.

**THIS NOTE AND THE RIGHTS AND OBLIGATIONS OF MAKER AND PAYEE HEREUNDER SHALL BE GOVERNED BY, AND SHALL BE CONSTRUED AND ENFORCED IN ACCORDANCE WITH, THE INTERNAL LAWS OF THE STATE OF CALIFORNIA WITHOUT REGARD TO CONFLICTS OF LAWS PRINCIPLES.**

IN WITNESS WHEREOF, Maker has caused this Note to be executed and delivered as of the day and year and at the place first above written.

"MAKER"

MICHAEL J. AVENATTI, individually

REAFFIRMED 7-25-16

2

0431

0431

# EXHIBIT 2

0432

1  BLANK ROME LLP
   Linda Kornfeld (SBN 155765)
2  lkornfeld@blankrome.com
   Anna K. Milunas (SBN 287382)
3  amilunas@blankrome.com
   2029 Century Park East | 6th Floor
4  Los Angeles, CA 90067
   Telephone:    424.239.3400
5  Facsimile:    424.239.3434

6  CAPPELLO & NOËL LLP
   A. Barry Cappello (SBN 037835)
7  abc@cappellonoel.com
   Lawrence J. Conlan (SBN 221350)
8  lconlan@cappellonoel.com
   831 State Street
9  Santa Barbara, CA 93101-3227
   Telephone: (805) 564-2444
10 Facsimile: (805) 965-5950

11 Attorneys for Plaintiffs
   PASSPORT 420, LLC; SPRING CREEK RESEARCH, LLC;
12 and WILLIAM PARRISH

13                  **SUPERIOR COURT OF THE STATE OF CALIFORNIA**

14                             **COUNTY OF SANTA BARBARA**

15

16 | PASSPORT 420, LLC a Delaware Limited | Case No. 19CV03596 |
17 | Liability Company; SPRING CREEK RESEARCH, LLC, a California Limited | **OBJECTIONS AND RESPONSES OF** |
18 | Liability Company; and WILLIAM PARRISH, an Individual, | **PASSPORT 420, LLC TO REQUESTS FOR ADMISSION PROPOUNDED BY** |
19 |                          Plaintiff, | **STARR INDEMNITY & LIABILITY COMPANY, SET NO. ONE** |
20 |            vs. | |
21 | STARR INDEMNITY & LIABILITY | |
22 | COMPANY, a Texas Corporation; AVENATTI & ASSOCIATES, APC, a | |
23 | California Professional Corporation; MICHAEL J. AVENATTI, an Individual; and | |
24 | DOES 1 through 10,                 Defendants. | |

25

26 **PROPOUNDING PARTY:**     STARR INDEMNITY & LIABILITY COMPANY

27 **RESPONDING PARTY:**     PASSPORT 420, LLC

28 **SET NO.:**              ONE

---

157334.00601/122537780v.4

**OBJECTIONS AND RESPONSES OF PASSPORT 420, LLC TO REQUESTS FOR ADMISSION PROPOUNDED BY STARR INDEMNITY & LIABILITY COMPANY, SET NO. ONE**

0433
0433

1          **RESPONSES TO REQUESTS FOR ADMISSION**

2   **REQUEST FOR ADMISSION NO. 1:**

3        Admit that Passport 420, LLC was organized on or about April 14, 2016, pursuant to a

4   Certificate of Formation duly executed and filed under the Delaware Limited Liability Company

5   Act, attached hereto as Exhibit "A".

6   **RESPONSE TO REQUEST FOR ADMISSION NO. 1:**

7        Subject to the foregoing general objections: Admit.

8   **REQUEST FOR ADMISSION NO. 2:**

9        Admit that Exhibit "B" is a true and accurate copy of the "Limited Liability Company

10   Operating Agreement" for Passport 420, LLC entered into as of July 11, 2016 between Avenatti

11   & Associates and Spring Creek Research, LLC.

12   **RESPONSE TO REQUEST FOR ADMISSION NO. 2:**

13        Subject to the foregoing general objections: Admit.

14   **REQUEST FOR ADMISSION NO. 3:**

15        Admit that on or about January 27, 2017 Passport 420, LLC took delivery of the 2016

16   Honda Jet, Model HA-420, Serial Number SN42000029, RegistrationN227WP, for a total net

17   price due of $4,383,605.00, pursuant to Exhibit "C".

18   **RESPONSE TO REQUEST FOR ADMISSION NO. 3:**

19        Subject to the foregoing general objections: Admit.

20   **REQUEST FOR ADMISSION NO. 4:**

21        Admit that the Limited Liability Company Operating Agreement attached as Exhibit "B"

22   was fully executed.

23   **RESPONSE TO REQUEST FOR ADMISSION NO. 4:**

24        Subject to the foregoing general objections: Admit.

25   **REQUEST FOR ADMISSION NO. 5:**

26        Admit that the signatures on the Limited Liability Company Operating Agreement

27   attached as Exhibit "B" of William Parrish are the true signatures of William Parrish.

28

**OBJECTIONS AND RESPONSES OF PASSPORT 420, LLC TO REQUESTS FOR ADMISSION
PROPOUNDED BY STARR INDEMNITY & LIABILITY COMPANY, SET NO. ONE**

0434
0434

**RESPONSE TO REQUEST FOR ADMISSION NO. 5:**

Subject to the foregoing general objections: Admit.

**REQUEST FOR ADMISSION NO. 6:**

Admit that the 2016 Honda Jet, Model HA-420, Serial Number SR42000029, Registration N227WP, was titled to Passport 420, LLC as the registered owner with no liens or encumbrances as reflected in the Aircraft Title Status Report attached hereto as Exhibit "D".

**RESPONSE TO REQUEST FOR ADMISSION NO. 6:**

Subject to the foregoing general objections: Admit.

**REQUEST FOR ADMISSION NO. 7:**

Admit that Michael Avenatti was appointed manager of Passport 420, LLC pursuant to the Limited Liability Company Operating Agreement for Passport 420, LLC attached as Exhibit "B".

**RESPONSE TO REQUEST FOR ADMISSION NO. 7:**

Subject to the foregoing general objections: Admit that Michael Avenatti was elected (not appointed) manager for a one-year term under the LLC-operating agreement however he was never duly re-elected for any term thereafter.

**REQUEST FOR ADMISSION NO. 8:**

Admit that Michael Avenatti signed as "Purchaser" for the Honda Jet, Model HA-420, Serial Number SN42000029, Registration N227WP in his capacity as manager of Passport 420, LLC as reflected in Exhibit "C".

**RESPONSE TO REQUEST FOR ADMISSION NO. 8:**

Subject to the foregoing general objections: Admit.

**REQUEST FOR ADMISSION NO. 9:**

Admit that prior to August 29, 2018 Michael Avenatti as manager had full and complete authority, power and discretion to manage and control the affairs of Passport 420, LLC pursuant to the Limited Liability Company Operating Agreement attached as Exhibit "B".

**RESPONSE TO REQUEST FOR ADMISSION NO. 9:**

In addition to the foregoing general objections, Responding Party objects on the basis that this request is vague and ambiguous, including as to time.  Subject to the foregoing specific and

**OBJECTIONS AND RESPONSES OF PASSPORT 420, LLC TO REQUESTS FOR ADMISSION PROPOUNDED BY STARR INDEMNITY & LIABILITY COMPANY, SET NO. ONE**

1  general objections: Deny.  Michael Avenatti's managerial authority over Passport 420, LLC

2  ended prior to August 29, 2018 due to earlier breaches of his fiduciary managerial obligations and

3  duties.

4  **REQUEST FOR ADMISSION NO. 10:**

5      Admit that pursuant to the Limited Liability Company Operating Agreement attached as

6  Exhibit "B" that ''the actions of the manager taken in accordance with this agreement shall bind

7  the company."

8  <u>RESPONSE TO REQUEST FOR ADMISSION NO. 10:</u>

9      Subject to the foregoing general objections: Admit that the stated material is a correct and

10  accurate quote from Exhibit "B".

11  **REQUEST FOR ADMISSION NO. 11:**

12      Admit that on or about August 29, 2018 William Parrish issued to Michael Avenatti a

13  "Notice of Default" attached hereto as Exhibit "E" pursuant to the Limited Liability Company

14  Operating Agreement attached as Exhibit "B".

15  <u>RESPONSE TO REQUEST FOR ADMISSION NO. 11:</u>

16      Subject to the foregoing general objections: Admit.

17  **REQUEST FOR ADMISSION NO. 12:**

18      Admit that William Parrish assumed the role of manager of Passport 420, LLC effective

19  on or about August 29, 2018.

20  <u>RESPONSE TO REQUEST FOR ADMISSION NO. 12:</u>

21      Subject to the foregoing general objections: Admit.

22  **REQUEST FOR ADMISSION NO. 13:**

23      Admit that after issuing the Notice of Default by William Parrish, a Notice of Intent to

24  Sell to Other Member was not issued by Spring Creek Research, LLC to Avenatti & Associates.

25  <u>RESPONSE TO REQUEST FOR ADMISSION NO. 13:</u>

26      Subject to the foregoing general objections: Admit.

27

28

**OBJECTIONS AND RESPONSES OF PASSPORT 420, LLC TO REQUESTS FOR ADMISSION PROPOUNDED BY STARR INDEMNITY & LIABILITY COMPANY, SET NO. ONE**

0436
0436

**REQUEST FOR ADMISSION NO. 14:**

Admit that Michael Avenatti embezzled approximately $2,500,000.00 from his client, Alexis Gardner.

**RESPONSE TO REQUEST FOR ADMISSION NO. 14:**

Subject to the foregoing general objections: Responding Party lacks sufficient information or knowledge to admit or deny the request but it appears from public filings that X-Law Group and attorney Fillipo Marchino received $2.5 million from Eagan Avenatti LLP and subsequently transferred that same amount of money to Honda.

**REQUEST FOR ADMISSION NO. 15:**

Admit that Michael Avenatti used the money he embezzled from his client Alexis Gardner to contribute towards the purchase of the 2016 Honda Jet, Model HA-420, Serial Number SR42000029, Registration N227WP.

**RESPONSE TO REQUEST FOR ADMISSION NO. 15:**

Subject to the foregoing general objections: Responding Party lacks sufficient information or knowledge to admit or deny the request but it appears from public filings that X-Law Group and attorney Fillipo Marchino received $2.5 million from Eagan Avenatti LLP and subsequently transferred that same amount of money to Honda.

**REQUEST FOR ADMISSION NO. 16:**

Admit that Exhibit "F" is a true and accurate copy of Starr Elite Comprehensive Corporate Aircraft Policy issued to Passport 420, LLC, Policy Number 1000320046-01 with effective dates from January 26, 2017 until January 26, 2018.

**RESPONSE TO REQUEST FOR ADMISSION NO. 16:**

Subject to the foregoing general objections: Admit.

**REQUEST FOR ADMISSION NO. 17:**

Admit that Exhibit "G" is a true and accurate copy of the "Aircraft Insurance Application" submitted on behalf of Passport 420, LLC, that led to the issuance of the Starr Elite Comprehensive Corporate Aircraft Policy attached as Exhibit "F".

8

**OBJECTIONS AND RESPONSES OF PASSPORT 420, LLC TO REQUESTS FOR ADMISSION PROPOUNDED BY STARR INDEMNITY & LIABILITY COMPANY, SET NO. ONE**

**RESPONSE TO REQUEST FOR ADMISSION NO. 17:**

In addition to the foregoing general objections, Responding Party objects to the phrase "that led to the issuance of" on the basis that this request necessarily seeks an admission exclusively within the knowledge of Propounding Party who issued Exhibit "F." Subject to the foregoing general and specific objections: Admit that Exhibit "G" is a true and accurate copy of the "Aircraft Insurance Application" submitted on behalf of Passport 420, LLC.

**REQUEST FOR ADMISSION NO. 18:**

Admit that Exhibit "H'' is a true and accurate copy of Starr Elite Comprehensive Corporate Aircraft Policy issued to Passport 420, LLC, Policy Number 1000320046-02 with effective dates from January 26, 2018 until January 26, 2019.

**RESPONSE TO REQUEST FOR ADMISSION NO. 18:**

Subject to the foregoing general objections: Admit.

**REQUEST FOR ADMISSION NO. 19:**

Admit that Exhibit "I" is a true and accurate copy of Starr Elite Comprehensive Company Aircraft Policy issued to Passport 420, LLC, Policy Number 1000320046-03 with effective dates from January 26, 2019 until January 26, 2020.

**RESPONSE TO REQUEST FOR ADMISSION NO. 19:**

In addition to the foregoing general objections, Responding Party objects to the Request to the extent it misidentifies the title of the document reflected in Exhibit "I". The correct title is "Starr Elite Comprehensive Corporate Aircraft Policy." Subject to the foregoing general and specific objections: Admit.

**REQUEST FOR ADMISSION NO. 20:**

Admit that Exhibit "I" is a true and accurate copy of the "Aircraft Insurance Application" submitted on behalf of Passport 420, LLC, that led to the issuance of the Starr Elite Comprehensive Corporate Aircraft Policy attached as Exhibit "J".

**RESPONSE TO REQUEST FOR ADMISSION NO. 20:**

In addition to the foregoing general objections, Responding Party objects to the phrase "that led to the issuance of" on the basis that this request necessarily seeks an admission

**OBJECTIONS AND RESPONSES OF PASSPORT 420, LLC TO REQUESTS FOR ADMISSION PROPOUNDED BY STARR INDEMNITY & LIABILITY COMPANY, SET NO. ONE**

1   exclusively within the knowledge of Propounding Party who issued Exhibit "J."  Subject to the

2   foregoing general and specific objections: Admit that Exhibit "I" is a true and accurate copy of

3   the "Aircraft Insurance Application" submitted on behalf of Passport 420, LLC.

4   **REQUEST FOR ADMISSION NO. 21:**

5         Admit that Passport 420, LLC is the only loss payee for money to be paid under Exhibit

6   "I" for a physical damage loss to the 2016 Honda Jet, Model HA-420, Serial Number

7   SR42000029, Registration N227WP.

8   **RESPONSE TO REQUEST FOR ADMISSION NO. 21:**

9         Subject to the foregoing general objections: Admit but deny to the extent the request

10   implies that William Parrish is not otherwise a loss payee through his ownership interest in Spring

11   Creek Research, LLC.  The Limited Liability Operating Agreement incorporated hereto as

12   Exhibit "B" states that Spring Creek Research, LLC is a loss payee of insurance proceeds paid to

13   Passport 420, LLC, which in turn are paid to William Parrish through his ownership interest in

14   Spring Creek Research, LLC.

15   **REQUEST FOR ADMISSION NO. 22:**

16         Admit that William Parrish is not a loss payee for money to be paid under Exhibit "I" for

17   a physical damage loss to the 2016 Honda Jet Model HA-420, Serial Number SR42000029,

18   Registration N227WP.

19   **RESPONSE TO REQUEST FOR ADMISSION NO. 22:**

20         Subject to the foregoing general objections: Admit that William Parrish is not identified as

21   a loss payee under Exhibit "I" but deny to the extent the request implies that William Parrish is

22   not otherwise a loss payee through his ownership interest in Spring Creek Research, LLC.  The

23   Limited Liability Operating Agreement incorporated hereto as Exhibit "B" states that Spring

24   Creek Research, LLC is a loss payee of insurance proceeds paid to Passport 420, LLC, which in

25   turn are paid to William Parrish through his ownership interest in Spring Creek Research, LLC.

26

27

28

**OBJECTIONS AND RESPONSES OF PASSPORT 420, LLC TO REQUESTS FOR ADMISSION PROPOUNDED BY STARR INDEMNITY & LIABILITY COMPANY, SET NO. ONE**

**REQUEST FOR ADMISSION NO. 23:**

Admit that Spring Creek Research, LLP is not a loss payee for money to be paid under Exhibit "I" for a physical damage loss to the 2016 Honda Jet Model HA-420, Serial Number SR42000029, Registration N227WP.

**RESPONSE TO REQUEST FOR ADMISSION NO. 23:**

Subject to the foregoing general objections: Admit that Spring Creek Research, LLC is not identified as a loss payee under Exhibit "I" but deny to the extent the request implies that Spring Creek Research, LLC is not otherwise a loss payee by virtue of being a member-owner of Passport 420, LLC. The Limited Liability Operating Agreement incorporated hereto as Exhibit "B" states that Spring Creek Research, LLC is a loss payee of insurance proceeds paid to Passport 420, LLC.

**REQUEST FOR ADMISSION NO. 24:**

Admit that Alexis Gardner claims an interest in the assets of Passport 420, LLC, including any benefits that might be paid under Exhibit "I" for a physical damage loss to the 2016 Honda Jet Model HA-420, Serial Number SR42000029, Registration N227WP.

**RESPONSE TO REQUEST FOR ADMISSION NO. 24:**

Subject to the foregoing general objections: Admit that Alexis Gardner has sought relief from the now-stayed federal action filed by Propounding Party in which Ms. Gardner asserts an unfounded interest in the assets of Passport 420, LLC and any benefits that might be paid to Passport 420, LLC under Exhibit "I" for a physical damage loss.

**REQUEST FOR ADMISSION NO. 25:**

Admit that Michael Avenatti assigned to Lisa-Storie Avenatti the membership interest of Avenatti & Associates in Passport 420, LLC.

**RESPONSE TO REQUEST FOR ADMISSION NO. 25:**

Subject to the foregoing general objections: Responding Party lacks sufficient information or knowledge to admit or deny the request due to the fact that publicly available information reflects that Michael Avenatti simultaneously claims that he has and has not assigned the membership interest of Avenatti & Associates in Passport 420, LLC to Lisa-Storie Avenatti.

OBJECTIONS AND RESPONSES OF PASSPORT 420, LLC TO REQUESTS FOR ADMISSION
PROPOUNDED BY STARR INDEMNITY & LIABILITY COMPANY, SET NO. ONE

0440
0440

1   Further, while Responding Party is aware of court filings suggesting Michael Avenatti attempted

2   to assign the membership interest of Avenatti & Associates in Passport 420, LLC to Lisa-Storie

3   Avenatti, that assignment is potentially void to the extent that it was not properly executed under

4   the terms of the Limited Liability Company Operating Agreement.

5   **REQUEST FOR ADMISSION NO. 26:**

6        Admit that Exhibit "K" is a true and accurate copy of the Civil Forfeiture Complaint

7   served by the United States of America upon Passport 420, LLC, Spring Creek Research, LLC

8   and William Parrish, among others.

9   **RESPONSE TO REQUEST FOR ADMISSION NO. 26:**

10      Subject to the foregoing general objections: Admit.

11   **REQUEST FOR ADMISSION NO. 27:**

12        Admit that Exhibit "L" is a true and accurate copy of an indictment filed by the United

13   States of America upon Michael Avenatti in the United States District Court, Central District of

14   California.

15   **RESPONSE TO REQUEST FOR ADMISSION NO. 27:**

16      Subject to the foregoing general objections: Admit.

17   **REQUEST FOR ADMISSION NO. 28:**

18        Admit that Exhibit "M" is a true and accurate copy of a "Cross-Claim" filed by Alexis

19   Gardner against Passport 420, LLC, among others, in the United States District Court, Central

20   District of California.

21   **RESPONSE TO REQUEST FOR ADMISSION NO. 28:**

22      Subject to the foregoing general objections: Admit.

23   **REQUEST FOR ADMISSION NO. 29:**

24        Admit that Exhibit "N" is a true and accurate copy of a complaint filed by William Parrish

25   against Michael Avenatti titled *WILLIAM PARRISH, an individual; E. TIMOTHY*

26   *FITZGIBBONS, an individual, Plaintiff, vs. MICHAEL AVENATI'I, individually; MICHAEL*

27   *EAGAN, individually; EAGAN AVENATTI, LLP, a California limited liability partnership;*

28   *AVENATI'I & ASSOCIATES, APC, a California professional corporation; JASON FRANK,*

157334.00601/122537780v.4         12

**OBJECTIONS AND RESPONSES OF PASSPORT 420, LLC TO REQUESTS FOR ADMISSION**
**PROPOUNDED BY STARR INDEMNITY & LIABILITY COMPANY, SET NO. ONE**

1   *individually; JASON FRANK LAW, PLC, a California professional law corporation; SCOTT*

2   *SIMS, individually; ALEXANDER CONTI; individually; and DOES 1 through 20, inclusive,*

3   *Defendants*, Superior Court of the State of California for the County of Santa Barbara, Case No.:

4   19CV01686.

