CUAUHTEMOC ORTEGA (Bar No. 257443)
Federal Public Defender
ADITHYA MANI (Bar No. 301880)
(E-Mail: Adithya_Mani@fd.org)
Deputy Federal Public Defender
411 West Fourth Street, Suite 7110
Santa Ana, CA 92701
Telephone: (714) 338-4500
Facsimile: (714) 338-4520

MARGARET A. FARRAND (Bar No. 235295)
(E-Mail: Margaret_Farrand@fd.org)
Deputy Federal Public Defender
321 East 2nd Street
Los Angeles, California 90012-4202
Telephone: (213) 894-2854
Facsimile: (213) 894-0081

Attorneys for Defendant
MICHAEL J. AVENATTI

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

### SOUTHERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>MICHAEL J. AVENATTI,<br><br>Defendant. | Case No. 8:19-CR-61-JVS<br><br>**DEFENDANT'S SENTENCING MEMORANDUM AND OBJECTIONS TO REVISED PRESENTENCE REPORT**<br><br>**[Exhibits A-U, and under-seal Exhibit V, filed concurrently]**<br><br>**Hearing: May 27, 2025, 9:00 a.m.**<br>**Crtrm: 10C – Hon. James V. Selna** |

# TABLE OF CONTENTS

Page

I.   INTRODUCTION ................................................................. 1

II.  THE NATURE AND CIRCUMSTANCES OF THE OFFENSE AND THE
     HISTORY AND CHARACTERISTICS OF THE DEFENDANT ...................... 2

III. THE NEED TO AVOID UNWARRANTED SENTENCING DISPARITIES..... 7

IV.  THE ADVISORY GUIDELINES RANGE ............................................ 8

     A.   The Loss Calculation................................................. 9

     B.   The Obstruction of Justice Enhancement ............................ 13

          1.   The applicable legal standards......................... 13

          2.   The government's examples fail to satisfy § 3C1.1's
               requirements........................................ 14

               a.   Signature on settlement agreement in EA LLP bankruptcy.. 14

               b.   Testimony at March 15, 2019 judgment debtor
                    examination ........................................ 15

               c.   Testimony at March 22, 2019 judgment debtor
                    examination ........................................ 18

                    (1)  Alleged testimony that "the $1,600,000 from Brock
                         USA that was deposited into Avenatti's attorney
                         client trust account did not belong to Barela".......... 18

                    (2)  Alleged testimony that "Johnson's matter with the
                         County of Los Angeles had not been settled in its
                         entirety;" "the settlement agreement in the Johnson
                         matter was not the settlement agreement;" and "the
                         Johnson settlement agreement was confidential" ...... 19

                    (3)  Alleged testimony that Mr. Avenatti "had
                         'absolutely not' stolen Johnson's money;" "it was
                         'absolutely false' to say that, instead of paying
                         Johnson his settlement money, Avenatti had been
                         making small payments;" "Avenatti was sure he
                         gave Johnson a lump sum payment after the
                         $4,000,000 came in;" and "the monies paid to
                         Johnson over the years were 'an advance' on future
                         settlement monies", that payments to Johnson were
                         "an advance" on future settlement monies; and that
                         "it was "absolutely false" that Phan . . . had accused
                         [Mr. Avenatti of stealing her money" ...................... 22

               d.   Testimony at January 14, 2020 state bar hearing ................ 24

               e.   Conclusion: the testimony does not satisfy the
                    enhancement ....................................... 26

i

# TABLE OF CONTENTS

**Page**

C.    Enhancement for Fraud in Bankruptcy Proceedings ................................. 26

D.    Third Point For Acceptance of Responsibility ........................................... 28

V.    RESTITUTION ............................................................................................. 29

VI.    OBJECTIONS TO THE PRESENTENCE REPORT ........................................ 32

VII.    CONCLUSION ............................................................................................. 35

# TABLE OF AUTHORITIES

**Page**

**Federal Cases**

*United States v. Anderson,*
   741 F.3d 938 (9th Cir. 2013) ............................................................... 35

*United States v. Avenatti,*
   2024 WL 4553810 (9th Cir. Oct. 23, 2024) .......................................... 12, 13, 33

*Bronston v. United States,*
   409 U.S. 352 (1973) .................................................................... *passim*

*United States v. Burnett,*
   16 F.3d 358 (9th Cir. 1994) ................................................................. 13

*United States v. Castillo,*
   69 F.4th 648 (9th Cir. 2023) ................................................................ 10

*United States v. Castro-Ponce,*
   770 F.3d 819 (9th Cir. 2014) ............................................................... 13

*United States v. Harper,*
   32 F.3d 1387 (9th Cir. 1994) ................................................................. 9

*United States v. Hernandez,*
   894 F.3d 1104 (9th Cir. 2018) ............................................................. 29

*United States v. Herrera,*
   974 F.3d 1040 (9th Cir. 2020) ............................................................. 11

*United States v. Jones,*
   482 F. Supp. 3d 969 (N.D. Cal. 2020) .................................................... 2

*Lagos v. United States,*
   584 U.S. 577 (2018) ......................................................................... 30

*United States v. Lizarraras-Chacon,*
   14 F.4th 961 (9th Cir. 2021) ................................................................. 3

*United States v. Lofton,*
   905 F.2d 1315 (9th Cir. 1990) ......................................................... 13, 21

*United States v. Lonich,*
   23 F.4th 881 (9th Cir. 2022) ............................................................... 33

## TABLE OF AUTHORITIES

**Page**

*United States v. Margiotta*,
   475 F.Supp.3d 1152 (D. MT) ............................................................ 30

*United States v. Moran*,
   778 F.3d 942 (11th Cir. 2015) .......................................................... 35

*United States v. Narramore*,
   36 F.3d 845 (9th Cir. 1994) .............................................................. 28

*United States v. Pepper*,
   562 U.S. 476 (2011) ............................................................................ 3

*United States v. Pete*,
   819 F.3d 1121 (9th Cir. 2016) ............................................................ 3

*United States v. Pham*,
   545 F.3d 712 (9th Cir. 2008) .............................................................. 9

*Scherer v. FCA US, LLC*,
   565 F. Supp. 3d 1184 (S.D. Cal. 2021) ............................................ 27

*Shoshone Indian Tribe v. United States*,
   364 F.3d 1339 (2004) ........................................................................ 11

*United States v. Spano*,
   421 F.3d 599 (7th Cir. 2005) .............................................................. 9

*United States v. Tat*,
   97 F.4th 1155 (9th Cir. 2024) .......................................................... 32

*United States v. Tavberidze*,
   2025 WL 826917 (S.D.N.Y. March 14, 2025) .................................. 29

*Thompson v. United States*,
   604 U.S. ___145 S. Ct. 821, 829 (March 21, 2025) ..................... 13, 17

*United States v. Thompson*,
   792 F.3d 273 (2d Cir. 2015) ........................................................ 30, 31

*United States v. Trujillo*,
   713 F.3d 1003 (9th Cir. 2013) ............................................................ 2

*United States v. Villasenor-Cesar*,
   114 F.3d 970 (9th Cir. 1997) ............................................................ 28

iv

# TABLE OF AUTHORITIES

**Page**

**Federal Statutes and Guideline Provisions**

18 U.S.C. § 3553 .................................................................................7

18 U.S.C. § 3664 ...........................................................................30, 31

U.S.S.G. § 2B1.1 ........................................................................*passim*

U.S.S.G. § 3C1.1 ...........................................................8, 13, 14, 15

U.S.S.G. § 3E1.1 ..............................................................9, 28, 29

U.S.S.G. § 5G1.3(b)(1) .......................................................................2

**Other Authorities**

Black's Law Dictionary (11th ed. 2019) .............................................27

Brittny Mejia, *Interpreter Who Stole Millions From Shohei Ohtani Gets Nearly Five Years In Prison,* LOS ANGELES TIMES, Feb. 6, 2025 .................8

## I.    INTRODUCTION

> *[Michael] Avenatti has been a model inmate during his incarceration. He
> has maintained an unblemished disciplinary report. He has served as a
> suicide watch companion for approximately two years, thereby helping to
> ensure the health and safety of other inmates. He has also tutored other
> inmates as part of their efforts aimed at obtaining a GED and
> successfully re-entering the community. He has distinguished himself
> through his work in the library, where he has voluntarily assisted
> academically challenged inmates with legal matters. Avenatti is seen by
> many inmates as someone they can go to for help.*

(Exhibit I, BOP Individualized Needs Plan - Program Review, Nov. 3, 2024, at 3).

Michael Avenatti violated his duties towards his clients: something he deeply
regrets.[1] Since his 2022 original sentencing, he has lived every day of his incarceration
seeking to atone for the harm he caused and set his life on a different path. A recent
Bureau of Prisons ("BOP") report notes that he "has shown exceptional character,
growth, and capacity for change over the last three years," has "shown considerable
humility and patience, often under difficult circumstances," and "has consistently
demonstrated remorse and accountability for his crimes." (Ex. K, BOP Progress Report,
April 1, 2025, at 4.) In recognition of his trustworthiness, the BOP selected him as a
Suicide Watch Companion entrusted with fellow inmates' safety and wellbeing. He has
completed "hundreds of hours of classes and programs covering an array of subjects,"
regularly attended AA meetings and religious services, completed the BOP's 500-hour
Residential Drug Abuse Program ("RDAP"), served as a GED tutor for inmates, and
helped inmates plan for reentry. (*Id*.) He did these things without knowing whether this
Court, or any other, would ever reconsider his lengthy sentence. His actions

---

[1] As Mr. Avenatti stated in his August 12, 2022 apology letter to his clients and
as referenced in the BOP reports cited throughout this pleading, he continues to take
responsibility and feels deep remorse. (*See* Docket no. 1199, Revised Presentence
Report ("PSR") ¶ 117.) The defense asserts its factual objections and objections as to
the calculation of the Guidelines to propose accurate calculations and a sentence that is
sufficient but no greater than necessary to achieve the goals of sentencing.

1

demonstrate remorse, rehabilitation, and a strong desire to become a source of positive change.