5   **RESPONSE TO REQUEST FOR ADMISSION NO. 29:**

6      Subject to the foregoing general objections: Admit.

7   **REQUEST FOR ADMISSION NO. 30:**

8      Admit that Exhibit "O" is a true and accurate copy of a complaint filed by William Parrish

9   against Michael Avenatti titles *WILLIAM PARRISH, an individual; Plaintiff, vs. Plaintiff, vs.*

10   *MICHAEL J. AVENATTI, an individual; and DOES 1 through 20, inclusive, DEFENDANTS,*

11   Superior Court of the State of California for the County of Santa Barbara, Case No.: 18CV04106

12   **RESPONSE TO REQUEST FOR ADMISSION NO. 30:**

13      Subject to the foregoing general objections: Admit.

14

15   DATED:  March 6, 2020        BLANK ROME LLP

16

17                 By: _____

18                      Linda Kornfeld
                         Anna K. Milunas

19                      Attorneys for Plaintiffs
                     PASSPORT 420, LLC;

20                      SPRING CREEK RESEARCH, LLC;
                     and WILLIAM PARRISH

21

22

23

24

25

26

27

28

**OBJECTIONS AND RESPONSES OF PASSPORT 420, LLC TO REQUESTS FOR ADMISSION
PROPOUNDED BY STARR INDEMNITY & LIABILITY COMPANY, SET NO. ONE**

# EXHIBIT 3

0443

0443

04/22/2015

MICHAEL JOHN AVENATTI- VOL. I

```
 1        SUPERIOR COURT OF CALIFORNIA, COUNTY OF ORANGE

 2                   CENTRAL JUSTICE CENTER

 3

 4

 5   EAGAN AVENATTI, LLP,            )
                                     )
 6                    Plaintiff,     )
                                     )
 7         vs.                       ) No. 30-2011-00483570
                                     )
 8   ROBERT J. STOLL, JR., an        ) Consolidated with:
     individual; STOLL, NUSSBAUM &   )      30-2013-00627604
 9   POLAKOV, a California Professional )
     Corporation,                    )   Pages 1 - 211
10                                   )
                      Defendants.    )
11   _____)
     AND RELATED CROSS-ACTIONS.      )
12                                   )

13

14   Deposition of:       MICHAEL JOHN AVENATTI
                          Volume I
15

16   Date and Time:      Wednesday, April 22, 2015
                          10:03 a.m.
17

18   Place:              Judicate West
                          1851 East First Street
19                        Suite 1600
                          Santa Ana, California
20

21   Reporter:           Linda A. Simpson, CSR,
                          RMR, CRR
22                        Certificate No. 2266

23

24

25
```

0444
0444

04/22/2015

MICHAEL JOHN AVENATTI- VOL. I

| 1 | Q. | Are you a trustor of any trust? |

1     Q.    Are you a trustor of any trust?

2     A.    No.

3     Q.    You a beneficiary of any trust?

4     A.    No.

5     Q.    Do you own any businesses?

6     A.    I own portions of businesses.

7     Q.    Okay.  What businesses do you own portions of?     11:03

8     A.    I own a portion of our law firm.

9     Q.    How much do you own of that law firm?

10    A.    75 percent.

11    Q.    What's the value of that 75 percent?

12    A.    I have no idea.  I haven't valued it.

13    Q.    What other businesses do you own portions of?     11:04

14    A.    I own Avenatti & Associates a hundred percent.

15    Q.    What does Avenatti & Associates do?

16    A.    Avenatti & Associates, among other things,

17 owns my interest in my law firm.

18    Q.    And what is the value of Avenatti &

19 Associates?     11:05

20    A.    I don't know because I haven't valued it.

21    Q.    What is the net equity in the house in Laguna?

22    A.    I would say at most, three million dollars.

23    Q.    Purchased the house for $7 million; is that

24 correct?

25    A.    That's correct.

0445
0445

# EXHIBIT 4

0446

CONFIDENTIAL

WILLIAM JAMES PARRISH- VOL. I

```
 1        SUPERIOR COURT OF CALIFORNIA, COUNTY OF ORANGE

 2                    CENTRAL JUSTICE CENTER

 3

 4

 5    EAGAN AVENATTI, LLP,              )
                                       )
 6                    Plaintiff,       )
                                       )
 7         vs.                         ) No. 30-2011-00483570
                                       )
 8    ROBERT J. STOLL, JR., an         ) Consolidated with:
      individual; STOLL, NUSSBAUM &    )     30-2013-00627604
 9    POLAKOV, a California Professional )
      Corporation,                     )
10                                     )     Pages 1 - 165
                      Defendants.      )
11    _____)
      AND RELATED CROSS-ACTIONS.       )
12                                     )

13

14    Videotaped
      Deposition of:       WILLIAM JAMES PARRISH
15                         Volume I

16    Date and Time:       Monday, January 18, 2016
                           8:38 a.m.
17

18    Place:               2030 Main Street
                           Suite 1040
19                         Irvine, California

20

21    Reporter:            Linda A. Simpson, CSR,
                           RMR, CRR, CCRR
22                         Certificate No. 2266

23

24

25
```

SIMPSON DEPOSITION SERVICES (800) 505-9994

CONFIDENTIAL

WILLIAM JAMES PARRISH- VOL. I

```
 1        Q.    And what else?
 2        A.    A Range Rover.  It's about three or four years
 3  old.                                                        13:27
 4        Q.    And what's the fourth car?
 5        A.    A Chevy Suburban.  It's about 12 years old.
 6  Just guessing there.  It's an old car.
 7        Q.    You have any other interests in any other     13:28
 8  companies than Spring Creek Research and Parrish Hanson
 9  LLC?
10        A.    Yeah, Seek.  Seek Thermal.
11        Q.    How much interest do you have in that company?
12        A.    Those are the stock -- that was the stock you
13  asked me about.  The shareholders, whatnot.
14        Q.    I thought that was for Spring Creek.            13:28
15        A.    No, no, Spring Creek is an LLC owned by my
16  wife and myself.
17        Q.    You and your wife are the only owners of
18  Spring Creek Research?
19        A.    Well, there's three owners, myself, my wife,
20  and the family trust.  It's a living trust.  I provided     13:28
21  you with documents on that.  I don't know if they've been
22  produced or not, but you have all that.  So all that
23  business about shareholders and board of directors and
24  all that stuff, that's with regard to Seek.
25        Q.    Thank you for qualifying that.  You own any
```

SIMPSON DEPOSITION SERVICES (800) 505-9994

# EXHIBIT 5

0449

0449

20.     Among other provisions, the insuring agreement in Endorsement No. 10 provides coverage up to $10 million for the "physical loss of . . . any scheduled aircraft . . . during the policy period arising out of any of the following perils:   (e) confiscation, nationalization, *seizure*, restraint, detention, appropriation, requisition for title, [or] use by . . . any government, public or local authority, whether civil, military, or de facto."   The Declarations Page of the Policy lists the Honda Jet as a "scheduled aircraft."   Endorsement No. 10 also provides coverage for extra expenses incurred following a seizure.

21.     The federal government seized the Honda Jet on April 10, 2019.   Subsequently, Plaintiffs provided a Sworn Statement in Proof of Loss to Defendant Starr Indemnity.   At a minimum, the seizure of the Honda Jet by the federal government is covered by the plain terms of the Policy's Endorsement No. 10, as it concerns the "seizure" of a "scheduled aircraft" by "any government" "during the policy period."

22.     Nonetheless, to date, Defendant Starr Indemnity has refused to acknowledge coverage for the federal government's seizure of the Honda Jet.   Defendant Starr Indemnity acknowledged that the seizure falls within the Policy's Endorsement No. 10, but asserts that coverage may be limited by the conduct of Mr. Avenatti in connection to the pending criminal charges against him in the Central District of California.   Plaintiffs have no knowledge or understanding of the criminal charges pending against Mr. Avenatti other than what is contained in public filings and media reports.   Irrespective of whether the criminal charges against Mr. Avenatti individually are proven, his alleged criminal acts are not attributable to Plaintiffs, and the seizure of the aircraft did not originate by any act, design or procurement of Plaintiffs, nor by any act of Mr. Avenatti in his capacity as the former manager of Plaintiff Passport (the term of which ended prior to the policy period).

23.     By issuing the Policy, Defendant Starr Indemnity agreed to provide coverage for the Plaintiffs against seizure of the Honda Jet.   Defendant Starr Indemnity cannot now renege on that agreement, as it appears to have done.   Regardless of whether the government seizure was lawful or legitimate, and regardless of whether Mr. Avenatti is found guilty of the crimes for which

Exhibit "1" Page 018

1   he has been charged, the fact remains that the aircraft that Starr Indemnity insured has been seized

2   by the federal government and is no longer in the possession or control of Plaintiffs.  Plaintiffs are

3   therefore unable to use the aircraft, and have been deprived of the value of their interest in it.

4   Accordingly, by this lawsuit Plaintiffs demand that Defendant Starr Indemnity immediately pay

5   this covered loss.

6                                                 **FIRST CAUSE OF ACTION**

7                    **(Breach of Contract – Against Defendant Starr Indemnity and Does 1-10)**

8            24.     Plaintiffs re-allege and incorporate by reference herein each allegation contained in

9   paragraphs 1 through 23 above.

10          25.     Defendant Starr Indemnity had duties under the Policy, the law, and insurance

11  industry custom and practice to, among other things, pay Plaintiffs for the loss of the Honda Jet.

12  Defendant Starr Indemnity likewise was obligated to conduct a thorough investigation of all bases

13  that might support Plaintiffs' claim for coverage, yet failed to do so.

14          26.     Defendant Starr Indemnity breached its duties under the Policy by failing to pay

15  Plaintiffs for the loss of the Honda Jet; asserting grounds to avoid or limit coverage that it knew

16  were not supported by, and are contrary to, the terms of the Policy, the law, industry custom and

17  practice, the parties' course of dealings, and the facts; failing to conduct an adequate investigation

18  of Plaintiffs' claims and asserting grounds to avoid coverage based on its inadequate investigation;

19  failing to fully inquire into possible bases that might support coverage for Plaintiffs; and by giving

20  greater consideration to its own interests than they gave to Plaintiffs' interests as Insureds.

21          27.     As a direct and proximate result of Defendant Starr Indemnity's breach of contract,

22  Plaintiffs have suffered, and continue to suffer, damages in an amount in excess of the Court's

23  jurisdictional limits.  When the precise amount of Plaintiffs' damages are known, they will assert

24  those damages accordingly.

25                                             **SECOND CAUSE OF ACTION**

26          **(Breach of the Covenant of Good Faith and Fair Dealing – Against Defendant Starr**

27                                               **Indemnity and Does 1-10)**

28

7

**COMPLAINT**

Exhibit "1" Page 019

1  28. Plaintiffs re-allege and incorporate by reference herein each allegation contained in

2 paragraphs 1 through 27 above.

3  29. In breach of the implied covenant of good faith and fair dealing, Defendant Starr

4 Indemnity did the things and committed the acts alleged above for the purpose of consciously

5 withholding from Plaintiffs the rights and benefits to which they are entitled under Policy and

6 without considering Plaintiffs' interests at least to the same extent as Defendant Starr Indemnity

7 considered its own interests.

8  30. As a direct and proximate result of Defendant Starr Indemnity's unreasonable acts,

9 Plaintiffs have been damaged in an amount in excess of the Court's jurisdictional limits.  The

10 actual amount of damages has not yet been precisely ascertained.  When the precise amount of

11 Plaintiffs' damages are known, they will assert those damages accordingly.

12  31. Defendant Starr Indemnity's acts are inconsistent with Plaintiffs' reasonable

13 expectations, and are contrary to established insurance claims practices and legal requirements,

14 and constitute bad faith.

15  32. Pursuant to the holding in *Brandt   v. Superior Court*, 37 Cal. 3d 813 (1985),

16 Plaintiffs are entitled to recover all attorneys' fees that they reasonably have incurred, and are

17 incurring, in their efforts to obtain the benefits of the coverage that Defendant Starr Indemnity

18 wrongfully has withheld, and is withholding, in bad faith, plus interest.  The total amount of these

19 attorneys' fees is currently unknown.  When the precise amount of Plaintiffs' damages are known,

20 they will assert those damages accordingly.

21  33. Defendant Starr Indemnity's conduct is despicable and has been done with a

22 conscious disregard of Plaintiffs' rights, constituting oppression, fraud, and/or malice.  Defendant

23 Starr Indemnity engaged in a series of acts designed to deny wrongfully the benefits due under the

24 Policy.  Specifically, Defendant Starr Indemnity, by acting as alleged above, in light of the

25 information, facts, and law to the contrary, consciously disregarded Plaintiffs' rights and forced

26 Plaintiffs to incur substantial financial loss, without sufficient assistance from it, thereby inflicting

27 substantial financial damage on Plaintiffs.  Defendant Starr Indemnity ignored Plaintiffs' interests

28

8

**COMPLAINT**

1  and concerns, with the requisite intent to injure, and acted fraudulently, within the meaning of

2  California Civil Code 3294. Therefore, Plaintiffs are entitled to recover punitive damages from

3  Defendant Starr Indemnity in an amount sufficient to punish and to make an example of it and in

4  order to deter similar conduct.

5  **THIRD CAUSE OF ACTION**

6  **(Declaratory Relief – Against All Defendants)**

7      34.     Plaintiffs re-allege and incorporate by reference herein each allegation contained in

8  paragraphs 1 through 33 above.

9      35.     An actual and justiciable controversy exists between Plaintiffs, on the one hand,

10 and Defendants, on the other hand, as to (a) Defendant Starr Indemnity's obligations to provide

11 coverage for the government seizure of the Honda Jet under the Policy, (b) whether the conduct of

12 the Avenatti Defendants provides a basis for Defendant Starr Indemnity to deny coverage for the

13 government seizure of the Honda Jet under the Policy, and (c) whether the Avenatti Defendants

14 incorrectly assert a claim, right, or interest in the Policy. Plaintiffs seek a judicial declaration as

15 to their rights and obligations against Defendants in connection with insurance coverage for

16 substantial losses as alleged herein.

17 **ON THE FIRST CAUSE OF ACTION**

18      1.     For damages, plus pre- and post-judgment interest, according to proof at the time

19 of trial;

20 **ON THE SECOND CAUSE OF ACTION**

21      2.     For damages, plus pre- and post-judgment interest, according to proof at the time

22 of trial;

23      3.     For reasonable attorneys' fees incurred in obtaining the benefits due under the

24 Policy, plus interest;

25      4.     For punitive damages;

26 **ON THE THIRD CAUSE OF ACTION**

27      5.     For a declaration consistent with Plaintiffs' contentions above;

28

9

**COMPLAINT**

1

### ON ALL CAUSES OF ACTION

2     6.     For such just, other, further, and/or different relief as may be just and proper.

3

4

5   DATED:   July 11, 2019                    KASOWITZ BENSON TORRES LLP

6

7                                    By: _Jerrold Oshinsky_
                                         Jerrold Oshinsky
8                                        Attorneys for Plaintiffs

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

10

**COMPLAINT**

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a trial by jury in this action.

DATED:     July 11, 2019                    KASOWITZ BENSON TORRES LLP

                                        By: _Jerold Oshinsky_
                                            Jerold Oshinsky
                                            Attorneys for Plaintiffs

**COMPLAINT**

Exhibit "1" Page 023

# EXHIBIT 6

0455

0456

## SWORN STATEMENT IN PROOF OF LOSS

| Insured Value | | Policy Certificate Number |
|---|---|---|
| $ 4,000,000.00 | | 10K822046-05 |

| Issued | Expires | Claim Number |
|---|---|---|
| 1/26/2019 | 1/26/2020 | AVSIL0-77727 |

TO:  Starr Indemnity and Liability Company

By the above-indicated policy of insurance Starr Indemnity and Liability Company insured

against loss from the perils specified therein to the following described aircraft:

Make and Model: 2016 Gloss 300   Registration: N330WM

(1) **DATE OF LOSS:**  A loss occurred on  4/16/19
The cause and origin of the said loss or damage was:
Contractual, See below.

At the time of the loss or damage the aircraft was operated solely by N/A, who then had a pilot's certificate number N/A, which authorized him to operate the aforementioned aircraft and the above listed pilot was approved under the Policy and was operating the aircraft for a purpose permitted by the policy.

(2) TITLE AND INTEREST: When this policy was acquired, during the currency thereof and at the time of the loss, the interest of the insured in the aircraft was sole and unconditional ownership, and no other person, firm or corporation had any interest, mortgage or otherwise, therein. (State exceptions below, if any, and amounts paid/owed, if any). If additional space is needed, please attach a separate sheet.
N/A

(3) TOTAL INSURANCE:  The undersigned hereby asserts there was no other insurance (whether or not val'd and/or collectible) on the above-described aircraft and/or equipment. (State exceptions, if any)
N/A

(4) USE OF AIRCRAFT:  The undersigned hereby asserts that at the time of loss the involved aircraft was being used consistent with the use of the aircraft as approved and agreed to by the Aviation Managers and as listed in the policy provisions. (State exceptions, if any)  N/A

(5) THE INSURED VALUE of said aircraft at the time of the loss was:                    $ 4,000,000
(6) STATEMENT OF LOSS:                                                                    $ 4,000,000

(7) DEDUCTIBLE:                                                                           $ 10,000.00

(8) THE AMOUNT CLAIMED under the above-numbered policy is:                                $ 3,990,000

(initial)

Page 1 of 4

Confidential

(9) SUBROGATION: To the extent of the amount paid under the Policy, the undersigned hereby assigns to the Company any and all claims and causes of action the undersigned may have against any third party arising out of the loss for which this Proof of Loss is submitted.  The Company is hereby subrogated to such claims and causes of action and is empowered to sue, compromise or settle in the name of the undersigned, and the undersigned hereby pledges cooperation in any such action.

_WP_
(initial)

(10) AUTHORITY TO PAY: I hereby direct payment of claim be made as follows:

_____ William J. Parrish
Passport 420, LLC
4185 La Ladera Rd
Santa Barbara, CA 93110

the sum of $_____ _WP_
(initial)

The said loss or damage did not originate by any act, design, or procurement on the part of the insured; nothing has been done by or with the privity or consent of the insured to violate the conditions of the policy, or to render it void; no articles are mentioned herein but such as were lost or damaged at time of loss and belonging to insured at time of loss, no property saved has in any manner been concealed, and no attempt to deceive the Company as to extent of this loss has in any manner been made.  Any other information which may be required, will be furnished upon request.  All information provided on this form is true and correct to the best of my knowledge.

It is expressly understood and agreed that the furnishing of this form to the insured or aid in the preparing of this form by an adjuster or any agent of the above Company is not a waiver of any rights of said company.

_____     5/1/19
Insured                              Date

## CERTIFICATE OF ACKNOWLEDGEMENT

STATE OF                      }
County of                     }

On this _Mon_ day of _3rd_, 2019, before me, _William Parish "ShyGuy"_ the undersigned, personally appeared _William Parish_, known to be to be the person whose name is subscribed to within the Release, and acknowledge that he executed the same.

_Cely R. Gring_ Notary Public
Notary Public in and for Said County and State

CHERYL R. GRING
Notary Public - California
Santa Barbara County
Commission # 2226651
My Comm. Expires Jan 21, 2022

_WP_
(initial)

Page 2 of 4

Confidential

Starr-01881

0457
0458

## FRAUD WARNINGS

**NOTICE TO APPLICANTS:** ANY PERSON WHO KNOWINGLY AND WITH INTENT TO DEFRAUD ANY INSURANCE COMPANY OR OTHER PERSON FILES AN APPLICATION FOR INSURANCE OR STATEMENT OF CLAIM CONTAINING ANY MATERIALLY FALSE INFORMATION OR, CONCEALS, FOR THE PURPOSE OF MISLEADING, INFORMATION CONCERNING ANY FACT MATERIAL THERETO, COMMITS A FRAUDULENT ACT, WHICH IS A CRIME AND MAY SUBJECT SUCH PERSON TO CRIMINAL AND CIVIL PENALTIES.

**NOTICE TO ARKANSAS AND NEW MEXICO APPLICANTS:** ANY PERSON WHO KNOWINGLY PRESENTS A FALSE OR FRAUDULENT CLAIM FOR PAYMENT OF A LOSS OR BENEFIT, OR KNOWINGLY PRESENTS FALSE INFORMATION IN AN APPLICATION FOR INSURANCE IS GUILTY OF A CRIME AND MAY BE SUBJECT TO FINES AND CONFINEMENT IN PRISON.

**NOTICE TO COLORADO APPLICANTS:** IT IS UNLAWFUL TO KNOWINGLY PROVIDE FALSE, INCOMPLETE, OR MISLEADING FACTS OR INFORMATION TO AN INSURANCE COMPANY FOR THE PURPOSE OF DEFRAUDING OR ATTEMPTING TO DEFRAUD THE COMPANY. PENALTIES MAY INCLUDE IMPRISONMENT, FINES, DENIAL OF INSURANCE, AND CIVIL DAMAGES. ANY INSURANCE COMPANY OR AGENT OF AN INSURANCE COMPANY WHO KNOWINGLY PROVIDES FALSE, INCOMPLETE, OR MISLEADING FACTS OR INFORMATION TO A POLICYHOLDER OR CLAIMANT FOR THE PURPOSE OF DEFRAUDING OR ATTEMPTING TO DEFRAUD THE POLICYHOLDER OR CLAIMANT WITH REGARD TO A SETTLEMENT OR AWARD PAYABLE FROM INSURANCE PROCEEDS SHALL BE REPORTED TO THE COLORADO DIVISION OF INSURANCE WITHIN THE DEPARTMENT OF REGULATORY AUTHORITIES.

**NOTICE TO DISTRICT OF COLUMBIA APPLICANTS:** WARNING: IT IS A CRIME TO PROVIDE FALSE OR MISLEADING INFORMATION TO AN INSURER FOR THE PURPOSE OF DEFRAUDING THE INSURER OR ANY OTHER PERSON. PENALTIES INCLUDE IMPRISONMENT AND/OR FINES. IN ADDITION, AN INSURER MAY DENY INSURANCE BENEFITS IF FALSE INFORMATION MATERIALLY RELATED TO A CLAIM WAS PROVIDED BY THE APPLICANT.

**NOTICE TO FLORIDA APPLICANTS:** ANY PERSON WHO KNOWINGLY AND WITH INTENT TO INJURE, DEFRAUD, OR DECEIVE ANY INSURER FILES A STATEMENT OF CLAIM OR AN APPLICATION CONTAINING ANY FALSE, INCOMPLETE OR MISLEADING INFORMATION IS GUILTY OF A FELONY IN THE THIRD DEGREE.

**NOTICE TO KENTUCKY APPLICANTS:** ANY PERSON WHO KNOWINGLY AND WITH INTENT TO DEFRAUD ANY INSURANCE COMPANY OR OTHER PERSON FILES AN APPLICATION FOR INSURANCE CONTAINING ANY MATERIALLY FALSE INFORMATION, OR CONCEALS FOR THE PURPOSE OF MISLEADING, INFORMATION CONCERNING ANY FACT MATERIAL THERETO, COMMITS A FRAUDULENT INSURANCE ACT, WHICH IS A CRIME.