Mr. Avenatti requests that the Court, after taking into account the Probation Office's Recommendation of 58 months (97 months, with credit for time already served), the revised Presentence Report, and Mr. Avenatti's additional arguments set forth below, sentence him to no more than 39 months: 78 months, the low-end of the Guideline range corresponding to offense level 27[2] and criminal history category II—minus the 39 months Mr. Avenatti will have served, as of his resentencing, for his conviction in *United States v. Clifford*, no. 1:19-CR-00374-001-JMF as a downward departure because that time will not be credited towards his sentence by the BOP, as noted by the Probation Office's recommendation. U.S.S.G. § 5G1.3(b)(1).[3]

## II.    THE NATURE AND CIRCUMSTANCES OF THE OFFENSE AND THE HISTORY AND CHARACTERISTICS OF THE DEFENDANT

"Post-sentencing rehabilitation is a "critical factor" in judging the reasonableness of a sentence under [18 U.S.C.] § 3553(a)." *United States v. Jones*, 482 F. Supp. 3d 969, 983 (N.D. Cal. 2020); *see also United States v. Trujillo*, 713 F.3d 1003, 1010 (9th Cir. 2013) ("In *Pepper* and *Gall*, the Supreme Court made clear that post-sentencing or post-offense rehabilitation—particularly in light of its tendency to reveal a defendant's likelihood of future criminal conduct—was a critical factor to

---

[2] Offense level 27 corresponds to any of the following: (1) the Court sustaining the defense's objection only as to one of the 2-level Guidelines enhancements objected to below (loss calculation, obstruction of justice, or misrepresentation in bankruptcy) and otherwise adopting the Probation Office's recommendations, including the recommended 6-level downward variance, (2) the Court adopting all of the PSR's calculations and applying an aggregate 8-level downward variance, comprised of the 4-level downward variance applied at the original sentencing and a further 4-level downward variance (instead of the 3 levels recommended by the Probation Office) to acknowledge Mr. Avenatti's significant post-sentencing rehabilitation, or (3) the Court sustaining the defense's objections totaling 7 levels, as detailed below, and applying a 1-level downward variance.

[3] The PSR correctly states that the time Mr. Avenatti will have served by the time of his resentencing will be 39 months and 20 days (PSR ¶ 325); however, the recommendation letter incorrectly states that time period as 39 months and 5 days. (Docket no. 1198 at 11.)

2

consider in the imposition of a sentence."); *United States v. Pepper*, 562 U.S. 476, 491
(2011) ("[P]ostsentencing rehabilitation may be highly relevant to several of the
§ 3553(a) factors.") When a defendant returns to district court for resentencing after
appeal, the district court must consider intervening events since the original sentencing
in arriving at the new sentence. *United States v. Pete*, 819 F.3d 1121, 1130 (9th Cir.
2016) ("[W]e have rejected the contention that at resentencing a district court should
not consider intervening events.") In particular, "a district court should consider how
the passage of time, including the defendant's maturation and personal development in
the interim, affect such sentencing factors as likelihood of rehabilitation and
recidivism." *Id.* at 1131; *see also United States v. Lizarraras-Chacon*, 14 F.4th 961,
967 (9th Cir. 2021) ("In a § 3553(a) factor analysis, [relevant] information should
include, where applicable, post-sentencing and post-offense rehabilitation.")

      At Mr. Avenatti's original sentencing on December 5, 2022 this Court, in
imposing a 4-level downward variance, stated that "Avenatti has done many noble and
good things in his life, some reflected in this case, but he has also done great evil for
which he must answer." (Docket no. 1072, sent. hrg. tx at 83:21-23.)  Hearing the Court
describe his actions as evil devastated Mr. Avenatti. But it also deepened his resolve to
change. Instead of allowing himself to be consumed by the shame of losing his legal
career, family and professional life, and public reputation, Mr. Avenatti harnessed that
devastation as a springboard for personal growth. Drawing upon the intelligence and
strong work ethic that have always propelled his achievements, he has returned to his
core purpose of using his talents to help others. Since February 2023 he has volunteered
and served as a Suicide Watch Companion: a highly-responsible position for which
inmates are selected based on their maturity, reliability, and credibility with inmates
and staff. In that position he is entrusted with monitoring inmates at risk of committing
suicide, and intervening in life-threatening situations. For his work with the Suicide
Watch program, Mr. Avenatti received a commendatory letter from Colette S. Peters,

3

then-Director of the Federal Bureau of Prisons, in March 2024, and a certificate

recognizing his "outstanding performance" in the Suicide Watch Companion program.

(Exhibit H, C. Peters Letter and Certificate.)

      Mr. Avenatti has also served as a resource for other inmates. In summarizing his

remorse, rehabilitation, and contributions, an April 1, 2025 BOP progress report says:[4]

> AVENATTI has shown exceptional character, growth, and capacity for
> change over the last three years. He has also shown considerable humility
> and patience, often under difficult circumstances. Importantly,
> AVENATTI has consistently demonstrated remorse and accountability
> for his crimes.
> AVENATTI has committed himself to self-improvement and
> rehabilitation as evidenced by his conduct while incarcerated. He has
> consistently worked towards self-development and personal growth
> through the completion of hundreds of hours of classes and programs
> covering an array of subjects; he has an extensive inmate transcript.
> AVENATTI has also regularly attended AA meetings in furtherance of
> his growth and rehabilitation. In addition, AVENATTI consistently
> attends religious services and participates in weekly religious studies as
> part of his commitment.
> AVENATTI'S dedication to his rehabilitation is further shown by his
> successful completion of the BOP's 500-hour Residential Drug Abuse
> Program (RDAP)… Following his completion of the program,
> AVENATTI participated in 12 months of additional institutional
> counseling as part of his treatment.
> AVENATTI has made many positive contributions while incarcerated.
> For instance, AVENATTI volunteered for and was selected as a Suicide
> Watch Companion for the BOP's critical Suicide Prevention Program,
> where he has served continually since February 2023. In this role,
> AVENATTI observes inmates placed on suicide watch and responds to
> potentially life-threatening emergencies for his fellow inmates at a
> precarious point in their lives, thereby helping to ensure their health and
> safety. Because of the sensitive nature of this work, BOP staff use
> considerable care to select suicide watch companions as explained in
> BOP Program Statement 5324.08 (Suicide Prevention Program).

---

[4] The "[u]nit team has observed and interacted with AVENATTI firsthand and on a frequent, regular basis during his incarceration, which began over three years ago. As a result, [the] unit team is familiar with his character as a person, work ethic, rehabilitation, programming, and interactions with staff and fellow inmates." (Ex. K, BOP Progress Report, April 1, 2025, at 3, "General Comments").

4

> Consistent with these requirements, inmates are selected based on their reputation within the institution, their maturity, reliability, and credibility with staff and inmates.
>
> AVENATTI has not only been dedicated to his own rehabilitation, but that of others as well. According to Education Department Staff, he has served as a tutor to inmates attempting to obtain their GED and has also routinely volunteered to assist other inmates attempting to better themselves and prepare for a successful re-entry into the community.
>
> AVENATTI has served as a mentor to younger inmates through his job and his participation in programming. Most recently, he assisted with the institution's 2025 job fair aimed at preparing inmates about to be released with the skills and training necessary for a positive re-entry into the community.
>
> AVENATTI has a BOP PATTERN recidivism risk of "MINIMUM," the lowest available. The BOP's PATTERN risk assessment tool is designed to predict whether an inmate will reoffend based on several characteristics or risk factors. AVENATTI has received a total of seven assessments during his incarceration over the last three years; he has always been scored "MINIMUM" - the best possible category.
>
> AVENATTI has maintained close relationships with his family and friends. He has expressed on many occasions his desire to be a dedicated father after his release from federal custody and do what he can to restore the trust of his children, especially that of his young son.

(Ex. K, BOP Progress Report, April 1, 2025, at 3-4.)

BOP Education Technician L. Sanchez, similarly, reports that "Mr. Avenatti is recognized by staff as someone who regularly goes the extra mile to do the right thing, and to educate and help others." (Ex. J, L. Sanchez Letter.) "He is seen as someone who genuinely cares for others and is interested in their success and rehabilitation, including by serving as a role model, leader, and mentor for younger inmates." (*Id.*) And he "shows an exceptional attitude towards work and a strong work ethic," "readily follows directives and guidance by staff, is respectful, and is open to feedback," and "has consistently shown humility, responsibility, and accountability." (*Id.*)

Mr. Avenatti's exceptional post-sentencing conduct reflects his lifelong focus on service. As discussed at his prior sentencing, Mr. Avenatti devoted a large part of his career to the public good. His prior sentencing submissions described his valuable

contributions to society and numerous public-interest-related legal cases he handled, including a $41 million jury verdict on behalf of defrauded investors in 2008, a $454 million jury verdict against the Kimberly Clark Corporation for sale of defective personal protective equipment in 2017, and, in 2014, an $80 million settlement on behalf of Jewish families for desecration of their deceased relatives' remains.[5] Mr. Avenatti also placed his personal safety at risk, and expended his own funds, to assist law enforcement in arresting and convicting notorious child sexual predator R. Kelly, and provided substantial assistance to the government in the prosecution against a Kimberly-Clark Corp. subsidiary relating to defective personal protective equipment. (Under-Seal Docket No. 1021, Defendant's Under-Seal Supplement to Sentencing Memorandum.)

The kindness and concern Mr. Avenatti showed through his public-interest work is further reflected in the letters of support from his family and friends, with whom he has remained close. (Ex. U.) His daughters know him as a "father who tells us he loves us just because," who "took us to plays and concerts, and always has encouraging words for us and coaches us through life's challenges." (*Id.* page 1.) His former wife admires him for his kindness and character, describing "the Michael I know" as someone who turned an "abusive and traumatic childhood" into "becoming a passionate advocate," "who loves his parents despite the history," "who helped me grieve and bury my mother" and "who checked in daily as I was battling cancer and cried out of fear that our girls would lose me." (*Id.* page 6.) Others describe him as "a loyal friend and like a brother," (*id.* page 7 (Jay Mannheimer); "a passionate advocate for the causes he believed in," (*id.* page 8 (Stephen J. Rodier, Jr.)), and a loving parent to his daughters. (*Id.* pages 9-10 (Michelle Rodier Greene)). The father of one of R. Kelly's victims recalls Mr. Avenatti as a "tenacious fighter and true advocate for the families and victims involved." (Under-Seal Ex. V.) And former pro-bono clients

---

[5] The facts in this sentence are drawn from Mr. Avenatti's prior sentencing position and exhibits filed before his first sentencing, at Docket nos. 1016 and 1016-1.