**NOTICE TO LOUISIANA APPLICANTS:** ANY PERSON WHO KNOWINGLY PRESENTS A FALSE OR FRAUDULENT CLAIM FOR PAYMENT OF A LOSS OR BENEFIT OR KNOWINGLY PRESENTS FALSE INFORMATION IN AN APPLICATION FOR INSURANCE IS GUILTY OF A CRIME AND MAY BE SUBJECT TO FINES AND CONFINEMENT IN PRISON.

**NOTICE TO MAINE APPLICANTS:** IT IS A CRIME TO KNOWINGLY PROVIDE FALSE, INCOMPLETE OR MISLEADING INFORMATION TO AN INSURANCE COMPANY FOR THE PURPOSE OF DEFRAUDING THE COMPANY. PENALTIES MAY INCLUDE IMPRISONMENT, FINES OR A DENIAL OF INSURANCE BENEFITS.

**NOTICE TO NEW JERSEY APPLICANTS:** ANY PERSON WHO INCLUDES ANY FALSE OR MISLEADING INFORMATION ON AN APPLICATION FOR AN INSURANCE POLICY IS SUBJECT TO CRIMINAL AND CIVIL PENALTIES.

**NOTICE TO NEW YORK APPLICANTS:** ANY PERSON WHO KNOWINGLY AND WITH INTENT TO DEFRAUD ANY INSURANCE COMPANY OR OTHER PERSON FILES AN APPLICATION FOR INSURANCE OR STATEMENT OF CLAIM CONTAINING ANY MATERIALLY FALSE INFORMATION, OR CONCEALS FOR THE PURPOSE OF MISLEADING, INFORMATION CONCERNING ANY FACT MATERIAL THERETO, COMMITS A FRAUDULENT INSURANCE ACT, WHICH IS A CRIME, AND SHALL ALSO BE SUBJECT TO A CIVIL PENALTY NOT TO EXCEED FIVE THOUSAND DOLLARS AND THE STATED VALUE OF THE CLAIM FOR EACH SUCH VIOLATION.

(Initial)

Confidential

Starr-01882

0458
0459

**NOTICE TO OHIO APPLICANTS:**  ANY PERSON WHO, WITH INTENT TO DEFRAUD OR KNOWING THAT HE IS FACILITATING A FRAUD AGAINST AN INSURER, SUBMITS AN APPLICATION OR FILES A CLAIM CONTAINING A FALSE OR DECEPTIVE STATEMENT IS GUILTY OF INSURANCE FRAUD.

**NOTICE TO OKLAHOMA APPLICANTS:  WARNING:**  ANY PERSON WHO KNOWINGLY, AND WITH INTENT TO INJURE, DEFRAUD OR DECEIVE ANY INSURER, MAKES ANY CLAIM FOR THE PROCEEDS OF AN INSURANCE POLICY CONTAINING ANY FALSE, INCOMPLETE OR MISLEADING INFORMATION IS GUILTY OF A FELONY (365:15-1-10, 36§3613.1).

**NOTICE TO PENNSYLVANIA APPLICANTS:**  ANY PERSON WHO KNOWINGLY AND WITH INTENT TO DEFRAUD ANY INSURANCE COMPANY OR OTHER PERSON FILES AN APPLICATION FOR INSURANCE OR STATEMENT OF CLAIM CONTAINING ANY MATERIALLY FALSE INFORMATION OR CONCEALS FOR THE PURPOSE OF MISLEADING, INFORMATION CONCERNING ANY FACT MATERIAL THERETO COMMITS A FRAUDULENT INSURANCE ACT, WHICH IS A CRIME AND SUBJECTS SUCH PERSON TO CRIMINAL AND CIVIL PENALTIES.

**NOTICE TO TENNESSEE AND VIRGINIA APPLICANTS:**  IT IS A CRIME TO KNOWINGLY PROVIDE FALSE, INCOMPLETE OR MISLEADING INFORMATION TO AN INSURANCE COMPANY FOR THE PURPOSE OF DEFRAUDING THE COMPANY.  PENALTIES INCLUDE IMPRISONMENT, FINES AND DENIAL OF INSURANCE BENEFITS.

(initial)

Confidential

Starr-01883

0459
0460

# EXHIBIT 7

0460

0461



**CAPPELLO
& NOËL** LLP
T R I A L   L A W Y E R S

LAWRENCE J. CONLAN

June 3, 2019

*Via U.S. Mail and E-mail*

Shari Thompson
STARR Companies
17550 N. Perimeter Drive, Suite 340
Scottsdale, AZ 85255
Shari.thompson@starrcompanies.com

> Re:     **Passport 420, LLC**
>          **Your file No. AVSIL0477727**

Dear Ms. Thompson:

We are the attorneys for William Parrish. I am writing in response to your letter to Ms. Nicole Krause of Tutton Insurance Services, Inc. dated May 8, 2019, regarding Starr Indemnity & Liability Company's obligation to cover the losses resulting from the government seizure of the aircraft owned and operated by Passport 420, LLC.

Your letter includes a number of questions concerning the proof of loss statement that was submitted following the seizure. Allow me to offer some background to help you understand. Mr. Parrish began contemplating the joint purchase of a private aircraft with his then-attorney Michael Avenatti, Esq. in approximately June 2016. On July 7, 2016, Mr. Parrish wired $350,000 from his family trust account to the account of Honda Aircraft at Wells Fargo Bank NA as a down payment on the Honda Jet that would be owned and operated by Mr. Parrish and Avenatti. Passport 420, LLC was formed and Mr. Parrish and Avenatti entered into an operating agreement dated as of July 11, 2016. Mr. Parrish owns his interest in Passport 420 through an entity called Spring Creek Research, LLC. Avenatti purchased his interest in Passport 420 through an entity known as Avenatti & Associates, APC. On January 18, 2017, Mr. Parrish wired an additional $1,985,000 from his family trust account into an account opened at California Bank & Trust in the name of Passport 420, LLC, for the purchase of the aircraft. The total net purchase price of the jet was $4,383,605, which included the base price, adjusted, plus options and tax. Mr. Parrish holds a 52.7% ownership interest in the aircraft, based on his total contribution of $2,311,000.

With that background, I will attempt to respond to the questions set forth in your May 8, 2019 letter. First, you've asked for an explanation why Mr. Parrish requested payment "to be made to him as an individual instead of Passport 420, LLC." In fact, as you acknowledge in your letter, Mr. Parrish requested in the proof of loss statement that payment of the claim be

831 STATE STREET, SANTA BARBARA, CALIFORNIA 93101-3227     LCONLAN@CAPPELLONOEL.COM
TEL  (805) 564-2444     FAX  (805) 965-5950     WWW.CAPPELLONOEL.COM

Ms. Shari Thompson
June 3, 2019
Page 2

made to "William J. Parrish, Passport 420, LLC." This is an appropriate request because Mr. Parrish is the acting manager of Passport 420, LLC and the manager has the responsibility for managing and controlling the affairs of the company, which owns and operates the aircraft. Alternatively, we believe payment could also be made to Spring Creek Research, LLC, the LLC Member provided by the operating agreement to be the Loss Payee, and an "insured" (partner, stockholder, etc.) as defined in Section Six of the policy.

Second, you state that you would expect the proof of loss "to be signed and returned on behalf of Passport 420, LLC by the managing member which I understand to be Michael Avenatti." This is not accurate. Michael Avenatti has never been the managing member of Passport 420, LLC. At the time Passport 420 was formed, Avenatti individually became the manager (not managing member), for a term of one year. By the summer of 2018, it became evident that Avenatti was not performing his duties as manager and had breached his fiduciary duties as Mr. Parrish's attorney. Accordingly, he was removed as manager on August 29, 2018, without objection, and Mr. Parrish, individually, assumed the role of manager (not managing member). Enclosed is a copy of the relevant correspondence with Avenatti concerning his removal as manager. At approximately the same time, Avenatti was terminated as Mr. Parrish's attorney. This should answer your question regarding why Mr. Parrish, and not Avenatti, signed the proof of loss.

Third, you state your belief that based on your "preliminary investigation . . . others might have an interest in the aircraft." You then describe your understanding of Avenatti's criminal indictment and ask whether Mr. Parrish can provide information about the criminal charges, whether he disputes them or agrees with them, whether if proven Mr. Parrish would contend that the U.S. Government and "Client 2" would have no interest in the aircraft, and whether Mr. Parrish disputes or agrees that the aircraft was taken by the Internal Revenue Service to compensate the U.S. Government for the alleged non-payment of taxes. In response to these questions, Mr. Parrish's understanding of the criminal charges is based on public filings and media reports, and he has no independent information to provide about them. More importantly, we do not believe the charges have any relevance as it relates to Starr Indemnity's obligation to cover the losses from the seizure of the aircraft.

Fourth, you requested documents associated with the purchase of the aircraft and the amount of Mr. Parrish's contribution of funds. Enclosed with this letter are written confirmations of Mr. Parrish's wire transfers for the purchase (described above), the invoice from Honda Aircraft Company, and an accounting prepared by Mr. Parrish detailing his contributions and ownership interest.

Fifth, you asked for agreements associated with the organization and operation of Passport 420, LLC. I am enclosing with this letter copies of the Certificate of Formation from the State of Delaware for Passport 420 and the Passport 420 Operating Agreement.

Sixth, you asked if Mr. Parrish can confirm whether any money for the operation and maintenance of the aircraft, including monies for the payment of insurance premiums, came from Michael Avenatti, Avenatti & Associates, or Eagan Avenatti, either directly or indirectly. Mr.

Ms. Shari Thompson
June 3, 2019
Page 3

Parrish is not aware of what funds Avenatti & Associates used to pay for its member share of operation and maintenance expenses or insurance premiums, nor do we believe it is relevant as it relates to Starr Indemnity's obligation to cover the losses for the seizure here.

Finally, you note that Mr. Parrish has attested that the government seizure of the aircraft did not "originate by any act, design, or procurement on the part of the insured" and ask whether Mr. Parrish contends that if the charges against Avenatti are proven that his acts are not attributable to Passport 420, LLC. This is accurate. Whether or not the criminal charges against Michael Avenatti individually are proven, we do not believe his criminal acts are attributable to Passport 420, LLC, and the seizure of the aircraft did not originate by any act, design or procurement of the company or by any act of Avenatti in his role as manager of the company.

Starr Indemnity agreed to insure against seizure of this aircraft. Regardless of whether the government seizure was lawful or legitimate, and regardless of whether Michael Avenatti is found guilty of the crimes for which he has been charged, the fact remains that the aircraft that Starr Indemnity insured has been seized by the federal government and is no longer in the possession or control of Mr. Parrish or of Passport 420 and/or Spring Creek Research as the majority member of Passport 420. Mr. Parrish is therefore unable to use the aircraft, and he has been deprived of the value of his interest in it. Accordingly, we request that this covered loss be paid promptly for the specified agreed value of $4 million, plus extra expense and other damages.

Sincerely,

Lawrence J. Conlan

# EXHIBIT 8

0464

0465

# THE CLARK LAW GROUP

SUITE 303
11355 W. OLYMPIC BOULEVARD
LOS ANGELES, CALIFORNIA 90064
Telephone: (310) 478-0077
Facsimile: (310) 478-0099

www.rclarklaw.com

ROGER W. CLARK
A Professional Law Corporation

BOARD CERTIFIED CIVIL TRIAL SPECIALIST
NATIONAL BOARD OF TRIAL ADVOCACY
rclark@cgold.cc

June 26, 2019

**VIA U.S. MAIL AND ELECTRONIC MAIL**

Lawrence J. Conlan, Esquire
**CAPPELLO & NOEL, LLP**
831 State Street
Santa Barbara, CA 93101

RE:  Named Insured: Passport 420, LLC
     Honda Jet 2016; N227WP
     Policy No.:1000320046-01; January 26, 2017-January 26, 2018
     Policy No.:1000320046-02; January 26, 2018-January 26, 2019
     Policy No.:1000320046-03; January 26, 2019-January 26, 2020

Dear Mr. Conlan:

    My office is responding on behalf of Ms. Shari Thompson who was the addressee in your letter dated June 3, 2019. My office is coverage counsel for Starr Indemnity & Liability Company ("Starr Aviation"), the insurance company which issued the above insurance policies to Passport 420 LLC (the policies are collectively referred to herein as the "Policy"). Thank you for your response and the materials you sent Ms. Thompson as part of your response.

Starr-06566

Lawrence J. Conlan, Esquire
**CAPPELLO & NOEL, LLP**
June 26, 2019
Page 2

My office is investigating whether coverage might be in order for the Proof of Loss you have submitted for the 2016 Honda Jet, N227WP ("Aircraft"). No determination has been made whether coverage is in order. Please note that no payment can be made until and if coverage is deemed to be in order. Your cooperation in the continuing coverage investigation will be appreciated.

According to a title search with the Federal Aviation Administration, the Aircraft is owned by and titled to Passport 420 LLC. There are no liens of record (at least as of the date of title search).

You have asked for payment to be made to your client, William Parrish, as an individual. That would be inappropriate because Mr. Parrish does not own the Aircraft. He has an interest (either as trustee, trustor or beneficiary, or all) in the Parrish Family Trust which in turn owns Spring Creek Research, LLC which in turn owns a one-half interest as a member in Passport 420, LLC, which in turn has title to the Aircraft.

Mr. Parrish's status as acting manager of Passport 420 LLC would not entitle him to a payment to him as an individual. A claim for loss of property owned by a limited liability company belongs only to the limited liability company, not to its members. *PacLink Communications International, Inc. v. Superior Court* (2011) 90 Cal.App.4th 958. "A limited liability company is a hybrid business entity . . . consisting of at least two 'members' . . . The company has a legal existence separate from its members. Its form provides members with limited liability to the same extent enjoyed by corporate shareholders . . . but permits the members to actively participate in the management and control of the company . . ." Because members of a limited liability company hold no direct ownership interest in a company's assets the members cannot be directly injured when the company is deprived of those assets.

In other words, no shareholder of a corporation or member of a limited liability company, or executive or officer of a corporation or a limited liability company, is entitled to receive payment as an individual of sums that might be payable to the entity. Otherwise, shareholders and members could successfully evade payment of an entity's obligations owing to creditors and claimants of the entity, effectively elevating shareholders and members to a secured creditor class which would be improper by law.

Starr-06567

Lawrence J. Conlan, Esquire
**CAPPELLO & NOEL, LLP**
June 26, 2019
Page 3


Passport 420, LLC, might have creditors who have a higher priority to the assets of the limited liability company than the members. This question requires consideration of the criminal charges brought against Mr. Avenatti in April by the United States Department of Justice. A thirty-six-count indictment ("Indictment"), pending in the United States District Court, Central District of California, includes a count accusing Mr. Avenatti of embezzling $2,500,000.00 from an individual identified as Client "2" and then using those monies to purchase the Aircraft.

The Indictment includes "Forfeiture Allegations" brought pursuant to 18 U.S.C. 981(A)(1)(c) and 28 U.S.C. 2461(c) whereby the Government gives notice that the United States of America will seek forfeiture as part of any sentence in the event of Mr. Avenatti's conviction of all right, title and interest in any and all property, real or personal, constituting or derived from any proceeds obtained directly or indirectly as a result of the offense or property traceable to such proceeds.

If the Aircraft was purchased with embezzled funds, either whole or in part, the embezzlement was not disclosed to Starr Aviation. The underwriters at Starr Aviation would not have issued the Policy if they had known the aircraft was being purchased with embezzled funds. Starr Aviation is investigating (to the extent it can at this time) whether the allegations of embezzlement are substantiated.  And Starr Aviation is considering whether rescission of the Policy would be in order. This communication is putting Passport 420, LLC (and all who claim through Passport 420) on notice that Starr Aviation is reserving its right to rescind the Policy because of the alleged embezzlement.

Another count of the indictment accuses Mr. Avenatti of wire and mail crimes in connection with an alleged bankruptcy fraud. Mr. Avenatti purportedly diverted monies around the bankruptcy estate of his law firm in violation of court orders and used the diverted funds for payment of personal expenses. If this is true it would mean that Mr. Avenatti, during the two-plus years he was manager of Passport 420, LLC, may have used funds belonging to the bankruptcy estate to pay for the operation and maintenance, including insurance premiums, of the Aircraft.


Starr-06568

Lawrence J. Conlan, Esquire
**CAPPELLO & NOEL, LLP**
June 26, 2019
Page 4


The underwriters at Starr Aviation would not have issued the Policy if they had known the funds for the operation, maintenance (including insurance premiums) had their source in a bankruptcy fraud. Starr Aviation is investigating (to the extent it can at this time) whether the allegations of bankruptcy fraud are substantiated. And Starr Aviation is considering whether rescission of the Policy would be in order because of the alleged bankruptcy fraud. This communication is putting Passport 420, LLC (and all who claim through Passport 420) on notice that Starr Aviation is reserving its right to rescind the Policy because of the alleged bankruptcy fraud.

The alleged criminal conduct of Mr. Avenatti further implicates certain exclusions, conditions and terms of the Policy. Section Seven – Exclusions Paragraph D (found on Page 31 of the Policy) provides that the insurance provided by the Policy shall not apply. . . to illegal, criminal or dishonest acts or activities, alleged or otherwise, committed by or at the directions of or with the knowledge and consent of directors or officers of the insured and with the knowledge at the time that such act was illegal or criminal, but with respect to the named insured this exclusion shall apply only if such activities or acts are with the knowledge and consent of an officer or director of the named insured."

Starr Aviation is considering whether the alleged conduct of Mr. Avenatti triggers application of the above Exclusion D. This will place Passport 420, LLC (and all who claim through Passport 420) on notice that Starr Aviation is reserving its right to deny coverage because of the applicability of Exclusion D.

You mention that you do not believe that Mr. Avenatti's alleged criminal acts are attributable to Passport 420, LLC. I respectfully disagree. Mr. Avenatti, from January 2017 if not earlier, to August of 2018, if not later, was the manager of Passport 420, LLC, acting on behalf of Passport 420, LLC, handling all of its business affairs. "As against a principal, both principal and agent are deemed to have notice of whatever either has notice of, and ought, in good faith and the exercise of ordinary care and diligence, to communicate to the other." *See,* California, *Civil Code,* Section 2332; *Northern Natural Gas Co.* v. *Superior Court* (1976) 64 Cal.App.3d 983, 992; *In re Marriage of Cloney* (2001) 91 Cal.App.4th 429, 439. An "agent's

Lawrence J. Conlan, Esquire
**CAPPELLO & NOEL, LLP**
June 26, 2019
Page 5

knowledge is imputed to the principal even where . . . the agent does not actually communicate with the principal, who thus lacks actual knowledge of the imputed fact." *Herman v. Los Angeles County Metropolitan Transportation Authority* (1999) 71 Cal.App.4th 819, 828; *Columbia Pictures Corp. v. De Toth* (1948) 87 Cal.App.2d 620, 630.

My understanding is that the Internal Revenue Service ("IRS") took possession of the aircraft on or about April 10, 2019, because of the alleged failure of Mr. Avenatti to pay taxes, including possibly personal and corporate income tax, and possibly wage and payroll taxes. The IRS presumably placed Mr. Avenatti on notice of taxes due and when Mr. Avenatti failed to pay those taxes the IRS took possession of the Aircraft. My understanding is that the IRS has a lien by operation of law on property linked to the tax debtor. *See, United States v. National Bank of Commerce,* 472 U.S. 713, 86 L.Ed2d 565, 105 S.Ct. 2919 (1985); 26 U.S.C. 7403; 26 U.S.C. 6331-6344.

With the comments of the above paragraph in mind, Starr Aviation is considering whether the following exclusions may apply, thus precluding coverage: (a) Exclusion (D) of Endorsement 10 ("War Risk For Physical Damage Coverage) which states "this endorsement will not cover any loss, damage or expense arising out of. . . any failure to provide any type of bond, security or any other financial cause whether or not required under a court order"; and (b) Exclusion (E) of Endorsement 10 ("War Risk For Physical Damage Coverage") which states this endorsement will not cover any loss, damage or expense arising out of. . . the repossession or any attempt at repossession by any person or organization having any legal title or lien on the scheduled aircraft or any other type of legal contractual relationship with the insured."

This will place Passport 420, LLC (and all who claim through Passport 420) on notice that Starr Aviation is reserving its right to deny coverage if either or both exclusions mentioned in the above paragraph are applicable.

As already mentioned above, no determination has yet been made whether coverage is in order, or not, whether the Policy is to be rescinded, or whether coverage will be denied. These issues are being investigated. But Client "2" and the United States (through the IRS and the Forfeiture Allegations set forth in the Indictment) appear to have an interest in the Aircraft

Lawrence J. Conlan, Esquire
**CAPPELLO & NOEL, LLP**
June 26, 2019
Page 6

and they may further have an interest in whatever decision is reached by Starr Aviation. Should coverage be in order and payment is to be made, or if the Policy is to rescinded and premiums returned, a decision will have to be made as to whether Client "2" and the United States (possibly others) should be placed on notice of any payment or return, thus giving them a right to assert their interest to any funds.

Starr Aviation is giving notice to Passport 420, LLC (and all who claim through Passport 420) that it reserves the right to file an interpleader, declaratory relief action and/or action for rescission to adjudicate rights and liabilities associated with this matter.

Nothing said herein or omitted here is intended to be a waiver of any matter, condition, exclusion, term or provision under either the Policy, or any other matter or thing, or any prior communication or reservation. All prior communications are referred to and incorporated herein as if fully set forth.

Starr Aviation is continuing with its investigation, and it may learn in the future that there are additional reasons why certain terms, conditions and exclusions in the Policy may apply to some or all the matters and issues discussed herein. Starr Aviation continues to reserve all rights under applicable terms, exclusions, definitions, conditions and endorsements of the Policy. This communication should not be taken as an indication that Starr Aviation has waived any of its rights under the Policy simply because they have not been mentioned here.