6

deported to South America recall Mr. Avenatti reuniting them with their children who had been separated from them and detained by American immigration authorities. (Ex. U, pages 20-23 (Lourdes de Leon, Elsa Ortiz Enriquez).)

Mr. Avenatti acknowledges that nothing can change how much he hurt the former clients he was entrusted to help.  Nothing can change the shame he still feels. But Mr. Avenatti has tried his best to show that his remorse and concern for others are real, not through his words, but through his actions while in custody.

### III.   THE NEED TO AVOID UNWARRANTED SENTENCING DISPARITIES

18 U.S.C. § 3553(a)(6) instructs courts to consider "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." This factor strongly favors the requested sentence here of 39 months: 78 months minus credit for time served on the *Clifford* case.

 Information from the United States Sentencing Commission's Judiciary Sentencing Information (JSIN)[6] shows the average sentence for defendants sentenced under U.S.S.G. § 2B1.1 with a final offense level of 29 and Criminal History Category of II—the same offense level and criminal history category applied by the Probation Officer after recommending a variance—from fiscal years 2019-2023, was 75 months, and the median was 81 months. (Ex. S, JSIN Data). Further, defendants in numerous similar fraud cases, involving comparable loss amounts, were sentenced to comparable terms under similar, or more egregious, circumstances than those here. A chart of comparable cases is set forth at Exhibit T (previously filed at Docket no. 1016-1).

In addition to those listed in Exhibit T, Mr. Avenatti directs the Court to two additional cases. First, in *United States v. Mizuhara*, C.D. Cal no. 8:24-cr-00054, the former interpreter for Major League Baseball star Shohei Ohtani stole $17 million from Mr. Ohtani to pay off his own gambling debts. The government said Mr. Mizuhara

---

[6] Available at https://jsin.ussc.gov/analytics/saw.dll?Dashboard

"exploited his position of trust as an advisor," "failed to report his ill-gotten gains as taxable income," (Ex. R, Press Release re *Mizuhara*) and "betrayed Mr. Ohtani's trust, causing him financial, reputational, and emotional harm." *United States v. Mizuhara*, C.D. Cal. no. 8:24-cr-0054, Dkt. no. 67 (Gov. Sentencing Position) at 9. The loss amount was approximately $17 million—an amount the sentencing judge called "shockingly high"[7]—and Mr. Mizuhara was sentenced to 57 months' imprisonment. Second, in *United States v. Terebelian*, 2:20-cr-579-SVW, defendant Marietta Terebelian was convicted of participating in a conspiracy to "defraud PPP lenders and the federal government of COVID-19 disaster relief funds and launder the resulting proceeds," including by falsifying personal identifiers to submit fraudulent applications for relief funds. *United States v. Terebelian*, C.D. Cal. case no. 2:20-cr-579-SVW, Docket 1147 at 2, 21. The government alleged that she and her co-conspirators "sought more than $20 million, and obtained more than $16 million, in fraudulent loans . . . intended to help small businesses" and their owners and employees. (*Id.* at 23-24.) The court sentenced Ms. Terebelian—who absconded and was sentenced in absentia—to 72 months' imprisonment. (*United States v. Terebelian*, C.D. Cal. case no. 2:20-cr-579-SVW, Docket 1147 at 2, 23-24; Docket 1186 (sentencing transcript).) These precedents support Mr. Avenatti's requested sentence here of no more than 78 months with a 39-month downward adjustment to account for the time served on the *Clifford* case.

## IV.   THE ADVISORY GUIDELINES RANGE

For the reasons set forth below, Mr. Avenatti objects to the Revised Presentence Report's loss calculation and imposition of an eighteen-level enhancement for loss (U.S.S.G. § 2B1.1(b)(1)(J)), application of the obstruction of justice enhancement (U.S.S.G. § 3C1.1), enhancement for misrepresentations in a bankruptcy proceeding

---

[7] Brittny Mejia, *Interpreter Who Stole Millions From Shohei Ohtani Gets Nearly Five Years In Prison,* LOS ANGELES TIMES, Feb. 6, 2025, *available at* https://www.latimes.com/california/story/2025-02-06/ippei-mizuhara-sentencing, (last visited May 5, 2025).

(U.S.S.G. § 2B1.1(b)(9)(B)), and the absence of a third point reduction for acceptance
of responsibility under U.S.S.G. § 3E1.1(b).

## A.    The Loss Calculation

The PSR assesses $6,750,161.58 in loss for an 18-level enhancement under
U.S.S.G. § 2B1.1(b)(1)(J):  $1,995,825 for Mr. Johnson, $1,528,288 for Ms. Gardner,
$598,887 for Mr. Barela, $2,329,661.58 for Ms. Phan, and $297,500 for Ms. Clifford.
(PSR ¶¶ 132-137.) Mr. Avenatti objects and submits that the loss is instead between
$1,500,000 and $3,500,000, for a 16-level enhancement. U.S.S.G. § 2B1.1(b)(1)(I).[8]

Mr. Avenatti objects to the PSR's inclusion in the loss and restitution
calculations of $2,329,661.58 attributable to Ms. Phan. (PSR ¶¶ 83, 102, 108, 135.) The
government has the burden to prove the loss amount by a preponderance of the
evidence. *United States v. Pham*, 545 F.3d 712, 720 (9th Cir. 2008). But it does not
meet that burden as to Ms. Phan because it has not proven (1) what the value was of
Em Cosmetics and the other assets Mr. Avenatti obtained for her;[9] or (2) that 7.5
percent of that value (to which he is entitled under the Ninth Circuit's opinion) is less
than the $4 million Mr. Avenatti did not send to Ms. Phan from Ipsy's cash buyback of
her stock and, if so, by how much. Without a showing that the attorney's fee is less than
the money Mr. Avenatti took from Ms. Phan's cash settlement, the government has
failed to prove that Ms. Phan sustained any loss under § 2B1.1. It has, in other words,
failed to prove that Ms. Phan was made "worse off" due to Mr. Avenatti's taking of the
$4 million from the cash portion of her settlement. *United States v. Spano*, 421 F.3d
599, 607 (7th Cir. 2005); *United States v. Harper*, 32 F.3d 1387, 1391 (9th Cir. 1994)

---

[8] The Second Addendum to the PSR, Docket no. 1200, states that Mr. Avenatti
"argue[d] in its submission to the probation officer "that the loss is between $3,500,000
and $9,500,000." Docket no. 1200 at 4. But Mr. Avenatti's submission merely said the
loss was "at most" in that range; it did not concede the amount was at least $3,500,000.

[9] The Second Addendum to the PSR lists numerous assets Mr. Avenatti obtained
for Ms. Phan, as shown by the contracts he negotiated with Ipsy on her behalf, which
were never valued by the government or accounted for in the loss analysis as to Ms.
Phan. *See* Docket no. 1200 at 10-11 (listing assets); Exs. B-G (Phan contracts).

("[A]ctual loss is a measure of what the victims of the fraud were actually relieved of.") Mr. Avenatti also obtained for Ms. Phan $22,271,179, beyond what her stock was worth (PSR ¶ 83 & n.17)—far more than the $4 million he kept from her settlement. Thus, under U.S.S.G. § 2B1.1, cmt. n.3(E)(i),[10] the value of the services Mr. Avenatti provided to Ms. Phan exceeds and thus negates any loss amount.

Mr. Avenatti also objects to the PSR's inclusion of $598,887 as to Mr. Barela. (PSR ¶¶ 68, 134.) Mr. Barela's testimony at trial showed Mr. Avenatti performed significant work for him beyond what was required by Mr. Avenatti's retainer agreement regarding the Brock U.S.A. matter, including: (1) work for Mr. Barela on a matter called *Carthey v. Pirch*, (Def. Tr. Ex. 1057; 8/5/21 pm tx at 22-23, 29-31), (2) litigation work for Mr. Barela involving the Oldcastle company (8/6/21 am tx at 86-87); (3) work for Mr. Barela's company Quix Supply (8/4/21 pm tx at 67; 8/5/21 pm tx at 33-34, 42; 8/6/21 am tx at 62-63, 65-75), and (4) work for Mr. Barela with the legal department at a company called Wirecard. (8/6/21 am tx at 63-64.)

Mr. Avenatti acknowledges that this work was not delineated in the scope of his written agreement with Mr. Barela. But that does not render it worthless. Further, neither § 2B1.1's text nor the offsets-against-loss rule of U.S.S.G. § 2B1.1, comment note 3(E)(i) expressly or actually limits the scope of offsetting services to those provided under the same contract giving rise to the offense. Rather, the Guideline defines "loss" as the "reasonably foreseeable pecuniary harm" from the offense, and requires that amount to be offset by "the fair market value of . . . the services rendered" to the victim by the defendant, cmt. n. 3(E)(i) without any requirement that those services be within the scope of any particular contract. *Cf. United States v. Castillo*, 69 F.4th 648, 658 (9th Cir. 2023) (when a Guideline's "plain text . . . unambiguously excludes" a modifying term, Guidelines commentary that adds back the omitted term is invalid.) To the contrary, the only qualification that comment note 3(E)(i) places on the

---

[10] In the 2024 version of the Guidelines Manual, note 3(E)(i) is redesignated as (3)(D)(i). Mr. Avenatti uses the original designation throughout this brief.

10

"services" the value of which must be offset against loss is a temporal one: the services must be rendered "before the offense was detected." U.S.S.G. § 2B1.1, cmt. n.3(E)(i). There is no additional requirement that the services be related to the fraud. "There exists a strong presumption that Congress expresses its intent through the language it chooses and that the choice of words in a statute is therefore deliberate and reflective." *Shoshone Indian Tribe v. United States*, 364 F.3d 1339, 1347 (2004) (cleaned up).[11] The commentary's unqualified plain language—requiring offsets for the value of "services rendered" to the victim by the defendant—therefore requires that the value of all "services" rendered by the defendant to the victim before detection of the offense must be included in the required offset. Because the value of the full scope of Mr. Avenatti's services to Mr. Barela was not determined or considered, the government has failed to prove $598,887 in loss as to Mr. Barela.