Starr Aviation invites you to let the company know if the understandings set forth herein are in any way incorrect, or if anything has been misstated in this letter. Starr Aviation welcomes any further information you believe may be relevant to its coverage analysis and welcomes any comments or observations by you should any of the assumptions set forth herein be inaccurate in your view. Starr Aviation will certainly consider any information you provide and reconsider its position if appropriate. This writer invites you to contact me directly if you have any questions, or if you would like to discuss this matter in greater detail.

If you believe this matter is subject to the law of California and you further believe this has been wrongfully reviewed, denied or rejected, you may have the matter reviewed by the California

Lawrence J. Conlan, Esquire
**CAPPELLO & NOEL, LLP**
June 26, 2019
Page 7

Department of Insurance, Claim Service Bureau, 300 South Spring Street, 11th Floor, Los Angeles, California 90013; or, a California resident may call 1-800-927-4357. Outside of California, you may call 1-213-897-8921.

Sincerely,

ROGER W. CLARK

C:\USERS\KGONZALEZ\CST SYNC  FOLDER\SHARE\DATA\WORK\19-1915\CORRESPONDENCE\CONLAN 002.DOCX

Starr-06572

0471
0472

# EXHIBIT 9

0472

0473

# STARR

## INSURANCE COMPANIES

Direct Phone: (480) 586-3607
Email: shari.thompson@StarrCompanies.com
CA Adjuster License # 2F37365

November 2, 2021

## **VIA CERTIFIED MAIL AND ELECTRONIC MAIL**

PASSPORT 420, LLC
c/o Matthew L. Hofer, Esquire
**CAPPELLO & NOEL, LLP**
831 State Street
Santa Barbara, CA 93101
mhofer@cappellonoel.com

RE:   Named Insured:   Passport 420, LLC
       Aircraft:         Honda Jet 2016; N227WP
       Policies:         1000320046-01, effective January 26, 2017-January 26,
                         2018 (the "17-18 Policy")
                         1000320046-02, effective January 26, 2018-January 26,
                         2019 (the "18-19 Policy")
                         1000320046-03, effective January 26, 2019 to January 26,
                         2020 (the "19-20 Policy")
       Our Claim Number: AVSIL0477727

Dear Mr. Hofer

       As you know, I am your contact on behalf of Starr Indemnity & Liability
Company ("Starr") in connection with our claim number AVSIL0477727.  This letter
will supplement the earlier communications with regards to whether coverage is available
in response to the Proof of Loss submitted by William Parrish for the 2016 Honda Jet,
N227WP (the "Aircraft"), under the 19-20 Policy, issued to Passport 420 LLC
(sometimes the 19-20 Policy will be referred to as the "Policy" and sometimes the three
policies will be referred to collectively as the "Policies").

       Your Proof of Loss claimed that the United States Government's taking of the
Aircraft was a covered loss under the Policy. The United States Government seized the
Aircraft because it believed the Aircraft was purchased on behalf of Passport 420 with

0473
0474

money embezzled by Michael Avenatti, the former manager of Passport 420, in violation of federal criminal laws (the "Loss").

Since your submission, the Proof of Loss has remained under investigation. Starr's investigation, however, has been delayed because of the Covid 19 shutdowns and the criminal prosecution of Michael Avenatti.

I am directing this correspondence to you based upon my understanding that you are the appropriate contact person for insurance-related correspondence in connection with the Loss. If Passport 420 has another representative who should receive this and future correspondence, please forward this letter and advise me accordingly. Moreover, please note that we have only evaluated the availability of coverage for the Loss pursuant to the Policy. If you believe you are entitled to coverage for the Loss under any other insurance policy, you should submit notice of the Loss pursuant to the relevant provisions of that policy.

## I.    The Loss

As an initial matter, I will point out that Passport 420 disregarded Starr Aviation's request for cooperation in its coverage investigation, instead filing a lawsuit almost immediately after Starr issued a letter reserving its rights pursuant to the Policy. Passport 420's refusal to cooperate with Starr and immediately instituting a coverage action effectively precluded Starr from continuing with its investigation – which the Policy expressly provide Starr the right to conduct with Passport 420's cooperation. Starr has, instead, gathered whatever information it can through the slow and adversarial pretrial discovery process.

As is noted above, the Loss arises from the United States Government's seizing the Aircraft on April 10, 2019.    The Aircraft was seized based upon federal law enforcement agencies' belief that it was purchased with funds that former manager of Passport 420, Michael Avenatti, embezzled in violation of State and federal criminal statutes. The United States Department of Justice ("DOJ") prosecuted Mr. Avenatti for his alleged crimes and, after Mr. Avenetti secured a mistrial, intends to retry him.

Our investigation indicates that Passport 420 flew the Aircraft for more than two years after the purchase, and that Mr. Parrish piloted the Aircraft from time to time, and Michael Avenatti flew on the Aircraft as a passenger from time to time. There were others who apparently used the Aircraft with the permission of Passport 420 during that time Passport 420 had control of the Aircraft.

The DOJ's thirty-six-count indictment (the "Indictment") in the United States District Court for the Central District of California included a count accusing Mr. Avenatti of embezzling $2,500,000.00 from Ms. Alexis Gardner, and then using the embezzled funds to purchase the Aircraft on behalf of Passport 420. The Aircraft was titled to "Passport 420", which claimed ownership of the Aircraft pursuant to filings made with the Federal Aviation Administration.  The Indictment included "Forfeiture

Allegations" pursuant to 18 U.S.C. 981(A)(1)(c) and 28 U.S.C. 2461(c), whereby the DOJ gave notice that it would seek forfeiture of the Aircraft as part of any sentence in the event of Mr. Avenatti's conviction.

Separately, the DOJ took possession of the Aircraft and filed a "Civil Forfeiture Proceeding," seeking judicial authorization to sell the Aircraft and distribute the proceeds of the sale to the victims of Mr. Avenatti's alleged criminal wrongdoing. The harm of Mr. Avenatti's crimes was apparently imputed to Passport 420, the titled owner of the Aircraft, pursuant to federal law. The DOJ named as interested parties in the Civil Forfeiture Proceeding Alexis Gardner, Passport 420, Spring Creek Research, LLC, Avenatti & Associates, Eagan Avenatti, LLP, Mr. Avenatti himself, and Mr. Parrish, among others. Passport 420 did not submit a claim in connection with the Civil Forfeiture Proceeding and therefore has apparently waived its claim to the Aircraft.

United States District Court Judge Selna presides over both Mr. Avenatti's criminal trial and the Civil Forfeiture Proceeding. Judge Selna stayed the Civil Forfeiture Proceeding until the resolution of Mr. Avenatti's criminal trial. As discussed below, that has not yet occurred.

## II.    Starr's Investigation and Correspondence with Passport 420

As you know, Starr has previously stated in connection with this Loss that Mr. Avenatti's criminal behavior would call into question whether there is coverage under the Policy for the Loss. Nonetheless, as you also know, Starr stated that it would not make a premature determination regarding coverage and would instead monitor the development of the factual record in Mr. Avenatti's criminal trial. Although Starr requested information from the DOJ as part of its investigation of the Loss, we did not ultimately receive any such information. The DOJ instead told Starr that information regarding Mr. Avenatti's alleged criminal behavior would only become available during or after his criminal trial.

Without access to the DOJ's information and the results of DOJ's investigation, Starr through its counsel twice asked Passport 420 directly to admit or deny whether Passport 420 had purchased the Aircraft, in whole or in part, with embezzled funds. As you no doubt know, Passport 420 responded that it had insufficient information to admit or deny the request, and therefore denied the relevant requests. In sum and substance, then, all avenues for Starr to investigate the alleged criminal wrongdoing had been effectively blocked until the conclusion of Mr. Avenatti's criminal trial.

As Starr previously stated in an earlier reservation letter to Passport 420 dated June 26, 2019, Passport 420 did not disclose to Starr's underwriters the use of embezzled funds to purchase the Aircraft. Starr underwriters have clearly indicated they would not have issued the Policies to Passport 420 if that criminal wrongdoing had been disclosed. Starr placed Passport 420 on notice, and all who may have a claim through Passport 420, that Starr was reserving its right to rescind the Policies, or deny coverage under the Policy if appropriate, because of the alleged criminal wrongdoing.

At that time, however, Starr made clear that it was not denying Passport 420's claim; Starr was only reserving the right to do so if the allegations of embezzlement were substantiated. Upon learning this position, Passport 420 filed a lawsuit against Starr within about two weeks.  As is noted above, Passport 420's adversarial stance precluded Starr from investigating the allegations of criminal wrongdoing.

### III.  Mr. Avenatti's Criminal Trial

As is noted above, Starr could not conduct an investigation of the Loss through Passport 420 directly, and the DOJ would not share information with Starr prior to Mr. Avenatti's criminal trial.  Accordingly, Starr's collection of information was – again, in large part due to Passport 420's adversarial posture toward Starr – limited to closely watching and analyzing in detail the evidence presented in Mr. Avenatti's criminal trial. Starr's recitation of the allegations against Mr. Avenatti and relevant analysis will appear below.

Mr. Avenatti's criminal trial began on July 13, 2021. The trial had been delayed several times from its original scheduled date because of Covid 19 closures. The trial ended in a mistrial on August 24, 2021. Prior to the mistrial, however, the DOJ completed its case-in-chief, and Mr. Avenatti (who represented himself) had almost completed his case-in-chief.

Mr. Avenatti, along with another attorney named Filippo Marchino, represented Alexis Gardner in a claim against basketball player Hassan Whiteside. The claim settled before a lawsuit was filed.  Joel Weiner, the attorney for Mr. Whiteside, testified that the *Gardner v. Whiteside* matter settled at mediation on January 7, 2017. The settlement agreement was executed at mediation and provided for payment of $2,750,000.00 on or before January 28, 2017, and a final payment of $250,000.00 in November of 2020, for a total settlement value of $3,000,000.[1]  Of this amount, Mr. Avenatti would have been entitled to $990,000 in fees; the settlement value would further have been reduced by $65,615 in fees and costs incurred in the case.

Judy Regnier, Mr. Avenatti's office manager, testified that, as of the beginning of the day on January 25, 2017, the balance the Eagan Avenatti client trust account was zero.  Later that same day, the Gardner settlement funds of $2,750,000.00 were paid by Mr. Whiteside (or his representatives) into the Eagan Avenatti client trust account.[2] The next day, on January 26, pursuant to Avenatti's instructions, Ms. Regnier triggered a wire in the amount of $2,500,000.00 to Chase Bank, a different client trust account for X-Law Group at Chase Bank.  Mr. Marchino controlled this second client trust account. Ms. Regnier, again at Mr. Avenatti's direction, also transferred $250,000.00 from the Eagan

---

[1]  John Drum, the forensic accounting expert called by the DOJ at the criminal trial, confirmed this sum.

[2]  Mr. Drum confirmed that this payment was made; he further confirmed that a $250,000 payment was made in November of 2020.

Avenatti client trust account to the Eagan Avenatti's operating account.  These two transfers depleted the entire settlement payment from Mr. Whiteside; indeed, Ms. Regnier testified there were no funds transferred to Alexis Gardner. Ms. Regnier confirmed there was no accounting of the settlement funds given to Ms. Gardner, and Ms. Regnier never saw the settlement agreement between Ms. Gardner and Mr. Whiteside.

Alexis Gardner took the stand on July 30, 2021. She identified the fee agreement she signed with Mr. Avenatti, entitling him to a contingent fee of thirty-three percent, plus reimbursement of costs and advances. Ms. Gardner testified that although she was at the mediation where her claim against Mr. Whiteside settled, Mr. Avenatti never showed her the full settlement agreement. In fact, she did not see the full settlement agreement until about two years later, when she was in the US Attorney's office in connection with the DOJ's case against Mr. Avenatti.

Mr. Avenatti told Gardner at the mediation, according to her sworn testimony, that her case against Mr. Whiteside had settled for $3,000,000.00. Mr. Avenatti said there was to be an initial "lump sum" of an undetermined amount and then monthly payments of $20,000.00 for eight years. Ms. Gardner testified that Mr. Avenatti never told her about the $2,750,000.00 to be paid by January 28, 2017. Nor did Mr. Avenatti tell her at any time that the $2,750,000.00 had been paid by Mr. Whiteside on January 25, 2017.

Ms. Gardner testified that she never "authorized" Mr. Avenatti to take her money to buy an airplane, and she testified that Mr. Avenatti never told her that he had used her money to buy an airplane; on cross examination, she confirmed that she did not have an ownership interest in the Aircraft.[3] Ms. Gardner testified that Mr. Avenatti never provided her with an accounting of the costs and advances made to her with respect to her case. Although she repeatedly asked for a copy of the settlement agreement, Mr. Avenatti never provided it.

On Tuesday, August 3, after the conclusion of Ms. Gardner's testimony, Filippo Marchino took the stand. He claimed to have referred Ms. Gardner to Mr. Avenatti. Mr. Marchino expected to receive one-half of the attorney's fee from the Gardner/Whiteside settlement, but no fee was paid to him. Mr. Marchino also testified that Avenatti talked to Marchino long before the Gardner case about buying a business jet, and that there were two jets on order with Honda.

Mr. Marchino was in Italy at the time of the mediation at which Ms. Gardner's case against Mr. Whiteside settled; he was purportedly there to investigate Mr. Whiteside. Upon conclusion of the mediation, Mr. Avenatti talked to Mr. Marchino by telephone, advising that the case settled for $3,000,000.00. Mr. Avenatti stated that the money was to be paid in a structure, and a lump sum was to be paid for fees at some time

---

[3]   Mr. Avenatti, on cross-examination, asked Ms. Gardner whether the signature on the settlement agreement belonged to her. She responded, "I didn't buy a jet." The answer was stricken as non-responsive to the question, but nevertheless confirms she did not have an interest in the Aircraft, nor did she intend to acquire one.

in the future, however, the date was not specified. Mr. Avenatti did not provide a copy of the settlement agreement to Mr. Marchino.

Mr. Marchino further testified that Mr. Avenatti did not tell him that Mr. Whiteside wired $2,750,000.00 into Mr. Avenatti's client trust account, and that he was not aware that Avenatti had received the money.

On January 26, 2017, Mr. Marchino received into his trust account at X-Law Group $2,500,000.00 from the trust account of Eagan Avenatti. Mr. Avenatti told Mr. Marchino that the funds were for purchasing the Aircraft, and had come from William Parrish. Mr. Avenatti stated that he had already paid his half of the Aircraft, and there "could be a problem" if the second payment came from Mr. Avenatti's firm. Thereafter, Mr. Avenatti instructed Mr. Marchino to wire the money to Honda; Mr. Marchino personally went to the bank and wired the money as instructed.

Mr. Marchino authenticated trial exhibit 153, which were written instructions from Mr. Avenatti instructing Mr. Marchino to notify Honda the $2,500,000.00 was for the account of Passport 420, specifying the contract number (which is a purchase order between Passport 420 and Honda), and the serial number of the Aircraft. Mr. Marchino identified the wire of January 26, 2017, whereby he transmitted the funds to Honda. In a cover email, Mr. Marchino notified Honda the money was for the account of Passport 420, and Mr. Marchino identified the contract number and the serial number of the Aircraft. This is the Aircraft that Passport 420 presented to Starr to insure.

Mr. Drum confirmed the foregoing details regarding the fate of the initial settlement payment. He testified that the $2,500,000.00 payment was received in Mr. Avenatti's client trust account on January 25, 2017, and then wired the next day to the X-Law Group's client trust account. The entire $2,500,000.00 was then wired the day after by the X-Law Group to Honda for the purchase of the Aircraft.

Ms. Regnier confirmed that, as one of the owners of Passport 420 – and with Mr. Avenatti as the manager of Passport 420 – Mr. Avenatti signed the purchase agreements for acquisition of the Aircraft, and that Mr. Avenatti corresponded on behalf of Passport 420 with Simon Roads at Honda for the purchase and delivery of the Aircraft. Ms. Regnier handled the bank account for Passport 420, along with Mr. Avenatti. Incidentally, Ms. Regnier and her husband flew once on the Aircraft.

Ultimately, Ms. Gardner testified that Mr. Avenatti never paid her the monies owed to her from the settlement; Mr. Drum confirmed that Ms. Gardner did not receive any of the recovery associated with the settlement. Considering that Avenatti would normally have been entitled to his thirty-three percent fee, plus reimbursement of his costs and advances, it appears the monies owed to her from the initial lump sum payment would have been somewhere between $1,400,000.00 - $2,000,000.00. Trying to do the math from the witness stand, Ms. Gardner testified the amount owed was about $1,760,000.00. Mr. Drum testified that as of January 25, 2017, Gardner was entitled to receive $1,700,000.00.

Mr. Drum also delved into the $65,615.00 in costs that Mr. Avenatti alleges were associated with the Gardner case (and which would be taken from the settlement sum owed to Ms. Gardner).  Mr. Drum confirmed that a part of that sum was, however, a handful of $16,000.00 monthly post-settlement payments sent to Ms. Gardner, which Mr. Avenatti had falsely told her were associated with the eight-year "structure" being paid monthly by Mr. Whiteside.  As is noted above, however, the post-settlement structured payments were a fabrication and not at all a part of the actual settlement agreement.  Mr. Avenatti had, in reality, stolen these monthly payments made to Ms. Gardner from yet another of his clients.

In executing a search warrant on Mr. Avenatti's office, the DOJ took certain electronically stored information from a program called "Tabs," which Mr. Avenatti used to track client expenses.  Mr. Drum was not given access to the Tabs data, and the Tabs data was not turned over to Mr. Avenatti in advance of trial.  Because Mr. Drum had not seen the Tabs data – and, it should go without saying, neither has Starr – it is unknown whether Tabs contained any cost information related to Ms. Gardner's case.

The DOJ's failure to provide Mr. Avenatti with the Tabs data was the basis for the Court's declaring a mistrial upon Mr. Avenatti's motion.  Judge Selna said the DOJ's failure in this regard was inadvertent. However, because the DOJ had placed specific numbers for all clients into evidence, Judge Selna believed that Mr. Avenatti could have been prejudiced by not having the Tabs data, which might have allowed him to take issue with those specific numbers.

## IV.   The Civil Forfeiture Proceeding

The facts of the Civil Forfeiture Proceeding are also relevant to Passport 420's claim under the Policy.  The Civil Forfeiture Proceeding is based, in part, on allegations that Mr. Avenatti allegedly embezzled approximately $1,984,198.00, if not more, from Mr. Parrish.  Mr. Parrish had apparently forwarded funds to Mr. Avenatti for contribution to the overall purchase price of the Aircraft. Mr. Parrish presumably expected his funds would be deposited to the Passport 420 bank account and then transferred to Honda for the account of Passport 420.

Mr. Avenatti controlled the bank account for Passport 420 along with Ms. Regnier.   Rather than using the aforementioned funds from Mr. Parish to purchase the Aircraft, Mr. Avenatti allegedly stole those funds and apparently used them for purposes unrelated to the purchase of the Aircraft. It appears that Mr. Avenatti then embezzled monies from other sources and used those embezzled funds to complete the purchase of the Aircraft. As already noted, the Civil Forfeiture Proceeding has not come to trial.

## V.   Starr's Position

### A. Rescission

Based upon the testimony given in open court at Mr. Avenatti's criminal trial, which is now a public record, Starr has concluded that the allegations of embezzlement have been substantiated.

Mr. Avenatti, in his cross-examinations at the criminal trial, questioned Mr. Drum's and Ms. Gardner's respective calculations, arguing that neither of them had accounted for all expenses and advances that Mr. Avenatti incurred in connection with Ms. Gardner's case against Mr. Whiteside.   Mr. Avenatti further attempted to demonstrate that the amount he embezzled from Ms. Gardner was necessarily not as high as Ms. Gardner believed. Notwithstanding these technical arguments that attacked the margins of the DOJ's case, Mr. Avenatti generally failed to contest the primary point at issue in the criminal case:  that a significant sum of money owed to Ms. Gardner – most likely far exceeding $1,000,000.00 – was stolen from her. This money was taken from her without her consent and used to purchase the Aircraft without her consent.  The record of Mr. Avenatti's criminal trial is clear on this point and there is no remaining issue of fact in the case as to whether this is true.

What is more, Starr does not believe that a second trial will produce evidence that alters this conclusion. However, should such evidence develop at this late date, Starr would naturally reconsider its position. Starr, in the meantime, invites Passport 420 to provide any information that would suggests this conclusion is in error.

The record of the criminal trial shows the Aircraft was purchased by Passport 420 with at least $1,000,000.00 that had been stolen from Ms. Gardner by Mr. Avenatti. If the entire $2,500,000.00 of the initial Whiteside settlement payment is deemed to be embezzled and the entire $1,800,000.00 (or more) of Mr. Parrish's money is deemed to be embezzled, the sum of stolen money used to purchase the Aircraft exceeds $4,000,000.00.

If the criminal scheme to purchase the Aircraft had been disclosed to Starr during the underwriting process, Starr would not have issued any of the Policies.  There can be no reasonable argument that Starr would have insured the Aircraft knowing that it was purchased with stolen funds. The Policies were obtained on false pretenses, and, therefore, Starr hereby rescinds the Policies and offers to return to Passport 420 the premiums paid for each of them.  What is more, Starr believes state law prohibits it from entering into a contract that insures Passport 420 against a loss that arises from illegal conduct.