Mr. Avenatti objects on the same basis to the PSR's calculation of $1,528,288 in loss to Ms. Gardner. Ms. Gardner testified at trial that Mr. Avenatti performed substantial valuable services for her, outside the scope of his retainer agreement with her regarding her dispute with Mr. Whiteside. (7/30/21 pm tx at 12-13; Gov. Tr. Ex. 164.) Indeed, Ms. Gardner agreed at trial that she had asked Mr. Avenatti "to assist [her] with a number of things that had nothing to do with Mr. Whiteside during [the time of the offense in this case]." (8/3/21 pm tx at 17.) Because the value of these services is not accounted for, the government's $1,528,288 loss figure for Mr. Gardner is likewise inadequately supported, and the government has failed to meet its burden.

Finally, Mr. Avenatti objects to the PSR's inclusion of $297,500 in loss as to Ms. Clifford. Ms. Clifford's trial established that Mr. Avenatti rendered extensive legal services to her in the course of his representation that were not accounted for in her loss calculation. As Mr. Avenatti's appellate brief in Ms. Clifford's case explained, an accounting introduced at trial showed that, during the relevant time period, four

---

[11] Ordinary principles of statutory interpretation apply equally to Guidelines text. *United States v. Herrera*, 974 F.3d 1040, 1047 (9th Cir. 2020).

attorneys of Mr. Avenatti's firm worked 2,381 hours on 10 matters for her, totaling $1,638,390 at standard hourly rates, and the firm incurred $635,434.18 of out-of-pocket expenses. *See United States v. Avenatti*, Second Cir. case no. 22-1242, Dkt. no. 59, Appellant's Opening Brief, at 64.[12] The brief also describes additional services including reviewing contracts, negotiating a book deal, setting up interviews, writing the book's foreword, reviewing the book and epilogue, and communicating with Ms. Clifford's publisher and agent. (*Id.*) Because the PSR's loss calculation does not consider or value these services, the $297,500 amount is inadequately supported.

Finally, Mr. Avenatti objects to the PSR's decision not to deduct from the loss amount the payments Mr. Avenatti made to and on behalf of his clients before the misappropriation of their settlement proceeds. (*See* PSR ¶ 52 & n.11 (not deducting from the Johnson loss amount $607,454.90 in payments to care facilities on the basis that those payments were made before the fraud and thus not "returned" to Mr. Johnson); ¶ 60 (not deducting from the Gardner loss amount $6,067.62 in hotel and Airbnb payments, or $103,870 in rent payments, because those amounts were paid before Avenatti's receipt of the settlement funds)). Mr. Avenatti acknowledges that the Ninth Circuit's opinion stated that "[t]he district court did not err in declining to credit payments Avenatti made *before* the misappropriation because those were not funds embezzled and subsequently "returned" to the victims." *United States v. Avenatti*, 2024 WL 4553810 at *2 (9th Cir. Oct. 23, 2024). But even if not credited under comment note 3(E)(i) as amounts "returned," those amounts still should not have been included in "loss" in the first place (regardless of offsets against loss), because they were not amounts of money that the clients forwent as a result of Mr. Avenatti's representation; on the contrary, they received those amounts.

For the foregoing reasons, Mr. Avenatti submits that the correct loss amount is $1,500,000-$3,500,000, for a 16-level enhancement under U.S.S.G. § 2B1.1(b)(1)(I).

---

[12] This accounting is discussed and set forth in the Second Circuit record at 1A.191, 2A.305-06, 3A.658-660 (GX 2). *United States v. Avenatti*, 2d Cir. no. 22-1242.

**B.   The Obstruction of Justice Enhancement**

The Revised Presentence Report applies the obstruction of justice enhancement under U.S.S.G. § 3C1.1 based on allegedly-perjured testimony in judgment debtor exams, bankruptcy proceedings, and other proceedings, as well as an alleged forgery in a bankruptcy proceeding that predated the investigation in this case. (PSR ¶¶ 158-67.) None of these statements justifies imposition of the enhancement.

**1.   The applicable legal standards**

When, as here, the government attempts to predicate the obstruction of justice enhancement on alleged perjury in other proceedings, the court must explicitly find the testimony was (1) false, (2) willful, and (3) material. *United States v. Castro-Ponce*, 770 F.3d 819, 823 (9th Cir. 2014). The government must prove each requirement by a preponderance. *United States v. Burnett*, 16 F.3d 358, 361 (9th Cir. 1994).

For the government to show a statement is "false" and thus perjurious, it is not enough to that the statement was merely misleading or incomplete. It is not perjury "for a witness to willfully state any material matter that *implies* any material matter that he does not believe to be true." *Bronston v. United States*, 409 U.S. 352, 357-58 (1973); *see also Thompson v. United States*, 604 U.S. __; 145 S. Ct. 821, 829 (March 21, 2025) (under federal statute prohibiting "false" statements, "it is not enough that a statement is misleading"). Nor is it sufficient for a statement to be unresponsive to the question. *Bronson,* 409 U.S. at 358.

To satisfy the requirement that the statement be "willful," the government must show "the defendant consciously act[ed] with the *purpose* of obstructing justice." *United States v. Lofton*, 905 F.2d 1315, 1316-17 (9th Cir. 1990) (cleaned up).

Finally, to satisfy the requirement that the statement be "material," "[b]ecause the perjury occurred outside of Avenatti's trial, [the government must show that] the falsehoods [were] material to the separate underlying proceeding as well as to this proceeding." *United States v. Avenatti*, 2024 WL 4553810 at *1 (9th Cir. Oct. 23, 2024)

13

(cleaned up.) As to each of those proceedings, the testimony must "tend to influence or affect the issue under determination." U.S.S.G. § 3C1.1, cmt. n.6.

**2.    The government's examples fail to satisfy § 3C1.1's requirements**

The testimony and conduct on which the PSR bases the obstruction-of-justice argument fails to satisfy the enhancement's requirements that it be objectively false, willful, or material to this case or to the separate proceedings in which the statements were made.

**a.    Signature on settlement agreement in EA LLP bankruptcy**

The PSR concludes the obstruction of justice enhancement is warranted based on, *inter alia*, Mr. Avenatti's alleged forgery of the signature of his law partner, Michael Eagan, on a settlement agreement to be used as part of the stipulation to dismiss the EA LLP bankruptcy proceedings. (PSR ¶ 166.) For this proposition, the PSR relies on application Note 4(C) to U.S.S.G. §3C1.1, which provides an enhancement for "producing or attempting to produce a false, altered, or counterfeit document or record during an official investigation or judicial proceeding." (*Id.*)

Any such forgery fails to support the enhancement, because the government cannot show by a preponderance of the evidence that it was made "with respect to the investigation, prosecution, or sentencing of the instant offense of conviction" or "related to (A) the defendant's offense of conviction and any relevant conduct; or (B) a closely related offense," as Guideline 3C1.1 requires. U.S.S.G. § 3C1.1. It was also not shown to be material to this case.

The alleged forgery occurred in December 2017 or January 2018, to dismiss the bankruptcy case: the signatures are dated December 12, 2017, and the document was filed in the bankruptcy case on January 30, 2018. (Ex. L [Gov Tr. Ex. 342], at page 56-57 of 67.) No evidence suggests dismissing the EA bankruptcy case had any relation to the investigation, prosecution, or sentencing for the offenses at issue in *this* case. Nor did any evidence indicate that the bankruptcy case's dismissal bore on the investigation, prosecution, or sentencing of the offenses to which Avenatti pled guilty.

14

1    The PSR merely says a forgery occurred to obtain the dismissal, period. (PSR ¶ 166.)

2           Nor was the alleged forgery shown to harbor the necessary mens rea or

3    likelihood of obstruction. To qualify for the enhancement, conduct occurring before the

4    start of the investigation into the offenses of conviction must have been "purposefully

5    calculated, and likely, to thwart th[ose offenses'] investigation or prosecution."

6    U.S.S.G. § 3C1.1, cmt. n.1. Here, Mr. Avenatti's alleged forgery occurred before the

7    start of the investigation into this case because the forgery occurred in December 2017

8    or January 2018 at the latest—well before much of the conduct at issue in this case had

9    even occurred, and before any evidence suggests the government had begun

10   investigating it. Indeed, a book by a Department of Justice official, Geoffrey Berman,

11   identifies March 2018 as the beginning of the investigation into Avenatti's instant

12   offenses: two months *after* the January 30, 2018 filing of the allegedly forged

13   settlement agreement. (Ex. Q (excerpt from Geoffrey Berman book, "Holding the

14   Line," stating that, as of Avenatti's March 2019 arrest in the Nike case, California

15   authorities "were a year into" the investigation in this case, placing the start of the

16   investigation in this case in March 2018).) Avenatti's alleged December-2017-or-

17   January-2018 forgery thus preceded the start of the investigation of this case by at least

18   two months (January 2018 to March 2018). No evidence suggests that any such pre-

19   investigation forgery was "purposefully calculated, [or] likely," to thwart the not-yet-

20   commenced investigation or prosecution of the offenses at issue here.

21          **b.    Testimony at March 15, 2019 judgment debtor examination**

22          The PSR states that "[d]uring a judgment-debtor examination ("JDE") on March

23   15, 2022, [13] Avenatti testified that, to the best of his knowledge, Johnson was paid all

24   the money he was owed and neither Avenatti nor his firm had any current obligation to

25   make payments to Johnson. (Gov. Tr. Ex. 404 at 12-14)." (PSR ¶ 161.)

26

27   ─────────────

28          [13] The PSR incorrectly lists the dates of the judgment debtor examinations as
     2022 instead of 2019; Mr. Avenatti objects to the 2022 date. (PSR ¶¶ 161, 162.)

                                              15

But the PSR's description of Mr. Avenatti's testimony is incorrect. Mr. Avenatti did not testify that Mr. Johnson had been "paid all the money he was owed," or that "neither Avenatti nor his firm had any current obligation to make payments to Johnson." Instead Mr. Avenatti testified that, "to the best of [his] knowledge," there was "no reason for [him (Mr. Avenatti)] to be paying Mr. Johnson on an ongoing basis," and that, "to the best of [his] knowledge," neither he nor his law firms had "any current obligation to make payments to Mr. Johnson."

The specific testimony Mr. Avenatti gave is:

Q: "So there is no reason for you to be paying Mr. Johnson on an ongoing basis?"
. . . [attorney-client privilege objection is made and denied]
A: "To the best of my knowledge, yes."