**Accordingly, based on the foregoing evidence and Passport 420's concealment of material facts from Starr during the underwriting process – specifically, that the Aircraft was purchased with stolen funds – Starr hereby**

**rescinds the Policies and offers to return to Passport 420 all premiums paid in connection with them.**

### B. Coverage Denial

Starr believes the substantiated embezzlement further implicates certain exclusions, conditions, and terms of the Policy. Although Starr believes these exclusions, conditions and terms would have no continuing force or effect after the Policies are rescinded, it is appropriate to mentioned them here. These exclusions, conditions, and terms have been mentioned in previous correspondence and accordingly, this letter would not be complete without mentioning them now. And in the unlikely event a rescission is not allowed in these circumstances, this will provide notice to Passport 420 that Starr would rely upon these exclusions, conditions, and terms, as set forth below.

### 1. *Claim Outside Grant of Coverage*

The alleged "seizure" of the Aircraft by the DOJ does not fall within the meaning of Endorsement 10, which provides coverage for physical loss or physical damage that is caused by an "occurrence". Under these circumstances an insured would have no reasonable expectation of coverage. The word "occurrence" means "an accident, including continuous or repeated exposure to conditions, which result in . . . property damage neither expected nor intended by the insured." A "seizure" resulting from intentional criminal misconduct is certainly not an "accident" – and the intentional conduct of United States law enforcement agents, premeditated and planned in an effort to enforce federal law to remedy the harm caused by the criminal misconduct, is not an accident. Any such seizure would reasonably be "expected" in light of the fact that Mr. Avenatti knew that he purchased the Aircraft with stolen funds that he himself embezzled. For the foregoing reasons, the seizure of the Aircraft was not an "occurrence" and Starr hereby declares that it would deny coverage for the Loss on the grounds that the claim does not fall within the basic grant of coverage under Endorsement 10 of the Policy.

### 2. *Exclusions*

Section Seven – Exclusions Paragraph D (found on Page 31 of each of the Policies) provides that the insurance provided by the Policy shall not apply. . . "to illegal, criminal or dishonest acts or activities, alleged or otherwise, committed by or at the directions of or with the knowledge and consent of directors or officers of the insured and with the knowledge at the time that such act was illegal or criminal, but with respect to the named insured this exclusion shall apply only if such activities or acts are with the knowledge and consent of an officer or director of the named insured." Mr. Avenatti's numerous embezzlements and thefts, detailed above and not seriously contested by Mr. Avenatti at his criminal trial, trigger application of the above Exclusion D. This will place Passport 420 (and all who claim through Passport 420) on notice that Starr Aviation would deny coverage because of the applicability of Exclusion D.

The following additional exclusions would also apply, thus precluding coverage: (1) Exclusion (D) of Endorsement 10 ("War Risk For Physical Damage Coverage"), which states "this endorsement will not cover any loss, damage or expense arising out of. . . any failure to provide any type of bond, security or any other financial cause whether or not required under a court order"; and (2) Exclusion (E) of Endorsement 10 ("War Risk For Physical Damage Coverage") which states "this endorsement will not cover any loss, damage or expense arising out of. . . the repossession or any attempt at repossession by any person or organization having any legal title or lien on the scheduled aircraft or any other type of legal contractual relationship with the insured." Please refer to our prior correspondence, the contents of which are fully incorporated herein by reference, for further analysis of these exclusions.

   3. *Conditions and Other Considerations*

In addition to the foregoing coverage exclusions, each of which would fully and completely preclude coverage for the Loss pursuant to the Policy, Starr also notes that Passport 420's conduct in connection with this claim has violated a number of the Policy's other terms, conditions, and provisions.

*First*, Passport 420 has breached Section Nine, Paragraphs G and H, of the Policy by abandoning the Aircraft in the Civil Forfeiture Proceeding and by failing to make any claim for return of the Aircraft or distribution of proceeds from the sale of the Aircraft. This will place Passport 420 on notice that Starr Aviation would deny coverage for the Loss as a result of Passport 420's breach of Section Nine, Paragraphs G and H of the Policy, which can be found on page 35 of all Policies.

*Second*, Passport 420 has breached Section Nine, Paragraph A, of the Policy by assuming obligations and liabilities by taking positions against the interests of Starr in the Civil Forfeiture Action, and by committing criminal actions that resulted in third parties making claims against the Aircraft. This will place Passport 420 on notice that Starr Aviation would deny coverage for breach of Section Nine, Paragraph A of the Policy, which can be found on page 35 of all Policies.

*Third*, Passport 420 has breached Section Nine, Paragraph E, of the Policy which obligates Passport 420 to "do nothing after the accident or loss to harm the Company's right of recovery against any person or organization who may be liable to the insured." Passport 420's conduct in connection with this claim and the Civil Forfeiture Proceeding have not complied with this provision of the Policy. This will place Passport 420 on notice that Starr would deny coverage for the Loss based upon Passport 420's breach of Section Nine, Paragraph E of the Policy, which can be found on page 35 of all Policies.

*Fourth*, Starr Aviation continues to reserve its right to deny coverage because Passport 420 precluded Starr from taking examinations of insureds under oath when it filed its premature lawsuit against Starr, and failed to cooperate with Starr Aviation in its investigation of the Loss. These acts violated Section Nine, Paragraph K of the Policy, which can be found on page 35 of all Policies.

*Fifth*, Starr Aviation continues to reserve its right to deny coverage under Section Ten, B. Action Against the Company, Paragraph 2 of the Policy, which prohibits an insured from bringing suit prematurely before the amount of a loss has been determined and prior to a proper proof of loss having been filed. As is noted above, Passport 420 almost immediately brought suit against Starr upon learning that Starr had merely reserved its rights in connection with the Loss. Section 10, Paragraph 2 can be found on page 37 of all Policies.

*Sixth* and finally, Section 533 of the California Insurance Code provides that an insurance company shall not be liable for losses resulting from the willful conduct of an insured. As is detailed above, Mr. Avenatti engaged in a series of lies, embezzlements, and misdirections to purchase the Aircraft. His actions are no doubt willful and were calculated and undertaken with a specific purpose in mind. Because Mr. Avenatti's misconduct in embezzling funds so that Passport 420 could purchase the Aircraft were no doubt willful, Starr hereby notifies Passport 420 that Starr is denying coverage for this Loss under the Policy because of the applicability of Section 533 of the California Insurance Code.

*          *          *          *          *          *

Starr's position in this matter is premised upon the allegations asserted and presently known facts; the views and positions stated in this letter are not intended to be exhaustive or all-inclusive. All of the insuring agreements, terms, conditions, exclusions and any endorsements of the Policy apply to define the proper extent of coverage issued with respect to the above-referenced claim and any other claim asserted. Starr reserves all of its rights with respect to the nature and scope of any coverage that may be available under the Policy. Starr reserves all of its rights under the terms, conditions, limits of liability, other insurance provisions, exclusions and any endorsements of the Policy, as well as all rights as otherwise may be available at law and in equity. This reservation of rights is without prejudice to Starr's right to assert any other defenses that may be ascertained during any further investigation of the above-referenced claim and is not meant to and does not waive any potential coverage defenses which may arise in accordance with its terms, conditions, provisions, exclusions and any endorsements of the Policy.

The steps that we have taken on Starr's behalf are without prejudice to its rights under the terms and conditions of the Policies and no act of any agent, servant or employee of Starr, including its attorneys, shall be deemed to constitute waiver or estoppel with respect to such reservation of rights. Starr reserves the right to amend its statement of position and/or to assert further grounds for disclaimer and/or specific reservations of rights to the extent that further information is received regarding this claim.

You are invited to supply any information you believe would be relevant to Starr's analysis and Starr requests you notify us if you disagree with the factual summary

set forth in this letter and, if so, the basis of the disagreement.  Starr would reserve the right to amend its statement of position based upon any additional information you provide.

If you believe this matter is subject to the law of California and you further believe this has been wrongfully reviewed, denied or rejected, you may have the matter reviewed by the California Department of Insurance, Claim Service Bureau, 300 South Spring Street, [1]1th Floor, Los Angeles, California 90013; or, a California resident may call 1-800-927-4357. Outside of California, you may call 1-213-897-8921.

Sincerely,

Shari Thompson
Claims Manager

cc:     Jacy Watt, EVP, Starr Adjustment Services, Inc.

# EXHIBIT 10

0485

0486

**EAGAN AVENATTI, LLP**
**520 Newport Center Drive, Suite 1400**
**Newport Beach, CA 92660**
**(949) 706-7000**

### December 5, 2016

### ATTORNEY-CLIENT FEE CONTRACT (CONTINGENCY)

This ATTORNEY-CLIENT FEE CONTRACT (this "Agreement") is the written fee contract that California law requires lawyers to have with their clients. It is between Eagan Avenatti, LLP (the "Attorney") and Alexis Gardner (the "Client").

**1.     CONDITIONS.**  This Agreement will not take effect, and Attorney will have no obligation to provide legal services, until Client returns a signed copy of this Agreement.

**2.     SCOPE OF SERVICES.**  Client is hiring Attorney to represent Client in connection with her affirmative claims arising out of her personal relationship with Hassan Whiteside. Attorney will provide those legal services reasonably required to represent Client and take reasonable steps to inform Client of progress and to respond to Client's inquiries.

Attorney will represent Client in any court action until a settlement or judgment, by motion, arbitration or trial, is reached, and in connection with any appropriate post-trial motions. In addition, Attorney may at any time and at its discretion retain outside counsel, whose legal fees will be deducted from the fees received by Attorney. Client and Attorney agree that any legal services provided on behalf of Client in connection with any appeal relating to Client's claims shall be covered by this Agreement.

Client acknowledges that certain of Client's claims referenced above may be barred by the applicable statute of limitations.

**3.     CLIENT'S DUTIES.**  Client agrees to be truthful with Attorney, to cooperate, to keep Attorney informed of developments, to abide by this Agreement, and to pay bills for costs on time.

**4.     LEGAL FEES, COSTS AND BILLING PRACTICES.**  Attorney will receive a Contingent Fee of thirty-three percent (33%) if a *Recovery* (defined below) is obtained between the date of this agreement and prior to the filing of a lawsuit or arbitration proceeding, and a Contingent Fee of forty percent (40%) of any *Recovery* obtained after the filing of a lawsuit or arbitration proceeding.

*"Recovery"* will include any cash; the fair market value of any property stock, note, partnership interest, carried interest, stock option, business accommodation, loan, and funding; and other consideration received in connection with the settlement, judgment, or other resolution of any of Client's claims as referenced above, including but not limited to any jury award, arbitration award, award of attorneys' fees, discovery sanctions, other monetary sanctions, and/or similar awards which an opposing party is required to pay to Client.

If payment of all or any part of the amount to be received will be deferred (such as in the case of an annuity, a structured settlement, or periodic payments), the *"Recovery"* for purposes of calculating the Attorney's fees, will be the initial lump-sum payment plus the present value, as of the time of the binding resolution, of the payments to be received thereafter. The attorney's fees will be paid out of the initial lump-sum payment. If the payment is insufficient to pay the attorney's fees in full, the balance will be paid from subsequent payments of the *Recovery* before any distribution to Client.

-1-

USAO_00567509
GB_T_00198206

Exhibit 132
Page 1 of 3

0486
0487

In the event of discharge or withdrawal of Attorney as provided in Paragraph 10, Client agrees that Attorney shall be entitled to be paid by Client, upon binding resolution of Clients' claims, whether by settlement, judgment or arbitration award in favor of Client, a reasonable fee for the legal services provided by Attorney, provided, however, that (a) in no event shall Attorney receive less than twenty percent (20%) of any Recovery even if discharged and (b) in the event Attorney is discharged after either resolution of any of Clients' claims as referenced above or an agreement to resolve any such Claims, Attorney shall be entitled to the full Contingent Fee described above in this Paragraph.

**5.     NEGOTIABILITY OF FEES.**  The rates set forth above are not set by law, but were negotiated between Attorney and Client.

**6.     COSTS, DISBURSEMENTS AND EXPENSES.**  Client will reimburse attorney for all out-of-pocket litigation and trial costs and expenses from the proceeds received by Client, if any, at the conclusion of litigation.     "Costs and expenses" include filing and court fees, investigation expenses, process fees, investigation fees, graphic art and filming fees, PowerPoint fees, computer animation fees, expert fees, deposition costs, photocopying charges, mock trials or focus groups, jury fees, computerized research, jury trial consultant fees, telephone toll charges, travel costs, mail messenger and other delivery charges, postage and any other necessary expenses in this matter. Client authorizes Attorney to incur all reasonable costs and to hire any investigators, consultants or expert witnesses reasonably necessary in Attorney's judgment.

**7.     INSURANCE COVERAGE.**  Attorney maintains errors and omissions insurance coverage applicable to the services to be rendered to Client.

**8.     ARBITRATION.  Any dispute arising under this Contract or in connection with legal services provided to Client, including but not limited to any claim by Client against Attorney or any employees or attorneys associated with Attorney for malpractice or other tort claim, shall be resolved by binding arbitration before JAMS located in Los Angeles, California. Such arbitration shall be conducted in accordance with the arbitration rules and procedures of JAMS then in effect.  Client acknowledges that Client has been fully advised of all of the possible consequences of arbitration including but not limited to:**

   a.  **If a malpractice action arises from this Agreement, neither Client nor Attorney will have the right to a jury trial.**
   b.  **Both parties retain the right to retain counsel to prepare their respective claims and/or defenses for the arbitration hearing.**
   c.  **Client can choose or hire an attorney who may not request or whose retainer agreement does not contain an arbitration provision.**

**9.     RELATED UNKNOWN MATTERS.**  Client represents that Client does not know of any related legal matters that would require legal services to be provided under this Agreement.  If such a matter arises later, Client agrees that this Agreement does not apply to any such related legal matters, and a separate Agreement for provision of services and payment for those services will be required if Client desires Attorney to perform that additional legal work.

**10.    DISCHARGE AND WITHDRAWAL.**  Client may discharge Attorney at any time, upon written notice to Attorney, and Attorney will immediately after receiving such notice cease to render additional services in a manner that avoids foreseeable prejudice to Client.  Such a discharge does not, however, relieve Client of the obligation to pay any costs incurred prior to such termination, and Attorney has the right to recover from Client the reasonable value of Attorney's legal services rendered from the effective date of the Agreement (Paragraph 14) to the date of discharge, provided, however, that in the event Attorney is discharged after either resolution of any of Clients' claims as referenced above or an agreement to resolve any such Claims, Attorney shall be entitled to the full Contingent Fee described above in Paragraph 4.

-2-

USAO_00567510
GB_T_00198206

Exhibit 132
Page 2 of 3

0487
0488

Attorney may withdraw from representation of Client (a) with Client's consent, or (b) upon court approval, or (c) if no court action has been filed, upon reasonable notice to Client.

**11.    LIEN.** Client hereby grants Attorney a lien on any and all claims or causes of action that are the subject of Attorney's representation under this Agreement. Attorney's lien will be for any sums owing to Attorney for any unpaid costs or attorneys fees under this Agreement. The lien will attach to any recovery Client may obtain, whether by arbitration award, judgment, settlement or otherwise. The lien created herein is considered an adverse interest within the meaning of Rule of Professional Conduct 3-300 and requires Client's informed written consent. In accordance with that Rule, Attorney advises Client that it may seek the advice of an independent lawyer of Client's choice, and that Client need not sign this Agreement until it has had a reasonable opportunity to seek that advice. By signing this Agreement, Client consents to the Attorney's Lien described herein.

**12.    CONCLUSION OF SERVICES.** When Attorney's services conclude, other than by discharge or withdrawal, all unpaid charges will immediately become due and payable. After Attorney's services conclude, Attorney will, upon Client's request, deliver Client's file to Client, along with any Client's funds or property in Attorney's possession.

**13.    DISCLAIMER OF GUARANTEE. Nothing In this Agreement and nothing in Attorney's statements to Client before or after the signing of this Agreement will be construed as a promise or guarantee about the outcome of Client's matter. Attorney makes no such promises or guarantees. There can be no assurance that Client will recover any sum or sums in this matter. Attorney comments about the outcome of Client's matter are expressions of opinion only.**

**14.    EFFECTIVE DATE.** This Agreement will take effect when Client has performed the conditions stated in Paragraph 1. The date at the beginning of this Agreement is for reference only.

**"Attorney"**

EAGAN AVENATTI, LLP

Michael J. Avenatti

I have read and understood the foregoing terms and agree to them. By signing this Agreement, I further acknowledge receipt of a fully executed duplicate of this Agreement.

**"Client"**

**Alexis Gardner**

Date:  12 - 5 - 16

-3-

USAO_00567511
GB_T_00198206

Exhibit 132
Page 3 of 3

0488
0489

# EXHIBIT 11

0489

0490

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA - SOUTHERN DIVISION**

**HONORABLE JAMES V. SELNA, U.S. DISTRICT JUDGE**

UNITED STATES OF AMERICA,                )
                                         )
                    Plaintiff,           )   CERTIFIED TRANSCRIPT
                                         )
        vs.                              )   Case No.
                                         )   SACR-19-00061-JVS
MICHAEL JOHN AVENATTI,                   )
                                         )   **TRIAL DAY 11**
                    Defendant.           )   **VOLUME 2**
                                         )

REPORTER'S TRANSCRIPT OF PROCEEDINGS

THURSDAY, JULY 29, 2021

1:00 P.M.

SANTA ANA, CALIFORNIA

**DEBBIE HINO-SPAAN, CSR 7953, CRR**
FEDERAL OFFICIAL COURT REPORTER
411 WEST 4TH STREET, ROOM 1-053
SANTA ANA, CA 92701
dhinospaan@yahoo.com

**UNITED STATES DISTRICT COURT**

```
 1    servers of Eagan Avenatti?

 2    A    It's on the computers or the servers of Eagan Avenatti,

 3    yes.

 4    Q    Do you know of any steps that Mr. Sagel or any other

 5    federal agent has taken to try to look at it?

 6    A    No.  I would not have that knowledge.

 7              MR. AVENATTI:  Nothing further.

 8              THE COURT:  May the witness be excused?

 9              MR. AVENATTI:  Your Honor, we reserve the right to

10    call her in our case in chief.

11              THE COURT:  Ms. Regnier, you're excused for now but

12    you're on recall.  Thank you.

13              Government call its next witness, please.

14              MR. SAGEL:  The Government calls Joel Weiner.

15    JOEL WEINER, GOVERNMENT WITNESS, WAS SWORN

16              THE COURTROOM DEPUTY:  If you'll state and spell

17    your first and last name.

18              THE WITNESS:  Joel, J-o-e-l, Weiner, W-e-i-n-e-r.

19              THE COURTROOM DEPUTY:  Thank you.  If you'll be

20    seated, please.

21              THE COURT:  Mr. Sagel.

22              MR. SAGEL:  Thank you, Your Honor.

23                        DIRECT EXAMINATION

24    BY MR. SAGEL:

25    Q    Good afternoon, Mr. Weiner.
```

```
 1   A      It's a settlement agreement between Ms. Gardner and
 2   Mr. Whiteside dated January 7th, 2017, which was an agreement
 3   reached at the mediation.
 4   Q      Is this a true and accurate copy of the settlement
 5   agreement between Alexis Gardner and Hassan Whiteside?
 6   A      Yes.
 7              MR. SAGEL:  At this time, Your Honor, the Government
 8   moves to admit Exhibit 139.
 9              MR. AVENATTI:  Objection.  Hearsay.
10              THE COURT:  Overruled.  239 [sic] will be received.
11              MR. SAGEL:  Thank you.
12   Q      Let's start at the top of page 1 --
13              THE COURT:  Sorry.  139 will be received.
14              (Exhibit Number 139 received.)
15   Q      BY MR. SAGEL:  Let's start at the top, Exhibit 139 at the
16   top.  The bold letters at the top say "Settlement Agreement";
17   is that correct?
18   A      Yes.
19   Q      Can you read the first sentence up to "other hand"?
20   A      "This agreement is dated as of the 7th day of
21          January, 2017, (the effective date) by and between
22          Alexis Gardner --"
23              And that has Gardner in quotes.
24   Q      "On the one hand"?
25   A      "-- on the one hand and Hassan Whiteside" -- and
```

03:21PM  (line 5)
03:21PM  (line 10)
03:22PM  (line 15)
03:22PM  (line 20)
03:22PM  (line 25)

77

```
 1            Whiteside in quotes -- "on the other hand."
 2   Q     And the date of this agreement is the same date as the
 3   mediation; is that correct?
 4   A     Yes.
 5   Q     Do you know when this settlement agreement was signed?
 6   A     Yes.  It was signed at the mediation on January 7, 2017.
 7   Q     Is it fair to say at the end?
 8   A     Yes.
 9   Q     If I could have you look at page 2, at the top.  Is
10   paragraph 2 titled "Payment"; is that correct?
11   A     Yes.
12   Q     Could you read the first -- can you read the first
13   sentence or up through the word "agreement."  Can you read
14   number 2?
15   A     "Payment.  As full and final settlement of any
16         and all claims and disputes, Whiteside will pay
17         Gardner the total sum of $3 million defined as the
18         payment amount as follows:  $2,750,000 using best
19         efforts to pay on or before January 21st, 2017, but
20         in no event any later than January 28, 2017, and
21         $250,000 on November 1st, 2020, assuming Gardner has
22         not been previously determined by the arbitrator to
23         have violated the terms of this agreement."
24   Q     So let me start with that.  Is this the full and final
25   settlement agreement?  Is this the only settlement agreement?
```

03:22PM (line 5)
03:23PM (line 10)
03:23PM (line 15)
03:24PM (line 20)
03:24PM (line 25)

**UNITED STATES DISTRICT COURT**

```
 1   A    Yes.

 2   Q    Were there any other agreements at this time -- or were

 3   there any other agreements at this time between Mr. Whiteside

 4   and Ms. Gardner?

 5   A    Not that I'm aware of.

 6   Q    And this requires the total sum of $3 million to be paid.

 7   Was that the ultimate settlement between the parties on that

 8   day, on January 7, 2017?

 9   A    Yes.

10   Q    And it breaks it down into two payments.  When was the

11   $2.75 million due pursuant to this settlement agreement?

12   A    It was due no later than January 28th, 2017.  But we had

13   agreed to use best efforts to pay on or before January 21,

14   2017.

15   Q    And then the last part of that paragraph says:  "All

16   payments shall be made by wire transfer according to the

17   following instructions."

18            What's the name on the account that the payments

19   should be made to?

20   A    Eagan Avenatti, LLP, client trust.

21   Q    And let me have you look at paragraph 8.  Probably should

22   have done that before I asked my previous question.

23            But what is the title of paragraph 8?

24   A    "Entire Agreement."

25   Q    And can you read what paragraph 8 says.
```

# EXHIBIT 12

0495

0496

Message

| | |
|---|---|
| **From:** | "Michael J. Avenatti" [mavenatti@eaganavenatti.com] |
| **on behalf of** | Michael J. Avenatti [/O=FIRST ORGANIZATION/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=MICHAEL J. AVENATTI] |
| **Sent:** | 12/22/2016 2:55:38 PM |
| **To:** | Judy K. Regnier |
| **Subject:** | Draft Agreement |
| **Attachments:** | Draft Settlement Agreement.doc |

Please see attached.  Can you please fill-in our trust account info and send back to me?