(Ex. M [Gov. Tr. Exh. 404 at pages 11-13 of 18].)

Mr. Avenatti's answer, "[t]o the best of my knowledge, yes," was not false—and certainly it was not *literally* false as required by *Bronson*, 409 U.S. at 357. For one thing, the answer is either unresponsive or ambiguous: it is not clear whether, by "yes," Mr. Avenatti meant that "yes" there *was*, in fact, a reason for him to be paying Mr. Johnson on an ongoing basis, or "yes," the question was correct that there was *no* such reason. But even putting aside that ambiguity and assuming the latter interpretation, Mr. Avenatti's testimony that he did not know of any reason for him to be paying Mr. Johnson on an ongoing basis, as of the time of his 2019 testimony, was not false. That Mr. Avenatti had previously misappropriated settlement money from Mr. Johnson in 2015 did not create a reason for him—as of the time of his testimony—to be paying Mr. Johnson on an ongoing basis (regardless of whether it created an obligation to pay Johnson a single lump sum of the amount taken). Mr. Avenatti had an obligation to pay Mr. Johnson the proceeds Mr. Johnson was due under his settlement, but not a continuing obligation to pay him "ongoing" or regular payments generally. Thus, Mr. Avenatti's testimony was literally true. Certainly, the evidence fails to show that Mr.

16

Avenatti intentionally or willfully misrepresented the truth by saying there was no reason for ongoing payments to Johnson.

> Q: "Mr. Avenatti, do you or your law firms have any current obligation to make payments to Mr. Johnson?"
> A: "To the best of my knowledge, no."

(Ex. M [Gov. Tr. Exh. 404 at page 14 of 18].) This, too, was literally true. Mr. Avenatti had no current obligation to make "payments" to Mr. Johnson; he had only his preexisting obligation to pay Mr. Johnson the settlement money that the County of Los Angeles had remitted to Johnson. The question asked whether an ongoing stream of payments was required, and it was true that no such ongoing series of payments was required. Even if this was misleading (because Mr. Avenatti had an obligation to pay Mr. Johnson some amount, though not in the form of multiple "payments"), "misleading" is not the same thing as "false" and cannot qualify as false in the context of perjury. *Thompson*, 145 U.S. at 829; *Bronson*, 409 U.S. at 357-58.

Even assuming the testimony was false (which it is not), the evidence also fails to show by a preponderance that Mr. Avenatti willfully misrepresented the truth, or that the testimony was material to this proceeding or the underlying proceeding. By the time of his March 2019 testimony, Mr. Avenatti had been paying for Mr. Johnson's living expenses at care facilities since approximately 2012, and making additional periodic payments to Mr. Johnson for approximately four years. (PSR ¶¶ 46, 48, 50(a); 7/22/21 am tx at 86-111.) Mr. Avenatti may reasonably have believed that he had, by the time of his testimony in March 2019, paid Mr. Johnson all the money Mr. Johnson had ever been due from his settlement, and no more was owed. Nothing suggests Mr. Avenatti had reviewed financial records before his testimony, so as to refresh his recollection on that point. Certainly, no evidence established that—as of March 2019—Mr. Avenatti knew the precise amounts of the payments he had made to Johnson, knew those payments did not amount to the sum Mr. Johnson had been due from his settlement, and intentionally and willfully misrepresented that fact to the court. Indeed, Mr.

Avenatti gave his answer only "to the best of [his] knowledge." (Ex. M at page 14 of 18.) And because the testimony was equivocal and uncertain, it was not material to either the underlying proceeding or this proceeding.

### c.   Testimony at March 22, 2019 judgment debtor examination

The PSR also cites Mr. Avenatti's testimony at another JDE on March 22, 2019, saying that in that proceeding "Avenatti falsely testified that: (a) the $1,600,000 from Brock USA that was deposited into Avenatti's attorney client trust account did not belong to Barela; (b) Johnson's matter with the County of Los Angeles had not been settled in its entirety; (c) the settlement agreement in the Johnson matter was not the settlement agreement; (d) the Johnson settlement agreement was confidential; (e) he had 'absolutely not' stolen Johnson's money; (f) it was 'absolutely false' to say that, instead of paying Johnson his settlement money, Avenatti had been making small payments; (g) Avenatti was sure he gave Johnson a lump sum payment after the $4,000,000 came in; (h) the monies paid to Johnson over the years were "an advance" on future settlement monies; and (i) it was 'absolutely false' that Phan, like Barela, had accused him of stealing her money. (Gov. Tr. Exs 405 at 8-26; 406.)." (PSR ¶ 162.) As explained below, these descriptions of Mr. Avenatti's testimony are either incorrect or fail to meet the threshold required for the obstruction of justice enhancement.

### (1)   Alleged testimony that "the $1,600,000 from Brock USA that was deposited into Avenatti's attorney client trust account did not belong to Barela"

Contrary to the PSR's description, Mr. Avenatti did not testify that "the $1,600,000 from Brock USA that was deposited into Avenatti's attorney client trust account did not belong to Barela." His actual testimony was as follows:

> Q: "I intend to ask Mr. Avenatti if the money he received from Brock is money that belongs to Mr. Barela."
> A: "No."

(Ex. N [Gov. Tr. Exh. 405 at page 9 of 27].) It is not even clear that Mr. Avenatti was asked a question here. Immediately before Mr. Avenatti says "no," the questioning

18

attorney appears to tell a third party—likely the court or opposing counsel—what he "intend[s]" to ask Mr. Avenatti, but does not actually pose any question directly to Mr. Avenatti. In this context, Mr. Avenatti's statement, "no" does not clearly respond to any question, is unresponsive, has no intelligible meaning, and is not false, willful, or material to the underlying proceeding or this proceeding. *Bronson*, 409 U.S. at 357-58.

> **(2)** **Alleged testimony that "Johnson's matter with the County of Los Angeles had not been settled in its entirety;" "the settlement agreement in the Johnson matter was not the settlement agreement;" and "the Johnson settlement agreement was confidential"**

Mr. Avenatti also did not unequivocally testify that Mr. Johnson's case was not fully settled, or that the settlement agreement "was not the settlement agreement" or "was confidential," and his statements about the settlement—even assuming they were false—were not shown to be willfully so, made for the purpose of obstructing justice, or material. The relevant testimony was as follows (emphasis added in all instances):

> Q: "Now, ultimately, that's a case that you settled for Mr. Johnson, correct?"
> A: "*I don't believe so, in its entirety, no.*"
> . . .
> Q: "This was a public settlement because it was done between the County of Los Angeles and Mr. Johnson, correct?"
> A: "*I don't think that's true, but it may have been. I don't know.*"

(Ex. N [Gov. Tr. Exh. 405 at page 12 of 27]) (emphasis added). Mr. Avenatti's answers to these questions are equivocal and claim lack of certainty as to whether Mr. Johnson's case was settled in its entirety, and whether or not any settlement was public. Mr. Avenatti's testimony that he did not believe the case was completely settled expresses only a state of mind or belief, not a claim as to whether or not the case actually was completely settled. And his statement that he did not "think" the settlement was public was similarly subjective. Indeed, he expressly allowed for the possibility that it could be "true" that the settlement was public. The statements are not false; certainly, they do not show willful or intentional misrepresentations for the purpose of obstructing justice.

19

1  Nor are they material to the underlying proceeding or this proceeding.

2      Mr. Avenatti's testimony then continued as follows:

3  Q: "Well, I've got the settlement agreement, so let's take a look. It's marked as
4  Exhibit 60. There's no confidentiality provisions in this settlement, as I read it.
   A: (Reviewing document). "Yeah, *this is not the entire settlement*."
5  Q: "I understand. The settlement is not confidential?"
6  A: "*No. It is confidential, actually. What I'm saying is that's not the entire
   settlement agreement*."
7  Q: That's fine. Your honor, I'm going to publish the settlement agreement that I
8  have that says it's the entire settlement agreement, and it is signed by Mr.
   Avenatti. It has no confidentiality clause."
9  A: "Your honor, the settlement—*portions of the settlement were confidential.
10 That's not the entire settlement agreement.*
   The Court: "This is the settlement agreement with the county, and that's not
11 confidential, right? So you're—"
12 A: "No, *I believe it is confidential, your honor. And without having the ability to
   review my documents, then I—then I would ask that this be handled in a closed*
13 *door session,* just like everything else. . . .
14 Q: "Well, in the Court's experience, the county typically would not enter into
   confidential settlement agreements."
15 A: ". . . I'm just telling you that *I believe that the terms of the settlement are
   confidential*, and out of abundance of caution, we ought to handle it like we've
16 done the other settlement agreements and do it in a closed-door session."
17 Q: "What basis do you have when the terms of the settlement are in Mr. Stolper's
   hands and they don't include a confidentiality provision?"
18 A: "*Because I don't believe those are the entirety of the terms of the settlement,
19 your Honor. I believe that there is a side letter or a further document that
   constitutes the confidential nature of the settlement,* and so out of an abundance
20 of caution, it should be handled in a closed-door proceeding, just like the other
21 settlements were."
22 . . .
   Q: "Did you sign a settlement agreement in the course of the representation of
23 Mr. Johnson?"
24 A: "No, if I'm understanding your question."
   Q: "Mr. Avenatti—this says, this document is entitled settlement agreement and
25 release of all claims, correct?"
26 A: "Sir, the document is titled whatever it is."
   Q: "Okay, and you signed this document, did you not, sir?"
27 A: "*Sir, I don't know where this document came from, and so . . . I don't know on
28 the preceding pages, whether it's accurate or not, okay? I saw the signature*

*page, but I don't know what the other pages are that go with it."*
Q: "Take a look."
A: "*Well, sir, you can—yeah. Yeah I don't—I don't believe this is an accurate
copy of the settlement agreement."*
Q: "What's inaccurate about it?"
A: "*My recollection is that the settlement agreement is not that document."*

(Ex. N [Gov. Tr. Exh. 405 at pages 12-15]) (emphasis added).