Thanks.

Michael

Michael J. Avenatti, Esq.
Eagan Avenatti, LLP
520 Newport Center Drive, Ste. 1400
Newport Beach, CA  92660
Tel:  (949) 706-7000
Fax: (949) 706-7050
Cell: (949) 887-4118
mavenatti@eaganavenatti.com

The preceding email message (including any attachments) contains information that may be confidential, protected by the attorney-client or other applicable privileges, or constitutes non-public information.  It is intended to be conveyed only to the designated recipient(s). If you are not an intended recipient of this message, please notify the sender by replying to this message and then delete it from your system.  Use, dissemination, or reproduction of this message by unintended recipients is not authorized and may be unlawful.

USAO_00569799
GB_T_00201306

Exhibit 137
Page 1 of 6

0496
0497

# SETTLEMENT AGREEMENT

This Agreement is dated as of the 7th day of January, 2017, by and between Alexis Gardner ("Gardner"), on the one hand, and Hassan Whiteside ("Whiteside"), on the other hand.  Gardner and Whiteside are each a "Party" and are collectively the "Parties" to this Agreement.

## RECITALS

**WHEREAS,** certain Disputes have arisen between the Parties; and

**WHEREAS,** the Parties desire to fully and finally settle the Disputes as well as all other Claims, acknowledging that settlement is in the best interests of the Parties.

## DEFINITIONS

"Agreement" means this Settlement Agreement.

"Claims" means any and all claims, counterclaims, cross-claims, defenses, affirmative defenses, causes of action of any type (whether common law, statutory, regulatory or administrative, and whether or not reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured or unsecured), demands, disputes, damages, costs, losses, detriments, interest, expenses, penalties, attorneys' fees, actions, debts, controversies, suits, and choses in action, whether known or unknown, relating in any way to the conduct, prior relationship and/or interactions between Gardner and Whiteside.

"Disputes" means issues that have arisen between Gardner and Whiteside relating to the alleged conduct and actions of Gardner and/or Whiteside.

"Unknown Claims" means Claims that any Party does not know or suspect to exist at the time of the release which might have affected the terms of this Agreement.

**NOW, THEREFORE,** in consideration of the mutual promises and covenants contained in this Agreement, and for other good and valuable consideration, the receipt and sufficiency of which are acknowledged, the Parties agree as follows:

**1.  Incorporation of Recitals; Definitions.**  The recitals stated above are incorporated into this Agreement and made a part of this Agreement as if fully set forth herein.  Capitalized terms shall have the meaning given unless undefined.

USAO_00569800
GB_T_00201307

Exhibit 137
Page 2 of 6

0497
0498

[ COMMENTS \* UPPER \* MERGEFORMAT ]

**2. Payment.** As full and final settlement of any and all Claims and Disputes, Whiteside will pay Gardner the total sum of $ ▮▮▮▮▮
(▮▮▮▮▮▮▮ Dollars) (the "Payment Amount") on or before January 17, 2017. All payments shall be made by wire transfer according to the following instructions:

Bank: Rabobank, N.A.
Bank Address: 90 E. Thousand Oaks Blvd, Ste 300, Thousand Oaks, CA 91360
Routing No. ▮▮▮7159
Bank Acct No. ▮▮▮7566
Tax ID No.: 32-0210824
Name on Account: Meridian Investors Trust 10-17952

**3. Mutual Release.** In consideration for the payment set forth in paragraph 2, Gardner and Whiteside release and forever discharge each other from any and all Claims, including Unknown Claims, which they may now have, may hereafter have, or claim to have against each other ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ with respect to the Disputes and/or the Claims. Provided, however, that nothing herein shall be construed to release any Party from the obligations created in this Agreement, including without limitation the confidentiality provisions of paragraph 10 and the representations and warranties set forth in paragraph 12, which claims, obligations and provisions shall survive execution of this Settlement Agreement. It is the intent of the Parties to give the broadest release and discharge possible under the law. This release is binding upon and for the benefit of each of the Parties, as well as their respective current and former predecessors, successors, assigns, past or present parents, subsidiaries, related entities, affiliates, partners, members, directors, officers, employees, principals, trustees, experts, attorneys, agents, respective current or former spouses, heirs, representatives, and insurers. As to Unknown Claims, the Parties and the Releasing Assignors expressly waive any and all provisions, rights and benefits conferred by any law of the United States or of any state or territory of the Unites States, or principle of common law, which is similar, comparable or equivalent to § 1542 of the California Civil Code, which provides:

**A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE CREDITOR DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE, WHICH IF KNOWN BY HIM OR HER MUST HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR.**

**4. Non-Admission.** The settlement of the Claims and Disputes between the Parties is voluntary, is undertaken to avoid the expense and burden of litigation, and does not constitute an admission of wrongdoing or any other basis for liability by any of the Parties, or an admission of the existence of any facts upon which liability could be based. Neither the existence nor the terms of this Settlement Agreement, nor any negotiations, act or omission relating to it, may be used in connection with any attempt to establish

[PAGE ]

USAO_00569801
GB_T_00201307

Exhibit 137
Page 3 of 6

0498
0499

[ COMMENTS \* UPPER \* MERGEFORMAT ]

liability or damages against any Party hereto relating to the Claims associated with the Dispute.

   **5.   Advice of Counsel.** Each Party to this Agreement has reviewed the Agreement independently, has had the opportunity to consult counsel, is fully informed of the terms and effect of this Agreement, and has not relied in any way on any inducement, representation, or advice of any other Party in deciding to enter into this Agreement.

   **6.   Fees and Costs.** Except for the payment identified in paragraph 2 above, each of the Parties shall pay its own respective costs and attorneys' fees incurred with respect to the Disputes, the Claims and this Agreement.

   **7.   Governing Law and Exclusive Jurisdiction.** This Agreement and the rights and obligations hereunder shall be governed by and construed in accordance with the laws of the State of California, without regard to the principles of the conflicts of laws thereof. In addition, the Parties expressly agree that any and all disputes under this Agreement shall be resolved through binding arbitration before the Honorable Louis Meisinger in Los Angeles, California. Each party shall be responsible for its own attorney's fees and expenses. The fees and expenses of the arbitrator shall be borne equally by the Parties. The decision of the arbitrator shall be final and binding and may not be appealed. A party may apply to any court having jurisdiction to obtain a judgment enforcing the decision of the arbitrator. The Parties agree that the limitation period for commencing the arbitration process through delivery of a written demand for arbitration shall be one (1) year after the cause of action arises. This Agreement shall not be construed against any of the Parties but shall be given a reasonable interpretation.

   **8.   Entire Agreement.** This Agreement constitutes the entire understanding between the Parties with respect to settlement of the Disputes and any and all Claims and supersedes any prior written and/or verbal agreements between the Parties.  This Agreement may not be amended except by a writing signed by all of the Parties.

   **9.   Severability.** Any term or provision of this Agreement which is invalid or unenforceable in any jurisdiction shall, as to that jurisdiction, be ineffective to the extent of such invalidity or unenforceability without rendering invalid or unenforceable the remaining terms and provisions of this Agreement or affecting the validity or enforceability of any of the terms or provisions of this Agreement in any other jurisdiction.  If any provision of this Agreement is so broad as to be unenforceable, that provision shall be interpreted to be only so broad as is enforceable

   **10. Confidentiality.** Gardner and Whiteside expressly represent and warrant that, except as required by law, rule, or regulation, they shall not disclose any information regarding this Agreement, the Disputes or the Claims, including the fact of this Agreement, to any third person (except their attorneys, accountants, insurance brokers, potential insurance brokers, insurers and potential insurers) without the prior express written consent of the other.  If Gardner or Whiteside are asked about the other, they are to solely respond "I wish [him or her] all the best."  Further, if a non-Party to this

[PAGE ]

USAO_00569802
GB_T_00201307

Exhibit 137
Page 4 of 6

0499
0500

[ COMMENTS \* UPPER \* MERGEFORMAT ]

Agreement requests or demands, by subpoena or by other lawful service, any information regarding this Agreement, the Disputes or the Claims from any of the Parties or their counsel, the requested Party or their counsel shall immediately notify the counsel for the other Party and shall cooperate with reasonable requests made by the other Party's counsel in furtherance of the other Party's efforts to prevent disclosure of information. The Parties may seek leave to intervene in any proceeding concerning disclosure of information regarding this Agreement and may take any appropriate action to preclude the voluntary disclosure by any Party's counsel of information regarding this Agreement. This paragraph will not prevent any Party, from responding to any request, order, summons, subpoena or other directive from any local, state, or federal regulatory, administrative, judicial, executive, or legislative agency or authority.

Notice under this provision, as well as under paragraph 7, shall be given to:

To Gardner:

> Michael J. Avenatti, Esq.
> Eagan Avenatti, LLP
> 520 Newport Center Dr.
> Suite 1400
> Newport Beach, CA 92660
> Fax: (949) 706-7050

To Whiteside:

[insert]

Gardner and Whiteside each acknowledge and agree that any breach or anticipatory breach of the provisions of this paragraph will cause irreparable injury to the other whose confidential information is or is about to be disclosed, and that any Party is therefore entitled to seek immediate injunctive relief (both interim and permanent) in any court having jurisdiction over the breaching Party.

**11. Counterparts.** This Agreement may be executed in two or more separate counterparts, and by facsimile, pdf, or other electronic copy, each of which, when executed, shall be an original, and all of which together shall constitute one and the same Agreement, notwithstanding that all Parties may not have executed the same counterpart, and each Party may execute a separate signature page which may be appended to form one or more duplicate originals of this Agreement.

**12. Representation and Warranties.** Each Party warrants and represents that other than disclosed in this agreement, (a) it has not assigned, encumbered or in any manner transferred all or any portion of the Claims released herein, (b) other than as released by this Agreement, there are no charges, complaints, suits, arbitrations or other claims or

[PAGE ]

USAO_00569803
GB_T_00201307

Exhibit 137
Page 5 of 6

0500
0501

[ COMMENTS \* UPPER \* MERGEFORMAT ]

proceedings between the Parties, (c) no other person, party, or corporation has any right, title or interest in any of the Claims released herein, and (d) that all lawful conditions precedent to their execution and delivery of this Agreement have been fully accomplished.

**IN WITNESS WHEREOF,** intending to be legally bound hereby, the Parties have executed this Agreement as of the day and year written above.

**ALEXIS GARDNER**

_____

**HASSAN WHITESIDE**

_____

[PAGE ]

USAO_00569804
GB_T_00201307

Exhibit 137
Page 6 of 6

0501
0502

# EXHIBIT 13

0502

0503

1      **UNITED STATES DISTRICT COURT**

2    **CENTRAL DISTRICT OF CALIFORNIA - SOUTHERN DIVISION**

3      **HONORABLE JAMES V. SELNA, U.S. DISTRICT JUDGE**

4

5   UNITED STATES OF AMERICA,              )
                                           )
6                   Plaintiff,             )   **CERTIFIED TRANSCRIPT**
                                           )
7         vs.                              )   Case No.
                                           )   SACR-19-00061-JVS
8   MICHAEL JOHN AVENATTI,                 )
                                           )   **TRIAL DAY 9**
9                   Defendant.             )   **VOLUME 2**
                                           )

10

11

12

13

14

15              REPORTER'S TRANSCRIPT OF PROCEEDINGS

16                 TUESDAY, JULY 27, 2021

17                      1:34 P.M.

18                 SANTA ANA, CALIFORNIA

19

20

21

22

23

24            **DEBBIE HINO-SPAAN, CSR 7953, CRR**
              FEDERAL OFFICIAL COURT REPORTER
              411 WEST 4TH STREET, ROOM 1-053
25                SANTA ANA, CA 92701
                  dhinospaan@yahoo.com

**UNITED STATES DISTRICT COURT**

6

| | |
|---|---|
| 1 | **SANTA ANA, CALIFORNIA; TUESDAY, JULY 27, 2021** |
| 2 | **1:34 P.M.** |
| 3 | **- - -** |
| 4 | |
| 01:34PM 5 | **(In the presence of the jury.)** |
| 6 | THE COURT:  Good afternoon, ladies and gentlemen. |
| 7 | Mr. Sagel? |
| 8 | MR. SAGEL:  Thank you, Your Honor. |
| 9 | JUDY REGNIER, WITNESS, RESUMED THE STAND |
| 01:34PM 10 | **DIRECT EXAMINATION (resumed)** |
| 11 | BY MR. SAGEL: |
| 12 | Q    Ms. Regnier, I'm going to turn your attention to late |
| 13 | 2018 as it relates to Mr. Johnson's rent.  Did you ever have a |
| 14 | conversation with the defendant about Mr. Johnson receiving an |
| 01:35PM 15 | eviction notice? |
| 16 | A    No, I don't believe I did. |
| 17 | Q    Did you ever -- did you ever have -- did you ever receive |
| 18 | any information from Geoff Johnson about his rent not being |
| 19 | paid? |
| 01:35PM 20 | A    I received, I believe, an e-mail from him saying that the |
| 21 | rent was late. |
| 22 | Q    Did you have a conversation about that with Mr. Avenatti? |
| 23 | A    I would have -- I don't know if I had a conversation or if |
| 24 | I sent an e-mail or what.  I would have advised him, yes. |
| 01:35PM 25 | MR. AVENATTI:  Your Honor, move to strike as |

**UNITED STATES DISTRICT COURT**

```
 1   Exhibit 146?
 2   A    Yes.
 3   Q    If I could have you look at Exhibit 148.
 4            MR. SAGEL:   And, Your Honor, the Government moves
 5   into evidence Exhibit 148, which is also part of the custodian
 6   declaration at 394, page 2.
 7            MR. AVENATTI:   Your Honor, same objections.
 8            THE COURT:   148 will be received.
 9            (Exhibit Number 148 received.)
10   Q    BY MR. SAGEL:   Starting at the top left, what bank
11   account is this -- are these bank records for?
12   A    State Bar of California, Eagan Avenatti, LLP,
13   attorney-client trust account.
14   Q    And the address is the office address; is that correct?
15   A    Yes, it is.
16   Q    If you were to look in the top right corner, which you
17   might have to look on your page, this is a statement from what
18   date to what date?
19   A    December 30th, 2016, to January 31st, 2017.
20   Q    And can you see how much is in the account according to
21   the previous balance?
22   A    23 cents.
23   Q    Then if you were to look at the deposits and credit
24   section, do you see a deposit on January 25th of 2017?
25   A    Yes, I do.
```

29

```
 1   Q      How much is that deposit for?
 2   A      2,750,000.
 3   Q      Do you know what this $2.75 million deposit into the
 4   account was for?
 5   A      That would be the settlement that we were just talking
 6   about.
 7   Q      For Ms. Gardner?
 8   A      For Ms. Gardner, yes.
 9          THE REPORTER:  Ms. Regnier, can you get closer to
10   the mic.
11          THE WITNESS:  I'm sorry.
12          THE COURT:  The mic will also move if you just want
13   to pull it.  Thank you.
14   Q      BY MR. SAGEL:  If I could have you look at -- while it's
15   still there, in the description of the deposit, can you read
16   what it says as the description.
17   A      "Wire in" --
18   Q      You don't need to read all the numbers, but "wire in" and
19   then skip past --
20   A      It says:  "ORG, Hassan Whiteside, OBI Whiteside," and then
21   another number.
22   Q      If I could have you look at Exhibit 138.  And I
23   apologize, I may go back a binder.
24   A      Okay.
25   Q      Is Exhibit 138 an e-mail that the defendant sent to you?
```

02:12PM 5
02:12PM 10
02:12PM 15
02:12PM 20
02:13PM 25

**UNITED STATES DISTRICT COURT**

32

```
 1   A      250,000 online transfer to an Eagan Avenatti account.
 2   Q      And would you have been responsible for this wire and
 3   this online transfer to another Eagan Avenatti account?
 4   A      For initiating them, yes.
 5   Q      And at whose direction?
 6   A      At Michael's direction.
 7   Q      If you were to turn to page 3 of Exhibit 48.
 8   A      Exhibit 48 or 148?
 9   Q      I'm sorry, 148, the same one.  Page 3 of it.  Do you see
10   a section titled "Daily Balances"?
11   A      Yes.
12   Q      On January 25th, when the $2.75 million wire was
13   deposited, what was the daily balance of this trust account?
14   A      It was zero.  And then the deposit came in so it was
15   2,750,000.
16   Q      And by the next day how much was in the client trust
17   account?
18   A      Zero.
19   Q      How much of the money from the $2.75 million that was
20   deposited did defendant ask you to send to Ms. Gardner from the
21   trust account?
22   A      He did not request any money to be sent to Ms. Gardner.
23   Q      If I could have you look at Exhibit 154.
24   A      Okay.
25   Q      Is this an e-mail that you received along with defendant?
```

02:17PM (line 5)
02:17PM (line 10)
02:18PM (line 15)
02:18PM (line 20)
02:19PM (line 25)

**UNITED STATES DISTRICT COURT**

```
 1    that correct?
 2    A    Yes, he did.
 3    Q    And what did Mr. Ohman say to you and Mr. Avenatti?
 4    A    "Michael and Judy, FYI, I just received this
 5         from Honda regarding a balance discrepancy after the
 6         two wire transfers today for the closing of the
 7         plane.  See e-mail thread below.  Judy, possibly
 8         there was a mistake on behalf of the bank that could
 9         be checked against the ACH records."
10    Q    If you were to look at -- let's go to 155 now.  Pulling
11    up the first page.  And let's -- Exhibit 155.  Starting at the
12    bottom of the page, is that the same e-mail that we just read
13    from 154 that Christopher Ohman sent to you?
14    A    Yes.
15    Q    And right above that did Mr. Avenatti send you an e-mail?
16    A    Yes, he did.
17    Q    What did Mr. Avenatti tell to you to do?
18    A    "Ignore this."
19    Q    And what did you say?
20    A    "Got it."
21    Q    When Mr. Avenatti told you to ignore the prior e-mail in
22    154 from Mr. Ohman, what did you do?
23    A    I didn't do anything.  I just ignored it.
24    Q    If you were to look at Exhibit 154, page 2 -- and,
25    actually, before I get there, Mr. Ohman's e-mail to you on
```

**UNITED STATES DISTRICT COURT**

```
       1    January 26 mentioned the balance discrepancy after the two wire
       2    transfers today closing the plane.  So that would have been
       3    January 26, 2017?
       4    A    Yes.
02:23PM 5    Q    If you were to turn to page 2, where it has a little
       6    almost Excel spreadsheet-looking addition, where does the "wire
       7    2 today" say?
       8    A    "Wire 2 today from X-Law Group IOLTA account."
       9    Q    And how much?
02:23PM 10   A    2,500,000.
       11   Q    And that's the same amount and the same day that you
       12   transferred money out of Eagan Avenatti to X-Law Group?
       13   A    Yes.
       14   Q    What was your understanding of why you were sending
02:24PM 15   $2.5 million to The X-Law Group?
       16   A    I did say I thought that Alexis Gardner was a partner --
       17   or partner, I'm sorry -- was a client of both firms and that
       18   that was -- we were working with The X-Law group on that.  So I
       19   didn't think anything about it.
02:24PM 20   Q    And you had sent the prior e-mail to Mr. Parrish about
       21   depositing money; is that correct?
       22   A    Yes, I have.
       23   Q    Based on what Mr. Avenatti had told you about how the
       24   plane was going to be purchased, where did you believe the
02:24PM 25   money was going to be coming from to purchase the plane?
```

**UNITED STATES DISTRICT COURT**

# EXHIBIT 14

0510

0511



**CALIFORNIA BANK**
T R U S T
P.O. Box 489, Lawndale, CA 90260-0489

**Statement of Accounts**
Page 1 of 4
This Statement: January 31, 2017
Last Statement: December 30, 2016

Account 5792778671

**DIRECT INQUIRIES TO:**
Customer Service 1 (800) 400-6080

0043905            4032-06-0000-CBT-PC/0023-00000

STATE BAR OF CALIFORNIA
EAGAN AVENATTI LLP
ATTORNEY CLIENT TRUST ACCOUNT
520 NEWPORT CENTER DR STE 1400
NEWPORT BEACH CA 92660-7034

Irvine Branch
1900 Main St.  Suite 100
Irvine, CA 92614-0000
(949) 223-7500

| Happy New Year From All of Us at California Bank & Trust |
| --- |

## SUMMARY OF ACCOUNT BALANCE

| Account Type | Account Number | Checking/Savings Ending Balance | Outstanding Balances Owed |
| --- | --- | --- | --- |
| Attorney Client Trust | 5792778671 | $12.81 | |

## ATTORNEY CLIENT TRUST 5792778671

220     0

| Previous Balance | Deposits/Credits | Charges/Debits | Checks Processed | Ending Balance |
| --- | --- | --- | --- | --- |
| 0.23 | 2,750,012.81 | 2,750,000.23 | 0.00 | 12.81 |

### 2 DEPOSITS/CREDITS

| Date | Amount | Description |
| --- | --- | --- |
| 01/25 | 2,750,000.00 | WIRE/IN-2017012500006396;ORG HASSAN WHITESIDE;OBI WHITESIDE  1304001668 |
| 01/31 | 12.81 | INTEREST PAYMENT  0008593750 |

### 3 CHARGES/DEBITS

| Date | Amount | Description |
| --- | --- | --- |
| 12/30 | .23 | INTEREST TRANSFER  0100072101 |
| 01/26 | 2,500,000.00 | WIRE/OUT-2017012600002965;BNF The X-Law Group P.C.  1303600794 |
| 01/26 | 250,000.00 | ONLINE XFER TO DDA EAGAN AVENAT ID: 000005375  2306900665 |

### 0 CHECKS PROCESSED

There were no transactions this period.