Again, this testimony is not false, willful, or material to the underlying proceeding or this proceeding because it is equivocal and expresses lack of knowledge or certainty as to various matters: specifically, whether the settlement agreement being shown to Mr. Avenatti in court is the entire—or accurate—Johnson settlement agreement, whether the entire agreement or part of it is confidential, and whether there is a "side letter or further document" that accompanies the settlement document Mr. Avenatti is being shown in court during his testimony. Mr. Avenatti testifies that he is unsure; not that the document he is being shown definitively is or is not the Johnson settlement agreement. Moreover, even if Mr. Avenatti had testified definitively that the document being shown to him in court was not the correct Johnson agreement, it is not possible to determine whether that statement is false because it is not clear from the record what document Mr. Avenatti was being shown, or whether that document was—in fact—the Johnson settlement agreement or the entire Johnson settlement agreement. Without seeing the document Mr. Avenatti was being handed during his testimony, the Court cannot conclude he was testifying falsely or without a good-faith belief that the document was not the true settlement. *Bronson*, 409 U.S. at 357-58.

Nor does the evidence establish that Mr. Avenatti is willfully lying about the settlement for the purpose of obstructing justice. *Lofton*, 905 U.S. at 1316-17. He says he "believe[s]" the settlement is confidential, that there is more to the document, and that he has not been able to "review my documents" to determine whether or not there are more pages. Nothing suggests his underlying concern is to obstruct justice; rather, he expresses a desire to discuss the settlement in a "closed door session" and directs his

21

comments about the settlement's completeness or confidentiality to that goal. This
vague and qualified testimony fails to meet *Bronson*'s heightened standard of falsity
needed for perjury, or the willfulness or materiality required by the obstruction of
justice enhancement.

> **(3)    Alleged testimony that Mr. Avenatti "had 'absolutely
> not' stolen Johnson's money;" "it was 'absolutely
> false' to say that, instead of paying Johnson his
> settlement money, Avenatti had been making small
> payments;" "Avenatti was sure he gave Johnson a
> lump sum payment after the $4,000,000 came in;" and
> "the monies paid to Johnson over the years were 'an
> advance' on future settlement monies", that payments
> to Johnson were "an advance" on future settlement
> monies; and that "it was "absolutely false" that Phan .
> . . had accused [Mr. Avenatti of stealing her money"**

Finally, the evidence does not establish that Mr. Avenatti willfully gave false
testimony about stealing money from Mr. Johnson or being accused by Ms. Phan. The
testimony referenced by the government was as follows:

> Q: (By Mr. Stolper): "Mr. Avenatti, did you steal Mr. Johnson's money?"
> The Court: "It's a yes or no question."
> A: "*Absolutely not.*"
> The Court: "Okay."
> Q: (By Mr. Stolper): "Mr. Avenatti, isn't it true that beginning in July of 2015,
> rather than pay Mr. Johnson his share of the $4 million that he was entitled to,
> instead, you've been doling out small payments each month to him? Isn't that
> true?"
> A: "*That's absolutely false.*"
> . . .

(Ex. N [Gov. Tr. Exh. 405 at page 19 of 27]) (emphasis added).

Mr. Avenatti could have believed—by the time of his testimony in March
2019— that he did not steal Mr. Johnson's money because he had already paid Mr.
Johnson all the money Mr. Johnson was entitled to obtain under his settlement
agreement. It is undisputed that Mr. Avenatti was entitled to retain, from Mr. Johnson's

22

settlement, a contingency fee of $1,600,000, that Mr. Avenatti calculated "costs" in
2015 of $736,883.89 and $2,776.43 that he had paid for Mr. Johnson's care and lodging
since approximately 2012 (though the PSR indicates the care costs were not
reimbursable under the fee agreement), and that Mr. Avenatti paid, between 2015 and
2019, an additional $283,070 to Mr. Johnson. (PSR ¶ 52.)  Those amounts total
$2,622,730.30 out of a $4 million settlement. Even if the costs Mr. Avenatti had
calculated in 2015 were not all reimbursable to Mr. Avenatti (*i.e.* the care home
expenses), Mr. Avenatti could have believed they were reimbursable at the time of his
testimony. He was being asked the question out of the blue, four years after he had
obtained the settlement agreement for Mr. Johnson and many years after he had begun
paying for Mr. Johnson's care in approximately 2012. It cannot be determined on a
preponderance of the evidence that Mr. Avenatti willfully lied about not having stolen
Mr. Johnson's money—rather than honestly believing he had paid Mr. Johnson the
money he was due, or at least had not "stolen" Johnson's money but paid it out to him
over time. Nor were these statements material to the current proceeding or the
underlying proceeding.

      Avenatti also did not testify that he was "sure he gave Johnson a lump sum
payment after the $4,000,000 came in;" as the PSR states. (PSR ¶ 162(g).) Rather, he
testified that he did not recall, but was sure that "we"—that is, not necessarily himself
personally but some group that included himself— had done so:

> Q: "Did you ever make a lump sum payment to Mr. Johnson that reflects the
> amount he was due out of his $4 million settlement, besides these $1,900
> monthly payments you've been sending him?"
> A: *"Without looking at the documents, I don't recall*. I'm sure we did."

(Ex. N [Gov. Tr. Exh. 405 at page 22 of 27]) (emphasis added). The crux of this
testimony is that Mr. Avenatti did not personally recall whether or not such a lump sum
payment was made, but he was sure that "we"—presumably, his law firm—had. That is
not an unequivocal statement that a lump sum had or had not been paid; at most, it was
a statement that Mr. Avenatti was not sure but believed his law firm had made such a

23

payment. It is unclear whether, in March 2019, he knew that no lump sum payment had

been made to Mr. Johnson by any party. It was not proved false, willful, or material.

> Q: "So this is money that was coming out of an Eagan Avenatti bank account.
> It's central to the judgment debtor exam. And the explanation that it's going out
> of the account because there's an attorney-client relationship doesn't explain why
> money is going from the attorney to the client. So the rationale for the payment
> does not appear privileged to the court."
> A: "It's an advance on future settlement monies, your honor."

(Ex. N [Gov. Tr. Exh. 405 at page 25 of 27]. Mr. Avenatti's statement "It's an advance

on future settlement monies" does not respond to any question, and it is unclear what is

being discussed or what the statement refers to in this out-of-context excerpt. The

statement has not been proven false, willful, or material.

> Q: "And Michelle Phan, like Mr. Barela, has accused you of stealing, in her case,
> $4 million, correct?"
> A: "That's absolutely false."

(Ex. N [Gov. Tr. Exh. 405, at page 26 of 27].) This statement has not been shown to be

false, willful, or material. Long Tran testified that he filed a police report in Fall 2018,

(8/10/21 am tx at 44), but not that the report accused Mr. Avenatti of stealing $4

million or that Ms. Phan was a party to that report; nor did anything suggest Mr.

Avenatti knew of the report as of his March 2019 testimony. Though Ms. Phan testified

she "brought it to the police" at some point, (8/12/21 am tx at 51), nothing indicated

when, whether she referenced $4 million, or whether Mr. Avenatti was aware of it.

### d.    Testimony at January 14, 2020 state bar hearing

The PSR also states that "[d]uring Avenatti's state bar disciplinary hearing on

January 14, 2020 . . . when the judge asked Avenatti whether he had informed Barela of

the $1,600,000 in settlement funds, Avenatti: (a) falsely stated 'Mr. Barela was fully

informed of the receipt of those monies' (b) falsely claimed that it was Barela who was

lying when he said he had not been notified of the $1,600,000 settlement money; and

(c) falsely claimed he provided Barela with [an] accounting. (1/14/2020 hearing

transcript, pages 62, 67-68, 81-82)." (PSR ¶ 163) (referencing Ex. P [1/14/2020 tx].)

24

Mr. Avenatti's testimony was not false, willful, or material. He testified:

> The Court: "Okay. Mr. Avenatti, do you recall generating an email or a text message, or any form of communication that informed Mr. Berella [sic] about the receipt of the 1.6 million dollars in settlement funds?"
> A: "*Mr. Berella [sic] was fully informed of the receipt of those monies, Your Honor. I don't recall how he was informed.*"

(Ex. P, Jan. 14, 2020 tx, at page 62) (emphasis added). This testimony was literally true. By the time of Mr. Avenatti's testimony at the January 2020 hearing, Mr. Barela had indeed been "fully informed" of the receipt of the monies Brock paid him, through attorneys at Brock. Mr. Barela testified at trial that he was fully informed of that information by December 3, 2018:

> Q: "By December 3rd, 2018, had you learned of the true [settlement] terms from the attorneys from Brock?"
> A: (Mr. Barella): "Yes, we had."
> Q: "And had you learned at this point that Brock had paid the money?"
> A: (Mr. Barella) "Yes, we had."

(Docket no. 656, 8/15/21 am tx at 72.) Thus, Mr. Avenatti was not lying or providing false testimony when he said in January 2020 that Mr. Barella "was fully informed of the receipt of those monies" from some source.

Mr. Avenatti also gave the following testimony:

> Q: "Well, time is very valuable here, but you can't point to one – to one exhibit, written exhibit, that you launched, that demonstrated that you notified him, in writing, of the receipt of his initial 1.6 million dollar settlement payment, can you, Mr. Avenatti?"
> A: "*Sir, I disagree with that, for the following reason. If you read through the text messages, the litany of text messages and other documents relating to my communications with Mr. Berella [sic], and you compare that to the testimony that he has provided in this hearing, the last two days, you can easily conclude that Mr. Berella [sic], number one is lying about being notified. And number two, his behavior and his communications were not consistent with what he is claiming in this matter. That is my testimony, sir.*"

(Ex. P, Jan 14, 2020 tx, at pages 67-68) (emphasis added).

This testimony was also not false, willful, or material. Mr. Avenatti testified that

25

if the questioning attorney "were to read through" the text messages and documents of his communication with Mr. Barela, and compare it to Mr. Barela's testimony, then the attorney could "easily conclude" that Mr. Barela was lying and his communications were not consistent with his claims. This merely set forth a hypothetical situation, and opined about what someone could—not necessarily would—conclude from comparing the documentation to Mr. Barela's testimony. No factual or false statement was made.