### AGGREGATE OVERDRAFT AND RETURNED ITEM FEES

| | Total for This Period | Total Year-to-Date |
| --- | --- | --- |
| Total Overdraft Fees | $0.00 | $0.00 |
| Total Returned Item Fees | $0.00 | $0.00 |

To learn more about our other products and services that may lower the cost of managing account overdrafts or to discuss removing overdraft coverage from your account, please contact Customer Service or visit your local branch.

A division of ZB, N.A. Member FDIC  

0043905-0000001-0125144

USAO_00265210

Exhibit 148
Page 1 of 4

0511
0512

## An Easy Approach To Balancing Your Account

**To reconcile your checkbook balance to your statement balance:** Mark off each entry in your check register that has been charged to your account during the statement period. List the checks you have written, but are not yet charged to your account in the "Checks Outstanding" column below. Then, follow the instructions in lines 1 through 10.

| CHECKS OUTSTANDING | | CHECKBOOK BALANCE | |
|---|---|---|---|
| Check Number | Check Amount | | |
| | | 1. LIST your checkbook balance. | |
| | | 2. ADD any deposits or other credits listed on the front of this statement which you have not recorded in your checkbook (such as payroll credits or other direct electronic deposits). | |
| | | 3. SUBTOTAL: | |
| | | 4. SUBTRACT any charges listed on the front of this statement which you have not recorded (such as service charges, automatic transfers, electronic transactions, etc). | |
| | | 5. ADJUSTED CHECKBOOK BALANCE: | |

*This balance should agree with line 10, below.*

| | | STATEMENT BALANCE | |
|---|---|---|---|
| | | 6. LIST your current statement balance as shown on the front of this statement. | |
| | | 7. ADD deposits made, but not shown on this statement. | |
| | | 8. SUBTOTAL: | |
| | | 9. SUBTRACT total from "Checks Outstanding." | |
| TOTAL: | | 10. ADJUSTED STATEMENT BALANCE: | |

*Transfer to Line 9.*   *This balance should agree with line 5, above.*

**PROMPTLY EXAMINE YOUR STATEMENT AND REPORT ANY PROBLEM**
You must promptly examine your account statements and report any discoverable errors, unauthorized signatures, alterations, missing endorsements, or unauthorized transfers. Failure to do so may result in your loss of certain rights or remedies. For example, you must identify the discoverable alteration or forgery of a check within 30 days of us sending you, or making available to you, the statement reflecting that check, and you must also immediately report to us what you find. Businesses should check their account transactions daily, for which various online services are available. For additional information, please see your deposit account agreement and application service agreement(s) for details. See also the consumer disclosures below.

**CONSUMER ACCOUNTS: IN CASE OF ERRORS OR QUESTIONS ABOUT YOUR ELECTRONIC TRANSFERS OR MONEY RESERVE TRANSACTIONS**
If you think your statement is wrong, or if you need more information about a transfer on this statement or on a receipt, please telephone or write us. Please use the telephone number or address listed on the front of this statement to contact us as you can. **We must hear from you no later than 60 days after we sent or made available the FIRST statement on which the problem or error appeared.** The provisions in this paragraph do not apply to business or other non-personal accounts. The owners of those accounts must settle all unauthorized transactions or errors within 24 hours of receipt of the item posting in order to be returned.

1.  Tell us your name and account number.
2.  Describe the error or transfer you are unsure about, and explain as clearly as you can why you believe there is an error or why you need more information.
3.  Tell us the dollar amount of the suspected error.

We will investigate your complaint and correct any error promptly. If we take more than 10 business days to do this, we will recredit your account for the amount you think is in error, so that you will have use of the money during the time it takes us to complete our investigation.

**FOR MONEY RESERVE ACCOUNTS:**

**IN CASE OF ERRORS OR QUESTIONS ABOUT YOUR PERSONAL CREDIT LINE**
*(This is a Summary of Your Billing Rights)*
If you think your statement is wrong, or you need more information about a transaction on your statement, write us at the address on the front of this statement as soon as possible. **We must hear from you no later than 60 days after we sent you the first statement on which the error or problem appeared.**

You can telephone us but doing so will not preserve your rights. In your letter, give us the following information.

1.  Your name and account number.
2.  The dollar amount of the suspected error.
3.  Describe the error and explain, if you can, why you believe there is an error. If you need more information, describe the item you are unsure about.

You do not have to pay any amount in question while we are investigating, but you are still obligated to pay the parts of your bill that are not in question. The charge in question may remain on your statement, and we may continue to charge you interest on that amount. But, if we determine that we made a mistake, you will not have to pay the amount in question or any interest or other fees related to that amount. While we investigate your question, we cannot report you as delinquent or take any action to collect the amount you question. You must notify us in writing. You can telephone us, but doing so will not preserve your rights. Contact us at California Bank & Trust, PO Box 25787, Salt Lake City, UT 84125-0787.

**Balance Subject to Interest Rate:** We use the method called "average daily balance", (including current transactions) to calculate the daily balance. If you have any further questions about the method and how resulting interest charges are determined, please feel free to contact us at 1-800-400-6080.

We may report information about your Money Reserve account to credit bureaus. Late payments, missed payments, or other defaults on your account may be reflected in your credit report.

**Please notify us** if we report any inaccurate information about your account(s) to a credit bureau. Your written notice describing the specific inaccuracy should be sent to us at the following address: California Bank & Trust, PO Box 25787, Salt Lake City, UT 84125-0787

*Thank you for banking with California Bank & Trust.*
Become an Online Banking Customer for 24-hour account access.
•Review account balances •Review posted transactions • Pay bills • Transfer funds
Sign up today at www.calbanktrust.com or call 888-217-1265.

0043905-0000001-0125144

USAO_00265211

Exhibit 148
Page 2 of 4

0512
0513



CALIFORNIA BANK
TRUST

P.O. Box 489, Lawndale, CA 90260-0489

Page 3 of 4
January 31, 2017
STATE BAR OF CALIFORNIA
5792778671

**DAILY BALANCES**

| Date | Balance | Date | Balance | Date | Balance |
|------|---------|------|---------|------|---------|
| 12/30 | 0.00 | 01/26 | 0.00 | 01/31 | 12.81 |
| 01/25 | 2,750,000.00 | | | | |

**INTEREST**

| | | | |
|---|---|---|---|
| Interest Earned This Interest Period | $12.81 | Number Of Days This Interest Period | 32 |
| Interest Paid Year-To-Date 2017 | $12.81 | Annual Percentage Yield Earned | 0.17% |

Current interest rate is 0.170% with no rate change this interest period

Please retain this statement. Interest paid on your account in 2016 was 7.93.

A division of ZB, N.A. Member FDIC

0043905-0000002-0125145

USAO_00265212

Exhibit 148
Page 3 of 4

0513
0514

**California Bank & Trust**

This page intentionally left blank

0043905-0000002-0125145

USAO_00265213

Exhibit 148
Page 4 of 4

0514
0515

# EXHIBIT 15

0515

0516

```
< < < Money Transfer System > > >

RCVD FROM HASSAN WHITESIDE          C/O INTERSECT CAPITAL
SENDER'S DDA # 123934245


TRN REF #: 20170125-00004957
-----------------------------------------------------------------
        **** MESSAGE ENVELOPE ****            ( Bank : CNB )

                                    SND DATE: 17/01/25
SRC:FAX CALLER:ELITE                EXT:

RPT#          AMT:2,750,000.00        CUR:USD          TRDR#
TEST: DUE:                   TYP:FTR/1000 FNDS:S CHG:DB:N CD:N COM:N CBL:N
-----------------------------------------------------------------
DBT D/123934245/                CDT *A/122232109          ADV:FED
DEBIT VAL: 17/01/25             CREDIT VAL: 17/01/25
DEPT:123                        DEPT:057
HASSAN WHITESIDE                ZB NA DBA CALIFORNIA BANK & TRUST
C/O INTERSECT CAPITAL           SAN DIEGO, CA
12657 ALCOSTA BLVD SUITE 500
SAN RAMON CA 94583              COUNTRY OF RESIDENCY: US
BANK TO BANK INFO:             BNF:/5792778671          CHG:  BK?N
1900 MIAN STREET SUITE 100     EAGAN AVENATTI LLP CLIENT TRUST
IRVINE CA                       520 NEWPORT CENTER DRIVE STE 1400
                                NEWPORT BEACH, CA 92660
                                ORIG TO BNF INFO:
                                WHITESIDE GARDNER 1-7-17



        **** CREDIT PAYMENT MESSAGE TEXT ****

(1510) Type/Subtype Code:
        Type Code:              10 (Transfer of funds)
        Subtype Code:           00 (Regular transfer)

(2000) Amount:                  $2,750,000.00

(3100) Sending Bank:
        ABA number:             122016066
        Short name:             CY NATL BK LA
        ABA lookup (AUX):       CITY NATIONAL BANK
                                LOS ANGELES, CA

(3320) Sender Reference:        2017012500004957

(3400) Receiving Bank:
        ABA number:             122232109
        Short name:             CAL BK & TRUST
        ABA lookup (AUX):       ZB NA DBA CALIFORNIA BANK & TRUST
                                SAN DIEGO, CA

(3600) Business Function Code:  CTP (Customer transfer plus)

(4200) Beneficiary:             D/5792778671
                                EAGAN AVENATTI LLP CLIENT TRUST
                                520 NEWPORT CENTER DRIVE STE 1400
                                NEWPORT BEACH, CA 92660

(5000) Originator:              D/123934245
                                HASSAN WHITESIDE
                                C/O INTERSECT CAPITAL
```

CONFIDENTIAL
K 000027

USAO_01141268

Exhibit 149
Page 1 of 2

0516
0517

```
           *SYS_MEMO        HASSAN O in DBT ADDRESS
           *SYS_MEMO        ACTUAL: HASSAN WHITESIDE C/O
           *SYS_MEMO        Multiple warnings - see history
           *SYS_MEMO        *MRSTOP/*MR/FRD/PSS/ /$$$IS2
           FED_OPACQ    DEQ
           STOP_PAY_LOG     OPRID: JBIAS  TIME: 25-JAN-2017 13:42:37.93
           Memo: APPROVAL BY FALSE HIT
           DDA_AUTQ     DEQ
           DDA_PDM_01
           Memo:                              170125004957000001 D
           *SYS_MEMO        Overdraft reported by IBM host, balance: 412,779.40;
code: 10
           *SYS_MEMO        Message from IBM host: code: 10, NON-SUFFICIENT FUNDS
           DDA_POST_01      SEQ #: 7163 25-JAN-2017 13:42:38.04 Info: PD
           Memo: ERROR FROM HOST: Unable to post.|170125004957|0000001||
           *SYS_MEMO        POTENTIAL OVERDRAFT IMPACT -2,337,220.60
           *SYS_MEMO        Rsn: AC-OD
           RISK_Q       DEQ
           Memo: Rsn: AC-OD
           RISK_LOG         OPRID: KWALTON  TIME: 25-JAN-2017 13:45:51.15
           Memo: KWALTON - OD OK CHRISTINE BALL  (VERBAL )
           *MEMO            All balance conditions overridden for TRN 20170125
-00004957; Routed.
           DDA_AUTQ     DEQ
           DDA_PDM_01       SEQ #: 7248 25-JAN-2017 13:45:51.16 Info: PD
           Memo:                              170125004957000002 D
           *SYS_MEMO        Message from IBM host: code: 00,
           *DDA             SAM_DBT AMOUNT: 2750000.00  USD
           DDA_POST_01      SEQ #: 7248 25-JAN-2017 13:45:51.25 Info: PD
           Memo: Dbt posted - tc: 9520|170125004957|0000002||
           OVDFTLOG         TIME: 25-JAN-2017 13:45:51,25
                            AMT1: 2750000.00   AMT2: 0.00

           Memo: $$$MPA
           PAYADVQ      DEQ
           PAYADV_LOG       OPRID: $$$PAY  TIME: 25-JAN-2017 13:45:51.26
           SYSPRFBAL        PRF_DDA_DBT AMOUNT: 2750000.00  USD
* BEGIN DESTINATION *DST(2), DLV STATE: S
     RTE: D/123934245/
     DST: LTR/STM//////
         HASSAN WHITESIDE
         C/O INTERSECT CAPITAL
         12657 ALCOSTA BLVD SUITE 500
         SAN RAMON CA 94583
         *DBT_CNF
* END DESTINATION
* BEGIN DESTINATION *DST(3), DLV STATE: Q
     RTE: D/123934245/
     DST: CMS/WEB//////
         HASSAN WHITESIDE
         C/O INTERSECT CAPITAL
         12657 ALCOSTA BLVD SUITE 500
         SAN RAMON CA 94583
         *DBT_CNF
         WEB_MSGQ     DEQ
         WEB_ACKPNDQ  DEQ
         Memo: >>>ISIACKPND00783020170125000004957WEB_OUT|*DBT
         WEB_OUT          SEQ #: 7830 25-JAN-2017 13:46:04.59 Info:  *DBT
* END DESTINATION
* BEGIN DESTINATION *DST(4), DLV STATE: Q
     RTE: D/123934245/
     DST: CMS/ESM//////
         HASSAN WHITESIDE
         C/O INTERSECT CAPITAL
         12657 ALCOSTA BLVD SUITE 500
         SAN RAMON CA 94583
         *DBT_CNF
```

CONFIDENTIAL
K 000028

USAO_01141269

Exhibit 149
Page 2 of 2

0517
0518

# EXHIBIT 16

0518

0519

1    **UNITED STATES DISTRICT COURT**

2    **CENTRAL DISTRICT OF CALIFORNIA - SOUTHERN DIVISION**

3    **HONORABLE JAMES V. SELNA, U.S. DISTRICT JUDGE**

4

5    UNITED STATES OF AMERICA,            )
                                          )
6                   Plaintiff,            )    <u>**CERTIFIED TRANSCRIPT**</u>
                                          )
7         vs.                             )    Case No.
                                          )    SACR-19-00061-JVS
8    MICHAEL JOHN AVENATTI,               )
                                          )    **TRIAL DAY 12**
9                   Defendant.            )    **VOLUME 2**
                                          )
10

11

12

13

14

15            REPORTER'S TRANSCRIPT OF PROCEEDINGS

16                 FRIDAY, JULY 30, 2021

17                      1:32 P.M.

18                 SANTA ANA, CALIFORNIA

19

20

21

22

23   _____

24            **DEBBIE HINO-SPAAN, CSR 7953, CRR**
              FEDERAL OFFICIAL COURT REPORTER
              411 WEST 4TH STREET, ROOM 1-053
25                SANTA ANA, CA 92701
                  dhinospaan@yahoo.com

**UNITED STATES DISTRICT COURT**

| | | |
|---|---|---|
| 11:01 | 1 | MR. AVENATTI:  Nothing further. |
| 11:01 | 2 | MR. SAGEL:  No redirect, Your Honor. |
| 11:01 | 3 | THE COURT:  May the witness be excused? |
| 11:01 | 4 | MR. AVENATTI:  We reserve the right to recall him, |
| 11:01 | 5 | Your Honor. |
| 11:01 | 6 | THE COURT:  Sir, you may be excused, but you are |
| 11:01 | 7 | subject to recall.  Thank you. |
| 11:01 | 8 | MR. SAGEL:  The government calls Alexis Gardner, |
| 11:01 | 9 | Your Honor. |
| 11:01 | 10 | I apologize, Your Honor, because the other witness |
| 11:02 | 11 | is in the witness room.  Ms. Gardner was down the hall. |
| 11:02 | 12 | THE COURT:  Okay. |
| 11:02 | 13 | ALEXIS GARDNER, GOVERNMENT'S WITNESS, SWORN |
| 11:04 | 14 | THE CLERK:  If I could please have you state and |
| 11:04 | 15 | spell your first and last name. |
| 11:04 | 16 | THE WITNESS:  My name is Alexis Gardner.  That's |
| 11:04 | 17 | A-l-e-x-i-s.  Last name, G-a-r-d-n-e-r. |
| 11:04 | 18 | THE CLERK:  Thank you. |
| 11:04 | 19 | THE COURT:  Could you pull the mic a little bit |
| 11:04 | 20 | closer to you, please.  Thank you. |
| 11:04 | 21 | Mr. Sagel. |
| 11:04 | 22 | MR. SAGEL:  Thank you, Your Honor. |
| 11:04 | 23 | DIRECT EXAMINATION |
| 11:04 | 24 | BY MR. SAGEL: |
| 11:04 | 25 | Q   Good morning, Ms. Gardner. |

```
11:08    1    Q    Did you meet Mr. Avenatti?

11:08    2    A    Yes, that same day.

11:08    3    Q    And where was that?

11:08    4    A    At the Starbucks on Santa Monica Boulevard, the one

11:08    5    that's attached by the pavilion.

11:08    6    Q    There's probably about a couple hundred Starbucks on

11:08    7    that one street.

11:08    8    A    Right off of, I guess to be more specific, Santa Monica

11:08    9    and Robertson.

11:09   10    Q    Okay.  Who was at the meeting -- and you met

11:09   11    Mr. Avenatti at that Starbucks?

11:09   12    A    Yes.

11:09   13    Q    Who was there other than you and the defendant?

11:09   14    A    Patrons of Starbucks and the people that work there.

11:09   15    As far as just the meeting, it was just him and I.

11:09   16    Q    If I could have you look at Exhibit 132.  It should be

11:09   17    in binder two, Volume 2.

11:10   18    A    (Witness complies.)  Okay.

11:10   19    Q    Do you have Exhibit 132 in front of you?

11:10   20    A    Yes.

11:10   21    Q    Do you recognize that document?  Actually let me make

11:10   22    it even easier.  If you could turn to page 3 of Exhibit 132.

11:10   23    Do you recognize your signature on that document?

11:10   24    A    Yes.

11:10   25    Q    Do you recognize that this is a document that defendant
```

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

| | | |
|---|---|---|
| 11:10 | 1 | had you sign during that meeting? |
| 11:10 | 2 | MR. AVENATTI:  Leading. |
| 11:10 | 3 | THE COURT:  Overruled. |
| 11:10 | 4 | THE WITNESS:  Yes. |
| 11:10 | 5 | BY MR. SAGEL: |
| 11:10 | 6 | Q    Is this a fair and accurate copy of the document you |
| 11:10 | 7 | signed that day? |
| 11:10 | 8 | A    Yes. |
| 11:10 | 9 | MR. SAGEL:  At this time, Your Honor, the |
| 11:10 | 10 | government moves to admit Exhibit 132. |
| 11:10 | 11 | MR. AVENATTI:  No objection. |
| 11:11 | 12 | THE COURT:  132 will be received. |
| 11:11 | 13 | (Exhibit 132 received in evidence) |
| 11:11 | 14 | MR. SAGEL:  If we could highlight the top portion |
| 11:11 | 15 | for now. |
| 11:11 | 16 | BY MR. SAGEL: |
| 11:11 | 17 | Q    Do you see that this document is titled |
| 11:11 | 18 | "Attorney/Client Fee Contract (Contingency)"? |
| 11:11 | 19 | A    Yes. |
| 11:11 | 20 | Q    On the day you met the defendant at the Starbucks, why |
| 11:11 | 21 | were you meeting him that day? |
| 11:11 | 22 | A    I'm not quite sure how to answer your question, but -- |
| 11:12 | 23 | Q    Let me ask it in a different way and we'll maybe go bit |
| 11:12 | 24 | by bit.  Did you know when you were meeting the defendant |
| 11:12 | 25 | that day that he was a lawyer? |

| | | |
|---|---|---|
| 11:26 | 1 | would see what I would receive. |
| 11:26 | 2 | MR. SAGEL:  Actually if we can put up 132, if you |
| 11:27 | 3 | can pull up the very bottom paragraph of page 1. |
| 11:27 | 4 | BY MR. SAGEL: |
| 11:27 | 5 | Q    In your fee agreement contract, there is a paragraph at |
| 11:27 | 6 | the bottom of page 1 that says:  "If payment of all or any |
| 11:27 | 7 | part of the amount to be received will be deferred, such as |
| 11:27 | 8 | in the case of an annuity, a structured settlement, or |
| 11:27 | 9 | periodic payments, the recovery for purposes of calculating |
| 11:27 | 10 | the attorneys' fees will be the initial lump-sum payment |
| 11:27 | 11 | plus the present value as of the time of the binding |
| 11:27 | 12 | resolution of the payments to be received thereafter." |
| 11:27 | 13 | Is that where your understanding came from that he |
| 11:27 | 14 | would get his attorneys' fees at the beginning? |
| 11:27 | 15 | A    Well, he kept on telling me that I would get a lump |
| 11:28 | 16 | sum, and after not receiving it, at some point I just |
| 11:28 | 17 | assumed. |
| 11:28 | 18 | Q    Did he tell you anything that night when you signed the |
| 11:28 | 19 | settlement agreement about it being confidential? |
| 11:28 | 20 | A    Yes. |
| 11:28 | 21 | Q    What did he say about that? |
| 11:28 | 22 | A    He told me that it was confidential.  I couldn't tell |
| 11:28 | 23 | anybody about it.  He told me that my ex knew how my mother |
| 11:28 | 24 | was, and so they made it a part of the agreement that I |
| 11:29 | 25 | couldn't tell my mother. |

42

```
 1   Q      Did you ever authorize the defendant to use your

 2   settlement money to buy a private plane?

 3   A      No.

 4              MR. SAGEL:  No further questions, Your Honor.

02:39PM 5              THE COURT:  Mr. Avenatti.

 6                        CROSS-EXAMINATION

 7   BY MR. AVENATTI:

 8   Q      Ms. Gardner, good afternoon.

 9   A      Hello.

02:40PM 10   Q      Could you please turn to Exhibit 160.  Exhibit 160 are

11   the text messages that Mr. Sagel just spent quite a lot of time

12   chatting with you about; right?

13   A      Yes.

14   Q      And do you know how Mr. Sagel got the text messages that

02:40PM 15   are part of 160?

16   A      Yes.

17   Q      How was that?

18   A      I provided them.

19   Q      And how did you go about providing Mr. Sagel the text

02:41PM 20   messages that are part of 160?

21   A      I turned on my phone.  I went to the earliest text

22   messages and I screenshot them one by one.

23   Q      Were you careful when you did that?

24   A      Very.

02:41PM 25   Q      Because you understood how important it was; right?
```

**UNITED STATES DISTRICT COURT**

# EXHIBIT 17

0525

0526



**CHASE** ○
JPMorgan Chase Bank, N.A.
P O Box 659754
San Antonio, TX 78265-9754

December 31, 2016 through January 31, 2017
Account Number: ███████7608

### CUSTOMER SERVICE INFORMATION

| | |
|---|---|
| Web site: | www.Chase.com |
| Service Center: | **1-877-425-8100** |
| Deaf and Hard of Hearing: | 1-800-242-7383 |
| Para Espanol: | 1-888-622-4273 |
| International Calls: | 1-713-262-1679 |

00059885 DRE 703 210 03217 NNNNNNNNNNN  1 000000000 60 0000
THE X-LAW GROUP, PC
IOLTA TRUST ACCOUNT
1910 W SUNSET BLVD STE 450
LOS ANGELES CA 90026-7118



---

## We changed how we explain ATM Withdrawal Limits

We revised the Deposit Account Agreement to change how we explain ATM withdrawal limits.