The government also highlighted the following testimony:

Q: "In fact, you don't have a recollection of ever providing Mr. Berella [sic] with an accounting, isn't that right?"
*A: "No, that is completely false. . . . No, that is completely false, Mr. Morgenstern. I would be happy to put my credibility up against Mr. Barella's at any point in time, on this issue, or any other issue."*

(Ex. P, Jan 14, 2020 tx, at pages 81-82) (emphasis added). This testimony, again, relates only to Mr. Avenatti's recollection. The government has not proven that Mr. Avenatti was willfully lying when he denied that he had no subjective recollection of ever providing Mr. Barella with an accounting. And the last portion of Mr. Avenatti's testimony merely says that Mr. Avenatti would be happy to participate in a credibility contest with Mr. Barella—not a factual matter at all. Nor are Mr. Avenatti's recollection or willingness to enter a credibility contest material to this case or the underlying matter.

### e.   Conclusion: the testimony does not satisfy the enhancement

The government has not proven Mr. Avenatti's testimony was false, willful, or material to this or underlying proceedings. The Court should reject the enhancement.

## C.   Enhancement for Fraud in Bankruptcy Proceedings

The PSR also applies the two-level enhancement under U.S.S.G § 2B1.1(b)(9)(B) for offenses that "involved . . . a misrepresentation or other fraudulent action during the course of a bankruptcy proceeding." (PSR ¶¶ 144-147.) In support of that enhancement, the PSR states that Mr. Avenatti "made various misrepresentations, material omissions, and took fraudulent actions while EA LLP was in bankruptcy [after

26

1   March 2017]," and that "[t]hese misrepresentations and other fraudulent actions served

2   to conceal his fraud scheme and prevent his wire-fraud victims and others from

3   discovering that he had stolen their money." (PSR ¶ 144.)

4          In support of that claim the PSR relies almost entirely on omissions, or failures to

5   disclose. It alleges that Mr. Avenatti omitted from the original and amended Statements

6   of Financial Affairs for EA LLP, filed in March and May 2017, "[Alexis] Gardner's

7   $2,750,000 settlement payment in January 2017 (or even his fees from that

8   settlement)," and "opened up two new bank accounts to receive [Michelle] Phan's

9   September 2017 settlement money and [Gregory] Barela's January 2018 settlement

10  money during the course of the bankruptcy and failed to include receipt of the funds on

11  the respective MORs that Avenatti signed under penalty of perjury." (PSR ¶ 145.) The

12  PSR further states that Mr. Avenatti made payments to Mr. Johnson and Ms. Gardner

13  from 2015 through early 2017 "from EA LLP bank accounts, but once EA LLP went

14  into bankruptcy, [Mr.] Avenatti no longer made the payments out of EA LLP bank

15  accounts and failed to disclose these liabilities or payments . . . on any of his

16  bankruptcy forms." (PSR ¶ 146.) "[T]o get EA LLP out of bankruptcy," it reports,

17  "Avenatti entered into a stipulation and agreement that required him to pay over

18  $1,500,000 in outstanding EA LLP payroll taxes to the IRS, among other payments to

19  other creditors," and "took the fraudulent action of stealing Phan's money in March

20  2017 to pay his creditors, including the IRS, to get the bankruptcy dismissed." (*Id.*)

21         All of these allegations—except the $1,500,000 taken from Ms. Phan—describe

22  fraud by omission. But to qualify as "fraudulent," an omission must be "knowing,"

23  "material," and "made to induce another to act to his or her detriment." Black's Law

24  Dictionary (11th ed. 2019), at 802 (defining "fraud" as, *inter alia*, "knowing

25  concealment of a material fact made to induce another to act to his or her detriment").;

26  *cf. Scherer v. FCA US, LLC*, 565 F. Supp. 3d 1184, 1189 (S.D. Cal. 2021) ("Under

27  California law, a claim of fraud by omission requires," *inter alia*, "intentional

28  concealment with intent to defraud.'")

27

The PSR fails to show Mr. Avenatti's omissions were fraudulent, because it fails to show he intentionally concealed facts he had a duty to disclose in the bankruptcy. It is unclear why Mr. Avenatti would have been obligated to report, as part of *EA LLP's* financial affairs, the firm's receipt of settlement funds that belonged to clients rather than to the firm, such as "[Alexis] Gardner's $2,750,000 settlement payment" and "[Gregory] Barela's January 2018 settlement money." (PSR ¶ 145.) Nor is it apparent why Mr. Avenatti would have disclosed, as part of EA LLP's financial disclosures, payments that he personally made to Mr. Barela and Ms. Gardner. As to all of these, the matters set forth in the PSR fail to prove Mr. Avenatti intentionally omitted information he knew he was obligated to disclose, or was actually obligated to disclose. Finally, the PSR's reliance on Mr. Avenatti's taking of $1,500,000 from Ms. Phan's money to pay the IRS to get the bankruptcy dismissed was not an act "during the course of [the] bankruptcy proceeding," U.S.S.G. § 2B1.1(b)(9)(B); it was an action taken outside that proceeding and thus cannot satisfy the enhancement.

For these reasons, the Court should not apply the § 2B1.1(b)(9)(B) enhancement.

## D.   Third Point For Acceptance of Responsibility

The PSR awards Mr. Avenatti a two-point reduction for acceptance of responsibility under U.S.S.G. § 3E1.1(a). (PSR ¶¶ 184-186), but not a third point under § 3E1.1(b). (PSR ¶ 187.) Mr. Avenatti submits that he should also receive the additional point for assisting authorities in the investigation or prosecution of his own misconduct by timely notifying authorities of his intention to enter a plea of guilty, because denial of the third point violates his Sixth Amendment right to a jury trial. Mr. Avenatti recognizes that this argument is currently foreclosed by Ninth Circuit precedent. *See United States v. Villasenor-Cesar*, 114 F.3d 970, 973-76 (9th Cir. 1997); *United States v. Narramore*, 36 F.3d 845, 847 (9th Cir. 1994). However, he raises it here to preserve his right to seek further review of the issue on appeal.

A defendant cannot be penalized by withholding the two-point acceptance of responsibility reduction under U.S.S.G. § 3E1.1(a), based purely on his or her decision

28

1    to go to trial. *United States v. Hernandez*, 894 F.3d 1104, 1109-11 (9th Cir. 2018). Mr.

2    Avenatti submits that, in the same way, it improperly penalizes defendants for

3    exercising their Sixth Amendment rights to deny defendants who do so the third point

4    under § 3E1.1(b). *United States v. Tavberidze*, 2025 WL 826917 at *1-2 (S.D.N.Y.

5    March 14, 2025). As *Tavberidze* recently explained, because "the three-point reduction

6    is the overwhelming norm," "in reality, section 3E1.1(b) operates as a penalty that is

7    imposed only on those few defendants who choose to go to trial and primarily for the

8    benefit of the Government. Applying the one-point reduction thus ensures that all

9    defendants are treated equally, regardless of whether or when they choose to exercise

10   their Sixth Amendment right. *United States v. Tavberidze*, 2025 WL 826917 at *1

11   (S.D.N.Y. March 14, 2025). Mr. Avenatti should be afforded the third point because,

12   after a mistrial was declared, he pleaded guilty so as to save the government substantial

13   expense and effort that would have been required to retry the case.

## V.    RESTITUTION

15       Mr. Avenatti objects to the PSR's restitution calculations on the same bases set

16   forth in section (IV)(A), above, regarding loss. For the same reasons that the

17   government has failed to prove loss amounts as to Ms. Phan, Ms. Gardner, and Mr.

18   Barela, it has not proven the restitution amounts as to them.

19       In addition, Mr. Avenatti objects to the PSR's conclusion that he is obligated to

20   pay certain amounts to "secondary priority restitution victims" who paid amounts to the

21   four client-victims. Regarding Mr. Johnson, the PSR states that "[Mr.] Johnson

22   personally received $671,750 from a settlement with Michael Eagan and $5,500 from a

23   settlement with Judy Regnier," and identifies Mr. Eagan and Ms. Regnier as

24   "secondary priority restitution victims" who, the PSR states, should be awarded

25   restitution in those amounts from Mr. Avenatti. (PSR ¶¶ 104-05.) Regarding Ms.

26   Gardner, the PSR identifies the State Bar of California Client Security Fund as "a

27   secondary priority restitution victim" as to her, on the basis that it paid her $100,000.

28   (PSR ¶ 106.) Regarding Mr. Barela, the PSR lists additional amounts to be paid to third

29

parties due to their payments to Mr. Barela: $100,000 to the State Bar of California

Client Security Fund, $24,000 paid to John Arden due to amounts Mr. Arden paid Mr.

Barela pursuant to a settlement, and $15,000 paid to Ahmed Ibrahim due to amounts

Mr. Ibrahim paid Mr. Barela pursuant to a settlement. (PSR ¶ 107.)

These secondary priority amounts have not been established sufficiently to allow

the designated payments to third parties. Secondary priority restitution payments to

third parties are only permissible under 18 U.S.C. § 3664 to the extent those third

parties made payments to "compensate[e]" the victim, and "assumed the victim's

losses," not to the extent the third parties made the payments to resolve or settle civil

claims or lawsuits against themselves or for some other purpose. *See* 18 U.S.C. §

3664(j)(1) (allowing payments to third parties who have paid "compensation" to the

victim); *United States v. Thompson*, 792 F.3d 273, 278 (2d Cir. 2015) (18 U.S.C. §

3664(j)(1) permits payments to a third party "where [the] third party has assumed the

victim's losses by reimbursing the victim"). Nor are third party payors themselves

victims. *Id*. Here, the government has not shown that the third party payors paid the

designated amounts to "assume[] the victim[s'] losses"—to the contrary, certain of the

third parties undisputedly paid the amounts to settle claims against themselves and

resolve their own asserted liabilities to the victims. The government has not shown the

amounts paid by any of the third parties were solely due to Mr. Avenatti's conduct and

not their own. This Court should not award the specified amounts to them as

restitution.[14]

---

[14] Mr. Avenatti further objects to the extent the third parties seek to recover
attorneys' fees and costs from civil matters. Such fees are not recoverable as restitution.
*Lagos v. United States*, 584 U.S. 577, 580-81 (2018) (attys fees and costs from civil
matter not recoverable); *United States v. Margiotta*, 475 F.Supp.3d 1152, 1157-60 (D.
MT). Even if they were— they would have to be supported with evidence and be
shown to be reasonable, which has not been shown here.