Below is the explanation provided in the Deposit Account Agreement for business accounts.

*Your ATM withdrawal limits may be different depending on which type of ATM you use:*

- *When you use a Staffed ATM, the following limitations apply and are separate from all other limits:*

  *Each cardholder can withdraw up to $3,000 each day from all linked accounts of each business. This separate limit does not apply to an Associate card.*

- *When you use an Enhanced ATM, the following limitations apply:*

  *All withdrawals made with any cardholder's ATM, debit or prepaid cards for the same business count toward every card's daily withdrawal limit.*

- *When you use non-Chase ATMs and Chase ATMs that are not Enhanced, you can withdraw up to the card's daily withdrawal limit. Withdrawals using other cards will not count towards that card's daily withdrawal limit.*

You can get the latest Deposit Account Agreement on chase.com, at a branch or by request when you call us. The parts of the Deposit Account Agreement that changed will be in the Change in Terms section.

If you have questions, please call the number on your statement.

## CHECKING SUMMARY | IOLTA Account



| | INSTANCES | AMOUNT |
|---|---|---|
| **Beginning Balance** | | |
| Deposits and Additions | | |
| Checks Paid | | |
| Electronic Withdrawals | | |
| Other Withdrawals | | |
| **Ending Balance** | | |
| | | |
| Interest Paid This Period | | |
| Interest Paid Year-to-Date | | |

Interest paid in 2016 for account ████████7608 was ████████

USAO_00265214

Exhibit 152
Page 1 of 4

0526
0527

# CHASE ◘

December 31, 2016 through January 31, 2017
Account Number:                    7608

## DEPOSITS AND ADDITIONS

| DATE | DESCRIPTION | AMOUNT |
|------|-------------|--------|
| 01/26 | Fedwire Credit Via: California Bank & Trust/122232109 B/O: State Bar of California Newport Beach CA 92660-7034 92660 Ref: Chase Nyc/Ctr/Bnf=The X-Law Group, PC IOLTA Trust Los Angeles, CA 9002 63262/Ac-000000007323 Rfb=21751607 Imad: 0126L4B74B1C000145 Trn: 3566609026Ff | 2,500,000.00 |
| Total Deposits and Additions | | |

## CHECKS PAID

| CHECK NO. | DESCRIPTION | DATE PAID | AMOUNT |
|-----------|-------------|-----------|--------|
| Total Checks Paid | | | |

If you see a description in the Checks Paid section, it means that we received only electronic information about the check, not the original or an image of the check. As a result, we're not able to return the check to you or show you an image.

^ An image of this check may be available for you to view on Chase.com.

## ELECTRONIC WITHDRAWALS

| DATE | DESCRIPTION | AMOUNT |
|------|-------------|--------|
| 01/26 | 01/26 Wire Transfer Via: Wells Fargo NA/121000248 A/C: Honda Aircraft Company, LLC Ref: Passport 420, LLC. Contract No. 4000316. Serial No. 42000029/Time/15:5 6 Imad: 0126B1Qgc08C031291 Trn: 4555400026Es | 2,500,000.00 |
| Total Electronic Withdrawals | | |

## OTHER WITHDRAWALS

| DATE | DESCRIPTION | AMOUNT |
|------|-------------|--------|
| Total Other Withdrawals | | |

## DAILY ENDING BALANCE

| DATE | AMOUNT |
|------|--------|
| 01/06 | |
| 01/09 | |
| 01/23 | |

USAO_00265215

Exhibit 152
Page 2 of 4

0527
0528

**CHASE** ◆

December 31, 2016 through January 31, 2017

Account Number: ▮▮▮▮7608

| DAILY ENDING BALANCE | *(continued)* |
| --- | --- |

| DATE | AMOUNT |
| --- | --- |
| 01/24 |  |
| 01/26 | |
| 01/30 | |
| 01/31 | |

**IN CASE OF ERRORS OR QUESTIONS ABOUT YOUR ELECTRONIC FUNDS TRANSFERS:** Call or write us at the phone number or address on the front of this statement (non-personal accounts contact Customer Service) if you think your statement or receipt is incorrect or if you need more information about a transfer listed on the statement or receipt. We must hear from you no later than 60 days after we sent you the FIRST statement on which the problem or error appeared. Be prepared to give us the following information:
- Your name and account number
- The dollar amount of the suspected error
- A description of the error or transfer you are unsure of, why you believe it is an error, or why you need more information.

We will investigate your complaint and will correct any error promptly. If we take more than 10 business days (or 20 business days for new accounts) to do this, we will credit your account for the amount you think is in error so that you will have use of the money during the time it takes us to complete our investigation.

**IN CASE OF ERRORS OR QUESTIONS ABOUT NON-ELECTRONIC TRANSACTIONS:** Contact the bank immediately if your statement is incorrect or if you need more information about any non-electronic transactions (checks or deposits) on this statement. If any such error appears, you must notify the bank in writing no later than 30 days after the statement was made available to you. For more complete details, see the Account Rules and Regulations or other applicable account agreement that governs your account.

 **JPMorgan Chase Bank, N.A. Member FDIC**

USAO_00265216

Exhibit 152
Page 3 of 4

0528
0529


**CHASE** ⬡

December 31, 2016 through January 31, 2017
Account Number:                    7608

This Page Intentionally Left Blank

USAO_00265217

Exhibit 152
Page 4 of 4

# EXHIBIT 18

1    **UNITED STATES DISTRICT COURT**

2    **CENTRAL DISTRICT OF CALIFORNIA - SOUTHERN DIVISION**

3    **HONORABLE JAMES V. SELNA, U.S. DISTRICT JUDGE**

4

5    UNITED STATES OF AMERICA,          )
                                        )
6                   Plaintiff,          )    **CERTIFIED TRANSCRIPT**
                                        )
7         vs.                           )    Case No.
                                        )    SACR-19-00061-JVS
8    MICHAEL JOHN AVENATTI,             )
                                        )    **TRIAL DAY 13**
9                   Defendant.          )    **VOLUME 2**
                                        )
10   ─────────────────────────────

11

12

13

14
                     REPORTER'S TRANSCRIPT OF PROCEEDINGS
15
                        TUESDAY, AUGUST 3, 2021
16
                              1:31 P.M.
17
                        SANTA ANA, CALIFORNIA
18

19

20

21

22

23   ────────────────────────────────────────────────

     **DEBBIE HINO-SPAAN, CSR 7953, CRR**
24   FEDERAL OFFICIAL COURT REPORTER
     411 WEST 4TH STREET, ROOM 1-053
25         SANTA ANA, CA 92701
           dhinospaan@yahoo.com

**UNITED STATES DISTRICT COURT**

```
            1              Ms. Gardner, you'll be excused at this time, but
            2    you're subject to recall.
            3              THE WITNESS:  Okay.
            4              THE COURT:  Thank you.  You may step down.
02:48PM     5              THE COURTROOM DEPUTY:  Please stand behind the court
            6    reporter and raise your right hand.
            7         FILIPPO MARCHINO, GOVERNMENT WITNESS, WAS SWORN
            8              MR. WYMAN:  For the record, Your Honor, the
            9    United States will call Filippo Marchino as a witness.
02:49PM    10              THE COURTROOM DEPUTY:  Sir, if you could please
           11    state and spell your first and last name.
           12              THE WITNESS:  My first name is Filippo.  It's
           13    F-i-l-i-p-p-o.  And my last name is Marchino, M-a-r-c-h-i-n-o.
           14              THE COURTROOM DEPUTY:  Thank you.
02:49PM    15                       DIRECT EXAMINATION
           16    BY MR. WYMAN:
           17    Q    Good afternoon, Mr. Marchino.
           18    A    Good afternoon.
           19    Q    Where do you live?
02:49PM    20    A    Los Angeles.
           21    Q    And what do you do for work?
           22    A    I'm an attorney.
           23    Q    What is the name of your law firm?
           24    A    It's called The X-Law Group, PC, which stands for
02:49PM    25    "professional corporation."
```

```
 1    percentage.  So it would be 30 percent, a third, 40 percent.

 2    It truly depends.  The costs are whatever they are, and they

 3    come out of the side of the plaintiff, or the client.

 4    Q    And the amount of the contingency fee, is that usually

 5    spelled out in the fee agreement?

 6               MR. AVENATTI:  Objection, Your Honor.  Lacks

 7    foundation.

 8               THE COURT:  Overruled.

 9               THE WITNESS:  It is.  It has to be, pursuant to

10    California State Bar rules.

11               MR. AVENATTI:  Move to strike, Your Honor.  Lacks

12    foundation.

13               THE COURT:  Denied.

14    Q    BY MR. WYMAN:  What was your understanding of what the

15    contingency fee percentage was in Ms. Gardner's case?

16    A    At the beginning, I was under the understanding it was

17    40 percent, because cases like that are typically signed up at

18    40 percent.  I later learned that it was actually a third.

19    Q    Did you have an agreement with the defendant about how

20    that contingency fee would be split between you and Eagan

21    Avenatti?

22    A    Yes.

23    Q    What was that agreement?

24    A    So for cases that were sourced by The X-Law Group -- and

25    there's a bit of a technical term, in a sense, of "source" --
```

**UNITED STATES DISTRICT COURT**

1    they were going to be split 50/50.

2    Q    And if you could explain briefly, what do you mean by

3    "sourced"?

4    A    So you can source a case directly, meaning I meet you at a

02:59PM 5    bar.  You tell me you were in a car accident.  I sign you up.

6    Or I can source it indirectly, which means I tell you that I

7    work with a firm.  You tell your buddy that was in the car

8    accident; he calls the firm directly.  So I indirectly sourced

9    it because it came through me, but the contact was direct with

02:59PM 10   the firm.

11   Q    I see.  Was Ms. Gardner's case one of the cases that was

12   sourced through you?

13   A    Indirectly so, yes.

14   Q    So for her case, you expected to receive half of the

02:59PM 15   contingency fee?

16   A    That's correct.

17   Q    When you were first hired by Ms. Gardner, I think you

18   said late 2016, where did you understand her to be living at

19   that time?

02:59PM 20   A    Well, nowhere.  She was living in a car.

21   Q    What, if anything, did you do to help her find a place to

22   stay?

23   A    I think my first contact with her was after she was -- she

24   retained the firm of Eagan Avenatti.  I was asked to find her a

03:00PM 25   place to stay, and we put her up at the Sofitel in L.A.

**UNITED STATES DISTRICT COURT**

61

|  | | |
|---|---|---|
| 1 | Q | BY MR. WYMAN:  Prior to March of 2019, did Ms. Gardner |
| 2 | | ever ask you for a copy of her settlement agreement? |
| 3 | A | Prior to when?  Sorry. |
| 4 | Q | March of 2019. |
| 03:27PM 5 | A | Not that I can recall. |
| 6 | Q | The understanding you were describing a minute ago of |
| 7 | | what the settlement agreement provided, was that based on the |
| 8 | | conversation you had with the defendant? |
| 9 | A | Yes. |
| 03:27PM 10 | Q | And you described the structure, as you called it.  At |
| 11 | | the end of January of 2017, were you aware that Mr. Whiteside |
| 12 | | had wired a total of $2.75 million of Ms. Gardner's settlement |
| 13 | | funds into an Eagan Avenatti trust account? |
| 14 | A | I was not. |
| 03:28PM 15 | Q | Does The X-Law Group maintain bank records with Chase |
| 16 | | Bank? |
| 17 | A | You mean bank accounts?  Yes. |
| 18 | Q | Yes.  Does that include attorney-client trust accounts? |
| 19 | A | Yes. |
| 03:28PM 20 | Q | Who has signatory authority over those bank accounts? |
| 21 | A | Only I do. |
| 22 | Q | Are you generally familiar with your firm's bank records |
| 23 | | and finances? |
| 24 | A | Yes.  I handle them.  Nobody else. |
| 03:28PM 25 | Q | Can you please take a look at Government's Exhibit 152. |

**UNITED STATES DISTRICT COURT**

62

```
 1   A     Okay.
 2   Q     Do you recognize this document?
 3   A     Yes.
 4   Q     What is it?
 5   A     It's a December 31st through -- sorry, December 31st,
 6   2016, through January 31st, 2017, statement from our IOLTA
 7   trust account.
 8   Q     When you say "our," who are you referring to?
 9   A     The X-Law Group.
10   Q     Is this an account that you control?
11   A     Yes.
12         COURT REPORTER:  I'm sorry.  Can you repeat the
13   question.
14         MR. WYMAN:  Sorry.
15   Q     Is this an account that you control?
16   A     Yes.
17   Q     Do you see that the statement has redactions throughout?
18   A     Yes.
19   Q     Other than these redactions, is this a fair and accurate
20   copy of a bank statement from one of the Chase Bank accounts
21   you control in the name of X-Law Group?
22   A     Yes.  Just one clarification.  It's an IOLTA trust
23   account; so it's not technically an account of The X-Law Group.
24   But yes.
25   Q     Thank you for the clarification.
```

03:29PM lines 5, 10, 15; 03:30PM lines 20, 25

**UNITED STATES DISTRICT COURT**

0536
0537

1    Is IOLTA a type of attorney-client trust account?

2  A    It is.  I think it stands for interest only lawyer trust

3  account or something along those lines.  But it basically means

4  that it's not the firm's money, it's the client's money.

03:30PM 5    MR. WYMAN:  Your Honor, at this time the Government

6  moves to admit 152.

7    MR. AVENATTI:  Your Honor, I move to strike the last

8  portion as nonresponsive to the question.

9    THE COURT:  Denied.

03:30PM 10    MR. AVENATTI:  And the objection, Your Honor, to 152

11 is hearsay.  There's no custodial declaration in connection

12 with this document.  Lack of foundation, authentication.

13    THE COURT:  I believe it's relevant.  The law firm

14 controlling the firm's finances is sufficient foundation and

03:31PM 15 sufficient basis for him to authenticate it.  152 will be

16 received.

17    MR. WYMAN:  Thank you.  If we can please publish

18 page 1.

19    **(Exhibit Number 152 received.)**

03:31PM 20 Q    BY MR. WYMAN:  On the top left there, what is the name of

21 this account?

22 A    It's The X-Law Group, PC, IOLTA trust account.

23 Q    I believe you said it when you were identifying the

24 document, but at the top right, what month does this statement

03:31PM 25 refer to?

UNITED STATES DISTRICT COURT

```
 1   A     December 31st, 2016, through January 31st, 2017.  So

 2   basically all of January 2017.

 3   Q     Please go to page 2 of the exhibit.  I'd like to direct

 4   your attention to the only unredacted line, under "Deposits and

 5   Additions."  Do you see that?

 6   A     I do.

 7   Q     Do you see a January 26 wire there?

 8   A     I do.

 9   Q     How much is that wire for -- I'm sorry -- deposit for?

10   A     It's $2 and a half million.

11   Q     Do you recall receiving that transfer?

12   A     I do.

13   Q     Who sent you that $2.5 million?

14   A     Well, I understood Mr. Avenatti, from the trust account to

15   Eagan Avenatti.

16   Q     Did the defendant tell you why he was wiring $2.5 million

17   into your IOLTA trust account?

18   A     Yes.

19   Q     What did he tell you?

20   A     That it was for the purchase of part of the -- part of one

21   of the Honda jets.

22   Q     What, if anything, did he tell you to do with that money?

23   A     Wire it to Honda.

24   Q     A little bit further down on the same page, do you see

25   the heading "Electronic Withdrawals"?
```

**UNITED STATES DISTRICT COURT**

```
 1    Q    Is that information that you provided when you initiated
 2    this wire transfer?
 3    A    I did.
 4    Q    Where did that information come from?
 5    A    It was e-mailed to me from Mr. Avenatti.
 6    Q    Can you please take a look at Government's Exhibit 153
 7    now.  Do you recognize this as an e-mail exchange between you
 8    and the defendant?
 9    A    Yes.
10    Q    Is it a fair and accurate copy of that e-mail exchange
11    with an attachment?
12    A    Yes.
13              MR. WYMAN:  The Government moves to admit
14    Exhibit 153.
15              MR. AVENATTI:  Objection, Your Honor.  Hearsay as to
16    the e-mail and the attachment.
17              THE COURT:  Mr. Avenatti's e-mail will be received
18    for the truth; Mr. Marchino's e-mail will be received just for
19    notice that Mr. Avenatti received it.
20              (Exhibit Number 153 received.)
21    Q    BY MR. WYMAN:  Focus on the first e-mail from the
22    defendant at the bottom.
23              MR. AVENATTI:  I'm sorry, Your Honor.  And the
24    attachment?
25              THE COURT:  The attachment appears to be part of
```

**UNITED STATES DISTRICT COURT**

```
 1   A     Honda Aircraft Company, LLC.

 2   Q     And then at the bottom of the top half, where it says

 3   "message to recipient," is that that same information there

 4   again?

 5   A     Yes.  It's the same one from the prior e-mail.

 6   Q     And on the bottom half, what is that information?

 7   A     It's the bank information of where the funds were sent to.

 8   Q     Based on what the defendant told you about this

 9   $2.5 million that he wired into your account, whose money did

10   you believe it was?

11   A     I believed it to belong to Mr. Bill Parrish, or William

12   Parrish.

13   Q     And who did you understand that to be?

14   A     Mr. Parrish is a longstanding client or was a longstanding

15   client of Eagan Avenatti.  They had done a case for him prior

16   to my time with Eagan Avenatti.

17   Q     And why did you understand that you were wiring

18   Mr. Parrish's money to Honda Aircraft?

19   A     Because that was the half of the plane that Mr. Parrish

20   was buying.  Mr. Avenatti and Mr. Parrish were buying it

21   together.  And I understood there could be a problem for

22   Mr. Avenatti to send the money directly, because he had already

23   paid his side, so Mr. Parrish's side had to come from a

24   different firm.

25   Q     And all of this understanding that you just described,
```

03:36PM (line 5)
03:37PM (line 10)
03:37PM (line 15)
03:37PM (line 20)
03:38PM (line 25)

**UNITED STATES DISTRICT COURT**

1    where did that come from?

2    A      From Mr. Avenatti.

3    Q      At the time that you received this wire from the

4    defendant on January 26, were you aware that he had received a

03:38PM 5    wire payment from Hassan Whiteside of $2.75 million the day

6    before?

7    A      I was not.

8    Q      Were you aware that prior to that transfer, the

9    defendant's account had only 23 cents in it?

03:38PM 10   A      I did not know that.

11   Q      Had you known those things, would you have sent the wire

12   of $2.5 million to Honda?

13              MR. AVENATTI:  Speculation, Your Honor.  Conjecture.

14              THE COURT:  Sustained.

03:38PM 15   Q      BY MR. WYMAN:  Mr. Marchino, did you ever receive the

16   portion of the settlement funds that was owed to The X-Law

17   Group under your agreement with the defendant on Ms. Gardner's

18   settlement?

19   A      No.  The costs and the fees were never paid.

03:39PM 20   Q      Let's start with the fees.  You said the fees were never

21   paid --

22   A      Correct.

23   Q      -- to The X-Law Group?

24   A      Correct.

03:39PM 25   Q      Did you ever ask the defendant about that?

**UNITED STATES DISTRICT COURT**

# EXHIBIT 19

0542

0543