30

Mr. Avenatti additionally objects to the disclosed recommendation letter's suggestion that "[r]estitution should be paid in full immediately." (Docket no. 1198, page 5 ¶ 12.) The recommendation letter states "[t]he Court finds from a consideration of the record that the defendant's economic circumstances allow for a full and immediate payment of restitution," *id.*, but fails to specify what in the record suggests Mr. Avenatti—who has been incarcerated for years, has been disbarred from the practice of law, and has no current means of earning significant income—is able to pay a substantial amount of restitution in the immediate future. Indeed, this Court must specifically consider not only Mr. Avenatti's financial position generally, but "projected earnings and other income," 18 U.S.C. § 3664(f)(2)(B), as well as "any financial obligations of the defendant; including obligations to dependents." 18 U.S.C. § 3664(f)(2)(C). Because these matters have not been considered—and Mr. Avenatti's future possible earnings are meagre at best and he has obligations to his family, including for child support—the Court should not conclude that he is able to pay immediate restitution. Moreover, this Court found at Mr. Avenatti's prior sentencing that his "economic circumstances do not allow for either immediate or future payment of the amount ordered." (Docket no. 1054, Judgment, at 1.) The Recommendation Letter provides no basis for any conclusion that Mr. Avenatti would somehow be better able to pay immediate restitution now, after having spent an additional two and a half years in prison, than he was when the original judgment issued in December 2022.

For these reasons, Mr. Avenatti objects to any order that he pay restitution "immediately," and to the Court not specifying a schedule for payments as required under the MVRA. 18 U.S.C. § 3664(f)(2) (court must set "the schedule according to which, the restitution is to be paid.") He asks that this Court order restitution in language similar to that ordered at his prior sentencing in 2022; specifically, that:

> Restitution shall be due during the period of imprisonment, at a rate of not less or more than $25 per quarter, and pursuant to the Bureau of Prisons' Inmate Financial Responsibility Program. If any amount of the restitution remains unpaid after release from custody, nominal monthly

31

payments of at least 10% of defendant's gross monthly income but not less than $50, whichever is greater, shall be made during the period of supervised release and shall begin 30 days after the commencement of supervision. Nominal restitution payments are ordered as the Court finds that the defendant's economic circumstances do not allow for either immediate or future payment of the amount ordered.

(Docket no. 1060, Amended Judgment, at 1.)

## VI.    OBJECTIONS TO THE PRESENTENCE REPORT

- p.5 n.1 and p.6 ¶¶ 10-16: counts "to be dismissed" have already been dismissed.

- p.7 ¶ 21: Mr. Avenatti was not required to keep the Gardner settlement confidential for all purposes; disclosure was permitted on order of a court of competent jurisdiction.

- p.11 n.5 & p.15 n.12: The defense asserts the objections stated in Section (IV)(C), above, in connection with the fraud-in-bankruptcy enhancement.

- p.11 n.7: The defense incorporates Docket no. 1016, objection 14.

- p.13 ¶ 50(c); p.34 ¶ 140; p.37 ¶ 154: The defense incorporates Docket no. 1016, objection 16.

- p.13 ¶ 50(d): The defense asserts the objections stated in section (IV)(B), above, in connection with the obstruction-of-justice enhancement.

- p.14 ¶ 52 & n.9: The defense objects to the PSR's conclusion that payments for Mr. Johnson's living expenses should not be deducted from loss. Those amounts were not loss but instead amounts Mr. Johnson received. Mr. Avenatti also objects to the conclusion that work by other attorneys was "forfeited" on appeal; a general remand for resentencing places "the defendant . . . in the same position as if he [or she] had never been sentenced." *United States v. Tat*, 97 F.4th 1155, 1161 (9th Cir. 2024) (cleaned up).

- p.15 ¶ 54: The defense incorporates Docket no. 1016, objection 20.

- The defense objects generally to the PSR's characterization of his payments to his victim-clients as "lulling payments." (PSR p. 11 n.5, p. 15 n.12, ¶¶ 74, 146, 150.)

- p.16, ¶¶ 57 & 57(a): The defense incorporates Docket no. 1016, objection 21.

32

- p.16 ¶ 60 & n.13: The PSR declines to subtract payments for Ms. Gardner's rent from loss. But these amounts are not loss to Ms. Gardner under U.S.S.G. § 2B1.1 because Ms. Gardner received them. *United States v. Lonich*, 23 F.4th 881, 916 (9th Cir. 2022). They should not be included in loss.

- p.17-19 ¶ 61, ¶63, ¶ 68: The defense objects to the PSR's loss calculation as to Mr. Barela for the reasons in section (IV)(A), above.

- p.17 n.14: The defense asserts the objections stated in Section (IV)(C), above, in connection with the fraud-in-bankruptcy enhancement.

- p.18 ¶ 65(b): The defense incorporates Docket no. 1016, objection 26.

- pp. 19-20, ¶¶ 69-73, p.21-22 ¶ 83: The defense objects to the PSR's assessment of any loss amount as to Ms. Phan, for the reasons in section (IV)(A), above. The PSR is also incorrect that Mr. Avenatti deducted his "entire fee" from Ms. Phan's cash payment. (PSR ¶¶ 71, 73.) The 7.5 percent fee also encompassed other assets Mr. Avenatti obtained for Ms. Phan in connection with the transaction that included Em Cosmetics. *United States v. Avenatti*, 2024 WL 4553810 at *2 (9th Cir. Oct. 23, 2024).

- p.20 ¶ 77: The defense objects to the description of Mr. Avenatti's testimony for the reasons in section IV(B), above.

- p.20-21, ¶¶ 79-80: The defense objects to the PSR's statement that his 7.5 percent fee extended to the value of "Em Cosmetics," without also extending the 7.5 percent to the additional assets Mr. Avenatti obtained for Mr. Phan. The "Recovery," of which his 7.5 percent fee was taken, included not just cash or Em Cosmetics alone, but also "the fair market value of any benefit, refund, carried interest, business accommodation, loan, and/or funding received in connection with the settlement, judgment, or any other resolution of any of Clients' claims, divestiture, and/or exits [from Ipsy]." (Gov. Ex. 266 [Phan/Avenatti Attorney-Client Fee Contract] at ¶ 4.)

- p.22-23, ¶¶ 84-90: The defense objects to the PSR's assessment of loss as to Ms. Clifford, for the reasons stated in section (IV)(A), above.

- p.24-26 ¶¶ 94-98: The defense incorporates Docket 1016, objection 30.

33

- p.27 ¶ 102: The defense objects to the loss calculation amounts set forth in this paragraph for the reasons set forth in the objections above, and in Section (IV)(A).

- p.28 ¶¶ 104-105: The defense objects to the loss calculation as to Mr. Johnson on the same basis as the objection set forth above, as to ¶ 52 & n.9.

- p.28 ¶ 106: The defense objects to the loss calculation as to Ms. Gardner on the same basis as the objection set forth above, as to p.16 ¶ 60 & n.13.

- pp.28-29 ¶ 107: The defense objects to the loss calculation as to Mr. Barela on the same basis as the objection set forth above, as to p.17-19 ¶ 61, ¶63, ¶ 68.

- p.29, ¶ 108: The defense objects to the loss calculation as to Ms. Phan on the same basis set forth in section (IV)(A), above, and the same basis as the objection set forth above, as to pp.19-20, ¶¶ 69-73, p.21-22 ¶ 83.

- p.30, ¶ 115: The allegations regarding a tweet referencing Ms. Gardner and her settlement with Mr. Whiteside are not relevant, and cannot form the basis for an obstruction of justice enhancement; indeed, the Court already rejected them as a basis for that enhancement. (Docket no. 1053 at 5-6.)

- pp. 33-34, ¶¶ 131-37: The defense objects to the loss calculation for the reasons set forth in section (IV)(A), above, and in its previously-asserted objections.

- p.35 ¶ 142: The defense incorporates Docket no. 1016, objection 23.

- p.44 ¶¶ 190-91: The defense incorporates Docket no. 1016, objection 42.

- p.44-46, ¶¶ 192-97: The defense incorporates Docket no. 1016, objections 43-44.

- p.48, ¶ 201, "Adjustment to Incarceration": Data is current as of 4/1/25, not 7/30/22.

- p.49 ¶ 207: The defense incorporates Docket no. 1016, objection 49.

- p.49, ¶ 208: No presentence interviews have been conducted since 2022.

- p.50, ¶ 209: Mr. Avenatti's mother and father are 89 and 88 years old, respectively.

- p.51, ¶ 215: Mr. Avenatti's older daughter is 22 years old, graduated with honors from Arizona State University, and works as a news anchor in Iowa. His younger daughter is 20 years old, and a sophomore at the University of Arizona.

- p.56 ¶ 246: Mr. Avenatti has been prescribed medication for the cited condition.

34

- p.46 ¶ 268: Regarding his ineligibility to practice law, Mr. Avenatti states he was disbarred earlier this year due to his conviction in S.D.N.Y. case no. 1:19-cr-373-1.

- p.66-67, ¶ 301: Mr. Avenatti does not currently have tort or potential tort claims against Jeffrey Toobin, Former U.S. Attorney General William Barr, or the BOP. He does not "expect[] to file claims in the coming weeks and months against certain of these entities and individuals." Mr. Avenatti's appeal in his case against Fox News and certain on-air talent is no longer pending but was affirmed. Mr. Avenatti further states that the "collective, estimated net settlement value of these claims" is approximately $3.0 million. He is not exploring possible actions against other parties for false statements and has chosen not to pursue any lawsuit for damages against the BOP.

- p.68 ¶ 312: This paragraph is no longer accurate.

- p.69 ¶ 322: The defense disputes the Guideline calculation as set forth in § (IV)(A).

- p.71 ¶ 340: The defense objects to the restitution figures for the reasons in § (V), above, and because restitution is limited to victims' actual losses, *United States v. Anderson*, 741 F.3d 938, 951 (9th Cir. 2013), minus "any value of the services or items received by the victim." *United States v. Moran*, 778 F.3d 942, 985 (11th Cir. 2015).

## VII.   CONCLUSION

For the foregoing reasons, Mr. Avenatti respectfully requests that the Court sentence him to at most 39 months.

Respectfully submitted,

CUAUHTEMOC ORTEGA
Federal Public Defender

DATED:  May 6, 2025          By  */s/ Margaret A. Farrand*

MARGARET A. FARRAND
ADITHYA MANI
Deputy Federal Public Defenders
Attorney for MICHAEL J. AVENATTI

35